**FILED**

**NOV 2 4 2020**

**CLERK OF SUPREME COURT OF WISCONSIN**

No._____

# In the Supreme Court of Wisconsin

The Wisconsin Voters Alliance, Ronald H. Heuer, William Joseph Laurent, Richard Kucksdorf, James Fitzgerald, Kelly Ruh, William Berglund, John Jaconi, Donna Utschig, Jeff Wellhouse, Kurt Johnson, Thomas Reczek, Linda Sinkula, Atilla Thorbjorsson, Jeff Kleiman, Navin Jarugumilli, Jonathan Hunt, Suzanne Vlach, Jacob Blazkovec, Donald Utschig, Carol Aldinger, Jay Plaumann, Deborah Gorman, Robert R. Liebeck, Valerie M. Bruns Liebeck, Edward Hudak, Ron Cork, Charles Risch, Karl Lehrke, Arnet Holty and Joseph McGrath, PETITIONERS,

v.

Wisconsin Elections Commission, and its members
Ann S. Jacobs, Mark L. Thomsen, Marge Bostelman,
Julie M. Glancey, Dean Knudson, Robert F. Spindell,
Jr., in their official capacities, Governor Tony Evers,
in his official capacity, RESPONDENTS

On Petition For Original Action
Before this Court

## EXPERT REPORT OF MATTHEW BRAYNARD

## I. INTRODUCTION

I have been retained as an expert witness on behalf of Petitioners in the above captioned proceeding. I expect to testify on the following subject matters: (i) analysis of the database for the November 3, 2020 election for the selection of Presidential Electors in the State of Wisconsin ("State"); (ii) render opinions regarding whether individuals identified in the State's voter database actually voted; and (iii) render opinions regarding whether individuals identified in the State's voter database were actually qualified to vote on election day.

This is a statement of my relevant opinions and an outline of the factual basis for these opinions. The opinions and facts contained herein are based on the information made available to me in this case prior to preparation of this report, as well as my professional experience as an election data analyst.

I reserve the right to supplement or amend this statement on the basis of further information obtained prior to the time of trial or in order to clarify or correct the information contained herein.

## II. DOCUMENTS REVIEWED

I reviewed the following documents in arriving at my opinions.

1. The voter records and election returns as maintained on the State's election database;

2. Records maintained by the National Change of Address Source which is maintained by the United States Postal Service and which is available for licensed users on the internet. I am a licensed member.

3. Records developed by the staff of my call centers and social media researchers; and

4. A national voter database maintained by L2 Political;

In addition, I discussed the facts of this matter with Petitioner's attorney Erick G. Kaardal and members of his legal team.

## III. PROFESSIONAL QUALIFICATIONS

I have attached hereto as Exhibit 1 a true and correct copy of my resume. As detailed in the resume, I graduated from George Washington University in 2000 with a degree in business administration with a concentration in finance and management information systems. I have been working in the voter data and election administration field since 1996. I have worked building and deploying voter databases for the Republican National Committee, five Presidential campaigns, and no less than one-hundred different campaigns and election-related organizations in all fifty states and the U.S. Virgin Islands. I worked for eight years as a senior analyst at the nation's premier redistricting and election administration firm, Election Data Services, where I worked with states and municipalities on voter databases, delineation, and litigation support related to these matters. Also, while at Election Data Services, I worked under our contract with the US Census Bureau analyzing voting age population. Since 2004, I have worked for my own business, now known as External Affairs, Inc., providing

3

statistical and data analysis for local, state, and federal candidates and policy organizations in the areas of voter targeting, polling/research, fundraising, branding, and online development and strategy. My firm has worked for over two-hundred candidates from president to town council and over a dozen DC-based policy/advocacy organizations.

With respect to publications I have authored in the last 10 years, I have not authored any publications in the last ten years.

### IV. COMPENSATION

I have been retained as an expert witness for Petitioners. I am being compensated for a flat fee of $40,000.

### V. PRIOR TESTIMONY

I have not provided testimony as an expert either at trial or in deposition in the last four years.

### VI. STATEMENT OF OPINIONS

As set forth above, I have been engaged to provide expert opinions regarding analysis in the November 3, 2020 election of Presidential electors. Based on my review of the documents set forth above, my discussions with statisticians and analysts working with me and at my direction, my discussions with the attorneys representing the Petitioners, I have the following opinions:

1. It is my opinion, to a reasonable degree of scientific certainty, that in the State, the State's database for the November 3, 2020 election show 96,711 voters whom the state marks as having requested and been sent an absentee ballot did not return it. It is my opinion, to a reasonable degree of scientific certainty, that in my sample

of this universe, 18.12% of these absentee voters in the State did not request an absentee ballot.

