## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

WILLIAM FEEHAN,

      Plaintiff,

      v.                          Case No. 20-CV-1771

WISCONSIN ELECTIONS COMMISSION,
and its members ANN S. JACOBS, MARK L.
THOMSEN, MARGE BOSTELMAN, JULIE
M. GLANCEY, DEAN KNUDSON, ROBERT
F. SPINDELL, JR., in their official capacities,
GOVERNOR TONY EVERS, in his official
capacity,

      Defendants.

## DEFENDANT COMMISSION AND COMMISSIONERS' RESPONSE OPPOSING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

JOSHUA L. KAUL
Attorney General of Wisconsin

S. MICHAEL MURPHY
Assistant Attorney General
State Bar #1078149

JODY J. SCHMELZER
Assistant Attorney General
State Bar #1027796

COLIN T. ROTH
Assistant Attorney General
State Bar #1103985

Attorneys for Defendants Wisconsin
Elections Commission and its members

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-5457 (Murphy)
(608) 266-3094 (Schmelzer)
(608) 264-6219 (Roth)
(608) 294-2907 (Fax)
murphysm@doj.state.wi.us
schmelzerjj@doj.state.wi.us
rothct@doj.state.wi.us

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................1

STATEMENT OF THE CASE ......................................................................2

ARGUMENT ................................................................................................4

    I.    Plaintiff has the burden to demonstrate that the Court should overturn the audited election results. ..................................4

    II.    Plaintiff has failed to demonstrate that he is likely to succeed on the merits of his claims. ..........................................................5

        A.    This case has fatal jurisdictional and procedural defects that would require dismissal. ....................................6

            1.    Plaintiff lacks Article III standing to assert any of his claims. ......................................................6

            2.    Laches bars Plaintiff's unreasonably late allegations. ....................................................8

            3.    The Eleventh Amendment precludes Plaintiff's claims seeking this Court to order state officials to comply with state election law. ...........................10

        B.    Plaintiff fails to state any valid federal claim. ...................11

            1.    Plaintiff fails to plead a claim under either the Election or Electors clauses. .....................................11

             2.    Plaintiff fails to state a claim for equal protection and due process because he asserts ordinary election irregularities that should be handled under state law. ..........................................13

             3.    Plaintiff's purported evidence is unpersuasive, unlikely to meet basic evidentiary standards, and does not support discarding the votes of millions of Wisconsin residents. ...............................17

        C.    Plaintiff's requested remedy would unconstitutionally disenfranchise Wisconsin voters. ........................................24

III. Plaintiff has failed to show that he will suffer irreparable harm without a preliminary injunction.......................................... 25

IV. The balance of equities and public interest favor denying an injunction............................................................................ 26

CONCLUSION ................................................................................ 27

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 3 of 30   Document 52

# INTRODUCTION

Wisconsin held its general election on November 3 after months of careful preparation and public announcement of election procedures. Since then, the votes have been counted, audited, and many were counted again. The results are now tallied and certified. The candidate who received the most votes for the office of President of the United States is Vice President Joe Biden.

Plaintiff was a nominee to be an electoral college elector for candidate President Donald Trump. He now, for the first time, alleges that the long-planned election procedures were unlawful and that the outcome is additionally tainted by a conspiracy dating back to the administration of Venezuelan president Hugo Chavez. He offers no direct evidence that even a single vote was miscounted in Wisconsin, and instead relies on conspiracy theories based on anonymous sources and inadmissible evidence. His claims are entirely meritless.

On this basis, he asks for disenfranchisement of hundreds of thousands Wisconsin voters and "an order instructing the Defendants to certify the results of the General Election for Office of the President in favor of President Donald Trump" in a preliminary ruling. (Dkt. 9 ¶ 139.) This unprecedented relief is unlawful, would take the election out of the hands of Wisconsin voters, and is fundamentally undemocratic. This Court should not reverse the outcome of the carefully planned and reliably executed Wisconsin election.

## STATEMENT OF THE CASE

The November 2020 Wisconsin election was secure and reliable. Nearly 3.3 million Wisconsin voters cast ballots for the office of President of the United States.[1] Those votes have been counted, audited, and many have even been re-counted. There is *zero* indication of any fraud, or anything else that would call into question the reliability of the election results. To the contrary, every indication is that the outcome is correct.

A statewide audit of electronic voting machines used in the November election found no systematic problems.[2] To conduct this audit, the Commission randomly selected 5% of all reporting units statewide—a sample that included at least one piece of voting equipment in each of Wisconsin's 72 counties and each kind of voting equipment. It included 28 voting Dominion machines. (WEC Audit Memo 4.) The audit then hand-counted 4.2% of all ballots, more than 140,000, and the hand-counted results were compared to the results tabulated by each kind of voting machine. (WEC Audit Memo 2.) Members of the public could attend the audit. (WEC Procedures Memo 2.)

That audit did not "identif[y] any issues with the tabulation functionality of the voting equipment nor did [it] uncover any programing issues with the machines

---

[1] Wisconsin Elections Commission, *WEC Canvass Reporting System*, Canvas Results for 2020 General Election  11/3/2020 6:00:00 AM https://elections.wi.gov/sites/elections.wi.gov/files/Statewide%20Results%20All%20Offices%20%28pre-Presidential%20recount%29.pdf (Nov. 18, 2020).

