# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

WILLIAM FEEHAN,

       Plaintiff,

  v.

WISCONSIN ELECTIONS COMMISSION,
and its members ANN S. JACOBS, MARK
L. THOMSEN, MARGE BOSTELMANN,
JULIE M. GLANCEY, DEAN HUDSON,
ROBERT F. SPINDELL, JR., in their official
capacities, GOVERNOR TONY EVERS,
in his official capacity,

       Defendants.

Case No.: 20CV1771

---

## BRIEF OF GOVERNOR TONY EVERS
## IN OPPOSITION TO PLAINTIFF'S AMENDED MOTION
## FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

Jeffrey A. Mandell
Rachel E. Snyder
Richard A. Manthe
STAFFORD ROSENBAUM LLP
222 W. Washington Ave., Suite 900
Post Office Box 1784
Madison, WI 53701-1784
Telephone: 608-256-0226
jmandell@staffordlaw.com
rsnyder@staffordlaw.com
rmanthe@staffordlaw.com

Paul Smith
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
Telephone: (202) 736-2200
psmith@campaignlegalcenter.org

Justin A. Nelson
Stephen E. Morrissey
Stephen Shackelford Jr.
Davida Brook
SUSMAN GODFREY L.L.P.
1000 Louisiana St., Suite 5100
Houston, TX 77002
Telephone: 713-651-9366
jnelson@susmangodfrey.com
smorrissey@susmangodfrey.com
sshackelford@susmangodfrey.com
dbrook@susmangodfrey.com

*Attorneys for Defendant,*
*Governor Tony Evers*

December 7, 2020

## INTRODUCTION

Plaintiff's motion seeks relief that is shockingly sweeping in scope. Wisconsin's Supreme Court recently called a similar request "the most dramatic invocation of judicial power [they] have ever seen." *Wis. Voters Alliance v. Wis. Elections Comm'n*, No. 2020AP1930-OA (Wis. Dec. 4, 2020) (Hagedorn, J., concurring on behalf of majority of Justices). Indeed, such a request would be unimaginable, except that it has already been proposed—and rejected—elsewhere.

In November's election, a record turnout of nearly 3.3 million Wisconsinites voted. Joe Biden and Kamala Harris won by 20,585 votes. President Trump sought a partial recount, confirming the result, which was then declared in the state canvass. As required by law, Governor Evers issued a certificate identifying Wisconsin's 10 participants in the Electoral College, who will soon convene and cast their votes in accord with the will of Wisconsin's voters.

Plaintiff's request in this Court is less a prayer for relief than a desperate plea for historical negation. His motion asks this Court to cast aside what has occurred, notwithstanding that the election results were checked and re-checked as required by Wisconsin law, that President Trump could—and did—request a recount, and that 5 percent of Wisconsin's voting machines were audited after the election. There is no basis, in fact or in law, for this Court to grant Plaintiff's requests, including, but not limited to:

- overturning and decertifying Wisconsin's election results, thereby disenfranchising nearly 3.3 million Wisconsin voters (Amend. Cmplt. ¶¶138, 142.1);
- requiring a statewide manual recount in the presidential election (*Id.* ¶142.8);
- impounding all election equipment, software, ballots, and other election materials maintained by non-party election officials in counties statewide (*Id.* ¶142.4); and
- declaring that President Trump won Wisconsin's Electoral College votes (*Id.* ¶142.3).

As the Wisconsin Supreme Court explained, "if there is a sufficient basis to invalidate an election, it must be established with evidence and arguments commensurate with the scale of the

claims and the relief sought." *Wis. Voters Alliance*, Order at *3 (Hagedorn, J., concurring). Here, as in that case, the record offered by the Plaintiff has "come nowhere close." *Id.*[1]

The Middle District of Pennsylvania, when confronted with analogous claims and requests, based on similarly scant evidence, also rebuked the plaintiffs:

> Plaintiffs ask this Court to disenfranchise almost seven million voters.… One might expect that when seeking such a startling outcome, a plaintiff would come formidably armed with compelling legal arguments and factual proof of rampant corruption, such that this Court would have no option but to regrettably grant the proposed injunctive relief despite the impact it would have on such a large group of citizens.
>
> That has not happened. Instead, this Court has been presented with strained legal arguments without merit and speculative accusations.… In the United States of America, this cannot justify the disenfranchisement of a single voter.

*Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-cv-02078-MWB, 2020 WL 6821992, at *1 (M.D. Pa. Nov. 21, 2020), *aff'd*, No. 20-3771, 2020 WL 7012522, at *1 (3d Cir. Nov. 27, 2020) ("Free, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But calling an election unfair does not make it so. Charges require specific allegations and proof. We have neither here.").[2] *See also Wood v. Raffensperger*, No. 1:2020-cv-04651-SDG, 2020 WL 6817513, at *8 (N.D. Ga. Nov. 20, 2020), *aff'd*, No. 20-14418, 2020 WL 7094866 (11th Cir. Dec. 5, 2020) (denying motion for preliminary relief that "would disenfranchise a substantial portion of the electorate and erode public confidence in the electoral process").

Sifting through Plaintiff's Amended Complaint and its exhibits (which, rather than marshaling as part of his motion, Plaintiff instead purports to have "incorporate[d] herein by reference"), is itself a daunting task that complicates any response. Consider:

- The narrative strays far beyond Wisconsin's borders, travelling through Venezuela, Germany, and Serbia. (*See* Amend. Cmplt. ¶¶7-8, 73-75, 80-81)

---

[1] This was a similar case, requesting similar relief, and relying heavily on one of the experts, Matthew Braynard, Plaintiff cites in this case.

[2] Pursuant to Civil L. R. 7(j)(2), all unpublished cases, orders, and dispositions cited are filed in conjunction with this brief.

- The exhibits include declarations from individuals in Japan and Texas with no apparent expertise or first-hand knowledge of anything pertaining to the Wisconsin election. (*See id.* ¶¶61-62, 87-88 & Exhs. 9, 14)

- Five of the purported affiants are, for reasons unknown and unexplained—but which regardless could not provide any conceivable basis for finding relevance or admissibility—anonymous. (*See id.* Exhs. 1, 4, 12, 13, 19)

Much of Plaintiff's Amended Complaint consists of Q-Anon conspiracy theories that do not come close to satisfying federal-court pleading standards.

Nonetheless, a charitable reading of the complaint could be read to assert four theories of "widespread fraud" that, according to Plaintiff, call into question Wisconsin's election results:

(1) the notion that voting machines manufactured by "Dominion Voting Systems" were prone to manipulation and *could have been* manipulated in a manner that compromised the integrity of the Wisconsin election;

(2) the *ipse dixit* assertions of two so-called experts, Matt Braynard and William Briggs, that a "survey" of individuals supposedly associated with "unreturned absentee ballots" in Wisconsin somehow calls into question the election results;

(3) the characterization of Wisconsin's election results as a "statistical impossibility" that simply cannot be believed; and

(4) the theory that, by administering an election in accord with Wisconsin election law, the Wisconsin Elections Commission ("WEC") somehow violated Plaintiff's rights.

None of these theories is remotely plausible, let alone supported by evidence that would suggest Plaintiff has any likelihood whatsoever of prevailing on his claims.

Most glaringly, Dominion voting machines—the subject of endless pages of allegations and affidavits in Plaintiff's submission—*are not used in the relevant counties*. The Complaint alleges "egregious" conduct involving these machines in eight Wisconsin counties (Amend. Cmplt. ¶3), but materials, sourced from the WEC website and included in Plaintiff's own exhibits, show that Dominion machines are used in only two of those counties. And those two counties, Ozaukee and Washington, are both places where President Trump won. Plaintiff's other theories similarly wilt under the slightest scrutiny and cannot show a reasonable likelihood of success.

Moreover, Plaintiff cannot meet any other element of the test for granting preliminary injunctive relief. He cannot demonstrate any cognizable injury, much less irreparable harm. (*See* Def. Evers Br. in Supp. of Mot. to Dismiss at 5-8, 16-24) Nor can Plaintiff demonstrate that he has no alternative remedy, while President Trump is pursuing claims through the recount procedures prescribed as exclusive by the Wisconsin Legislature. And, even if Plaintiff could carry his burdens, the balance of harms indelibly tilts away from Plaintiff, because the relief he seeks would cause enormous prejudice to nearly 3.3 million Wisconsin voters by depriving them of their chosen representation in the Electoral College, as well as doing "indelible damage to every future election" and diminishing "public trust in our constitutional order." *Wis. Voters All.*, Order at *3 (Hagedorn, J., concurring).

For all of these reasons, as detailed below, Plaintiff's motion should be denied.

## RELEVANT FACTS

In the face of a global pandemic, the WEC took extraordinary steps to ensure a safe and secure election. Since March 1, 2020, WEC has sent approximately 150 direct communications to the 1,850 municipal clerks and 72 county clerks who administer Wisconsin elections.[3] These communications address how to conduct an election in the middle of a global pandemic. The WEC met approximately 30 times between March 1 and the November 3rd election.[4] The WEC's carefully crafted guidance assisted election officials and helped ensure the safety of voters. For example, the WEC developed comprehensive guidelines, rooted in and consistent with Wisconsin law, about municipal drop boxes as a safe, convenient way for voters to return absentee ballots.[5]

---

[3] *See* https://elections.wi.gov/clerks/recent-communications (last visited Dec. 5, 2020).
[4] *See* https://elections.wi.gov/calendar (last visited Dec. 5, 2020).
[5] https://elections.wi.gov/sites/elections.wi.gov/files/2020-08/Drop%20Box%20Final.pdf (last visited Dec. 5, 2020).

4

Throughout this year, Wisconsin election officials prepared for record turnout and unprecedented use of absentee ballots. In Wisconsin's April presidential primary and nonpartisan election, more than 70 percent of all votes cast (approximately 1,138,491 votes) were absentee.[6] In the August partisan primary, approximately 75 percent of votes cast were absentee.[7] By contrast, over the prior decade, Wisconsin averaged less than six percent of votes cast by absentee ballot.[8] In the November election, nearly 3.3 million Wisconsinites— approximately 72.66 percent of the voting-age population—voted.[9] Almost two million of those votes were cast by absentee ballot.[10]

All of this occurred consistent with Wisconsin law, which includes extensive safeguards. Prior to the election, local election officials must test the voting machines no more than ten days prior to the election to ensure the machines give an accurate vote count. Wis. Stat. § 5.84(1). That test is open to the public, and indeed the municipal clerk must provide the public notice of the test two days in advance. *Id.* After the clerk receives an accurate test result, the clerk then secures the machine until the election. Wis. Stat. § 5.84(2).

An absentee ballot may be requested only by a registered voter, and that voter must sign an affirmation on the ballot envelope in the presence of a witness, who also signs; both sign under penalty of perjury. *See* Wis. Stat. §§ 6.86, 6.87(2). Once the polls close, Wisconsin begins its canvassing process. Election inspectors conduct a local canvass at each polling place on election

---

[6] https://elections.wi.gov/sites/elections.wi.gov/files/2020-05/April%202020%20Absentee%20Voting%20Report.pdf at 3-5 (last visited Dec. 5, 2020).
[7] https://elections.wi.gov/sites/elections.wi.gov/files/2020-09/Election%20Statistics%20Report%202020%20Partisan%20Primary%20Election%202020-09-21.xlsx (last visited Dec. 5, 2020).
[8] https://elections.wi.gov/sites/elections.wi.gov/files/2020-05/April%202020%20Absentee%20Voting%20Report.pdf at 6 (last visited December 5, 2020).
[9] https://www.wispolitics.com/2020/wec-important-things-voters-should-know-after-the-election/ (last visited Dec. 5, 2020).
[10] *Id.*

night. Wis. Stat. § 7.51. The few dozen municipalities that count absentee ballots at a central count location proceed under the auspices of an absentee ballot board of canvassers. Wis. Stat. § 7.52.

Within a week of the election, every municipality has a three-member municipal board of canvass that publicly meets to reconcile the poll lists and canvass the returns. Wis. Stat. § 7.53. All municipal canvass results are reported to county clerks, each of whom convenes their county board of canvass to publicly meet and examine the returns for all municipalities in their county. Wis. Stat. § 7.60. Within two weeks of the election, county clerks report county canvass results to the WEC. Wis. Stat. § 7.60(5). Once the WEC has received all of the county canvass results, the chairperson reviews the results, publicly canvasses the returns, and prepares a statement certifying the results and indicating the names of persons who have been elected to state and national offices. Wis. Stat. § 7.70(3). Where a candidate in an election where more than 4,000 votes have been cast trails the leading candidate by less than 1 percent of the total votes cast, the trailing candidate may request a recount of the results. Wis. Stat. § 9.01(1). That recount occurs before the state canvass.

President Trump requested a recount of the canvasses in Dane and Milwaukee counties.[11] As part of the recount, the county board of canvassers compares the poll lists to determine the total number of voters, examines every absentee-ballot envelope and container, and then conducts a reconciliation process to ensure the number of ballots and the number of voters match. Wis. Stat. § 9.01(1)(b)1.-4. Election officials then recount the votes, ensuring tabulation machines provide accurate counts. Wis. Stat. § 9.01(1)(b)7.-8m., 10. Every step of the recount process is open to the public. Wis. Stat. § 9.01(1)(b)11. Once the recount is complete, the county board of canvassers certifies the results and provides them to the WEC chairperson, who must then complete the state

---

[11] "Completed Wisconsin recount confirms Joe Biden's win over Donald Trump," *Associated Press* (Nov. 30, 2020), available at https://madison.com/wsj/news/local/govt-and-politics/elections/completed-wisconsin-recount-confirms-joe-bidens-win-over-donald-trump/article_6335f4cb-4308-5108-ae71-88bf62ce90bf.html (last visited Dec. 5, 2020).

canvass using the recounted results. Wis. Stat. § 9.01(5)(c). After the recounts in Dane and Milwaukee Counties concluded, Joe Biden's statewide lead increased by 87 votes.[12]

After every general election, Wisconsin election officials conduct an audit of selected voting machines. Wis. Stat. § 7.08(6). Under federal law, no machine may demonstrate an error rate greater than 1 in 500,000 ballots (0.0002 percent). 52 U.S.C. § 21081(a)(5); Fed. Elections Comm'n, *Voting System Standards* § 3.2.1 (Apr. 2002).[13] The WEC established the following selection criteria for the audit following the November 2020 election:

1. Establish the audit sample as 5% of all reporting units statewide for a minimum of 184 total audits.
2. Ensure at least one piece of voting equipment is selected for audit in each of Wisconsin's 72 counties.
3. Ensure that a minimum of five reporting units are selected for every model of equipment certified for use in Wisconsin.

WEC, *Preliminary 2020 Post-Election Audit of Electronic Voting Equipment Report*, at 2 (Nov. 17, 2020).[14] The WEC audited 28 Dominion machines.[15] The audit found no programming errors, nor found any "identifiable bugs, errors, or failures of the tabulation voting equipment…."[16] At the WEC's most recent meeting, Commissioner Dean Knudson, a former Republican legislator and immediate-past chair of the WEC, said the audit showed "no evidence of systemic problems [or] hacking [or] of switched votes."[17] He specifically noted that the WEC had "audited 15 percent of the Dominion machines," and found "no evidence of any Dominion machines changing votes

---

[12] https://apnews.com/article/election-2020-joe-biden-donald-trump-madison-wisconsin-7aef88488e4a801545a13cf4319591b0 (last visited Dec. 5, 2020).

[13] Available at https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf (last visited Dec. 5, 2020).

[14] https://elections.wi.gov/sites/elections.wi.gov/files/202012/2020%20Audit%20Program%20Update%20for%2012_1_2020%20Meeting%20FINAL.pdf (last visited Dec. 5, 2020).

[15] *Id.* at 4.

[16] *Id* at 8.

[17] Video available at https://wiseye.org/2020/12/01/wisconsin-elections-commission-december-2020-meeting/ at 2:05:18.

or doing any of the like."[18] Noting that Wisconsin's "election equipment operated with great accuracy," he categorically asserted that he had "yet to see a credible claim of fraudulent activity during this election."[19]

Plaintiff waited until the day after Commissioner Knudson's public comments to file this lawsuit, alleging, without evidence, "massive fraud" in Wisconsin's election. Plaintiff's attorneys have filed lawsuits substantially identical to this one in three other states. *See King v. Whitmer*, No. 2:20-cv-13134 (E.D. Mich.); *Pearson v. Kemp*, No. 1:20-cv-04809-TCB (N.D. Ga.); *Bowyer v. Ducey*, No. 20-cv-02321 (D. Az.). All of these suits allege widespread fraud as part of a grand multi-national conspiracy to steal the election. None provides specific or even remotely reliable evidence to support those extravagant claims. Each suit is a last-ditch attempt to overturn election results and disenfranchise millions of voters without a shred of evidence. Just today the Eastern District of Michigan rejected Plaintiff's attorney's lawsuit on six separate grounds, including that the Eleventh Amendment barred relief, the claim was moot after Michigan certified the election results, laches barred relief, abstention, lack of standing, and that the plaintiff had no likelihood of success on the merits. *King v. Whitmer*, No. 2:20-cv-13134 (E.D. Mich. Dec. 7, 2020). A Georgia District Court dismissed an identical lawsuit in an oral decision, and the Arizona District Court on its own order put over an evidentiary hearing after receiving the defendants' motions to dismiss.

## STANDARD OF REVIEW

The legal standard for a temporary restraining order is the same as a preliminary injunction. *Democratic Nat'l Comm. v. Bostelmann*, 447 F. Supp. 3d 757, 765 (W.D. Wis. 2020). The plaintiff "has the burden of making a threshold showing: (1) that he will suffer irreparable harm absent preliminary injunctive relief during the pendency of his action; (2) inadequate remedies at law

---

[18] *Id.* at 2:08:16.
[19] *Id.* at 2:05:18, 2:06:52.

exist; and (3) he has a reasonable likelihood of success on the merits." *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). If the court finds the first three elements satisfied, it balances the relevant harms. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008). The balancing process "takes into consideration the consequences to the public interest of granting or denying preliminary relief." *Id.*

## ARGUMENT

### I. Defendants are overwhelmingly likely to prevail on the merits.

#### A.     There is no evidence of fraud in Wisconsin's election results.

The Dominion machines in Wisconsin have shown no evidence of irregularities. And they have been extensively audited. Dean Knudson, a Republican appointee to the WEC and former Republican member of the Wisconsin Assembly, publicly said this month that "the Dominion machines operated as they were designed to do within the specifications of our testing."[20] He specifically rejected the Dominion conspiracy theory: "We do not see problems with our voting machines. … And we have no evidence of any Dominion machines changing votes or doing any of the like."[21] Despite seemingly being aware of the theories underlying Plaintiff's Dominion allegations, Mr. Knudson definitively ruled out Dominion changing any votes. Nor is Commissioner Knudson alone. Jim Steineke, the Republican Majority Leader for Wisconsin's State Assembly, called allegations of widespread voter fraud "nonsense" and dismissed the notion of "widespread fraud large enough in numbers to overturn the result" of Wisconsin's presidential

---

[20] Video available at https://wiseye.org/2020/12/01/wisconsin-elections-commission-december-2020-meeting/ at 2:05:18.
[21] *Id.* at 2:08:16.

election.[22] And U.S. Attorney General William Barr, "one of the president's most ardent allies," said last week that U.S. Attorneys and FBI agents investigating claims of election irregularities "have not seen fraud on a scale that could have effected a different outcome in the election."[23]

Audit results in Wisconsin contravene Plaintiff's allegations. Wisconsin audited 60 Sequoia machines and 28 Dominion machines in the second half of November. Audits showed that the machines tabulated ballots correctly, "with no bugs, errors, or failures occurring between the individual cast vote record and the total tabulated vote record."[24] Recounts in Dane and Milwaukee Counties further underscore the lack of evidence of any fraud. After a full recount spanning more than a week, Dane County Clerk Scott McDonell, said, "what this recount showed was that there was absolutely no evidence of voter fraud in this election even after looking at over 300,000 ballots, over 254,000 envelopes."[25] As he noted, "this incredible level of transparency should provide reassurance to the public that the election was run properly and accurately and there was no fraud."[26] Milwaukee County's recount also found no evidence of fraud.[27]

Christopher Krebs, President Trump's chosen director for the Cybersecurity and Infrastructure Security Agency, the agency tasked with ensuring secure elections, characterized

---

[22] Rob Mentzer, "GOP Leader Pushes Back Against Election 'Misinformation,' Says No Evidence Of Widespread Voter Fraud," *WPR* (Nov. 16, 2020), available at https://www.wpr.org/gop-leader-pushes-back-against-election-misinformation-says-no-evidence-widespread-voter-fraud (last visited Dec. 5, 2020).

[23] Michael Balsamo, "Disputing Trump, Barr says no widespread election fraud," *Associated Press* (Dec. 1, 2020), available at https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d (last visited Dec. 5, 2020).

[24] Audit available at https://elections.wi.gov/sites/elections.wi.gov/files/2020-12/2020%20Audit%20Program%20Update%20for%2012_1_2020%20Meeting%20FINAL.pdf (last visited Dec. 6, 2020).

[25] Patrick Marley, "Biden gains 87 votes in Trump's $3 million Wisconsin recount as Dane County wraps up review. President plans lawsuit," *Milwaukee Journal Sentinel* (Nov. 29, 2020), available at https://www.jsonline.com/story/news/politics/2020/11/29/dane-county-recount-show-biden-won-wisconsin-trump-prepares-lawsuit/6455880002/ (last visited Dec. 4, 2020).

[26] *Id.*

[27] James Groh, "Milwaukee County election officials found "no instances of fraud" during recount," *TMJ4* (Nov. 27, 2020), available at https://www.tmj4.com/news/election-2020/milwaukee-county-election-officials-found-no-instances-of-fraud-during-recount (last visited Dec. 5, 2020).

10

the 2020 election as "the most secure in U.S. history."[28] Specifically with respect to Wisconsin, he noted that election administrators "worked overtime to ensure there was a paper trail that could be audited or recounted by hand, independent of any allegedly hacked software or hardware."[29] He explained that "Americans' confidence in the security of the 2020 election is entirely justified" because "[p]aper ballots and post-election checks ensured the accuracy of the count.[30] Mr. Krebs's comments could not be more apt: Wisconsin's recount of the ballots and audit of the machines ensured accuracy and inspires confidence. There is no evidence of fraud in Wisconsin's election; to the contrary, all evidence is that the election was free and fair. Nothing Plaintiff has offered—a mishmash of unattributed affidavits, hearsay, and extraordinary speculation—changes that.

### B. Plaintiff's "witnesses" and "experts" should be ignored.

None of Plaintiff's "experts" are experts at all. They lack qualifications, and they fail to provide methodological information to show their opinions are reliable. Their opinions should be ignored. Plaintiff's fact witnesses fare no better. Their affidavits are unsupported, speculative and unhelpful. Many are anonymous. They are inadmissible and unworthy of the Court's attention.

### 1. Plaintiff's affiants are entirely unqualified.

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Most of the affidavits appended to the Amended Complaint purport to conduct expert analyses ranging from statistical tests to forensic assessments of electronic voting systems. Yet almost none of Plaintiff's

---

[28] Christopher Krebs, "Trump fired me for saying this, but I'll say it again: The election wasn't rigged," *Washington Post* (Dec. 1, 2020), available at https://www.washingtonpost.com/opinions/christopher-krebs-trump-election-wasnt-hacked/2020/12/01/88da94a0-340f-11eb-8d38-6aea1adb3839_story.html (last visited Dec. 6, 2020).

[29] *Id.*

[30] *Id.*

affiants have *any* identifiable experience or education in the fields in which they opine, let alone sufficient education and experience to qualify as an expert.

Exhibit 3 to the Amended Complaint is an affidavit from Matthew Braynard, who discusses a survey that he maintains uncovered assorted irregularities in Wisconsin's election results. But Braynard's only identified education is "a degree in business administration," and he identifies no other qualifications, experience, or publications in survey design, statistical methods in the social sciences, or political science. (Exh. 3) Exhibit 2, an affidavit from William Briggs, is an analysis based entirely on Braynard's survey results, but Briggs also fails to identify any relevant experience or qualifications in survey design. Neither Briggs nor Braynard is qualified to express the opinions identified in their affidavits.

The qualifications of Plaintiff's remaining affiants are equally infirm. Exhibits 4, 12, 13, and 19 are "expert" analyses conducted by anonymous individuals whose credentials—or even existence—cannot be tested or assessed. Even taken on their own terms, these affidavits do not disclose any remotely acceptable qualifications. Exhibit 12 purports to be a forensic analysis of various computer networks, but the anonymous author identifies no relevant qualifications or education, aside from "extensive experience as a white hat hacker." Exhibit 13 purports to be a technical analysis of certain voting technologies, but the author states that his degree is in physiology and that he is an "amateur network tracer." He does not identify any specific education or experience that would qualify him to analyze electronic voting systems. And Exhibit 19 is a statistical analysis conducted by an electrical engineer with no discernible experience in statistics.

Exhibit 8, a statement by Ana Mercedes Diaz Cardozo, expresses opinions about the security of electronic voting systems, but she is not a computer scientist or information security expert, nor does she possess any other relevant qualifications. Exhibit 9, the affidavit of Seth

Keshel, is a statistical analysis conducted by a "trained data analyst" who describes nothing about his education, experience, or other qualifications, aside from "political involvement requiring a knowledge of election trends and voting behavior." Exhibit 14, the declaration of Ronald Watkins, analyzes the security of electronic voting systems, but identifies only "experience as a network and information defense analyst and a network security engineer." Watkins does not describe what that experience is with any degree of detail, nor does he explain how this experience qualifies him to testify as to the security of electronic voting systems. In reality, Watkins operates the online message board 8kun and is a key propagator of the QAnon conspiracy theory.[31]

And Exhibit 17, the affidavit of Russell James Ramsland, Jr., contains both statistical "analysis" and a technical assessment of electronic voting systems, but Ramsland identifies no education, experience, publications, or other qualifications in any relevant field. Indeed, Ramsland concedes that he has relied on certain "experts and resources" (Exh. 17 at 1), but he does not identify who those experts are, what their qualifications are, how they performed their work, or how *he* relied on their work. The substance of his analysis is nonsensical. Ramsland claims that a "spike" in Biden returns in the early morning the day after the election was a "statistical impossibility" and evidence of fraud. (Amend. Cmplt. ¶¶77-79) Of course, this spike was just the City of Milwaukee, a traditional Democratic stronghold, reporting its city-wide absentee-ballot returns in one fell swoop when all counting at its central-count facility had concluded. It was anticipated this would happen, as Milwaukee had warned that it would deliver absentee results

---

[31] Drew Harwell, "To boost voter-fraud claims, Trump advocate Sidney Powell turns to unusual source: The longtime operator of QAnon's Internet home," *Washington Post* (Dec. 1, 2020), available at https://www.washingtonpost.com/technology/2020/12/01/powell-cites-qanon-watkins/ (last visited Dec. 6, 2020).

between 3:00 and 6:00 a.m. the morning after Election Day.[32] Rather than a statistical anomaly, this was an entirely expected development.[33]

### 2. Plaintiff's affiants fail to disclose a generally accepted methodology, or any methodology at all.

Expert testimony requires a reliable methodology. *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014). "An expert's methodology can be evaluated by considering its error rate, whether the methodology has been or is capable of being tested, whether it has been subject to peer review, and whether it is generally accepted in the relevant community of experts." *Id.* Even if Plaintiffs' "expert" affiants were qualified, none of them disclose any remotely reliable methodology in arriving at their conclusions—and most disclose no methodology whatsoever.

As an initial matter, the Briggs and Braynard affidavits (Exhs. 2-3) rely on Braynard's survey results—but Braynard made no effort to make his survey even appear scientific. "The criteria for the trustworthiness of survey evidence are that: (1) the 'universe' was properly defined; (2) a representative sample of that universe was selected; (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered was accurately reported; (6) the data was analyzed in accordance with accepted statistical principles[;] and (7) objectivity of the entire process was assured." *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 952 (N.D. Ill. 2009); *see also Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 776 (7th

---

[32] Laurel White, "Wisconsin Election Officials Say Vote Counting Will Take Longer This Year. Here's What To Expect," *WPR* (Nov. 3, 2020), available at https://www.wpr.org/wisconsin-election-officials-say-vote-counting-will-take-longer-year-heres-what-expect (last visited Dec. 5, 2020).

[33] If the Court does determine an evidentiary hearing is necessary, Defendant would request the right to bring *Daubert* challenges to each of Plaintiff's experts.

Cir. 2007) ("But we emphasize that survey evidence … must comply with the principles of professional survey research; if it does not, it is not even admissible."). Braynard's affidavit identifies no sampling method, no telephone protocols, no scripts used by interviewers, no quality control steps, no information about who conducted the phone calls, and no information about how voter telephone numbers were located and verified. None of Braynard's estimates are presented with any measures of uncertainty, like confidence intervals or margins of error. Braynard's survey has none of the indicia of reliability necessary to admit survey evidence. And because the Briggs affidavit relies exclusively on the Braynard survey, it too should be ignored.

Braynard's affidavit also contains conclusions about voters who indicated they were indefinitely confined. But this discussion likewise lacks any meaningful methodology. Braynard purportedly had unidentified researchers look at social media profiles they believed matched specific voters to determine whether they were indefinitely confined on Election Day. No sampling methodology is identified; no objective standards used in determining whether an individual is indefinitely confined are identified; no information about how voter identities were verified is identified; no quality control measures are identified. The Court cannot accept Braynard's and Plaintiff's invitation to invalidate tens of thousands of votes based on subjective and unverifiable assessments of social media pages that may not even belong to the voters in question.

Moreover, several of Plaintiff's affidavits are statistical "analyses" that cloak their lack of a coherent methodology in pseudoscientific language. At a bare minimum, in addition to using generally accepted statistical tests, a reliable statistical methodology must contain an accounting of the sample tested and must "correct for potentially explanatory variables." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (expert was properly excluded where he arbitrarily excluded certain individuals from a sample and failed to account for potential

explanatory factors); *see also Elliott v. CFTC*, 202 F.3d 926, 934 (7th Cir. 2000) (expert statistical testimony was unreliable where it failed to conduct key analyses that weighed upon his conclusion). Plaintiffs' experts do not use any standard or accepted statistical methodologies, do not identify their data or even data sources, and fail to account for obvious explanatory factors.

Exhibit 4 is an anonymous statistical analysis purporting to show that counties using Dominion machines favored Biden, but there is no meaningful description of what data was used, when it was compiled, or where much of it was sourced from; no analysis or methodology described or identified beyond the assertion that the author used "Chi-Squared Automatic Interaction Detection," which the author fails to even try to explain; and no results from any efforts to control for confounding factors. The study also evidently ignores key confounding factors—for instance, the graph on which the report relies appears to demonstrate that *every* voting system used in Wisconsin yielded results favorable to Biden, and that a greater percentage of non-Dominion machines in Wisconsin are above the prediction line—in other words, it is Wisconsin, and not Dominion, that is more Biden-friendly than the overall sample.

The Keshel affidavit, Exhibit 9, is a statistical analysis of political trends that contains no methodology whatsoever—there is no testing, no controls, just stray observations that certain electoral outcomes seem odd to the author. The Ramsland affidavit, Exhibit 17, claims that it is statistically improbable that a large number of ballots favoring Biden would be reported at one time, but contains virtually every flaw a statistical analysis can have: it does not contain any controls; it ignores obvious explanations for the identified phenomenon (*i.e.*, it simply reflects the timing of Milwaukee County's reporting of absentee ballot results); uses a "random population of Wisconsin votes" as its comparison group notwithstanding significant and meaningful differences between different areas of the state; and fails to identify the sources of any of its data or

assumptions concerning expected voter turnout. Exhibit 19, an anonymous statistical analysis of vote reporting patterns, likewise contains virtually every error one can make: it does not identify the source of the overwhelming majority of the data used; there are no meaningful controls used, and no controls whatsoever used in the analysis related to Wisconsin; and it ignores obvious confounding factors, including that Wisconsin counted in-person ballots before absentee ballots, and that different parts of various states with substantial political differences reported results at different times. In short, Plaintiffs' statistical analyses are not analyses at all, and are instead just a series of observations not grounded in any identifiable data set or reliable statistical testing. They should be ignored.

So, too, with respect to the affidavits concerning the security of electronic voting systems and supposed connections between Dominion and a variety of foreign countries. Exhibit 12, which purports to be a forensic analysis of various websites and computer systems, employs no meaningful methodology and appears to just be a series of screenshots that the author, without any coherent explanation, maintains represents connections between various companies and certain foreign countries and/or unlawful activity. For instance, the author insists that the existence of the domain name "scorecard.indivisible.org" means that the organization Indivisible employed scorecard software to manipulate the results of the election. (Exh. 12 at 8) Like Exhibit 12, the anonymous analysis in Exhibit 13, which purportedly assesses the security of various electronic voting systems, contains a dizzying array of pseudo-technical representations that lack any coherent explanation or accepted methodology. These analyses too do not warrant the Court's consideration. *See Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 460 (7th Cir. 2019) (expert properly excluded where he "offered no methodology to explain how he drew conclusions");

*Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 895 (7th Cir. 2011) (expert testimony properly excluded where expert "used no particular methodology to reach his conclusions").

### 3.  Plaintiff's affidavits are unsupported, speculative, and unhelpful.

In addition to Plaintiff's woefully insufficient expert affidavits, Plaintiff also offers fact affidavits unsupported by the affiants' personal knowledge and irrelevant to Wisconsin's election. The anonymous Exhibit 1 and the Cardozo affidavit, Exhibit 8, offer numerous observations about the years-old elections in Venezuela, but make no coherent connection between activity in Venezuela and the 2020 election in Wisconsin. The affidavit of Harri Hursti (Exh. 7) is a lengthy discussion of issues arising out of a primary election in Georgia—again with no connection to any Wisconsin election. This testimony should be disregarded as irrelevant.

Likewise, numerous affiants make factual representations for which they have no apparent firsthand knowledge. The anonymous author of Exhibit 1 makes observations about the timing of vote reporting in the 2020 election, but identifies no reason to believe she has firsthand knowledge of when votes were counted or reported in any jurisdiction, nor does she identify any sources on which she relied. (*See* Exh. 1 ¶26) The Cardozo affidavit contains numerous observations about Venezuela's purported contract with Smartmatic, but none of it is based on her personal experience with the contract; she is simply stating the contents of a document she saw years after the fact. The document was not included in Plaintiff's filing. Exhibit 13 contains a variety of outlandish representations with no reason to believe the author has firsthand knowledge of any of them—for instance, the affiant makes extensive representations that Joe Biden and Barack Obama in 2013 and 2014 conspired to manipulate an election in an unidentified foreign country. The testimony of these witnesses should be ignored. *See Zilisch v. R.J. Reynolds Tobacco Co.*, No. 10-cv-474-bbc, 2011 WL 7630628, at *1 (W.D. Wis. June 21, 2011) (statements in affidavit were "inadmissible because they are conclusory and not made on the basis of [affiant's] personal knowledge"); *Ross*

*v. Bd. of Regents of Univ. of Wis. Sys.*, 655 F. Supp. 2d 895, 923 (E.D. Wis. 2009) (declining to consider portions of affidavit "not based upon the affiant's personal knowledge").

Finally, the affidavit of Eric Oltmann, Exhibit 6, purports to recreate a conversation the affiant purportedly overheard several months ago, in which someone Oltmann speculates was a Dominion employee makes representations about the 2020 election. Oltmann then proceeds to describe social media posts from a profile that he says belongs to the Dominion employee. Oltmann's affidavit layers speculation on top of hearsay to propagate a conspiracy theory about election manipulation. Like every other affidavit offered by Plaintiff, it is unreliable and unworthy of the Court's consideration.

### 4. Several affidavits are anonymous and therefore inadmissible.

Plaintiff offers five anonymous affidavits on a variety of topics, including elections in Venezuela (Exh. 1), statistical analysis of the 2020 election (Exhs. 4, 19), and analysis of electronic voting systems (Exhs. 12, 13). Because the affiants are anonymous, it is impossible to assess their credibility or qualifications; indeed, it is impossible to know whether their affidavits are even verified by the affiant as required by 28 U.S.C § 1746. *See also* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Consol. Water Power Co. v. 0.40 Acres of Land*, No. 10-CV-397-bbc, 2011 WL 1831608, at *5 (W.D. Wis. May 12, 2011) (affidavits should identify "the name of the affiant"). Anonymous affidavits should be excluded or ignored.

### C. Plaintiff provides no evidence to support his preposterous claims.

Plaintiff alleges that Dominion voting machines *could be* compromised, but provides no evidence that proves, or even suggests, that Wisconsin machines actually *were* tampered with. Consider Exhibit 6: It begins by recreating a conversation the declarant allegedly overhead several months

ago, and then proceeds to weave an elaborate conspiracy theory based on who one of the participants might have been; this hodgepodge of rank speculation on top of hearsay is not evidence. Exhibit 12 is no more compelling in presenting an anonymous declarant's claims ("supported" by an impenetrable sequence of random screenshots) that Dominion is affiliated with China and Iran. Nor is Exhibit 1, which contains an unnamed declarant's opinions about elections in Venezuela. Exhibit 14's author's only conclusion is that voting machines could possibly be tampered with. None of this is relevant, probative, or compelling. Indeed, taken together, Plaintiff's proffered evidence fails to even connect his wild theories to Wisconsin. This is why the court in *King v. Whitmer*, found that all that Plaintiff's attorney alleged were "an amalgamation of theories, conjecture, and speculation that such alterations were *possible*." Op. & Order, at *34.

Paragraph 3 of the Amended Complaint promises an "egregious range of conduct" involving Dominion voting machines in Milwaukee, Dane, La Crosse, Waukesha, St. Croix, Washington, Bayfield, and Ozaukee Counties. Plaintiff's evidence shows that of those counties, only two—Ozaukee and Washington—use Dominion machines (Amend. Cmplt. Exh. 5); Trump won those counties with 55%[34] and 68%[35] of the vote. Despite pages of allegations and declarations relating to Dominion and its potential susceptibility to hacking, Plaintiff offers no actual facts.

Plaintiff's claim that approximately 7,000 voters moved from Wisconsin and voted illegally is also unavailing. Amend. Cmplt. ¶51. This analysis does not account for voters changing their addresses for reasons that still allow for voting in Wisconsin. For example, college students attending school out of state, or retirees temporarily travelling south prior to winter are common. Such voters retain the right to vote in Wisconsin. *See* Wis. Stat. § 6.10(1) ("The residence of a

---

[34] https://www.co.ozaukee.wi.us/DocumentCenter/View/14392/ElectionSummaryReport-11-3-20 (last visited Dec. 5, 2020).
[35] https://www.co.washington.wi.us/uploads/docs/electionsummaryreport1132020-Final.pdf (last visited Dec. 5, 2020).

person is the place where the person's habitation is fixed, without any present intent to move, and to which, when absent, the person intends to return."). Plaintiff provides no evidence that even one of these out of state voters should be disenfranchised. And Wisconsin law requires that a challenge to a ballot on the basis of the voter's eligibility must be raised on a ballot-by-ballot basis, at the time of voting or counting, and the challenge to any individual ballot must be for cause. *See* Wis. Stat. §§ 6.925-.93, 7.52(5); Wis. Admin. Code. § EL 9.02. Wisconsin law does not countenance Plaintiff's belated, *en masse* challenge to thousands of ballots based on (totally unreliable) statistical analysis.

> **D.    Plaintiff has no valid claim under the Electors and Election Clauses because WEC's guidance is consistent with Wisconsin law.**

Plaintiff has not asserted a valid claim for a violation of either the Electors Clause or the Election Clause of the U.S. Constitution. Even if such a claim were cognizable, *but see Bognet v. Secretary*, 2020 WL 6686120 (3d Cir. 2020), Plaintiff erroneously argues that WEC failed to follow Wisconsin's election laws by issuing contrary guidance. An actual reading of the statutes shows WEC's guidance comported with Wisconsin's election laws.

Consistent with the Electors and Elections Clauses, state legislatures can delegate authority to administer elections. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,* 576 U.S. 787, 814 (2015). Wisconsin has a detailed statutory framework governing elections, but the Legislature has delegated to the WEC authority to administer elections. *See* Wis. Stat. § 5.05(1) ("General authority. The elections commission shall have the responsibility for the administration of chs. 5 to 10 and 12 and other laws relating to elections and election campaigns…."). Plaintiff challenges guidance reflecting longstanding interpretations of Wisconsin election law. His challenges fail for several reasons.

*First*, Plaintiff, as a Wisconsin voter, is required to bring his challenges through a complaint to the WEC pursuant to Wis. Stat. § 5.06. This provision provides an administrative remedy to electors and allows WEC to investigate the complaint and potentially provide a hearing. Wis. Stat. § 5.06(1), (5). Critically, Wis. Stat. § 5.06(2) prohibits a voter from commencing a court action unless they complied with the administrative procedure. Because Plaintiff has failed to exhaust his administrative remedies, this Court cannot provide the extraordinary relief requested. *See Glisson v. U.S. Forest Serv.*, 55 F.3d 1325, 1326 (7th Cir. 1995).

*Second*, Plaintiff's claims are barred by the doctrine of laches and the Eleventh Amendment. (*See* Evers Br. in Supp. of Mot. to Dismiss at 12-16, 24-26)

*Third*, Plaintiff's claims are baseless and fail on the merits. Plaintiff raises two primary arguments under Wisconsin law—that election officials must discard any absentee ballot for which the witness provided incomplete address information and that ballots submitted by voters who designated themselves indefinitely confined should be discounted. Neither argument is correct.

### 1. Longstanding WEC guidance on witness address information is consistent with Wisconsin law.

Despite the WEC having longstanding guidance concerning election officials assisting with deficient witness addresses, Plaintiff now claims that guidance contravenes Wisconsin law. On October 18, 2016, the WEC advised all municipal clerks that, if an absentee-ballot envelope had a missing or incomplete witness address, clerks could make reasonable attempts to obtain the missing information.[36] Notably, the proposal to adopt this guidance was made by a Republican appointee to the WEC, was supported by the Wisconsin Department of Justice (under the leadership of a Republican Attorney General), and was unanimously adopted by the WEC. The

---

[36] https://elections.wi.gov/sites/elections.wi.gov/files/memo/20/guidance_insufficient_witness_address_amended_10_1_38089.pdf (last visited Dec. 5, 2020).

WEC has not changed its guidance since 2016, and it incorporated this recommendation into its Election Administration Manual.[37] The November 2020 election was the twelfth consecutive election for which this guidance has been in place.

The guidance on witness addresses is consistent with Wisconsin law, which encourages clerks to correct errors with witness addresses: clerks may "return the ballot to the elector, inside the sealed envelope when an envelope is received, together with a new envelope if necessary, whenever time permits the elector to correct the defect and return the ballot." Wis. Stat. § 6.87(9). This is not an exclusive remedy. Although a ballot without a witness address cannot be counted, nothing in the statute prohibits the clerk from taking steps to cure a missing address. Doing so is consistent with the statutory instruction that provisions of the elections code "shall be construed to give effect to the will of the electors, if that can be ascertained." Wis. Stat. § 5.01(1).[38] No statute commands that the witness is the only person who can fill in the address information. Thus, the WEC's longstanding guidance is entirely consistent with Wisconsin law. If the Legislature disagreed with that interpretation, it could have changed the statute any time within the last four years, but it did not.

### 2. The provision on "indefinitely confined" voters has been longstanding.

Plaintiff misconstrues Wisconsin law to argue that the WEC's guidance on indefinitely confined voters is unlawful. The text of the provision now numbered as Wis. Stat. § 6.86(2)(a) has existed in the Wisconsin Statutes for more than 40 years and has been unchanged since 1985. For three-and-a-half decades, that provision has provided an alternate method for voters to obtain a

---

[37] https://elections.wi.gov/sites/elections.wi.gov/files/202010/Election%20Administration%20Manual%20%282020-09%29.pdf at 99-100 (last visited Dec. 6, 2020).

[38] Arguably, Wis. Stat. § 6.84 overrides this legislative command by requiring that several provisions related to absentee voting be strictly applied. Assuming without conceding that section 6.84 is constitutional, by its own terms it does not apply to Wis. Stat. § 6.87(9).

mail-in absentee ballot if they are "indefinitely confined." Section 6.86(2)(a) recognizes that some electors are indefinitely confined in ways that preclude voting in person, and may complicate the typical process of obtaining an absentee ballot. The provision offers an alternative, based on an elector's statement that they are indefinitely confined.

Section 6.86(2)(a) does not excuse indefinitely confined voters from additional safeguards that apply to mail-in absentee ballots, including the requirement that each ballot be signed by the voter, witnessed by an adult U.S. citizen, and carefully opened, reviewed, and tabulated during a public canvas. Wis. Stat. §§ 6.87, 6.88. On March 29, 2020, the WEC issued guidance specifically addressing "Indefinitely Confined Absentee Applications."[39] In that guidance, the WEC stated that the statutory definition of "age, illness, infirmity or disability" does not require a voter to meet a particular qualification and "indefinitely confined status need not be permanent."[40] The guidance expressly notes that voters "self-certify" whether they are indefinitely confined.[41] The WEC also instructed municipal clerks to "remove the name of any elector from the list of indefinitely confined electors upon receipt of reliable information that an elector no longer qualifies for that designation and service."[42] The Wisconsin Supreme Court has reviewed the March 29 guidance and deemed it accurate. *See Jefferson v. Dane Cty.*, No. 2020AP557-OA, Order, at *2 (Wis. Mar. 31, 2020) (noting in context of order in response to temporary injunction motion that the WEC guidance "provides the clarification on the purpose and proper use of the indefinitely confined status that is required at this time").

---

[39] https://elections.wi.gov/sites/elections.wi.gov/files/202003/Clerk%20comm%20re.%20Indefinitely%20Confined%203.29.20.pdf (last visited Dec. 6, 2020).
[40] *Id.*
[41] *Id.*
[42] *Id.* at 3.

Plaintiff complains about additional WEC guidance, issued on May 13, 2020, that a clerk cannot remove a voter from the indefinitely confined list based on the clerk's unsupported *belief* that the elector is not indefinitely confined. This does not contradict the statute. The portion cited by Plaintiff was an instruction consistent with decades of interpretation and guidance that voters self-certify whether they are indefinitely confined; and it left in place the clear instruction that clerks should remove a voter from the indefinitely confined list upon receiving reliable information that the voter was no longer indefinitely confined. The WEC's March guidance, with the Wisconsin Supreme Court's imprimatur, still applies. There is no statutory basis for Plaintiff's belief that municipal clerks are obliged to investigate voters claiming to be indefinitely confined.

Notably, Plaintiff has not claimed or provided any evidence that a single voter who claimed indefinitely confined status did so improperly. Plaintiff asserts only his belief that it was odd so many people claimed this status during the COVID-19 pandemic. But it is imminently logical that the pandemic would increase the number of people who considered themselves indefinitely confined. And, because the *Jefferson* lawsuit brought increased attention to the indefinitely confined provision, more people may have known about and chosen to avail themselves of the law. The Jefferson case remains pending before the Wisconsin Supreme Court, where the merits were argued at the end of September. If that court had concerns about voters using (or misusing) the statute for the November election, it could and would have granted additional preliminary relief. It did not do so, and Plaintiff provides no basis for this Court to second-guess that decision.

### E.   Plaintiff makes no valid claim under the Fourteenth Amendment.

Plaintiff's Equal Protection and Due Process[43] claims, like the Elections and Electors claim, fails because WEC's guidance is entirely consistent with Wisconsin law. To the extent

---

[43] It is unclear whether Plaintiff is suing as a class of one or is arguing that he represents all Wisconsin voters. If his claim is based on "disparate treatment of Wisconsin voters" (Amend. Cmplt. ¶114) or "all

Plaintiff makes a claim for unequal treatment under Wisconsin's election laws, that also fails because there is no unequal treatment, or a rational basis exists for the laws.

The "rational-basis variant of substantive due process differs little, if at all, from the most deferential form of equal protection review." *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 576 (7th Cir. 2014). "Unless a governmental practice encroaches on a fundamental right," substantive due process and equal protection "requires only that the practice be rationally related to a legitimate government interest, or alternatively phrased, that the practice be neither arbitrary nor irrational." *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003). Substantive due process is "not a blanket protection against unjustifiable interferences with property." *Id.* at 467. "The rational-basis requirement sets the legal bar low and simply requires a rational relationship between the disparity of treatment and some legitimate governmental purpose." *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) (internal quotation marks omitted).

From the outset, it is important to note that the WEC's guidance treated all voters equally. Any voter had the opportunity to obtain an absentee ballot. Any voter believing themselves indefinitely confined could notify their municipal clerk.

Speculation and conjecture regarding switched votes cannot establish an equal protection or due process claim. *See King*, Op. & Order, at *34 ("with nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails"); *Wood*, 2020 WL 6817513, at *9 ("Wood cannot transmute allegations that state officials violated state law into a claim that his vote was somehow weighted differently than others."); *Bognet*, 2020 WL 6686120, at *12 ("Put another way, a vote

---

candidates, political parties, and voters" (*id.* ¶115), then there is no standing because that would be a general grievance as opposed to a concrete injury to Plaintiff. If his claim is individual, he has no injury.

Plaintiff does not specify whether he is making a procedural or substantive due process claim. However, it appears to be a substantive due process claim.

cast by fraud or mailed in by the wrong person through mistake, or otherwise counted illegally, has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged." (internal quotation marks omitted)). Plaintiff has not established that any votes were changed or provided any theory as to how votes were diluted.

Even if the Plaintiff had evidence to support his claims, this case would strongly resemble *Hennings v. Grafton*, where six electors requested a new election for several county officers because of "inaccurate tabulation of votes in fifty precincts and 'arbitrary' action by the defendant county clerk as chief election official, all stemming directly or indirectly from the malfunctioning of electronic voting devices." 523 F.2d 861, 862-63 (7th Cir. 1975). Despite the clear evidence of inaccurate vote counts, the court held that "not every election irregularity … will give rise to a constitutional claim and an action under § 1983. Mere violation of a state statute by an election official, for example, will not." *Id.* at 864. The Seventh Circuit continued:

> Voting device malfunction, the failure of election officials to take statutorily prescribed steps to diminish what was at most a theoretical possibility that the devices might be tampered with, and the refusal of those officials after the election to conduct a retabulation, assuming these events to have occurred, fall far short of constitutional infractions, absent aggravating circumstances of fraud or other wilful conduct….

*Id*. The Seventh Circuit further asserted that "errors and irregularities … are inevitable, and no constitutional guarantee exists to remedy them." *Id.* at 865. This controlling case alone would foreclose any of the claims brought by Plaintiff.

Nonetheless, even the merits show there are no constitutional claims. The Equal Protection Clause does not require uniform treatment, but only that any differences be rationally based on a legitimate government interest. Indefinitely confined voter laws ensure that vulnerable voters— any voter who is indefinitely confined due to "age, physical illness or infirmity or is disabled," Wis. Stat. § 6.86(2)(a)—can safely cast their ballots. Protecting such voters' safety while ensuring they can vote is a legitimate governmental interest.

Other guidance issued by the WEC serves the purpose of ensuring that elections account for the preferences of all eligible voters who choose to participate. Wis. Stat. § 5.01(1) provides that Wisconsin's election laws "shall be construed to give effect to the will of the electors, if that can be ascertained from the proceedings, notwithstanding informality or failure to fully comply with some of their provisions." Wis. Stat. § 7.50(2) reiterates that point, stating that ballots "shall be counted for the person or referendum question for whom or for which they were intended, so far as the electors' intent can be ascertained from the ballots notwithstanding informality or failure to fully comply with other provisions of chs. 5 to 12." As Chief Justice Roggensack of the Wisconsin Supreme Court recently noted, "The right to vote is protected by Wis. Const. art. III, § 1. Therefore, a vote legally cast and received by the time the polls close on Election Day must be counted if the ballot expresses the will of the voter." *O'Bright v. Lynch*, No. 2020AP1761-OA, Order, at *3, ¶7 (Wis. Oct. 29, 2020) (Roggensack, C.J. concurring).

WEC guidance furthers that purpose while still remaining entirely consistent with absentee voting requirements. For example, the witness address guidance does not remove the requirement for an address, but allows clerks the discretion to help correct that error so a ballot is not discounted because of a technicality. There is nothing nefarious nor illegal with doing so. The WEC's guidance is rationally related to ensuring everyone who wants to safely vote, can.

## II. An Adequate Remedy at Law Exists.

The recount procedures under Wis. Stat. § 9.01 unambiguously constitute the "exclusive remedy" for challenging any election results: "EXCLUSIVE REMEDY. This section constitutes the exclusive judicial remedy for testing the right to hold an elective office as the result of an alleged irregularity, defect or mistake committed during the voting or canvassing process." Wis. Stat. § 9.01(11). Section 9.01 generally provides for a recount process for an aggrieved party following an election. Judicial review cannot occur until after a recount, and that appeal must go to state

28

circuit court. *See* Wis. Stat. § 9.01(6)(a); *Trump v. Wis. Elections Comm'n*, No. 2020AP1971-OA, Order at *2 (Wis. Dec. 3, 2020); *see also id.* (Hagedorn, J. concurring) ("[C]hallenges to election results are also governed by law. … [Section 9.01] provides that these actions should be filed in the circuit court, and spells out detailed procedures for ensuring their orderly and swift disposition. See § 9.01(6)-(8). Consequently, an adequate, and exclusive, state law remedy exists to challenge results of an election."). Given that President Trump is prosecuting an appeal in state court under this exclusive process, and given that Plaintiff has no cognizable interest here distinct from the President's, Plaintiff's motion necessarily fails to meet this prerequisite for a TRO.

## III.    Plaintiff Will Not Suffer Any Harm from Denial of Injunctive Relief.

Plaintiff must establish "that he will suffer irreparable harm absent preliminary injunctive relief during the pendency of his action." *Whitaker*, 858 F.3d at 1044. Plaintiff has not alleged any harm. Plaintiff asserts his vote has been diluted. However, a "vote dilution claim alleges that the State has enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential" groups, often racial or ethnic minorities in the context of redistricting. *Miller v. Johnson*, 515 U.S. 900, 911 (1995). The WEC's guidance does not disenfranchise a single voter, nor has it minimized the influence of any groups, protected or otherwise. Plaintiff has not been disenfranchised, nor has he pleaded any specific harm except that his preferred candidate lost the election. This is a generalized grievance, not an actual harm. *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam). Allowing the status quo to continue does not harm Plaintiff.

## IV.    By Contrast, the Requested Relief would Cause Enormous Prejudice to Defendants and Wisconsin Voters.

The relief requested by the Plaintiff would retroactively deprive millions of Wisconsin voters of their constitutional right to vote in the 2020 presidential election. Plaintiff's

unprecedented request would nullify the outcome of an entire election. That harm is unprecedented, and would crack the bedrock of representative democracy.

The U.S. Supreme Court has repeatedly emphasized the fundamental importance of the right to vote. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Voting is "one of the most fundamental rights of our citizens." *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009). Plaintiff's request undermines a belief this country was founded upon. A greater public harm can hardly be conceived.

Besides the obvious harm to the millions of Wisconsin voters, granting the Plaintiff's order would have other irreparable consequences. The State of Wisconsin and its 1,850 municipalities spent millions of dollars preparing for and conducting the November election. Governor Evers enlisted 400 members of the National Guard to ensure the election was properly staffed. All of the resources that went into protecting voters and election officials would be for naught if the Plaintiff obtains his requested relief. The relief, if granted, would also undermine the State's ability to conduct its own elections, and open the door to additional frivolous challenges in the future. Not only that, but the requested relief would raise serious federalism and separation of powers questions. Those harms heavily weigh against Plaintiff. Accordingly, the motion should be denied.

## CONCLUSION

For the reasons above, Plaintiff's Amended Motion for Temporary Restraining Order and Preliminary Injunction to Be Considered in an Expedited Manner (Dkt. 10) should be denied.

Dated: December 7, 2020

Respectfully submitted,

/s/ Jeffrey A. Mandell
Jeffrey A. Mandell
Rachel E. Snyder
Richard A. Manthe
STAFFORD ROSENBAUM LLP
222 W. Washington Ave., Suite 900
Post Office Box 1784
Madison, WI 53701-1784
Telephone: 608-256-0226
jmandell@staffordlaw.com
rsnyder@staffordlaw.com
rmanthe@staffordlaw.com

Paul Smith
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
Telephone: (202) 736-2200
psmith@campaignlegalcenter.org

Justin A. Nelson
Stephen E. Morrissey
Stephen Shackelford Jr.
Davida Brook
SUSMAN GODFREY L.L.P.
1000 Louisiana St., Suite 5100
Houston, TX 77002
Telephone: 713-651-9366
jnelson@susmangodfrey.com
smorrissey@susmangodfrey.com
sshackelford@susmangodfrey.com
dbrook@susmangodfrey.com

*Attorneys for Defendant,*
*Governor Tony Evers*

# EXHIBIT 1



# Supreme Court of Wisconsin

**110 EAST MAIN STREET, SUITE 215**
**P.O. BOX 1688**
**MADISON, WI 53701-1688**

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

December 4, 2020

To:

Gregory M. Erickson
Erick G. Kaardal
Mohrmann, Kaardal and Erickson
150 S. 5th Street, Suite 3100
Minneapolis, MN 55414

Colin T. Roth
Thomas C. Bellavia
Colin R. Stroud
Brian P. Keenan
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857

Brian S. Levy
Katten & Temple
11512 N. Port Washington Road, Suite 101J
Mequon, WI 53092

Joseph S. Goode
Mark M. Leitner
John W. Halpin
Allison E. Laffey
Laffey, Leitner & Goode LLC
325 E. Chicago Street, Suite 200
Milwaukee, WI 53202

*Address list continued on page 5.

You are hereby notified that the Court has entered the following order:

---

No. 2020AP1930-OA      Wisconsin Voters Alliance v. Wisconsin Elections Commission

A petition for leave to commence an original action under Wis. Stat. § (Rule) 809.70 and a supplement thereto, a supporting legal memorandum, and supporting expert reports have been filed on behalf of petitioners, Wisconsin Voters Alliance, et al. A response to the petition has been filed by respondents, Wisconsin Elections Commission, Ann S. Jacobs, Mark L. Thomsen, Marge Bostelman, Julie M. Glancey, Dean Knudsen, and Robert F. Spindell, and a separate response has been filed by respondent Governor Tony Evers. Amicus briefs regarding the issue of whether to grant leave to commence an original action have been filed by (1) Christine Todd Whitman, et al; (2) the City of Milwaukee; (3) Wisconsin State Conference NAACP, et al.; and (4) the Center for Tech and Civic Life. In addition, a motion to intervene has been filed by proposed intervenor-respondent, Democratic National Committee.

After considering all of the filings, we conclude that this petition does not satisfy our standards for granting leave to commence an original action. Although the petition raises time-

sensitive questions of statewide significance, "issues of material fact [would] prevent the court from addressing the legal issues presented." State ex rel. Ozanne v. Fitzgerald, 2011 WI 43, ¶19, 334 Wis. 2d 70, 798 N.W.2d 436 (Prosser, J., concurring). It is therefore not an appropriate case in which to exercise our original jurisdiction. Accordingly,

IT IS ORDERED that the petition for leave to commence an original action is denied; and

IT IS FURTHER ORDERED that the motion to intervene is denied as moot.

BRIAN HAGEDORN, J.,  (concurring). The Wisconsin Voters Alliance and a group of Wisconsin voters bring a petition for an original action raising a variety of questions about the operation of the November 3, 2020 presidential election. Some of these legal issues may, under other circumstances, be subject to further judicial consideration. But the real stunner here is the sought-after remedy. We are invited to invalidate the entire presidential election in Wisconsin by declaring it "null"—yes, the whole thing. And there's more. We should, we are told, enjoin the Wisconsin Elections Commission from certifying the election so that Wisconsin's presidential electors can be chosen by the legislature instead, and then compel the Governor to certify those electors. At least no one can accuse the petitioners of timidity.

Such a move would appear to be unprecedented in American history. One might expect that this solemn request would be paired with evidence of serious errors tied to a substantial and demonstrated set of illegal votes. Instead, the evidentiary support rests almost entirely on the unsworn expert report[1] of a former campaign employee that offers statistical estimates based on call center samples and social media research.

This petition falls far short of the kind of compelling evidence and legal support we would undoubtedly need to countenance the court-ordered disenfranchisement of every Wisconsin voter. The petition does not even justify the exercise of our original jurisdiction.

As an initial matter, the Wisconsin Supreme Court is not a fact-finding tribunal. Yet the petition depends upon disputed factual claims. In other words, we couldn't just accept one side's description of the facts or one side's expert report even if we were inclined to believe them.[2] That alone means this case is not well-suited for an original action. The petition's legal support is no less wanting. For example, it does not explain why its challenge to various election processes

---

[1] After filing their petition for original action, the Petitioners submitted a second expert report. But the second report only provides additional computations based on the assumptions and calculations in the initial expert report.

[2] The Attorney General and Governor offer legitimate arguments that this report would not even be admissible evidence under Wis. Stat. § 907.02 (2017-18).

All subsequent references to the Wisconsin Statutes are to the 2017-18 version.

comes after the election, and not before. Nor does it grapple with how voiding the presidential election results would impact every other race on the ballot, or consider the import of election statutes that may provide the "exclusive remedy."[3] These are just a few of the glaring flaws that render the petition woefully deficient. I therefore join the court's order denying the original action.

Nonetheless, I feel compelled to share a further observation. Something far more fundamental than the winner of Wisconsin's electoral votes is implicated in this case. At stake, in some measure, is faith in our system of free and fair elections, a feature central to the enduring strength of our constitutional republic. It can be easy to blithely move on to the next case with a petition so obviously lacking, but this is sobering. The relief being sought by the petitioners is the most dramatic invocation of judicial power I have ever seen. Judicial acquiescence to such entreaties built on so flimsy a foundation would do indelible damage to every future election. Once the door is opened to judicial invalidation of presidential election results, it will be awfully hard to close that door again. This is a dangerous path we are being asked to tread. The loss of public trust in our constitutional order resulting from the exercise of this kind of judicial power would be incalculable.

I do not mean to suggest this court should look the other way no matter what. But if there is a sufficient basis to invalidate an election, it must be established with evidence and arguments commensurate with the scale of the claims and the relief sought. These petitioners have come nowhere close. While the rough and tumble world of electoral politics may be the prism through which many view this litigation, it cannot be so for us. In these hallowed halls, the law must rule.

Our disposal of this case should not be understood as a determination or comment on the merits of the underlying legal issues; judicial review of certain Wisconsin election practices may be appropriate. But this petition does not merit further consideration by this court, much less grant us a license to invalidate every single vote cast in Wisconsin's 2020 presidential election.

I am authorized to state that Justices ANN WALSH BRADLEY, REBECCA FRANK DALLET, and JILL J. KAROFSKY join this concurrence.

ROGGENSACK, C.J.   (*dissenting*).   It is critical that voting in Wisconsin elections not only be fair, but that the public also perceives voting as having been fairly conducted.

This is the third time that a case filed in this court raised allegations about purely legal questions that concern Wisconsin Elections Commission (WEC) conduct during the November 3,

---

[3] See Wis. Stat. § 9.01(11) (providing that § 9.01 "constitutes the exclusive judicial remedy for testing the right to hold an elective office as the result of an alleged irregularity, defect or mistake committed during the voting or canvassing process"); Wis. Stat. § 5.05(2m)(k) (describing "[t]he commission's power to initiate civil actions" under § 5.05(2m) as the "exclusive remedy for alleged civil violations of chs. 5 to 10 or 12").

2020, presidential election.[4]  This is the third time that a majority of this court has turned its back on pleas from the public to address a matter of statewide concern that requires a declaration of what the statutes require for absentee voting.  I dissent and write separately because I have concluded that the court has not meet its institutional responsibilities by repeatedly refusing to address legal issues presented in all three cases.

I agree with Justice Hagedorn that we are not a circuit court, and therefore, generally, we do not take cases for which fact-finding is required.  Green for Wisconsin v. State Elections Bd., 2006 WI 120, 297 Wis. 2d 300, 301, 723 N.W.2d 418.  However, when the legal issue that we wish to address requires it, we have taken cases that do require factual development, referring any necessary factual determinations to a referee or to a circuit court.  State ex rel. LeFebre v. Israel, 109 Wis. 2d 337, 339, 325 N.W.2d 899 (1982); State ex rel White v. Gray, 58 Wis. 2d 285, 286, 206 N.W.163 (1973).

We also have taken cases where the issues we wish to address are purely legal questions for which no factual development is required in order to state what the law requires.  Wisconsin Legislature v. Palm, 2020 WI 42, 391 Wis. 2d 497, 942 N.W.2d 900.  The statutory authority of WEC is a purely legal question. There is no factual development required for us to declare what the law requires in absentee voting.

Justice Hagedorn is concerned about some of the relief that Petitioners request.  He begins his concurrence saying, "the real stunner here is the sought after remedy."  He next relates, "The relief being sought by the petitioners is the most dramatic invocation of judicial power I have ever seen."  Then, he concludes with, "this petition does not merit further consideration by this court, much less grant us a license to invalidate every single vote cast in Wisconsin's 2020 presidential election."[5]

Those are scary thoughts, but Justice Hagedorn has the cart before the horse in regard to our consideration of this petition for an original action.  We grant petitions to exercise our jurisdiction based on whether the legal issues presented are of state wide concern, not based on the remedies requested.  Petition of Heil, 230 Wis. 428, 284 N.W.42 (1938).

Granting a petition does not carry with it the court's view that the remedy sought is appropriate for the legal issues raised.  Historically, we often do not provide all the relief requested.  Bartlett v. Evers, 2020 WI 68, ¶9, 393 Wis. 2d 172, 945 N.W.2d 685 (upholding some but not all partial vetoes).  There have been occasions when we have provided none of the relief requested by the petitioner, but nevertheless declared the law.  See Sands v. Menard, Inc., 2010 WI 96, ¶46, 328 Wis. 2d 647, 787 N.W.2d 384 (concluding that while reinstatement is the preferred remedy under

---

[4] Trump v. Evers, No. 2020AP1971-OA, unpublished order (Wis. S. Ct. Dec. 3, 2020); Mueller v. WEC, No. 2020AP1958-OA, unpublished order (Wis. S. Ct. Dec. 3, 2020) and Wisconsin Voters Alliance v. WEC, No. 2020AP193-OA.

[5] Justice Hagedorn forgets to mention that one form of relief sought by Petitioners is, "Any other relief the Court deems appropriate."

Title VII, it is an equitable remedy that may or may not be appropriate); Coleman v. Percy, 96 Wis. 2d 578, 588-89, 292 N.W.2d 615 (1980) (concluding that the remedy Coleman sought was precluded).

We have broad subject matter jurisdiction that enables us to grant the petition for original action pending before us. Our jurisdiction is grounded in the Wisconsin Constitution. Wis. Const., art. VII, Section 3(2); City of Eau Claire v. Booth, 2016 WI 65, ¶7, 370 Wis. 2d 595, 882 N.W.2d 738.

I dissent because I would grant the petition and address the people of Wisconsin's concerns about whether WEC's conduct during the 2020 presidential election violated Wisconsin statutes. As I said as I began, it is critical that voting in Wisconsin elections not only be fair, but that the public also perceives voting as having been fairly conducted. The Wisconsin Supreme Court should not walk away from its constitutional obligation to the people of Wisconsin for a third time.

I am authorized to state that Justices ANNETTE KINGSLAND ZIEGLER and REBECCA GRASSL BRADLEY join this dissent.

Sheila T. Reiff
Clerk of Supreme Court

Address list continued:

| | |
|---|---|
| Tearman Spencer | Jeffrey A. Mandell |
| Mary L. Schanning | Rachel E. Snyder |
| Scott F. Brown | Stafford Rosenbaum LLP |
| Kathryn Z. Block | 222 W. Washington Avenue |
| Patrick J. McClain | Post Office Box 1784 |
| Tyrone M. St. Junior | Madison, WI 53701 |
| James M. Carroll | |
| Milwaukee City Attorney's Office | Charles G. Curtis, Jr. |
| 200 East Wells Street | Sopen B. Shah |
| 800 City Hall | Will M. Conley |
| Milwaukee, WI 53202 | Perkins Coie LLP |
| | One East Main St., Ste. 201 |
| Kendall W. Harrison | Madison, WI 53703 |
| Mike B. Wittenwyler | |
| Godfrey & Kahn | Matthew W. O'Neill |
| 1 E. Main St., Ste 500 | Fox, O'Neill & Shannon, S.C. |
| P.O. Box 2719 | 622 North Water Street Suite 500 |
| Madison, WI 53701-2719 | Milwaukee, WI 53202 |

Joshua Matz
Harmann Singh
350 Fifth Avenue, Suite 7110
New York, NY 10118

Justin A. Nelson
Stephen Shackelford Jr.
Davida Brook
Susman Godfrey LLP
1000 Louisiana Street
Suite 5100
Houston, TX 77002

Paul Smith
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005

David S. Lesser
Jamie Dycus
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Marc E. Elias
John Devaney
Zachary J. Newkirk
Perkins Coie LLP
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005

Seth P. Waxman
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006

# EXHIBIT 2

2020 WL 6821992
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

DONALD J. TRUMP FOR
PRESIDENT, INC., et al., Plaintiffs,

v.

Kathy BOOCKVAR, et al., Defendants.

No. 4:20-CV-02078
|
Filed November 21, 2020

**Synopsis**
**Background:** Voters and President's reelection campaign
brought action against Secretary of the Commonwealth
of Pennsylvania and county boards of elections, seeking
to invalidate millions of votes cast by Pennsylvanians in
presidential election during COVID-19 pandemic based on
allegations that Secretary's authorization of notice-and-cure
procedure for procedurally defective mail-in ballots violated
the Equal Protection Clause and that poll watchers were
impermissibly excluded from canvass. Secretary and county
boards of elections moved to dismiss.

**Holdings:** The District Court, Matthew W. Brann, J., held
that:

voters lacked standing to pursue action;

campaign lacked associational standing to pursue action;

campaign lacked competitive standing to pursue action;

rational basis existed for Secretary's decision to provide
counties with discretion to use notice-and-cure procedure for
procedurally defective mail-in ballots, and thus, Secretary's
decision did not violate voters' rights under the Equal
Protection Clause; and

campaign failed to allege that its poll watchers were treated
differently than opposing party presidential candidate's poll
watchers, as required to state equal protection claim for
allegedly excluding watchers from canvass.

Motion granted.

**Attorneys and Law Firms**

Brian C. Caffrey, Marc A. Scaringi, Rudolph William
Giuliani, Scaringi & Scaringi PC, Rudolph Giuliani, PLLC,
Harrisburg, PA, New York, NY, for Plaintiff.

Thomas W. King, III, Dillon McCandless King Coulter &
Graham LLP, Buter, PA, for Intervenor Plaintiff.

Daniel T. Brier, Donna A. Walsh, John B. Dempsey, Karen
Mascio Romano, Keli M. Neary, Nicole J. Boland, Stephen
Moniak, John Coit, John B. Hill, Andrew F. Szefi, Christina
C. Matthias, Mark A. Aronchick, Michele D. Hangley,
Robert A. Wiygul, Virginia Scott, Elizabeth A. Dupuis,
Molly E. Meacham, Edward D. Rogers, Elizabeth Wingfield,
Terence M. Grugan, Timothy D. Katsiff, Brian J. Taylor,
Timothy P. Brennan, Myers Brier & Kelly, LLP, Pennsylvania
Office of Attorney General, Office of Attorney General,
Office of Attorney General Civil Litigation Section, Hangley
Aronchick Segal Pudlin & Schiller, Scott Law Office, Babst,
Calland, Clements and Zomnir, P.C., Ballard Spahr LLP, King
Spry Herman Freund & Faul LLC, Scranton, PA, Harrisburg,
PA, Philadelphia, PA, Pittsburgh, PA, State College, PA,
Bethlehem, PA, Easton, PA, for Defendant.

Jon Greenbaum, Witold J. Walczak, Adriel I. Cepeda Derieux,
Benjamin D. Geffen, Claudia De Palma, Dale E. Ho,
David Meir Zionts, Ezra D. Rosenberg, Ihaab Syed, Marian
K. Schneider, Mary M. McKenzie, Rani Gupta, Sarah E.
Brannon, Shankar Duraiswamy, Sophia Lin Lakin, Lawyers'
Committee for Civil Rights Under Law District Of Columbia,
American Civil Liberties Union of PA, American Civil
Liberties Union Foundation, Inc., Covington & Burling
LLP, Washington, DC, Pittsburgh, PA, New York, NY,
Philadelphia, PA, Palo Alto, CA, for Intervenor/Interpleader
Defendant.

Remy Green, Jonathan Wallace, Sean M. Shultz, Zachary
Michael Wallen, Nancy A. Temple, Richard Bernstein, James
P. DeAngelo, Joshua John Voss, Shohin Vance, Matthew
H. Haverstick, Cohen & Green P.L.L.C., Hanft & Knight,
P.C., Chalmers & Adams LLC, Katten & Temple LLP,
McNees Wallace & Nurick, Kleinbard LLC, Ridgewood, NY,
Amagansett, NY, Carlisle, PA, Pittsburgh, PA, Chicago, IL,
Harrisburg, PA, Philadelphia, PA, for Amicus.

Alex M. Lacey, Ari Holtzblatt, John Michael Geise, Kyle J.
Semroc, Lalitha D. Madduri, Marc E. Elias, Seth Waxman,

Uzoma Nkwonta, Witold J. Walczak, Clifford B. Levine, Robert M. Linn, Dentons Cohen & Grigsby P.C., Wilmer Cutler Pickering Hale & Dorr LLP, Perkins Coie LLP, American Civil Liberties Union of PA, Cohen & Grigsby, PC, Pittsburgh, PA, Washington, DC, for Intervenor.

Jeffrey Cutler, York, PA, pro se.

## MEMORANDUM OPINION

Matthew W. Brann, United States District Judge

**\*1** Pending before this Court are various motions to dismiss Plaintiffs' First Amended Complaint. Plaintiffs in this matter are Donald J. Trump for President, Inc. (the "Trump Campaign"), and two voters, John Henry and Lawrence Roberts (the "Individual Plaintiffs").[1] Defendants, who filed these motions to dismiss, include seven Pennsylvania counties (the "Defendant Counties"), as well as Secretary of the Commonwealth Kathy Boockvar.[2]

## I. INTRODUCTION

In this action, the Trump Campaign and the Individual Plaintiffs (collectively, the "Plaintiffs") seek to discard millions of votes legally cast by Pennsylvanians from all corners – from Greene County to Pike County, and everywhere in between. In other words, Plaintiffs ask this Court to disenfranchise almost seven million voters. This Court has been unable to find any case in which a plaintiff has sought such a drastic remedy in the contest of an election, in terms of the sheer volume of votes asked to be invalidated. One might expect that when seeking such a startling outcome, a plaintiff would come formidably armed with compelling legal arguments and factual proof of rampant corruption, such that this Court would have no option but to regrettably grant the proposed injunctive relief despite the impact it would have on such a large group of citizens.

That has not happened. Instead, this Court has been presented with strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence. In the United States of America, this cannot justify the disenfranchisement of a single voter, let alone all the voters of its sixth most populated state. Our people, laws, and institutions demand more. At bottom, Plaintiffs have failed to meet their burden to state a claim upon which relief may be granted. Therefore, I

grant Defendants' motions and dismiss Plaintiffs' action with prejudice.

## II. BACKGROUND

### A. Legal and Factual Background

The power to regulate and administer federal elections arises from the Constitution.[3] "Because any state authority to regulate election to those offices could not precede their very creation by the Constitution, such power 'had to be delegated to, rather than reserved to by, the States.' "[4] Consequently, the Elections Clause "delegated to the States the power to regulate the 'Times, Places, and Manner of holding Elections for Senators and Representatives,' subject to a grant of authority to Congress to 'make or alter such Regulations.' "[5] Accordingly, States' power to "regulate the incidents of such elections, including balloting" is limited to "the exclusive delegation of power under the Elections Clause."[6]

Pennsylvania regulates the "times, places, and manner" of its elections through the Pennsylvania Election Code.[7] The Commonwealth's Constitution mandates that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."[8] Recognizing this as a foundational principle, the Pennsylvania Supreme Court has declared that the purpose of the Election Code is to promote "freedom of choice, a fair election and an honest election return."[9]

**\*2** In October 2019, the General Assembly of Pennsylvania enacted Act 77, which, "for the first time in Pennsylvania," extended the opportunity for all registered voters to vote by mail.[10] Following the beginning of the COVID-19 outbreak in March 2020, the General Assembly enacted laws regulating the mail-in voting system.[11] Section 3150.16 of the Election Code sets forth procedural requirements that voters must follow in order for their ballot to be counted.[12] These procedures require, for example, that voters mark their ballots in pen or pencil, place them in secrecy envelopes, and that ballots be received by the county elections board on or before 8:00 P.M. on Election Day.[13]

Nowhere in the Election Code is any reference to "curing" ballots, or the related practice of "notice-and-cure." This practice involves notifying mail-in voters who submitted procedurally defective mail-in ballots of these deficiencies

and allowing those voters to cure their ballots.[14] Notified voters can cure their ballots and have their vote counted by requesting and submitting a provisional ballot.[15]

Recently, the Supreme Court of Pennsylvania in *Democratic Party of Pennsylvania v. Boockvar* addressed whether counties are *required* to adopt a notice-and-cure policy under the Election Code.[16] Holding that they are not, the court declined to explicitly answer whether such a policy is necessarily *forbidden*.[17]

Following this decision, Secretary Boockvar sent an email on November 2, 2020 encouraging counties to "provide information to party and candidate representatives during the pre-canvass that identifies the voters whose ballots have been rejected" so those ballots could be cured.[18] From the face of the complaint, it is unclear which counties were sent this email, which counties received this email, or which counties ultimately followed Secretary Boockvar's guidance.

Some counties chose to implement a notice-and-cure procedure while others did not.[19] Importantly, however, Plaintiffs allege only that Philadelphia County implemented such a policy.[20] In contrast, Plaintiffs also claim that Lancaster and York Counties (as well as others) did not adopt any cure procedures and thus rejected all ballots cast with procedural deficiencies instead of issuing these voters provisional ballots.[21]

Both Individual Plaintiffs had their ballots cancelled in the 2020 Presidential Election.[22] John Henry submitted his mail-in ballot to Lancaster County; however, it was cancelled on November 6, 2020 because he failed to place his ballot in the required secrecy envelope.[23] Similarly, after submitting his ballot to Fayette County, Lawrence Roberts discovered on November 9, 2020 that his ballot had been cancelled for an unknown reason.[24] Neither was given an opportunity to cure his ballot.[25]

### B. The 2020 Election Results

In large part due to the coronavirus pandemic still plaguing our nation, the rate of mail-in voting in 2020 was expected to increase dramatically. As anticipated, millions more voted by mail this year than in past elections. For weeks before Election Day, ballots were cast and collected. Then, on November 3, 2020, millions more across Pennsylvania and the country descended upon their local voting precincts and cast ballots for their preferred candidates. When the votes were counted, the Democratic Party's candidate for President, Joseph R. Biden Jr., and his running-mate, Kamala D. Harris, were determined to have received more votes than the incumbent ticket, President Donald J. Trump and Vice President Michael R. Pence. As of the day of this Memorandum Opinion, the Biden/Harris ticket had received 3,454,444 votes, and the Trump/Pence ticket had received 3,373,488 votes, giving the Biden ticket a lead of more than 80,000 votes, per the Pennsylvania state elections return website.[26] These results will become official when counties certify their results to Secretary Boockvar on November 23, 2020 – the result Plaintiffs seek to enjoin with this lawsuit.

### C. Procedural History

**\*3** Although this case was initiated less than two weeks ago, it has already developed its own tortured procedural history. Plaintiffs have made multiple attempts at amending the pleadings, and have had attorneys both appear and withdraw in a matter of seventy-two hours. There have been at least two perceived discovery disputes, one oral argument, and a rude and ill-conceived voicemail which distracted the Court's attention from the significant issues at hand.[27] The Court finds it helpful to place events in context before proceeding further.

In the evening of November 9, 2020, Plaintiffs filed suit in this Court against Secretary Boockvar, as well as the County Boards of Elections for the following counties: Allegheny, Centre, Chester, Delaware, Montgomery, Northampton, and Philadelphia.[28] The original complaint raised seven counts; two equal-protection claims, two due-process claims, and three claims under the Electors and Elections Clauses.[29]

The following day, I convened a telephonic status conference with the parties to schedule future proceedings. During that conference, I learned that several organizations, including the Democratic National Committee, sought to file intervention motions with the Court. Later that day, I set a briefing schedule.[30] Additionally, November 17, 2020 was set aside for oral argument on any motions to dismiss, and the Court further told the parties to reserve November 19, 2020 in their calendars in the event that the Court determined that an evidentiary hearing was necessary. Subsequent to the Court's scheduling order, the proposed-intervenors filed their motions, and the parties filed their briefings. Plaintiffs then

filed a motion for a preliminary injunction on November 12, 2020.[31]

On November 12, 2020, Plaintiffs also underwent their first change in counsel. Attorneys Ronald L. Hicks, Jr., and Carolyn B. McGee with Porter Wright Morris & Arthur LLP filed a motion seeking to withdraw from the case. The Court granted this motion, and Plaintiffs retained two attorneys from Texas, John Scott and Douglas Brian Hughes, to serve as co-counsel to their original attorney, Linda A. Kerns.

The next day, November 13, 2020, was a relatively quiet day on the docket for this case, but an important one for the parties. That day, the United States Court of Appeals for the Third Circuit issued a decision in *Bognet v. Secretary Commonwealth of Pennsylvania*.[32] This decision, though not factually connected to this matter, addressed issues of standing and equal protection relevant to the Plaintiffs' claims.[33]

Thereafter, on Sunday, November 15, 2020 – the day Plaintiffs' response to Defendants' motions to dismiss was due – Plaintiffs filed a First Amended Complaint (the "FAC") with the Court. This new complaint excised five of the seven counts from the original complaint, leaving just two claims: one equal-protection claim, and one Electors and Elections Clauses claim.[34] In addition, a review of the redline attached to the FAC shows that Plaintiffs deleted numerous allegations that were pled in the original complaint.

Plaintiffs acknowledge that under the Third Circuit's decision in *Bognet*, this Court cannot find that Plaintiffs have standing for their Elections and Electors Clauses claim in the FAC. Plaintiffs represent that they have included this claim in the FAC to preserve the argument for appellate review. Because Plaintiffs have made this concession, and because the Third Circuit's decision in *Bognet* is clear, this Court dismisses Count II for lack of standing without further discussion.

**\*4**  Defendants filed new motions to dismiss and briefs in support thereof on November 16, 2020. That evening, less than 24 hours before oral argument was to begin, Plaintiffs instituted a second series of substitutions in counsel. Ms. Kerns, along with Mr. Scott and Mr. Hughes, requested this Court's permission to withdraw from the litigation. I granted the motions of the Texan attorneys because they had been involved with the case for approximately seventy-two hours. Because oral argument was scheduled for the

following day, however, and because Ms. Kerns had been one of the original attorneys in this litigation, I denied her request. I believed it best to have some semblance of consistency in counsel ahead of the oral argument. That evening, attorney Marc A. Scaringi entered an appearance on behalf of Plaintiffs. Furthermore, Mr. Scaringi asked the Court to postpone the previously-scheduled oral argument and evidentiary hearing. The Court denied Mr. Scaringi's motion for a continuance; given the emergency nature of this proceeding, and the looming deadline for Pennsylvania counties to certify their election results, postponing those proceedings seemed imprudent.

On November 17, 2020, the Court prepared to address the parties in oral argument. That morning, attorney Rudolph W. Giuliani entered his appearance on behalf of Plaintiffs. With this last-minute appearance, Plaintiffs had made their final addition to their representation.[35] At the conclusion of the argument, I determined that an evidentiary hearing (previously scheduled to take place on November 19, 2020) was no longer needed and cancelled that proceeding. Instead, I imposed a new briefing schedule in light of the FAC's filing, which arguably mooted the initial motions to dismiss. The parties submitted briefing on the issues.[36]

### D. Plaintiffs' Claims

Plaintiffs' only remaining claim alleges a violation of equal protection. This claim, like Frankenstein's Monster, has been haphazardly stitched together from two distinct theories in an attempt to avoid controlling precedent. The general thrust of this claim is that it is unconstitutional for Pennsylvania to give counties discretion to adopt a notice-and-cure policy. Invoking *Bush v. Gore*, Plaintiffs assert that such local control is unconstitutional because it creates an arbitrary system where some persons are allowed to cure procedurally defective mail-in ballots while others are not.

Apparently recognizing that such a broad claim is foreclosed under the Third Circuit's decision in *Bognet*, Plaintiffs try to merge it with a much simpler theory of harm based on the cancellation of Individual Plaintiffs' ballots in order to satisfy standing.[37] Because Individual Plaintiffs' votes were invalidated as procedurally defective, Individual Plaintiffs argue, that their claim is based on the denial of their votes. But on the merits, Plaintiffs appear to have abandoned this theory of harm and instead raise their broader argument that the lack of a uniform prohibition against notice-and-cure is unconstitutional.[38] They assert this

theory on behalf of both Individual Plaintiffs and the Trump Campaign.

**\*5** That Plaintiffs are trying to mix-and-match claims to bypass contrary precedent is not lost on the Court. The Court will thus analyze Plaintiffs' claims as if they had been raised properly and asserted as one whole for purposes of standing *and* the merits. Accordingly, the Court considers Plaintiffs as alleging two equal-protection claims. The first being on behalf of Individual Plaintiffs whose ballots were cancelled. And the second being on behalf of the Trump Campaign and raising the broad *Bush v. Gore* arguments that Plaintiffs allege is the main focus of this lawsuit.[39] The Court analyzes both claims separately for purposes of standing and the merits analysis.

### III. STANDING

Plaintiffs lack standing to raise either of their claims. "Article III of the United States Constitution limits the power of the federal judiciary to 'cases' and 'controversies.' "[40] To satisfy the case-or-controversy requirement, a plaintiff must establish that they have standing.[41] Standing is a "threshold" issue.[42] It is an "irreducible constitutional minimum," without which a federal court lacks jurisdiction to rule on the merits of an action.[43] Consequently, federal courts are obligated to raise the issue of standing sua sponte.[44]

The plaintiff bears the burden of establishing standing.[45] To demonstrate standing, he must show: (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.[46] "In assessing whether a plaintiff has carried this burden, [courts must] separate [the] standing inquiry from any assessment of the merits of the plaintiff's claim."[47] "To maintain this fundamental separation between standing and merits at the dismissal stage, [courts] assume for the purposes of [the] standing inquiry that a plaintiff has stated valid legal claims."[48] "While the [Court's] standing inquiry may necessarily reference the 'nature and source of the claims asserted,' [the Court's] focus remains on whether the plaintiff is the proper party to bring those claims."[49]

As discussed above, Plaintiffs allege two possible theories of standing. First, Individual Plaintiffs argue that their votes have been unconstitutionally denied. Under this theory, Individual Plaintiffs must show that Defendant Counties'

use of the notice-and-cure procedure, as well as Secretary Boockvar's authorization of this procedure, denied Individual Plaintiffs the right to vote.[50] Second, the Trump Campaign maintains that it has competitive standing.[51]

**\*6** Both theories are unavailing. Assuming, as this Court must, that Plaintiffs state a valid equal-protection claim, the Court finds that Individual Plaintiffs have adequately established an injury-in-fact. However, they fail to establish that it was Defendants who caused these injuries and that their purported injury of vote-denial is adequately redressed by invalidating the votes of others. The Trump Campaign's theory also fails because neither competitive nor associational standing applies, and it does not assert another cognizable theory of standing.

### A. Voters

#### 1. Injury in Fact

Individual Plaintiffs have adequately demonstrated that they suffered an injury-in-fact. "[A] person's right to vote is 'individual and personal in nature.' "[52] Accordingly, the denial of a person's right to vote is typically always sufficiently concrete and particularized to establish a cognizable injury.[53] This is true regardless of whether such a harm is widely shared.[54] So long as an injury is concrete, courts will find that an injury in fact exists despite the fact that such harm is felt by many.[55]

This is precisely the situation presented here. Individual Plaintiffs have adequately pled that their votes were denied. As discussed above, the denial of a vote is a highly personal and concrete injury. That Individual Plaintiffs had their ballots cancelled and thus invalidated is sufficiently personal to establish an injury in fact. It is of no matter that many persons across the state might also have had their votes invalidated due to their county's failure to implement a curing procedure. Accordingly, the Court finds that Individual Plaintiffs have established injury in fact.

#### 2. Causation

However, Individual Plaintiffs fail to establish that Defendant Counties or Secretary Boockvar actually caused their injuries. First, Defendant Counties, by Plaintiffs' own pleadings, had

nothing to do with the denial of Individual Plaintiffs' ability to vote. Individual Plaintiffs' ballots were rejected by Lancaster and Fayette Counties, neither of which is a party to this case. None of Defendant Counties received, reviewed, or discarded Individual Plaintiffs' ballots. Even assuming that Defendant Counties unconstitutionally allowed *other* voters to cure their ballots, that alone cannot confer standing on Plaintiffs who seek to challenge the denial of *their* votes.

Second, Individual Plaintiffs have not shown that their purported injuries are fairly traceable to Secretary Boockvar. Individual Plaintiffs have entirely failed to establish any causal relationship between Secretary Boockvar and the cancellation of their votes. The only connection the Individual Plaintiffs even attempt to draw is that Secretary Boockvar sent an email on November 2, 2020 to some number of counties, encouraging them to adopt a notice-and-cure policy. However, they fail to allege which counties received this email or what information was specifically included therein. Further, that this email encouraged counties to adopt a notice-and-cure policy does not suggest in any way that Secretary Boockvar intended or desired Individual Plaintiffs' votes to be cancelled. To the contrary, this email suggests that Secretary Boockvar encouraged counties to allow exactly these types of votes to be counted. Without more, this Court cannot conclude that Individual Plaintiffs have sufficiently established that their injuries are fairly traceable to Secretary Boockvar.[56]

### 3. Redressability

**\*7** In large part because the Individual Plaintiffs cannot establish that their injury is "fairly traceable" to the Defendants' conduct, they also cannot show that their injury could be redressed by a favorable decision from this Court.[57] Beyond that substantial hurdle, however, a review of the injury alleged and the relief sought plainly shows that the Individual Plaintiffs' injury would not be redressable. The Individual Plaintiffs base their equal-protection claim on the theory that their right to vote was denied. Their prayer for relief seeks, in pertinent part: (1) an order, declaration, or injunction from this Court prohibiting the Defendants from certifying the results of the 2020 General Election in Pennsylvania on a Commonwealth-wide basis; and (2) another order prohibiting Defendants from certifying the results which include ballots the Defendants permitted to be cured.

Neither of these orders would redress the injury the Individual Plaintiffs allege they have suffered. Prohibiting certification of the election results would not reinstate the Individual Plaintiffs' right to vote. It would simply deny more than 6.8 million people *their* right to vote. "Standing is measured based on the theory of harm and the specific relief requested."[58] It is not "dispensed in gross: A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."[59] Here, the answer to invalidated ballots is not to invalidate millions more. Accordingly, Plaintiffs have not shown that their injury would be redressed by the relief sought.

### B. Trump Campaign

The standing inquiry as to the Trump Campaign is particularly nebulous because neither in the FAC nor in its briefing does the Trump Campaign clearly assert what its alleged injury is. Instead, the Court was required to embark on an extensive project of examining almost every case cited to by Plaintiffs to piece together the theory of standing as to this Plaintiff – the Trump Campaign.

The Trump Campaign first posits that "as a political committee for a federal candidate," it has "Article III standing to bring this action."[60] On its face, this claim is incorrect. Simply being a political committee does not obviate the need for an injury-in-fact, nor does it automatically satisfy the other two elements of standing.

For this proposition, the Trump Campaign relies on two federal cases where courts found associational standing by a political party's state committee. Therefore, the Court considers whether the Trump Campaign can raise associational standing, but finds that those cases are inapposite.[61] First, a candidate's political committee and a political party's state committee are not the same thing. Second, while the doctrine of associational standing is well established, the Trump Campaign overlooks a particularly relevant, very recent decision from another federal court – one where the Trump Campaign itself argued that it had associational standing. In *Donald J. Trump for President, Inc. v. Cegavske*,[62] the Trump Campaign asserted associational standing, and that court rejected this theory.

Associational standing allows an entity to bring suit on behalf of members upon a showing that: (1) "its members would otherwise have standing to sue in their own right;" (2) "the

interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[63]

 **\*8** In *Cegavske* (another case in which the Trump Campaign alleged violations of equal protection), the court found that the Trump Campaign failed to satisfy the second prong of associational standing because it "represents only Donald J. Trump and his 'electoral and political goals' of reelection."[64] That court noted that while the Trump Campaign might achieve its purposes through its member voters, the "constitutional interests of those voters are wholly distinct" from that of the Trump Campaign.[65] No different here. Even if the Individual Plaintiffs attempted to vote for President Trump, their constitutional interests are different, precluding a finding of associational standing. In any event, because the Individual Plaintiffs lack standing in this case, the Trump Campaign cannot satisfy the first prong of associational standing either.

The Trump Campaign's second theory is that it has " 'competitive standing' based upon disparate state action leading to the 'potential loss of an election.' "[66] Pointing to a case from the United States Court of Appeals for the Ninth Circuit, *Drake v. Obama*,[67] the Trump Campaign claims this theory proves injury-in-fact. First, the Court finds it important to emphasize that the term "competitive standing" has specific meaning in this context. Second, the Trump Campaign's reliance on the theory of competitive standing under *Drake v. Obama* is, at best, misguided. Subsequent case law from the Ninth Circuit has explained that competitive standing "is the notion that 'a candidate or his political party has standing to challenge the *inclusion of an allegedly ineligible rival on the ballot*, on the theory that doing so hurts the candidate's or party's own chances of prevailing in the election.' "[68] In the present matter, there is no allegation that the Democratic Party's candidate for President, or any other candidate, was ineligible to appear on the ballot.

Examination of the other case law cited to by Plaintiffs contradicts their theory that competitive standing is applicable here for the same reason. For example, in *Texas Democratic Party v. Benkiser*, the United States Court of Appeals for the Fifth Circuit found competitive standing in a case in which the Democratic Party petitioned against the decision to deem a candidate ineligible and replace him with another.[69] Likewise, in *Schulz v. Williams*, the United States Court of

Appeals for the Second Circuit found competitive standing where the Conservative party alleged an injury in fact by arguing that a candidate from the Libertarian Party of New York was improperly placed on the ballot for the Governor's race in 1994.[70] By way of yet another example, Plaintiffs' citation to *Fulani v. Hogsett* makes the same point; competitive standing applies to challenges regarding the eligibility of a candidate. There, the Indiana Secretary of State was required to certify the names of candidates for President by a certain date.[71] When the Secretary failed to certify the Democratic and Republican candidates by that date, the New Alliance party challenged the inclusion of those candidates on the ballot, arguing that allowing these ineligible candidates constituted an injury-in-fact.[72] Three other cases relied on by Plaintiffs illustrate separate grounds for stating an injury in fact, all still relating to ballot provisions.[73]

 **\*9** It is telling that the only case from the Third Circuit cited to by Plaintiffs, *Marks v. Stinson*, does not contain a discussion of competitive standing or any other theory of standing applicable in federal court.[74] Simply pointing to another case where a competitor in an election was found to have standing does not establish *competitive standing* in this matter. Without more, this Court declines to take such an expansive view of the theory of competitive standing, particularly given the abundance of guidance from other Circuits, based on Plaintiffs' own citations, limiting the use of this doctrine.

The Trump Campaign has not offered another theory of standing, and therefore, cannot meet its burden of establishing Article III jurisdiction. To be clear, this Court is not holding that a political campaign can never establish standing to challenge the outcome of an election; rather, it merely finds that in this case, the Trump Campaign has not pled a cognizable theory.[75]

## IV. MOTION TO DISMISS 12(b)(6)

### A. Legal Standard
Under Federal Rule of Civil Procedure 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff has failed to "state a claim upon which relief can be granted." A motion to dismiss "tests the legal sufficiency of a claim"[76] and "streamlines litigation by dispensing with needless discovery and factfinding."[77] "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."[78]

This is true of any claim, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."[79]

Following the Roberts Court's "civil procedure revival,"[80] the landmark decisions of *Bell Atlantic Corporation v. Twombly*[81] and *Ashcroft v. Iqbal*[82] tightened the standard that district courts must apply to 12(b)(6) motions.[83] These cases "retired" the lenient "no-set-of-facts test" set forth in *Conley v. Gibson* and replaced it with a more exacting "plausibility" standard.[84]

Accordingly, after *Twombly* and *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "[85] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[86] "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."[87] Moreover, "[a]sking for plausible grounds ... calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[88]

**\*10** The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[89] No matter the context, however, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' "[90]

When disposing of a motion to dismiss, the Court "accept[s] as true all factual allegations in the complaint and draw[s] all inferences from the facts alleged in the light most favorable to [the plaintiff]."[91] However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[92] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[93]

As a matter of procedure, the Third Circuit has instructed that:

Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. First, it must tak[e] note of the elements [the] plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[94]

**B. Equal Protection**

Even if Plaintiffs had standing, they fail to state an equal-protection claim. The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws."[95] The principle of equal protection is fundamental to our legal system because, at its core, it protects the People from arbitrary discrimination at the hands of the State.

But, contrary to Plaintiffs' assertions, not all "unequal treatment" requires Court intervention.[96] The Equal Protection Clause "does not forbid classifications."[97] It simply keeps governmental decisionmakers from treating similarly situated persons differently.[98] The government could not function if complete equality were required in all situations. Consequently, a classification resulting in "some inequality" will be upheld unless it is based on an inherently suspect characteristic or "jeopardizes the exercise of a fundamental right."[99]

One such fundamental right, at issue in this case, is the right to vote. Voting is one of the foundational building blocks of our democratic society, and that the Constitution firmly protects this right is "indelibly clear."[100] All citizens of the United States have a constitutionally protected right to vote.[101] And all citizens have a constitutionally protected right to have their votes counted.[102]

**\*11** With these background principles firmly rooted, the Court turns to the merits of Plaintiffs' equal-protection claims. The general gist of their claims is that Secretary Boockvar, by failing to prohibit counties from implementing a notice-and-cure policy, and Defendant Counties, by adopting such a policy, have created a "standardless" system and thus unconstitutionally discriminated against Individual Plaintiffs.

Though Plaintiffs do not articulate why, they also assert that this has unconstitutionally discriminated against the Trump Campaign.

As discussed above, the Court will address Individual Plaintiffs' and the Trump Campaign's claims separately. Because Individual Plaintiffs premised standing on the purported wrongful cancellation of their votes, the Court will only analyze whether Defendants have impermissibly burdened Individual Plaintiffs' ability to vote. Further, the Court will consider two issues raised by the Trump Campaign; the first being whether it has stated a valid claim alleging discrimination relating to its use of poll-watchers, and the second being whether the General Assembly's failure to uniformly prohibit (or permit) the notice-and-cure procedure is unconstitutional.

### 1. Individual Plaintiffs

States have "broad authority to regulate the conduct of elections, including federal ones."[103] "This authority includes 'broad powers to determine the conditions under which the right of suffrage may be exercised.' "[104] Because states must have freedom to regulate elections if "some sort of order, rather than chaos, is to accompany the democratic processes,"[105] such regulation is generally insulated from the stringent requirements of strict scrutiny.[106]

Instead, state regulation that burdens voting rights is normally subject to the *Anderson-Burdick* balancing test, which requires that a court "weigh the asserted injury to the right to vote against the 'precise interests put forward by the State as justifications for the burden imposed by its rule.' "[107] Under this test, "any 'law respecting the right to vote – whether it governs voter qualifications, candidate selection, or the voting process,' is subjected to 'a deferential "important regulatory interests" standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote.' "[108]

The *Anderson-Burdick* balancing test operates on a sliding scale.[109] Thus, more restrictive laws are subject to greater scrutiny. Conversely, "minimally burdensome and nondiscriminatory" regulations are subject to "a level of scrutiny 'closer to rational basis.' "[110] "And where the state

imposes no burden on the 'right to vote' at all, true rational basis review applies."[111]

**\*12** Here, because Defendants' conduct "imposes no burden" on Individual Plaintiffs' right to vote, their equal-protection claim is subject to rational basis review.[112] Defendant Counties, by implementing a notice-and-cure procedure, have in fact *lifted* a burden on the right to vote, even if only for those who live in those counties. Expanding the right to vote for some residents of a state does not burden the rights of others.[113] And Plaintiffs' claim cannot stand to the extent that it complains that "the state is *not* imposing a restriction on *someone else's* right to vote."[114] Accordingly, Defendant Counties' use of the notice-and-cure procedure (as well as Secretary Boockvar's authorization of this procedure) will be upheld unless it has no rational basis.[115]

Individual Plaintiffs' claims fail because it is perfectly rational for a state to provide counties discretion to notify voters that they may cure procedurally defective mail-in ballots. Though states may not discriminatorily sanction procedures that are likely to burden some persons' right to vote more than others, they need not expand the right to vote in perfect uniformity. All Plaintiffs have alleged is that Secretary Boockvar allowed counties to choose whether or not they wished to use the notice-and-cure procedure. No county was forced to adopt notice-and-cure; each county made a choice to do so, or not. Because it is not irrational or arbitrary for a state to allow counties to expand the right to vote if they so choose, Individual Plaintiffs fail to state an equal-protection claim.

Moreover, even if they could state a valid claim, the Court could not grant Plaintiffs the relief they seek. Crucially, Plaintiffs fail to understand the relationship between right and remedy. Though every injury must have its proper redress,[116] a court may not prescribe a remedy unhinged from the underlying right being asserted.[117] By seeking injunctive relief preventing certification of the Pennsylvania election results, Plaintiffs ask this Court to do exactly that. Even assuming that they can establish that their right to vote has been denied, which they cannot, Plaintiffs seek to remedy the denial of their votes by invalidating the votes of millions of others. Rather than requesting that their votes be counted, they seek to discredit scores of other votes, but only for one race.[118] This is simply not how the Constitution works.

When remedying an equal-protection violation, a court may either "level up" or "level down."[119] This means that a court may either extend a benefit to one that has been wrongfully denied it, thus leveling up and bringing that person on par with others who already enjoy the right,[120] or a court may level down by withdrawing the benefit from those who currently possess it.[121] Generally, "the preferred rule in a typical case is to extend favorable treatment" and to level up.[122] In fact, leveling down is impermissible where the withdrawal of a benefit would necessarily violate the Constitution.[123] Such would be the case if a court were to remedy discrimination by striking down a benefit that is constitutionally guaranteed.

**\*13** Here, leveling up to address the alleged cancellation of Plaintiffs' votes would be easy; the simple answer is that their votes would be counted. But Plaintiffs do not ask to level up. Rather, they seek to level down, and in doing so, they ask the Court to violate the rights of over 6.8 million Americans. It is not in the power of this Court to violate the Constitution.[124] "The disenfranchisement of even one person validly exercising his right to vote is an extremely serious matter."[125] "To the extent that a citizen's right to vote is debased, he is that much less a citizen."[126]

Granting Plaintiffs' requested relief would necessarily require invalidating the ballots of every person who voted in Pennsylvania. Because this Court has no authority to take away the right to vote of even a single person, let alone millions of citizens, it cannot grant Plaintiffs' requested relief.

## 2. Trump Campaign

Plaintiffs' brief in opposition to the motions to dismiss spends only *one* paragraph discussing the merits of its equal-protection claim. Plaintiffs raise two arguments as to how equal protection was violated. The first is that "Defendants excluded Republican/Trump observers from the canvass so that they would not observe election law violations."[127] The second claims that the "use of notice/cure procedures violated equal protection because it was deliberately done in counties where defendants knew that mail ballots would favor Biden/Democrats."[128] The former finds no support in the operative pleading, and neither states an equal-protection violation.

Count I of the FAC makes no mention of disparity in treatment of observers based on which campaign they represented.

Instead, Count I discusses the use of "standardless" procedures. These are two separate theories of an equal protection violation. That deficiency aside, to the extent this new theory is even pled, Plaintiffs fail to plausibly plead that there was "uneven treatment" of Trump and Biden watchers and representatives. Paragraphs 132-143 of the FAC are devoted to this alleged disparity. None of these paragraphs support Plaintiffs' argument. A selection below:

- "Defendants have not allowed *watchers and representatives* to be present ..."[129]

- "In Centre County, the central pre-canvassing location was a large ballroom. The set-up was such that the *poll watchers did not have meaningful access* to observe the canvassing and tabulation process of mail-in and absentee ballots, and in fact, the *poll watchers and observers* who were present could not actually observe the ballots such that they could confirm or object to the validity of the ballots."[130]

- "In Philadelphia County, *poll watchers and canvass representatives* were denied access altogether in some instances."[131]

- "In Delaware County, *observers* were denied access to a back room counting area ..."[132]

None of these allegations (or the others in this section) claim that the Trump Campaign's watchers were treated *differently* than the Biden campaign's watchers. Simply alleging that poll watchers did not have access or were denied access to some areas does not plausibly plead unequal treatment. Without actually alleging that one group was treated differently than another, Plaintiffs' first argument falls flat.

**\*14** Likewise, Plaintiffs cannot salvage their notice-and-cure theory by invoking *Bush v. Gore*.[133] Plaintiffs claim that the Equal Protection clause "imposes a 'minimum requirement for nonarbitrary treatment of voters' and forbids voting systems and practices that distribute resources in 'standardless' fashion, without 'specific rules designed to ensure uniform treatment.'"[134] Plaintiffs attempt to craft a legal theory from *Bush*, but they fail because: (1) they misapprehend the issues at play in that case; and (2) the facts of this case are distinguishable.

Plaintiffs' interpretation of *Bush v. Gore* would broaden the application of that case far beyond what the Supreme Court

of the United States endorsed. In *Bush*, the Supreme Court stopped a recount of votes in Florida in the aftermath of the 2000 Presidential Election. Despite Plaintiffs' assertions, *Bush* does not stand for the proposition that every rule or system must ensure uniform treatment. In fact, the Supreme Court explicitly said so, explaining: "[t]he question before the Court is *not* whether local entities, in the exercise of their expertise, may develop different systems for implementing elections."[135] Instead, the Court explained that its holding concerned a "situation where a state court with the power to assure uniformity has ordered a statewide recount with minimal procedural safeguards."[136] Where a state court has ordered such a remedy, the Supreme Court held that "there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied."[137] In other words, the lack of guidance from a court constituted an equal-protection violation.

In the instant matter, Plaintiffs are not challenging any court action as a violation of equal protection, and they do not allege that Secretary Boockvar's guidance differed from county to county, or that Secretary Boockvar told some counties to cure ballots and others not to. That some counties may have chosen to implement the guidance (or not), or to implement it differently, does not constitute an equal-protection violation. "[M]any courts that have recognized that counties may, consistent with equal protection, employ entirely different election procedures and voting systems within a single state."[138] "Arguable differences in how elections boards apply uniform statewide standards to the innumerable permutations of ballot irregularities, although perhaps unfortunate, are to be expected, just as judges in sentencing-guidelines cases apply uniform standards with arguably different results."[139] Requiring that every single county administer elections in exactly the same way would impose untenable burdens on counties, whether because of population, resources, or a myriad of other reasonable considerations.

## V. CONCLUSION

Defendants' motions to dismiss the First Amended Complaint are granted with prejudice. Leave to amend is denied. "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive,

prejudice, and futility."[140] Given that: (1) Plaintiffs have already amended once as of right; (2) Plaintiffs seek to amend simply in order to effectively reinstate their initial complaint and claims; and (3) the deadline for counties in Pennsylvania to certify their election results to Secretary Boockvar is November 23, 2020, amendment would unduly delay resolution of the issues. This is especially true because the Court would need to implement a new briefing schedule, conduct a second oral argument, and then decide the issues.

**\*15** An appropriate Order follows.

## ORDER

**AND NOW**, this 21st day of November 2020, in accordance with the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that:

1. Defendants' motions to dismiss the First Amended Complaint (Docs. 127, 135, 140, 145, 161, and 165) are **GRANTED WITH PREJUDICE. NO LEAVE TO AMEND IS GRANTED**.

2. Defendants' motions to dismiss the original complaint (Docs. 81, 85, 90, 92, 96, and 98) are **DENIED AS MOOT**.

3. Plaintiffs' motion for leave to file a second amended complaint (Doc. 172) is **DENIED AS MOOT**.

4. Plaintiffs' motions for preliminary injunction (Docs. 89 and 182) are **DENIED AS MOOT.**

5. Plaintiffs' motions regarding discovery (Docs. 118 and 171) are **DENIED AS MOOT.**

6. Further motions regarding amicus briefing and intervention (Docs. 166, 180, and 200) are **DENIED AS MOOT**.

7. The case is dismissed and the Clerk of Court is directed to close the case file.

## All Citations

--- F.Supp.3d ----, 2020 WL 6821992

Footnotes

1    Doc. 125.

2    *Id.* Since the filing of the initial complaint, there have also been several intervenors and amicus petitioners.

3    *Cook v. Gralike*, 531 U.S. 510, 522, 121 S.Ct. 1029, 149 L.Ed.2d 44 (2001).

4    *Id.* (quoting *U.S. Term Limits v. Thornton*, 514 U.S. 779, 804, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995)).

5    *Id.* (quoting U.S. Const. Art. I, § 4, cl. 1).

6    *Id.* at 523, 121 S.Ct. 1029.

7    25 P.S. §§ 2601, *et seq.*

8    *Pa. Democratic Party v. Boockvar*, ⎯⎯ Pa. ⎯⎯, 238 A.3d 345, 356 (2020) (quoting Pa. Const., Art. I, § 5).

9    *Id.* (quoting *Perles v. Hoffman*, 419 Pa. 400, 213 A.2d 781, 783 (1965)).

10    *Id.* at 352 (citing 25 P.S. §§ 3150.11-3150.17). Prior to the enactment of Act 77, voters were only permitted to vote by mail if they could "demonstrate their absence from the voting district on Election Day." *Id.* (internal citations omitted).

11    *E.g.*, 25 P.S. § 3150.16.

12    *Id.*

13    *Id.*

14    *Pa. Democratic Party*, 238 A.3d at 372.

15    Doc. 93 at 9.

16    *Pa. Democratic Party*, 238 A.3d at 374.

17    *Id.* (holding only that the Election Code "does not provide for the 'notice and opportunity to cure' procedure sought by Petitioner").

18    Doc. 125 at ¶ 129.

19    *Id.* at ¶¶ 124-27.

20    *Id.* at ¶ 127.

21    *Id.* at ¶ 130.

22    *Id.* at ¶¶ 15-16.

23    *Id.* at ¶ 15.

24    *Id.* at ¶ 16.

25    *Id.* at ¶¶ 15-16.

26    Pa. Dep't of State, *Unofficial Returns, Statewide*, https://www.electionreturns.pa.gov/ (last visited on November 21, 2020).

27    Doc. 131 (denied).

28    *See* Doc. 1.

29    *Id.*

30    *See* Doc. 35.

31    Doc. 89.

32    No. 20-3214, ⎯⎯ F.3d ⎯⎯, 2020 WL 6686120 (3d Cir. Nov. 13, 2020) (pending publication).

33    For example, *Bognet* held that only the General Assembly had standing to raise claims under the Elections and Electors Clauses. *Id.* at ⎯⎯, 2020 WL 6686120, at *7. This ruling effectively shut the door on Plaintiffs' allegations under those clauses of the Constitution.

34    Doc. 125.

35    Ms. Kerns has since withdrawn from the case.

36    Separately, Plaintiffs filed a motion seeking leave to file a second amended complaint. Doc. 172. Having filed the FAC as of right, Plaintiffs may file a second amended complaint only with the opposing party's written consent or the court's leave. During the oral argument on November 17, 2020, Defendants indicated that they would not consent to the filing of a third pleading and did not concur in the motion for leave to file this second amended complaint.

37    Plaintiffs initially appeared to base their standing under the Equal Protection Clause on the theory that the notice-and-cure policy unlawfully allowed certain ballots to be counted, and that this inclusion of illegal ballots diluted Plaintiffs' legal votes. Doc. 1. After *Bognet* expressly rejected this theory of standing, however, Plaintiffs have since reversed course and now argue that their standing is based on the cancellation of Individual Plaintiffs' votes and the Trump Campaign's "competitive standing." ⎯⎯ F.3d at ⎯⎯ – ⎯⎯, 2020 WL 6686120, at *9-10; Doc. 124 at 2. To the extent that Plaintiffs may still argue that votes have been unconstitutionally diluted (*see*, FAC ¶ 97), those claims are barred by the Third Circuit's decision in *Bognet.*

38    Plaintiffs essentially conceded that they were only setting forth the vote-denial theory for purposes of standing when they stated on the record at oral argument that they believed Individual Plaintiffs' votes were *lawfully* cancelled. Hr'g. Tr. 110:22-111:02.

39    In briefing, Plaintiffs attempt to revive their previously-dismissed poll-watcher claims. Count I does not seek relief for those allegations, but the Court considers them, *infra*.

40    *Pa. Voters All. v. Centre Cnty.*, No. 4:20-CV-01761, ––– F.Supp.3d ––––, ––––, 2020 WL 6158309, at *3 (M.D. Pa. Oct. 21, 2020) (*quoting Cottrell v. Alcon Laboratories*, 874 F.3d 154, 161-62 (3d Cir. 2017)).

41    *Cottrell*, 874 F.3d at 161-62.

42    *Wayne Land & Mineral Grp., LLC v. Del. River Basin Comm'n*, 959 F.3d 569, 573-74 (3d Cir. 2020) (internal citations omitted).

43    *Id.* at 574 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

44    *Id.* (quoting *Seneca Reservation Cnty. v. Twp. of Highland*, 863 F.3d 245, 252 (3d Cir. 2017).

45    *Cottrell*, 874 F.3d at 162 (quoting *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016)).

46    *Id.* (quoting *Spokeo*, 136 S. Ct. at 1547).

47    *Id.*

48    *Id.* (citing *Info. Handling Servs., Inc. v. Defense Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003)).

49    *Id.* (brackets and internal citations omitted).

50    As discussed above, to the extent that Plaintiffs would have premised standing on the theory that Pennsylvania's purportedly unconstitutional failure to uniformly prohibit the notice-and-cure procedure constitutes vote-dilution, such an assertion would be foreclosed under *Bognet*, ––– F.3d at ––– – ––––, 2020 WL 6686120, at *9-10. Accordingly, the Court will only consider whether Individual Plaintiffs have standing under their vote-denial theory.

51    In the interest of comprehensiveness, the Court also addresses whether the Trump Campaign has associational standing.

52    *Gill v. Whitford*, ––– U.S. ––––, 138 S.Ct. 1916, 1929, 201 L.Ed.2d 313 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)).

53    *See Gomillion v. Lightfoot*, 364 U.S. 339, 349, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (Whittaker, J.) (noting the distinction between injuries caused by outright denial of the right to vote versus those caused by reducing the weight or power of an individual's vote). The Court notes that much of standing doctrine as it relates to voting rights arises from gerrymandering or vote-dilution cases, which often involve relatively abstract harms. *See, e.g., Gill*, 138 S. Ct. at 1929; *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)).

54    *See Federal Election Comm'n v. Akins*, 524 U.S. 11, 24, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (citing *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449-50, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989)).

55    *See id.* ("[W]here a harm is concrete, though widely shared, the [United States Supreme] Court has found 'injury in fact.' ") (quoting *Public Citizen*, 491 U.S. at 449-50, 109 S.Ct. 2558).

56    The Third Circuit has held that a party may have standing "to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action." *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 366 (3d Cir. 2014) (quoting *Bloomberg L.P. v. CFTC*, 949 F. Supp. 2d 91, 116 (D.D.C. 2013)). But in that case, standing was permitted to avoid a catch-22 situation where, absent standing against a third-party government actor, a plaintiff would not be able to bring suit against any responsible party. *Id.* at 367. Here, Plaintiffs allege that Secretary Boockvar is responsible for authorizing the unconstitutional actions of Defendant Counties. However, unlike the plaintiffs in *Aichele*, Plaintiffs are able to sue Defendant Counties for their allegedly unconstitutional actions. Moreover, because this Court has already concluded that Plaintiffs lack standing to sue Defendant Counties for their use of the notice-and-cure policy, it would be counterintuitive for Plaintiffs to have standing to challenge Secretary Boockvar's authorization of this policy, which is even further removed from any purported harm that Individual Plaintiffs have suffered.

57    *See, e.g., Newdow v. Roberts*, 603 F.3d 1002, 1011 (D.C. Cir. 2010) (noting that when an injury is caused by a third party not before the Court, courts cannot "redress injury ... that results from [such] independent action.") (ellipses and alterations in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

58    *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, ––– F.Supp.3d ––––, ––––, 2020 WL 5997680, at *37 (W.D. Pa. Oct. 10, 2020) (citing *Gill*, 138 S. Ct. at 1934).

59    *Gill*, 138 S. Ct. at 1934 (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006)).

60    Doc. 170 at 11.

61  *Texas Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006); *Orloski v. Davis*, 564 F. Supp. 526 (M.D. Pa. 1983).

62  No. 2:20-CV-1445, ––– F.Supp.3d ––––, 2020 WL 5626974 (D. Nev. Sept. 18, 2020).

63  *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

64  *Cegavske*, ––– F.Supp.3d at ––––, 2020 WL 5626974 at *4 (internal citations omitted).

65  *Id.*

66  Doc. 170 at 11 (citing *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011)).

67  664 F.3d at 783.

68  *Townley v. Miller*, 722 F.3d 1128, 1135 (9th Cir. 2013) (emphasis added) (quoting *Drake*, 664 F.3d at 782); *see also Mecinas v. Hobbs*, No. CV-19-05547, ––– F.Supp.3d ––––, ––– – ––––, 2020 WL 3472552, at *11-12 (D. Ariz. June 25, 2020) (explaining the current state of the doctrine of competitive standing and collecting cases).

69  459 F.3d at 586.

70  44 F.3d 48, 53 (2d Cir. 1994).

71  917 F.2d 1028, 1029-30 (7th Cir. 1990).

72  *Id.*

73  See *Green Party of Tennessee v. Hargett*, 767 F.3d 533, 542-43 (6th Cir. 2014) (finding that Plaintiffs had standing to challenge Tennessee's *ballot-access* laws); *see also Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 907 (8th Cir. 2020) (finding that Plaintiffs had standing to challenge the *ballot-ordering* provision in Minnesota); *Nelson v. Warner*, No. 3:19-0898, ––– F.Supp.3d ––––, ––––, 2020 WL 4582414, at *3 (S.D. W. Va. Aug. 10, 2020) (same).

74  19 F.3d 873 (3d Cir. 1994).

75  Even assuming, however, that the Trump Campaign could establish that element of standing, it would still fail to satisfy the causation and redressability requirements for the same reasons that the Voter Plaintiffs do. To the extent the Trump Campaign alleges any injury at all, its injury is attenuated from the actions challenged.

76  *Richardson v. Bledsoe*, 829 F.3d 273, 289 n. 13 (3d Cir. 2016) (Smith, C.J.) (*citing Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) (Easterbrook, J.)).

77  *Neitzke v. Williams*, 490 U.S. 319, 326-27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

78  *Id.* at 326, 109 S.Ct. 1827 (internal citations omitted).

79  *Id.* at 327, 109 S.Ct. 1827.

80  Howard M. Wasserman, The Roberts Court and the Civil Procedure Revival, 31 Rev. Litig. 313, 316, 319-20 (2012).

81  550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

82  556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

83  *Id.* at 670, 129 S.Ct. 1937.

84  *Id.*

85  *Id.* at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

86  *Id.*

87  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (Jordan, J.) (internal quotations and citations omitted).

88  *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955.

89  *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937.

90  *Id.* at 678, 129 S.Ct. 1937 (*quoting Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

91  *Phillips v. County. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

92  *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937;

93  *Id.* (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.) ("After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss.").

94  *Connelly*, 809 F.3d at 787 (internal quotations and citations omitted).

95  U.S. Const. Amend. XIV, cl. 1.

96  Doc. 170 at 29.

97  *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)).

98  *Id.* (citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)).

99  *Id.* (quoting *McGowan v. Maryland*, 366 U.S. 420, 425-26, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)).

100    *Reynolds v. Sims*, 377 U.S. 533, 554, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

101    *Id.* (citing *Ex parte Yarbrough*, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884)).

102    *Id.* (citing *United States v. Mosley*, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915)).

103    *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (citing U.S. Const. Art. I, § 4, cl. 1).

104    *Donald J. Trump for President, Inc.*, —— F.Supp.3d at ——, 2020 WL 5997680, at *38 (quoting *Shelby County, Ala. v. Holder*, 570 U.S. 529, 543, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013)).

105    *Id.* (quoting *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992)).

106    *Burdick*, 504 U.S. at 432-33, 112 S.Ct. 2059.

107    *Crawford v. Marion County Election Board*, 553 U.S. 181, 190, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (quoting *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059).

108    *Donald J. Trump for President*, —— F.Supp.3d at ——, 2020 WL 5997680, at *39 (quoting *Crawford*, 553 U.S. at 204, 128 S.Ct. 1610 (Scalia, J. concurring)).

109    *See id.* at ——, 2020 WL 5997680, at *40; *see also Arizona Libertarian Party v. Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019); *Fish v. Schwab*, 957 F.3d 1105, 1124 (10th Cir. 2020).

110    *Donald J. Trump for President*, —— F.Supp.3d at ——, 2020 WL 5997680, at *39 (quoting *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016)).

111    *Id.* (citing *Biener v. Calio*, 361 F.3d 206, 215 (3d Cir. 2004)).

112    Even after questioning from this Court during oral argument regarding the appropriate standard of review for their equal-protection claim, Plaintiffs failed to discuss this key aspect of the claim in briefing. *See* Doc. 170.

113    *See, e.g.*, *Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018).

114    *Donald J. Trump for President*, —— F.Supp.3d at ——, 2020 WL 5997680, at *44 (emphasis in original).

115    *Biener*, 361 F.3d at 215.

116    *Marbury v. Madison*, 5 U.S. 137, 147, 1 Cranch 137, 2 L.Ed. 60 (1803).

117    *Gill*, 138 S. Ct. at 1934 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury.") (citing *Cuno*, 547 U.S. at 353, 126 S.Ct. 1854).

118    Curiously, Plaintiffs now claim that they seek only to enjoin certification of the presidential election results. Doc. 183 at 1. They suggest that their requested relief would thus not interfere with other election results in the state. But even if it were logically possible to hold Pennsylvania's electoral system both constitutional and unconstitutional at the same time, the Court would not do so.

119    *Heckler v. Mathews*, 465 U.S. 728, 740, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984) (internal citations omitted).

120    *Id.* at 741, 104 S.Ct. 1387; *Califano v. Westcott*, 443 U.S. 76, 90-91, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979).

121    *E.g., Sessions v. Morales-Santana*, —— U.S. ——, 137 S. Ct. 1678, 1701, 198 L.Ed.2d 150 (2017).

122    *Id.* (internal citations omitted).

123    *See Palmer v. Thompson*, 403 U.S. 217, 226-27, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971) (addressing whether a city's decision to close pools to remedy racial discrimination violated the Thirteenth Amendment); *see also Reynolds*, 377 U.S. at 554, 84 S.Ct. 1362 (citing *Mosley*, 238 U.S. at 383, 35 S.Ct. 904).

124    *Marbury*, 5 U.S. at 147.

125    *Perles v. County Return Bd. of Northumberland County*, 415 Pa. 154, 202 A.2d 538, 540 (1964) (cleaned up).

126    *Id.* at 567.

127    Doc. 170 at 29. Count I makes no mention of the poll-watching allegations, nor does it seek relief for any violation of law on the basis of those allegations. Out of an abundance of caution, however, the Court considers whether these allegations state a claim.

128    *Id.*

129    Doc. 125 at ¶ 134 (emphasis added).

130    *Id.* at ¶ 135 (emphasis added).

131    *Id.* at ¶ 136 (emphasis added).

132    *Id.* at ¶ 137 (emphasis added).

133    531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

134    Doc. 170 at 13.

135    *Bush*, 531 U.S. at 109, 121 S.Ct. 525 (emphasis added).

136    *Id.*

137   *Id.*

138   *Donald J. Trump for President,* —— F.Supp.3d at ——, 2020 WL 5997680, at *44.

139   *Northeast Ohio Coalition for the Homeless v. Husted,* 837 F.3d 612, 636 (6th Cir. 2016).

140   *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1413–14 (3d Cir.1993).

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 3

2020 WL 6817513
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

L. LIN WOOD, JR., Plaintiff,

v.

BRAD RAFFENSPERGER, in his official
capacity as Secretary of State of Georgia;
REBECCA N. SULLIVAN, in her official
capacity as Vice Chair of the Georgia State
Election Board; DAVID J. WORLEY,
in his official capacity as a Member
of the Georgia State Election Board;
MATTHEW MASHBURN, in his official
capacity as a Member of the Georgia
State Election Board; and ANH LE, in
her official capacity as a Member of the
Georgia State Election Board, Defendants.

Civil Action No. 1:20-cv-04651-SDG
|
11/20/2020

Steven D. Grimberg, United States District Court Judge

## OPINION AND ORDER

**\*1** This matter is before the Court on a motion for temporary restraining order filed by Plaintiff L. Lin Wood, Jr. [ECF 6]. For the following reasons, and with the benefit of oral argument, Wood's motion is **DENIED**.

## I. BACKGROUND

On November 3, 2020, the United States conducted a general election for various federal, state, and local political offices (the General Election).[1] However, the voting process in Georgia began in earnest before that date. On September 15, 2020, local election officials began mailing absentee ballots for the General Election to eligible voters.[2] On October 12, 2020, Georgia's in-person, early voting period started.[3] This entire process played out amidst the throes of a global health

pandemic caused by the novel coronavirus SARS-CoV-2—colloquially known as COVID-19. Due in large part to the threat posed by COVID-19, an overwhelming number of Georgia voters—over 1 million of the 5 million votes cast by November 3—participated in the General Election through the use of absentee ballots.[4]

Wood, a registered voter in Fulton County, Georgia, believes Defendants— the elected officials tasked with conducting elections in the state—performed their roles in an unconstitutional manner. As such, Wood initiated this action on November 13, 2020, ten days after the conclusion of the General Election.[5] On November 16, Wood filed an Amended Complaint, asserting three claims against Defendants—all in their official capacities—for violation of: the First Amendment and the Equal Protection Clause of the Fourteenth Amendment (Count I); the Electors and Elections Clause of the Constitution (Count II); and the Due Process Clause of the Fourteenth Amendment (Count III).[6]

Counts I and II seek extraordinary relief:

> As a result of Defendants' unauthorized actions and disparate treatment of defective absentee ballots, this Court should enter an order, declaration, and/or injunction that prohibits Defendants from certifying the results of the 2020 general election in Georgia on a statewide basis.

> Alternatively, this Court should enter an order, declaration, and/or injunction prohibiting Defendants from certifying the results of the General Election which include the tabulation of defective absentee ballots, regardless of whether said ballots were cured.

> Alternatively, this Court should enter an order, declaration, and/or injunction that the results of the 2020 general election in Georgia are defective as a result of the above-described constitutional violations, and that Defendants are required to cure said deficiencies in a manner consistent with federal and Georgia law, and without the taint of the procedures described in the Litigation Settlement.[7]

For Count III, Wood requests an order, declaration, and/or injunction requiring Defendants to perform a myriad of activities, including ordering a second recount prior to the certification of the election results and permitting monitors designated by the Republican Party to have special access to observe all election activity.[8]

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 2 of 13   Document 55-3

**\*2** On November 17, 2020, Wood filed an emergency motion for a temporary restraining order.[9] Two sets of parties subsequently sought permission to intervene as defendants (collectively, the Intervenors): (1) the Democratic Party of Georgia, Inc. (DPG), DSCC, and DCCC; and (2) the Georgia State Conference of the NAACP (Georgia NAACP) and Georgia Coalition for the People's Agenda (GCPA).[10] On November 19, Defendants and Intervenors filed separate responses in opposition to Wood's motion for a temporary restraining order.[11] The Court held oral argument on Wood's motion the same day. At the conclusion of the oral argument, the Court denied Wood's request for a temporary restraining order. This Order follows and supplements this Court's oral ruling.

### a. Georgia Statutory Law Regarding Absentee Ballots.

Georgia law authorizes any eligible voter to cast his or her absentee ballot

by mail without providing a reason. O.C.G.A. § 21-2-380(b). To initiate the absentee-voting process, a prospective voter must submit an application to the applicable registrar's or absentee ballot clerk's office. O.C.G.A. § 21-2-381(a)(1) (A). Upon receipt of a timely absentee ballot request, a registrar or absentee ballot clerk must enter the date the office received the application and compare the prospective voter's information and signature on the application with the information and signature on file in the registrar's or clerk's office. O.C.G.A. § 21-2-381(b)(1). If the prospective voter's eligibility is confirmed, the registrar or clerk must mail the voter an absentee ballot. O.C.G.A. § 21-2-381(b)(2)(A).

An absentee voter receives two envelopes along with the absentee ballot; the completed ballot is placed in the smaller envelope, which is then placed in the larger envelope, which contains the oath of the elector and a signature line. O.C.G.A. § 21-2-384(b). Upon receipt of a timely absentee ballot, a registrar or clerk is required to compare the identifying information and signature provided in the oath with the information and signature on file in the respective office. O.C.G.A. § 21-2-386(a)(1)(B). If the information and signature appear to match, the registrar or clerk signs his or her name below the voter's oath. *Id.* If the information or signature is missing or does not appear to match, the registrar or clerk is required to write "Rejected" across the envelope and provide the reason for the rejection. O.C.G.A. § 21-2-386(a)(1)(C). The board of registrars or absentee ballot clerk is required to "promptly notify" the elector of the rejection, who then has until the end of the period for

verifying provisional ballots to cure the issue that resulted in the rejection. *Id.*

Secretary of State Raffensperger is "the state's chief election official."

O.C.G.A. § 21-2-50(b). *See also* Ga. Op. Att'y Gen. No. 2005-3 (Apr. 15, 2005) ("Just as a matter of sheer volume and scope, it is clear that under both the Constitution and the laws of the State the Secretary is the state official with the power, duty, and authority to manage the state's electoral system. No other state official or entity is assigned the range of responsibilities given to the Secretary of State in the area of elections."). In this role, Raffensperger is required to, among other things, "promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials" and "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-3-31(1)-(2).

### b. The Settlement Agreement

Wood does not challenge the underlying constitutionality of the absentee ballot framework enacted by the Georgia General Assembly. The genesis of his claims instead derive from a lawsuit filed over one year ago by the DPG against Raffensperger, the then-Members of the Georgia State Election Board, and the then-Members of the Gwinnett County Board of Registration and Elections.[12] In that action, the DPG, DSCC, and DCCC challenged several aspects of the process for rejecting absentee ballots based on a missing or mismatched signature.[13]

**\*3** On March 6, 2020, the DPG, DSCC, DCCC, Raffensperger, and the Members of the Georgia State Election Board executed—and filed on the public docket—a "Compromise Settlement Agreement and Release" (Settlement Agreement).[14] As part of the Settlement Agreement, Raffensperger agreed to issue an Official Election Bulletin containing certain procedures for the review of signatures on absentee ballot envelopes by county election officials for the March 24, 2020 Presidential Primary Election and subsequent General Election. In relevant part, the procedures stated:

> When reviewing an elector's signature on the mail-in absentee ballot envelope, the registrar or clerk must compare the signature on the mail-in absentee ballot

envelope to each signature contained in such elector's voter registration record in eNet and the elector's signature on the application for the mail-in absentee ballot. **If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks. A mail in absentee ballot shall not be rejected unless a majority of the registrars, deputy registrars, or absentee ballot clerks reviewing the signature agree that the signature does not match any of the voter's signatures on file in eNet or on the absentee ballot application.** If a determination is made that the elector's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk shall write the names of the three elections officials who conducted the signature review across the face of the absentee ballot envelope, which shall be in addition to writing "Rejected" and the reason for the rejection as required under OCGA 21-2-386(a)(1)(C).[15]

No entity or individual sought permission to intervene and challenge the Settlement Agreement. United States District Judge William M. Ray closed the case on March 9.[16]

### c. The Risk-Limiting Audit

Georgia law provides procedures for conducting a "risk-limiting audit" prior to the final certification of an election. O.C.G.A. § 21-2-498. Such an audit must be "[c]omplete[d]...in public view." O.C.G.A. § 21-2-498(c)(4). And the State Election Board is "authorized to promulgate rules, regulations, and procedures to implement and administer" an audit, including "security procedures to ensure that [the] collection of validly cast ballots is complete, accurate, and trustworthy throughout the audit." O.C.G.A. § 21-2-498(d). *See also* Ga. Comp. R. & Regs. 183-1-15-.04 (2020).

On November 11, 2020, Raffensperger announced a statewide risk-limiting audit (the Audit)—also referred to as a "full hand recount"—of all votes cast in the contest for President of the United States.[17] Every county in Georgia was required to begin the Audit at 9:00 am on November 13 and finish by 11:59 pm on November 18.[18] The statewide election results are set to be certified on November 20.[19] Raffensperger

required the Audit to "be open to the public and the press" and required local election officials to "designate a viewing area from which members of the public and press may observe the audit for the purpose of good order and maintaining the integrity of the audit."[20] The two major political parties—Democratic and Republican—were permitted "the right to have one properly designated person as a monitor of the audit for each ten audit teams that are conducting the audit, with a minimum of two designated monitors in each county per party per room where the audit is being conducted."[21] The designated monitors were not required to remain in the public viewing areas, but were required to comply with the rules promulgated by Raffensperger and the local election officials.[22] The Audit process differs from that required by Georgia law for a recount requested by a unsuccessful candidate following the official certification of votes. *See* O.C.G.A. § 21-2-524.

## II. LEGAL STANDARD

**\*4** The standard for the issuance of a temporary restraining order and a preliminary injunction are identical. *Windsor v. United States*, 379 F. App'x 912, 916–17 (11th Cir. 2010). A preliminary injunction is "an extraordinary remedy." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). To obtain the relief he seeks, Wood must affirmatively demonstrate: "(1) substantial likelihood of success on the merits; (2) [that] irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to [him] outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). *See also Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites.").

## III. DISCUSSION

Wood's motion essentially boils down to two overarching claims:

that Defendants violated the Constitution by (1) executing and enforcing the Settlement Agreement to the extent it requires different procedures than the Georgia Election Code, and (2) not permitting designated monitors to have certain live viewing privileges of the Audit at the county locations.

Defendants and Intervenors posit a number of challenges to Wood's claims.

**a. Standing**

As a threshold matter, the Court finds Wood lacks standing to assert these claims. Article III limits federal courts to the consideration of "Cases" and "Controversies." *U.S. Const. art. III, § 2, cl. 1*. The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). It is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). *See also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.") (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). The standing inquiry is threefold: "The litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan*, 504 U.S. at 561). Wood must "demonstrate standing for each claim he seeks to press and for each form of relief that is sought"—*Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017)—and shoulders "the burden of establishing [each] element[ ]." *Lujan*, 504 U.S. at 561.

Injury in fact is "the first and foremost of standing's three elements" and requires Wood to show that he suffered "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1547–48. To be "particularized," the alleged injury "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 561 n.1. Wood must demonstrate "a personal stake in the outcome of the controversy," as a federal court "is not a forum for generalized grievances." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). This requires more than a mere "keen interest in the issue." *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018). The alleged injury must be "distinct from a generally available grievance about government." *Gill*, 138 S. Ct. at 1923. *See also id.* at 1929 (explaining that a person's "right to vote is individual and personal in nature...[t]hus [only] voters who allege facts showing disadvantage to themselves as individuals have standing to sue to remedy that disadvantage") (quoting *Reynolds v.*

*Sims*, 377 U.S. 533, 561 (1964); *Baker v. Carr*, 369 U.S. 186, 206 (1962)). Claims premised on allegations that "the law...has not been followed...[are] precisely the kind of undifferentiated, generalized grievance about the conduct of government...[and] quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing." *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1332–33 (11th Cir. 2007) (citing *Baker*, 369 U.S. at 207–08). *See also Lance v. Coffman*, 549 U.S. 437, 440–41 (2007) ("Our refusal to serve as a forum for generalized grievances has a lengthy pedigree. . . . [A] generalized grievance that is plainly undifferentiated and common to all members of the public" is not sufficient for standing).

**\*5** Wood alleges he has standing because he is "a qualified registered elector residing in Fulton County, Georgia" who has "made donations to various Republican candidates on the ballot for the November 3, 2020 elections, and his interests are aligned with those of the Georgia Republican Party for the purposes of the instant lawsuit."[23] These allegations fall far short of demonstrating that Wood has standing to assert these claims.

**i. The Elections and Electors Clause**

Starting with his claim asserted under the Elections and Electors Clause, Wood lacks standing as a matter of law. The law is clear: A generalized grievance regarding a state government's failure to properly follow the Elections Clause of the Constitution does not confer standing on a private citizen.[24] *Lance*, 549 U.S. at 442; *Bognet*, 2020 WL 6686120, at \*6 ("[P]rivate plaintiffs lack standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause....Their relief would have no more directly benefitted them than the public at large."); *Dillard*, 495 F.3d at 1332–33.

**ii. Equal Protection**

For his equal protection claim, Wood relies on a theory of vote dilution, *i.e.*, because Defendants allegedly did not follow the correct processes, invalid absentee votes may have been cast and tabulated, thereby diluting Wood's in-person vote. But the same prohibition against generalized grievances applies to equal protection claims. *United States v. Hays*, 515 U.S. 737, 743 (1995) ("The rule against generalized grievances applies with as much force in the equal protection context as in any other.") Wood does not differentiate his alleged injury from any harm felt in precisely the same

manner by every Georgia voter. As Wood conceded during oral argument, under his theory any one of Georgia's more than seven million registered voters would have standing to assert these claims. This is a textbook generalized grievance. *Bognet*, 2020 WL 6686120, at *12 ("Voter Plaintiffs' dilution claim is a paradigmatic generalized grievance that cannot support standing....Put another way, a vote cast by fraud or mailed in by the wrong person through mistake, or otherwise counted illegally, has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged. Such an alleged dilution is suffered equally by all voters and is not particularized for standing purposes.") (internal punctuation omitted) (collecting cases); *Moore v. Circosta*, No. 1:20-cv-911, 2020 WL 6063332, a *14 (M.D.N.C. Oct. 14, 2020) ("[T]he notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury in fact necessary for Article III standing."). *See also Citizens for Fair Representation v. Padilla*, 815 F. App'x 120, 123 (9th Cir. 2020) (dismissing equal protection claim for lack of standing and stating "the Supreme Court has consistently held that a plaintiff raising only a generally available grievance...does not state an Article III case or controversy.").

### iii. Due Process

**\*6** For the same reasons, Wood also does not have standing to pursue his due process claim. Wood asserts that various election monitors appointed by the Republican Party "have been denied the opportunity to be present throughout the entire Hand Recount, and when allowed to be present, they were denied the opportunity to observe the Hand Recount in any meaningful way."[25] Yet, Wood does not allege that *he* attempted to participate as a designated monitor. Nor does he allege that, on behalf of the Republican Party, he himself designated monitors who were ultimately denied access. Wood's broad objection is that Defendants failed to conduct the Audit fairly and consistently under Georgia law. This is a generalized grievance.[26] *Lance*, 549 U.S. at 440–41. *See also Nolles v. State Comm. for Reorganization of Sch. Dists.*, 524 F.3d 892, 900 (8th Cir. 2008) (voters lacked standing because substantive due process claim that delay of implementation of new statute until after referendum election violated their right to fair election did not allege particularized injury).

### iv. Alignment with Non-Parties

Wood further points to his status as a donor to the Republican Party whose interests are aligned with that party and its political candidates to support his standing argument. But this does not sufficiently differentiate his alleged injury from that which *any* voter might have suffered—no matter the party affiliation. Ostensibly, Wood believes he suffered a particularized injury because his preferred candidates—to whom he has contributed money—did not prevail in the General Election. This argument has been squarely rejected by the Eleventh Circuit. *Jacobson*, 974 F.3d at 1247 ("A candidate's electoral loss does not, by itself, injure those who voted for the candidate. Voters have no judicially enforceable interest in the outcome of an election. Instead, they have an interest in their ability to vote and in their vote being given the same weight as any other.") (internal citation omitted).

### v. Lack of Relevant Authorities

Finally, the Court notes the futility of Wood's standing argument is particularly evident in that his sole relied-on authority—*Meek v. Metropolitan Dade County, Florida*, 985 F.2d 1471 (11th Cir. 1993)—is no longer good law. The Eleventh Circuit ***expressly abrogated*** its holding in that case over thirteen years ago. *Dillard*, 495 F.3d at 1331–32 ("We subsequently upheld *Meek's* reasoning against repeated challenges that it was wrongly decided in light of the Supreme Court's later decisions...[b]ut it is clear that we can no longer do so in light of the Supreme Court's most recent pronouncement on voter standing in *Lance*.").

During oral argument, Wood additionally pointed to *Roe v. State of Alabama by & through Evans*, 43 F.3d 574 (11th Cir. 1995), but that case does not support Wood's standing argument. For example, two plaintiffs in *Roe* were candidates for a political office decided in the challenged election. *Id.* at 579. Wood is a private citizen, not a candidate for any elected office. Moreover, the Eleventh Circuit found particularized harm in the post-election inclusion of absentee ballots that had been deemed invalid. *Id.* at 580. Wood here seeks to do the opposite—remove validly cast absentee ballots after completion of the election.

In sum, Wood lacks standing to pursue these claims in the first instance.

### b. The Doctrine of Laches

**\*7** Even if the Court found Wood possessed standing to pursue his claims regarding the Settlement Agreement (Counts I and II), such claims would nonetheless be barred by

the doctrine of laches. To establish laches, Defendants must show "(1) there was a delay in asserting a right or a claim, (2) the delay was not excusable, and (3) the delay caused [them] undue prejudice." *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005). *See also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1326 (11th Cir. 2019) ("To succeed on a laches claim, [defendant] must demonstrate that [p]laintiffs inexcusably delayed bringing their claim and that the delay caused it undue prejudice."). Courts apply laches in election cases. *E.g.*, *Sanders v. Dooly Cnty., Ga.*, 245 F.3d 1289, 1291 (11th Cir. 2001) ("[W]e conclude that the district court did not abuse its discretion in deeming the claims seeking injunctive relief to be laches-barred."). *See also, e.g.*, *Detroit Unity Fund v. Whitmer*, 819 F. App'x 421, 422 (6th Cir. 2020) (holding district court did not err in finding that plaintiff's claims regarding deadline for local ballot initiatives "barred by laches, considering the unreasonable delay on the part of [p]laintiffs and the consequent prejudice to [d]efendants"). *Cf. Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence. That is as true in election law cases as elsewhere.") (internal citation omitted). Defendants have established each element of laches.

**i. Delay**

First, Wood delayed considerably in asserting these claims. On March 6, 2020, the GDP, DSCC, DCCC, and Defendants executed the Settlement Agreement, which was entered on the public docket. It has since been in effect for at least three elections. Nearly eight months later—and **after** over one million voters cast their absentee ballots in the General Election—Wood challenges the terms of the Settlement Agreement as unconstitutional. Wood could have, and should have, filed his constitutional challenge much sooner than he did, and certainly not two weeks *after* the General Election.

**ii. Excuse**

Nor has Wood articulated any reasonable excuse for his prolonged delay. Wood failed to submit any evidence explaining why he waited to bring these claims until the eleventh hour. He instead relies solely on a representation from his legal counsel during oral argument, without evidence, that Wood did not vote in any election between the execution of the Settlement Agreement and the General Election. Even assuming this proffer to be true, it does not provide a reasonable justification for the delay. Wood's claims are constitutional challenges to Defendants' promulgation authority under state law. If valid, these claims should not depend on the outcome of any particular election, to wit, whether Wood's preferred candidates won or lost. Indeed, Wood's claims, even assuming his standing for bringing them could be established, were ripe the moment the parties executed the Settlement Agreement.

**iii. Prejudice**

Finally, Defendants, Intervenors, and the public at large would be significantly injured if the Court were to excuse Wood's delay. A bedrock principle of election law is that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006)). This is because a last-minute intervention by a federal court could "result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5. *See also Democratic Nat'l Comm. v. Wisc. State Legislature*, No. 20A66, 2020 WL 6275871, at *4 (U.S. Oct. 26, 2020) (Kavanaugh, J., concurring in denial of application to vacate stay) ("The principle [of judicial restraint] also discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process. For those reasons, among others, this Court has regularly cautioned that a federal court's last-minute interference with state election laws is ordinarily inappropriate.").

**\*8** Underscoring the exceptional nature of his requested relief, Wood's claims go much further; rather than changing the rules on the eve of an election, he wants the rules for the already concluded election declared unconstitutional and over one million absentee ballots called into question. Beyond merely causing confusion, Wood's requested relief could disenfranchise a substantial portion of the electorate and erode the public's confidence in the electoral process. *See Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) ("Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented.") (citation omitted); *Arkansas United v. Thurston*, No. 5:20-cv-5193, 2020 WL 6472651, at *5 (W.D. Ark. Nov. 3, 2020) ("[T]he equities do not favor intervention where the election is already in progress and the requested relief would change the rules of the game mid-play.").

Thus, Wood is not entitled to injunctive relief on Counts I and II for the additional reason that these claims are barred by the doctrine of laches.

WESTLAW

### c. The Merits of the Request for Injunctive Relief

Even assuming Wood possessed standing, and assuming Counts I and II are not barred by laches, the Court nonetheless finds Wood would not be entitled to the relief he seeks. The Court addresses each required element for a temporary restraining order in turn.

### i. Substantial Likelihood of Success on the Merits

### 1. Equal Protection (Count I)

Wood argues the execution and enforcement of the Settlement Agreement burdens his right to vote in contravention of the Equal Protection Clause because the agreement sets forth additional voting safeguards not found in the Georgia Election Code. States retain the power to regulate their own elections. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citing U.S. Const. Art. I, § 4, cl. 1). The Supreme Court has held that:

> Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.

*Burdick*, 504 U.S. at 433 (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

Inevitably, most election laws will "impose some burden upon individual voters." *Burdick*, 504 U.S. at 433. But the Equal Protection Clause only becomes applicable if "a state either classifies voters in disparate ways...or places restrictions on the right to vote." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012). As recently summarized by one federal district court:

> The Supreme Court has identified two theories of voting harms prohibited by the Fourteenth Amendment. First, the Court has identified a harm caused by debasement or dilution of the weight of a citizen's vote, also referred to [as] vote dilution....Second, the Court has found that the Equal Protection Clause is violated where the state, having once granted the right to vote on equal terms, through later arbitrary and disparate treatment, values one person's vote over that of another.

*Moore*, 2020 WL 6063332, at *12 (citing *Bush v. Gore*, 531 U.S. 98, 104–05 (2000); *Reynolds*, 377 U.S. at 554). A rationale basis standard of review applies if the plaintiff alleges "that a state treated him or her differently than

similarly situated voters, without a corresponding burden on the fundamental right to vote." *Obama for Am.*, 697 F.3d at 429 (citing *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807–09 (1969)). If a fundamental right is implicated, the claim is governed by the flexible *Anderson/Burdick* balancing test. *Burdick*, 504 U.S. at 433–35; *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

**\*9** Wood's equal protection claim does not fit within this framework.[27] Wood does not articulate a cognizable harm that invokes the Equal Protection Clause. For example, to the extent Wood relies on a theory of disparate treatment, *Bush v. Gore* is inapplicable. Defendants applied the Settlement Agreement in a wholly uniform manner across the entire state.[28] In other words, no voter—including Wood—was treated any differently than any other voter. *E.g., Wise v. Circosta*, 978 F.3d 93, 100 (4th Cir. 2020); *Deutsch v. New York State Bd. of Elections*, No. 20 CIV. 8929 (LGS), 2020 WL 6384064, at *6 (S.D.N.Y. Oct. 30, 2020).

Wood fares no better with a vote dilution argument. According to Wood, his fundamental right to vote was burdened because the "rules and regulations set forth in the [Settlement Agreement] created an arbitrary, disparate, and ad hoc process for processing defective absentee ballots, and for determining which of such ballots should be 'rejected,' contrary to Georgia law."[29] At the starting gate, the additional safeguards on signature and identification match enacted by Defendants did not burden Wood's ability to cast his ballot at all. Wood, according to his legal counsel during oral argument, did not vote absentee during the General Election. And the "burden that [a state's] signature-match scheme imposes on the right to vote...falls on vote-by-mail and provisional voters' fundamental right to vote." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019).

This leaves Wood to speculate that, because the Settlement Agreement required three ballot clerks—as opposed to just one—to review an absentee ballot before it could be rejected, fewer ballots were ultimately rejected, invalid ballots were tabulated, and his in-person vote was diluted. In support of this argument, Wood relies on *Baker v. Carr*, where the Supreme Court found vote dilution in the context of apportionment of elected representatives. 369 U.S. at 204–208. But Wood cannot transmute allegations that state officials violated state law into a claim that his vote was somehow weighted differently than others. This theory has been squarely rejected. *Bognet*, 2020 WL 6686120, at

WESTLAW

*11 ("[T]he Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently. Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment. And if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity. That is not how the Equal Protection Clause works.").

**10**   Even if Wood's claim were cognizable in the equal protection framework, it is not supported by the evidence at this stage. Wood's argument is that the procedures in the Settlement Agreement regarding information and signature match so overwhelmed ballot clerks that the rate of rejection plummeted and, ergo, invalid ballots were passed over and counted. This argument is belied by the record; the percentage of absentee ballots rejected for missing or mismatched information and signature is the exact same for the 2018 election and the General Election (.15%).[30] This is despite a substantial increase in the total number of absentee ballots submitted by voters during the General Election as compared to the 2018 election.[31]

In sum, there is insubstantial evidence supporting Wood's equal protection theory and he has not established a substantial likelihood of success on the merits as to Count I.

## 2. Electors and Elections Clauses (Count II)

In relevant part, the Constitution states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. This provision— colloquially known as the Elections Clause— vests authority in the states to regulate the mechanics of federal elections. *Foster v. Love*, 522 U.S. 67, 69 (1997). The "Electors Clause" of the Constitution similarly states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of [Presidential] Electors." U.S. Const. art. II, § 1, cl. 2.

Wood argues Defendants violated the Elections and Electors Clauses because the "procedures set forth in the [Settlement Agreement] for the handling of defective absentee ballots

is not consistent with the laws of the State of Georgia, and thus, Defendants' actions...exceed their authority."[32] Put another way, Wood argues Defendants usurped the role of the Georgia General Assembly—and thereby violated the United States Constitution—by enacting additional safeguards regarding absentee ballots not found in the Georgia Election Code. In support, Wood points to Chief Justice Rehnquist's concurrence in *Bush v. Gore*, which states that "in a Presidential election the clearly expressed intent of the legislature must prevail." 531 U.S. at 120 (Rehnquist, C.J., concurring).

State legislatures—such as the Georgia General Assembly —possess the authority to delegate their authority over elections to state officials in conformity with the Elections and Electors Clauses. *Ariz. State Legislature*, 576 U.S. at 816 ("The Elections Clause [ ] is not reasonably read to disarm States from adopting modes of legislation that place the lead rein in the people's hands...it is characteristic of our federal system that States retain autonomy to establish their own governmental processes."). *See also Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) ("The Elections Clause, therefore, affirmatively grants rights to state legislatures, and under Supreme Court precedent, to other entities to which a state may, consistent with the Constitution, delegate lawmaking authority."). *Cf. Bullock*, 2020 WL 5810556, at *11 ("A survey of the relevant case law makes clear that the term 'Legislature' as used in the Elections Clause is not confined to a state's legislative body.").

Recognizing that Secretary Raffensperger is "the state's chief election official,"[33] the General Assembly enacted legislation permitting him (in his official capacity) to "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). The Settlement Agreement is a manifestation of Secretary Raffensperger's statutorily granted authority. It does not override or rewrite state law. It simply adds an additional safeguard to ensure election security by having more than one individual review an absentee ballot's information and signature for accuracy before the ballot is rejected. Wood does not articulate how the Settlement Agreement is not "consistent with law" other than it not being a verbatim recitation of the statutory code. Taking Wood's argument at face value renders O.C.G.A. § 21-2-31(2) superfluous. A state official—such as Secretary Raffensperger—could never wield his or her authority to make rules for conducting elections that had not otherwise already been adopted

by the Georgia General Assembly. The record in this case demonstrates that, if anything, Defendants' actions in entering into the Settlement Agreement sought to achieve consistency among the county election officials in Georgia, which *furthers* Wood's stated goals of conducting "[f]ree, fair, and transparent public elections."[34]

**\*11** Wood has not demonstrated a substantial likelihood of success as to Count II.

### 3. Due Process (Count III)

Under the Fourteenth Amendment, "[n]o State shall...deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Due Process Clause has two components: procedural and substantive. *DeKalb Stone, Inc. v. Cnty. of DeKalb, Ga.*, 106 F.3d 956, 959 (11th Cir. 1997). Wood alleges that Defendants have "fail[ed]...to ensure that the Hand Recount is conducted fairly and in compliance with the Georgia Election Code" by denying monitors "the opportunity to be present throughout the entire Hand Recount, and when allowed to be present, they were denied the opportunity to observe the Hand Recount in any meaningful way."[35] Although not articulated in his Amended Complaint or motion for temporary restraining order, Wood clarified during oral argument that he is pursing both a procedural and substantive due process claim. Each will be addressed in turn.

#### a) Procedural Due Process

A procedural due process claim raises two inquires: "(1) whether there exists a liberty or property interest which has been interfered with by the State and (2) whether the procedures attendant upon that deprivation were constitutionally sufficient." *Richardson v. Texas Sec'y of State*, 978 F.3d 220, 229 (5th Cir. 2020) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). The party invoking the Due Process Clause's procedural protections bears the "burden...of establishing a cognizable liberty or property interest." *Richardson*, 978 F.3d at 229 (citing *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). Wood bases his procedural due process claim on "a vested interest in being present and having meaningful access to observe and monitor the electoral process."[36] But Wood does not articulate how this "vested interest" fits within a recognized, cognizable interest protected by procedural due process. The Court is not persuaded that the right to monitor an audit or vote recount is a liberty or property right secured by

the Constitution. For example, the Eleventh Circuit does "assume that the right to vote is a liberty interest protected by the Due Process Clause." *Jones v. Governor of Fla.*, 975 F.3d 1016, 1048 (11th Cir. 2020). But the circuit court has expressly declined to extend the strictures of procedural due process to "a State's election procedures." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) ("The generalized due process argument that the plaintiffs argued for and the district court applied would stretch concepts of due process to their breaking point.").

More specifically, federal courts have rejected the very interest Wood claims has been violated, *i.e.*, the right to observe the electoral process. *See, e.g.*, *Republican Party of Penn. v. Cortes*, 218 F. Supp. 3d 396, 408 (E.D. Pa. 2016) ("[T]here is no individual constitutional right to serve as a poll watcher...but rather the right is conferred by statute."); *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680, at \*67 (W.D. Pa. Oct. 10, 2020) (same); *Dailey v. Hands*, No. 14-423, 2015 WL 1293188, at \*5 (S.D. Ala. Mar. 23, 2015) ("[P]oll watching is not a fundamental right."); *Turner v. Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) (finding no authority "that supports the proposition that [plaintiff] had a first amendment right to act as a pollwatcher. Indeed, we would suggest that the state is not constitutionally required to permit pollwatchers for political parties and candidates to observe the conduct of elections."). Without such an interest, Wood cannot establish a substantial likelihood of success on the merits as to his procedural due process claim.

#### b) Substantive Due Process

**\*12** Wood's substantive due process claim fares no better. The types of voting rights covered by the substantive due process clause are considered narrow. *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986). Pursuant to the "functional structure embodied in the Constitution," a federal court must not "intervene to examine the validity of individual ballots or supervise the administrative details of a local election." *Id*. In only "extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation." *Id*. *See also Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998) ("We have drawn a distinction between garden variety election irregularities and a pervasive error that undermines the integrity of the vote. In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election.") (citation and punctuation omitted) (collecting cases); *Duncan v. Poythress*, 657 F.2d 691, 700 (5th Cir. 1981) ("[T]he due

process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process."). It is well understood that "garden variety" election disputes, including "the ordinary dispute over the counting and marking of ballots" do not rise to the level of a constitutional deprivation.[37] *Curry, 802 F.2d at 1314–15*. *See also Serpentfoot v. Rome City Comm'n, 426 F. App'x 884, 887 (11th Cir. 2011)* ("[Plaintiff's] allegations show, at most, a single instance of vote dilution and not an election process that has reached the point of patent and fundamental unfairness indicative of a due process violation.").

Although Wood generally claims fundamental unfairness, and the declarations and testimony submitted in support of his motion speculate as to wide-spread impropriety, the actual harm alleged by Wood concerns merely a "garden variety" election dispute. Wood does not allege unfairness in counting the ballots; instead, he alleges that select non-party, partisan monitors were not permitted to observe the Audit in an ideal manner. Wood presents no authority, and the Court finds none, providing for a right to unrestrained observation or monitoring of vote counting, recounting, or auditing. Precedent militates against a finding of a due process violation regarding such an "ordinary dispute over the counting and marking of ballots." *Gamza v. Aguirre, 619 F.2d 449, 453 (5th Cir. 1980)* ("If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute."). Wood has not satisfied his burden of establishing a substantial likelihood of success on the merits as to his substantive due process claim.

**ii. Irreparable Harm**

Because Wood cannot show a likelihood of success on the merits, an extensive discussion of the remaining factors for the issuance of a temporary restraining order is unnecessary. *Obama for Am., 697 F.3d at 436* ("When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor."). *See also Bloedorn, 631 F.3d at 1229* ("If [plaintiff] is unable to show a substantial likelihood of success on the merits, we need not consider the other requirements."). Nonetheless, for the

second factor, Plaintiffs must show that "irreparable injury would result if no injunction were issued." *Siegel, 234 F.3d at 1175–76* ("A showing of irreparable injury is the *sine qua non* of injunctive relief."). This factor also weighs in Defendants' favor. As discussed above, Wood's allegations are the quintessential generalized grievance. He has not presented any evidence demonstrating how he will suffer any particularized harm as a voter or donor by the denial of this motion. The fact that Wood's preferred candidates did not prevail in the General Election—for whom he may have voted or to whom he may have contributed financially—does not create a legally cognizable harm, much less an irreparable one. *Jacobson, 974 F.3d at 1247.*

**iii. Balance of the Equities and Public Interest**

**\*13** The Court finds that the threatened injury to Defendants as state officials and the public at large far outweigh any minimal burden on Wood. To reiterate, Wood seeks an extraordinary remedy: to prevent Georgia's certification of the votes cast in the General Election, after millions of people had lawfully cast their ballots. To interfere with the result of an election that has already concluded would be unprecedented and harm the public in countless ways. *See Sw. Voter Registration Educ. Project, 344 F.3d at 919; Arkansas United, 2020 WL 6472651, at \*5.* Granting injunctive relief here would breed confusion, undermine the public's trust in the election, and potentially disenfranchise of over one million Georgia voters. Viewed in comparison to the lack of any demonstrable harm to Wood, this Court finds no basis in fact or in law to grant him the relief he seeks.

**IV. CONCLUSION**

Wood's motion for temporary restraining order [ECF 6] is **DENIED**. **SO ORDERED** this the 20th day of November 2020.

Steven D. Grimberg

United States District Court Judge

**All Citations**

Slip Copy, 2020 WL 6817513

---

Footnotes

1     *Elections and Voter Registration Calendars*, https://sos.ga.gov/index.php/electi

2    ons/elections_and_voter_registration_calendars (last accessed Nov. 19, 2020).

2    *Id.*

3    *Id.*

4    ECF 33-2; ECF 33-6; ECF 33-8.

5    ECF 1.

6    ECF 5.

7    *E.g.*, ECF 5, ¶¶ 81–83, 93–95. The Litigation Settlement—also referred to as the Settlement Agreement—is discussed *infra* in Section I.b.

8    ECF 5, ¶ 106.

9    ECF 6.

10    ECF 8; ECF 22.

11    ECF 31; ECF 34; ECF 39.

12    *Democratic Party of Ga., Inc. v. Raffensperger*, 1:19-cv-05028-WMR (ECF 1) (Compl.).

13    *Id.*

14    *Id.* at ECF 56 (Settlement Agreement).

15    *Id.* (emphasis added).

16    *Id.* at ECF 57.

17    ECF 33-1; ECF 33-2; ECF 33-3.

18    *Id.*

19    *Id.*

20    ECF 33-4.

21    *Id.*

22    *Id.*

23    ECF 5, ¶ 8.

24    Although separate constitutional provisions, the Electors Clause and Elections Clause share "considerably similarity" and may be interpreted in the same manner. *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839 (2015) (Roberts, C.J., dissenting). *See also Bognet v. Sec'y Commonwealth of Pa.*, No. 20-3214, 2020 WL 6686120, at *7 (3d Cir. Nov. 13, 2020) (applying same test for standing under both Elections Clause and Electors Clause); *Donald J. Trump for President, Inc. v. Bullock*, No. CV 20-66-H-DLC, 2020 WL 5810556, at *11 (D. Mont. Sept. 30, 2020) ("As an initial matter, the Court finds no need to distinguish between the term 'Legislature' as it is used in the Elections Clause as opposed to the Electors Clause.").

25    ECF 6, at 21.

26    To the extent Wood attempts to rely on a theory of third party standing, the Court disagrees; the doctrine is disfavored and Wood has not alleged or proven any of the required elements—that (1) he "suffered an injury-in-fact that gives [him] a sufficiently concrete interest in the dispute"; (2) he has "a close relationship to the third party"; and (3) there is "a hindrance to the third party's ability to protect its own interests." *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1339 (11th Cir. 2019) (internal quotation marks omitted).

27    The Court notes that, in the Amended Complaint, Wood alludes to issues caused by Raffensperger's adoption of Ballot Trax—an electronic interface that permits an elector to track his or her ballot as it is being processed [ECF 5, ¶¶ 44–46]. Wood also alleges harm in that the Settlement Agreement permitted the DPG to submit "additional guidance and training materials" for identifying a signature mismatch, which Defendants "agree[d] to consider in good faith" [*id.* ¶ 47; *see also* ECF 5-1, ¶ 4]. Wood did not address how these items violated his constitutional rights—equal protection or otherwise—in either his motion or during oral argument. Therefore, the Court need not address them at this stage.

28    Wood concedes as much in the Amended Complaint. *See* ECF 5, ¶ 25 (alleging the Settlement Agreement "set[ ] forth different standards to be followed by the clerks and registrars in processing absentee ballots **in the State of Georgia**.") (emphasis added).

29    ECF 6, at 18.

30    ECF 33-6.

31    *Id.*

| | |
|---|---|
| 32 | ECF 5, ¶ 90. |
| 33 | O.C.G.A. § 21-2-50(b). |
| 34 | ECF 5, ¶ 11. |
| 35 | ECF 6, at 20–21. |
| 36 | ECF 5, ¶ 101. |
| 37 | In contrast, as Defendants note, it would be a violation of the constitutional rights of the millions of absentee voters who relied on the absentee ballot procedures in exercising their right to vote. *See e.g. Griffin v. Burns*, 570 F.2d 1065, 1079 (1st Cir. 1978) (finding disenfranchisement of electorate who voted by absentee ballot a violation of substantive due process). |

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 4

2020 WL 7094866
Only the Westlaw citation is currently available.
United States Court of Appeals, Eleventh Circuit.

L. Lin WOOD, Jr., Plaintiff-Appellant,

v.

Brad RAFFENSPERGER, in his
official capacity as Secretary of State
of the State of Georgia, Rebecca N.
Sullivan, in her official capacity as Vice
Chair of the Georgia State Election
Board, et al., Defendants-Appellees.

No. 20-14418
|
(December 5, 2020)

**Attorneys and Law Firms**

Ray S. Smith, III, Smith & Liss LLC, Atlanta, GA, for
Plaintiff-Appellant.

Charlene S. McGowan, Christopher Michael Carr, Russell
D. Willard, Attorney General's Office, Atlanta, GA, for
Defendants-Appellees.

Marc Erik Elias, Amanda Rebecca Callais, Perkins Coie,
LLP, Washington, DC, Kevin J. Hamilton, Perkins Coie, LLP,
Seattle, WA, Susan Coppedge, U.S. Attorney's Office, Halsey
G. Knapp, Jr., Joyce Gist Lewis, Adam M. Sparks, Krevolin
& Horst, LLC, Atlanta, GA, for Intervenors-Appellees.

Jon M. Greenbaum, Lawyers' Committee for Civil Rights
Under Law, Washington, DC, Bryan L. Sells, Law Office
of Bryan L. Sells, LLC, Atlanta, GA, for Amici Curiae
Helen Butler, Georgia State Conference of the NAACP,
Georgia Coalition for the Peoples' Agenda, James Woodall,
and Melvin Ivey.

Amanda J. Beane, Perkins Coie, LLP, Seattle, WA, Emily
Rachel Brailey, Alexi M. Velez, Perkins Coie, LLP,
Washington, DC, Gillian Kuhlmann, Perkins Coie, LLP, Los
Angeles, CA, Matthew Joseph Mertens, Perkins Coie, LLP,
Portland, OR, for Service.

Appeal from the United States District Court for the Northern
District of Georgia, D.C. Docket No. 1:20-cv-04651-SDG

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR and
LAGOA, Circuit Judges.

**Opinion**

WILLIAM PRYOR, Chief Judge:

**\*1** This appeal requires us to decide whether we have
jurisdiction over an appeal from the denial of a request for
emergency relief in a post-election lawsuit. Ten days after the
presidential election, L. Lin Wood Jr., a Georgia voter, sued
state election officials to enjoin certification of the general
election results, to secure a new recount under different rules,
and to establish new rules for an upcoming runoff election.
Wood alleged that the extant absentee-ballot and recount
procedures violated Georgia law and, as a result, his federal
constitutional rights. After Wood moved for emergency relief,
the district court denied his motion. We agree with the
district court that Wood lacks standing to sue because he
fails to allege a particularized injury. And because Georgia
has already certified its election results and its slate of
presidential electors, Wood's requests for emergency relief
are moot to the extent they concern the 2020 election. The
Constitution makes clear that federal courts are courts of
limited jurisdiction, U.S. Const. art. III; we may not entertain
post-election contests about garden-variety issues of vote
counting and misconduct that may properly be filed in state
courts. We affirm.

**I. BACKGROUND**

Secretary of State Brad Raffensperger is the "chief election
official" of Georgia. Ga. Code Ann. § 21-2-50(b). He
manages the state system of elections and chairs the State
Election Board. *Id.* § 21-2-30(a), (d). The Board has the
authority to promulgate rules and regulations to ensure
uniformity in the practices of county election officials and,
"consistent with law," to aid "the fair, legal, and orderly
conduct of primaries and elections." *Id.* § 21-2-31(1)–
(2). The Board may also publish and distribute to county
election officials a compilation of Georgia's election laws
and regulations. *Id.* § 21-2-31(3). Many of these laws and
regulations govern absentee voting.

Any voter in Georgia may vote by absentee ballot. *Id.* §
21-2-380(b). State law prescribes the procedures by which
a voter may request and submit an absentee ballot. *Id.* §§
21-2-381; 21-2-384; 21-2-385. The ballot comes with an oath,

Case 2:20-cv-01771-PP Filed 12/07/20 Page 2 of 8 Document 55-4

which the voter must sign and return with his ballot. *Id.*
§ 21-2-385(a). State law also prescribes the procedures for
how county election officials must certify and count absentee
ballots. *Id.* § 21-2-386(a). It directs the official to "compare
the identifying information on the oath with the information
on file" and "compare the signature or mark on the oath with
the signature or mark" on file. *Id.* § 21-2-386(a)(1)(B). If
everything appears correct, the official certifies the ballot. *Id.*
But if there is a problem, such as a signature that does not
match, the official is to "write across the face of the envelope
'Rejected.' " *Id.* § 21-2-386(a)(1)(C). The government must
then notify the voter of this rejection, and the voter may cure
the problem. *Id.*

In November 2019, the Democratic Party of Georgia,
the Democratic Senatorial Campaign Committee, and the
Democratic Congressional Campaign Committee challenged
Georgia's absentee ballot procedures as unconstitutional
under the First and Fourteenth Amendments. They sued
Secretary Raffensperger and members of the Board for
declaratory and injunctive relief. Secretary Raffensperger and
the Board maintained that the procedures were constitutional,
but they agreed to promulgate regulations to ensure uniform
practices across counties. In March 2020, the parties entered
into a settlement agreement and dismissed the suit.

**\*2** In the settlement agreement, Secretary Raffensperger
and the Board agreed to issue an Official Election Bulletin
regarding the review of signatures on absentee ballots. The
Bulletin instructed officials to review the voter's signature
with the following process:

> If the registrar or absentee ballot clerk determines that the
> voter's signature on the mail-in absentee ballot envelope
> does not match any of the voter's signatures on file ...,
> the registrar or absentee ballot clerk must seek review
> from two other registrars, deputy registrars, or absentee
> ballot clerks. A mail-in absentee ballot shall not be rejected
> unless a majority of the registrars, deputy registrars, or
> absentee ballot clerks reviewing the signature agree that the
> signature does not match any of the voter's signatures on
> file ....

Secretary Raffensperger and the Board also agreed to train
county election officials to follow this process.

This procedure has been in place for at least three elections
since March, including the general election on November 3,
2020. Over one million Georgians voted by absentee ballot
in the general election. No one challenged the settlement
agreement until the filing of this action. By then, the general

election returns had been tallied and a statewide hand recount
of the presidential election results was underway.

On November 13, L. Lin Wood Jr. sued Secretary
Raffensperger and the members of the Board in the district
court. Wood alleged that he sued "in his capacity as a private
citizen." He is a registered voter in Fulton County, Georgia,
and a donor to various 2020 Republican candidates. His
amended complaint alleged that the settlement agreement
violates state law. As a result, he contends, it violates
the Election Clause of Article I; the Electors Clause of
Article II; and the Equal Protection Clause of the Fourteenth
Amendment. *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl.
2; *id.* amend. XIV, § 1. Wood also alleged that irregularities
in the hand recount violated his rights under the Due Process
Clause of the Fourteenth Amendment. *Id.* amend. XIV, § 1.

State law requires that such recounts be done in public view,
and it permits the Board to promulgate policies that facilitate
recounting. Ga. Code Ann. § 21-2-498(c)(4), (d). Secretary
Raffensperger directed county election officials to designate
viewing areas for members of the public and the news media
to observe the recount. He also permitted the Democratic and
Republican Parties to designate special recount monitors.

Wood alleged that officials ignored their own rules and
denied Wood and President Donald Trump's campaign
"meaningful access to observe and monitor the electoral
process." Although Wood did not personally attempt to
observe or monitor the recount, he alleged that Secretary
Raffensperger and the Board violated his "vested interest in
being present and having meaningful access to observe and
monitor the electoral process to ensure that it is properly
administered ... and ... otherwise free, fair, and transparent."

Wood submitted two affidavits from volunteer monitors. One
monitor stated that she was not allowed to enter the counting
area because there were too many monitors already present,
and she could not be sure from a distance whether the recount
was accurate. The other explained that the counting was
hard for her to follow and described what she thought were
possible tabulation errors.

**\*3** Wood moved for extraordinary relief. He asked that
the district court take one of three steps: prohibit Georgia
from certifying the results of the November election; prevent
it from certifying results that include "defective absentee
ballots, regardless of whether said ballots were cured"; or
declare the entire election defective and order the state to fix

the problems caused by the settlement agreement. He also sought greater access for Republican election monitors, both at a new hand recount of the November election and in a runoff election scheduled for January 5, 2021.

Wood's lawsuit faced a quickly approaching obstacle: Georgia law requires the Secretary of State to certify its general election results by 5:00 p.m. on the seventeenth day after Election Day. Ga. Code Ann. § 21-2-499(b). And it requires the Governor to certify Georgia's slate of presidential electors by 5:00 p.m. on the eighteenth day after Election Day. *Id.* Secretary Raffensperger's deadline was November 20, and Governor Brian Kemp had a deadline of November 21.

To avoid these deadlines, Wood moved to bar officials from certifying the election results until a court could consider his lawsuit. His emergency motion reiterated many of the requests from his amended complaint, including requests for changes to the procedures for the January runoff. He also submitted additional affidavits and declarations in support of his motion.

The district court held a hearing on November 19 to consider whether it should issue a temporary restraining order. It heard from Wood, state officials, and two groups of intervenors. Wood also introduced testimony from Susan Voyles, a poll manager who participated in the hand recount. Voyles described her experience during the recount. She recalled that one batch of absentee ballots felt different from the rest, and that that batch favored Joe Biden to an unusual extent. At the end of the hearing, the district court orally denied Wood's motion.

On November 20, the district court issued a written opinion and order that explained its denial. It first ruled that Wood lacked standing because he had alleged only generalized grievances, instead of injuries that affected him in a personal and individual way. It next explained that, even if Wood had standing, the doctrine of laches barred him from challenging the settlement agreement now: he could have sued eight months earlier, yet he waited until two weeks after the election. Finally, it explained why Wood would not be entitled to a temporary restraining order even if the district court could reach the merits of his claims. On the same day, Secretary Raffensperger certified the results of the general election and Governor Kemp certified a slate of presidential electors.

## II. STANDARD OF REVIEW

"We are required to examine our jurisdiction *sua sponte*, and we review jurisdictional issues *de novo*." *United States v. Lopez*, 562 F.3d 1309, 1311 (11th Cir. 2009) (citation omitted).

## III. DISCUSSION

This appeal turns on one of the most fundamental principles of the federal courts: our limited jurisdiction. Federal courts are not "constituted as free-wheeling enforcers of the Constitution and laws." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc). As the Supreme Court "ha[s] often explained," we are instead "courts of limited jurisdiction." *Home Depot U.S.A., Inc. v. Jackson*, ___ U.S. ___, 139 S. Ct. 1743, 1746, 204 L.Ed.2d 34 (2019) (internal quotation marks omitted). Article III of the Constitution establishes that our jurisdiction —that is, our judicial power—reaches only "Cases" and "Controversies." U.S. Const. art. III, § 2. Absent a justiciable case or controversy between interested parties, we lack the "power to declare the law." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

 **\*4** When someone sues in federal court, he bears the burden of proving that his suit falls within our jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Wood had the choice to sue in state or federal court. Georgia law makes clear that post-election litigation may proceed in a state court. Ga. Code Ann. §§ 21-2-499(b), 21-2-524(a). But Wood chose to sue in federal court. In doing so, he had to prove that his suit presents a justiciable controversy under Article III of the Constitution. *See Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (listing examples of problems that preclude our jurisdiction). He failed to satisfy this burden.

We divide our discussion in two parts. We first explain why Wood lacks standing to sue. We then explain that, even if he had standing, his requests to recount and delay certification of the November election results are moot. Because this case is not justiciable, we lack jurisdiction. *Id.* And because we lack the power to entertain this appeal, we will not address the other issues the parties raise.

*A. Wood Lacks Standing Because He Has Not Been Injured in a Particularized Way.*

Standing is a threshold jurisdictional inquiry: the elements of standing are "an indispensable part of the plaintiff's case." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To prove standing, Wood "must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). If he cannot satisfy these requirements, then we may not decide the merits of his appeal. *Steel Co.*, 523 U.S. at 94, 118 S.Ct. 1003.

Wood lacks standing because he fails to allege the "first and foremost of standing's three elements": an injury in fact. *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (alteration adopted) (internal quotation marks omitted). An injury in fact is "an invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (internal quotation marks omitted). Wood's injury is not particularized.

Wood asserts only a generalized grievance. A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks omitted). For example, if Wood were a political candidate harmed by the recount, he would satisfy this requirement because he could assert a personal, distinct injury. *Cf. Roe v. Alabama ex rel. Evans*, 43 F.3d 574, 579 (11th Cir. 1995). But Wood bases his standing on his interest in "ensur[ing that] ... only lawful ballots are counted." An injury to the right "to require that the government be administered according to the law" is a generalized grievance. *Chiles v. Thornburgh*, 865 F.2d 1197, 1205–06 (11th Cir. 1989) (alteration adopted) (internal quotation marks omitted). And the Supreme Court has made clear that a generalized grievance, "no matter how sincere," cannot support standing. *Hollingsworth v. Perry*, 570 U.S. 693, 706, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013).

A generalized grievance is "undifferentiated and common to all members of the public." *Lujan*, 504 U.S. at 575, 112 S.Ct. 2130 (internal quotation marks omitted). Wood cannot explain how his interest in compliance with state election laws is different from that of any other person. Indeed,

he admits that any Georgia voter could bring an identical suit. But the logic of his argument sweeps past even that boundary. All Americans, whether they voted in this election or whether they reside in Georgia, could be said to share Wood's interest in "ensur[ing] that [a presidential election] is properly administered."

**\*5** Wood argues that he has two bases for standing, but neither satisfies the requirement of a distinct, personal injury. He first asserts that the inclusion of unlawfully processed absentee ballots diluted the weight of his vote. To be sure, vote dilution can be a basis for standing. *Cf. Jacobson*, 974 F.3d at 1247–48. But it requires a point of comparison. For example, in the racial gerrymandering and malapportionment contexts, vote dilution occurs when voters are harmed compared to "irrationally favored" voters from other districts. *See Baker v. Carr*, 369 U.S. 186, 207–08, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). By contrast, "no single voter is specifically disadvantaged" if a vote is counted improperly, even if the error might have a "mathematical impact on the final tally and thus on the proportional effect of every vote." *Bognet v. Sec'y Commonwealth of Pa.*, ––– F.3d ––––, ––––, 2020 WL 6686120, at *12 (3d Cir. Nov. 13, 2020) (internal quotation marks omitted). Vote dilution in this context is a "paradigmatic generalized grievance that cannot support standing." *Id.* (internal quotation marks omitted).

Wood's second theory—that Georgia "value[d] one person's vote over that of another" through "arbitrary and disparate treatment"—fares no better. He argues that Georgia treats absentee voters as a "preferred class" compared to those who vote in person, both by the terms of the settlement agreement and in practice. In his view, all voters were bound by law before the settlement agreement, but the rules for absentee voting now run afoul of the law, while in-person voters remain bound by the law. And he asserts that in practice Georgia has favored absentee voters because there were "numerous irregularities" in the processing and recounting of absentee ballots. Setting aside the fact that "[i]t is an individual voter's *choice* whether to vote by mail or in person," *Bognet*, ––– F.3d at ––––, 2020 WL 6686120, at *15, these complaints are generalized grievances. Even if we assume that absentee voters are favored over in-person voters, that harm does not affect Wood as an individual—it is instead shared identically by the four million or so Georgians who voted in person this November. "[W]hen the asserted harm is ... shared in substantially equal measure by ... a large class of citizens," it is not a particularized injury. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). And irregularities

in the tabulation of election results do not affect Wood differently from any other person. His allegation, at bottom, remains "that the law ... has not been followed." *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1332 (11th Cir. 2007) (quoting *Lance v. Coffman*, 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007)).

Wood's attempts to liken his injury to those we have found sufficient in other appeals fall short. In *Common Cause/ Georgia v. Billups*, we ruled that "[r]equiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing." 554 F.3d 1340, 1351–52 (11th Cir. 2009). But the injury there was the burden of producing photo identification, not the existence of separate rules for in-person and absentee voters. *Id.* And the burden to produce photo identification affected each voter in a personal way. For example, some plaintiffs in *Common Cause* alleged that they "would be required to make a special trip" to obtain valid identification "that is not required of voters who have driver's licenses or passports." *Id.* at 1351 (internal quotation marks omitted). By contrast, even Wood agrees that he is affected by Georgia's alleged violations of the law in the same way as every other Georgia voter. "This injury is precisely the kind of undifferentiated, generalized grievance that the Supreme Court has warned must not be countenanced." *Dillard*, 495 F.3d at 1335 (internal quotation marks omitted).

*Roe v. Alabama ex rel. Evans*, 43 F.3d 574, also does not support Wood's argument for standing. In *Roe*, we ruled that the post-election inclusion of previously excluded absentee ballots would violate the substantive-due-process rights of Alabama voters and two political candidates. *Id.* at 579–81. But no party raised and we did not address standing in *Roe*, so that precedent provides no basis for Wood to establish standing. *Cf. Lewis v. Casey*, 518 U.S. 343, 352 n.2, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (noting that in cases where "standing was neither challenged nor discussed ... the existence of unaddressed jurisdictional defects has no precedential effect"). And Wood's purported injury is far more general than the voters' injury in *Roe*. The voters in *Roe* bore individual burdens—to obtain notarization or witness signatures if they wanted to vote absentee—that state courts post-election retroactively permitted other voters to ignore. *Roe*, 43 F.3d at 580–81. In contrast, Georgia applied uniform rules, established before the election, to all voters, who could choose between voting in person or by absentee ballot, and Wood asserts that the effect of those rules

harmed the electorate collectively. That alleged harm is not a particularized injury.

**\*6** Wood suggested in his amended complaint that his status as a donor contributed to standing and aligned his interests with those of the Georgia Republican Party. But he forfeited this argument when he failed to raise it in his opening brief. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1335 (11th Cir. 2004); *see also Nat'l All. for the Mentally Ill v. Bd. of Cnty. Comm'rs*, 376 F.3d 1292, 1296 (11th Cir. 2004) (ruling standing claims forfeited for failure to comply with the Federal Rules of Appellate Procedure). And the donor argument fails on its own terms. True, a donor can establish standing based on injuries that flow from his status as a donor. *See, e.g., Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019). But donors, like voters, "have no judicially enforceable interest in the *outcome* of an election." *Jacobson*, 974 F.3d at 1246. Nor does a donation give the donor a legally cognizable interest in the proper administration of elections. Any injury to Wood based on election irregularities must flow from his status as a voter, unrelated to his donations. And that fact returns him to the stumbling block of particularization.

"[T]he 'injury in fact' test requires ... that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 563, 112 S.Ct. 2130 (internal quotation marks omitted). Wood's allegations suggest that various nonparties might have a particularized injury. For example, perhaps a candidate or political party would have standing to challenge the settlement agreement or other alleged irregularities. Or perhaps election monitors would have standing to sue if they were denied access to the recount. But Wood cannot place himself in the stead of these groups, even if he supports them. *Cf. Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1127 (9th Cir. 2006) (explaining that "associational standing ... does not operate in reverse," so a member cannot represent an association). He is at most a "concerned bystander." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004) (internal quotation marks omitted). So he is not "entitled to have the court[s] decide the merits of [his] dispute." *Warth*, 422 U.S. at 498, 95 S.Ct. 2197.

*B. Wood's Requested Relief Concerning the 2020 General Election Is Moot.*

Even if Wood had standing, several of his requests for relief are barred by another jurisdictional defect: mootness. We are

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"not empowered to decide moot questions." *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (internal quotation marks omitted). "An issue is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1189 (11th Cir. 2011) (alteration rejected) (internal quotation marks omitted). And an issue can become moot at any stage of litigation, even if there was a live case or controversy when the lawsuit began. *Id.* at 1189–90.

Wood asked for several kinds of relief in his emergency motion, but most of his requests pertained to the 2020 election results. He moved the district court to prohibit either the certification of the election results or certification that included the disputed absentee ballots. He also asked the district court to order a new hand recount and to grant Republican election monitors greater access during both the recount and the January runoff election. But after the district court denied Wood's motion, Secretary Raffensperger certified the election results on November 20. And Governor Kemp certified the slate of presidential electors later that day.

Because Georgia has already certified its results, Wood's requests to delay certification and commence a new recount are moot. "We cannot turn back the clock and create a world in which" the 2020 election results are not certified. *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015). And it is not possible for us to delay certification nor meaningful to order a new recount when the results are already final and certified. *Cf. Tropicana Prods. Sales, Inc. v. Phillips Brokerage Co.*, 874 F.2d 1581, 1582 (11th Cir. 1989) ("[A]n appeal from the denial of a motion for preliminary injunction is mooted when the requested effective end-date for the preliminary injunction has passed."). Nor can we reconstrue Wood's previous request that we temporarily prohibit certification into a new request that we undo the certification. A district court "must first have the opportunity to pass upon [every] issue," so we may not consider requests for relief made for the first time on appeal. *S.F. Residence Club, Inc. v. 7027 Old Madison Pike, LLC*, 583 F.3d 750, 755 (11th Cir. 2009).

**\*7** Wood's arguments reflect a basic misunderstanding of what mootness is. He argues that the certification does not moot anything "because this litigation is ongoing" and he remains injured. But mootness concerns the availability of relief, not the existence of a lawsuit or an injury. *Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1304 (11th Cir. 2011). So even if post-election litigation is not

always mooted by certification, *see, e.g., Siegel v. LePore*, 234 F.3d 1163, 1172–73 (11th Cir. 2000) (en banc), Wood's particular requests are moot. Wood is right that certification does not moot his requests for relief concerning the 2021 runoff—although Wood's lack of standing still forecloses our consideration of those requests—but the pendency of other claims for relief cannot rescue the otherwise moot claims. *See, e.g., Adler v. Duval Cnty. Sch. Bd.*, 112 F.3d 1475, 1478–79, 1481 (11th Cir. 1997) (instructing the district court to dismiss moot claims but resolving other claims on the merits). Wood finally tells us that President Trump has also requested a recount, but that fact is irrelevant to whether Wood's requests remain live.

Nor does any exception to mootness apply. True, we often review otherwise-moot election appeals because they are "capable of repetition yet evading review." *ACLU v. The Fla. Bar*, 999 F.2d 1486, 1496 (11th Cir. 1993) (internal quotation marks omitted). We may apply this exception when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Nat'l Broad. Co. v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1023 (11th Cir. 1988) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)). But we will not apply this exception if there is "some alternative vehicle through which a particular policy may effectively be subject to" complete review. *Bourgeois v. Peters*, 387 F.3d 1303, 1308 (11th Cir. 2004).

The "capable of repetition yet evading review" exception does not save Wood's appeal because there is no "reasonable expectation" that Wood will again face the issues in this appeal. Based on the posture of this appeal, the challenged action is the denial of an emergency injunction against the certification of election results. *See Fleming*, 785 F.3d at 446 (explaining that whether the issues in an interlocutory appeal are "capable of repetition, yet evading review" is a separate question from whether the issues in the overall lawsuit are capable of doing so). That denial is the decision we would review but for the jurisdictional problems. But Wood cannot satisfy the requirement that there be a "reasonable expectation" that he will again seek to delay certification. Wood does not suggest that this situation might recur. *Cf. FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 463–64, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007). And we have no reason to think it would: he is a private citizen, so the possibility of a

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

recurrence is purely theoretical. *Cf. Hall v. Sec'y, Ala.,* 902 F.3d 1294, 1305 (11th Cir. 2018).

## IV. CONCLUSION

We **AFFIRM** the denial of Wood's motion for emergency relief.

**All Citations**

--- F.3d ----, 2020 WL 7094866

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KING, MARIAN ELLEN
SHERIDAN, JOHN EARL HAGGARD,
CHARLES JAMES RITCHARD,
JAMES DAVID HOOPER, and
DAREN WADE RUBINGH,

     Plaintiffs,

v.              Civil Case No. 20-13134
              Honorable Linda V. Parker

GRETCHEN WHITMER, in her official
capacity as Governor of the State of Michigan,
JOCELYN BENSON, in her official capacity as
Michigan Secretary of State, and MICHIGAN
BOARD OF STATE CANVASSERS,

     Defendants,

and

CITY OF DETROIT, DEMOCRATIC
NATIONAL COMMITTEE and
MICHIGAN DEMOCRATIC PARTY, and
ROBERT DAVIS,

     Intervenor-Defendants.
_____/

## OPINION AND ORDER DENYING PLAINTIFFS' "EMERGENCY MOTION FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF" (ECF NO. 7)

The right to vote is among the most sacred rights of our democracy and, in

turn, uniquely defines us as Americans. The struggle to achieve the right to vote is

1

one that has been both hard fought and cherished throughout our country's history. Local, state, and federal elections give voice to this right through the ballot. And elections that count each vote celebrate and secure this cherished right.

These principles are the bedrock of American democracy and are widely revered as being woven into the fabric of this country. In Michigan, more than 5.5 million citizens exercised the franchise either in person or by absentee ballot during the 2020 General Election. Those votes were counted and, as of November 23, 2020, certified by the Michigan Board of State Canvassers (also "State Board"). The Governor has sent the slate of Presidential Electors to the Archivist of the United States to confirm the votes for the successful candidate.

Against this backdrop, Plaintiffs filed this lawsuit, bringing forth claims of widespread voter irregularities and fraud in the processing and tabulation of votes and absentee ballots. They seek relief that is stunning in its scope and breathtaking in its reach. If granted, the relief would disenfranchise the votes of the more than 5.5 million Michigan citizens who, with dignity, hope, and a promise of a voice, participated in the 2020 General Election. The Court declines to grant Plaintiffs this relief.

## I.    Background

In the weeks leading up to, and on, November 3, 2020, a record 5.5 million Michiganders voted in the presidential election ("2020 General Election"). (ECF

2

No. 36-4 at Pg ID 2622.)  Many of those votes were cast by absentee ballot.  This was due in part to the coronavirus pandemic and a ballot measure the Michigan voters passed in 2018 allowing for no-reason absentee voting.  When the polls closed and the votes were counted, Former Vice President Joseph R. Biden, Jr. had secured over 150,000 more votes than President Donald J. Trump in Michigan. (*Id.*)

Michigan law required the Michigan State Board of Canvassers to canvass results of the 2020 General Election by November 23, 2020.  Mich. Comp. Laws § 168.842.  The State Board did so by a 3-0 vote, certifying the results "for the Electors of President and Vice President," among other offices.  (ECF No. 36-5 at Pg ID 2624.)  That same day, Governor Gretchen Whitmer signed the Certificates of Ascertainment for the slate of electors for Vice President Biden and Senator Kamala D. Harris.  (ECF No. 36-6 at Pg ID 2627-29.)  Those certificates were transmitted to and received by the Archivist of the United States.  (*Id*.)

Federal law provides that if election results are contested in any state, and if the state, prior to election day, has enacted procedures to decide controversies or contests over electors and electoral votes, and if these procedures have been applied, and the decisions are made at least six days before the electors' meetings, then the decisions are considered conclusive and will apply in counting the electoral votes.  3 U.S.C. § 5.  This date (the "Safe Harbor" deadline) falls on

3

December 8, 2020.  Under the federal statutory timetable for presidential elections, the Electoral College must meet on "the first Monday after the second Wednesday in December," 3 U.S.C. § 7, which is December 14 this year.

Alleging widespread fraud in the distribution, collection, and counting of ballots in Michigan, as well as violations of state law as to certain election challengers and the manipulation of ballots through corrupt election machines and software, Plaintiffs filed the current lawsuit against Defendants at 11:48 p.m. on November 25, 2020—the eve of the Thanksgiving holiday.  (ECF No. 1.)  Plaintiffs are registered Michigan voters and nominees of the Republican Party to be Presidential Electors on behalf of the State of Michigan.  (ECF No. 6 at Pg ID 882.)  They are suing Governor Whitmer and Secretary of State Jocelyn Benson in their official capacities, as well as the Michigan Board of State Canvassers.

On November 29, a Sunday, Plaintiffs filed a First Amended Complaint (ECF No. 6), "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof" (ECF No. 7), and Emergency Motion to Seal (ECF No. 8).  In their First Amended Complaint, Plaintiffs allege three claims pursuant to 42 U.S.C. § 1983: (Count I) violation of the Elections and Electors Clauses; (Count II) violation of the Fourteenth Amendment Equal Protection Clause; and, (Count III) denial of the Fourteenth

Amendment Due Process Clause.  (ECF No. 6.)  Plaintiffs also assert one count alleging violations of the Michigan Election Code.  (*Id.*)

By December 1, motions to intervene had been filed by the City of Detroit (ECF No. 15), Robert Davis (ECF No. 12), and the Democratic National Committee and Michigan Democratic Party ("DNC/MDP") (ECF No. 14).  On that date, the Court entered a briefing schedule with respect to the motions.  Plaintiffs had not yet served Defendants with their pleading or emergency motions as of December 1.  Thus, on December 1, the Court also entered a text-only order to hasten Plaintiffs' actions to bring Defendants into the case and enable the Court to address Plaintiffs' pending motions.  Later the same day, after Plaintiffs filed certificates of service reflecting service of the summons and Amended Complaint on Defendants (ECF Nos. 21), the Court entered a briefing schedule with respect to Plaintiffs' emergency motions, requiring response briefs by 8:00 p.m. on December 2, and reply briefs by 8:00 p.m. on December 3 (ECF No. 24).

On December 2, the Court granted the motions to intervene.  (ECF No. 28.)  Response and reply briefs with respect to Plaintiffs' emergency motions were thereafter filed.  (ECF Nos. 29, 31, 32, 34, 35, 36, 37, 39, 49, 50.)  Amicus curiae Michigan State Conference NAACP subsequently moved and was granted leave to file a brief in support of Defendants' position.  (ECF Nos. 48, 55.)  Supplemental briefs also were filed by the parties.  (ECF Nos. 57, 58.)

5

In light of the limited time allotted for the Court to resolve Plaintiffs'

emergency motion for injunctive relief—which Plaintiffs assert "must be granted

in advance of December 8, 2020" (ECF No. 7 at Pg ID 1846)—the Court has

disposed of oral argument with respect to their motion pursuant to Eastern District

of Michigan Local Rule 7.1(f).[1]

## II.     Standard of Review

A preliminary injunction is "an extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v.*

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted).  The plaintiff

bears the burden of demonstrating entitlement to preliminary injunctive relief.

*Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).  Such relief will only be

granted where "the movant carries his or her burden of proving that the

circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty.*

*Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  "Evidence that goes beyond the

unverified allegations of the pleadings and motion papers must be presented to

---

[1] "'[W]here material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing.'" *Nexus Gas Transmission, LLC v. City of Green, Ohio*, 757 Fed. Appx. 489, 496-97 (6th Cir. 2018) (quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007)) (citation omitted).

6

support or oppose a motion for a preliminary injunction."  11A Mary Kay Kane, Fed. Prac. & Proc.  § 2949 (3d ed.).

Four factors are relevant in deciding whether to grant preliminary injunctive relief: "'(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.'"  *Daunt v. Benson*, 956 F.3d 396, 406 (6th Cir. 2020) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012)).  "At the preliminary injunction stage, 'a plaintiff must show more than a mere possibility of success,' but need not 'prove his case in full.'"  *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007)).  Yet, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion …."  *Leary*, 228 F.3d at 739.

## III.   Discussion

The Court begins by discussing those questions that go to matters of subject matter jurisdiction or which counsel against reaching the merits of Plaintiffs' claims.  While the Court finds that any of these issues, alone, indicate that Plaintiffs' motion should be denied, it addresses each to be thorough.

## A.    Eleventh Amendment Immunity

The Eleventh Amendment to the United States Constitution provides:

> The judicial power of the United States shall not be
> construed to extend to any suit in law or equity,
> commenced or prosecuted against one of the United
> States by Citizens of another State, or by Citizens or
> Subjects of any Foreign State.

U.S. Const. amend. XI.  This immunity extends to suits brought by citizens against

their own states.  *See, e.g., Ladd v. Marchbanks*, 971 F.3d 574, 578 (6th Cir. 2020)

(citing *Hans v. Louisiana*, 134 U.S. 1, 18-19 (1890)).  It also extends to suits

against state agencies or departments, *Pennhurst State Sch. & Hosp. v. Halderman*,

465 U.S. 89, 100 (1984) (citations omitted), and "suit[s] against state officials

when 'the state is the real, substantial party in interest[,]'" *id.* at 101 (quoting *Ford*

*Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)).

A suit against a State, a state agency or its department, or a state official is in

fact a suit against the State and is barred "regardless of the nature of the relief

sought."  *Pennhurst State Sch. & Hosp.*, 465 U.S. at 100-02 (citations omitted).

"'The general rule is that a suit is against the sovereign if the judgment sought

would expend itself on the public treasury or domain, or interfere with the public

administration, or if the effect of the judgment would be to restrain the

Government from acting, or to compel it to act.'"  *Id.* at 101 n.11 (quoting *Dugan*

*v. Rank*, 372 U.S. 609, 620 (1963)) (internal quotation marks omitted).

8

Eleventh Amendment immunity is subject to three exceptions: (1) congressional abrogation; (2) waiver by the State; and (3) "a suit against a state official seeking prospective injunctive relief to end a continuing violation of federal law." *See Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002) (citations omitted).  Congress did not abrogate the States' sovereign immunity when it enacted 42 U.S.C. § 1983.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989).  "The State of Michigan has not consented to being sued in civil rights actions in the federal courts."  *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004) (citing *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986)). The Eleventh Amendment therefore bars Plaintiffs' claims against the Michigan Board of State Canvassers.  *See McLeod v. Kelly*, 7 N.W.2d 240, 242 (Mich. 1942) ("The board of State canvassers is a State agency …"); *see also Deleeuw v. State Bd. of Canvassers*, 688 N.W.2d 847, 850 (Mich. Ct. App. 2004).  Plaintiffs' claims are barred against Governor Whitmer and Secretary Benson unless the third exception applies.

The third exception arises from the Supreme Court's decision in *Ex parte Young*, 209 U.S. 123 (1908).  But as the Supreme Court has advised:

> To interpret *Young* to permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle … that Eleventh Amendment immunity represents a real

9

> limitation on a federal court's federal-question
> jurisdiction.  The real interests served by the Eleventh
> Amendment are not to be sacrificed to elementary
> mechanics of captions and pleading.  Application of the
> *Young* exception must reflect a proper understanding of
> its role in our federal system and respect for state courts
> instead of a reflexive reliance on an obvious fiction.

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997).  Further, "the

theory of *Young* has not been provided an expansive interpretation."  *Pennhurst*

*State Sch. & Hosp.*, 465 U.S. at 102.  "'In determining whether the doctrine of *Ex*

*parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct

a straightforward inquiry into whether [the] complaint alleges an ongoing violation

of federal law and seeks relief properly characterized as prospective.'"  *Verizon*

*Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (quoting *Coeur d'Alene*

*Tribe of Idaho*, 521 U.S. 296 (O'Connor, J., concurring)).

    *Ex parte Young* does not apply, however, to *state law* claims against state

officials, regardless of the relief sought.  *Pennhurst State Sch. & Hosp.*, 465 U.S. at

106 ("A federal court's grant of relief against state officials on the basis of state

law, whether prospective or retroactive, does not vindicate the supreme authority

of federal law.  On the contrary, it is difficult to think of a greater intrusion on state

sovereignty than when a federal court instructs state officials on how to conform

their conduct to state law."); *see also In re Ohio Execution Protocol Litig*., 709 F.

App'x 779, 787 (6th Cir. 2017) ("If the plaintiff sues a state official under state law

10

in federal court for actions taken within the scope of his authority, sovereign immunity bars the lawsuit regardless of whether the action seeks monetary or injunctive relief.").  Unquestionably, Plaintiffs' state law claims against Defendants are barred by Eleventh Amendment immunity.

The Court then turns its attention to Plaintiffs' § 1983 claims against Defendants.  Defendants and Intervenor DNC/MDP contend that these claims are not in fact federal claims as they are premised entirely on alleged violations of *state* law.  (ECF No. 31 at Pg ID 2185 ("Here, each count of Plaintiffs' complaint—even Counts I, II, and III, which claim to raise violations of federal law—is predicated on the election being conducted contrary to Michigan law."); ECF No. 36 at Pg ID 2494 ("While some of [Plaintiffs'] allegations concern fantastical conspiracy theories that belong more appropriately in the fact-free outer reaches of the Internet[,] … what Plaintiffs assert at bottom are violations of the Michigan Election Code.")  Defendants also argue that even if properly stated as federal causes of action, "it is far from clear whether Plaintiffs' requested injunction is actually prospective in nature, as opposed to retroactive."  (ECF No. 31 at Pg ID 2186.)

The latter argument convinces this Court that *Ex parte Young* does not apply.  As set forth earlier, "'[i]n order to fall with the *Ex parte Young* exception, a claim must seek prospective relief to end a continuing violation of federal law.'"

11

*Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) (quoting *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013)).  Unlike *Russell*, which Plaintiffs cite in their reply brief, this is not a case where a plaintiff is seeking to enjoin the continuing enforcement of a statute that is allegedly unconstitutional. *See id.* at 1044, 1047 (plaintiff claimed that Kentucky law creating a 300-foot no-political-speech buffer zone around polling location violated his free-speech rights).  Instead, Plaintiffs are seeking to undo what has already occurred, as their requested relief reflects.[2]  (*See* ECF No. 7 at Pg ID 1847; *see also* ECF No. 6 at Pg 955-56.)

Before this lawsuit was filed, the Michigan Board of State Canvassers had already certified the election results and Governor Whitmer had transmitted the State's slate of electors to the United States Archivist.  (ECF Nos. 31-4, 31-5.) There is no continuing violation to enjoin.  *See Rios v. Blackwell*, 433 F. Supp. 2d 848 (N.D. Ohio Feb. 7, 2006); *see also King Lincoln Bronzeville Neighborhood Ass'n v. Husted*, No. 2:06-cv-00745, 2012 WL 395030, at *4-5 (S.D. Ohio Feb. 7, 2012); *cf. League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008) (finding that the plaintiff's claims fell within the *Ex parte Young* doctrine

---

[2] To the extent Plaintiffs ask the Court to certify the results in favor of President Donald J. Trump, such relief is beyond its powers.

12

where it alleged that the problems that plagued the election "are chronic and will continue absent injunctive relief").

For these reasons, the Court concludes that the Eleventh Amendment bars Plaintiffs' claims against Defendants.

## B.     Mootness

This case represents well the phrase: "this ship has sailed."  The time has passed to provide most of the relief Plaintiffs request in their Amended Complaint; the remaining relief is beyond the power of any court.  For those reasons, this matter is moot.

"'Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies.'"  *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 595 (6th Cir. 2014) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).  A case may become moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396, 410 (1980) (internal quotation marks and citation omitted).  Stated differently, a case is moot where the court lacks "the ability to give meaningful relief[.]" *Sullivan v. Benningfield*, 920 F.3d 401, 410 (6th Cir. 2019).  This lawsuit was moot well before it was filed on November 25.

In their prayer for relief, Plaintiffs ask the Court to: (a) order Defendants to decertify the results of the election; (b) enjoin Secretary Benson and Governor

Whitmer from transmitting the certified election results to the Electoral College;
(c) order Defendants "to transmit certified election results that state that President
Donald Trump is the winner of the election"; (d) impound all voting machines and
software in Michigan for expert inspection; (e) order that no votes received or
tabulated by machines not certified as required by federal and state law be counted;
and, (f) enter a declaratory judgment that mail-in and absentee ballot fraud must be
remedied with a manual recount or statistically valid sampling.[3]  (ECF No. 6 at Pg
ID 955-56, ¶ 233.)  What relief the Court could grant Plaintiffs is no longer
available.

Before this lawsuit was filed, all 83 counties in Michigan had finished
canvassing their results for all elections and reported their results for state office
races to the Secretary of State and the Michigan Board of State Canvassers in
accordance with Michigan law.  *See* Mich. Comp. Laws § 168.843.  The State
Board had certified the results of the 2020 General Election and Governor
Whitmer had submitted the slate of Presidential Electors to the Archivists.  (ECF

---

[3] Plaintiffs also seek an order requiring the impoundment of all voting machines
and software in Michigan for expert inspection and the production of security
camera footage from the TCF Center for November 3 and 4.  (ECF No. 6 at Pg ID
956, ¶ 233.)  This requested relief is not meaningful, however, where the remaining
requests are no longer available.  In other words, the evidence Plaintiffs seek to
gather by inspecting voting machines and software and security camera footage
only would be useful if an avenue remained open for them to challenge the election
results.

No. 31-4 at Pg ID 2257-58; ECF No. 31-5 at Pg ID 2260-63.)  The time for

requesting a special election based on mechanical errors or malfunctions in voting

machines had expired.  *See* Mich. Comp. Laws §§ 168.831, 168.832 (petitions for

special election based on a defect or mechanical malfunction must be filed "no

later than 10 days after the date of the election").  And so had the time for

requesting a recount for the office of President.  *See* Mich. Comp. Laws § 168.879.

The Michigan Election Code sets forth detailed procedures for challenging

an election, including deadlines for doing so.  Plaintiffs did not avail themselves of

the remedies established by the Michigan legislature.  The deadline for them to do

so has passed.  Any avenue for this Court to provide meaningful relief has been

foreclosed.  As the Eleventh Circuit Court of Appeals recently observed in one of

the many other post-election lawsuits brought to specifically overturn the results of

the 2020 presidential election:

> "We cannot turn back the clock and create a world in
> which" the 2020 election results are not certified.
> *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015).
> And it is not possible for us to delay certification nor
> meaningful to order a new recount when the results are
> already final and certified.

*Wood v. Raffensperger*, -- F.3d -- , 2020 WL 7094866 (11th Cir. Dec. 5, 2020).

And as one Justice of the Supreme Court of Pennsylvania advised in another 2020

post-election lawsuit: "there is no basis in law by which the courts may grant

Petitioners' request to ignore the results of an election and recommit the choice to

15

the General Assembly to substitute its preferred slate of electors for the one chosen

by a majority of Pennsylvania's voters." *Kelly v. Commonwealth*, No. 68 MAP

2020, 2020 WL 7018314, at *3 (Pa. Nov. 28, 2020) (Wecht, J., concurring); *see*

*also Wood v. Raffensperger*, No. 1:20-cv-04651, 2020 WL 6817513, at *13 (N.D.

Ga. Nov. 20, 2020) (concluding that "interfer[ing] with the result of an election

that has already concluded would be unprecedented and harm the public in

countless ways").

In short, Plaintiffs' requested relief concerning the 2020 General Election is

moot.

### C. Laches

Defendants argue that Plaintiffs are unlikely to succeed on the merits

because they waited too long to knock on the Court's door. (ECF No. 31 at Pg ID

2175-79; ECF No. 39 at Pg ID 2844.) The Court agrees.

The doctrine of laches is rooted in the principle that "equity aids the vigilant,

not those who slumber on their rights." *Lucking v. Schram*, 117 F.2d 160, 162 (6th

Cir. 1941); *see also United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 9

(2008) ("A constitutional claim can become time-barred just as any other claim

can."). An action may be barred by the doctrine of laches if: (1) the plaintiff

delayed unreasonably in asserting his rights and (2) the defendant is prejudiced by

this delay. *Brown-Graves Co. v. Central States, Se. and Sw. Areas Pension Fund*,

206 F.3d 680, 684 (6th Cir. 2000); *Ottawa Tribe of Oklahoma v. Logan*, 577 F.3d

634, 639 n.6 (6th Cir. 2009) ("Laches arises from an extended failure to exercise a

right to the detriment of another party."). Courts apply laches in election cases.

*Detroit Unity Fund v. Whitmer*, 819 F. App'x 421, 422 (6th Cir. 2020) (holding

that the district court did not err in finding plaintiff's claims regarding deadline for

local ballot initiatives "barred by laches, considering the unreasonable delay on the

part of [p]laintiffs and the consequent prejudice to [d]efendants"). *Cf. Benisek v.*

*Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary

injunction must generally show reasonable diligence. That is as true in election law

cases as elsewhere.").

First, Plaintiffs showed no diligence in asserting the claims at bar. They

filed the instant action on November 25—more than 21 days after the 2020

General Election—and served it on Defendants some five days later on December

1. (ECF Nos. 1, 21.) If Plaintiffs had legitimate claims regarding whether the

treatment of election challengers complied with state law, they could have brought

their claims well in advance of or on Election Day—but they did not. Michigan's

83 Boards of County Canvassers finished canvassing by no later than November

17 and, on November 23, both the Michigan Board of State Canvassers and

Governor Whitmer certified the election results. Mich. Comp. Laws §§ 168.822,

168.842.0. If Plaintiffs had legitimate claims regarding the manner by which

ballots were processed and tabulated on or after Election Day, they could have

brought the instant action on Election Day or during the weeks of canvassing that

followed—yet they did not.  Plaintiffs base the claims related to election machines

and software on "expert and fact witness" reports discussing "glitches" and other

alleged vulnerabilities that occurred as far back as 2010.  (*See e.g.,* ECF No. 6 at

Pg ID 927-933, ¶¶ 157(C)-(E), (G), 158, 160, 167.)  If Plaintiffs had legitimate

concerns about the election machines and software, they could have filed this

lawsuit well before the 2020 General Election—yet they sat back and did nothing.

Plaintiffs proffer no persuasive explanation as to why they waited so long to

file this suit.  Plaintiffs concede that they "would have preferred to file sooner, but

[] needed some time to gather statements from dozens of fact witnesses, retain and

engage expert witnesses, and gather other data supporting their Complaint."  (ECF

No. 49 at Pg ID 3081.)  But according to Plaintiffs themselves, "[m]anipulation of

votes was apparent *shortly after the polls closed on November 3, 2020*."  (ECF No.

7 at Pg ID 1837 (emphasis added).)  Indeed, where there is no reasonable

explanation, there can be no true justification.  *See Crookston v. Johnson*, 841 F.3d

396, 398 (6th Cir. 2016) (identifying the "first and most essential" reason to issue a

stay of an election-related injunction is plaintiff offering "no reasonable

explanation for waiting so long to file this action").  Defendants satisfy the first

element of their laches defense.

18

Second, Plaintiffs' delay prejudices Defendants. *See Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) ("As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made, and the candidate's claim to be a serious candidate who has received a serious injury becomes less credible by his having slept on his rights.") This is especially so considering that Plaintiffs' claims for relief are not merely last-minute—they are after the fact. While Plaintiffs delayed, the ballots were cast; the votes were counted; and the results were certified. The rationale for interposing the doctrine of laches is now at its peak. *See McDonald v. Cnty. of San Diego*, 124 F. App'x 588 (9th Cir. 2005) (citing *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988)); *Soules*, 849 F.2d at 1180 (quoting *Hendon v. N.C. State Bd. Of Elections*, 710 F.2d 177, 182 (4th Cir. 1983)) (applying doctrine of laches in post-election lawsuit because doing otherwise would, "permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action").

Plaintiffs could have lodged their constitutional challenges much sooner than they did, and certainly not three weeks after Election Day and one week after certification of almost three million votes. The Court concludes that Plaintiffs' delay results in their claims being barred by laches.

19

### D.    Abstention

As outlined in several filings, when the present lawsuit was filed on November 25, 2020, there already were multiple lawsuits pending in Michigan state courts raising the same or similar claims alleged in Plaintiffs' Amended Complaint.  (*See, e.g.*, ECF No. 31 at Pg ID 2193-98 (summarizing five state court lawsuits challenging President Trump's defeat in Michigan's November 3, 2020 General Election).)  Defendants and the City of Detroit urge the Court to abstain from deciding Plaintiffs' claims in deference to those proceedings under various abstention doctrines.  (*Id.* at Pg ID 2191-2203; ECF No. 39 at Pg ID 2840-44.) Defendants rely on the abstention doctrine outlined by the Supreme Court in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). The City of Detroit relies on the abstention doctrines outlined in *Colorado River*, as well as those set forth in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 500-01 (1941), and *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).  The City of Detroit maintains that abstention is particularly appropriate when resolving election disputes in light of the autonomy provided to state courts to initially settle such disputes.

The abstention doctrine identified in *Colorado River* permits a federal court to abstain from exercising jurisdiction over a matter in deference to parallel state-court proceedings.  *Colorado River*, 424 U.S. at 813, 817.  The exception is found

warranted "by considerations of 'proper constitutional adjudication,' 'regard for federal-state relations,' or 'wise judicial administration.'"  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (quoting *Colorado River*, 424 U.S. at 817).  The Sixth Circuit has identified two prerequisites for abstention under this doctrine. *Romine v. Compuserve Corp.*, 160 F.3d 337, 339-40 (6th Cir. 1998).

First, the court must determine that the concurrent state and federal actions are parallel.  *Id*. at 339.  Second, the court must consider the factors outlined by the Supreme Court in *Colorado River* and subsequent cases:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; … (4) the order in which jurisdiction was obtained; … (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

*Romine*, 160 F.3d at 340-41 (internal citations omitted).  "These factors, however, do not comprise a mechanical checklist.  Rather, they require 'a careful balancing of the important factors as they apply in a give[n] case' depending on the particular facts at hand."  *Id*. (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983)).

As summarized in Defendants' response brief and reflected in their exhibits (*see* ECF No. 31 at Pg ID 2193-97; *see also* ECF Nos. 31-7, 31-9, 31-11, 31-12,

31-14), the allegations and claims in the state court proceedings and the pending

matter are, at the very least, substantially similar, *Romine*, 160 F.3d at 340 ("Exact

parallelism is not required; it is enough if the two proceedings are substantially

similar." (internal quotation marks and citation omitted)). A careful balancing of

the factors set forth by the Supreme Court counsel in favor of deferring to the

concurrent jurisdiction of the state courts.

The first and second factor weigh against abstention. *Id.* (indicating that the

weight is against abstention where no property is at issue and neither forum is

more or less convenient). While the Supreme Court has stated that "'the presence

of federal law issues must always be a major consideration weighing against

surrender of federal jurisdiction in deference to state proceedings[,]'" *id.* at 342

(quoting *Moses H. Cone*, 460 U.S. at 26), this "'factor has less significance where

the federal courts' jurisdiction to enforce the statutory rights in question is

concurrent with that of the state courts.'"[4] *Id.* (quoting *Moses H. Cone*, 460 U.S. at

25). Moreover, the Michigan Election Code seems to dominate even Plaintiffs'

federal claims. Further, the remaining factors favor abstention.

"Piecemeal litigation occurs when different courts adjudicate the identical

issue, thereby duplicating judicial effort and potentially rendering conflicting

---

[4] State courts have concurrent jurisdiction over § 1983 actions. *Felder v. Casey*, 487 U.S. 131, 139 (1988).

results." *Id.* at 341.  The parallel proceedings are premised on similar factual allegations and many of the same federal and state claims.  The state court proceedings were filed well before the present matter and at least three of those matters are far more advanced than this case.  Lastly, as Congress conferred concurrent jurisdiction on state courts to adjudicate § 1983 claims, *Felder v. Casey*, 487 U.S. 131, 139 (1988), "[t]here can be no legitimate contention that the [Michigan] state courts are incapable of safeguarding [the rights protected under this statute]," *Romine*, 160 F.3d at 342.

For these reasons, abstention is appropriate under the *Colorado River* doctrine.  The Court finds it unnecessary to decide whether abstention is appropriate under other doctrines.

### E.     Standing

Under Article III of the United States Constitution, federal courts can resolve only "cases" and "controversies."  U.S. Const. art. III § 2.  The case-or-controversy requirement is satisfied only where a plaintiff has standing to bring suit.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016).  Each plaintiff must demonstrate standing for each claim he seeks to press.[5]

---

[5] Plaintiffs assert a due process claim in their Amended Complaint and twice state in their motion for injunctive relief that Defendants violated their due process rights.  (*See* ECF No. 7 at Pg ID 1840, 1844.)  Plaintiffs do not pair either statement with anything the Court could construe as a developed argument.  (*Id.*)  The Court finds it unnecessary, therefore, to further discuss the due process claim.

23

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). To establish standing, a plaintiff must show that: (1) he has suffered an injury in fact that is "concrete and particularized" and "actual or imminent"; (2) the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992) (internal quotation marks and citations omitted).

### 1.   Equal Protection Claim

Plaintiffs allege that Defendants engaged in "several schemes" to, among other things, "destroy," "discard," and "switch" votes for President Trump, thereby "devalu[ing] Republican votes" and "diluting" the influence of their individual votes. (ECF No. 49 at Pg ID 3079.) Plaintiffs contend that "the vote dilution resulting from this systemic and illegal conduct did not affect all Michigan voters equally; it had the intent and effect of inflating the number of votes for Democratic candidates and reducing the number of votes for President Trump and Republican candidates." (ECF No. 49 at Pg ID 3079.) Even assuming that Plaintiffs establish

---

*McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

injury-in-fact and causation under this theory,[6] their constitutional claim cannot stand because Plaintiffs fall flat when attempting to clear the hurdle of redressability.

Plaintiffs fail to establish that the alleged injury of vote-dilution can be redressed by a favorable decision from this Court.  Plaintiffs ask this Court to de-certify the results of the 2020 General Election in Michigan.  But an order de-certifying the votes of approximately 2.8 million people would not reverse the dilution of Plaintiffs' vote.  To be sure, standing is not "dispensed in gross: A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill*, 138 S. Ct. at 1934 (citing *Cuno*, 547 U.S. at 353); *Cuno*, 547 U.S. at 353 ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).  Plaintiffs' alleged injury does not entitle them to seek their requested remedy because the harm of having one's vote invalidated or diluted is not remedied by denying millions of others *their* right to vote.  Accordingly, Plaintiffs have failed to show that their injury can be redressed by the relief they seek and thus possess no standing to pursue their equal protection claim.

---

[6] To be clear, the Court does not find that Plaintiffs satisfy the first two elements of the standing inquiry.

## 2.   Elections Clause & Electors Clause Claims

The provision of the United States Constitution known as the Elections Clause states in part: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]"  U.S. Const. art. I, § 4, cl. 1.  "The Elections Clause effectively gives state governments the 'default' authority to regulate the mechanics of federal elections, *Foster v. Love*, 522 U.S. 67, 69, 118 S. Ct. 464, 139 L.Ed.2d 369 (1997), with Congress retaining 'exclusive control' to 'make or alter' any state's regulations, *Colegrove v. Green*, 328 U.S. 549, 554, 66 S. Ct. 1198, 90 L.Ed. 1432 (1946)."  *Bognet*, 2020 WL 6686120, *1.  The "Electors Clause" of the Constitution states: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors …."  U.S. Const. art. II, § 1, cl. 2.

Plaintiffs argue that, as "nominees of the Republican Party to be Presidential Electors on behalf of the State of Michigan, they have standing to allege violations of the Elections Clause and Electors Clause because "a vote for President Trump and Vice-President Pence in Michigan … is a vote for each Republican elector[], and … illegal conduct aimed at harming candidates for President similarly injures Presidential Electors."  (ECF No. 7 at Pg ID 1837-38; ECF No. 49 at Pg ID 3076-78.)

26

But where, as here, the only injury Plaintiffs have alleged is that the

Elections Clause has not been followed, the United States Supreme Court has made

clear that "[the] injury is precisely the kind of undifferentiated, generalized

grievance about the conduct of government that [courts] have refused to

countenance."[7]  *Lance v. Coffman*, 549 U.S. 437, 442 (2007).  Because Plaintiffs

"assert no particularized stake in the litigation," Plaintiffs fail to establish injury-

in-fact and thus standing to bring their Elections Clause and Electors Clause

claims.  *Id.*; *see also Johnson v. Bredesen*, 356 F. App'x 781, 784 (6th Cir. 2009)

(citing *Lance*, 549 U.S. at 441-42) (affirming district court's conclusion that

citizens did not allege injury-in-fact to support standing for claim that the state of

Tennessee violated constitutional law).

---

[7] Although separate constitutional provisions, the Electors Clause and Elections
Clause share "considerable similarity," *Ariz. State Leg. v. Ariz. Indep. Redistricting
Comm'n*, 576 U.S. 787, 839, (2015) (Roberts, C.J., dissenting), and Plaintiffs do
not at all distinguish the two clauses in their motion for injunctive relief or reply
brief (ECF No. 7; ECF No. 49 at Pg ID 3076-78).  *See also Bognet v. Sec'y
Commonwealth of Pa*., No. 20-3214, 2020 WL 6686120, at *7 (3d Cir. Nov. 13,
2020) (applying same test for standing under both Elections Clause and Electors
Clause); *Wood*, 2020 WL 6817513, at *1 (same); *Foster*, 522 U.S. at 69
(characterizing Electors Clause as Elections Clauses' "counterpart for the
Executive Branch"); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804-05
(1995) (noting that state's "duty" under Elections Clause "parallels the duty"
described by Electors Clause).

This is so because the Elections Clause grants rights to "the Legislature" of "each State."  U.S. Const. art. I, § 4, cl. 1.  The Supreme Court interprets the words "the Legislature," as used in that clause, to mean the lawmaking bodies of a state. *Ariz. State Legislature*, 135 S.Ct. at 2673.  The Elections Clause, therefore, grants rights to state legislatures and to other entities to which a State may delegate lawmaking authority.  *See id.* at 2668.  Plaintiffs' Elections Clause claims thus belong, if to anyone, Michigan's state legislature.  *Bognet v. Secy. Commonwealth of Pa.*, -- F.3d. --, 2020 WL 6686120, *7 (3d Cir. Nov. 13, 2020).  Plaintiffs here are six presidential elector nominees; they are not a part of Michigan's lawmaking bodies nor do they have a relationship to them.

To support their contention that they have standing, Plaintiffs point to *Carson v. Simon*, 78 F.3d 1051 (8th Cir. 2020), a decision finding that electors had standing to bring challenges under the Electors Clause.  (ECF No. 7 at Pg ID 1839 (citing *Carson*, 978 F.3d at 1057).)  In that case, which was based on the specific content and contours of Minnesota state law, the Eighth Circuit Court of Appeals concluded that because "the plain text of Minnesota law treats prospective electors as candidates," it too would treat presidential elector nominees as candidates. *Carson*, 78 F.3d at 1057.  This Court, however, is as unconvinced about the majority's holding in *Carson* as the dissent:

> I am not convinced the Electors have Article III standing
> to assert claims under the Electors Clause.  Although

28

> Minnesota law at times refers to them as "candidates,"
> *see, e.g.*, Minn. Stat. § 204B.03 (2020), the Electors are
> not candidates for public office as that term is commonly
> understood.  Whether they ultimately assume the office
> of elector depends entirely on the outcome of the state
> popular vote for president.  *Id*. § 208.04 subdiv. 1 ("[A]
> vote cast for the party candidates for president and vice
> president shall be deemed a vote for that party's
> electors.").  They are not presented to and chosen by the
> voting public for their office, but instead automatically
> assume that office based on the public's selection of
> entirely different individuals.

78 F.3d at 1063 (Kelly, J., dissenting).[8]

Plaintiffs contend that the Michigan Election Code and relevant Minnesota

law are similar.  (See ECF No. 49 at Pg ID 3076-78.)  Even if the Court were to

---

[8] In addition, at least one Circuit Court, the Third Circuit Court of Appeals, has
distinguished *Carson*'s holding, noting:

> Our conclusion departs from the recent decision of an
> Eighth Circuit panel which, over a dissent, concluded
> that candidates for the position of presidential elector had
> standing under *Bond* to challenge a Minnesota state-court
> consent decree that effectively extended the receipt
> deadline for mailed ballots. . . . The *Carson* court appears
> to have cited language from *Bond* without considering
> the context—specifically, the Tenth Amendment and the
> reserved police powers—in which the U.S. Supreme
> Court employed that language. There is no precedent for
> expanding *Bond* beyond this context, and the *Carson*
> court cited none.

*Bognet*, 2020 WL 6686120, at *8 n.6.

agree, it finds that Plaintiffs lack standing to sue under the Elections and Electors Clauses.

### F. The Merits of the Request for Injunctive Relief

#### 1. Likelihood of Success on the Merits

The Court may deny Plaintiffs' motion for injunctive relief for the reasons discussed above. Nevertheless, the Court will proceed to analyze the merits of their claims.

##### a. Violation of the Elections & Electors Clauses

Plaintiffs allege that Defendants violated the Elections Clause and Electors Clause by deviating from the requirements of the Michigan Election Code. (*See, e.g.,* ECF No. 6 at Pg ID 884-85, ¶¶ 36-40, 177-81, 937-38.) Even assuming Defendants did not follow the Michigan Election Code, Plaintiffs do not explain how or why such violations of state election procedures automatically amount to violations of the clauses. In other words, it appears that Plaintiffs' claims are in fact state law claims disguised as federal claims.

A review of Supreme Court cases interpreting these clauses supports this conclusion. In *Cook v. Gralike*, the Supreme Court struck down a Missouri law that required election officials to print warnings on the ballot next to the name of any congressional candidate who refused to support term limits after concluding that such a statute constituted a "'regulation' of congressional elections," as used in

30

the Elections Clause.  531 U.S. 510, 525-26 (2001) (quoting U.S. Const. art. I, § 4,

cl. 1).  In *Arizona State Legislature v. Arizona Independent Redistricting*

*Commission*, the Supreme Court upheld an Arizona law that transferred

redistricting power from the state legislature to an independent commission after

concluding that "the Legislature," as used in the Elections Clause, includes any

official body with authority to make laws for the state.  576 U.S. 787, 824 (2015).

In each of these cases, federal courts measured enacted state election laws against

the federal mandates established in the clauses—they did not measure *violations* of

enacted state elections law against those federal mandates.

By asking the Court to find that they have made out claims under the clauses

due to alleged violations of the Michigan Election Code, Plaintiffs ask the Court to

find that any alleged deviation from state election law amounts to a modification of

state election law and opens the door to federal review.  Plaintiffs cite to no case—

and this Court found none—supporting such an expansive approach.

### b.     Violation of the Equal Protection Clause

Most election laws will "impose some burden upon individual voters."

*Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  But "[o]ur Constitution leaves no

room for classification of people in a way that unnecessarily abridges this right [to

vote]."  *Reynolds v. Sims*, 377 U.S. 533, 559 (1964) (quoting *Wesberry v. Sanders*,

376 U.S. 1, 17-18 (1964)).  Voting rights can be impermissibly burdened "by a

debasement or dilution of the weight of a citizen's vote just as effectively as by

wholly prohibiting the free exercise of the franchise." *Id*. (quoting *Reynolds*, 377

U.S. at 555).

Plaintiffs attempt to establish an Equal Protection claim based on the theory

that Defendants engaged in "several schemes" to, among other things, "destroy,"

"discard," and "switch" votes for President Trump, thereby "devalu[ing]"

Republican votes" and "diluting" the influence of their individual votes.  (ECF No.

49 at Pg ID 3079.)

But, to be perfectly clear, Plaintiffs' equal protection claim is not supported

by any allegation that Defendants' alleged schemes caused votes for President

Trump to be changed to votes for Vice President Biden.  For example, the closest

Plaintiffs get to alleging that physical ballots were altered in such a way is the

following statement in an election challenger's sworn affidavit:  "I believe some of

these workers were changing votes that had been cast for Donald Trump and other

Republican candidates."[9]  (ECF No. 6 at Pg ID 902 ¶ 91 (citing Aff. Articia

---

[9] Plaintiffs allege in several portions of the Amended Complaint that election
officials improperly tallied, counted, or marked ballots.  But some of these
allegations equivocate with words such as "believe" and "may" and none of these
allegations identify which presidential candidate the ballots were allegedly altered
to favor. (*See, e.g.,* ECF No. 6 at Pg ID 902, ¶ 91 (citing Aff. Articia Bomer, ECF
No. 6-3 at Pg ID 1008-10 ("I *believe* some of these ballots *may* not have been
properly counted." (emphasis added))); Pg ID 902-03, ¶ 92 (citing Tyson Aff. ¶ 17)
("At least one challenger observed poll workers adding marks to a ballot where
there was no mark for any candidate.").

32

Bomer, ECF No. 6-3 at Pg ID 1008-1010).)  But of course, "[a] belief is not evidence" and falls far short of what is required to obtain any relief, much less the extraordinary relief Plaintiffs request.  *United States v. O'Connor*, No. 96-2992, 1997 WL 413594, at *1 (7th Cir. 1997); *see Brown v. City of Franklin*, 430 F. App'x 382, 387 (6th Cir. 2011) ("Brown just submits his belief that Fox's 'protection' statement actually meant "protection from retaliation. . . . An unsubstantiated belief is not evidence of pretext."); *Booker v. City of St. Louis*, 309 F.3d 464, 467 (8th Cir. 2002) ("Booker's "belief" that he was singled out for testing is not evidence that he was.").[10]  The closest Plaintiffs get to alleging that election machines and software changed votes for President Trump to Vice

---

[10] As stated by the Circuit Court for the District of Columbia Circuit:

> The statement is that the complainant believes and
> expects to prove some things. Now his belief and
> expectation may be in good faith; but it has been
> repeatedly held that suspicion is not proof; and it is
> equally true that belief and expectation to prove cannot
> be accepted as a substitute for fact.  The complainant
> carefully refrains from stating that he has any
> information upon which to found his belief or to justify
> his expectation; and evidently he has no such
> information.  But belief, without an allegation of fact
> either upon personal knowledge or upon information
> reasonably sufficient upon which to base the belief,
> cannot justify the extraordinary remedy of injunction.

*Magruder v. Schley*, 18 App. D.C. 288, 292, 1901 WL 19131, at *2 (D.C. Cir. 1901).

President Biden in Wayne County is an amalgamation of theories, conjecture, and speculation that such alterations were *possible*.  (*See e.g.,* ECF No. 6 at ¶¶ 7-11, 17, 125, 129, 138-43, 147-48, 155-58, 160-63, 167, 171.)  And Plaintiffs do not at all explain how the question of whether the treatment of election challengers complied with state law bears on the validity of votes, or otherwise establishes an equal protection claim.

With nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails.[11]  *See Wood*, 2020 WL 7094866 (quoting *Bognet*, 2020 WL 6686120, at *12) ("'[N]o single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'").

---

[11] "[T]he Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently.  Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment.  And if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity.  That is not how the Equal Protection Clause works." *Bognet*, 2020 WL 6686120, at *11.

34

## 2.    Irreparable Harm & Harm to Others

Because "a finding that there is simply no likelihood of success on the merits is usually fatal[,]" *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997), the Court will not discuss the remaining preliminary injunction factors extensively.

As discussed, Plaintiffs fail to show that a favorable decision from the Court would redress their alleged injury.  Moreover, granting Plaintiffs' injunctive relief would greatly harm the public interest.  As Defendants aptly describe, Plaintiffs' requested injunction would "upend the statutory process for election certification and the selection of Presidential Electors.  Moreover, it w[ould] disenfranchise millions of Michigan voters in favor [of] the preferences of a handful of people who [are] disappointed with the official results."  (ECF No. 31 at Pg ID 2227.)

In short, none of the remaining factors weigh in favor of granting Plaintiffs' request for an injunction.

## IV.   Conclusion

For these reasons, the Court finds that Plaintiffs are far from likely to succeed in this matter.  In fact, this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court— and more about the impact of their allegations on People's faith in the democratic

35

process and their trust in our government.  Plaintiffs ask this Court to ignore the

orderly statutory scheme established to challenge elections and to ignore the will of

millions of voters.  This, the Court cannot, and will not, do.

The People have spoken.

The Court, therefore, **DENIES** Plaintiffs' "Emergency Motion for

Declaratory, Emergency, and Permanent Injunctive Relief" (ECF No. 7.)

**IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: December 7, 2020

36

# EXHIBIT 6

2011 WL 7630628
Only the Westlaw citation is currently available.
United States District Court,
W.D. Wisconsin.

Lorene ZILISCH, Plaintiff,

v.

R.J. REYNOLDS TOBACCO
COMPANY, Defendant.

No. 10–cv–474–bbc.
|
June 21, 2011.

**Attorneys and Law Firms**

Peter J. Fox, Fox & Fox, S.C., Monona, WI, for Plaintiff.

Jonathan Matthew Linas, Michael Jeffrey Gray, Jones Day, Chicago, IL, for Defendant.

OPINION and ORDER

BARBARA B. CRABB, District Judge.

**\*1** In May 2008, plaintiff Lorene Zilisch was terminated by her former employer, defendant R.J. Reynolds Tobacco Company, after she signed a customer's name to a contract in violation of company policy. In this civil action brought under the Age Discrimination in Employment Act, 29 U.S.C. § 623, plaintiff contends that defendant fired her not because she violated company policy, but because of her age. Now before the court is defendant's motion for summary judgment in which defendant argues that plaintiff cannot establish a prima facie case that it discriminated against her on the basis of her age. Dkt. # 14. Plaintiff opposes the motion and has filed additional proposed findings of fact in conjunction with her opposition brief.

As an initial matter, several of plaintiff's proposed findings of fact rely on inadmissible evidence. Specifically, several statements in the affidavit of Carlo Fasciani, dkt. # 22, a former division manager for defendant, are inadmissible because they are conclusory and not made on the basis of Fasciani's personal knowledge. For example, plaintiff proposes as fact that "[Defendant] has always followed [its] progressive discipline practice .... ", citing the Fasciani's

affidavit containing the same conclusory statement. Plt.'s PFOF, dkt. # 18, ¶ 14 (citing dkt. # 22 at ¶ 30). Also, Fasciani avers that defendant gave older employees "unreasonable goals, unjustly penalized them and gave them unfair performance reviews," *id.* at ¶ 12, while younger employees "were frequently promoted and allowed to perform poorly with less accountability." *Id.* at ¶ 14.

Fasciani worked in discrete divisions of the company and his affidavit provides no factual basis upon which he can make such sweeping conclusions about the disciplinary practices "always" utilized by defendant or statements about how employees were treated outside his own division, let alone in the Minneapolis Region or the Green Bay Division where plaintiff worked. In other words, Fasciani does not show that he has personal knowledge of the matters in his affidavit. Fed.R.Civ.P. 56(c)(4) (affidavits used in opposition to motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Additionally, much of Fasciani's testimony is vague and conclusory. *Hall v. Bodine Electric Co.,* 276 F.3d 345, 354 (7th Cir.2002) ("It is well-settled that conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact."); *Drake v. Minnesota Mining & Manufacturing Co.,* 134 F.3d 878, 887 (7th Cir.1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). Thus, I will not consider Fasciani's affidavit it or the statements of fact that rely on averments in the affidavit. *Watson v. Lithonia Lighting,* 304 F.3d 749, 752 (7th Cir.2002) (affidavits used to support or oppose summary judgment must be made on personal knowledge); *see also Haka v. Lincoln County,* 533 F.Supp.2d 895, 899 (W.D.Wis.2008) (disregarding proposed facts not properly supported by admissible evidence).

**\*2** After reviewing the parties' arguments and proposed facts, I conclude that defendant is entitled to summary judgment in its favor because plaintiff cannot establish a prima facie case of age discrimination. No reasonable jury could conclude that plaintiff lost her job because of her age; rather, the uncontradicted evidence shows that defendant terminated plaintiff because she violated company policy.

From the parties' proposed findings of fact and the record, I find the following facts to be material and undisputed.

UNDISPUTED FACTS

A. *Plaintiff's Employment with Defendant*

Plaintiff Lorene Zilisch was born in December 1957. She began her employment with defendant R.J. Reynolds Tobacco Co. in 2004 at the age of 46, following a merger between Brown & Williamson Tobacco Company, her previous employer, and defendant. In late 2007, plaintiff began working in the Green Bay Division as a Trade Marketing Representative, reporting directly to Brent Trader, the division manager, who reported to David Williams, the director of regional sales for the Minneapolis region.

As a trade marketing representative for defendant, plaintiff's duties included visiting stores to build customer relationships, negotiating and implementing contracts with defendant's customers, reviewing customer order books to insure that customers ordered the correct products according to their contracts and checking product distribution in customer stores. Defendant uses several different forms of written contracts that trade marking representatives can propose to retail store customers. The terms of these contracts vary in many respects and address issues such as pricing of defendant's products at the store, customer rebates and discounts, space and signage the retailer must make available for display in the store and configuration of defendants' products on merchandising displays.

When a trade marketing representative and a customer agree upon the terms of a contract, the trade marketing representative selects the appropriate contract from a list of electronic contracts on the representative's laptop computer. (Defendant does not use paper contracts with retailers.) The trade marketing representative and the customer then sign the contract using an electric pen on an electronic signature pad that is attached to the representative's laptop through a USB port. Defendant's "Contract Signatures" policy, which is included in the Trade Marketing Employee Handbook, provides:

> It is important that all agreements/contracts between the Company and its retail customers are properly executed. It is your responsibility to ensure that an authorized person signs the agreement/contract on behalf of the retailer. Therefore, ask the person if he or she has the authority to sign the Company agreement/contract. It is not acceptable

for you to sign for the retailer under any circumstances. Make sure all agreements/contracts are properly dated and appropriately filed according to company guidelines.

**\*3 Signing for the retailer could lead to termination of employment.**

Dkt. # 19–3 at 15 (emphasis in original). The Trade Marketing Employee Handbook is distributed to all trade marketing representatives, including plaintiff. Plaintiff received the handbook at the start of her employment with defendant and signed an agreement stating that she had read and understood the policies contained within it.

Division managers sometimes accompany trade marketing representatives on visits to customers. On April 23, 2008, division manager Trader accompanied plaintiff on her visits to several customers. Plaintiff and Trader traveled together in plaintiff's car to their first appointment at Ace Oil Express, where they planned to meet with the owner of Ace Oil Express, Mary Lis, for the purpose of negotiating a contract between Ace Oil Express and defendant. During their meeting, the parties agreed to specific contract terms that would go into effect on June 2, 2008. Before the meeting concluded, both plaintiff and Lis signed a contract. However, plaintiff had presented the incorrect contract to Lis by mistake. Both plaintiff and Lis signed it without realizing that it did not reflect the terms upon which the parties had agreed.

After leaving Ace Oil Express, plaintiff and Trader proceeded to their next appointment at Stanley Travel Stop, where plaintiff and the manager of Stanley Travel Stop agreed upon the terms of a contract between defendant and the Travel Stop. When plaintiff searched on her laptop for the correct contract, she noticed that she and Mary Lis had signed the wrong contract at their meeting earlier that day. After noticing this error, plaintiff told Trader, "Hey, I made a mistake, I had [Mary Lis] sign, you know, the wrong addendum [to the contract]." Dep. of plaintiff, dkt. # 16–1, at 130, lns. 9–22. Plaintiff opened up a new contract on her laptop that she believed reflected the terms upon which she and Lis had agreed at their meeting. (This contract did not actually contain the correct terms that plaintiff and Lis had agreed upon.) Using the electronic pen and signature pad attached to her computer, plaintiff signed both her own and Lis's name on the new contract. Trader, who was standing a few feet away from plaintiff, saw her sign Lis's name on the signature pad. (The parties dispute whether plaintiff called Lis and asked for permission to sign the contract on her behalf. Plaintiff testified during her deposition that she did not call Lis before signing

Lis's name on the contract and Trader testified that he never saw plaintiff call Lis. However, plaintiff states in her affidavit that she talked to Lis at some point that day about signing her name. Lis also testifies in her affidavit that she talked with plaintiff on the phone and gave her permission to sign the contract. Neither plaintiff nor Lis says when the phone call took place.)

After finishing their business at Stanley Travel Stop, plaintiff and Trader went to plaintiff's car. After entering the car, plaintiff told Trader, "You didn't see me do that," referring to her act of signing Lis's name on the contract. Trader told plaintiff it was inappropriate for her to sign a contract for a retailer and that she should never do it again. He suggested that they return to Ace Oil Express that day to have Lis execute the correct contract on her own behalf. Plaintiff and Trader then went to lunch at a nearby restaurant, where they discussed again why plaintiff had signed Lis's name. Plaintiff told Trader that her previous managers told her that it was acceptable to sign for customers. Trader responded that he was her manager now and that it was not acceptable. After lunch, plaintiff and Trader drove back to Ace Oil Express, but Lis's vehicle was not in the parking lot, so they left. At the end of the day, Trader talked with plaintiff about her performance that day and plaintiff told him that she would never sign a retailer's name to a contract again. Trader told plaintiff to obtain a signature from Lis on the correct contract. He did not tell plaintiff to cancel the contract she had signed on Lis's behalf and did not cancel it himself. (Plaintiff avers that Trader gave her positive feedback about her performance that day, but defendant denies this.)

**\*4** Immediately after he finished working with plaintiff on April 23, 2008, Trader consulted with his human resources liaison, Jennifer Sanders, to determine whether a recommendation to terminate plaintiff would be fair and within the parameters of company policies. He also consulted with Sanders several times between that date and the date of plaintiff's termination, discussing company termination policies. Also, Trader consulted with his supervisor, David Williams, either on April 23 or 24, regarding termination of plaintiff.

Defendant has a corrective action policy stating that progressive discipline, including a series of oral and written warnings, is appropriate in some circumstances. Dkt. # 19–3 at 71–72. The policy states that

> [I]t is not possible to specify the corrective action step appropriate for each type of behavior. However, it is

the responsibility of management *in consultation with Human Resources,* to determine on a case-by-case basis which of the following corrective action steps based on the particular facts and circumstances involved.... Some improper behavior, for example, justifies immediate discharge. The fact that a progressive corrective action system is utilized by the Company neither requires the use of prior corrective action before discharge nor alters the fact that employment with the Company is "at will" and can be terminated at any time and for any reason by either the Company or the employee.

*Id.* (emphasis in original).

Additionally, defendant's policy regarding "Reasons for Immediate Termination" provides that "there may be instances where [progressive action] steps may be omitted, due to the nature or severity of the infraction." *Id.* at 73. That policy provides a non-inclusive "list of offenses that will normally result in immediate termination for the first offense," including "gross representation of information as it relates to business practices." *Id.* at 73–74.

Trader decided not to utilize progressive discipline in plaintiff's case because he believed she had engaged in a clear violation of company policy that was a terminable offense. In particular, he believed her actions fell into the category of "gross representation of information as it relates to business practices."

On May 5, 2008, Trader told plaintiff that he needed to meet with her the next day at a restaurant near her house. (Plaintiff had spoken to Trader on several occasions between April 23, 2008 and May 5, but Trader had not mentioned her signing the contract for Lis or any discipline or termination related to it.) After Trader's call, plaintiff went to Ace Oil Express to meet with Mary Lis. This was the first time since April 23, 2008 that plaintiff had attempted to meet with Lis. At their meeting, plaintiff apologized to Lis for signing Lis's name on the contract and Lis signed a contract that reflected the actual terms upon which Lis and plaintiff agreed previously. Lis was not upset that plaintiff had signed on her behalf and never complained to defendant about plaintiff's signing the contract for her.

**\*5** The following morning, May 6, 2008, plaintiff met with Trader and May Carroll, another division manager in the Minneapolis regions. Trader read from a document explaining that plaintiff was being terminated from employment because she had "forg[ed] the signature of May Li[s] ... in an attempt to

fix [her] contract mistake" in violation of defendant's Contract Signatures policy. Dkt. # 19–1. The letter stated that plaintiff's action amounted to "[g]ross misrepresentation of information as it relates to business practices ." *Id.*

Before May 6, 2008, plaintiff had never been disciplined for any performance or behavior deficiencies and no customer had complained about her to defendant. She felt comfortable with Trader and had a good working relationship with him. Trader had never made comments to plaintiff about her age and plaintiff had never reported any concerns to defendant's human resources department regarding Trader's treatment of her. In addition, Trader had evaluated plaintiff's performance as satisfactory in the past and had considered her a good performer.

Between January 1, 2006 and September 30, 2010, defendant terminated eight trade marketing representatives. Two of them were more than 40 and six were under 40. Dkt. # 26–6. Plaintiff was the oldest employee terminated during this period. Defendant replaced plaintiff with an employee who is under 30.

## B. *Other Employees of Defendant*

While Megan Anderson was employed as a trade marketing representative for defendant, she hit a deer with a company car. Anderson had been talking on the company-issued cellular phone while driving, in violation of defendant's cell phone policy. She was approximately 23 years old at the time of the accident. Brent Trader, Anderson's supervisor at the time of the accident, instructed her to not talk on her cell phone anymore while driving. He did not discipline her otherwise.

While Molly Anderson was employed as a trade marketing representative for defendant, she left coupons with one of her customers. (It is not clear whether she left the coupons intentionally or by mistake.) It is a violation of defendant's policy and grounds for immediate termination to leave coupons at a store with a customer. Anderson was approximately 22 years old at the time and was not terminated for violating defendant's policy. Anderson has never been employed in the Green Bay Division and has never reported to Brent Trader.

(The parties dispute whether Brian Hietpas misrepresented the number of products available to a customer or ordered

by him while Hietpas was employed as a trade marketing representative for defendant and when he was about 30. Plaintiff says that Hietpas falsified certain records in violation of defendant's policy, and she contends that she reported his behavior to Trader and David Williams but that they did not discipline him. Defendant denies that Hietpas violated company policy and says that even if he did, neither Trader nor Williams was ever made aware of any alleged misbehavior by Heitpas. It is undisputed that Trader was never Hietpas's supervisor.)

OPINION

**\*6** Under the Age Discrimination in Employment Act (ADEA), it is unlawful for an employer to "discharge any individual or otherwise discriminate against any individual" because of the individual's age. 29 U.S.C. § 623(a) (1). Traditionally, courts in this circuit have explained that a plaintiff asserting age discrimination may prove discrimination under a "direct" or "indirect" method of proof. Under the direct method proof, the plaintiff presents direct evidence of discrimination, such as such as an outright admission from the employer, or circumstantial evidence that points directly to a discriminatory reason for an adverse employment action. *Ptasznik v. St. Joseph Hospital,* 464 F.3d 691, 695 (7th Cir.2006). Under the indirect method, a plaintiff may prove discrimination using the burden-shifting approach in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Burks v. Wisconsin Department of Transportation,* 464 F.3d 744, 750–51 (7th Cir.2006).

The Supreme Court stated recently that to prevail in an action under the ADEA "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that [an unlawful motive] was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Financial Services, Inc.,* 557 U.S. 167, 129 S.Ct. 2343, 2351 (2009); *see also Lindsey v. Walgreen Co.,* 615 F.3d 873, 876 (7th Cir.2010); *Senske v. Sybase, Inc.,* 588 F.3d 501, 508– 09 (7th Cir.2009). Additionally, the Supreme Court noted that it "has not definitively decided whether the evidentiary framework of *McDonnell Douglas* [ ], utilized in Title VII cases is appropriate in the ADEA context." *Gross,* 129 S.Ct. at 2349, n. 2. The Seventh Circuit has noted that "[w]hether [the] burden shifting analysis survives the Supreme Court's declaration in *Gross* in non-Title VII cases, remains to be seen." *Kodish v. Oakbrook Terrace Fire Protection District,* 604 F.3d 490, 501 (7th Cir.2010).

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Relying on *Gross* and *Kodish*, defendant contends that plaintiff must prove her case through the direct method. However, the Court of Appeals for the Seventh Circuit has long applied the indirect method of proof to ADEA claims, *e.g., Faas v. Sears, Roebuck, & Co.,* 532 F.3d 633, 641–42 (7th Cir.2008), and continues to do so in the wake of *Gross*, despite its comments in *Kodish*. E.g., *Van Antwerp v. City of Peoria, Illinois,* 627 F.3d 295, 298 (7th Cir.2010) (stating that plaintiff may prove ADEA claim through direct or indirect method); *Naik v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 627 F.3d 596, 599 (7th Cir.2010) (applying *McDonnell Douglas* burden shifting approach to AEDA claim); *Mach v. Will County Sheriff,* 580 F.3d 495, 498 n. 3 (7th Cir.2009); *Martino v. MCI Communications Services, Inc.,* 574 F.3d 447, 452 (7th Cir.2009). Thus, I conclude that plaintiff may still attempt to prove her discrimination case using the indirect method of proof set forth in *McDonnell Douglas*.

A. *Direct Method of Proof*

 **\*7** To survive summary judgment under the direct method, plaintiff must demonstrate "triable issues as to whether discrimination motivated the adverse employment action." *Kodish,* 604 F.3d at 501 (quoting *Darchak v. City of Chicago Board of Education,* 580 F.3d 622, 631 (7th Cir.2009)). "Direct" proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion (e.g., "You're too old to work here."), but also includes circumstantial evidence which suggests discrimination through a longer chain of inferences." *Id.* Circumstantial evidence can take many forms, including "suspicious timing, ambiguous oral or written statements, [ ] behavior toward or comments directed at other employees in the protected group [and] evidence showing that similarly situated employees outside the protected class received systematically better treatment." *Van Antwerp,* 627 F.3d at 298 (internal citations and quotations omitted). However, all circumstantial evidence must "point directly to a discriminatory reason for the employer's action." *Id.*

Plaintiff presents no evidence suggesting that the timing of her termination was "suspicious" or that the person who made the decision to discharge her, her supervisor Brent Trader, was biased against older workers. Plaintiff concedes that she had a good working relationship with Trader and that he never made comments about her age. She has presented no evidence of improper behavior toward her

or any other trade marketing representative who was over 40 and worked in the same division or region. She has identified no improper comments made by Trader to her or to other female employees. Nonetheless, plaintiff contends that there is sufficient circumstantial evidence from which a jury could infer intentional discrimination under the direct method of proof. In particular, she contends that intentional discrimination can be inferred from (1) statistical evidence concerning defendant's hiring practices; and (2) evidence that other employees were treated better than she was.

Plaintiff contends that statistical evidence regarding defendant's hiring practices shows that defendant prefers younger workers. Specifically, she contends that in the last few years, nearly all of defendant's new trade marketing representatives are under the age of 40. However, plaintiff does not explain adequately why evidence concerning the *hiring* of employees has much bearing on defendant's reason for terminating her, particularly when the person who terminated her, Trader, did not have the authority to hire trade marketing representatives. Evidence concerning defendant's *termination* practices is more relevant to the issues in this case; such evidence shows that between January 1, 2006 and August 23, 2010, six out of eight trade marketing representatives who were terminated were *under* the age of 40. More important, plaintiff provides no analysis or context for the hiring statistics she provides. For example, plaintiff has provided no evidence of the age or experience of the applicant pool from which trade marketing representatives were hired in the Minneapolis region. The mere citation of statistics does not create a triable issue. *Barracks v. Eli Lilly & Co.,* 481 F.3d 556, 559 (7th Cir.2007) ("We have frequently discussed the dangers of relying on raw data without further analysis or context in employment discrimination disputes."); *see also Jarrells v. Select Publishing, Inc.,* 2003 WL 23221278, \*5 (W.D.Wis. Feb. 19, 2003) ("Plaintiff has failed to present any evidence tying the statistical disparity to the decision not to hire her.").

 **\*8** Additionally, plaintiff has identified no similarly situated trade marketing representative who was substantially younger and treated more favorably than she was. Plaintiff identifies three younger employees who she asserts committed policy violations comparable to hers: (1) Brian Hietpas, who allegedly falsified information; (2) Molly Anderson, who left coupons with a customer; and (3) Megan Anderson, who used her cell phone while driving. None of these employees, however, is similarly situated to plaintiff.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Similarly situated employees must be "directly comparable to the plaintiff in all material respects, which includes showing that the coworkers engaged in comparable rule or policy violations." *Patterson v. Indiana Newspapers, Inc.,* 589 F.3d 357, 365–66 (7th Cir.2009) (internal quotations and citation omitted). In the course of this inquiry, the court considers all of the relevant factors, including "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications...." *Brummett v. Sinclair Broadcast Group, Inc.,* 414 F.3d 686, 692 (7th Cir.2005) (internal citation and quotation omitted).

Brian Hietpas and Molly Anderson were not supervised by plaintiff's supervisor, Brent Trader, the person who made the decision to terminate plaintiff's employment. *Radue,* 219 F.3d at 618 (noting importance of showing common supervisor because different supervisors make employment decisions in different ways). The only trade marketing representative that plaintiff identified who reported to Trader was Megan Anderson, who was reprimanded by Trader after she violated defendant's policy prohibiting employees from talking on their cell phones while driving. This policy violation is not comparable to a violation of the Contract Signatures policy. *Naik,* 627 F.3d at 600 (similarly situated employee must have violated comparable policy to plaintiff). Not only is it not the same violation, but according to the employee handbook, violation of the cell phone policy is not grounds for immediate termination, unlike the Contract Signatures policy that plaintiff violated.

In sum, plaintiff has produced no evidence "point[ing] directly to a discriminatory reason for [defendant's] actions," *Rhodes v. Illinois Department of Transportation,* 359 F.3d 498, 504 (7th Cir.2004), or that is "directly related to the employment decision" at issue. *Venturelli v. ARC Community Services, Inc.,* 350 F.3d 592, 602 (7th Cir.2003). Thus, plaintiff's claim fails under the direct method.

A. *Indirect Method of Proof*

Because plaintiff has failed to demonstrate any potential claim of direct discrimination, she must attempt to prove her case under the *McDonnell Douglas* burden-shifting approach. Under this approach, plaintiff must demonstrate that (1) she is a member of a protected class; (2) she was performing her job to defendant's legitimate expectations;

(3) in spite of her meeting those legitimate expectations, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who are substantially younger. *Naik,* 627 F.3d at 599–600; *Ransom v. CSC Consulting, Inc.,* 217 F.3d 467, 470 (7th Cir.2000). " 'Substantially younger' means at least a ten-year age difference." *Fisher v. Wayne Dalton Corp.,* 139 F.3d 1137, 1141 (7th Cir.1998) (quoting *Kariotis v. Navistar International Transportation Corp.,* 131 F.3d 672, 676 n. 1 (7th Cir.1997)).

**\*9** Summary judgment for defendant is appropriate if plaintiff fails to establish any of the foregoing elements of the prima facie case. *Atanus v. Perry,* 520 F.3d 662, 673 (7th Cir.2008). If plaintiff can make a prima facie case with respect to all elements, the burden shifts to defendant to offer a nondiscriminatory reason for its actions. *Burks,* 464 F.3d at 751. Once the defendant proffers such a reason, the burden shifts back to plaintiff to show that the reason is pretextual. *Id.*

The second and fourth elements of *McDonnell Douglas* are at issue here. With respect to the second element, defendant contends that plaintiff has not shown that she met its legitimate expectations because she violated company policy by signing a customer's name on a contract. Defendant's policy in this regard was clear, stating that "[s]igning for the retailor could lead to termination of employment." In addition, her supervisor made it clear that plaintiff's actions had been unacceptable. Plaintiff's response is that she was meeting defendant's legitimate expectations because she had performed well in the past, her supervisor was positive in his assessment of her performance on the same day she signed a customer's name to a contract and defendant did not "cancel" the contract on which she signed a customer's signature.

That plaintiff performed well in the past is not dispositive. *Naik,* 627 F.3d at 598 (plaintiff "must show that he was meeting [his employer's] expectations at the time of his termination, which includes evidence that he did not violate [company] policies."); *Luckie v. Ameritech Corp.,* 389 F.3d 708, 715 (7th Cir.2004). Plaintiff must show that she was meeting defendant's expectations at the time of her termination, which includes evidence that she did not violate defendant's policies. In addition, regardless whether Trader gave plaintiff some positive feedback on the day she signed a customer's name to a contract (a fact that defendant disputes), it is undisputed that Trader told plaintiff repeatedly that her actions were unacceptable and that he began the process of terminating her employment.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Finally, the fact that defendant failed to "cancel" the contract does not imply defendant's approval of plaintiff's behavior, particularly in light of her supervisor's reprimands. In sum, because plaintiff admits that she violated defendant's policies, she has failed to establish the second element of her prima facie case.

Turning to the fourth element, defendant contends that plaintiff cannot show that similarly situated employees not in her protected class were treated more favorably. As discussed above, plaintiff has presented no evidence that any employee who violated defendant's Contract Signatures policy remained on the job. *Naik, 627 F.3d at 600* (plaintiff cannot satisfy similarly-situated prong with "no evidence that any employee who violated the [same policy as plaintiff] remained on the job"); *Everroad v. Scott Truck Systems, Inc., 604 F.3d 471, 479–480 (7th Cir.2010)* (no similarly situated employees violated same "insubordination" standard that plaintiff violated).

 **\*10** Plaintiff argues that she satisfies the fourth element of her prima facie case by showing that defendant hired a substantially younger employee to replace her, citing *Hoffman v. Primedia Special Interest Publications, 217 F.3d 522, 524 (7th Cir.2000)*. In *Hoffman,* the Court of Appeals for the Seventh Circuit held that the plaintiff had to show only that he was replaced by someone substantially younger. *Id.* However, the court of appeals explained in *Naik* that this more relaxed standard for the fourth element applies only if the plaintiff has proven the second element of the prima facie case. *Naik, 627 F.3d at 600–01.* Because plaintiff has not shown that she was meeting defendant's legitimate expectations when she was terminated, her claim falls outside the more relaxed requirement mentioned in *Hoffman. Id.* Therefore, plaintiff has failed to establish the fourth element of her prima facie case.

Moreover, even if I assume that plaintiff established a prima facie case of age discrimination, she could not prevail because defendant came forth with a legitimate, nondiscriminatory reason for her termination that she fails to rebut: her violation of the Contract Signatures policy. *Naik, 627 F.3d at 600–01.* It is irrelevant whether defendant made a smart business decision or whether it treated plaintiff harshly. *Ineichen v. Ameritech, 410 F.3d 956, 961 (7th Cir.2005)* ("[I]t is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered

reason was pretextual, meaning that it was a lie.") (quotations and citation omitted). "If it is the true ground and not a pretext, the case is over." *Forrester v. Rauland–Borg Corp., 453 F.3d 416, 417 (7th Cir.2006)*. Defendant offered affidavits and deposition testimony as well as a copy of its Contract Signatures policy to support its contention that it terminated plaintiff on the basis of her violation. Because defendant articulated a credible reason, plaintiff must demonstrate that it was a pretext or lie.

Plaintiff makes two arguments in support of her position that defendant's justification for termination was pretextual. First, she contends that signing a customer's name on a contract was an "accepted practice" for trade marketing representatives. However, the evidence does not support a conclusion that this was an accepted practice. Although plaintiff says that one of her former supervisors (not Trader) told her it was acceptable to initiate a customer contract by signing for the customer, this practice is forbidden specifically by defendant's Contract Signatures policy. In addition, plaintiff testified that she had never signed a customer's name on a contract before April 23, 2008.

Plaintiff's second argument is that defendant did not comply with its own corrective action policy before terminating plaintiff because it did not apply its progressive discipline provisions. However, defendant's corrective action policy does not require that progressive discipline be applied in every situation; rather it states that some offenses merit immediate termination. Plaintiff's belief that her violation warranted progressive discipline is not evidence that defendant's justification for terminating her was pretextual. *Atanus, 520 F.3d at 674* (plaintiff's "belief that her conduct ... did not warrant a ten-day suspension [is insufficient] to show that the [employer] did not act honestly and in good faith").

 **\*11** Again, plaintiff has not directed the court to any evidence, direct or circumstantial, from which a jury could conclude that the but for cause of her termination was age and not her violation of company policy. Accordingly, defendant is entitled to summary judgment in its favor.

IT IS ORDERED that defendant R.J. Reynolds Tobacco Company's motion for summary judgment, dkt. # 14, is GRANTED. The clerk of court is directed to enter judgment for defendant and close this case.

Case 2:20-cv-01771-PP Filed 12/07/20 Page 8 of 9 Document 55-6

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 7630628

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   8

# EXHIBIT 7

2011 WL 1831608
Only the Westlaw citation is currently available.
United States District Court,
W.D. Wisconsin.

CONSOLIDATED WATER
POWER COMPANY, Plaintiff,

v.

0.40 ACRES OF LAND, More or
Less, in Portage County, Wisconsin
and Robert D. Moodie, Defendants.

No. 10–CV–397–bbc.
|
May 12, 2011.

**Attorneys and Law Firms**

Allen Arntsen, Foley & Lardner LLP, Madison, WI, for
Plaintiff.

Robert D. Moodie, Plover, WI, pro se.

ORDER

BARBARA B. CRABB, District Judge.

 **\*1** The parties have filed supplemental materials in response
to this court's April 28, 2011 order. Because the parties' filings
raise new issues of fact and law that cannot be resolved
without further development, I am striking the trial date and
directing the parties to start over.

This case started out as a claim brought by plaintiff
Consolidated Water Power Company under the Federal Power
Act, 16 U.S .C. § 814, to condemn a piece of land in Stevens
Point, Wisconsin that defendant Robert D. Moodie claimed
he purchased in 1998. (Plaintiff asked for condemnation of a
second parcel as well, but I dismissed the complaint as to that
parcel in the April 28 order.) Plaintiff's contention was that
the Act authorizes condemnation of the land because plaintiff
is a licensee under the Act, the land is a necessary part of the
project and it has been unable to obtain the property through
contract.

The case got off track because plaintiff raised two
incompatible arguments in its motion for summary judgment.
Although it continued to assert its claim for condemnation, it
argued that it did not need to compensate defendant because it
already owned the parcel at issue through adverse possession.
Because one cannot condemn what one already owns, I gave
plaintiff a choice: (1) seek leave to amend the complaint
to include a claim for declaratory relief under state law
regarding the ownership of the land and ask for condemnation
in the alternative; or (2) concede for the purpose of this
case that defendant owns the land and abandon its argument
that defendant is entitled to no compensation because he
does not own the land. Dkt. # 28. Plaintiff chose the first
option. Defendant's only objection was that a state law claim
should be decided by a state court, but I concluded that it
was appropriate to exercise supplemental jurisdiction over the
state law claim under 28 U.S.C. § 1367 because it arose out
of the same facts as plaintiff's federal claim.

Because the parties already had submitted evidence and
argument on the adverse possession claim, I conducted a
preliminary review of the merits of that claim in the April
28 order. The evidence in the record supported a conclusion
that plaintiff had obtained the parcel at issue through adverse
possession no later than 1971, but I noted that neither
side had discussed Wis. Stat. § 706.09, which, in some
circumstances, gives bona fide purchasers of land rights that
take priority over others with adverse claims. I gave both sides
an opportunity to address the statute.

The parties' responses show that it would be premature to
decide plaintiff's adverse possession claim now. Plaintiff
submits new evidence to support its view that defendant had
notice of plaintiff's adverse claim when he purchased the
property in the 1998 and that plaintiff meets the statutory
definition of "public service corporation," two questions that
are important to the application of § 706.09. However, it
would be unfair to consider this new evidence without giving
defendant an opportunity to respond.

 **\*2** For his part, defendant in his response seems to be
raising two new affirmative defenses to plaintiff's claim
for adverse possession: estoppel and laches. This brings up
an issue I overlooked in the April 28 order, which is that
defendant has not yet had an opportunity to file an answer
to plaintiff's amended complaint. Although I do not know
whether defendant can prevail on these defenses, it seems
that both can apply in the context of a property dispute,
*e.g., Buza v. Wojtalewicz,* 48 Wis.2d 557, 180 N.W.2d 556

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(1970)(estoppel); *Lemieux v. Agate Land Co.,* 193 Wis. 462, 214 N.W. 454, 458 (1927) (laches), so he should be allowed to develop them.

Because of the new issues raised in the parties' filings, I conclude that it is time to hit the reset button on this case. First, I will give defendant an opportunity to file an answer to plaintiff's amended complaint. An answer is simply a document that responds to each of the allegations in the complaint, agreeing or disagreeing with each allegation, as appropriate. In addition, the answer is the document in which the defendant identifies any affirmative defenses or counterclaims he wishes to assert. The top of the answer should be a caption similar to the amended complaint that includes the name of the court, the parties and the case number. Below that, defendant should include numbered paragraphs that correspond to each of the paragraphs in the amended complaint. Next to each paragraph number, he should say whether he admits each allegation in the complaint, denies it or does not have enough information to know whether the allegation is true or false. If he wishes to raise any affirmative defenses or counterclaims, he should include those in his answer as well. The requirements for preparing an answer are described further in Federal Rules of Civil Procedure 8(b) and 10.

Second, I will give the parties a new deadline for filing dispositive motions. Although both sides have had multiple opportunities to present their side of the story, I believe a do over is necessary in light of the new issues both sides have raised.

In anticipation of the new motions for summary judgment, I will give defendant a few words of advice in preparing his summary judgment submissions. First, as I explained to defendant in the April 28 order, his own statements and those of his witnesses are not admissible unless they are sworn. *Collins v. Seeman,* 462 F.3d 757, 760 n. 1 (7th Cir.2006). Defendant says that he "was under the impression that anything stated to the court with my signature attached was already sworn to be the truth." Dft.'s Br., dkt. # 54, at 1. This is wrong. In federal court, a statement may be sworn in one of two ways: (1) with the signature and seal of a notary public that is provided upon the signing of the document; or (2) with a declaration at the completion of his affidavit that includes the following statement followed by a signature: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date)." 28 U.S.C. § 1746. A court

cannot consider as evidence statements that are made in a brief. Further, defendant cannot correct the problem simply by asking the court to "consider all statements to be the truth in all deliberations." Dft.'s Br., dkt. # 54, at 1. If defendant relies on a document that does not comply with the procedure identified above, the court will not consider it.

**\*3** Second, if defendant wants the court to use documents as evidence, they must be authenticated as Fed.R.Evid. 901(a) requires. To authenticate a document, a party must submit "evidence sufficient to support a finding that the matter in question is what its proponent claims." Ordinarily, documents are authenticated by attaching them to an affidavit of an individual who swears that the documents are true and correct copies of the originals. However, the individual who authenticates the documents must have personal knowledge of their authenticity. Fed.R.Evid. 901(b)(1).

More generally, defendant should study carefully the summary judgment procedures he received from the court after the preliminary pretrial conference in the case. In particular, defendant should read the *Memorandum to Pro Se Litigants Regarding Summary Judgment Motions.* This memorandum is designed to help pro se parties avoid common mistakes, such as those defendant made in responding to plaintiff's first summary judgment motion. (I am attaching the memorandum and the procedures to this opinion in the event thatdefendant no longer has them.) If defendant does not believe he can comply with the procedures, he should seek assistance from a lawyer.

ORDER

IT IS ORDERED that

1. The trial date in this case is STRICKEN.

2. Defendant Robert Moodie may have until May 27, 2011, to file an answer to plaintiff Consolidated Water Power Company's amended complaint.

3. The parties may have until June 17, 2011, to file renewed dispositive motions, such as a motion to dismiss or a motion for summary judgment.

4. If the case is not resolved on dispositive motions, I will set a new trial date at that time.

MEMORANDUM TO PRO SE LITIGANTS REGARDING SUMMARY JUDGMENT MOTIONS

This court expects all litigants, including persons representing themselves, to follow this court's Procedures to be Followed on Motions for Summary Judgment. If a party does not follow the procedures, there will be no second chance to do so. Therefore, PAY ATTENTION to the following list of mistakes pro se plaintiffs tend to make when they oppose a defendant's motion for summary judgment:

• *Problem:* The plaintiff does not answer the defendant's proposed facts correctly.

*Solution:* To answer correctly, a plaintiff must file a document titled "Response to Defendant's Proposed Findings of Fact." In this document, the plaintiff must answer each numbered fact that the defendant proposes, using separate paragraphs that have the same numbers as defendant's paragraphs. See Procedure II.D. If plaintiff does not object to a fact that the defendant proposes, he should answer, "No dispute."

• *Problem:* The plaintiff submits his own set of proposed facts without answering the defendant's facts.

• *Solution:* Procedure II.B. allows a plaintiff to file his own set of proposed facts in response to a defendant's motion ONLY if he thinks he needs additional facts to prove his claim.

**\*4** • *Problem:* The plaintiff does not tell the court and the defendant where there is evidence in the record to support his version of a fact.

• *Solution:* Plaintiff must pay attention to Procedure II.D .2., which tells him how to dispute a fact proposed by the defendant. Also, he should pay attention to Procedure I.B.2., which explains how a new proposed fact should be written.

• *Problem:* The plaintiff supports a fact with an exhibit that the court cannot accept as evidence because it is not authenticated.

*Solution:* Procedure I.C. explains what may be submitted as evidence. A copy of a document will not be accepted as evidence unless it is authenticated. That means that the plaintiff or someone else who has personal knowledge what the document is must declare under penalty of

perjury in a separate affidavit that the document is a true and correct copy of what it appears to be. For example, if plaintiff wants to support a proposed fact with evidence that he received a conduct report, he must submit a copy of the conduct report, together with an affidavit in which he declares under penalty of perjury that the copy is a true and unaltered copy of the conduct report he received on such and such a date.

*NOTE WELL:* If a party fails to respond to a fact proposed by the opposing party, the court will accept the opposing party's proposed fact as undisputed. If a party's response to any proposed fact does not comply with the court's procedures or cites evidence that is not admissible, the court will take the opposing party's factual statement as true and undisputed. Additional tips for making sure that your submissions comply with the court's procedures are attached to the front of the Procedures.

HELPFUL TIPS FOR FILING A SUMMARY JUDGMENT MOTION

Please read the attached directions carefully—doing so will save your time and the court's.

**REMEMBER:**

1. *All* facts necessary to sustain a party's position on a motion for summary judgment must be explicitly proposed as findings of fact. This includes facts establishing jurisdiction. (Think of your proposed findings of fact as telling a story to someone who knows nothing of the controversy.)

2. The court will not search the record for factual evidence. Even if there is evidence in the record to support your position on summary judgment, if you do not propose a finding of fact with the proper citation, the court will not consider that evidence when deciding the motion.

3. A fact properly proposed by one side will be accepted by the court as undisputed unless the other side properly responds to the proposed fact and establishes that it is in dispute.

4. Your brief is the place to make your legal argument, not to restate the facts. When you finish it, check it over with a fine tooth comb to be sure you haven't relied upon or assumed any facts in making your legal argument that you failed to include

in the separate document setting out your proposed findings of fact.

 **\*5**  5. A chart listing the documents to be filed by the deadlines set by the court for briefing motions for summary judgment or cross-motions for summary judgment is printed on the last page of the procedures.

*PROCEDURE TO BE FOLLOWED ON MOTIONS FOR SUMMARY JUDGMENT*

I. *MOTION FOR SUMMARY JUDGMENT*

A. Contents:

   1.  A motion, together with such materials permitted by Rule 56(e) as the moving party may wish to serve and file; *and*

     2.  In a separate document, a statement of proposed findings of fact or a stipulation of fact between or among the parties to the action, or both; *and*

     3.  Evidentiary materials (see I.C.); *and*

     4.  A supporting brief.

B. Rules Regarding Proposed Findings of Fact:

   1.  Each fact must be proposed in a separate, numbered paragraph, limited as nearly as possible to a single factual proposition.

     2.  Each factual proposition must be followed by a reference to evidence supporting the proposed fact. For example,

     "1. Plaintiff Smith bought six Holstein calves on July 11, 2006. Harold Smith Affidavit, Jan. 6, 2007, p. 1, ¶ 3."

     3.  The statement of proposed findings of fact shall include ALL factual propositions the moving party considers necessary for judgment in the party's favor. For example, the proposed findings shall include factual statements relating to jurisdiction, the identity of the parties, the dispute, and the context of the dispute.

   4.  The court will not consider facts contained only in a brief.

C. Evidence

   1.  As noted in I.B. above, each proposed finding must be supported by admissible evidence. The court will not search the record for evidence. To support a proposed fact, you may use:

     a.  Depositions. Give the name of the witness, the date of the deposition, and page of the transcript of cited deposition testimony;

     b.  Answers to Interrogatories. State the number of the interrogatory and the party answering it;

     c.  Admissions made pursuant to Fed.R.Civ.P. 36. (state the number of the requested admission and the identity of the parties to whom it was directed); or

     d.  Other Admissions. The identity of the document, the number of the page, and paragraph of the document in which that admission is made.

     e.  Affidavits. The page and paragraph number, the name of the affiant, and the date of the affidavit. (Affidavits must be made by persons who have first hand knowledge and must show that the person making the affidavit is in a position to testify about those facts.)

     f.  Documentary evidence that is shown to be true and correct, either by an affidavit or by stipulation of the parties. (State exhibit number, page and paragraph.)

II. *RESPONSE TO MOTION FOR SUMMARY JUDGMENT*

A. Contents:

   1.  A response to the moving party's proposed finding of fact; *and*

     2.  A brief in opposition to the motion for summary judgment; *and*

     3.  Evidentiary materials (See I.C.)

B. In addition to responding to the moving party's proposed facts, a responding party may propose its own findings of fact following the procedure in section I.B. and C. above.

**\*6** 1. A responding party should file additional proposed findings of fact if it needs them to defeat the motion for summary judgment.

2. The purpose of additional proposed findings of fact is to SUPPLEMENT the moving party's proposed findings of fact, not to dispute any facts proposed by the moving party. They do not take the place of responses. Even if the responding party files additional proposed findings of fact, it MUST file a separate response to the moving party's proposed findings of fact.

C. Unless the responding party puts into dispute a fact proposed by the moving party, the court will conclude that the fact is undisputed.

D. Rules Regarding Responses to the Moving Party's Proposed Factual Statements:

1. Answer each numbered fact proposed by the moving party in separate paragraphs, *using the same number.*

2. If you dispute a proposed fact, state your version of the fact and refer to evidence that supports that version. For example,

Moving party proposes as a fact:

"1. Plaintiff Smith purchased six Holstein calves from Dell's Dairy Farm on July 11, 2006. Harold Smith Affidavit, Jan. 6, 2007, p. 1, ¶ 3."

Responding party responds:

"1. Dispute. The purchase Smith made from Dell's Dairy Farm on July 11, 2006 was for one Black Angus bull John Dell Affidavit, Feb. 1, 2007, Exh. A."

3. The court prefers but does not require that the responding party repeat verbatim the moving party's proposed fact and then respond to it. Using this format for the example above would lead to this response by the responding party:

"1. *Plaintiff Smith purchased six Holstein calves from Dell's Dairy Farm on July 11, 2006. Harold Smith Affidavit, Jan. 6, 2007, p. 1, ¶ 3.*

"**Dispute.** The purchase Smith made from Dell's Dairy Farm on July 11, 2006 was for one Black Angus bull." John Dell Affidavit, Feb. 1, 2007, Exh. A."

4. When a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact. If a responding party believes that more facts are necessary to tell its story, it should include them in its own proposed facts, as discussed in II.B.

E. Evidence

1. Each fact proposed in disputing a moving party's proposed factual statement and all additional facts proposed by the responding party must be supported by admissible evidence. The court will not search the record for evidence. To support a proposed fact, you may use evidence as described in Procedure I.C.1. a. through f.

2. The court will not consider any factual propositions made in response to the moving party's proposed facts that are not supported properly and sufficiently by admissible evidence.

III. *REPLY BY MOVING PARTY*

A. Contents:

1. An answer to each numbered factual statement made by the responding party in response to the moving party's proposed findings of fact, together with references to evidentiary materials; *and*

**\*7** 2. An answer to each additional numbered factual statement proposed by the responding party under Procedure II.B., if any, together with references to evidentiary materials; *and*

3. A reply brief; *and*

4. Evidentiary materials (see I.C.)

B. If the responding party has filed additional proposed findings of fact, the moving party should file its response to those proposed facts at the same time as its reply, following the procedure in section II.

C. When the moving party answers the responding party's responses to the moving party's original proposed findings of fact, and answers the responding party's additional proposed findings of

fact, the court prefers but does not require that the moving party repeat verbatim the entire sequence associated with each proposed finding of fact so that reply is a self-contained history of all proposed facts, responses and replies by all parties.

IV. *SUR–REPLY BY RESPONDING PARTY*

A responding party shall not file a sur-reply without first obtaining permission from the court. The court only permits sur-replies in rare, unusual situations.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1831608

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 8



OFFICE OF THE CLERK

# Supreme Court of Wisconsin

**110 EAST MAIN STREET, SUITE 215**
**P.O. BOX 1688**
**MADISON, WI 53701-1688**

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site:  www.wicourts.gov

March 31, 2020

To:

David R. Gault
Marcia A. MacKenzie
Dane County Corporation Counsel
Room 419
210 Martin Luther King Jr. Blvd.
Madison, WI 53703-3345

Lisa M. Lawless
Husch Blackwell, LLP
555 E. Wells St., Ste. 1900
Milwaukee, WI 53202-3819

Eric M. McLeod
Lane E. B. Ruhland
Husch Blackwell LLP
P.O. Box 1379
Madison, WI 53701-1379

Misha Tseytlin
Kevin M. LeRoy
Troutman Sanders LLP
1 N. Wacker Dr., Ste. 2905
Chicago, IL 60606

You are hereby notified that the Court has entered the following order:

---

2020AP557-OA         <u>Jefferson v. Dane County</u>

On March 27, 2020, petitioners, Mark Jefferson and the Republican Party of Wisconsin, filed a petition for leave to commence an original action under Wis. Stat. § (Rule) 809.70, a supporting legal memorandum, and a motion for temporary injunctive relief.  On that same date, the court ordered the named respondents, Dane County and Scott McDonell, in his official capacity as Dane County Clerk, to file a response to the original action petition and the motion for temporary injunctive relief by 1:00 on March 30, 2020.  The court has reviewed the filings of the parties and now addresses the motion for temporary injunctive relief.

When we have considered whether to grant temporary injunctive relief, we have required a movant to show (1) a reasonable probability of success on the merits; (2) a lack of an adequate remedy at law; (3) that the movant will suffer irreparable harm in the absence of an injunction; and (4) that a balancing of the equities favors issuing the injunction.  <u>See</u>, <u>e.g.</u>, <u>Pure Milk Products Coop. v. National Farmers Org.</u>, 90 Wis. 2d 781, 800, 280 N.W.2d 691 (1979); <u>Werner v. A.L. Grootemaat & Sons, Inc.</u>, 80 Wis. 2d 513, 520, 259 N.W.2d 310 (1977).  The decision whether to grant an injunction is a discretionary one, although injunctions are not to be issued lightly. <u>Werner</u>, 80 Wis. 2d at 520.

The temporary injunction the petitioners seek would order respondent, Scott McDonell, the Dane County Clerk, to remove a March 25, 2020 Facebook post in which he indicated, inter alia, that all Dane County voters could declare themselves to be "indefinitely confined" under Wis. Stat. § 6.86(2) due to illness solely because of the Wisconsin Department of Health Services Emergency Order #12 (the Safer at Home Order) and difficulties in presenting or uploading a valid proof of identification, thereby avoiding the legal requirement to present or upload a copy of the voter's proof of identification when requesting an absentee ballot.[1]  The petitioners further ask this court to order respondent McDonell and respondent Dane County to issue new statements setting forth the statutory interpretation proposed by the petitioners.

Although respondents do not represent that McDonell's original March 25, 2020 post has been removed, they argue that McDonell's later posting renders the petitioners' motion moot because McDonell has now posted the Wisconsin Elections Commission's (WEC) guidance on his Facebook page.  They also argue that the petitioners' petition and motion for temporary relief cannot go forward in this court because they have not exhausted their administrative remedies by first filing a complaint with the WEC under Wis. Stat. § 5.06(1) and (2).

McDonell's March 25, 2020, advice was legally incorrect.  In addition, McDonell's subsequent Facebook posting does not preclude McDonell's future posting of the same erroneous advice.  Furthermore, his erroneous March 25, 2020 Facebook posting continues distribution on the internet.

Accordingly, we conclude that clarification of the purpose and proper use of the indefinitely confined status pursuant to Wis. Stat. § 6.86(2) as well as a temporary injunction are warranted.

In regard to clarification, the WEC has met and has issued guidance on the proper use of indefinitely confined status under Wis. Stat. § 6.86(2) in its March 29, 2020 publication, "Guidance for Indefinitely Confined Electors COVID-19."   The WEC guidance states as follows:

1. Designation of indefinitely confined status is for each individual voter to make based upon their current circumstances.  It does not require permanent or total inability to travel outside of the residence.  The designation is appropriate for electors who are indefinitely confined because of age, physical illness or infirmity or are disabled for an indefinite period.

2. Indefinitely confined status shall not be used by electors simply as a means to avoid the photo ID requirement without regard to whether they are indefinitely confined because of age, physical illness or infirmity, or disability.

We conclude that the WEC's guidance quoted above provides the clarification on the purpose and proper use of the indefinitely confined status that is required at this time.

We further determine that the petitioners have demonstrated a reasonable probability of success on the merits, at least with respect to certain statements in McDonell's March 25th

---

[1] Petitioners note that the Milwaukee County Clerk issued nearly identical advice.

Facebook post.  Voters may be misled to exercise their right to vote in ways that are inconsistent with Wis. Stat. § 6.86(2).  Namely, McDonell appeared to assert that all voters are automatically, indefinitely confined solely due to the emergency and the Safer at Home Order and that voters could therefore declare themselves to be indefinitely confined when requesting an absentee ballot, which would allow them to skip the step of presenting or uploading a valid proof of identification. Indeed, we do not see how the respondents could prevail with an argument that such statements in the March 25th post constitute an accurate statement of the relevant statutory provisions.

NOW THEREFORE, IT IS ORDERED that the petitioners' motion for temporary injunctive relief is granted and we order McDonell to refrain from posting advice as the County Clerk for Dane County inconsistent with the above quote from the WEC guidance.

DANIEL KELLY, J., did not participate.

Sheila T. Reiff
Clerk of Supreme Court

# EXHIBIT 9

2020 WL 6686120
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

Jim BOGNET, Donald K. Miller,
Debra Miller, Alan Clark,
Jennifer Clark, Appellants

v.

SECRETARY COMMONWEALTH OF
PENNSYLVANIA; Adams County Board
of Elections; Allegheny County Board
of Elections; Armstrong County Board
of Elections; Beaver County Board
of Elections; Bedford County Board
of Elections; Berks County Board of
Elections; Blair County Board of Elections;
Bradford County Board of Elections;
Bucks County Board of Elections; Butler
County Board of Elections; Cambria
County Board of Elections; Cameron
County Board of Elections; Carbon County
Board of Elections; Centre County Board
of Elections; Chester County Board
of Elections; Clarion County Board of
Elections; Clearfield County Board of
Elections; Clinton County Board of
Elections; Columbia County Board of
Elections; Crawford County Board of
Elections; Cumberland County Board
of Elections; Dauphin County Board of
Elections; Delaware County Board of
Elections; Elk County Board of Elections;
Erie County Board of Elections; Fayette
County Board of Elections; Forest County
Board of Elections; Franklin County
Board of Elections; Fulton County Board
of Elections; Greene County Board of
Elections; Huntingdon County Board

of Elections; Indiana County Board
of Elections; Jefferson County Board
of Elections; Juniata County Board of
Elections; Lackawanna County Board
of Elections; Lancaster County Board
of Elections; Lawrence County Board
of Elections; Lebanon County Board
of Elections; Lehigh County Board of
Elections; Luzerne County Board of
Elections; Lycoming County Board
of Elections; Mckean County Board
of Elections; Mercer County Board
of Elections; Mifflin County Board of
Elections; Monroe County Board of
Elections; Montgomery County Board
of Elections; Montour County Board
of Elections; Northampton County
Board of Elections; Northumberland
County Board of Elections; Perry County
Board of Elections; Philadelphia County
Board of Elections; Pike County Board
of Elections; Potter County Board of
Elections; Schuylkill County Board
of Elections; Snyder County Board of
Elections; Somerset County Board of
Elections; Sullivan County Board of
Elections; Susquehanna County Board of
Elections; Tioga County Board of Elections;
Union County Board of Elections; Venango
County Board of Elections; Warren County
Board of Elections; Washington County
Board of Elections; Wayne County Board
of Elections; Westmoreland County Board
of Elections; Wyoming County Board of
Elections; York County Board of Elections
Democratic National
Committee, Intervenor

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

No. 20-3214
|
Submitted Pursuant to Third Circuit
L.A.R. 34.1(a) November 9, 2020
|
(Filed: November 13, 2020)

**Synopsis**

**Background:** Voters and congressional candidate brought action against Secretary of Commonwealth of Pennsylvania and county boards of elections, seeking to enjoin the counting of mail-in ballots received during the three-day extension of the ballot-receipt deadline ordered by the Pennsylvania Supreme Court, and seeking a declaration that the extension period and presumption of timeliness was unconstitutional. The United States District Court for the Western District of Pennsylvania, Kim R. Gibson, Senior District Judge, 2020 WL 6323121, denied voters' and candidate's motion for a temporary restraining order (TRO) and preliminary injunction. Voters and candidate appealed.

**Holdings:** The Court of Appeals, Smith, Chief Judge, held that:

the District Court's order was immediately appealable;

voters and candidate lacked standing to bring action alleging violation of Constitution's Elections Clause and Electors Clause;

voters lacked concrete injury for their alleged harm of vote dilution, and thus voters did not have standing for such claim;

voters lacked particularized injury for their alleged harm of vote dilution, and thus voters did not have standing for such claim;

voters failed to allege legally cognizable "preferred class," for purposes of standing to claim equal protection violation;

alleged harm from presumption of timeliness was hypothetical or conjectural, and thus voters did not have standing to challenge presumption; and

voters and candidate were not entitled to receive injunction so close to election.

Affirmed.

On Appeal from the United States District Court for the Western District of Pennsylvania, District Court No. 3-20-cv-00215, District Judge: Honorable Kim. R. Gibson

**Attorneys and Law Firms**

Brian W. Barnes, Peter A. Patterson, David H. Thompson, Cooper & Kirk, 1523 New Hampshire Avenue, N.W., Washington, D.C. 20036, Counsel for Appellants

Mark A. Aronchick, Michele D. Hangley, Robert A. Wiygul, Hangley Aronchick Segal Pudlin & Schiller, One Logan Square, 18th & Cherry Streets, 27th Floor, Philadelphia, PA 19103, J. Bart DeLone, Sean A. Kirkpatrick, Keli M. Neary, Office of Attorney General of Pennsylvania, Strawberry Square, Harrisburg, PA 17120, Dimitrios Mavroudis, Jessica Rickabaugh, Joe H. Tucker, Jr., Tucker Law Group, Ten Penn Center, 1801 Market Street, Suite 2500, Philadelphia, PA 19103, Counsel Secretary Commonwealth of Pennsylvania

Elizabeth A. Dupuis, Molly E. Meacham, Babst Calland, 330 Innovation Boulevard, Suite 302, State College, PA 16803, Counsel for Armstrong, Bedford, Blair, Centre Columbia, Dauphin, Fayette, Huntingdon, Indiana, Lackawanna, Lawrence, Northumberland, Venango, and York County Boards of Elections

Christine D. Steere, Deasey Mahoney & Valentini, 103 Chesley Drive, Lafayette Building, Suite 101, Media, PA 19063, Counsel for Berks County Board of Elections

Edward D. Rogers, Elizabeth V. Wingfield, Ballard Spahr, 1735 Market Street, 51st Floor, Philadelphia, PA 19103, Counsel for Delaware County Board of Elections

Stephen B. Edwards, Frank J. Lavery, Jr., Andrew W. Norfleet, Lavery Law, 225 Market Street, Suite 304, P.O. Box 1245, Harrisburg, PA 17108, Counsel for Franklin and Perry County Boards of Elections

Thomas R. Shaffer, Glassmire & Shaffer Law Offices, 5 East Third Street, P.O. Box 509, Coudersport, PA 16915, Counsel for Potter County Board of Elections

Marc E. Elias, Uzoma Nkwonta, Courtney A. Elgart, Perkins Coie, 700 13th Street, N.W. Suite 800, Washington, D.C. 20005, Counsel for Intervenor Democratic National Committee

Before: SMITH, Chief Judge, SHWARTZ and SCIRICA, Circuit Judges

OPINION OF THE COURT

SMITH, Chief Judge.

**\*1** *A share in the sovereignty of the state, which is exercised by the citizens at large, in voting at elections is one of the most important rights of the subject, and in a republic ought to stand foremost in the estimation of the law.*—Alexander Hamilton[1]

The year 2020 has brought the country unprecedented challenges. The COVID-19 pandemic, which began early this year and continues today, has caused immense loss and vast disruption. As this is a presidential election year, the pandemic has also presented unique challenges regarding where and how citizens shall vote, as well as when and how their ballots shall be tabulated. The appeal on which we now rule stems from the disruption COVID-19 has wrought on the national elections. We reach our decision, detailed below, having carefully considered the full breadth of statutory law and constitutional authority applicable to this unique dispute over Pennsylvania election law. And we do so with commitment to a proposition indisputable in our democratic process: that the lawfully cast vote of every citizen must count.

**I. Background & Procedural History**

**A. The Elections and Presidential Electors Clause**

The U.S. Constitution delegates to state "Legislature[s]" the authority to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives," subject to Congress's ability to "make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. This provision is known as the "Elections Clause." The Elections Clause effectively gives state governments the "default" authority to regulate the mechanics of federal elections, *Foster v. Love*, 522 U.S. 67, 69, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997), with Congress retaining "exclusive control" to "make or alter" any state's regulations, *Colegrove v. Green*, 328 U.S. 549, 554, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946). Congress has not often wielded this power but, "[w]hen exercised, the action of Congress, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them." *Ex Parte Siebold*, 100 U.S. 371, 384, 399, 25 L.Ed. 717 (1879) ("[T]he Constitution and constitutional laws of the [United States] are ... the supreme law of the land; and, when they conflict with the laws of the States, they are of paramount authority and obligation."). By statute, Congress has set "[t]he Tuesday next after the 1st Monday in November, in every even numbered year," as the day for the election. 2 U.S.C. § 7.

Much like the Elections Clause, the "Electors Clause" of the U.S. Constitution provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of [Presidential] Electors." U.S. Const. art. II, § 1, cl. 2. Congress can "determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." U.S. Const. art. II, § 1, cl. 4. Congress has set the time for appointing electors as "the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President." 3 U.S.C. § 1.

**\*2** This year, both federal statutes dictate that the day for the election was to fall on Tuesday, November 3 ("Election Day").

**B. Pennsylvania's Election Code**

In keeping with the Constitution's otherwise broad delegation of authority to states to regulate the times, places, and manner of holding federal elections, the Pennsylvania General Assembly has enacted a comprehensive elections code. In 2019, the General Assembly passed Act 77, which (among other things) established "no-excuse" absentee voting in Pennsylvania[2]: all eligible voters in Pennsylvania may vote by mail without the need to show their absence from their voting district on the day of the election. 25 Pa. Stat. and Cons. Stat. §§ 3150.11–3150.17. Under Act 77, "[a]pplications for mail-in ballots shall be processed if received not later than five o'clock P.M. of the first Tuesday prior to the day of any primary or election." *Id.* § 3150.12a(a). After Act 77, "a completed absentee [or mail-in] ballot must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election" for that vote to count. *Id.* §§ 3146.6(c), 3150.16(c).

**C. The Pennsylvania Supreme Court Decision**

Soon after Act 77's passage, Donald J. Trump for President, Inc., the Republican National Committee ("RNC"), and several Republican congressional candidates and voters brought suit against Kathy Boockvar, Secretary of the

Commonwealth of Pennsylvania, and all of Pennsylvania's county boards of elections. That suit, filed in the Western District of Pennsylvania, alleged that Act 77's "no-excuse" mail-in voting regime violated both the federal and Pennsylvania constitutions. *Donald J. Trump for Pres., Inc. v. Boockvar*, No. 2:20-cv-966, ––– F.Supp.3d ––––, 2020 WL 4920952, at *1 (W.D. Pa. Aug. 23, 2020). Meanwhile, the Pennsylvania Democratic Party and several Democratic elected officials and congressional candidates filed suit in Pennsylvania's Commonwealth Court, seeking declaratory and injunctive relief related to statutory-interpretation issues involving Act 77 and the Pennsylvania Election Code. *See Pa. Democratic Party v. Boockvar*, ––– Pa. ––––, 238 A.3d 345, 352 (2020). Secretary Boockvar asked the Pennsylvania Supreme Court to exercise extraordinary jurisdiction to allow it to immediately consider the case, and her petition was granted without objection. *Id.* at 354–55.

Pending resolution of the Pennsylvania Supreme Court case, Secretary Boockvar requested that the Western District of Pennsylvania stay the federal case. *Trump for Pres. v. Boockvar*, ––– F.Supp.3d at ––––, 2020 WL 4920952, at *1. The District Court obliged and concluded that it would abstain under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *See Trump for Pres. v. Boockvar*, ––– F.Supp.3d at ––––, 2020 WL 4920952, at *21. The RNC then filed a motion for limited preliminary injunctive relief asking that all mailed ballots be segregated, but the District Court denied the motion, finding that the plaintiffs' harm had "not yet materialized in any actualized or imminent way." *Donald J. Trump for Pres., Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5407748, at *1 (W.D. Pa. Sept. 8, 2020).

**\*3** With the federal case stayed, the state court matter proceeded. The Pennsylvania Democratic Party argued that a combination of the COVID-19 pandemic and U.S. Postal Service ("USPS") mail-delivery delays made it difficult for absentee voters to timely return their ballots in the June 2020 Pennsylvania primary election. *Pa. Democratic Party*, 238 A.3d at 362. The Pennsylvania Democratic Party claimed that this voter disenfranchisement violated the Pennsylvania Constitution's Free and Equal Elections Clause, art I., § 5,[3] and sought, among other things, a weeklong extension of the deadline for receipt of ballots cast by Election Day in the upcoming general election—the same deadline for the receipt of ballots cast by servicemembers residing overseas. *Id.* at 353–54. Secretary Boockvar originally opposed the extension deadline; she changed her position after receiving a letter

from USPS General Counsel which stated that Pennsylvania's ballot deadlines were "incongruous with the Postal Service's delivery standards," and that to ensure that a ballot in Pennsylvania would be received by 8:00 P.M. on Election Day, the voter would need to mail it a full week in advance, by October 27, which was also the deadline to *apply* for a mail-in ballot. *Id.* at 365–66; 25 Pa. Stat. and Cons. Stat. § 3150.12a(a). Secretary Boockvar accordingly recommended a three-day extension to the received-by deadline. *Pa. Democratic Party*, 238 A.3d at 364–65.

In a September 17, 2020 decision, the Pennsylvania Supreme Court concluded that USPS's existing delivery standards could not meet the timeline built into the Election Code and that circumstances beyond voters' control should not lead to their disenfranchisement. *Pa. Democratic Party*, 238 A.3d at 371. The Court accordingly held that the Pennsylvania Constitution's Free and Equal Elections Clause required a three-day extension of the ballot-receipt deadline for the November 3 general election. *Id.* at 371, 386–87. All ballots postmarked by 8:00 P.M. on Election Day and received by 5:00 P.M. on the Friday after Election Day, November 6, would be considered timely and counted ("Deadline Extension"). *Id.* at 386–87. Ballots postmarked or signed after Election Day, November 3, would be rejected. *Id.* If the postmark on a ballot received before the November 6 deadline was missing or illegible, the ballot would be presumed to be timely unless "a preponderance of the evidence demonstrates that it was mailed after Election Day" ("Presumption of Timeliness"). *Id.* Shortly after the ruling, Pennsylvania voters were notified of the Deadline Extension and Presumption of Timeliness.

**D. Appeal to the U.S. Supreme Court, and This Litigation**

The Republican Party of Pennsylvania and several intervenors, including the President pro tempore of the Pennsylvania Senate, sought to challenge in the Supreme Court of the United States the constitutionality of the Pennsylvania Supreme Court's ruling. Because the November election date was fast approaching, they filed an emergency application for a stay of the Pennsylvania Supreme Court's order pending review on the merits. The U.S. Supreme Court denied the emergency stay request in a 4-4 decision. *Republican Party of Pa. v. Boockvar*, No. 20A54, 592 U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, 2020 WL 6128193 (Oct. 19, 2020); *Scarnati v. Boockvar*, No. 20A53, 592 U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, 2020 WL 6128194 (Oct. 19, 2020). After denial of the stay, the

petitioners moved for expedited consideration of their petition for certiorari. In denying that motion, Justice Alito noted that, per the Pennsylvania Attorney General, all county boards of elections would segregate ballots received during the Deadline Extension period from those received by 8:00 P.M. on Election Day. *Republican Party of Pa. v. Boockvar*, No. 20-542, 592 U.S. ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2020 WL 6304626, at \*2 (Oct. 28, 2020) (Alito, J., statement). Justice Alito later issued an order requiring that all county boards of elections segregate such ballots and count them separately. *Republican Party of Pa. v. Boockvar*, No. 20A84, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 6536912 (Mem.) (U.S. Nov. 6, 2020) (Alito, J.).

 \*4  In the meantime, on October 22, 2020, three days after the U.S. Supreme Court declined to stay the Pennsylvania Supreme Court's order, Plaintiffs herein filed this suit in the Western District of Pennsylvania. Plaintiffs are four registered voters from Somerset County, Pennsylvania, who planned to vote in person on Election Day ("Voter Plaintiffs") and Pennsylvania congressional candidate Jim Bognet. Defendants are Secretary Boockvar and each Pennsylvania county's board of elections.

Bognet, the congressional candidate, claimed that the Deadline Extension and Presumption of Timeliness "allow[ ] County Boards of Elections to accept votes ... that would otherwise be unlawful" and "undermine[ ] his right to run in an election where Congress has paramount authority to set the 'times, places, and manner' " of Election Day. *Bognet v. Boockvar*, No. 3:20-cv-215, 2020 WL 6323121, at \*2 (W.D. Pa. Oct. 28, 2020). The Voter Plaintiffs alleged that by voting in person, they had to comply with the single, uniform federal Election Day deadline, whereas mail-in voters could submit votes any time before 5:00 P.M. on November 6. *Id.* Thus, they alleged, the Pennsylvania Supreme Court treated them in an arbitrary and disparate way by elevating mail-in voters to a "preferred class of voters" in violation of the U.S. Constitution's Equal Protection Clause and the single, uniform, federal Election Day set by Congress. *Id.* The Voter Plaintiffs also asserted that counting ballots received after Election Day during the Deadline Extension period would unlawfully dilute their votes in violation of the Equal Protection Clause. *Id.*

All Plaintiffs sought to enjoin Defendants from counting ballots received during the Deadline Extension period. *Id.* They also sought a declaration that the Deadline Extension and Presumption of Timeliness are unconstitutional under

the Elections Clause and the Electors Clause as well as the Equal Protection Clause. *Id.* Because Plaintiffs filed their suit less than two weeks before Election Day, they moved for a temporary restraining order ("TRO"), expedited hearing, and preliminary injunction. *Id.*

The District Court commendably accommodated Plaintiffs' request for an expedited hearing, then expeditiously issued a thoughtful memorandum order on October 28, denying the motion for a TRO and preliminary injunction. *Id.* at \*7. The District Court held that Bognet lacked standing because his claims were too speculative and not redressable. *Id.* at \*3. Similarly, the District Court concluded that the Voter Plaintiffs lacked standing to bring their Equal Protection voter dilution claim because they alleged only a generalized grievance. *Id.* at \*5.

At the same time, the District Court held that the Voter Plaintiffs had standing to pursue their Equal Protection arbitrary-and-disparate-treatment claim. But it found that the Deadline Extension did not engender arbitrary and disparate treatment because that provision did not extend the period for mail-in voters to actually cast their ballots; rather, the extension only directed that the timely cast ballots of mail-in voters be counted. *Id.* As to the Presumption of Timeliness, the District Court held that the Voter Plaintiffs were likely to succeed on the merits of their arbitrary-and-disparate-treatment challenge. *Id.* at \*6. Still, the District Court declined to grant a TRO because the U.S. Supreme Court "has repeatedly emphasized that ... federal courts should ordinarily not alter the election rules on the eve of an election." *Id.* at \*7 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam)). The District Court concluded that with "less than two weeks before the election. ... [g]ranting the relief Plaintiffs seek would result in significant voter confusion; precisely the kind of confusion that *Purcell* seeks to avoid." *Id.*

 \*5  Plaintiffs appealed the denial of their motion for a TRO and preliminary injunction to this Court on October 29, less than a week before Election Day. Plaintiffs requested an expedited briefing schedule: specifically, their opening brief would be due on October 30 and the response briefs on November 2. Notably, Plaintiffs sought to file a reply brief on November 3—Election Day. Appellants' Emergency Mot. for Expedited Briefing, Dkt. No. 17. Defendants opposed the expedited briefing schedule, arguing that Plaintiffs' own delay had caused the case to reach this Court mere days before the election. Sec'y Boockvar's Opp. to Appellants'

Emergency Mot. for Expedited Briefing, Dkt. No. 33. Defendants also contended that Plaintiffs sought to punish voters by invalidating the very rules mail-in voters had relied on when they cast their ballots. Defendants asked us to deny the motion for expedited briefing and offered to supply us with the actual numbers of mail-in ballots received during the Deadline Extension period together with an approximate count of how many of those mail-in ballots lacked legible postmarks. *Id.*

Even had we granted Plaintiffs' motion for expedited briefing, the schedule they proposed would have effectively foreclosed us from ruling on this appeal before Election Day. So we denied Plaintiffs' motion and instead ordered that their opening brief be filed by November 6. Order, No. 20-3214, Oct. 30, 2020, Dkt. No. 37. We directed Defendants to file response briefs by November 9, forgoing receipt of a reply brief.[4] *Id.* With the matter now fully briefed, we consider Plaintiffs' appeal of the District Court's denial of a TRO and preliminary injunction.

## II. Standard of Review

The District Court exercised jurisdiction under 28 U.S.C. § 1331. We exercise jurisdiction under § 1292(a)(1).

Ordinarily, an order denying a TRO is not immediately appealable. *Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 159 (3d Cir. 2020). Here, although Bognet and the Voter Plaintiffs styled their motion as an Emergency Motion for a TRO and Preliminary Injunction, *see Bognet v. Boockvar*, No. 3:20-cv-00215, Dkt. No. 5 (W.D. Pa. Oct. 22, 2020), the District Court's order plainly went beyond simply ruling on the TRO request.

Plaintiffs filed their motion for a TRO and a preliminary injunction on October 22, along with a supporting brief. Defendants then filed briefs opposing the motion, with Plaintiffs filing a reply in support of their motion. The District Court heard argument from the parties, remotely, during a 90-minute hearing. The next day, the District Court ruled on the merits of the request for injunctive relief. *Bognet*, 2020 WL 6323121, at *7. The District Court's Memorandum Order denied both Bognet and the Voter Plaintiffs the affirmative relief they sought to obtain prior to Election Day, confirming that the Commonwealth was to count mailed ballots received after the close of the polls on Election Day but before 5:00 P.M. on November 6.

In determining whether Bognet and the Voter Plaintiffs had standing to sue, we resolve a legal issue that does not require resolution of any factual dispute. Our review is de novo. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 266 (3d Cir. 2014). "When reviewing a district court's denial of a preliminary injunction, we review the court's findings of fact for clear error, its conclusions of law de novo, and the ultimate decision ... for an abuse of discretion." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010)) (cleaned up).

## III. Analysis

### A. Standing

Derived from separation-of-powers principles, the law of standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (citations omitted). Article III of the U.S. Constitution vests "[t]he judicial Power of the United States" in both the Supreme Court and "such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. But this "judicial Power" extends only to "Cases" and "Controversies." *Id.* art. III, § 2; *see also Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). To ensure that judges avoid rendering impermissible advisory opinions, parties seeking to invoke federal judicial power must first establish their standing to do so. *Spokeo*, 136 S. Ct. at 1547.

**\*6** Article III standing doctrine speaks in jargon, but the gist of its meaning is plain enough. To bring suit, you—and you personally—must be injured, and you must be injured in a way that concretely impacts your own protected legal interests. If you are complaining about something that does not harm you—and does not harm you in a way that is concrete—then you lack standing. And if the injury that you claim is an injury that does no specific harm to you, or if it depends on a harm that may never happen, then you lack an injury for which you may seek relief from a federal court. As we will explain below, Plaintiffs here have not suffered a concrete, particularized, and non-speculative injury necessary under the U.S. Constitution for them to bring this federal lawsuit.

The familiar elements of Article III standing require a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). To plead an injury in fact, the party invoking federal jurisdiction must establish three sub-elements: first, the "invasion of a legally protected interest"; second, that the injury is both "concrete and particularized"; and third, that the injury is "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130); *see also Mielo v. Steak 'n Shake Operations*, 897 F.3d 467, 479 n.11 (3d Cir. 2018). The second sub-element requires that the injury "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1, 112 S.Ct. 2130. As for the third, when a plaintiff alleges future injury, such injury must be "certainly impending." *Clapper*, 568 U.S. at 409, 133 S.Ct. 1138 (quoting *Lujan*, 504 U.S. at 565 n.2, 112 S.Ct. 2130). Allegations of "possible" future injury simply aren't enough. *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). All elements of standing must exist at the time the complaint is filed. *See Lujan*, 504 U.S. at 569 n.4, 112 S.Ct. 2130.

With these guideposts in mind, we turn to whether Plaintiffs have pleaded an Article III injury. They bring several claims under 42 U.S.C. § 1983, asserting deprivation of their constitutional rights. They allege that Defendants' implementation of the Pennsylvania Supreme Court's Deadline Extension and Presumption of Timeliness violates the Elections Clause of Article I, the Electors Clause of Article II, and the Equal Protection Clause of the Fourteenth Amendment. Because Plaintiffs lack standing to assert these claims, we will affirm the District Court's denial of injunctive relief.

### 1. Plaintiffs lack standing under the Elections Clause and Electors Clause.

Federal courts are not venues for plaintiffs to assert a bare right "to have the Government act in accordance with law." *Allen v. Wright*, 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–27, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). When the alleged injury is undifferentiated and common to all members of the public, courts routinely dismiss such cases as "generalized grievances" that cannot support standing. *United States v. Richardson*, 418 U.S. 166, 173–75, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). Such is the case here insofar as Plaintiffs, and specifically candidate Bognet, theorize their harm as the right to have government administered in compliance with the Elections Clause and Electors Clause.

To begin with, private plaintiffs lack standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause. For example, in *Lance v. Coffman*, 549 U.S. 437, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007) (per curiam), four private citizens challenged in federal district court a Colorado Supreme Court decision invalidating a redistricting plan passed by the state legislature and requiring use of a redistricting plan created by Colorado state courts. *Id.* at 438, 127 S.Ct. 1194. The plaintiffs alleged that the Colorado Supreme Court's interpretation of the Colorado Constitution violated the Elections Clause "by depriving the state legislature of its responsibility to draw congressional districts." *Id.* at 441, 127 S.Ct. 1194. The U.S. Supreme Court held that the plaintiffs lacked Article III standing because they claimed harm only to their interest, and that of every citizen, in proper application of the Elections Clause. *Id.* at 442, 127 S.Ct. 1194 ("The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed."). Their relief would have no more directly benefitted them than the public at large. *Id.* The same is true here. If anything, Plaintiffs' "interest in the State's ability to 'enforce its duly enacted laws' " is even less compelling because Pennsylvania's "election officials support the challenged decree." *Republican Nat'l Comm. v. Common Cause R.I.*, No. 20A28, 591 U.S. ––––, –––– S.Ct. ––––, ––––, –––– L.Ed.2d ––––, 2020 WL 4680151 (Mem.), at *1 (Aug. 13, 2020) (quoting *Abbott v. Perez*, –––– U.S. ––––, 138 S. Ct. 2305, 2324 n.17, 201 L.Ed.2d 714 (2018)).

**\*7** Because the Elections Clause and the Electors Clause have "considerable similarity," *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015) (Roberts, C.J., dissenting) (discussing how Electors Clause similarly vests power to determine manner of appointing electors in "the Legislature" of each State), the same logic applies to Plaintiffs' alleged injury stemming from the claimed violation of the Electors Clause. *See also Foster*, 522 U.S. at 69, 118 S.Ct. 464 (characterizing Electors Clause as Elections Clause's "counterpart for the Executive Branch"); *U.S. Term*

*Limits, Inc. v. Thornton*, 514 U.S. 779, 804–05, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (noting that state's "duty" under Elections Clause "parallels the duty" described by Electors Clause).

Even a party that meets Article III standing requirements must ordinarily rest its claim for relief on violation of its own rights, not those of a third party. *Pitt News v. Fisher*, 215 F.3d 354, 361–62 (3d Cir. 2000). Plaintiffs assert that the Pennsylvania Supreme Court's Deadline Extension and Presumption of Timeliness usurped the General Assembly's prerogative under the Elections Clause to prescribe "[t]he Times, Places and Manner of holding Elections." U.S. Const. art. I, § 4, cl. 1. The Elections Clause grants that right to "the Legislature" of "each State." *Id.* Plaintiffs' Elections Clause claims thus "belong, if they belong to anyone, only to the Pennsylvania General Assembly." *Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) (three-judge panel) (per curiam). Plaintiffs here are four individual voters and a candidate for federal office; they in no way constitute the General Assembly, nor can they be said to comprise any part of the law-making processes of Pennsylvania. *Ariz. State Legislature*, 576 U.S. at 824, 135 S.Ct. 2652.[5] Because Plaintiffs are not the General Assembly, nor do they bear any conceivable relationship to state lawmaking processes, they lack standing to sue over the alleged usurpation of the General Assembly's rights under the Elections and Electors Clauses. No member of the General Assembly is a party to this lawsuit.

That said, prudential standing can suspend Article III's general prohibition on a litigant's raising another person's legal rights. Yet Plaintiffs don't fit the bill. A plaintiff may assert the rights of another if he or she "has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (citation omitted). Plaintiffs cannot invoke this exception to the rule against raising the rights of third parties because they enjoy no close relationship with the General Assembly, nor have they alleged any hindrance to the General Assembly's ability to protect its own interests. *See, e.g.*, *Corman*, 287 F. Supp. 3d at 573. Nor does Plaintiffs' other theory of prudential standing, drawn from *Bond v. United States*, 564 U.S. 211, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011), advance the ball.

**\*8** In *Bond*, the Supreme Court held that a litigant has prudential standing to challenge a federal law that allegedly impinges on the state's police powers, "in contravention of constitutional principles of federalism" enshrined in the Tenth Amendment. *Id.* at 223–24, 131 S.Ct. 2355. The defendant in *Bond* challenged her conviction under 18 U.S.C. § 229, which Congress enacted to comply with a chemical weapons treaty that the United States had ratified. *Id.* at 214–15, 131 S.Ct. 2355. Convicted under the statute she sought to challenge, Bond satisfied Article III's standing requirements. *Id.* at 217, 131 S.Ct. 2355 (characterizing Bond's sentence and incarceration as concrete, and redressable by invalidation of her conviction); *id.* at 224–25, 131 S.Ct. 2355 (noting that Bond was subject to "[a] law," "prosecution," and "punishment" she might not have faced "if the matter were left for the Commonwealth of Pennsylvania to decide"). She argued that her conduct was "local in nature" such that § 229 usurped the Commonwealth's reserved police powers. *Id.* Rejecting the Government's contention that Bond was barred as a third party from asserting the rights of the Commonwealth, *id.* at 225, 131 S.Ct. 2355, the Court held that "[t]he structural principles secured by the separation of powers protect the individual as well" as the State. *Id.* at 222, 131 S.Ct. 2355 ("Federalism also protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions. ... When government acts in excess of its lawful powers, that [personal] liberty is at stake.").

But the nub of Plaintiffs' argument here is that the Pennsylvania Supreme Court intruded on the authority delegated to the Pennsylvania General Assembly under Articles I and II of the U.S. Constitution to regulate federal elections. They do not allege any violation of the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Nor could they. After all, states have no inherent or reserved power over federal elections. *U.S. Term Limits*, 514 U.S. at 804–05, 115 S.Ct. 1842. When "deciding issues raised under the Elections Clause," courts "need not be concerned with preserving a 'delicate balance' between competing sovereigns." *Gonzalez v. Arizona*, 677 F.3d 383, 392 (9th Cir. 2012). Either federal and state election law "operate harmoniously in a single procedural scheme," or they don't—and the federal law preempts ("alter[s]") state election law under the Elections Clause. *Id.* at 394. An assessment that the Pennsylvania Supreme Court lacked the legislative authority under the state's constitution necessary to comply with the Elections Clause (Appellants' Br. 24–27) does not implicate *Bond*, the Tenth Amendment, or even Article VI's Supremacy

Clause.[6] *See Gonzalez,* 677 F.3d at 390–92 (contrasting Elections Clause with Supremacy Clause and describing former as "unique," containing "[an] unusual delegation of power," and "unlike virtually all other provisions of the Constitution"). And, of course, third-party standing under *Bond* still presumes that the plaintiff otherwise meets the requirements of Article III; as discussed above, Plaintiffs do not.

Plaintiff Bognet, a candidate for Congress who is currently a private citizen, does not plead a cognizable injury by alleging a "right to run in an election where Congress has paramount authority," Compl. ¶ 69, or by pointing to a "threatened" reduction in the competitiveness of his election from counting absentee ballots received within three days after Election Day. Appellants' Br. 21. Bognet does not explain how that "right to run" affects him in a particularized way when, in fact, all candidates in Pennsylvania, including Bognet's opponent, are subject to the same rules. And Bognet does not explain how counting *more* timely cast votes would lead to a *less* competitive race, nor does he offer any evidence tending to show that a greater proportion of mailed ballots received after Election Day than on or before Election Day would be cast for Bognet's opponent. What's more, for Bognet to have standing to enjoin the counting of ballots arriving after Election Day, such votes would have to be sufficient in number to change the outcome of the election to Bognet's detriment. *See, e.g., Sibley v. Alexander,* 916 F. Supp. 2d 58, 62 (D.D.C. 2013) ("[E]ven if the Court granted the requested relief, [plaintiff] would still fail to satisfy the redressability element [of standing] because enjoining defendants from casting the ... votes would not change the outcome of the election." (citing *Newdow v. Roberts,* 603 F.3d 1002, 1011 (D.C. Cir. 2010) (citations omitted)). Bognet does not allege as much, and such a prediction was inherently speculative when the complaint was filed. The same can be said for Bognet's alleged wrongfully incurred expenditures and future expenditures. Any harm Bognet sought to avoid in making those expenditures was not "certainly impending"—he spent the money to avoid a speculative harm. *See Donald J. Trump for Pres., Inc. v. Boockvar,* No. 2:20-cv-966, ___ F.Supp.3d ___, ___, 2020 WL 5997680, at *36 (W.D. Pa. Oct. 10, 2020). Nor are those expenditures "fairly traceable" under Article III to the actions that Bognet challenges. *See, e.g., Clapper,* 568 U.S. at 402, 416, 133 S.Ct. 1138 (rejecting argument that plaintiff can "manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending").[7]

**\*9** Plaintiffs therefore lack Article III standing to challenge Defendants' implementation of the Pennsylvania Supreme Court's Deadline Extension and Presumption of Timeliness under the Elections Clause and Electors Clause.

## 2. The Voter Plaintiffs lack standing under the Equal Protection Clause.

Stressing the "personal" nature of the right to vote, the Voter Plaintiffs assert two claims under the Equal Protection Clause.[8] First, they contend that the influence of their votes, cast in person on Election Day, is "diluted" both by (a) mailed ballots cast on or before Election Day but received between Election Day and the Deadline Extension date, ballots which Plaintiffs assert cannot be lawfully counted; and (b) mailed ballots that were unlawfully cast (*i.e.*, placed in the mail) after Election Day but are still counted because of the Presumption of Timeliness. Second, the Voter Plaintiffs allege that the Deadline Extension and the Presumption of Timeliness create a preferred class of voters based on "arbitrary and disparate treatment" that values "one person's vote over that of another." *Bush v. Gore,* 531 U.S. 98, 104–05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). The Voter Plaintiffs lack Article III standing to assert either injury.

### a. Vote Dilution

As discussed above, the foremost element of standing is injury in fact, which requires the plaintiff to show a harm that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo,* 136 S. Ct. at 1547–48 (citation omitted). The Voter Plaintiffs lack standing to redress their alleged vote dilution because that alleged injury is not concrete as to votes counted under the Deadline Extension, nor is it particularized for Article III purposes as to votes counted under the Deadline Extension or the Presumption of Timeliness.

### i. No concrete injury from vote dilution attributable to the Deadline Extension.

The Voter Plaintiffs claim that Defendants' implementation of the Deadline Extension violates the Equal Protection Clause because "unlawfully" counting ballots received within three days of Election Day dilutes their votes. But the source of this

purported illegality is necessarily a matter of state law, which makes any alleged harm abstract for purposes of the Equal Protection Clause. And the purported vote dilution is also not concrete because it would occur in equal proportion *without* the alleged procedural illegality—that is, had the *General Assembly* enacted the Deadline Extension, which the Voter Plaintiffs do not challenge substantively.[9]

**\*10** The concreteness of the Voter Plaintiffs' alleged vote dilution stemming from the Deadline Extension turns on the federal and state laws applicable to voting procedures. Federal law does not provide for *when* or *how* ballot counting occurs. *See, e.g., Trump for Pres., Inc. v. Way*, No. 20-cv-01753, ––– F.Supp.3d ––––, ––––, 2020 WL 5912561, at \*12 (D.N.J. Oct. 6, 2020) ("Plaintiffs direct the Court to no federal law regulating methods of determining the timeliness of mail-in ballots or requiring that mail-in ballots be postmarked."); *see also Smiley v. Holm*, 285 U.S. 355, 366, 52 S.Ct. 397, 76 L.Ed. 795 (1932) (noting that Elections Clause delegates to state lawmaking processes all authority to prescribe "procedure and safeguards" for "counting of votes"). Instead, the Elections Clause delegates to each state's lawmaking function the authority to prescribe such procedural regulations applicable to federal elections. *U.S. Term Limits*, 514 U.S. at 832–35, 115 S.Ct. 1842 ("The Framers intended the Elections Clause to grant States authority to create procedural regulations .... [including] 'whether the electors should vote by ballot or vivâ voce ....' " (quoting James Madison, 2 Records of the Federal Convention of 1787, at 240 (M. Farrand ed. 1911) (cleaned up)); *Smiley*, 285 U.S. at 366, 52 S.Ct. 397 (describing state authority under Elections Clause "to provide a complete code for congressional elections ... in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns"). That delegation of authority embraces all procedures "which experience shows are necessary in order to enforce the fundamental right involved." *Smiley*, 285 U.S. at 366, 52 S.Ct. 397. Congress exercises its power to "alter" state election regulations only if the state regime cannot "operate harmoniously" with federal election laws "in a single procedural scheme." *Gonzalez*, 677 F.3d at 394.

The Deadline Extension and federal laws setting the date for federal elections can, and indeed do, operate harmoniously. At least 19 other States and the District of Columbia have post-Election Day absentee ballot receipt deadlines.[10] And many States also accept absentee ballots mailed by overseas

uniformed servicemembers that are received after Election Day, in accordance with the federal Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. §§ 20301–20311. So the Voter Plaintiffs' only cognizable basis for alleging dilution from the "unlawful" counting of invalid ballots is state law defining lawful and unlawful ballot counting practices. *Cf. Wise v. Circosta*, 978 F.3d 93, 100–01 (4th Cir. 2020) ("Whether ballots are *illegally* counted if they are received more than three days after Election Day depends on an issue of state law from which we must abstain." (emphasis in original)), *application for injunctive relief denied sub nom. Moore v. Circosta*, No. 20A72, 592 U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, 2020 WL 6305036 (Oct. 28, 2020). The Voter Plaintiffs seem to admit as much, arguing "that counting votes that are unlawful under the General Assembly's enactments will unconstitutionally dilute the lawful votes" cast by the Voter Plaintiffs. Appellants' Br. 38; *see also id.* at 31. In other words, the Voter Plaintiffs say that the Election Day ballot receipt deadline in Pennsylvania's codified election law renders the ballots untimely and therefore unlawful to count. Defendants, for their part, contend that the Pennsylvania Supreme Court's extension of that deadline under the Free and Equal Elections Clause of the state constitution renders them timely, and therefore lawful to count.

**\*11** This conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment. Violation of state election laws by state officials or other unidentified third parties is not always amenable to a federal constitutional claim. *See Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A deliberate violation of state election laws by state election officials does not transgress against the Constitution.") (cleaned up); *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970) (rejecting Equal Protection Clause claim arising from state's erroneous counting of votes cast by voters unqualified to participate in closed primary). "It was not intended by the Fourteenth Amendment ... that all matters formerly within the exclusive cognizance of the states should become matters of national concern." *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 88 L.Ed. 497 (1944).

Contrary to the Voter Plaintiffs' conceptualization, vote dilution under the Equal Protection Clause is concerned with votes being weighed differently. *See Rucho v. Common Cause*, ––– U.S. ––––, 139 S. Ct. 2484, 2501, 204 L.Ed.2d 931 (2019) (" '[V]ote dilution' in the one-person, one-

vote cases refers to the idea that each vote must carry *equal weight*." (emphasis added)); *cf. Baten v. McMaster*, 967 F.3d 345, 355 (4th Cir. 2020), *as amended* (July 27, 2020) ("[N]o vote in the South Carolina system is diluted. Every qualified person gets one vote and each vote is counted equally in determining the final tally."). As explained below, the Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently. Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment. And if dilution of lawfully cast ballots by the "unlawful" counting of invalidly cast ballots "were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity." *Trump for Pres. v. Boockvar*, ---- F.Supp.3d at ---- – ----, 2020 WL 5997680, at *45–46. That is not how the Equal Protection Clause works.[11]

Even if we were to entertain an end-run around the Voter Plaintiffs' lack of Elections Clause standing—by viewing the *federal* Elections Clause as the source of "unlawfulness" of Defendants' vote counting—the alleged vote dilution would not be a concrete injury. Consider, as we've noted, that the Voter Plaintiffs take no issue with the content of the Deadline Extension; they concede that the General Assembly, as other state legislatures have done, could have enacted exactly the same Deadline Extension as a valid "time[ ], place[ ], and manner" regulation consistent with the Elections Clause. *Cf. Snowden*, 321 U.S. at 8, 64 S.Ct. 397 (concluding that alleged "unlawful administration by state officers of a state statute *fair on its face*, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection" (emphasis added)); *Powell*, 436 F.2d at 88 ("Uneven or erroneous application of an *otherwise valid* statute constitutes a denial of equal protection only if it represents 'intentional or purposeful discrimination.' " (emphasis added) (quoting *Snowden*, 321 U.S. at 8, 64 S.Ct. 397)). Reduced to its essence, the Voter Plaintiffs' claimed vote dilution would rest on their allegation that federal law required a different state organ to issue the Deadline Extension. The Voter Plaintiffs have not alleged, for example, that they were prevented from casting their votes, *Guinn v. United States*, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915), nor that their votes were not counted, *United States v. Mosley*, 238 U.S. 383, 35 S.Ct. 904, 59

L.Ed. 1355 (1915). Any alleged harm of vote dilution that turns not on the proportional influence of votes, but solely on the federal illegality of the Deadline Extension, strikes us as quintessentially abstract in the election law context and "divorced from any concrete harm." *Spokeo*, 136 S. Ct. at 1549 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009)). That the alleged violation here relates to election law and the U.S. Constitution, rather than the mine-run federal consumer privacy statute, does not abrogate the requirement that a concrete harm must flow from the procedural illegality. *See, e.g., Lujan*, 504 U.S. at 576, 112 S.Ct. 2130 ("[T]here is absolutely no basis for making the Article III inquiry turn on the source of the asserted right.").

**\*12** The Voter Plaintiffs thus lack a concrete Equal Protection Clause injury for their alleged harm of vote dilution attributable to the Deadline Extension.

*ii. No particularized injury from votes counted under the Deadline Extension or the Presumption of Timeliness.*

The opposite of a "particularized" injury is a "generalized grievance," where "the impact on plaintiff is plainly undifferentiated and common to all members of the public." *Id.* at 575, 112 S.Ct. 2130 (cleaned up); *see also Lance*, 549 U.S. at 439, 127 S.Ct. 1194. The District Court correctly held that the Voter Plaintiffs' "dilution" claim is a "paradigmatic generalized grievance that cannot support standing." *Bognet*, 2020 WL 6323121, at *4 (quoting *Carson v. Simon*, No. 20-cv-02030, ---- F.Supp.3d ----, ----, 2020 WL 6018957, at *7 (D. Minn. Oct. 12, 2020), *rev'd on other grounds*, No. 20-3139, ---- F.3d ----, 2020 WL 6335967 (8th Cir. Oct. 29, 2020)). The Deadline Extension and Presumption of Timeliness, assuming they operate to allow the illegal counting of unlawful votes, "dilute" the influence of all voters in Pennsylvania equally and in an "undifferentiated" manner and do not dilute a certain group of voters particularly.[12]

Put another way, "[a] vote cast by fraud or mailed in by the wrong person through mistake," or otherwise counted illegally, "has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged." *Martel v. Condos*, No. 5:20-cv-00131, ---- F.Supp.3d ----, ----, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020). Such an alleged "dilution" is suffered equally by all voters and is not "particularized" for standing purposes. The courts to consider

this issue are in accord. *See id.*; *Carson*, ---- F.Supp.3d at
---- – ----, 2020 WL 6018957, at *7–8; *Moore v. Circosta*,
Nos. 1:20-cv-00911, 1:20-cv-00912, ---- F.Supp.3d ----,
----, 2020 WL 6063332, at *14 (M.D.N.C. Oct. 14, 2020),
*emergency injunction pending appeal denied sub nom. Wise
v. Circosta*, 978 F.3d 93 (4th Cir. 2020), *application for
injunctive relief denied sub nom. Moore v. Circosta*, No.
20A72, 592 U.S. ----, ---- S.Ct. ----, ---- L.Ed.2d ----,
2020 WL 6305036 (U.S. Oct. 28, 2020); *Paher v. Cegavske*,
457 F. Supp. 3d 919, 926–27 (D. Nev. Apr. 30, 2020).

But the Voter Plaintiffs argue that their purported "vote
dilution" is an injury in fact sufficient to confer standing, and
*not* a generalized grievance belonging to all voters, because
the Supreme Court has "long recognized that a person's
right to vote is 'individual and personal in nature.'" *Gill v.
Whitford*, ---- U.S. ----, 138 S. Ct. 1916, 1929, 201 L.Ed.2d
313 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561, 84
S.Ct. 1362, 12 L.Ed.2d 506 (1964)). "Thus, 'voters who allege
facts showing disadvantage to themselves as individuals have
standing to sue' to remedy that disadvantage." *Id.* (quoting
*Baker v. Carr*, 369 U.S. 186, 206, 82 S.Ct. 691, 7 L.Ed.2d 663
(1962)).

**\*13** The Voter Plaintiffs' reliance on this language
from *Baker* and *Reynolds* is misplaced. In *Baker*, the
plaintiffs challenged Tennessee's apportionment of seats in its
legislature as violative of the Equal Protection Clause of the
Fourteenth Amendment. 369 U.S. at 193, 82 S.Ct. 691. The
Supreme Court held that the plaintiffs *did* have standing under
Article III because "[t]he injury which appellants assert is that
this classification disfavors the voters in the counties in which
they reside, placing them in a position of constitutionally
unjustifiable inequality *vis-à-vis* voters in irrationally favored
counties." *Id.* at 207–08, 82 S.Ct. 691.

Although the *Baker* Court did not decide the merits of the
Equal Protection claim, the Court in a series of cases—
including *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801,
9 L.Ed.2d 821 (1963), and *Reynolds*—made clear that the
Equal Protection Clause prohibits a state from "diluti[ng] ...
the *weight* of the votes of certain ... voters merely because
of where they reside[ ]," just as it prevents a state from
discriminating on the basis of the voter's race or sex.
*Reynolds*, 377 U.S. at 557, 84 S.Ct. 1362 (emphasis added).
The Voter Plaintiffs consider it significant that the Court in
*Reynolds* noted—though not in the context of standing—that
"the right to vote" is "individual and personal in nature."
*Id.* at 561, 84 S.Ct. 1362 (quoting *United States v. Bathgate*,

246 U.S. 220, 227, 38 S.Ct. 269, 62 L.Ed. 676 (1918)). The
Court then explained that a voter's right to vote encompasses
both the right to cast that vote and the right to have that vote
counted without "debasement or dilution":

> The right to vote can neither be denied outright, *Guinn
> v. United States*, 238 U.S. 347 [35 S.Ct. 926, 59 L.Ed.
> 1340 (1915) ], *Lane v. Wilson*, 307 U.S. 268 [59 S.Ct.
> 872, 83 L.Ed. 1281 (1939) ], nor destroyed by dilution
> of ballots, see *United States v. Classic*, 313 U.S. 299, 315
> [61 S.Ct. 1031, 85 L.Ed. 1368 (1941) ], nor diluted by
> ballot-box stuffing, *Ex parte Siebold*, 100 U.S. 371 [25
> L.Ed. 717 (1880) ], *United States v. Saylor*, 322 U.S. 385
> [64 S.Ct. 1101, 88 L.Ed. 1341 (1944) ]. As the Court
> stated in *Classic*, "Obviously included within the right to
> choose, secured by the Constitution, is the right of qualified
> voters within a state to cast their ballots and have them
> counted ...." 313 U.S. at 315 [61 S.Ct. 1031].

> ...

> "The right to vote includes the right to have the ballot
> counted. ... It also includes the right to have the vote
> counted at full value without dilution or discount. ... That
> federally protected right suffers substantial dilution ...
> [where a] favored group has full voting strength ... [and]
> [t]he groups not in favor have their votes discounted."

*Reynolds*, 377 U.S. at 555 & n.29, 84 S.Ct. 1362 (alterations
in last paragraph in original) (quoting *South v. Peters*, 339
U.S. 276, 279, 70 S.Ct. 641, 94 L.Ed. 834 (1950) (Douglas,
J., dissenting)).

Still, it does not follow from the labeling of the right to vote as
"personal" in *Baker* and *Reynolds* that *any* alleged illegality
affecting voting rights rises to the level of an injury in fact.
After all, the Court has observed that the harms underlying
a racial gerrymandering claim under the Equal Protection
Clause "are personal" in part because they include the harm of
a voter "being personally subjected to a racial classification."
*Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263,
135 S.Ct. 1257, 191 L.Ed.2d 314 (2015) (cleaned up). Yet a
voter "who complains of gerrymandering, but who does not
live in a gerrymandered district, 'assert[s] only a generalized
grievance against governmental conduct of which he or she
does not approve.' " *Gill*, 138 S. Ct. at 1930 (quoting *United
States v. Hays*, 515 U.S. 737, 745, 115 S.Ct. 2431, 132
L.Ed.2d 635 (1995)) (alteration in original). The key inquiry
for standing is whether the alleged violation of the right to
vote arises from an invidious classification—including those
based on "race, sex, economic status, or place of residence

within a State," *Reynolds*, 377 U.S. at 561, 84 S.Ct. 1362—to which the plaintiff is subject and in which "the favored group has full voting strength and the groups not in favor have their votes discounted," *id.* at 555 n.29, 84 S.Ct. 1362 (cleaned up). In other words, "voters who allege facts *showing disadvantage to themselves*" have standing to bring suit to remedy that disadvantage, *Baker*, 369 U.S. at 206, 82 S.Ct. 691 (emphasis added), but a disadvantage to the plaintiff exists only when the plaintiff is part of a group of voters whose votes will be weighed differently compared to another group. Here, no Pennsylvania voter's vote will count for less than that of any other voter as a result of the Deadline Extension and Presumption of Timeliness.[13]

**\*14** This conclusion cannot be avoided by describing one group of voters as "those ... who lawfully vote in person and submit their ballots *on time*" and the other group of voters as those whose (mail-in) ballots arrive after Election Day and are counted because of the Deadline Extension and/or the Presumption of Timeliness. Appellants' Br. 33 (emphasis in original). Although the former group, under Plaintiffs' theory, should make up 100% of the total votes counted and the latter group 0%, there is simply no differential *weighing* of the votes. *See Wise*, 978 F.3d at 104 (Motz, J., concurring) ("But if the extension went into effect, plaintiffs' votes would not count for less *relative to other North Carolina voters*. This is the core of an Equal Protection Clause challenge." (emphasis in original)). Unlike the malapportionment or racial gerrymandering cases, a vote cast by a voter in the so-called "favored" group counts not one bit more than the same vote cast by the "disfavored" group—no matter what set of scales one might choose to employ. *Cf. Reynolds*, 377 U.S. at 555 n.29, 84 S.Ct. 1362. And, however one tries to draw a contrast, this division is not based on a voter's personal characteristics at all, let alone a person's race, sex, economic status, or place of residence. Two voters could each have cast a mail-in ballot before Election Day at the same time, yet perhaps only one of their ballots arrived by 8:00 P.M. on Election Day, given USPS's mail delivery process. It is passing strange to assume that one of these voters would be denied "equal protection of the laws" were *both* votes counted. U.S. Const. amend. XIV, § 1.

The Voter Plaintiffs also emphasize language from *Reynolds* that "[t]he right to vote can neither be denied outright ... nor diluted by ballot-box stuffing." 377 U.S. at 555, 84 S.Ct. 1362 (citing *Ex parte Siebold*, 100 U.S. 371, 25 L.Ed. 717 (1879); *United States v. Saylor*, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944)). In the first place, casting a vote in accordance

with a procedure approved by a state's highest court—even assuming that approval violates the Elections Clause—is not equivalent to "ballot-box stuffing." The Supreme Court has only addressed this "false"-tally type of dilution where the tally was false as a result of a scheme to cast falsified or fraudulent votes. *See Saylor*, 322 U.S. at 386, 64 S.Ct. 1101. We are in uncharted territory when we are asked to declare that a tally that includes false or fraudulent votes is equivalent to a tally that includes votes that are or may be unlawful for non-fraudulent reasons, and so is more aptly described as "incorrect." *Cf. Gray*, 372 U.S. at 386, 83 S.Ct. 801 (Harlan, J., dissenting) ("[I]t is hard to take seriously the argument that 'dilution' of a vote in consequence of a legislatively sanctioned electoral system can, without more, be analogized to an impairment of the political franchise by ballot box stuffing or other criminal activity.").

Yet even were this analogy less imperfect, it still would not follow that every such "false" or incorrect tally is an injury in fact for purposes of an Equal Protection Clause claim. The Court's cases that describe ballot-box stuffing as an injury to the right to vote have arisen from criminal prosecutions under statutes making it unlawful for anyone to injure the exercise of another's constitutional right. *See, e.g.*, *Ex parte Siebold*, 100 U.S. at 373–74 (application for writ of habeas corpus); *Saylor*, 322 U.S. at 385–86, 64 S.Ct. 1101 (criminal appeal regarding whether statute prohibiting "conspir[ing] to injure ... any citizen in the free exercise ... of any right or privilege secured to him by the Constitution" applied to conspiracy to stuff ballot boxes); *Anderson v. United States*, 417 U.S. 211, 226, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) (criminal prosecution for conspiracy to stuff ballot boxes under successor to statute in *Saylor*). Standing was, of course, never an issue in those cases because the Government was enforcing its criminal laws. Here, the Voter Plaintiffs, who bear the burden to show standing, have presented no instance in which an individual voter had Article III standing to claim an equal protection harm to his or her vote from the existence of an allegedly illegal vote cast by someone else in the same election.

Indeed, the logical conclusion of the Voter Plaintiffs' theory is that whenever an elections board counts any ballot that deviates in some way from the requirements of a state's legislatively enacted election code, there is a *particularized* injury in fact sufficient to confer Article III standing on every other voter—provided the remainder of the standing analysis is satisfied. Allowing standing for such an injury strikes us as indistinguishable from the proposition that a plaintiff has

Article III standing to assert a general interest in seeing the "proper application of the Constitution and laws"—a proposition that the Supreme Court has firmly rejected. *Lujan,* 504 U.S. at 573–74, 112 S.Ct. 2130. The Voter Plaintiffs thus lack standing to bring their Equal Protection vote dilution claim.

b. Arbitrary and Disparate Treatment

**\*15** The Voter Plaintiffs also lack standing to allege an injury in the form of "arbitrary and disparate treatment" of a preferred class of voters because the Voter Plaintiffs have not alleged a legally cognizable "preferred class" for equal protection purposes, and because the alleged harm from votes counted solely due to the Presumption of Timeliness is hypothetical or conjectural.

*i. No legally protected "preferred class."*

The District Court held that the Presumption of Timeliness creates a "preferred class of voters" who are "able to cast their ballots after the congressionally established Election Day" because it "extends the date of the election by multiple days for a select group of mail-in voters whose ballots will be presumed to be timely in the absence of a verifiable postmark."[14] *Bognet,* 2020 WL 6323121, at *6. The District Court reasoned, then, that the differential treatment between groups of voters is by itself an injury for standing purposes. To the District Court, this supposed "unequal treatment of voters ... harms the [Voter] Plaintiffs because, as in-person voters, they must vote by the end of the congressionally established Election Day in order to have their votes counted." *Id.* The District Court cited no case law in support of its conclusion that the injury it identified gives rise to Article III standing.

The District Court's analysis suffers from several flaws. First, the Deadline Extension and Presumption of Timeliness apply to all voters, not just a subset of "preferred" voters. It is an individual voter's *choice* whether to vote by mail or in person, and thus whether to become a part of the so-called "preferred class" that the District Court identified. Whether to join the "preferred class" of mail-in voters was entirely up to the Voter Plaintiffs.

Second, it is not clear that the mere creation of so-called "classes" of voters constitutes an injury in fact. An injury in

fact requires the "invasion of a legally protected interest." *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. We doubt that the mere existence of groupings of voters qualifies as an injury per se. "An equal protection claim will not lie by 'conflating all persons not injured into a preferred class receiving better treatment' than the plaintiff." *Thornton v. City of St. Helens,* 425 F.3d 1158, 1167 (9th Cir. 2005) (quoting *Joyce v. Mavromatis,* 783 F.2d 56, 57 (6th Cir. 1986)); *see also, e.g., Batra v. Bd. of Regents of Univ. of Neb.,* 79 F.3d 717, 721 (8th Cir. 1996) ("[T]he relevant prerequisite is unlawful discrimination, not whether plaintiff is part of a victimized class."). More importantly, the Voter Plaintiffs have shown no disadvantage to themselves that arises simply by being separated into groupings. For instance, there is no argument that it is inappropriate that some voters will vote in person and others will vote by mail. The existence of these two groups of voters, without more, simply does not constitute an injury in fact to in-person voters.

Plaintiffs may believe that injury arises because of a preference shown for one class over another. But what, precisely, is the preference of which Plaintiffs complain? In *Bush v. Gore,* the Supreme Court held that a State may not engage in arbitrary and disparate treatment that results in the valuation of one person's vote over that of another. 531 U.S. at 104–05, 121 S.Ct. 525. Thus, "the right of suffrage can be denied by a *debasement or dilution of the weight of a citizen's vote* just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* at 105, 121 S.Ct. 525 (quoting *Reynolds,* 377 U.S. at 555, 84 S.Ct. 1362) (emphasis added). As we have already discussed, vote dilution is not an injury in fact here.

**\*16** What about the risk that some ballots placed in the mail after Election Day may still be counted? Recall that no voter—whether in person or by mail—is *permitted* to vote after Election Day. Under Plaintiffs' argument, it might theoretically be easier for one group of voters—mail-in voters—to illegally cast late votes than it is for another group of voters—in-person voters. But even if that is the case, no group of voters has the *right* to vote after the deadline.[15] We remember that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (citations omitted). And "a plaintiff lacks standing to complain about his inability to commit crimes because no one has a right to commit a crime." *Citizen Ctr. v. Gessler,* 770 F.3d 900, 910 (10th Cir. 2014). Without a showing of discrimination or other intentionally unlawful

conduct, or at least some burden on Plaintiffs' own voting rights, we discern no basis on which they have standing to challenge the slim opportunity the Presumption of Timeliness conceivably affords wrongdoers to violate election law. *Cf. Minn. Voters Alliance v. Ritchie*, 720 F.3d 1029, 1033 (8th Cir. 2013) (affirming dismissal of claims "premised on potential harm in the form of vote dilution caused by insufficient pre-election verification of [election day registrants'] voting eligibility and the absence of post-election ballot rescission procedures").

### ii. Speculative injury from ballots counted under the Presumption of Timeliness.

Plaintiffs' theory as to the Presumption of Timeliness focuses on the potential for some voters to vote after Election Day and still have their votes counted. This argument reveals that their alleged injury in fact attributable to the Presumption is "conjectural or hypothetical" instead of "actual or imminent." *Spokeo*, 136 S. Ct. at 1547–48 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). The Supreme Court has emphasized that a threatened injury must be "*certainly impending*" and not merely "*possible*" for it to constitute an injury in fact. *Clapper*, 568 U.S. at 409, 133 S.Ct. 1138 (emphasis in original) (quoting *Whitmore v. Ark.*, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). When determining Article III standing, our Court accepts allegations based on well-pleaded facts; but we do not credit bald assertions that rest on mere supposition. *Finkelman v. NFL*, 810 F.3d 187, 201–02 (3d Cir. 2016). The Supreme Court has also emphasized its "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414, 133 S.Ct. 1138. A standing theory becomes even more speculative when it requires that independent actors make decisions to act *unlawfully*. *See City of L.A. v. Lyons*, 461 U.S. 95, 105–06 & 106 n.7, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (rejecting Article III standing to seek injunction where party invoking federal jurisdiction would have to establish that he would unlawfully resist arrest or police officers would violate department orders in future).

Here, the Presumption of Timeliness could inflict injury on the Voter Plaintiffs only if: (1) another voter violates the law by casting an absentee ballot after Election Day; (2) the illegally cast ballot does not bear a legible postmark, which is against USPS policy;[16] (3) that same ballot still arrives within three days of Election Day, which is faster than USPS anticipates mail delivery will occur;[17] (4) the

ballot lacks sufficient indicia of its untimeliness to overcome the Presumption of Timeliness; and (5) that same ballot is ultimately counted. *See Donald J. Trump for Pres., Inc. v. Way*, No. 20-cv-10753, 2020 WL 6204477, at \*7 (D.N.J. Oct. 22, 2020) (laying out similar "unlikely chain of events" required for vote dilution harm from postmark rule under New Jersey election law); *see also Reilly v. Ceridian Corp.*, 664 F.3d 38, 43 (3d Cir. 2011) (holding purported injury in fact was too conjectural where "we cannot now describe how Appellants will be injured in this case without beginning our explanation with the word 'if' "). This parade of horribles "may never come to pass," *Trump for Pres. v. Boockvar*, 2020 WL 5997680, at \*33, and we are especially reluctant to endorse such a speculative theory of injury given Pennsylvania's "own mechanisms for deterring and prosecuting voter fraud," *Donald J. Trump for Pres., Inc. v. Cegavske*, No. 20-1445, ––– F.Supp.3d ––––, ––––, 2020 WL 5626974, at \*6 (D. Nev. Sept. 18, 2020).[18]

**\*17** To date, the Secretary has reported that at least 655 ballots without a legible postmark have been collected within the Deadline Extension period.[19] But it is mere speculation to say that any one of those ballots was cast after Election Day. We are reluctant to conclude that an independent actor —here, one of 655 voters—decided to mail his or her ballot after Election Day contrary to law. The Voter Plaintiffs have not provided any empirical evidence on the frequency of voter fraud or the speed of mail delivery that would establish a statistical likelihood or even the plausibility that any of the 655 ballots was cast after Election Day. Any injury to the Voter Plaintiffs attributable to the Presumption of Timeliness is merely "possible," not "actual or imminent," and thus cannot constitute an injury in fact.

### B. Purcell

Even were we to conclude that Plaintiffs have standing, we could not say that the District Court abused its discretion in concluding on this record that the Supreme Court's election-law jurisprudence counseled against injunctive relief. Unique and important equitable considerations, including voters' reliance on the rules in place when they made their plans to vote and chose how to cast their ballots, support that disposition. Plaintiffs' requested relief would have upended this status quo, which is generally disfavored under the "voter confusion" and election confidence rationales of *Purcell v. Gonzalez*, 549 U.S. 1, 4–5, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006). One can assume for the sake of argument that aspects of the now-prevailing regime in Pennsylvania are unlawful as

alleged and still recognize that, given the timing of Plaintiffs' request for injunctive relief, the electoral calendar was such that following it "one last time" was the better of the choices available. *Perez,* 138 S. Ct. at 2324 ("And if a [redistricting] plan is found to be unlawful very close to the election date, the only reasonable option may be to use the plan one last time.").

Here, less than two weeks before Election Day, Plaintiffs asked the District Court to enjoin a deadline established by the Pennsylvania Supreme Court on September 17, a deadline that may have informed voters' decisions about whether and when to request mail-in ballots as well as when and how they cast or intended to cast them. In such circumstances, the District Court was well within its discretion to give heed to Supreme Court decisions instructing that "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, --- U.S. ----, 140 S. Ct. 1205, 1207, 206 L.Ed.2d 452 (2020) (per curiam) (citing *Purcell,* 549 U.S. at 1, 127 S.Ct.).

In *Purcell,* an appeal from a federal court order enjoining the State of Arizona from enforcing its voter identification law, the Supreme Court acknowledged that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." 549 U.S. at 4, 127 S.Ct. 5. In other words, "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5, 127 S.Ct. 5. Mindful of "the necessity for clear guidance to the State of Arizona" and "the imminence of the election," the Court vacated the injunction. *Id.* at 5, 127 S.Ct. 5.

The principle announced in *Purcell* has very recently been reiterated. First, in *Republican National Committee,* the Supreme Court stayed on the eve of the April 7 Wisconsin primary a district court order that altered the State's voting rules by extending certain deadlines applicable to absentee ballots. 140 S. Ct. at 1206. The Court noted that it was adhering to *Purcell* and had "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Id.* at 1207 (citing *Purcell,* 549 U.S. at 1, 127 S.Ct. 5). And just over two weeks ago, the Court denied an application to vacate a stay of a district court order that made similar changes to Wisconsin's election rules six weeks before Election Day. *Democratic Nat'l Comm. v. Wis. State Legislature,* No. 20A66, 592 U.S.

----, --- S.Ct. ----, --- L.Ed.2d ----, 2020 WL 6275871 (Oct. 26, 2020) (denying application to vacate stay). Justice Kavanaugh explained that the injunction was improper for the "independent reason[ ]" that "the District Court changed Wisconsin's election rules too close to the election, in contravention of this Court's precedents." *Id.* at ----, 2020 WL 6275871 at *3 (Kavanaugh, J., concurring). *Purcell* and a string[20] of Supreme Court election-law decisions in 2020 "recognize a basic tenet of election law: When an election is close at hand, the rules of the road should be clear and settled." *Id.*

**\*18** The prevailing state election rule in Pennsylvania permitted voters to mail ballots up through 8:00 P.M. on Election Day so long as their ballots arrived by 5:00 P.M. on November 6. Whether that rule was wisely or properly put in place is not before us now. What matters for our purposes today is that Plaintiffs' challenge to it was not filed until sufficiently close to the election to raise a reasonable concern in the District Court that more harm than good would come from an injunction changing the rule. In sum, the District Court's justifiable reliance on *Purcell* constitutes an "alternative and independent reason[ ]" for concluding that an "injunction was unwarranted" here. *Wis. State Legislature,* ---- S.Ct. at ----, 2020 WL 6275871, at *3 (Kavanaugh, J., concurring).

### IV. Conclusion

We do not decide today whether the Deadline Extension or the Presumption of Timeliness are proper exercises of the Commonwealth of Pennsylvania's lawmaking authority, delegated by the U.S. Constitution, to regulate federal elections. Nor do we evaluate the policy wisdom of those two features of the Pennsylvania Supreme Court's ruling. We hold only that when voters cast their ballots under a state's facially lawful election rule and in accordance with instructions from the state's election officials, private citizens lack Article III standing to enjoin the counting of those ballots on the grounds that the source of the rule was the wrong state organ or that doing so dilutes their votes or constitutes differential treatment of voters in violation of the Equal Protection Clause. Further, and independent of our holding on standing, we hold that the District Court did not err in denying Plaintiffs' motion for injunctive relief out of concern for the settled expectations of voters and election officials. We will affirm the District Court's denial of Plaintiffs' emergency motion for a TRO or preliminary injunction.

**All Citations**

--- F.3d ----, 2020 WL 6686120

Footnotes

1    Second Letter from Phocion (April 1784), *reprinted in* 3 The Papers of Alexander Hamilton, 1782–1786, 530–58 (Harold C. Syrett ed., 1962).

2    Throughout this opinion, we refer to absentee voting and mail-in voting interchangeably.

3    The Free and Equal Elections Clause of the Pennsylvania Constitution provides: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. 1, § 5.

4    Because we have received comprehensive briefing, and given the weighty public interest in a prompt ruling on the matter before us, we have elected to forgo oral argument.

5    Bognet seeks to represent Pennsylvania in Congress, but even if he somehow had a relationship to *state* lawmaking processes, he would lack personal standing to sue for redress of the alleged "institutional injury (the diminution of legislative power), which necessarily damage[d] all Members of [the legislature] ... equally." *Raines v. Byrd*, 521 U.S. 811, 821, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (plaintiffs were six out of 535 members of Congress); *see also Corman*, 287 F. Supp. 3d at 568–69 (concluding that "two of 253 members of the Pennsylvania General Assembly" lacked standing to sue under Elections Clause for alleged "deprivation of 'their legislative authority to apportion congressional districts' "); *accord Va. House of Delegates v. Bethune-Hill*, ––– U.S. ––––, 139 S. Ct. 1945, 1953, 204 L.Ed.2d 305 (2019).

6    Our conclusion departs from the recent decision of an Eighth Circuit panel which, over a dissent, concluded that candidates for the position of presidential elector had standing under *Bond* to challenge a Minnesota state-court consent decree that effectively extended the receipt deadline for mailed ballots. *See Carson v. Simon*, No. 20-3139, ––– F.3d ––––, ––––, 2020 WL 6335967, at *5 (8th Cir. Oct. 29, 2020). The *Carson* court appears to have cited language from *Bond* without considering the context—specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding *Bond* beyond this context, and the *Carson* court cited none.

7    The alleged injury specific to Bognet does not implicate the Qualifications Clause or exclusion from Congress, *Powell v. McCormack*, 395 U.S. 486, 550, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), nor the standing of members of Congress to bring actions alleging separation-of-powers violations. *Moore v. U.S. House of Reps.*, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring).

8    Only the Voter Plaintiffs bring the Equal Protection count in the Complaint; Bognet did not join that count.

9    We exclude the Presumption of Timeliness from our concreteness analysis. Plaintiffs allege that the federal statutes providing for a uniform election day, 3 U.S.C. § 1 and 2 U.S.C. § 7, conflict with, and thus displace, any state law that would authorize voting after Election Day. They claim that the Presumption permits, theoretically at least, some voters whose ballots lack a legible postmark to vote *after* Election Day, in violation of these federal statutes. So unlike the Deadline Extension, Plaintiffs contend that the General Assembly could not enact the Presumption consistent with the Constitution. This conceptualization of injury is thus more properly characterized as "concrete" than is the purported Deadline Extension injury attributable to voters having their timely voted ballots received and counted after Election Day. That said, we express no opinion about whether the Voter Plaintiffs have, in fact, alleged such a concrete injury for standing purposes.

10   *See* AS § 15.20.081(e) & (h) (Alaska – 10 days after Election Day if postmarked on or before Election Day); West's Ann. Cal. Elec. Code § 3020(b) (California – three days after Election Day if postmarked on or before Election Day); DC ST § 1-1001.05(a)(10A) (District of Columbia – seven days after the election if postmarked on or before Election Day); 10 ILCS 5/19-8, 5/18A-15 (Illinois – 14 days after the election if postmarked on or before Election Day); K.S.A. 25-1132 (Kansas – three days after the election if postmarked before the close of polls on Election Day); MD Code, Elec. Law, § 9-505 (Maryland – the second Friday after Election Day if postmarked on or before Election Day); Miss. Code Ann. § 23-15-637 (Mississippi – five business days after Election Day if postmarked on or before Election Day); NV Rev Stat § 293.317 (Nevada – by 5:00 P.M. on the seventh day after Election Day if postmarked by Election Day, and ballots with unclear postmarks must be received by 5:00 P.M. on the third day after Election Day); N.J.S.A. 19:63-22 (New Jersey – 48 hours after polls close if postmarked on or before Election Day); McKinney's Elec. Law § 8-412 (New York – seven days after the election for mailed ballots postmarked on Election Day); N.C. Gen. Stat. § 163-231(b)(2) and *Wise v. Circosta*,

978 F.3d 93, 96 (4th Cir. 2020) (North Carolina – recognizing extension from three to nine days after the election deadline for mail ballots postmarked on or before Election Day); Texas Elec. Code § 86.007 (the day after the election by 5:00 P.M. if postmarked on or before Election Day); Va. Code 24.2-709 (Virginia – by noon on the third day after the election if postmarked on or before Election Day); West's RCWA 29A.40.091 (Washington – no receipt deadline for ballots postmarked on or before Election Day); W. Va. Code, §§ 3-3-5, 3-5-17 (West Virginia – five days after the election if postmarked on or before Election Day); *see also* Iowa Code § 53.17(2) (by noon the Monday following the election if postmarked by the day before Election Day); NDCC 16.1-07-09 (North Dakota – before the canvass if postmarked the day before Election Day); R.C. § 3509.05 (Ohio – 10 days after the election if postmarked by the day before Election Day); Utah Code Ann. § 20A-3a-204 (seven to 14 days after the election if postmarked the day before the election).

11    *Bush v. Gore* does not require us to perform an Equal Protection Clause analysis of Pennsylvania election law as interpreted by the Pennsylvania Supreme Court. *See* 531 U.S. at 109, 121 S.Ct. 525 ("Our consideration is limited to the present circumstances ...."); *id.* at 139–40, 121 S.Ct. 525 (Ginsburg, J., dissenting) (discussing "[r]are[ ]" occasions when Supreme Court rejected state supreme court's interpretation of state law, one of which was in 1813 and others occurred during Civil Rights Movement—and none decided federal equal protection issues).

12    In their complaint, the Voter Plaintiffs alleged that they are all "residents of Somerset County, a county where voters are requesting absentee ballots at a rate *far less* than the state average" and thus, somehow, the Voter Plaintiffs' votes "will be diluted to a greater degree than other voters." Compl. ¶ 71 (emphasis in original). Plaintiffs continue to advance this argument on appeal in support of standing, and it additionally suffers from being a conjectural or hypothetical injury under the framework discussed *infra* Section III.A.2.b.ii. It is purely hypothetical that counties where a greater percentage of voters request absentee ballots will more frequently have those ballots received after Election Day.

13    Plaintiffs also rely on *FEC v. Akins*, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), for the proposition that a widespread injury—such as a mass tort injury or an injury "where large numbers of voters suffer interference with voting rights conferred by law"—does not become a "generalized grievance" just because many share it. *Id.* at 24–25, 118 S.Ct. 1777. That's true as far as it goes. But the Voter Plaintiffs have not alleged an injury like that at issue in *Akins*. There, the plaintiffs' claimed injury was their inability to obtain information they alleged was required to be disclosed under the Federal Election Campaign Act. *Id.* at 21, 118 S.Ct. 1777. The plaintiffs alleged a statutory right to obtain information and that the same information was being withheld. Here, the Voter Plaintiffs' alleged injury is to their right under the Equal Protection Clause not to have their votes "diluted," but the Voter Plaintiffs have not alleged that their votes are less influential than any other vote.

14    The District Court did not find that the Deadline Extension created such a preferred class.

15    Moreover, we cannot overlook that the mail-in voters potentially suffer a *disadvantage* relative to the in-person voters. Whereas in-person ballots that are timely cast will count, timely cast mail-in ballots may not count because, given mail delivery rates, they may not be received by 5:00 P.M. on November 6.

16    *See* Defendant-Appellee's Br. 30 (citing 39 C.F.R. § 211.2(a)(2); Postal Operations Manual at 443.3).

17    *See* Pa. Democratic Party, 238 A.3d at 364 (noting "current two to five day delivery expectation of the USPS").

18    Indeed, the conduct required of a voter to effectuate such a scheme may be punishable as a crime under Pennsylvania statutes that criminalize forging or "falsely mak[ing] the official endorsement on any ballot," 25 Pa. Stat. & Cons. Stat. § 3517 (punishable by up to two years' imprisonment); "willfully disobey[ing] any lawful instruction or order of any county board of elections," *id.* § 3501 (punishable by up to one year's imprisonment); or voting twice in one election, *id.* § 3535 (punishable by up to seven years' imprisonment).

19    As of the morning of November 12, Secretary Boockvar estimates that 655 of the 9383 ballots received between 8:00 P.M. on Election Day and 5:00 P.M. on November 6 lack a legible postmark. *See* Dkt. No. 59. That estimate of 655 ballots does not include totals from five of Pennsylvania's 67 counties: Lehigh, Northumberland, Tioga, Warren, and Wayne. *Id.* The 9383 ballots received, however, account for all of Pennsylvania's counties. *Id.*

20    *See, e.g.*, *Andino v. Middleton*, No. 20A55, 592 U.S. ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2020 WL 5887393, at *1 (Oct. 5, 2020) (Kavanaugh, J., concurring) ("By enjoining South Carolina's witness requirement shortly before the election, the District Court defied [the *Purcell*] principle and this Court's precedents." (citations omitted)); *Merrill v. People First of Ala.*, No. 19A1063, 591 U.S. ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2020 WL 3604049 (Mem.), at *1 (July 2, 2020); *Republican Nat'l Comm.*, 140 S. Ct. at 1207; *see also* Democratic Nat'l Comm. v. Bostelmann, 977 F.3d 639, 641 (7th Cir. 2020) (per curiam) (holding that injunction issued six weeks before election violated *Purcell*); *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. Oct. 2, 2020) ("[W]e are not on the eve of the election—we are in the middle of it, with absentee ballots already printed and mailed. An injunction here would thus violate *Purcell*'s

well-known caution against federal courts mandating new election rules—especially at the last minute." (citing *Purcell*, 549 U.S. at 4–5, 127 S.Ct. 5)).

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 10



OFFICE OF THE CLERK

# 𝕾𝖚𝖕𝖗𝖊𝖒𝖊 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝖂𝖎𝖘𝖈𝖔𝖓𝖘𝖎𝖓

**110 EAST MAIN STREET, SUITE 215**
**P.O. BOX 1688**
**MADISON, WI 53701-1688**

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

October 29, 2020

To:

Kyle J. Sargent
Deputy Corporation Counsel
320 S. Walnut St.
Appleton, WI 54911

Kimberly A. Tenerelli
Corporation Counsel
Calumet County
206 Court St.
Chilton, WI 53014

Thomas C. Bellavia
S. Michael Murphy
Colin T. Roth
Assistant Attorneys General
P.O. Box 7857
Madison, WI 53707

Christopher Behrens
Amanda Kate Abshire
City of Appleton Attorney's Office
100 North Appleton Street
Appleton, WI 54911

*Address list continued on page 5.

You are hereby notified that the Court has entered the following order:

No. 2020AP1761-OA        O'Bright v. Lynch

The court has considered the following filings: (1) an "Emergency Petition For Original Jurisdiction And Declaratory Judgment" filed by Outagamie County and Calumet County; (2) responses to the petition filed by the City of Appleton; the Village of Black Creek; the Town of Buchanan, et al.; the Town of Cicero; the Town of Center, et al.; the Village of Hortonville, et al.; the City of Kaukauna; the Town of Vandenbroek; and the Wisconsin Elections Commission; and (3) a statement in support of the petition filed by amicus curiae, Wisconsin Counties Association;

IT IS ORDERED that the petition is denied.

¶1      PATIENCE DRAKE ROGGENSACK, C.J.   *(concurring).*  Wisconsinites have a fundamental right to vote.  Therefore, a vote legally cast and received by the time the polls close on Election Day must be counted if the ballot expresses the will of the voter.

¶2      In the present case, clerks for Outagamie County and Calumet County are concerned that they cannot count and report such votes by a statutorily-imposed deadline. They ask us to assume original jurisdiction and issue what amounts to an advisory opinion explaining what election laws they are free to disregard. We will not do that. However, I write separately to clarify that our denial of the petition for an original action should not be construed as an endorsement to disregard Wisconsinites' fundamental right to vote. Accordingly, I respectfully concur.

## I.      BACKGROUND

¶3      For context, the petitioners for declaratory judgment are the clerks of Outagamie County and Calumet County. For the upcoming November 3rd election, the Outagamie County clerk ordered ballots on behalf of all municipalities in Outagamie County and the portions of the City of Appleton and the Town of Harrison that fall in Calumet and Winnebago Counties. On September 3, the Outagamie County clerk approved proofs of ballots provided by JP Graphics, Inc. From September 8 to September 16, JP delivered more than 133,000 printed ballots for absentee voting to the municipalities. Subsequently, the municipalities mailed some of those absentee ballots to registered voters who had requested them.

¶4      Unfortunately, a portion of the absentee ballots had a printing error, which has been described to us as a blemish in the timing mark that prevents the affected ballots from being counted by electronic voting systems. Approximately 13,500 absentee ballots with this error were available to be mailed to voters.

¶5      Outagamie County and Calumet County became concerned that those absentee ballots were "defective" such that municipalities had to follow the procedures outlined in Wis. Stat. § 5.85(3) (2017-18),[1] which require that defective ballots that cannot be counted by an electronic voting system be duplicated in the presence of witnesses. If such a procedure were required, Outagamie County and Calumet County worried that their municipalities could not comply with statutorily-imposed deadlines set forth in Wis. Stat. § 7.51(5)(b) by 4 p.m. on the day following the election.

¶6      Outagamie County asked the Wisconsin Elections Commission (WEC) for advice about how to proceed. The WEC responded that it lacked the authority to extend deadlines imposed by Wis. Stat. § 7.51(5)(b). Furthermore, it could not authorize the municipalities to utilize a procedure other than Wis. Stat. § 5.85(3). The WEC also explained that, while it could authorize a hand count pursuant to Wis. Stat. § 5.40(5m), it did not believe that it could authorize hand counting of only affected ballots. As it stated, "[p]ermission to hand count is not a 'mix or match' situation where some ballots in a municipality may be counted by electronic voting equipment, and other ballots counted by hand. Either all ballots in a municipality must be counted by electronic voting equipment, or, if permission is granted, all ballots [in] that municipality must be counted by hand." According to Outagamie County and Calumet County, they cannot comply

---

[1] All subsequent references to the Wisconsin Statutes are to the 2017-18 version.

with Wis. Stat. § 5.85(3) by 4 p.m. November 4.  Outagamie County and Calumet County did not discuss hand-counting some or all of the ballots in their petition or memorandum relating to an original action.

## II.  DISCUSSION

### A.  The Right to Vote

¶7     The right to vote is protected by Wis. Const. art. III, § 1.  Therefore, a vote legally cast and received by the time the polls close on Election Day must be counted if the ballot expresses the will of the voter.[2]  In Ollmann v. Kowalewski, 238 Wis. 574, 578, 300 N.W. 183 (1941), we explained the extent of the protection afforded by § 1.  There, we noted that "the voters' constitutional right to vote 'cannot be baffled by latent official failure or defect.'"  Id. at 579 (quoting State ex rel. Wood v. Baker, 38 Wis. 71 (1875)).

¶8     Ollmann is not a standalone case.  As the court of appeals explained in Board of Canvassers of the City of Bayfield v. Erickson:  "Wisconsin has a long tradition of protecting the individual citizen's right to have his vote counted, consistent with necessary restrictions to insure the integrity of the election process."  147 Wis. 2d 467, 471, 433 N.W.2d 266 (Ct. App. 1988).

### B.  Application

¶9     Here, election officials desire to ignore deadlines imposed by Wis. Stat. § 7.51(5)(b), or, alternatively, to use a procedure other than the one prescribed by Wis. Stat. § 5.85(3).  Effectively, they ask us to render legal advice about how to proceed.  We will not do that.  However, a vote legally cast and received by the time the polls close on Election Day must be counted if the ballot expresses the will of the voter.

¶10     Election officials may have to make difficult decisions regarding how to proceed as they comply with what the law requires.  Obtaining more election workers appears to be necessary.

## III.  CONCLUSION

¶11     In conclusion, I write separately to clarify that our denial of the petition for an original action should not be construed as an endorsement to disregard Wisconsinites' fundamental right to vote.  We have repeatedly recognized that Wisconsinites have a fundamental right to vote, and a vote legally cast and received by the time the polls close on Election Day must be counted if the ballot expresses the will of the voter.  Accordingly, I respectfully concur to the order.

---

[2] Similar protection is afforded by the United States Constitution.  Reynolds v. Sims, 377 U.S. 533, 554 (1964) ("It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote and to have their votes counted."  (Internal citations omitted)).

3

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 4 of 7   Document 55-10

¶12     ANN WALSH BRADLEY, J.   (*dissenting*).  In recent months, this court has been inundated with petitions for original actions.  And the court has accepted the lion's share.[3]  Yet in this case, arguably one of the most consequential of the lot and a case where time is of the essence, the court denies the petition without explanation.

¶13     The petitioners, the Clerks of Outagamie and Calumet Counties, together with all of the respondents[4] as well as the Wisconsin Counties Association, ask this court to grant the petition for original action.  The parties may differ in approach, but they are unanimous in their desire that some relief be granted.

¶14     The issues presented are significant and meet the criteria established for the court to exercise its original jurisdiction as set forth in Wis. Stat. § (Rule) 809.70.  If the court exercises original jurisdiction and declares the parties' rights and obligations as requested in the petition, it would provide the necessary clarity and certainty as to the election process and avoid disputes that may arise after Election Day.

¶15     I conclude that our input is needed to provide critical guidance to local election officials in advance of processing ballots for a national, state, and local election that is already underway.  Accordingly, I would grant the petition for original action.

¶16     The majority, however, concludes otherwise.  In explaining its rationale for the denial, the concurrence seemingly rests its analysis on the premise that if the court grants the petition it would be rendering a prohibited advisory opinion.  See Chief Justice Roggensack's concurrence, ¶9 ("Effectively, they ask us to render legal advice about how to proceed.  We will not do that.").  That premise appears to be merely an excuse.

¶17     The petition here requests a declaratory judgment from this court.  The very essence of a declaratory judgment is to declare the rights and obligations of the parties so that they know

_____

    [3]  See, e.g., Fabick v. Evers, No. 2020AP1718-OA; James v. Heinrich, No. 2020AP1419-OA; Wis. Council of Independent and Religious Schools v. Heinrich, No. 2020AP1420-OA; St. Ambrose Academy, Inc. v. Heinrich, No. 2020AP1446-OA; Hawkins v. Wis. Elections Comm'n, 2020 WI 75, 393 Wis. 2d 629, 948 N.W.2d 877; Jefferson v. Dane Cty., No. 2020AP557-OA; Wis. Legislature v. Palm, 2020 WI 42, 391 Wis. 2d 497, 942 N.W.2d 900; Wis. Legislature v. Evers, No. 2020AP608-OA, unpublished order (Apr. 6, 2020).

    [4] The respondents in this action are the Wisconsin Elections Commission and the clerks for the City of Appleton, City of Kaukauna, Town of Bovina, Town of Buchanan, Town of Center, Town of Cicero, Town of Ellington, Town of Freedom, Town of Grand Chute, Town of Hortonia, Town of Kaukauna, Town of Maine, Town of Maple Creek, Town of Oneida, Town of Osborn, Town of Seymour, Town of Vandenbroek, Village of Black Creek, Village of Combined Locks, Village of Hortonville, Village of Kimberly, Village of Nichols, Village of Shiocton, and Village of Harrison.

how to proceed consistent with the law.  Wis. Stat. § 806.04.  It is a well-recognized and often used procedure in courts throughout this state.

¶18     Having eschewed the very idea of being called upon to render an advisory opinion, the concurrence seemingly engages in what it says it will not do.  It observes that the clerks "did not discuss hand-counting some or all of the ballots in their petition or memorandum relating to an original action."  Chief Justice Roggensack's concurrence, ¶6.  It appears that the concurrence makes this observation to suggest a possible avenue of recourse.  Such a suggestion, however, may be inconsistent with both reality and the law.

¶19     Given the resources available to municipalities, it appears inconsistent with the on-the-ground reality of some of the clerks' abilities to report their results within the statutory deadline of 4:00 p.m. the following day.  See Wis. Stat. § 7.51(5)(b).  Additionally, it may be inconsistent with the law in that it suggests hand-counting all ballots without advance permission from the Elections Commission or some ballots in violation of Elections Commission guidance.  Wis. Stat. § 5.40(5m).

¶20     In sum, the majority leaves local election officials in the lurch.  Without the requested and critical guidance from this court, they are left to do their best under difficult circumstances.  For the foregoing reasons, I respectfully dissent.

¶21     I am authorized to state that Justice REBECCA FRANK DALLET and Justice JILL J. KAROFSKY join this dissent.

Sheila T. Reiff
Clerk of Supreme Court

Address list continued:

Kevin Davidson
Kaukauna City Attorney
144 W 2nd St
Kaukauna, WI 54130

Ashley C. Lehocky
Adam V. Marshall
Richard J. Carlson
Town Counsel Law & Litigation, LLC
119 N. McCarthy Rd, Suite C
Appleton, WI 54913

Steven J. Frassetto
MENN Law Firm
2501 E. Enterprise Ave.
P.O. Box 785
Appleton, WI 54912

Robert E. Sorenson
MENN Law Firm
223 North Pine Street
Hortonville, WI 54944

Matthew Parmentier
Dempsey, Edgarton, St Peter, Petak &
Rosenfeldt
P.O. Box 1276
Fond du Lac, WI 54936

Charles D. Koehler
Andrew J. Rossmeissl
Tyler J. Claringbole
Herrling Clark Law Firm LTD
800 North Lynndale Dr
Appleton, WI 54914

Debra K. Vander Heiden
Clerk for Town of Kaukauna
W780 Greiner Rd
Kaukauna, WI 54130-8028

Anthony J. Steffek
Davis & Kuelthau, SC
318 S. Washington St., Ste. 300
Green Bay, WI 54301

Robert D. Sweeney
Sweeney Law Office, S.C.
P.O. Box 206
Seymour, WI 54165

Andrew T. Phillips
von Briesen & Roper, S.C.
411 E. Wisconsin Ave., Ste. 1000
Milwaukee, WI 53202

# EXHIBIT 11



**OFFICE OF THE CLERK**

# Supreme Court of Wisconsin

**110 EAST MAIN STREET, SUITE 215**
**P.O. BOX 1688**
**MADISON, WI 53701-1688**

**TELEPHONE (608) 266-1880**
**FACSIMILE (608) 267-0640**
**Web Site: www.wicourts.gov**

December 3, 2020

To:

R. George Burnett
Conway, Olejniczak & Jerry, SC
P.O. Box 23200
Green Bay, WI 54305-3200

James R. Troupis
Troupis Law Office, LLC
4126 Timber Lane
Cross Plains, WI 53528

Margaret C. Daun
Milwaukee County Corporation Counsel
901 N. 9th Street, Room 303
Milwaukee, WI 53233

Joshua L. Kaul
Thomas C. Bellavia
Colin T. Roth
Colin R. Stroud
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857

David R. Gault
Assistant Corporation Counsel
Office of the Dane County Corporation
Counsel
210 Martin Luther King, Jr. Blvd., Room 419
Madison, WI 53703-3345

*Address list continued on page 9.

You are hereby notified that the Court has entered the following order:

No. 2020AP1971-OA        Trump v. Evers

A petition for leave to commence an original action under Wis. Stat. § (Rule) 809.70, a supporting legal memorandum, and an appendix have been filed on behalf of petitioners, Donald J. Trump, et al.  Responses to the petition have been filed by (1) Governor Tony Evers; (2) the Wisconsin Elections Commission and its Chair, Ann S. Jacobs; (3) Scott McDonell, Dane County Clerk, and Alan A. Arnsten and Joyce Waldrop, members of the Dane County Board of Canvassers; and (4) George L. Christensen, Milwaukee County Clerk, and Timothy H. Posnanski, Richard Baas, and Dawn Martin, members of the Milwaukee County Board of Canvassers. A non-party brief in support of the petition has been filed by the Liberty Justice Center.  A motion to intervene, a proposed response of proposed respondents-intervenors, and an appendix have been filed by the Democratic National Committee (DNC) and Margaret J. Andrietsch, Sheila Stubbs,

Ronald Martin, Mandela Barnes, Khary Penebaker, Mary Arnold, Patty Schachtner, Shannon Holsey, and Benjamin Wikler (collectively, "the Biden electors"). The court having considered all of the filings,

IT IS ORDERED that the petition for leave to commence an original action is denied. One or more appeals from the determination(s) of one or more boards of canvassers or from the determination of the chairperson of the Wisconsin Elections Commission may be filed by an aggrieved candidate in circuit court. Wis. Stat. § 9.01(6); and

IT IS FURTHER ORDERED that the motion to intervene is denied as moot.

BRIAN HAGEDORN, J. (*concurring*). I understand the impulse to immediately address the legal questions presented by this petition to ensure the recently completed election was conducted in accordance with the law. But challenges to election results are also governed by law. All parties seem to agree that Wis. Stat. § 9.01 (2017–18)[1] constitutes the "exclusive judicial remedy" applicable to this claim. § 9.01(11). After all, that is what the statute says. This section provides that these actions should be filed in the circuit court, and spells out detailed procedures for ensuring their orderly and swift disposition. See § 9.01(6)–(8). Following this law is not disregarding our duty, as some of my colleagues suggest. It is following the law.

Even if this court has constitutional authority to hear the case straightaway, notwithstanding the statutory text, the briefing reveals important factual disputes that are best managed by a circuit court.[2] The parties clearly disagree on some basic factual issues, supported at times by competing affidavits. I do not know how we could address all the legal issues raised in the petition without sorting through these matters, a task we are neither well-positioned nor institutionally designed to do. The statutory process assigns this responsibility to the circuit court. Wis. Stat. § 9.01(8)(b) ("The [circuit] court shall separately treat disputed issues of procedure, interpretations of law, and findings of fact.").

We do well as a judicial body to abide by time-tested judicial norms, even—and maybe especially—in high-profile cases. Following the law governing challenges to election results is no threat to the rule of law. I join the court's denial of the petition for original action so that the petitioners may promptly exercise their right to pursue these claims in the manner prescribed by the legislature.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2017–18 version.

[2] The legislature generally can and does set deadlines and define procedures that circumscribe a court's competence to act in a given case. Village of Trempealeau v. Mikrut, 2004 WI 79, ¶¶9–10, 273 Wis. 2d 76, 681 N.W.2d 190. The constitution would obviously override these legislative choices where the two conflict.

PATIENCE DRAKE ROGGENSACK, C.J.    *(dissenting).*    Before us is an emergency petition for leave to commence an original action brought by President Trump, Vice President Pence and Donald Trump for President, Inc., against Governor Evers, the Wisconsin Elections Commission (WEC), its members and members of both the Milwaukee County Board of Canvassers and the Dane County Board of Canvassers.  The Petitioners allege that the WEC and election officials caused voters to violate various statutes in conducting Wisconsin's recent presidential election.  The Petitioners raised their concerns during recount proceedings in Dane County and Milwaukee County.  Their objections were overruled in both counties.

The Respondents argue, in part, that we lack subject matter jurisdiction because of the "exclusive judicial remedy" provision found in Wis. Stat. § 9.01(11) (2017-18).[3]  Alternatively, the Respondents assert that we should deny this petition because fact-finding is required, and we are not a fact-finding tribunal.

I conclude that we have subject matter jurisdiction that enables us to grant the petition for original action pending before us.  Our jurisdiction arises from the Wisconsin Constitution and cannot be impeded by statute.  Wis. Const., art. VII, Section 3(2); City of Eau Claire v. Booth, 2016 WI 65, ¶7, 370 Wis. 2d 595, 882 N.W.2d 738.  Furthermore, time is of the essence.

However, fact-finding may be central to our evaluation of some of the questions presented. I agree that the circuit court should examine the record presented during the canvasses to make factual findings where legal challenges to the vote turn on questions of fact.  However, I dissent because I would grant the petition for original action, refer for necessary factual findings to the circuit court, who would then report its factual findings to us, and we would decide the important legal questions presented.

I also write separately to emphasize that by denying this petition, and requiring both the factual questions and legal questions be resolved first by a circuit court, four justices of this court are ignoring that there are significant time constraints that may preclude our deciding significant legal issues that cry out for resolution by the Wisconsin Supreme Court.

## I.  DISCUSSION

The Petitioners set out four categories of absentee votes that they allege should not have been counted because they were not lawfully cast:  (1) votes cast during the 14-day period for in-person absentee voting at a clerk's office with what are alleged to be insufficient written requests for absentee ballots, pursuant to Wis. Stat. § 6.86(1)(b); (2) votes cast when a clerk has completed information missing from the ballot envelope, contrary to Wis. Stat. § 6.87(6d); (3) votes cast by those who obtained an absentee ballot after March 25, 2020 by alleging that they were indefinitely

---

[3] All subsequent references to the Wisconsin Statutes are to the 2017–18 version.

confined; and (4) votes cast in Madison at "Democracy in the Park" events on September 26 and October 3, in advance of the 14-day period before the election, contrary to Wis. Stat. § 6.87.

Some of the Respondents have asserted that WEC has been advising clerks to add missing information to ballot envelopes for years, so the voters should not be punished for following WEC's advice. They make similar claims for the collection of votes more than 14 days before the November 3 election.

If WEC has been giving advice contrary to statute, those acts do not make the advice lawful. WEC must follow the law. We, as the law declaring court, owe it to the public to declare whether WEC's advice is incorrect. However, doing so does not necessarily lead to striking absentee ballots that were cast by following incorrect WEC advice. The remedy Petitioners seek may be out of reach for a number of reasons.

Procedures by which Wisconsin elections are conducted must be fair to all voters. This is an important election, but it is not the last election in which WEC will be giving advice. If we do not shoulder our responsibilities, we leave future elections to flounder and potentially result in the public's perception that Wisconsin elections are unfair. The Wisconsin Supreme Court can uphold elections by examining the procedures for which complaint was made here and explaining to all where the WEC was correct and where it was not.

I also am concerned that the public will misunderstand what our denial of the petition means. Occasionally, members of the public seem to believe that a denial of our acceptance of a case signals that the petition's allegations are either false or not serious. Nothing could be further from the truth. Indeed, sometimes, we deny petitions even when it appears that a law has been violated. Hawkins v. Wis. Elec. Comm'n, 2020 WI 75, ¶¶14–16, 393 Wis. 2d 629, 948 N.W.2d 877 (Roggensack, C.J., dissenting).

## II. CONCLUSION

I conclude that we have subject matter jurisdiction that enables us to grant the petition for original action pending before us. Our jurisdiction arises from the Wisconsin Constitution and cannot be impeded by statute. Wis. Const., art. VII, Section 3(2); City of Eau Claire, 370 Wis. 2d 595, ¶7. Furthermore, time is of the essence.

However, fact-finding may be central to our evaluation of some of the questions presented. I agree that the circuit court should examine the record presented during the canvasses to make factual findings where legal challenges to the vote turn on questions of fact. However, I dissent because I would grant the petition for original action, refer for necessary factual findings to the circuit court, who would then report its factual findings to us, and we would decide the important legal questions presented.

I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.

REBECCA GRASSL BRADLEY, J.   (*dissenting*).   "It is emphatically the province and duty of the Judicial Department to say what the law is."   Marbury v. Madison, 5 U.S. 137, 177 (1803).  The Wisconsin Supreme Court forsakes its duty to the people of Wisconsin in declining to decide whether election officials complied with Wisconsin's election laws in administering the November 3, 2020 election.  Instead, a majority of this court passively permits the Wisconsin Elections Commission (WEC) to decree its own election rules, thereby overriding the will of the people as expressed in the election laws enacted by the people's elected representatives.  Allowing six unelected commissioners to make the law governing elections, without the consent of the governed, deals a death blow to democracy.  I dissent.

The President of the United States challenges the legality of the manner in which certain Wisconsin election officials directed the casting of absentee ballots, asserting they adopted and implemented particular procedures in violation of Wisconsin law.  The respondents implore this court to reject the challenge because, they argue, declaring the law at this point would "retroactively change the rules" after the election.  It is THE LAW that constitutes "the rules" of the election and election officials are bound to follow the law, if we are to be governed by the rule of law, and not of men.

Under the Wisconsin Constitution, "all governmental power derives 'from the consent of the governed' and government officials may act only within the confines of the authority the people give them.  Wis. Const. art. I, § 1."  Wisconsin Legislature v. Palm, 2020 WI 42, ¶66, 391 Wis. 2d 497, 942 N.W.2d 900 (Rebecca Grassl Bradley, J., concurring).  The Founders designed our "republic to be a government of laws, and not of men . . . bound by fixed laws, which the people have a voice in making, and a right to defend."  John Adams, Novanglus: A History of the Dispute with America, from Its Origin, in 1754, to the Present Time, in Revolutionary Writings of John Adams (C. Bradley Thompson ed. 2000) (emphasis in original).  Allowing any person, or unelected commission of six, to be "bound by no law or limitation but his own will" defies the will of the people.  Id.

The importance of having the State's highest court resolve the significant legal issues presented by the petitioners warrants the exercise of this court's constitutional authority to hear this case as an original action.   See Wis. Const. Art. VII, § 3.   "The purity and integrity of elections is a matter of such prime importance, and affects so many important interests, that the courts ought never to hesitate, when the opportunity is offered, to test them by the strictest legal standards."  State v. Conness, 106 Wis. 425, 82 N.W. 288, 289 (1900).  While the court reserves this exercise of its jurisdiction for those original actions of statewide significance, it is beyond dispute that "[e]lections are the foundation of American government and their integrity is of such monumental importance that any threat to their validity should trigger not only our concern but our prompt action."  State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued June 1, 2020 (Rebecca Grassl Bradley, J., dissenting)).

The majority notes that an action "may be filed by an aggrieved candidate in circuit court.  Wis. Stat. § 9.01(6)."  Justice Hagedorn goes so far as to suggest that § 9.01 "constitutes the 'exclusive judicial remedy' applicable to this claim."  No statute, however, can circumscribe the

constitutional jurisdiction of the Wisconsin Supreme Court to hear this (or any) case as an original action.    "The Wisconsin Constitution IS the law—and it reigns supreme over any statute." Wisconsin Legislature v. Palm, 391 Wis. 2d 497, ¶67 n.3 (Rebecca Grassl Bradley, J., concurring). "The Constitution's supremacy over legislation bears repeating:  'the Constitution is to be considered in court as a paramount law' and 'a law repugnant to the Constitution is void, and . . . courts, as well as other departments, are bound by that instrument.'  See Marbury [v. Madison], 5 U.S. (1 Cranch) [137] at 178, 180 [1803])."  Mayo v. Wis. Injured Patients and Families Comp. Fund, 2018 WI 78, ¶91, 383 Wis. 2d 1, 914 N.W.2d 678 (Rebecca Grassl Bradley, J., concurring). Wisconsin Statute § 9.01 is compatible with the constitution.  While it provides an avenue for aggrieved candidates to pursue an appeal to a circuit court after completion of the recount determination, it does not foreclose the candidate's option to ask this court to grant his petition for an original action.  Any contrary reading would render the law in conflict with the constitution and therefore void.  Under the constitutional-doubt canon of statutory interpretation, "[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt."  Antonin Scalia & Brian A. Garner, Reading Law:  The Interpretation of Legal Texts 247.  See also Wisconsin Legislature v. Palm, 391 Wis. 2d 497, ¶31 ("[W]e disfavor statutory interpretations that unnecessarily raise serious constitutional questions about the statute under consideration.").

While some will either celebrate or decry the court's inaction based upon the impact on their preferred candidate, the importance of this case transcends the results of this particular election.  "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."  Purcell v. Gonzalez, 549 U.S. 1, 4 (2006).  The majority takes a pass on resolving the important questions presented by the petitioners in this case, thereby undermining the public's confidence in the integrity of Wisconsin's electoral processes not only during this election, but in every future election.  Alarmingly, the court's inaction also signals to the WEC that it may continue to administer elections in whatever manner it chooses, knowing that the court has repeatedly declined to scrutinize its conduct.  Regardless of whether the WEC's actions affect election outcomes, the integrity of every election will be tarnished by the public's mistrust until the Wisconsin Supreme Court accepts its responsibility to declare what the election laws say.  "Only . . . the supreme court can provide the necessary clarity to guide all election officials in this state on how to conform their procedures to the law" going forward.  State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued January 13, 2020 (Rebecca Grassl Bradley, J., dissenting)).

The majority's recent pattern of deferring or altogether dodging decisions on election law controversies[4] cannot be reconciled with its lengthy history of promptly hearing cases involving

---

[4] Hawkins v. Wis. Elec. Comm'n, 2020 WI 75, ¶¶84, 86, 393 Wis. 2d 629, 948 N.W.2d 877 (Rebecca Grassl Bradley, J., dissenting) ("The majority upholds the Wisconsin Elections Commission's violation of Wisconsin law, which irrefutably entitles Howie Hawkins and Angela Walker to appear on Wisconsin's November 2020 general election ballot as candidates for President and Vice President of the United States . . . .  In dodging its responsibility to uphold the rule of law, the majority ratifies a grave threat to our republic, suppresses the votes of

voting rights and election processes under the court's original jurisdiction or by bypassing the court of appeals.[5]  While the United States Supreme Court has recognized that "a state indisputably has a compelling interest in preserving the integrity of its election process[,]" Burson v. Freeman, 504 U.S. 191, 199 (1992), the majority of this court repeatedly demonstrates a lack of any interest in doing so, offering purely discretionary excuses or no reasoning at all.  This year, the majority in Hawkins v. Wis. Elec. Comm'n declined to hear a claim that the WEC unlawfully kept the Green Party's candidates for President and Vice President off of the ballot, ostensibly because the majority felt the candidates' claims were brought "too late."[6]  But when litigants have filed cases involving voting rights well in advance of Wisconsin elections, the court has "take[n] a pass,"

---

Wisconsin citizens, irreparably impairs the integrity of Wisconsin's elections, and undermines the confidence of American citizens in the outcome of a presidential election"); State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued January 13, 2020 (Rebecca Grassl Bradley, J., dissenting)) ("In declining to hear a case presenting issues of first impression immediately impacting the voting rights of Wisconsin citizens and the integrity of impending elections, the court shirks its institutional responsibilities to the people who elected us to make important decisions, thereby signaling the issues are not worthy of our prompt attention."); State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued June 1, 2020 (Rebecca Grassl Bradley, J., dissenting)) ("A majority of this court disregards its duty to the people we serve by inexplicably delaying the final resolution of a critically important and time-sensitive case involving voting rights and the integrity of Wisconsin's elections.").

    [5] See, e.g., NAACP v. Walker, 2014 WI 98, ¶¶1, 18, 357 Wis. 2d 469, 851 N.W.2d 262 (2014) (this court took jurisdiction of appeal on its own motion in order to decide constitutionality of the voter identification act enjoined by lower court); Elections Bd. of Wisconsin v. Wisconsin Mfrs. & Commerce, 227 Wis. 2d 650, 653, 670, 597 N.W.2d 721 (1999) (this court granted bypass petition to decide whether express advocacy advertisements advocating the defeat or reelection of incumbent legislators violated campaign finance laws, in absence of cases interpreting applicable statutes); State ex rel. La Follette v. Democratic Party of United States, 93 Wis. 2d 473, 480-81, 287 N.W.2d 519 (1980) (original action deciding whether Wisconsin open primary system was binding on national political parties or infringed their freedom of association), rev'd, Democratic Party of United States v. Wisconsin ex rel. La Follette, 450 U.S. 107 (1981); State ex rel. Reynolds v. Zimmerman, 22 Wis. 2d 544, 548, 126 N.W.2d 551 (1964) (original action seeking to enjoin state from holding elections pursuant to legislative apportionment alleged to violate constitutional rights); State ex rel. Broughton v. Zimmerman, 261 Wis. 398, 400, 52 N.W.2d 903 (1952) (original action to restrain the state from holding elections based on districts as defined prior to enactment of reapportionment law), overruled in part by Reynolds, 22 Wis. 2d 544; State ex rel. Conlin v. Zimmerman, 245 Wis. 475, 476, 15 N.W.2d 32 (1944) (original action to interpret statutes in determining whether candidate for Governor timely filed papers to appear on primary election ballot).

    [6] Hawkins v. Wis. Elec. Comm'n, 2020 WI 75, ¶5, 393 Wis. 2d 629, 948 N.W.2d 877 (denying the petition for leave to commence an original action).

thereby "irreparably den[ying] the citizens of Wisconsin a timely resolution of issues that impact voter rights and the integrity of our elections."  State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued January 13, 2020 (Rebecca Grassl Bradley, J., dissenting)). Having neglected to identify any principles guiding its decisions, the majority leaves Wisconsin's voters and candidates guessing as to when, exactly, they should file their cases in order for the majority to deem them worthy of the court's attention.

The consequence of the majority operating by whim rather than rule is to leave the interpretation of multiple election laws in flux—or worse yet, in the hands of the unelected members of the WEC.  "To be free is to live under a government by law . . . .  Miserable is the condition of individuals, danger is the condition of the state, if there is no certain law, or, which is the same thing, no certain administration of the law . . . ."  Judgment in Rex vs. Shipley, 21 St Tr 847 (K.B. 1784) (Lord Mansfield presiding).  The Wisconsin Supreme Court has an institutional responsibility to decide important questions of law—not for the benefit of particular litigants, but for citizens we were elected to serve.  Justice for the people of Wisconsin means ensuring the integrity of Wisconsin's elections.  A majority of this court disregards its duty to the people of Wisconsin, denying them justice.

"No aspect of the judicial power is more fundamental than the judiciary's exclusive responsibility to exercise judgment in cases and controversies arising under the law."  Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶37, 376 Wis. 2d 147, 897 N.W.2d 384.  Once again, a majority of this court instead "chooses to sit idly by,"[7] in a nationally important and time-sensitive case involving voting rights and the integrity of Wisconsin's elections, depriving the people of Wisconsin of answers to questions of statutory law that only the state's highest court may resolve. The majority's "refusal to hear this case shows insufficient respect to the State of [Wisconsin], its voters,"[8] and its elections.

"This great source of free government, popular election, should be perfectly pure." Alexander Hamilton, Speech at New York Ratifying Convention (June 21, 1788), in Debates on the Federal Constitution 257 (J. Elliot ed. 1876).  The majority's failure to act leaves an indelible stain on our most recent election.  It will also profoundly and perhaps irreparably impact all local, statewide, and national elections going forward, with grave consequence to the State of Wisconsin and significant harm to the rule of law.  Petitioners assert troubling allegations of noncompliance with Wisconsin's election laws by public officials on whom the voters rely to ensure free and fair elections.  It is not "impulse"[9] but our solemn judicial duty to say what the law is that compels the exercise of our original jurisdiction in this case.  The majority's failure to embrace its duty (or even

---

[7] United Student Aid Funds, Inc. v. Bible, 136 S. Ct. 1607, 1609 (2016) (Thomas, J., dissenting from the denial of certiorari).

[8] County of Maricopa, Arizona v. Lopez-Valenzuela, 135 S. Ct. 2046, 2046 (2015) (Thomas, J., dissenting from the denial of certiorari).

[9] See Justice Hagedorn's concurrence.

an impulse) to decide this case risks perpetuating violations of the law by those entrusted to follow it.  I dissent.

I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK and Justice ANNETTE KINGSLAND ZIEGLER join this dissent.

Sheila T. Reiff
Clerk of Supreme Court

Address list continued:

Andrew A. Jones
Andrew J. Kramer
James F. Cirincione
Hansen Reynolds LLC
301 N. Broadway St., Ste. 400
Milwaukee, WI 53202-2660

John W. McCauley
Hansen Reynolds LLC
10 E. Doty St. Ste 800
Madison, WI 53703

Jeffrey A. Mandell
Rachel E. Snyder
Stafford Rosenbaum LLP
222 W. Washington Avenue
Post Office Box 1784
Madison, WI 53701

Daniel R. Suhr
Liberty Justice Center
190 LaSalle St., Ste. 1500
Chicago, IL 60603

Matthew W. O'Neill
Fox, O'Neill & Shannon, S.C.
622 North Water Street, Suite 500
Milwaukee, WI 53202

Charles G. Curtis
Michelle M. Umberger
Sopen B. Shah
Will M. Conley
Perkins Coie LLP
One East Main St., Suite 201
Madison, WI 53703

Justin A. Nelson
Stephen Shackelford Jr.
Davida Brook
Susman Godfrey LLP
1000 Louisiana Street
Suite 5100
Houston, TX 77002

Paul Smith
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005

David S. Lesser
Jamie Dycus
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Marc E. Elias

John Devaney
Zachary J. Newkirk
Perkins Coie LLP
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005

Seth P. Waxman
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006