# EXHIBIT 3

2020 WL 6817513
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

L. LIN WOOD, JR., Plaintiff,
v.
BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia; REBECCA N. SULLIVAN, in her official capacity as Vice Chair of the Georgia State Election Board; DAVID J. WORLEY, in his official capacity as a Member of the Georgia State Election Board; MATTHEW MASHBURN, in his official capacity as a Member of the Georgia State Election Board; and ANH LE, in her official capacity as a Member of the Georgia State Election Board, Defendants.

Civil Action No. 1:20-cv-04651-SDG
|
11/20/2020

Steven D. Grimberg, United States District Court Judge

**OPINION AND ORDER**

*\*1* This matter is before the Court on a motion for temporary restraining order filed by Plaintiff L. Lin Wood, Jr. [ECF 6]. For the following reasons, and with the benefit of oral argument, Wood's motion is **DENIED**.

**I. BACKGROUND**
On November 3, 2020, the United States conducted a general election for various federal, state, and local political offices (the General Election).[1] However, the voting process in Georgia began in earnest before that date. On September 15, 2020, local election officials began mailing absentee ballots for the General Election to eligible voters.[2] On October 12, 2020, Georgia's in-person, early voting period started.[3] This entire process played out amidst the throes of a global health pandemic caused by the novel coronavirus SARS-CoV-2—colloquially known as COVID-19. Due in large part to the threat posed by COVID-19, an overwhelming number of Georgia voters—over 1 million of the 5 million votes cast by November 3—participated in the General Election through the use of absentee ballots.[4]

Wood, a registered voter in Fulton County, Georgia, believes Defendants— the elected officials tasked with conducting elections in the state—performed their roles in an unconstitutional manner. As such, Wood initiated this action on November 13, 2020, ten days after the conclusion of the General Election.[5] On November 16, Wood filed an Amended Complaint, asserting three claims against Defendants—all in their official capacities—for violation of: the First Amendment and the Equal Protection Clause of the Fourteenth Amendment (Count I); the Electors and Elections Clause of the Constitution (Count II); and the Due Process Clause of the Fourteenth Amendment (Count III).[6]

Counts I and II seek extraordinary relief:

> As a result of Defendants' unauthorized actions and disparate treatment of defective absentee ballots, this Court should enter an order, declaration, and/or injunction that prohibits Defendants from certifying the results of the 2020 general election in Georgia on a statewide basis.
>
> Alternatively, this Court should enter an order, declaration, and/or injunction prohibiting Defendants from certifying the results of the General Election which include the tabulation of defective absentee ballots, regardless of whether said ballots were cured.
>
> Alternatively, this Court should enter an order, declaration, and/or injunction that the results of the 2020 general election in Georgia are defective as a result of the above-described constitutional violations, and that Defendants are required to cure said deficiencies in a manner consistent with federal and Georgia law, and without the taint of the procedures described in the Litigation Settlement.[7]

For Count III, Wood requests an order, declaration, and/or injunction requiring Defendants to perform a myriad of activities, including ordering a second recount prior to the certification of the election results and permitting monitors designated by the Republican Party to have special access to observe all election activity.[8]

**\*2** On November 17, 2020, Wood filed an emergency motion for a temporary restraining order.[9] Two sets of parties subsequently sought permission to intervene as defendants (collectively, the Intervenors): (1) the Democratic Party of Georgia, Inc. (DPG), DSCC, and DCCC; and (2) the Georgia State Conference of the NAACP (Georgia NAACP) and Georgia Coalition for the People's Agenda (GCPA).[10] On November 19, Defendants and Intervenors filed separate responses in opposition to Wood's motion for a temporary restraining order.[11] The Court held oral argument on Wood's motion the same day. At the conclusion of the oral argument, the Court denied Wood's request for a temporary restraining order. This Order follows and supplements this Court's oral ruling.

### a. Georgia Statutory Law Regarding Absentee Ballots.

Georgia law authorizes any eligible voter to cast his or her absentee ballot by mail without providing a reason. O.C.G.A. § 21-2-380(b). To initiate the absentee-voting process, a prospective voter must submit an application to the applicable registrar's or absentee ballot clerk's office. O.C.G.A. § 21-2-381(a)(1)(A). Upon receipt of a timely absentee ballot request, a registrar or absentee ballot clerk must enter the date the office received the application and compare the prospective voter's information and signature on the application with the information and signature on file in the registrar's or clerk's office. O.C.G.A. § 21-2-381(b)(1). If the prospective voter's eligibility is confirmed, the registrar or clerk must mail the voter an absentee ballot. O.C.G.A. § 21-2-381(b)(2)(A).

An absentee voter receives two envelopes along with the absentee ballot; the completed ballot is placed in the smaller envelope, which is then placed in the larger envelope, which contains the oath of the elector and a signature line. O.C.G.A. § 21-2-384(b). Upon receipt of a timely absentee ballot, a registrar or clerk is required to compare the identifying information and signature provided in the oath with the information and signature on file in the respective office. O.C.G.A. § 21-2-386(a)(1)(B). If the information and signature appear to match, the registrar or clerk signs his or her name below the voter's oath. *Id*. If the information or signature is missing or does not appear to match, the registrar or clerk is required to write "Rejected" across the envelope and provide the reason for the rejection. O.C.G.A. § 21-2-386(a)(1)(C). The board of registrars or absentee ballot clerk is required to "promptly notify" the elector of the rejection, who then has until the end of the period for verifying provisional ballots to cure the issue that resulted in the rejection. *Id*.

