**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| WILLIAM FEEHAN,<br><br>               Plaintiff,<br><br>     v.<br><br>WISCONSIN ELECTIONS COMMISSION,<br>and its members ANN S. JACOBS, MARC L.<br>THOMSEN, MARGE BOSTELMANN,<br>JULIE M. GLANCEY, DEAN HUDSON,<br>ROBERT F. SPINDELL, JR., in their official<br>capacities, GOVERNOR TONY EVERS, in<br>his official capacity,<br><br>              Defendants. | No. 2:20-cv-1771 |

**DEMOCRATIC NATIONAL COMMITTEE'S *AMICUS CURIAE* BRIEF
IN OPPOSITION TO PLAINTIFF'S AMENDED MOTION
FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (ECF NO. 10)**

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF THE ARGUMENT ......................................................... 1

BACKGROUND ...................................................................................................................... 6

    A. WEC-Approved Practices ............................................................................................ 6

    B. "Massive election fraud" ............................................................................................ 9

    C. "Statistical anomalies and mathematical impossibilities" ........................................ 10

LEGAL STANDARD ............................................................................................................. 11

ARGUMENT ........................................................................................................................... 12

    I.   The Court should dismiss this case because Plaintiff lacks standing. ........................... 12

    II.  The doctrine of laches bars Plaintiff's claims. ........................................................... 16

    III. The Eleventh Amendment bars Plaintiff's claims. ..................................................... 18

    IV. Principles of federalism and comity strongly favor abstention. ................................ 20

    V.  Plaintiff fails to state a claim on which relief can be granted. ..................................... 23

    VI. Plaintiff is not entitled to a TRO or preliminary injunction. ...................................... 27

    A. Plaintiff cannot establish irreparable harm and has an adequate remedy at law. ........ 27

    B. The balance of equities and public interest weigh heavily against the issuance of a restraining order or injunction. .............................................................................. 28

CONCLUSION ....................................................................................................................... 29

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 2 of 39   Document 57

# TABLE OF AUTHORITIES

**Page(s)**

C̲ASES

Am. Civil Rights Union v. Martinez-Rivera,
   166 F. Supp. 3d 779 (W.D. Tex. 2015)......................................................................13

AnchorBank, FSB v. Hofer,
   649 F.3d 610 (7th Cir. 2011) ....................................................................................11

Archie v. City of Racine,
   847 F.2d 1211 (7th Cir. 1988) ..................................................................................20

Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n,
   576 U.S. 787 (2015) (Roberts, C.J., dissenting) ......................................................14

Ashcroft v. Iqbal,
   556 U.S. 662 (2009)..............................................................................................23, 24

Balsam v. Sec'y of State,
   607 F. App'x 177 (3d Cir. 2015) ..............................................................................19

Bell Atl. Corp. v. Twombly,
   550 U.S. 544 (2007)..............................................................................................11, 23

Bennett v. Yoshina,
   140 F.3d 1218 (9th Cir. 1998) ..................................................................................26

Bodine v. Elkhart Cnty. Election Bd.,
   788 F.2d 1270 (7th Cir. 1986) ..................................................................................26

Bognet v. Sec'y of Commonwealth,
   No. 20-3214, 2020 WL 6686120 (3d Cir. Nov. 13, 2020) ....................13, 14, 25, 26

Bond v. United States,
   564 U.S. 211 (2011)....................................................................................................14

Bowes v. Indiana Secretary of State,
   837 F.3d 813 (7th Cir. 2016) ....................................................................................16

Carson v. Simon,
   978 F.3d 1051 (8th Cir. 2020) ..................................................................................14

City Investing Co. v. Simcox,
   633 F.2d 56 (7th Cir. 1980) ......................................................................................21

Colon v. Schneider,
   899 F.2d 660 (7th Cir. 1990) ....................................................................................18

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 3 of 39   Document 57

*Curry v. Baker*,
802 F.2d 1302 (11th Cir. 1986) .......................................................................26

*Dean Foods Co. v. Brancel*,
187 F.3d 609 (7th Cir. 1999) .............................................................................18

*Democratic Nat'l Comm. v. Bostelmann*,
451 F. Supp. 3d 952 (W.D. Wis. 2020) .............................................................12

*Democratic Nat'l Comm. v. Bostelmann*,
977 F.3d 639 (7th Cir. 2020) .............................................................................17

*DePuy Synthes Sales, Inc. v. OrthoLA, Inc.*,
953 F.3d 469 (7th Cir. 2020) .............................................................................22

*Donald J. Trump for President, Inc. v. Boockvar*,
No. 20-cv-966, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020) ...................13, 19, 26

*Donald J. Trump for President, Inc. v. Cegavske*,
No. 2:20-CV-1445 JCM (VCF), 2020 WL 5626974 (D. Nev. Sept. 18, 2020)......................13

*Donald J. Trump for President, Inc. v. Pennsylvania*,
No. 20-3371, 2020 WL 7012522 (3d Cir. Nov. 27, 2020) ....................................5, 27, 28, 29

*Firestone Fin. Corp. v. Meyer*,
796 F.3d 822 (7th Cir. 2015) .............................................................................11

*Fulani v. Hogsett*,
917 F.2d 1028 (7th Cir. 1990) ...........................................................................16

*Griffin v. Burns*,
570 F.2d 1065 (1st Cir. 1978) ...........................................................................26

*Hawkins v. Wisconsin Elections Comm'n*,
2020 WI 75, 393 Wis. 2d 629, 948 N.W.2d 877 (2020)......................................17

*Hotze v. Hollins*,
No. 4:20-cv-03709, 2020 WL 6437668 (S.D. Tex. Nov. 2, 2020) .......................14

*Jefferson v. Dane Cnty.*,
No 2020AP557-OA (Mar. 31, 2020) (Ex. 6) ...................................................8, 21

*Jones v. Markiewicz-Qualkinbush*,
842 F.3d 1053 (7th Cir. 2016) ...........................................................................16

*Kasper v. Hayes*,
651 F. Supp. 1311 (N.D. Ill. 1987), *aff'd sub nom. Kasper v. Bd. of Election
Comm'rs*, 810 F.2d 1167 (7th Cir. 1987)...........................................................26

*King v. Whitmer*,
No. 2:20-cv-13134 (E.D. Mich. Dec. 7, 2020) (Ex. 4) ...........................................6, 13, 22, 25

*King v. Whitmer*,
No. 2:20-cv-13134-LVP-RSW, ECF No. 1 (E.D. Mich. Nov. 25, 2020).....................3, 15, 18

*Lance v. Coffman*,
549 U.S. 437 (2007) (per curiam) ...........................................................................................14

*Langenhorst v. Pecore*,
No. 1:20-cv-1701-WCG (E.D. Wis.) .........................................................................................2

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................................................................................................................15

*Martel v Condos*,
No. 5:20-cv-131, 2020 WL 5755289 (D. Vt. Sept. 16, 2020) .................................................13

*Massey v. Coon*,
No. 87-3768, 1989 WL 884 (9th Cir. Jan. 3, 1989) .................................................................18

*Mays v. Dart*,
974 F.3d 810 (7th Cir. 2020) ..................................................................................................12

*Mueller v. Jacobs*,
No. 2020AP1958-OA (petition denied Dec. 3, 2020) (Ex. 3) ..................................................2

*N. Tr. Co. v. Peters*,
69 F.3d 123 (7th Cir. 1995) ....................................................................................................11

*Nader v. Keith*,
385 F.3d 729 (7th Cir. 2004) ..................................................................................................16

*Navarro v. Neal*,
904 F. Supp. 2d 812 (N.D. Ill. 2012), *aff'd*, 716 F.3d 425 (7th Cir. 2013) ............................17

*Ohio Republican Party v. Brunner*,
543 F.3d 357 (6th Cir. 2008) ..................................................................................................20

*Paher v. Cegavske*,
457 F. Supp. 3d 919 (D. Nev. 2020) ........................................................................................13

*Pearson v. Kemp*,
No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) ..........................................................................6

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984) ...........................................................................................................18, 20

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 5 of 39   Document 57

*Railroad Comm'n v. Pullman Co.*,
    312 U.S. 496 (1941) ................................................................................4, 20, 21, 23

*Rucho v. Common Cause*,
    139 S. Ct. 2484 (2019) ........................................................................................23

*Shipley v. Chi. Bd. of Election Comm'rs*,
    947 F.3d 1056 (7th Cir. 2020) ............................................................................28

*SKS & Assocs., Inc. v. Dart*,
    619 F.3d 674 (7th Cir. 2010) ..............................................................................23

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ........................................................................................12

*Sw. Voter Registration Educ. Project v. Shelley*,
    344 F.3d 914 (9th Cir. 2003) ..............................................................................18

*Trump v. Evers*,
    No. 2020AP1971-OA (petition denied Dec. 3, 2020) (Ex. 2) .............................2, 22

*Trump v. Wisconsin Elections Comm'n*,
    E.D. Wis. No. 2:20-cv-01785-BHL ......................................................................1

*Tully v. Okeson*,
    977 F.3d 608 (7th Cir. 2020) ..........................................................................12, 27

*Ty, Inc. v. Jones Grp., Inc.*,
    237 F.3d 891 (7th Cir. 2001) ..............................................................................27

*United States v. Classic*,
    313 U.S. 299 (1941) ............................................................................................28

*United States v. Rural Elec. Convenience Co-op. Co.*,
    922 F.2d 429 (7th Cir. 1991) ..............................................................................28

*Walton v. Walker*,
    364 F. App'x 256 (7th Cir. 2010) .....................................................................3, 24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................12

*Wisconsin Right to Life State Political Action Comm. v. Barland*,
    664 F.3d 139 (7th Cir. 2011) ....................................................................20, 21, 22

*Wisconsin Voters All. v. Wisconsin Elections Comm'n*,
    No. 2020AP1930-OA (petition denied Dec. 4, 2020) (Ex. 1) ....................2, 4, 5, 18

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 6 of 39   Document 57

*Wood v. Raffensperger,*
No. 1:20-cv-04561-SDG, 2020 WL 6817513 (N.D. Ga. Nov. 20, 2020), *aff'd,*
No. 20-14418, 2020 WL 7094866 (11th Cir. Dec. 5, 2020).........................................29

*Wood v. Raffensperger,*
No. 20-14418, 2020 WL 7094866 (11th Cir. Dec. 5, 2020)...........................................14, 16

### STATUTES

3 U.S.C. § 6..........................................................................................................................1

Wis. Stat. § 6.86(2) (1985)................................................................................................7

Wis. Stat. § 227.40(1).....................................................................................................8, 17

Wis. Stat. § 5.10.................................................................................................................1

Wis. Stat. § 5.64(1)(em).....................................................................................................1

Wis. Stat. § 6.86(2)(a)........................................................................................................7

Wis. Stat. § 6.87................................................................................................................9

Wis. Stat. § 6.87(4)(b)........................................................................................................8

Wis. Stat. § 6.87(4)(b)(2)....................................................................................................7

Wis. Stat. § 7.70(3)(a).........................................................................................................1

Wis. Stat. § 7.70(5)(b).........................................................................................................1

Wis. Stat. § 8.18, 8.25(1)....................................................................................................1

Wis. Stat. § 9.01(11).........................................................................................................22

### OTHER AUTHORITIES

Wright & Miller, 11A *Federal Practice and Procedure*, § 2948.1 (3d ed., Apr.
2017 update)..................................................................................................................27

Fed. R. Civ. P. 9(b)......................................................................................10, 11, 23, 24

Rule 8.........................................................................................................................23, 24

Rule 12(b)(6)....................................................................................................................23

U.S. Const. art. I, § 4........................................................................................................23

U.S. Const. art. I, § 4, cl. 1...............................................................................................24

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 7 of 39   Document 57

# TABLE OF AUTHORITIES

U.S. Const. art. II, § 1, cl. 2 ...............................................................................23, 24, 25

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 8 of 39   Document 57

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Democratic National Committee ("DNC") appreciates the Court's invitation to file an *amicus curiae* brief in opposition to Plaintiff's Amended Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 10). As the Court requested, the DNC will attempt to provide "unique information and a unique perspective that the defendants do not have," in order to "help to fully develop the record." ECF No. 41 at 17.

The DNC certainly has a "unique perspective" and a substantial stake in this litigation. Its nominees for President and Vice-President, President-elect Joseph R. Biden, Jr. and Vice President-elect Kamala D. Harris, won the 2020 national popular vote nearly five weeks ago by over seven million votes. Biden and Harris are expected to win the Electoral College vote by a tally of 306-232 when the College meets next Monday, December 14, 2020. In Wisconsin, the Biden-Harris ticket initially won by a margin of 20,585 votes. The partial recount demanded by President Trump and Vice President Pence, which at their behest was targeted at only two of Wisconsin's 72 counties, increased the Biden-Harris winning margin in Wisconsin to 20,682 votes.

Biden and Harris are therefore entitled—as a matter of state and federal law—to Wisconsin's ten electoral votes. *See* Wis. Stat. §§ 5.10, 5.64(1)(em), 7.70(5)(b), 8.18, 8.25(1). The results of the Wisconsin Presidential election have been certified by the Chairperson of the Wisconsin Elections Commission ("WEC"), and Governor Evers in turn has signed the Certificate of Ascertainment and transmitted it to the Archivist of the United States. *See* 3 U.S.C. § 6; *see also* Wis. Stat. §§ 7.70(3)(a), 7.70(5)(b). Wisconsin's Presidential election is over.

Except in the courts. President Trump and his allies have now filed *seven* challenges in Wisconsin's state and federal courts since November 12, three of which remain pending: this action brought solely by William Feehan, a Wisconsin voter who also is a nominated Trump elector; *Trump v. Wisconsin Elections Comm'n,* E.D. Wis. No. 2:20-cv-01785-BHL, pending

before Judge Ludwig; and President Trump's state court challenge to the recount results, pending in *Trump v. Biden,* Milwaukee Cnty. Case No. 2020-CV-7092 and Dane County Case No. 2020-CV-2514.[1]

Like this case, these other challenges have all, in the words of Wisconsin Supreme Court Justice Brian Hagedorn, sought to "invalidate the entire Presidential election in Wisconsin by declaring it 'null'—yes, the whole thing," a result that "would appear to be **unprecedented in American history**." *Wisconsin Voters All. v. Wisconsin Elections Comm'n,* No. 2020AP1930-OA, at 2 (Wis. Sup. Ct. Dec. 4, 2020) (Hagedorn, J., concurring) (emphasis added) (Ex. 1).[2] And just like the *Wisconsin Voters All.* case that Justice Hagedorn described—which raised many of the same allegations and relied on much of the same "expert" testimony and other "evidence" that is being recycled in this litigation—Plaintiff's submissions "fall[] far short of the kind of compelling evidence and legal support we would undoubtedly need to countenance the **court-ordered disenfranchisement of every Wisconsin voter**." *Id.* (emphasis added).

Not only is this case part of serial post-election litigation in Wisconsin, it is also the fourth "cookie-cutter" complaint filed nationwide in recent weeks by attorneys Sidney Powell, L. Lin

---

[1] Three of the other Wisconsin post-election cases were petitions for original actions filed in Wisconsin Supreme Court; all were denied. *See Trump v. Evers,* No. 2020AP1971-OA (petition denied Dec. 3, 2020) (Ex. 2); *Mueller v. Jacobs,* No. 2020AP1958-OA (petition denied Dec. 3, 2020) (Ex. 3); *Wisconsin Voters All. v. Wisconsin Elections Comm'n*, No. 2020AP1930-OA, at 2 (petition denied Dec. 4, 2020) (Ex. 1). The remaining case challenging the Wisconsin election results was *Langenhorst v. Pecore,* No. 1:20-cv-1701-WCG (E.D. Wis.), filed on November 12 but voluntarily dismissed on November 16.

[2] The Trump recount effort does not seek to invalidate the entire Wisconsin vote, but rather seeks to nullify large numbers of ballots in only Dane and Milwaukee Counties—the two most urban, nonwhite, and Democratic counties in the State. Most of the targeted votes were cast in reliance on WEC guidance, practices, and forms dating back as long as a decade. Voters and local election officials throughout Wisconsin relied on the challenged WEC guidance, practices, and forms, but President Trump seeks to invalidate only the ballots of Dane and Milwaukee County voters who did so. That would blatantly violate equal protection guarantees.

Wood, and others in which they seek to baselessly undermine the legitimacy of the presidential election by fanning the flames of repeatedly debunked wingnut conspiracy theories, relying on the same discredited and/or unnamed "experts."[3]  As discussed below, two of those lawsuits already have been dismissed.  As those dismissals show, the willingness of Plaintiff's counsel to propagate their fantastical allegations across multiple jurisdictions does not make his claims any more plausible, actionable, or meritorious.   The Seventh Circuit has emphasized that seemingly "paranoid" allegations of "a vast, encompassing conspiracy" must meet a "high standard of plausibility" before a plaintiff may proceed, with the court "making the determination of plausibility" by "rely[ing] upon judicial experience and common sense."  *Walton v. Walker,* 364 Fed. App'x 256, 258 (7th Cir. 2010) (citation omitted).  It is an understatement to say Mr. Feehan's allegations are "implausible."

There are multiple other grounds for denying Mr. Feehan's requests for emergency relief. These include:

- Mr. Feehan lacks Article III standing either as a voter or a nominated Trump elector. His claims of vote dilution and other alleged injuries (even if they had a plausible basis, which they do not) are generalized grievances, not individual harms *to him.*

- Many of Mr. Feehan's claims are barred by laches because he could have sought judicial relief *prior* to the election, *before* 3.2 million Wisconsin voters had cast their

---

[3]  In addition to the *Feehan* action, *see* Compl., *King v. Whitmer*, No. 2:20-cv-13134-LVP-RSW, ECF No. 1 (E.D. Mich. Nov. 25, 2020); Compl., *Pearson v. Kemp*, No. 1:20-cv-4809, ECF No. 1 (N.D. Ga. Nov. 25, 2020); Compl., *Boyer v. Ducey,* No. 2:20-cv-02321-DJH, ECF No. 1 (D. Ariz. Dec. 4, 2020).  The cookie-cutter character of the pleadings in these actions is revealed in part by Plaintiff's attacks on the alleged failures to enforce Wisconsin's "signature verification requirement."  ECF No. 9 ("Amend. Compl.") at 49.  Wisconsin has no signature verification requirement.

ballots. And *all* of his claims are barred by laches because he has waited for so long *after* the election to bring suit—nearly a full month.

- Mr. Feehan's claims also are barred under blackletter Eleventh Amendment law. He cannot ask a federal court to adjudicate state law claims against state actors, and he cannot turn those claims into federal questions by relabeling them as due process, equal protection, or other federal constitutional violations.

- Basic principles of federalism and comity also counsel both *Pullman* and *Colorado River* abstention.

- Mr. Feehan states no claim upon which relief can be granted, instead positing a sweeping and implausible conspiracy by foreign and domestic malefactors to steal the election, together with an assortment of baseless allegations that Defendants violated state election law.

- Mr. Feehan satisfies none of the requirements for the injunctive relief he seeks. He is not likely to succeed on the merits, he has failed to establish he will suffer irreparable harm, and both the public interest and the equities weigh decisively against him.

This Court should therefore deny Plaintiff's amended motion for a TRO or preliminary injunction and dismiss this suit in its entirety. President Trump and his allies have now brought dozens of lawsuits in state and federal courts throughout the Nation seeking to challenge the election results, and in many instances to nullify those results outright.[4] None of those cases has succeeded. Nor should this one.

---

[4] Alanna Durkin Richer, *Trump loves to win but keeps losing election lawsuits*, AP NEWS (Dec. 4, 2020), https://apnews.com/article/donald-trump-losing-election-lawsuits-36d113484ac0946fa5f0614deb7de15e.

State and federal judges from across the ideological spectrum have united in rejecting these sorts of flimsy and audacious attacks on the Presidential election results and the rule of law, as many of the citations in this brief will attest. Lawsuits like these not only are an abuse of process, they continue to, and perhaps are intended to, erode public confidence in our electoral system. The corrosive effects are like battery acid on the body politic. There must be an end to spurious litigation, and courts must communicate that to current and would-be litigants and their lawyers. As Justice Hagedorn emphasized last week in his *Wisconsin Voters All.* concurrence:

> I feel compelled to share a further observation. Something far more fundamental than the winner of Wisconsin's electoral votes is implicated in this case. At stake, in some measure, is faith in our system of free and fair elections, a feature central to the enduring strength of our constitutional republic. It can be easy to blithely move on to the next case with a petition so obviously lacking, but this is sobering. The relief being sought by the petitioners is **the most dramatic invocation of judicial power I have ever seen.** Judicial acquiescence to such entreaties built on so flimsy a foundation would do indelible damage to every future election. Once the door is opened to judicial invalidation of presidential election results, it will be awfully hard to close that door again. This is a dangerous path we are being asked to tread. The loss of public trust in our constitutional order resulting from the exercise of this kind of judicial power would be incalculable.

Ex. 1 at 2 (emphasis added). Other courts have joined not only in dismissing, but in strongly condemning, insidious lawsuits like these seeking the "drastic," "breathtaking," "unprecedented," and "disenfranchising" relief of nullifying the voters' decision and awarding the election to President Trump. *Donald J. Trump for President, Inc. v. Pennsylvania,* No. 20-3371, 2020 WL 7012522, at **1-7 (3d Cir. Nov. 27, 2020).

Earlier today, a federal court in Michigan dismissed another "cookie-cutter" lawsuit brought by these same counsel advancing the same allegations as here with the following observation:

> [T]he Court finds that Plaintiffs are far from likely to succeed in this matter. In fact, this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court—and more about the impact of their allegations on People's faith in the democratic process and their trust in our

government.  Plaintiffs ask this Court to ignore the orderly statutory scheme established to challenge elections and to ignore the will of millions of voters.  This, the Court cannot, and will not, do.

Slip Op. at 35-36, *King v. Whitmer*, No. 2:20-cv-13134 (E.D. Mich. Dec. 7, 2020) (Ex. 4).  And still another of the four "cookie-cutter" lawsuits brought by Mr. Feehan's counsel was dismissed from the bench this morning by a federal court in Georgia.  *See Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020).[5]

Respectfully, this Court should likewise not only deny Plaintiff's requested relief, but should dismiss and condemn this litigation in the strongest terms possible.