2. From the State's database for the November 3, 2020 election and our call center results, it is my opinion to a reasonable degree of scientific certainty that 96,771 individuals whom the State's database identifies as having not returned an absentee ballot, that in my sample of this universe, 15.37% of those absentee voters did in fact mail back an absentee ballot to the clerk's office.

3. From the State's database for the November 3, 2020 election, the NCOA database, and our call center results, it is my opinion to a reasonable degree of scientific certainty that out of the 26,673 individuals had changed their address before the election, that in my sample of this universe, 1.11% of those individuals denied casting a ballot.

4. From the State's database for the November 3, 2020 election and the NCOA database and other state's voter databases, it is my opinion to a reasonable degree of scientific certainty, that at least 6,848 absentee or early voters were not residents of the State when they voted.

5. From the State's database for the November 3, 2020 election and my staff's review of social media for voters who applied for indefinitely confined absentee voting status, it is my opinion to a reasonable degree of scientific certainty, that of the 213,215 who claimed indefinitely confined absentee voter status in the State, that in my sample of this universe, 45.23% of those individuals were not indefinitely confined on Election Day.

6. From the State's database for the November 3, 2020 election and comparing that data to other states voting data and identifying individuals who cast early/absentee ballots in multiple states, it is my opinion to a reasonable degree of scientific certainty, that at least 234 individuals in the State voted in multiple states.

## VII. BASIS AND REASONS SUPPORTING OPINIONS.

First, State maintains a database for the November 3, 2020 election which I obtained from L2 Political and which L2 Political obtained from the State's records on, among other things, voters who applied for an absentee or early voter status. I received this database from L2 Political in a table format with columns and rows which can be searched, sorted and filtered. Each row sets forth data on an individual voter. Each

column contained information such as the name of the voter, the voter's address, whether the voter applied for an absentee ballot, whether the voter voted and whether the voter voted indefinitely confined status.

Second, we are able to obtain other data from other sources such as the National Change of Address Database maintained by the United States Postal Service and licensed by L2 Political. This database also in table format shows the name of an individual, the individual's new address, the individual's old address and the date that the change of address became effective.

Third, I conducted randomized surveys of data obtained from the State's database by having my staff or the call center's staff make phone calls to and ask questions of individuals identified on the State's database by certain categories such as absentee voters who did not return a ballot. Our staff, if they talked to any of these individuals, would then ask a series of questions beginning with a confirmation of the individual's name to ensure it matched the name of the voter identified in the State's database. The staff would then ask additional questions of the individuals and record the answers.

Fourth, I had this staff survey a random sample I obtained from the State's database on indefinitely confined voters. The staff conducted research on the internet and social media postings by these individuals. Staff would undertake to determine if the individual was the individual listed on the database meant the State's definition of indefinitely confined. Staff would then attempt to determine if the individuals had posted photos, images or other information demonstrating that the individuals were not indefinitely confined. For instance, if the individual's social media showed a photo on or

near election day of the individual doing something inconsistent with indefinitely confined status such as riding a bike. Staff would then record the results as either "not indefinitely confined," "confirmed indefinitely confined," or "inconclusive."

Fifth, attached as Exhibits 2 is my written analysis of the data obtained.

Below are the opinions I rendered and the basis of the reasons for those opinions.

1. It is my opinion, to a reasonable degree of scientific certainty, that in the State, the State's database for the November 3, 2020 election show 96,711 voters whom the state marks as having requested and been sent an absentee ballot did not return it. It is my opinion, to a reasonable degree of scientific certainty, that in my sample of this universe, 18.12% of these absentee voters in the State did not request an absentee ballot.

I obtained this data from the State via L2 Political after the November 3, 2020, Election Day. This data identified 96,771 absentee voters who were sent an absentee ballot but who failed to return the absentee ballot.

I then had my staff make phone calls to a sample of this universe. When contacted, I had my staff confirm the individual's identity by name. Once the name was confirmed, I then had staff ask if the person requested an absentee ballot or not. Staff then recorded the number of persons who answered yes. My staff then recorded that of the 2,114 individuals who answered the question, 1,731 individuals answered yes to the question whether they requested an absentee ballot. My staff recorded that 383 individuals answered no to the question whether they requested an absentee ballot. Attached as Exhibit 2 is my written analysis containing information from the data above on absentee voters. Paragraph 2 of Exhibit 2 presents this information.