[2] The Commission's Audit Memo is publicly available at https://elections.wi.gov/sites/elections.wi.gov/files/2020-12/2020%20Audit%20Program%20Update%20for%2012_1_2020%20Meeting%20FINAL.pdf

on which results were audited." (WEC Audit Memo 4.) Instead, it showed that "the tabulation voting equipment"—including the challenged Dominion voting machines— "performed up to certification standards and accurately recorded and tabulated votes." (WEC Audit Memo 5.) Although some "minor discrepancies" were uncovered, the "vast majority . . . were due to human error . . . and only impacted one or two votes . . . and were not indicative of equipment malfunction or failure." (WEC Audit Memo 5.) The Commission concluded that "the results of the audit did not identify any programming errors that impacted how the voting equipment subject to audit counted votes . . . . This expanded audit and random selection process effectively confirmed the accuracy of voting equipment used in Wisconsin at the election." (WEC Audit Memo 8.)

Additionally, a recount confirmed that there were no errors in two major counties. President Donald Trump requested a recount of ballots cast in Dane and Milwaukee counties. That recount did not materially change the vote tallies for either President Trump or Vice President Biden.[3] More to the point, nothing uncovered during the recount pointed to widespread fraud through hacked or otherwise manipulated voting machines. President Trump, to be sure, identified various categories of ballots that he contends were cast illegally, but he did not identify any vote tallies maliciously altered.

---

[3] 2020 General Election Recount, https://elections.wi.gov/sites/elections.wi.gov/files/2020-11/2020%20General%20Election%20Recount%2011-30-20%20final.xlsx (Nov. 30, 2020).

Moreover, the wild accusations of election unreliability, such as those in the Plaintiff's complaint, led federal agencies to investigate. That investigation revealed nothing to substantiate the allegations. U.S. Attorney General William Barr even specifically commented on the types of claims being made in this case, concluding:

> There's been one assertion that would be systemic fraud and that would be the claim that machines were programmed essentially to skew the election results. And the DHS and DOJ have looked into that, and so far, we haven't seen anything to substantiate that.[4]

These accusations were also denounced by Dominion itself, when it issued a public statement specifically addressing the claims brought by Plaintiff's counsel and further demonstrating the frivolity of these claims.[5]

From the initial canvassing, through the audit, recount, and federal investigation, there is no credible allegation of any material election irregularity. This Court, and the public, can be confident that votes were correctly recorded and counted.

## ARGUMENT

## I. Plaintiff has the burden to demonstrate that the Court should overturn the audited election results.

Plaintiff characterizes his request as preliminary, though the reality is that this Court's initial determination is likely to be effectively final for challenging

---

[4] Balsamo, Michael, *Disrupting Trump, Barr says no widespread election fraud*, AP News, https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d (Dec. 1, 2020).

[5] Dominion's statement is available online. Dominion Voting, *Statement From Dominion on Sidney Powell's Charges* (Nov. 26, 2020), https://www.dominionvoting.com/dominion-statement-on-sidney-powell-charges/.

4

Wisconsin's presidential vote before inauguration. The type of immediate relief he seeks is already a drastic remedy and is never awarded as a matter of right. *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). The timing reality here makes his request especially extraordinary.

Plaintiff carries the burden for his request. A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat'l. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (quoting *Winter*, 555 U.S. at 20).

## II. Plaintiff has failed to demonstrate that he is likely to succeed on the merits of his claims.

Plaintiff has no likelihood of success on the merits. This case has multiple threshold defects that would require dismissal. Plaintiff lacks standing, his inexplicably late claim is barred by laches, and the relief he requests is barred by the Eleventh Amendment and Substantive Due Process Clause.

Turning to the individual causes of action, he has stated no constitutional claim as a matter of law. The Elections and Electors Clauses do not create federal claims for alleged vote-counting disputes and violations of state election law of the kind alleged here do not amount to federal equal protection or due process claims.

5

Even if Plaintiff had a claim, his purported evidence is shockingly unreliable, is unlikely to even meet basic evidentiary standards, and cannot possibly support overturning the results of the election. Finally, the relief he seeks is nothing short of mass disenfranchisement.

## A. This case has fatal jurisdictional and procedural defects that would require dismissal.

### 1. Plaintiff lacks Article III standing to assert any of his claims.

Plaintiff is a registered voter and nominee to be a presidential elector for the Republican Party. (Dkt. 9 ¶ 24.) Neither his status as a registered voter nor an elector nominee establishes standing.