Secretary of State Raffensperger is "the state's chief election official."
O.C.G.A. § 21-2-50(b). *See also* Ga. Op. Att'y Gen. No. 2005-3 (Apr. 15, 2005) ("Just as a matter of sheer volume and scope, it is clear that under both the Constitution and the laws of the State the Secretary is the state official with the power, duty, and authority to manage the state's electoral system. No other state official or entity is assigned the range of responsibilities given to the Secretary of State in the area of elections."). In this role, Raffensperger is required to, among other things, "promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials" and "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-3-31(1)-(2).

### b. The Settlement Agreement

Wood does not challenge the underlying constitutionality of the absentee ballot framework enacted by the Georgia General Assembly. The genesis of his claims instead derive from a lawsuit filed over one year ago by the DPG against Raffensperger, the then-Members of the Georgia State Election Board, and the then-Members of the Gwinnett County Board of Registration and Elections.[12] In that action, the DPG, DSCC, and DCCC challenged several aspects of the process for rejecting absentee ballots based on a missing or mismatched signature.[13]

**\*3** On March 6, 2020, the DPG, DSCC, DCCC, Raffensperger, and the Members of the Georgia State Election Board executed—and filed on the public docket—a "Compromise Settlement Agreement and Release" (Settlement Agreement).[14] As part of the Settlement Agreement, Raffensperger agreed to issue an Official Election Bulletin containing certain procedures for the review of signatures on absentee ballot envelopes by county election officials for the March 24, 2020 Presidential Primary Election and subsequent General Election. In relevant part, the procedures stated:

> When reviewing an elector's signature on the mail-in absentee ballot envelope, the registrar or clerk must compare the signature on the mail-in absentee ballot

envelope to each signature contained in such elector's voter registration record in eNet and the elector's signature on the application for the mail-in absentee ballot. **If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks. A mail in absentee ballot shall not be rejected unless a majority of the registrars, deputy registrars, or absentee ballot clerks reviewing the signature agree that the signature does not match any of the voter's signatures on file in eNet or on the absentee ballot application.** If a determination is made that the elector's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk shall write the names of the three elections officials who conducted the signature review across the face of the absentee ballot envelope, which shall be in addition to writing "Rejected" and the reason for the rejection as required under OCGA 21-2-386(a)(1)(C).[15]

No entity or individual sought permission to intervene and challenge the Settlement Agreement. United States District Judge William M. Ray closed the case on March 9.[16]

### c. The Risk-Limiting Audit

Georgia law provides procedures for conducting a "risk-limiting audit" prior to the final certification of an election. O.C.G.A. § 21-2-498. Such an audit must be "[c]omplete[d]...in public view." O.C.G.A. § 21-2-498(c)(4). And the State Election Board is "authorized to promulgate rules, regulations, and procedures to implement and administer" an audit, including "security procedures to ensure that [the] collection of validly cast ballots is complete, accurate, and trustworthy throughout the audit." O.C.G.A. § 21-2-498(d). *See also* Ga. Comp. R. & Regs. 183-1-15-.04 (2020).

On November 11, 2020, Raffensperger announced a statewide risk-limiting audit (the Audit)—also referred to as a "full hand recount"—of all votes cast in the contest for President of the United States.[17] Every county in Georgia was required to begin the Audit at 9:00 am on November 13 and finish by 11:59 pm on November 18.[18] The statewide election results are set to be certified on November 20.[19] Raffensperger required the Audit to "be open to the public and the press" and required local election officials to "designate a viewing area from which members of the public and press may observe the audit for the purpose of good order and maintaining the integrity of the audit."[20] The two major political parties—Democratic and Republican—were permitted "the right to have one properly designated person as a monitor of the audit for each ten audit teams that are conducting the audit, with a minimum of two designated monitors in each county per party per room where the audit is being conducted."[21] The designated monitors were not required to remain in the public viewing areas, but were required to comply with the rules promulgated by Raffensperger and the local election officials.[22] The Audit process differs from that required by Georgia law for a recount requested by a unsuccessful candidate following the official certification of votes. *See* O.C.G.A. § 21-2-524.

### II. LEGAL STANDARD

**\*4** The standard for the issuance of a temporary restraining order and a preliminary injunction are identical. *Windsor v. United States*, 379 F. App'x 912, 916–17 (11th Cir. 2010). A preliminary injunction is "an extraordinary remedy." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). To obtain the relief he seeks, Wood must affirmatively demonstrate: "(1) substantial likelihood of success on the merits; (2) [that] irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to [him] outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). *See also Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites.").

### III. DISCUSSION

Wood's motion essentially boils down to two overarching claims:

that Defendants violated the Constitution by (1) executing and enforcing the Settlement Agreement to the extent it requires different procedures than the Georgia Election Code, and (2) not permitting designated monitors to have certain live viewing privileges of the Audit at the county locations.