## BACKGROUND

Mr. Feehan's Amended Complaint is a cut-and-paste job from other lawsuits that bolts together into one pleading various generalized grievances and conspiracy theories that fall into three broad categories.

### A.     WEC-Approved Practices

The Amended Complaint argues that the WEC violated Wisconsin election statutes by providing unauthorized guidance that was widely relied upon by voters and local election officials—in one instance, for over four years.  Plaintiff now seeks to exclude these votes cast in reliance on WEC guidance on the theory that these "illegal" votes "diluted" his single vote.  *See generally* Amend. Compl. ¶¶ 1, 14, 37-45, 104-07, 116.

---

[5] Nicole Carr, *Federal judge dismisses Sidney Powell lawsuit seeking to decertify Georgia's elections,* WSB-TV2.com (Dec. 7, 2020), (available at: https://urldefense.proofpoint.com/v2/url?u=https-3A__protect-2Dus.mimecast.com_s_EVT4Cv29yYU778N0uQNLbw_&d=DwMF-g&c=XRWvQHnpdBDRh-yzrHjqLpXuHNC_9nanQc6pPG_SpT0&r=ujHaccxZeCkVMgPPje6IryfbR0QhDRwqm2pPPtsv haw&m=Eq0xjcOJkBwSYhlm3PuGAZhfC4GhCttJ4_A4ZTuutbw&s=bRBVgiwxyHTp-Rvu36TxkTFObbXDtRBq3fwpDppFaSY&e=)

**"Indefinitely confined" exemption.**  Voters who self-certify that they are "indefinitely confined because of age, physical illness or infirmity or . . . disabled for an indefinite period" are not required to submit photocopies of their photo IDs with their absentee ballot applications.  Wis. Stat. §§ 6.86(2)(a), 6.87(4)(b)(2).  After the pandemic hit Wisconsin in March and the Evers Administration issued a "Safer-at-Home Order" on March 24, some county clerks advised voters they could claim to be "indefinitely confined" pursuant to the order for purposes of voting absentee in the April 7 spring election.  Both the WEC and the Wisconsin Supreme Court disagreed with that broad and unqualified reading.  Instead, the WEC issued, and the State's high court endorsed, much narrower guidance that left the decision to individual voters subject to certain guidelines.

The WEC's March 29, 2020 guidance, which remains in effect, provides in pertinent part:

> 1. Designation of indefinitely confined status is for each individual voter to make based upon their current circumstance. It does not require permanent or total inability to travel outside of the residence. The designation is appropriate for electors who are indefinitely confined because of age, physical illness or infirmity or are disabled for an indefinite period.

> 2. Indefinitely confined status shall not be used by electors simply as a means to avoid the photo ID requirement without regard to whether they are indefinitely confined because of age, physical illness, infirmity or disability.

Ex. 5.  The WEC's guidance emphasized that, "[d]uring the current public health crisis, *many voters of a certain age or in at-risk populations may meet that standard of indefinitely confined until the crisis abates*."  Ex. 5 (emphasis added).[6]

---

[6] Wisconsin has a decades-long legislative policy of taking voters at their word concerning "indefinite confinement."  The relevant portion of what is now numbered Section 6.86(2)(a) has been unchanged since 1985, when the Legislature eliminated a formal affidavit requirement for those claiming to be "indefinitely confined" and allowed voters to self-certify instead.  *See* WIS. STAT. § 6.86(2) (1985).  Consistent with this statutory self-certification approach, the Commission's guidance emphasizes the importance of avoiding any "proof" requirements. "Statutes do not establish the option to require proof or documentation from indefinitely confined voters.  Clerks may tactfully verify with voters that the voter understood the indefinitely confined

In a March 31, 2020 order, the Wisconsin Supreme Court granted the Republican Party of Wisconsin's motion for a temporary restraining order, directing the Dane County Clerk to "refrain from posting advice as the County Clerk for Dane County inconsistent with" the above quote from the WEC guidance. *Jefferson v. Dane Cnty.*, No 2020AP557-OA (Mar. 31, 2020) (Ex. 6) . Neither the WEC nor the Wisconsin Supreme Court provided further guidance before the November 3 election; WEC's March 29 guidance (as endorsed by the State's highest court) thus remained in effect through the election, and voters throughout the State relied upon it.

But like other Wisconsin litigants seeking to upend the November 3rd election in recent weeks, Mr. Feehan now argues that the WEC's definition of "indefinitely confined" is far too lenient, that WEC should have allowed local officials to demand further proof, and that WEC should have taken further efforts to limit reliance on the "indefinitely confined" exemption in the midst of the worst global pandemic in over a century. Amend. Compl. ¶¶ 1, 14, 37-45, 104-07, 116. Mr. Feehan offers no explanation for why he waited until *after* the election to challenge WEC's guidance, as he easily could have done under Wis. Stat. § 227.40(1). Nor does Mr. Feehan offer any actual facts showing that the WEC's supposedly problematic interpretation led to any abuse of the "indefinitely confined" provision. Instead, he relies upon the claim of a purported "expert" that precisely 96,437 voters "were improperly relying on the 'indefinitely confined' exemption to voter ID" in last month's election, as if Mr. Feehan or his expert has any clue about the health and veracity of nearly 100,000 Wisconsin citizens. *Id.* ¶ 59.

**Witness address requirement.** An absentee voter must complete her ballot and sign a "Certification of Voter" on the absentee ballot envelope in the presence of a witness. Wis. Stat.

---

status designation when they submitted their request, but they may not request or require proof." Ex. 5.

§ 6.87(4)(b). The witness must then sign a "Certification of Witness" on the envelope, which must include the witness's address. Wis. Stat. § 6.87. Since October 2016, the WEC has instructed municipal clerks that, while they may *never* add missing *signatures*, they "*must* take corrective action" to add missing *witness addresses* if they are "'reasonably able to discern'" that information by contacting the witnesses or looking up the addresses through reliable sources. Ex. 7. The WEC has repeated these instructions in multiple guidance documents over the past four years. *See* Ex. 8 (guidance in current WEC Election Administration Manual that clerks "may add a missing witness address using whatever means are available," and "should initial next to the added witness address"). This construction was adopted unanimously by the WEC over four years ago; has governed in *eleven* statewide races since then, including the 2016 presidential election and recount; has been relied upon by local election officials and voters throughout the State; and has never been challenged through Chapter 227 judicial review or otherwise. Ex. 9 at 4–5.

Until now. Like the plaintiffs in many of the other Wisconsin court challenges in the past month, Mr. Feehan argues that WEC has exceeded its statutory authority over the past four years in requiring clerks to attempt to fill in missing witness addresses, and seeks to exclude all such ballots cast last month. Amend. Compl. ¶¶ 14, 43-45, 104-05. Here again, he offers no explanation for why he waited until *after* the election to raise this challenge.

B. **"Massive election fraud"**

Most of Mr. Feehan's Amended Complaint is devoted to recounting the supposed details of a "massive election fraud" perpetrated by Dominion Voting Systems and a motley collection of unnamed "domestic third parties or hostile foreign actors," including "rogue actors" in Iran, China, and Venezuela. Amend. Compl. ¶¶ 1, 6, 16, 70, 81; *see generally id.* ¶¶ 3, 46-50, 52, 60-99. Mr. Feehan says at one point that he is "seeking to hold election riggers like Dominion to account and to prevent the United States' descent into Venezuelan levels of voting fraud and corruption out of

which Dominion was born." *Id.* ¶ 94.  Many of the supposed evidentiary sources are "redacted," so we have no idea who (or what) is feeding these tales to Mr. Feehan's credulous lawyers.  The Amended Complaint throws out the word "fraud" (or variations like "fraudulent") no fewer than **47 times**, but none of those allegations of fraud meets Fed. R. Civ. P. 9(b) standards.  Not one.

It is difficult to figure out why, precisely, Mr. Feehan's lawyers are pulling Governor Evers and the individual members of the WEC into the web of what Ms. Powell has now infamously called this "Kraken."[7]  The Amended Complaint repeatedly makes false and frivolous claims such as this:  "The multifacted schemes and artifices implemented by Defendants"—that is, the WEC Commissioners and Governor Evers—"and their collaborators to defraud resulted in the unlawful counting, or fabrication, or hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots in the State of Wisconsin."  Amend. Compl. ¶ 4.  These "Kraken" allegations against the defendants are not only implausible, but outrageous.

### C. "Statistical anomalies and mathematical impossibilities"

Mr. Feehan's lawyers also submit various declarations from so-called "experts," purporting to point out perceived "statistical anomalies and mathematical impossibilities" in the data they have examined that have led them to deduce that "it is statistically impossible for Joe Biden to have won Wisconsin." *Id.* ¶ 1.  Never mind the statewide canvass process and the rigorous recount process in Dane and Milwaukee Counties.  Never mind the pending state recount litigation.  And never mind all the other media and public scrutiny of the Wisconsin election returns over the past month.  Because a few "experts" believe there is a "statistical impossibility" that Joe Biden carried

---

[7] Davey Alba, *'Release the Kraken,' a catchphrase for unfounded conspiracy theory, trends on Twitter*, N.Y. TIMES (Nov. 17, 2020), https://www.nytimes.com/2020/11/17/technology/release-the-kraken-a-catchphrase-for-unfounded-conspiracy-theory-trends-on-twitter.html.

Wisconsin, Mr. Feehan and his counsel insist "this Court must set aside the results of the 2020 General Election" and issue "[a]n order requiring Governor Evers to transmit certified election results that state that President Donald Trump is the winner of the election." *Id.* ¶¶ 5, 142(3). Requests like these would be laughable if they were not so antidemocratic and unconstitutional.

## LEGAL STANDARD

**Motion to Dismiss**. Although the DNC as a nonparty may not move to dismiss Mr. Feehan's claims, it may properly oppose Feehan's requested injunctive relief by showing that Feehan's Amended Complaint fails to state a cognizable claim for relief. In deciding a motion to dismiss, the Court presumes the veracity of all well-pleaded material allegations in the Complaint, *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015), but "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (alteration in original) (quoting Fed. R. Civ. P. 8(a)). "[C]onclusory statements of law . . . and their unwarranted inferences . . . are not sufficient to defeat a motion to dismiss for failure to state a claim." *N. Tr. Co. v. Peters*, 69 F.3d 123, 129 (7th Cir. 1995).

Mr. Feehan's drumbeat of claims about alleged "fraud" are subject to the pleading requirements of Fed. R. Civ. P. 9(b), which require a party pleading fraud to "state with particularity the circumstances constituting fraud." This standard "ordinarily requires describing the 'who, what, when, where, and how'" of the fraud. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011).

**Motion for Preliminary Injunction**. To obtain a preliminary injunctive relief "a movant 'must make a threshold showing that (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law;

and (3) he has a reasonable likelihood of success on the merits." *Tully v. Okeson*, 977 F.3d 608, 612–13 (7th Cir. 2020). Then, "if the movant makes this threshold showing, the court proceeds to consider the balance of harms between the parties and the effect of granting or denying a preliminary injunction on the 'public interest.'" *Id.* (quoting *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Democratic Nat'l Comm. v. Bostelmann*, 451 F. Supp. 3d 952, 968 (W.D. Wis. 2020) (applying same standard to request for temporary restraining order).

This is a demanding standard in any case but, where, as here, plaintiffs seek a mandatory injunction, it is heightened. *See, e.g.*, *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) ("Mandatory preliminary injunctions—those 'requiring an affirmative act by the defendant'—are 'ordinarily cautiously viewed and sparingly issued.'") (quoting *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997)).

## ARGUMENT

### I.     The Court should dismiss this case because Plaintiff lacks standing.

To avoid dismissal on Article III grounds, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). (citation omitted). Mr. Feehan fails all three prongs.

**No cognizable injury-in-fact**. Mr. Feehan has failed to establish that he has suffered an injury in fact sufficient to maintain any of his claims. As to his equal protection and due process claims in Counts II and III (as well as his freestanding fraud claim in Count IV, for which he cites neither a constitutional nor statutory basis), Feehan does not allege that he suffered any specific harm as a presidential elector, or that, as a voter, he was deprived of the right to vote; instead, he alleges that "Defendants failed to comply with the requirements of the Wisconsin Election Code

and thereby diluted the lawful ballots of the Plaintiff and of other Wisconsin voters and electors."
Amend. Compl. ¶ 116; *see also id.* ¶¶ 114, 125-26, 136. But Plaintiff's theory of vote-dilution-
through-unlawful-voting has been thoroughly and repeatedly rejected by federal courts as a viable
basis for standing (including in several decisions in the last few weeks alone). *See, e.g.*, Slip Op.
at 25, *King v. Whitmer*, No. 2:20-cv-13134, (E.D. Mich. Dec. 7, 2020) (no standing in cookie-
cutter litigation) (Ex. 4); *Bognet v. Sec'y of Commonwealth*, No. 20-3214, 2020 WL 6686120, at
*11-14 (3d Cir. Nov. 13, 2020) ("This conceptualization of vote dilution—state actors counting
ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause
of the Fourteenth Amendment"); *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-
1445 JCM (VCF), 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) (similar).

Thus, in *Donald J. Trump for President v. Boockvar*, the court rejected a challenge to
restrictions on poll watchers and ballot challenges on a theory, like the one Plaintiff advances, that
state practices constituted fraud and thus diluted lawfully submitted votes. The court found that
the fears of voter fraud that animated the claims were "based on a series of speculative events—
which falls short of the requirement to establish a concrete injury." 2020 WL 5997680, at *33.
Other cases have reached similar results. *See, e.g.*, *Martel v Condos*, No. 5:20-cv-131, 2020 WL
5755289, at *3-5 (D. Vt. Sept. 16, 2020) (holding voters challenging a directive expanding vote-
by-mail lacked concrete and particularized injury necessary for standing); *Paher v. Cegavske*, 457
F. Supp. 3d 919, 925-26 (D. Nev. 2020) (same); *Am. Civil Rights Union v. Martinez-Rivera*, 166
F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution" as a result of allegedly
inaccurate voter rolls "[is] speculative and, as such, [is] more akin to a generalized grievance about
the government than an injury in fact."). Mr. Feehan's claims are similarly deficient.

Feehan also claims he has suffered harm as a result of alleged violations of the Elections

and Electors Clauses, but that injury, too, has been repeatedly rejected as "precisely the kind of undifferentiated, generalized grievance about the conduct of government" insufficient to constitute an injury for Article III standing. *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam); *accord Wood v. Raffensperger*, No. 20-14418, 2020 WL 7094866, *4 (11th Cir. Dec. 5, 2020) ("Wood cannot explain how his interest in compliance with state election laws is different from that of any other person."). Plaintiff's reliance on *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020), is misplaced. *See* Amend. Compl. ¶ 25. There, the Eighth Circuit held that "[a]n inaccurate vote tally is a concrete and particularized injury" to electors, under the theory that Minnesota electors are candidates for office under Minnesota law. 978 F.3d at 1058. *Carson* is neither binding on this Court nor in the legal mainstream; federal courts have repeatedly held that even candidates for office lack Article III standing to challenge alleged violations of state law under the Elections Clause. *See Bognet*, 2020 WL 6686120, at *6-7 (voters and candidate lacked standing to bring claims under Elections and Electors Clauses); *id.* at *8 n.6 (rejecting *Carson* as being based on an incorrect reading of *Bond v. United States*, 564 U.S. 211 (2011)); *Hotze v. Hollins*, No. 4:20-cv-03709, 2020 WL 6437668, at *2 (S.D. Tex. Nov. 2, 2020) (holding candidate lacked standing under Elections Clause and concluding that Supreme Court's cases "stand for the proposition that only the state legislature (or a majority of the members thereof) have standing to assert a violation of the Elections Clause," but not individuals).[8] Neither of the additional cases Plaintiff cites so much as mentions Article III standing and Plaintiff provides no explanation regarding either case's supposed significance. *See* Dkt. No. 42 at 4 (citing *McPherson v. Blacker*, 146 U.S. 1, 27 (1892);

---

[8] Although separate constitutional provisions, the Electors and Elections Clauses share "considerable similarity" and should be interpreted in the same manner. *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839 (2015) (Roberts, C.J., dissenting); *see also Bognet*, 2020 WL 6686120, at *7 (applying same test for standing under both Elections and Electors Clauses).

*Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam)).

**No traceability**.  Mr. Feehan has also failed to allege facts sufficient to establish that any supposed injury is traceable to Defendants.  *First*, he alleges a "fraudulent scheme to rig the 2020 General Election."  Amend. Compl. ¶ 50.  But there are no allegations in the Amended Complaint that connect this alleged "fraudulent scheme" to Defendants.  Instead, Plaintiff explicitly blames other parties, including a technology company, *see id.* ¶ 98 (describing "clear motive on the part of Dominion to rig the election"), and various unnamed foreign actors, *see id.* ¶ 70 (describing "foreign interference by Iran and China").  *Second*, Plaintiff alleges that certain actions by the WEC did not follow state law.  *Id.* ¶¶ 40-41, 44-45.  But other than Plaintiff's generic complaint that such supposed legal errors created an "avenue for fraudulent voting," *id.* ¶ 38, there are no allegations in the Amended Complaint showing that anything WEC allegedly did caused (or even relates to) any alleged injury to Plaintiff himself.  This lack of traceability dooms Mr. Feehan's standing to pursue any claims against the WEC.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  The same is true *a fortiori* of the individual Defendants, none of whom is alleged in the Amended Complaint to have done anything in particular.

**No redressability**.  Finally, as relief sought, Mr. Feehan attempts to bypass the popular vote in Wisconsin by asking the Court to issue an injunction to prevent Governor Evers and the WEC "from transmitting the currently certified electoral results [to] the Electoral College." Amend. Compl. ¶ 142(2).  Doing so would not redress Mr. Feehan's alleged injuries.  As explained earlier today in *King v. Whitmer*, which concerns nearly identical claims, "Plaintiffs' alleged injury does not entitle them to seek their requested remedy because the harm of having one's vote invalidated or diluted is not remedied by denying millions of others their right to vote."  Slip Op. at 25, *King*, No. 2:20-cv-13134 (E.D. Mich. Dec. 7, 2020) (Ex. 4).  Not only that, granting the

requested relief is *impossible*, because the Certificate of Ascertainment has already been transmitted. *See* Nat'l Archives, *2020 Electoral College Results*, https://www.archives.gov/electoral-college/2020. No remedy Plaintiff seeks can make it otherwise. *See Wood v. Raffensperger*, 2020 WL 7094866, *6 ("Because Georgia has already certified its results, Wood's requests to delay certification and commence a new recount are moot. 'We cannot turn back the clock and create a world in which' the 2020 election results are not certified.") (citation omitted).

In sum, Mr. Feehan meets none of the three requirements for Article III standing and this Court should dismiss the Amended Complaint on that basis alone.

## II.     The doctrine of laches bars Plaintiff's claims.

Even if Mr. Feehan were able to establish that he has standing to pursue his claims (and, for the reasons discussed above, he does not), the doctrine of laches independently bars any relief. "Laches arises when an unwarranted delay in bringing a suit or otherwise pressing a claim produces prejudice to the defendant." *Fulani v. Hogsett,* 917 F.2d 1028, 1031 (7th Cir. 1990). The doctrine applies with special force and urgency in the election-law context. A long line of Seventh Circuit decisions emphasizes that election-law claims "must be brought 'expeditiously' … to afford the district court 'sufficient time *in advance of an election* to rule without disruption of the electoral cycle.'" *Jones v. Markiewicz-Qualkinbush,* 842 F.3d 1053, 1061 (7th Cir. 2016) (citations omitted) (emphasis added); *see also Bowes v. Indiana Secretary of State*, 837 F.3d 813, 818 (7th Cir. 2016) ("plaintiffs in general must act quickly once they become aware of a constitutional violation, so as not to disrupt an upcoming election process"); *Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004) ("It would be inequitable to order preliminary relief in a suit filed so gratuitously late in the campaign season."); *Fulani*, 917 F.2d at 1031 (denying relief where plaintiffs' delay risked "interfer[ing] with the rights of other Indiana citizens, in particular the

absentee voters"); *Navarro v. Neal*, 904 F. Supp. 2d 812, 816 (N.D. Ill. 2012) ("By waiting so long to bring this action, plaintiffs 'created a situation in which any remedial order would throw the state's preparations for the election into turmoil.'"), *aff'd*, 716 F.3d 425 (7th Cir. 2013).

Through not using the term "laches," the U.S. Supreme Court has long "insisted that federal courts not change electoral rules close to an election date." *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 641-42 (7th Cir. 2020) (citing, *inter alia*, *Purcell v. Gonzalez*, 549 U.S. 1 (2006)), *stay denied*, No. 20A66, 2020 WL 6275871 (Oct. 26, 2020). Wisconsin law is in accord. *See Hawkins v. Wisconsin Elections Comm'n*, 2020 WI 75, ¶¶ 9-10, 393 Wis. 2d 629, 948 N.W.2d 877 (2020) (rejecting petition for original action filed nearly three months *before* the 2020 general election where the Court concluded there was insufficient time to grant "any form of relief that would be feasible," and that granting relief would "completely upset[] the election," cause "confusion and disarray," and "undermine confidence in the general election results"). Overturning the results of an election *after* it has been held, as Mr. Feehan and his counsel seek to accomplish, would create far more confusion, disarray, and loss of public confidence in the results.

All of the elements of laches are satisfied here. Mr. Feehan and his counsel are guilty of egregious delays. Many of the practices he challenges were in place long before November 3rd and could have been readily challenged before the election. The WEC's guidance, for example, could have been challenged at any time before the election in a declaratory judgment action under Wis. Stat. § 227.40(1). These "exclusive" review procedures could have been used to present claims that the WEC's guidance "exceeds the statutory authority of the agency," *id.* § 227.40(4)(a), which is precisely what Mr. Feehan is claiming here. But Mr. Feehan and his

counsel inexcusably waited nearly a full month *after* the election before bringing suit—and until *after* Wisconsin had certified its presidential election results—to seek relief.

Nor is there any question that the DNC and its nominees, the public, and the administration of justice in general would be deeply prejudiced if the Court excused Plaintiff's delay in bringing this suit. Plaintiff's requested relief would retroactively disenfranchise some, or all, of Wisconsin's voters *after* voting has concluded and would destroy confidence in the electoral process. As explained earlier today in *King v. Whitmer*, the "rationale for interposing the doctrine of laches is at its peak." Slip Op. at 19, No. 2:20-cv-13134 (E.D. Mich. Dec. 7, 2020). "Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) (citing *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)). And as Justice Hagedorn emphasized last week, interference with an election *after* it has concluded "would appear to be unprecedented in American history." *Wisconsin Voters All.,* No. 2020AP1930-OA, at 2 (Hagedorn, J., concurring) (Ex. 1). Plaintiff's claims are barred by laches.