Next, I then had staff ask the individuals who answered yes, they requested an absentee ballot, whether the individual mailed back the absentee ballot or did not mail back the absentee ballot. Staff then recorded that of the 1,626 individuals who answered the question, 325 individuals answered yes, they mailed back the absentee ballot. Staff recorded 1301 individuals answered no, they did not mail back the absentee ballot. Paragraph 2 of Exhibit 2 presents this information.

Based on these results, 18.12% of our sample of these absentee voters in the State did not request an absentee ballot.

> 2. From the State's database for the November 3, 2020 election and our call center results, it is my opinion to a reasonable degree of scientific certainty that 96,771 individuals whom the State's database identifies as having not returned an absentee ballot, that in my sample of this universe, 15.37% of those absentee voters did in fact mail back an absentee ballot to the clerk's office.

This opinion includes the analysis set forth above. Among the 1,626 who told our call center that they did request an absentee ballot and answered the second question, 325 told our staff that they mailed the absentee ballot back, which is 15.37% of those whom the State identified as having not returned the absentee ballot the State sent them. Paragraph 2 of Exhibit 2 presents this information.

> 3. From the State's database for the November 3, 2020 election, the NCOA database, and our call center results, it is my opinion to a reasonable degree of scientific certainty that out of the 26,673 individuals had changed their address before the election, that in my sample of this universe, 1.11% of those individuals denied casting a ballot.

On Exhibit 2, in paragraph 4, I took the State's database of all absentee or early voters and matched those voters to the NCOA database for the day after election day.

This data identified 26,673 individuals whose address on the State's database did not match the address on the NCOA database on election day. Next, I had my staff call the persons identified and ask these individuals whether they had voted. My call center staff identified 1,607 individuals who confirmed that they had casted a ballot. My call center staff identified 18 individuals who denied casting a ballot. Our analysis shows that 1.11% of our sample of these individuals who changed address did not vote despite the State's data recorded that the individuals did vote.

    4. From the State's database for the November 3, 2020 election and the NCOA data and other state's voter data, it is my opinion to a reasonable degree of scientific certainty, that at least 6,848 absentee or early voters were not residents of the State when they voted.

On Exhibit 2, in paragraph 1, I took the State's database of all absentee or early voters and matched those voters to the NCOA database for the day after Election Day. This data identified 6,207 individuals who had moved of the State prior to Election Day. Further, by comparing the other 49 states voter databases to the State's database, I identified 765 who registered to vote in a state other than the State subsequent to the date they registered to vote in the State. When merging these two lists and removing the duplicates, and accounting for moves that would not cause an individual to lose their residency and eligibility to vote under State law, these voters total 6,848.

    5. From the State's database for the November 3, 2020 election and my staff's review of social media for voters who applied for indefinitely confined absentee voting status, it is my opinion to a reasonable degree of scientific certainty, that of the 213,215 who claimed indefinitely confined absentee voter status in the State, that in my sample of this universe, 45.23% of those individuals were not indefinitely confined on Election Day.

This opinion is taken from data developed on Exhibit 3. For this determination, I had my staff investigate using the internet and social media the individuals the State's data identified as claiming indefinitely confined status in their absentee ballot applications. The staff conducted research on the internet and social media postings by these individuals. Staff would undertake to determine if the individual was the individual listed on the database as indefinitely confined. Staff would then attempt to determine if the individuals had posted photos, images or other information demonstrating that the individuals were not indefinitely confined. For instance, if the individual's social media showed a photo on or near election day doing something inconsistent with indefinitely confined status such as riding a bike. Staff would then record the results as either "not indefinitely confined," "confirmed indefinitely confined," or "inconclusive."

These results showed that of the 213,215 who claimed indefinitely confined absentee voter status in the State, that in my sample of this universe, 45.23% of those individuals were not indefinitely confined on Election Day.

6. From the State's database for the November 3, 2020 election and comparing that data to other states voting data and identifying individuals who cast early/absentee ballots in multiple states, it is my opinion to a reasonable degree of scientific certainty, that at least 234 individuals in the State voted in multiple states.

On Exhibit 2, in paragraph 2, I had my staff compare the State's early and absentee voters to other states voting data and identified individuals who cast early/absentee ballots in multiple states. My staff located 234 individuals who voted in the State and in other states for the November 3, 2020 general election.

10

## VIII. EXHIBITS TO BE USED AT TRIAL TO SUMMARIZE OR EXPLAIN OPINIONS

At the present time, I intend to rely on the documents produced set forth above as possible exhibits.

**REMAINDER OF PAGE LEFT INTENTIONALLY BLANK**

**SIGNATURE PAGE TO FOLLOW**

Dated: 11/22/2020

_____
Matthew Braynard