Plaintiff states that he is registered to vote in Wisconsin but does not even allege that he actually voted in the November 2020 election. (Dkt. 9 ¶ 24.) He cannot claim any injury by being simply registered. Even if he had voted, it is well established a voter cannot allege the particularized harm necessary to bring a claim based on alleged defects in other votes. This is so because the harm Plaintiff alleges to have suffered would, if proven, be experienced equally by all voters in the state. *Martel v. Condos*, No. 20-cv-131, 2020 WL 5755289, at *4 (D. Vt. 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); *see also Moore v. Circosta*, No. 20CV911, 2020 WL 6063332 at *14 (M.D.N.C. 2020); *Donald J. Trump for Pres., Inc. v. Cegavske*, No. 20-cv-1445 JCM, 2020 WL 5626974, at *4–5 (D. Nev. 2020); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926 (D. Nev. 2020).

Plaintiff's status as a presidential elector likewise does not grant him standing. He cites *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020), for the proposition, never recognized in the Seventh Circuit, that elector status grants one standing to challenge election results. But the dissent in *Carson* persuasively explained why it does not:

> Electors are not candidates for public office as that term is commonly understood. Whether they ultimately assume the office of elector depends entirely on the outcome of the state popular vote for president . . . . They are not presented to and chosen by the voting public for their office, but instead automatically assume that office based on the public's selection of entirely different individuals.

*Id.* at 1063 (Kelly, J., dissenting). Electors therefore do not have a "particularized stake" in the election outcome beyond that of ordinary voters. *Id.* The Third Circuit rejected a similar standing argument, holding instead that a congressional candidate lacked Article III standing to assert nearly-identical claims to the ones Plaintiff pursues here, showing that *Carson* is an outlier. *See Bognet v. Sec'y Commonwealth of Pennsylvania*, No. 20-3214, 2020 WL 6686120, at *8 n.6 (3d. Cir. 2020). And just today, the Eastern District of Michigan rejected an identical claim. *King v. Whitmer,* No. 20-13134 (E.D. MI. December 7, 2020) (explaining that the court is unconvinced regarding elector-nominee standing). Plaintiff's elector status grants him no special standing privileges. Even if the Plaintiff had standing for some claims, he particularly lacks standing for any claim that violations of state elections law amount to a federal claim under the Electors Clause. For Electors Clause claims, even candidate-plaintiffs fare no better in the standing inquiry than other citizens. *See, e.g., Bognet*, 2020 WL 6686120 at *8. This is because every candidate, just like every other citizen, is in precisely the same position. *See id*. If an Electors Clause claim belongs to anyone,

it belongs "only to the [legislature]." *Id.* at \*7. Here, for claimants like Plaintiff who are not the legislature, and bear not even a "conceivable relationship to state lawmaking processes, they lack standing to sue over the alleged usurpation of the [legislature's] rights under the . . . Electors Clause[ ]." *Id.* at \*7.

### 2. Laches bars Plaintiff's unreasonably late allegations.

Plaintiff inexplicitly waited until after the Wisconsin election, after the canvassing, after the recount, after the audit, after results were certified, and indeed until the eve of the electoral college vote, to bring his claim of state law violations and widespread fraud that allegedly originated years ago in the era of Hugo Chavez's Venezuelan presidency. If the doctrine of laches means anything, it is that Plaintiff here cannot overturn the results of a completed and certified election through preliminary relief in this late-filed case.

"Laches arises when an unwarranted delay in bringing a suit or otherwise pressing a claim produces prejudice." *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1060 (7th Cir. 2016) (citation omitted). "The obligation to seek injunctive relief in a timely manner in the election context is hardly a new concept." *Id.* at 1060–61. "In the context of elections, . . . any claim against a state electoral procedure must be expressed expeditiously." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990). Plaintiff's tardy claims meets every element laches.

Plaintiff waited to challenge widely-known procedures until after millions of voters cast their ballots in reliance on those procedures. That delay is unreasonable under both the law and common sense and this case should be dismissed *See Wood v.*

8

*Raffensperger*, No. 20-14418, 2020 WL 7094866, at *6 (11th Cir. Dec. 5, 2020) (Dismissing a case as moot where Plaintiff challenged vote certification after the election and after results were certified.); (*King*, No. 20-13134 Dkt. 62:19 ("Plaintiffs could have lodged their constitutional challenges much sooner than they did, and certainly not three weeks after Election Day and one week after certification of almost three million votes. The Court concludes that Plaintiffs' delay results in their claims being barred by laches").)

Just for example, on the issue of "indefinitely confined" voters, the legal issues were litigated in state court almost *eight months* ago. *See* Pet. for Original Action, date March 27, 2020, Supreme Court of Wisconsin, No. 2020AP000557-OA. Plaintiff obviously could have pressed this indefinite confinement issue in the many months between when it emerged and the November general election, thus allowing Wisconsin election officials to adjust accordingly.

The prejudice caused by Plaintiff's delay is profound. Plaintiff sat on his claims allowing millions of Wisconsinites to vote in reliance on those procedures, only to attack those decisions after they became irreversible. *See Fulani*, 917 F.2d at 1031 ("As time passes, the state's interest in proceeding with the election increases in importance as . . . irrevocable decisions are made."). This is precisely the type of prejudice the laches doctrine exists to prevent.