Defendants and Intervenors posit a number of challenges to Wood's claims.

### a. Standing

As a threshold matter, the Court finds Wood lacks standing to assert these claims. Article III limits federal courts to the consideration of "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). It is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013). See also Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) ("[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.") (quoting Raines v. Byrd, 521 U.S. 811, 818 (1997)). The standing inquiry is threefold: "The litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing Lujan, 504 U.S. at 561). Wood must "demonstrate standing for each claim he seeks to press and for each form of relief that is sought"—Town of Chester, N.Y. v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (2017)—and shoulders "the burden of establishing [each] element[ ]." Lujan, 504 U.S. at 561.

Injury in fact is "the first and foremost of standing's three elements" and requires Wood to show that he suffered "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Spokeo, 136 S. Ct. at 1547–48. To be "particularized," the alleged injury "must affect the plaintiff in a personal and individual way." Lujan, 504 U.S. at 561 n.1. Wood must demonstrate "a personal stake in the outcome of the controversy," as a federal court "is not a forum for generalized grievances." Gill v. Whitford, 138 S. Ct. 1916, 1929 (2018). This requires more than a mere "keen interest in the issue." Trump v. Hawaii, 138 S. Ct. 2392, 2416 (2018). The alleged injury must be "distinct from a generally available grievance about government." Gill, 138 S. Ct. at 1923. See also id. at 1929 (explaining that a person's "right to vote is individual and personal in nature...[t]hus [only] voters who allege facts showing disadvantage to themselves as individuals have standing to sue to remedy that disadvantage") (quoting Reynolds v. Sims, 377 U.S. 533, 561 (1964); Baker v. Carr, 369 U.S. 186, 206 (1962)). Claims premised on allegations that "the law...has not been followed...[are] precisely the kind of undifferentiated, generalized grievance about the conduct of government...[and] quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing." Dillard v. Chilton Cnty. Comm'n, 495 F.3d 1324, 1332–33 (11th Cir. 2007) (citing Baker, 369 U.S. at 207–08). See also Lance v. Coffman, 549 U.S. 437, 440–41 (2007) ("Our refusal to serve as a forum for generalized grievances has a lengthy pedigree. . . . [A] generalized grievance that is plainly undifferentiated and common to all members of the public" is not sufficient for standing).

*5 Wood alleges he has standing because he is "a qualified registered elector residing in Fulton County, Georgia" who has "made donations to various Republican candidates on the ballot for the November 3, 2020 elections, and his interests are aligned with those of the Georgia Republican Party for the purposes of the instant lawsuit."[23] These allegations fall far short of demonstrating that Wood has standing to assert these claims.

### i. The Elections and Electors Clause

Starting with his claim asserted under the Elections and Electors Clause, Wood lacks standing as a matter of law. The law is clear: A generalized grievance regarding a state government's failure to properly follow the Elections Clause of the Constitution does not confer standing on a private citizen.[24] Lance, 549 U.S. at 442; Bognet, 2020 WL 6686120, at *6 ("[P]rivate plaintiffs lack standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause....Their relief would have no more directly benefitted them than the public at large."); Dillard, 495 F.3d at 1332–33.

### ii. Equal Protection

For his equal protection claim, Wood relies on a theory of vote dilution, i.e., because Defendants allegedly did not follow the correct processes, invalid absentee votes may have been cast and tabulated, thereby diluting Wood's in-person vote. But the same prohibition against generalized grievances applies to equal protection claims. United States v. Hays, 515 U.S. 737, 743 (1995) ("The rule against generalized grievances applies with as much force in the equal protection context as in any other.") Wood does not differentiate his alleged injury from any harm felt in precisely the same

manner by every Georgia voter. As Wood conceded during oral argument, under his theory any one of Georgia's more than seven million registered voters would have standing to assert these claims. This is a textbook generalized grievance. *Bognet,* 2020 WL 6686120, at *12 ("Voter Plaintiffs' dilution claim is a paradigmatic generalized grievance that cannot support standing....Put another way, a vote cast by fraud or mailed in by the wrong person through mistake, or otherwise counted illegally, has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged. Such an alleged dilution is suffered equally by all voters and is not particularized for standing purposes.") (internal punctuation omitted) (collecting cases); *Moore v. Circosta,* No. 1:20-cv-911, 2020 WL 6063332, a *14 (M.D.N.C. Oct. 14, 2020) ("[T]he notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury in fact necessary for Article III standing."). *See also Citizens for Fair Representation v. Padilla,* 815 F. App'x 120, 123 (9th Cir. 2020) (dismissing equal protection claim for lack of standing and stating "the Supreme Court has consistently held that a plaintiff raising only a generally available grievance...does not state an Article III case or controversy.").