## III. The Eleventh Amendment bars Plaintiff's claims.

In addition to the hurdles described above, the Eleventh Amendment also separately and independently bars Mr. Feehan's claims. The Eleventh Amendment prohibits federal courts from granting "relief against state officials on the basis of state law, whether prospective or retroactive." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *see also Dean Foods Co. v. Brancel*, 187 F.3d 609, 613 (7th Cir. 1999) ("[F]ederal courts cannot enjoin a state officer from violating state law.") This is true even when state law claims are styled as federal causes of action. *See Colon v. Schneider*, 899 F.2d 660, 672 (7th Cir. 1990) (rejecting plaintiff's attempt to "transmute a violation of state law into a constitutional violation" and noting that such state law claims would be barred by the Eleventh Amendment); *see also, e.g.*, *Massey v. Coon*, No. 87-3768,

1989 WL 884, at *2 (9th Cir. Jan. 3, 1989) (affirming dismissal where "on its face the complaint states a claim under the due process and equal protection clauses of the Constitution, [but] these constitutional claims are entirely based on the failure of defendants to conform to state law"); *Balsam v. Sec'y of State*, 607 F. App'x 177, 183–84 (3d Cir. 2015) (Eleventh Amendment bars state law claims even when "premised on violations of the federal Constitution").

None of Mr. Feehan's claims escapes this bar. In substance, he asks the Court to determine that state officials violated state law and compel state officials to do what he believes Wisconsin law requires. Count I, his purported Elections and Electors Clause claim, asserts that Defendants violated the U.S. Constitution by exercising powers that are the province of the Wisconsin Legislature. Amend. Compl. ¶ 103. While less than clear, Plaintiff's allegation appears to be that Defendants did so by violating the Wisconsin State Election Code. *Id.* ¶¶ 104–06. Count II, Plaintiff's purported Equal Protection Clause claim, alleges vote dilution because "Defendants failed to comply with the requirements of the Wisconsin Election Code." *Id.* ¶ 116. It also relies on the assertion that Defendants violated "Plaintiff's right to be present and have actual observation and access to the electoral process …." *Id.* ¶ 117. But there is no constitutional right to poll watching or observation; any "right" to do so exists under state law. *See, e.g.*, *Donald J. Trump for President, Inc. v. Boockvar*, No. 20-cv-966, 2020 WL 5997680, at *67 (W.D. Pa. Oct. 10, 2020) ("[T]here is no individual constitutional right to serve as a poll watcher." (quoting *Pa. Democratic Party v. Boockvar*, No. 133 MM 2020, 2020 WL 5554644, at *30 (Pa. Sept. 17, 2020))). Count III, Plaintiff's purported due process claim, also relies primarily on alleged violations of Wisconsin law. *See* Amend. Compl. ¶ 129 (discussing "violations of the Wisconsin Election Code"). Finally, Plaintiff's free-standing "fraud" claim in Count IV is expressly based on Defendants' failure to comply with state election laws. Amend. Compl. ¶ 137 (alleging

-19-

"defendants intentionally violated multiple provisions of the Wisconsin Election Code").

Mr. Feehan's motion only serves to underscore that his issues are truly state law claims masquerading as the basis for a federal action. Once again, it asserts purported violations of Wisconsin law. *See* Dkt. 19 at 3 ("Plaintiff is more likely to succeed on the merits of his claims than not due to substantial and multiple violations of Wisconsin election laws . . . ."). Granting Mr. Feehan's request would be problematic for a host of reasons; one is that it would violate the Eleventh Amendment. *See Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988) ("[T]o treat a violation of state law as a violation of the Constitution is to make the federal government the enforcer of state law. State rather than federal courts are the appropriate institutions to enforce state rules."); *see also, e.g.*, *Ohio Republican Party v. Brunner*, 543 F.3d 357, 360-61 (6th Cir. 2008) (holding *Pennhurst* bars claim that Secretary of State violated state election law).

## IV. Principles of federalism and comity strongly favor abstention.

Even if the Court were to conclude that none of the above hurdles barred it from exercising jurisdiction, principles of federalism and comity would still weigh strongly against doing so. Plaintiff seeks an extraordinary intrusion on state sovereignty from which a federal court should abstain under longstanding precedent.

Under the *Pullman* abstention doctrine, Mr. Feehan's claims should be addressed, if at all, in state court. *See Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 501 (1941). The doctrine "is based on considerations of comity and federalism and applies when 'the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law.'" *Wisconsin Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 150 (7th Cir. 2011) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716-17 (1996)). If a state law "is 'fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question,' abstention may be required 'in order to avoid

unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication.'" *City Investing Co. v. Simcox*, 633 F.2d 56, 60 (7th Cir. 1980) (quoting *Harman v. Forssenius*, 380 U.S. 528, 534-35 (1965)). The Seventh Circuit looks to two factors to determine whether *Pullman* abstention is appropriate: whether there is (1) "a substantial uncertainty as to the meaning of the state law" and (2) "a reasonable probability that the state court's clarification of state law might obviate the need for a federal constitutional ruling." *Wisconsin Right to Life*, 664 F.3d at 150 (quoting *Imt'l Coll. of Surgeons v. City of Chi.*, 153 F.3d 356, 365 (7th Cir. 1998)). Each factor weighs in favor of abstention here.

*First*, a central contention of the Amended Complaint is that official WEC guidance misinterpreted the Wisconsin Election Code. Plaintiff alleges, among other things, legal errors by WEC in relation to "indefinitely confined" voters, Amend. Compl. ¶¶ 37-42, 104, and missing witness addresses on absentee-ballot envelopes, *id.* ¶¶ 43-45, 105-06; *see also id.* ¶ 137 ("Defendants intentionally violated multiple provisions of the Wisconsin Election Code ...."). Plaintiff's TRO motion echoes these state-law concerns. *See* Dkt. No. 10, ¶ 7. Accordingly, adjudicating Plaintiff's claims would require this Court to resolve alleged uncertainty about the meaning of Wisconsin law. In fact, some of the same state law issues Plaintiff raises are currently under consideration by the Wisconsin Supreme Court. *See generally Jefferson v. Dane Cnty.*, No 2020AP557-OA (challenge to official interpretation of "indefinite confinement" provisions of Wisconsin law). The "indefinite confinement" and "witness address" issues are both also being litigated in the Wisconsin recount appeals. *See generally Trump v. Biden,* Milwaukee County Case No. 2020-CV-7092; Dane County Case No. 2020-CV-2514. And recently, in dissenting from the denial of an original action petition in which the Trump campaign raised similar challenges,

Wisconsin's Chief Justice described the petition as raising "significant legal issues that cry out for resolution by the Wisconsin Supreme Court." *Trump v. Evers*, No. 2020AP1971-OA (Wis. Dec. 3, 2020) (Roggensack, C.J., dissenting) (Ex. 2).

*Second*, it is at least "reasonably probable" that the Wisconsin courts' adjudication of the state law issues Mr. Feehan raises could "obviate the need for a federal constitutional ruling." *Wisconsin Right to Life*, 664 F.3d at 150. If, as the DNC submits would be proper, a Wisconsin court rejected Mr. Feehan's claim that WEC guidance violates state law, there would be no need for this Court to opine about whether constitutional injury arose from such alleged violations.

Abstention is also warranted under the *Colorado River* doctrine, which provides that "a federal suit," in certain circumstances, "should yield to a parallel state suit." *DePuy Synthes Sales, Inc. v. OrthoLA, Inc.*, 953 F.3d 469, 477 (7th Cir. 2020). Both conditions for abstention are met here. First, there is a concurrent and parallel state-court action: President Trump's appeal from the WEC's post-recount determinations in state court, which "involve[s] the same parties, the same facts, and the same issues." *Id.* at 478. Second, "the necessary exceptional circumstances exist to support" abstention. *Id.* at 477. It is highly desirable to avoid "piecemeal" litigation of the issues raised here, and the "source of governing law" is overwhelmingly Wisconsin election law. *Id.* Moreover, the pending state-court action is not only "adequa[te] … to protect [Plaintiff's] rights," but also the "exclusive judicial remedy" under Wisconsin law "for testing the right to hold an elective office as the result of an alleged irregularity, defect or mistake committed during the voting or canvassing process." Wis. Stat. § 9.01(11). Just today, a federal court in Michigan, considering identical claims, found *Colorado River* abstention appropriate. *See* Slip Op. at 20-23, *King v. Whitmer*, No. 2:20-cv-13134, (E.D. Mich. Dec. 7, 2020).

*Finally*, even if the Court were to conclude that this case falls outside the scope of *Pullman*, *Colorado River*, and other abstention doctrines, the DNC respectfully submits that the Court should nonetheless abstain because the case "implicates the principles of equity, comity, and federalism" that lie at the foundation of those doctrines. *SKS & Assocs., Inc. v. Dart*, 619 F.3d 674, 677 (7th Cir. 2010). The conduct of elections is uniquely constitutionally entrusted to the states. *See* U.S. Const. art. I, § 4; *id.* art. II, § 1, cl. 2. There are few areas where a federal court should tread more lightly. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2506-07 (2019).

Moreover, as Plaintiff himself notes, "Wisconsin law allows elections to be contested through litigation," Amend. Compl. ¶ 121—litigation that President Trump is already pursuing in state court, as noted above. That litigation raises many of the same concerns Mr. Feehan raises, so he can hardly claim there is no alternative to federal-court adjudication. To the contrary, "principles of equity, comity, and federalism," *SKS & Assocs.*, 619 F.3d at 677, support abstaining from federal adjudication and instead allowing the post-recount litigation already initiated in state court by President Trump to proceed.

**V.    Plaintiff fails to state a claim on which relief can be granted.**

The Amended Complaint is also subject to dismissal under Rule 12(b)(6), which requires a plaintiff to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. While Rule 8 "does not require 'detailed factual allegations,' … it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). The shortcomings in the Amended Complaint are particularly stark because Plaintiff's claims sound in fraud and thus are subject to the requirement of Rule 9(b) to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Supreme Court has also instructed that "[d]etermining whether

-23-

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 31 of 39   Document 57

a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Mr. Feehan fails to meet the standards of Rule 8, much less Rule 9(b). He speculates that Wisconsin election officials and "the State of Wisconsin" engaged in "widespread fraud" to manipulate the election results, supposedly in cahoots with domestic and international actors. Amend. Compl. ¶ 48. He asserts that local election officials helped advance a "multi-state fraudulent scheme to rig the 2020 General Election," *id*. ¶ 50, by using voting machines made by Dominion, *id.* ¶ 3, a company allegedly created exclusively to ensure election-rigging so that "Venezuelan dictator Hugo Chavez never lost another election," *id*. ¶ 7, while also permitting Iran and China to manipulate the 2020 general election to ensure President-elect Biden's victory, *id.* ¶ 16, and intentionally enabling mass voter fraud among mail-in voters, *id.* ¶¶ 46, 48.

Plainly, judicial experience and common sense alone dictate that the Amended Complaint should be dismissed. "[T]he sheer size of the alleged conspiracy—involving numerous agencies of state and local government—points in the direction of paranoid fantasy" rather than plausible allegations grounded in fact. *Walton v. Walker*, 364 F. App'x 256, 257 (7th Cir. 2010) (internal quotation marks omitted). But Mr. Feehan also has failed to state cognizable legal claims. His Elections and Electors Clause claims as alleged in Count I of the Amended Complaint do not state a claim for relief. The Elections and Electors Clauses vest authority in "the Legislature" of each state to regulate "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives," U.S. Const. art. I, § 4, cl. 1, and to direct the selection of presidential electors, U.S. Const. art. II, § 1, cl. 2, respectively. Plaintiff's putative claims under the Elections and Electors Clauses appear to be grounded on his allegation that Defendants failed to follow state law. Amend. Compl. ¶¶ 104–06. Plaintiff, however, fails to tie these allegations to the Electors and

Elections Clauses. He has not explained how alleged deviations from state election procedures constitutes a violation of either constitutional provision. *See, e.g.*, Slip Op. at 30, *King v. Whitmer*, No. 2:20-cv-13134 (E.D. Mich. Dec. 7, 2020) ("Even assuming Defendants did not follow the Michigan Election Code, Plaintiffs do not explain how or why such violations of state election procedures automatically amount to violations of the clauses."). Nowhere does he allege that Defendants or state laws violate the authority of the Legislature to direct selection of the presidential electors, U.S. Const. art. II, § 1, cl. 2, or regulate elections, *id.* art. I, § 4, cl. 1.

Count II, Plaintiff's putative Equal Protection claim, similarly fails as a matter of law. Mr. Feehan alleges that "Defendants failed to comply with the requirements of Wisconsin Election Code and thereby diluted the lawful ballots of the Plaintiff and of other Wisconsin voters …." Amend. Compl. ¶ 116. That is not a cognizable equal protection injury. Vote dilution may give rise to a federal claim only in certain contexts, such as when laws structurally devalue one community's votes over another's. *See, e.g.*, *Bognet*, 2020 WL 6686120, at *11 ("[V]ote dilution under the Equal Protection Clause is concerned with votes being weighed differently."). Courts have repeatedly found the "conceptualization of vote dilution" that Mr. Feehan urges here—that is, "state actors counting ballots in violation of state election law"—is not a cognizable violation of equal protection. *Id.* For good reason: "if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots 'were a true equal-protection problem, then it would transform every violation of state election law … into a potential federal equal-protection claim.'" *Id.* (quoting *Boockvar*, 2020 WL 5997680, at *45-46); *see also* Slip Op. at 34 n.11, *King v. Whitmer*, No. 2:20-cv-13134 (E.D. Mich. Dec. 7, 2020) (same) (Ex. 4).[9]

---

[9] Mr. Feehan's allegation that Defendants "enacted regulations, or issued guidance, that had the intent and effect of favoring one class of voters—Democratic absentee voters—over

Count III also fails. Mr. Feehan appears to allege that violations of law diluted his vote in violation of the Due Process Clause. *See* Amend. Compl. ¶¶ 128-29. As noted, Mr. Feehan has failed to plead a cognizable vote-dilution claim, but regardless, vote dilution is a context-specific theory of constitutional harm premised on the Equal Protection Clause, not the Due Process Clause. And even if this Court construed Mr. Feehan's allegations as attempting to state a substantive due process claim, they would still fall short, because "section 1983 does not cover garden variety election irregularities." *Bodine v. Elkhart Cnty. Election Bd.*, 788 F.2d 1270, 1272 (7th Cir. 1986) (characterizing *Griffin v. Burns*, 570 F.2d 1065, 1076 (1st Cir. 1978)); *see also Kasper v. Hayes*, 651 F. Supp. 1311, 1314 (N.D. Ill. 1987) ("The Constitution is not an election fraud statute, … [and] '[i]t is not every election irregularity … which will give rise to a constitutional claim and an action under section 1983'." (quoting *Bodine*, 788 F.2d at 1271)), *aff'd sub nom. Kasper v. Bd. of Election Comm'rs*, 810 F.2d 1167 (7th Cir. 1987). Instead, to "strike down an election on substantive due process grounds," two elements must be met: "(1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures." *Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir. 1998); *see also Curry v. Baker*, 802 F.2d 1302, 1315 (11th Cir. 1986) (to implicate due process, problems must "go well beyond the ordinary dispute over the counting and marking of ballots") (internal quotation marks omitted). Plaintiff's allegations here fall far short. Indeed, he does not

Republican voters" (Amend. Compl. ¶ 116) also does not state a viable equal protection claim, because the guidance at issue applied equally to all absentee voters. *See Boockvar*, 2020 WL 5997680, at *60 (absentee ballot guidance did not violate Equal Protection Clause because "[i]t was issued to all counties and applies equally to all counties, and by extension, voters."); *Bognet*, 2020 WL 6686120, at *14 (rejecting plaintiffs' proposed absentee voter groupings under Equal Protection Clause because "there is simply no differential *weighing* of the votes.").

plausibly allege that any disenfranchisement has occurred, but rather asks the Court to negate the votes cast by millions of eligible Wisconsin voters.

## VI.    Plaintiff is not entitled to a TRO or preliminary injunction.

For the reasons discussed above, Mr. Feehan cannot establish a "likelihood of success on the merits." *Tully*, 977 F.3d at 612-13. He has failed to carry his burden on any of the remaining factors necessary to entitle him to preliminary relief, much less the extraordinary and unprecedented relief he seeks. No court has ever done what Feehan asks this Court to do—throw out the election results and ordain the losing candidate the victor by judicial proclamation. As the Third Circuit put it recently when the Trump Campaign sought an order prohibiting Pennsylvania's officials from certifying election results, such relief—"throwing out millions of votes—is unprecedented" and a "drastic remedy." *Donald J. Trump for President, Inc.* 2020 WL 7012522, at *7. "Voters, not lawyers, choose the President. Ballots, not briefs, decide elections." *Id* *9.

### A.    Plaintiff cannot establish irreparable harm and has an adequate remedy at law.

Mr. Feehan has not shown injury or a likelihood of success of the merits of his constitutional claims. So, his assertion that he will suffer irreparable harm based on those violations is unfounded. Further, his delay before seeking relief weighs against the probability of irreparable injury. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001); *see also* Wright & Miller, 11A *Federal Practice and Procedure*, § 2948.1 (3d ed., Apr. 2017 update) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). Mr. Feehan's alleged injuries occurred (if they occurred at all), on or before election day. Yet he waited until nearly four weeks after election day, after the election had been certified, to file this motion. This Court should consider his inexcusable delay in determining whether he is entitled to "emergency" relief.

Mr. Feehan also has an adequate remedy at law, weighing against a finding of irreparable harm. *See United States v. Rural Elec. Convenience Co-op. Co.*, 922 F.2d 429, 432 (7th Cir. 1991) ("It is well settled that the availability of an adequate remedy at law renders injunctive relief inappropriate."). In this case, Wisconsin law allows for mechanisms to dispute election results. Because Feehan could engage these mechanisms, he has an adequate remedy at law. *See, e.g.*, *Donald J. Trump for President, Inc. v. Pennsylvania*, 2020 WL 7012522, at *8 ("Because the Campaign can raise these issues and seek relief through state courts and then the U.S. Supreme Court, any harm may not be irreparable."); *see also Rural Elec. Convenience Co-op. Co.*, 922 F.2d at 432 (observing that "a party's ability to assert its claims as a defense in another proceeding constitutes an adequate remedy at law").

### B. The balance of equities and public interest weigh heavily against the issuance of a restraining order or injunction.

The balance of equities and public interest cut sharply against granting injunctive relief. Plaintiff's request that this Court order Defendants "to de-certify the results of the General Election for the Office of President" and "certify the results … in favor of President Donald Trump," would wreak havoc on Wisconsin's elections processes and violate the constitutional rights of millions of Wisconsinites, all while undermining public confidence and trust in the election's results. *See United States v. Classic*, 313 U.S. 299, 315 (1941) ("Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted …."); *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1061 (7th Cir. 2020) ("It is undeniable that the right to vote is a fundamental right guaranteed by the Constitution. The right to vote is not just the right to put a ballot in a box but also the right to have one's vote counted." (citations omitted)).

For these reasons, in the past several weeks, courts have rightly refused to issue similar

injunctions. *See Donald J. Trump for President, Inc.*, 2020 WL 7012522, at \*8–9 (construing Trump Campaign's request to enjoin Pennsylvania's certification of results as a request to disenfranchise voters, and refusing to do so); *Wood v. Raffensperger*, No. 1:20-cv-04561-SDG, 2020 WL 6817513 at \*13 (N.D. Ga. Nov. 20, 2020) (denying request to enjoin Georgia from certifying its election results, concluding that "interfer[ing] with the result of an election that has already concluded would be unprecedented and harm the public in countless ways"), *aff'd,* No. 20-14418, 2020 WL 7094866 (11th Cir. Dec. 5, 2020). This Court should do the same.

## CONCLUSION

For the foregoing reasons, *amicus curiae* DNC respectfully requests that the Court deny Plaintiff's Amended Motion for Temporary Restraining Order and Preliminary Injunction in its entirety.

DATED: December 7, 2020

Respectfully Submitted,

*s/ Michelle M. Umberger*

Seth P. Waxman*
WILMER CUTLER PICKERING HALE AND
    DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
(202) 663-6000
seth.waxman@wilmerhale.com

David S. Lesser
Jamie Dycus
Christopher Bouchoux*
Joseph J. Yu*
Charles Bridge*
WILMER CUTLER PICKERING HALE AND
DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
david.lesser@wilmerhale.com
jamie.dycus@wilmerhale.com
christopher.bouchoux@wilmerhale.com
joseph.yu@wilmerhale.com
charles.bridge@wilmerhale.com

Matthew W. O'Neill
    SBN 1019269
FOX, O'NEILL &
    SHANNON, S.C.
622 North Water Street,
    Suite 500
Milwaukee, WI 53202
(414) 273-3939
mwoneill@foslaw.com

Charles G. Curtis, Jr.
    SBN 1013075
Michelle M. Umberger
    SBN 1023801
Sopen B. Shah
    SBN 1105013
Will M. Conley
    SBN 1104680
PERKINS COIE LLP
One East Main St., Suite 201
Madison, WI 53703
(608) 663-7460
ccurtis@perkinscoie.com
mumberger@perkinscoie.com
sshah@perkinscoie.com
wconley@perkinscoie.com

Marc E. Elias*
John Devaney
Zachary J. Newkirk*
PERKINS COIE LLP
    700 Thirteenth St., N.W.,
        Suite 800
Washington, D.C. 20005
(202) 654-6200
melias@perkinscoie.com
jdevaney@perkinscoie.com
znewkirk@perkinscoie.com

*Counsel for Proposed Respondent-Intervenor*

*\* Admission pending*

**CERTIFICATE OF SERVICE**

I hereby certify that on Monday, December 7, 2020, I filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Michelle M. Umberger*
Counsel for Proposed Intervenor

# Exhibit 1



# Supreme Court of Wisconsin

**110 EAST MAIN STREET, SUITE 215**
**P.O. BOX 1688**
**MADISON, WI 53701-1688**

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

December 4, 2020

To:

Gregory M. Erickson
Erick G. Kaardal
Mohrmann, Kaardal and Erickson
150 S. 5th Street, Suite 3100
Minneapolis, MN 55414

Colin T. Roth
Thomas C. Bellavia
Colin R. Stroud
Brian P. Keenan
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857

Brian S. Levy
Katten & Temple
11512 N. Port Washington Road, Suite 101J
Mequon, WI 53092

Joseph S. Goode
Mark M. Leitner
John W. Halpin
Allison E. Laffey
Laffey, Leitner & Goode LLC
325 E. Chicago Street, Suite 200
Milwaukee, WI 53202

*Address list continued on page 5.