Nothing less than the right of every Wisconsinite to have their vote for President counted is at stake if Plaintiff's requests are granted. Indeed, as the U.S. Supreme Court explains, "[c]onfidence in the integrity of our electoral processes is

essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). One could not shake the public's confidence in our electoral process more vigorously than by allowing unforeseeable post-election legal challenges to invalidate hundreds of thousands of votes that were cast in reliance on election officials' guidance.

> **3.    The Eleventh Amendment precludes Plaintiff's claims seeking this Court to order state officials to comply with state election law.**

Plaintiff fundamentally asks this court for a declaration and injunction against state officials for alleged violations of state election law that he describes as "Violations of Wisconsin Election Code." (Dkt. 9:11.) Such a claim is barred by the Eleventh Amendment.

The Eleventh Amendment bars "relief against state officials on the basis of state law, whether prospective or retroactive." *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106 (1984). The Supreme Court has explained that "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.*; *see also Rose v. Bd. of Election Comm'rs for City of Chi.*, 815 F.3d 372, 375 n.2 (7th Cir. 2016) ("[A]ny argument to the effect that the state did not follow its own laws is barred by the Eleventh Amendment.").

Plaintiff's federal constitutional claims turn almost entirely on his allegations about state election officials improperly administering state election law. His

Elections and Electors Clause claim turns on "three separate instances where Defendants violated the Wisconsin Election Code," (Dkt. 9 ¶¶ 104–06), just as his Equal Protection Clause claim rests on how "Defendants failed to comply with the requirements of the Wisconsin Election Code" (Dkt. 9 ¶ 116) and his due process claim relies on "Defendants['] violation of the Wisconsin Election Code" (Dkt. 9 ¶ 129). Just as in the parallel case from Michigan decided today, "the Eleventh Amendment bars Plaintiffs' claims against Defendants". (*King,* No. 20-13134, Dkt. 62:13.) Plaintiff fundamentally asks this Court to order state officials to follow state election law, relief that the Eleventh Amendment and *Pennhurst* squarely bars.

### B. Plaintiff fails to state any valid federal claim.

#### 1. Plaintiff fails to plead a claim under either the Election or Electors clauses.

In Count I of the Amended Complaint, Plaintiff alleges violations of the federal Constitution's Elections and Electors Clauses which vest authority in "the Legislature" of each state to regulate "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives", U.S. Const. art. I, § 4, cl. 1., and to direct the selection of presidential electors, U.S. Const. art. II, § 1, cl. 2, respectively. The cause of action rests entirely on allegations that three aspects of administrative guidance issued by the Commission were contrary to state election law. (Dkt. 9 ¶¶ 104–106.) Those claims fail as a matter of law because his disagreement with how state officials administered state elections law does not state a violation of the Elections and Electors Clause.

It is black-letter law that "'[a] violation of state law does not state a claim under § 1983,' and, more specifically, 'a deliberate violation of state election laws by state election officials does not transgress against the Constitution.'" *Shipley v. Chi. Bd. of Election Commissioners*, 947 F.3d 1056, 1062 (7th Cir. 2020) (citation omitted); *see also Bognet*, 2020 WL 6686120, *6 ("[F]ederal courts are not venues for plaintiffs to assert a bare right 'to have the Government act in accordance with law.'") (citation omitted); *Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir. 1995) ("[T]he Constitution is not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations—no matter how egregious those violations may appear within the local legal framework.").

This non-interference principle rests on a "caution against excessive entanglement of federal courts in state election matters":

> The very nature of the federal union contemplates separate functions for the states. If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral process, would be superseded by a section 1983 gloss.

*Bodine v. Elkhart Cty. Election Bd.*, 788 F.2d 1270, 1272 (7th Cir. 1986).

Plaintiff's theory here violates this core federalism principle, as it rests solely on three aspects of administrative guidance issued by the Commission. (Dkt. 9 ¶¶ 104–106.) None of these alleged state law violations can support a federal constitutional claim under cases like *Shipley* and *Bodine*. The general rule that "[a] violation of state law does not state a claim under § 1983," *Shipley*, 947 F.3d at 1062,

would no longer have any teeth, and plaintiffs could evade it simply by alleging an Elections Clause violation. This would threaten to replace Wisconsin's "elaborate state election contest procedures" with federal court intervention in the "multitudinous questions that may arise in the electoral process," just as *Bodine* warned against. 788 F.2d at 1272 (citation omitted); (*see also King,* No. 20-13134, Dkt. 62:29–30 (holding in a nearly identical case that "Plaintiffs lack standing to sue under the Elections and Electors Clause").) Indeed, this collision between federal and state proceedings can be seen playing out here and now. This week, President Trump is litigating his challenge to Wisconsin's recount results through the state procedures under Wis. Stat. § 9.01. *Donald J. Trump v. Joseph R. Biden*, No. 20CV7092 (Wis. Cir. Ct. Milwaukee Cty.); *Donald J. Trump v. Joseph R. Biden*, No. 20CV2514 (Wis. Cir. Ct. Dane Cty.) (consolidated with Milwaukee County case No. 20CV007092.). Simultaneously, Plaintiff here is challenging the count in this Court. It would be hard to better illustrate the federalism concerns raised by opening the federal courthouse doors to Plaintiff's state election law grievances.