### iii. Due Process

*6 For the same reasons, Wood also does not have standing to pursue his due process claim. Wood asserts that various election monitors appointed by the Republican Party "have been denied the opportunity to be present throughout the entire Hand Recount, and when allowed to be present, they were denied the opportunity to observe the Hand Recount in any meaningful way."[25] Yet, Wood does not allege that *he* attempted to participate as a designated monitor. Nor does he allege that, on behalf of the Republican Party, he himself designated monitors who were ultimately denied access. Wood's broad objection is that Defendants failed to conduct the Audit fairly and consistently under Georgia law. This is a generalized grievance.[26] *Lance,* 549 U.S. at 440–41. *See also Nolles v. State Comm. for Reorganization of Sch. Dists.,* 524 F.3d 892, 900 (8th Cir. 2008) (voters lacked standing because substantive due process claim that delay of implementation of new statute until after referendum election violated their right to fair election did not allege particularized injury).

### iv. Alignment with Non-Parties

Wood further points to his status as a donor to the Republican Party whose interests are aligned with that party and its political candidates to support his standing argument. But this does not sufficiently differentiate his alleged injury from that which *any* voter might have suffered—no matter the party affiliation. Ostensibly, Wood believes he suffered a particularized injury because his preferred candidates—to whom he has contributed money—did not prevail in the General Election. This argument has been squarely rejected by the Eleventh Circuit. *Jacobson,* 974 F.3d at 1247 ("A candidate's electoral loss does not, by itself, injure those who voted for the candidate. Voters have no judicially enforceable interest in the outcome of an election. Instead, they have an interest in their ability to vote and in their vote being given the same weight as any other.") (internal citation omitted).

### v. Lack of Relevant Authorities

Finally, the Court notes the futility of Wood's standing argument is particularly evident in that his sole relied-on authority—*Meek v. Metropolitan Dade County, Florida,* 985 F.2d 1471 (11th Cir. 1993)—is no longer good law. The Eleventh Circuit ***expressly abrogated*** its holding in that case over thirteen years ago. *Dillard,* 495 F.3d at 1331–32 ("We subsequently upheld *Meek's* reasoning against repeated challenges that it was wrongly decided in light of the Supreme Court's later decisions...[b]ut it is clear that we can no longer do so in light of the Supreme Court's most recent pronouncement on voter standing in *Lance*.").

During oral argument, Wood additionally pointed to *Roe v. State of Alabama by & through Evans,* 43 F.3d 574 (11th Cir. 1995), but that case does not support Wood's standing argument. For example, two plaintiffs in *Roe* were candidates for a political office decided in the challenged election. *Id.* at 579. Wood is a private citizen, not a candidate for any elected office. Moreover, the Eleventh Circuit found particularized harm in the post-election inclusion of absentee ballots that had been deemed invalid. *Id.* at 580. Wood here seeks to do the opposite—remove validly cast absentee ballots after completion of the election.

In sum, Wood lacks standing to pursue these claims in the first instance.

### b. The Doctrine of Laches

*7 Even if the Court found Wood possessed standing to pursue his claims regarding the Settlement Agreement (Counts I and II), such claims would nonetheless be barred by

the doctrine of laches. To establish laches, Defendants must show "(1) there was a delay in asserting a right or a claim, (2) the delay was not excusable, and (3) the delay caused [them] undue prejudice." *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005). *See also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1326 (11th Cir. 2019) ("To succeed on a laches claim, [defendant] must demonstrate that [p]laintiffs inexcusably delayed bringing their claim and that the delay caused it undue prejudice."). Courts apply laches in election cases. *E.g.*, *Sanders v. Dooly Cnty., Ga.*, 245 F.3d 1289, 1291 (11th Cir. 2001) ("[W]e conclude that the district court did not abuse its discretion in deeming the claims seeking injunctive relief to be laches-barred."). *See also, e.g., Detroit Unity Fund v. Whitmer*, 819 F. App'x 421, 422 (6th Cir. 2020) (holding district court did not err in finding that plaintiff's claims regarding deadline for local ballot initiatives "barred by laches, considering the unreasonable delay on the part of [p]laintiffs and the consequent prejudice to [d]efendants"). *Cf. Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence. That is as true in election law cases as elsewhere.") (internal citation omitted). Defendants have established each element of laches.

**i. Delay**

First, Wood delayed considerably in asserting these claims. On March 6, 2020, the GDP, DSCC, DCCC, and Defendants executed the Settlement Agreement, which was entered on the public docket. It has since been in effect for at least three elections. Nearly eight months later—and *after* over one million voters cast their absentee ballots in the General Election—Wood challenges the terms of the Settlement Agreement as unconstitutional. Wood could have, and should have, filed his constitutional challenge much sooner than he did, and certainly not two weeks *after* the General Election.

**ii. Excuse**

Nor has Wood articulated any reasonable excuse for his prolonged delay. Wood failed to submit any evidence explaining why he waited to bring these claims until the eleventh hour. He instead relies solely on a representation from his legal counsel during oral argument, without evidence, that Wood did not vote in any election between the execution of the Settlement Agreement and the General Election. Even assuming this proffer to be true, it does not provide a reasonable justification for the delay. Wood's claims are constitutional challenges to Defendants' promulgation authority under state law. If valid, these claims should not depend on the outcome of any particular election, to wit, whether Wood's preferred candidates won or lost. Indeed, Wood's claims, even assuming his standing for bringing them could be established, were ripe the moment the parties executed the Settlement Agreement.