You are hereby notified that the Court has entered the following order:

No. 2020AP1930-OA          <u>Wisconsin Voters Alliance v. Wisconsin Elections Commission</u>

A petition for leave to commence an original action under Wis. Stat. § (Rule) 809.70 and a supplement thereto, a supporting legal memorandum, and supporting expert reports have been filed on behalf of petitioners, Wisconsin Voters Alliance, et al. A response to the petition has been filed by respondents, Wisconsin Elections Commission, Ann S. Jacobs, Mark L. Thomsen, Marge Bostelman, Julie M. Glancey, Dean Knudsen, and Robert F. Spindell, and a separate response has been filed by respondent Governor Tony Evers. Amicus briefs regarding the issue of whether to grant leave to commence an original action have been filed by (1) Christine Todd Whitman, et al; (2) the City of Milwaukee; (3) Wisconsin State Conference NAACP, et al.; and (4) the Center for Tech and Civic Life. In addition, a motion to intervene has been filed by proposed intervenor-respondent, Democratic National Committee.

After considering all of the filings, we conclude that this petition does not satisfy our standards for granting leave to commence an original action. Although the petition raises time-

sensitive questions of statewide significance, "issues of material fact [would] prevent the court from addressing the legal issues presented." State ex rel. Ozanne v. Fitzgerald, 2011 WI 43, ¶19, 334 Wis. 2d 70, 798 N.W.2d 436 (Prosser, J., concurring).  It is therefore not an appropriate case in which to exercise our original jurisdiction.  Accordingly,

IT IS ORDERED that the petition for leave to commence an original action is denied; and

IT IS FURTHER ORDERED that the motion to intervene is denied as moot.

BRIAN HAGEDORN, J.,  (concurring).  The Wisconsin Voters Alliance and a group of Wisconsin voters bring a petition for an original action raising a variety of questions about the operation of the November 3, 2020 presidential election.  Some of these legal issues may, under other circumstances, be subject to further judicial consideration.  But the real stunner here is the sought-after remedy.  We are invited to invalidate the entire presidential election in Wisconsin by declaring it "null"—yes, the whole thing.  And there's more.  We should, we are told, enjoin the Wisconsin Elections Commission from certifying the election so that Wisconsin's presidential electors can be chosen by the legislature instead, and then compel the Governor to certify those electors.  At least no one can accuse the petitioners of timidity.

Such a move would appear to be unprecedented in American history.  One might expect that this solemn request would be paired with evidence of serious errors tied to a substantial and demonstrated set of illegal votes.  Instead, the evidentiary support rests almost entirely on the unsworn expert report[1] of a former campaign employee that offers statistical estimates based on call center samples and social media research.

This petition falls far short of the kind of compelling evidence and legal support we would undoubtedly need to countenance the court-ordered disenfranchisement of every Wisconsin voter.  The petition does not even justify the exercise of our original jurisdiction.

As an initial matter, the Wisconsin Supreme Court is not a fact-finding tribunal.  Yet the petition depends upon disputed factual claims.  In other words, we couldn't just accept one side's description of the facts or one side's expert report even if we were inclined to believe them.[2]  That alone means this case is not well-suited for an original action.  The petition's legal support is no less wanting.  For example, it does not explain why its challenge to various election processes

---

[1] After filing their petition for original action, the Petitioners submitted a second expert report.  But the second report only provides additional computations based on the assumptions and calculations in the initial expert report.

[2] The Attorney General and Governor offer legitimate arguments that this report would not even be admissible evidence under Wis. Stat. § 907.02 (2017-18).

All subsequent references to the Wisconsin Statutes are to the 2017-18 version.

comes after the election, and not before.  Nor does it grapple with how voiding the presidential election results would impact every other race on the ballot, or consider the import of election statutes that may provide the "exclusive remedy."[3]  These are just a few of the glaring flaws that render the petition woefully deficient.  I therefore join the court's order denying the original action.

Nonetheless, I feel compelled to share a further observation.  Something far more fundamental than the winner of Wisconsin's electoral votes is implicated in this case.  At stake, in some measure, is faith in our system of free and fair elections, a feature central to the enduring strength of our constitutional republic.  It can be easy to blithely move on to the next case with a petition so obviously lacking, but this is sobering.  The relief being sought by the petitioners is the most dramatic invocation of judicial power I have ever seen.  Judicial acquiescence to such entreaties built on so flimsy a foundation would do indelible damage to every future election.  Once the door is opened to judicial invalidation of presidential election results, it will be awfully hard to close that door again.  This is a dangerous path we are being asked to tread.  The loss of public trust in our constitutional order resulting from the exercise of this kind of judicial power would be incalculable.

I do not mean to suggest this court should look the other way no matter what.  But if there is a sufficient basis to invalidate an election, it must be established with evidence and arguments commensurate with the scale of the claims and the relief sought.  These petitioners have come nowhere close.  While the rough and tumble world of electoral politics may be the prism through which many view this litigation, it cannot be so for us.  In these hallowed halls, the law must rule.

Our disposal of this case should not be understood as a determination or comment on the merits of the underlying legal issues; judicial review of certain Wisconsin election practices may be appropriate.  But this petition does not merit further consideration by this court, much less grant us a license to invalidate every single vote cast in Wisconsin's 2020 presidential election.

I am authorized to state that Justices ANN WALSH BRADLEY, REBECCA FRANK DALLET, and JILL J. KAROFSKY join this concurrence.

ROGGENSACK, C.J.  (*dissenting*).  It is critical that voting in Wisconsin elections not only be fair, but that the public also perceives voting as having been fairly conducted.

This is the third time that a case filed in this court raised allegations about purely legal questions that concern Wisconsin Elections Commission (WEC) conduct during the November 3,

---

[3] See Wis. Stat. § 9.01(11) (providing that § 9.01 "constitutes the exclusive judicial remedy for testing the right to hold an elective office as the result of an alleged irregularity, defect or mistake committed during the voting or canvassing process"); Wis. Stat. § 5.05(2m)(k) (describing "[t]he commission's power to initiate civil actions" under § 5.05(2m) as the "exclusive remedy for alleged civil violations of chs. 5 to 10 or 12").

2020, presidential election.[4]  This is the third time that a majority of this court has turned its back on pleas from the public to address a matter of statewide concern that requires a declaration of what the statutes require for absentee voting.  I dissent and write separately because I have concluded that the court has not meet its institutional responsibilities by repeatedly refusing to address legal issues presented in all three cases.

I agree with Justice Hagedorn that we are not a circuit court, and therefore, generally, we do not take cases for which fact-finding is required.  Green for Wisconsin v. State Elections Bd., 2006 WI 120, 297 Wis. 2d 300, 301, 723 N.W.2d 418.  However, when the legal issue that we wish to address requires it, we have taken cases that do require factual development, referring any necessary factual determinations to a referee or to a circuit court.  State ex rel. LeFebre v. Israel, 109 Wis. 2d 337, 339, 325 N.W.2d 899 (1982); State ex rel White v. Gray, 58 Wis. 2d 285, 286, 206 N.W.163 (1973).

We also have taken cases where the issues we wish to address are purely legal questions for which no factual development is required in order to state what the law requires.  Wisconsin Legislature v. Palm, 2020 WI 42, 391 Wis. 2d 497, 942 N.W.2d 900.  The statutory authority of WEC is a purely legal question. There is no factual development required for us to declare what the law requires in absentee voting.

Justice Hagedorn is concerned about some of the relief that Petitioners request.  He begins his concurrence saying, "the real stunner here is the sought after remedy."  He next relates, "The relief being sought by the petitioners is the most dramatic invocation of judicial power I have ever seen."  Then, he concludes with, "this petition does not merit further consideration by this court, much less grant us a license to invalidate every single vote cast in Wisconsin's 2020 presidential election."[5]

Those are scary thoughts, but Justice Hagedorn has the cart before the horse in regard to our consideration of this petition for an original action.  We grant petitions to exercise our jurisdiction based on whether the legal issues presented are of state wide concern, not based on the remedies requested.  Petition of Heil, 230 Wis. 428, 284 N.W.42 (1938).

Granting a petition does not carry with it the court's view that the remedy sought is appropriate for the legal issues raised.  Historically, we often do not provide all the relief requested.  Bartlett v. Evers, 2020 WI 68, ¶9, 393 Wis. 2d 172, 945 N.W.2d 685 (upholding some but not all partial vetoes).  There have been occasions when we have provided none of the relief requested by the petitioner, but nevertheless declared the law.  See Sands v. Menard, Inc., 2010 WI 96, ¶46, 328 Wis. 2d 647, 787 N.W.2d 384 (concluding that while reinstatement is the preferred remedy under

---

[4] Trump v. Evers, No. 2020AP1971-OA, unpublished order (Wis. S. Ct. Dec. 3, 2020); Mueller v. WEC, No. 2020AP1958-OA, unpublished order (Wis. S. Ct. Dec. 3, 2020) and Wisconsin Voters Alliance v. WEC, No. 2020AP193-OA.

[5] Justice Hagedorn forgets to mention that one form of relief sought by Petitioners is, "Any other relief the Court deems appropriate."

Title VII, it is an equitable remedy that may or may not be appropriate); <u>Coleman v. Percy</u>, 96 Wis. 2d 578, 588-89, 292 N.W.2d 615 (1980) (concluding that the remedy Coleman sought was precluded).

We have broad subject matter jurisdiction that enables us to grant the petition for original action pending before us. Our jurisdiction is grounded in the Wisconsin Constitution. Wis. Const., art. VII, Section 3(2); <u>City of Eau Claire v. Booth</u>, 2016 WI 65, ¶7, 370 Wis. 2d 595, 882 N.W.2d 738.

I dissent because I would grant the petition and address the people of Wisconsin's concerns about whether WEC's conduct during the 2020 presidential election violated Wisconsin statutes. As I said as I began, it is critical that voting in Wisconsin elections not only be fair, but that the public also perceives voting as having been fairly conducted. The Wisconsin Supreme Court should not walk away from its constitutional obligation to the people of Wisconsin for a third time.

I am authorized to state that Justices ANNETTE KINGSLAND ZIEGLER and REBECCA GRASSL BRADLEY join this dissent.

---

Sheila T. Reiff
Clerk of Supreme Court

<u>Address list continued</u>:

| | |
|---|---|
| Tearman Spencer | Jeffrey A. Mandell |
| Mary L. Schanning | Rachel E. Snyder |
| Scott F. Brown | Stafford Rosenbaum LLP |
| Kathryn Z. Block | 222 W. Washington Avenue |
| Patrick J. McClain | Post Office Box 1784 |
| Tyrone M. St. Junior | Madison, WI 53701 |
| James M. Carroll | |
| Milwaukee City Attorney's Office | Charles G. Curtis, Jr. |
| 200 East Wells Street | Sopen B. Shah |
| 800 City Hall | Will M. Conley |
| Milwaukee, WI 53202 | Perkins Coie LLP |
| | One East Main St., Ste. 201 |
| Kendall W. Harrison | Madison, WI 53703 |
| Mike B. Wittenwyler | |
| Godfrey & Kahn | Matthew W. O'Neill |
| 1 E. Main St., Ste 500 | Fox, O'Neill & Shannon, S.C. |
| P.O. Box 2719 | 622 North Water Street Suite 500 |
| Madison, WI 53701-2719 | Milwaukee, WI 53202 |

Joshua Matz
Harmann Singh
350 Fifth Avenue, Suite 7110
New York, NY 10118

Justin A. Nelson
Stephen Shackelford Jr.
Davida Brook
Susman Godfrey LLP
1000 Louisiana Street
Suite 5100
Houston, TX 77002

Paul Smith
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005

David S. Lesser
Jamie Dycus
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Marc E. Elias
John Devaney
Zachary J. Newkirk
Perkins Coie LLP
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005

Seth P. Waxman
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006

Exhibit 2



OFFICE OF THE CLERK

# 𝔖𝔲𝔭𝔯𝔢𝔪𝔢 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔚𝔦𝔰𝔠𝔬𝔫𝔰𝔦𝔫

110 EAST MAIN STREET, SUITE 215
P.O. BOX 1688
MADISON, WI 53701-1688

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

December 3, 2020

To:

R. George Burnett
Conway, Olejniczak & Jerry, SC
P.O. Box 23200
Green Bay, WI 54305-3200

James R. Troupis
Troupis Law Office, LLC
4126 Timber Lane
Cross Plains, WI 53528

Margaret C. Daun
Milwaukee County Corporation Counsel
901 N. 9th Street, Room 303
Milwaukee, WI 53233

Joshua L. Kaul
Thomas C. Bellavia
Colin T. Roth
Colin R. Stroud
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857

David R. Gault
Assistant Corporation Counsel
Office of the Dane County Corporation
Counsel
210 Martin Luther King, Jr. Blvd., Room 419
Madison, WI 53703-3345

*Address list continued on page 9.

You are hereby notified that the Court has entered the following order:

No. 2020AP1971-OA        Trump v. Evers

     A petition for leave to commence an original action under Wis. Stat. § (Rule) 809.70, a supporting legal memorandum, and an appendix have been filed on behalf of petitioners, Donald J. Trump, et al.  Responses to the petition have been filed by (1) Governor Tony Evers; (2) the Wisconsin Elections Commission and its Chair, Ann S. Jacobs; (3) Scott McDonell, Dane County Clerk, and Alan A. Arnsten and Joyce Waldrop, members of the Dane County Board of Canvassers; and (4) George L. Christensen, Milwaukee County Clerk, and Timothy H. Posnanski, Richard Baas, and Dawn Martin, members of the Milwaukee County Board of Canvassers. A non-party brief in support of the petition has been filed by the Liberty Justice Center.  A motion to intervene, a proposed response of proposed respondents-intervenors, and an appendix have been filed by the Democratic National Committee (DNC) and Margaret J. Andrietsch, Sheila Stubbs,

Ronald Martin, Mandela Barnes, Khary Penebaker, Mary Arnold, Patty Schachtner, Shannon Holsey, and Benjamin Wikler (collectively, "the Biden electors"). The court having considered all of the filings,

IT IS ORDERED that the petition for leave to commence an original action is denied. One or more appeals from the determination(s) of one or more boards of canvassers or from the determination of the chairperson of the Wisconsin Elections Commission may be filed by an aggrieved candidate in circuit court. Wis. Stat. § 9.01(6); and

IT IS FURTHER ORDERED that the motion to intervene is denied as moot.

BRIAN HAGEDORN, J. (*concurring*). I understand the impulse to immediately address the legal questions presented by this petition to ensure the recently completed election was conducted in accordance with the law. But challenges to election results are also governed by law. All parties seem to agree that Wis. Stat. § 9.01 (2017–18)[1] constitutes the "exclusive judicial remedy" applicable to this claim. § 9.01(11). After all, that is what the statute says. This section provides that these actions should be filed in the circuit court, and spells out detailed procedures for ensuring their orderly and swift disposition. See § 9.01(6)–(8). Following this law is not disregarding our duty, as some of my colleagues suggest. It is following the law.

Even if this court has constitutional authority to hear the case straightaway, notwithstanding the statutory text, the briefing reveals important factual disputes that are best managed by a circuit court.[2] The parties clearly disagree on some basic factual issues, supported at times by competing affidavits. I do not know how we could address all the legal issues raised in the petition without sorting through these matters, a task we are neither well-positioned nor institutionally designed to do. The statutory process assigns this responsibility to the circuit court. Wis. Stat. § 9.01(8)(b) ("The [circuit] court shall separately treat disputed issues of procedure, interpretations of law, and findings of fact.").

We do well as a judicial body to abide by time-tested judicial norms, even—and maybe especially—in high-profile cases. Following the law governing challenges to election results is no threat to the rule of law. I join the court's denial of the petition for original action so that the petitioners may promptly exercise their right to pursue these claims in the manner prescribed by the legislature.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2017–18 version.

[2] The legislature generally can and does set deadlines and define procedures that circumscribe a court's competence to act in a given case. Village of Trempealeau v. Mikrut, 2004 WI 79, ¶¶9–10, 273 Wis. 2d 76, 681 N.W.2d 190. The constitution would obviously override these legislative choices where the two conflict.

PATIENCE DRAKE ROGGENSACK, C.J.    *(dissenting).*    Before us is an emergency petition for leave to commence an original action brought by President Trump, Vice President Pence and Donald Trump for President, Inc., against Governor Evers, the Wisconsin Elections Commission (WEC), its members and members of both the Milwaukee County Board of Canvassers and the Dane County Board of Canvassers. The Petitioners allege that the WEC and election officials caused voters to violate various statutes in conducting Wisconsin's recent presidential election. The Petitioners raised their concerns during recount proceedings in Dane County and Milwaukee County. Their objections were overruled in both counties.

The Respondents argue, in part, that we lack subject matter jurisdiction because of the "exclusive judicial remedy" provision found in Wis. Stat. § 9.01(11) (2017-18).[3]    Alternatively, the Respondents assert that we should deny this petition because fact-finding is required, and we are not a fact-finding tribunal.

I conclude that we have subject matter jurisdiction that enables us to grant the petition for original action pending before us. Our jurisdiction arises from the Wisconsin Constitution and cannot be impeded by statute. Wis. Const., art. VII, Section 3(2); City of Eau Claire v. Booth, 2016 WI 65, ¶7, 370 Wis. 2d 595, 882 N.W.2d 738. Furthermore, time is of the essence.

However, fact-finding may be central to our evaluation of some of the questions presented. I agree that the circuit court should examine the record presented during the canvasses to make factual findings where legal challenges to the vote turn on questions of fact. However, I dissent because I would grant the petition for original action, refer for necessary factual findings to the circuit court, who would then report its factual findings to us, and we would decide the important legal questions presented.

I also write separately to emphasize that by denying this petition, and requiring both the factual questions and legal questions be resolved first by a circuit court, four justices of this court are ignoring that there are significant time constraints that may preclude our deciding significant legal issues that cry out for resolution by the Wisconsin Supreme Court.

## I.  DISCUSSION

The Petitioners set out four categories of absentee votes that they allege should not have been counted because they were not lawfully cast:  (1) votes cast during the 14-day period for in-person absentee voting at a clerk's office with what are alleged to be insufficient written requests for absentee ballots, pursuant to Wis. Stat. § 6.86(1)(b); (2) votes cast when a clerk has completed information missing from the ballot envelope, contrary to Wis. Stat. § 6.87(6d); (3) votes cast by those who obtained an absentee ballot after March 25, 2020 by alleging that they were indefinitely

---

[3] All subsequent references to the Wisconsin Statutes are to the 2017–18 version.

confined; and (4) votes cast in Madison at "Democracy in the Park" events on September 26 and October 3, in advance of the 14-day period before the election, contrary to Wis. Stat. § 6.87.

Some of the Respondents have asserted that WEC has been advising clerks to add missing information to ballot envelopes for years, so the voters should not be punished for following WEC's advice. They make similar claims for the collection of votes more than 14 days before the November 3 election.

If WEC has been giving advice contrary to statute, those acts do not make the advice lawful. WEC must follow the law. We, as the law declaring court, owe it to the public to declare whether WEC's advice is incorrect. However, doing so does not necessarily lead to striking absentee ballots that were cast by following incorrect WEC advice. The remedy Petitioners seek may be out of reach for a number of reasons.

Procedures by which Wisconsin elections are conducted must be fair to all voters. This is an important election, but it is not the last election in which WEC will be giving advice. If we do not shoulder our responsibilities, we leave future elections to flounder and potentially result in the public's perception that Wisconsin elections are unfair. The Wisconsin Supreme Court can uphold elections by examining the procedures for which complaint was made here and explaining to all where the WEC was correct and where it was not.

I also am concerned that the public will misunderstand what our denial of the petition means. Occasionally, members of the public seem to believe that a denial of our acceptance of a case signals that the petition's allegations are either false or not serious. Nothing could be further from the truth. Indeed, sometimes, we deny petitions even when it appears that a law has been violated. Hawkins v. Wis. Elec. Comm'n, 2020 WI 75, ¶¶14–16, 393 Wis. 2d 629, 948 N.W.2d 877 (Roggensack, C.J., dissenting).

## II. CONCLUSION

I conclude that we have subject matter jurisdiction that enables us to grant the petition for original action pending before us. Our jurisdiction arises from the Wisconsin Constitution and cannot be impeded by statute. Wis. Const., art. VII, Section 3(2); City of Eau Claire, 370 Wis. 2d 595, ¶7. Furthermore, time is of the essence.

However, fact-finding may be central to our evaluation of some of the questions presented. I agree that the circuit court should examine the record presented during the canvasses to make factual findings where legal challenges to the vote turn on questions of fact. However, I dissent because I would grant the petition for original action, refer for necessary factual findings to the circuit court, who would then report its factual findings to us, and we would decide the important legal questions presented.

I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.

REBECCA GRASSL BRADLEY, J.   (*dissenting*).   "It is emphatically the province and duty of the Judicial Department to say what the law is."  Marbury v. Madison, 5 U.S. 137, 177 (1803).  The Wisconsin Supreme Court forsakes its duty to the people of Wisconsin in declining to decide whether election officials complied with Wisconsin's election laws in administering the November 3, 2020 election.  Instead, a majority of this court passively permits the Wisconsin Elections Commission (WEC) to decree its own election rules, thereby overriding the will of the people as expressed in the election laws enacted by the people's elected representatives.  Allowing six unelected commissioners to make the law governing elections, without the consent of the governed, deals a death blow to democracy.  I dissent.

The President of the United States challenges the legality of the manner in which certain Wisconsin election officials directed the casting of absentee ballots, asserting they adopted and implemented particular procedures in violation of Wisconsin law.  The respondents implore this court to reject the challenge because, they argue, declaring the law at this point would "retroactively change the rules" after the election.  It is THE LAW that constitutes "the rules" of the election and election officials are bound to follow the law, if we are to be governed by the rule of law, and not of men.