> **2.** **Plaintiff fails to state a claim for equal protection and due process because he asserts ordinary election irregularities that should be handled under state law.**

In counts II and III, Plaintiff alleges constitutional equal protection and due process claims. But he states no constitutional claim; he merely makes state-law claims that are fully addressable through state procedures.

The federal "Constitution is not an election fraud statute." *Bodine*, 788 F.2d at 1271. "It is not every election irregularity . . . which will give rise to a constitutional

claim." *Id.* The federal constitution "is implicated only when there is 'willful conduct which undermines the organic processes by which candidates are elected.'" *Id.* at 1272 (emphasis omitted) (citation omitted). Therefore, "garden variety election irregularities that could have been adequately dealt with through the procedures set forth in [state] law" do not support constitutional due process claims. *Id.*; *see also Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998) ("[G]arden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election.").

Plaintiff relies on a vote-dilution theory. (Dkt. 9 ¶¶ 114, 125–26.) This theory fails in its premise because he does not allege that he voted. (Dkt. 9 ¶ 24.) With no vote, there is nothing to dilute, and his voter-dilution claim fails in its premise.

Additionally, Plaintiffs' novel version of vote dilution could not support a federal claim, even if he had voted. Recognized vote dilution claims involve state laws that structurally disadvantage certain groups in the voting process. For instance, *Reynolds v. Sims*, 377 U.S. 533 (1964), held that state legislative districts must be apportioned by population to avoid diluting the votes of residents in disproportionately populous districts. Other vote dilution claims similarly target legislative apportionment schemes that disadvantage minorities in violation of either equal protection or the Voting Rights Act of 1965 ("VRA"). *See, e.g., Thornburg v. Gingles*, 478 U.S. 30, 34 (1986) (multimember districts in North Carolina violated VRA by diluting black vote); *Miller v. Johnson*, 515 U.S. 900, 911 (1995) ("[A] vote dilution claim alleges that the State has enacted a particular voting scheme as a

14

purposeful device '[t]o minimize or cancel out the voting potential of racial or ethnic minorities.'" (citation omitted)).)

Plaintiff's novel vote dilution theory, in contrast, rests on alleged vote counting violations and does not fit within this recognized malapportionment framework, as the Third Circuit held just days ago in *Bognet*, 2020 WL 6686210, at *11. There, individual voters alleged that votes arriving or cast after election day were unlawfully counted, thereby diluting the plaintiffs' votes in an unconstitutional manner. *Id.* at *9. The Third Circuit rejected this theory, explaining that "[c]ontrary to [this] conceptualization, vote dilution under the Equal Protection Clause is concerned with votes being weighed differently." *Id.* Recognizing this unprecedented kind of dilution claim would upset the delicate balance between state and federal authority over elections:

> [I]f dilution of lawfully cast ballots by the "unlawful" counting of invalidly cast ballots "were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity."

*Bognet*, 2020 WL 6686210, at *11 (citation omitted).

Plaintiffs' novel vote dilution claim would implicate practically *any* state election, because "[i]n just about every election, votes are counted, or discounted, when the state election code says they should not be. But the Constitution 'd[oes] not authorize federal courts to be state election monitors.'" *Donald J. Trump for President, Inc. v. Boockvar*, No. 20-cv-966, 2020 WL 5997680, at *48  (Oct. 10, 2020) (second alteration in original) (citing *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir.

15

1980)). Yet state election monitors is exactly what federal courts would become, if unlawfully cast votes alone sufficed to state a constitutional claim.[6]

Plaintiff does not cite a single vote dilution case resting on allegedly illegal votes. Instead, Plaintiff relies primarily on *Reynolds*—again, a case about dilution caused by malapportionment. 377 U.S. at 555 (Dkt. 9 ¶ 114.). But *Reynolds* relied on cases involving whether Congress had the power to criminalize certain state election misconduct under federal law. *See Ex parte Siebold*, 100 U.S. 371 (1879), and *United States v. Saylor*, 322 U.S. 385 (1944). As the Third Circuit recognized, *Reynolds'* citation to those two criminal cases does not mean that individual voters may assert civil vote dilution claims based solely on illegal votes. *See Bognet*, 2020 WL 6686120, at *14. Plaintiff also cites *Donald J. Trump for President, Inc. v. Bullock*, No. CV 20-66-H-DLC, 2020 WL 5810556 (Sept. 2020), but that case merely "assum[ed] such a claim exists" only to dismiss it based on a lack of evidence.