**iii. Prejudice**

Finally, Defendants, Intervenors, and the public at large would be significantly injured if the Court were to excuse Wood's delay. A bedrock principle of election law is that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006)). This is because a last-minute intervention by a federal court could "result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5. *See also Democratic Nat'l Comm. v. Wisc. State Legislature*, No. 20A66, 2020 WL 6275871, at *4 (U.S. Oct. 26, 2020) (Kavanaugh, J., concurring in denial of application to vacate stay) ("The principle [of judicial restraint] also discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process. For those reasons, among others, this Court has regularly cautioned that a federal court's last-minute interference with state election laws is ordinarily inappropriate.").

*8 Underscoring the exceptional nature of his requested relief, Wood's claims go much further; rather than changing the rules on the eve of an election, he wants the rules for the already concluded election declared unconstitutional and over one million absentee ballots called into question. Beyond merely causing confusion, Wood's requested relief could disenfranchise a substantial portion of the electorate and erode the public's confidence in the electoral process. *See Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) ("Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented.") (citation omitted); *Arkansas United v. Thurston*, No. 5:20-cv-5193, 2020 WL 6472651, at *5 (W.D. Ark. Nov. 3, 2020) ("[T]he equities do not favor intervention where the election is already in progress and the requested relief would change the rules of the game mid-play.").

Thus, Wood is not entitled to injunctive relief on Counts I and II for the additional reason that these claims are barred by the doctrine of laches.

#### c. The Merits of the Request for Injunctive Relief

Even assuming Wood possessed standing, and assuming Counts I and II are not barred by laches, the Court nonetheless finds Wood would not be entitled to the relief he seeks. The Court addresses each required element for a temporary restraining order in turn.

#### i. Substantial Likelihood of Success on the Merits

#### 1. Equal Protection (Count I)

Wood argues the execution and enforcement of the Settlement Agreement burdens his right to vote in contravention of the Equal Protection Clause because the agreement sets forth additional voting safeguards not found in the Georgia Election Code. States retain the power to regulate their own elections. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citing U.S. Const. Art. I, § 4, cl. 1). The Supreme Court has held that:

> Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.

*Burdick*, 504 U.S. at 433 (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

Inevitably, most election laws will "impose some burden upon individual voters." *Burdick*, 504 U.S. at 433. But the Equal Protection Clause only becomes applicable if "a state either classifies voters in disparate ways...or places restrictions on the right to vote." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012). As recently summarized by one federal district court:

> The Supreme Court has identified two theories of voting harms prohibited by the Fourteenth Amendment. First, the Court has identified a harm caused by debasement or dilution of the weight of a citizen's vote, also referred to [as] vote dilution....Second, the Court has found that the Equal Protection Clause is violated where the state, having once granted the right to vote on equal terms, through later arbitrary and disparate treatment, values one person's vote over that of another.

*Moore*, 2020 WL 6063332, at *12 (citing *Bush v. Gore*, 531 U.S. 98, 104–05 (2000); *Reynolds*, 377 U.S. at 554). A rationale basis standard of review applies if the plaintiff alleges "that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote." *Obama for Am.*, 697 F.3d at 429 (citing *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807–09 (1969)). If a fundamental right is implicated, the claim is governed by the flexible *Anderson/Burdick* balancing test. *Burdick*, 504 U.S. at 433–35; *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

**\*9** Wood's equal protection claim does not fit within this framework.[27] Wood does not articulate a cognizable harm that invokes the Equal Protection Clause. For example, to the extent Wood relies on a theory of disparate treatment, *Bush v. Gore* is inapplicable. Defendants applied the Settlement Agreement in a wholly uniform manner across the entire state.[28] In other words, no voter—including Wood—was treated any differently than any other voter. *E.g.*, *Wise v. Circosta*, 978 F.3d 93, 100 (4th Cir. 2020); *Deutsch v. New York State Bd. of Elections*, No. 20 CIV. 8929 (LGS), 2020 WL 6384064, at *6 (S.D.N.Y. Oct. 30, 2020).

Wood fares no better with a vote dilution argument. According to Wood, his fundamental right to vote was burdened because the "rules and regulations set forth in the [Settlement Agreement] created an arbitrary, disparate, and ad hoc process for processing defective absentee ballots, and for determining which of such ballots should be 'rejected,' contrary to Georgia law."[29] At the starting gate, the additional safeguards on signature and identification match enacted by Defendants did not burden Wood's ability to cast his ballot at all. Wood, according to his legal counsel during oral argument, did not vote absentee during the General Election. And the "burden that [a state's] signature-match scheme imposes on the right to vote...falls on vote-by-mail and provisional voters' fundamental right to vote." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019).

This leaves Wood to speculate that, because the Settlement Agreement required three ballot clerks—as opposed to just one—to review an absentee ballot before it could be rejected, fewer ballots were ultimately rejected, invalid ballots were tabulated, and his in-person vote was diluted. In support of this argument, Wood relies on *Baker v. Carr*, where the Supreme Court found vote dilution in the context of apportionment of elected representatives. 369 U.S. at 204–208. But Wood cannot transmute allegations that state officials violated state law into a claim that his vote was somehow weighted differently than others. This theory has been squarely rejected. *Bognet*, 2020 WL 6686120, at

*11 ("[T]he Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently. Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment. And if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity. That is not how the Equal Protection Clause works.").