Under the Wisconsin Constitution, "all governmental power derives 'from the consent of the governed' and government officials may act only within the confines of the authority the people give them.  Wis. Const. art. I, § 1."  Wisconsin Legislature v. Palm, 2020 WI 42, ¶66, 391 Wis. 2d 497, 942 N.W.2d 900 (Rebecca Grassl Bradley, J., concurring).  The Founders designed our "republic to be a government of laws, and not of men . . . bound by fixed laws, which the people have a voice in making, and a right to defend."  John Adams, Novanglus: A History of the Dispute with America, from Its Origin, in 1754, to the Present Time, in Revolutionary Writings of John Adams (C. Bradley Thompson ed. 2000) (emphasis in original).  Allowing any person, or unelected commission of six, to be "bound by no law or limitation but his own will" defies the will of the people.  Id.

The importance of having the State's highest court resolve the significant legal issues presented by the petitioners warrants the exercise of this court's constitutional authority to hear this case as an original action.  See Wis. Const. Art. VII, § 3.   "The purity and integrity of elections is a matter of such prime importance, and affects so many important interests, that the courts ought never to hesitate, when the opportunity is offered, to test them by the strictest legal standards."  State v. Conness, 106 Wis. 425, 82 N.W. 288, 289 (1900).  While the court reserves this exercise of its jurisdiction for those original actions of statewide significance, it is beyond dispute that "[e]lections are the foundation of American government and their integrity is of such monumental importance that any threat to their validity should trigger not only our concern but our prompt action."  State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued June 1, 2020 (Rebecca Grassl Bradley, J., dissenting)).

The majority notes that an action "may be filed by an aggrieved candidate in circuit court.  Wis. Stat. § 9.01(6)."  Justice Hagedorn goes so far as to suggest that § 9.01 "constitutes the 'exclusive judicial remedy' applicable to this claim."  No statute, however, can circumscribe the

constitutional jurisdiction of the Wisconsin Supreme Court to hear this (or any) case as an original action.     "The Wisconsin Constitution IS the law—and it reigns supreme over any statute." Wisconsin Legislature v. Palm, 391 Wis. 2d 497, ¶67 n.3 (Rebecca Grassl Bradley, J., concurring). "The Constitution's supremacy over legislation bears repeating:  'the Constitution is to be considered in court as a paramount law' and 'a law repugnant to the Constitution is void, and . . . courts, as well as other departments, are bound by that instrument.'  See Marbury [v. Madison], 5 U.S. (1 Cranch) [137] at 178, 180 [1803])."  Mayo v. Wis. Injured Patients and Families Comp. Fund, 2018 WI 78, ¶91, 383 Wis. 2d 1, 914 N.W.2d 678 (Rebecca Grassl Bradley, J., concurring). Wisconsin Statute § 9.01 is compatible with the constitution.  While it provides an avenue for aggrieved candidates to pursue an appeal to a circuit court after completion of the recount determination, it does not foreclose the candidate's option to ask this court to grant his petition for an original action.  Any contrary reading would render the law in conflict with the constitution and therefore void.  Under the constitutional-doubt canon of statutory interpretation, "[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt."  Antonin Scalia & Brian A. Garner, Reading Law:  The Interpretation of Legal Texts 247.  See also Wisconsin Legislature v. Palm, 391 Wis. 2d 497, ¶31 ("[W]e disfavor statutory interpretations that unnecessarily raise serious constitutional questions about the statute under consideration.").

While some will either celebrate or decry the court's inaction based upon the impact on their preferred candidate, the importance of this case transcends the results of this particular election.  "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."  Purcell v. Gonzalez, 549 U.S. 1, 4 (2006).  The majority takes a pass on resolving the important questions presented by the petitioners in this case, thereby undermining the public's confidence in the integrity of Wisconsin's electoral processes not only during this election, but in every future election.  Alarmingly, the court's inaction also signals to the WEC that it may continue to administer elections in whatever manner it chooses, knowing that the court has repeatedly declined to scrutinize its conduct.  Regardless of whether the WEC's actions affect election outcomes, the integrity of every election will be tarnished by the public's mistrust until the Wisconsin Supreme Court accepts its responsibility to declare what the election laws say.  "Only . . . the supreme court can provide the necessary clarity to guide all election officials in this state on how to conform their procedures to the law" going forward.  State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued January 13, 2020 (Rebecca Grassl Bradley, J., dissenting)).

The majority's recent pattern of deferring or altogether dodging decisions on election law controversies[4] cannot be reconciled with its lengthy history of promptly hearing cases involving

_____

[4] Hawkins v. Wis. Elec. Comm'n, 2020 WI 75, ¶¶84, 86, 393 Wis. 2d 629, 948 N.W.2d 877 (Rebecca Grassl Bradley, J., dissenting) ("The majority upholds the Wisconsin Elections Commission's violation of Wisconsin law, which irrefutably entitles Howie Hawkins and Angela Walker to appear on Wisconsin's November 2020 general election ballot as candidates for President and Vice President of the United States . . . .  In dodging its responsibility to uphold the rule of law, the majority ratifies a grave threat to our republic, suppresses the votes of

Page 7
December 3, 2020
No. 2020AP1971-OA  <u>Trump v. Evers</u>

voting rights and election processes under the court's original jurisdiction or by bypassing the court of appeals.[5]  While the United States Supreme Court has recognized that "a state indisputably has a compelling interest in preserving the integrity of its election process[,]" <u>Burson v. Freeman</u>, 504 U.S. 191, 199 (1992), the majority of this court repeatedly demonstrates a lack of any interest in doing so, offering purely discretionary excuses or no reasoning at all.  This year, the majority in <u>Hawkins v. Wis. Elec. Comm'n</u> declined to hear a claim that the WEC unlawfully kept the Green Party's candidates for President and Vice President off of the ballot, ostensibly because the majority felt the candidates' claims were brought "too late."[6]  But when litigants have filed cases involving voting rights well in advance of Wisconsin elections, the court has "take[n] a pass,"

---

Wisconsin citizens, irreparably impairs the integrity of Wisconsin's elections, and undermines the confidence of American citizens in the outcome of a presidential election"); <u>State ex rel. Zignego v. Wis. Elec. Comm'n</u>, 2020AP123-W (S. Ct. Order issued January 13, 2020 (Rebecca Grassl Bradley, J., dissenting)) ("In declining to hear a case presenting issues of first impression immediately impacting the voting rights of Wisconsin citizens and the integrity of impending elections, the court shirks its institutional responsibilities to the people who elected us to make important decisions, thereby signaling the issues are not worthy of our prompt attention."); <u>State ex rel. Zignego v. Wis. Elec. Comm'n</u>, 2020AP123-W (S. Ct. Order issued June 1, 2020 (Rebecca Grassl Bradley, J., dissenting)) ("A majority of this court disregards its duty to the people we serve by inexplicably delaying the final resolution of a critically important and time-sensitive case involving voting rights and the integrity of Wisconsin's elections.").

 [5] <u>See, e.g.</u>, <u>NAACP v. Walker</u>, 2014 WI 98, ¶¶1, 18, 357 Wis. 2d 469, 851 N.W.2d 262 (2014) (this court took jurisdiction of appeal on its own motion in order to decide constitutionality of the voter identification act enjoined by lower court); <u>Elections Bd. of Wisconsin v. Wisconsin Mfrs. & Commerce</u>, 227 Wis. 2d 650, 653, 670, 597 N.W.2d 721 (1999) (this court granted bypass petition to decide whether express advocacy advertisements advocating the defeat or reelection of incumbent legislators violated campaign finance laws, in absence of cases interpreting applicable statutes); <u>State ex rel. La Follette v. Democratic Party of United States</u>, 93 Wis. 2d 473, 480-81, 287 N.W.2d 519 (1980) (original action deciding whether Wisconsin open primary system was binding on national political parties or infringed their freedom of association), <u>rev'd</u>, <u>Democratic Party of United States v. Wisconsin ex rel. La Follette</u>, 450 U.S. 107 (1981); <u>State ex rel. Reynolds v. Zimmerman</u>, 22 Wis. 2d 544, 548, 126 N.W.2d 551 (1964) (original action seeking to enjoin state from holding elections pursuant to legislative apportionment alleged to violate constitutional rights); <u>State ex rel. Broughton v. Zimmerman</u>, 261 Wis. 398, 400, 52 N.W.2d 903 (1952) (original action to restrain the state from holding elections based on districts as defined prior to enactment of reapportionment law), <u>overruled in part by Reynolds</u>, 22 Wis. 2d 544; <u>State ex rel. Conlin v. Zimmerman</u>, 245 Wis. 475, 476, 15 N.W.2d 32 (1944) (original action to interpret statutes in determining whether candidate for Governor timely filed papers to appear on primary election ballot).

 [6] <u>Hawkins v. Wis. Elec. Comm'n</u>, 2020 WI 75, ¶5, 393 Wis. 2d 629, 948 N.W.2d 877 (denying the petition for leave to commence an original action).

thereby "irreparably den[ying] the citizens of Wisconsin a timely resolution of issues that impact voter rights and the integrity of our elections."  State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued January 13, 2020 (Rebecca Grassl Bradley, J., dissenting)). Having neglected to identify any principles guiding its decisions, the majority leaves Wisconsin's voters and candidates guessing as to when, exactly, they should file their cases in order for the majority to deem them worthy of the court's attention.

The consequence of the majority operating by whim rather than rule is to leave the interpretation of multiple election laws in flux—or worse yet, in the hands of the unelected members of the WEC.  "To be free is to live under a government by law . . . .  Miserable is the condition of individuals, danger is the condition of the state, if there is no certain law, or, which is the same thing, no certain administration of the law . . . ."  Judgment in Rex vs. Shipley, 21 St Tr 847 (K.B. 1784) (Lord Mansfield presiding).  The Wisconsin Supreme Court has an institutional responsibility to decide important questions of law—not for the benefit of particular litigants, but for citizens we were elected to serve.  Justice for the people of Wisconsin means ensuring the integrity of Wisconsin's elections.  A majority of this court disregards its duty to the people of Wisconsin, denying them justice.

"No aspect of the judicial power is more fundamental than the judiciary's exclusive responsibility to exercise judgment in cases and controversies arising under the law."  Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶37, 376 Wis. 2d 147, 897 N.W.2d 384.  Once again, a majority of this court instead "chooses to sit idly by,"[7] in a nationally important and time-sensitive case involving voting rights and the integrity of Wisconsin's elections, depriving the people of Wisconsin of answers to questions of statutory law that only the state's highest court may resolve.  The majority's "refusal to hear this case shows insufficient respect to the State of [Wisconsin], its voters,"[8] and its elections.

"This great source of free government, popular election, should be perfectly pure."  Alexander Hamilton, Speech at New York Ratifying Convention (June 21, 1788), in Debates on the Federal Constitution 257 (J. Elliot ed. 1876).  The majority's failure to act leaves an indelible stain on our most recent election.  It will also profoundly and perhaps irreparably impact all local, statewide, and national elections going forward, with grave consequence to the State of Wisconsin and significant harm to the rule of law.  Petitioners assert troubling allegations of noncompliance with Wisconsin's election laws by public officials on whom the voters rely to ensure free and fair elections.  It is not "impulse"[9] but our solemn judicial duty to say what the law is that compels the exercise of our original jurisdiction in this case.  The majority's failure to embrace its duty (or even

---

[7] United Student Aid Funds, Inc. v. Bible, 136 S. Ct. 1607, 1609 (2016) (Thomas, J., dissenting from the denial of certiorari).

[8] County of Maricopa, Arizona v. Lopez-Valenzuela, 135 S. Ct. 2046, 2046 (2015) (Thomas, J., dissenting from the denial of certiorari).

[9] See Justice Hagedorn's concurrence.

an impulse) to decide this case risks perpetuating violations of the law by those entrusted to follow it.  I dissent.

I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK and Justice ANNETTE KINGSLAND ZIEGLER join this dissent.

Sheila T. Reiff
Clerk of Supreme Court

Address list continued:

Andrew A. Jones
Andrew J. Kramer
James F. Cirincione
Hansen Reynolds LLC
301 N. Broadway St., Ste. 400
Milwaukee, WI 53202-2660

John W. McCauley
Hansen Reynolds LLC
10 E. Doty St. Ste 800
Madison, WI 53703

Jeffrey A. Mandell
Rachel E. Snyder
Stafford Rosenbaum LLP
222 W. Washington Avenue
Post Office Box 1784
Madison, WI 53701

Daniel R. Suhr
Liberty Justice Center
190 LaSalle St., Ste. 1500
Chicago, IL 60603

Matthew W. O'Neill
Fox, O'Neill & Shannon, S.C.
622 North Water Street, Suite 500
Milwaukee, WI 53202

Charles G. Curtis
Michelle M. Umberger
Sopen B. Shah
Will M. Conley
Perkins Coie LLP
One East Main St., Suite 201
Madison, WI 53703

Justin A. Nelson
Stephen Shackelford Jr.
Davida Brook
Susman Godfrey LLP
1000 Louisiana Street
Suite 5100
Houston, TX 77002

Paul Smith
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005

David S. Lesser
Jamie Dycus
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Marc E. Elias                           Seth P. Waxman
John Devaney                            Wilmer Cutler Pickering Hale and Dorr LLP
Zachary J. Newkirk                      1875 Pennsylvania Ave., NW
Perkins Coie LLP                        Washington, DC 20006
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005

# Exhibit 3



OFFICE OF THE CLERK

# 𝔖𝔲𝔭𝔯𝔢𝔪𝔢 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔚𝔦𝔰𝔠𝔬𝔫𝔰𝔦𝔫

**110 EAST MAIN STREET, SUITE 215**
**P.O. BOX 1688**
**MADISON, WI  53701-1688**

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site:  www.wicourts.gov

December 3, 2020

To:

Joshua Kaul
Charlotte Gibson
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857

Karen L. Mueller
Amos Center for Justice and Liberty
18261 57th Avenue
Chippewa Falls, WI 54729

Charles G. Curtis
Michelle M. Umberger
Sopen B. Shah
Will M. Conley
Perkins Coie LLP
One East Main St., Ste. 201
Madison, WI 53703

Matthew W. O'Neill
Fox, O'Neill & Shannon, S.C.
622 North Water Street Suite 500
Milwaukee, WI 53202

*Address list continued on Page 2

You are hereby notified that the Court has entered the following order:

No. 2020AP1958-OA          Mueller v. Jacobs

A petition for leave to commence an original action under Wis. Stat. § (Rule) 809.70 has been filed on behalf of petitioner, Dean W. Mueller. A response has been filed by respondents, Ann S. Jacobs, in her official capacity as chair of the Wisconsin Elections Commission, et al. A motion to intervene has been filed by proposed intervenor-respondent, Democratic National Committee.  The court having considered all of the filings,

IT IS ORDERED that the petition for leave to commence an original action is denied; and

IT IS FURTHER ORDERED that the motion to intervene is denied as moot.

PATIENCE DRAKE ROGGENSACK, C.J., ANNETTE KINGSLAND ZIEGLER, J., and REBECCA GRASSL BRADLEY, J. (*dissenting*). This court cannot continue to shirk its institutional responsibilities to the people of Wisconsin.

Sheila T. Reiff
Clerk of Supreme Court

Address list continued:

David S. Lesser
Jamie Dycus
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Marc E. Elias
John Devaney
Zachary J. Newkirk
Perkins Coie LLP
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005

Seth P. Waxman
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006

# Exhibit 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KING, MARIAN ELLEN
SHERIDAN, JOHN EARL HAGGARD,
CHARLES JAMES RITCHARD,
JAMES DAVID HOOPER, and
DAREN WADE RUBINGH,

          Plaintiffs,

v.                                                                  Civil Case No. 20-13134
                                                                    Honorable Linda V. Parker
GRETCHEN WHITMER, in her official
capacity as Governor of the State of Michigan,
JOCELYN BENSON, in her official capacity as
Michigan Secretary of State, and MICHIGAN
BOARD OF STATE CANVASSERS,

          Defendants,

and

CITY OF DETROIT, DEMOCRATIC
NATIONAL COMMITTEE and
MICHIGAN DEMOCRATIC PARTY, and
ROBERT DAVIS,

          Intervenor-Defendants.
_____/

## <u>OPINION AND ORDER DENYING PLAINTIFFS' "EMERGENCY MOTION FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF" (ECF NO. 7)</u>

The right to vote is among the most sacred rights of our democracy and, in

turn, uniquely defines us as Americans. The struggle to achieve the right to vote is

1

one that has been both hard fought and cherished throughout our country's history. Local, state, and federal elections give voice to this right through the ballot. And elections that count each vote celebrate and secure this cherished right.

These principles are the bedrock of American democracy and are widely revered as being woven into the fabric of this country. In Michigan, more than 5.5 million citizens exercised the franchise either in person or by absentee ballot during the 2020 General Election. Those votes were counted and, as of November 23, 2020, certified by the Michigan Board of State Canvassers (also "State Board"). The Governor has sent the slate of Presidential Electors to the Archivist of the United States to confirm the votes for the successful candidate.

Against this backdrop, Plaintiffs filed this lawsuit, bringing forth claims of widespread voter irregularities and fraud in the processing and tabulation of votes and absentee ballots. They seek relief that is stunning in its scope and breathtaking in its reach. If granted, the relief would disenfranchise the votes of the more than 5.5 million Michigan citizens who, with dignity, hope, and a promise of a voice, participated in the 2020 General Election. The Court declines to grant Plaintiffs this relief.

## I.   Background

In the weeks leading up to, and on, November 3, 2020, a record 5.5 million Michiganders voted in the presidential election ("2020 General Election"). (ECF

2

No. 36-4 at Pg ID 2622.)  Many of those votes were cast by absentee ballot.  This was due in part to the coronavirus pandemic and a ballot measure the Michigan voters passed in 2018 allowing for no-reason absentee voting.  When the polls closed and the votes were counted, Former Vice President Joseph R. Biden, Jr. had secured over 150,000 more votes than President Donald J. Trump in Michigan. (*Id.*)

Michigan law required the Michigan State Board of Canvassers to canvass results of the 2020 General Election by November 23, 2020.  Mich. Comp. Laws § 168.842.  The State Board did so by a 3-0 vote, certifying the results "for the Electors of President and Vice President," among other offices.  (ECF No. 36-5 at Pg ID 2624.)  That same day, Governor Gretchen Whitmer signed the Certificates of Ascertainment for the slate of electors for Vice President Biden and Senator Kamala D. Harris.  (ECF No. 36-6 at Pg ID 2627-29.)  Those certificates were transmitted to and received by the Archivist of the United States.  (*Id.*)

Federal law provides that if election results are contested in any state, and if the state, prior to election day, has enacted procedures to decide controversies or contests over electors and electoral votes, and if these procedures have been applied, and the decisions are made at least six days before the electors' meetings, then the decisions are considered conclusive and will apply in counting the electoral votes.  3 U.S.C. § 5.  This date (the "Safe Harbor" deadline) falls on

3

December 8, 2020. Under the federal statutory timetable for presidential elections, the Electoral College must meet on "the first Monday after the second Wednesday in December," 3 U.S.C. § 7, which is December 14 this year.

Alleging widespread fraud in the distribution, collection, and counting of ballots in Michigan, as well as violations of state law as to certain election challengers and the manipulation of ballots through corrupt election machines and software, Plaintiffs filed the current lawsuit against Defendants at 11:48 p.m. on November 25, 2020—the eve of the Thanksgiving holiday. (ECF No. 1.) Plaintiffs are registered Michigan voters and nominees of the Republican Party to be Presidential Electors on behalf of the State of Michigan. (ECF No. 6 at Pg ID 882.) They are suing Governor Whitmer and Secretary of State Jocelyn Benson in their official capacities, as well as the Michigan Board of State Canvassers.

On November 29, a Sunday, Plaintiffs filed a First Amended Complaint (ECF No. 6), "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof" (ECF No. 7), and Emergency Motion to Seal (ECF No. 8). In their First Amended Complaint, Plaintiffs allege three claims pursuant to 42 U.S.C. § 1983: (Count I) violation of the Elections and Electors Clauses; (Count II) violation of the Fourteenth Amendment Equal Protection Clause; and, (Count III) denial of the Fourteenth

Amendment Due Process Clause.  (ECF No. 6.)  Plaintiffs also assert one count alleging violations of the Michigan Election Code.  (*Id*.)

By December 1, motions to intervene had been filed by the City of Detroit (ECF No. 15), Robert Davis (ECF No. 12), and the Democratic National Committee and Michigan Democratic Party ("DNC/MDP") (ECF No. 14).  On that date, the Court entered a briefing schedule with respect to the motions.  Plaintiffs had not yet served Defendants with their pleading or emergency motions as of December 1.  Thus, on December 1, the Court also entered a text-only order to hasten Plaintiffs' actions to bring Defendants into the case and enable the Court to address Plaintiffs' pending motions.  Later the same day, after Plaintiffs filed certificates of service reflecting service of the summons and Amended Complaint on Defendants (ECF Nos. 21), the Court entered a briefing schedule with respect to Plaintiffs' emergency motions, requiring response briefs by 8:00 p.m. on December 2, and reply briefs by 8:00 p.m. on December 3 (ECF No. 24).

On December 2, the Court granted the motions to intervene.  (ECF No. 28.) Response and reply briefs with respect to Plaintiffs' emergency motions were thereafter filed.  (ECF Nos. 29, 31, 32, 34, 35, 36, 37, 39, 49, 50.)  Amicus curiae Michigan State Conference NAACP subsequently moved and was granted leave to file a brief in support of Defendants' position.  (ECF Nos. 48, 55.)  Supplemental briefs also were filed by the parties.  (ECF Nos. 57, 58.)

5

In light of the limited time allotted for the Court to resolve Plaintiffs'

emergency motion for injunctive relief—which Plaintiffs assert "must be granted

in advance of December 8, 2020" (ECF No. 7 at Pg ID 1846)—the Court has

disposed of oral argument with respect to their motion pursuant to Eastern District

of Michigan Local Rule 7.1(f).[1]

## II.    Standard of Review

A preliminary injunction is "an extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v.*

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted).  The plaintiff

bears the burden of demonstrating entitlement to preliminary injunctive relief.

*Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).  Such relief will only be

granted where "the movant carries his or her burden of proving that the

circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban Cnty.*

*Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  "Evidence that goes beyond the

unverified allegations of the pleadings and motion papers must be presented to

---

[1] "'[W]here material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing.'"  *Nexus Gas Transmission, LLC v. City of Green, Ohio*, 757 Fed. Appx. 489, 496-97 (6th Cir. 2018) (quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007)) (citation omitted).

support or oppose a motion for a preliminary injunction."  11A Mary Kay Kane, Fed. Prac. & Proc.  § 2949 (3d ed.).

Four factors are relevant in deciding whether to grant preliminary injunctive relief: "'(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.'"  *Daunt v. Benson*, 956 F.3d 396, 406 (6th Cir. 2020) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012)).  "At the preliminary injunction stage, 'a plaintiff must show more than a mere possibility of success,' but need not 'prove his case in full.'"  *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007)).  Yet, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion …."  *Leary*, 228 F.3d at 739.

## III.   Discussion

The Court begins by discussing those questions that go to matters of subject matter jurisdiction or which counsel against reaching the merits of Plaintiffs' claims.  While the Court finds that any of these issues, alone, indicate that Plaintiffs' motion should be denied, it addresses each to be thorough.

## A.     Eleventh Amendment Immunity

The Eleventh Amendment to the United States Constitution provides:

> The judicial power of the United States shall not be
> construed to extend to any suit in law or equity,
> commenced or prosecuted against one of the United
> States by Citizens of another State, or by Citizens or
> Subjects of any Foreign State.

U.S. Const. amend. XI.  This immunity extends to suits brought by citizens against

their own states.  *See, e.g., Ladd v. Marchbanks*, 971 F.3d 574, 578 (6th Cir. 2020)

(citing *Hans v. Louisiana*, 134 U.S. 1, 18-19 (1890)).  It also extends to suits

against state agencies or departments, *Pennhurst State Sch. & Hosp. v. Halderman*,

465 U.S. 89, 100 (1984) (citations omitted), and "suit[s] against state officials

when 'the state is the real, substantial party in interest[,]'" *id.* at 101 (quoting *Ford*

*Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)).

A suit against a State, a state agency or its department, or a state official is in

fact a suit against the State and is barred "regardless of the nature of the relief

sought." *Pennhurst State Sch. & Hosp.*, 465 U.S. at 100-02 (citations omitted).

"'The general rule is that a suit is against the sovereign if the judgment sought

would expend itself on the public treasury or domain, or interfere with the public

administration, or if the effect of the judgment would be to restrain the

Government from acting, or to compel it to act.'" *Id.* at 101 n.11 (quoting *Dugan*

*v. Rank*, 372 U.S. 609, 620 (1963)) (internal quotation marks omitted).

8

Eleventh Amendment immunity is subject to three exceptions: (1) congressional abrogation; (2) waiver by the State; and (3) "a suit against a state official seeking prospective injunctive relief to end a continuing violation of federal law." *See Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002) (citations omitted). Congress did not abrogate the States' sovereign immunity when it enacted 42 U.S.C. § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). "The State of Michigan has not consented to being sued in civil rights actions in the federal courts." *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004) (citing *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986)). The Eleventh Amendment therefore bars Plaintiffs' claims against the Michigan Board of State Canvassers. *See McLeod v. Kelly*, 7 N.W.2d 240, 242 (Mich. 1942) ("The board of State canvassers is a State agency …"); *see also Deleeuw v. State Bd. of Canvassers*, 688 N.W.2d 847, 850 (Mich. Ct. App. 2004). Plaintiffs' claims are barred against Governor Whitmer and Secretary Benson unless the third exception applies.

The third exception arises from the Supreme Court's decision in *Ex parte Young*, 209 U.S. 123 (1908). But as the Supreme Court has advised:

> To interpret *Young* to permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle … that Eleventh Amendment immunity represents a real

> limitation on a federal court's federal-question
> jurisdiction.  The real interests served by the Eleventh
> Amendment are not to be sacrificed to elementary
> mechanics of captions and pleading.  Application of the
> *Young* exception must reflect a proper understanding of
> its role in our federal system and respect for state courts
> instead of a reflexive reliance on an obvious fiction.

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997).  Further, "the

theory of *Young* has not been provided an expansive interpretation."  *Pennhurst*

*State Sch. & Hosp.*, 465 U.S. at 102.  "'In determining whether the doctrine of *Ex*

*parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct

a straightforward inquiry into whether [the] complaint alleges an ongoing violation

of federal law and seeks relief properly characterized as prospective.'"  *Verizon*

*Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (quoting *Coeur d'Alene*

*Tribe of Idaho*, 521 U.S. 296 (O'Connor, J., concurring)).

    *Ex parte Young* does not apply, however, to *state law* claims against state

officials, regardless of the relief sought.  *Pennhurst State Sch. & Hosp.*, 465 U.S. at

106 ("A federal court's grant of relief against state officials on the basis of state

law, whether prospective or retroactive, does not vindicate the supreme authority

of federal law.  On the contrary, it is difficult to think of a greater intrusion on state

sovereignty than when a federal court instructs state officials on how to conform

their conduct to state law."); *see also In re Ohio Execution Protocol Litig*., 709 F.

App'x 779, 787 (6th Cir. 2017) ("If the plaintiff sues a state official under state law

10

in federal court for actions taken within the scope of his authority, sovereign immunity bars the lawsuit regardless of whether the action seeks monetary or injunctive relief.").  Unquestionably, Plaintiffs' state law claims against Defendants are barred by Eleventh Amendment immunity.

The Court then turns its attention to Plaintiffs' § 1983 claims against Defendants.  Defendants and Intervenor DNC/MDP contend that these claims are not in fact federal claims as they are premised entirely on alleged violations of *state* law.  (ECF No. 31 at Pg ID 2185 ("Here, each count of Plaintiffs' complaint—even Counts I, II, and III, which claim to raise violations of federal law—is predicated on the election being conducted contrary to Michigan law."); ECF No. 36 at Pg ID 2494 ("While some of [Plaintiffs'] allegations concern fantastical conspiracy theories that belong more appropriately in the fact-free outer reaches of the Internet[,] … what Plaintiffs assert at bottom are violations of the Michigan Election Code.")  Defendants also argue that even if properly stated as federal causes of action, "it is far from clear whether Plaintiffs' requested injunction is actually prospective in nature, as opposed to retroactive."  (ECF No. 31 at Pg ID 2186.)

The latter argument convinces this Court that *Ex parte Young* does not apply.  As set forth earlier, "'[i]n order to fall with the *Ex parte Young* exception, a claim must seek prospective relief to end a continuing violation of federal law.'"

11

*Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) (quoting *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013)).  Unlike *Russell*, which Plaintiffs cite in their reply brief, this is not a case where a plaintiff is seeking to enjoin the continuing enforcement of a statute that is allegedly unconstitutional. *See id.* at 1044, 1047 (plaintiff claimed that Kentucky law creating a 300-foot no-political-speech buffer zone around polling location violated his free-speech rights).  Instead, Plaintiffs are seeking to undo what has already occurred, as their requested relief reflects.[2]  (*See* ECF No. 7 at Pg ID 1847; *see also* ECF No. 6 at Pg 955-56.)

Before this lawsuit was filed, the Michigan Board of State Canvassers had already certified the election results and Governor Whitmer had transmitted the State's slate of electors to the United States Archivist.  (ECF Nos. 31-4, 31-5.) There is no continuing violation to enjoin.  *See Rios v. Blackwell*, 433 F. Supp. 2d 848 (N.D. Ohio Feb. 7, 2006); *see also King Lincoln Bronzeville Neighborhood Ass'n v. Husted*, No. 2:06-cv-00745, 2012 WL 395030, at *4-5 (S.D. Ohio Feb. 7, 2012); *cf. League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008) (finding that the plaintiff's claims fell within the *Ex parte Young* doctrine

---

[2] To the extent Plaintiffs ask the Court to certify the results in favor of President Donald J. Trump, such relief is beyond its powers.

12

where it alleged that the problems that plagued the election "are chronic and will continue absent injunctive relief").

For these reasons, the Court concludes that the Eleventh Amendment bars Plaintiffs' claims against Defendants.

## B.    Mootness

This case represents well the phrase: "this ship has sailed."  The time has passed to provide most of the relief Plaintiffs request in their Amended Complaint; the remaining relief is beyond the power of any court.  For those reasons, this matter is moot.

"'Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies.'"  *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 595 (6th Cir. 2014) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).  A case may become moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396, 410 (1980) (internal quotation marks and citation omitted).  Stated differently, a case is moot where the court lacks "the ability to give meaningful relief[.]"  *Sullivan v. Benningfield*, 920 F.3d 401, 410 (6th Cir. 2019).  This lawsuit was moot well before it was filed on November 25.

In their prayer for relief, Plaintiffs ask the Court to: (a) order Defendants to decertify the results of the election; (b) enjoin Secretary Benson and Governor

13

Whitmer from transmitting the certified election results to the Electoral College;
(c) order Defendants "to transmit certified election results that state that President
Donald Trump is the winner of the election"; (d) impound all voting machines and
software in Michigan for expert inspection; (e) order that no votes received or
tabulated by machines not certified as required by federal and state law be counted;
and, (f) enter a declaratory judgment that mail-in and absentee ballot fraud must be
remedied with a manual recount or statistically valid sampling.[3]  (ECF No. 6 at Pg
ID 955-56, ¶ 233.)  What relief the Court could grant Plaintiffs is no longer
available.

     Before this lawsuit was filed, all 83 counties in Michigan had finished
canvassing their results for all elections and reported their results for state office
races to the Secretary of State and the Michigan Board of State Canvassers in
accordance with Michigan law.  *See* Mich. Comp. Laws § 168.843.  The State
Board had certified the results of the 2020 General Election and Governor
Whitmer had submitted the slate of Presidential Electors to the Archivists.  (ECF

---

[3] Plaintiffs also seek an order requiring the impoundment of all voting machines
and software in Michigan for expert inspection and the production of security
camera footage from the TCF Center for November 3 and 4.  (ECF No. 6 at Pg ID
956, ¶ 233.)  This requested relief is not meaningful, however, where the remaining
requests are no longer available.  In other words, the evidence Plaintiffs seek to
gather by inspecting voting machines and software and security camera footage
only would be useful if an avenue remained open for them to challenge the election
results.

14

No. 31-4 at Pg ID 2257-58; ECF No. 31-5 at Pg ID 2260-63.)  The time for requesting a special election based on mechanical errors or malfunctions in voting machines had expired.  *See* Mich. Comp. Laws §§ 168.831, 168.832 (petitions for special election based on a defect or mechanical malfunction must be filed "no later than 10 days after the date of the election").  And so had the time for requesting a recount for the office of President.  *See* Mich. Comp. Laws § 168.879.

The Michigan Election Code sets forth detailed procedures for challenging an election, including deadlines for doing so.  Plaintiffs did not avail themselves of the remedies established by the Michigan legislature.  The deadline for them to do so has passed.  Any avenue for this Court to provide meaningful relief has been foreclosed.  As the Eleventh Circuit Court of Appeals recently observed in one of the many other post-election lawsuits brought to specifically overturn the results of the 2020 presidential election:

> "We cannot turn back the clock and create a world in which" the 2020 election results are not certified.  *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015).  And it is not possible for us to delay certification nor meaningful to order a new recount when the results are already final and certified.

*Wood v. Raffensperger*, -- F.3d -- , 2020 WL 7094866 (11th Cir. Dec. 5, 2020).  And as one Justice of the Supreme Court of Pennsylvania advised in another 2020 post-election lawsuit: "there is no basis in law by which the courts may grant Petitioners' request to ignore the results of an election and recommit the choice to

15

the General Assembly to substitute its preferred slate of electors for the one chosen

by a majority of Pennsylvania's voters." *Kelly v. Commonwealth*, No. 68 MAP

2020, 2020 WL 7018314, at *3 (Pa. Nov. 28, 2020) (Wecht, J., concurring); *see*

*also Wood v. Raffensperger*, No. 1:20-cv-04651, 2020 WL 6817513, at *13 (N.D.

Ga. Nov. 20, 2020) (concluding that "interfer[ing] with the result of an election

that has already concluded would be unprecedented and harm the public in

countless ways").

In short, Plaintiffs' requested relief concerning the 2020 General Election is

moot.

## C.   Laches

Defendants argue that Plaintiffs are unlikely to succeed on the merits

because they waited too long to knock on the Court's door.  (ECF No. 31 at Pg ID

2175-79; ECF No. 39 at Pg ID 2844.)  The Court agrees.

The doctrine of laches is rooted in the principle that "equity aids the vigilant,

not those who slumber on their rights."  *Lucking v. Schram*, 117 F.2d 160, 162 (6th

Cir. 1941); *see also United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 9

(2008) ("A constitutional claim can become time-barred just as any other claim

can.").  An action may be barred by the doctrine of laches if: (1) the plaintiff

delayed unreasonably in asserting his rights and (2) the defendant is prejudiced by

this delay.  *Brown-Graves Co. v. Central States, Se. and Sw. Areas Pension Fund*,

16

206 F.3d 680, 684 (6th Cir. 2000); *Ottawa Tribe of Oklahoma v. Logan*, 577 F.3d

634, 639 n.6 (6th Cir. 2009) ("Laches arises from an extended failure to exercise a

right to the detriment of another party.").  Courts apply laches in election cases.

*Detroit Unity Fund v. Whitmer*, 819 F. App'x 421, 422 (6th Cir. 2020) (holding

that the district court did not err in finding plaintiff's claims regarding deadline for

local ballot initiatives "barred by laches, considering the unreasonable delay on the

part of [p]laintiffs and the consequent prejudice to [d]efendants").  *Cf. Benisek v.*

*Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary

injunction must generally show reasonable diligence. That is as true in election law

cases as elsewhere.").

First, Plaintiffs showed no diligence in asserting the claims at bar.  They

filed the instant action on November 25—more than 21 days after the 2020

General Election—and served it on Defendants some five days later on December

1.  (ECF Nos. 1, 21.)  If Plaintiffs had legitimate claims regarding whether the

treatment of election challengers complied with state law, they could have brought

their claims well in advance of or on Election Day—but they did not.  Michigan's

83 Boards of County Canvassers finished canvassing by no later than November

17 and, on November 23, both the Michigan Board of State Canvassers and

Governor Whitmer certified the election results.  Mich. Comp. Laws §§ 168.822,

168.842.0.  If Plaintiffs had legitimate claims regarding the manner by which

ballots were processed and tabulated on or after Election Day, they could have

brought the instant action on Election Day or during the weeks of canvassing that

followed—yet they did not.  Plaintiffs base the claims related to election machines

and software on "expert and fact witness" reports discussing "glitches" and other

alleged vulnerabilities that occurred as far back as 2010.  (*See e.g.,* ECF No. 6 at

Pg ID 927-933, ¶¶ 157(C)-(E), (G), 158, 160, 167.)  If Plaintiffs had legitimate

concerns about the election machines and software, they could have filed this

lawsuit well before the 2020 General Election—yet they sat back and did nothing.

Plaintiffs proffer no persuasive explanation as to why they waited so long to

file this suit.  Plaintiffs concede that they "would have preferred to file sooner, but

[] needed some time to gather statements from dozens of fact witnesses, retain and

engage expert witnesses, and gather other data supporting their Complaint."  (ECF

No. 49 at Pg ID 3081.)  But according to Plaintiffs themselves, "[m]anipulation of

votes was apparent *shortly after the polls closed on November 3, 2020*."  (ECF No.

7 at Pg ID 1837 (emphasis added).)  Indeed, where there is no reasonable

explanation, there can be no true justification.  *See Crookston v. Johnson*, 841 F.3d

396, 398 (6th Cir. 2016) (identifying the "first and most essential" reason to issue a

stay of an election-related injunction is plaintiff offering "no reasonable

explanation for waiting so long to file this action").  Defendants satisfy the first

element of their laches defense.

Second, Plaintiffs' delay prejudices Defendants.  *See Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) ("As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made, and the candidate's claim to be a serious candidate who has received a serious injury becomes less credible by his having slept on his rights.") This is especially so considering that Plaintiffs' claims for relief are not merely last-minute—they are after the fact.  While Plaintiffs delayed, the ballots were cast; the votes were counted; and the results were certified.  The rationale for interposing the doctrine of laches is now at its peak.  *See McDonald v. Cnty. of San Diego*, 124 F. App'x 588 (9th Cir. 2005) (citing *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988)); *Soules*, 849 F.2d at 1180 (quoting *Hendon v. N.C. State Bd. Of Elections*, 710 F.2d 177, 182 (4th Cir. 1983)) (applying doctrine of laches in post-election lawsuit because doing otherwise would, "permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action").

Plaintiffs could have lodged their constitutional challenges much sooner than they did, and certainly not three weeks after Election Day and one week after certification of almost three million votes.  The Court concludes that Plaintiffs' delay results in their claims being barred by laches.

19

### D.    Abstention

As outlined in several filings, when the present lawsuit was filed on

November 25, 2020, there already were multiple lawsuits pending in Michigan

state courts raising the same or similar claims alleged in Plaintiffs' Amended

Complaint.  (*See, e.g.*, ECF No. 31 at Pg ID 2193-98 (summarizing five state court

lawsuits challenging President Trump's defeat in Michigan's November 3, 2020

General Election).)  Defendants and the City of Detroit urge the Court to abstain

from deciding Plaintiffs' claims in deference to those proceedings under various

abstention doctrines.  (*Id.* at Pg ID 2191-2203; ECF No. 39 at Pg ID 2840-44.)

Defendants rely on the abstention doctrine outlined by the Supreme Court in

*Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).

The City of Detroit relies on the abstention doctrines outlined in *Colorado River*,

as well as those set forth in *Railroad Commission of Texas v. Pullman Co.*, 312

U.S. 496, 500-01 (1941), and *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).  The

City of Detroit maintains that abstention is particularly appropriate when resolving

election disputes in light of the autonomy provided to state courts to initially settle

such disputes.

The abstention doctrine identified in *Colorado River* permits a federal court

to abstain from exercising jurisdiction over a matter in deference to parallel state-

court proceedings.  *Colorado River*, 424 U.S. at 813, 817.  The exception is found

warranted "by considerations of 'proper constitutional adjudication,' 'regard for federal-state relations,' or 'wise judicial administration.'" *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (quoting *Colorado River*, 424 U.S. at 817). The Sixth Circuit has identified two prerequisites for abstention under this doctrine. *Romine v. Compuserve Corp.*, 160 F.3d 337, 339-40 (6th Cir. 1998).

First, the court must determine that the concurrent state and federal actions are parallel. *Id*. at 339. Second, the court must consider the factors outlined by the Supreme Court in *Colorado River* and subsequent cases:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; … (4) the order in which jurisdiction was obtained; … (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

*Romine*, 160 F.3d at 340-41 (internal citations omitted). "These factors, however, do not comprise a mechanical checklist. Rather, they require 'a careful balancing of the important factors as they apply in a give[n] case' depending on the particular facts at hand." *Id*. (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983)).

As summarized in Defendants' response brief and reflected in their exhibits (*see* ECF No. 31 at Pg ID 2193-97; *see also* ECF Nos. 31-7, 31-9, 31-11, 31-12,

21

31-14), the allegations and claims in the state court proceedings and the pending

matter are, at the very least, substantially similar, *Romine*, 160 F.3d at 340 ("Exact

parallelism is not required; it is enough if the two proceedings are substantially

similar." (internal quotation marks and citation omitted)).  A careful balancing of

the factors set forth by the Supreme Court counsel in favor of deferring to the

concurrent jurisdiction of the state courts.

The first and second factor weigh against abstention.  *Id.* (indicating that the

weight is against abstention where no property is at issue and neither forum is

more or less convenient).  While the Supreme Court has stated that "'the presence

of federal law issues must always be a major consideration weighing against

surrender of federal jurisdiction in deference to state proceedings[,]'" *id.* at 342

(quoting *Moses H. Cone*, 460 U.S. at 26), this "'factor has less significance where

the federal courts' jurisdiction to enforce the statutory rights in question is

concurrent with that of the state courts.'"[4]  *Id.* (quoting *Moses H. Cone*, 460 U.S. at

25).  Moreover, the Michigan Election Code seems to dominate even Plaintiffs'

federal claims.  Further, the remaining factors favor abstention.

"Piecemeal litigation occurs when different courts adjudicate the identical

issue, thereby duplicating judicial effort and potentially rendering conflicting

---

[4] State courts have concurrent jurisdiction over § 1983 actions.  *Felder v. Casey*,
487 U.S. 131, 139 (1988).

results." *Id.* at 341.  The parallel proceedings are premised on similar factual

allegations and many of the same federal and state claims.  The state court

proceedings were filed well before the present matter and at least three of those

matters are far more advanced than this case.  Lastly, as Congress conferred

concurrent jurisdiction on state courts to adjudicate § 1983 claims, *Felder v. Casey*,

487 U.S. 131, 139 (1988), "[t]here can be no legitimate contention that the

[Michigan] state courts are incapable of safeguarding [the rights protected under

this statute]," *Romine*, 160 F.3d at 342.

    For these reasons, abstention is appropriate under the *Colorado River*

doctrine.  The Court finds it unnecessary to decide whether abstention is

appropriate under other doctrines.

## E.    Standing

    Under Article III of the United States Constitution, federal courts can

resolve only "cases" and "controversies."  U.S. Const. art. III § 2.  The case-or-

controversy requirement is satisfied only where a plaintiff has standing to bring

suit.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24,

2016).  Each plaintiff must demonstrate standing for each claim he seeks to press.[5]

---

[5] Plaintiffs assert a due process claim in their Amended Complaint and twice state
in their motion for injunctive relief that Defendants violated their due process
rights.  (*See* ECF No. 7 at Pg ID 1840, 1844.)  Plaintiffs do not pair either
statement with anything the Court could construe as a developed argument.  (*Id.*)
The Court finds it unnecessary, therefore, to further discuss the due process claim.

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted) ("[A]

plaintiff must demonstrate standing separately for each form of relief sought.").

To establish standing, a plaintiff must show that:  (1) he has suffered an injury in

fact that is "concrete and particularized" and "actual or imminent"; (2) the injury is

"fairly . . . trace[able] to the challenged action of the defendant"; and (3) it is

"likely, as opposed to merely speculative, that the injury will be redressed by a

favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992)

(internal quotation marks and citations omitted).