Rejecting Plaintiff's "illegal vote" dilution theory would not leave the integrity of Wisconsin's elections without safeguards. A wide range of regulations govern voter

---

    [6] Many other federal courts have rejected these kinds of vote dilution claims. *See also, e.g.*, *Republican Party of Pennsylvania v. Cortes*, 218 F. Supp. 3d 396, 407 (E.D. Pa. 2016) ("[V]ote dilution cases do not extend to "speculation that fraudulent voters may be casting ballots elsewhere."); *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, 2020 WL 5997680, at *59 (W.D. Pa. Oct. 10, 2020) (rejecting vote dilution claim resting on potential fraud that did not involve "malapportionment, disenfranchisement, or intentional discrimination"); *Minnesota Voters All. v. Ritchie*, 720 F.3d 1029, 1033 (8th Cir. 2013) (rejecting vote dilution claim resting on "illegally cast votes" by election day registrants, absent allegations of "discriminatory or other intentional, unlawful misconduct" by election officials or "willful and illegal conduct [by] election officials [that] results in fraudulently obtained or fundamentally unfair voting results").

registration and absentee voting to ensure that only eligible residents receive and cast absentee ballots. *See generally* Wis. Stat. ch. 6. If those regulations are purposely evaded, state election fraud prosecutions may ensue. *See generally* Wis. Stat. § 12.13. And recounts are the ultimate backstop, where votes may be identified, challenged, and, if appropriate, invalidated. *See generally* Wis. Stat. § 9.01. The crucial point is that our system of federalism entrusts electoral integrity to these state-level protections, not to federal constitutional claims by individual voters. Plaintiff's vote dilution claim rests on a fatally flawed legal theory and fails as a matter of law.

> ### 3. Plaintiff's purported evidence is unpersuasive, unlikely to meet basic evidentiary standards, and does not support discarding the votes of millions of Wisconsin residents.

Count IV of the Amended Complaint alleges massive election fraud through an "insidious, and egregious ploy" to falsely report the outcome of the 2020 Wisconsin general election. (Dkt. 9 ¶¶ 2, 132–135.) The general theory is that foreign oligarchs and dictators created a voting system called "Smartmatic" to help Hugo Chavez in Venezuelan elections. (Dkt. 9 ¶¶ 7–8; 9-1 ¶¶ 13–20.) There is no allegation that Smartmatic is used in Wisconsin. Instead, an anonymous declarant says that "software of Dominion and other election tabulating companies relies upon software that is a descendant of . . . Smartmatic" and Plaintiffs allege that "Dominion Systems derive from the software designed by Smartmatic Corporation." (Dkt. 9 ¶ 7; 9-1 ¶ 21.)

Plaintiff then makes the incredible, and implausible, leap that Dominion machines in Wisconsin were hacked in 2020. He asks the court to overturn the

election results because anonymous declarants say that a different system, used in a different country, for a different election, was manipulated. This would not even pass Rule 9(b) pleadings standards, let alone support the unprecedented and extraordinary act of having a federal court reverse the outcome of a certified state election.

Things get even worse looking past the pleadings to the supporting documents. Even a facial review shows a complete lack of reliable evidence. Much of Plaintiff's purported evidence comes from undisclosed witnesses or is completely irrelevant to Wisconsin. What little even mentions Wisconsin is based on plainly unreliable data and reasoning. His purported evidence does not meet admissibility standards and is not in the ballpark of supporting his extraordinary request.

Of Plaintiff's 18 proffers of evidence, five are from anonymous declarants where the names of the witness or expert are redacted. (Dkt. 9-1; 9-4; 9-12; 9-13; 9-19.) This makes it impossible to evaluate the legitimacy or potential bias of the evidence and those declarations should be disregarded. Even hypothetically looking past the secret sources, the affidavits are astoundingly thin. Exhibit 1 propounds at length about the integrity of past elections in Venezuela but offers no information about the 2020 Wisconsin election. Exhibit 12 is from a self-proclaimed "white-hat hacker" who testifies to the unremarkable fact that Dominion's public website has internet interrelationships in other countries, but makes absolutely no connection to Wisconsin voting machines or data security. (Dkt. 9-12:1.) Exhibit 13 is from an anonymous source who purports to be an "amateur network tracer and typographer"

whose third-hand amateur opinions about corporate relationships amount to a conspiracy theory. (Dkt. 9-13:1.)

The documents include two anonymous expert reports. (Dkt. 9-4; 9-19.) Exhibit 4 offers a terse statistical analysis culminating in a graphic where the author identifies "large red dots" on a vote ratio chart where Biden overperformed predictions in counties using Dominion voting machines. (Dkt. 9-4:2–3.) It is difficult to discern what, if anything, the scatter plot shows, and the report notably leaves unexplained that nearly all of the graph's "large dot" indicators, red and blue, show overperformance, which is more consistent with the conclusion that more voters turned out and Biden overperformed everywhere, which is why he won the election. That one candidate received more than expected votes at a particular voting machine is entirely unremarkable in an election with high turnout where that candidate won. And anonymous expert report Exhibit 19 leads its analysis with the unhelpful statement that "it is possible to obtain rough estimates on how vote fraud could possibly have effected [sic] the election." (Dkt. 9-19:2.) As if that were not speculative enough, the report indicates that its Wisconsin "data was obtained from the twitter account of @shylockh, who derived his sources from the New York Times and in some cases from the unofficial precinct reports." (Dkt. 9-19:8–9.) Such anonymous, bare speculation on third- or fourth-hand information is unpersuasive.