*10 Even if Wood's claim were cognizable in the equal protection framework, it is not supported by the evidence at this stage. Wood's argument is that the procedures in the Settlement Agreement regarding information and signature match so overwhelmed ballot clerks that the rate of rejection plummeted and, ergo, invalid ballots were passed over and counted. This argument is belied by the record; the percentage of absentee ballots rejected for missing or mismatched information and signature is the exact same for the 2018 election and the General Election (.15%).[30] This is despite a substantial increase in the total number of absentee ballots submitted by voters during the General Election as compared to the 2018 election.[31]

In sum, there is insubstantial evidence supporting Wood's equal protection theory and he has not established a substantial likelihood of success on the merits as to Count I.

**2. Electors and Elections Clauses (Count II)**

In relevant part, the Constitution states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. This provision— colloquially known as the Elections Clause— vests authority in the states to regulate the mechanics of federal elections. Foster v. Love, 522 U.S. 67, 69 (1997). The "Electors Clause" of the Constitution similarly states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of [Presidential] Electors." U.S. Const. art. II, § 1, cl. 2.

Wood argues Defendants violated the Elections and Electors Clauses because the "procedures set forth in the [Settlement Agreement] for the handling of defective absentee ballots is not consistent with the laws of the State of Georgia, and thus, Defendants' actions...exceed their authority."[32] Put another way, Wood argues Defendants usurped the role of the Georgia General Assembly—and thereby violated the United States Constitution—by enacting additional safeguards regarding absentee ballots not found in the Georgia Election Code. In support, Wood points to Chief Justice Rehnquist's concurrence in *Bush v. Gore*, which states that "in a Presidential election the clearly expressed intent of the legislature must prevail." 531 U.S. at 120 (Rehnquist, C.J., concurring).

State legislatures—such as the Georgia General Assembly —possess the authority to delegate their authority over elections to state officials in conformity with the Elections and Electors Clauses. *Ariz. State Legislature*, 576 U.S. at 816 ("The Elections Clause [ ] is not reasonably read to disarm States from adopting modes of legislation that place the lead rein in the people's hands...it is characteristic of our federal system that States retain autonomy to establish their own governmental processes."). See also Corman v. Torres, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) ("The Elections Clause, therefore, affirmatively grants rights to state legislatures, and under Supreme Court precedent, to other entities to which a state may, consistent with the Constitution, delegate lawmaking authority."). Cf. *Bullock*, 2020 WL 5810556, at *11 ("A survey of the relevant case law makes clear that the term 'Legislature' as used in the Elections Clause is not confined to a state's legislative body.").

Recognizing that Secretary Raffensperger is "the state's chief election official,"[33] the General Assembly enacted legislation permitting him (in his official capacity) to "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). The Settlement Agreement is a manifestation of Secretary Raffensperger's statutorily granted authority. It does not override or rewrite state law. It simply adds an additional safeguard to ensure election security by having more than one individual review an absentee ballot's information and signature for accuracy before the ballot is rejected. Wood does not articulate how the Settlement Agreement is not "consistent with law" other than it not being a verbatim recitation of the statutory code. Taking Wood's argument at face value renders O.C.G.A. § 21-2-31(2) superfluous. A state official—such as Secretary Raffensperger—could never wield his or her authority to make rules for conducting elections that had not otherwise already been adopted

by the Georgia General Assembly. The record in this case demonstrates that, if anything, Defendants' actions in entering into the Settlement Agreement sought to achieve consistency among the county election officials in Georgia, which *furthers* Wood's stated goals of conducting "[f]ree, fair, and transparent public elections."[34]

**\*11** Wood has not demonstrated a substantial likelihood of success as to Count II.

**3. Due Process (Count III)**
Under the Fourteenth Amendment, "[n]o State shall...deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Due Process Clause has two components: procedural and substantive. *DeKalb Stone, Inc. v. Cnty. of DeKalb, Ga.*, 106 F.3d 956, 959 (11th Cir. 1997). Wood alleges that Defendants have "fail[ed]...to ensure that the Hand Recount is conducted fairly and in compliance with the Georgia Election Code" by denying monitors "the opportunity to be present throughout the entire Hand Recount, and when allowed to be present, they were denied the opportunity to observe the Hand Recount in any meaningful way."[35] Although not articulated in his Amended Complaint or motion for temporary restraining order, Wood clarified during oral argument that he is pursing both a procedural and substantive due process claim. Each will be addressed in turn.