### 1.     Equal Protection Claim

Plaintiffs allege that Defendants engaged in "several schemes" to, among

other things, "destroy," "discard," and "switch" votes for President Trump, thereby

"devalu[ing] Republican votes" and "diluting" the influence of their individual

votes.  (ECF No. 49 at Pg ID 3079.)  Plaintiffs contend that "the vote dilution

resulting from this systemic and illegal conduct did not affect all Michigan voters

equally; it had the intent and effect of inflating the number of votes for Democratic

candidates and reducing the number of votes for President Trump and Republican

candidates."  (ECF No. 49 at Pg ID 3079.)  Even assuming that Plaintiffs establish

---

*McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a
perfunctory manner, unaccompanied by some effort at developed argumentation,
are deemed waived.").

24

injury-in-fact and causation under this theory,[6] their constitutional claim cannot

stand because Plaintiffs fall flat when attempting to clear the hurdle of

redressability.

Plaintiffs fail to establish that the alleged injury of vote-dilution can be

redressed by a favorable decision from this Court.  Plaintiffs ask this Court to de-

certify the results of the 2020 General Election in Michigan.  But an order de-

certifying the votes of approximately 2.8 million people would not reverse the

dilution of Plaintiffs' vote.  To be sure, standing is not "dispensed in gross: A

plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill*,

138 S. Ct. at 1934 (citing *Cuno*, 547 U.S. at 353); *Cuno*, 547 U.S. at 353 ("The

remedy must of course be limited to the inadequacy that produced the injury in fact

that the plaintiff has established." (quoting *Lewis v. Casey*, 518 U.S. 343, 357

(1996)).  Plaintiffs' alleged injury does not entitle them to seek their requested

remedy because the harm of having one's vote invalidated or diluted is not

remedied by denying millions of others *their* right to vote.  Accordingly, Plaintiffs

have failed to show that their injury can be redressed by the relief they seek and

thus possess no standing to pursue their equal protection claim.

---

[6] To be clear, the Court does not find that Plaintiffs satisfy the first two elements of
the standing inquiry.

##### 2.      Elections Clause & Electors Clause Claims

The provision of the United States Constitution known as the Elections

Clause states in part: "The Times, Places and Manner of holding Elections for

Senators and Representatives, shall be prescribed in each State by the Legislature

thereof[.]"  U.S. Const. art. I, § 4, cl. 1.  "The Elections Clause effectively gives

state governments the 'default' authority to regulate the mechanics of federal

elections, *Foster v. Love*, 522 U.S. 67, 69, 118 S. Ct. 464, 139 L.Ed.2d 369 (1997),

with Congress retaining 'exclusive control' to 'make or alter' any state's

regulations, *Colegrove v. Green*, 328 U.S. 549, 554, 66 S. Ct. 1198, 90 L.Ed. 1432

(1946)."  *Bognet*, 2020 WL 6686120, *1.  The "Electors Clause" of the

Constitution states: "Each State shall appoint, in such Manner as the Legislature

thereof may direct, a Number of Electors …."  U.S. Const. art. II, § 1, cl. 2.

Plaintiffs argue that, as "nominees of the Republican Party to be Presidential

Electors on behalf of the State of Michigan, they have standing to allege violations

of the Elections Clause and Electors Clause because "a vote for President Trump

and Vice-President Pence in Michigan … is a vote for each Republican elector[],

and … illegal conduct aimed at harming candidates for President similarly injures

Presidential Electors."  (ECF No. 7 at Pg ID 1837-38; ECF No. 49 at Pg ID 3076-

78.)

But where, as here, the only injury Plaintiffs have alleged is that the

Elections Clause has not been followed, the United States Supreme Court has made

clear that "[the] injury is precisely the kind of undifferentiated, generalized

grievance about the conduct of government that [courts] have refused to

countenance."[7] *Lance v. Coffman*, 549 U.S. 437, 442 (2007). Because Plaintiffs

"assert no particularized stake in the litigation," Plaintiffs fail to establish injury-

in-fact and thus standing to bring their Elections Clause and Electors Clause

claims. *Id.*; *see also Johnson v. Bredesen*, 356 F. App'x 781, 784 (6th Cir. 2009)

(citing *Lance*, 549 U.S. at 441-42) (affirming district court's conclusion that

citizens did not allege injury-in-fact to support standing for claim that the state of

Tennessee violated constitutional law).

---

[7] Although separate constitutional provisions, the Electors Clause and Elections
Clause share "considerable similarity," *Ariz. State Leg. v. Ariz. Indep. Redistricting
Comm'n*, 576 U.S. 787, 839, (2015) (Roberts, C.J., dissenting), and Plaintiffs do
not at all distinguish the two clauses in their motion for injunctive relief or reply
brief (ECF No. 7; ECF No. 49 at Pg ID 3076-78). *See also Bognet v. Sec'y
Commonwealth of Pa.*, No. 20-3214, 2020 WL 6686120, at *7 (3d Cir. Nov. 13,
2020) (applying same test for standing under both Elections Clause and Electors
Clause); *Wood*, 2020 WL 6817513, at *1 (same); *Foster*, 522 U.S. at 69
(characterizing Electors Clause as Elections Clauses' "counterpart for the
Executive Branch"); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804-05
(1995) (noting that state's "duty" under Elections Clause "parallels the duty"
described by Electors Clause).

This is so because the Elections Clause grants rights to "the Legislature" of "each State."  U.S. Const. art. I, § 4, cl. 1.  The Supreme Court interprets the words "the Legislature," as used in that clause, to mean the lawmaking bodies of a state. *Ariz. State Legislature*, 135 S.Ct. at 2673.  The Elections Clause, therefore, grants rights to state legislatures and to other entities to which a State may delegate lawmaking authority.  *See id.* at 2668.  Plaintiffs' Elections Clause claims thus belong, if to anyone, Michigan's state legislature.  *Bognet v. Secy. Commonwealth of Pa.*, -- F.3d. --, 2020 WL 6686120, *7 (3d Cir. Nov. 13, 2020).  Plaintiffs here are six presidential elector nominees; they are not a part of Michigan's lawmaking bodies nor do they have a relationship to them.

To support their contention that they have standing, Plaintiffs point to *Carson v. Simon*, 78 F.3d 1051 (8th Cir. 2020), a decision finding that electors had standing to bring challenges under the Electors Clause.  (ECF No. 7 at Pg ID 1839 (citing *Carson*, 978 F.3d at 1057).)  In that case, which was based on the specific content and contours of Minnesota state law, the Eighth Circuit Court of Appeals concluded that because "the plain text of Minnesota law treats prospective electors as candidates," it too would treat presidential elector nominees as candidates. *Carson*, 78 F.3d at 1057.  This Court, however, is as unconvinced about the majority's holding in *Carson* as the dissent:

> I am not convinced the Electors have Article III standing
> to assert claims under the Electors Clause.  Although

28

> Minnesota law at times refers to them as "candidates,"
> *see, e.g.*, Minn. Stat. § 204B.03 (2020), the Electors are
> not candidates for public office as that term is commonly
> understood.  Whether they ultimately assume the office
> of elector depends entirely on the outcome of the state
> popular vote for president.  *Id*. § 208.04 subdiv. 1 ("[A]
> vote cast for the party candidates for president and vice
> president shall be deemed a vote for that party's
> electors.").  They are not presented to and chosen by the
> voting public for their office, but instead automatically
> assume that office based on the public's selection of
> entirely different individuals.

78 F.3d at 1063 (Kelly, J., dissenting).[8]

Plaintiffs contend that the Michigan Election Code and relevant Minnesota

law are similar.  (See ECF No. 49 at Pg ID 3076-78.)  Even if the Court were to

---

[8] In addition, at least one Circuit Court, the Third Circuit Court of Appeals, has distinguished *Carson*'s holding, noting:

> Our conclusion departs from the recent decision of an
> Eighth Circuit panel which, over a dissent, concluded
> that candidates for the position of presidential elector had
> standing under *Bond* to challenge a Minnesota state-court
> consent decree that effectively extended the receipt
> deadline for mailed ballots. . . . The *Carson* court appears
> to have cited language from *Bond* without considering
> the context—specifically, the Tenth Amendment and the
> reserved police powers—in which the U.S. Supreme
> Court employed that language. There is no precedent for
> expanding *Bond* beyond this context, and the *Carson*
> court cited none.

*Bognet*, 2020 WL 6686120, at *8 n.6.

agree, it finds that Plaintiffs lack standing to sue under the Elections and Electors Clauses.

**F.     The Merits of the Request for Injunctive Relief**

**1.     Likelihood of Success on the Merits**

The Court may deny Plaintiffs' motion for injunctive relief for the reasons discussed above.  Nevertheless, the Court will proceed to analyze the merits of their claims.

**a.     Violation of the Elections & Electors Clauses**

Plaintiffs allege that Defendants violated the Elections Clause and Electors Clause by deviating from the requirements of the Michigan Election Code.  (*See, e.g.,* ECF No. 6 at Pg ID 884-85, ¶¶ 36-40, 177-81, 937-38.)  Even assuming Defendants did not follow the Michigan Election Code, Plaintiffs do not explain how or why such violations of state election procedures automatically amount to violations of the clauses.  In other words, it appears that Plaintiffs' claims are in fact state law claims disguised as federal claims.

A review of Supreme Court cases interpreting these clauses supports this conclusion.  In *Cook v. Gralike*, the Supreme Court struck down a Missouri law that required election officials to print warnings on the ballot next to the name of any congressional candidate who refused to support term limits after concluding that such a statute constituted a "'regulation' of congressional elections," as used in

30

the Elections Clause.  531 U.S. 510, 525-26 (2001) (quoting U.S. Const. art. I, § 4, cl. 1).  In *Arizona State Legislature v. Arizona Independent Redistricting Commission*, the Supreme Court upheld an Arizona law that transferred redistricting power from the state legislature to an independent commission after concluding that "the Legislature," as used in the Elections Clause, includes any official body with authority to make laws for the state.  576 U.S. 787, 824 (2015).  In each of these cases, federal courts measured enacted state election laws against the federal mandates established in the clauses—they did not measure *violations* of enacted state elections law against those federal mandates.

By asking the Court to find that they have made out claims under the clauses due to alleged violations of the Michigan Election Code, Plaintiffs ask the Court to find that any alleged deviation from state election law amounts to a modification of state election law and opens the door to federal review.  Plaintiffs cite to no case— and this Court found none—supporting such an expansive approach.

> **b.**     **Violation of the Equal Protection Clause**

Most election laws will "impose some burden upon individual voters." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  But "[o]ur Constitution leaves no room for classification of people in a way that unnecessarily abridges this right [to vote]."  *Reynolds v. Sims*, 377 U.S. 533, 559 (1964) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17-18 (1964)).  Voting rights can be impermissibly burdened "by a

31

debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id*. (quoting *Reynolds*, 377 U.S. at 555).

Plaintiffs attempt to establish an Equal Protection claim based on the theory that Defendants engaged in "several schemes" to, among other things, "destroy," "discard," and "switch" votes for President Trump, thereby "devalu[ing] Republican votes" and "diluting" the influence of their individual votes.  (ECF No. 49 at Pg ID 3079.)

But, to be perfectly clear, Plaintiffs' equal protection claim is not supported by any allegation that Defendants' alleged schemes caused votes for President Trump to be changed to votes for Vice President Biden.  For example, the closest Plaintiffs get to alleging that physical ballots were altered in such a way is the following statement in an election challenger's sworn affidavit:  "I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates."[9]  (ECF No. 6 at Pg ID 902 ¶ 91 (citing Aff. Articia

_____

[9] Plaintiffs allege in several portions of the Amended Complaint that election officials improperly tallied, counted, or marked ballots.  But some of these allegations equivocate with words such as "believe" and "may" and none of these allegations identify which presidential candidate the ballots were allegedly altered to favor. (*See, e.g.,* ECF No. 6 at Pg ID 902, ¶ 91 (citing Aff. Articia Bomer, ECF No. 6-3 at Pg ID 1008-10 ("I *believe* some of these ballots *may* not have been properly counted." (emphasis added))); Pg ID 902-03, ¶ 92 (citing Tyson Aff. ¶ 17) ("At least one challenger observed poll workers adding marks to a ballot where there was no mark for any candidate.").

Bomer, ECF No. 6-3 at Pg ID 1008-1010).)  But of course, "[a] belief is not

evidence" and falls far short of what is required to obtain any relief, much less the

extraordinary relief Plaintiffs request.  *United States v. O'Connor*, No. 96-2992,

1997 WL 413594, at *1 (7th Cir. 1997); *see Brown v. City of Franklin*, 430 F.

App'x 382, 387 (6th Cir. 2011) ("Brown just submits his belief that Fox's

'protection' statement actually meant "protection from retaliation. . . . An

unsubstantiated belief is not evidence of pretext."); *Booker v. City of St. Louis*, 309

F.3d 464, 467 (8th Cir. 2002) ("Booker's "belief" that he was singled out for

testing is not evidence that he was.").[10]  The closest Plaintiffs get to alleging that

election machines and software changed votes for President Trump to Vice

---

[10] As stated by the Circuit Court for the District of Columbia Circuit:

> The statement is that the complainant believes and
> expects to prove some things. Now his belief and
> expectation may be in good faith; but it has been
> repeatedly held that suspicion is not proof; and it is
> equally true that belief and expectation to prove cannot
> be accepted as a substitute for fact.  The complainant
> carefully refrains from stating that he has any
> information upon which to found his belief or to justify
> his expectation; and evidently he has no such
> information.  But belief, without an allegation of fact
> either upon personal knowledge or upon information
> reasonably sufficient upon which to base the belief,
> cannot justify the extraordinary remedy of injunction.

*Magruder v. Schley*, 18 App. D.C. 288, 292, 1901 WL 19131, at *2 (D.C. Cir.
1901).

President Biden in Wayne County is an amalgamation of theories, conjecture, and speculation that such alterations were *possible*.  (*See e.g.,* ECF No. 6 at ¶¶ 7-11, 17, 125, 129, 138-43, 147-48, 155-58, 160-63, 167, 171.)  And Plaintiffs do not at all explain how the question of whether the treatment of election challengers complied with state law bears on the validity of votes, or otherwise establishes an equal protection claim.

With nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails.[11]  *See Wood*, 2020 WL 7094866 (quoting *Bognet*, 2020 WL 6686120, at *12) ("'[N]o single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'").

---

[11] "[T]he Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently.  Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment.  And if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity.  That is not how the Equal Protection Clause works." *Bognet*, 2020 WL 6686120, at *11.

34

## 2.    Irreparable Harm & Harm to Others

Because "a finding that there is simply no likelihood of success on the merits is usually fatal[,]" *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997), the Court will not discuss the remaining preliminary injunction factors extensively.

As discussed, Plaintiffs fail to show that a favorable decision from the Court would redress their alleged injury.  Moreover, granting Plaintiffs' injunctive relief would greatly harm the public interest.  As Defendants aptly describe, Plaintiffs' requested injunction would "upend the statutory process for election certification and the selection of Presidential Electors.  Moreover, it w[ould] disenfranchise millions of Michigan voters in favor [of] the preferences of a handful of people who [are] disappointed with the official results."  (ECF No. 31 at Pg ID 2227.)

In short, none of the remaining factors weigh in favor of granting Plaintiffs' request for an injunction.

## IV.    Conclusion

For these reasons, the Court finds that Plaintiffs are far from likely to succeed in this matter.  In fact, this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court— and more about the impact of their allegations on People's faith in the democratic

process and their trust in our government.  Plaintiffs ask this Court to ignore the

orderly statutory scheme established to challenge elections and to ignore the will of

millions of voters.  This, the Court cannot, and will not, do.

The People have spoken.

The Court, therefore, **DENIES** Plaintiffs' "Emergency Motion for

Declaratory, Emergency, and Permanent Injunctive Relief" (ECF No. 7.)

**IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: December 7, 2020

# Exhibit 5



# Wisconsin Elections Commission

212 East Washington Avenue | Third Floor | P.O. Box 7984 | Madison, WI 53707-7984
(608) 266-8005 | elections@wi.gov | elections.wi.gov

**MEMORANDUM**

| | |
|---|---|
| **TO**: | Wisconsin Municipal Clerks<br>City of Milwaukee Election Commission<br>Wisconsin County Clerks<br>Milwaukee County Election Commission |
| **FROM**: | Meagan Wolfe<br>Administrator |
| **DATE**: | March 29, 2020 |
| **SUBJECT**: | Guidance for Indefinitely Confined Electors |

Due to the continuing spread of COVID-19, staff of the Wisconsin Elections Commission (WEC) has received numerous inquiries regarding the application of the indefinitely confined designation for absentee voters under Wisconsin Statutes. At its meeting of March 27, 2020, the Commission discussed this issue and adopted the following guidance related to the use of indefinitely confined status to assist local election officials working with absentee voters:

1. Designation of indefinitely confined status is for each individual voter to make based upon their current circumstance. It does not require permanent or total inability to travel outside of the residence. The designation is appropriate for electors who are indefinitely confined because of age, physical illness or infirmity or are disabled for an indefinite period.

2. Indefinitely confined status shall not be used by electors simply as a means to avoid the photo ID requirement without regard to whether they are indefinitely confined because of age, physical illness, infirmity or disability.

This guidance is consistent with and supplements previous statements of the WEC related to absentee voters who may qualify as indefinitely confined or "permanent" absentee voters. For ease of reference, on March 24, 2020, the WEC posted the following guidance in one of its FAQ documents addressing issues related to conducting the Spring Election in the midst of the COVID-19 pandemic:

*Wisconsin Elections Commissioners*
Dean Knudson, chair | Marge Bostelmann | Julie M. Glancey | Ann S. Jacobs | Robert Spindell | Mark L. Thomsen

*Administrator*
Meagan Wolfe

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 2 of 4   Document 57-5

Indefinitely Confined Absentee Applications

WEC staff has received numerous questions from clerks about the increase in voters requesting absentee ballots as indefinitely confined. Wisconsin Statutes provide the option for a voter to self-certify whether they meet the definition of indefinitely confined. The statutory definition of "age, illness, infirmity or disability" does not require any voter to meet a threshold for qualification and indefinitely confined status need not be permanent. A voter with a broken leg or one recovering from surgery may be temporarily indefinitely confined and may use that status when voting during that period of time.

We understand the concern over the use of indefinitely confined status and do not condone abuse of that option as it is an invaluable accommodation for many voters in Wisconsin. During the current public health crisis, many voters of a certain age or in at-risk populations may meet that standard of indefinitely confined until the crisis abates. We have told clerks if they do not believe a voter understood the declaration they made when requesting an absentee ballot, they can contact the voter for confirmation of their status. They should do so using appropriate discretion as voters are still entitled to privacy concerning their medical and disability status. Any request for confirmation of indefinitely confined status should not be accusatory in nature.

There may be a need to do some review of the absentee voting rolls after this election to confirm voters who met the definition of indefinitely confined during the public health crisis would like to continue that status. WEC staff has already discussed this possibility and may be able to provide resources to assist clerks with these efforts.

This guidance is based upon applicable statutes. An elector who is indefinitely confined because of age, physical illness or infirmity or is disabled for an indefinite period may by signing a statement to that effect require that an absentee ballot be sent to the elector automatically for every election. *Wis. Stat. § 6.86(2)(a).* The absentee ballot request form asks voters to certify to their indefinitely confined status. Statutes do not establish the option to require proof or documentation from indefinitely confined voters. Clerks may tactfully verify with voters that the voter understood the indefinitely confined status designation when they submitted their request but they may not request or require proof.

An elector who qualifies as indefinitely confined "may, in lieu of providing proof of identification, submit with his or her absentee ballot a statement signed by the same individual who witnesses voting of the ballot which contains the name and address of the elector and verifies that the name and address are correct." *Wis. Stat. 6.87(4)(b)2.* Thus, indefinitely confined electors may satisfy the photo ID requirement by obtaining the signature of a witness on the absentee ballot certificate envelope.

Electors who are indefinitely confined due to age, physical illness, infirmity or disability, may be unable to obtain a current photo ID or make a copy to submit with their written absentee ballot request or upload an image of their photo ID with their electronic request through MyVote Wisconsin. If a clerk is contacted by an elector in such circumstances,

WEC recommends discussing the options and making the voter aware of the criteria for qualifying as an indefinitely confined elector.

If any elector is no longer indefinitely confined, they shall so notify the municipal clerk. *Wis. Stat. 6.86(2)(a).* An elector also loses indefinitely confined status if they do not vote in a Spring or General Election and do not respond to a mailing from the municipal clerk asking whether they wish to continue automatically receiving absentee ballots. *Wis. Stat. 6.86(2)(b).* Finally, the municipal clerk shall remove the name of any elector from the list of indefinitely confined electors upon receipt of reliable information that an elector no longer qualifies for that designation and service. The clerk shall notify the elector of such action not taken at the elector's request within 5 days, if possible. *Wis. Stat. § 6.86(2)(b).*

If you have questions regarding this communication, please contact the Help Desk at 608-261-2028 or elections@wi.gov.

# Exhibit 6



OFFICE OF THE CLERK

# Supreme Court of Wisconsin

110 EAST MAIN STREET, SUITE 215
P.O. BOX 1688
MADISON, WI 53701-1688

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site:  www.wicourts.gov

March 31, 2020

To:

David R. Gault
Marcia A. MacKenzie
Dane County Corporation Counsel
Room 419
210 Martin Luther King Jr. Blvd.
Madison, WI 53703-3345

Lisa M. Lawless
Husch Blackwell, LLP
555 E. Wells St., Ste. 1900
Milwaukee, WI 53202-3819

Eric M. McLeod
Lane E. B. Ruhland
Husch Blackwell LLP
P.O. Box 1379
Madison, WI 53701-1379

Misha Tseytlin
Kevin M. LeRoy
Troutman Sanders LLP
1 N. Wacker Dr., Ste. 2905
Chicago, IL 60606

You are hereby notified that the Court has entered the following order:

2020AP557-OA          Jefferson v. Dane County

On March 27, 2020, petitioners, Mark Jefferson and the Republican Party of Wisconsin, filed a petition for leave to commence an original action under Wis. Stat. § (Rule) 809.70, a supporting legal memorandum, and a motion for temporary injunctive relief.  On that same date, the court ordered the named respondents, Dane County and Scott McDonell, in his official capacity as Dane County Clerk, to file a response to the original action petition and the motion for temporary injunctive relief by 1:00 on March 30, 2020.  The court has reviewed the filings of the parties and now addresses the motion for temporary injunctive relief.