Of the documents that are at least authored, many have nothing to do with the Wisconsin election. (Dkt. 9-6; 9-7; 9-8; 9-10; 9-11; 9-14; 9-15; 9-16; 9-18.) For example, Exhibit 6 is a statement from a Colorado resident who reports going to an Antifa

meeting and overhearing a conversation where he believes he heard a person named "Eric" state that he is making sure Trump does not win the election. (Dkt. 9-6:2.) Through a series of Google searches and listeners of his podcast, he opines that a former employee of Dominion named Eric has altered the election. (Dkt. 9-6:2–6.) This Googled evidence, based on hearsay at an alleged meeting in Colorado, is not reliable evidence of election fraud in Wisconsin.

Exhibit 7 is from a person who observed polls in Atlanta, Georgia, in June and August of 2020 and does not even mention Wisconsin. Exhibit 8 opines on the political status of Venezuela. Exhibit 14 is from a person who reports that he has reviewed materials about Dominion voting systems, all from public websites, but offers no information about Wisconsin election processes. And Exhibits 10, 11, 15, 16 and 18 are generalized articles or letters about election systems generally that do nothing to prove Plaintiff's claims that vote tabulating in Wisconsin is inaccurate.

The very few non-anonymous filings that even discuss the Wisconsin election are facially unpersuasive and likely do not even meet evidentiary reliability standards. Expert testimony is inadmissible unless it: will help the trier of fact to understand the evidence; is based on sufficient facts or data; is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. In assessing the admissibility of expert testimony, courts must ensure that the testimony is both reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). District courts "must evaluate: (1) the proffered expert's qualifications; (2) the reliability of

the expert's methodology; and (3) the relevance of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). The party offering the expert testimony has the burden of establishing that the proffered testimony satisfies Fed. R. Evid. 702. *Id.* at 782.

Plaintiff offers four expert opinions in support of his request to overturn the Presidential election. (Dkt. 9-2; 9-3; 9-9; 9-17.) None meet the standard in Rule 702.

One is a re-filing of a report that was previously filed in a state court case, from Matthew Braynard. (Dkt. 9-3.) Braynard does not appear to be qualified to offer the opinions in his report. He offers statistical conclusions based on a purported sampling of voters in certain categories, which he opines are representative of various larger categories of voters. Braynard has no formal education in statistics or statistical surveys. Instead, his report indicates he has a degree in business administration. (Dkt. 9-3:3.) It is dubious whether Braynard's opinions are based on "sufficient facts and data" or whether his methods are reliable. Braynard says he used voter information provided by "L2 Political" (Dkt. 9-3:3), but it is unknown whether this data reliably reflects information on Wisconsin voters. He also purports to rely on a database of address changes, but it is unclear whether this database accurately reflects electors' correct addresses for voting purposes. Further, his conclusions are based on the results of telephone calls made by call centers and "social media researchers" that are of unknown quality. (Dkt. 9-3:3.) These telephone surveys could easily include bad data and unreliable methods, given that the report does not disclose exactly how these surveys were conducted. Plaintiff has not shown that

phone surveys like these can reliably obtain information about voters or that his limited sample of voters who responded is representative of the whole.

Next is the report of William Briggs, which exclusively used the flawed data from Braynard. (Dkt. 9-2:1.) Even apart from this flawed underlying data, Briggs's analyses are woeful. He concludes that thousands of people received absentee ballots who did not request one. (Dkt. 9-2:1.) His report fails to account for voters who have requested that absentee ballots be sent automatically for every election, which would fully explain his concern. Even setting aside whether that is even an indicia of fraud, one would assume that to reach this conclusion he identified people who received a ballot without requesting one. Not so. His report explains that he used phone survey results that asked, for example, whether a person requested an absentee ballot. (Dkt. 9-2:5.) His report indicates that only 433 people, out of the millions of Wisconsin voters, completed the survey. (Dkt. 9-2:5.) He assumes that this tiny sample was representative of the whole state and scaled the number up to predict the total number of people who requested ballots, and compared that to the number of people receiving ballots. (Dkt. 9-2:1.) What he did not do is the obvious analysis of asking anyone whether they received a ballot without asking for one. As he concedes in his report: "Survey respondents were not asked if they received an unrequested ballot . . . This is clearly a lively [sic] possibility . . . no estimates or likelihood can be calculated for this potential error due to absence of data." (Dkt. 9-2:2.) This type of methodology failure pervades his report.

The final two are the Keshel and Ramshland Jr. opinions, which are likewise unpersuasive. (Dkt. 9:9, 17.) Keshel is a data analysist with no apparent elections training but who reports that he has "political involvement requiring knowledge of election trends and voting behavior." (Dkt. 9-9:1.) He used uncertified information from an "unofficial tracker" to determine that the 2020 elections went "against the trends of the previous election" to elect a Democratic candidate. (Dkt. 9-9:1, 4.) But this is no more than acknowledging that a Republican won in 2016 and a Democrat won in 2020. Keshel refers to this as "suspicious vote totals" but it does not show any more than a different outcome in 2020 than in the past.