**a) Procedural Due Process**
A procedural due process claim raises two inquires: "(1) whether there exists a liberty or property interest which has been interfered with by the State and (2) whether the procedures attendant upon that deprivation were constitutionally sufficient." *Richardson v. Texas Sec'y of State*, 978 F.3d 220, 229 (5th Cir. 2020) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). The party invoking the Due Process Clause's procedural protections bears the "burden...of establishing a cognizable liberty or property interest." *Richardson*, 978 F.3d at 229 (citing *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). Wood bases his procedural due process claim on "a vested interest in being present and having meaningful access to observe and monitor the electoral process."[36] But Wood does not articulate how this "vested interest" fits within a recognized, cognizable interest protected by procedural due process. The Court is not persuaded that the right to monitor an audit or vote recount is a liberty or property right secured by the Constitution. For example, the Eleventh Circuit does "assume that the right to vote is a liberty interest protected by the Due Process Clause." *Jones v. Governor of Fla.*, 975 F.3d 1016, 1048 (11th Cir. 2020). But the circuit court has expressly declined to extend the strictures of procedural due process to "a State's election procedures." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) ("The generalized due process argument that the plaintiffs argued for and the district court applied would stretch concepts of due process to their breaking point.").

More specifically, federal courts have rejected the very interest Wood claims has been violated, *i.e.*, the right to observe the electoral process. *See, e.g.*, *Republican Party of Penn. v. Cortes*, 218 F. Supp. 3d 396, 408 (E.D. Pa. 2016) ("[T]here is no individual constitutional right to serve as a poll watcher...but rather the right is conferred by statute."); *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680, at \*67 (W.D. Pa. Oct. 10, 2020) (same); *Dailey v. Hands*, No. 14-423, 2015 WL 1293188, at \*5 (S.D. Ala. Mar. 23, 2015) ("[P]oll watching is not a fundamental right."); *Turner v. Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) (finding no authority "that supports the proposition that [plaintiff] had a first amendment right to act as a pollwatcher. Indeed, we would suggest that the state is not constitutionally required to permit pollwatchers for political parties and candidates to observe the conduct of elections."). Without such an interest, Wood cannot establish a substantial likelihood of success on the merits as to his procedural due process claim.

**b) Substantive Due Process**
**\*12** Wood's substantive due process claim fares no better. The types of voting rights covered by the substantive due process clause are considered narrow. *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986). Pursuant to the "functional structure embodied in the Constitution," a federal court must not "intervene to examine the validity of individual ballots or supervise the administrative details of a local election." *Id*. In only "extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation." *Id*. *See also Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998) ("We have drawn a distinction between garden variety election irregularities and a pervasive error that undermines the integrity of the vote. In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election.") (citation and punctuation omitted) (collecting cases); *Duncan v. Poythress*, 657 F.2d 691, 700 (5th Cir. 1981) ("[T]he due

process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process."). It is well understood that "garden variety" election disputes, including "the ordinary dispute over the counting and marking of ballots" do not rise to the level of a constitutional deprivation.[37] *Curry,* 802 F.2d at 1314–15. *See also Serpentfoot v. Rome City Comm'n,* 426 F. App'x 884, 887 (11th Cir. 2011) ("[Plaintiff's] allegations show, at most, a single instance of vote dilution and not an election process that has reached the point of patent and fundamental unfairness indicative of a due process violation.").

Although Wood generally claims fundamental unfairness, and the declarations and testimony submitted in support of his motion speculate as to wide-spread impropriety, the actual harm alleged by Wood concerns merely a "garden variety" election dispute. Wood does not allege unfairness in counting the ballots; instead, he alleges that select non-party, partisan monitors were not permitted to observe the Audit in an ideal manner. Wood presents no authority, and the Court finds none, providing for a right to unrestrained observation or monitoring of vote counting, recounting, or auditing. Precedent militates against a finding of a due process violation regarding such an "ordinary dispute over the counting and marking of ballots." *Gamza v. Aguirre,* 619 F.2d 449, 453 (5th Cir. 1980) ("If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute."). Wood has not satisfied his burden of establishing a substantial likelihood of success on the merits as to his substantive due process claim.

### ii. Irreparable Harm

Because Wood cannot show a likelihood of success on the merits, an extensive discussion of the remaining factors for the issuance of a temporary restraining order is unnecessary. *Obama for Am.,* 697 F.3d at 436 ("When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor."). *See also Bloedorn,* 631 F.3d at 1229 ("If [plaintiff] is unable to show a substantial likelihood of success on the merits, we need not consider the other requirements."). Nonetheless, for the second factor, Plaintiffs must show that "irreparable injury would result if no injunction were issued." *Siegel,* 234 F.3d at 1175–76 ("A showing of irreparable injury is the *sine qua non* of injunctive relief."). This factor also weighs in Defendants' favor. As discussed above, Wood's allegations are the quintessential generalized grievance. He has not presented any evidence demonstrating how he will suffer any particularized harm as a voter or donor by the denial of this motion. The fact that Wood's preferred candidates did not prevail in the General Election—for whom he may have voted or to whom he may have contributed financially—does not create a legally cognizable harm, much less an irreparable one. *Jacobson,* 974 F.3d at 1247.