When we have considered whether to grant temporary injunctive relief, we have required a movant to show (1) a reasonable probability of success on the merits; (2) a lack of an adequate remedy at law; (3) that the movant will suffer irreparable harm in the absence of an injunction; and (4) that a balancing of the equities favors issuing the injunction.  See, e.g., Pure Milk Products Coop. v. National Farmers Org., 90 Wis. 2d 781, 800, 280 N.W.2d 691 (1979); Werner v. A.L. Grootemaat & Sons, Inc., 80 Wis. 2d 513, 520, 259 N.W.2d 310 (1977).  The decision whether to grant an injunction is a discretionary one, although injunctions are not to be issued lightly. Werner, 80 Wis. 2d at 520.

Page 2
March 31, 2020
2020AP557-OA          <u>Jefferson v. Dane County</u>

      The temporary injunction the petitioners seek would order respondent, Scott McDonell, the Dane County Clerk, to remove a March 25, 2020 Facebook post in which he indicated, inter alia, that all Dane County voters could declare themselves to be "indefinitely confined" under Wis. Stat. § 6.86(2) due to illness solely because of the Wisconsin Department of Health Services Emergency Order #12 (the Safer at Home Order) and difficulties in presenting or uploading a valid proof of identification, thereby avoiding the legal requirement to present or upload a copy of the voter's proof of identification when requesting an absentee ballot.[1]  The petitioners further ask this court to order respondent McDonell and respondent Dane County to issue new statements setting forth the statutory interpretation proposed by the petitioners.

      Although respondents do not represent that McDonell's original March 25, 2020 post has been removed, they argue that McDonell's later posting renders the petitioners' motion moot because McDonell has now posted the Wisconsin Elections Commission's (WEC) guidance on his Facebook page.  They also argue that the petitioners' petition and motion for temporary relief cannot go forward in this court because they have not exhausted their administrative remedies by first filing a complaint with the WEC under Wis. Stat. § 5.06(1) and (2).

      McDonell's March 25, 2020, advice was legally incorrect.  In addition, McDonell's subsequent Facebook posting does not preclude McDonell's future posting of the same erroneous advice.  Furthermore, his erroneous March 25, 2020 Facebook posting continues distribution on the internet.

      Accordingly, we conclude that clarification of the purpose and proper use of the indefinitely confined status pursuant to Wis. Stat. § 6.86(2) as well as a temporary injunction are warranted.

      In regard to clarification, the WEC has met and has issued guidance on the proper use of indefinitely confined status under Wis. Stat. § 6.86(2) in its March 29, 2020 publication, "Guidance for Indefinitely Confined Electors COVID-19."   The WEC guidance states as follows:

1. Designation of indefinitely confined status is for each individual voter to make based upon their current circumstances.  It does not require permanent or total inability to travel outside of the residence.  The designation is appropriate for electors who are indefinitely confined because of age, physical illness or infirmity or are disabled for an indefinite period.

2. Indefinitely confined status shall not be used by electors simply as a means to avoid the photo ID requirement without regard to whether they are indefinitely confined because of age, physical illness or infirmity, or disability.

We conclude that the WEC's guidance quoted above provides the clarification on the purpose and proper use of the indefinitely confined status that is required at this time.

      We further determine that the petitioners have demonstrated a reasonable probability of success on the merits, at least with respect to certain statements in McDonell's March 25th

---

[1] Petitioners note that the Milwaukee County Clerk issued nearly identical advice.

Page 3
March 31, 2020
2020AP557-OA          <u>Jefferson v. Dane County</u>


Facebook post.  Voters may be misled to exercise their right to vote in ways that are inconsistent with Wis. Stat. § 6.86(2).  Namely, McDonell appeared to assert that all voters are automatically, indefinitely confined solely due to the emergency and the Safer at Home Order and that voters could therefore declare themselves to be indefinitely confined when requesting an absentee ballot, which would allow them to skip the step of presenting or uploading a valid proof of identification. Indeed, we do not see how the respondents could prevail with an argument that such statements in the March 25th post constitute an accurate statement of the relevant statutory provisions.

          NOW THEREFORE, IT IS ORDERED that the petitioners' motion for temporary injunctive relief is granted and we order McDonell to refrain from posting advice as the County Clerk for Dane County inconsistent with the above quote from the WEC guidance.

          DANIEL KELLY, J., did not participate.

Sheila T. Reiff
Clerk of Supreme Court

# Exhibit 7

# WISCONSIN ELECTIONS COMMISSION

212 EAST WASHINGTON AVENUE, 3RD FLOOR
POST OFFICE BOX 7984
MADISON, WI 53707-7984
(608) 261-2028
ELECTIONS@WI.GOV
ELECTIONS.WI.GOV

ADMINISTRATOR MICHAEL HAAS



COMMISSIONERS

BEVERLY R. GILL
JULIE M. GLANCEY
ANN S. JACOBS
STEVE KING
DON MILLIS
MARK L. THOMSEN, CHAIR

## MEMORANDUM

**DATE**:             October 18, 2016

**TO**:               Wisconsin Municipal Clerks and the Milwaukee City Elections Commission
                     Wisconsin County Clerks and the Milwaukee County Elections Commission

**FROM**:             Michael Haas, Interim Elections Administrator
                     Diane Lowe, Lead Elections Specialist

**SUBJECT**:          **AMENDED:** Missing or Insufficient Witness Address on Absentee Certificate
                     Envelopes

**PLEASE NOTE:  The previous guidance on this topic, which was issued on October 4, 2016, has been modified by the WEC and is replaced with the guidance below.**

One of the components of 2015 Wisconsin Act 261 is the requirement for an absentee ballot witness to provide their address when signing the absentee certificate envelope.

> **SECTION 78.** 6.87 (6d) of the statutes is created to read:
> 6.87 (**6d**) If a certificate is missing the address of a witness, the ballot may not be counted.

In implementing this requirement, the first question that comes to mind is "What constitutes an address?"  The Wisconsin Elections Commission (WEC) has set a policy that a complete address contains a *street number, street name and name of municipality*.  But in many cases, at least one component of the address could be missing; usually the municipality.

The purpose of this memorandum is to offer guidance to assist you in addressing this issue. The WEC has determined that clerks **must** take corrective actions in an attempt to remedy a witness address error. If clerks are reasonably able to discern any missing information from outside sources, clerks are not required to contact the voter before making that correction directly to the absentee certificate envelope.

Clerks may contact voters and notify them of the address omission and the effect if the deficiency is not remedied but contacting the voter is only required if clerks cannot remedy the address insufficiency from extrinsic sources. When contacting a voter, you should advise that their ballot will not be counted with an incomplete address so that they can take action and also prevent a similar issue in the future. Clerks shall offer suggestions for correcting the certificate envelope to ensure the voter's absentee ballot will not be rejected.

Clerks shall assist in rehabilitating an absentee certificate that does not contain the street number and street name (or P.O. Box) and the municipality of the witness address. If a clerk adds information to an absentee certificate, either based on contact with the voter or based on other sources, clerks shall indicate such assistance was provided by initialing next to the information that was added on the absentee certificate. The Commission recognized the concern some clerks have expressed about altering information on the certificate envelope, especially in the case of a recount. On balance, in order to promote uniformity in the treatment of absentee ballots statewide, the Commission determined that clerks must attempt to obtain any information that is missing from the witness address and document any addition by including their initials.

In short, the Commission's guidance is that municipal clerks shall do all that they can reasonably do to obtain any missing part of the witness address. Those steps may include one or more of the following options:

1. The clerk is able to reasonably discern the missing address or address component by information appearing on the envelope or from some other source, such as:

   o The voter has provided his or her complete address and the clerk has personal knowledge that the witness resides at the same address as the voter.
   o The clerk has personal knowledge of the witness and knows his/or her address.
   o The voter's complete address appears on the address label, and the witness indicates the same street address as the voter.
   o The clerk is able to utilize lists or databases at his or her disposal to determine the witness's address.

2. The voter or witness may wish to appear in person to add the missing information, or provide the address information by phone, fax, email or mail. The voter may provide the address separately as an alternative to returning the certificate envelope and having the voter mail it back again as outlined below.

3. The voter may request that the clerk return the certificate envelope so the voter can personally add the witness address.

   o Be sure to include a self-addressed stamped envelope in which the voter may return the certificate envelope containing the ballot. The post office does not approve of placing another stamp over a cancelled stamp. Contact your postmaster or a Mail Piece Design Analyst before attempting to re-stamp or re-meter the certificate envelope. Also, note that the U.S. Postal Service is advising that voters mail absentee ballots at least one week before Election Day to accommodate new delivery standards. We suggest advising the voter of the importance of timely mailing if the voter wishes to have the certificate envelope mailed back to them.

4. The voter may wish to spoil the original ballot and vote a new one.

   If the request to spoil the ballot is within the proper time frame, the clerk mails a second ballot and new certificate envelope to the voter. (See procedure for *Spoiling and Replacement Ballots*, beginning on page 109 of Election Administration Manual.)

I hope this guidance is helpful as you continue to issue and receive absentee ballots. Thank you for your efforts to assist voters in completing the absentee certificate sufficiently so their votes may be counted.

If you have questions, please contact the Elections Help Desk at 608-261-2028 or elections@wi.gov.

Exhibit 8



# Election
# Administration
# Manual

for
Wisconsin Municipal Clerks

Wisconsin Elections
Commission

September 2020

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 2 of 4   Document 57-8 **App. 200**

      i. The clerk is not required to provide postage on certificate envelopes that will be returned from outside of the United States.

    g. For military and overseas voters, use the postage paid envelopes; EL-120m mailer envelope and the EL-122m certificate envelope.

6. Mail the Absentee Carrier Envelope to the mailing address provided by the absentee elector within one business day of receiving the request. Wis. Stat. § 7.15(1)(cm).

7. The clerk maintains the Absentee Ballot Log (EL-124).

    a. The Absentee Ballot Log (EL-124) is used to track the events that occur during the absentee ballot process (e.g. application received, ballot issued, ballot canceled, 2nd ballot issued, ballot received, ballot counted, etc.)

    b. The Absentee Ballot Log (EL-124) enables the clerk to track any problems with the absentee certificate envelope (missing certificate, voter signature, witness signature and address, or two SVD signatures) and communicate this information to the election inspectors so they can reject the ballot if the error is not corrected by 8:00 p.m. on Election Day.

    c. Municipal clerks who maintain their own WisVote data may also track absentee ballots and print ballot labels in WisVote.

    d. The Absentee Ballot Log (EL-124) is sent to the polling place with the absentee ballots on Election Day.

8. An absentee ballot is marked by an absent voter, and sealed in an Absentee Ballot Certificate Envelope (EL-122). The Absentee Ballot Certificate Envelope (EL-122) is then completed and signed by the absentee voter, witnessed by an adult U.S. Citizen, and mailed or delivered in person to the municipal clerk. Wis. Stat. § 6.87(4)(b). Note: The witness for absentee ballots completed by Military, Permanent and Temporary Overseas voters, must be an adult, but does not have to be a U.S. Citizen.

    a. The witness must include their address.

b. Clerks may add a missing witness address using whatever means are available. Clerks should initial next to the added witness address.

*Correcting Defective Absentee Certificate Envelopes*



1. The municipal clerk reviews each absentee certificate envelope when it is returned to the clerk's office for any errors (e.g. missing certificate, voter signature, witness signature and address, or two SVD signatures).

2. If there is an error, the clerk should contact the voter, if possible. Wis. Stat. § 6.87(9).

   a. The voter has the option to correct the absentee certificate envelope in the clerk's office, by mail, or at the polling place/central count location on Election Day.

      i. If the voter wants the original ballot mailed back to them, the clerk shall enclose the original ballot in its unopened certificate

# Exhibit 9

# Wisconsin Elections Commission

## State of Wisconsin

212 E. Washington Ave., Third Floor ▪ Madison, WI 53703 ▪ elections@wi.gov ▪ (608) 266-8005 ▪ http://elections.wi.gov

FOR IMMEDIATE RELEASE:  
November 10, 2020

FOR MORE INFORMATION, CONTACT:  
Reid.Magney@wi.gov or 608-267-7887

# Correcting Misinformation about Wisconsin's Election

MADISON, WI – In the week after the presidential election, misinformation has circulated on social media and political websites raising unfounded rumors about the integrity of Wisconsin's election results.

"Wisconsin's election was conducted according to law and in the open," said Meagan Wolfe, Wisconsin's chief election official. "While the results are still unofficial and are currently being triple checked as part of the canvass and certification process, we have not seen any credible information to cast any doubt on those unofficial results."

Wolfe further stated, "When issues are reported to our office, we take them very seriously. We look into each allegation and request evidence from parties involved. At this time, no evidence has been provided that supports allegations of systemic or widespread election issues."

"Unfortunately, we are seeing many concerns that result from this unsubstantiated misinformation. We want Wisconsin's voters to know we hear their concerns and to provide facts on these processes to combat the rumors and misinformation," Wolfe said.

Every step of the election process is publicly observable and transparent, Wolfe said. This includes voting at the polls on Election Day and the counting of absentee ballots. It also includes the canvass and certification of the tally that is happening right now in counties across the state. Every ballot cast in Wisconsin has a paper audit trail. Voting equipment is randomly selected for audit after the presidential election and the paper trail is audited against the electronic vote totals; this process is conducted as part of a public meeting. If there is a recount, these materials will again be analyzed, as they were in 2016.

"Election results in Wisconsin are triple-checked for accuracy before they are certified," Wolfe said. "Your municipal and county clerks, and the staff of the Wisconsin Elections Commission are looking at everything to ensure the will of the voters is carried out and to affirm that only valid ballots were cast and counted."

In response to the misinformation, the WEC today released a list of the top facts about Wisconsin elections. This list is in addition to last week's news release which addressed rumors like Wisconsin having more votes than registrations and ballots being added to the unofficial totals on the morning of November 4, that release can be found here: https://elections.wi.gov/node/7235.

**1. Wisconsin voters can trust their vote was counted.**

"Many voters are visiting our MyVote Wisconsin website to check their records," said Wolfe. "As allowed by state law, it can take 45 days after a presidential election for local clerks to record everyone's paper registrations and voter participation into the electronic statewide voter database. If you do not see your participation or registration recorded right away, don't worry it takes time to get all of the data entered into the system.

A message on the MyVote.wi.gov website informs voters how long it can take to enter participation. Wolfe said the MyVote website absentee ballot tracking feature will continue to show voters whether their absentee ballot arrived.

Wolfe noted that in the last three presidential elections, Wisconsin had among the lowest rates of mail ballot rejections and other problems in the nation, according to the Elections Performance Index, a state-by-state data monitoring project maintained by the Massachusetts Institute of Technology.

However, voters should note that their record will never contain information on how you voted. State and federal law protect voter anonymity. Once you cast your ballot, who you voted for can not be tracked back to you. Your paper ballot is always anonymous, and it cannot be tied to your voter participation record.

**2. Minor news media errors in reporting Wisconsin's unofficial results do not affect the outcome of the election.**

"Several people have contacted us about discrepancies they may have seen in unofficial results on media websites or TV broadcasts on Election Night," Wolfe said. "They believe that these reporting errors are evidence that vote totals were somehow changed or flipped. Nothing could be farther from the truth."

Wolfe explained that Wisconsin does not have a statewide system for reporting unofficial results on Election Night, and there is no central official website or feed where results are reported. State law requires that counties post the unofficial election night numbers for each polling place. The unofficial statewide and county results numbers that the public sees on Election Night and the days thereafter come from the news media, including the Associated Press, which collects them from the 72 county clerks' websites.

One false rumor circulating now is that results were flipped in Rock County on Election Night, based on screenshots from FOXNews.com. According to the Associated Press, there was an error that occurred in the way they gathered results from Rock County's website which caused AP to transpose results for Joe Biden and Donald Trump. An AP correspondent noticed the error within a few minutes and corrected it, according to a statement from the newswire:

Patrick Maks, media relations manager for The Associated Press said, "There was a brief technical error in AP's collection of the vote count in Rock County, Wisconsin, that was quickly

corrected. AP has myriad checks and redundancies in place to ensure the integrity of the vote count reporting. We are confident in what we have delivered to customers."

https://www.politifact.com/factchecks/2020/nov/10/eric-trump/no-rock-county-did-not-have-glitch-stole-votes-tru/

The AP's error in no way reflects any problem with how Rock County counted or posted unofficial results. The WEC has confirmed with Rock County that their unofficial results reporting was always accurate.

There have been similar false claims about numbers on a CNN broadcast around 4 a.m. Wednesday when the city of Milwaukee's absentee ballot results were added to ballots cast at the polls on Election Day.

"Voters should be extremely cautious about drawing any conclusions based on changes in numbers during Election Night reporting," Wolfe said. "The news media is doing its best to report accurate results, but sometimes they make minor mistakes. These errors have nothing to do with Wisconsin's official results, which are triple checked at the municipal, county and state levels before they are certified."

**3. Absentee ballots were counted properly, regardless of when the results were reported.**

There are 39 municipalities which count their voters' absentee ballots at a central location. Because several municipalities could not finish processing their absentee ballots by the time the polls closed at 8 p.m. on Election Day, there was a delay in reporting those results to county clerks. This was especially true in major cities including Milwaukee, Green Bay and Kenosha, where final unofficial results were reported after 3 a.m. Wednesday.

"Due to the pandemic and the high number of absentee ballots, it took until early Wednesday for all the unofficial results to come in," said Wolfe. "It does not mean something went wrong – it means election officials did their jobs and made sure every valid ballot was counted."

In Wisconsin, voters must be registered before they can request an absentee ballot. Voters then need to submit a valid request for an absentee to their municipal clerk who sends the ballot and tracks it in the statewide database and using USPS intelligent mail barcodes. When a voted ballot is received by your clerk, it has to be recorded that it was received. On Election Day and night, only ballots issued to registered voters, with a valid request on file, and with completed certificates signed by the voter and their witness, are counted. If any of these elements are missing, the ballot is rejected and is not counted.

Some central count municipalities, including Milwaukee and Green Bay, took extra steps to provide the public and the media with live webcams of the absentee tabulation, and the physical locations were all open to the public and the media. Representatives of both major political parties were present, as well as independent poll watchers.

"Despite this transparency, we have seen unfounded allegations that clerks and poll workers stopped counting, that they mysteriously found absentee ballots in the middle of the night, or that all the votes on absentee ballots were only for one candidate," Wolfe said. "It's just not true."

The Wisconsin Elections Commission anticipated there would be misinformation about late absentee ballot reports in central count municipalities. To proactively provide insight into the process of counting and reporting absentee ballot totals, the WEC put out news releases in advance of the election and even produced a video about how results get reported. https://elections.wi.gov/2020

**4. The pens or markers used by some voters did not prevent their ballots from being counted.**

Wolfe said that voters have contacted the WEC because of posts they saw on social media about the use of felt tip pens or "sharpies" on ballots. "Voters do not need to worry, their ballots were counted," Wolfe said. "Voting equipment in Wisconsin is tested at both the local, state, and federal level for all kinds of pens and other marking devices. While we recommend that voters use the pen or marking device provided at their polling place or as instructed in their absentee ballot, the use of a felt-tip pen doesn't invalidate a ballot."

**5. Wisconsin ballots do not have any special encoding with invisible watermarks or blockchain codes.**

One of the stranger claims after the election was that legitimate ballots had been specially encoded by one of the political parties so any illegitimate ballots could be rejected.

Wisconsin county clerks are responsible for printing ballots which are distributed to municipal clerks, Wolfe said. "The secrecy of your ballot is safe," Wolfe said. "Clerks do not print any watermarks or codes on them that would identify any voter or political party." Ballot anonymity is a requirement of the law, and what candidate a voter chose is not a part of their record. The state of Wisconsin also does not track party affiliation. Local election officials do not know voter's party preference when issuing ballots.

**6. Clerks and poll workers followed state law in curing absentee ballot certificates that were missing address information.**

Another unfounded claim is that just before the election the WEC illegally told clerks they could add witness addresses to absentee ballot certificate envelopes. Here are the facts:

- The Wisconsin Elections Commission's guidance permitting municipal clerks to fix missing witness address components based on reliable information has been in effect since October 2016. There was no new guidance or change to this requirement.
- Voter and witness signatures can only be added by the voter and the original witness. Signatures can never be added by poll workers (unless they were the original witness during in-person absentee).

- The motion to approve the guidance was made by Republican members of the Commission in 2016 and it passed unanimously.
- The guidance has been in effect for 11 statewide elections, including the 2016 presidential and presidential recount, and no one has objected to it until now.
- Guidance to clerks that was posted on October 19, 2020, simply restates this earlier guidance.
- The law says that a witness address needs to be present for the certificate to be accepted and the ballot to be counted, it does not specify who affixes the address (for example, voter address is added by the clerk on the certificate envelope). If an absentee certificate does not contain a witness address (i.e. the witness forgot or the clerk cannot add it based on reliable information) then the ballot cannot be counted.
- There were no corrections made to "ballots" as some articles and posts claim. These were witness addresses added to the certificate, in accordance with the 2016 directive. They are also distinguishable (initials, red pen, etc.) and done as part of the publicly observable process.

## 7. The WEC followed the law and court orders about the ERIC Movers list.

There have been unfounded allegations that the WEC violated the law by not removing approximately 232,000 voters from the registration list because they may have moved.

The Wisconsin Court of Appeals ruled in February 2020 that WEC could not remove voters from the registration list. The court case, *Zignego v. Wisconsin Elections Commission,* was argued before the Wisconsin Supreme Court in September and no decision has been issued yet. The WEC will follow the Supreme Court's decision once it is issued.

The current process requires anyone who may have moved to affirm their address when receiving a ballot. These voters have a watermark next to their name in the poll book and are asked to sign to affirm that they still live there. If any voter has moved, they are directed to register to vote before they can be issued a ballot.

###

---

The Wisconsin Elections Commission is responsible for administration and enforcement of election laws in Wisconsin. The Commission is made up of six Commissioners – four appointed directly by the State Senate Majority Leader, Speaker of the Assembly and the Minority Leaders in the State Senate and Assembly. The remaining two Commissioners are by the Governor with confirmation by the State Senate from lists of former municipal and county clerks submitted by the legislative leadership in each party.