Ramshland Jr. does not disclose his data source other than "[m]y colleague and I . . . have studied the information that was publicly available." (Dkt. 9-17:4.) From this, he identifies "red flags" including a very high turnout in several Wisconsin counties. (Dkt. 9-17:9.) He concludes that fraud occurred because many votes for Biden were counted late in the tabulating process. (Dkt. 9-17:4–5.) But, as now been repeatedly publicly explained, this occurred because absentee ballots, which favored Democratic candidates, were counted together late in the election day. The report also "normalized" the turnout to a lower rate and found that "the excess votes are at least 384,085 over the maximum that could be expected. (Dkt. 9-17:9.) But this "normalization" is nothing more than lowering the vote count. He concludes on this analysis that there were up to 384,085 "illegal votes that must be disregarded." (Dkt. 9-17:12.) The idea that Wisconsin should discard votes because more people voted than normal is absurd.

23

This unpersuasive and unreliable evidence stands in contrast to an actual hand-count audit of the machines used in the election, which showed no fraud. Like in the parallel Michigan case, "With nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails." (*King,* No. 20-13134, Dkt. 62:29–30.) This Court should not conclude, on Plaintiff's proffer of anonymous declarations, hearsay, and facially faulty analyses, that Wisconsin should disregard the outcome of the election for President.[7]

## C. Plaintiff's requested remedy would unconstitutionally disenfranchise Wisconsin voters.

Regardless of all of the other reasons Plaintiff's claims fail, the remedy he seeks—the exclusion of hundreds of thousands of votes in Wisconsin—would violate these voter's federal due process rights by retroactively overriding election procedures that those voters relied on and nullifying votes cast for Vice President Biden based on a speculative and far-fetched conspiracy theory of voter fraud.

Once a state legislature has directed that the state's electors are to be appointed by popular election, the people's "right to vote as the legislature has prescribed is fundamental." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam). That fundamental right to vote includes "the right of qualified voters within a state to cast

---

[7] Plaintiff's request for the Court to "seize and impound" all equipment statewide, is also misdirected. (Dkt. 9 ¶ 48.) The Commission does not own or have custody over such election equipment. *See* Wis. Stat. 5.91; Wis. Admin. Code ch. EL 7; https://elections.wi.gov/elections-voting/security (explaining that municipalities purchase the equipment.)

their ballots and have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941).

Due process is violated when voters rely on an established election procedure and significant disenfranchisement results from a change in the procedures post-election. *Bennett*, 140 F.3d at 1227*; Northeast Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612 (6th Cir. 2016) (finding no reason to invalidate a ballot when there was no evidence of voter fraud.); *Griffin v. Burns*, 570 F.2d 1065, 1079 (1st Cir. 1978) (retroactive invalidation of absentee ballots violated due process). Those conditions would be squarely met here by Plaintiff's requested relief.

Wisconsin voters who reasonably relied on the established voting procedures would be disenfranchised by the thousands, raising serious concerns of a due process violation. To throw out the votes of 181,440 Wisconsin voters based on an implausible conspiracy regarding voting machine would violate the constitutional rights of these voters.

## III. Plaintiff has failed to show that he will suffer irreparable harm without a preliminary injunction.

Plaintiff has made no meaningful showing that state law violations or fraud conspiracies violated his voting rights or harmed his status as a nominated elector for an unsuccessful candidate. He faces no harm by denial of his injunction; indeed such order would only harm the millions of Wisconsin voters who determined the outcome of the election.

## IV. The balance of equities and public interest favor denying an injunction.

The public would be severely harmed by Plaintiff's requested relief. Disenfranchising hundreds of thousands of Wisconsin voters on the basis of a flimsy conspiracy theory outweighs the scant chance that Plaintiff will succeed on his claims. It would also declare Donald Trump as the winner in Wisconsin—relief Plaintiff has made no attempt at proving would have occurred, even if all of his baseless and fanciful claims succeeded. (*See* Dkt. 9 ¶ 59.)

As explained by the Third Circuit, "[d]emocracy depends on counting all lawful votes promptly and finally, not setting them aside without weighty proof. The public must have confidence that our Government honors and respects their votes." *Donald J. Trump for President, Inc. v. Pennsylvania*, No. 20-3371, 2020 WL 7012522, at *9 (3d Cir. Nov. 27, 2020). The "public interest strongly favors finality, counting every lawful voter's vote, and not disenfranchising . . . voters who voted by mail." *Id.* That is because "[d]emocracy depends on counting all lawful votes promptly and finally, not setting them aside without weighty proof." *Id.*

# CONCLUSION

Plaintiff's request for a temporary restraining order and preliminary injunction should be denied.

Dated this 7th day of December 2020.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ S. Michael Murphy
S. MICHAEL MURPHY
Assistant Attorney General
State Bar #1078149

JODY J. SCHMELZER
Assistant Attorney General
State Bar #1027796

COLIN T. ROTH
Assistant Attorney General
State Bar #1103985

Attorneys for Defendants Wisconsin
Elections Commission and its members

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-5457 (Murphy)
(608) 266-3094 (Schmelzer)
(608) 264-6219 (Roth)
(608) 294-2907 (Fax)
murphysm@doj.state.wi.us
schmelzerjj@doj.state.wi.us
rothct@doj.state.wi.us

27