### iii. Balance of the Equities and Public Interest

**\*13** The Court finds that the threatened injury to Defendants as state officials and the public at large far outweigh any minimal burden on Wood. To reiterate, Wood seeks an extraordinary remedy: to prevent Georgia's certification of the votes cast in the General Election, after millions of people had lawfully cast their ballots. To interfere with the result of an election that has already concluded would be unprecedented and harm the public in countless ways. *See Sw. Voter Registration Educ. Project,* 344 F.3d at 919; *Arkansas United,* 2020 WL 6472651, at \*5. Granting injunctive relief here would breed confusion, undermine the public's trust in the election, and potentially disenfranchise of over one million Georgia voters. Viewed in comparison to the lack of any demonstrable harm to Wood, this Court finds no basis in fact or in law to grant him the relief he seeks.

### IV. CONCLUSION

Wood's motion for temporary restraining order [ECF 6] is **DENIED**. **SO ORDERED** this the 20th day of November 2020.

Steven D. Grimberg

United States District Court Judge

**All Citations**

Slip Copy, 2020 WL 6817513

Footnotes

1     *Elections and Voter Registration Calendars*, https://sos.ga.gov/index.php/electi

| | |
|---|---|
| | ons/elections_and_voter_registration_calendars (last accessed Nov. 19, 2020). |
| 2 | *Id.* |
| 3 | *Id.* |
| 4 | ECF 33-2; ECF 33-6; ECF 33-8. |
| 5 | ECF 1. |
| 6 | ECF 5. |
| 7 | *E.g.*, ECF 5, ¶¶ 81–83, 93–95. The Litigation Settlement—also referred to as the Settlement Agreement—is discussed *infra* in Section I.b. |
| 8 | ECF 5, ¶ 106. |
| 9 | ECF 6. |
| 10 | ECF 8; ECF 22. |
| 11 | ECF 31; ECF 34; ECF 39. |
| 12 | *Democratic Party of Ga., Inc. v. Raffensperger*, 1:19-cv-05028-WMR (ECF 1) (Compl.). |
| 13 | *Id.* |
| 14 | *Id.* at ECF 56 (Settlement Agreement). |
| 15 | *Id.* (emphasis added). |
| 16 | *Id.* at ECF 57. |
| 17 | ECF 33-1; ECF 33-2; ECF 33-3. |
| 18 | *Id.* |
| 19 | *Id.* |
| 20 | ECF 33-4. |
| 21 | *Id.* |
| 22 | *Id.* |
| 23 | ECF 5, ¶ 8. |
| 24 | Although separate constitutional provisions, the Electors Clause and Elections Clause share "considerably similarity" and may be interpreted in the same manner. *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839 (2015) (Roberts, C.J., dissenting). *See also Bognet v. Sec'y Commonwealth of Pa.*, No. 20-3214, 2020 WL 6686120, at \*7 (3d Cir. Nov. 13, 2020) (applying same test for standing under both Elections Clause and Electors Clause); *Donald J. Trump for President, Inc. v. Bullock*, No. CV 20-66-H-DLC, 2020 WL 5810556, at \*11 (D. Mont. Sept. 30, 2020) ("As an initial matter, the Court finds no need to distinguish between the term 'Legislature' as it is used in the Elections Clause as opposed to the Electors Clause."). |
| 25 | ECF 6, at 21. |
| 26 | To the extent Wood attempts to rely on a theory of third party standing, the Court disagrees; the doctrine is disfavored and Wood has not alleged or proven any of the required elements—that (1) he "suffered an injury-in-fact that gives [him] a sufficiently concrete interest in the dispute"; (2) he has "a close relationship to the third party"; and (3) there is "a hindrance to the third party's ability to protect its own interests." *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1339 (11th Cir. 2019) (internal quotation marks omitted). |
| 27 | The Court notes that, in the Amended Complaint, Wood alludes to issues caused by Raffensperger's adoption of Ballot Trax—an electronic interface that permits an elector to track his or her ballot as it is being processed [ECF 5, ¶¶ 44–46]. Wood also alleges harm in that the Settlement Agreement permitted the DPG to submit "additional guidance and training materials" for identifying a signature mismatch, which Defendants "agree[d] to consider in good faith" [*id.* ¶ 47; *see also* ECF 5-1, ¶ 4]. Wood did not address how these items violated his constitutional rights—equal protection or otherwise—in either his motion or during oral argument. Therefore, the Court need not address them at this stage. |
| 28 | Wood concedes as much in the Amended Complaint. *See* ECF 5, ¶ 25 (alleging the Settlement Agreement "set[ ] forth different standards to be followed by the clerks and registrars in processing absentee ballots **in the State of Georgia**.") (emphasis added). |
| 29 | ECF 6, at 18. |
| 30 | ECF 33-6. |
| 31 | *Id.* |

| | |
|---|---|
| 32 | ECF 5, ¶ 90. |
| 33 | O.C.G.A. § 21-2-50(b). |
| 34 | ECF 5, ¶ 11. |
| 35 | ECF 6, at 20–21. |
| 36 | ECF 5, ¶ 101. |
| 37 | In contrast, as Defendants note, it would be a violation of the constitutional rights of the millions of absentee voters who relied on the absentee ballot procedures in exercising their right to vote. *See e.g. Griffin v. Burns,* 570 F.2d 1065, 1079 (1st Cir. 1978) (finding disenfranchisement of electorate who voted by absentee ballot a violation of substantive due process). |

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.