# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

WILLIAM FEEHAN,

      Plaintiff,

      v.                         Case No. 20-CV-1771

WISCONSIN ELECTIONS
COMMISSION, and its members ANN S.
JACOBS, MARK L. THOMSEN, MARGE
BOSTELMAN, JULIE M. GLANCEY,
DEAN KNUDSON, ROBERT F.
SPINDELL, JR., in their official
capacities, GOVERNOR TONY EVERS,
in his official capacity,

      Defendants.

---

## DEFENDANTS WISCONSIN ELECTIONS COMMISSION AND ITS MEMBERS' SUBMISSION OF UNREPORTED AUTHORITY PURSUANT TO CIVIL L.R. 7(J)

---

Defendants Wisconsin Elections Commission, Ann S. Jacob, Mark L. Thomsen, Marge Bostelman, Julie M. Glancey, Dean Knudson, and Robert F. Spindell, Jr., by their attorneys, and pursuant to Civil L. R. 7(j), hereby submit the following attached unreported authority cited in both *Defendant Commission and Commissioner's Response Opposing Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction* and *Defendants Wisconsin Elections Commission and Its Members' Brief in Support of Motion*

*to Dismiss*, both of which are filed herewith. The unreported authority cited in both briefs is the same and consists of the following cases:

1.  *Martel v. Condos*, -- F. Supp. 3d. --, 2020 WL 5755289 (D. Vt. 2020);

2.  *Moore v. Circosta*, -- F. Supp. 3d --, 2020 WL 6063332 (M.D.N.C. 2020);

3.  *Donald J. Trump for Pres., Inc. v. Cegavske*, -- F. Supp. 3d --, 2020 WL 5626974 (D. Nev. 2020);

4.  *Bognet v. Sec'y Commonwealth of Pennsylvania*, -- F.3d --, 2020 WL 6686120 (3d. Cir. Nov. 13, 2020);

5.  *Donald J. Trump for President, Inc. v. Boockvar*, No. 20-CV-966, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020);

6.  *Donald J. Trump for President, Inc. v. Pennsylvania*, No. 20-3371, 2020 WL 7012522 (3d Cir. Nov. 27, 2020).

7.  *Wood v. Raffensperger*, No. 20-14418, 2020 WL 7094866 (11th Cir. Dec. 5, 2020)

8.  *King v. Whitmer,* No. 20-13134 (E.D. Mi. Dec. 7, 2020)

Dated this 7th day of December, 2020.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ S. Michael Murphy
S. MICHAEL MURPHY
Assistant Attorney General
State Bar #1078149

2

JODY J. SCHMELZER
Assistant Attorney General
State Bar #1027796

COLIN T. ROTH
Assistant Attorney General
State Bar #1103985

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-5457 (Murphy)
(608) 266-3094 (Schmelzer)
(608) 264-6219 (Roth)
(608) 294-2907 (Fax)
murphysm@doj.state.wi.us
schmelzerjj@doj.state.wi.us
rothct@doj.state.wi.us

3

2020 WL 5755289
Only the Westlaw citation is currently available.
United States District Court, D. Vermont.

Tracey MARTEL, Robert Frenier,
Brian Smith, Raoul Beaulieu,
and Mary Beausoleil, Plaintiffs,
v.
James C. CONDOS, in his official
capacity as the Secretary of
State of Vermont, Defendant.

Case No. 5:20-cv-131
|
Signed 09/16/2020

**Synopsis**

**Background:** Five registered voters brought action to challenge Secretary of State directive that an election ballot be mailed to every active voter on the statewide voter checklist, alleging that the directive was unconstitutional, ultra vires, and contrary to law and seeking an injunction rescinding the directive and preventing Secretary of State from issuing mail-in ballots. Voter filed motion for preliminary injunction, and Secretary of State filed motion to dismiss.

The District Court, Geoffrey W. Crawford, Chief Judge, held that voters lacked concrete and particularized injury in fact necessary for standing.

Motion for injunction denied, case dismissed.

**Attorneys and Law Firms**

David A. Warrington, Esq., Pro Hac Vice, Kutak Rock LLP, Richmond, VA, Deborah T. Bucknam, Esq., Bucknam Law PC, Walden, VT, Harmeet K. Dhillon, Esq., Pro Hac Vice, Dhillon Law Group Inc., San Francisco, CA, Mark P. Meuser, Esq., Pro Hac Vice, Dhillon Law Group Inc., San Francisco, CA, for Plaintiffs.

David R. Groff, Esq., Philip A. Back, Esq., Office of the Vermont Attorney General, Montpelier, VT, for Defendant.

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION AND ON MOTION TO DISMISS

Geoffrey W. Crawford, Chief Judge

**\*1** In the spring of 2020, faced with the crisis resulting from the spread of COVID-19 infection, the Vermont legislature passed two bills that changed Vermont election law for the 2020 primary and general elections. *See* 2020 Vt. Acts & Resolves Nos. 92 and 135 (Act 92 and Act 135, respectively). These became law in July 2020 after the governor declined to sign or veto the measures. *See* Letter from Philip B. Scott, Governor, to the Vt. Gen. Assembly (July 2, 2020), https://governor.vermont.gov/sites/scott/files/documents/Vermont% 20General% 20Assembly% 20Letter% 20re% 20S.348.pdf. Vermont Secretary of State James C. Condos issued a Directive on July 20, 2020 exercising the authority conferred upon him by the two Acts. (Doc. 1-1.) The Directive includes, among other things, a provision stating that, for the November general election, "[a] ballot will be mailed to every active voter on the statewide voter checklist." (Doc. 1-1 at 4.)

The above-captioned plaintiffs have filed a complaint against Secretary Condos seeking a declaration that the Directive is unconstitutional, *ultra vires*, and contrary to law. (Doc. 1 at 25.) They also seek an injunction rescinding the Directive and preventing Secretary Condos from distributing mail-in ballots as contemplated by the Directive. (*Id.*) Currently pending is Plaintiffs' Motion for a Preliminary Injunction (Doc. 2) and Defendant's Motion to Dismiss (Doc. 10). The court held a hearing on the motions on September 15, 2020.

### Background

The provisions in Acts 92 and 135 principally at issue in this case concern the legislature's decision to authorize the Secretary of State to require local election officials to send ballots by mail to all registered voters. Act 92 states, in pertinent part:

> In the year 2020, the Secretary of State is authorized, in consultation and agreement with the Governor, to order or permit, as applicable appropriate elections procedures for the purpose of protecting the health, safety and welfare of voters, elections workers, and candidates in carrying out elections including:

(1) requiring mail balloting by requiring town clerks to send ballots by mail to all registered voters ....

Act 92, § 3(a). Act 135 amended Act No. 92. It removed the requirement of "agreement" with the Governor. Act 135, § 1. It also added a new subsection (c):

If the Secretary of State orders or permits the mailing of 2020 General Election ballots to all registered voters pursuant to subsection (a) of this section, the Secretary shall:

(1) inform the Governor as soon as reasonably practicable following the Secretary's decision to do so; and

(2) require the return of those ballots to be in the manner prescribed by 17 V.S.A. § 2543 (return of ballots) as set forth in Sec. la of this act, the provisions of which shall apply to that return.

*Id.*[1] Other changes in election practices authorized by the Acts include provisions for collecting and counting mail-in ballots early, permitting drive-up, car window collection of ballots, and extending both voting hours and the time to process and count ballots. Act 92, § 3(a)(1–6); Act 135 § 1 a(1–6).

[1]    Paragraph (2) of subsection (c) contains a mistake. Section 2543 of Title 17 sets out procedures for returning early ballots to local election officials. Sec. 1a appeared in prior versions of Act No. 135. It contained procedures restricting so-called "ballot harvesting" by third party organizations. Section la was dropped from the final version of Act 135 and never enacted. The reference to it is a legislative drafting mistake which was noted in the Governor's July 2, 2020 letter as a technical error. It refers to a proposed change in the law which was not ultimately passed. Such mistakes are unhelpful in understanding statutory language, but this one does not have any effect on the other provisions of Acts 92 and 135. The court will apply the other provisions of the Acts despite the mistaken reference to the (non-existent) Section 1a.

**\*2** In response to the legislative initiative, the Secretary of State issued a Directive on July 20, 2020 exercising the authority conferred upon him by the two Acts. (Doc. 1-1.) The Directive states that it is issued "[n]otwithstanding any provisions of law contained in Title 17 of the Vermont Statutes Annotated to the contrary" and "pursuant to the authority granted to the Secretary of State by Act 92 (2020) and Act 135 (2020)." (*Id.* at 1.) The Directive describes a variety of measures for both the August primary and November general elections, including new procedures for ballot returns, processing, outdoor and drive-through polling places, outdoor

ballot handling, overseas voters, changes of polling places, qualifications of election officials, home delivery of ballots, mask requirements, and voting in person after receiving a ballot by mail. (*See id.* at 1–4.) Regarding ballot returns, the Directive states that, with four enumerated exceptions, "[b]allots may not be returned to the Clerk by any candidate whose name appears on the ballot for that election, or any campaign staff member of any such candidate." (*Id.* at 1.) Regarding changes to polling places, the Directive states that "[t]he location of a polling place may be changed no less than 15 days prior to the election." (*Id.* at 3.)

The Directive contains the following provision for "mailed ballots" in the November general election:

A ballot will be mailed to every active voter on the statewide voter checklist. "Active" voters are any voters that have not been sent a challenge letter by the BCA asking the voter to affirm their residence, or who have responded to any such letter and have affirmed their residence.

- Ballots will be mailed to all active registered voters starting Friday, September 18.

- Ballots will be mailed or otherwise delivered to all military and overseas voters no later than the September 19 deadline mandated by federal law.

- All ballots will be mailed from a central location by the Secretary of State's Office.

- For mailing purposes, the Secretary of State will use the mailing address contained in any pending request for a General Election ballot first, and if none will use the mailing address in the voter's record second, and if none the legal address in the voter's record.

- The issue date for all ballots will be recorded in the statewide election management system by the Secretary of State on a batch basis as they are sent. Clerks will only by required to record the date that ballots are returned. Clerks will be required to enter the request, issue, and return date for any ballots requested by voters after the statewide mailing is sent, including for those voters who may register after that date.

- Postage for the mailing of ballots and the return of ballots to the Clerks by voters will be paid by the Secretary of State's office. All envelopes will be pre-paid.

(*Id.* at 4–5.)

After issuing the Directive and in preparation for the August primary election, the Secretary caused absentee primary ballot request forms printed on postcards to be sent to every person listed on the statewide voter checklist. (Doc. 1 ¶ 42.) According to the Complaint, the issuance of the postcards "was intended to be a test of the process by which Condos intended to mail ballots to all voters on the statewide voter checklist pursuant to the Directive." (*Id.* ¶ 43.) Plaintiffs allege that the postcard mailing revealed "numerous problems," such as postcards being sent to voters at addresses they no longer used, postcards sent to people who are no longer eligible to vote in Vermont, and some longtime registered voters who received no postcard. (*Id.* ¶¶ 45–48.)

The Secretary of State is prepared to follow the Directive and Acts 92 and 135 by mailing out ballots to all active registered voters on Friday, September 18, 2020.

## Analysis

### I. Plaintiffs' Challenges

Plaintiffs are five registered Vermont voters. In addition to their status as registered voters, several have played a role in local and state government. Plaintiff Tracey Martel is the town clerk of Victory, Vermont, where she is responsible for the administration of Victory's elections. Robert Frenier is a former member of the Vermont House of Representatives. Brian Smith is a current member of the Vermont House. Mary Beausoleil is a resident of Lyndon and previously a Justice of the Peace.

#### A. Challenge to Statewide Mail-In Ballots

**\*3** Plaintiffs complain that their individual votes will be diluted if the distribution of mail-in ballots leads—as they fear—to mistaken votes or widespread voter fraud. The Complaint alleges that:

> if General Election mail-in ballots are automatically distributed to every eligible voter (any voter on a voter check-list), without any request for such a ballot from that voter, many castable ballots will inevitably fall in the hands of persons other than the voter to whom the mail-in ballot was directed, including some mail-in ballots that will be sent to persons to have moved, died or otherwise become ineligible."

(Doc. 1 ¶ 25.) Plaintiffs fear that ballots will be mailed to voters who have moved away, died, or otherwise become ineligible and that these ballots will be used to vote illegally by the ineligible voter or others who acquire the ballots and return them to polling places. (*See id.* ¶ 62.)

#### B. Other Challenges

In addition to their challenge based on alleged dilution of their votes, Plaintiffs assert in Count II that the Directive is unconstitutional and an *ultra vires* use of legislative power. They assert that the Directive contains provisions that are inconsistent with Vermont law. (*See id.* ¶ 71.) Finally, in Count III, Plaintiffs assert that the Directive is *ultra vires* because, in Plaintiffs' view, it does nothing beyond existing Vermont law to "protect[ ] the health, safety, and welfare of voters, elections workers, and candidates in carrying out elections"—the stated purpose of Acts 92 and 135. *See* Act 92, § 3(a); Act 135 § 1(a).

### II. Standing

Plaintiffs' case begins and ends with the issue of standing. This is a constitutional requirement which operates as a check on the ability of litigants to file claims for injuries which are insufficiently specific and direct in their effect on the plaintiff. *See Allen v. Wright*, 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–27, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014).[2] Cases in which plaintiffs assert "generalized grievances" of unlawful governmental action are commonly dismissed on standing grounds. *See United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (impact of government action plainly undifferentiated and common to all members of the public). The constitutional minimum of standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 184 (2d Cir. 2020) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

2       Standing has both a constitutional and a prudential aspect. In this case, the court is only concerned with

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

constitutional standing. Because it is absent, there is no need to consider the further issue of whether standing is not present for prudential reasons.

The requirement of "injury in fact" serves multiple purposes. It limits justiciable cases to those controversies which are sufficiently well-defined by injury to the plaintiff that the parties will develop the facts and seek remedies which are responsive to the harm. *See Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("The requirement of 'actual injury redressable by the court' ... tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." (internal citations omitted)). In a manner directly relevant to this case, the requirement supports principles of separation of power and caution in second-guessing decisions made by the other branches. *See Laird v. Tatum,* 408 U.S. 1, 15, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) ("Carried to its logical end, [litigation without direct injury] would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for the Congress acting through its committees and the 'power of the purse,' it is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action."). The "injury in fact" must have been "concrete and particularized" and also "actual or imminent, not conjectural or hypothetical." *Liberian Cmty. Ass'n of Conn.,* 970 F.3d at 184 (quoting *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130).

**\*4** Standing doctrine has an extensive history in the context of challenges to election practices. In *United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), the Supreme Court recognized the constitutional right to vote and have one's vote counted. "Obviously included within the right to choose [representatives], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted at Congressional elections." *Id.* at 315, 61 S.Ct. 1031. *See The Ku Klux Cases,* 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884). In reapportionment cases, the Court has long recognized the standing of the disadvantaged voter. *See Baker v. Carr,* 369 U.S. 186, 208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ("[Plaintiffs] are asserting a plain, direct and adequate interest in maintaining the effectiveness of their votes, not merely a claim of the right possessed by every citizen to require that the government be administered according to law.") (citations and internal quotations omitted).

Standing in such cases, however, does not extend to parties who have not themselves suffered discrimination or other individualized injury. *See United States v. Hays,* 515 U.S. 737, 745, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (without evidence that "plaintiff has personally been subjected to a racial classification ... [he] would be asserting only a generalized grievance against governmental conduct of which he or she does not approve."); *Sinkfield v. Kelley,* 531 U.S. 28, 121 S.Ct. 446, 148 L.Ed.2d 329 (2000) (majority white voters lacked standing to complain of unlawful racial practices to which they had not been subjected). The Second Circuit recognized the same principles in *League of Women Voters of Nassau County v. Nassau County Bd. of Supervisors,* 737 F.2d 155, 162 (2d Cir. 1984) ("[parties] who are not persons domiciled in underrepresented voting districts lack standing to prosecute this appeal.") *See Roxbury Taxpayers Alliance v. Delaware Cty Bd. of Supervisors,* 80 F.3d 42 (2d Cir. 1996) (only underrepresented voters have standing to bring claims of disproportional representation).

It would over-simplify the standing analysis to conclude that no state-wide election law is subject to challenge simply because it affects all voters. State legislation which unfairly restricts a voter's right to vote is subject to review by the courts. "We have long recognized that a person's right to vote is 'individual and personal in nature.' " *Gill v. Whitford,* ––– U.S. ––––, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018) (citing *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)). But as the *Gill* decision illustrates, the Supreme Court continues to decline to extend standing to plaintiffs asserting generalized objections to state election laws. In this case, the alleged injury is similar to the impact alleged by the majority voters who lacked standing in the reapportionment cases. The gerrymandered districts altered the proportional impact of every vote, but only those specifically disadvantaged by the unconstitutional scheme have standing. A vote cast by fraud or mailed in by the wrong person through mistake has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged.

These cases lead the court to be cautious in this case about extending standing to any registered voter – such as the five who have sued here – who alleges an injury common to all other registered voters. If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury. As the affidavit submitted by plaintiffs' expert makes clear, plaintiffs believe that the new processes

in place for the 2020 general election in Vermont have an excessive error rate. They propose a different system with heightened security, principally through a system to compare the signature accompanying the mail-in ballot with the signature on file. It is unnecessary to decide whether their proposed change is a good idea or not since the standing doctrine does not permit everyone and anyone to bring a lawsuit to challenge the merits of legislation.

The Vermont Superior Court in *Paige v. State of Vermont* recently rejected a similar challenge to the Directive on standing grounds. In that case, a Vermont voter and candidate for elected office in the upcoming election, H. Brooke Paige, challenged the Directive's statewide mail-in ballot procedure in the context of what he described as an interlocutory appeal of an administrative election complaint that he had filed. The Superior Court declined to hear the case because Mr. Paige had not exhausted his administrative remedies. *Paige v. State of Vermont*, No. 20-CV-00307 (Vt. Super. Ct. Sept. 8, 2020) (Zonay, J.). But the court also held that Mr. Paige lacked standing to challenge the statewide mail-in ballot procedure based on concerns of fraud because his claim consisted of "theoretical harms to the election process rather than threats of actual injury being caused to a protected legal interest." *Id.*

 **\*5**  Plaintiffs seek to distinguish *Paige.* They note that Mr. Paige filed his suit prematurely. That is one of the bases for the Superior Court's decision, but the court also separately found that Mr. Paige lacked standing. On the issue of standing, Plaintiffs argue that Mr. Paige had standing because a Vermont statute allowed him to file an election complaint with the Secretary of State. Plaintiffs here do not rely on that Vermont statute, but instead assert that they have alleged an individualized and particular harm flowing from the Directive. For the reasons stated above, the court disagrees; Plaintiffs have failed to show the "injury in fact" necessary to have standing. The *Paige* court's conclusion on the standing issue applies with equal force in this case. *Accord, Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, ––– F.Supp.3d ––––, ––––, 2020 WL 2089813, at \*5 (D. Nev.

Apr. 30, 2020) (Nevada voters lacked standing to challenge all-mail election plan based on concerns of an increase in illegal votes; their "purported injury of having their votes diluted due to ostensible election fraud may be conceivable raised by any Nevada voter. Such claimed injury therefore does not satisfy the requirement that Plaintiffs must state a concrete and particularized injury").

At oral argument, counsel for the plaintiff drew attention to a problem different from dilution by fraudulent votes which formed the focus of the complaint. Instead, plaintiffs seek to argue that the universal mail-in system may deprive them of an individualized right to vote if they (1) do not receive their ballot in the mail and (2) fail to take other measures to obtain a ballot such as contacting the town clerk directly or appearing at the polling place on election day in person. As this is not a class action, the court considers the experience of the individual plaintiffs themselves. These are sophisticated voters who have gone to considerable lengths to obtain counsel skilled in election law and to file a lawsuit in federal court. Of all people likely to be confused about how to vote, these five plaintiffs must be last on the list. The court will not enjoin a state-wide mailing because one or more of these plaintiffs may be confused by the non-receipt of a separate mailing last month in connection with the primary election.

## Conclusion

Plaintiffs' Motion for Preliminary Injunction (Doc. 2) is DENIED.

Defendant's Motion to Dismiss (Doc. 10) is GRANTED.

This case is DISMISSED WITHOUT PREJUDICE.

## All Citations

--- F.Supp.3d ----, 2020 WL 5755289

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 5 of 5   Document 58-1

Ex. 1

🏴 KeyCite Blue Flag – Appeal Notification

Appeal Filed by TIMOTHY MOORE v. DAMON CIRCOSTA, 4th Cir., October 15, 2020

2020 WL 6063332

Editor's Note: Additions are indicated by Text and deletions by ~~Text~~ .

Only the Westlaw citation is currently available.

United States District Court, M.D. North Carolina.

Timothy K. MOORE, et al., Plaintiffs,

v.

Damon CIRCOSTA, et al., Defendants,

and

North Carolina Alliance for Retired Americans, et al., Defendant-Intervenors.

Patsy J. Wise, et al., Plaintiffs,

v.

The North Carolina State Board of Elections, et al., Defendants,

and

North Carolina Alliance for Retired Americans, et al., Defendant-Intervenors.

1:20CV911

|

1:20CV912

|

Signed 10/14/2020

**Synopsis**

**Background:** State legislative leaders and individual registered voters sued the executive director and members of the North Carolina State Board of Elections (SBE), seeking an injunction against enforcement and distribution of memoranda issued by SBE pertaining to absentee voting. In a second case, individual voters, a campaign committee, national political parties, and two Members of the U.S. House of Representatives also sought an injunction against the same memoranda. Advocacy group for retirees and individual registered voters who were plaintiffs in a related state court action that resulted in a consent judgment intervened in both cases. Plaintiffs moved for preliminary injunction.

**Holdings:** The District Court, William L. Osteen, J., held that:

plaintiffs lacked Article III standing to bring vote-dilution claim;

individual plaintiffs who had already cast their absentee ballots by mail had standing to raise equal protection claims;

plaintiffs demonstrated a likelihood of success on the merits of their equal protection claims against the mail-in ballot witness-requirement cure procedure and extension of mail-in ballot receipt deadline;

plaintiffs demonstrated a likelihood of irreparable injury on their equal protection claims against witness-requirement cure procedure and extension of mail-in ballot receipt deadline;

balance of equities weighed heavily against preliminary injunction, and thus district court would deny injunctive relief; and

SBE exceeded its statutory authority and emergency powers when it entered into consent agreement and eliminated witness requirements for mail-in ballots.

Motion denied.

**Attorneys and Law Firms**

David H. Thompson, Peter A. Patterson, Nicole Jo Moss, Cooper & Kirk, PLLC, Washington, DC, Nathan Andrew Huff, Phelps Dunbar LLP, Raleigh, NC, for Plaintiffs.

Alexander McClure Peters, Sarah G. Boyce, Terence Steed, North Carolina Department of Justice, Raleigh, NC, for Defendants.

Burton Craige, Patterson Harkavy LLP, Raleigh, NC, Marc E. Elias, Lalitha D. Madduri, Perkins Coie, LLP, Uzoma N. Nkwonta, Kirkland & Ellis, LLP, Washington, DC, Narendra K. Ghosh, Patterson Harkavy, LLP, Chapel Hill, NC, for Defendant-Intervenors.

**<u>MEMORANDUM OPINION AND ORDER</u>**

[OSTEEN, JR.](), District Judge

**\*1** Presently before this court are two motions for a preliminary injunction in two related cases.

In the first case, <u>Moore v. Circosta</u>, No. 1:20CV911 ("<u>Moore</u>"), Plaintiffs Timothy K. Moore and Philip E. Berger (together, "State Legislative Plaintiffs"), Bobby Heath, Maxine Whitley, and Alan Swain (together, "<u>Moore</u> Individual Plaintiffs") seek an injunction against the enforcement and distribution of several Numbered Memoranda issued by the North Carolina State Board of Elections pertaining to absentee voting. (<u>Moore v. Circosta</u>, No. 1:20CV911, Mot. for Prelim. Inj. and Mem. in Supp. ("<u>Moore</u> Pls.' Mot.") (Doc. 60).)

In the second case, <u>Wise v. North Carolina State Board of Elections</u>, No. 1:20CV912 ("<u>Wise</u>"), Plaintiffs Patsy J. Wise, Regis Clifford, Samuel Grayson Baum, and Camille Annette Bambini (together, "<u>Wise</u> Individual Plaintiffs"), Donald J. Trump for President, Inc. ("Trump Campaign"), U.S. Congressman Gregory F. Murphy and U.S. Congressman Daniel Bishop (together, "Candidate Plaintiffs"), Republican National Committee ("RNC"), National Republican Senatorial Committee ("NRSC"), National Republican Congressional Committee ("NRCC"), and North Carolina Republican Party ("NCRP") seek an injunction against the enforcement and distribution of the same Numbered Memoranda issued by the North Carolina State Board of Elections at issue in <u>Moore</u>. (<u>Wise</u> Pls.' Mem. in Supp. of Mot. to Convert the Temp. Restraining Order into a Prelim. Inj. ("<u>Wise</u> Pls.' Mot.") (Doc. 43).)

By this order, this court finds Plaintiffs have established a likelihood of success on their Equal Protection challenges with respect to the State Board of Elections' procedures for curing ballots without a witness signature and for the deadline extension for receipt of ballots. This court believes the unequal treatment of voters and the resulting Equal Protection violations as found herein should be enjoined. Nevertheless, under [Purcell]() and recent Supreme Court orders relating to [Purcell](), this court is of the opinion that it is required to find that injunctive relief should be denied at this late date, even in the face of what appear to be clear violations.

## I. BACKGROUND

### A. Parties

**1. Moore v. Circosta (1:20CV911)**

State Legislative Plaintiffs Timothy K. Moore and Philip E. Berger are the Speaker of the North Carolina House of Representatives and the President Pro Tempore of the North Carolina Senate, respectively. (<u>Moore v. Circosta</u>, No. 1:20CV911, Compl. for Declaratory and Injunctive Relief ("<u>Moore</u> Compl.") (Doc. 1) ¶¶ 7-8.) Individual Plaintiffs Bobby Heath and Maxine Whitley are registered North Carolina voters who voted absentee by mail and whose ballots have been accepted by the State Board of Elections on September 21, 2020, and September 17, 2020, respectively. (<u>Id.</u> ¶¶ 9-10.) Plaintiff Alan Swain is a resident of Wake County, North Carolina, who is running as a Republican candidate to represent the State's Second Congressional District. (<u>Id.</u> ¶ 11.)

Executive Defendants include Damon Circosta, Stella Anderson, Jeff Carmon, III, and Karen Brinson Bell are members of the State Board of Elections ("SBE"). (<u>Id.</u> ¶¶ 12-15.) Executive Defendant Karen Brinson Bell is the Executive Director of SBE. (<u>Id.</u> ¶ 15.)

**\*2** Intervenor-Defendants North Carolina Alliance for Retired Americans, Barker Fowler, Becky Johnson, Jade Jurek, Rosalyn Kociemba, Tom Kociemba, Sandra Malone, and Caren Rabinowitz ("Alliance Intervenors") are plaintiffs in the related state court action in Wake County Superior Court. (<u>Moore v. Circosta</u>, No. 1:20CV911 (Doc. 28) at 15.)[1] Barker Fowler, Becky Johnson, Jade Jurek, Rosalyn Kociemba, Tom Kociemba, Sandra Malone, and Caren Rabinowitz are individual voters who are concerned they will be disenfranchised by Defendant SBE's election rules, (<u>id.</u>), and North Carolina Alliance for Retired Americans ("NC Alliance") is an organization "dedicated to promoting the franchise and ensuring the full constitutional rights of its members ...." (<u>Id.</u>)

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

**2. Wise v. N.C. State Bd. of Elections (1:20CV912)**

Individual Plaintiffs Patsy J. Wise, Regis Clifford, Camille Annette Bambini, and Samuel Grayson Baum are registered

Ex. 2

voters in North Carolina. (Wise v. N.C. State Bd. of Elections, No. 1:20CV912, Compl. for Declaratory and Injunctive Relief ("Wise Compl.") (Doc. 1) ¶¶ 25-28.) Wise has already cast her absentee ballot for the November 3, 2020 election by mail, "in accordance with statutes, including the Witness Requirement, enacted by the General Assembly." (Id. ¶ 25.) Plaintiffs Clifford, Bambini, and Baum intend to vote in the November 3, 2020 election and are "concern[ed] that [their] vote[s] will be negated by improperly cast or fraudulent ballots." (Id. ¶¶ 26-28.)

Plaintiff Trump Campaign represents the interests of President Donald J. Trump, who is running for re-election. (Id. ¶¶ 29-30.) Together, Candidate Plaintiffs Trump Campaign, U.S. Congressman Daniel Bishop, and U.S. Congressman Gregory F. Murphy are candidates who will appear on the ballot for re-election in the November 3, 2020 general election. (Id. ¶¶ 29-32.)

Plaintiff RNC is a national political party, (id. ¶¶ 33-36), that seeks to protect "the ability of Republican voters to cast, and Republican candidates to receive, effective votes in North Carolina elections and elsewhere," (id. ¶ 37), and avoid diverting resources and spending significant amounts of resources educating voters regarding confusing changes in election rules, (id. ¶ 38).

Plaintiff NRSC is a national political party committee that is exclusively devoted to electing Republican candidates to the U.S. Senate. (Id. ¶ 40.) Plaintiff NRCC is the national organization of the Republican Party dedicated to electing Republicans to the U.S. House of Representatives. (Id. ¶ 41.) Plaintiff NRCP is a North Carolina state political party organization that supports Republican candidates running in North Carolina elections. (Id. ¶¶ 44-45.)

Executive Defendant North Carolina SBE is the agency responsible for the administration of the elections laws of the State of North Carolina. (Id. ¶ 46.) As in Moore, included as Executive Defendants are Damon Circosta, Stella Anderson, Jeff Carmon, III, and Karen Brinson Bell of the North Carolina SBE. (Id. ¶¶ 47-50.)

Alliance Intervenors from Moore are also Intervenor-Defendants in Wise. (1:20CV912 (Doc. 22).)

**B. Factual Background**

**1. This Court's Decision in *Democracy***

On August 4, 2020, this court issued an order in a third related case, Democracy North Carolina v. North Carolina State Board of Elections, No. 1:20CV457, ---- F.Supp.3d ----, 2020 WL 4484063 (M.D.N.C. Aug. 4, 2020) ("the August Democracy Order"), that "left the One-Witness Requirement in place, enjoined several rules related to nursing homes that would disenfranchise Plaintiff Hutchins, and enjoined the rejection of absentee ballots unless the voter is provided due process." (Id. at ----, 2020 WL 4484063, at *1.) As none of the parties appealed that order, the injunctive relief is still in effect.

**2. Release of the Original Memo 2020-19**

**\*3** In response to the August Democracy Order, on August 21, 2020, SBE officials released guidance for "the procedure county boards must use to address deficiencies in absentee ballots." (Numbered Memo 2020-19 ("Memo 2020-19" or "the original Memo") (Moore v. Circosta, No. 1:20CV911, Moore Compl. (Doc. 1) Ex. 3 – NC State Bd. of Elections Mem. ("Original Memo 2020-19") (Doc. 1-4) at 2.) This guidance instructed county boards regarding multiple topics. First, it instructed county election boards to "accept [a] voter's signature on the container-return envelope if it appears to be made by the voter ... [a]bsent clear evidence to the contrary," even if the signature is illegible. (Id.) The guidance clarified that "[t]he law does not require that the voter's signature on the envelope be compared with the voter's signature in their registration record," as "[v]erification of the voter's identity is completed through the witness requirement." (Id.)

Second, the guidance sorted ballot deficiencies into two categories: curable and uncurable deficiencies. (Id. at 3.) Under this version of Memo 2020-19, a ballot could be cured via voter affidavit alone if the voter failed to sign the certification or signed in the wrong place. (Id.) A ballot error could not be cured, and instead, was required to be spoiled, in the case of all other listed deficiencies, including a missing signature, printed name, or address of the witness; an incorrectly placed witness or assistant signature; or an unsealed or re-sealed envelope. (Id.) Counties were required to notify voters in writing regarding any ballot deficiency – curable or incurable - within one day of the county identifying the defect and to enclose either a cure affidavit or a new ballot, based on the type of deficiency at issue. (Id. at 4.)

Ex. 2

In the case of an incurable deficiency, a new ballot could be issued only "if there [was] time to mail the voter a new ballot ... [to be] receive[d] by Election Day." (Id. at. 3) If a voter who submitted an incurable ballot was unable to receive a new absentee ballot in time, he or she would have the option to vote in person on Election Day. (Id. at 4.)

If the deficiency was curable by a cure affidavit, the guidance stated that the voter must return the cure affidavit by no later than 5 p.m. on Thursday, November 12, 2020. (Id.)

### 3. Rescission of Numbered Memo 2020-19

The State began issuing ballots on September 4, 2020, marking the beginning of the election process. (Wise, No. 1:20CV912, Wise Pls.' Mot. (Doc. 43).) On September 11, 2020, SBE directed counties to stop notifying voters of deficiencies in their ballot, as advised in Memo 2020-19, pending further guidance from SBE. (Moore, No. 1:20CV911, Moore Pls.' Mot. (Doc. 60) Ex. 3, Democracy Email Chain (Doc. 60-4) at 6.)

### 4. Revision of Numbered Memo 2020-19

On September 22, over two weeks after the State began issuing ballots, SBE issued a revised Numbered Memo 2020-19, which set forth a variety of new policies not implemented in the original Memo 2020-19. (Numbered Memo 2020-19 ("the Revised Memo" or "Revised Memo 2020-19") (Moore v. Circosta, No. 1:20CV911 (Doc. 36) Ex. 3, Revised Numbered Memo 2020-19 ("Revised Memo 2020-19") (Doc. 36-3).) In subsequent litigation in Wake County Superior Court, SBE advised the court that both the original memo 2020-19 and the Revised Memo were issued "to ensure full compliance with the injunction entered by Judge Osteen." (Moore v. Circosta, No. 1:20CV911, Exec. Defs.' Br. in Supp. of Joint Mot. for Entry of Consent Judgment ("SBE State Court Br.") (Doc. 68-1) at 15.) Moreover, on September 28, 2020, during a status conference with a district court in the Eastern District of North Carolina prior to transfer to this court, counsel for Defendant SBE stated that Defendant SBE issued the revised Memo 2020-19 "in order to comply with Judge Osteen's preliminary injunction in the Democracy N.C. action in the Middle District." (Moore v. Circosta, No. 1:20CV911, Order Granting Mot. for Temp. Restraining Order ("TRO") (Doc.

47) at 9.) At that time, counsel for SBE indicated that they had not yet submitted the Revised Memo 2020-19 to this court, "but that it was on counsel's list to get [it] done today." (Id.) (internal quotations omitted.) On September 28, 2020, Defendant SBE filed the Revised Memo 2020-19 with this court in the Democracy action. (Democracy N.C. v. N.C. State Bd. of Elections, No. 1:20CV457 (Doc. 143-1).)

**\*4** The revised guidance modified which ballot deficiencies fell into the curable and uncurable categories. Unlike the original Memo 2020-19, the Revised Memo advised that ballots missing a witness or assistant name or address, as well as ballots with a missing or misplaced witness or assistant signature, could be cured via voter certification. (Moore v. Circosta, No. 1:20CV911, Revised Memo 2020-19 (Doc. 36-3) at 3.) According to the revised guidance, the only deficiencies that could not be cured by certification, and thus required spoliation, were where the envelope was unsealed or where the envelope indicated the voter was requesting a replacement ballot. (Id. at 4.)

The cure certification in Revised 2020-19 required voters to sign and affirm the following:

> I am submitting this affidavit to correct a problem with missing information on the ballot envelope. I am an eligible voter in this election and registered to vote in [name] County, North Carolina. I solemnly swear or affirm that I voted and returned my absentee ballot for the November 3, 2020 general election and that I have not voted and will not vote more than one ballot in this election. I understand that fraudulently or falsely completing this affidavit is a Class I felony under Chapter 163 of the North Carolina General Statutes.

(Moore v. Circosta, No. 1:20CV911 (Doc. 45-1) at 34.)

The revised guidance also extended the deadline for civilian absentee ballots to be received to align with that for military and overseas voters. (Moore v. Circosta, No. 1:20CV911, Revised Memo 2020-19 (Doc. 36-3) at 5.) Under the original Memo 2020-19, in order to be counted, civilian absentee ballots must have been received by the county board office by 5 p.m. on Election Day, November 3, 2020, or if postmarked, by Election Day, by 5:00 p.m. on November 6, 2020. (Moore v. Circosta, No. 1:20CV911, Original Memo 2020-19 (Doc. 1-4) at 5 (citing N.C. Gen. Stat. § 163-231(b)).) Under the Revised Memo 2020-19, however, a late civilian ballot would be counted if postmarked on or before Election Day and received by 5:00 p.m. on November 12, 2020. (Moore v. Circosta, No. 1:20CV911, Revised Memo 2020-19 (Doc.

Ex. 2

36-3) at 5.) This is the same as the deadline for military and overseas voters, as indicated in the Original Memo 2020-19. (Id.)[2]

[2]    In <u>Democracy N. Carolina v. N.C. State Board of Elections</u>, No. 1:20CV457, an order is entered contemporaneously with this Memorandum Opinion and Order enjoining certain aspects of the Revised Memo 2020-19.

### 5. <u>Numbered Memoranda 2020-22 and 2020-23</u>

SBE issued two other Numbered Memoranda on September 22, 2020, in addition to Revised Numbered Memo 2020-19.

First, SBE issued Numbered Memo 2020-22, the purpose of which was to further define the term postmark used in Numbered Memo 2020-19. (<u>Wise</u>, No. 1:20CV912, Wise Compl. (Doc. 1), Ex. 3, N.C. State Bd. of Elections Mem. ("Memo 2020-22") (Doc. 1-3) at 2.) Numbered Memo 2020-22 advised that although "[t]he postmark requirement for ballots received after Election Day is in place to prohibit a voter from learning the outcome of an election and then casting their ballot.... [T]he USPS does not always affix a postmark to a ballot return envelope." (Id.) Recognizing that SBE now offers "BallotTrax," a system in which voters and county boards can track the status of a voter's absentee ballot, SBE said "it is possible for county boards to determine when a ballot was mailed even if does not have a postmark." (Id.) Moreover, SBE recognized that commercial carriers offer tracking services that document when a ballot was deposited with the commercial carrier. (Id.) For these reasons, the new guidance stated that a ballot would be considered postmarked by Election Day if it had a postmark, there is information in BallotTrax, or "another tracking service offered by the USPS or a commercial carrier, indicat[es] that the ballot was in the custody of USPS or the commercial carrier on or before Election Day." (Id. at 3.)

**\*5** Second, SBE issued Numbered Memo 2020-23, which provides "guidance and recommendations for the safe, secure, and controlled in-person return of absentee ballots." (<u>Wise</u>, No. 1:20CV912, Wise Compl. (Doc. 1), Ex. 4, N.C. State Bd. of Elections Mem. ("Memo 2020-23") (Doc. 1-4) at 2.) Referring to <u>N.C. Gen. Stat. § 163-226.3(a)(5),</u>[3] which prohibits any person other than the voter's near relative or legal guardian to take possession of an absentee ballot of another voter for delivery or for return to a county board

of elections, (id.), Numbered Memo 2020-23 confirms that "an absentee ballot may not be left in an unmanned drop box." (Id.) The guidance reminds county boards that they must keep a written log when any person returns an absentee ballot in person, which includes the name of the individual returning the ballot, their relationship to the voter, the ballot number, and the date it was received. (Id. at 3.) If the individual who drops off the ballot is not the voter, their near relative, or legal guardian, the log must also record their address and phone number. (Id.)

[3]    The Memoranda incorrectly cites this statute as N.C. Gen. Stat. § 163-223.6(a)(5).

At the same time, the guidance advises county boards that "[f]ailure to comply with the logging requirement, or delivery or an absentee ballot by a person other than the voter, the voter's near relative, or the voter's legal guardian, is not sufficient evidence in and of itself to establish that the voter did not lawfully vote their ballot." (Id. at 3.) Instead, the guidance advises county boards that they "may ... consider the delivery of a ballot ... in conjunction with other evidence in determining whether the ballot is valid and should be counted." (Id. at 4.)

### 6. <u>Consent Judgment in North Carolina Alliance for Retired Americans v. North Carolina State Bd. of Elections</u>

On August 10, 2020, NC Alliance, the Defendant-Intervenors in the two cases presently before this court, filed an action against SBE in North Carolina's Wake County Superior Court challenging, among other voting rules, the witness requirement for mail-in absentee ballots and rejection of mail-in absentee ballots that are postmarked by Election Day but delivered to county boards more than three days after the election. (<u>Moore v Circosta</u>, No. 1:20CV911, SBE State Court Br. (Doc. 68-1) at 15.)

On August 12, 2020, Philip Berger and Timothy Moore, Plaintiffs in <u>Moore</u>, filed a notice of intervention as of right in the state court action and became parties to that action as intervenor-defendants on behalf of the North Carolina General Assembly. (Id. at 16.)

On September 22, 2020, SBE and NC Alliance filed a Joint Motion for Entry of a Consent Judgment with the superior court. (Id.) Philip Berger and Timothy Moore were not aware of this "secretly-negotiated" Consent Judgment, (<u>Wise</u> Pls.'

Mot. (Doc. 43) at 6), until the parties did not attend a previously scheduled deposition, (Democracy v. N.C. Bd. of Elections, No. 1:20CV457 (Doc. 168) at 73.)

Among the terms of the Consent Judgment, SBE agreed to extend the deadline for receipt of mail-in absentee ballots mailed on or before Election Day to nine days after Election Day, to implement the cure process established in Revised Memo 2020-19, and to establish separate mail in absentee ballot "drop off stations" at each early voting site and county board of elections office which were to be staffed by county board officials. (Moore v. Circosta, No. 1:20CV911, SBE State Court Br. (Doc. 68-1) at 16.)

In its filings with the state court, SBE frequently cited this court's decision in Democracy as a reason for why the Wake County Superior Court Judge should accept the Consent Judgment. SBE argued that a cure procedure for deficiencies related to the witness requirement were necessary because "[w]itness requirements for absentee ballots have been shown to be, broadly speaking, disfavored by the courts," (id. at 26), and that "[e]ven in North Carolina, a federal court held that the witness requirement could not be implemented as statutorily authorized without a mechanism for voters to have adequate notice of and [an opportunity to] cure materials [sic] defects that might keep their votes from being counted," (id. at 27). SBE argued that, "to comply with the State Defendants' understanding of the injunction entered by Judge Osteen, the State Board directed county boards of elections not to disapprove any ballots until a new cure procedure that would comply with the injunction could be implemented," (id. at 30), and that ultimately, the cure procedure introduced in Revised Memo 2020-19 as part of the consent judgment would comply with this injunction. (Id.) SBE indicated that it had notified the federal court of the cure mechanism process on September 22, 2020, (id.), although this court was not made aware of the cure procedure until September 28, 2020, (Democracy N.C. v. N.C. State Bd. of Elections, No. 1:20CV457 (Doc. 143-1)), the day before the processing of absentee ballots was scheduled to begin on September 29, 2020, (Moore v. Circosta, No. 20CV911 Transcript of Oral Argument ("Oral Argument Tr.")(Doc. 70) at 109.)

**\*6** On October 2, 2020, the Wake County Superior Court entered the Stipulation and Consent Judgment. (Moore v. Circosta, No. 1:20CV911, State Court Consent Judgment (Doc. 45-1).) Among its recitals, which Defendant SBE drafted and submitted to the judge as is customary in state court, (Oral Argument Tr. (Doc. 70) at 91), the Wake County

Superior Court noted this court's preliminary injunction in Democracy, finding,

> WHEREAS, on August 4, 2020, the United States District Court for the Middle District of North Carolina enjoined the State Board from "the "disallowance or rejection ... of absentee ballots without due process as to those ballots with a material error that is subject to remediation." Democracy N.C. v. N.C. State Bd. of Elections, No. 1:20-cv-00457-WO-JLW [—— F.Supp.3d ——, 2020 WL 4484063] (M.D.N.C. Aug. 4, 2020) (Osteen, J.). ECF 124 at 187. The injunction is to remain in force until the State Board implements a cure process that provides a voter with "notice and an opportunity to be heard before an absentee ballot with a material error subject to remediation is disallowed or rejected." Id.

(State Court Consent Judgment (Doc. 45-1) at 6.)[4]

[4]    An additional discussion of the facts related to SBE's use of this court's order in obtaining a Consent Judgment is set out in this court's order in Democracy v. North Carolina State Board of Elections, No. 1:20CV457, 2020 WL 6058048 (M.D.N.C. Oct. 14, 2020) (enjoining witness cure procedure).

## 7. Numbered Memoranda 2020-27, 2020-28, and 2020-29

In addition to the Numbered Memoranda issued on September 22, 2020, as part of the consent judgment in the state court case, SBE has issued three additional numbered memoranda.

First, on October 1, 2020, SBE issued Numbered Memo 2020-27, which was issued in response to this court's order in Democracy regarding the need for parties to attend a status conference to discuss Numbered Memo 2020-19. (Moore v. Circosta, No. 1:20CV911 (Doc. 40-2) at 2.) The guidance advises county boards that this court did not find Numbered Memo 2020-19:

> "consistent with the Order entered by this Court on August 4, 2020," and indicates that its preliminary injunction order should "not be construed as finding that the failure of a witness to sign the application and certificate as a witness is a deficiency which may be cured with a certification after the ballot has been returned."

(Id.) "In order to avoid confusion while related matters are pending in a number of courts," the guidance advises that "[c]ounty boards that receive an executed absentee container-return envelope with a missing witness signature shall take

Ex. 2

no action as to that envelope." (Id.) In all other respects, SBE stated that Revised Numbered Memo 2020-19 remains in effect. (Id.)

Second, on October 4, 2020, SBE issued Numbered Memo 2020-28, which states that both versions of Numbered Memo 2020-19, as well as Numbered Memoranda 2020-22, 2020-23, and 2020-27 "are on hold until further notice" following the temporary restraining order entered in the instant cases on October 3, 2020. (Moore v. Circosta, No. 1:20CV911 (Doc. 60-5) at 2.) Moreover, the guidance reiterated that "[c]ounty boards that receive an executed absentee container-return envelope with a deficiency shall take no action as to that envelope," including sending a cure notification or reissuing the ballot. (Id. at 2-3.) Instead, the guidance directs county boards to store envelopes with deficiencies in a secure location until further notice. (Id. at 3.) If, however, a county board had previously issued a ballot and the second envelope is returned without any deficiencies, the guidance permits the county board to approve the second ballot. (Id.)

*7 Finally, on October 4, 2020, SBE issued Numbered Memo 2020-29, which states that it provides "uniform guidance and further clarification on how to determine if the correct address can be identified if the witness's or assistant's address on an absentee container-return envelope is incomplete. (Wise, No. 1:20CV912 (Doc. 43-5).) First, the guidance clarifies that if a witness or assistant does not print their address, the envelope is deficient. (Id. at 2.) Second, the guidance states that failure to list a witness's ZIP code does not require a cure; a witness or assistant's address may be a post office box or other mailing address; and if the address is missing a city or state, but the county board can determine the correct address, the failure to include this information does not invalidate the container-return envelope. (Id.) Third, if both the city and ZIP code are missing, the guidance directs staff to determine whether the correct address can be identified. (Id.) If they cannot be identified, then the envelope is deficient. (Id.)

### C. Procedural History

On September 26, 2020, Plaintiffs in Moore filed their action in the United States District Court for the Eastern District of North Carolina. (Moore Compl. (Doc. 1).) Plaintiffs in Wise also filed their action in the United States District Court for the Eastern District of North Carolina on September 26, 2020. (Wise Compl. (Doc. 1).)

Alliance Intervenors filed a Motion to Intervene as Defendants in Moore on September 30, 2020, (Moore v. Circosta, No. 1:20CV911 (Doc. 27)), and in Wise on October 2, 2020, (Wise, No. 1:20CV912 (Doc. 21).) This court granted Alliance Intervenors' Motion to Intervene on October 8, 2020. (Moore v. Circosta, No. 1:20CV911 (Doc. 67); Wise, No. 1:20CV912 (Doc. 49).)

The district court in the Eastern District of North Carolina issued a temporary restraining order in both cases on October 3, 2020, and transferred the actions to this court for this court's "consideration of additional or alternative injunctive relief along with any such relief in Democracy North Carolina v. North Carolina State Board of Elections ...." (Moore v. Circosta, 1:20CV911, TRO (Doc. 47) at 2; Wise, No. 1:20CV912 (Doc. 25) at 2.)

On October 5, 2020, this court held a Telephone Conference, (Moore v. Circosta, No. 1:20CV911, Minute Entry 10/05/2020; Wise, No. 1:20CV912, Minute Entry 10/05/2020), and issued an order directing the parties to prepare for a hearing on the temporary restraining order and/or a preliminary injunction and to submit additional briefing, (Moore v. Circosta, No. 1:20CV911 (Doc. 51); Wise, No. 1:20CV912 (Doc. 30)). On October 6, 2020, Plaintiffs in Wise filed a Memorandum in Support of Plaintiffs' Motion to Convert the Temporary Restraining Order into a Preliminary Injunction, (Wise Pls.' Mot. (Doc. 43)), and Plaintiffs in Moore filed a Motion for a Preliminary Injunction and Memorandum in Support of Same, (Moore Pls.' Mot. (Doc. 60).) Defendant SBE filed a response to Plaintiffs' motions in both cases on October 7, 2020. (Moore v. Circosta, No. 1:20CV911, State Defs.' Resp. to Pls.' Mot. for Prelim. Inj. ("SBE Resp.") (Doc. 65); Wise, No. 1:20CV912 (Doc. 45).) Alliance Intervenors also filed a response to Plaintiffs' motions in both cases on October 7, 2020. (Moore v. Circosta, No. 1:20CV911, Proposed Intervenors' Mem. in Opp'n to Pls.' Mot. for a Prelim. Inj. ("Alliance Resp.") (Doc. 64); Wise, No. 1:20CV912 (Doc. 47).)[5]

---

[5] Defendant SBE and Alliance Intervenors' memoranda filed in opposition to Plaintiffs' motions for a preliminary injunction in Moore are identical to those that each party filed in Wise. (Compare SBE Resp. (Doc. 65) and Alliance Resp. (Doc. 64) with Wise, No. 1:20CV912 (Doc. 45) and Wise, No. 1:20CV912 (Doc. 47).) For clarity and ease, this court will cite only to the briefs Defendant SBE and Alliance Intervenors filed in Moore in subsequent citations.

This court held oral arguments on October 8, 2020, in which all of the parties in these two cases presented arguments with respect to Plaintiffs' motions for a preliminary injunction. (Moore v. Circosta, No. 1:20CV911, Minute Entry 10/08/2020; Wise, No. 1:20CV912, Minute Entry 10/08/2020.)

 **\*8** This court has federal question jurisdiction over these cases under 28 U.S.C. § 1331. This matter is ripe for adjudication.

### D. Preliminary Injunction Standard of Review

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Such an injunction "is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017).

## II. ANALYSIS

Executive Defendants and Alliance Intervenors challenge Plaintiffs' standing to seek a preliminary injunction regarding their Equal Protection, Elections Clause, and Electors Clause claims. (Alliance Resp. (Doc. 64) at 14-18; SBE Resp. (Doc. 65) at 11-13.) Executive Defendants and Alliance Intervenors also challenge this court's ability to hear this action under abstention, (Alliance Resp. (Doc. 64) at 10-14; SBE Resp. (Doc. 65) at 10-11), Rooker-Feldman (Alliance Resp. (Doc. 64) at 13), and preclusion doctrines, (SBE Resp. (Doc. 65) at 7-10). Finally, Executive Defendants and Alliance Intervenors attack Plaintiffs' motions for preliminary injunction on the merits. (Alliance Resp. (Doc. 64) at 19-26; SBE Resp. (Doc. 65) at 13-18.)

Because Rooker-Feldman, abstention, and preclusion are dispositive issues, this court addresses them first, then addresses Plaintiffs' motions on standing and the likelihood of success on the merits.

As to each of these abstention doctrines, as will be explained further, this court's preliminary injunction order, (Doc. 124), in Democracy North Carolina v. North Carolina State Board of Elections, No. 1:20CV457, played a substantial role as relevant authority supporting SBE's request for approval, in

North Carolina state court, of Revised Memo 2020-19 and the related Consent Judgment. (See discussion infra Part II.D.3.b.i.) As Berger, Moore, and SBE are all parties in Democracy, this court initially finds that abstention doctrines do not preclude this court's exercise of jurisdiction. This court's August Democracy Order was issued prior to the filing of these state court actions, and that Order was the basis of the subsequent grant of affirmative relief by the state court. This court declines to find that any abstention doctrine would preclude it from issuing orders in aid of its jurisdiction, or as to parties appearing in a pending case in this court.

### A. Rooker-Feldman Doctrine

Rooker-Feldman doctrine is a jurisdictional doctrine that prohibits federal district courts from " 'exercising appellate jurisdiction over final state-court judgments.' " See Thana v. Bd. of License Comm'rs for Charles Cnty., 827 F.3d 314, 319 (4th Cir. 2016) (quoting Lance v. Dennis, 546 U.S. 459, 463, 126 S.Ct. 1198, 163 L.Ed.2d 1059 (2006) (per curiam)). The presence or absence of subject matter jurisdiction under Rooker-Feldman is a threshold issue that this court must determine before considering the merits of the case. Friedman's, Inc. v. Dunlap, 290 F.3d 191, 196 (4th Cir. 2002).

 **\*9** Although Rooker-Feldman originally limited only federal-question jurisdiction, the Supreme Court has recognized the applicability of the doctrine to cases brought under diversity jurisdiction:

> Rooker and Feldman exhibit the limited circumstances in which this Court's appellate jurisdiction over state-court judgments, 28 U.S.C. § 1257, precludes a United States district court from exercising subject-matter jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority, e.g., § 1330 (suits against foreign states), § 1331 (federal question), and § 1332 (diversity).

See Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 291-92, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). Under the Rooker-Feldman doctrine, courts lack subject matter jurisdiction to hear "cases brought by [1] state-court losers complaining of [2] injuries caused by state-court judgments [3] rendered before the district court proceedings commenced and [4] inviting district court review and rejection of those judgments." Id. at 284, 125 S.Ct. 1517. The doctrine is "narrow and focused." Thana, 827 F.3d at 319. "[I]f a plaintiff in federal court does not seek review of the state court judgment itself but instead 'presents an independent claim, it

Ex. 2

is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court.' " Id. at 320 (quoting Skinner v. Switzer, 562 U.S. 521, 532, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011)). Rather, "any tensions between the two proceedings should be managed through the doctrines of preclusion, comity, and abstention." Id. (citing Exxon, 544 U.S. at 292–93, 125 S.Ct. 1517).

Moreover, "the Rooker–Feldman doctrine applies only when the loser in state court files suit in federal district court seeking redress for an injury allegedly caused by the state court's decision itself." Davani v. Va. Dep't of Transp., 434 F.3d 712, 713 (4th Cir. 2006); see also Hulsey v. Cisa, 947 F.3d 246, 250 (4th Cir. 2020) ("A plaintiff's injury at the hands of a third party may be 'ratified, acquiesced in, or left unpunished by' a state-court decision without being 'produced by' the state-court judgment.") (internal citations omitted).

Here, Plaintiffs are challenging SBE's election procedures and seeking injunction of those electoral rules, not attempting to directly appeal results of a state court order. More importantly, however, the Fourth Circuit has previously found that a party is not a state court loser for purposes of Rooker-Feldman if "[t]he [state court] rulings thus were not 'final state-court judgments' " against the party bringing up the same issues before a federal court. Hulsey, 947 F.3d at 251 (quoting Lance, 546 U.S. at 463, 126 S.Ct. 1198). In the Alliance state court case, Alliance brought suit against SBE. The Plaintiffs from this case were intervenors. They were not parties to the Settlement Agreement and were in no way properly adjudicated "state court losers." Given the Supreme Court's intended narrowness of the Rooker-Feldman doctrine, see Lance, 546 U.S. at 464, 126 S.Ct. 1198, and Plaintiffs' failure to fit within the Fourth Circuit's definition of "state-court losers," this court will decline to abstain under the Rooker-Feldman doctrine.

## B. Abstention

### 1. Colorado River Abstention

**\*10** Abstention "is the exception, not the rule." Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); see also id. at 817, 96 S.Ct. 1236 (noting the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them"). Thus, this court's task "is not to find some

substantial reason for the exercise of federal jurisdiction," but rather "to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' ... to justify the surrender of that jurisdiction." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25-26, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

First, and crucially for this case, the court must determine whether there are ongoing state and federal proceedings that are parallel. Al-Abood ex rel. Al-Abood v. El-Shamari, 217 F.3d 225, 232 (4th Cir. 2000) ("The threshold question in deciding whether Colorado River abstention is appropriate is whether there are parallel suits."); Ackerman v. ExxonMobil Corp., 734 F.3d 237, 248 (4th Cir. 2013) (finding that abstention is exercised only "in favor of ongoing, parallel state proceedings" (emphasis added)). In this instance, the parties have failed to allege any ongoing state proceeding that this federal suit might interfere with. In fact, Plaintiffs in this case are excluded as parties in the Consent Judgment and are bringing independent claims in this federal court alleging violations, inter alia, of the Equal Protection Clause. This court does not find that Colorado River abstention prevents it from adjudicating Equal Protection claims raised by parties who were not parties to the Consent Judgment.

### 2. Pennzoil Abstention

As alleged by Defendants, Pennzoil does dictate that federal courts should not "interfere with the execution of state judgments." Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 14, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). However, in the very next sentence, the Pennzoil court caveats that this doctrine applies "[s]o long as those challenges relate to pending state proceedings." Id. In fact, in Pennzoil itself, the Court clarified that abstention was proper because "[t]here is at least one pending judicial proceeding in the state courts; the lawsuit out of which Texaco's constitutional claims arose is now pending before a Texas Court of Appeals in Houston, Texas." Id. at 14, 107 S.Ct. 1519 n.13.

Abstention was also justified in Pennzoil because the Texas state court was not presented with the contested federal constitutional questions, and thus, "when [the subsequent] case was filed in federal court, it was entirely possible that the Texas courts would have resolved this case ... without reaching the federal constitutional questions." Id. at 12, 107 S.Ct. 1519. In the present case, Plaintiffs raised their constitutional claims in the state court prior to the entry of

Ex. 2

the Consent Judgment. The state court, through the Consent Judgment and without taking evidence, adjudicated those claims as to the settling parties. The Consent Judgment is effective through the 2020 Election and specifies no further basis upon which Plaintiffs here may seek relief. As a result, there does not appear to be any relief available to Plaintiffs for the federal questions raised here. For these reasons, this court will also decline to abstain under Pennzoil.

**3. Pullman Abstention**

Pullman abstention can be exercised where: (1) there is "an unclear issue of state law presented for decision"; and (2) resolution of that unclear state law issue "may moot or present in a different posture the federal constitutional issue such that the state law issue is potentially dispositive." Educ. Servs., Inc. v. Md. State Bd. for Higher Educ., 710 F.2d 170, 174 (4th Cir. 1983); see also N.C. State Conference of NAACP v. Cooper, 397 F. Supp. 3d 786, 794 (M.D.N.C. 2019). Pullman does not apply here because any issues of state law are not, in this court's opinion, unclear or ambiguous. Alliance's brief in Moore posits that "whether NCSBE has the authority to enter the Consent Judgment and promulgate the Numbered Memos" are at the center of this case, thereby urging Pullman abstention. (Alliance Resp. (Doc. 64 at 12).) SBE has undisputed authority to issue guidance consistent with state law and may issue guidance contrary to state law only in response to natural disasters – the court finds this, though ultimately unnecessary to the relief issued in this case, fairly clear. (See discussion supra at Part II.e.2.b.ii.) Moreover, this court has already expressly assessed and upheld the North Carolina state witness requirement, which is the primary state law at issue in this case. Democracy N. Carolina, ––– F.Supp.3d at ––––, 2020 WL 4484063, at *48.

**\*11** Furthermore, Defendants and Intervenors would additionally need to show how "resolution of ... state law issues pending in state court" would "eliminate or substantially modify the federal constitutional issues raised in Plaintiffs' Complaint." N.C. State Conference of NAACP, 397 F. Supp. 3d at 796. As Alliance notes, the Plaintiffs did not appeal the state court's conclusions, but sought relief in federal court – there is no state law issue pending in state court here. For all of these reasons, this court declines to abstain under Pullman.

**C. Issue Preclusion**

Collateral estoppel, or issue preclusion "refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." New Hampshire v. Maine, 532 U.S. 742, 748-49, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). The purpose of this doctrine is to "protect the integrity of the judicial process ...." Id. at 749, 121 S.Ct. 1808 (internal quotations omitted).

Plaintiffs argue that issue preclusion does not bar their Equal Protection claims. Citing Arizona v. California, 530 U.S. 392, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000), Plaintiffs in Wise argue that a negotiated settlement between parties, like the consent judgment between the Alliance Intervenors and Defendant SBE in Wake County Superior Court, does not constitute a final judgment for issue preclusion. (Wise Pls.' Mot. (Doc. 43) at 23.) Plaintiffs in Moore, citing In re Microsoft Corp. Antitrust Litig., 355 F.3d 322 (4th Cir. 2004), argue that issue preclusion cannot be asserted because the Individual Plaintiffs in Moore were not parties to the state court litigation that resulted in the consent judgment. (Moore Pls.' Mot. (Doc. 60) at 4.)

In response, Defendant SBE argues that, under North Carolina law, issue preclusion applies where (1) the issue is identical to the issue actually litigated and necessary to a prior judgment, (2) the prior action resulted in a final judgment on the merits, and (3) the plaintiffs in the latter action are the same as, or in privity with, the parties in the earlier action, (SBE Resp. (Doc. 65) at 7), and the parties in these federal actions and those in the state actions are in privity under the third element of the test, (id. at 8).

This court finds that issue preclusion does not bar Plaintiffs' claims. In Arizona v. California, the Supreme Court held that "[i]n most circumstances, it is recognized that consent agreements ordinarily are intended to preclude any further litigation on the claim presented but are not intended to preclude further litigation on any of the issues presented." 530 U.S. at 414, 120 S.Ct. 2304 (internal quotations omitted). Moreover, "settlements ordinarily occasion no issue preclusion ... unless it is clear ... that the parties intend their agreement to have such an effect." Id.

The Consent Judgment SBE and Alliance entered into does not clearly demonstrate that they intended their agreement to have an issue preclusive effect with regard to claims brought now by Plaintiffs in Moore and Wise. The language

of the Consent Judgment demonstrates that it "constitutes a settlement and resolution of Plaintiffs' claims against Executive Defendants pending in this Lawsuit" and that "by signing this Stipulation and Consent Judgment, they are releasing any claims ... that they might have against Executive Defendants." (State Court Consent Judgment (Doc. 45-1) at 14 (emphasis added).) Although Timothy Moore and Philip Berger, State Legislative Plaintiffs in Moore, were Defendant-Intervenors in the NC Alliance action, they were not parties to the consent judgment. (Id.) Thus, because the plain language of the agreement did not expressly indicate an intention to preclude Plaintiffs Moore and Berger from litigating the issue in subsequent litigation, neither these State Legislative Plaintiffs, nor any other parties with whom they may or may not be in privity, are estopped from raising these claims now before this court.

### D. Plaintiffs' Equal Protection Claims

**\*12** Plaintiffs raise "two separate theories of an equal protection violation," – a "vote dilution claim, and an arbitrariness claim." (Oral Argument Tr. (Doc. 70) at 52; see also Wise Pls.' Mot. (Doc. 43) at 12-15.)

### 1. Voting Harms Prohibited by the Equal Protection Clause

Under the Fourteenth Amendment of the U.S. Constitution, a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Fourteenth Amendment is one of several constitutional provisions that "protects the right of all qualified citizens to vote, in state as well as federal elections." Reynolds v. Sims, 377 U.S. 533, 554, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Because the Fourteenth Amendment protects not only the "initial allocation of the franchise," as well as "to the manner of its exercise," Bush v. Gore, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), "lines may not be drawn which are inconsistent with the Equal Protection Clause ...." Id. at 105, 121 S.Ct. 525 (citing Harper v. Va. State Bd. of Elections, 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)).

The Supreme Court has identified two theories of voting harms prohibited by the Fourteenth Amendment. First, the Court has identified a harm caused by "debasement or dilution of the weight of a citizen's vote," also referred to "vote dilution." Reynolds, 377 U.S. at 555, 84 S.Ct. 1362. Courts find this harm arises where gerrymandering under

a redistricting plan has diluted the "requirement that all citizens' votes be weighted equally, known as the one person, one vote principle," and resulted in one group or community's vote counting more than another's. Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections, 827 F.3d 333, 340 (4th Cir. 2016); see also Gill v. Whitford, 585 U.S. ——, ——, 138 S. Ct. 1916, 1930-31, 201 L.Ed.2d 313 (2018) (finding that the "harm" of vote dilution "arises from the particular composition of the voter's own district, which causes his vote – having been packed or cracked – to carry less weight than it would carry in another, hypothetical district"); Wesberry v. Sanders, 376 U.S. 1, 18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (finding that vote dilution occurred where congressional districts did not guarantee "equal representation for equal numbers of people"); Wright v. North Carolina, 787 F.3d 256, 268 (4th Cir. 2015) (invalidating a voter redistricting plan).

Second, the Court has found that the Equal Protection Clause is violated where the state, "[h]aving once granted the right to vote on equal terms," through "later arbitrary and disparate treatment, value[s] one person's vote over that of another." Bush, 531 U.S. at 104-05, 121 S.Ct. 525 (2000); see also Baker v. Carr, 369 U.S. 186, 208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ("A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false tally, or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of the ballot box.") (internal citations omitted). This second theory of voting harms requires courts to balance competing concerns around access to the ballot. On the one hand, a state should not engage in practices which prevent qualified voters from exercising their right to vote. A state must ensure that there is "no preferred class of voters but equality among those who meet the basic qualifications." Gray v. Sanders, 372 U.S. 368, 379-80, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). On the other hand, the state must protect against "the diluting effect of illegal ballots." Id. at 380, 83 S.Ct. 801. Because "the right to have one's vote counted has the same dignity as the right to put a ballot in a box," id., the vote dilution occurs only where there is both "arbitrary and disparate treatment." Bush, 531 U.S. at 105, 121 S.Ct. 525. To this end, states must have "specific rules designed to ensure uniform treatment" of a voter's ballot. Id. at 106, 121 S.Ct. 525.

### 2. Standing to Bring Equal Protection Claims

Ex. 2

**\*13** In light of the harms prohibited by the Equal Protection Clause, this court must first consider whether Plaintiffs have standing to bring these claims.

For a case or controversy to be justiciable in federal court, a plaintiff must allege "such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." White Tail Park, Inc. v. Stroube, 413 F.3d 451, 458 (4th Cir. 2005) (quoting Planned Parenthood of S.C. Inc. v. Rose, 361 F.3d 786, 789 (4th Cir. 2004)).

The party seeking to invoke the federal courts' jurisdiction has the burden of satisfying Article III's standing requirement. Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006). To meet that burden, a plaintiff must demonstrate three elements: (1) that the plaintiff has suffered an injury in fact that is "concrete and particularized" and "actual or imminent"; (2) that the injury is fairly traceable to the challenged conduct of the defendant; and (3) that a favorable decision is likely to redress the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

In multi-plaintiff cases, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." Town of Chester v. Laroe Estates, Inc., 581 U.S. ––––, ––––, 137 S. Ct. 1645, 1651, 198 L.Ed.2d 64 (2017). Further, if there is one plaintiff "who has demonstrated standing to assert these rights as his own," the court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 & n.9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

In the voting context, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue," Baker, 369 U.S. at 206, 82 S.Ct. 691, so long as their claimed injuries are "distinct from a 'generally available grievance about the government,' " Gill, 138 S. Ct. at 1923 (quoting Lance v. Coffman, 549 U.S. 437, 439, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007) (per curiam)).

Defendant SBE and Alliance Intervenors argue that Individual Plaintiffs in Wise and Moore have not alleged a concrete and particularized injury under either of the two Equal Protection theories. (Alliance Resp. (Doc. 64) at 14-15; SBE Resp. (Doc. 65) at 12-13.)

First, under a vote dilution theory, they argue that courts have "repeatedly rejected this theory as a basis for standing, both because it is unduly speculative and impermissibly generalized." (Alliance Resp. (Doc. 64) at 17.) Second, under an arbitrary and disparate treatment theory, they argue that the injury is too generalized because the Numbered Memoranda apply equally to all voters across the state and that Plaintiffs "cannot claim an injury for not having to go through a remedial process put in place for other voters." (SBE Resp. (Doc. 65) at 12.)

Plaintiffs in Moore and Wise do not address standing for their Equal Protection claims in their memoranda in support of their motions for a preliminary injunction. (See Wise Pls.' Mot. (Doc. 43); Moore Pls.' Mot. (Doc. 60).) At oral argument held on October 8, 2020, however, counsel for the Moore Plaintiffs responded to Defendant SBE and Alliance Intervenor's standing arguments. (Oral Argument Tr. (Doc. 70) at 52-59.)

**\*14** First, under a vote dilution theory, counsel argued that "the Defendants confuse a widespread injury with not having a personal injury," (id. at 53), and that the Supreme Court's decision in Reynolds demonstrates that "impermissible vote dilution occurs when there's ballot box stuffing," (id.), suggesting that each voter would have standing to sue under the Supreme Court's precedent in Reynolds because their vote has less value. (Id.) Second, under an arbitrary and disparate treatment theory, counsel argued that Plaintiffs were subjected to the witness requirement and that "[t]here are burdens associated with that" which support a finding of an injury in fact. (Id. at 56.) Counsel argued the harm that is occurring is not speculative because, for example, voters have and will continue to fail to comply with the witness requirement, (id. at 55-56), and ballots will arrive between the third and ninth day following the election pursuant to the Postmark Requirement, (id. at 58). Moreover, counsel argued that the "regime" imposed by the state is arbitrary, citing limitations on assistance allowed to complete a ballot, compared to the lessened restrictions associated with the witness requirement under Numbered Memo 2020-19. (Id. at 59.)

This court finds that Individual Plaintiffs in Moore and Wise have not articulated a cognizable injury in fact for their vote dilution claims. However, all of the Individual Plaintiffs in Moore, and one Individual Plaintiff in Wise have articulated an injury in fact for an arbitrary and disparate treatment claim.

Ex. 2

**a. Vote Dilution**

Although the Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature.' " [Gill, 138 S. Ct. at 1930](#) (citing [Reynolds, 377 U.S. at 561, 84 S.Ct. 1362](#)), the Court has expressly held that "vote dilution" refers specifically to "invidiously minimizing or canceling out the voting potential of racial or ethnic minorities," [Abbott v. Perez, 585 U.S. ——, ——, 138 S. Ct. 2305, 2314, 201 L.Ed.2d 714 (2018)](#) (internal quotations and modifications omitted) (emphasis added), a harm which occurs where "the particular composition of the voter's own district ... causes where his vote – having been packed or cracked – to carry less weight than it would carry in another, hypothetical district." [Gill, 138 S. Ct. at 1931](#).

Indeed, lower courts which have addressed standing in vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted, as Plaintiffs have argued here, have said that this harm is unduly speculative and impermissibly generalized because all voters in a state are affected, rather than a small group of voters. See, e.g., [Donald J. Trump for President, Inc. v. Cegavske, Case No. 2:20-CV-1445 JCM (VCF), —— F.Supp.3d ——, ——, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020)](#) ("As with other generally available grievances about the government, plaintiffs seek relief on behalf of their member voters that no more directly and tangibly benefits them than it does the public at large.") (internal quotations and modifications omitted); [Martel v. Condos, Case No. 5:20-cv-131, —— F.Supp.3d ——, ——, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020)](#) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); [Paher v. Cegavske, 457 F.Supp.3d 919, 926–27 (D. Nev. 2020)](#) ("Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter."); [Am. Civil Rights Union v. Martinez-Rivera, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015)](#) ("[T]he risk of vote dilution [is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.").

Although "[i]t would over-simplify the standing analysis to conclude that no state-wide election law is subject to challenge simply because it affects all voters," [Martel, —— F.Supp.3d at ——, 2020 WL 5755289, at *4](#), the notion that a single person's vote will be less valuable as a result of

unlawful or invalid ballots being cast is not a concrete and particularized injury in fact necessary for Article III standing. Compared to a claim of gerrymandering, in which the injury is specific to a group of voters based on their racial identity or the district where they live, all voters in North Carolina, not just Individual Plaintiffs, would suffer the injury Individual Plaintiffs allege. This court finds this injury too generalized to give rise to a claim of vote dilution, and thus, neither Plaintiffs in Moore nor in Wise have standing to bring their vote dilution claims under the Equal Protection Clause.

**b. Arbitrary and Disparate Treatment**

**\*15** In [Bush](#), the Supreme Court held that, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." [531 U.S. at 104-05, 121 S.Ct. 525](#). Plaintiffs argue that they have been subjected to arbitrary and disparate treatment because they voted under one set of rules, and other voters, through the guidance in the Numbered Memoranda, will be permitted to vote invalidly under a different and unequal set of rules, and that this is a concrete and particularized injury. (Oral Argument Tr. (Doc. 70) at 70-71.)

For the purposes of determining whether Plaintiffs have standing, is it not "necessary to decide whether [Plaintiffs'] allegations of impairment of their votes" by Defendant SBE's actions "will, ultimately, entitle them to any relief," [Baker, 369 U.S. at 208, 82 S.Ct. 691](#); whether a harm has occurred is best left to this court's analysis of the merits of Plaintiffs' claims, (see discussion infra Section II.D.3). Instead, the appropriate inquiry is, "[i]f such impairment does produce a legally cognizable injury," whether Plaintiffs "are among those who have sustained it." [Baker, 369 U.S. at 208, 82 S.Ct. 691](#).

This court finds that Individual Plaintiffs in Moore and one Individual Plaintiff in Wise have standing to raise an arbitrary and disparate treatment claim because their injury is concrete, particularized, and not speculative. Bobby Heath and Maxine Whitley, the Individual Plaintiffs in Moore, are registered North Carolina voters who voted absentee by mail and whose ballots have been accepted by SBE. (Moore Compl. (Doc. 1) ¶¶ 9-10.) In Wise, Individual Plaintiff Patsy Wise is a registered voter who cast her absentee ballot by mail. (Wise Compl. (Doc. 1) ¶ 25.)

Ex. 2

If Plaintiffs Heath, Whitley, and Wise were voters who intended to vote by mail but who had not yet submitted their ballots, as is the case with the other Individual Plaintiffs in Wise, (Wise Compl. (Doc. 1) ¶¶ 26-28), or voters who had intended to vote in-person either during the Early Voting period or on Election Day, then they would not in fact have been impacted by the laws and procedures for submission of absentee ballots by mail and the complained-of injury would be merely "an injury common to all other registered voters," Martel, ––– F.Supp.3d at –––, 2020 WL 5755289, at *4. See also Donald J. Trump for President, Inc., ––– F.Supp.3d at ––––, 2020 WL 5626974, at *4 ("Plaintiffs never describe how their member voters will be harmed by vote dilution where other voters will not."). Indeed, this court finds that Individual Plaintiffs Clifford, Bambini, and Baum in Wise do not have standing to challenge the Numbered Memoranda, because any "shock[]" and "serious concern[s]" they have that their vote "will be negated by improperly cast or fraudulent ballots," (Wise Compl. (Doc. 1) ¶¶ 26-28), is merely speculative until such point that they have actually voted by mail and had their ballots accepted, which Plaintiffs' Complaint in Wise does not allege has occurred. (Id.)

Yet, because Plaintiffs Heath, Whitley, and Wise have, in fact, already voted by mail, (Moore Compl. (Doc. 1) ¶¶ 9-10; Wise Compl. (Doc. 1) ¶ 25), their injury is not speculative. Under the Numbered Memoranda 2020-19, 2020-22, and 2020-23, other voters who vote by mail will be subjected to a different standard than that to which Plaintiffs Heath, Whitley, and Wise were subjected when they cast their ballots by mail. Assuming this is an injury that violates the Equal Protection Clause, Baker, 369 U.S. at 208, 82 S.Ct. 691, the harm alleged by Plaintiffs is particular to voters in Heath, Whitley, and Wise's position, rather than a generalized injury that any North Carolina voter could claim. For this reason, this court finds that Individual Plaintiffs Heath, Whitley, and Wise have standing to raise Equal Protection claims under an arbitrary and disparate treatment theory. Because at least one plaintiff in each of these multi-plaintiff cases has standing to seek the relief requested, the court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." Vill. of Arlington Heights, 429 U.S. at 264 & n.9, 97 S.Ct. 555.

### 3. Likelihood of Success on the Merits

 *16  Having determined that Individual Plaintiffs have standing to bring their arbitrary and disparate treatment claims, this court now considers whether Plaintiffs' claims are likely to succeed on the merits. To demonstrate a likelihood of success on the merits, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." Di Biase, 872 F.3d at 230.

#### a. Parties' Arguments

Plaintiffs argue that four policies indicated in the Numbered Memoranda are invalid under the Equal Protection Clause: (1) the procedure which allows ballots without a witness signature to be retroactively validated through the cure procedure indicated in Revised Numbered Memo 2020-19 ("Witness Requirement Cure Procedure"); (2) the procedure which allows absentee ballots to be received up to nine days after Election Day if they are postmarked on Election Day, as indicated in Numbered Memo 2020-19 ("Receipt Deadline Extension"); and (3) the procedure which allows for anonymous delivery of ballots to unmanned drop boxes, as indicated in Numbered Memo 2020-23 ("Drop Box Cure Procedure"); (4) the procedure which allows ballots to be counted without a United States Postal Service postmark, as indicated in Numbered Memo 2020-22 ("Postmark Requirement Changes"). (Moore Compl. (Doc. 1) ¶ 93; Wise Compl. (Doc. 1) ¶ 124; Wise Pls.' Mot. (Doc. 43) at 13-14.)

Plaintiffs in Wise argue that the changes in these Memoranda "guarantee that voters will be treated arbitrarily under the ever-changing voting regimes." (Wise Pls.' Mot. (Doc. 43) at 11.) Similarly, Plaintiffs in Moore argue that the three Memoranda were issued "after tens of thousands of North Carolinians cast their votes following the requirements set by the General Assembly," which deprives Plaintiffs "of the Equal Protection Clause's guarantee because it allows for 'varying standards to determine what [i]s a legal vote.' " (Moore Compl. (Doc. 1) ¶ 90 (citing Bush, 531 U.S. at 107, 121 S.Ct. 525).)

In response, Defendants argue that the Numbered Memoranda will not lead to the arbitrary and disparate treatment of ballots prohibited by the Supreme Court's decision in Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). Defendant SBE argues that the consent judgment and Numbered Memos do "precisely what Bush contemplated: It establishes uniform and adequate standards for determining what is a legal vote, all of which apply statewide, well in advance of Election Day. Indeed, the only thing stopping uniform statewide standards from going into effect is the

Ex. 2

TRO entered in these cases." (SBE Resp. (Doc. 65) at 17.) Moreover, Defendant SBE argues that the consent judgment "simply establishes uniform standards that help county boards ascertain which votes are lawful," and "in no way lets votes be cast unlawfully." (Id. at 18.)

Alliance Intervenors argue that the Numbered Memos "apply equally to all voters," (Alliance Resp. (Doc. 64) at 18), and "Plaintiffs have not articulated, let alone demonstrated, how their right to vote – or anyone else's – is burdened or valued unequally," (id. at 19). Moreover, Alliance Intervenors argue that the release of the Numbered Memoranda after the election began does not raise equal protection issues because, "[e]lection procedures often change after voting has started to ensure that the fundamental right to vote is protected." (Id. at 20.)

Both Defendant SBE and Alliance Intervenors argue that the release of the Numbered Memoranda after the election began does not raise equal protection issues, as election procedures often change after voting has started. (SBE Resp. (Doc. 65) at 18; Alliance Resp. (Doc. 64) at 20.) For example, Defendant SBE argues that "[i]f it is unconstitutional to extend the receipt deadline for absentee ballots to address mail disruptions, then it would also be unconstitutional to extend hours at polling places on Election Day to address power outages or voting-machine malfunctions." (SBE Resp. (Doc. 65) at 18 (citing N.C. Gen. Stat. § 163-166.01).) "Likewise, the steps that the Board has repeatedly taken to ensure that people can vote in the face of natural disasters like hurricanes would be invalid if those steps are implemented after voting begins." (Id.)

### b. Analysis

**\*17** This court agrees with the parties that an Equal Protection violation occurs where there is both arbitrary and disparate treatment. Bush, 531 U.S. at 105, 121 S.Ct. 525. This court also agrees with Defendants that not all disparate treatment rises to the level of an Equal Protection violation. As Defendant SBE argues, the General Assembly has empowered SBE to make changes to voting policies and procedures throughout the election, including extending hours at polling places or adjusting voting in response to natural disasters. (SBE Resp. (Doc. 65) at 18.) Other federal courts have upheld changes to election procedures even after voting has commenced. For example, in 2018, a federal court enjoined Florida's signature matching procedures and ordered

a cure process after the election. Democratic Exec. Comm. of Fla. v. Detzner, 347 F. Supp. 3d 1017, 1031 (N.D. Fla. 2018), appeal dismissed as moot sub nom. Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm., 950 F.3d 790 (11th Cir. 2020). Similarly, a Georgia federal court in 2018 ordered a cure process in the middle of the absentee and early voting periods. Martin v. Kemp, 341 F. Supp. 3d 1326 (N.D. Ga. 2018), appeal dismiss sub nom. Martin v. Sec'y of State of Ga., No. 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018).

A change in election rules that results in disparate treatment shifts from constitutional to unconstitutional when these rules are also arbitrary. The ordinary definition of the word "arbitrary" refers to matters "[d]epending on individual discretion" or "involving a determination made without consideration of or regard for facts, circumstances, fixed rules, or procedures." Arbitrary, Black's Law Dictionary (11th ed. 2019). This definition aligns with the Supreme Court's holding in Reynolds and Bush, that the State must ensure equal treatment of voters both at the time it grants citizens the right to vote and throughout the election. Bush, 531 U.S. at 104-05, 121 S.Ct. 525 ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."); Reynolds, 377 U.S. at 555, 84 S.Ct. 1362 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

The requirement that a state "grant[ ] the right to vote on equal terms," Bush, 531 U.S. at 104, 121 S.Ct. 525, includes protecting the public "from the diluting effect of illegal ballots," Gray, 372 U.S. at 380, 83 S.Ct. 801. To fulfill this requirement, a state legislature must define the manner in which voting should occur and the minimum requirements for a valid, qualifying ballot. In North Carolina, the General Assembly has passed laws defining the requirements for permissible absentee voting, N.C. Gen. Stat. § 163-226 et seq., including as recently as this summer, when it modified the one-witness requirement, 2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1.(a). As this court found in its order issuing a preliminary injunction in Democracy, these requirements reflect a desire by the General Assembly to prevent voter fraud resulting from illegal voting practices. Democracy N. Carolina, ––– F.Supp.3d at ––––, 2020 WL 4484063, at *35.

A state cannot uphold its obligation to ensure equal treatment of all voters at every stage of the election if another body,

Ex. 2

including SBE, is permitted to contravene the duly enacted laws of the General Assembly and to permit ballots to be counted that do not satisfy the fixed rules or procedures the state legislature has deemed necessary to prevent illegal voting. Any guidance SBE adopts must be consistent with the guarantees of equal treatment contemplated by the General Assembly and Equal Protection.

Thus, following this precedent, and the ordinary definition of the word "arbitrary," this court finds that SBE engages in arbitrary behavior when it acts in ways that contravene the fixed rules or procedures the state legislature has established for voting and that fundamentally alter the definition of a validly voted ballot, creating "preferred class[es] of voters." Gray, 372 U.S. at 380, 83 S.Ct. 801.

 **\*18** This definition of arbitrariness does not require this court to consider whether the laws enacted by the General Assembly violate other provisions in the North Carolina or U.S. Constitution or whether there are better public policy alternatives to the laws the General Assembly has enacted. These are separate inquiries. This court's review is limited to whether the challenged Numbered Memos are consistent with state law and do not create a preferred class or classes of voters.

### i. Witness Requirement Cure Procedure

This court finds Plaintiffs have demonstrated a likelihood of success on the merits with respect to their Equal Protection challenge to the Witness Requirement Cure Procedure in Revised Memo 2020-19.

Under the 2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1.(a), a witnessed absentee ballot must be "marked ... in the presence of at least one [qualified] person ...." This clear language dictates that the witness must be (1) <u>physically present</u> with the voter, and (2) present <u>at the time the ballot is marked</u> by the voter.

Revised Memo 2020-19 counsels that ballots missing a witness signature may be cured where voters sign and affirm the following statement:

> I am submitting this affidavit to correct a problem with missing information on the ballot envelope. I am an eligible voter in this election and registered to vote in [name] County, North Carolina. I solemnly swear or affirm that I

voted and returned my absentee ballot for the November 3, 2020 general election and that I have not voted and will not vote more than one ballot in this election. I understand that fraudulently or falsely completing this affidavit is a Class I felony under Chapter 163 of the North Carolina General Statutes.

(Moore v. Circosta, No. 1:20CV911 (Doc. 45-1) at 34.)

This "cure" affidavit language makes no mention of whether a witness was in the presence of the voter at the time that the voter cast their ballot, which is the essence of the Legislature's Witness Requirement. 2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1.(a). In fact, a voter could truthfully sign and affirm this statement and have their ballot counted by their county board of elections without any witness becoming involved in the process.[6] Because the effect of this affidavit is to eliminate the statutorily required witness requirement, this court finds that Plaintiffs have demonstrated a likelihood of success on the merits in proving that the Witness Requirement Cure Procedure indicated in Revised Memo 2020-19 is arbitrary.

6    Plaintiffs do not challenge the use of the cure affidavit for ballot deficiencies generally, aside from arguing that the cure affidavit circumvents the statutory Witness Requirement. (See Moore Compl. (Doc. 1) ¶ 93; Wise Compl. (Doc. 1) ¶ 124.) Although not raised by Plaintiffs, this courts finds the indefiniteness of the cure affidavit language troubling as a means of correcting even curable ballot deficiencies.
       During oral arguments, Defendants did not and could not clearly define what it means to "vote," (see, e.g., Oral Argument Tr. (Doc. 70) at 130-32), which is all that the affidavit requires voters to attest that they have done. (Moore v. Circosta, No. 1:20CV911, State Court Consent Judgment (Doc. 45-1) at 34.) Under the vague "I voted" language used in the affidavit, a voter who completed their ballot with assistance from an unauthorized individual; a voter who does not qualify for voting assistance; or a voter who simply delegated the responsibility for completing their ballot to another person could truthfully sign this affidavit, although all three acts are prohibited under state law. See N.C. Gen. Stat. § 163-226.3(a)(1). Because the cure affidavit does not define what it means to vote, voters are permitted to decide what that means for themselves.
       This presents additional Equal Protection concerns. A state must ensure that there is "no preferred class of voters but equality among those who meet the basic qualifications." Gray, 372 U.S. at 380, 83 S.Ct. 801. Because the affidavit does not serve as an adequate means to ensure that voters did not engage in

Ex. 2

unauthorized ballot casting procedures, inevitably, not all voters will be held to the same standards for casting their ballot. This is, by definition, arbitrary and disparate treatment inconsistent with existing state law.

This court's concerns notwithstanding, however, Plaintiffs do not challenge the use of a cure affidavit in other contexts, so this court will decline to enjoin the use of a cure affidavit beyond its application as an alternative for compliance with the Witness Requirement.

**\*19** Based on counsel's statements at oral arguments, Defendant SBE may contend that the guidance in Revised Memo 2020-19 is not arbitrary because it was necessary to resolve the <u>Alliance</u> state court action. (Oral Argument Tr. (Doc. 70) at 105 ("Our reading then of state law is that the Board has the authority to make adjustments in emergencies or as a means of settling protracted litigation until the General Assembly reconvenes.").) However, Defendant SBE's arguments to the state court judge and the court in the Eastern District of North Carolina belie that assertion, as they advised the state court that both the original Memo 2020-19 and the Revised Memo were issued "to ensure full compliance with the injunction entered by Judge Osteen," (SBE State Court Br. (Doc. 68-1) at 15), and they advised the court in the Eastern District of North Carolina that they had issued the revised Memo 2020-19 "in order to comply with Judge Osteen's preliminary injunction in the <u>Democracy N.C.</u> action in the Middle District." (TRO (Doc. 47) at 9.) As this court more fully explains in its order issued in <u>Democracy</u>, this court finds that Defendant SBE improperly used this court's August Democracy Order to modify the witness requirement. Democracy v. N. Carolina, No. 1:20CV457, 2020 WL 6058048 (M.D.N.C. Oct. 14, 2020) (enjoining witness cure procedure). Because Defendant SBE acted improperly in that fashion, this court declines to accept an argument now that elimination of the witness requirement was a rational and justifiable basis upon which to settle the state lawsuit. Furthermore, it is difficult to conceive that SBE was authorized to resolve a pending lawsuit that could create a preferred class of voters: those who may submit an absentee ballot without a witness under an affidavit with no definition of the meaning of "vote."

This court also finds Plaintiffs have demonstrated a likelihood of success on the merits in proving disparate treatment may result as a result of the elimination of the Witness Requirement. Individual Plaintiffs Wise, Heath, and Whitley assert that they voted absentee by mail, including complying with the Witness Requirement. (<u>Wise</u> Compl. (Doc. 1) ¶ 25; <u>Moore</u> Compl. (Doc. 1) ¶¶ 9-10.) Whether because a voter inadvertently cast a ballot without a witness or because a

voter was aware of the "cure" procedure and thus, willfully did not cast a ballot with a witness, there will be voters whose ballots are cast without a witness. Accordingly, this court finds that Plaintiffs have demonstrated a likelihood of success on the merits in proving that the Witness Requirement Cure Procedure indicated in Memo 2020-19 creates disparate treatment.

Thus, because Plaintiffs have demonstrated a likelihood of success on the merits with respect to arbitrary and disparate treatment that may result from under Witness Requirement Cure Procedure in Revised Memo 2020-19, this court finds Plaintiffs have established a likelihood of success on their Equal Protection claim.

### ii. Receipt Deadline Extension

This court finds that Plaintiffs are likely to succeed on their Equal Protection challenge to the Receipt Deadline Extension in Revised Memo 2020-19.

Under N.C. Gen. Stat. § 163-231(b), in order to be counted, civilian absentee ballots must have been received by the county board office by 5 p.m. on Election Day, November 3, 2020, or if postmarked by Election Day, by 5:00 p.m. on November 6, 2020. The guidance in Revised Memo 2020-19 extends the time in which absentee ballots must be returned, allowing a late civilian ballot to be counted if postmarked on or before Election Day and received by 5:00 p.m. on November 12, 2020 (Revised Memo 2020-19 (Doc. 36-3) at 5.)

Alliance Intervenors argue that, "[t]o the extent Numbered Memo 2020-22 introduces a new deadline, it affects only the counting of ballots for election officials after Election Day has passed – not when voters themselves must submit their ballots. All North Carolina absentee voters still must mail their ballots by Election Day." (Alliance Resp. (Doc. 64) at 21.)

This court disagrees, finding Plaintiffs have demonstrated a likelihood of success on the merits in proving that this change contravenes the express deadline established by the General Assembly, by extending the deadline from three days after Election Day, to nine days after Election Day. Moreover, it results in disparate treatment, as voters like Individual Plaintiffs returned their ballots within the time-frame permitted under state law, (<u>Wise</u> Compl. (Doc. 1) ¶

Ex. 2

25; Moore Compl. (Doc. 1) ¶¶ 9-10), but other voters whose ballots would otherwise not be counted if received three days after Election Day, will now have an additional six days to return their ballot.

Because Plaintiffs have demonstrated a likelihood of success on the merits in proving arbitrary and disparate treatment may result under the Receipt Deadline Extension, this court finds Plaintiffs have established a likelihood of success on the merits of their Equal Protection claim.

### iii. Drop Box Cure Procedure

**\*20** Plaintiffs have failed to establish a likelihood of success, however, on their Equal Protection challenge to the Drop Box Cure Procedure indicated in Numbered Memo 2020-23. (Wise, No. 1:20CV912, Memo 2020-23 (Doc. 1-4).)

N.C. Gen. Stat. § 163-226.3(a)(5) makes it a felony for any person other than the voter's near relative or legal guardian to take possession of an absentee ballot of another voter for delivery or for return to a county board of elections.

"Because of this provision in the law," and the need to ensure compliance with it, SBE recognized in Memo 2020-23 that, "an absentee ballot may not be left in an unmanned drop box," (Wise, No. 1:20CV912, Memo 2020-23 (Doc. 1-4) at 2), and directed county boards which have a "drop box, slot, or similar container at their office" for other business purposes to place a "sign indicating that absentee ballots may not be deposited in it." (Id.)

Moreover, the guidance reminds county boards that they must keep a written log when any person returns an absentee ballot in person, which includes the name of the individual returning the ballot, their relationship to the voter, the ballot number, and the date it was received. (Id. at 3.) If the individual who drops off the ballot is not the voter, their near relative, or legal guardian, the log must also record their address and phone number. (Id.) The guidance also advises county boards that "[f]ailure to comply with the logging requirement, or delivery or an absentee ballot by a person other than the voter, the voter's near relative, or the voter's legal guardian, is not sufficient evidence in and of itself to establish that the voter did not lawfully vote their ballot." (Id. at 3.) Instead, the guidance advises the county board that they "may ... consider the delivery of a ballot ... in conjunction with other

evidence in determining whether the ballot is valid and should be counted." (Id. at 4.)

Plaintiffs argue that this guidance "undermines the General Assembly's criminal prohibition of the unlawful delivery of ballots," (Moore Compl. (Doc. 1) ¶ 68), and "effectively allow[s] voters to use drop boxes for absentee ballots," (Wise Pls.' Mot. (Doc. 43) at 13), and thus, violates the Equal Protection Clause, (Moore Compl. (Doc. 1) ¶ 93). This court disagrees.

Although Numbered Memo 2020-23 was released on September 22, 2020, (Wise, No. 1:20CV912, Memo 2020-23 (Doc. 1-4) at 2), the guidance it contains is not new. Consistent with the guidance in Numbered Memo 2020-23, SBE administrative rules adopted on December 1, 2018, require that any person delivering a ballot to a county board of elections office provide:

(1) Name of voter;

(2) Name of person delivering ballot;

(3) Relationship to voter;

(4) Phone Number (if available) and current address of person delivering ballot;

(5) Date and time of delivery of ballot; and

(6) Signature or mark of person delivering ballot certifying that the information provided is true and correct and that the person is the voter or the voter's near relative as defined in [N.C. Gen. Stat § 163-226(f) or verifiable legal guardian as defined in [N.C. Gen. Stat. § 163-226(e)].

8 N.C. Admin. Code 18.0102 (2018). Moreover, the administrative rule states that "the county board of elections may consider the delivery of a ballot in accordance with this Rule in conjunction with other evidence in determining whether the container-return envelope has been properly executed according to the requirements of [N.C. Gen. Stat. § 163-231]," (id.), and that "[f]ailure to comply with this Rule shall not constitute evidence sufficient in and of itself to establish that the voter did not lawfully vote his or her ballot." (Id.)

**\*21** Because the guidance contained in Numbered Memo 2020-23 was already in effect at the start of this election as a result of SBE's administrative rules, Individual Plaintiffs were already subject to it at the time that they cast their votes. Accordingly, because all voters were subject to the

Ex. 2

same guidance, Plaintiffs have not demonstrated a likelihood of success on the merits in proving disparate treatment.

It is a closer issue with respect to whether Plaintiffs have demonstrated a likelihood of success on the merits in proving that the rules promulgated by Defendant SBE are inconsistent with N.C. Gen. Stat. § 163-226.3(a)(5).

This statute makes it a felony for any person other than the voter's near relative or legal guardian to take possession of an absentee ballot of another voter for delivery or for return to a county board of elections. Id. It would seem logically inconsistent that the General Assembly would criminalize this behavior, while at the same time, permit ballots returned by unauthorized third parties to be considered valid. Yet, upon review of the legislative history, this court finds the felony statute has been in force since 1979, 1979 N.C. Sess. Laws Ch. 799 (S.B. 519) § 4, https://www.ncleg.gov/enactedlegislation/sessionlaws/pdf/1979-1980/sl1979-799.pdf (last visited Oct. 13, 2020), and in its current form since 2013. 2013 N.C. Sess. Laws 381 (H.B. 589) § 4.6.(a).

That the General Assembly, by not taking legislative action, and instead, permitted SBE's administrative rule and the General Assembly's statute to coexist for nearly two years and through several other elections undermines Plaintiffs' argument that Defendant SBE has acted arbitrarily. For this reason, this court finds that Plaintiffs have not demonstrated a likelihood of success on the merits in proving the arbitrariness of the guidance in Numbered Memo 2020-23 and accordingly, Plaintiffs have failed to establish a likelihood of success on their Equal Protection challenge to Numbered Memo 2020-23.

If the General Assembly believes that SBE's administrative rules are inconsistent with its public policy goals, they are empowered to pass legislation which overturns the practice permitted under the administrative rule.

### iv. Postmark Requirement Changes

Similarly, this court finds that Plaintiffs have failed to establish likelihood of success on the merits with respect to their Equal Protection challenge to the Postmark Requirement Changes in Numbered Memo 2020-22. (Wise, 1:20CV912, Memo 2020-22 (Doc. 1-3).)

Under Numbered Memo 2020-22, a ballot will be considered postmarked by Election Day if it has a USPS postmark, there is information in BallotTrax, or "another tracking service offered by the USPS or a commercial carrier, indicat[es] that the ballot was in the custody of USPS or the commercial carrier on or before Election Day." (Id. at 3.) This court finds that these changes are consistent with N.C. Gen. Stat. § 163-231(b)(2)b, which does not define what constitutes a "postmark," and instead, merely states that ballots received after 5:00 p.m. on Election Day may not be accepted unless the ballot is "postmarked and that postmark is dated on or before the day of the ... general election ... and are received by the county board of elections not later than three days after the election by 5:00 p.m."

In the absence of a statutory definition for postmark, this court finds Plaintiffs have not demonstrated a likelihood of success on the merits in proving that Numbered Memo 2020-22 is inconsistent with N.C. Gen. Stat. § 163-231(b)(2)b, and thus, arbitrary. If the General Assembly believes that the Postmark Requirement Changes indicated in Memo 2020-22 are inconsistent with its public policy goals, they are empowered to pass legislation which further specifies the definition of a "postmark." In the absence of such legislation, however, this court finds that Plaintiffs have failed to establish a likelihood of success on the merits of their Equal Protection challenge.

### 4. Irreparable Harm

**\*22** In addition to a likelihood of success on the merits, a plaintiff must also make a "clear showing that it is likely to be irreparably harmed absent preliminary relief" in order to obtain a preliminary injunction. UBS Fin. Servs. Inc. v. Carilion Clinic, 880 F. Supp. 2d 724, 733 (E.D. Va. 2012) (quoting Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 347 (4th Cir. 2009)). Further, an injury is typically deemed irreparable if monetary damages are inadequate or difficult to ascertain. See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994), abrogated on other grounds by Winter, 555 U.S. at 22, 129 S.Ct. 365. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014). "[O]nce the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin th[ese] law[s]." Id.

The court therefore finds Plaintiffs have demonstrated a likelihood of irreparable injury regarding the Equal Protection challenges to the Witness Requirement and the Receipt Deadline Extension.

### 5. Balance of Equities

The third factor in determining whether preliminary relief is appropriate is whether the plaintiff demonstrates "that the balance of equities tips in his favors." Winter, 555 U.S. at 20, 129 S.Ct. 365.

The Supreme Court's decision in Purcell v. Gonzalez, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006), urges that this court should issue injunctive relief as narrowly as possible. The Supreme Court has made clear that "lower federal courts should ordinarily not alter the election rules on the eve of an election," Republican Nat'l Comm. v. Democratic Nat'l Comm., 589 U.S. ——, ——, 140 S. Ct. 1205, 1207, 206 L.Ed.2d 452 (2020) (per curiam), as a court order affecting election rules will progressively increase the risk of "voter confusion" as "an election draws closer." Purcell, 549 U.S. at 4-5, 127 S.Ct. 5; see also Texas All. for Retired Americans v. Hughs, —— F.3d ——, ——, 2020 WL 5816887, at *2 (5th Cir. Sept. 30, 2020) ("The principle ... is clear: court changes of election laws close in time to the election are strongly disfavored."). This year alone, the Purcell doctrine of noninterference has been invoked by federal courts in cases involving witness requirements and cure provisions during COVID-19, Clark v. Edwards, Civil Action No. 20-283-SDD-RLB, —— F.Supp.3d ——, —— – ——, 2020 WL 3415376, at *1-2 (M.D. La. June 22, 2020); the implementation of an all-mail election plan developed by county election officials, Paher v. Cegavske, 2020 WL 2748301, at *1, *6 (D. Nev. 2020); and the use of college IDs for voting, Common Cause v. Thomsen, No. 19-cv-323-JDP, 2020 WL 5665475, at *1 (W.D. Wis. Sept. 23, 2020) – just to name a few.

Purcell is not a per se rejection of any injunctive relief close to an election. However, as the Supreme Court's restoration of the South Carolina witness requirement last week illustrates, a heavy thumb on the scale weighs against changes to voting regulations. Andino v. Middleton, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 5887393, at *1 (Oct. 5, 2020) (Kavanaugh, J., concurring) ("By enjoining South Carolina's witness requirement shortly before the election, the

District Court defied [the Purcell] principle and this Court's precedents.").

In this case, there are two SBE revisions where this court has found that Plaintiffs are likely to succeed on the merits. First, the Witness Requirement Cure Procedure, which determines whether SBE will send the voter a cure certification or spoil the ballot and issue a new one. This court has, on separate grounds, already enjoined the Witness Requirement Cure Procedure in Democracy North Carolina v. North Carolina State Board of Elections, No. 1:20CV457, 2020 WL 6058048 (M.D.N.C. Oct. 14, 2020) (enjoining witness cure procedure). Thus, the issue of injunctive relief on the Witness Requirement Cure Procedure is moot at this time. Nevertheless, in the absence of relief in Democracy, it seems likely that SBE's creation of "preferred class[es] of voters", Gray, 372 U.S. at 380, 83 S.Ct. 801, with elimination of the witness requirement and the cure procedure could merit relief in this case.

**\*23** Ripe for this court's consideration is the Receipt Deadline Extension, which contradicts state statutes regarding when a ballot may be counted. Ultimately, this court will decline to enjoin the Receipt Deadline Extension, in spite of its likely unconstitutionality and the potential for irreparable injury. The Purcell doctrine dictates that this court must "ordinarily" refrain from interfering with election rules. Republican Nat'l Comm., 140 S. Ct. at 1207. These issues may be taken up by federal courts after the election, or at any time in state courts and the legislature. However, in the middle of an election, less than a month before Election Day itself, this court cannot cause "judicially created confusion" by changing election rules. Id. Accordingly, this court declines to impose a preliminary injunction because the balance of equities weighs heavily against such an injunction.

### E. Plaintiffs' Electors Clause and Elections Clause Claims

As an initial matter, this court will address the substantive issues of the Electors Clause and the Elections Clause together. The Electors Clause of the U.S. Constitution requires "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President. U.S. Const. art. II, § 1, cl. 2. Plaintiffs in Wise argue that, in order to "effectuate" this Electors requirement, "the State must complete its canvas of all votes cast by three weeks after the general election" under N.C. Gen. Stat. § 163-182.5(c). (Wise Pls.' Mot. (Doc. 43) at 15.) Plaintiffs argue that (1) the extension of the ballot receipt deadline

Ex. 2

and (2) the changing of the postmark requirement "threaten to extend the process and threaten disenfranchisement," as North Carolina "must certify its electors by December 14 or else lose its voice in the Electoral College. (Id.)

The meaning of "Legislature" within the Electors Clause can be analyzed in the same way as "Legislature" within the Elections Clause. For example,

> As an initial matter, the Court finds no need to distinguish between the term 'Legislature' as it is used in the Elections Clause as opposed to the Electors Clause. Not only were both these clauses adopted during the 1787 Constitutional Convention, but the clauses share a "considerable similarity.
>
> ....
>
> ... [T]he Court finds that the term "Legislature" is used in a sufficiently similar context in both clauses to properly afford the term an identical meaning in both instances.

Donald J. Trump for President, Inc. v. Bullock, No. CV 20-66-H-DLC, ---- F.Supp.3d ----, ----, 2020 WL 5810556, at *11 (D. Mont. Sept. 30, 2020). Nor do Plaintiffs assert any difference in the meaning they assign to "Legislature" and its authority between the two Clauses.

This court finds that all Plaintiffs lack standing under either Clause. The discussion infra of the Elections Clause applies equally to the Electors Clause.

### 1. Elections Clause

#### a. Standing

The Elections Clause standing analysis differs in Moore and Wise, though this court ultimately arrives at the same conclusion in both cases.

#### i. Standing in Wise

In Wise, Plaintiffs are private parties clearly established by Supreme Court precedent to have no standing to contest the Elections Clause in this manner. Plaintiffs are individual voters, a campaign committee, national political parties, and two Members of the U.S. House of Representatives. Even though Plaintiffs are part of the General Assembly, they bring

their Elections Clause claim alleging an institutional harm to the General Assembly. Though the Plaintiffs claim to have suffered "immediate and irreparable harm", (Wise Compl. (Doc. 1) ¶¶ 100, 109), this does not establish standing for their Elections Clause claim or Electors Clause claim. See Corman v. Torres, 287 F. Supp. 558, 573 (M.D. Pa. 2018) ("[T]he Elections Clause claims asserted in the verified complaint belong, if they belong to anyone, only to the ... General Assembly."). The Supreme Court has already held that a private citizen does not have standing to bring an Elections Clause challenge without further, more particularized harms. See Lance, 549 U.S. at 441-42, 127 S.Ct. 1194 ("The only injury [private citizen] plaintiffs allege is that ... the Elections Clause ... has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past."). Plaintiffs allege no such extra harms, and in fact, do not speak to standing in their brief at all.

#### ii. Standing in Moore

**\*24** In Moore, both Plaintiff Moore and Plaintiff Berger are leaders of chambers in the General Assembly. The Plaintiffs allege harm stemming from SBE flouting the General Assembly's institutional authority. (Wise Pls.' Mot. (Doc. 43) at 16.) However, as Proposed Intervenors NC Alliance argue, "a subset of legislators has no standing to bring a case based on purported harm to the Legislature as a whole." (Alliance Resp. (Doc. 64) at 15.) The Supreme Court has held that legislative plaintiffs can bring Elections Clause claims on behalf of the legislature itself only if they allege some extra, particularized harm to themselves – or some direct authority from the whole legislative body to bring the legal claim. Specifically, the Supreme Court found a lack of standing where "[legislative plaintiffs] have alleged no injury to themselves as individuals"; where "the institutional injury they allege is wholly abstract and widely disperse"; and where the plaintiffs "have not been authorized to represent their respective Houses of Congress in this action." Raines v. Byrd, 521 U.S. 811, 829, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997).

An opinion in a very similar case in the Middle District of Pennsylvania is instructive:

> [T]he claims in the complaint rest solely on the purported usurpation of the Pennsylvania General Assembly's exclusive rights under the Elections Clause of the United

States Constitution. We do not gainsay that these [two] Senate leaders are in some sense aggrieved by the Pennsylvania Supreme Court's actions. But that grievance alone does not carry them over the standing bar. United States Supreme Court precedent is clear — a legislator suffers no Article III injury when alleged harm is borne equally by all members of the legislature.

Corman, 287 F. Supp. 3d at 567. In the instant case, the two members of the legislature do not allege individual injury. The institutional injury they allege is dispersed across the entire General Assembly. The crucial element, then, is whether Moore and Berger are authorized by the General Assembly to represent its interests. The General Assembly has not directly authorized Plaintiffs to represent its interests in this specific case. See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, 576 U.S. 787, 802, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015) (finding plaintiff "[t]he Arizona Legislature" had standing in an Elections Clause case only because it was "an institutional plaintiff asserting an institutional injury" which "commenced this action after authorizing votes in both of its chambers"). Moore and Berger argued the general authorization in N.C. Gen. Stat. Section 120-32.6(b), which explicitly authorizes them to represent the General Assembly "[w]henever the validity or constitutionality of an act of the General Assembly or a provision of the Constitution of North Carolina is the subject of an action in any State or federal court." N.C. Gen. Stat. § 120-32.6(b). The text of § 120-32.6 references N.C. Gen. Stat. § 1-72.2, which further specifies that Plaintiffs will "jointly have standing to intervene on behalf of the General Assembly as a party in any judicial proceeding challenging a North Carolina statute or provision of the North Carolina Constitution." (emphasis added).

Neither statute, however, authorizes them to represent the General Assembly as a whole when acting as plaintiffs in a case such as this one. See N.C. State Conference of NAACP v. Berger, 970 F.3d 489, 501 (4th Cir. 2020) (granting standing to Moore and Berger in case where North Carolina law was directly challenged, distinguishing "execution of the law" from "defense of a challenged act"). The facts of this case do not match up with this court's prior application of N.C. Gen. Stat. § 1-72.2, which has been invoked where legislators defend the constitutionality of legislation passed by the legislature when the executive declines to do so. See Fisher-Borne v. Smith, 14 F. Supp. 3d 699, 703 (M.D.N.C. 2014). Furthermore, to the extent Plaintiffs Moore and Berger disagree with the challenged provisions of the Consent Judgment, they have not alleged they lack the authority to bring the challenge back into

session to negate SBE's exercise of settlement authority. See N.C. Gen. Stat. § 163-22.2.

**\*25** Thus, even Plaintiff Moore and Plaintiff Berger lack standing to proceed with the Elections Clause claim. Nonetheless, this court will briefly address the merits as well.

### 2. Merits of Elections Clause Claim

#### a. The 'Legislature' May Delegate to SBE

The Elections Clause of the U.S. Constitution states that the "Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. Plaintiffs assert that the General Assembly instituted one such time/place/manner rule regarding the election by passing H.B. 1169. Therefore, Plaintiffs argue, SBE "usurped the General Assembly's authority" when it "plainly modif[ied]" what the General Assembly had implemented. (Wise Pls.' Mot. (Doc. 43) at 14.)

The Elections Clause certainly prevents entities other than the legislature from unilaterally tinkering with election logistics and procedures. However, Plaintiffs fail to establish that the Elections Clause forbids the legislature itself from voluntarily delegating this authority. The "Legislature" of a state may constitutionally delegate the power to implement election rules – even rules that may contradict previously enacted statutes.

State legislatures historically have the power and ability to delegate their legislative authority over elections and remain in compliance with the Elections Clause. See Ariz. State Legislature, 576 U.S. at 816, 135 S.Ct. 2652 (noting that, despite the Elections Clause, "States retain autonomy to establish their own governmental processes"). Here, the North Carolina General Assembly has delegated some authority to SBE to contravene previously enacted statutes, particularly in the event of certain "unexpected circumstances." (SBE Resp. (Doc. 65) at 15.)

The General Assembly anticipated that SBE may need to implement rules that would contradict previously enacted statutes. See N.C. Gen. Stat. § 163-27.1(a) ("In exercising those emergency powers, the Executive Director shall avoid <u>unnecessary</u> conflict with the provisions of this Chapter." (emphasis added)). Plaintiffs claim that "[t]he

Ex. 2

General Assembly could not, consistent with the Constitution of the United States, delegate to the Board of Elections the power to suspend or re-write the state's election laws." (Wise Compl. (Doc. 1) ¶ 97.) This would mean that the General Assembly could not delegate any emergency powers to SBE. For example, if a hurricane wiped out all the polling places in North Carolina, Plaintiffs' reading of the Constitution would prohibit the legislature from delegating to SBE any power to contradict earlier state law regarding election procedures. (See SBE Resp. (Doc. 65) at 15.)

As courts have adopted a broad understanding of "Legislature" as written in the Elections Clause, see Corman, 287 F. Supp. 3d at 573, it follows that a valid delegation from the General Assembly allowing SBE to override the General Assembly in certain circumstances would not be unconstitutional. See Donald J. Trump for President, --- F.Supp.3d at ——, 2020 WL 5810556, at *12 (finding that the legislature's "decision to afford" the Governor certain statutory powers to alter the time/place/manner of elections was legitimate under the Elections Clause).

#### b. Whether SBE Exceeded Legitimate Delegated Powers

**\*26** The true question becomes, then, whether SBE was truly acting within the power legitimately delegated to it by the General Assembly. Even Proposed Intervenors NC Alliance note that SBE's actions "could ... constitute plausible violations of the Elections Clause if they exceeded the authority granted to [SBE] by the General Assembly." (Alliance Resp. (Doc. 64) at 19.)

SBE used two sources of authority to enter into the Consent Agreement changing the laws and rules of the election process after it had begun: N.C. Gen. Stat. § 163-22.2 and § 163-27.1.

#### i. SBE's Authority to Avoid Protracted Litigation

First, this court finds that, while N.C. Gen. Stat. § 163-22.2 authorizes agreements in lieu of protracted litigation, it does not authorize the extensive measures taken in the Consent Agreement:

> In the event any portion of Chapter 163 of the General Statutes or any State election law or form of election of any county board of commissioners, local board of education, or city officer is held unconstitutional or invalid by a State

or federal court or is unenforceable because of objection interposed by the United States Justice Department under the Voting Rights Act of 1965 and such ruling adversely affects the conduct and holding of any pending primary or election, the State Board of Elections shall have authority to make reasonable interim rules and regulations with respect to the pending primary or election as it deems advisable so long as they do not conflict with any provisions of this Chapter 163 of the General Statutes and such rules and regulations shall become null and void 60 days after the convening of the next regular session of the General Assembly. The State Board of Elections shall also be authorized, upon recommendation of the Attorney General, to enter into agreement with the courts in lieu of protracted litigation until such time as the General Assembly convenes.

N.C. Gen. Stat. § 163-22.2. While the authority delegated under this statute is broad, it limits SBE's powers to implementing rules that "do not conflict with any provisions of this Chapter." Moreover, this power appears to exist only "until such time as the General Assembly convenes." Id. By eliminating the witness requirement, SBE implemented a rule that conflicted directly with the statutes enacted by the North Carolina legislature.

Moreover, SBE's power to "enter into agreement with the courts in lieu of protracted litigation" is limited by the language "until such time as the General Assembly convenes." Id. Plaintiffs appear to have a remedy to what they contend is an overreach of SBE authority by convening.

#### ii. SBE's Power to Override the Legislature in an Emergency

Second, Defendants rely upon N.C. Gen. Stat. § 163-27.1. That statute provides:

> (a) The Executive Director, as chief State elections official, may exercise emergency powers to conduct an election in a district where the normal schedule for the election is disrupted by any of the following:

> (1) A natural disaster.

> (2) Extremely inclement weather.

> (3) An armed conflict involving Armed Forces of the United States, or mobilization of those forces, including

Ex. 2

North Carolina National Guard and reserve components of the Armed Forces of the United States.

N.C. Gen. Stat. § 163-27.1(a)(1-3). As neither (a)(2) or (3) apply, the parties agree that only (a)(1), a natural disaster, is at issue in this case. On March 10, 2020, the Governor of North Carolina declared a state of emergency as a result of the spread of COVID-19. N.C. Exec. Order No. 116 (March 10, 2020). Notably, the Governor did not declare a state of disaster pursuant to N.C. Gen. Stat. § 166A-19.21. Instead, on March 25, 2020, it was the President of the United States who declared a state of disaster existed in North Carolina:

> **\*27** I have determined that the emergency conditions in the State of North Carolina resulting from the Coronavirus Disease 2019 (COVID-19) pandemic beginning on January 20, 2020, and continuing, are of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 et seq. (the "Stafford Act"). Therefore, I declare that such a major disaster exists in the State of North Carolina.

Notice, North Carolina; Major Disaster and Related Determinations, 85 Fed. Reg. 20701 (Mar. 25, 2020) (emphasis added). The President cited the Stafford Act as justification for declaring a major disaster. See 42 U.S.C. § 5122(2). Notably, neither the Governor's Emergency Proclamation nor the Presidential Proclamation identified COVID-19 as a natural disaster.

On March 12, 2020, the Executive Director of SBE, Karen Brinson Bell ("Bell"), crafted an amendment to SBE's Emergency Powers rule. Bell's proposed rule change provided as follows:

> (a) In exercising his or her emergency powers and determining whether the "normal schedule" for the election has been disrupted in accordance with G.S. ~~163A-750~~, 163-27.1, the Executive Director shall consider whether one or more components of ~~election~~ administration has been impaired. The Executive Director shall consult with State ~~Board~~ members when exercising his or her emergency powers if feasible given the circumstances set forth in this Rule.

> (b) For the purposes of G.S. ~~163A-750~~, 163-27.1, the following shall apply:

> (1) A natural disaster or extremely inclement weather include ~~a:~~ any of the following:

> (A) Hurricane;

> (B) Tornado;

> (C) Storm or snowstorm;

> (D) Flood;

> (E) Tidal wave or tsunami;

> (F) Earthquake or volcanic eruption;

> (G) Landslide or mudslide; or

> (H) Catastrophe arising from natural causes ~~resulted and~~ resulting in a disaster declaration by the President of the United States or the ~~Governor.~~ Governor, a national emergency declaration by the President of the United States, or a state of emergency declaration issued under G.S. 166A-19.3(19). "Catastrophe arising from natural causes" includes a disease epidemic or other public health incident. The disease epidemic or other public health incident must make [~~that makes~~] it impossible or extremely hazardous for elections officials or voters to reach or otherwise access the voting [~~place or that creates~~] place, create a significant risk of physical harm to persons in the voting place, or [~~that~~] would otherwise convince a reasonable person to avoid traveling to or being in a voting place.

https://files.nc.gov/ncoah/documents/Rules/RRC/06182020-Follow-up-Tab-B-Board-of-Elections.pdf at 5 (proposed changes in strikethroughs, or underline.) Shortly after submitting the rule change, effective March 20, 2020, SBE declared COVID-19 a natural disaster, attempting to invoke its authority under the Emergency Powers Statute, § 163-27.1. However, the Rules Review Commission subsequently unanimously rejected Bell's proposed rule change, finding in part that there was a "lack of statutory authority as set forth in G.S. 150B-21.9(a)(1)," and more specifically, that "the [SBE] does not have the authority to expand the definition of 'natural disaster' as proposed." North Carolina Office of Administrative Hearings, Rules Review Commission Meeting Minutes (May 21, 2020), at 4 https://files.nc.gov/ncoah/Minutes-May-2020.pdf.

In a June 12, 2020 letter, the Rules Review Commission Counsel indicated that Bell had responded to the committee's findings by stating "that the agency will not be submitting a new statement or additional findings," and, as a result, "the Rule [was] returned" to the agency. Letter re: Return of Rule 08 NCAC 01.0106 (June

Ex. 2

12, 2020) at 1 https://files.nc.gov/ncoah/documents/Rules/RRC/06182020-Follow-up-Tab-B-Board-of-Elections.pdf. Despite the Rules Review Commission's rejection of Bell's proposed changes, on July 17, 2020, Bell issued an Emergency Order with the following findings:

**\*28** 18. N.C. Gen. Stat. § 163-27.1 and 08 NCAC 01. 0106 authorize me to exercise emergency powers to conduct an election where the normal schedule is disrupted by a catastrophe arising from natural causes that has resulted in a disaster declaration by the President of the United States or the Governor, while avoiding unnecessary conflict with the laws of North Carolina. The emergency remedial measures set forth here are calculated to offset the nature and scope of the disruption from the COVID-19 disaster.

19. Pursuant to N.C. Gen. Stat. § 163-27.1 and 08 NCAC 01. 0106(a) and (b), and after consultation with the State Board, I have determined that the COVID-19 health emergency is a catastrophe arising from natural causes — i.e., a naturally occurring virus — resulting in a disaster declaration by the President of the United States and a declaration of a state of emergency by the Governor, and that the disaster has already disrupted and continues to disrupt the schedule and has already impacted and continues to impact multiple components of election administration.

(Democracy N. Carolina, No. 1:20CV457 (Doc. 101-1) ¶¶ 18-19.) This directly contradicted the Rules Commission's finding that such a change was outside SBE's authority. In keeping with Bell's actions, the State failed to note in argument before this court that Bell's proposal had been rejected explicitly because SBE <u>lacked statutory authority to exercise its emergency powers</u>. In fact, at the close of a hearing before this court, the State made the following arguments:

> but the Rules Review Commission declined to let it go forward as a temporary rule, I think I'm remembering this right, without stating why. But it did not go through.

> In the meantime, the president had declared a state of national -- natural disaster declaration. The president had declared a disaster declaration, so under the existing rule, the powers kicked into place.

> ....

And the statute that does allow her to make those emergency decisions says in it, in exercising those

emergency decisions says in it, in exercising those emergency powers, the Executive Director shall avoid unnecessary conflict with the provisions of this chapter, this chapter being Chapter 163 of the election laws.

(Democracy N. Carolina, No. 1:20CV457, Evidentiary Hr'g Tr. vol. 3 (Doc. 114) at 109.) This court agrees with the Rules Review Commission: re-writing the definition of "natural disaster" is outside SBE's rulemaking authority. N.C. Gen. Stat. § 163-27.1(a)(1) limits the Executive Director's emergency powers to those circumstances where "the normal schedule for the election is disrupted by any of the following: (1) A natural disaster."[7]

---

[7] Notably, Bell makes no finding as to whether this is a Type I, II, or III Declaration of Disaster, which would in turn limit the term of the Disaster Declaration. See, e.g., N.C. Gen. Stat. § 166A-19.21.

---

Nor does the President's major disaster proclamation define COVID-19 as a "natural disaster" – at least not as contemplated by the state legislature when § 163-27.1 (or its predecessor, § 163A-750) was passed. To the contrary, the Emergency Powers are limited to an election "in a district where the normal schedule for the election is disrupted." N.C. Gen. Stat. § 163-27.1(a). Nothing about COVID-19 disrupts the normal schedule for the election as might be associated with hurricanes, tornadoes, or other natural disasters.

**(a) <u>Elimination of the Witness Requirement</u>**

Finally, even if, as SBE argues, it had the authority to enter into a Consent Agreement under its emergency powers, it did not have the power to contradict statutory authority by eliminating the witness requirement. See N.C. Gen. Stat. § 163-27.1(a) ("In exercising those emergency powers, the Executive Director shall <u>avoid unnecessary conflict</u> with the provisions of this Chapter.") (emphasis added). The legislature implemented a witness requirement and SBE removed that requirement. This is certainly an unnecessary conflict with the legislature's choices.

**\*29** By the State's own admission, any ballots not subject to witnessing would be unverified. The State of North Carolina argued as much in urging this court to uphold the one-witness requirement:

> As Director Bell testified, it is a basic bedrock principle of elections that you have some form of verifying that the voter is who they say they are; voter verification. As she

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 25 of 27   Document 58-2

Ex. 2

said, when a voter comes into the poll, whether that is on election day proper or whether it is by –

....

Obviously, you can't do that when it is an absentee ballot. Because you don't see the voter, you can't ask the questions. So the witness requirement, the purpose of it is to have some means that the person who sent me this is the person -- the person who has sent this absentee ballot is who they say they are. That's the purpose of the witness requirement. The witness is witnessing that they saw this person, and they know who they are, that they saw this person fill out the ballot and prepare the ballot to mail in. And that is the point of it.

And, as Director Bell testified, I mean, we've heard a lot from the Plaintiffs about how many states do not have witness requirements. And that is true, that the majority of states, I think at this point, do not have a witness requirement.

But as Director Bell testified, they're going to have one of two things. They're going to either have the witness requirement, or they're going to have a means of verifying the signature ....

One thing -- and I think that is unquestionably an important State interest. Some means of knowing that this ballot that says it came from Alec Peters actually is from Alec Peters, because somebody else put their name down and said, yes, I saw Alec Peters do this. I saw him fill out this ballot.

Otherwise, we have no way of knowing who the ballot -- whether the ballot really came from the person who voted. It is there to protect the integrity of the elections process, but it is also there to protect the voter, to make sure that the voter knows -- everybody knows that the voter is who they say they are, and so that somebody else is not voting in their place.

Additionally, it is a tool for dealing with voter fraud. (Democracy N. Carolina, No. 1:20CV457, Evidentiary Hr'g Tr. vol. 3 (Doc. 114) at 111-12.) In this hearing, the State continued on to note that "there needs to be some form of verification of who the voter is," which can "either be through a witness requirement or ... through signature verification," but "it needs to be one or the other." (Id. at 115-16.) Losing the witness requirement, according to the State, would mean having "no verification." (Id. at 116.) Contravening a legislatively implemented witness requirement and switching

to a system of "no verification," (id.), was certainly not a necessary conflict under § 163-27.1(a).

SBE argues that this court does not have authority to address how this switch contradicted state law and went outside its validly delegated emergency powers. This is a state law issue, as the dispute is over the extent of the Executive Director's authority as granted to her by the North Carolina Legislature. The State claims that, since a North Carolina Superior Court Judge has approved this exercise of authority, this court is obligated to follow that state court judgment. (SBE Resp. (Doc. 65) at 16.)

**\*30** However, when the Supreme Court of a state has not spoken, federal courts must predict how that highest court would rule, rather than automatically following any state court that might have considered the question first. See Doe v. Marymount Univ., 297 F. Supp. 3d 573, 590 (E.D. Va. 2018) ("[F]ederal courts are not bound to follow state trial court decisions in exercising their supplemental jurisdiction."). The Fourth Circuit has addressed this issue directly in diversity jurisdiction contexts as well:

> a federal court sitting in diversity is not bound by a state trial court's decision on matters of state law. In King v. Order of United Commercial Travelers of America, 333 U.S. 153, 68 S. Ct. 488, 92 L. Ed. 608 (1948), the Supreme Court upheld the Fourth Circuit's refusal to follow an opinion issued by a state trial court in a South Carolina insurance case. The Court concluded, "a Court of Common Pleas does not appear to have such importance and competence within South Carolina's own judicial system that its decisions should be taken as authoritative expositions of that State's 'law.' " Id. at 161, 68 S. Ct. 488.

Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 370 (4th Cir. 2005). In other words, this court's job is to predict how the Supreme Court of North Carolina would rule on the disputed state law question. Id. at 369 ("If the Supreme Court of [North Carolina] has spoken neither directly nor indirectly on the particular issue before us, [this court is] called upon to predict how that court would rule if presented with the issue.")(quotation omitted); Carter v. Fid. Life Ass'n, 339 F. Supp. 3d 551, 554 (E.D.N.C.), aff'd, 740 F. App'x 41 (4th Cir. 2018) ("Accordingly, the court applies North Carolina law, and the court must determine how the Supreme Court of North Carolina would rule."). In predicting how the North Carolina Supreme Court might decide, this court "consider[s] lower court opinions in [North Carolina], the teachings of treatises, and the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369. This court

"follow[s] the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 397-98 (4th Cir. 2013).

In all candor, this court cannot conceive of a more problematic conflict with the provisions of Chapter 163 of the North Carolina General Statutes than the procedures implemented by the Revised 2020-19 memo and the Consent Order. Through this abandonment of the witness requirement, some class of voters will be permitted to submit ballots with no verification. Though SBE suggests that its "cure" is sufficient to protect against voter fraud, the cure provided has few safeguards: it asks only if the voter "voted" with no explanation of the manner in which that vote was exercised. (Moore v. Circosta, No. 1:20CV911, State Court Consent Judgment (Doc. 45-1) at 34.) This court believes this is in clear violation of SBE's powers, even its emergency powers under N.C. Gen. Stat. § 163-27.1(a). However, none of this changes the fact that Plaintiffs in both Wise and Moore lack standing to challenge the legitimacy of SBE's election rule-setting power under either the Elections Clause or the Electors Clause.

## III. CONCLUSION

This court believes the unequal treatment of voters and the resulting Equal Protection violations as found herein should be enjoined. Nevertheless, under Purcell and recent Supreme Court orders relating to Purcell, this court is of the opinion that it is required to find that injunctive relief should be denied at this late date, even in the face of what appear to be clear violations. For the foregoing reasons, this court finds that in Moore v. Circosta, No. 1:20CV911, Plaintiffs' Motion for Preliminary Injunction should be denied. This court also finds that in Wise v. N. Carolina State Bd. of Elections, No. 1:20CV912, the Plaintiffs' Motion to Convert the Temporary Restraining Order into a Preliminary Injunction should be denied.

**\*31  IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Preliminary Injunction in Moore v. Circosta, No. 1:20CV911, (Doc. 60), is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Convert the Temporary Restraining Order into a Preliminary Injunction in Wise v. N. Carolina State Bd. of Elections, No. 1:20CV912, (Doc. 43), is **DENIED.**

**All Citations**

--- F.Supp.3d ----, 2020 WL 6063332

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5626974
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

DONALD J. TRUMP FOR
PRESIDENT, INC., et al., Plaintiff(s),
v.
Barbara CEGAVSKE, Defendant(s).

Case No. 2:20-CV-1445 JCM (VCF)
|
Signed 09/18/2020

**Synopsis**
**Background:** Presidential election campaign and political party brought action challenging constitutionality of Nevada statute which expanded mail-in voting for Nevada voters during COVID-19 pandemic. Nevada Secretary of State moved to dismiss.

**Holdings:** The District Court, James C. Mahan, Senior District Judge, held that:

presidential election campaign and political party lacked associational standing to bring suit on behalf of its member voters, and

plaintiffs lacked direct organizational standing.

Motion granted.

**Attorneys and Law Firms**

Donald J. Campbell, J Colby Williams, Campbell & Williams, Las Vegas, NV, Thomas McCarthy, Pro Hac Vice, Cameron Thomas Norris, Pro Hac Vice, Tyler Green, Pro Hac Vice, William Spencer Consovoy, Pro Hac Vice, Consovoy McCarthy PLLC, Arlington, VA, for Plaintiff(s).

Aaron D. Ford-AG, Nearvada Attorney General, Craig A. Newby, Gregory Louis Zunino, Nevada State Attorney General's Office, Carson City, NV, for Defendant(s).

ORDER

James C. Mahan, UNITED STATES DISTRICT JUDGE

**\*1** Presently before the court is defendant Barbara Cegavske, Nevada Secretary of State's, motion to dismiss the first amended complaint. (ECF No. 37). Plaintiffs Donald J. Trump for President, Inc. ("Trump campaign"), the Republican National Committee, and the Nevada Republican Party responded. (ECF No. 42). Defendant replied. (ECF No. 45).

**I. Background**
On August 3, 2020, Nevada joined the growing ranks of states that have expanded mail-in voting due to the COVID-19 pandemic.[1] See Assembly Bill No. 4 of the 32nd Special Session (2020) of the Nevada Legislature, Act of August 3, 2020, ch. 3, 2020 Nev. Stat. 18, §§ 1–88 ("AB 4"). The Nevada State Legislature passed Assembly Bill 4 ("AB 4"), which codified procedures for elections impacted by emergencies or disasters.[2] Specifically, the law directs city and county election officials to mail paper ballots to all active registered voters in Nevada. AB 4 at § 15.

[1]      Prior to the COVID-19 pandemic, Nevada voters could request an absentee ballot without providing an excuse or justification, and certain voters in rural areas could be grouped together in "mailing precincts" and "automatically mailed their paper ballots." (See ECF No. 37 at 7 (citing NRS §§ 293.3038-.340; 293.343-.355)).

[2]      "[I]f a state of emergency or declaration of disaster is proclaimed by the Governor or by resolution of the Legislature pursuant to NRS 414.070 for the entire State of Nevada, the following elections are deemed to be affected elections." AB 4 at § 8. Governor Steve Sisolak declared a state of emergency due to the COVID-19 pandemic on March 12, 2020. (ECF No. 29 at ¶ 103).

The next day, plaintiffs filed this instant suit.[3] (ECF No. 1). They challenge several key provisions of AB 4:

[3]      This suit is one of several that the Trump campaign has filed challenging expansions of mail-in voting during the COVID-19 pandemic. See Donald J. Trump for President, Inc. v. Bullock, No. CV 20-6-H-DLC (D. Mont. filed Sept. 2, 2020); Donald J. Trump for President, Inc. v. Murphy, No. 3:20-cv-10753, 2020 WL

4805762 (D.N.J. filed Aug. 18, 2020); *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-00966 (W.D. Pa. filed Jun. 29, 2020). This court only takes notice of the existence of these lawsuits, and not the disputed facts therein. Fed. R. Evid. 201.

Section 20(2) of AB 4 establishes a presumption that a ballot was cast in time, as long as it is received by election officials before 5 p.m. on the third day after the election, even if it lacks a postmark.[4] AB 4 at § 20(2). Plaintiffs allege that section 20(2) is preempted by federal laws that set the date of the general election,[5] because the provision allegedly permits election officials to count ballots cast after election day. (ECF No. 29 at ¶¶ 104–123). Plaintiffs theorize that, due to the speed of the United States Postal Service, a ballot mailed in Clark or Washoe county "in a state-provided, postage prepaid first-class envelope on the Wednesday or Thursday after Election Day will likely be received [by election officials] before 5:00pm on the Friday after the election" and "almost certainly will arrive without bearing a postmark." (*Id.* at ¶ 96).

---

[4]     Section 20(2) of AB 4 duplicates NRS § 293.317, a statute that has been in effect since January 1, 2020, but makes it applicable to affected elections. (ECF No. 37 at 8, 15).

[5]     U.S. Const. art. I, § 4, cl. 1 (Elections Clause); U.S. Const. art. II, § 1, cl. 4 (Electors Clause); U.S. Const. art. VI, § 2 (Supremacy Clause); 3 U.S.C. § 1 ("Time of appointing electors"); 2 U.S.C. § 7 ("Time of election"); 2 U.S.C. § 1 ("Time for election of senators").

**\*2** Sections 11 and 12 of AB 4 require election officials to establish a minimum number of in-person voting locations for early voting and election-day voting, respectively. AB 4 at §§ 11, 12. A county with a population of "700,000 or more" must establish at least 100 voting centers for election day. *Id.* at § 12. A county with a population of "100,000 or more but less than 700,000" must establish at least 25 voting centers. *Id.* And a county with a population of "less than 100,000" may establish one or more voting center. *Id.* Plaintiffs allege that sections 11 and 12 authorize the disparate treatment of rural voters in violation of the Equal Protection Clause, because there will be "more in-person voting places per capita for voters in urban counties than in rural counties." (ECF No. 29 at ¶ 100). Plaintiffs speculate that rural Nevada counties will have substantially higher numbers of registered voters per in-person voting location than urban counties such as Washoe. (*Id.* at ¶¶ 130–138).

Section 22 of AB 4 requires election officials to establish "procedures for the processing and counting of mail ballots" for any affected election.[6] AB 4 at § 22. Section 25 provides that "if two or more mail ballots are found folded together to present the appearance of a single ballot" and "a majority of the inspectors are of the opinion that the mail ballots folded together were voted by one person, the mail ballots must be rejected."[7] AB 4 at § 25(2). Plaintiffs allege that sections 22 and 25 violate the Equal Protection Clause, because they authorize " 'standardless' procedures" across counties and cities for processing, inspecting, and counting mail ballots with no "specific rules designed to ensure uniform treatment" and no " 'minimal procedural safeguards.' " (ECF No. 29 at ¶¶ 145, 159) (quoting *Bush v. Gore*, 531 U.S. 98, 105–106, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (per curiam)).

---

[6]     Section 22 is read together with other provisions in AB 4 that establish procedures for processing and counting mail ballots. For example, section 17 requires election officials to secure proof of identification from certain first-time voters before counting their mail ballots. AB 4 at § 17. Section 23 requires election officials to verify the signature on mail ballots. *Id.* at § 23. Section 26 requires election officials to verify that the voter did not vote in person before counting the mail ballot. *Id.* at § 26. And Section 22(b) forbids election officials from establishing any procedures that conflict with sections 2 to 27 of AB 4. *Id.* at § 22.

[7]     Section 25 of AB 4 duplicates NRS § 293.363, a statute that has been in effect since 1960, but makes it applicable to affected elections. (ECF No. 37 at 9, 21).

And finally, plaintiffs allege that all of the aforementioned provisions of AB 4, along with section 21,[8] "facilitate fraud and other illegitimate voting practices" and "dilute the value of honest, lawful votes" in violation of the Fourteenth Amendment. (ECF No. 29 at ¶ 169).

---

[8]     Section 21 allows for "a person authorized by the voter may return the mail ballot on behalf of the voter by mail or personal delivery to the county or city clerk, as applicable, or any ballot drop box established in the county or city, as applicable." AB 4 at § 21.

On August 20, 2020, plaintiffs amended their complaint without altering the parties or their claims. (ECF No. 29). Defendant now moves to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). (ECF No. 37).

---

Ex. 3

## II. Legal Standard

Federal courts are courts of limited jurisdiction. *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock West, Inc. v. Confederated Tribes of Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989).

### A. Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows defendants to seek dismissal of a claim or action for a lack of subject matter jurisdiction. Dismissal under Rule 12(b)(1) is appropriate if the complaint, considered in its entirety, fails to allege facts on its face sufficient to establish subject matter jurisdiction. *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984–85 (9th Cir. 2008).

**\*3** Plaintiffs bear the burden of proving that the case is properly in federal court to survive a Rule 12(b)(1) motion. *McCauley v. Ford Motor Co.*, 264 F.3d 952, 957 (9th Cir. 2001) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)). They must plead "the existence of whatever is essential to federal jurisdiction, and, if [plaintiffs do[ ] not do so, the court, on having the defect called to its attention or on discovering the same, must dismiss the case, unless the defect be corrected by amendment." *Smith v. McCullough*, 270 U.S. 456, 459, 46 S.Ct. 338, 70 L.Ed. 682 (1926).

### B. Article III Standing

Standing to sue is a "doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). The doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* In this way, standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 576–77, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

To establish standing, plaintiff must plead three elements: (1) an injury in fact; (2) a causal connection between the injury and the alleged misconduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. The party invoking federal jurisdiction bears the burden of demonstrating that it has standing to sue. *Id.* at 561, 112 S.Ct. 2130. "[A]t the pleading stage, the plaintiff must 'clearly ... allege facts demonstrating' each element" of standing. *Spokeo*, 136 S. Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent[.]' " *Spokeo*, 136 S. Ct. at 1548. Moreover, a concrete injury must actually exist and affect the plaintiff in a personal and individual way. *Id.* As the Supreme Court noted in *Spokeo*:

> Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation. For that reason, [plaintiff] could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III.

*Id.* at 1549 (citing *Summers v. Earth Island Institute*, 555 U.S. 488, 496, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation ... is insufficient to create Article III standing.")).

## III. Discussion

Defendant argues that plaintiffs do not have standing to bring their claims for relief. (ECF Nos. 37, 45). This court agrees.

Plaintiffs attempt to establish standing in three ways: (1) associational standing to vindicate harms to their member voters, (2) direct organizational standing due to their need to divert resources, and (3) direct and associational standing to vindicate competitive injuries to their candidates. (ECF No. 42).

This court will address each of plaintiffs' theories in turn.

### A. Associational Standing for Voters

**\*4** Plaintiffs argue that they have associational standing to vindicate the injuries caused to their member voters by

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 3 of 7   Document 58-3

Ex. 3

AB 4. (ECF No. 42 at 10–13). These injuries are two-fold: an individual "right under the Constitution to have [your] vote fairly counted, without being distorted by fraudulently cast votes"—vote dilution—and an "arbitrary and disparate treatment of the members of its electorate"—violations of the Equal Protection Clause. (ECF No. 29 at ¶¶ 33, 35).

An entity may establish associational standing to bring suit on behalf of its members when: (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

This court finds that the Trump campaign fails to satisfy the second prong of associational standing: the interests of the voters are not "germane to the organization's purpose." *Id.* The Trump campaign does not represent Nevada voters. The Trump campaign represents only Donald J. Trump and his "electoral and political goals" of reelection. (ECF No. 29 at ¶ 11). By statutory definition, a federal election candidate's "principal campaign committee" is simply a reserve of funds set aside for that campaign. *See* 52 U.S.C. § 30102 ("Organization of political committees"). Although the Trump campaign may achieve its "organization's purpose" through Nevada voters, the individual constitutional interests of those voters are wholly distinct. (ECF No. 29 at ¶ 11).

In contrast to the Trump campaign, the Republican National Committee and Nevada Republican Party satisfy the second prong; the interests of their member voters are germane to their "organization's purpose." *See Hunt*, 432 U.S. at 343, 97 S.Ct. 2434. Still, however, plaintiffs' member voters would not "otherwise have standing to sue in their own right." *Id.* Plaintiffs' alleged injury of vote dilution is impermissibly "generalized" and "speculative" at this juncture. *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011). To establish these future injuries, plaintiffs must plead facts that establish a ‘substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013)). Plaintiffs' allegations of equal protection violations are also generalized and speculative. However, plaintiffs' claim against sections 11 and 12 fail to satisfy redressability as well—"a likelihood that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130.

To demonstrate the substantial risk of voter fraud, plaintiffs cite studies and news articles on the subject. (ECF No. 29 at ¶¶ 63–81). The news articles describe a parade of administrative problems in Wisconsin, New Jersey, Connecticut, and New York, states that "hurriedly" implemented mail-in voting for elections during the COVID-19 pandemic. (*Id.* at ¶¶ 63–75). Plaintiffs also point to reported irregularities in Nevada's June 2020 mail-in primary elections. (*Id.* at ¶¶ 57–62).

Even if accepted as true, plaintiffs' pleadings allude to vote dilution that is impermissibly generalized. The alleged injuries are speculative as well, *see Lujan*, 504 U.S. at 560, 112 S.Ct. 2130, but their key defect is generality. As a court in this district has already recognized, plaintiffs' claims of a substantial risk of vote dilution "amount to general grievances that cannot support a finding of particularized injury as to [p]laintiffs." *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2748301, at *4 (D. Nev. May 27, 2020). Indeed, the key provisions of AB 4 apply to all Nevada voters. Plaintiffs never describe how their member voters will be harmed by vote dilution where other voters will not. As with other "[g]enerally available grievance[s] about the government," plaintiffs seek relief on behalf of their member voters that "no more directly and tangibly benefits [them] than it does the public at large." *Lujan*, 504 U.S. at 573–74, 112 S.Ct. 2130; *see Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 485, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("The proposition that all constitutional provisions are enforceable by any citizen simply because citizens are the ultimate beneficiaries of those provisions has no boundaries."). Plaintiffs' allegations are "precisely the kind of undifferentiated, generalized grievance about the conduct of government" that fail to confer Article III standing. *Lance v. Coffman*, 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007).

**\*5** As to plaintiffs' equal protection claims, plaintiffs first argue that "[s]ections 11 and 12 of AB4 authorize disparate treatment of voters in rural counties" due to the law's differences in *minimum* number of in-person voting locations across counties and lack of further guidance on how election officials should make their determinations. (ECF No. 29 at ¶ 126). However, plaintiffs fail to demonstrate how these harms are redressed by their requested relief. "The proposition that plaintiffs must seek relief that actually improves their position is a well-established principle." *Townley v. Miller*, 722 F.3d 1128, 1134 (9th Cir. 2013). AB 4 simply establishes a minimum number of in-person voting locations. AB 4 at

Ex. 3

§§ 11, 12. Removing this one safeguard does not alleviate plaintiffs' concerns. In fact, it "worsen[s] plaintiffs' injury rather than redressing it." *Townley*, 722 F.3d at 1135 ("[I]f plaintiffs were to prevail in this lawsuit, ... voters would no longer have the opportunity to affirmatively express their opposition at the ballot box at all. The relief plaintiffs seek will therefore *decrease* their (and other voters') expression of political speech rather than increase it, worsening plaintiffs' injury rather than redressing it."). An injunction against the enforcement of AB 4 would not address plaintiffs' issues with the discretion that Nevada election officials have to establish in-person voting locations. It would instead eliminate the safeguard of a minimum number of in-person voting locations from all counties.[9]

[9] During the pendency of this motion, Nevada election officials established polling places and voting centers for the 2020 general election. *2020 General Election & Polling Locations*, Nevada Secretary of State (2020), https://www.nvsos.gov/sos/elections/election-day-information (presenting this information by county). This does not impact this court's finding on redressability.

Plaintiffs also claim that "AB 4's three-day, post-election receipt deadline for non-postmarked ballots—coupled with its deeming rule, the faster average mailing time in urban districts such as Clark County, and the postal service's practice of not postmarking prepaid mail—will likely result in significantly more untimely ballots being counted from urban areas." (ECF No. 42 at 12). These injuries are too speculative to establish standing. Plaintiffs offer a patchwork theory of harm that does not rely on AB 4, but on the speed of the United States Postal Service, an entity out of defendant's control. (ECF No. 29 at ¶¶ 73–81, 90–97). A "future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158, 134 S.Ct. 2334. Even among the segment of voters who vote by mail, plaintiffs offer no indication that the alleged future injury is "certainly impending" or "substantial[ly]" likely. *Id.*

This court finds that plaintiffs do not have associational standing to represent their member voters.

**B. Direct Organizational Standing**

Plaintiffs next allege that they have direct organizational standing to bring their claims. (ECF No. 42 at 3–8). Organizational standing is recognized where the alleged misconduct of the defendant causes "a drain on [plaintiffs'] resources from both a diversion of its resources and frustration of its mission." *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (quotation omitted); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) ("Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."). Plaintiffs allege that AB 4 forces them "to divert resources and spend significant amounts of money educating Nevada voters ... and encouraging them to still vote." (ECF No. 29 at ¶ 17). Plaintiffs also briefly allege a need to divert resources to counteract voter fraud. (ECF No. 42 at 5) (citing *Am. Civil Rights Union v. Martinez Rivera*, 166 F. Supp. 3d 779, 800 (W.D. Tex. 2015)).

This court is unpersuaded by plaintiffs' theory of organizational standing. Plaintiffs argue that AB 4 would "confuse" their voters and "create incentive to remain away from the polls." (ECF No. 29 at ¶ 17). Outside of stating "confus[ion]" and "discourage[ment]" in a conclusory manner, plaintiffs make no indication of how AB 4 will discourage their member voters from voting. (ECF No. 29); *see Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (holding that a "new law injures" a political party when it compels it "to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."). If plaintiffs did not expend any resources on educating their voters on AB 4, their voters would proceed to vote in-person as they overwhelmingly have in prior elections. (ECF No. 29 at ¶¶ 43–47). AB 4 does not abolish in-person voting. An organization cannot "simply choos[e] to spend money fixing a problem that otherwise would not affect the organization at all. It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (quoting *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)). Plaintiffs make no showing of their voters' confusion. Indeed, voters exercised their ability to vote by mail in Nevada's 2020 primary election. NRS §§ 293.343-.355; *see Paher v. Cegavske*, No. 320CV00243MMDWGC, —— F.Supp.3d ——, ——, 2020 WL 2089813, at *2 (D. Nev. Apr. 30, 2020) ("[A]ll active

registered voters will be mailed an absentee ballot (mail-in ballot) for the primary election.").

 **\*6** In making this fact-intensive finding, this court also notes the substantive differences between AB 4 and the laws challenged in plaintiffs' cited authority. *Compare AB 4*, *with Pavek v. Simon*, No. 19-CV3000 (SRN/DTS), ---- F.Supp.3d ----, ----, 2020 WL 3183249, at *14 (D. Minn. June 15, 2020) (finding organizational standing to challenge a state law which "requires that in Minnesota general elections, major political party candidates must be listed, on the ballot, in reverse order based on the average number of votes that their party received in the last state general election"); *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018), *rev'd on other grounds sub nom. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) (en banc) (finding organizational standing to challenge a state law that prohibits third-party ballot collection); *Georgia Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1258 (N.D. Ga. 2018) (finding organizational standing to challenge a state voter identification and registration law); *Feldman v. Arizona Sec'y of State's Office*, 208 F. Supp. 3d 1074, 1080–81 (D. Ariz. 2016) (finding organizational standing to challenge a state law that "limits who may possess another's early ballot"); *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (finding organizational standing to challenge a state voter identification law). In these cases with organizational standing, the challenged law has a direct and specific impact on a voter's ability to vote. Indeed, a diversion of resources for education would be required in such situations. But here, the challenged law expands access to voting through mail without restricting prior access to in-person voting. Thus, as detailed above, plaintiffs need not *divert* resources to enable or encourage their voters to vote.

Plaintiffs also briefly argue that they will need to divert resources to fight voter fraud. (ECF No. 42 at 4–5). This court repeats its prior finding on vote dilution: it is a speculative and "generalized grievance" in this case. *See Paher*, 2020 WL 2748301, at *4 (finding no standing where plaintiffs failed to "state a particularized injury" and did no more than "speculatively connect the specific conduct they challenge ... and the claimed injury [of] vote dilution"); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution[ is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact."). Plaintiffs note in their response to defendant's motion to dismiss that they will need

to divert resources to combat voter fraud. (ECF No. 42 at 4–5). Plaintiffs cannot divert resources to combat an impermissibly speculative injury. *See Susan B. Anthony List*, 573 U.S. at 158, 134 S.Ct. 2334. Not only have plaintiffs failed to allege a substantial risk of voter fraud, the State of Nevada has its own mechanisms for deterring and prosecuting voter fraud. *See* NRS §§ 293.700-.840 ("unlawful acts and penalties" in the context of an election). Here, plaintiffs do not allege that those mechanisms would fail and that they would need to divert resources accordingly. This court finds that plaintiffs have again failed to show that they would "suffer[ ] some other injury if [they] had not diverted resources to counteracting the problem." *Valle del Sol*, 732 F.3d at 1018.

**C. Direct and Associational Standing for Candidates**

Finally, plaintiffs argue that they have both direct and associational standing to challenge "competitive harms" to their electoral candidates. (ECF No. 42 at 8). "Competitive standing" can exist when a state action will lead to the "potential loss of an election." *Drake*, 664 F.3d at 783 (quoting *Owen v. Mulligan*, 640 F.2d 1130, 1132–33 (9th Cir. 1981)).

Plaintiffs seek to vindicate the rights of their candidates, because AB 4 will undermine the ability of "Republican candidates to receive[ ] effective votes in Nevada" by "confus[ing] voters, undermin[ing] confidence in the electoral process, and creat[ing] incentives to remain away from the polls." (ECF No. 29 at ¶¶ 16–17). The pleadings make no showing of "an unfair advantage in the election process." *Drake*, 664 F.3d at 783. Plaintiffs rely on conclusory statements on confusion and disincentives that this court has already found unpersuasive. *See supra* III.B. Plaintiffs seek to muster "*competitive* standing," yet their candidates face no harms that are unique from their electoral opponents. *Owen*, 640 F.2d at 1132–33 (finding competitive standing where the postal service gave plaintiff's opponent a preferential mailing rate).

 **\*7** As to AB 4's disparate treatment of rural voters, this court repeats its prior findings: plaintiffs' requested relief fails to satisfy redressability and the alleged harm is too speculative. *See supra* III.A. Enjoining Nevada election officials from enforcing AB 4 would not apparently improve the odds for plaintiffs' candidates. *See Drake*, 664 F.3d at 783 (quoting *Owen*, 640 F.2d at 1132–33 (9th Cir. 1981)). Plaintiffs make no such allegations. Election officials would operate without the guidance of AB 4's minimum number of in-person voting locations. On plaintiffs' theory as to Sections 20 and 22 of AB

4, plaintiffs have not established a "substantial risk" that their alleged harm will occur. *Susan B. Anthony List*, 573 U.S. at 158, 134 S.Ct. 2334. Thus, neither plaintiffs nor their member candidates "have standing to sue in their own right." *Hunt*, 432 U.S. at 343, 97 S.Ct. 2434.

Ultimately, as plaintiffs concede, they hold "policy disagreements" with proponents of AB 4. (ECF No. 42 at 2). Although they purport to allege constitutional harms that go beyond these policy disagreements, at this juncture, plaintiffs' allegations remain just that. (*Id.*). Since initiating this matter on August 4, 2020, (ECF No. 1), plaintiffs have not requested an injunction or expedited review. Plaintiffs ask for a remedy to cure the "confusion" caused by AB 4, yet they have positioned this case for last minute adjudication before the general election.[10]

[10]    The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, No. 19A1016, —— U.S. ——, 140 S.Ct. 1205, 1207, 206 L.Ed.2d 452 (2020) (citing *Purcell*; *Frank v. Walker*, 574 U.S. 929, 135 S.Ct. 7, 190 L.Ed.2d 245 (2014); and *Veasey v. Perry*, 574 U.S. ——, 135 S. Ct. 9, 190 L.Ed.2d 283 (2014)).

This court grants defendant's motion to dismiss due to plaintiffs' lack of standing. (ECF No. 37). Plaintiffs' amended complaint is hereby dismissed. (ECF No. 29). The remaining motions before the court are denied as moot. (ECF Nos. 10, 40, 41, 43).

## IV. Conclusion

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendant's motion to dismiss the amended complaint (ECF No. 37) be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that defendant's motion to dismiss the original complaint (ECF No. 10) be, and the same hereby is, DENIED as moot.

IT IS FURTHER ORDERED that intervenor-defendants DNC Services Corporation/Democratic National Committee, Democratic Congressional Campaign Committee, and the Nevada State Democratic Party's motion to dismiss the amended complaint (ECF No. 40) be, and the same hereby is, DENIED as moot.

IT IS FURTHER ORDERED that plaintiff's motion for partial summary judgment (ECF No. 41) be, and the same hereby is, DENIED as moot.

IT IS FURTHER ORDERED that non-parties Walker River Paiute Tribe and Pyramid Lake Paiute Tribe's motion to intervene (ECF No. 43) be, and the same hereby is, DENIED as moot.

The clerk is instructed to close the case.

**All Citations**

--- F.Supp.3d ----, 2020 WL 5626974

End of Document        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification
Petition for Certiorari Docketed by JIM BOGNET, ET AL. v. KATHY
BOOCKVAR, SECRETARY OF PENNSYLVANIA, ET AL., U.S.,
November 27, 2020

2020 WL 6686120
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

Jim BOGNET, Donald K. Miller,
Debra Miller, Alan Clark,
Jennifer Clark, Appellants

v.

SECRETARY COMMONWEALTH OF
PENNSYLVANIA; Adams County Board
of Elections; Allegheny County Board
of Elections; Armstrong County Board
of Elections; Beaver County Board
of Elections; Bedford County Board
of Elections; Berks County Board of
Elections; Blair County Board of Elections;
Bradford County Board of Elections;
Bucks County Board of Elections; Butler
County Board of Elections; Cambria
County Board of Elections; Cameron
County Board of Elections; Carbon County
Board of Elections; Centre County Board
of Elections; Chester County Board
of Elections; Clarion County Board of
Elections; Clearfield County Board of
Elections; Clinton County Board of
Elections; Columbia County Board of
Elections; Crawford County Board of
Elections; Cumberland County Board
of Elections; Dauphin County Board of
Elections; Delaware County Board of
Elections; Elk County Board of Elections;
Erie County Board of Elections; Fayette
County Board of Elections; Forest County
Board of Elections; Franklin County
Board of Elections; Fulton County Board
of Elections; Greene County Board of
Elections; Huntingdon County Board
of Elections; Indiana County Board
of Elections; Jefferson County Board
of Elections; Juniata County Board of
Elections; Lackawanna County Board
of Elections; Lancaster County Board
of Elections; Lawrence County Board
of Elections; Lebanon County Board
of Elections; Lehigh County Board of
Elections; Luzerne County Board of
Elections; Lycoming County Board
of Elections; Mckean County Board
of Elections; Mercer County Board
of Elections; Mifflin County Board of
Elections; Monroe County Board of
Elections; Montgomery County Board
of Elections; Montour County Board
of Elections; Northampton County
Board of Elections; Northumberland
County Board of Elections; Perry County
Board of Elections; Philadelphia County
Board of Elections; Pike County Board
of Elections; Potter County Board of
Elections; Schuylkill County Board
of Elections; Snyder County Board of
Elections; Somerset County Board of
Elections; Sullivan County Board of
Elections; Susquehanna County Board of
Elections; Tioga County Board of Elections;
Union County Board of Elections; Venango
County Board of Elections; Warren County
Board of Elections; Washington County
Board of Elections; Wayne County Board
of Elections; Westmoreland County Board

of Elections; Wyoming County Board of
Elections; York County Board of Elections
Democratic National
Committee, Intervenor

No. 20-3214
|
Submitted Pursuant to Third Circuit
L.A.R. 34.1(a) November 9, 2020
|
(Filed: November 13, 2020)

**Synopsis**
**Background:** Voters and congressional candidate brought
action against Secretary of Commonwealth of Pennsylvania
and county boards of elections, seeking to enjoin the counting
of mail-in ballots received during the three-day extension
of the ballot-receipt deadline ordered by the Pennsylvania
Supreme Court, and seeking a declaration that the extension
period and presumption of timeliness was unconstitutional.
The United States District Court for the Western District
of Pennsylvania, Kim R. Gibson, Senior District Judge,
2020 WL 6323121, denied voters' and candidate's motion
for a temporary restraining order (TRO) and preliminary
injunction. Voters and candidate appealed.

**Holdings:** The Court of Appeals, Smith, Chief Judge, held
that:

the District Court's order was immediately appealable;

voters and candidate lacked standing to bring action alleging
violation of Constitution's Elections Clause and Electors
Clause;

voters lacked concrete injury for their alleged harm of vote
dilution, and thus voters did not have standing for such claim;

voters lacked particularized injury for their alleged harm of
vote dilution, and thus voters did not have standing for such
claim;

voters failed to allege legally cognizable "preferred class," for
purposes of standing to claim equal protection violation;

alleged harm from presumption of timeliness was
hypothetical or conjectural, and thus voters did not have
standing to challenge presumption; and

voters and candidate were not entitled to receive injunction
so close to election.

Affirmed.

On Appeal from the United States District Court for the
Western District of Pennsylvania, District Court No. 3-20-
cv-00215, District Judge: Honorable Kim. R. Gibson

**Attorneys and Law Firms**

Brian W. Barnes, Peter A. Patterson, David H. Thompson,
Cooper & Kirk, 1523 New Hampshire Avenue, N.W.,
Washington, D.C. 20036, Counsel for Appellants

Mark A. Aronchick, Michele D. Hangley, Robert A. Wiygul,
Hangley Aronchick Segal Pudlin & Schiller, One Logan
Square, 18th & Cherry Streets, 27th Floor, Philadelphia, PA
19103, J. Bart DeLone, Sean A. Kirkpatrick, Keli M. Neary,
Office of Attorney General of Pennsylvania, Strawberry
Square, Harrisburg, PA 17120, Dimitrios Mavroudis, Jessica
Rickabaugh, Joe H. Tucker, Jr., Tucker Law Group, Ten Penn
Center, 1801 Market Street, Suite 2500, Philadelphia, PA
19103, Counsel Secretary Commonwealth of Pennsylvania

Elizabeth A. Dupuis, Molly E. Meacham, Babst Calland, 330
Innovation Boulevard, Suite 302, State College, PA 16803,
Counsel for Armstrong, Bedford, Blair, Centre Columbia,
Dauphin, Fayette, Huntingdon, Indiana, Lackawanna,
Lawrence, Northumberland, Venango, and York County
Boards of Elections

Christine D. Steere, Deasey Mahoney & Valentini, 103
Chesley Drive, Lafayette Building, Suite 101, Media, PA
19063, Counsel for Berks County Board of Elections

Edward D. Rogers, Elizabeth V. Wingfield, Ballard Spahr,
1735 Market Street, 51st Floor, Philadelphia, PA 19103,
Counsel for Delaware County Board of Elections

Stephen B. Edwards, Frank J. Lavery, Jr., Andrew W.
Norfleet, Lavery Law, 225 Market Street, Suite 304, P.O. Box
1245, Harrisburg, PA 17108, Counsel for Franklin and Perry
County Boards of Elections

Thomas R. Shaffer, Glassmire & Shaffer Law Offices, 5 East Third Street, P.O. Box 509, Coudersport, PA 16915, Counsel for Potter County Board of Elections

Marc E. Elias, Uzoma Nkwonta, Courtney A. Elgart, Perkins Coie, 700 13th Street, N.W. Suite 800, Washington, D.C. 20005, Counsel for Intervenor Democratic National Committee

Before: SMITH, Chief Judge, SHWARTZ and SCIRICA, Circuit Judges.

## OPINION OF THE COURT

SMITH, Chief Judge.

**\*1** *A share in the sovereignty of the state, which is exercised by the citizens at large, in voting at elections is one of the most important rights of the subject, and in a republic ought to stand foremost in the estimation of the law.*—Alexander Hamilton[1]

[1]    Second Letter from Phocion (April 1784), *reprinted in* 3 The Papers of Alexander Hamilton, 1782–1786, 530–58 (Harold C. Syrett ed., 1962).

The year 2020 has brought the country unprecedented challenges. The COVID-19 pandemic, which began early this year and continues today, has caused immense loss and vast disruption. As this is a presidential election year, the pandemic has also presented unique challenges regarding where and how citizens shall vote, as well as when and how their ballots shall be tabulated. The appeal on which we now rule stems from the disruption COVID-19 has wrought on the national elections. We reach our decision, detailed below, having carefully considered the full breadth of statutory law and constitutional authority applicable to this unique dispute over Pennsylvania election law. And we do so with commitment to a proposition indisputable in our democratic process: that the lawfully cast vote of every citizen must count.

## I. Background & Procedural History

### A. The Elections and Presidential Electors Clause

The U.S. Constitution delegates to state "Legislature[s]" the authority to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives," subject to Congress's ability to "make or alter such Regulations."

U.S. Const. art. I, § 4, cl. 1. This provision is known as the "Elections Clause." The Elections Clause effectively gives state governments the "default" authority to regulate the mechanics of federal elections, *Foster v. Love*, 522 U.S. 67, 69, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997), with Congress retaining "exclusive control" to "make or alter" any state's regulations, *Colegrove v. Green*, 328 U.S. 549, 554, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946). Congress has not often wielded this power but, "[w]hen exercised, the action of Congress, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them." *Ex Parte Siebold*, 100 U.S. 371, 384, 399, 25 L.Ed. 717 (1879) ("[T]he Constitution and constitutional laws of the [United States] are ... the supreme law of the land; and, when they conflict with the laws of the States, they are of paramount authority and obligation."). By statute, Congress has set "[t]he Tuesday next after the 1st Monday in November, in every even numbered year," as the day for the election. 2 U.S.C. § 7.

Much like the Elections Clause, the "Electors Clause" of the U.S. Constitution provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of [Presidential] Electors." U.S. Const. art. II, § 1, cl. 2. Congress can "determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." U.S. Const. art. II, § 1, cl. 4. Congress has set the time for appointing electors as "the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President." 3 U.S.C. § 1.

**\*2** This year, both federal statutes dictate that the day for the election was to fall on Tuesday, November 3 ("Election Day").

### B. Pennsylvania's Election Code

In keeping with the Constitution's otherwise broad delegation of authority to states to regulate the times, places, and manner of holding federal elections, the Pennsylvania General Assembly has enacted a comprehensive elections code. In 2019, the General Assembly passed Act 77, which (among other things) established "no-excuse" absentee voting in Pennsylvania[2]: all eligible voters in Pennsylvania may vote by mail without the need to show their absence from their voting district on the day of the election. 25 Pa. Stat. and Cons. Stat. §§ 3150.11–3150.17. Under Act 77, "[a]pplications for mail-in ballots shall be processed if received not later than five o'clock P.M. of the first Tuesday prior to the day of

any primary or election." *Id.* § 3150.12a(a). After Act 77, "a completed absentee [or mail-in] ballot must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election" for that vote to count. *Id.* §§ 3146.6(c), 3150.16(c).

2       Throughout this opinion, we refer to absentee voting and mail-in voting interchangeably.

### C. The Pennsylvania Supreme Court Decision

Soon after Act 77's passage, Donald J. Trump for President, Inc., the Republican National Committee ("RNC"), and several Republican congressional candidates and voters brought suit against Kathy Boockvar, Secretary of the Commonwealth of Pennsylvania, and all of Pennsylvania's county boards of elections. That suit, filed in the Western District of Pennsylvania, alleged that Act 77's "no-excuse" mail-in voting regime violated both the federal and Pennsylvania constitutions. *Donald J. Trump for Pres., Inc. v. Boockvar*, No. 2:20-cv-966, --- F.Supp.3d ----, ----, 2020 WL 4920952, at *1 (W.D. Pa. Aug. 23, 2020). Meanwhile, the Pennsylvania Democratic Party and several Democratic elected officials and congressional candidates filed suit in Pennsylvania's Commonwealth Court, seeking declaratory and injunctive relief related to statutory-interpretation issues involving Act 77 and the Pennsylvania Election Code. *See Pa. Democratic Party v. Boockvar*, --- Pa. ----, ----, 238 A.3d 345, 352 (2020). Secretary Boockvar asked the Pennsylvania Supreme Court to exercise extraordinary jurisdiction to allow it to immediately consider the case, and her petition was granted without objection. *Id.* at 354–55.

Pending resolution of the Pennsylvania Supreme Court case, Secretary Boockvar requested that the Western District of Pennsylvania stay the federal case. *Trump for Pres. v. Boockvar*, --- F.Supp.3d at ----, 2020 WL 4920952, at *1. The District Court obliged and concluded that it would abstain under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *See Trump for Pres. v. Boockvar*, --- F.Supp.3d at ----, 2020 WL 4920952, at *21. The RNC then filed a motion for limited preliminary injunctive relief asking that all mailed ballots be segregated, but the District Court denied the motion, finding that the plaintiffs' harm had "not yet materialized in any actualized or imminent way." *Donald J. Trump for Pres., Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5407748, at *1 (W.D. Pa. Sept. 8, 2020).

**\*3** With the federal case stayed, the state court matter proceeded. The Pennsylvania Democratic Party argued that a combination of the COVID-19 pandemic and U.S. Postal Service ("USPS") mail-delivery delays made it difficult for absentee voters to timely return their ballots in the June 2020 Pennsylvania primary election. *Pa. Democratic Party*, 238 A.3d at 362. The Pennsylvania Democratic Party claimed that this voter disenfranchisement violated the Pennsylvania Constitution's Free and Equal Elections Clause, art I., § 5,[3] and sought, among other things, a weeklong extension of the deadline for receipt of ballots cast by Election Day in the upcoming general election—the same deadline for the receipt of ballots cast by servicemembers residing overseas. *Id.* at 353–54. Secretary Boockvar originally opposed the extension deadline; she changed her position after receiving a letter from USPS General Counsel which stated that Pennsylvania's ballot deadlines were "incongruous with the Postal Service's delivery standards," and that to ensure that a ballot in Pennsylvania would be received by 8:00 P.M. on Election Day, the voter would need to mail it a full week in advance, by October 27, which was also the deadline to *apply* for a mail-in ballot. *Id.* at 365–66; 25 Pa. Stat. and Cons. Stat. § 3150.12a(a). Secretary Boockvar accordingly recommended a three-day extension to the received-by deadline. *Pa. Democratic Party*, 238 A.3d at 364–65.

3       The Free and Equal Elections Clause of the Pennsylvania Constitution provides: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." *Pa. Const. art. 1, § 5.*

In a September 17, 2020 decision, the Pennsylvania Supreme Court concluded that USPS's existing delivery standards could not meet the timeline built into the Election Code and that circumstances beyond voters' control should not lead to their disenfranchisement. *Pa. Democratic Party*, 238 A.3d at 371. The Court accordingly held that the Pennsylvania Constitution's Free and Equal Elections Clause required a three-day extension of the ballot-receipt deadline for the November 3 general election. *Id.* at 371, 386–87. All ballots postmarked by 8:00 P.M. on Election Day and received by 5:00 P.M. on the Friday after Election Day, November 6, would be considered timely and counted ("Deadline Extension"). *Id.* at 386–87. Ballots postmarked or signed after Election Day, November 3, would be rejected. *Id.* If the postmark on a ballot received before the November 6 deadline was missing or illegible, the ballot would be presumed to be timely unless "a preponderance of the evidence demonstrates that it was mailed after Election Day" ("Presumption of

Ex. 4

Timeliness"). *Id.* Shortly after the ruling, Pennsylvania voters were notified of the Deadline Extension and Presumption of Timeliness.

### D. Appeal to the U.S. Supreme Court, and This Litigation

The Republican Party of Pennsylvania and several intervenors, including the President pro tempore of the Pennsylvania Senate, sought to challenge in the Supreme Court of the United States the constitutionality of the Pennsylvania Supreme Court's ruling. Because the November election date was fast approaching, they filed an emergency application for a stay of the Pennsylvania Supreme Court's order pending review on the merits. The U.S. Supreme Court denied the emergency stay request in a 4-4 decision. *Republican Party of Pa. v. Boockvar*, No. 20A54, 592 U.S. ––––, –––– S.Ct. ––––, –––– L.Ed.2d ––––, 2020 WL 6128193 (Oct. 19, 2020); *Scarnati v. Boockvar*, No. 20A53, 592 U.S. ––––, –––– S.Ct. ––––, –––– L.Ed.2d ––––, 2020 WL 6128194 (Oct. 19, 2020). After denial of the stay, the petitioners moved for expedited consideration of their petition for certiorari. In denying that motion, Justice Alito noted that, per the Pennsylvania Attorney General, all county boards of elections would segregate ballots received during the Deadline Extension period from those received by 8:00 P.M. on Election Day. *Republican Party of Pa. v. Boockvar*, No. 20-542, 592 U.S. ––––, –––– S.Ct. ––––, ––––, –––– L.Ed.2d ––––, 2020 WL 6304626, at *2 (Oct. 28, 2020) (Alito, J., statement). Justice Alito later issued an order requiring that all county boards of elections segregate such ballots and count them separately. *Republican Party of Pa. v. Boockvar*, No. 20A84, –––– U.S. ––––, –––– S.Ct. ––––, –––– L.Ed.2d ––––, 2020 WL 6536912 (Mem.) (U.S. Nov. 6, 2020) (Alito, J.).

**\*4** In the meantime, on October 22, 2020, three days after the U.S. Supreme Court declined to stay the Pennsylvania Supreme Court's order, Plaintiffs herein filed this suit in the Western District of Pennsylvania. Plaintiffs are four registered voters from Somerset County, Pennsylvania, who planned to vote in person on Election Day ("Voter Plaintiffs") and Pennsylvania congressional candidate Jim Bognet. Defendants are Secretary Boockvar and each Pennsylvania county's board of elections.

Bognet, the congressional candidate, claimed that the Deadline Extension and Presumption of Timeliness "allow[ ] County Boards of Elections to accept votes ... that would otherwise be unlawful" and "undermine[ ] his right to run in an election where Congress has paramount authority to set

the 'times, places, and manner' " of Election Day. *Bognet v. Boockvar*, No. 3:20-cv-215, 2020 WL 6323121, at *2 (W.D. Pa. Oct. 28, 2020). The Voter Plaintiffs alleged that by voting in person, they had to comply with the single, uniform federal Election Day deadline, whereas mail-in voters could submit votes any time before 5:00 P.M. on November 6. *Id.* Thus, they alleged, the Pennsylvania Supreme Court treated them in an arbitrary and disparate way by elevating mail-in voters to a "preferred class of voters" in violation of the U.S. Constitution's Equal Protection Clause and the single, uniform, federal Election Day set by Congress. *Id.* The Voter Plaintiffs also asserted that counting ballots received after Election Day during the Deadline Extension period would unlawfully dilute their votes in violation of the Equal Protection Clause. *Id.*

All Plaintiffs sought to enjoin Defendants from counting ballots received during the Deadline Extension period. *Id.* They also sought a declaration that the Deadline Extension and Presumption of Timeliness are unconstitutional under the Elections Clause and the Electors Clause as well as the Equal Protection Clause. *Id.* Because Plaintiffs filed their suit less than two weeks before Election Day, they moved for a temporary restraining order ("TRO"), expedited hearing, and preliminary injunction. *Id.*

The District Court commendably accommodated Plaintiffs' request for an expedited hearing, then expeditiously issued a thoughtful memorandum order on October 28, denying the motion for a TRO and preliminary injunction. *Id.* at *7. The District Court held that Bognet lacked standing because his claims were too speculative and not redressable. *Id.* at *3. Similarly, the District Court concluded that the Voter Plaintiffs lacked standing to bring their Equal Protection voter dilution claim because they alleged only a generalized grievance. *Id.* at *5.

At the same time, the District Court held that the Voter Plaintiffs had standing to pursue their Equal Protection arbitrary-and-disparate-treatment claim. But it found that the Deadline Extension did not engender arbitrary and disparate treatment because that provision did not extend the period for mail-in voters to actually cast their ballots; rather, the extension only directed that they cast ballots of mail-in voters be counted. *Id.* As to the Presumption of Timeliness, the District Court held that the Voter Plaintiffs were likely to succeed on the merits of their arbitrary-and-disparate-treatment challenge. *Id.* at *6. Still, the District Court declined to grant a TRO because the U.S. Supreme Court "has

repeatedly emphasized that ... federal courts should ordinarily not alter the election rules on the eve of an election." *Id.* at *7 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam)). The District Court concluded that with "less than two weeks before the election. ... [g]ranting the relief Plaintiffs seek would result in significant voter confusion; precisely the kind of confusion that *Purcell* seeks to avoid." *Id.*

**\*5** Plaintiffs appealed the denial of their motion for a TRO and preliminary injunction to this Court on October 29, less than a week before Election Day. Plaintiffs requested an expedited briefing schedule: specifically, their opening brief would be due on October 30 and the response briefs on November 2. Notably, Plaintiffs sought to file a reply brief on November 3—Election Day. Appellants' Emergency Mot. for Expedited Briefing, Dkt. No. 17. Defendants opposed the expedited briefing schedule, arguing that Plaintiffs' own delay had caused the case to reach this Court mere days before the election. Sec'y Boockvar's Opp. to Appellants' Emergency Mot. for Expedited Briefing, Dkt. No. 33. Defendants also contended that Plaintiffs sought to confuse voters by invalidating the very rules mail-in voters had relied on when they cast their ballots. Defendants asked us to deny the motion for expedited briefing and offered to supply us with the actual numbers of mail-in ballots received during the Deadline Extension period together with an approximate count of how many of those mail-in ballots lacked legible postmarks. *Id.*

Even had we granted Plaintiffs' motion for expedited briefing, the schedule they proposed would have effectively foreclosed us from ruling on this appeal before Election Day. So we denied Plaintiffs' motion and instead ordered that their opening brief be filed by November 6. Order, No. 20-3214, Oct. 30, 2020, Dkt. No. 37. We directed Defendants to file response briefs by November 9, forgoing receipt of a reply brief.[4] *Id.* With the matter now fully briefed, we consider Plaintiffs' appeal of the District Court's denial of a TRO and preliminary injunction.

4    Because we have received comprehensive briefing, and given the weighty public interest in a prompt ruling on the matter before us, we have elected to forgo oral argument.

## II. Standard of Review

The District Court exercised jurisdiction under 28 U.S.C. § 1331. We exercise jurisdiction under § 1292(a)(1).

Ordinarily, an order denying a TRO is not immediately appealable. *Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 159 (3d Cir. 2020). Here, although Bognet and the Voter Plaintiffs styled their motion as an Emergency Motion for a TRO and Preliminary Injunction, *see Bognet v. Boockvar*, No. 3:20-cv-00215, Dkt. No. 5 (W.D. Pa. Oct. 22, 2020), the District Court's order plainly went beyond simply ruling on the TRO request.

Plaintiffs filed their motion for a TRO and a preliminary injunction on October 22, along with a supporting brief. Defendants then filed briefs opposing the motion, with Plaintiffs filing a reply in support of their motion. The District Court heard argument from the parties, remotely, during a 90-minute hearing. The next day, the District Court ruled on the merits of the request for injunctive relief. *Bognet*, 2020 WL 6323121, at *7. The District Court's Memorandum Order denied both Bognet and the Voter Plaintiffs the affirmative relief they sought to obtain prior to Election Day, confirming that the Commonwealth was to count mailed ballots received after the close of the polls on Election Day but before 5:00 P.M. on November 6.

In determining whether Bognet and the Voter Plaintiffs had standing to sue, we resolve a legal issue that does not require resolution of any factual dispute. Our review is de novo. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 266 (3d Cir. 2014). "When reviewing a district court's denial of a preliminary injunction, we review the court's findings of fact for clear error, its conclusions of law de novo, and the ultimate decision ... for an abuse of discretion." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010)) (cleaned up).

## III. Analysis

### A. Standing

Derived from separation-of-powers principles, the law of standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (citations omitted). Article III of the U.S. Constitution vests "[t]he judicial Power of the United States" in both the Supreme Court and "such inferior Courts as the

Ex. 4

Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. But this "judicial Power" extends only to "Cases" and "Controversies." *Id.* art. III, § 2; *see also Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). To ensure that judges avoid rendering impermissible advisory opinions, parties seeking to invoke federal judicial power must first establish their standing to do so. *Spokeo*, 136 S. Ct. at 1547.

**\*6** Article III standing doctrine speaks in jargon, but the gist of its meaning is plain enough. To bring suit, you—and you personally—must be injured, and you must be injured in a way that concretely impacts your own protected legal interests. If you are complaining about something that does not harm you—and thus won't harm you in a way that is concrete—then you lack standing. And if the injury that you claim is an injury that does no specific harm to you, or if it depends on a harm that may never happen, then you lack an injury for which you may seek relief from a federal court. As we will explain below, Plaintiffs here have not suffered a concrete, particularized, and non-speculative injury necessary under the U.S. Constitution for them to bring this federal lawsuit.

The familiar elements of Article III standing require a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). To plead an injury in fact, the party invoking federal jurisdiction must establish three sub-elements: first, the "invasion of a legally protected interest"; second, that the injury is both "concrete and particularized"; and third, that the injury is "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130); *see also Mielo v. Steak 'n Shake Operations*, 897 F.3d 467, 479 n.11 (3d Cir. 2018). The second sub-element requires that the injury "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1, 112 S.Ct. 2130. As for the third, when a plaintiff alleges future injury, such injury must be "certainly impending." *Clapper*, 568 U.S. at 409, 133 S.Ct. 1138 (quoting *Lujan*, 504 U.S. at 565 n.2, 112 S.Ct. 2130). Allegations of "possible" future injury simply aren't enough. *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). All elements of standing

must exist at the time the complaint is filed. *See Lujan*, 504 U.S. at 569 n.4, 112 S.Ct. 2130.

With these guideposts in mind, we turn to whether Plaintiffs have pleaded an Article III injury. They bring several claims under 42 U.S.C. § 1983, asserting deprivation of their constitutional rights. They allege that Defendants' implementation of the Pennsylvania Supreme Court's Deadline Extension and Presumption of Timeliness violates the Elections Clause of Article I, the Electors Clause of Article II, and the Equal Protection Clause of the Fourteenth Amendment. Because Plaintiffs lack standing to assert these claims, we will affirm the District Court's denial of injunctive relief.

**1. Plaintiffs lack standing under the Elections Clause and Electors Clause.**

Federal courts are not venues for plaintiffs to assert a bare right "to have the Government act in accordance with law." *Allen v. Wright*, 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–27, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). When the alleged injury is undifferentiated and common to all members of the public, courts routinely dismiss such cases as "generalized grievances" that cannot support standing. *United States v. Richardson*, 418 U.S. 166, 173–75, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). Such is the case here insofar as Plaintiffs, and specifically candidate Bognet, theorize their harm as the right to have government administered in compliance with the Elections Clause and Electors Clause.

To begin with, private plaintiffs lack standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause. For example, in *Lance v. Coffman*, 549 U.S. 437, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007) (per curiam), four private citizens challenged in federal district court a Colorado Supreme Court decision invalidating a redistricting plan passed by the state legislature and requiring use of a redistricting plan created by Colorado state courts. *Id.* at 438, 127 S.Ct. 1194. The plaintiffs alleged that the Colorado Supreme Court's interpretation of the Colorado Constitution violated the Elections Clause "by depriving the state legislature of its responsibility to draw congressional districts." *Id.* at 441, 127 S.Ct. 1194. The U.S. Supreme Court held that the plaintiffs lacked Article III standing because they claimed harm only to their interest, and that of every

Ex. 4

citizen, in proper application of the Elections Clause. *Id.* at 442, 127 S.Ct. 1194 ("The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed."). Their relief would have no more directly benefitted them than the public at large. *Id.* The same is true here. If anything, Plaintiffs' "interest in the State's ability to 'enforce its duly enacted laws' " is even less compelling because Pennsylvania's "election officials support the challenged decree." *Republican Nat'l Comm. v. Common Cause R.I.*, No. 20A28, 591 U.S. ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2020 WL 4680151 (Mem.), at *1 (Aug. 13, 2020) (quoting *Abbott v. Perez*, —— U.S. ——, 138 S. Ct. 2305, 2324 n.17, 201 L.Ed.2d 714 (2018)).

**\*7** Because the Elections Clause and the Electors Clause have "considerable similarity," *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015) (Roberts, C.J., dissenting) (discussing how Electors Clause similarly vests power to determine manner of appointing electors in "the Legislature" of each State), the same logic applies to Plaintiffs' alleged injury stemming from the claimed violation of the Electors Clause. *See also Foster*, 522 U.S. at 69, 118 S.Ct. 464 (characterizing Electors Clause as Elections Clause's "counterpart for the Executive Branch"); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804–05, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (noting that state's "duty" under Elections Clause "parallels the duty" described by Electors Clause).

Even a party that meets Article III standing requirements must ordinarily rest its claim for relief on violation of its own rights, not those of a third party. *Pitt News v. Fisher*, 215 F.3d 354, 361–62 (3d Cir. 2000). Plaintiffs assert that the Pennsylvania Supreme Court's Deadline Extension and Presumption of Timeliness usurped the General Assembly's prerogative under the Elections Clause to prescribe "[t]he Times, Places and Manner of holding Elections." U.S. Const. art. I, § 4, cl. 1. The Elections Clause grants that right to "the Legislature" of "each State." *Id.* Plaintiffs' Elections Clause claims thus "belong, if they belong to anyone, only to the Pennsylvania General Assembly." *Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) (three-judge panel) (per curiam). Plaintiffs here are four individual voters and a candidate for federal office; they in no way constitute the General Assembly, nor can they be said to comprise any part of the law-making processes of Pennsylvania. *Ariz. State Legislature*, 576 U.S. at 824, 135 S.Ct. 2652.[5] Because Plaintiffs are not the General Assembly, nor do they bear any conceivable relationship to

state lawmaking processes, they lack standing to sue over the alleged usurpation of the General Assembly's rights under the Elections and Electors Clauses. No member of the General Assembly is a party to this lawsuit.

[5]   Bognet seeks to represent Pennsylvania in Congress, but even if he somehow had a relationship to *state* lawmaking processes, he would lack personal standing to sue for redress of the alleged "institutional injury (the diminution of legislative power), which necessarily damage[d] all Members of [the legislature] ... equally." *Raines v. Byrd*, 521 U.S. 811, 821, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (plaintiffs were six out of 535 members of Congress); *see also Corman*, 287 F. Supp. 3d at 568–69 (concluding that "two of 253 members of the Pennsylvania General Assembly" lacked standing to sue under Elections Clause for alleged "deprivation of 'their legislative authority to apportion congressional districts' "); *accord Va. House of Delegates v. Bethune-Hill*, —— U.S. ——, 139 S. Ct. 1945, 1953, 204 L.Ed.2d 305 (2019).

That said, prudential standing can suspend Article III's general prohibition on a litigant's raising another person's legal rights. Yet Plaintiffs don't fit the bill. A plaintiff may assert the rights of another if he or she "has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (citation omitted). Plaintiffs cannot invoke this exception to the rule against raising the rights of third parties because they enjoy no close relationship with the General Assembly, nor have they alleged any hindrance to the General Assembly's ability to protect its own interests. *See, e.g., Corman*, 287 F. Supp. 3d at 573. Nor does Plaintiffs' other theory of prudential standing, drawn from *Bond v. United States*, 564 U.S. 211, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011), advance the ball.

**\*8** In *Bond*, the Supreme Court held that a litigant has prudential standing to challenge a federal law that allegedly impinges on the state's police powers, "in contravention of constitutional principles of federalism" enshrined in the Tenth Amendment. *Id.* at 223–24, 131 S.Ct. 2355. The defendant in *Bond* challenged her conviction under 18 U.S.C. § 229, which Congress enacted to comply with a chemical weapons treaty that the United States had entered. *Id.* at 214–15, 131 S.Ct. 2355. Convicted under the statute she sought to challenge, Bond satisfied Article III's standing requirements. *Id.* at 217, 131 S.Ct. 2355 (characterizing Bond's sentence and incarceration as concrete, and redressable by invalidation

Ex. 4

of her conviction); *id.* at 224–25, 131 S.Ct. 2355 (noting that Bond was subject to "[a] law," "prosecution," and "punishment" she might not have faced "if the matter were left for the Commonwealth of Pennsylvania to decide"). She argued that her conduct was "local in nature" such that § 229 usurped the Commonwealth's reserved police powers. *Id.* Rejecting the Government's contention that Bond was barred as a third party from asserting the rights of the Commonwealth, *id.* at 225, 131 S.Ct. 2355, the Court held that "[t]he structural principles secured by the separation of powers protect the individual as well" as the State. *Id.* at 222, 131 S.Ct. 2355 ("Federalism also protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions. ... When government acts in excess of its lawful powers, that [personal] liberty is at stake.").

But the nub of Plaintiffs' argument here is that the Pennsylvania Supreme Court intruded on the authority delegated to the Pennsylvania General Assembly under Articles I and II of the U.S. Constitution to regulate federal elections. They do not allege any violation of the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Nor could they. After all, states have no inherent or reserved power over federal elections. U.S. Term Limits, 514 U.S. at 804–05, 115 S.Ct. 1842. When "deciding issues raised under the Elections Clause," courts "need not be concerned with preserving a 'delicate balance' between competing sovereigns." Gonzalez v. Arizona, 677 F.3d 383, 392 (9th Cir. 2012). Either federal and state election law "operate harmoniously in a single procedural scheme," or they don't—and the federal law preempts ("alter[s]") state election law under the Elections Clause. *Id.* at 394. An assessment that the Pennsylvania Supreme Court lacked the legislative authority under the state's constitution necessary to comply with the Elections Clause (Appellants' Br. 24–27) does not implicate *Bond*, the Tenth Amendment, or even Article VI's Supremacy Clause.[6] *See* Gonzalez, 677 F.3d at 390–92 (contrasting Elections Clause with Supremacy Clause and describing former as "unique," containing "[an] unusual delegation of power," and "unlike virtually all other provisions of the Constitution"). And, of course, third-party standing under *Bond* still presumes that the plaintiff otherwise meets the requirements of Article III; as discussed above, Plaintiffs do not.

[6] Our conclusion departs from the recent decision of an Eighth Circuit panel which, over a dissent, concluded that candidates for the position of presidential elector had standing under *Bond* to challenge a Minnesota state-court consent decree that effectively extended the receipt deadline for mailed ballots. *See* Carson v. Simon, No. 20-3139, ---- F.3d ----, ----, 2020 WL 6335967, at *5 (8th Cir. Oct. 29, 2020). The *Carson* court appears to have cited language from *Bond* without considering the context—specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding *Bond* beyond this context, and the *Carson* court cited none.

Plaintiff Bognet, a candidate for Congress who is currently a private citizen, does not plead a cognizable injury by alleging a "right to run in an election where Congress has paramount authority," Compl. ¶ 69, or by pointing to a "threatened" reduction in the competitiveness of his election from counting absentee ballots received within three days after Election Day. Appellants' Br. 21. Bognet does not explain how that "right to run" affects him in a particularized way when, in fact, all candidates in Pennsylvania, including Bognet's opponent, are subject to the same rules. And Bognet does not explain how counting *more* timely cast votes would lead to a *less* competitive race, nor does he offer any evidence tending to show that a greater proportion of mailed ballots received after Election Day than on or before Election Day would be cast for Bognet's opponent. What's more, for Bognet to have standing to enjoin the counting of ballots arriving after Election Day, such votes would have to be sufficient in number to change the outcome of the election to Bognet's detriment. *See, e.g.*, Sibley v. Alexander, 916 F. Supp. 2d 58, 62 (D.D.C. 2013) ("[E]ven if the Court granted the requested relief, [plaintiff] would still fail to satisfy the redressability element [of standing] because enjoining defendants from casting the ... votes would not change the outcome of the election." (citing Newdow v. Roberts, 603 F.3d 1002, 1011 (D.C. Cir. 2010) (citations omitted)). Bognet does not allege as much, and such a prediction is inherently speculative when the complaint was filed. The same can be said for Bognet's alleged wrongfully incurred expenditures and future expenditures. Any harm Bognet sought to avoid in making those expenditures was not "certainly impending"—he spent the money to avoid a speculative harm. *See* Donald J. Trump for Pres., Inc. v. Boockvar, No. 2:20-cv-966, ---- F.Supp.3d ----, ----, 2020 WL 5997080, at *36 (W.D. Pa. Oct. 10, 2020). Nor are those expenditures "fairly traceable" under Article III to the actions that Bognet challenges. *See, e.g.*, Clapper, 568 U.S. at 402, 416, 133 S.Ct. 1138 (rejecting argument that

Ex. 4

plaintiff can "manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending").[7]

[7] The alleged injury specific to Bognet does not implicate the Qualifications Clause or exclusion from Congress, *Powell v. McCormack*, 395 U.S. 486, 550, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), nor the standing of members of Congress to bring actions alleging separation-of-powers violations. *Moore v. U.S. House of Reps.*, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring).

**\*9** Plaintiffs therefore lack Article III standing to challenge Defendants' implementation of the Pennsylvania Supreme Court's Deadline Extension and Presumption of Timeliness under the Elections Clause and Electors Clause.

## 2. The Voter Plaintiffs lack standing under the Equal Protection Clause.

Stressing the "personal" nature of the right to vote, the Voter Plaintiffs assert two claims under the Equal Protection Clause.[8] First, they contend that the influence of their votes, cast in person on Election Day, is "diluted" by (a) mailed ballots cast on or before Election Day but received between Election Day and the Deadline Extension date, ballots which Plaintiffs assert cannot be lawfully counted; and (b) mailed ballots that were unlawfully cast (*i.e.*, placed in the mail) after Election Day but are still counted because of the Presumption of Timeliness. Second, the Voter Plaintiffs allege that the Deadline Extension and the Presumption of Timeliness create a preferred class of voters based on "arbitrary and disparate treatment" that values "one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). The Voter Plaintiffs lack Article III standing to assert either injury.

[8] Only the Voter Plaintiffs bring the Equal Protection count in the Complaint; Bognet did not join that count.

### a. Vote Dilution

As discussed above, the foremost element of standing is injury in fact, which requires the plaintiff to show a harm that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1547–48 (citation omitted). The Voter Plaintiffs lack standing to redress their alleged vote dilution because that alleged injury is not

concrete as to votes counted under the Deadline Extension, nor is it particularized for Article III purposes as to votes counted under the Deadline Extension or the Presumption of Timeliness.

### *i. No concrete injury from vote dilution attributable to the Deadline Extension.*

The Voter Plaintiffs claim that Defendants' implementation of the Deadline Extension violates the Equal Protection Clause because "unlawfully" counting ballots received within three days of Election Day dilutes their votes. But the source of this purported illegality is necessarily a matter of state law, which makes any alleged harm abstract for purposes of the Equal Protection Clause. And the purported vote dilution is also not concrete because it would occur in equal proportion *without* the alleged procedural illegality—that is, had the *General Assembly* enacted the Deadline Extension, which the Voter Plaintiffs do not challenge substantively.[9]

[9] We exclude the Presumption of Timeliness from our concreteness analysis. Plaintiffs allege that the federal statutes providing for a uniform election day, 3 U.S.C. § 1 and 2 U.S.C. § 7, conflict with, and thus displace, any state law that would authorize voting after Election Day. They claim that the Presumption permits, theoretically at least, some voters whose ballots lack a legible postmark to vote *after* Election Day, in violation of these federal statutes. So unlike the Deadline Extension, Plaintiffs contend that the General Assembly could not enact the Presumption consistent with the Constitution. This conceptualization of injury is thus more properly characterized as "concrete" than is the purported Deadline Extension injury attributable to voters having their timely voted ballots received and counted after Election Day. That said, we express no opinion about whether the Voter Plaintiffs have, in fact, alleged such a concrete injury for standing purposes.

**\*10** The concreteness of the Voter Plaintiffs' alleged vote dilution stemming from the Deadline Extension turns on the federal and state laws applicable to voting procedures. Federal law does not provide for *when* or *how* ballot counting occurs. *See, e.g.*, *Trump for Pres., Inc. v. Way*, No. 20-cv-01753, ––– F.Supp.3d ––––, ––––, 2020 WL 5912561, at *12 (D.N.J. Oct. 6, 2020) ("Plaintiffs direct the Court to no federal law regulating methods of determining the timeliness of mail-in ballots or requiring that mail-in ballots be postmarked."); *see also Smiley v. Holm*, 285 U.S. 355, 366, 52 S.Ct. 397, 76 L.Ed.

795 (1932) (noting that Elections Clause delegates to state lawmaking processes all authority to prescribe "procedure and safeguards" for "counting of votes"). Instead, the Elections Clause delegates to each state's lawmaking function the authority to prescribe such procedural regulations applicable to federal elections. *U.S. Term Limits*, 514 U.S. at 832–35, 115 S.Ct. 1842 ("The Framers intended the Elections Clause to grant States authority to create procedural regulations .... [including] 'whether the electors should vote by ballot or vivâ voce ....' " (quoting James Madison, 2 Records of the Federal Convention of 1787, at 240 (M. Farrand ed. 1911) (cleaned up)); *Smiley*, 285 U.S. at 366, 52 S.Ct. 397 (describing state authority under Elections Clause "to provide a complete code for congressional elections ... in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns"). That delegation of authority embraces all procedures "which experience shows are necessary in order to enforce the fundamental right involved." *Smiley*, 285 U.S. at 366, 52 S.Ct. 397. Congress exercises its power to "alter" state election regulations only if the state regime cannot "operate harmoniously" with federal election laws "in a single procedural scheme." *Gonzalez*, 677 F.3d at 394.

The Deadline Extension and federal laws setting the date for federal elections can, and indeed do, operate harmoniously. At least 19 other States and the District of Columbia have post-Election Day absentee ballot receipt deadlines.[10] And many States also accept absentee ballots mailed by overseas uniformed servicemembers that are received after Election Day, in accordance with the federal Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. §§ 20301–20311. So the Voter Plaintiffs' only cognizable basis for alleging dilution from the "unlawful" counting of invalid ballots is state law defining lawful and unlawful ballot counting practices. *Cf. Wise v. Circosta*, 978 F.3d 93, 100–01 (4th Cir. 2020) ("Whether ballots are *illegally* counted if they are received more than three days after Election Day depends on an issue of state law from which we must abstain." (emphasis in original)), *application for injunctive relief denied sub nom. Moore v. Circosta*, No. 20A72, 592 U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 6305036 (Oct. 28, 2020). The Voter Plaintiffs seem to admit as much, arguing "that counting votes that are unlawful under the General Assembly's enactments will unconstitutionally dilute the lawful votes" cast by the Voter Plaintiffs. Appellants' Br. 38; *see also id.* at 31. In other words, the Voter

Plaintiffs say that the Election Day ballot receipt deadline in Pennsylvania's codified election law renders the ballots untimely and therefore unlawful to count. Defendants, for their part, contend that the Pennsylvania Supreme Court's extension of that deadline under the Free and Equal Elections Clause of the state constitution renders them timely, and therefore lawful to count.

10     *See* AS § 15.20.081(e) & (h) (Alaska – 10 days after Election Day if postmarked on or before Election Day); West's Ann. Cal. Elec. Code § 3020(b) (California – three days after Election Day if postmarked on or before Election Day); DC ST § 1-1001.05(a)(10A) (District of Columbia – seven days after the election if postmarked on or before Election Day); 10 ILCS 5/19-8, 5/18A-15 (Illinois – 14 days after the election if postmarked on or before Election Day); K.S.A. 25-1132 (Kansas – three days after the election if postmarked before the close of polls on Election Day); MD Code, Elec. Law, § 9-505 (Maryland – the second Friday after Election Day if postmarked on or before Election Day); Miss. Code Ann. § 23-15-637 (Mississippi – five business days after Election Day if postmarked on or before Election Day); NV Rev Stat § 293.317 (Nevada – by 5:00 P.M. on the seventh day after Election Day if postmarked by Election Day, and ballots with unclear postmarks must be received by 5:00 P.M. on the third day after Election Day); N.J.S.A. 19:63-22 (New Jersey – 48 hours after polls close if postmarked on or before Election Day); McKinney's Elec. Law § 8-412 (New York – seven days after the election for mailed ballots postmarked on Election Day); N.C. Gen. Stat. § 163-231(b)(2) and *Wise v. Circosta*, 978 F.3d 93, 96 (4th Cir. 2020) (North Carolina – recognizing extension from three to nine days after the election the deadline for mail ballots postmarked on or before Election Day); Texas Elec. Code § 86.007 (the day after the election by 5:00 P.M. if postmarked on or before Election Day); Va. Code 24.2-709 (Virginia – by noon on the third day after the election if postmarked on or before Election Day); West's RCWA 29A.40.091 (Washington – no receipt deadline for ballots postmarked on or before Election Day); W. Va. Code, §§ 3-3-5, 3-5-17 (West Virginia – five days after the election if postmarked on or before Election Day; *see also* Iowa Code § 53.17(2) (by noon the Monday following the election if postmarked by the day before Election Day); NDCC 16.1-07-09 (North Dakota – before the canvass if postmarked the day before Election Day); R.C. § 3509.05 (Ohio – 10 days after the election if postmarked by the day before Election Day); Utah Code Ann. § 20A-3a-204 (seven to 14 days after the election if postmarked the day before the election).

**\*11** This conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment. Violation of state election laws by state officials or other unidentified third parties is not always amenable to a federal constitutional claim. *See Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A deliberate violation of state election laws by state election officials does not transgress against the Constitution.") (cleaned up); *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970) (rejecting Equal Protection Clause claim arising from state's erroneous counting of votes cast by voters unqualified to participate in closed primary). "It was not intended by the Fourteenth Amendment ... that all matters formerly within the exclusive cognizance of the states should become matters of national concern." *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 88 L.Ed. 497 (1944).

Contrary to the Voter Plaintiffs' conceptualization, vote dilution under the Equal Protection Clause is concerned with votes being weighed differently. *See Rucho v. Common Cause*, ––– U.S. ––––, 139 S. Ct. 2484, 2501, 204 L.Ed.2d 931 (2019) (" '[V]ote dilution' in the one-person, one-vote cases refers to the idea that each vote must carry *equal weight*." (emphasis added)); *cf. Baten v. McMaster*, 967 F.3d 345, 355 (4th Cir. 2020), *as amended* (July 27, 2020) ("[N]o vote in the South Carolina system is diluted. Every qualified person gets one vote and each vote is counted equally in determining the final tally."). As explained below, the Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently. Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment. And if dilution of lawfully cast ballots by the "unlawful" counting of invalidly cast ballots "were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity." *Trump for Pres. v. Boockvar*, ––– F.Supp.3d at –––– – ––––, 2020 WL 5997680, at \*45–46. That is not how the Equal Protection Clause works.[11]

[11] *Bush v. Gore* does not require us to perform an Equal Protection Clause analysis of Pennsylvania election law as interpreted by the Pennsylvania Supreme Court. *See* 531 U.S. at 109, 121 S.Ct. 525 ("Our consideration is

limited to the present circumstances ...."); *id. at 139–40, 121 S.Ct. 525* (Ginsburg, J., dissenting) (discussing "[r]are[ ]" occasions when Supreme Court rejected state supreme court's interpretation of state law, one of which was in 1813 and others occurred during Civil Rights Movement—and none decided federal equal protection issues).

Even if we were to entertain an end-run around the Voter Plaintiffs' lack of Elections Clause standing—by viewing the *federal* Elections Clause as the source of "unlawfulness" of Defendants' vote counting—the alleged vote dilution would not be a concrete injury. Consider, as we've noted, that the Voter Plaintiffs take no issue with the content of the Deadline Extension; they concede that the General Assembly, as other state legislatures have done, could have enacted exactly the same Deadline Extension as a valid "time[ ], place[ ], and manner" regulation consistent with the Elections Clause. *Cf. Snowden*, 321 U.S. at 8, 64 S.Ct. 397 (concluding that alleged "unlawful administration by state officers of a state statute *fair on its face*, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection" (emphasis added)); *Powell*, 436 F.2d at 88 ("Uneven or erroneous application of an *otherwise valid* statute constitutes a denial of equal protection only if it represents 'intentional or purposeful discrimination.' " (emphasis added) (quoting *Snowden*, 321 U.S. at 8, 64 S.Ct. 397)). Reduced to its essence, the Voter Plaintiffs' claimed vote dilution would rest on their allegation that federal law required a different state organ to issue the Deadline Extension. The Voter Plaintiffs have not alleged, for example, that they were prevented from casting their votes, *Guinn v. United States*, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915), nor that their votes were not counted, *United States v. Mosley*, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915). Any alleged harm of vote dilution that turns not on the proportional influence of votes, but solely on the federal illegality of the Deadline Extension, strikes us as quintessentially abstract in the election law context and "divorced from any concrete harm." *Spokeo*, 136 S. Ct. at 1549 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009)). That the alleged violation here relates to election law and the U.S. Constitution, rather than the mine-run federal consumer privacy statute, does not abrogate the requirement that a concrete harm must flow from the procedural illegality. *See, e.g., Lujan*, 504 U.S. at 576, 112 S.Ct. 2130 ("[T]here is absolutely no basis for making the Article III inquiry turn on the source of the asserted right.").

**\*12** The Voter Plaintiffs thus lack a concrete Equal Protection Clause injury for their alleged harm of vote dilution attributable to the Deadline Extension.

*ii. No particularized injury from votes counted under the Deadline Extension or the Presumption of Timeliness.*

The opposite of a "particularized" injury is a "generalized grievance," where "the impact on plaintiff is plainly undifferentiated and common to all members of the public." *Id.* at 575, 112 S.Ct. 2130 (cleaned up); *see also Lance*, 549 U.S. at 439, 127 S.Ct. 1194. The District Court correctly held that the Voter Plaintiffs' "dilution" claim is a "paradigmatic generalized grievance that cannot support standing." *Bognet*, 2020 WL 6323121, at \*4 (quoting *Carson v. Simon*, No. 20-cv-02030, ─── F.Supp.3d ────, ────, 2020 WL 6018957, at \*7 (D. Minn. Oct. 12, 2020), *rev'd on other grounds*, No. 20-3139, ─── F.3d ────, 2020 WL 6335967 (8th Cir. Oct. 29, 2020)). The Deadline Extension and Presumption of Timeliness, assuming they operate to allow the illegal counting of unlawful votes, "dilute" the influence of all voters in Pennsylvania equally and in an "undifferentiated" manner and do not dilute a certain group of voters particularly.[12]

[12]      In their complaint, the Voter Plaintiffs alleged that they are all "residents of Somerset County, a county where voters are requesting absentee ballots at a rate *far less* than the state average" and thus, somehow, the Voter Plaintiffs' votes "will be diluted to a greater degree than other voters." Compl. ¶ 71 (emphasis in original). Plaintiffs continue to advance this argument on appeal in support of standing, and it additionally suffers from being a conjectural or hypothetical injury under the framework discussed *infra* Section III.A.2.b.ii. It is purely hypothetical that counties where a greater percentage of voters request absentee ballots will more frequently have those ballots received after Election Day.

Put another way, "[a] vote cast by fraud or mailed in by the wrong person through mistake," or otherwise counted illegally, "has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged." *Martel v. Condos*, No. 5:20-cv-00131, ─── F.Supp.3d ────, ────, 2020 WL 5755289, at \*4 (D. Vt. Sept. 16, 2020). Such an alleged "dilution" is suffered equally by all voters and is not "particularized" for standing purposes. The courts to consider this issue are in accord. *See id.*; *Carson*, ─── F.Supp.3d at ──── – ────, 2020 WL 6018957, at \*7–8; *Moore v. Circosta*,

Nos. 1:20-cv-00911, 1:20-cv-00912, ─── F.Supp.3d ────, ────, 2020 WL 6063332, at \*14 (M.D.N.C. Oct. 14, 2020), *emergency injunction pending appeal denied sub nom. Wise v. Circosta*, 978 F.3d 93 (4th Cir. 2020), *application for injunctive relief denied sub nom. Moore v. Circosta*, No. 20A72, 592 U.S. ────, ─── S.Ct. ────, ─── L.Ed.2d ────, 2020 WL 6305036 (U.S. Oct. 28, 2020); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926–27 (D. Nev. Apr. 30, 2020).

But the Voter Plaintiffs argue that their purported "vote dilution" is an injury in fact sufficient to confer standing, and *not* a generalized grievance belonging to all voters, because the Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature.' " *Gill v. Whitford*, ─── U.S. ────, 138 S.Ct. 1916, 1929, 201 L.Ed.2d 313 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)). "Thus, 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 206, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

**\*13** The Voter Plaintiffs' reliance on this language from *Baker* and *Reynolds* is misplaced. In *Baker*, the plaintiffs challenged Tennessee's apportionment of seats in its legislature as violative of the Equal Protection Clause of the Fourteenth Amendment. 369 U.S. at 193, 82 S.Ct. 691. The Supreme Court held that the plaintiffs *did* have standing under Article III because "[t]he injury which appellants assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality *vis-à-vis* voters in irrationally favored counties." *Id.* at 207–08, 82 S.Ct. 691.

Although the *Baker* Court did not decide the merits of the Equal Protection claim, the Court in a series of cases—including *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), and *Reynolds*—made clear that the Equal Protection Clause prohibits a state from "diluti[ng] ... the *weight* of the votes of certain ... voters merely because of where they reside[ ]," just as it prevents a state from discriminating on the basis of the voter's race or sex. *Reynolds*, 377 U.S. at 557, 84 S.Ct. 1362 (emphasis added). The Voter Plaintiffs consider it significant that the Court in *Reynolds* noted—though not in the context of standing—that "the right to vote" is "individual and personal in nature." *Id.* at 561, 84 S.Ct. 1362 (quoting *United States v. Bathgate*, 246 U.S. 220, 227, 38 S.Ct. 269, 62 L.Ed. 676 (1918)). The Court then explained that a voter's right to vote encompasses

both the right to cast that vote and the right to have that vote counted without "debasement or dilution":

> The right to vote can neither be denied outright, *Guinn v. United States*, 238 U.S. 347 [35 S.Ct. 926, 59 L.Ed. 1340 (1915) ], *Lane v. Wilson*, 307 U.S. 268 [59 S.Ct. 872, 83 L.Ed. 1281 (1939) ], nor destroyed by alteration of ballots, see *United States v. Classic*, 313 U.S. 299, 315 [61 S.Ct. 1031, 85 L.Ed. 1368 (1941) ], nor diluted by ballot-box stuffing, *Ex parte Siebold*, 100 U.S. 371 [25 L.Ed. 717 (1880) ], *United States v. Saylor*, 322 U.S. 385 [64 S.Ct. 1101, 88 L.Ed. 1341 (1944) ]. As the Court stated in *Classic*, "Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted ...." 313 U.S. at 315 [61 S.Ct. 1031].

> ...

> "The right to vote includes the right to have the ballot counted. ... It also includes the right to have the vote counted at full value without dilution or discount. ... That federally protected right suffers substantial dilution ... [where a] favored group has full voting strength ... [and] [t]he groups not in favor have their votes discounted."

*Reynolds*, 377 U.S. at 555 & n.29, 84 S.Ct. 1362 (alterations in last paragraph in original) (quoting *South v. Peters*, 339 U.S. 276, 279, 70 S.Ct. 641, 94 L.Ed. 834 (1950) (Douglas, J., dissenting)).

Still, it does not follow from the labeling of the right to vote as "personal" in *Baker* and *Reynolds* that *any* alleged illegality affecting voting rights rises to the level of an injury in fact. After all, the Court has observed that the harms underlying a racial gerrymandering claim under the Equal Protection Clause "are personal" in part because they include the harm of a voter "being personally subjected to a racial classification." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263, 135 S.Ct. 1257, 191 L.Ed.2d 314 (2015) (cleaned up). Yet a voter "who complains of gerrymandering, but who does not live in a gerrymandered district, 'assert[s] only a generalized grievance against governmental conduct of which he or she does not approve.' " *Gill*, 138 S. Ct. at 1930 (quoting *United States v. Hays*, 515 U.S. 737, 745, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995)) (alteration in original). The key inquiry for standing is whether the alleged violation of the right to vote arises from an invidious classification—including those based on "race, sex, economic status, or place of residence within a State," *Reynolds*, 377 U.S. at 561, 84 S.Ct. 1362— to which the plaintiff is subject and in which "the favored

group has full voting strength and the groups not in favor have their votes discounted," *id.* at 555 n.29, 84 S.Ct. 1362 (cleaned up). In other words, "voters who allege facts *showing disadvantage to themselves*" have standing to bring suit to remedy that disadvantage, *Baker*, 369 U.S. at 206, 82 S.Ct. 691 (emphasis added), but a disadvantage to the plaintiff exists only when the plaintiff is part of a group of voters whose votes will be weighed differently compared to another group. Here, no Pennsylvania voter's vote will count for less than that of any other voter as a result of the Deadline Extension and Presumption of Timeliness.[13]

[13] Plaintiffs also rely on *FEC v. Akins*, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), for the proposition that a widespread injury—such as a mass tort injury or an injury "where large numbers of voters suffer interference with voting rights conferred by law"—does not become a "generalized grievance" just because many share it. *Id.* 24–25, 118 S.Ct. 1777. That's true as far as it goes. But the Voter Plaintiffs have not alleged an injury like that at issue in *Akins*. There, the plaintiffs' claimed injury was their inability to obtain information they alleged was required to be disclosed under the Federal Election Campaign Act. *Id.* at 21, 118 S.Ct. 1777. The plaintiffs alleged a statutory right to obtain information and that the same information was being withheld. Here, the Voter Plaintiffs' alleged injury is to their right under the Equal Protection Clause not to have their votes "diluted," but the Voter Plaintiffs have not alleged that their votes are less influential than any other vote.

**\*14** This conclusion cannot be avoided by describing one group of voters as "those ... who lawfully vote in person and submit their ballots *on time*" and the other group of voters as those whose (mail-in) ballots arrive after Election Day and are counted because of the Deadline Extension and/or the Presumption of Timeliness. Appellants' Br. 33 (emphasis in original). Although the former group, under Plaintiffs' theory, should make up 100% of the total votes counted and the latter group 0%, there is simply no differential *weighing* of the votes. *See Wise*, 978 F.3d at 104 (Motz, J., concurring) ("But if the extension went into effect, plaintiffs' votes would not count for less *relative to other North Carolina voters*. This is the core of an Equal Protection Clause challenge." (emphasis in original)). Unlike the malapportionment or racial gerrymandering cases, a vote cast by a voter in the so-called "favored" group counts not one bit more than the same vote cast by the "disfavored" group— no matter what set of scales one might choose to employ. *Cf. Reynolds*, 377 U.S. at 555 n.29, 84 S.Ct. 1362. And, however one tries to draw a contrast, this division is not based on

Ex. 4

a voter's personal characteristics at all, let alone a person's race, sex, economic status, or place of residence. Two voters could each have cast a mail-in ballot before Election Day at the same time, yet perhaps only one of their ballots arrived by 8:00 P.M. on Election Day, given USPS's mail delivery process. It is passing strange to assume that one of these voters would be denied "equal protection of the laws" were *both* votes counted. U.S. Const. amend. XIV, § 1.

The Voter Plaintiffs also emphasize language from *Reynolds* that "[t]he right to vote can neither be denied outright ... nor diluted by ballot-box stuffing." 377 U.S. at 555, 84 S.Ct. 1362 (citing *Ex parte Siebold*, 100 U.S. 371, 25 L.Ed. 717 (1879); *United States v. Saylor*, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944)). In the first place, casting a vote in accordance with a procedure approved by a state's highest court—even assuming that approval violates the Elections Clause—is not equivalent to "ballot-box stuffing." The Supreme Court has only addressed this "false"-tally type of dilution where the tally was false as a result of a scheme to cast falsified or fraudulent votes. *See Saylor*, 322 U.S. at 386, 64 S.Ct. 1101. We are in uncharted territory when we are asked to declare that a tally that includes false or fraudulent votes is equivalent to a tally that includes votes that are or may be unlawful for non-fraudulent reasons, and so is more aptly described as "incorrect." *Cf. Gray*, 372 U.S. at 386, 83 S.Ct. 801 (Harlan, J., dissenting) ("[I]t is hard to take seriously the argument that 'dilution' of a vote in consequence of a legislatively sanctioned electoral system can, without more, be analogized to an impairment of the political franchise by ballot box stuffing or other criminal activity.").

Yet even were this analogy less imperfect, it still would not follow that every such "false" or incorrect tally is an injury in fact for purposes of an Equal Protection Clause claim. The Court's cases that describe ballot-box stuffing as an injury to the right to vote have arisen from criminal prosecutions under statutes making it unlawful for anyone to injure the exercise of another's constitutional right. *See, e.g.*, *Ex parte Siebold*, 100 U.S. at 373–74 (application for writ of habeas corpus); *Saylor*, 322 U.S. at 385–86, 64 S.Ct. 1101 (criminal appeal regarding whether statute prohibiting "conspir[ing] to injure ... any citizen in the free exercise ... of any right or privilege secured to him by the Constitution" applied to conspiracy to stuff ballot boxes); *Anderson v. United States*, 417 U.S. 211, 226, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) (criminal prosecution for conspiracy to stuff ballot boxes under successor to statute in *Saylor*). Standing was, of course, never an issue in those cases because the Government was

enforcing its criminal laws. Here, the Voter Plaintiffs, who bear the burden to show standing, have presented no instance in which an individual voter had Article III standing to claim an equal protection harm to his or her vote from the existence of an allegedly illegal vote cast by someone else in the same election.

Indeed, the logical conclusion of the Voter Plaintiffs' theory is that whenever an elections board counts any ballot that deviates in some way from the requirements of a state's legislatively enacted election code, there is a *particularized* injury in fact sufficient to confer Article III standing on every other voter—provided the remainder of the standing analysis is satisfied. Allowing standing for such an injury strikes us as indistinguishable from the proposition that a plaintiff has Article III standing to assert a general interest in seeing the "proper application of the Constitution and laws"—a proposition that the Supreme Court has firmly rejected. *Lujan*, 504 U.S. at 573–74, 112 S.Ct. 2130. The Voter Plaintiffs thus lack standing to bring their Equal Protection vote dilution claim.

### b. Arbitrary and Disparate Treatment

**\*15** The Voter Plaintiffs also lack standing to allege an injury in the form of "arbitrary and disparate treatment" of a preferred class of voters because the Voter Plaintiffs have not alleged a legally cognizable "preferred class" for equal protection purposes, and because the alleged harm from votes counted solely due to the Presumption of Timeliness is hypothetical or conjectural.

### i. No legally protected "preferred class."

The District Court held that the Presumption of Timeliness creates a "preferred class of voters" who are "able to cast their ballots after the congressionally established Election Day" because it "extends the date of the election by multiple days for a select group of mail-in voters whose ballots will be presumed to be timely in the absence of a verifiable postmark."[14] *Bognet*, 2020 WL 6323121, at \*6. The District Court reasoned, then, that the differential treatment between groups of voters is by itself an injury for standing purposes. To the District Court, this supposed "unequal treatment of voters ... harms the [Voter] Plaintiffs because, as in-person voters, they must vote by the end of the congressionally established Election Day in order to have their votes counted."

Ex. 4

*Id.* The District Court cited no case law in support of its conclusion that the injury it identified gives rise to Article III standing.

14      The District Court did not find that the Deadline Extension created such a preferred class.

The District Court's analysis suffers from several flaws. First, the Deadline Extension and Presumption of Timeliness apply to all voters, not just a subset of "preferred" voters. It is an individual voter's *choice* whether to vote by mail or in person, and thus whether to become a part of the so-called "preferred class" that the District Court identified. Whether to join the "preferred class" of mail-in voters was entirely up to the Voter Plaintiffs.

Second, it is not clear that the mere creation of so-called "classes" of voters constitutes an injury in fact. An injury in fact requires the "invasion of a legally protected interest." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. We doubt that the mere existence of groupings of voters qualifies as an injury per se. "An equal protection claim will not lie by 'conflating all persons not injured into a preferred class receiving better treatment' than the plaintiff." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) (quoting *Joyce v. Mavromatis*, 783 F.2d 56, 57 (6th Cir. 1986)); *see also, e.g.*, *Batra v. Bd. of Regents of Univ. of Neb.*, 79 F.3d 717, 721 (8th Cir. 1996) ("[T]he relevant prerequisite is unlawful discrimination, not whether plaintiff is part of a victimized class."). More importantly, the Voter Plaintiffs have shown no disadvantage to themselves that arises simply by being separated into groupings. For instance, there is no argument that it is inappropriate that some voters will vote in person and others will vote by mail. The existence of these two groups of voters, without more, simply does not constitute an injury in fact to in-person voters.

Plaintiffs may believe that injury arises because of a preference shown for one class over another. But what, precisely, is the preference of which Plaintiffs complain? In *Bush v. Gore*, the Supreme Court held that a State may not engage in arbitrary and disparate treatment that results in the valuation of one person's vote over that of another. 531 U.S. at 104–05, 121 S.Ct. 525. Thus, "the right of suffrage can be denied by a *debasement or dilution of the weight of a citizen's vote* just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* at 105, 121 S.Ct. 525 (quoting *Reynolds*, 377 U.S. at 555, 84 S.Ct. 1362) (emphasis added). As we have already discussed, vote dilution is not an injury in fact here.

**\*16** What about the risk that some ballots placed in the mail after Election Day may still be counted? Recall that no voter—whether in person or by mail—is *permitted* to vote after Election Day. Under Plaintiffs' argument, it might theoretically be easier for one group of voters—mail-in voters—to illegally cast late votes than it is for another group of voters—in-person voters. But even if that is the case, no group of voters has the *right* to vote after the deadline.[15] We remember that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (citations omitted). And "a plaintiff lacks standing to complain about his inability to commit crimes because no one has a right to commit a crime." *Citizen Ctr. v. Gessler*, 770 F.3d 900, 910 (10th Cir. 2014). Without a showing of discrimination or other intentionally unlawful conduct, or at least some burden on Plaintiffs' own voting rights, we discern no basis on which they have standing to challenge the slim opportunity the Presumption of Timeliness conceivably affords wrongdoers to violate election law. *Cf. Minn. Voters Alliance v. Ritchie*, 720 F.3d 1029, 1033 (8th Cir. 2013) (affirming dismissal of claims "premised on potential harm in the form of vote dilution caused by insufficient pre-election verification of [election day registrants'] voting eligibility and the absence of post-election ballot rescission procedures").

15      Moreover, we cannot overlook that the mail-in voters potentially suffer a *disadvantage* relative to the in-person voters. Whereas in-person ballots that are timely cast will count, timely cast mail-in ballots may not count because, given mail delivery rates, they may not be received by 5:00 P.M. on November 6.

*ii. Speculative injury from ballots counted under the Presumption of Timeliness.*

Plaintiffs' theory as to the Presumption of Timeliness focuses on the potential for some voters to vote after Election Day and still have their votes counted. This argument reveals that their alleged injury in fact attributable to the Presumption is "conjectural or hypothetical" instead of "actual or imminent." *Spokeo*, 136 S. Ct. at 1547–48 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). The Supreme Court has emphasized that a threatened injury must be "*certainly impending*" and not merely "*possible*" for it to constitute an injury in fact. *Clapper*, 568 U.S. at 409, 133 S.Ct. 1138 (emphasis in original) (quoting *Whitmore v. Ark.*, 495 U.S. 149, 158, 110

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 16 of 19   Document 58-4   Ex. 4

S.Ct. 1717, 109 L.Ed.2d 135 (1990)). When determining Article III standing, our Court accepts allegations based on well-pleaded facts; but we do not credit bald assertions that rest on mere supposition. *Finkelman v. NFL*, 810 F.3d 187, 201–02 (3d Cir. 2016). The Supreme Court has also emphasized its "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414, 133 S.Ct. 1138. A standing theory becomes even more speculative when it requires that independent actors make decisions to act *unlawfully*. *See City of L.A. v. Lyons*, 461 U.S. 95, 105–06 & 106 n.7, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (rejecting Article III standing to seek injunction where party invoking federal jurisdiction would have to establish that he would unlawfully resist arrest or police officers would violate department orders in future).

Here, the Presumption of Timeliness could inflict injury on the Voter Plaintiffs only if: (1) another voter violates the law by casting an absentee ballot after Election Day; (2) the illegally cast ballot does not bear a legible postmark, which is against USPS policy;[16] (3) that same ballot still arrives within three days of Election Day, which is faster than USPS anticipates mail delivery will occur;[17] (4) the ballot lacks sufficient indicia of its untimeliness to overcome the Presumption of Timeliness; and (5) that same ballot is ultimately counted. *See Donald J. Trump for Pres., Inc. v. Way*, No. 20-cv-10753, 2020 WL 6204477, at *7 (D.N.J. Oct. 22, 2020)) (laying out similar "unlikely chain of events" required for vote dilution harm from postmark rule under New Jersey election law); *see also Reilly v. Ceridian Corp.*, 664 F.3d 38, 43 (3d Cir. 2011) (holding purported injury in fact was too conjectural where "we cannot now describe how Appellants will be injured in this case without beginning our explanation with the word 'if' "). This parade of horribles "may never come to pass," *Trump for Pres. v. Boockvar*, 2020 WL 5997680, at *33, and we are especially reluctant to endorse such a speculative theory of injury given Pennsylvania's "own mechanisms for deterring and prosecuting voter fraud," *Donald J. Trump for Pres., Inc. v. Cegavske*, No. 20-1445, ––– F.Supp.3d ––––, ––––, 2020 WL 5626974, at *6 (D. Nev. Sept. 18, 2020).[18]

[16]   *See* Defendant-Appellee's Br. 30 (citing 39 C.F.R. § 211.2(a)(2); Postal Operations Manual at 443.3).

[17]   *See Pa. Democratic Party*, 238 A.3d at 364 (noting "current two to five day delivery expectation of the USPS").

[18]   Indeed, the conduct required of a voter to effectuate such a scheme may be punishable as a crime under Pennsylvania statutes that criminalize forging or "falsely mak[ing] the official endorsement on any ballot," 25 Pa. Stat. & Cons. Stat. § 3517 (punishable by up to two years' imprisonment); "willfully disobey[ing] any lawful instruction or order of any county board of elections," *id.* § 3501 (punishable by up to one year's imprisonment); or voting twice in one election, *id.* § 3535 (punishable by up to seven years' imprisonment).

**\*17** To date, the Secretary has reported that at least 655 ballots without a legible postmark have been collected within the Deadline Extension period.[19] But it is mere speculation to say that any one of those ballots was cast after Election Day. We are reluctant to conclude that an independent actor —here, one of 655 voters—decided to mail his or her ballot after Election Day contrary to law. The Voter Plaintiffs have not provided any empirical evidence on the frequency of voter fraud or the speed of mail delivery that would establish a statistical likelihood or even the plausibility that any of the 655 ballots was cast after Election Day. Any injury to the Voter Plaintiffs attributable to the Presumption of Timeliness is merely "possible," not "actual or imminent," and thus cannot constitute an injury in fact.

[19]   As of the morning of November 12, Secretary Boockvar estimates that 655 of the 9383 ballots received between 8:00 P.M. on Election Day and 5:00 P.M. on November 6 lack a legible postmark. *See* Dkt. No. 59. That estimate of 655 ballots does not include totals from five of Pennsylvania's 67 counties: Lehigh, Northumberland, Tioga, Warren, and Wayne. *Id.* The 9383 ballots received, however, account for all of Pennsylvania's counties. *Id.*

### B. Purcell

Even were we to conclude that Plaintiffs have standing, we could not say that the District Court abused its discretion in concluding on this record that the Supreme Court's election-law jurisprudence counseled against injunctive relief. Unique and important equitable considerations, including voters' reliance on the rules in place when they made their plans to vote and chose how to cast their ballots, support that disposition. Plaintiffs' requested relief would have upended this status quo, which is generally disfavored under the "voter confusion" and election confidence rationales of *Purcell v. Gonzalez*, 549 U.S. 1, 4–5, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006). One can assume for the sake of argument that aspects of the now-prevailing regime in Pennsylvania are unlawful as alleged and still recognize that, given the timing of Plaintiffs'

Ex. 4

request for injunctive relief, the electoral calendar was such that following it "one last time" was the better of the choices available. *Perez,* 138 S. Ct. at 2324 ("And if a [redistricting] plan is found to be unlawful very close to the election date, the only reasonable option may be to use the plan one last time.").

Here, less than two weeks before Election Day, Plaintiffs asked the District Court to enjoin a deadline established by the Pennsylvania Supreme Court on September 17, a deadline that may have informed voters' decisions about whether and when to request mail-in ballots as well as when and how they cast or intended to cast them. In such circumstances, the District Court was well within its discretion to give heed to Supreme Court decisions instructing that "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.,* --- U.S. ----, 140 S. Ct. 1205, 1207, 206 L.Ed.2d 452 (2020) (per curiam) (citing *Purcell,* 549 U.S. at 1, 127 S.Ct. 5).

In *Purcell,* an appeal from a federal court order enjoining the State of Arizona from enforcing its voter identification law, the Supreme Court acknowledged that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." 549 U.S. at 4, 127 S.Ct. 5. In other words, "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5, 127 S.Ct. 5. Mindful of "the necessity for clear guidance to the State of Arizona" and "the imminence of the election," the Court vacated the injunction. *Id.* at 5, 127 S.Ct. 5.

The principle announced in *Purcell* has very recently been reiterated. First, in *Republican National Committee,* the Supreme Court stayed on the eve of the April 7 Wisconsin primary a district court order that altered the State's voting rules by extending certain deadlines applicable to absentee ballots. 140 S. Ct. at 1206. The Court noted that it was adhering to *Purcell* and had "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Id.* at 1207 (citing *Purcell,* 549 U.S. at 1, 127 S.Ct. 5). And just over two weeks ago, the Court denied an application to vacate a stay of a district court order that made similar changes to Wisconsin's election rules six weeks before Election Day. *Democratic Nat'l Comm. v. Wis. State Legislature,* No. 20A66, 592 U.S. ----, --- S.Ct. ----, --- L.Ed.2d ----, 2020 WL 6275871

(Oct. 26, 2020) (denying application to vacate stay). Justice Kavanaugh explained that the injunction was improper for the "independent reason[ ]" that "the District Court changed Wisconsin's election rules too close to the election, in contravention of this Court's precedents." *Id.* at ----, --- S.Ct. ----, 2020 WL 6275871 at *3 (Kavanaugh, J., concurring). *Purcell* and a string[20] of Supreme Court election-law decisions in 2020 "recognize a basic tenet of election law: When an election is close at hand, the rules of the road should be clear and settled." *Id.*

[20]   *See, e.g., Andino v. Middleton,* No. 20A55, 592 U.S. ----, --- S.Ct. ----, --- L.Ed.2d ----, 2020 WL 5887393, at *1 (Oct. 5, 2020) (Kavanaugh, J., concurring) ("By enjoining South Carolina's witness requirement shortly before the election, the District Court defied [the *Purcell*] principle and this Court's precedents." (citations omitted)); *Merrill v. People First of Ala.,* No. 19A1063, 591 U.S. ----, --- S.Ct. ----, --- L.Ed.2d ----, 2020 WL 3604049 (Mem.), at *1 (July 2, 2020); *Republican Nat'l Comm.,* 140 S. Ct. at 1207; *see also Democratic Nat'l Comm. v. Bostelmann,* 977 F.3d 639, 641 (7th Cir. 2020) (per curiam) (holding that injunction issued six weeks before election violated *Purcell*); *New Ga. Project v. Raffensperger,* 976 F.3d 1278, 1283 (11th Cir. Oct. 2, 2020) ("[W]e are not on the eve of the election—we are in the middle of it, with absentee ballots already printed and mailed. An injunction here would thus violate *Purcell*'s well-known caution against federal courts mandating new election rules—especially at the last minute." (citing *Purcell,* 549 U.S. at 4–5, 127 S.Ct. 5)).

**\*18** The prevailing state election rule in Pennsylvania permitted voters to mail ballots up through 8:00 P.M. on Election Day so long as their ballots arrived by 5:00 P.M. on November 6. Whether that rule was wisely or properly put in place is not before us now. What matters for our purposes today is that Plaintiffs' challenge to it was not filed until sufficiently close to the election to raise a reasonable concern in the District Court that more harm than good would come from an injunction changing the rule. In sum, the District Court's justifiable reliance on *Purcell* constitutes an "alternative and independent reason[ ]" for concluding that an "injunction was unwarranted" here. *Wis. State Legislature,* --- S.Ct. at ----, 2020 WL 6275871, at *3 (Kavanaugh, J., concurring).

## IV. Conclusion

Case 2:20-cv-01771-PP    Filed 12/07/20    Page 18 of 19    Document 58-4

Ex. 4

We do not decide today whether the Deadline Extension or the Presumption of Timeliness are proper exercises of the Commonwealth of Pennsylvania's lawmaking authority, delegated by the U.S. Constitution, to regulate federal elections. Nor do we evaluate the policy wisdom of those two features of the Pennsylvania Supreme Court's ruling. We hold only that when voters cast their ballots under a state's facially lawful election rule and in accordance with instructions from the state's election officials, private citizens lack Article III standing to enjoin the counting of those ballots on the grounds that the source of the rule was the wrong state organ or that doing so dilutes their votes or constitutes differential treatment of voters in violation of the Equal Protection Clause. Further, and independent of our holding on standing, we hold that the District Court did not err in denying Plaintiffs' motion for injunctive relief out of concern for the settled expectations of voters and election officials. We will affirm the District Court's denial of Plaintiffs' emergency motion for a TRO or preliminary injunction.

**All Citations**

--- F.3d ----, 2020 WL 6686120

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Ex. 4

2020 WL 5997680
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

DONALD J. TRUMP FOR
PRESIDENT, INC., et al., Plaintiffs

v.

Kathy BOOCKVAR, in her capacity
as Secretary of the Commonwealth
of Pennsylvania, et al., Defendants.

No. 2:20-cv-966
|
Signed 10/10/2020

**Synopsis**

**Background:** President's reelection campaign, Republican National Committee, and Republican congressional candidates and electors filed suit against state and county election officials alleging federal and state constitutional violations stemming from Pennsylvania's implementation of mail-in voting plan for upcoming general election and its poll watcher residency requirement. State Democratic Party, advocacy organizations, and their members intervened. Parties filed cross-motions for summary judgment.

**Holdings:** The District Court, J. Nicholas Ranjan, J., held that:

plaintiffs' claims were ripe for adjudication;

any injury that plaintiffs would suffer was too speculative to establish Article III standing;

use of unmanned drop boxes for mail-in ballots by some counties, but not others, did not violate Equal Protection Clause;

use of unmanned drop boxes for mail-in ballots did not violate substantive due process principles;

state law did not impose signature comparison requirement for mail-in and absentee ballots;

state law did not impose signature comparison requirement for applications for mail-in and absentee ballots;

fact that some county boards of elections intended to verify signatures on mail-in and absentee ballots and applications, while others did not, did not violate Equal Protection Clause;

fact that state did not require signature comparison for mail-in and absentee ballots, but did for in-person ballots, did not violate Equal Protection Clause; and

county residency requirement on being poll watcher did not violate plaintiffs' constitutional rights.

Defendants' motion granted.

**Attorneys and Law Firms**

Ronald L. Hicks, Jr., Carolyn Batz McGee, Jeremy A. Mercer, Russell D. Giancola, Devin A. Winklosky, Porter Wright Morris & Arthur LLP, Pittsburgh, PA, Justin R. Clark, Pro Hac Vice, Matthew Earl Morgan, Pro Hac Vice, Elections LLC, Washington, DC, for Plaintiffs.

Daniel T. Donovan, Pro Hac Vice, Caroline Darmody, Pro Hac Vice, Kristen Leigh Bokhan, Michael Glick, Pro Hac Vice, Susan Marie Davies, Pro Hac Vice, Kirkland & Ellis LLP, Washington, DC, Howard G. Hopkirk, Karen Mascio Romano, Keli Marie Neary, Pro Hac Vice, Nicole Boland, Pro Hac Vice, Stephen Moniak, Pennsylvania Office of Attorney General, Kathleen M. Kotula, Kenneth L. Joel, M. Abbegael Giunta, Governor's Office of General Counsel, Timothy Gates, Pennsylvania Department of State Office of Chief Counsel, Harrisburg, PA, Daniel T. Brier, Donna A. Walsh, John B. Dempsey, Nicholas F. Kravitz, Pro Hac Vice, Myers, Brier & Kelly, LLP, Scranton, PA, Jaywin Singh Malhi, Pro Hac Vice, Madelyn Morris, Sara S. Tatum, Kirkland & Ellis LLP, New York, NY, for Defendant Kathy Boockvar.

Molly R. Mudd, Pro Hac Vice, County of Adams, Gettysburg, PA, for Defendant Adams County Board of Elections.

Andrew F. Szefi, Allan J. Opsitnick, George M. Janocsko, Allegheny County Law Department, Pittsburgh, PA, for Defendant Allegheny County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland,

State College, PA, for Defendants Armstrong County Board of Elections, Bedford County Board of Elections, Centre County Board of Elections, Columbia County Board of Elections, Fayette County Board of Elections, Indiana County Board of Elections, Lackawanna County Board of Elections, Lebanon County Board of Elections, Montour County Board of Elections, Northumberland County Board of Elections, Venango County Board of Elections.

Nathan A. Morgan, Beaver, PA, for Defendant Beaver County Board of Elections.

Christine D. Steere, Deasey, Mahoney & Valentini, Ltd., Media, PA, for Defendant Berks County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, Nathan W. Karn, Evey Black Attorneys LLC, Hollidaysburg, PA, for Defendant Blair County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Peter V. Keays, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, Joseph J. Khan, County of Bucks, Doylestown, PA, for Defendant Bucks County Board of Elections.

William Gleason Barbin, Cambria County Solicitor's Office, Ebensburg, PA, for Defendant Cambria County Board of Elections.

Gerard Joseph Geiger, Pro Hac Vice, Newman Williams, Stroudsburg, PA, for Defendant Carbon County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, for Defendant Chester County Board of Elections.

Christopher P. Gabriel, Carfardi Ferguson Wyrick Weis + Gabriel, Sewickley, PA, for Defendant Clarion County Board of Elections.

Frank A. Blum, III, Jefferson Hills, PA, for Defendant Clearfield County Board of Elections.

Keith A. Button, Shafer Law Firm, Meadville, PA, for Defendant Crawford County Board of Elections.

Keith O. Brenneman, Law Office of Keith O. Brenneman, P.C., Mechanicsburg, PA, for Defendant Cumberland County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, Joseph A. Curcillo, III, Dauphin County, Harrisburg, PA, for Defendant Dauphin County Board of Elections.

Edward D. Rogers, Pro Hac Vice, Elizabeth Wingfield, Pro Hac Vice, Kahlil Williams, Pro Hac Vice, David S. Fryman, Ballard, Spahr, Andrews & Ingersoll, Terence Grugan, Pro Hac Vice, Ballard Spahr, Philadelphia, PA, for Defendant Delaware County Board of Elections.

Thomas S. Talarico, Talarico & Niebauer, Erie, PA, for Defendant Erie County Board of Elections.

Andrew W. Norfleet, Frank J. Lavery, Jr., Stephen B. Edwards, Lavery Law, Harrisburg, PA, for Defendants Franklin County Board of Elections, Perry County Board of Elections.

Robert Eugene Grimm, Robert Eugene Grimm Attorney, Smithfield, PA, for Defendant Greene County Board of Elections.

Peter M. McManamon, Pro Hac Vice, Gill, McManamon & Ghaner, Huntingdon, PA, Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant Huntingdon County Board of Elections.

C.J. Zwick, Zwick & Zwick LLP, DuBois, PA, Gregory D. Sobol, Brookville, PA, for Defendant Jefferson County Board of Elections.

Donald Zagurskie, Pro Hac Vice, Johnston & Zagurskie, PC, Mifflin, PA, for Defendant Juniata County Board of Elections.

Christina L. Hausner, Pro Hac Vice, County of Lancaster, Lancaster, PA, for Defendant Lancaster County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Thomas W. Leslie, New Castle, PA, Elizabeth

Ex. 5

A. Dupuis, Babst Calland, State College, PA, for Defendant Lawrence County Board of Elections.

Thomas M. Caffrey, Pro Hac Vice, PO BOX A, Coplay, PA, Sarah Mae Murray, Pro Hac Vice, County of Lehigh, Allentown, PA, for Defendant Lehigh County Board of Elections.

Lawrence J. Moran, Jr., Matthew J. Carmody, Joyce, Carmody & Moran, P.C., Regina M. Blewitt, Joyce Carmody Moran, Pittston, PA, for Defendant Luzerne County Board of Elections.

Joseph D. Smith, McCormick Law Firm, Williamsport, PA, for Defendant Lycoming County Board of Elections.

Anthony V. Clarke, The Clarke Firm, Bradford, PA, for Defendant Mckean County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, William J. Madden, Solicitor, Mercer County, Sharon, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant Mercer County Board of Elections.

Gerard Joseph Geiger, Newman Williams, Stroudsburg, PA, for Defendants Monroe County Board of Elections, Pike County Board of Elections, Schuylkill County Board of Elections, Snyder County Board of Elections, Wayne County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, Maureen Calder, Pro Hac Vice, Montgomery County Solicitor's Office, Norristown, PA, for Defendant Montgomery County Board of Elections.

Brian Taylor, Pro Hac Vice, Richard E. Santee, Pro Hac Vice, County of Northampton, Easton, PA, Timothy P. Brennan, Pro Hac Vice, County of Northampton, PA, PA, for Defendant Northampton County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Zachary Strassburger, City of Philadelphia Law Department, Philadelphia, PA, for Defendant Philadelphia County Board of Elections.

Thomas R. Shaffer, Glassmire & Shaffer Law Offices, Coudersport, PA, for Defendant Potter County Board of Elections.

Michael P. Barbera, Barbera, Melvin, Svonavec & Sperlazza LLP, Somerset, PA, for Defendant Somerset County Board of Elections.

Kenneth R. Levitzky, Kenneth R. Levitzky, Esquire, Dushore, PA, for Defendants Sullivan County Board of Elections, Wyoming County Board of Elections.

Robert Gawlas, Robert Schaub, Rosenn Jenkins & Greenwald LLP, Wilkes-Barre, PA, for Defendant Susquehanna County Board of Elections.

Christopher P. Gabriel, Carfardi Ferguson Wyrick Weis + Gabriel, Sewickley, PA, Raymond E. Ginn, Jr., Pro Hac Vice, Ginn & Vickery, P.C., Wellsboro, PA, for Defendant Tioga County Board of Elections.

Steven B. Silverman, Sean R. Keegan, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, Allen P. Page, McNerney, Page, Vanderlin & Hall, Williamsport, PA, for Defendant Union County Board of Elections.

Nathaniel Justus Schmidt, Schmidt Law Firm, Warren, PA, for Defendant Warren County Board of Elections.

Robert J. Grimm, Swartz Campbell, Ryan Michael Joyce, Swartz Campbell, LLC, Pittsburgh, PA, for Defendant Washington County Board of Elections.

David A. Regoli, New Kensington, PA, for Defendant Westmoreland County Board of Elections.

Michelle Pokrifka, Pro Hac Vice, York County Solicitor's Office, York, PA, Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant York County Board of Elections.

Adriel I. Cepeda Derieux, Pro Hac Vice, Dale E. Ho, Pro Hac Vice, Sophia Lin Lakin, Pro Hac Vice, American Civil Liberties Union Foundation, Christopher R. Noyes, Pro Hac Vice, Eleanor Davis, Pro Hac Vice, Jared Vasconcellos Grubow, Pro Hac Vice, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E.

Brannon, Pro Hac Vice, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Pro Hac Vice, Boston, MA, Samantha Picans, Pro Hac Vice, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendant NAACP Pennsylvania State Conference.

Adriel I. Cepeda Derieux, Pro Hac Vice, Dale E. Ho, Pro Hac Vice, Sophia Lin Lakin, Pro Hac Vice, American Civil Liberties Union Foundation, Christopher R. Noyes, Pro Hac Vice, Eleanor Davis, Jared Vasconcellos Grubow, Pro Hac Vice, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E. Brannon, Pro Hac Vice, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Pro Hac Vice, Boston, MA, Samantha Picans, Pro Hac Vice, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendant Common Cause Pennsylvania.

Adriel I. Cepeda Derieux, Dale E. Ho, Sophia Lin Lakin, American Civil Liberties Union Foundation, Christopher R. Noyes, Eleanor Davis, Jared Vasconcellos Grubow, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E. Brannon, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Boston, MA, Samantha Picans, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendants League of Women Voters of Pennsylvania, Patricia Demarco, Danielle Graham Robinson, Kathleen Wise.


## OPINION

J. Nicholas Ranjan, United States District Judge

 **\*1** Plaintiffs in this case are President Trump's reelection campaign, the Republican National Committee, and several other Republican congressional candidates and electors. They originally filed this suit, alleging federal and state constitutional violations stemming from Pennsylvania's

implementation of a mail-in voting plan for the upcoming general election.

Since then, the Pennsylvania Supreme Court issued a decision involving similar claims, which substantially narrowed the focus of this case. And Secretary of the Commonwealth, Kathy Boockvar, issued additional election "guidance," which further narrowed certain of the claims.

Therefore, as this case presently stands, only three claims remain. First, whether the use of so-called "drop boxes"[1] for mail-in ballots is unconstitutional, given the lack of guidance or mandates that those drop boxes have security guards to man them. Second, whether the Secretary's guidance as to mail-in ballots—specifically, her guidance that county election boards should not reject mail-in ballots where the voter's signature does not match the one on file—is unconstitutional. Third, whether Pennsylvania's restriction that poll watchers be residents in the county for which they are assigned, as applied to the facts of this case, is unconstitutional.

[1]    "Drop boxes" are receptacles similar to U.S. Postal Service mailboxes. They are made of metal, and have a locking mechanism, storage compartment, and an insert or slot into which a voter can insert a ballot. *See generally* [ECF 549-9].

In order to present these claims to the Court on a complete record, the parties engaged in extensive fact and expert discovery, and have filed cross-motions for summary judgment. No party has raised a genuine dispute of material fact that would require a trial, and the Court has found none. As such, the parties' cross-motions for summary judgment are ready for disposition.

After a careful review of the parties' submissions and the extensive evidentiary record, the Court will enter judgment in favor of Defendants on all of Plaintiffs' federal-constitutional claims, decline to exercise supplemental jurisdiction over the state-constitutional claims, and dismiss this case. This is so for two main reasons.

First, the Court concludes that Plaintiffs lack Article III standing to pursue their claims. Standing, of course, is a necessary requirement to cross the threshold into federal court. Federal courts adjudicate cases and controversies, where a plaintiff's injury is concrete and particularized. Here, however, Plaintiffs have not presented a concrete injury to warrant federal-court review. All of Plaintiffs' remaining claims have the same theory of injury—one of "vote dilution."

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 4 of 64   Document 58-5

Ex. 5

Plaintiffs fear that absent implementation of the security measures that they seek (guards by drop boxes, signature comparison of mail-in ballots, and poll watchers), there is a risk of voter fraud by other voters. If another person engages in voter fraud, Plaintiffs assert their own lawfully cast vote will, by comparison, count for less, or be diluted.

**\*2**  The problem with this theory of harm is that it is speculative, and thus Plaintiffs' injury is not "concrete"—a critical element to have standing in federal court. While Plaintiffs may not need to prove actual voter fraud, they must at least prove that such fraud is "certainly impending." They haven't met that burden. At most, they have pieced together a sequence of uncertain assumptions: (1) they assume potential fraudsters may attempt to commit election fraud through the use of drop boxes or forged ballots, or due to a potential shortage of poll watchers; (2) they assume the numerous election-security measures used by county election officials may not work; and (3) they assume their own security measures may have prevented that fraud.

All of these assumptions could end up being true, and these events could theoretically happen. But so could many things. The relevant question here is: are they "certainly impending"? At least based on the evidence presented, the answer to that is "no." And that is the legal standard that Plaintiffs must meet. As the Supreme Court has held, this Court cannot "endorse standing theories that rest on speculation about the decisions of independent actors." See *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013).

Second, even if Plaintiffs had standing, their claims fail on the merits. Plaintiffs essentially ask this Court to second-guess the judgment of the Pennsylvania General Assembly and election officials, who are experts in creating and implementing an election plan. Perhaps Plaintiffs are right that guards should be placed near drop boxes, signature-analysis experts should examine every mail-in ballot, poll watchers should be able to man any poll regardless of location, and other security improvements should be made. But the job of an unelected federal judge isn't to suggest election improvements, especially when those improvements contradict the reasoned judgment of democratically elected officials. See *Andino v. Middleton*, ––– U.S. ––––, S.Ct. ––––, ––––, ––– L.Ed.2d ––––, 2020 WL 5887393, at \*1 (Oct. 5, 2020) (Kavanaugh, J. concurring) (state legislatures should not be subject to "second-guessing by an unelected federal judiciary," which is "not accountable to the people") (cleaned up).

Put differently, "[f]ederal judges can have a lot of power—especially when issuing injunctions. And sometimes we may even have a good idea or two. But the Constitution sets out our sphere of decision-making, and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules." *New Georgia Project v. Raffensperger*, ––– F.3d ––––, ––––, 2020 WL 5877588, at \*4 (11th Cir. Oct. 2, 2020).

As discussed below, the Court finds that the election regulations put in place by the General Assembly and implemented by Defendants do not significantly burden any right to vote. They are rational. They further important state interests. They align with the Commonwealth's elaborate election-security measures. They do not run afoul of the United States Constitution. They will not otherwise be second-guessed by this Court.

## BACKGROUND

### I. Procedural Background

#### A. Plaintiffs' original claims.

On June 29, 2020, Plaintiffs filed their original complaint in this case against Defendants, who are the Secretary of the Commonwealth and the 67 county boards of elections. [ECF 4]. With their lawsuit, Plaintiffs challenged a number of Pennsylvania's procedures with respect to mail-in voting—in particular, the use of drop boxes and the counting of mail-in ballots that contained certain procedural defects. See [*id.*]. Shortly after filing their original complaint, Plaintiffs moved for expedited discovery and an expedited declaratory-judgment hearing. [ECF 6]. Defendants opposed the motion. The Court partially granted the motion, scheduled a speedy hearing, and ordered expedited discovery before that hearing. [ECF 123; ECF 124].

**\*3**  After Plaintiffs filed the original complaint, many non-parties sought to intervene in the action, including several organizations.[2] The Court granted all intervention motions. [ECF 309].

2    Intervenors include the Pennsylvania State Democratic Party, the League of Women Voters, the NAACP Pennsylvania State Conference, Common Cause Pennsylvania, Citizens for Pennsylvania's Future, the Sierra Club, the Pennsylvania Alliance for Retired

Americans, and several affiliated individuals of these organizations.

Defendants and Intervenors moved to dismiss the original complaint. In response, Plaintiffs filed an amended complaint. [ECF 234]. The amended complaint maintained the gist of the original, but added two new counts and made a variety of other drafting changes. *See* [ECF 242]. Defendants and Intervenors moved to dismiss the first amended complaint, too, primarily asking the Court to abstain and stay the case.

Plaintiffs' first amended complaint asserted nine separate counts, but they could be sorted into three overarching categories.

### 1. Claims alleging vote dilution due to unlawful ballot collection and counting procedures.

The first category covered claims related to allegedly unlawful procedures implemented by some Defendants for the collection and counting of mail-in and absentee ballots. Those included claims related to (1) Defendants' uneven use of drop boxes and other satellite ballot-collection sites, (2) procedures for verifying the qualifications of voters applying in person for mail-in or absentee ballots, and (3) rules for counting non-compliant ballots (such as ballots submitted without a secrecy envelope, without an elector declaration, or that contained stray marks on the envelope).

In Count I, Plaintiffs alleged violations of the Elections Clause and the related Presidential Electors Clause of the U.S. Constitution. [ECF 234, ¶¶ 193-205]. Plaintiffs asserted that, under these provisions, only the state legislature may set the time, place, and manner of congressional elections and determine how the state chooses electors for the presidency. [*Id.* at ¶ 196].

In support of this claim, Plaintiffs alleged that Secretary Boockvar's guidance concerning the use of mail-in ballot drop boxes, whether county boards of elections must independently verify mail-in ballot applications, and the counting of non-compliant mail-in ballots, was an executive overreach—in that the Secretary's guidance allegedly violated certain provisions of the Election Code enacted by the Pennsylvania General Assembly. [*Id.* at ¶ 201]. Plaintiffs also claimed that the Secretary's "unlawful guidance" increased the risk of fraudulent or unlawful voting and infringed on the right to vote, which, they said, amounted to additional

violations of the 1st and 14th Amendments to the U.S. Constitution. [*Id.* at ¶¶ 202-03].

In Count II, Plaintiffs alleged a violation of the Equal-Protection Clause under the 14th Amendment. [*Id.* at ¶¶ 206-15]. Plaintiffs asserted that the implementation of the foregoing (*i.e.*, mail-in ballot drop boxes, the verification of mail-in ballot applications, and the counting of non-compliant ballots) was different in different counties, thereby treating voters across the state in an unequal fashion. [*Id.* at ¶¶ 211-13].

**\*4** In Count III, Plaintiffs asserted a violation of the Pennsylvania State Constitution. [*Id.* at ¶¶ 216-22]. Plaintiffs alleged that the same actions and conduct that comprised Counts I and II also violated similar provisions of the Pennsylvania Constitution. [*Id.* at ¶ 220].

Finally, in Counts VI and VII, Plaintiffs alleged that Defendants violated provisions of the federal and state constitutions by disregarding the Election Code's notice and selection requirements applicable to "polling places." [*Id.* at ¶¶ 237-52]. Plaintiffs alleged that drop boxes are "polling places," and thus subject to certain criteria for site selection and the requirement that county election boards provide 20 days' public notice. [*Id.* at ¶¶ 239-42]. Plaintiffs asserted that Defendants' failure to provide this notice or select appropriate "polling places" in the primary election, if repeated in the general election, would create the risk of voter fraud and vote dilution. [*Id.* at ¶¶ 243-246].

### 2. Poll-watcher claims.

The second category of claims in the first amended complaint consisted of challenges to the constitutionality of Election-Code provisions related to poll watchers.

In Count IV, Plaintiffs alleged violations of the 1st and 14th Amendments. These claims had both a facial and an as-applied component. [ECF 234, ¶ 230 ("On its face and as applied to the 2020 General Election ...") ].

First, Plaintiffs alleged that 25 P.S. § 2687 was facially unconstitutional because it "arbitrarily and unreasonably" limits poll watchers to serving only in their county of residence and to monitoring only in-person voting at the polling place on election day. [*Id.* at ¶ 226]. Second, Plaintiffs alleged that the same provision was unconstitutional as

Ex. 5

applied in the context of Pennsylvania's new vote-by-mail system, because these poll-watcher restrictions, combined with insecure voting procedures, create unacceptable risks of fraud and vote dilution. [*Id.* at ¶ 228]. Plaintiffs contended that these limitations make it "functionally impracticable" for candidates to ensure that they have poll watchers present where ballots are deposited and collected, given the widespread use of remote drop boxes and other satellite collection sites. [*Id.*].

Count V was the same as Count IV, but alleged that the same poll-watching restrictions violated the Pennsylvania Constitution, too. [*Id.* at ¶ 234].

### 3. In-person voting claims.

The third category of claims consisted of challenges to the procedures for allowing electors to vote in person after requesting a mail-in ballot.

That is, in Counts VIII and IX, Plaintiffs asserted that the Election Code permits an elector that has requested a mail-in ballot to still vote in person so long as he remits his spoiled ballot. [ECF 234, ¶¶ 253-267]. Plaintiffs asserted that during the primary, some counties allowed such electors to vote in person, while others did not, and they fear the same will happen in the general election. [*Id.* at ¶¶ 255, 259]. Plaintiffs also asserted that some counties allowed electors who had voted by mail to vote in person, in violation of the Election Code. [*Id.* at ¶¶ 257-58]. Plaintiffs alleged that this conduct also violates the federal and state constitutional provisions concerning the right to vote and equal protection. [*Id.* at ¶¶ 261, 265].

### B. The Court's decision to abstain.

**\*5** Upon consideration of Defendants' and Intervenors' motions to dismiss the first amended complaint, on August 23, 2020, the Court issued an order abstaining under *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) and temporarily staying the case. [ECF 409, 410].

In doing so, the Court determined that the three requisite prongs for *Pullman* abstention were met, and that the discretionary considerations weighed in favor of abstention. [ECF 409, p. 3 ("[Under *Pullman*, federal courts abstain] if (1) doing so requires interpretation of 'unsettled questions

of state law'; (2) permitting resolution of the unsettled state-law questions by state courts would 'obviate the need for, or substantially narrow the scope of adjudication of the constitutional claims'; and (3) an 'erroneous construction of state law would be disruptive of important state policies[.]' " (citing *Chez Sez III Corp. v. Township of Union*, 945 F.2d 628, 631 (3d Cir. 1991))); *id.* at p. 30 (explaining that after the three prongs of *Pullman* abstention are met, the court must "make a discretionary determination of whether abstention is appropriate given the particular facts of this case," which requires weighing "such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." (cleaned up)) ].

The Court found that abstaining under *Pullman* was appropriate because of several unresolved ambiguities in Pennsylvania's Election Code. Specifically, the Court found that there were significant ambiguities as to whether the Election Code (1) permitted delivery of ballots to locations other than the county election board's headquarters, such as drop boxes, (2) permitted counties to count ballots that were not placed within the "secrecy envelope" (*i.e.*, "naked ballots"), (3) considered drop boxes and other ballot-collection sites as "polling places," as defined in the Election Code, and (4) required counties to automatically verify ballot applications for mail-in ballots (where the person applied for the ballot in person), even if there was no "bona fide objection" to the application. [ECF 409, pp. 17-23].

The Court explained that each of these ambiguities, if settled, would significantly narrow—or even resolve—some of Plaintiffs' claims. As the Court explained, for example, if a state court interpreted the Election Code to disallow drop boxes, Plaintiffs would obtain their requested relief (*i.e.*, no drop boxes); alternatively, if drop boxes were authorized by the Election Code, then Plaintiffs' allegations that drop boxes were illegal would be eliminated, which would, in turn, significantly affect the constitutional analysis of Plaintiffs' claims. [*Id.* at pp. 25-28]. The same held true for "naked ballots," the breadth of coverage of "polling places," and the requisite verification for personal ballot applications.

The Court then explained that it was appropriate for it to abstain until a state court could interpret the ambiguous state law. [*Id.* at pp. 28-30]. The Court concluded that if it interpreted the ambiguous state law, there was a sufficient chance that a state court could disagree with the interpretation, which would render this Court's interpretation not only

advisory, but disruptive to state policies. The Court noted that especially in the election context, states have considerable discretion to implement their own policies without federal intervention. Accordingly, because these were questions of uninterpreted state law that were sufficiently ambiguous, federalism and comity demanded that a state court, not this Court, be the first interpreter.

**\*6** Finally, the Court explained that, despite the imminence of the election, abstention was still proper. [*Id.* at pp. 30-33]. The Court noted that state-court litigation was already pending that would resolve some of the statutory ambiguities at issue. [*Id.* at p. 31]. Further, the Court highlighted three courses Plaintiffs could immediately take to resolve the statutory ambiguities: intervene in the pending state-court litigation; file their own state-court case; or appeal this Court's abstention decision to the Third Circuit, and then seek certification of the unsettled state-law issues in the Pennsylvania Supreme Court. [*Id.* at pp. 31-33].

Additionally, the Court explained that it would stay the entire case, despite several of Plaintiffs' claims not being subject to *Pullman* abstention as they were not based on ambiguous state law. [*Id.* at pp. 34-37]. That's because, in its discretion, the Court determined it would be more efficient for this case to progress as a single proceeding, rather than in piecemeal fashion. [*Id.*]. However, the Court allowed any party to move to lift the stay as to the few claims not subject to *Pullman* abstention, if no state-court decision had been issued by October 5, 2020. [*Id.*].

On August 28, 2020, five days after the Court abstained, Plaintiffs moved to modify the Court's stay, and moved for a preliminary injunction. [ECF 414]. Plaintiffs requested, among other things, that the Court order Defendants to segregate, and not pre-canvass or canvass, all ballots that were returned in drop boxes, lacked a secrecy envelope, or were delivered by a third party. [*Id.*]. Plaintiffs also requested that the Court lift the stay by September 14, 2020, instead of October 5, 2020. [*Id.*].

The Court denied Plaintiffs' motion for preliminary injunctive relief, finding that Plaintiffs failed to show they would be irreparably harmed. [ECF 444; ECF 445]. The Court also declined to move up the date when the stay would be lifted. [*Id.*]. The Court noted that, at the request of Secretary Boockvar, the Pennsylvania Supreme Court had already exercised its extraordinary jurisdiction to consider five discrete issues and clarify Pennsylvania law in time for

the general election. [*Id.* at p. 1]. Since that case appeared to be on track, the Court denied Plaintiffs' motion without prejudice, and the Court's abstention opinion and order remained in effect.

### C. The Pennsylvania Supreme Court's decision.

On September 17, 2020, the Pennsylvania Supreme Court issued its decision in *Pennsylvania Democratic Party v. Boockvar,* —— Pa. ——, —— A.3d ——, 2020 WL 5554644 (Sept. 17, 2020). The court clarified three issues of state election law that are directly relevant to this case.

### 1. Counties are permitted under the Election Code to establish alternate ballot-collection sites beyond just their main county office locations.

The Pennsylvania Supreme Court first considered whether the Election Code allowed a Pennsylvania voter to deliver his or her mail-in ballot in person to a location other than the established office address of the county's board of election. *Boockvar,* —— A.3d at ——, 2020 WL 5554644, at \*8. The court further considered the means by which county boards of election could accept hand-delivered mail-in ballots. *Id.*

Consistent with this Court's abstention opinion, the court found that "the parties' competing interpretations of the Election Code on [these questions] are reasonable, rendering the Code ambiguous" on these questions. *Id.* After applying traditional principles of statutory interpretation, the court held that "the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including dropboxes." *Id.* at——, 2020 WL 5554644, at \*9. The court reached this conclusion due to "the clear legislative intent underlying Act 77 ... to provide electors with options to vote outside of traditional polling places." *Id.*

**\*7** The respondents in that case further argued that this interpretation would cause county boards of election to "employ myriad systems to accept hand-delivered mail-in ballots," which would "be unconstitutionally disparate from one another in so much as some systems will offer more legal protections to voters than others will provide" and violate the Equal-Protection Clause *Id.* The court rejected this argument. It found that "the exact manner in which each county board of election will accept these votes is entirely unknown at this point; thus, we have no metric by which to measure whether

any one system offers more legal protection than another, making an equal protection analysis impossible at this time." *Id.*

## 2. Ballots lacking inner secrecy envelopes should not be counted.

The court next considered whether the boards of elections "must 'clothe and count naked ballots,' *i.e.*, place ballots that were returned without the secrecy envelope into a proper envelope and count them, rather than invalidate them." *Boockvar*, ––– A.3d at ––––, 2020 WL 5554644, at *21. The court concluded that they should not.

The court held that "the Legislature intended for the secrecy envelope provision [in the Election Code] to be mandatory." *Id.* at ––––, 2020 WL 5554644, at *24. In other words, the relevant provisions "make clear the General Assembly's intention that, during the collection and canvassing processes, when the outer envelope in which the ballot arrived is unsealed and the sealed ballot removed, it should not be readily apparent who the elector is, with what party he or she affiliates, or for whom the elector has voted." *Id.* The secrecy envelope "properly unmarked and sealed ensures that result," and "[w]hatever the wisdom of the requirement, the command that the mail-in elector utilize the secrecy envelope and leave it unblemished by identifying information is neither ambiguous nor unreasonable." *Id.*

As a result, the court ultimately concluded, "a mail-ballot that is not enclosed in the statutorily-mandated secrecy envelope must be disqualified." *Id.* at ––––, 2020 WL 5554644, at *26

## 3. Pennsylvania's county-residency requirement for poll watchers is constitutional.

The final relevant issue the court considered was whether the poll-watcher residency requirement found in 25 P.S. § 2687(b) violates state or federal constitutional rights. *Boockvar*, ––– A.3d at ––––, 2020 WL 5554644, at *26. Relying on *Republican Party of Pennsylvania v. Cortés*, 218 F. Supp. 3d 396 (E.D. Pa. 2016), the court concluded that the poll-watcher residency provision "impose[d] no burden on one's constitutional right to vote and, accordingly, requires only a showing that a rational basis exists to be upheld." *Id.* at ––––, 2020 WL 5554644, at *30. The court found rational-basis review was appropriate for three reasons.

First, "there is no individual constitutional right to serve as a poll watcher; rather, the right to do so is conferred by statute." *Id.* (citation omitted). Second, "poll watching is not incidental to the right of free association and, thus, has no distinct First Amendment protection." *Id.* (cleaned up). Third, "poll watching does not implicate core political speech." *Id.* (citation omitted).

The court went on to find that there was a "clear rational basis for the county poll watcher residency requirement[.]" *Id.* That is, given "Pennsylvania has envisioned a county-based scheme for managing elections within the Commonwealth," it is "reasonable that the Legislature would require poll watchers, who serve within the various counties of the state, to be residents of the counties in which they serve." *Id.*

In upholding the constitutionality of the "county poll watcher residency requirement," the court rejected the claim that "poll watchers are vital to protect against voter fraud and that because of the distribution of voters throughout Pennsylvania, the residency requirement makes it difficult to identify poll watchers in all precincts." *Id.* The court concluded that the claims of "heightened election fraud involving mail-in voting" were "unsubstantiated" and "specifically belied by the Act 35 report issued by [Secretary Boockvar] on August 1, 2020." *Id.* Moreover, the court held that the "speculative claim that it is 'difficult' for both parties to fill poll watcher positions in every precinct, even if true, is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice." *Id.*

**\*8** Based on the foregoing, the court declared "that the poll-watcher residency requirement does not violate the state or federal constitutions." *Id.* at ––––, 2020 WL 5554644, at *31.

## D. Plaintiffs' notice of remaining claims.

Following the Pennsylvania Supreme Court's decision, this Court lifted the stay it had imposed pursuant to the *Pullman* abstention doctrine and ordered the parties to identify the remaining viable claims and defenses in the case. [ECF 447].

In their notice, Plaintiffs took the position that nearly all their claims remained viable, with a few discrete exceptions. Plaintiffs conceded that their "federal and state constitutional claims of voter dilution solely on the basis that drop boxes and other collection sites are not statutorily authorized by the

Pennsylvania Election Code [were] no longer viable." [ECF 448, p. 4]. They also stated that their "facial challenge to the county residency requirement under 25 P.S. § 2687 is no longer a viable claim." [*Id.* at p. 10]. Plaintiffs also moved for leave to amend their complaint a second time to add new allegations and a new claim relating to Secretary Boockvar's recent signature-comparison guidance. [ECF 451].

Defendants and Intervenors, for their part, suggested that Plaintiffs' claims had been substantially narrowed, if not outright mooted, by the Pennsylvania Supreme Court's decision, and reminded the Court that their arguments for dismissal remained outstanding.

### E. The Court's September 23, 2020, memorandum orders.

In response to the notices filed by the parties and Plaintiffs' motion for leave to amend the first amended complaint, the Court issued an order granting Plaintiffs' motion, narrowing the scope of the lawsuit, and establishing the procedure for resolving the remaining claims. [ECF 459].

As to Plaintiffs' proposed amendment to their complaint, the Court found that the new claim and allegations were relatively narrow, and thus amendment wouldn't prejudice Defendants and Intervenors. [*Id.* at pp. 3-4]. As a result, the Court granted the motion. [*Id.* at p. 4].

The Court, however, did inform the parties that it would "continue to abstain under *Pullman* as to Plaintiffs' claim pertaining to the notice of drop box locations and, more generally, whether the "polling place" requirements under the Election Code apply to drop-box locations." [*Id.* at p. 5]. This was so because those claims involve still-unsettled issues of state law. The Court explained that the "fact that the Pennsylvania Supreme Court did not address this issue in its recent decision is immaterial" because the "propriety of *Pullman* abstention does not depend on the existence of parallel state-court proceedings." [*Id.* (citing *Stoe v. Flaherty,* 436 F.3d 209, 213 (3d Cir. 2006)) ]. Moreover, Plaintiffs had several other avenues to pursue prompt interpretation of state law after this Court abstained. [*Id.* at p. 6].

The Court also informed the parties, for similar reasons, that it would continue to abstain with respect to Plaintiffs' claims regarding Secretary Boockvar's guidance that personal applications for mail-in ballots shall be accepted absent a "bona fide objection." [ECF 460].

The Court found that "no Article III 'case or controversy' remain[ed] with respect to the claims on which the Pennsylvania Supreme Court effectively ruled in Plaintiffs' favor on state-law grounds (*e.g.*, illegality of third-party ballot delivery; excluding 'naked ballots' submitted without inner-secrecy envelopes)." [ECF 459, p. 6]. Because there was "no reason to believe Defendants plan to violate what they themselves now agree the law requires," the Court held that Plaintiffs' claims were premature and speculative. [*Id.* at p. 7]. The Court therefore dismissed those claims as falling outside of its Article III power to adjudicate. [*Id.* (citations omitted) ].

**\*9** To resolve the remaining claims, the Court directed the parties to file cross-motions for summary judgment presenting all arguments for dismissal or judgment under Federal Rule of Civil Procedure 56. [*Id.* at pp. 8-10]. Before briefing on those motions, the Court authorized additional expedited discovery. [*Id.* at pp. 4-5]. The parties completed discovery and timely filed their motions; they identified no material disputes of fact; and therefore, the motions are now fully briefed and ready for disposition.

### F. The claims now at issue.

Based on the Pennsylvania Supreme Court's prior ruling, this Court's prior decisions, Plaintiffs' nine-count Second Amended Complaint, and recent guidance issued by Secretary Boockvar, the claims remaining in this case are narrow and substantially different than those asserted at the outset of the case.

**Drop Boxes (Counts I-III).** Plaintiffs still advance a claim that drop boxes are unconstitutional, but in a different way. Now that the Pennsylvania Supreme Court has expressly held that drop boxes are authorized under the Election Code, Plaintiffs now assert that the use of "unmanned" drop boxes is unconstitutional under the federal and state constitutions, for reasons discussed in more detail below.

**Signature Comparison (Counts I-III).** Plaintiffs' newly added claim relates to signature comparison. Secretary Boockvar's September 2020 guidance informs the county boards that they are not to engage in a signature analysis of mail-in ballots and applications, and they must count those ballots, even if the signature on the ballot does not match the voter's signature on file. Plaintiffs assert that this guidance is unconstitutional under the federal and state constitutions.

**Poll Watching (Counts IV, V).** The Pennsylvania Supreme Court already declared that Pennsylvania's county-residency

Ex. 5

requirement for poll watchers is **facially** constitutional. Plaintiffs now only assert that the requirement, **as applied**, is unconstitutional under the federal and state constitutions.

The counts that remain in the Second Amended Complaint, but which are **not** at issue, are the counts related to where poll watchers can be located. That is implicated mostly by Counts VI and VII, and by certain allegations in Counts IV and V. The Court continues to abstain from reaching that issue. Plaintiffs have filed a separate state lawsuit that would appear to address many of those issues, in any event. [ECF 549-22; ECF 573-1]. Counts VIII and IX concern challenges related to voters that have requested mail-in ballots, but that instead seek to vote in person. The Secretary issued recent guidance, effectively mooting those claims, and, based on Plaintiffs' positions taken in the course of this litigation, the Court deems Plaintiffs to have withdrawn Counts VIII and IX. [ECF 509, p. 15 n.4 ("[I]n the September 28 guidance memo, the Secretary corrected [her] earlier guidance to conform to the Election Code and states that any mail-in voter who spoils his/her ballot and the accompanying envelopes and signs a declaration that they did not vote by mail-in ballot will be allowed to vote a regular ballot. Therefore, Plaintiffs agree to withdraw this claim from those that still are being pursued.") ].

## II. Factual Background

### A. Pennsylvania's Election Code, and the adoption of Act 77.

#### 1. The county-based election system.

Pennsylvania's Election Code, first enacted in 1937, established a county-based system for administering elections. *See* 25 P.S. § 2641(a) ("There shall be a county board of elections in and for each county of this Commonwealth, which shall have jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions of [the Election Code]."). The Election Code vests county boards of elections with discretion to conduct elections and implement procedures intended to ensure the honesty, efficiency, and uniformity of Pennsylvania's elections. *Id.* §§ 2641(a), 2642(g).

#### 2. The adoption of Act 77.

**\*10** On October 31, 2019, the Pennsylvania General Assembly passed "Act 77," a bipartisan reform of Pennsylvania's Election Code. *See* [ECF 461, ¶¶ 91]; 2019 Pa. Legis. Serv. Act 2019-77 (S.B. 421).

Among other things, by passing Act 77, Pennsylvania joined 34 other states in authorizing "no excuse" mail-in voting by all qualified electors. *See* [ECF 461, ¶¶ 92]; 25 P.S. §§ 3150.11-3150.17; [ECF 549-11, p. 5 ("The largest number of states (34), practice no-excuse mail-in voting, allowing any persons to vote by mail regardless of whether they have a reason or whether they will be out of their jurisdiction on Election Day.") ]. Previously, a voter could only cast an "absentee" ballot if certain criteria were met, such as that the voter would be away from the election district on election day. *See* 1998 Pa. Legis. Serv. Act. 1998-18 (H.B. 1760), § 14.

Like the previous absentee voting system, Pennsylvania's mail-in voting system requires voters to "opt-in" by requesting a ballot from either the Secretary or the voter's county board of elections. *See* 25 P.S. §§ 3146.2(a), 3150.12(a). When requesting a ballot, the voter must provide, among other things, his or her name, date of birth, voting district, length of time residing in the voting district, and party choice for primary elections. *See* 25 P.S. §§ 3146.2(b), 3150.12(b). A voter must also provide proof of identification; namely, either a driver's license number or, in the case of a voter who does not have a driver's license, the last four digits of the voter's Social Security number, or, in the case of a voter who has neither a driver's license nor a Social Security number, another form of approved identification. 25 P.S. § 2602(z.5)(3). In this respect, Pennsylvania differs from states that automatically mail each registered voter a ballot—a practice known as "universal mail-in voting." [ECF 549-11, p. 6 ("[N]ine states conduct universal vote-by-mail elections in which the state (or a local entity, such [as] a county or municipality) mails all registered voters a ballot before each election without voters' [sic] having to request them.").

#### 3. The COVID-19 pandemic.

Since early 2020, the United States, and Pennsylvania, have been engulfed in a viral pandemic of unprecedented scope and scale. [ECF 549-8, ¶ 31]. In that time, COVID-19 has spread to every corner of the globe, including Pennsylvania, and jeopardized the safety and health of many people. [*Id.* at ¶¶ 31, 38-39, 54-55, 66]. As of this date, more than 200,000 Americans have died,

Ex. 5

including more than 8,000 Pennsylvanians. *See* Covid in the U.S.: Latest Map and Case Count, The New York Times, available at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Oct. 10, 2020); COVID-19 Data for Pennsylvania, Pennsylvania Department of Health, available at https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last visited Oct. 10, 2020).

There have been many safety precautions that Pennsylvanians have been either required or urged to take, such as limiting participation in large gatherings, maintaining social distance, and wearing face coverings. [ECF 549-8, ¶¶ 58, 63-65]. The threat of COVID-19 is likely to persist through the November general election. [*Id.* at ¶¶ 53-56, 66-68].

### B. Facts relevant to drop boxes.

**\*11** Pennsylvania's county-based election system vests county boards of elections with "jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions" of the Election Code. 25 P.S. § 2641(a). The Election Code further empowers the county boards to "make and issue such rules, regulations and instructions, not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, elections officers and electors." *Id.* at § 2642(f). The counties are also charged with the responsibility to "purchase, preserve, store and maintain primary and election equipment of all kinds, including voting booths, ballot boxes and voting machines." *Id.* at § 2642(c).

As noted above, in *Pennsylvania Democratic Party v. Boockvar*, the Pennsylvania Supreme Court interpreted the Election Code, which allows for mail-in and absentee ballots to be returned to the "county board of election," to "permit[ ] county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes." ––– A.3d at ––––, 2020 WL 5554644, at \*10.

Thus, it is now settled that the Election Code permits (but does not require) counties to authorize drop boxes and other satellite-collection locations for mailed ballots. 25 P.S. § 3150.16(a). Pennsylvania is not alone in this regard—as many as 34 other states and the District of Columbia authorize the use of drop boxes or satellite ballot collection sites to one degree or another. [ECF 549-11, p. 8, fig. 4]. Indeed, Secretary Boockvar stated that as many as 16% of voters nationwide had cast their ballots using drop boxes in the 2016 general election, including the majority of voters in Colorado

(75%) and Washington (56.9%). [ECF 547, p. 18 (citing ECF 549-16) ].

### 1. Secretary Boockvar's guidance with respect to drop boxes.

Since the passage of Act 77, Secretary Boockvar has issued several guidance documents to the counties regarding the counties' implementation of mail-in voting, including guidance with respect to the use of drop boxes. [ECF 504-21; 504-22; 504-23; 504-24; 504-25; 571-1, Ex. E]. In general terms, the Secretary's guidance as to drop boxes informed the counties that the use of drop boxes was authorized by the Election Code and recommended "best practices" for their use. Her latest guidance offered standards for (1) where drop boxes should be located, [ECF 504-23, § 1.2), (2) how drop boxes should be designed and what signage should accompany them, [*id.* at §§ 2.2-2.3], (3) what security measures should be employed, [*id.* at § 2.5], and (4) what procedures should be implemented for collecting and returning ballots to the county election office, [*id.* at §§ 3.1-3.3, 4].

As to the location of drop boxes, the Secretary recommended that counties consider the following criteria, [*id.* at § 1.2]:

- Locations that serve heavily populated urban/suburban areas, as well as rural areas;

- Locations near heavy traffic areas such as commercial corridors, large residential areas, major employers and public transportation routes;

- Locations that are easily recognizable and accessible within the community;

- Locations in areas in which there have historically been delays at existing polling locations, and areas with historically low turnout;

- Proximity to communities with historically low vote by mail usage;

- Proximity to language minority communities;

- Proximity to voters with disabilities;

- Proximity to communities with low rates of household vehicle ownership;

- Proximity to low-income communities;

Ex. 5

• Access to accessible and free parking; and

• The distance and time a voter must travel by car or public transportation.

With respect to drop-box design criteria, the Secretary recommended to counties, [*id.* at § 2.2]:

**\*12** • Hardware should be operable without any tight grasping, pinching, or twisting of the wrist;

• Hardware should require no more than 5 lbs. of pressure for the voter to operate;

• Receptacle should be operable within reach-range of 15 to 48 inches from the floor or ground for a person utilizing a wheelchair;

• The drop-box should provide specific points identifying the slot where ballots are inserted;

• The drop-box may have more than one ballot slot (e.g. one for drive-by ballot return and one for walk-up returns);

• To ensure that only ballot material can be deposited and not be removed by anyone but designated county board of election officials, the opening slot of a drop-box should be too small to allow tampering or removal of ballots; and

• The opening slot should also minimize the ability for liquid to be poured into the drop-box or rainwater to seep in.

The Secretary's guidance as to signage recommended, [*id.* at § 2.3]:

• Signage should be in all languages required under the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10503);

• Signage should display language stating that counterfeiting, forging, tampering with, or destroying ballots is a second-degree misdemeanor pursuant to sections 1816 and 1817 of the Pennsylvania Election Code (25 P.S. §§ 3516 and 3517);

• Signage should also provide a statement that third-party return of ballots is prohibited unless the person returning the ballot is rendering assistance to a disabled voter or an emergency absentee voter. Such assistance requires a

declaration signed by the voter and the person rendering assistance; and

• Signage should provide a statement requesting that the designated county elections official should be notified immediately in the event the receptacle is full, not functioning, or is damaged in any fashion, and should provide a phone number and email address for such purpose.

With respect to ballot security, the Secretary stated that county boards should implement the following security measures, [*id.* at § 2.5]:

• Only personnel authorized by the county board of elections should have access to the ballots inside of a drop-box;

• Drop-boxes should be secured in a manner to prevent their unauthorized removal;

• All drop-boxes should be secured by a lock and sealed with a tamper-evident seal. Only authorized election officials designated by the county board of elections may access the keys and/or combination of the lock;

• Drop-boxes should be securely fastened in a manner as to prevent moving or tampering, such as fastening the drop-box to concrete or an immovable object;

• During the hours when the staffed return site is closed or staff is unavailable, the drop-box should be placed in a secure area that is inaccessible to the public and/or otherwise safeguarded;

• The county boards of election should ensure adequate lighting is provided at all ballot return sites when the site is in use;

• When feasible, ballot return sites should be monitored by a video security surveillance system, or an internal camera that can capture digital images and/or audio. A video security surveillance system can include existing systems on county, city, municipal, or private buildings. Video surveillance should be retained by the county election office through 60 days following the deadline to certify the election; and

**\*13** • To prevent physical damage and unauthorized entry, the drop-box at a ballot return site located outdoors should be constructed of durable material able to withstand vandalism, removal, and inclement weather.

Ex. 5

With respect to ballot collection and "chain of custody" procedures, the Secretary stated that counties should adhere to the following standards, [*id.* at §§ 3.1-3.2]:

- Ballots should be collected from ballot return sites only by personnel authorized by the county board of elections and at times determined by the board of elections, at least every 24 hours, excluding Saturdays and Sundays;

- The county board of elections should designate at least two election officials to collect voted ballots from a ballot return site. Each designated election official should carry identification or an official designation that identifies them as an election official authorized to collect voted ballots;

- Election officials designated to collect voted ballots by the board of elections should sign a declaration declaring that he or she will timely and securely collect and return voted ballots, will not permit any person to tamper with a ballot return site or its contents, and that he or she will faithfully and securely perform his or her duties;

- The designated election officials should retrieve the voted ballots from the ballot return site and place the voted ballots in a secure ballot transfer container;

- The designated election officials should note on *Ballot Return Site Collection Forms* the site and unique identification number of the ballot return site and the date and time of retrieval;

- Ballots collected from any ballot return site should be immediately transported to the county board of elections;

- Upon arrival at the office of the county board of elections, the county board of elections, or their designee(s), should note the time of arrival on the same form, as described above;

- The seal number should be verified by a county election official or a designated representative;

- The county board of elections, or their designee(s), should inspect the drop-box or secure ballot transfer container for evidence of tampering and should receive the retrieved ballots by signing the retrieval form and including the date and time of receipt. In the event tampering is evident, that fact must be noted on the retrieval form;

- The completed collection form should be maintained in a manner proscribed by the board of elections to ensure that the form is traceable to its respective secure ballot container; and

- The county elections official at the county election office or central count location should note the number of ballots delivered on the retrieval form.

And finally, as to election day and post-election day procedures with respect to drop boxes, the Secretary provided as follows, [*id.* at §§ 3.3, 4]:

- The county board of elections should arrange for authorized personnel to retrieve ballots on election night and transport them to the county board of elections for canvassing of the ballots;

- Authorized personnel should be present at ballot return sites immediately prior to 8:00 p.m. or at the time the polls should otherwise be closed;

- At 8:00 p.m. on election night, or later if the polling place hours have been extended, all ballot return sites and drop-boxes must be closed and locked;

**\*14** • Staff must ensure that no ballots are returned to the ballot return site after the close of polls;

- After the final retrieval after the closing of the polls, the drop-box must be removed or locked and/or covered to prevent any further ballots from being deposited, and a sign shall be posted indicating that polling is closed for the election; and

- Any ballots collected from a return site should be processed in the same manner as mail-in ballots personally delivered to the central office of the county board of elections official by the voter and ballots received via the United States Postal Service or any other delivery service.

The Secretary and her staff developed this guidance in consultation with subject-matter experts within her Department and after review of the policies, practices, and laws in other states where drop boxes have been used. [ECF 549-6, pp. 23:14-22]. The evidence reflects at least one instance in which the Secretary's deputies reiterated that these "best practices" should be followed in response to inquiries from county officials considering whether to use drop boxes.

Ex. 5

[ECF 549-32 ("Per our conversation, the list of items are things the county must keep in mind if you are going to provide a box for voters to return their ballots in person.") ].

Approximately 24 counties plan to use drop boxes during the November general election, to varying degrees. [ECF 549-28; ECF 504-1]. Of these, about nine counties intend to staff the drop boxes with county officials, while about 17 counties intend to use video surveillance in lieu of having staff present. [ECF 549-28].

### 2. Defendants' and Intervenors' evidence of the benefits and low risks associated with drop boxes.

Secretary Boockvar advocates for the use of drop boxes as a "direct and convenient way" for voters to deliver cast ballots to their county boards of elections, "thereby increasing turnout." [ECF 547, p. 22 ¶ 54 (citing 549-11 at pp. 10-11) ]. The Secretary also touts the special benefits of expanding drop-box use in the ongoing COVID-19 pandemic. Specifically, she asserts that drop boxes reduce health risks and inspire voter confidence because "many voters understandably do not wish to cast their votes in person at their polling place on Election Day" due to COVID-19. [*Id.* at ¶¶ 55, 57 (citing ECF 549-2 ¶ 39; ECF 549-11 at p. 10; 549-8, ¶ 95) ]. Drop boxes, she says, allow voters to vote in person without coming into "close proximity to other members of the public, compared to in-person voting or personally delivering a mail-in ballot to a public office building." [*Id.* at ¶ 57].

Secretary Boockvar also states that drop boxes are highly convenient, and cost-saving, for both counties and voters. For counties, she notes that "24-hour secure ballot drop boxes" are "cost-effective measures ... as they do not have to be staffed by election judges." [*Id.* at p. 24 ¶ 62 (citing ECF 549-11 at p. 11; ECF 549-9 at ¶ 34]. As for voters, the Secretary explains that, in a state where "ten counties ... cover more than 1,000 square miles" and "two-thirds" of counties "cover more than 500 square miles," many Pennsylvania voters "could be required to drive dozens of miles (and perhaps in excess of 100 miles) if he or she wished to deposit his or her mail-in ballot in person at the main county board of elections office." [*Id.* at ¶ 58 (citing ECF 549-29) ].

 **\*15**  In addition to any tangible benefit drop boxes may have for voter access and turnout, Secretary Boockvar also states that drop boxes have a positive impact on voter confidence.

In particular, she cites a recent news article, and a letter sent by the General Counsel of the U.S. Postal Service regarding Pennsylvania's absentee and mail-in ballot deadline, which have raised concerns over the timeliness and reliability of the U.S. Postal Service. [*Id.* at ¶¶ 60-61 (citing ECF 549-13; ECF 549-14); ECF 549-17; ECF 549-2 ¶¶ 42-43]. Voters' fears that votes returned by mail will not be timely counted could, the Secretary worries, "justifiably dissuade voters from wanting to rely upon the Postal Service for return of their mail-in or absentee ballot." [ECF 547, ¶ 61]. Drop boxes, she says, can address this concern by allowing voters to safely return mail-in ballots to an in-person location.

In exchange for these benefits, the Secretary insists that any potential security risk associated with drop boxes is low. She notes that the federal Department of Homeland Security has released guidance affirming that a "ballot drop box provides a secure and convenient means for voters to return their mail ballot," and recommending that states deploy one drop box for every 15,000 to 20,000 registered voters. [*Id.* at ¶¶ 63-65 (citing ECF 549-24, p. 1) ]. She also points to a purported lack of evidence of systemic ballot harvesting or any attempts to tamper with, destroy, or otherwise commit voter fraud using drop boxes, either in Pennsylvania's recent primary election, or in other states that have used drop boxes for many years. [*Id.* at ¶¶ 68-74 (citations omitted) ]. And she asserts that "[i]n the last 20 years in the entire state of Pennsylvania, there have been fewer than a dozen confirmed cases of fraud involving a handful of absentee ballots" among the many millions of votes cast during that time period. [*Id.* at ¶ 70 (citing ECF 549-10, pp. 3-4) ].

Finally, the Secretary, and other Defendants and Intervenors, argue that Pennsylvania already has robust measures in place to prevent fraud, including its criminal laws, voter registration system, mail-in ballot application requirement, and canvassing procedures. [*Id.* at ¶¶ 66-67 (citing 25 P.S. §§ 3516 - 3518) ]; [ECF 549-9, p. 15, ¶¶ 46-47 ("These allegations are not consistent with my experience with drop box security, particularly given the strong voter verification procedures that are followed by elections officials throughout the country and in Pennsylvania. Specifically, the eligibility and identity of the voter to cast a ballot is examined by an election judge who reviews and confirms all the personal identity information provided on the outside envelope. Once voter eligibility is confirmed, the ballot is extracted and separated from the outside envelope to ensure the ballot remains secret. During this step, election judges confirm that there is only one ballot in the envelope and checks for

Ex. 5

potential defects, such as tears in the ballot.... Regardless of the receptacle used for acceptance of the ballot (drop box versus USPS mailbox), ballot validation occurs when the ballot is received by the county board of elections. The validation is the same regardless of how the ballots are collected or who delivers the ballot, even where that delivery contravenes state law.") ].

Defendants and Intervenors also point to several expert reports expressing the view that drop boxes are both low risk and beneficial. These experts include:

**Professor Matthew A. Barreto**, a Professor of Political Science and Chicana/o Studies at UCLA. [ECF 549-7]. Professor Barreto offers the opinion that ballot drop boxes are an important tool in facilitating voting in Black and Latino communities. Specifically, he discusses research showing that Black and Latino voters are "particularly concerned about the USPS delivering their ballots." [*Id.* at ¶ 22]. And he opines that ballot drop boxes help to reassure these voters that their vote will count, because "there is no intermediary step between the voters and the county officials who collect the ballot." [*Id.* at ¶ 24].

 **\*16 Professor Donald S. Burke**, a medical doctor and Distinguished University Professor of Health Science and Policy, Jonas Salk Chair in Population Health, and Professor of Epidemiology at the University of Pittsburgh. [ECF 549-8]. Professor Burke details the "significant risk of exposure" to COVID-19 in "enclosed areas like polling places." [*Id.* at ¶ 69]. He opines that "depositing a ballot in a mailbox and depositing a ballot in a drop-box are potential methods of voting that impart the least health risk to individual voters, and the least public health risk to the community." [*Id.* at ¶ 95].

**Amber McReynolds**, the CEO of the National Vote at Home Institute, with 13 years of experience administering elections as an Elections Director, Deputy Director, and Operations Manager for the City and County of Denver, Colorado. [ECF 549-9]. Ms. McReynolds opines that "[b]allot drop-boxes can be an important component of implementing expanded mail-in voting" that are "generally more secure than putting a ballot in post office boxes." [*Id.* at ¶ 16 (a) ]. She notes that "[d]rop boxes are managed by election officials ... delivered to election officials more quickly than delivery through the U.S. postal system, and are secure." [*Id.*].

Ms. McReynolds also opines that Secretary Boockvar's guidance with respect to drop boxes is "consistent with best practices and advice that NVAHI has provided across jurisdictions." [*Id.* at ¶ 35]. But she also notes that "[b]est practices will vary by county based on the county's available resources, population, needs, and assessment of risk." [*Id.* at ¶ 52].

More generally, Ms. McReynolds argues that "[d]rop-boxes do not create an increased opportunity for fraud" as compared to postal boxes. [*Id.* at ¶ 44]. She also suggests that Pennsylvania guards against such fraud through other "strong voter verification procedures," including "ballot validation [that] occurs when the ballot is received by the county board of elections" and "[r]econciliation procedures adopted by election officials ... [to] protect against the potential risk of double voting." [*Id.* at ¶¶ 46-48]. She notes that "Pennsylvania's balloting system requires that those who request a mail-in vote and do not return the ballot (or spoil the mail-in ballot at their polling place), can only vote a provisional ballot" and "[i]f a mail-in or absentee ballot was submitted by an individual, their provisional ballot is not counted." [*Id.* at ¶ 48].

**Professor Lorraine C. Minnite**, an Associate Professor and Chair of the Department of Public Policy and Administration at Rutgers University-Camden. [ECF 549-10]. Professor Minnite opines that "the incidence of voter fraud in contemporary U.S. elections is exceedingly rare, including the incidence of voter impersonation fraud committed through the use of mail-in absentee ballots." [*Id.* at p. 3]. In Pennsylvania specifically, she notes that "[i]n the last 20 years ... there have been fewer than a dozen confirmed cases of fraud involving a handful of absentee ballots, and most of them were perpetrated by insiders rather than ordinary voters." [*Id.* at pp. 3-4]. As a "point of reference," she notes that 1,459,555 mail-in and absentee ballots were cast in Pennsylvania's 2020 primary election alone. [*Id.* at 4].

**Professor Robert M. Stein**, a Professor of Political Science at Rice University and a fellow in urban politics at the Baker Institute. [ECF 549-11]. Professor Stein opines that "the Commonwealth's use of drop boxes provides a number of benefits without increasing the risk of mail-in or absentee voter fraud that existed before drop boxes were implemented because (manned or unmanned) they are at least as secure as U.S. Postal Service ('USPS') mailboxes, which have been successfully used to return mail-in ballots for decades in the Commonwealth and elsewhere around the U.S." [*Id.* at p. 3]. According to Professor Stein, the use of drop boxes "has been shown to increase turnout," which he suggests is

Ex. 5

particularly important "during a global pandemic and where research has shown that natural and manmade disasters have historically had a depressive effect on voter turnout." [*Id.* at p. 4]. Professor Stein notes that "[d]rop boxes are widely used across a majority of states as a means to return mail-in ballots" and he is "not aware of any studies or research that suggest that drop boxes (manned or unmanned) are a source for voter fraud." [*Id.*]. Nor is he aware "of any evidence that drop boxes have been tampered with or led to the destruction of ballots." [*Id.*].

**\*17 Professor Paul Gronke**, a Professor of Political Science at Reed College and Director of the Early Voting Information Center. [ECF 545-7]. Professor Gronke recommends that "drop boxes should be provided in every jurisdiction that has significant (20% or more) percentage[ ] of voters casting a ballot by mail, which includes Pennsylvania" for the general election. [*Id.* at ¶ 6]. He avers that "[s]cientific research shows that drop boxes raise voter turnout and enhance voter confidence in the elections process." [*Id.* at ¶ 7]. Voters, he explains, "utilize drop boxes heavily—forty to seventy percent of voters in vote by mail states and twenty-five percent or more in no-excuse absentee states." [*Id.*]. Professor Gronke further states that he is "not aware of any reports that drop boxes are a source for voter fraud" despite having "been in use for years all over the country." [*Id.* at ¶ 8]. And he suggests that the use of drop boxes is "especially important" in an election "that will be conducted under the cloud of the COVID-19 pandemic, and for a state like Pennsylvania that is going to experience an enormous increase in the number of by-mail ballots cast by the citizenry of the state." [*Id.* at ¶ 9].

Based on this evidence, and the purported lack of any contrary evidence showing great risks of fraud associated with the use of drop boxes, Defendants and Intervenors argue that Pennsylvania's authorization of drop boxes, and the counties' specific implementation of them, furthers important state interests at little cost to the integrity of the election system.

### 3. Plaintiffs' evidence of the risks of fraud and vote dilution associated with drop boxes.

Plaintiffs, on the other hand, argue that the drop boxes allow for an unacceptable risk of voter fraud and "illegal delivery or ballot harvesting" that, when it occurs, will "dilute" the votes of all lawful voters who comply with the Election Code. *See, e.g.*, [ECF 461, ¶¶ 127-128]. As evidence of the

dilutive impact of drop boxes, Plaintiffs offer a combination of anecdotal and expert evidence.

Foremost among this evidence is the expert report of Greg Riddlemoser, the former Director of Elections and General Registrar for Stafford County, Virginia from 2011 until 2019. [ECF 504-19]. According to Mr. Riddlemoser, "voter fraud exists." [*Id.* at p. 2]. He defines the term "voter fraud" to mean any "casting and/or counting of ballots in violation of a state's election code." [*Id.*]. Examples he gives include: "Voting twice yourself—even if in multiple jurisdictions," "voting someone else's ballot," and "[e]lection officials giving ballots to or counting ballots from people who were not entitled to vote for various reasons." [*Id.* at pp. 2-3]. All of these things, he asserts, are "against the law and therefore fraudulent." [*Id.*].[3]

[3]     As noted above, Plaintiffs and Mr. Riddlemoser use the term "voter fraud" to mean "illegal voting"—*i.e.*, voter fraud is any practice that violates the Election Code. For purposes of the Court's decision and analysis of Plaintiffs' vote-dilution claims, the Court accepts this definition.

Mr. Riddlemoser argues that "ballot harvesting" (which is the term Plaintiffs use to refer to situations in which an individual returns the ballots of other people) "persists in Pennsylvania." [*Id.* at p. 3]. He points to the following evidence to support this opinion:

- Admissions by Pennsylvania's Deputy Secretary for Elections and Commissions, Jonathan Marks, that "several Pennsylvania counties permitted ballot harvesting by counting ballots that were delivered in violation of Pennsylvania law" during the recent primary election, [*Id.*];

- "[S]everal instances captured by the media where voters in the June 2020 Primary deposited multiple ballots into unstaffed ballot drop boxes," [*Id.* at p. 4];

- "Other photographs and video footage of at least one county's drop box (Elk County) on Primary Election day" which "revealed additional instances of third-party delivery," [*Id.*]; and

- "Documents produced by Montgomery County" which "reveal that despite signs warning that ballot harvesting is not permitted, people during the 2020 Primary attempted to deposit into the five drop boxes used by that county ballots that were not theirs," [*Id.*].

Ex. 5

**\*18** With respect to the use of "unstaffed" or "unmanned" ballot drop boxes, Mr. Riddlemoser expresses the opinion that "the use of unmanned drop boxes presents the easiest opportunity for voter fraud" and "certain steps must be taken to make drop boxes 'secure' and 'monitored.' " [*Id.* at p. 16].

He states that, to be "secure," drop boxes must be "attended" by "sworn election officials" at all times (*i.e.*, "never left unattended at any time they are open for ballot drop-off."). [*Id.*]. He further suggests that officials stationed at drop boxes must be empowered, and required, to "verify the person seeking to drop off a ballot is the one who voted it and is not dropping off someone else's ballot." [*Id.*]. Doing so, he says, would, in addition to providing better security, also "allow the election official to ask the voter if they followed the instructions they were provided ... and assist them in doing so to remediate any errors, where possible, before ballot submission." [*Id.*].

In addition to being "manned," Mr. Riddlemoser suggests that certain procedures with respect to ballot collection are necessary to ensure the integrity of votes cast in drop boxes. For example, he suggests that, at the end of each day, drop boxes, which should themselves be "tamperproof," should "be verifiably completely emptied into fireproof/tamperproof receptacles, which are then sealed and labeled by affidavit as to whom, where, when, etc." [*Id.*] Once sealed, the containers "must then be transported by sworn officials in a county owned vehicle (preferably marked law enforcement) back to the county board where they are properly receipted and safeguarded." [*Id.*]. Emptied drop boxes should also be sealed at the end of each day "such that they are not able to accept any additional ballots until they are 'open' again[.]" [*Id.*]. And boxes should be "examined to ensure no ballots are in the box, that nothing else is inside the box, and that the structural integrity and any security associated with the box remains intact." [*Id.*]. All of this, he suggests, should also be "available for monitoring by poll watchers." [*Id.*].

According to Mr. Riddlemoser, anything short of these robust procedures won't do. In particular, "video cameras would not prevent anyone from engaging in activity that could or is designed to spoil the ballots inside the box; such as dumping liquids into the box, lighting the ballots on fire by using gasoline and matches, or even removing the box itself." [*Id.* at p. 17]. Even if the "identity of the person responsible may be determined ... the ballots themselves would be destroyed —effectively disenfranchising numerous voters." [*Id.*]. And

given "recent footage of toppled statues and damage to government buildings" in the news, Mr. Riddlemoser finds the "forcible removal of ballot drop boxes" to be "a distinct possibility." [*Id.*]. In addition to increasing the risk of ballot destruction, Mr. Riddlemoser notes that reliance on video cameras would also "not prohibit someone from engaging in ballot harvesting by depositing more than one ballot in the drop box[.]" [*Id.*].

Beyond Mr. Riddlemoser's expert testimony, Plaintiffs proffer several other pieces of evidence to support their claims that drop boxes pose a dilutive threat to the ballots of lawful voters. Most notably, they present photographs and video stills of, by the Court's count, approximately seven individuals returning more than one ballot to drop boxes in Philadelphia and Elk County (the same photographs referenced by Mr. Riddlemoser). [ECF 504-19, PDF pp. 49-71].

**\*19** Those photographs depict the following:

- **An unidentified woman holding what appear to be two ballots at a Philadelphia drop box.**



- **Instagram user "thefoodiebarrister" posing for a selfie with two ballots in Philadelphia; captioned, in part, "dropping of [sic] my votes in a designated ballot drop box."**

Ex. 5







• **A photograph posted to social media showing a hand placing two ballots in a drop box; captioned, in part, "Cory and I voted!"**

• **A photograph of an unidentified man wearing a "Philadelphia Water" sweater and hat, placing two ballots in a Philadelphia drop box.**



- **Several video stills that, according to Plaintiffs, show voters depositing more than one ballot in an Elk County drop box.**





In addition to these photographs and video stills, Plaintiffs also provide a May 24, 2020, email sent by an official in Montgomery County (which placed security guards to monitor its drop boxes) observing that security "have turned people away yesterday and today without incident who had ballots other than their own." [ECF 504-28].

Separate and apart from this evidence specific to the use of drop boxes, Plaintiffs and their expert also provide evidence of instances of election fraud, voter fraud, and illegal voting generally. These include, for example:

- A case in which a New Jersey court ordered a new municipal election after a city councilman and councilman-elect were charged with fraud involving mail-in ballots. [ECF 504-19, p. 3].

- A New York Post article written by an anonymous fraudster who claimed to be a "master at fixing mail-in ballots" and detailed his methods. [*Id.*].

- Philadelphia officials' admission that approximately 40 people were permitted to vote twice during the 2020 primary elections. [*Id.*].

- A YouTube video purporting to show Philadelphia election officials approving the counting of mail-in ballots that lacked a completed certification on the outside of the envelope. [*Id.* (citation omitted) ].

- The recent guilty plea of the former Judge of Elections in South Philadelphia, Dominick J. DeMuro, to adding fraudulent votes to voting machines on election day. [ECF 461, ¶ 61]; *see United States v. DeMuro*, No. 20-cr-112 (E.D. Pa. May 21, 2020).

- The 2014 guilty plea of Harmar Township police chief Richard Allen Toney to illegally soliciting absentee ballots to benefit his wife and her running mate in the 2009 Democratic primary for town council, [ECF 461, ¶ 69];

- The 2015 guilty plea of Eugene Gallagher for unlawfully persuading residents and non-residents of Taylor, in Lackawanna County, Pennsylvania, to register for absentee ballots and cast them for him during his councilman candidacy in the November 2013 election, [*Id.*];

- **\*20** • The 1999 indictment of Representative Austin J. Murphy in Fayette County for forging absentee ballots for residents of a nursing home and adding his wife as a write-in candidate for township election judge, [*Id.*];

- The 1994 Eastern District of Pennsylvania and Third Circuit case *Marks v. Stinson*, which involved an alleged incident of extensive absentee ballot fraud by a candidate for the Pennsylvania State Senate, *see Marks v. Stinson, 19 F.3d 873 (3d Cir. 1994); Marks v. Stinson,* No. 93-6157, 1994 WL 146113 (E.D. Pa. Apr. 26, 1994), [ECF 461, ¶ 78]; and

- A report from the bipartisan Commission on Federal Election Reform, chaired by former President Jimmy Carter and former Secretary of State James A. Baker III, which observed that absentee voting is "the largest source of potential voter fraud" and proposed that states "reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists from handling absentee ballots." [ECF 461, ¶¶ 66-67, 80].

**C. Facts relevant to signature comparison.**

Many of the facts relevant to Plaintiffs' signature-comparison claim relate to the verification procedures for mail-in and absentee ballots, on one hand, and those procedures for in-person voting, on the other. These are described below.

**1. Mail-in and absentee ballot verification.**

As noted above, Pennsylvania does not distribute unsolicited mail-in and absentee ballots. Rather, a voter must apply for the ballot (and any voter can). [ECF 549-2, ¶ 64]. As part of the application for a mail-in ballot,[4] an applicant must provide certain identifying information, including name, date of birth, length of time as a resident of the voting district, voting district if known, party choice in the primary, and address where the ballot should be sent. 25 P.S. § 3150.12(b). In applying for a mail-in ballot, the applicant must also provide "proof of identification," which is defined by statute as that person's driver's license number, last four digits of Social Security number, or another specifically approved form of identification. [ECF 549-2, ¶ 64; ECF 549-27]; 25 P.S. § 2602(z.5)(3). A signature is not mentioned in the definition of "proof of identification." 25 P.S. § 2602(z.5)(3). However, if physically capable, the applicant must sign the application. Id. at § 3150.12(c)-(d).

4    The procedure for absentee ballots and applications largely resembles the procedure for mail-in ballots and applications.

Upon receiving the mail-in ballot application, the county board of elections determines if the applicant is qualified by "verifying the proof of identification and comparing the information provided on the application with the information contained on the applicant's permanent registration card." 25 P.S. § 3150.12b(a). The county board of elections then either approves the application[5] or "immediately" notifies the applicant if the application is not approved. Id. at § 3150.12b(a), (c). Upon approval, the county mails the voter the mail-in ballot.

5    If the application is approved, the approval is "final and binding," subject only to challenges "on the grounds that the applicant was not a qualified elector." 25 P.S. § 3150.12b(a)(2). An unqualified elector would be, for example, an individual who has not "been a citizen of the United States at least one month." Pa. Const. Art. 7, § 1; see also 25 P.S. § 2602(t) (defining "qualified elector" as "any person who shall possess all of the qualifications for voting now or hereafter prescribed by the Constitution of this Commonwealth, or who, being otherwise qualified by continued residence in his election district, shall obtain such qualifications before the next ensuing election").

 *21    After receiving the ballot, the mail-in voter must "mark the ballot" with his or her vote, insert the ballot into the "secrecy" envelope, and place the "secrecy" envelope into a larger envelope. Id. at § 3150.16(a). Then, the voter must "fill out, date and sign the declaration printed on [the larger] envelope. [The larger] envelope shall then be securely sealed and the elector shall send [it] by mail ... or deliver it in person to said county board of election." Id. The declaration on the larger envelope must be signed, unless the voter is physically unable to do so. Id. at § 3150.16(a)-(a.1).

Once the voter mails or delivers the completed mail-in ballot to the appropriate county board of elections, the ballot is kept "in sealed or locked containers until they are to be canvassed by the county board of elections." Id. at § 3146.8(a). The county boards of elections can begin pre-canvassing and canvassing the mail-in ballots no earlier than election day. Id. at § 3146.8(g)(1.1).

When pre-canvassing and canvassing the mail-in ballots, the county boards of elections must "examine the declaration on the [larger] envelope of each ballot ... and shall compare the information thereon with that contained in the ...Voters File." Id. at § 3146.8(g)(3). The board shall then verify the "proof of identification" and shall determine if "the declaration [on the larger envelope] is sufficient." Id. If the information in the "Voters File ... verifies [the elector's] right to vote," the ballot shall be counted. Id.

**2. In-person voting verification.**

When a voter decides to vote in-person on election day, rather than vote by mail, the procedures are different. There is no application to vote in person. Rather, on election day, the in-person voter arrives at the polling place and "present[s] to an election officer proof of identification," which the election officer "shall examine." Id. at § 3050(a). The in-person voter shall then sign a voter's certificate" and give it to "the election officer in charge of the district register." Id. at § 3050(a.3)(1). Next, the election officer shall "announce the elector's name" and "shall compare the elector's signature on his voter's certificate with his signature in the district register." Id. at § 3050(a.3)(2). If the election officer believes the signature to be "genuine," the in-person voter may vote. Id. But if the election officer does not deem the signature "authentic," the

Ex. 5

in-person voter may still cast a provisional ballot and is given the opportunity to remedy the deficiency. *Id.*

### 3. The September 11, 2020, and September 28, 2020, sets of guidance.

In September 2020, Secretary Boockvar issued two new sets of guidance related to signature comparisons of mail-in and absentee ballots and applications. The first, issued on September 11, 2020, was titled "Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes." [ECF 504-24]. The guidance stated, in relevant part, the "Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." [*Id.* at p. 3]. The second set of guidance, issued on September 28, 2020, was titled, "Guidance Concerning Civilian Absentee and Mail-In Ballot Procedures." [ECF 504-25]. This September 28, 2020, guidance stated, in relevant part, "The Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis. ... No challenges may be made to mail-in and absentee ballots at any time based on signature analysis." [*Id.* at p. 9]. Thus, as evidenced by these two sets of guidance, Secretary Boockvar advised the county boards of elections not to engage in a signature-comparison analysis of voters' signatures on ballots and applications for ballots.

**\*22** Most of the counties intend to follow the Secretary's guidance and will not compare signatures on mail-in ballots and applications for the upcoming general election. *E.g.*, [ECF 504-1]. A few counties, however, stated their intent to not comply with the guidance, and instead would compare and verify the authenticity of signatures. *E.g.*, [*id.* (noting the counties of Cambria, Elk, Franklin, Juniata, Mifflin, Sullivan, Susquehanna, and Wyoming, as not intending to follow Secretary Boockvar's guidance to not compare signatures) ].

According to Defendants, there are valid reasons to not require signature comparisons for mail-in and absentee ballots. For example, Secretary Boockvar notes that signature verification is a technical practice, and election officers are not "handwriting experts." [ECF 549-2, p. 19, ¶ 68]. Secretary Boockvar also notes that voters' signatures can change over time, and various medical conditions (*e.g.*, arthritis) can impact a person's signature. [*Id.*] Defendants' expert, Amber McReynolds, also finds that "signature verification"

involves "inherent subjectivity." [ECF 549-9, p. 20, ¶ 64]. Ms. McReynolds further notes the "inherent variability of individuals' signatures over time." [*Id.*] And according to Secretary Boockvar, these are just some reasons Pennsylvania implements verification procedures other than signature comparisons for mail-in voters, who, unlike in-person voters, are not present when their signature would be verified. [ECF 549-2, p. 20, ¶ 69].

Plaintiffs' expert, Greg Riddlemoser, on the other hand, states that signature comparison is "a crucial security aspect of vote-by-mail" and failing to verify signatures on mail-in ballots would "undermine voter confidence and would increase the possibility of voter fraud." [ECF 504-19, pp. 10-11]. Mr. Riddlemoser asserts that Secretary Boockvar's September 11, 2020, and September 28, 2020, guidance "encourage, rather than prevent, voter fraud." [*Id.* at p. 12]. As such, Mr. Riddlemoser explains that mail-in voters should be subject to the same signature-comparison requirement as in-person voters. [*Id.* at pp. 13-14].

### 4. Secretary Boockvar's King's Bench petition.

In light of this case and the parties' disagreement over whether the Election Code mandates signature comparison for mail-in ballots, Secretary Boockvar filed a "King's Bench" petition with the Pennsylvania Supreme Court on October 4, 2020. In that petition, she asked the Pennsylvania Supreme Court to exercise its extraordinary jurisdiction, in light of the impending election, to clarify whether the Election Code mandates signature comparison of mail-in and absentee ballots and applications. [ECF 556, p. 11; ECF 557].

On October 7, 2020, several groups, including Donald J. Trump for President, Inc. and the Republican National Committee—who are Plaintiffs in this case—moved to intervene as Respondents in the Pennsylvania Supreme Court case. [ECF 571-1]. The Pennsylvania Supreme Court has not yet decided the motion to intervene or whether to accept the case. The petition remains pending.

### D. Facts relevant to poll-watcher claims.

The position of "poll watcher" is a creation of state statute. *See* 25 P.S. § 2687. As such, the Election Code defines how a poll watcher may be appointed, what a poll watcher may do, and where a poll watcher may serve.

**1. The county-residency requirement for poll watchers.**

 **\*23** The Election Code permits candidates to appoint two poll watchers for each election district. 25 P.S. § 2687(a). The Election Code permits political parties and bodies to appoint three poll watchers for each election district. *Id.*

For many years, the Pennsylvania Election Code required that poll watchers serve only within their "election district," which the Code defines as "a district, division or precinct, ... within which all qualified electors vote at one polling place." 25 P.S. § 2687(b) (eff. to May 15, 2002) (watchers "shall serve in only one district and must be qualified registered electors of the municipality or township in which the district where they are authorized to act is located"); 25 P.S. § 2602(g). Thus, originally, poll watching was confined to a more limited geographic reach than one's county, as counties are themselves made up of many election districts.

Then, in 2004, the General Assembly amended the relevant poll-watcher statute to provide that a poll watcher "shall be authorized to serve in the election district for which the watcher was appointed and, when the watcher is not serving in the election district for which the watcher was appointed, in any other election district in the county in which the watcher is a qualified registered elector." 25 P.S. § 2687(b) (eff. Oct. 8, 2004).

This county-residency requirement is in line with (or is, in some cases, more permissive than) the laws of at least eight other states, which similarly require prospective poll watchers to reside in the county in which they wish to serve as a watcher or (similar to the pre-2004 Pennsylvania statute) limit poll watchers to a sub-division of the county. *See, e.g.,* Fla. Stat. Ann. § 101.131(1) (Florida); Ind. Code Ann. § 3-6-8-2.5 (Indiana); Ky. Rev. Stat. Ann. § 117.315(1) (Kentucky); N.Y. Elec. Law § 8-500(5) (New York); N.C. Gen. Stat. Ann. § 163-45(a) (North Carolina); Tex. Elec. Code Ann. § 33.031(a) (Texas); S.C. Code Ann. § 7-13-860 (South Carolina); Wyo. Stat. Ann. § 22-15-109(b) (Wyoming). However, at least one state (West Virginia) does not provide for poll watchers at all. *See* W. Va. Code Ann. § 3-1-37; W. Va. Code Ann. § 3-1-41

The General Assembly has not amended the poll-watcher statute since 2004, even though some lawmakers have advocated for the repeal of the residency requirement. *See Cortés,* 218 F. Supp. 3d at 402 (observing that legislative

efforts to repeal the poll-watcher residency requirement have been unsuccessful).

As part of its September 17, 2020, decision, the Pennsylvania Supreme Court found that the county-residency requirement does not violate the U.S. or Pennsylvania constitutions. *Boockvar,* ––– A.3d at ––––, 2020 WL 5554644, at \*31.

**2. Where and when poll watchers can be present during the election.**

The Pennsylvania Election Code sets forth the rules for where and when poll watchers are permitted to be present.

The Election Code provides that poll watchers may be present "at any public session or sessions of the county board of elections, and at any computation and canvassing of returns of any primary or election and recount of ballots or recanvass of voting machines under" the Code. 25 P.S. § 2650. Additionally, one poll watcher for each candidate, political party, or political body may "be present in the polling place ... from the time that the election officers meet prior to the opening of the polls ... until the time that the counting of votes is complete and the district register and voting check list is locked and sealed." 25 P.S. § 2687(b).

 **\*24** During this time, poll watchers may raise objections to "challenge any person making application to vote." *Id.* Poll watchers also may raise challenges regarding the voters' identity, continued residence in the election district, or registration status. 25 P.S. § 3050(d).

Although Pennsylvania has historically allowed absentee ballots to be returned by U.S. Postal Service or by in-person delivery to a county board of elections office, the Election Code does not provide (and has never provided for) any right to have poll watchers in locations where absentee voters fill out their ballots (which may include their home, office, or myriad other locations), nor where those votes are mailed (which may include their own mailbox, an official U.S. Postal Service collection box, a work mailroom, or other places U.S. Postal Service mail is collected), nor at county board of elections offices. [ECF 549-2, ¶¶ 86-90].

Before Act 77, absentee ballots were held in election districts rather than centralized at the county board of elections. *See* 25 P.S. § 3146.8 (eff. Mar. 14, 2012 to Oct. 30, 2019) ("In all election districts in which electronic voting systems are

used, absentee ballots shall be opened at the election district, checked for write-in votes in accordance with section 1113-A and then either hand-counted or counted by means of the automatic tabulation equipment, whatever the case may be.").

At such time (again, before Act 77), poll workers opened those absentee ballots at each polling place after the close of the polls. *Id.* ("Except as provided in section 1302.1(a.2), the county board of elections shall then distribute the absentee ballots, unopened, to the absentee voter's respective election district concurrently with the distribution of the other election supplies. Absentee ballots shall be canvassed immediately and continuously without interruption until completed after the close of the polls on the day of the election in each election district. The results of the canvass of the absentee ballots shall then be included in and returned to the county board with the returns of that district." (footnote omitted)).

With the enactment of Act 77, processing and counting of mail-in and absentee ballots is now centralized in each county board of elections, with all mail-in and absentee ballots in such county held and counted at the county board of elections (or such other site as the county board may choose) without regard to which election district those ballots originated from. 25 P.S. § 3146.8(a) (eff. Mar. 27, 2020); [ECF 549-2, ¶ 81].

Under Act 12, counties are permitted to "pre-canvass" mail-in or absentee ballots received before Election Day beginning at 7:00 a.m. on Election Day. 25 P.S. § 3146.8(g)(1.1). Counties are further permitted to "canvass" ballots received after that time beginning "no earlier than the close of the polls on the day of the election and no later than the third day following the election." *Id.* § 3146.8(g)(2).

The Election Code permits "[o]ne authorized representative of each candidate" and "one representative from each political party" to "remain in the room in which the absentee ballots and mail-in ballots are pre-canvassed." 25 P.S. § 3146.8(g)(1.1). Similarly, during canvassing, the Election Code permits "[o]ne authorized representative of each candidate" and "one representative from each political party" to "remain in the room in which the absentee ballots and mail-in ballots are canvassed." 25 P.S. § 3146.8(g)(2).

\*25 The Election Code provisions pertaining to the "pre-canvass" and "canvass" do not make any separate reference to poll watchers, instead referring only to the "authorized representatives" of parties and candidates. *See* 25 P.S. § 3146.8.

On October 6, 2020, Secretary Boockvar issued guidance concerning poll watchers and authorized representatives. [ECF 571-1]. The guidance states that poll watchers "have no legal right to observe or be present at ... ballot return sites," such as drop-box locations. [ECF 571-1, Ex. E, p. 5]. The guidance also states that while a candidate's authorized representative may be present when mail-in ballots are opened (including during pre-canvass and canvass), the representative cannot challenge those ballots. [*Id.* at Ex. E, p. 4].

On October 9, 2020, in a separate lawsuit brought by the Trump Campaign in the Philadelphia County Court of Common Pleas, the state court there confirmed Secretary Boockvar's guidance. Specifically, the state court held that satellite ballot-collection locations, such as drop-box locations, are not "polling places," and therefore poll watchers are not authorized to be present in those places. [ECF 573-1, p. 12 ("It is clear from a reading of the above sections [of the Election Code] that the satellite offices where these activities, and only these activities, occur are true 'offices of the Board of Elections' and are not polling places, nor public sessions of the Board of Elections, at which watchers have a right to be present under the Election Code.") ]. Immediately after issuance of this decision, the Trump Campaign filed a notice of appeal, indicating its intention to appeal the decision to the Commonwealth Court of Pennsylvania. Having just been noticed, that appeal remains in its infancy as of the date of this Opinion.

### 3. Plaintiffs' efforts to recruit poll watchers for the upcoming general election.

In order to become a certified poll watcher, a candidate must meet certain criteria. [ECF 504-20, ¶ 9]. That is, a poll watcher needs to be "willing to accept token remuneration, which is capped at $120 under Pennsylvania state law" and must be able to take off work or otherwise make arrangements to be at the polling place during its open hours on Election Day, which can mean working more than 14 hours in a single day. [*Id.*].

The Pennsylvania Director for Election Day Operations for the Trump Campaign, James J. Fitzpatrick, stated that the Trump Campaign wants to recruit poll watchers for every county in Pennsylvania. [ECF 504-2, ¶ 30]. To that end, the RNC and the Trump Campaign have initiated poll-watcher recruitment efforts for the general election by

using a website called DefendYourBallot.com. [ECF 528-14, 265:2-15, 326:14-329-7]. That website permits qualified electors to volunteer to be a poll watcher. [*Id.*]. In addition, Plaintiffs have called qualified individuals to volunteer to be poll watchers, and worked with county chairs and conservative activists to identify potential poll watchers. [*Id.*].

Despite these efforts, the Trump Campaign claims it "is concerned that due to the residency restriction, it will not have enough poll watchers in certain counties." [ECF 504-2, ¶ 25]. Mr. Fitzpatrick, however, could not identify a specific county where the Trump Campaign has been unable to obtain full coverage of poll watchers or any county where they have tried and failed to recruit poll watchers for the General Election. [ECF 528-14, 261:21-262:3, 263:8-19, 265:2-266:3].

**\*26** In his declaration, Representative Reschenthaler shared Mr. Fitzpatrick's concern, stating that he does not believe that he will "be able to recruit enough volunteers from Greene County to watch the necessary polls in Greene County." [ECF 504-6, ¶ 12]. But Representative Reschenthaler did not provide any information regarding his efforts to recruit poll watchers to date, or what he plans to do in the future to attempt to address his concern. *See generally* [*id.*].

Representative Kelly stated in his declaration that he was "likely to have difficulty getting enough poll watchers from within Erie County to watch all polls within that county on election day." [ECF 504-5, ¶ 16]. Representative Kelly never detailed his efforts (*e.g.*, the outreach he tried, prospective candidates he unsuccessfully recruited, and the like), and he never explained why those efforts aren't likely to succeed in the future. *See generally* [*id.*].

In his declaration, Representative Thompson only stated that based on his experience, "parties and campaigns cannot always find enough volunteers to serve as poll watchers in each precinct." [ECF 504-4, ¶ 20].

According to statistics collected and disseminated by the Pennsylvania Department of State, there is a gap between the number of voters registered as Democrats and Republicans in some Pennsylvania counties. [ECF 504-34]. Plaintiffs' expert, Professor Lockerbie, believes this puts the party with less than a majority of voters in that county at a disadvantage in recruiting poll watchers. [ECF 504-20, ¶ 15]. However, despite this disadvantage, Professor Lockerbie states that "the Democratic and Republican parties might be able to meet the relevant criteria and recruit a sufficient population of qualified

poll watchers who meet the residency requirement[ ]." [*Id.* at ¶ 16].

Additionally, Professor Lockerbie finds the gap in registered voters in various counties to be especially problematic for minor political parties. [*Id.* at ¶ 16]. As just one example, according to Professor Lockerbie, even if one were to assume that all third-party voters were members of the same minor party, then in Philadelphia County it would require "every 7th registrant" to be a poll watcher in order for the third party to have a poll watcher observing each precinct." [*Id.*].

Professor Lockerbie believes that disruptions to public life caused by the COVID-19 pandemic "magnified" the difficulties in securing sufficient poll watchers. [*Id.* at ¶ 10].

Nothing in the Election Code limits parties from recruiting only registered voters from their own party. [ECF 528-14, 267:23-268:1]. For example, the Trump Campaign utilized at least two Democrats among the poll watchers it registered in the primary. [ECF 528-15, P001648].

### 4. Rationale for the county-residency requirement.

Defendants have advanced several reasons to explain the rationale behind county-residency requirement for poll watchers.

Secretary Boockvar has submitted a declaration, in which she has set forth the reasons for and interests supporting the county-residency requirement. Secretary Boockvar states that the residency requirement "aligns with Pennsylvania's county-based election scheme[.]" [ECF 549-2, p. 22, ¶ 77]. "By restricting poll watchers' service to the counties in which they actually reside, the law ensures that poll watchers should have some degree of familiarity with the voters they are observing in a given election district." [*Id.* at p. 22, ¶ 78].

**\*27** In a similar vein, Intervenors' expert, Dr. Barreto, in his report, states that, voters are more likely to be comfortable with poll watchers that "they know" and are "familiar with ... from their community." [ECF 524-1, p. 14, ¶ 40]. That's because when poll watchers come from the community, "there is increased trust in government, faith in elections, and voter turnout[.]" [*Id.*].

At his deposition, Representative Kelly agreed with this idea: "Yeah, I think – again, depending how the districts

Ex. 5

are established, I think people are probably even more comfortable with people that they – that they know and they recognize from their area." [ECF 524-23, 111:21-25].

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the Court must ask whether the evidence presents "a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making that determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

The summary-judgment stage "is essentially 'put up or shut up' time for the non-moving party," which "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). The parties' filing of cross-motions "does not constitute an agreement that if one is rejected the other is necessarily justified[.]" *Id.* But the Court may "resolve cross-motions for summary judgment concurrently." *Hawkins v. Switchback MX, LLC*, 339 F. Supp. 3d 543, 547 (W.D. Pa. 2018). When doing so, the Court views the evidence "in the light most favorable to the non-moving party with respect to each motion." *Id.*

## DISCUSSION & ANALYSIS

Plaintiffs, Defendants, and Intervenors all cross-move for summary judgment on all three of Plaintiffs' remaining claims, which the Court refers to, in the short-hand, as (1) the

drop-box claim, (2) the signature-comparison claim, and (3) the poll-watching claim. The common constitutional theory behind each of these claims is vote dilution. Absent the security measures that Plaintiffs seek, they fear that others will commit voter fraud, which will, in turn, dilute their lawfully cast votes. They assert that this violates the federal and Pennsylvania constitutions.

The Court will address only the federal-constitutional claims. For the reasons that follow, the Court finds that Plaintiffs lack standing to bring their federal-constitutional claims because Plaintiffs' injury of vote dilution is not "concrete" for Article III purposes.

But even assuming Plaintiffs had standing, the Court also concludes that Defendants' regulations, conduct, and election guidance here do not infringe on any right to vote, and if they do, the burden is slight and outweighed by the Commonwealth's interests—interests inherent in the Commonwealth's other various procedures to police fraud, as well as its overall election scheme.

**\*28** Finally, because the Court will be dismissing all federal-constitutional claims, it will decline to exercise supplemental jurisdiction over any of the state-constitutional claims and will thus dismiss those claims without prejudice.

## I. Defendants' procedural and jurisdictional challenges.

At the outset, Defendants and Intervenors raise a number of jurisdictional, justiciability, and procedural arguments, which they assert preclude review of the merits of Plaintiffs' claims. Specifically, they assert (1) the claims are not ripe and are moot, (2) there is a lack of evidence against certain county boards, and those boards are not otherwise necessary parties, and (3) Plaintiffs lack standing. The Court addresses each argument, in turn.

### A. Plaintiffs' claims are ripe and not moot.

Several Defendants have argued that Plaintiffs' claims in the Second Amended Complaint are not ripe and are moot. The Court disagrees.

### 1. Plaintiffs' claims are ripe.

The ripeness doctrine seeks to "prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Artway v. Attorney*

Ex. 5

*Gen. of N.J.*, 81 F.3d 1235, 1246-47 (3d Cir. 1996) (cleaned up). The ripeness inquiry involves various considerations including whether there is a "sufficiently adversarial posture," the facts are "sufficiently developed," and a party is "genuinely aggrieved." *Peachlum v. City of York*, 333 F.3d 429, 433-34 (3d Cir. 2003). Ripeness requires the case to "have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands*, 385 F.3d 801, 806 (3d Cir. 2004) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236, 97 L.Ed. 291 (1952)). "A dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.*

Ultimately, "[r]ipeness involves weighing two factors: (1) the hardship to the parties of withholding court consideration; and (2) the fitness of the issues for judicial review." *Artway*, 81 F.3d at 1247. Unlike standing, ripeness is assessed at the time of the court's decision (rather than the time the complaint was filed). *See Blanchette v. Connecticut General Ins. Corp.*, 419 U.S. 102, 139-40, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

The Court finds that Plaintiffs' claims are ripe. Applying the two-factor test here, the Court first concludes that the parties would face significant hardship if the Court were to hold that the case was unripe (assuming it was otherwise justiciable). The general election is less than one month away, and Plaintiffs assert claims that could significantly affect the implementation of Pennsylvania's electoral procedures. Further, if the Court were to find that Plaintiffs' claims were not ripe, Plaintiffs would be burdened. This is because Plaintiffs would then have to either wait until after the election occurred—and thus after the alleged harms occurred—or Plaintiffs would have to bring suit on the very eve of the election, and thus there would be insufficient time for the Court to address the issues. This hardship makes judicial review at this time appropriate. The first factor is met.

**\*29** Some Defendants argue that because some of the Secretary's guidance was issued after the 2020 primary election, Plaintiffs' claims that rely on such guidance are not ripe because the guidance has not been implemented in an election yet. The Court disagrees. Both the allegations in the Second Amended Complaint, and the evidence presented on summary judgment, reveal that the guidance issued after the

primary election will apply to the upcoming general election. This is sufficient to make this a properly ripe controversy.[6]

6    In her summary-judgment brief, Secretary Boockvar argues that Plaintiffs' as-applied challenge to Pennsylvania's county-residency requirement is unripe. [ECF 547, pp. 60-63]. The Secretary reasons that Plaintiffs have not shown sufficient evidence that they are harmed by the county-residency requirement. This argument is directed more towards a lack of standing and a lack of evidence to support the claim on the merits. As the sufficiency of the evidence of harm is a separate issue from ripeness (which is more concerned with timing), the Court does not find Plaintiffs' as-applied challenge to the county-residency requirement unripe. *See Progressive Mountain Ins. Co. v. Middlebrooks*, 805 F. App'x 731, 734 (11th Cir. 2020) ("The question of ripeness frequently boils down to the same question as questions of Article III standing, but the distinction between the two is that standing focuses [on] whether the type of injury alleged is qualitatively sufficient to fulfill the requirements of Article III and whether the plaintiff has personally suffered that harm, whereas ripeness centers on whether that injury has occurred yet." (cleaned up) (citations omitted)).

The second factor the Court must consider in determining ripeness is "the fitness of the issues for judicial review." *Artway*, 81 F.3d at 1247. "The principal consideration [for this factor] is whether the record is factually adequate to enable the court to make the necessary legal determinations. The more that the question presented is purely one of law, and the less that additional facts will aid the court in its inquiry, the more likely the issue is to be ripe, and vice-versa." *Id.* at 1249.

Under this framework, the Court concludes that the issues are fit for review. The parties have engaged in extensive discovery, creating a developed factual record for the Court to review. Further, as shown below, the Court finds it can assess Plaintiffs' claims based on the current factual record and can adequately address the remaining legal questions that predominate this lawsuit. As such, the Court finds Plaintiffs' claims fit for judicial review.

Thus, Plaintiffs' claims are presently ripe.

**2. Plaintiffs' claims are not moot.**

Some Defendants also assert that Plaintiffs' claims are moot because Plaintiffs reference allegations of harm that occurred

during the primary election, and since then, Secretary Boockvar has issued new guidance and the Pennsylvania Supreme Court has interpreted the Election Code to clarify several ambiguities. The Court, however, concludes that Plaintiffs' remaining claims are not moot.

Mootness stems from the same principle as ripeness, but is stated in the inverse: courts "lack jurisdiction when 'the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.' " *Merle v. U.S.*, 351 F.3d 92, 94 (3d Cir. 2003) (quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). Like ripeness and unlike standing, mootness is determined at the time of the court's decision (rather than at the time the complaint is filed). *See U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). When assessing mootness, the Court may assume (for purposes of the mootness analysis) that standing exists. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citation omitted).

**\*30** Here, the Court finds that Plaintiffs' claims are not moot, as the claims Plaintiffs are proceeding with are "live." First, Plaintiffs' claims are based on guidance that issued after the primary election and are to be applied in the upcoming general election. As such, the *harms* alleged are not solely dependent on the already-passed primary election. Second, Defendants, by and large, have made clear that they intend to abide by guidance that Plaintiffs assert is unlawful or unconstitutional. Third, Plaintiffs sufficiently show that certain Defendants intend to engage in the conduct (*e.g.*, use unmanned drop-boxes) that Plaintiffs say infringes their constitutional rights. Thus, these issues are presently "live" and are not affected by the completion of the primary election.[7] Plaintiffs' claims are not moot.

---

7    In their briefing, the parties focused on the "capable of repetition yet evading review" exception to the mootness doctrine. The Court, however, does not find that it needs to rely on this exception. Nearing the eve of the election, it is clear that Defendants intend to engage in the conduct that Plaintiffs assert is illegal and unconstitutional. Thus, the claims are presently live, and are not "evading review" in this circumstance.

---

**3. All named Defendants are necessary parties to this lawsuit.**

Many of the county boards of elections that are Defendants in this case argue that the claims against them should be dismissed because Plaintiffs did not specifically allege or prove sufficient violative facts against them. Plaintiffs argue in response that all county boards have been joined because they are necessary parties, and the Court cannot afford relief without their presence in this case. The Court agrees with Plaintiffs, and declines to dismiss the county boards from the case. They are necessary parties.

Federal Rule of Civil Procedure 19(a) states that a party is a necessary party that must be joined in the lawsuit if, "in that [party's] absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A).

Here, if the county boards were not named defendants in this case, the Court would not be able to provide Plaintiffs complete relief should Plaintiffs prove their case. That's because the Court could not enjoin the county boards if they were not parties. *See* Fed. R. Civ. P. 65(d)(2).[8] This is important because each individual county board of elections manages the electoral process within its county lines. As one court previously summarized, "Election procedures and processes are managed by each of the Commonwealth's sixty-seven counties. Each county has a board of elections, which oversees the conduct of all elections within the county." *Cortés*, 218 F. Supp. 3d at 403 (citing 25 P.S. § 2641(a)). "The county board of elections selects, fixes and at times alters the polling locations of new election districts. Individual counties are also tasked with the preservation of all ballots cast in that county, and have the authority to investigate fraud and report irregularities or any other issues to the district attorney[.]" *Id.* (citing 25 P.S. §§ 2726, 2649, and 2642). The county boards of elections may also make rules and regulations "as they may deem necessary for the guidance of voting machine custodians, elections officers and electors." 25 P.S. § 2642(f).

---

8    While Rule 65(d)(2)(C) states that an injunction binds "[non-parties] who are in active concert or participation" with the parties or the parties' agents, the Court does not find that Rule 65(d) helps the county boards. As discussed, the county boards manage the elections and implement the electoral procedures. While the Court could enjoin Secretary Boockvar, for example, from using unmanned drop boxes, each individual county election board could still use unmanned drop boxes on their own. Doing so would not result in the counties being in "active concert or participation" with Secretary Boockvar, as each county is independently managing the electoral process within their county lines. *See*

---

Ex. 5

*Marshak v. Treadwell*, 595 F.3d 478, 486 (3d Cir. 2009) ("[N]on-parties guilty of aiding or abetting or acting in concert with a named defendant or his privy in violating the injunction may be held in contempt." (cleaned up) (citations omitted)). In other words, each county elections board would not be "aiding or abetting" Secretary Boockvar in violating the injunction (which would implicate Rule 65(d)(2)(C)); rather, the counties would be utilizing their independent statutory authority to manage elections within their county lines.

**\*31** Indeed, Defendants' own arguments suggest that they must be joined in this case. As just one example, a handful of counties assert in their summary-judgment brief that the "[Election] Code permits Boards to exercise discretion in certain areas when administering elections, to administer the election in a manner that is both legally-compliant and meets the unique needs of each County's citizens." [ECF 518, p. 6]. Thus, because of each county's discretionary authority, if county boards engage in unconstitutional conduct, the Court would not be able to remedy the violation by enjoining only Secretary Boockvar.[9]

[9]  As evidence of the county boards' indispensability, one court recently found that the failure to join local election officials in an election case can make the harm alleged not "redressable." It would be a catch-22 to say that county boards cannot be joined to this case as necessary parties, but then dismiss the case for lack of standing due to the boards' absence. *Cf. Jacobson v. Florida Secretary of States*, 974 F.3d 1236, ——— - ———, 2020 WL 5289377, at \*11-12 (11th Cir. Sept. 3, 2020) ("The problem for the [plaintiffs] is that Florida law tasks the [county] Supervisors, independently of the Secretary, with printing the names of candidates on ballots in the order prescribed by the ballot statute. ... The Secretary is responsible only for certifying to the supervisor of elections of each county the names of persons nominated ... Because the Secretary didn't do (or fail to do) anything that contributed to [plaintiffs'] harm, the voters and organizations cannot meet Article III's traceability requirement." (cleaned up)).

To grant Plaintiffs relief, if warranted, the Court would need to enter an order affecting all county boards of elections—which the Court could not do if some county boards were not joined in this case. Otherwise, the Court could only enjoin violative conduct in some counties but not others. As a result, inconsistent rules and procedures would be in effect throughout the Commonwealth. While some counties can pledge to follow orders issued by this Court, the judicial system cannot rely on pledges and promises, regardless of

the county boards' good intent. The only way to ensure that any illegal or unconstitutional conduct is uniformly remedied, permanently, is to include all county boards in this case.

Thus, because the county boards are necessary parties, the Court cannot dismiss them.

## 4. Plaintiffs lack Article III standing to raise their claims of vote dilution because they cannot establish a "concrete" injury-in-fact.

While Plaintiffs can clear the foregoing procedural hurdles, they cannot clear the final one—Article III standing.

Federal courts must determine that they have jurisdiction before proceeding to the merits of any claim. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." One component of the case-or-controversy requirement is standing, which requires a plaintiff to demonstrate the now-familiar elements of (1) injury in fact, (2) causation, and (3) redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Standing is particularly important in the context of election-law cases, including a case like this one, that challenge the laws, regulations, and guidance issued by elected and appointed state officials through the democratic processes. As the Supreme Court has explained, the standing "doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, ——— U.S. ———, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (cleaned up). The doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* In this way, "Article III standing serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* Nowhere is that concern more acute than in a case that challenges a state's exercise of its core constitutional authority to regulate the most deeply political arena of all—elections.

**\*32** Here, Defendants and Intervenors claim that Plaintiffs lack standing, largely arguing that Plaintiffs' injury is too speculative. [ECF 547, pp. 43-50]. The Court agrees and finds that Plaintiffs lack Article III standing for this reason.

Ex. 5

Initially, to frame the standing inquiry, understanding the specific claims at issue is important. As discussed above, there are essentially three claims remaining in this case: (1) a challenge to Secretary Boockvar's guidance that does not require all drop boxes to have manned security personnel; (2) a challenge to Secretary Boockvar's guidance that counties should not perform a signature comparison for mail-in ballots; and (3) a challenge to Pennsylvania's county-residency restriction for poll-watchers. *See* [ECF 509, pp. 4-5]. The theory behind all of these claims and the asserted injury is one of vote dilution due to the heightened risk of fraud; that is, without the above measures in place, there is an imminent risk of voter fraud (primarily by mail-in voters); and if that fraud occurs, it will dilute the votes of many of Plaintiffs, who intend to vote in person in the upcoming election. [ECF 551, p. 12 ("As qualified electors who will be voting in the November election, Plaintiffs will suffer an injury through their non-equal treatment and/or the dilution or debasement of their legitimately case votes by absentee and mail-in votes that have not been properly verified by matching the voters' signatures on their applications and ballots to the permanent voter registration record and/or that have been improperly delivered by others to drop boxes or other mobile collection sites in manners that are different[ ] from those offered or being used in their counties of residence.") ].

Turning to the familiar elements of Article III standing, the first and, in the Supreme Court's estimation, "foremost" element—injury-in-fact—is dispositive. *See Gill v. Whitford, ––– U.S. ––––, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018).* Specifically, the Court finds that Plaintiffs' theory of vote dilution, based on the evidence presented, is insufficient to establish standing because Plaintiffs' injury-in-fact is not sufficiently "concrete."

With respect to injury-in-fact, the Supreme Court has made clear that an injury must be "concrete" and "particularized." *See Spokeo, 136 S. Ct. at 1548.* Defendants argue that the claimed injury of vote dilution caused by possible voter fraud here is too speculative to be concrete. The Court agrees.

To establish a "concrete" injury, Plaintiffs rely on a chain of theoretical events. They first argue that Defendants' lack of election safeguards (poll watchers, drop-box guards, and signature-comparison procedures) creates a risk of voter fraud or illegal voting. *See* [ECF 461, ¶¶ 230-31, 240, 256]. That risk, they say, will lead to potential fraudsters committing voter fraud or ballot destruction. [*Id.*]. And if that happens,

each vote cast in contravention of the Election Code will, in Plaintiffs' view, dilute Plaintiffs' lawfully cast votes, resulting in a constitutional violation.

The problem with this theory of harm is that this fraud hasn't yet occurred, and there is insufficient evidence that the harm is "certainly impending."

To be clear, Plaintiffs need not establish actual fraud at this stage; but they must establish that fraud is "certainly impending," and not just a "possible future injury." *See Clapper, 568 U.S. at 409, 133 S.Ct. 1138* ("Thus, we have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient.") (cleaned up).

**\*33** This case is well past the pleading stage. Extensive fact and expert discovery are complete. [ECF 462]. Nearly 300 exhibits have been submitted on cross-motions for summary judgment (including 68 by Plaintiffs alone). Plaintiffs bear the burden of proof on this issue, and unlike on a motion to dismiss, on summary judgment, they must come forward with proof of injury, taken as true, that will prove standing, including a concrete injury-in-fact. *See Lujan, 504 U.S. at 561, 112 S.Ct. 2130 (1992)* ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice ... In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts ... which for purposes of the summary judgment motion will be taken to be true.") (cleaned up).

Based on the evidence presented by Plaintiffs, accepted as true, Plaintiffs have only proven the "possibility of future injury" based on a series of speculative events—which falls short of the requirement to establish a concrete injury. For example, Plaintiffs' expert, Mr. Riddlemoser, opines that the use of "unstaffed or unmanned" drop boxes merely "increases the ***possibility*** for voter fraud (and vote destruction)[.]" [ECF 504-19, p. 20 (emphasis added) ]. That's because, according to him (and Plaintiffs' other witnesses), theoretical bad actors ***might*** intentionally "target" a drop box as the "easiest opportunity for voter fraud" or with the malicious "intent to destroy as many votes ... as possible." [*Id.* at pp. 16-18; *see also* ECF 504-2, ¶ 12 (declaring that drop boxes "***may*** serve as a target for bad actors that may wish to tamper with lawfully case ballots before such ballots are counted") (emphasis added) ]. But there's no way of knowing whether these independent actors will ever surface, and if they do,

whether they will act as Mr. Riddlemoser and Plaintiffs predict.

Similarly, Mr. Riddlemoser concludes that, at most, not conducting signature analysis for mail-in and absentee ballots "open[s] the door to the potential for massive fraud through a mechanism already susceptible to voter fraud." [ECF 504-19, p. 20].

This increased susceptibility to fraud and ballot destruction is the impetus for Plaintiffs, in their various capacities, to express their concerns that vote dilution might occur and disrupt their right to a "free and fair election." *See, e.g.,* [504-3, ¶ 6; 504-4, ¶ 7; ECF 504-6, ¶¶ 6-8; ECF 504-7, ¶¶ 5-9]. But these concerns, as outlined above, are based solely on a chain of unknown events that may never come to pass.

In addition to Plaintiffs' expert report, Plaintiffs' evidence consists of instances of voter fraud in the past, including an article in the N.Y. Post purporting to detail the strategies of an anonymous fraudster, as well as pointing to certain prior cases of voter fraud and election irregularities (*e.g.*, Philadelphia inadvertently allowing 40 people to vote twice in the 2020 primary election; some counties counting ballots that did not have a completed declaration in the 2020 primary election). [ECF 461, ¶¶ 63-82; ECF 504-19, p. 3 & Ex. D]. Initially, with one exception noted directly below, none of this evidence is tied to individuals using drop boxes, submitting forged mail-in ballots, or being unable to poll watch in another county —and thus it is unclear how this can serve as evidence of a concrete harm in the upcoming election as to the specific claims in this case.

**\*34** Perhaps the best evidence Plaintiffs present are the several photographs and video stills, which are depicted above, and which are of individuals who appear to be delivering more than one ballot to a drop box during the primary election. It is undisputed that during the primary election, some county boards believed it be appropriate to allow voters to deliver ballots on behalf of third parties. [ECF 504-9, 92:4-10; ECF 504-10, 60:3-61:10; ECF 504-49].

But this evidence of past injury is also speculative. Initially, the evidence is scant. But even assuming the evidence were more substantial, it would still be speculative to find that third-party ballot delivery will also occur in the general election. It may; it may not. Indeed, it may be less likely to occur now that the Secretary issued her September 28, 2020, guidance, which made clear to all county boards that for

the general election, third-party ballot delivery is prohibited. [ECF 504-25 ("Third-person delivery of absentee or mail-in ballots is not permitted, and any ballots delivered by someone other than the voter are required to be set aside. The only exceptions are voters with a disability, who have designated in writing an agent to deliver their ballot for them.") ]. It may also be less likely to occur in light of the Secretary's other guidance, which recommends that county boards place signs near drop boxes, warning voters that third-party delivery is prohibited.

It is difficult—and ultimately speculative—to predict future injury from evidence of past injury. This is why the Supreme Court has recognized that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Lujan*, 504 U.S. at 564, 112 S.Ct. 2130 (cleaned up).

In fact, based on Plaintiffs' theory of harm in this case, it is almost impossible for them to present anything other than speculative evidence of injury. That is, they would have to establish evidence of a certainly impending illegal practice that is likely to be prevented by the precautions they seek. All of this sounds in "possible future injury," not "certainly impending" injury. In that way, this case is very much like the Supreme Court's decision in *Clapper*.

In *Clapper*, plaintiffs-respondents were attorneys, other advocates, and media groups who communicated with clients overseas whom they feared would be subject to government surveillance under a FISA statute. 568 U.S. at 406, 133 S.Ct. 1138. The plaintiffs there alleged that the FISA statute at issue created a risk of possible government surveillance, which prevented them from communicating in confidence with their clients and compelled them to travel overseas instead and incur additional costs. *Id.* at 406-07, 133 S.Ct. 1138. Based on these asserted injures, the plaintiffs filed suit, seeking to invalidate provisions of FISA. *Id.* at 407, 133 S.Ct. 1138.

The Supreme Court held that plaintiffs there lacked standing because their risk of harm was not concrete—rather, it was attenuated and based on a series of speculative events that may or may not ever occur. *Id.* at 410, 133 S.Ct. 1138 (finding that "respondents' argument rests on their highly speculative fear that: (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than

Ex. 5

utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts).

**\*35** In the end, the Court found that it would not "endorse standing theories that rest on speculation about the decisions of independent actors." *Id.* at 414, 133 S.Ct. 1138.

Like *Clapper*, here, Plaintiffs' theory of harm rests on speculation about the decisions of independent actors. For drop boxes, that speculation includes that unknown individuals will utilize drop boxes to commit fraud or other illegal activity; for signature comparison, that fraudsters will submit forged ballots by mail; for poll watchers, that illegal votes will not be sufficiently challenged; and for all these claims, that other security measures in place to monitor drop boxes, to verify ballot information, and to challenge ballots will not work.

All of this may occur and may result in some of Plaintiffs' votes being diluted; but the question is whether these events are "certainly impending." The evidence outlined above and presented by Plaintiffs simply fails to meet that standard.

This is not to say that claims of vote dilution or voter fraud never give rise to a concrete injury. A plaintiff can have standing to bring a vote-dilution claim—typically, in a malapportionment case—by putting forth statistical evidence and computer simulations of dilution and establishing that he or she is in a packed or cracked district. *See Gill*, 138 S. Ct. at 1936 (Kagan, J., concurring). And a plaintiff can have standing to bring a voter-fraud claim, but the proof of injury there is evidence of actual fraud in the election and thus the suit will be brought after the election has occurred. *See, e.g., Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994). But, at least based on the evidence presented here, a claim of vote dilution brought in advance of an election on the theory of the risk of potential fraud fails to establish the requisite concrete injury for purposes of Article III standing.

Plaintiffs advance three other theories of harm here, in order to establish standing—none of which establish a concrete injury-in-fact.

First, Plaintiffs assert that since some of them are Republican candidates and that Republicans are more likely to vote in person and Democrats more likely to vote by mail, that their injury here is a competitive disadvantage in the electoral process. [ECF 551, pp. 16-18 ("The challenged guidance will further harm the RNC through the institutional prioritization of voting by mail and the potential disenfranchisement of Republican voters, who prefer to vote in person in the upcoming General Election.") ]. This too is a speculative, non-concrete injury. There is nothing in the record to establish that potential voter fraud and dilution will impact Republicans more than Democrats.

**\*36** To be sure, the information that Plaintiffs present shows that more Democrats are likely to use mail-in ballots. [ECF 551, p. 31 ("[I]n Pennsylvania, of the 1.9 million absentee or mail-in ballots that have been requested for the November 3, 2020 General Election, 'nearly 1.5 million Democrats have requested a mail-in ballot—nearly three times the requests from Republicans.' ") (quoting L. Broadwater, "Both Parties Fret as More Democrats Request Mail Ballots in Key States," New York Times (Sept. 30, 2020), *available at* https://www.nytimes.com/2020/09/30/us/mail-voting-democrats-republicans-turnout.html) ]. But it doesn't necessarily follow that more Democrats will commit voter fraud, such as through the destruction of drop boxes or third-party ballot harvesting, and thus more Republicans' votes will be diluted.

In fact, as Plaintiffs' expert, Mr. Riddlemoser, explains, fraudsters from either party could target drop boxes in specific areas in order to destroy ballots, depending on who may be the predominant party in the area. [ECF 504-19, at pp. 17-18 ("In short, nothing would prevent someone from intentionally targeting a drop box in a predominantly Republican or predominantly Democratic area with an intent to destroy as many votes for that political party or that party's candidate(s) as possible.") ]. Indeed, the more important fact for this theory of harm is not the party of the voter, but the party of the fraudster—and, on this, Plaintiffs present no evidence that one party over the other is likely to commit voter fraud.

Second, Plaintiffs also argue that the RNC, the Congressional Plaintiffs, and the Trump Campaign have organizational standing because they "have and will continue to devote their time and resources to ensure that their Pennsylvania supporters, who might otherwise be discouraged by the Secretary's guidance memos favoring mail-in and absentee

voting and Defendants' implementation thereof, get out to the polls and vote on Election Day." [ECF 551, p. 19]. This is a similar argument raised by the plaintiffs in *Clapper*, and rejected there by the Supreme Court. Because Plaintiffs' harm is not "certainly impending," as discussed above, spending money in response to that speculative harm cannot establish a concrete injury. *Clapper*, 568 U.S. at 416, 133 S.Ct. 1138 ("Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."); *see also Donald J. Trump for President, Inc. v. Cegavske*, —— F. Supp. 3d ——, ——, 2020 WL 5626974, at *5 (D. Nev. Sept. 18, 2020) ("Outside of stating 'confusion' and 'discouragement' in a conclusory manner, plaintiffs make no indication of how AB 4 will discourage their member voters from voting. If plaintiffs did not expend any resources on educating their voters on AB4, their voters would proceed to vote in-person as they overwhelmingly have in prior elections.").

Third, with respect to the poll-watching claim, Plaintiffs argue that at least one of the Plaintiffs, Ms. Patterson, is a prospective poll watcher who is being denied the right to poll watch based on the county-residency restriction, and thus she meets the Article III requirements. [ECF 551, p. 34 (citing ECF 551-3, ¶¶ 9-10) ]. However, Ms. Patterson cannot establish standing because, by Plaintiffs' own concession, the theory of harm in this case is not the denial of the right to poll watch, but instead dilution of votes from fraud caused from the failure to have sufficient poll watchers. [ECF 509, p. 67 ("But, the core of the as-applied challenge here is not that the Plaintiffs cannot staff a particular polling place, it is that a candidate and his or her party is presented with the Hobson's choice of selecting limited polling places to observe due to the residency requirement and accept that unobserved polling places must exist due to the inability to recruit a sufficient force of poll watchers due to the necessity that candidates be county residents.") ].

**\*37** And the remedy sought here is much broader than simply allowing Ms. Patterson to poll watch in a certain county, but is tied to the broader harm of vote dilution that Plaintiffs assert. [ECF 503-1, p. 3, ¶ 3 ("Plaintiffs shall be permitted to have watchers present at all locations where voters are registering to vote, applying for absentee or mail-in ballots, voting absentee or mail-in ballots, and/or returning

or collecting absentee or mail-in ballots, including without limitation any satellite or early voting sites established by any county board of elections.") ]. Standing is measured based on the theory of harm and the specific relief requested. *See Gill*, 138 S. Ct. at 1934 ("We caution, however, that 'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). As with all of the claims, the poll-watching claim rests on evidence of vote dilution that does not rise to the level of a concrete harm.

In sum, Plaintiffs here, based on the evidence presented, lack Article III standing to assert their claims. Because they lack standing, the Court will enter judgment in Defendants' favor and dismiss all claims.[10] However, because of the novelty of Plaintiffs' claims and theories, a potential appeal in this case, and the short time before the general election, out of an abundance of caution, the Court will, in the alternative, proceed to examine the claims on the merits.

---

[10]    The organizational Plaintiffs also raise certain associational and organizational standing arguments, asserting that they represent their members' interests. The associational standing arguments are derivative of their members' interests. That is, because the Court has found no concrete injury suffered by the individual voters, which would include the members of the organizational Plaintiffs, there are no separate grounds to establish standing for these organizations. *See United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1997) (an organization only has standing to sue on behalf of its members when "its members would otherwise have standing to sue in their own right") (citation omitted).

---

**II. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' claim that drop boxes violate the U.S. Constitution.**

Plaintiffs' drop-box claim has materially changed since the Pennsylvania Supreme Court's decision authorizing the use of drop boxes. Plaintiffs now allege that drop boxes effectively allow third parties to return the ballots of voters other than themselves because, they say, no one is there to stop them. Absent an in-person guard or poll worker to monitor the drop boxes and prevent the return of ballots cast in a manner contrary to what the Election Code permits, Plaintiffs assert that they face an unacceptable risk of vote dilution, which burdens their right to vote. Plaintiffs also argue that the "uneven" use of drop boxes in Pennsylvania, by some counties but not others, violates equal protection by

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 33 of 64   Document 58-5

Ex. 5

subjecting voters in different counties to different amounts of dilutive risk, and perhaps by diluting lawful votes cast by individuals who failed to comply with the Election Code.

The evidence relevant to these claims is undisputed. *See* [ECF 509, p. 45 ("After the completion of extensive discovery, including numerous depositions and responses to discovery requests, no genuine dispute of material fact exists regarding Plaintiffs' constitutional claims.") ]. Viewed in the light most favorable to Plaintiffs, the Court could conclude from this evidence, and will assume for purposes of this decision, that (1) drop boxes allow for greater risk of third-party ballot delivery in violation of the Election Code than in-person polling locations or manned drop boxes, and (2) that the use of drop boxes is "uneven" across Pennsylvania due to its county-based election system—*i.e.*, some counties are using "unmanned" drop boxes with varying security measures, some are using "manned" drop boxes, some are using dozens of drop boxes in a variety of locations, some are using one drop box in a county office building, and some are not using drop boxes at all. The question before the Court is whether this state of affairs violates equal protection or due process.

**\*38** The Court finds that it does not. The uneven use of drop boxes across counties does not produce dilution as between voters in different counties, or between "lawful" and "unlawful" voters, and therefore does not present an equal-protection violation. But even if it did, the guidelines provided by Secretary Boockvar are rational, and weighing the relative burdens and benefits, the Commonwealth's interests here outweigh any burden on Plaintiffs' right to vote.

### A. Pennsylvania's "uneven" use of drop boxes does not violate federal equal-protection rights.

Plaintiffs' primary claim concerns the uneven use of drop boxes across the Commonwealth, which they contend violates the Equal-Protection Clause of the 14th Amendment.

The 14th Amendment's Equal-Protection Clause commands that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const. amend. XIV, § 1.* This broad and simple promise is "an essential part of the concept of a government of laws and not men." *Reynolds v. Sims,* 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

But while the Constitution demands equal protection, that does not mean all forms of differential treatment are forbidden. *See Nordlinger v. Hahn,* 505 U.S. 1, 10, 112

S.Ct. 2326, 120 L.Ed.2d 1 (1992) ("Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications."). Instead, equal protection "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.* (citation omitted). What's more, "unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Id.* (citations omitted).

Of course, the right of every citizen to vote is a fundamental right. *See Ill. State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) ("[F]or reasons too self-evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure.") (citations omitted). Indeed, it is a foundational right "that helps to preserve all other rights." *Werme v. Merrill,* 84 F.3d 479, 483 (1st Cir. 1996); *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined."). And its scope is broad enough to encompass not only the right of each voter to cast a ballot, but also the right to have those votes "counted without dilution as compared to the votes of others." *Minn. Voters Alliance v. Ritchie,* 720 F.3d 1029, 1031 (8th Cir. 2013) (cleaned up).

As a result, Plaintiffs are quite correct when they suggest that a state election procedure that burdens the right to vote, including by diluting the value of votes compared to others, must "comport with equal protection and all other constitutional requirements." *Cortés,* 218 F. Supp. 3d at 407. That much, at least, is not in dispute.

At the same time, however, the Constitution "confers on the states broad authority to regulate the conduct of elections, including federal ones." *Griffin v. Roupas,* 385 F.3d 1128, 1130 (7th Cir. 2004) (citing *U.S. Const. Art. I, § 4, cl. 1*). This authority includes "broad powers to determine the conditions under which the right of suffrage may be exercised." *Shelby Cnty., Ala. v. Holder,* 570 U.S. 529, 543, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013) (cleaned up). Indeed, "[c]ommon sense, as well as constitutional law, compels the conclusion" that states must be free to engage in "substantial regulation of elections" if "some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi,*

504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (cleaned up). And all "[e]lection laws will invariably impose some burden upon individual voters." *Id.*

**\*39** If the courts were "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest," it "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id.* The "machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. of Tex. v. Pinson,* 282 U.S. 499, 501, 51 S.Ct. 228, 75 L.Ed. 482 (1931). Thus, when faced with a constitutional challenge to a state election law, or to the actions of state officials responsible for regulating elections, a federal court must weigh these competing constitutional considerations and "make the 'hard judgment' that our adversary system demands." *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 190, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008).

The Supreme Court has supplied lower courts guidance as to how to make these hard judgments, by "forg[ing]" the "flexible standard" for assessing the constitutionality of election regulations into "something resembling an administrable rule." *Id.* at 205, 128 S.Ct. 1610 (Scalia, J. concurring) (citing *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059).

Under this standard, first articulated in *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) and then refined in *Burdick,* the fact "[t]hat a law or state action imposes some burden on the right to vote does not make it subject to strict scrutiny." *Donatelli v. Mitchell,* 2 F.3d 508, 513 (3d Cir. 1993); *see also Libertarian Party of Ohio v. Blackwell,* 462 F.3d 579, 585 (6th Cir. 2006) ("[V]oting regulations are not automatically subjected to heightened scrutiny."). Instead, any "law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process," is subjected to "a deferential 'important regulatory interests' standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote." *Crawford,* 553 U.S. at 204, 128 S.Ct. 1610 (Scalia, J. concurring).

In practice, this means that courts must weigh the "character and magnitude of the burden the State's rule imposes" on the right to vote "against the interests the State contends justify that burden, and consider the extent to which the State's concerns make that burden necessary." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct.

1364, 137 L.Ed.2d 589 (1997) (cleaned up). If the state imposes a "severe" burden on the right to vote, strict scrutiny applies—the rule may survive only if it is "narrowly tailored" and only if the state advances a "compelling interest." *Id.* But if the state imposes only "reasonable, nondiscriminatory restrictions," its "important regulatory interests will usually be enough" to justify it. *Id.* Indeed, where state regulations are "minimally burdensome and nondiscriminatory" a level of scrutiny "closer to rational basis applies[.]" *Ohio Council 8 Am. Fed'n of State v. Husted,* 814 F.3d 329, 335 (6th Cir. 2016). And where the state imposes no burden on the "right to vote" at all, true rational basis review applies. *See Biener v. Calio,* 361 F.3d 206, 215 (3d Cir. 2004) ("Biener also cannot establish an infringement on the fundamental right to vote ... As the [election] filing fee does not infringe upon a fundamental right, nor is Biener in a suspect class, we consider the claims under a rational basis test.") (citation omitted); *Common Cause/New York v. Brehm,* 432 F. Supp. 3d 285, 310 (S.D.N.Y. 2020) ("Under this framework, election laws that impose no burden on the right to vote are subject to rational-basis review.").

**\*40** This operates as a "sliding scale"—the "more severe the burden imposed, the more exacting our scrutiny; the less severe, the more relaxed our scrutiny." *Arizona Libertarian Party v. Hobbs,* 925 F.3d 1085, 1090 (9th Cir. 2019); *see also Fish v. Schwab,* 957 F.3d 1105, 1124 (10th Cir. 2020) ("We, and our sister circuits and commentators, have referred to this as a 'sliding scale' test."); *Libertarian Party of New Hampshire v. Gardner,* 638 F.3d 6, 14 (1st Cir. 2011) ("We review all of the First and Fourteenth Amendment claims under the sliding scale approach announced by the Supreme Court in *Anderson ...* and *Burdick*[.]"); *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059 ("[T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.").

Against that backdrop, the Court now turns to Plaintiffs' claim that the use of unmanned drop boxes by some Pennsylvania counties, but not others, violates equal protection. As will be discussed, Plaintiffs' equal-protection claim fails at the threshold, without even reaching *Anderson-Burdick,* because Plaintiffs have not alleged or shown that Pennsylvania's system will result in the dilution of votes in certain counties and not others. Furthermore, even if the Court applies *Anderson-Burdick,* the attenuated "burden" Plaintiffs have identified—an increased risk of vote dilution created by the use of unmanned drop boxes—is more than justified

by Defendants' important and precise interests in regulating elections.

### 1. Plaintiffs have not shown that Pennsylvania treats equivalent votes in different counties differently.

Plaintiffs' equal-protection claim asserts differential treatment on a theory of vote dilution. As far as the Court can discern, this claim has two dimensions.

First, the main thrust concerns differential treatment as between counties. Plaintiffs assert that some counties will use drop boxes in certain ways (specifically, without in-person guards or in varying number and locations), while others will not—resulting in differential treatment. *See, e.g.,* [ECF 551, p. 44 ("Plaintiffs assert (and have proven) that Defendants have adopted, and intend to implement in the General Election, an election regime that applies Pennsylvania's Election Code in a way that treats the citizens of Pennsylvania unequally depending on ... the location where they happen to live: in some counties, voters will have around-the-clock access to 'satellite election offices' at which they can deposit their vote, but in other counties, voters will have no access at all to such drop boxes; in some counties those drop boxes will be staffed and secure, but in other counties drop boxes will be unmonitored and open to tampering[.]") ]; [*Id.* at p. 46 ("Defendants' ongoing actions and stated intentions ensure that votes will not be counted the same as those voting in other counties, and in some instances, in the same Congressional district. For instance, the harm flowing from those actions will fall disproportionately on the Republican candidates that bring suit here because many Democrat-heavy counties have stated intentions to implement the Secretary's unconstitutional ... ballot collection guidance, and many Republican-heavy counties have stated intentions to follow the Election Code as it is written.") ].

 **\*41** Second, although less clear, Plaintiffs' equal-protection claim may also concern broader differential treatment between law-abiders and scofflaws. In other words, Plaintiffs appear to suggest that Pennsylvania discriminates against all law-abiding voters by adopting policies which tolerate an unacceptable risk of a lawfully cast vote being diluted by each unlawfully cast vote anywhere in Pennsylvania. *See, e.g.,* [ECF 509, p. 55 ("The use of unstaffed drop boxes ... not only dilutes the weight of *all* qualified Pennsylvanian electors, it curtails a sense of security in the voting process.") (emphasis in original) ]; [ECF 509 p. 68 ("There will be no

protection of one-person, one-vote in Pennsylvania, because her policies ... allowing inconsistently located/used drop boxes will result in illegal ballots being cast and counted with legitimate votes[.]") ].

As discussed below, both of these species of equal protection fail because there is, in fact, no differential treatment here—a necessary predicate for an equal-protection claim.

Initially, Plaintiffs "have to identify a burden before we can weigh it." *Crawford*, 553 U.S. at 205, 128 S.Ct. 1610 (Scalia, J. concurring). In the equal-protection context, this means the plaintiff "must present evidence that s/he has been treated differently from persons who are similarly situated." *Renchenski v. Williams*, 622 F.3d 315, 337 (3d Cir. 2010) (cleaned up). And not just any differential treatment will do. As discussed above, differences in treatment raise equal-protection concerns, and necessitate heightened scrutiny of governmental interests, only if they burden a fundamental right (such as the right to vote) or involve a suspect classification based on a protected class. *See Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012) ("If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used.").

Plaintiffs argue that equal protection is implicated because Pennsylvania has permitted counties to use drop boxes to varying extents, and with varying degrees of security. Some, like Delaware County, intend to use dozens of drop boxes. *See generally* [ECF 549-28]. Many others will not use drop boxes at all. *See generally* [ECF 504-1]. And among the counties that *do* use drop boxes, some will staff them with county officials, while others will monitor them only with video surveillance or not at all. *See generally* [ECF 549-28].

In this respect, Plaintiffs argue that they suffer an equal-protection harm similar to that found by the Supreme Court in *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). There, the Supreme Court held that the Florida Supreme Court violated equal protection when it "ratified" election recount procedures that allowed different counties to use "varying standards to determine what was a legal vote." *Id.* at 107, 121 S.Ct. 525. This meant that entirely equivalent votes might be counted in one county but discounted in another. *See, e.g., id.* ("Broward County used a more forgiving standard than Palm Beach County, and uncovered almost three times as many new votes, a result markedly

Ex. 5

disproportionate to the difference in population between the counties."). Given the absence of uniform, statewide rules or standards to determine which votes counted, the Court concluded that the patchwork recount scheme failed to "satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right [to vote]." *Id.*

**\*42** While the Supreme Court expressly limited its holding in *Bush* "to the present circumstances" of a standardless "statewide recount under the authority of a single state judicial officer," *id.* at 109, 121 S.Ct. 525, a few courts have found its reasoning to be persuasive as a broader principle of equal protection. *See Stewart v. Blackwell*, 444 F.3d 843, 859 (6th Cir. 2006) ("Somewhat more recently decided is *Bush v. Gore*, ... which reiterated long established Equal Protection principles."); *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 598 (6th Cir. 2012) ("We agree with all of the parties and the district court that the consent decree likely violates the equal protection principle recognized in *Bush v. Gore.*"); *Pierce v. Allegheny Cty. Bd. of Elections*, 324 F. Supp. 2d 684, 705 (W.D. Pa. 2003) (Conti, J.) ("As noted above, the court finds that the facts presented raise a serious equal protection claim under a theory similar to that espoused by the United States Supreme Court in *Bush v. Gore, supra.*"); *Black v. McGuffage*, 209 F. Supp. 2d 889, 899 (N.D. Ill. 2002) ("The Court is certainly mindful of the limited holding of Bush. However, we believe that situation presented by this case is sufficiently related to the situation presented in *Bush* that the holding should be the same.").

Indeed, *Bush's* core proposition—that a state may not take the votes of two voters, similarly situated in all respects, and, for no good reason, count the vote of one but not the other—seems uncontroversial. It also seems reasonable (or at least defensible) that this proposition should be extended to situations where a state takes two equivalent votes and, for no good reason, adopts procedures that greatly increase the risk that one of them will not be counted—or perhaps gives more weight to one over the other. *See, e.g., Black*, 209 F. Supp. 2d at 899 ("Plaintiffs in this case allege that the resulting vote dilution, which was found to be unacceptable in *Bush* without any evidence of a disproportionate impact on any group delineated by traditional suspect criteria, is impacting African American and Hispanic groups disproportionately.... Any voting system that arbitrarily and unnecessarily values some votes over others cannot be constitutional."); *see also Reynolds*, 377 U.S. at 555, 84 S.Ct. 1362 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

That is the sort of equal-protection claim Plaintiffs purport to be asserting—a claim that voters in counties that use drop boxes are subjected to a much higher risk of vote dilution than those in other counties that do not. But that characterization falls apart under scrutiny. Indeed, despite their assertions, Plaintiffs have not actually alleged, let alone proven, that votes cast in some counties are diluted by a greater amount relative to votes cast in others. Rather, they have, at best, shown only that events causing dilution are more likely to occur in counties that use drop boxes. But, importantly, the effect of those events will, by Plaintiffs' own admission, be felt by every voter across all of Pennsylvania. [ECF 509, p. 55. ("The use of unstaffed drop boxes places the security of unknown hundreds (if not thousands) of ballots in jeopardy of theft, destruction, and manipulation. This not only dilutes the weight of *all* qualified Pennsylvanian electors, it curtails a sense of security in the voting process.") (citations omitted) (emphasis in original) ]. Such dilution impacts the entire electorate equally; not just voters in the county where it occurs.

To illustrate this distinction, consider, for example, a presidential election. The Court agrees with Plaintiffs that the relevant electoral unit in such an election is "the entire Commonwealth of Pennsylvania." [ECF 551, p. 55 ("The electoral unit in this election is the entire Commonwealth of Pennsylvania.") ]. Indeed, on election night, votes cast in each of Pennsylvania's 67 counties will be canvassed, counted, and ultimately added to a statewide vote total that decides who wins Pennsylvania's 20 electoral votes. So, ask: what is the dilutive impact of a hypothetical illegal vote cast in Philadelphia during that election? Does it cause, in any sense, an "unequal evaluation of ballots" cast in different counties, *Bush*, 531 U.S. at 106, 121 S.Ct. 525, such that lawful ballots cast in Philadelphia will be less likely to count, worth less if they do, or otherwise disfavored when compared to votes cast in other counties? The answer is evident—it does not. Rather, the hypothetical illegal vote cast in Philadelphia dilutes *all lawful votes* cast in the election *anywhere* in the Commonwealth by the exact same amount.

**\*43** The same reasoning holds in elections that occur within part of a state, rather than statewide. For example, consider a hypothetical legislative district covering two counties—one that uses drop boxes and one that does not. There may well be a greater risk that illegal voting will occur in the county that

Ex. 5

uses drop boxes. But any dilutive impact of those votes will be felt equally by voters in *both* counties.

This is categorically different from the harm at issue in *Bush* and cases like it. In *Bush*, Florida's arbitrary use of different recount standards in different counties meant that the state was counting equivalent ballots differently in different counties, meaning that voters in some counties were more likely to have their votes counted than those in others.

In *Black v. McGuffage*, an Illinois district-court case on which Plaintiffs heavily rely, the plaintiffs alleged that the type of voting machines used in some Illinois counties were statistically much more likely to result in equivalent votes being discounted at a much higher frequency in some counties than others, and that the worst machines were those being used in counties with high populations of minority groups. *209 F. Supp. 2d at 899*. As a result, voters (and, specifically, minority voters) were much more likely to have their votes discounted, based just on the county in which they lived. *See id.* ("As a result, voters in some counties are statistically less likely to have their votes counted than voters in other counties in the same state in the same election for the same office. Similarly situated persons are treated differently in an arbitrary manner.... In addition, the Plaintiffs in this case allege that the resulting vote dilution ... is impacting African American and Hispanic groups disproportionately.").

Finally, *Stewart v. Blackwell*, another case cited by Plaintiffs, was the same as *Black*—voters in counties that used punch-card voting were "approximately four times as likely not to have their votes counted" as a voter in a different county "using reliable electronic voting equipment." *444 F.3d at 848*.

What ties these cases together is that each of them involves a state arbitrarily "valu[ing] one person's vote over that of another," *Bush*, *531 U.S. at 104-05, 121 S.Ct. 525*, by permitting counties to either apply different standards to decide what votes count (*Bush*) or use different voting technologies that create a great risk of votes being discounted in one county that does not exist in others (*Black* and *Stewart*). It is this sort of "differential treatment ... burden[ing] a fundamental right" that forms the bedrock of equal protection. *Sullivan v. Benningfield*, *920 F.3d 401, 409 (6th Cir. 2019)*.

Plaintiffs, in contrast, have shown no constitutionally significant differential treatment at all.

Instead, as discussed, if Plaintiffs are correct that the use of drop boxes increases the risk of vote dilution, all votes in the relevant electoral unit—whether that is statewide, a subset of the state, or a single county—face the same degree of increased risk and dilution, regardless of which county is most at fault for elevating that risk.

What Plaintiffs have really identified, then, are not uneven ***risks of vote dilution***—affecting voters in some counties more than equivalent voters in others—but merely different voting procedures in different counties that may contribute different amounts of vote dilution ***distributed equally across the electorate as a whole***. The Court finds that this is not an equal-protection issue.

**\*44** To be clear, the reason that there is no differential treatment is solely based on Plaintiffs' theory of harm in this case. In the more "routine" vote-dilution cases, the state imposes some restriction or direct impact on the plaintiff's right to vote—that results in his or her vote being weighed less (*i.e.*, diluted) compared to those in other counties or election districts. *See Gill*, *138 S. Ct. at 1930*, (explaining that "the holdings in *Baker* and *Reynolds* were expressly premised on the understanding that the injuries giving rise to those claims were individual and personal in nature, because the claims were brought by voters who alleged facts showing disadvantage to themselves as individuals") (cleaned up). In this case, though, Plaintiffs complain that the state is ***not*** imposing a restriction on ***someone else's*** right to vote, which, they say, raises the risk of fraud, which, if it occurs, could dilute the value of Plaintiffs' vote. The consequence of this inverted theory of vote dilution is that all other votes are diluted in the same way; all feel the same effect.

Finally, the Court's ruling in this regard is consistent with the many courts that have recognized that counties may, consistent with equal protection, employ entirely different election procedures and voting systems within a single state. *See, e.g.*, *Wexler v. Anderson*, *452 F.3d 1226, 1231-33 (11th Cir. 2006)* ("Plaintiffs do not contend that equal protection requires a state to employ a single kind of voting system throughout the state. Indeed, local variety in voting systems can be justified by concerns about cost, the potential value of innovation, and so on.") (cleaned up); *Hendon v. N.C. State Bd. of Elections*, *710 F.2d 177, 181 (4th Cir. 1983)* ("A state may employ diverse methods of voting, and the methods by which a voter casts his vote may vary throughout the state."); *Short v. Brown*, *893 F.3d 671, 679 (9th Cir. 2018)* ("[T]he appellants' reading of the Supreme Court's

Ex. 5

voting cases would essentially bar a state from implementing any pilot program to increase voter turnout. Under their theory, unless California foists a new system on all fifty-eight counties at once, it creates 'unconstitutional vote-dilution' in counties that do not participate in the pilot plan. Nothing in the Constitution, the Supreme Court's controlling precedent, or our case law suggests that we can micromanage a state's election process to this degree."); *Fla. State Conference of N.A.A.C.P. v. Browning*, 569 F. Supp. 2d 1237, 1258 (N.D. Fla. 2008) ("[A]s with countless public services delivered through Florida's political subdivisions—such as law enforcement and education—resource disparities are to some degree inevitable. They are not, however, unconstitutional."); *Green Party of State of New York v. Weiner*, 216 F. Supp. 2d 176, 192 (S.D.N.Y. 2002) ("Even in that situation, [*Bush v. Gore*] did not challenge, and the Court did not question, the use of entirely different technologies of voting in different parts of the state, even in the same election."); *Paher v. Cegavske*, No. 20-243, 2020 WL 2748301, at *9 (D. Nev. May 27, 2020) ("[I]t cannot be contested that Clark County, which contains most of Nevada's population—and likewise voters (69% of all registered voters [ ] )—is differently situated than other counties. Acknowledging this as a matter of generally known (or judicially noticeable) fact and commonsense makes it more than rational for Clark County to provide additional accommodations to assist eligible voters."); *Ron Barber for Cong. v. Bennett*, No. 14-2489, 2014 WL 6694451, at *5 (D. Ariz. Nov. 27, 2014) ("[T]he [*Bush v. Gore*] Court did not invalidate different county systems regarding implementation of election procedures."); *Tex. Democratic Party v. Williams*, No. 07-115, 2007 WL 9710211, at n.4 (W.D. Tex. Aug. 16, 2007) ("In *Bush v. Gore*, the Supreme Court specifically noted: 'The question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections.' ").

**\*45** Equal protection does not demand the imposition of "mechanical compartments of law all exactly alike." *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31, 43 S.Ct. 9, 67 L.Ed. 107 (1922). Rather, "the Constitution is sufficiently flexible to permit its requirements to be considered in relation to the ... contexts which they are invoked." *Merchants Nat'l Bank of Mobile v. Dredge Gen. G. L. Gillespie*, 663 F.2d 1338, 1343 (5th Cir. 1981). And in this context, "few (if any) electoral systems could survive constitutional scrutiny if the use of different voting mechanisms by counties offended the Equal Protection Clause." *Trump v. Bullock*, ––– F.3d ––––, ––––, 2020 WL 5810556, at *14 (D. Mont. Sept. 30, 2020).

The distinction—between differences in county election procedures and differences in the treatment of votes or voters between counties—is reflected in *Bush* itself. There, the Supreme Court took pains to clarify that the question before it was "not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Bush*, 531 U.S. at 109, 121 S.Ct. 525; *see also id.* at 134, 121 S.Ct. 525 (Souter, J. dissenting) ("It is true that the Equal Protection Clause does not forbid the use of a variety of voting mechanisms within a jurisdiction, even though different mechanisms will have different levels of effectiveness in recording voters' intentions; local variety can be justified by concerns about cost, the potential value of innovation, and so on."); *Bullock*, ––– F.3d at ––––, 2020 WL 5810556, at *14 ("[T]he Supreme Court was clear in *Bush v. Gore* that the question was not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections.") (cleaned up).

Thus, coming back to the theory of Plaintiffs' case, Plaintiffs contend that Secretary Boockvar's drop-box guidance will result in differences between counties and differing risks of fraud. But the result of that uneven implementation will not be votes in certain counties being valued less than others. And the result won't be that voters who vote in person will have their votes valued less, either. Instead, if Plaintiffs are right, any unlawful votes will dilute all other lawful votes in the same way. While certainly voter fraud and illegal voting are bad, as a matter of equal protection, there is no unequal treatment here, and thus no burden on Plaintiffs' rights under the Equal Protection Clause.

In addition to their equal-protection claim based on county differences, Plaintiffs also appear to allude to a more general type of equal-protection violation. They assert that Pennsylvania comprises a single election unit. [ECF 551, p. 55 ("The electoral unit in this election is the entire Commonwealth of Pennsylvania.") ]. They assert that they intend to cast their ballots lawfully. *See, e.g.,* [ECF 504-3, ¶ 4 ("As a Pennsylvania qualified registered elector, I have always voted in-person at primary and general elections, and I intend to vote in-person at the upcoming November 3, 2020 General Election.") ]. And they assert that unmanned drop boxes across the Commonwealth (regardless of the county) will, on a statewide basis, dilute their votes. *See, e.g.,* [*id.* at ¶ 6 ("As a Pennsylvania qualified registered elector who votes in-person, I do not want my in-person vote diluted or cancelled by votes that are cast in a manner contrary

to the requirements enacted by the Pennsylvania General Assembly.") ]. For example, if one "qualified elector" casts a lawful ballot, but a fraudulent voter casts ten ballots, then that elector's vote will, under Plaintiffs' theory, be diluted by a magnitude of ten—resulting in differential treatment.

**\*46** The problem with this theory is that there does not appear to be any law to support it. Indeed, if this were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's "interest" in failing to do more to stop illegal activity. This is not the law. To the contrary, it is well-established that even violations of state election laws by state officials, let alone violations by unidentified third parties, do not give rise to federal constitutional claims except in unusual circumstances. *See Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A violation of state law does not state a claim under § 1983, and, more specifically, a deliberate violation of state election laws by state election officials does not transgress against the Constitution.") (cleaned up); *Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir. 1995) ("[T]he Constitution is not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations— no matter how egregious those violations may appear within the local legal framework.").

Thus, this type of equal-protection claim fails as a matter of law, as well.

**2. If Pennsylvania's "uneven" use of drop boxes indirectly burdens the right to vote at all, that burden is slight, and justified by important state interests.**

Even assuming that Plaintiffs could establish unequal treatment to state an equal-protection claim, their claim nonetheless fails because the governmental interests here outweigh any burden on the right to vote.

Initially, the Court finds that the appropriate level of scrutiny is rational basis. Defendants' failure to implement a mandatory requirement to "man" drop boxes doesn't directly infringe or burden Plaintiffs' rights to vote at all. Indeed, as discussed above in the context of standing, what Plaintiffs characterize as the burden or harm here is really just an ancillary 'increased risk' of a theoretical harm, the degree of which has not been established with any empirical precision.

*See Obama*, 697 F.3d at 429 ("If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used."); *Brehm*, 432 F. Supp. 3d at 310 ("Under this framework, election laws that impose no burden on the right to vote are subject to rational-basis review.").

On rational-basis review, the Secretary's guidance here passes constitutional muster. Her guidance certainly provides some flexibility in how counties may use drop boxes, but the guidance overall is rationally related to a legitimate governmental interest—namely, the implementation of drop boxes in a secure manner, taking into account specific county differences. That Plaintiffs feel the decisions and actions of the Pennsylvania General Assembly, Secretary Boockvar, and the county Defendants are insufficient to prevent fraud or illegal voting is of no significance. "[R]ational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller v. Doe by Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

As detailed above, Secretary Boockvar's guidance provides lawful, comprehensive, and reasonable standards with respect to (1) selecting the location of drop boxes, (2) drop-box design criteria, (3) signage, (4) drop-box security measures, and (5) drop-box ballot collection and chain of custody procedures. Of particular note, with respect to ballot security, the Secretary's guidance calls for the use of reasonably robust measures like video surveillance, durable and tamperproof design features, regular ballot collection every 24 hours, chain-of-custody procedures to maintain ballot traceability, and signage advising voters that third-party delivery is prohibited, among other things.

To be sure, the Secretary's guidance doesn't insist on the use of security personnel—though some counties have decided to post security guards outside of drop boxes on their own. But the Court can't say that either the Secretary's failure to provide that requirement, or the decision of some counties to proceed with drop boxes "unmanned," is irrational. For example, the evidence presented demonstrates that placing a security guard outside of a drop box at all times is costly, particularly for cash-strapped counties—at least $13 per hour or about $104 (8 hours) to $312 (24 hours) per day, according to Defendants' expert, Professor Robert McNair. [ECF 549-11, p. 11] In the context of a broader election system that detects and deters fraud at many other stages of the voting process, and given

that that there are also no equivalent security measures present at U.S. postal mailboxes (which constitute an arguably more tempting vehicle for the would-be ballot harvester), the Court finds that the lack of any statewide requirement that all drop boxes be manned or otherwise surveilled is reasonable, and certainly rational.

**\*47** But even assuming Plaintiffs are right that their right to vote here has been burdened (and thus a heightened level of scrutiny must apply), that burden is slight and cannot overcome Defendants' important state interests under the *Anderson-Burdick* framework. Indeed, courts routinely find attenuated or ancillary burdens on the right to vote to be "slight" or insignificant, even burdens considerably *less* attenuated or ancillary than any burden arguably shown here. *See, e.g., Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) ("Under *Burdick*, the use of touchscreen voting systems is not subject to strict scrutiny simply because this particular balloting system may make the possibility of some kinds of fraud more difficult to detect.").[11]

[11]    *See, also, e.g., Dudum v. Arntz*, 640 F.3d 1098, 1117 (9th Cir. 2011) ("If the aspects of the City's restricted IRV scheme Dudum challenges impose any burdens on voters' constitutional rights to vote, they are minimal at best."); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1354–55 (11th Cir. 2009) ("The district court determined that the burden imposed on Georgia voters who lack photo identification was not undue or significant, and we agree.... The NAACP and voters are unable to direct this Court to any admissible and reliable evidence that quantifies the extent and scope of the burden imposed by the Georgia statute."); *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1183 (9th Cir. 1988) ("Appellants claim that Hawaii's absentee voting law fails to prohibit 'the solicitation, examination and delivery of absentee ballots by persons other than the voters' and that such activities occurred during the special election ... We agree with the district court that the Hawaii absentee ballot statute and the regulations adopted under it adequately protect the secrecy and integrity of the ballot. Although Hawaii has not adopted a regulation to prevent the delivery of ballots by persons other than the voter, the Hawaii regulations go into great detail in their elaboration of procedures to prevent tampering with the ballots."); *McLain v. Meier*, 637 F.2d 1159, 1167 (8th Cir. 1980) ("[A]lthough ballot format has an effect on the fundamental right to vote, the effect is somewhat attenuated."); *Nemes v. Bensinger*, —— F. Supp. 3d ——, ——, 2020 WL 3402345, at *13 (W.D. Ky. June 18, 2020) ("The burden imposed

by the contraction to one polling place is modest, and the identified groups are afforded various other means under the voting plans to easily and effectively avoid disenfranchisement. As already discussed, Defendants have offered evidence of the substantial government interest in implementing voting plans that provide for a free and fair election while attempting to minimize the spread of COVID-19."); *Paralyzed Veterans of Am. v. McPherson*, No. 06-4670, 2008 WL 4183981, at *22 (N.D. Cal. Sept. 9, 2008) ("Plaintiff Bohlke's listed burdens rely on speculative risk or the ancillary effects of third party assistance, but not on evidence of any concrete harm. Such speculations or effects are insufficient under Supreme Court and Ninth Circuit precedent to demonstrate a severe burden on the fundamental right to vote.").

To begin with, application of the *Anderson-Burdick* framework here presents something of a "square peg, round hole" dilemma. After all, that test assumes there is some constitutional injury to "weigh" against the state's "important" regulatory interests in the first place. And without differential treatment of votes or voters, there isn't any equal-protection injury for the Court to balance.

The *Anderson-Burdick* test is also ill-fitted to Plaintiffs' claims for another reason. Typically, *Anderson-Burdick* is invoked where the government takes some direct action to burden or restrict a plaintiff's right to vote. Here, in contrast, Plaintiffs complain that Pennsylvania has indirectly burdened the right to vote through **inaction**—*i.e.*, by not imposing **enough** regulation to secure the voting process it has adopted, which, Plaintiffs say, will allow third parties to vote in an unlawful way, which, if it happens, will dilute (and thus burden) the right to vote.

**\*48** This unusual causal daisy-chain makes it difficult to apply *Anderson-Burdick*'s balancing approach. After all, it is one thing to assess the government's interest in taking a specific action that imposed burdens on the right to vote. It is much less natural for a court to evaluate whether the government had a good reason for not doing something differently, or for failing to do more to prevent (or reduce the risk of) misconduct by third parties that could burden the right to vote.

To the extent *Anderson-Burdick* applies in such circumstances, the appropriate course would, in this Court's view, be to weigh any burden stemming from the government's alleged failures against the government's interest in enacting the broader election scheme it has

erected, of which the challenged piece is usually only one part. Focusing solely on the allegedly inadequate procedure being challenged, such as the state's authorization of "drop boxes" here, would ignore the fact that Election Code provisions and regulations operate as part of a single, complex organism balancing many competing interests, all of which are "important" for purposes of the *Anderson-Burdick* analysis. *See, e.g., Crawford*, 553 U.S. at 184, 128 S.Ct. 1610 ("deterring and detecting voter fraud"); *Tedards v. Ducey*, 951 F.3d 1041, 1067 (9th Cir. 2020) ("voter turnout"); *Lunde v. Schultz*, 221 F. Supp. 3d 1095, 1106 (S.D. Iowa 2014) ("expanding ballot access to nonparty candidates"); *Greenville Cnty. Republican Party Exec. Comm. v. South Carolina*, 824 F. Supp. 2d 655, 671 (D.S.C. 2011) ("promoting voter participation in the electoral process"); *Mays v. LaRose,* 951 F.3d 775, 787 (6th Cir. 2020) ("orderly administration of elections"); *Dudum*, 640 F.3d at 1115 ("orderly administration of ... elections"); *Paher v. Cegavske* , 457 F.Supp.3d 919, ––––, 2020 WL 2089811, at *7 (2020) ("protect[ing] the health and safety of ... voters" and "safeguard[ing] the voting franchise"); *Nemes*, –––– F. Supp. 3d at ––––, 2020 WL 3402345, at *13 ("implementing voting plans that provide for a free and fair election while attempting to minimize the spread of COVID-19").

Thus, on the "burden" side of the equation is Plaintiffs' harm of vote dilution predicated on a risk of fraud. As discussed above in the context of lack of standing, that burden is slight, factually, because it is based on largely speculative evidence of voter fraud generally, anecdotal evidence of the mis-use of certain drop boxes during the primary election, and worries that the counties will not implement a "best practice" of having poll workers or guards man the drop boxes. *See* [ECF 461, ¶¶ 63-82; ECF 504-2, ¶ 12; 504-3, ¶ 6; 504-4, ¶7;; ECF 504-6, ¶¶ 6-8; ECF 504-7, ¶¶ 5-9; ECF 504-9, 92:4-10; ECF 504-10, 60:3-61:10; 504-19, pp. 3, 16-18, 20 & Ex. D; ECF 504-25; ECF 504-49; ECF 509, p. 67; ECF 551, p. 34].

This somewhat scant evidence demonstrates, at most, an increased risk of some election irregularities—which, as many courts have held, does not impose a meaningful burden under *Anderson-Burdick*. "Elections are, regrettably, not always free from error," *Hutchinson v. Miller*, 797 F.2d 1279, 1286–87 (4th Cir. 1986), let alone the "risk" of error. In just about every election, votes are counted, or discounted, when the state election code says they should not be. But the Constitution "d[oes] not authorize federal courts to state election monitors." *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980). It is "not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations." *Fournier v. Reardon*, 160 F.3d 754, 757 (1st Cir. 1998). Nor is it "an election fraud statute." *Minnesota Voters*, 720 F.3d at 1031.

**\*49** "Garden variety" election irregularities, let alone the "risk" of such irregularities, are simply not a matter of federal constitutional concern "even if they control the outcome of the vote or election." *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998). And as discussed above, most often, even "a deliberate violation of state election laws by state election officials does not transgress against the Constitution." *Shipley*, 947 F.3d at 1062. *see, e.g., Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 919 (E.D. Va. 2018) ("[E]ven assuming the Fredericksburg officials' failure to provide provisional ballots amounted to a violation of state law, it would not rise to the level of an equal protection violation.").

Compared, then, to Plaintiffs' slight burden, the Commonwealth has put forward reasonable, precise, and sufficiently weighty interests that are undisputed and that can be distilled into three general categories: (1) the benefits of drop boxes, (2) the Commonwealth's interests in furthering its overall election-security plan concerning drop boxes, and (3) the interests inherent in the Commonwealth's general mail-in ballot scheme.

The first category concerns the benefits of drop boxes generally. Secretary Boockvar has pointed out the Commonwealth's interests generally in using drop boxes—including, (1) the increase of voter turnout, (2) the protection of voters' health in the midst of the ongoing pandemic, (3) the increase of voter satisfaction, in light of ongoing U.S. Postal Service issues, and (4) the reduction of costs for counties. [ECF No. 547, at pp. 22-25; ECF No. 549-2, ¶¶ 36-39, 42-44]. Plaintiffs do not dispute any of these interests.

The second category of interests concerns the Commonwealth's interests in implementing drop boxes with appropriate and effective safety measures and protocols in place. That is, Secretary Boockvar has, in her capacity as the chief state official charged with overseeing elections, issued uniform guidance to all counties regarding the use of drop boxes, which is noted above. That guidance includes (1) advising counties that the Election Code permits the use of drop boxes, and (2) setting forth best practices that the counties should "consider" with respect to their use. Among other things, the Secretary advised that counties

Ex. 5

should maintain a traceable chain of custody for mail-in and absentee ballots retrieved from drop boxes; utilize drop boxes with various security features (*e.g.,* anti-tampering features, locks, video surveillance, and removal when the site is closed or cannot be monitored); and designate sworn county personnel to remove ballots from drop boxes. And evidence suggests that the Secretary's deputies have emphasized these best practices when queried by county officials. [ECF 549-32 ("Per our conversation, the list of items are things the county must keep in mind if you are going to provide a box for voters to return their ballots in person.") ].

This guidance is lawful, reasonable, and non-discriminatory, and so does not create any constitutional issue in its own right. With this guidance, the Secretary has diminished the risks tolerated by the legislature in adopting mail-in voting and authorizing drop-boxes, by encouraging the counties to adopt rather comprehensive security and chain-of-custody procedures if they do elect to use drop boxes. Conversely, the legislature's decision to leave the counties with ultimate discretion when it comes to how, and to what extent, to use drop boxes (as opposed to adopting a scheme in which the Secretary could enforce compliance with her guidance) is also reasonable, and justified by sufficiently weighty governmental interests, given the many variations in population, geography, local political culture, crime rates, and resources. [ECF 549-9 ("There is no logical reason why ballot receptacles such as drop boxes must be uniform across different counties; particularly because the verification of the voter is determined by election officials upon receipt of the ballot. Counties vary in size and need. Across the country, best practices dictate that counties determine what type of box and size works for them. The needs of a large county are very different from the needs of a smaller county."); ECF 549-11, p. 9 ("Such variation between counties even within a state makes sense, since the needs of different counties vary and their use of drop boxes reflects those considerations (e.g., the geographic size of a county, the population of the county, and the ease with which voters in the county can access other locations to return mail-in ballots).")].

**\*50** The third category of interests is, more generally, the interests of the Commonwealth in administering its overall mail-in ballot regime, including the various security and accountability measures inherent in that legislative plan.

Pennsylvania did not authorize drop boxes in a vacuum. Last year, the Pennsylvania legislature "weigh[ed] the pros and cons," *Weber,* 347 F.3d at 1107, and adopted a broader system

of "no excuse" mail-in voting as part of the Commonwealth's Election Code. As the Pennsylvania Supreme Court has now confirmed, that system left room for counties to authorize drop boxes and other satellite locations for returning ballots to the county boards of elections. *See Boockvar,* —— A.3d at ——, 2020 WL 5554644, at \*9 ("[W]e need not belabor our ultimate conclusion that the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes.").

Inherent in any mail-in or absentee voting system is some degree of increased risk of votes being cast in violation of other provisions of the Election Code, regardless of whether those ballots are returned to drop boxes, mailboxes, or some other location. For example, there is simply no practical way to police third party delivery of ballots to any mailbox anywhere in the Commonwealth, where Plaintiffs do not dispute that such ballots can be lawfully returned. It is also likely that more (and perhaps many more) voters than usual will be disenfranchised by technicalities this year, for failing to comply with the procedural requirements associated with mail-in ballots, such as the requirement that such ballots be placed in "inner secrecy envelopes."

But in enacting the "no excuse" mail-in voting system that it did, the Pennsylvania legislature chose to tolerate the risks inherent in that approach. And the key point is that the legislature made that judgment in the context of erecting a broader election scheme that authorizes other forms of voting and has many other safeguards in place to catch or deter fraud and other illegal voting practices. These safeguards include voter registration; a mail-in ballot application and identity verification process, 25 P.S. §§ 3146.2, 3150.12; a system for tracking receipt of mail-in ballots, 25 P.S. §§ 3146.3(a), 3150.13(a); and, perhaps most important of all, a pre-canvassing and canvassing process during which mail-in ballots are validated before being counted. In addition, Pennsylvania law also seeks to deter and punish fraud by imposing criminal penalties for unlawful voting, 25 P.S. § 3533; voting twice in one election, 25 P.S. § 3535; forging or destroying ballots, 25 P.S. § 3517; unlawful possession or counterfeiting of ballots 25 P.S § 3516; and much more of the conduct Plaintiffs fear, *see* 25 P.S. § 3501, *et seq.*

In this larger context, the Court cannot say that the balance Pennsylvania struck across the Election Code was unreasonable, illegitimate, or otherwise not "sufficiently weighty to justify," *Crawford,* 553 U.S. at 191, 128 S.Ct.

1610, whatever ancillary risks may be associated with the use of drop boxes, or with allowing counties to exercise discretion in that regard. Pennsylvania may balance the many important and often contradictory interests at play in the democratic process however it wishes, and it must be free to do so "without worrying that a rogue district judge might later accuse it of drawing lines unwisely." *Abbott*, 961 F.3d at 407.

**\*51** Thus, balancing the slight burden of Plaintiffs' claim of dilution against the categories of interests above, the Court finds that the Commonwealth and Defendants' interests in administering a comprehensive county-based mail-in ballot plan, while both promoting voting and minimizing fraud, are sufficiently "weighty," reasonable, and justified. Notably, in weighing the burdens and interests at issue, the Court is mindful of its limited role, and careful to not intrude on what is "quintessentially a legislative judgment." *Griffin*, 385 F.3d at 1131. "[I]t is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems." *Weber*, 347 F.3d at 1106. "So long as their choice is reasonable and neutral, it is free from judicial second-guessing." *Id.*; *see also Abbott*, 961 at 407, ("That the line might have been drawn differently ... is a matter for legislative, rather than judicial, consideration.") (cleaned up); *Trinsey v. Com. of Pa.*, 941 F.2d 224, 235 (3d Cir. 1991) ("We take no position on the balancing of the respective interests in this situation. That is a function for which the legislature is uniquely fitted.").

Thus, even under the *Anderson-Burdick* framework, the Court finds that Plaintiffs' constitutional challenge fails as a matter of law.

### B. Pennsylvania's use of drop boxes does not violate federal due process.

In addition to their equal-protection challenge to the use of drop boxes, Plaintiffs also appear to argue that the use of unmanned drop boxes violates substantive due process protected by the 14th Amendment. This argument is just a variation on their equal-protection argument—*i.e.*, the uneven use of drop boxes will work a "patent and fundamental unfairness" in violation of substantive due process principles. *See Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978) (substantive due process rights are violated "[i]f the election process itself reaches the point of patent and fundamental unfairness[.]"). The analysis for this claim is the same as that for equal protection, and thus it fails for the same reasons.

But beyond that, this claim demands even stricter proof. Such a claim exists in only the most extraordinary circumstances.

*See Nolles v. State Comm. for Reorganization of Sch. Districts*, 524 F.3d 892, 898 (8th Cir. 2008) ("A canvass of substantive due process cases related to voting rights reveals that voters can challenge a state election procedure in federal court only in limited circumstances, such as when the complained of conduct discriminates against a discrete group of voters, when election officials refuse to hold an election though required by state law, resulting in a complete disenfranchisement, or when the willful and illegal conduct of election officials results in fraudulently obtained or fundamentally unfair voting results.") (cleaned up); *Yoshina*, 140 F.3d at 1226 ("We have drawn a distinction between 'garden variety' election irregularities and a pervasive error that undermines the integrity of the vote. In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election.") (citation omitted); *Bennett v. Mollis*, 590 F. Supp. 2d 273, 278 (D.R.I. 2008) ("Before an election error becomes a key that unlocks the restraints on the federal court's authority to act, the Plaintiffs must demonstrate either an intentional election fraud or an unintentional error resulting in broad-gauge unfairness.").

Indeed, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense"—the "executive action must be so ill-conceived or malicious that it 'shocks the conscience.' " *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999) (cleaned up).

Based on the slight burden imposed here, and the Commonwealth's interests in their overall county specific voting regime, which includes a host of other fraud-prevention measures, the Court finds that the drop-box claim falls short of the standard of substantive due process.

### III. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' signature-comparison claims.

**\*52** Plaintiffs' next claim concerns whether the Secretary's recent guidance on signature comparison violates the federal Constitution. Plaintiffs frame their claims pertaining to signature comparison in two ways—one based on due process and the other based on equal protection.

Plaintiffs initially assert that the Election Code requires a signature comparison for mail-in and absentee applications and ballots. Thus, according to Plaintiffs, Secretary Boockvar's guidance, which says the opposite, is creating unconstitutional vote dilution, in violation of due-process principles—*i.e.*, certain unlawful, unverified ballots will

Ex. 5

now be counted, thereby diluting the lawful ones cast by other voters (such as in-person voters, whose signatures are verified). Plaintiffs also appear to argue more generally that absent signature comparison, there is a heightened risk of voter fraud, and therefore a heightened risk of vote dilution of lawful votes.

In addition to due process, Plaintiffs argue that the guidance violates equal-protection principles—first, by counties engaging in a patchwork of procedures (where some counties intend to do a signature comparison for mail-in ballots, while others do not); and second, by implementing different standards between mail-in ballots and in-person ones.

In contrast, Defendants and Intervenors take the position that state law does not require signature comparison, and for good reason. According to them, requiring such comparisons is fraught with trouble, as signatures change over time and elections officials are not signature-analysis experts. This leaves open the possibility for arbitrary and discriminatory application that could result in the disenfranchisement of valid voters.

For the reasons that follow, the Court will dismiss the signature-comparison claims and enter judgment in favor of Defendants. A plain reading of the Election Code demonstrates that it does not impose a signature-comparison requirement for mail-in ballots and applications, and thus Plaintiffs' vote-dilution claim sounding in due process fails at the outset. Further, the heightened risk of fraud resulting from a lack of signature comparison, alone, does not rise to the level of a federal constitutional violation. Finally, the equal-protection claims fail because there are sound reasons for the different treatment of in-person ballots versus mail-in ballots; and any potential burdens on the right to vote are outweighed by the state's interests in their various election security measures.

**A. The Election Code does not require signature comparison for mail-in and absentee ballots or ballot applications.**

Plaintiffs' federal-constitutional claims in Count I of their Second Amended Complaint are partially based on the Secretary's guidance violating state law. That is, Plaintiffs' first theory is that by the Secretary violating state law, unlawful votes are counted and thus lawfully cast votes are diluted. According to Plaintiffs, this violates the 1st and 14th Amendments, as well as the Elections Clause (the latter of

which requires the legislature, not an executive, to issue election laws).[12]

[12] The parties do not specifically brief the elements of an Elections-Clause claim. This is typically a claim brought by a state legislature, and the Court has doubts that this is a viable theory for Plaintiffs to assert. *See Lance v. Coffman*, 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007). Regardless, if state law does not require signature comparison, then there is no difference between the Secretary's guidance and the Election Code, and the Elections-Clause claim necessarily fails.

**\*53** Thus, a necessary predicate for these constitutional claims is whether the Election Code mandates signature comparison for mail-in and absentee ballots. If it doesn't, as the Secretary's guidance advises, then there can be no vote dilution as between lawful and unlawful votes, nor a usurpation of the legislature's authority in violation of the Elections Clause.

After carefully considering the parties' arguments and the relevant law, the Court finds that the plain language of the Election Code imposes no requirement for signature comparison for mail-in and absentee ballots and applications.[13] In other words, the Secretary's guidance is consistent with the Election Code, and creates no vote-dilution problems.[14]

[13] Several Defendants and Intervenors have asked this Court to abstain from deciding this issue on the basis of *Pullman*. As this Court previously discussed, a court can abstain under *Pullman* if three factors are met: "(1) [the dispute] requires interpretation of "unsettled questions of state law,"; (2) permitting resolution of the unsettled state-law questions by state courts would "obviate the need for, or substantially narrow the scope of adjudication of the constitutional claims"; and (3) an "erroneous construction of state law would be disruptive of important state policies[.]" " [ECF 409, p. 3 (quoting *Chez Sez*, 945 F.2d at 631) ]. But if, on the other hand, the answer to the state law dispute is "clear and unmistakable," abstention is not warranted. [*Id.* at p. 15 (citing *Chez Sez*, 945 F.2d at 632) ]. Here, the Court concludes (as discussed below) that the Election Code is clear that signature comparison is not required and further, that Plaintiffs' competing interpretation is not plausible. As such, the Court cannot abstain under *Pullman*.

The *Pullman* analysis does not change simply because Secretary Boockvar has filed a "King's Bench" petition

with the Pennsylvania Supreme Court, requesting that court to clarify whether the Election Code mandates signature comparison of mail-in and absentee ballots and applications. [ECF 556, p. 11; ECF 557]. The fact that such a petition was filed does not change this Court's conclusion that the Election Code is clear. The *Pullman* factors remain the same. And they are not met here.

14    The Secretary's September 11, 2020, guidance, stated that the "Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." [ECF 504-24, p. 3, § 3]. Similarly, the Secretary's September 28, 2020, guidance stated that "Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis. ... No challenges may be made to mail-in and absentee ballots at any time based on signature analysis." [ECF 504-25, p. 9, § 5.2].

Plaintiffs, in advancing their claim, rely on section 3146.8(g) (3)-(7) of the Election Code to assert that the Code requires counties to "verify" the signatures on mail-in and absentee ballots (*i.e.*, examine the signatures to determine whether they are authentic). Plaintiffs specifically point to section 3146.8(g)(3) as requiring this signature verification. [ECF 509, pp. 17-18].

Section 3146.8(g)(3) states:

When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots ... the board shall examine the declaration on the envelope of each ballot ... and shall compare the information thereon with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable. If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File" verifies his right to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed.

**\*54** 25 P.S. § 3146.8(g)(3).

According to Plaintiffs, Section 3146.8(g)(3)'s requirement to verify the proof of identification, and compare the

information on the declaration, is tantamount to signature comparison. The Court disagrees, for at least three reasons.

First, nowhere does the plain language of the statute require signature comparison as part of the verification analysis of the ballots.

When interpreting a statute enacted by the Pennsylvania General Assembly, courts apply Pennsylvania's Statutory Construction Act, 1 Pa. C.S. §§ 1501-1991. And as the Act instructs, the "object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa C.S. § 1921(a). If the words of the statute are clear and unambiguous, the letter of the law applies. *Id.* at § 1921(b). Otherwise, courts may consider a variety of factors to determine the legislature's intent, including "other statutes upon the same or similar subjects" and "[t]he consequences of a particular interpretation." *Id.* at § 1921(c)(5)-(6).

Section 3146.8(g)(3) does not expressly require any signature verification or signature comparison. 25 P.S. § 3146.8(g) (3). It instead requires election officials to (1) "examine the declaration on the envelope of each ballot," (2) "compare the information thereon with that contained in the ... 'Voters file' [or] the absentee voters' list," and (3) if "the county board has [a] verified the proof of identification as required under this act and [b] is satisfied that the declaration is sufficient and the information contained in the [Voter's file] ... verifies his right to vote," the election official shall include the ballot to be counted. *Id.*

Under the express terms of the statute, then, the information to be "verified" is the "proof of identification." *Id.* The Election Code defines "proof of identification" as the mail-in/absentee voter's driver's license number, last four digits of their Social Security number, or a specifically approved form of identification. 25 P.S. § 2602(z.5)(3)(i)-(iv).[15] The only other "verification" the election official must conduct is to determine whether "the information contained in the [Voter's file] ... verifies his right to vote."

15    The Election Code's definition of "proof of identification" in full provides:
      The words "proof of identification" shall mean ... For a qualified absentee elector ... or a qualified mail-in elector ...:

i. in the case of an elector who has been issued a current and valid driver's license, the elector's driver's license number;

ii. in the case of an elector who has not been issued a current and valid driver's license, the last four digits of the elector's Social Security number;

iii. in the case of an elector who has a religious objection to being photographed, a copy of a document that satisfies paragraph (1) [*i.e.*, "a valid-without-photo driver's license or a valid-without-photo identification card issued by the Department of Transportation"]; or

iv. in the case of an elector who has not been issued a current and valid driver's license or Social Security number, a copy of a document that satisfies paragraph (2) [*i.e.*, "a document that shows the name of the individual to whom the document was issued and the name substantially conforms to the name of the individual as it appears in the district register; shows a photograph of the individual to whom the document was issued; includes an expiration date and is not expired, except (A) ... or (B) ...; and was issued by" the federal, state, or municipal government, or an "accredited Pennsylvania public or private institution of higher learning [or] "a Pennsylvania are facility."].

25 P.S. § 2602(z.5)(3).

**\*55** Nowhere does this provision require the election official to compare and verify the authenticity of the elector's signature. In fact, the word "signature" is absent from the provision. It is true that the elector must fill out and sign the declaration included on the ballot. 25 P.S. §§ 3146.6(a), 3150.16(a). However, while section 3146.8(g)(3) instructs the election official to "examine the declaration ... and compare the information thereon with that contained in the [Voter's file]," the provision clarifies that this is so the election official can be "satisfied that the declaration is sufficient." 25 P.S. § 3146.8(g)(3). In other words, the election official must be "satisfied" that the declaration is "fill[ed] out, date[d] and sign[ed]," as required by sections 3150.16(a) and 3146.6(a) of the Election Code. Notably absent is any instruction to verify the signature and set aside the ballot if the election official believes the signature to be non-genuine. There is an obvious difference between checking to see if a signature was provided at all, and checking to see if the provided signature is sufficiently authentic. Only the former is referred to in section 3146.8(g)(3).

Second, beyond the plain language of the statute, other canons of construction compel the Court's interpretation. When interpreting statutes passed by the General Assembly, Pennsylvania law instructs courts to look at other aspects of

the statute for context. *See* 1 Pa. C.S. § 1921(c)(5) ("When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering ... other statutes upon the same or similar subjects."); *O'Rourke v. Commonwealth*, 566 Pa. 161, 778 A.2d 1194, 1201 (2001) ("The cardinal rule of all statutory construction is to ascertain and effectuate the intent of the Legislature. To accomplish that goal, we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear." (citation omitted)).

Context here is important because the General Assembly mandated signature comparison for in-person voting elsewhere in the Election Code—thus evidencing its intention not to require such comparison for mail-in ballots. *See Fonner v. Shandon, Inc.*, 555 Pa. 370, 724 A.2d 903, 907 (1999) ("[W]here a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent.") (citation omitted).

In addressing in-person voting, the General Assembly explicitly instructs that the election official shall, after receiving the in-person elector's voter certificate, immediately "***compare the elector's signature*** on his voter's certificate with his signature in the district register. If, upon such comparison, the signature upon the voter's certificate appears to be genuine, the elector who has signed the certificate shall, if otherwise qualified, be permitted to vote: Provided, That ***if the signature on the voter's certificate, as compared with the signature as recorded in the district register, shall not be deemed authentic*** by any of the election officers, such elector shall not be denied the right to vote for that reason, but shall be considered challenged as to identity and required to [cure the deficiency]." 25 P.S. § 3050(a.3)(2) (emphasis added).

Elsewhere, the General Assembly also explicitly accounts for signature comparison of in-person voters: "[I]f it is determined that the individual was registered and entitled to vote at the election district where the ballot was cast, ***the county board of elections shall compare the signature on the provisional ballot envelope with the signature on the elector's registration form and, if the signatures are determined to be genuine, shall count the ballot*** if the county board of elections confirms that the individual did not cast any other ballot, including an absentee ballot, in the election. ... [But a] provisional ballot shall not be counted if ... the signature[s] required ... are either not genuine or are not executed by the same individual ..." 25 P.S. §

3050(a.4)(5)(i)-(ii) (emphasis added); *see also* 25 P.S. § 2936 ("[When reviewing nomination papers], the Secretary of the Commonwealth or the county board of elections, although not hereby required so to do, ***may question the genuineness of any signature or signatures appearing thereon***, and if he or it shall thereupon find that any such signature or signatures are not genuine, such signature or signatures shall be disregarded[.]" (emphasis added)).

**\*56** Clearly then, the General Assembly, in enacting the Election Code, knew that it could impose a signature-comparison requirement that requires an analysis to determine whether a signature is "genuine." And when that was its intent, the General Assembly explicitly and unequivocally imposed that requirement. It is thus telling, from a statutory construction standpoint, that no such explicit requirement is imposed for returned mail-in or absentee ballots. Indeed, the General Assembly is aware—and in fact, requires—that a voter must sign their application for an absentee or mail-in ballot, and must sign the declaration on their returned ballot. 25 P.S. §§ 3146.2(d) (absentee-ballot application), 3150.12(c) (mail-in-ballot application), 3146.6(a) (absentee-voter declaration), 3150.16(a) (mail-in voter declaration). Despite this, the General Assembly did not mention a signature-comparison requirement for returned absentee and mail-in ballots.

The Court concludes from this context that this is because the General Assembly did not intend for such a requirement. *See, e.g.*, *Mishoe v. Erie Ins. Co.*, 573 Pa. 267, 824 A.2d 1153, 1155 (2003) ("In arriving at our conclusion that the foregoing language does not provide for the right to a jury trial, we relied on three criteria. First, we put ***substantial emphasis*** on the fact that the PHRA was silent regarding the right to a jury trial. As we explained, 'the General Assembly is well aware of its ability to grant a jury trial in its legislative pronouncements,' and therefore, 'we can presume that the General Assembly's express granting of trial by jury in some enactments means that it did not intend to permit for a jury trial under the PHRA.' " (cleaned up) (emphasis added)); *Holland v. Marcy*, 584 Pa. 195, 883 A.2d 449, 456, n.15 (2005) ("We additionally note that the legislature, in fact, did specify clearly when it intended the choice of one individual to bind others. In every other category addressed by Section 1705(a) other than (a)(5) which addressed uninsured owners, the General Assembly specifically referenced the fact that the decision of the named insured ... binds other household members.... Similar reference to the ability of the uninsured owner's

deemed choice to affect the rights of household members is conspicuously missing from Section 1705(a)(5).").

Accordingly, the Court finds that the General Assembly's decision not to expressly refer to signature comparisons for mail-in ballots, when it did so elsewhere, is significant.

Third, this Court is mindful that Pennsylvania's election statutes are to be construed in a manner that does not risk disenfranchising voters. *See, e.g.*, 1 Pa. C.S. § 1922(3) ("In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used: ... That the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth."); *id.* at § 1921(c)(6) (in interpreting a statute, the court may consider "[t]he consequences of a particular interpretation").

As the Pennsylvania Supreme Court emphasized last month, "[I]t is well-settled that, although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of the right to vote. Indeed, our goal must be to enfranchise and not to disenfranchise the electorate." *Boockvar*, ––– A.3d at ––––, 2020 WL 5554644, at \*9 (cleaned up); *see also id.* ("[A]lthough both Respondent and the Caucus offer a reasonable interpretation of Section 3150.16(a) as it operates within the Election Code, their interpretation restricts voters' rights, as opposed to the reasonable interpretation tendered by Petitioner and the Secretary. The law, therefore, militates in favor of this Court construing the Election Code in a manner consistent with the view of Petitioner and the Secretary, as this construction of the Code favors the fundamental right to vote and enfranchises, rather than disenfranchises, the electorate.").

**\*57** Here, imposing a signature-comparison requirement as to mail-in and absentee ballots runs the risk of restricting voters' rights. This is so because election officials, unstudied and untested in signature verification, would have to subjectively analyze and compare signatures, which as discussed in greater detail below, is potentially problematic.[16] [ECF 549-2, p. 19, ¶ 68]; [ECF 549-9, p. 20, ¶ 64]. And perhaps more importantly, even assuming an adequate, universal standard is implemented, mail-in and absentee voters whose signatures were "rejected" would, unlike in-person voters, be unable to cure the purported error. *See* 25 P.S. § 3146.8(a) (stating that in-person and absentee ballots "shall [be safely kept] in sealed or locked containers until they are to be canvassed by the county board of

elections," which § 3146.8(g)(1.1)-(2) states is no earlier than election day); *Boockvar, —— A.3d at ——, 2020 WL 5554544, at \*20* ("[A]lthough the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the 'notice and opportunity to cure' procedure sought by Petitioner. To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, we agree that the decision to provide a 'notice and opportunity to cure' procedure to alleviate that risk is one best suited for the Legislature."). As discussed in more detail below, unlike in-person voters, whose signatures are verified in their presence, mail-in and absentee voters' signatures would be verified at a later date outside the presence of the voter. *See generally* 25 P.S. § 3146.8(a), (g) (requiring mail-in and absentee ballots to be kept secured in a sealed container until Election Day). Unbeknownst to the voter, then, and without an opportunity to remedy the purported error, these mail-in and absentee voters may not have their votes counted. Based on this risk of disenfranchisement, which the Court must consider in interpreting the statute, the Court cannot conclude that this was the General Assembly's intention.

16    While election officials must engage in signature comparison for in-person voters, that requirement is explicitly required by the Election Code, unlike for mail-in ballots. 25 P.S. § 3050(a.3)(2). And as discussed below, in-person voters, unlike mail-in voters, are immediately notified if their signatures are deficient.

The Court is not persuaded by Plaintiffs' arguments to the contrary.

Plaintiffs argue that section 3146.8(g)(5)-(7) provides a voter, whose ballot-signature was rejected, notice and an opportunity to cure the signature deficiency. [ECF 509, pp. 13, 18, 50]. That section, however, refers to when a person raises a specific challenge to a specific ballot or application on the grounds that the elector is not a "qualified elector." 25 P.S. § 3146.8(g)(4) (stating that mail-in and absentee ballots shall be counted unless they were challenged under §§ 3146.2b or 3150.12b, which allow challenges on the grounds that the elector applying for a mail-in or absentee ballot wasn't qualified). Thus, the "challenges" referenced in § 3146.8(g)(5)-(7) refer to a voter's qualifications to vote, not a signature verification.

Plaintiffs similarly argue that section 3146.8(h) provides mail-in voters notice and opportunity to cure signature deficiencies. [ECF 552, p. 60]. But that section relates to

"those absentee ballots or mail-in ballots for which proof of identification has not been received or could not be verified." 25 P.S. § 3146.8(h). As discussed above, "proof of identification" is a defined term, and includes the voter's driver's license number, last four digits of their Social Security number, or a specifically approved form of identification. 25 P.S. § 2602(z.5)(3)(i)-(iv). Not included is the voter's signature.[17]

17    Plaintiffs also argue that signature comparison for mail-in and absentee ballots is supported by historical case law. [ECF 552, pp. 58-59]. Plaintiffs cite to two cases from the 1960s that the Court of Common Pleas decided. [*Id.*]. The first, *Appeal of Fogleman*, concluded that under the then-applicable election law, an absentee voter had to sign a declaration to show that he was a proper resident who had not already voted in that election. 36 Pa. D. & C.2d 426, 427 (Pa. Ct. Comm. Pl. 1964). Regarding the voter's signature, the court simply stated, "[i]f the elector fails or refuses to attach his or her signature, then such elector has not completed the declaration as required by law of all voters." *Id.* Thus, no signature comparison or verification was implicated there; rather, the court simply stated that the declaration must be signed (*i.e.*, completed). The second case Plaintiffs cite, *In re Canvass of Absentee Ballots of Gen. Election* [ECF 552, pp. 58-59], arose from individual, post-election challenges to 46 individual absentee ballots. 39 Pa. D. & C.2d 429, 430 (Pa. Ct. Comm. Pl. 1965). Thus, a universal and mandatory signature-comparison requirement was not at issue there, unlike what Plaintiffs contest here. This Court finds neither case persuasive.

  **\*58** At bottom, Plaintiffs request this Court to impose a requirement—signature comparison—that the General Assembly chose not to impose. Section 3146.8(g)(3) does not mention or require signature comparison. The Court will not write it into the statute.

For the same reasons that the Election Code does not impose a signature-comparison requirement for mail-in and absentee ballots, the Election Code does not impose a signature-comparison requirement for mail-in and absentee ballot ***applications***. While the General Assembly imposed a requirement that the application be signed, there is no mention of a requirement that the signature be verified, much less that the application be rejected based solely on such verification. 25 P.S. §§ 3146.2(d) (absentee-ballot application), 3150.12(c) (mail-in-ballot application). Again, finding no explicit instructions for signature comparison here (unlike elsewhere in the Code), the Court concludes that

Ex. 5

the General Assembly chose not to include a signature-comparison requirement for ballot applications.

The Court again finds Plaintiffs' arguments to the contrary unavailing. Plaintiffs argue that "there is no other proof of identification required to be submitted with the ballot applications," and thus, a signature comparison must be required. [ECF 509, p. 16].

But the Election Code expressly requires the applicant to include several pieces of identifying information, including their name, mailing address, and date of birth. 25 P.S. §§ 3146.2(b), 3150.12(b). And after receiving the applicant's application, the election official must "verify[ ] the proof of identification [a defined term as discussed above] and compar[e] the information provided on the application with the information contained on the applicant's permanent registration card."[18] *Id.* at §§ 3146.2b(c), 3150.12b(a). Thus, contrary to Plaintiffs' argument, the General Assembly provided for certain methods of identification as to ballot applications. Signature verification isn't one of them.

18    This identifying information on a ballot application includes much of the same information expressly listed for what a voter must provide in initially registering to vote. 25 Pa. C.S.A. § 1327(a) (stating that the "official voter registration application" shall request the applicant's: full name, address of residence (and mailing address if different), and date of birth).

For these reasons, the Court concludes that the Election Code does not impose a signature-comparison requirement for absentee and mail-in ballots and applications. As such, the Secretary's September 11, 2020, and September 28, 2020, guidance is consistent with the Election Code. Plaintiffs' claims of vote dilution based on this guidance will therefore be dismissed.

### B. The lack of a signature comparison does not violate substantive due process.

In addition to alleging that the Secretary's guidance violates the Election Code, Plaintiffs appear to also argue that their right to vote is unconstitutionally burdened and diluted due to a risk of fraud. That is, regardless of what the Election Code requires, Plaintiffs assert that absent signature comparison, mail-in and absentee ballots will be prone to fraud, thereby diluting other lawful ballots. [ECF 509, pp. 45-50; 504-19, pp. 10-15]. Plaintiffs argue that this significantly burdens their

fundamental right to vote, resulting in a due-process violation, and thus strict scrutiny applies. The Court disagrees.

**\*59** As discussed above in the context of Plaintiffs' drop-box claim, Plaintiffs' claim here simply does not rise to the high level for a substantive due process claim. To violate substantive due process in the voting-rights context, the infringements are much more severe. Only in extraordinary circumstances will there be "patent and fundamental unfairness" that causes a constitutional harm. *See Bonas v. Town of North Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001); *Shannon v. Jacobowitz*, 394 F.3d 90, 94 (2d Cir. 2005).

Here, Plaintiffs' signature-comparison claim does not meet this high standard. This isn't a situation of malapportionment, disenfranchisement, or intentional discrimination. And the risk of voter fraud generally without signature comparison —as a matter of fact and law—does not rise to "patent and fundamental unfairness."

Indeed, as discussed above, Plaintiffs' evidence of potential voter fraud here is insufficient to establish "patent and fundamental unfairness." In their summary-judgment brief, Plaintiffs argue that "the Secretary's September 2020 guidance memos promote voter fraud." [ECF 509, p. 48]. Plaintiffs then offer a hypothetical where a parent signs a ballot application on their child's behalf because the child is out-of-state. [ECF 509, p. 48]. Plaintiffs assert that without signature comparisons, such "fraud" could proceed unchecked. [*Id.*]. Plaintiffs continue, arguing that the "fraud" would "snowball," so that "spouses, neighbors, acquaintances, strangers, and others" were signing applications and ballots on others' behalf. [*Id.* at pp. 48-49]. To prevent such fraud, Plaintiffs' expert, Mr. Riddlemoser, asserts that signature comparison is needed. [ECF 504-19, p. 10 ("Not only does enforcing the Election Code's requirement of a completed and signed declaration ensure uniformity, which increases voter confidence, it also functions to reduce fraud possibilities by allowing signature verification.") ].

Mr. Riddlemoser first highlights that in Philadelphia in the primary, ballots were counted "that lacked a completed declaration." [*Id.* at p. 11]. Mr. Riddlemoser further opines that the September 11, 2020, guidance and September 28, 2020, guidance, in instructing that signature comparison is not required for mail-in and absentee ballots and applications, "encourage[s], rather than prevent[s], voter fraud." [*Id.* at pp. 12-13]. Mr. Riddlemoser also notes that signature comparison

is "the most common method" to verify ballots and that the Secretary's guidance "leave the absentee/mail-in ballots subject to the potential for unfettered fraud." [*Id.* at p. 14]. He concludes that the guidance "invites the dilution of legitimately cast votes." [*Id.*].

Based on this evidentiary record, construed in Plaintiffs' favor, the Court cannot conclude that there exists "patent and fundamental unfairness." Rather, Plaintiffs present only the possibility and potential for voter fraud. In their briefing, Plaintiffs relied on hypotheticals, rather than actual events. [ECF 509, p. 48]. Mr. Riddlemoser admits that failing to verify signatures only creates "the potential" for fraud and "invites" vote dilution. [ECF 504-19, pp. 14, 15]. Even assuming an absence of signature comparison does indeed invite the potential for fraud, the nondiscriminatory, uniform practice and guidance does not give rise to "patent and fundamental unfairness" simply because of a "potential" for fraud. Plaintiffs have not presented evidence to establish a sufficient burden on their constitutional right to vote.

**\*60** Indeed, even if the Court assumed some "forged" applications or ballots were approved or counted, this is insufficient to establish substantial, widespread fraud that undermines the electoral process. Rather, limited instances of "forged" ballots—which according to Plaintiffs' definition, includes an individual signing for their spouse or child— amount to what the law refers to as "garden variety" disputes of limited harm. As has long been understood, federal courts should not intervene in such "garden variety" disputes. *Hutchinson*, 797 F.2d at 1283 ("[C]ourts have uniformly declined to endorse action under § 1983 with respect to garden variety election irregularities.") (cleaned up); *Yoshina*, 140 F.3d at 1226 ("In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election." (collecting cases)); *Curry v. Baker*, 802 F.2d 1302, 1314-15 (11th Cir. 1986) ("[I]f the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots." (cleaned up)).

To be clear, the Court does not take Plaintiffs' allegations and evidence lightly. Election fraud is serious and disruptive. And Plaintiffs could be right that the safer course would be to mandate signature comparison for all ballots. But what Plaintiffs essentially complain of here is whether the

procedures employed by the Commonwealth are sufficient to prevent that fraud. That is a decision left to the General Assembly, not to the meddling of a federal judge. *Crawford*, 553 U.S. at 208, 128 S.Ct. 1610 (Scalia, J. concurring) ("It is for state legislatures to weigh the costs and benefits of possible changes to their election codes, and their judgment must prevail unless it imposes a severe and unjustified overall burden upon the right to vote, or is intended to disadvantage a particular class."). *Griffin*, 385 F.3d at 1131-32 ("[S]triking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry.").

### C. Plaintiffs' federal equal-protection claims based on signature comparison fail.

Plaintiffs present two federal equal-protection claims. The Court will address each in turn.

### 1. County differences over signature comparison do not violate federal equal-protection rights.

Plaintiffs' first federal equal-protection claim is based on some boards of elections intending to verify the signatures on mail-in and absentee ballots and applications, while others do not intend to do so. To that end, Plaintiffs have presented evidence that some, but not all, counties do intend to verify signatures. *E.g.*, [ECF 504-1].[19] According to Plaintiffs, this arbitrary and differential treatment of mail-in and absentee ballots among counties—purportedly caused by the Secretary's September 11, 2020, and September 28, 2020, guidance—violates the Equal-Protection Clause because voters will be treated differently simply because of the county in which they reside. The Court, however, finds no equal-protection violation in this context.

[19]    The counties that intend to compare and verify signatures in the upcoming election include at least the following counties: Cambria, Elk, Franklin, Juniata, Mifflin, Sullivan, Susquehanna, and Wyoming. [ECF 504-1].

The Secretary's guidance about which Plaintiffs complain is uniform and nondiscriminatory. It was issued to all counties and applies equally to all counties, and by extension, voters. Because the uniform, nondiscriminatory guidance is rational, it is sound under the Equal-Protection Clause. *See Gamza*, 619 F.2d at 453 (5th Cir. 1980) ("We must, therefore, recognize a distinction between state laws and

patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote. Unlike systematically discriminatory laws, isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause.") (citation omitted). Indeed, the guidance merely instructs counties to abide by the Election Code—an instruction to follow the law is certainly rational and related to an obviously rational government interest.

**\*61** In fact, if there is any unequal application now, it is caused by those counties that are *not* following the guidance and are going above and beyond the Election Code to impose a signature-comparison requirement. That claim, though, is not before the Court, as Plaintiffs here do not assert that imposing a signature-comparison requirement violates the Constitution (they allege the opposite).

In any event, to the extent there was uncertainty before, this decision informs the counties of the current state of the law as it relates to signature comparison. If any county still imposes a signature-comparison requirement in order to disallow ballots, it does so without support from the Secretary's guidance or the Election Code. Further, counties that impose this signature-comparison requirement to reject ballots may be creating a different potential constitutional claim for voters whose ballots are rejected. *Boockvar, ——— A.3d at ———, 2020 WL 5554644, at \*34, n.16* (Wecht, J. concurring) (noting that courts around the country have found due process issues with signature-comparison requirements; and collecting cases).

For these reasons, Plaintiffs' equal-protection claim falls short.

### 2. Different treatment between in-person ballots and mail-in ballots also does not violate federal equal-protection rights.

Plaintiffs also assert a second federal equal-protection claim on the grounds that the Election Code, by not requiring signature comparison for mail-in and absentee ballots, treats such ballots differently than in-person ballots (which require signature comparisons). Plaintiffs argue that this is an unconstitutionally arbitrary and unequal treatment. The Court disagrees.

It is well-settled that states may employ in-person voting, absentee voting, and mail-in voting and each method need not be implemented in exactly the same way. *See Hendon, 710 F.2d at 181* ("A state may employ diverse methods of voting, and the methods by which a voter casts his vote may vary throughout the state.")

"Absentee voting is a fundamentally different process from in-person voting, and is governed by procedures entirely distinct from in-person voting procedures." *ACLU of New Mexico v. Santillanes, 546 F.3d 1313, 1320 (10th Cir. 2008)* (citations omitted). It is an "obvious fact that absentee voting is an inherently different procedure from in-person voting." *Indiana Democratic Party v. Rokita, 458 F. Supp. 2d 775, 830-31 (S.D. Ind. 2006).* Because in-person voting is "inherently different" from mail-in and absentee voting, the procedures for each need not be the same. *See, e.g., Santillanes, 546 F.3d at 1320-21* ("[B]ecause there are clear differences between the two types of voting procedures, the law's distinction is proper."); *Rokita, 458 F. Supp. 2d at 831* ("[I]t is axiomatic that a state which allows for both in-person and absentee voting must therefore apply different requirements to these two groups of voters."); *Billups, 439 F. Supp. 2d at 1356-57* ("[A]bsentee voting and in-person voting are inherently different processes, and both processes use different standards, practices, and procedures.").

Plaintiffs argue that while absentee and mail-in voting "is a fundamentally different process from in-person voting," Defendants have "no justification in this instance to create such an arbitrary and disparate rule between absentee/mail-in voters and in-person voters." [ECF 509, p. 51]. Not so.

**\*62** Because of the "inherent" differences between in-person voting and mail-in and absentee voting, Pennsylvania's requirement for signature comparison for in-person ballots, but not mail-in and absentee ballots, is not arbitrary. By way of example, Secretary Boockvar articulated several valid reasons why Pennsylvania implements different verification procedures for mail-in and absentee voters versus in-person voters. [ECF 504-12; ECF 549-2].

In her deposition, Secretary Boockvar explained that for in-person voters, the only possible verification is signature comparison and verification. [ECF 504-12, 55:19-56:19]. This is because, unlike mail-in and absentee voters who must apply for a ballot, in-person voters may simply show up at the polls on Election Day and vote. In contrast, for mail-in and absentee voters, there are several verification steps

Ex. 5

implemented before the voter's mail-in/absentee ballot is counted, such as checking their application and their drivers' license number or social security number. [*Id.* at 56:8-19]. Thus, counties don't need to resort to a signature comparison to identify and verify the mail-in or absentee voter.

This is important, as Defendants and Intervenors present valid concerns about the uniformity and equality of signature comparisons, in part, due to the technical nature of signature analysis, the subjective underpinnings of signature analysis, and the variety of reasons that signatures can naturally change over time. [ECF 549-2, pp. 19-20, ¶ 68; ECF 549-9, p. 20, ¶¶ 63-64]. Such factors can reasonably justify not requiring a signature comparison when the elector is not physically present.

For example, Secretary Boockvar notes the concern with non-handwriting-expert election officials comparing signatures, without uniform standards. [ECF 549-2, pp. 19-20, ¶ 68]. She also notes that people's signatures can change over time, due to natural and unavoidable occurrences, like injuries, arthritis, or the simple passage of time. [*Id.*]. Such reasons are valid and reasonable. *See Boockvar*, ⸺ A.3d at ⸺, 2020 WL 5554644, at *34 (Wecht, J. concurring) ("Signature comparison is a process fraught with the risk of error and inconsistent application, especially when conducted by lay people.").

Secretary Boockvar further asserts that signature comparison is justified for in-person voting, but not mail-in or absentee voting, because the in-person voter is notified of his or her signature deficiency, and afforded an opportunity to cure. [ECF 549-2, pp. 19-20, ¶¶ 66-68 (explaining that in-person voters can be immediately notified of the signature deficiency, but mail-in/absentee voters cannot) ]. Secretary Boockvar's justifications are consistent with the Election Code's framework.

When a voter votes in person, he or she signs the voter's certificate, and the election official immediately, in the voter's presence, verifies the signature. 25 P.S. § 3050(a.3)(1)-(2). If the election official finds the signature to be problematic, the in-person voter is told as such. *Id.* at § 3050(a.3)(2). Notably, however, the in-person voter may still cast a ballot. *Id.* ("[I]f the signature on the voter's certificate ... shall not be deemed authentic by any of the election officers, such elector shall not be denied the right to vote for that reason[.]"). The in-person voter whose signature is questioned must, after casting the ballot, "produce at least one qualified elector of the election

district as a witness, who shall make affidavit of his identity or continued residence in the election district." *Id.* at § 3050(d). Thus, the in-person voter whose signature is not verified is immediately notified, is still allowed to cast a ballot, and is given the opportunity to remedy the signature-deficiency.

**\*63** In contrast, a voter who casts a mail-in or absentee ballot cannot be afforded this opportunity. Absentee and mail-in ballots are kept in "sealed or locked containers" until they are "canvassed by the county board of elections." 25 P.S. § 3146.8(a). The pre-canvassing and canvassing cannot begin until Election Day. *Id.* at § 3146.8(g)(1.1)-(2). As such, the absentee and mail-in ballots cannot be verified until Election Day, regardless of when the voter mails the ballot. Further, even if there were sufficient time, a voter cannot cure these types of deficiencies on their mail-in or absentee ballot. *Boockvar*, ⸺ A.3d at ⸺, 2020 WL 5554644, at *20 ("[A]lthough the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the "notice and opportunity to cure" procedure sought by Petitioner.").

Therefore, if mail-in and absentee ballots were subject to signature comparison, an election official—who is unstudied in the technical aspects of signature comparison—could deem a voter's signature problematic and not count the ballot, which would effectively disenfranchise that voter. Unlike the in-person voter, the mail-in or absentee voter may not know that his or her signature was deemed inauthentic, and thus may be unable to promptly cure the deficiency even if he or she were aware.

Accordingly, the Court concludes that the inherent differences and opportunities afforded to in-person voters compared to mail-in and absentee voters provides sufficient reason to treat such voters differently regarding signature comparison. The Court concludes that the lack of signature comparison for mail-in and absentee ballots is neither arbitrary, nor burdens Plaintiffs' equal-protection rights.

For these reasons, the Court will dismiss Plaintiffs' federal equal-protection claims related to signature comparison.

### 3. The Election Code provisions related to signature comparison satisfy *Anderson-Burdick*.

Finally, even assuming the Election Code's absence of a signature-comparison requirement imposes some burden

Ex. 5

on Plaintiffs' constitutional rights, Plaintiffs' constitutional claims still fail.

As discussed above with respect to Defendants' drop-box implementation, *Anderson-Burdick* does not apply neatly to this claim either. This is because Plaintiffs aren't challenging a specific regulation affecting their right to vote, but are instead challenging the *lack* of a restriction on someone else's right to vote. This makes both the burden difficult to assess and also the state's interests in *not* doing something more abstract. As such, the Court finds that the proper application of the *Anderson-Burdick* framework here includes weighing the burden involving Plaintiffs' risk of vote dilution against the state's interests and overall plan in preventing against voter fraud, including with respect to forged mail-in ballots.

Weighing these considerations compels a conclusion that there is no constitutional violation here. With respect to any burden on Plaintiffs' right to vote, that burden is slight, at best. A failure to engage in a signature comparison may, crediting Plaintiffs' evidence, increase the risk of voter fraud. But even then, this remains a largely speculative concern. This burden too is lessened by the numerous other regulations imposed by the Election Code, including the detailed verification procedure as to the information on mail-in ballots (discussed above), and the deterrence furthered by criminal sanctions for those engaging in such voter fraud.

Against these burdens, the Commonwealth has precise and weighty interests in verifying ballot applications and ballots in an appropriate manner to ensure that they are accurate. As discussed above, the Commonwealth determined that the risk of disenfranchising mail-in and absentee voters, did not justify signature comparison for those voters. [ECF 549-2, pp. 19-20, ¶¶ 66-69]. Unlike for in-person voters, there are other means of identifying and verifying mail-in and absentee voters, such as having to specifically apply for a mail-in or absentee ballot and provide various categories of identifying information. [ECF 504-12, 55:19-56:19]; 25 P.S. §§ 3146.2(b), 3150.1(b). And ultimately, due to the slight burden imposed on Plaintiffs, Pennsylvania's regulatory interests in a uniform election pursuant to established procedures is sufficient to withstand scrutiny. *Timmons*, 520 U.S. at 358, 117 S.Ct. 1364.

 **\*64** The General Assembly opted not to require signature comparisons for mail-in and absentee ballots and applications. And as previously discussed, absent

extraordinary reasons to, the Court is not to second-guess the legislature.

## IV. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' as-applied, federal constitutional challenge to the county-residency requirement for poll watchers.

Plaintiffs next take exception with the provision of the Election Code that restricts a registered voter from serving as a poll watcher outside the county of his or her residence. [ECF 461, ¶ 217].

Plaintiffs argue that "[a]s applied to the 2020 General Election, during the midst of the COVID-19 pandemic, Pennsylvania's residency requirement for watchers violates equal protection." [ECF 509, p. 58]. That's because, according to Plaintiffs, the "current pandemic severely challenges the ability of parties to staff watchers[.]" [*Id.* at p. 60]. And not having enough poll watchers in place "puts into danger the constitutionally-guaranteed right to a transparent and undiluted vote," [*id.* at p. 68], by "fostering an environment that encourages ballot fraud or tampering," [ECF 461, ¶ 256]. As such, Plaintiffs believe that the county residency requirement "is not rationally connected or reasonably related to any interest presented by the Commonwealth." [ECF 509, p. 63].

Defendants and Intervenors have a markedly different view.

As an initial matter, the Democratic Intervenors argue that Plaintiffs "are precluded from relitigating their claim that the Commonwealth lacks a constitutionally recognized basis for imposing a county-residence restriction for poll watchers" based on the doctrine articulated in *England v. Louisiana State Bd. of Med. Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). [ECF 529, p. 16]. That doctrine requires that after a federal court has abstained under *Pullman*, the plaintiff must expressly reserve the right to litigate any federal claims in federal court while litigating state-law issues in state court. *England*, 375 U.S. at 419, 421-22, 84 S.Ct. 461. Defendants and Intervenors contend that Plaintiffs (specifically, the Trump Campaign, the RNC, and the Republican Party) failed to do so in the proceedings before the Pennsylvania Supreme Court.

And if the *England* doctrine doesn't bar this claim, Defendants and Intervenors argue that "Plaintiffs' as-applied challenge simply fails to state a constitutional claim." *See, e.g.*, [ECF 547, p. 65]. They believe that the county-residency

requirement does not infringe on a fundamental right or regulate a suspect classification (such as race, sex, or national origin). [*Id.*]. As a result, the Commonwealth need only provide a rational basis for the requirement, which Defendants and Intervenors believe the Commonwealth has done. [*Id.*].

After carefully reviewing the record and considering the parties' arguments and evidence, the Court finds that the *England* doctrine does not bar Plaintiffs' ability to bring this claim. Even so, after fully crediting Plaintiffs' evidence, the Court agrees with Defendants and Intervenors that Plaintiffs' as-applied challenge fails on the merits.

**A. The *England* doctrine does not bar Plaintiffs' federal challenge to the county-residency requirement.**

**\*65** In *England*, the Supreme Court established that after a federal court abstains under *Pullman*, "if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then ... he has elected to forgo his right to return to the District Court." 375 U.S. at 419, 84 S.Ct. 461. To reserve those rights, a plaintiff forced into state court by way of abstention must inform the state court that he is exposing the federal claims there only to provide the proper context for considering the state-law questions. *Id.* at 421, 84 S.Ct. 461. And that "he intends, should the state court[ ] hold against him on the question of state law, to return to the District Court for disposition of his federal contentions." *Id.* Essentially, in *England*, the Supreme Court created a special doctrine of *res judicata* for *Pullman* abstention cases.

The Democratic Intervenors argue that because none of the three Plaintiffs who participated in the Pennsylvania Supreme Court case as either intervenors or *amici* "reserved the right to relitigate [Plaintiffs' poll-watcher claim] in federal court," they are now "precluded" from doing so. [ECF 529, p. 17]. The Court is not convinced that this doctrine bars Plaintiffs' claim for at least two reasons.

First, in its original abstention decision, the Court noted that "[n]one of Plaintiffs' poll-watching claims directly ask the Court to construe an ambiguous state statute." [ECF 409, p. 24]. Instead, these claims resided in a *Pullman* gray area, because they were only indirectly affected by other unsettled state-law issues. In light of that, the Court finds that the *England* doctrine was not "triggered," such that Plaintiffs needed to reserve their right to return to federal court to litigate the specific as-applied claim at issue here.

Second, even if it were triggered, not all of the Plaintiffs here were parties in the Pennsylvania Supreme Court case, and only one (the Republican Party) was even given intervenor status. But even the Republican Party, acting as an intervenor, did not have an opportunity to develop the record or present evidence relevant to its as-applied challenge. Thus, this claim wasn't "fully litigated" by any of the Plaintiffs, which is a necessary condition for the claim to be barred under the *England* doctrine. *Cf. Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1073 (3d Cir. 1990) (explaining that a litigant "may not relitigate an issue s/he fully and unreservedly litigated in state court").

Thus, Plaintiffs are not precluded by the *England* doctrine from bringing their remaining as applied poll-watcher claim. The Court will now address the claim on the merits.

**B. The county-residency requirement, as applied to the facts presented and the upcoming general election, does not violate the U.S. Constitution.**

Originally, Plaintiffs raised a facial challenge to the county-residency requirement under 25 P.S. § 2687. That is, Plaintiffs first took the position that there was no conceivable constitutional application of the requirement that an elector be a resident of the county in which he or she seeks to serve. But, as Plaintiffs' concede, that facial challenge is no longer viable in light of the Pennsylvania Supreme Court's recent decision. [ECF 448, p. 10]. As a result, Plaintiffs now focus solely on raising an as-applied challenge to the county-residency requirement.

"[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).

At a fundamental level, a "facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). By contrast, an "as-applied attack" on a statute "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Id.* The distinction between facial and an as-applied attack, then, "goes to the breadth of the remedy employed by the Court, not what must be pleaded

in a complaint." *Citizens United*, 558 U.S. at 331, 130 S.Ct. 876; *see also Bruni v. City of Pittsburgh*, 824 F.3d 353, 362 (3d Cir. 2016) ("The distinction between facial and as-applied constitutional challenges, then, is of critical importance in determining the remedy to be provided).

  **\*66** Because the distinction is focused on the available remedies, not the substantive pleading requirements, "[t]he substantive rule of law is the same for both challenges." *Edwards v. D.C.*, 755 F.3d 996, 1001 (D.C. Cir. 2014); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 509, n.5 (D.C. Cir. 2016) ("Indeed, the substantive rule of law is the same for both as-applied and facial First Amendment challenges.") (cleaned up); *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010) ("The underlying constitutional standard, however, is no different [in an as-applied challenge] th[a]n in a facial challenge.").

"In other words, *how* one must demonstrate the statute's invalidity remains the same for both type of challenges, namely, by showing that a specific rule of law, usually a constitutional rule of law, invalidates the statute, whether in a personal application or to all." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006), *abrogated on other grounds by Bond v. United States*, 564 U.S. 211, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011).

In determining whether a state election law violates the U.S. Constitution, the Court must "first examine whether the challenged law burdens rights protected by the First and Fourteenth Amendments." *Patriot Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 95 F.3d 253, 258 (3d Cir. 1996). "Where the right to vote is not burdened by a state's regulation on the election process, ... the state need only provide a rational basis for the statute." *Cortés*, 218 F. Supp. 3d at 408. The same is true under an equal protection analysis. "If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used." *Obama*, 697 F.3d at 428 (6th Cir. 2012); *see also Biener*, 361 F.3d at 214-15 (applying rational basis where there was no showing of an "infringement on the fundamental right to vote."); *Donatelli*, 2 F.3d at 515 ("A legislative classification that does not affect a suspect category or infringe on a fundamental constitutional right must be upheld against equal protection challenge if there is any reasonably

conceivable state of facts that could provide a rational basis for the classification." (cleaned up)).

But where the law imposes at least some burden on protected rights, the court "must gauge the character and magnitude of the burden on the plaintiff and weigh it against the importance of the interests that the state proffers to justify the burden." *Patriot Party*, 95 F.3d at 258 (citations omitted).

Consistent with the Pennsylvania Supreme Court's recent decision, but now based on a complete record, this Court finds that the county-residency requirement for poll watching does not, as applied to the particular circumstances of this election, burden any of Plaintiffs' fundamental constitutional rights, and so a deferential standard of review should apply. *See Boockvar*, —— A.3d at ——, 2020 WL 5554644, at \*30. Under a rational-basis review and considering all the relevant evidence before the Court, the county-residency requirement is rational, and thus constitutional. But even if the requirement burdened the right to vote, that burden is slight—and under the *Anderson-Burdick* test, the Commonwealth's interests in a county-specific voting system, viewed in the context of its overall polling-place security measures, outweigh any slight burden imposed by the county-residency restriction.

**1. The county-residency requirement neither burdens a fundamental right, including the right to vote, nor discriminates based on a suspect classification.**

  **\*67** At the outset, "there is no individual constitutional right to serve as a poll watcher[.]" *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at \*30 (citing *Cortés*, 218 F. Supp. 3d at 408); *see also Dailey v. Hands*, No. 14-423, 2015 WL 1293188, at \*5 (S.D. Ala. Mar. 23, 2015) ("[P]oll watching is not a fundamental right protected by the First Amendment."); *Turner v. Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) ("Plaintiffs have cited no authority ..., nor have we found any, that supports the proposition that [the plaintiff] had a first amendment right to act as a poll watcher.").

"State law, not the Federal Constitution, grants individuals the ability to serve as poll watchers and parties and candidates the authority to select those individuals." *Cortés*, 218 F. Supp. 3d at 414; *see also Boockvar*, —— A.3d at ——, 2020 WL 5554644, at \*30 (the right to serve as a poll watcher "is conferred by statute"); *Tiryak v. Jordan*, 472 F. Supp. 822, 824 (E.D. Pa. 1979) ("The number of poll-watchers allowed, the manner of their appointment, their location within the

Ex. 5

polling place, the activities permitted and the amount of compensation allowed are all dictated by [25 P.S. § 2687].”). Given the nature of the right, “[i]t is at least arguable that the [Commonwealth of Pennsylvania] could eliminate the position of poll watcher” without offending the constitution. *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007). In fact, one neighboring state—West Virginia—has eliminated poll watchers. W. Va. Ann. Code § 3-1-37; W. Va. Code Ann. § 3-1-41.

Nor does the county-residency requirement hinder the “exercise of the franchise.” *Cortés*, 218 F. Supp. 3d at 408. It doesn't in any way limit voters’ “range of choices in the voting booth”—voters can still “cast ballots for whomever they wish[.]” *Id.* And, as Plaintiffs admit, the county-residency requirement doesn't make the actual act of casting a vote any harder. *See* [ECF 524-24, 67:1-6]. Indeed, at least one of the plaintiffs here, Representative Joyce, testified that he was unaware of anyone unable to cast his ballot because of the county-residency requirement for poll watchers [*Id.*].

Finally, Plaintiffs’ claim that Pennsylvania's “poll watching system” denies them “equal access” to the ability to observe polling places in the upcoming election does not, on its own, require the Court to apply anything other than rational-basis scrutiny. [ECF 551, p. 75]. To the extent Plaintiffs are denied equal access (which discussed below, as a matter of evidence, is very much in doubt), it isn't based on their membership in any suspect classification.

For a state law to be subject to strict scrutiny, it must not only make a distinction among groups, but the distinction must be based on inherently suspect classes such as race, gender, alienage, or national origin. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Political parties are not such a suspect class. *Greenville Republican Party*, 824 F. Supp. 2d at 669 (“[T]his court is unfamiliar with, and Plaintiffs have not cited, any authority categorizing political parties as an inherently suspect class.”) Likewise, “[c]ounty of residence is not a suspect classification warranting heightened scrutiny[.]” *Short*, 893 F.3d at 679.

Plaintiffs don't dispute this. [ECF 509, p. 65 (“To be clear, the right at issue here is the right of **candidates** and **political parties** to participate in an election where the process is transparent and open to observation and the right of the **voters** to participate in such election.” (emphasis in original)) ]. Rather, Plaintiffs’ theory as to how the county-residency

requirement burdens the right to vote is based on the same threat of vote dilution by fraud that they have advanced with their other claims. In other words, Plaintiffs’ claim that the county-residency requirement for poll watchers limits the ability to find fraud and ballot tampering. [ECF 461, ¶¶ 256-57]. The resulting fraudulent or destroyed ballots cause the dilution of lawfully cast ballots. [ECF 509, pp. 64-68].

**\*68** Thus, based on this theory, to establish the burden flowing from the county-residency restriction, Plaintiffs must show (1) the county-residency requirement prevents them from recruiting enough registered Republican poll watchers in every county, (2) the absence of these Republican poll watchers creates a material risk of increased fraud and ballot tampering, and (3) this risk of fraud and ballot tampering will dilute the value of honestly cast votes.

There are both factual and legal problems fatal to Plaintiffs’ vote-dilution theory in this context. Factually, Plaintiffs’ evidence, accepted as true, fails to establish that they cannot find enough poll watchers because of the county-residency requirement. But even if they made that factual showing, the inability to find poll watchers still does not burden any recognized constitutional right in a way that would necessitate anything more than deferential review.

**2. Plaintiffs’ evidence does not establish any factual predicate for their theory.**

Even accepting as true Plaintiffs’ version of events, Plaintiffs have not established that the county-residency requirement is responsible for an inability to find enough poll watchers for at least two reasons.

First, Plaintiffs’ evidence stops short of demonstrating any actual shortfall of desired poll watchers.

For example, in his declaration, James J. Fitzpatrick, the Pennsylvania Director for Election Day Operations for the Trump Campaign, stated only that the “Trump Campaign is *concerned* that due to the residency restriction, it will not have enough poll watchers in certain counties.” [ECF 504-2, ¶ 25 (emphasis added) ]. Notably, however, Mr. Fitzpatrick, even when specifically asked during his deposition, never identified a single county where the Trump Campaign has *actually* tried and failed to recruit a poll watcher because

Ex. 5

of the county-residency requirement. *See, e.g.*, [ECF 528-14, 261:21-25] ("Q: Which counties does the Trump campaign or the RNC contend that they will not be able to obtain what you refer to as full coverage of poll watchers for the November 2020 election? A: I'm not sure. I couldn't tell you a list.").

Nor do any of Plaintiffs' other witness declarations establish an actual, inability to recruit poll watchers in any specific county. Representative Reschenthaler stated only that he was "concerned" that he "will not be able to recruit enough volunteers from Greene County to watch the necessary polls in Greene County." [ECF 504-6, ¶ 12].

Representative Kelly stated that he was "likely to have difficulty getting enough poll watchers from within Erie County to watch all polls within that county on election day." [ECF 504-5, ¶ 16]. "Likely difficulty" isn't the same as "an actual inability." That aside, the declaration doesn't provide any basis for Representative Kelly's assessment of this "likely difficulty." Nowhere does he detail the efforts he took (*e.g.*, the outreach he tried, prospective candidates he unsuccessfully recruited, and the like), nor did he explain why those efforts aren't likely to succeed in the future.

The same goes for Representative Thompson's declaration. Representative Thompson stated that during some unspecified prior elections, unidentified parties and campaigns did not "always find enough volunteers to serve as poll watchers in each precinct." [ECF 504-4, ¶ 20]. But this undetailed statement doesn't help Plaintiffs' cause, because it doesn't identify the elections during which this was a problem, the parties and campaigns affected by a lack of poll watchers, or the precincts for which no poll watcher could be found.

**\*69** Representative Joyce's declaration doesn't even express a "concern" about "likely difficulty" in recruiting poll watchers. He simply stated his belief that "[p]oll watchers play a very important role in terms of protecting the integrity of the election process[.]" [ECF 504-7, ¶ 11]. While he may be right, it has no bearing on whether Plaintiffs can find enough people to play that "very important role."

Indeed, Plaintiffs' prediction that they will "likely" have difficulty finding poll watchers is belied by the uncontested Pennsylvania voter registration statistics for 2019 that they included as an exhibit to their summary-judgment brief. [ECF 504-34]. Those statistics suggest that there is no shortage of registered Republican voters who are qualified to serve as poll watchers. [*Id.*]. Even in the three specific counties in

which Plaintiffs warn that "Democratic registered voters outnumber ... their Republican counterparts" (*i.e.*, Philadelphia, Delaware, and Centre), there are still significant numbers of registered Republicans. *See* [ECF 504-34 (Philadelphia – 118,003; Delaware – 156,867; and Centre – 42,903) ]. And only a very small percentage of the registered Republicans would be needed to fill all the necessary poll watcher positions in those allegedly problematic counties. *See, e.g.*, *Cortés*, 218 F. Supp. 3d at 410 (noting that, in 2016, the Republican Party "could staff the entirety of the poll watcher allotment in Philadelphia county with just 4.1% of the registered Republicans in the county."). While Plaintiffs argue that these statistics don't show the number of registered Republicans *willing* to serve as a poll watcher, the Court is hard pressed to see, nor do Plaintiffs show, how among the tens—or hundreds—of thousands of registered Republicans in these counties, Plaintiffs are unable to find enough poll workers.[20]

[20]     Plus, these figures do not even tell the whole story because they do not take into account the hundreds of thousands of voters who are registered to other parties who could also conceivably serve as poll watchers for the Trump Campaign and the candidate Plaintiffs. [504-34]. While that may not be the ideal scenario for Plaintiffs, they concede there's nothing in the Election Code that limits them to recruiting only registered voters from the Republican Party. [ECF 528-14, 267:23-268:1 (Q: And you don't have to be a registered Republican to serve as a poll watcher for the Trump campaign, do you? A: No.) ]. To that point, the Trump Campaign utilized at least two Democrats among the poll watchers it registered in the primary. [ECF 528-15, P001648].

Plaintiffs have not presented any evidence that would explain how, despite these numbers, they will have a hard time finding enough poll watchers. In fact, Plaintiffs' own expert, Professor Lockerbie, admits that "the Democratic and Republican parties might be able to meet the relevant criteria and recruit a sufficient population of qualified poll watchers who meet the residency requirements[.]" [ECF 504-20, ¶ 16].

Professor Lockerbie's report makes clear, and Plaintiffs appear to agree, that the county-residency requirement only potentially burdens other, "minor" political parties' ability to recruit enough poll watchers. [ECF 509, p. 61 (citing ECF 504-20, ¶¶ 16-17) ]. Regardless, any burden on these third parties is not properly before the Court. They are not parties to this litigation, and so the Court doesn't know their precise identities, whether they have, in fact, experienced any

Ex. 5

difficulty in recruiting poll watchers, or, more fundamentally, whether they even want to recruit poll watchers at all.[21]

[21]    To the extent that Plaintiffs are attempting to bring their claim on behalf of these third parties (which is unclear), they would lack standing to do so. Ordinarily, "a litigant must assert his or her own legal rights and interests and cannot rest a claim of relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). The only time a litigant can bring an action on behalf of a third party is when "three important criteria are satisfied." *Id.* "The litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interest." *Id.* at 410-11, 111 S.Ct. 1364 (cleaned up). Plaintiffs cannot satisfy the second or third criteria.

Plaintiffs claim that they "have a close relationship with these minor parties such that it will act as an effective advocate for the minor parties." [ECF 551, p. 30]. It is hard to see how Plaintiffs can be said to have a close relationship with rival political parties who are their direct adversaries in the upcoming election.

Plaintiffs also argue that these "minor parties are hindered from protecting their own interests, particularly in this action when there are no minor party intervenors." [*Id.*]. But that doesn't hold water either. Just because these other parties have not asked to intervene, it does not mean they were incapable of intervening or seeking relief elsewhere. Indeed, these parties and their candidates have demonstrated time and again that they can raise their own challenges to election laws when they so desire, including by filing suit in federal district court. *See, e.g.*, *Stein v. Cortés*, 223 F. Supp. 3d 423 (E.D. Pa. 2016) (Green Party Presidential candidate Jill Stein seeking recount); *Libertarian Party of Conn. v. Merrill*, No. 20-467, 2020 WL 3526922 (D. Conn. June 27, 2020) (seeking to enjoin Connecticut's ballot access rules that required minor party candidates to petition their way onto the ballot); *Green Party of Ark. v. Martin*, 649 F.3d 675 (8th Cir. 2011) (challenging Arkansas' ballot access laws).

**\*70**  Additionally, Plaintiffs failed to present evidence that connects the county-residency requirement to their inability to find enough poll watchers. To succeed on their theory Plaintiffs cannot just point to difficulty recruiting poll watchers, they need to also show that "Section 2687(b) is responsible for their purported staffing woes." *Cortés*, 218 F. Supp. 3d at 410. Plaintiffs fail to show this, too.

Plaintiffs argue that the ongoing COVID-19 pandemic greatly reduces the number of people who would be willing to serve as a poll watcher, which further exacerbates the alleged problem caused by the county-residency requirement. [ECF 509, p. 60]. The primary problem with this argument, though, is that Plaintiffs have not presented any evidence to support it. Plaintiffs have not put forward a statement from a single registered voter who says they are unwilling to serve as a poll watcher due to concerns about contracting COVID-19.

Despite this shortcoming, the Court also acknowledges that COVID-19 generally has made it more difficult to do anything in person, and it is entirely plausible that the current pandemic will limit Plaintiffs from recruiting poll watchers to man polling places on election day. But that is likely true for just about every type of election rule and regulation. For example, the effects of the ongoing pandemic coupled with the requirement that the poll watcher be a registered voter (a requirement that unquestionably narrows the pool of potential candidates) would also make it harder to recruit poll watchers. There is no basis to find that the current public-health conditions, standing alone, render the county-residency requirement irrational or unconstitutional.

To bolster their concerns over COVID-19, Plaintiffs point to *Democratic Nat'l Committee v. Bostelmann*, No. 20-249, ---- F.Supp.3d ----, 2020 WL 5627186 (W.D. Wis. Sept. 21, 2020), where the court there enjoined Wisconsin's statute that requires that each election official (*i.e.*, poll worker) be an elector of the county in which the municipality is located. That case is distinguishable in at least two important ways.

First, *Bostelmann* concerned poll **workers**, not poll **watchers**. *Id.* at ----, 2020 WL 5627186, at \*7. The difference between the two is significant. Poll workers are a more fundamental and essential aspect of the voting process. Without poll workers, counties cannot even open polling sites, which creates the possibility that voters will be completely disenfranchised. In fact, in *Bostelmann*, the plaintiffs presented evidence that Milwaukee was only able to open 5 of its normal 180 polling places. *Id.* A failure to provide voters a place to vote is a much more direct and established constitutional harm than the one Plaintiffs allege here.

Second, the plaintiffs in *Bostelmann* actually presented evidence that they were unable to find the poll workers they needed due to the confluence of the COVID-19 pandemic and

Ex. 5

the challenged restriction. *Id.* As discussed above, Plaintiffs here have presented no such evidence.

To succeed on summary judgment, Plaintiffs need to move beyond the speculative concerns they offer and into the realm of proven facts. But they haven't done so on two critical fronts —they haven't shown an actual inability to find the necessary poll watchers, or that such an inability is caused by the county-residency requirement. Because Plaintiffs have not pointed to any specific "polling place that Section 2687(b) prevents [them] from staffing with poll watchers," Plaintiffs' theory of burden is doomed at launch. *Cortés,* 218 F. Supp. 3d at 409.

### 3. Even if Plaintiffs could establish a factual predicate for their theory, it would fail as a matter of law.

**\*71** As the Pennsylvania Supreme Court concluded last month, Plaintiffs' "speculative claim that it is 'difficult' for both parties to fill poll watcher positions in every precinct, *even if true,* is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice." *Boockvar,* —— A.3d at ——, 2020 WL 5554644, at \*30 (emphasis added).[22] The fundamental constitutional principles undergirding this finding are sound.

22    The Sierra Club Intervenors argue this should end the analysis. [ECF 542, p. 14 ("Even 'as applied,' Plaintiffs' claim has already been rejected") ]. While the Court finds the Pennsylvania Supreme Court's apparent ruling on Plaintiffs' as-applied challenge instructive, it is not outcome determinative. That is because the Pennsylvania Supreme Court did not have the benefit of the full evidentiary record that the Court has here.

Plaintiffs' only alleged burden on the right to vote is that Defendants' lawful imposition of a county-residency requirement on poll watching will result in an increased risk of voter irregularities (*i.e.*, ballot fraud or tampering) that will, in turn, potentially cause voter dilution. While vote dilution is a recognized burden on the right to vote in certain contexts, such as when laws are crafted that structurally devalue one community's or group of people's votes over another's, there is no authority to support a finding of burden based solely on a speculative, future possibility that election irregularities might occur. *See, e.g.,* *Minnesota Voters,* 720 F.3d at 1033 (affirming dismissal of claims "premised on potential harm in the form of vote dilution caused by insufficient pre-election verification of EDRs' voting eligibility and the absence of

post-election ballot rescission procedures"); *Common Cause Rhode Island v. Gorbea,* 970 F.3d 11, 15 (1st Cir. 2020) (rejecting the claim that a ballot witness signature requirement should not be enjoined during a pandemic because it would allegedly increase the risk of voter fraud and put Republican candidates at risk); *Cook Cnty. Rep. Party v. Pritzker,* No. 20-4676, 2020 WL 5573059, at \*4 (N.D. Ill. Sept. 17, 2020) (denying a motion to enjoin a law expanding the deadline to cure votes because plaintiffs did not show how voter fraud would dilute the plaintiffs' votes).

Without a recognized burden on the right to vote, Plaintiffs' "argument that the defendants did not present an adequate justification is immaterial." *Green Party of Tennessee v. Hargett,* No. 16-6299, 2017 WL 4011854, at \*4 (6th Cir. May 11, 2017). That's because the Court need not apply the *Anderson-Burdick* framework, and its intermediate standards, in this situation. *See* *Donatelli,* 2 F.3d at 514 & n.10. Instead, just as the Pennsylvania Supreme Court held, the Commonwealth here need only show "that a rational basis exists [for the county-residency requirement] to be upheld. *Boockvar,* —— A.3d at ——, 2020 WL 5554644, at \*30 (citing *Cortes,* 218 F. Supp. 3d at 408); *see also* *Voting for Am., Inc. v. Andrade,* 488 F. App'x 890, 899 (5th Cir. 2012) (applying rational basis review as opposed to the *Anderson-Burdick* balancing test because state election law did not implicate or burden specific constitutional rights); *McLaughlin v. North Carolina Bd. of Elections,* 65 F.3d 1215, 1227 (4th Cir. 1995) (concluding that a ballot access law "fails the *Anderson* balancing test only if it also does in fact burden protected rights").

**\*72** "Under rational-basis review, the challenged classification must be upheld 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' " *Donatelli,* 2 F.3d at 513 (quoting *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). "This standard of review is a paradigm of judicial restraint." *FCC,* 508 U.S. at 314, 113 S.Ct. 2096. It "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313, 113 S.Ct. 2096. Nor is it the Court's "place to determine whether the [General Assembly's decisions] were the best decisions or even whether they were good ones." *Donatelli,* 2 F.3d at 518.

Applying this deferential standard of review, the Pennsylvania Supreme Court found that given Pennsylvania's "county-based scheme for conducting elections, it is reasonable that the Legislature would require poll watchers,

who serve within the various counties of the state, to be residents of the counties in which they serve." *Boockvar,* ––– A.3d at ––––, 2020 WL 5554644, at \*30 (citing *Cortés,* 218 F. Supp. 3d at 409). The Court agrees.

There are multiple reasons for this. As Secretary Boockvar advises, "[b]y restricting poll watchers' service to the counties in which they actually reside, the law ensures that poll watchers should have some degree of familiarity with the voters they are observing in a given election district." [ECF 549-2, p. 22, ¶ 78]. In a similar vein, Intervenors' expert, Dr. Barreto, in his report, states that, voters are more likely to be comfortable with poll watchers that "they know and they recognize from their area." [ECF 524-1, ¶40 ("Research in political science suggests that voters are much more comfortable and trusting of the process when they know or are familiar with poll workers who are from their community.") ]. When poll watchers come from the community, "there is increased trust in government, faith in elections, and voter turnout[.]" [*Id.*].

At his deposition, Representative Kelly agreed with this idea: "Yeah, I think – again, depending how the districts are established, I think people are probably even more comfortable with people that they – that they know and they recognize from their area." [ECF 524-23, 111:21-25].

Whether requiring poll watchers to be residents of the county in which they will serve is the best or wisest rule is not the issue before the Court. The issue is whether that rule is *reasonable* and rationally advances Pennsylvania's legitimate interests. This Court, like multiple courts before it, finds that it does.

**4. Plaintiffs' poll-watcher claim fails under the *Anderson-Burdick* framework.**

Even if rational-basis review did not apply and Plaintiffs had established a burden on their right to vote, their claim nonetheless fails under the *Anderson-Burdick* framework.

Viewing Plaintiffs' evidence in the best possible light, at most, the county-residency requirement for poll watching places only an indirect, ancillary burden on the right to vote through an elevated risk of vote dilution.

Against this slight burden, the Commonwealth has sound interests in imposing a county-residency requirement,

including, as noted above, local familiarity with rules, regulations, procedures, and the voters. Beyond this, in assessing the Commonwealth's interest in imposing the county-based restriction, that interest must be viewed in the overall context of the Commonwealth's security measures involving polling places that are designed to prevent against fraud and vote dilution.

As the court in *Cortés* recognized, "while poll watchers may help guard the integrity of the vote, they are not the Election Code's only, or even best, means of doing so." 218 F. Supp. 3d at 404.

**\*73** Each county has the authority to investigate fraud and report irregularities to the district attorney. 25 P.S. § 2642(i). Elections in each district are conducted by a multimember election board, which is comprised of an election judge, a majority inspector, and a minor inspector. 25 P.S. § 2671. Each voting district may also use two overseers of election, who are appointed from different political parties by the Pennsylvania Courts of Common Pleas, and "carry greater authority than poll watchers." *Cortés,* 218 F. Supp. 3d at 403 (citing 25 P.S. § 2685). "Election overseers have the right to be present with the officers of an election 'within the enclosed space during the entire time the ... election is held." *Id.* "Poll watchers have no such right," they must "remain 'outside the enclosed space' where ballots are counted or voting machines canvassed." *Id.* (citing 25 P.S. § 2687(b)). Election overseers can also challenge any person offering to vote, while poll watchers have no such authority. 25 P.S. § 2687. For these reasons, concerns "over potential voter fraud —whether perpetrated by putative electors or poll workers themselves—appear more effectively addressed by election overseers than poll watchers[.]" *Id.* at 406.

Plaintiffs complain that poll watchers may not be present during the pre-canvass and canvass meetings for absentee and mail-in ballots. But the Election Code provides that "authorized representatives" of each party *and* each candidate can attend such canvassing. 25 P.S. § 3146.8(g)(1.1), (2). That means if, for example, 15 Republican candidates appear on ballots within a particular county (between both the state and federal elections), there could be up to 16 "authorized representatives" related to the Republican Party (one for each candidate and one for the party as a whole) present during canvassing. Adding poll watchers to that mix would just be forcing unnecessary cooks into an already crowded kitchen.[23] *See* [ECF 549-2, p. 23, ¶ 83 ("If every certified poll watcher within a county was permitted to attend the pre-canvass

meeting, the elections staff could be overwhelmed by the vast numbers of poll watchers, and the pre-canvassing process could become chaotic and compromised.") ].

23    After the briefing on the cross-motions for summary judgment had closed, on October 6, 2020, Secretary Boockvar issued additional guidance, which Plaintiffs then raised with the Court the following day. [ECF 571]. This new guidance confirms that poll watchers cannot be present during the pre-canvassing and canvassing of mail-in ballots. It also makes clear that while the authorized representative can be present, the representative cannot make any challenges to the ballots. The Court finds that this new guidance has minimal relevance to the current disputes at issue here. The scope of duties of a representative is not before the Court. Of sole relevance here is whether this new guidance changes how this Court weighs the burdens and benefits of the county-residency restriction for poll watchers. The Court finds that the representative's inability to challenge mail-in ballots does appear to provide less protection to Plaintiffs; but in the grand election scheme, particularly in light of the role of the election overseers, the Court does not find the new guidance to materially upset the Commonwealth's interests in its overall election-monitoring plan.

 *74  Further, Secretary Boockvar testified that Pennsylvania has adopted new voting systems that will provide an additional layer of security. [ECF 524-27, 237:21-238:11]. That is, there will now be a paper trail in the form of verifiable paper ballots that will allow voters to confirm their choice, and the state recently piloted a new program that will help ensure that votes can be properly verified. [*Id.*].

On balance, then, it is clear that to the extent any burden on the right to vote exists, it is minimal. On the other hand, the Commonwealth's interest in a county-specific voting system, including with county-resident poll watchers, is rational and weighty, particularly when viewed in the context of the measures that the Commonwealth has implemented to prevent against election fraud at the polls. As such, under the flexible *Anderson-Burdick* standard, Plaintiffs have failed to establish that the county-residency requirement is unconstitutional.

**5. The Court will continue to abstain from deciding where the Election Code permits poll watching to occur.**

Plaintiffs also appear to challenge any attempts to limit poll watching to "monitoring only in-person voting at the polling place on Election Day." [ECF 461, ¶ 254]. That is, in their proposed order accompanying their Motion for Summary Judgement, Plaintiffs seek a declaration that they are "permitted to have watchers present at all locations where voters are registering to vote, applying for absentee or mail-in ballots, voting absentee or mail-in ballots, and/or returning or collecting absentee or mail-in ballots, including without limitation any satellite or early voting sites established by any county board of elections." [ECF 503-1, ¶ 3].

Plaintiffs also argue that Secretary Boockvar's October 6, 2020, guidance expressly, and unlawfully, prohibits poll watchers from being present at county election offices, satellite offices, and designated ballot-return sites. [ECF 571].

This challenge, however, is directly related to the unsettled state-law question of whether drop boxes and other satellite locations are "polling places" as envisioned under the Election Code. If they are, then Plaintiffs may be right in that poll watchers must be allowed to be present. However, the Court previously abstained under *Pullman* in addressing this "location" claim due to the unsettled nature of the state-law issues; and it will continue to do so. [ECF 459, p. 5 ("The Court will continue to abstain under *Pullman* as to Plaintiffs' claim pertaining to the notice of drop box locations and, more generally, whether the 'polling place' requirements under the Election Code apply to drop-box locations. As discussed in the Court's prior opinion, this claim involves unsettled issues of state law.") ].

Moreover, Plaintiffs have filed a lawsuit in the Court of Common Pleas of Philadelphia to secure access to drop box locations for poll watchers. The state court held that satellite ballot-collection locations, such as drop-box locations, are not "polling places," and therefore poll watchers are not authorized to be present in those places. [ECF 573-1, at p. 12]. The Trump Campaign immediately filed a notice of appeal of that decision. Regardless of what happens on appeal, Plaintiffs appear to be on track to obtain resolution of that claim in state court. [ECF 549-22]. Although this isn't dispositive, it does give the Court comfort that Plaintiffs will be able to seek timely resolution of these issues, which appear to be largely matters of state law. *See Barr v. Galvin*, 626 F.3d 99, 108 n.3 (1st Cir. 2010) ("Though the existence of a pending state court action is sometimes considered as a factor in favor of abstention, the lack of such pending proceedings does not necessarily prevent abstention by a federal court.").

Ex. 5

**V. The Court will decline to exercise supplemental jurisdiction over Plaintiffs' state-constitutional claims.**

 **\*75**  In addition to the federal-constitutional claims addressed above, Plaintiffs assert violations of the Pennsylvania Constitution in Counts III, V, VII, and IX of the Second Amended Complaint. Because the Court will be dismissing all federal-constitutional claims in this case, it will decline to exercise supplemental jurisdiction over these state-law claims.

Under 28 U.S.C. § 1367(c)(3), a court "may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it has original jurisdiction[.]" *Stone v. Martin*, 720 F. App'x 132, 136 (3d Cir. 2017) (cleaned up). "It 'must decline' to exercise supplemental jurisdiction in such circumstances 'unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for [exercising supplemental jurisdiction].' " *Id.* (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (emphasis in original)).

Courts have specifically applied this principle in cases raising federal and state constitutional challenges to provisions of the state's election code. *See, e.g., Silberberg v. Bd. of Elections of New York*, 272 F. Supp. 3d 454, 480–81 (S.D.N.Y. 2017) ("Having dismissed plaintiffs' First and Fourteenth Amendment claims, the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims."); *Bishop v. Bartlett*, No. 06-462, 2007 WL 9718438, at \*10 (E.D.N.C. Aug. 18, 2007) (declining "to exercise supplemental jurisdiction over the state constitutional claim" following dismissal of all federal claims and recognizing "the limited role of the federal judiciary in matters of state elections" and that North Carolina's administrative, judicial, and political processes provide a better forum for plaintiffs to seek vindication of their state constitutional claim), *aff'd*, 575 F.3d 419 (4th Cir. 2009).

Beyond these usual reasons to decline to exercise supplemental jurisdiction over the state-constitutional claims, there are two additional reasons to do so here.

First, the parties do not meaningfully address the state-constitutional claims in their cross-motions for summary judgment, effectively treating them as coextensive with

the federal-constitutional claims here. The Pennsylvania Supreme Court, however, has held that Pennsylvania's "Free and Equal Elections" Clause is not necessarily coextensive with the 14th Amendment. *See League of Women Voters v. Commonwealth*, 645 Pa. 1, 178 A.3d 737, 812-813 (2018) (referring to the Pennsylvania Free and Equal Elections Clause as employing a "separate and distinct standard" than that under the 14th Amendment to the U.S. Constitution). Given the lack of briefing on this issue and out of deference to the state courts to interpret their own state constitution, the Court declines to exercise supplemental jurisdiction.

Second, several Defendants have asserted a defense of sovereign immunity in this case. That defense does not apply to Plaintiffs' federal-constitutional claims under the *Ex parte Young* doctrine. *See Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 627 (E.D. Pa. 2018) ("Here, the doctrine of *Ex parte Young* applies to Plaintiffs' constitutional claims for prospective injunctive and declaratory relief, and therefore the First and Fourteenth Amendment claims are not barred by the Eleventh Amendment. Secretary Cortés, as an officer of the Pennsylvania Department of State, may be sued in his individual and official capacities 'for prospective injunctive and declaratory relief to end continuing or ongoing violations of federal law.' "). But sovereign immunity may apply to the state-law claims, at least those against Secretary Boockvar. The possibility of sovereign immunity potentially applying here counsels in favor of declining supplemental jurisdiction to decide the state-law claims.

 **\*76**  As such, all state-constitutional claims will be dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of Defendants and against Plaintiffs on all federal-constitutional claims, decline to exercise supplemental jurisdiction over the remaining state-law claims, and dismiss all claims in this case. Because there is no just reason for delay, the Court will also direct entry of final judgment under Federal Rule of Civil Procedure 54(b). An appropriate order follows.

**All Citations**

--- F.Supp.3d ----, 2020 WL 5997680

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 63 of 64   Document 58-5

Ex. 5

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S.
                                        Government Works.

2020 WL 7012522
Only the Westlaw citation is currently available.
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of
Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

DONALD J. TRUMP FOR
PRESIDENT, INC.; Lawrence Roberts;
David John Henry, Appellants

v.

Secretary Commonwealth of
PENNSYLVANIA; Allegheny County
Board of Elections; Centre County
Board of Elections; Chester County
Board of Elections; Delaware County
Board of Elections; Montgomery County
Board of Elections; Northampton
County Board of Elections;
Philadelphia County Board of Elections

No. 20-3371
|
Submitted Under Third Circuit
L.A.R. 34.1(a) on November 25, 2020
|
(Filed: November 27, 2020)

**Synopsis**

**Background:** Voters and President's reelection campaign brought action against Secretary of the Commonwealth of Pennsylvania and county boards of elections, seeking to invalidate millions of votes cast by Pennsylvanians in presidential election during COVID-19 pandemic based on allegations that Secretary's authorization of notice-and-cure procedure for procedurally defective mail-in ballots violated the Equal Protection Clause and that poll watchers were impermissibly excluded from canvass. The United States District Court for the Middle District of Pennsylvania, Matthew W. Brann, J., 2020 WL 6821992, granted motion by

Secretary and county boards of elections to dismiss. Voters and campaign appealed.

**Holdings:** The Court of Appeals, Bibas, Circuit Judge, held that:

delay by President's reelection campaign in moving to amend complaint second time was undue;

second amendment of complaint would have been futile;

county-to-county variations in processing votes from election did not show discrimination;

failure of President's reelection campaign to request injunction pending appeal from district court or show that it could not have made that request barred campaign from pursuing that motion on appeal;

campaign likely could not succeed on merits;

campaign likely would not suffer irreparable harm; and

granting relief would not have been equitable.

Affirmed.

On Appeal from the United States District Court for the Middle District of Pennsylvania (D.C. No. 4:20-cv-02078), District Judge: Honorable Matthew W. Brann

**Attorneys and Law Firms**

Brian C. Caffrey, Esq., Keith E. Kendall, Esq., Marc A. Scaringi, Esq., Scaringi & Scaringi, Harrisburg, PA, Rudolph W. Giuliani, Esq., New York, NY, for Plaintiffs-Appellants

Barry H. Berke, Esq., Dani R. James, Esq., Kramer Levin Naftalis & Frankel, New York, NY, Nicole J. Boland, Esq., Stephen Moniak, Esq., Keli M. Neary, Esq., Karen M. Romano, Esq., Office of Attorney General of Pennsylvania, Harrisburg, PA, Daniel T. Brier, Esq., John B. Dempsey, Esq., Donna A. Walsh, Esq., Myers Brier & Kelly, Scranton, PA, Dani R. James, Esq., Kramer Levin Naftalis & Frankel, New York, NY, for Defendant - Appellee Secretary Commonwealth of Pennsylvania

Mark A. Aronchick, Esq., John Coit, Esq., Michele D. Hangley, Esq., John B. Hill, Esq., Christina Matthies, Esq., Robert A. Wiygul, Esq., Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, Stephen H. Barrett, Esq., Brian H. Benjet, Esq., Ilana H. Eisenstein, Esq., Ben C. Fabens-Lassen, Esq., Rachel A.H. Horton, Esq., Danielle T. Morrison, Esq., Jayne A. Risk, Esq., DLA Piper, Philadelphia, PA, Virginia S. Scott, Esq., Andrew F. Szefi, Esq., Office of Allegheny County, Law Department, Pittsburgh, PA, for Defendant - Appellee Allegheny County Board of Elections

Mark A. Aronchick, Esq., John Coit, Esq., Michele D. Hangley, Esq., John B. Hill, Esq., Christina Matthies, Esq., Robert A. Wiygul, Esq., Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, Stephen H. Barrett, Esq., Brian H. Benjet, Esq., Ilana H. Eisenstein, Esq., Ben C. Fabens-Lassen, Esq., Rachel A.H. Horton, Esq., Danielle T. Morrison, Esq., Jayne A. Risk, Esq., DLA Piper, Philadelphia, PA, for Defendants-Appellees Chester County Board of Elections, Montgomery County Board of Elections, Philadelphia County Board of Elections

Elizabeth A. Dupuis, Esq., Molly E. Meacham, Esq., Babst Calland, State College, PA, for Defendant-Appellee Centre County Board of Elections

Timothy P. Brennan, Esq., Brian Jeffrey Taylor, Northampton County Office of the Solicitor, Easton, PA, Molly E. Meacham, Esq., Babst Calland, Pittsburgh, PA, for Defendant-Appellee Northampton County Board of Elections

Terence M. Grugan, Esq., Timothy D. Katsiff, Esq., Edward D. Rogers, Esq., Elizabeth V. Wingfield, Esq., Ballard Spahr, Philadelphia, PA, Molly E. Meacham, Esq., Babst Calland, Pittsburgh, PA, for Defendant-Appellee Delaware County Board of Elections

Adriel I. Cepeda Derieux, Esq., Sophia Lin Lakin, Esq., American Civil Liberties Union, New York, NY, Witold J. Walczak, Esq., American Civil Liberties Union, Pittsburgh, PA, Claudia De Palma, Esq., Benjamin D. Geffen, Esq., Mary M. McKenzie, Esq., Public Interest Law Center of Philadelphia, Philadelphia, PA, Jon M. Greenbaum, Esq., Lawyers' Committee for Civil Rights Under Law, Washington, DC, David M. Zionts, Esq., Covington & Burling, Washington, DC, for Intervenor-Defendants-Appellees Joseph Ayeni, Black Political Empowerment Project, Common Cause of Pennsylvania, Stephanie Higgins, Meril Lara, League of Women Voters of Pennsylvania, Ricardo Morales, Pennsylvania State Conference of NAACP

Branches, Natalie Price, Tim Stevens, Taylor Stover, Lucia Gajda

Marc E. Elias, Esq., Ariel B. Glickman, Esq., Laura Hill, Esq., Lalitha S. Madduri, Esq., Uzoma N. Nkwonta, Esq., Perkins Coie, Washington, DC, Seth P. Waxman, Esq., Wilmer Cutler Pickering Hale & Dorr, Washington, DC, for Intervenor-Defendant - Appellee Democratic National Committee

Remy Green, Esq., Cohen Green, Ridgewood, NY, for Amicus Appellee Democrats Abroad

James P. DeAngelo, Esq., McNees Wallace & Nurick, Harrisburg, PA, for Amicus Curiae Christine T. Whitman

Matthew Stiegler, Esq., Law Office of Matthew Stiegler, Philadelphia, PA, for Amicus Appellee Erwin Chemerinsky

Before: SMITH, Chief Judge, and CHAGARES and BIBAS, Circuit Judges

OPINION[*]

[*] This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

BIBAS, Circuit Judge.

**\*1** Free, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here.

The Trump Presidential Campaign asserts that Pennsylvania's 2020 election was unfair. But as lawyer Rudolph Giuliani stressed, the Campaign "doesn't plead fraud. ... [T]his is not a fraud case." Mot. to Dismiss Hr'g Tr. 118:19–20, 137:18. Instead, it objects that Pennsylvania's Secretary of State and some counties restricted poll watchers and let voters fix technical defects in their mail-in ballots. It offers nothing more.

This case is not about whether those claims are true. Rather, the Campaign appeals on a very narrow ground: whether the District Court abused its discretion in not letting the Campaign amend its complaint a second time. It did not.

Most of the claims in the Second Amended Complaint boil down to issues of state law. But Pennsylvania law is willing

to overlook many technical defects. It favors counting votes as long as there is no fraud. Indeed, the Campaign has already litigated and lost many of these issues in state courts.

The Campaign tries to repackage these state-law claims as unconstitutional discrimination. Yet its allegations are vague and conclusory. It never alleges that anyone treated the Trump campaign or Trump votes worse than it treated the Biden campaign or Biden votes. And federal law does not require poll watchers or specify how they may observe. It also says nothing about curing technical state-law errors in ballots. Each of these defects is fatal, and the proposed Second Amended Complaint does not fix them. So the District Court properly denied leave to amend again.

Nor does the Campaign deserve an injunction to undo Pennsylvania's certification of its votes. The Campaign's claims have no merit. The number of ballots it specifically challenges is far smaller than the roughly 81,000-vote margin of victory. And it never claims fraud or that any votes were cast by illegal voters. Plus, tossing out millions of mail-in ballots would be drastic and unprecedented, disenfranchising a huge swath of the electorate and upsetting all down-ballot races too. That remedy would be grossly disproportionate to the procedural challenges raised. So we deny the motion for an injunction pending appeal.

### I. Background

#### A. Pennsylvania election law

In Pennsylvania, each county runs its own elections. 25 Pa. Stat. § 2641(a). Counties choose and staff polling places. § 2642(b), (d). They buy their own ballot boxes and voting booths and machines. § 2642(c). They even count the votes and post the results. § 2642(k), (*l*). In all this, counties must follow Pennsylvania's Election Code and regulations. But counties can, and do, adopt rules and guidance for election officers and electors. § 2642(f). And they are charged with ensuring that elections are "honestly, efficiently, and uniformly conducted." § 2642(g).

1. *Poll watchers and representatives*. Counties must admit qualified poll "watchers" to observe votes being tallied. 25 Pa. Stat. § 2650(a). Poll watchers must be registered to vote in the county where they will serve. § 2687(b). Each candidate can pick two poll watchers per election district; each political party, three. § 2687(a). The poll watchers remain at the polling place while election officials count in-person ballots.

§ 2687(b). They can ask to check voting lists. *Id.* And they get to be present when officials open and count all the mail-in ballots. § 3146.8(b). Likewise, candidates' and political parties' "representatives" may be present when absentee and mail-in ballots are inspected, opened, or counted, or when provisional ballots are examined. §§ 2602(a.1), (q.1), 3050(a.4)(4), 3146.8(g)(1.1) & (2); *see also* § 3050(a.4)(12) (defining provisional ballots as those cast by voters whose voter registration cannot be verified right away).

**\*2** Still, counties have some control over these poll watchers and representatives. The Election Code does not tell counties how they must accommodate them. Counties need only allow them "in the polling place" or "in the room" where ballots are being inspected, opened, or counted. §§ 2687(b), 3050(a.4) (4), 3146.8(g)(1.1) & (2). Counties are expected to set up "an enclosed space" for vote counters at the polling place, and poll watchers "shall remain outside the enclosed space." § 2687(b). So the counties decide where the watchers stand and how close they get to the vote counters.

2. *Mail-in ballots*. For decades, Pennsylvania let only certain people, like members of the military and their families, vote by mail. *See, e.g.*, 25 Pa. Stat. § 3146.1. But last year, as part of a bipartisan election reform, Pennsylvania expanded mail-in voting. Act of Oct. 31, 2019, Pub. L. No. 552, sec. 8, § 1310-D, 2019 Pa. Legis. Serv. Act 2019-77 (S.B. 421). Now, any Pennsylvania voter can vote by mail for any reason. *See* 25 Pa. Stat. §§ 2602(t), 3150.11(a).

To vote by mail, a Pennsylvania voter must take several steps. First, he (or she) must ask the State (Commonwealth) or his county for a mail-in ballot. 25 Pa. Stat. § 3150.12(a). To do that, he must submit a signed application with his name, date of birth, address, and other information. § 3150.12(b)– (c). He must also provide a driver's license number, the last four digits of his Social Security number, or the like. §§ 2602(z.5), 3150.12b(a), (c). Once the application is correct and complete, the county will approve it. *See* §§ 3150.12a(a), 3150.12b.

Close to the election, the county will mail the voter a mail-in ballot package. § 3150.15. The package has a ballot and two envelopes. The smaller envelope (also called the secrecy envelope) is stamped "Official Election Ballot." § 3150.14(a). The larger envelope is stamped with the county board of election's name and address and bears a printed voter declaration. *Id.*

Ex. 6

Next, the voter fills out the ballot. § 3150.16(a). He then folds the ballot; puts it into the first, smaller secrecy envelope; and seals it. *Id.* After that, he puts the secrecy envelope inside the larger envelope and seals that too. *Id.* He must also "fill out, date and sign the declaration printed" on the outside of the larger envelope. §§ 3150.16(a), 3150.14(b). The declaration for the November 2020 election read thus:

> I hereby declare that I am qualified to vote from the below stated address at this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.
>
> [BAR CODE]
>
> Voter, sign or mark here/Votante firme o mar[q]ue aqui
>
> X_____
>
> _____
>
> Date of signing (MM/DD/YYYY)/Fechade firme (MM/ DD/YYYY)
>
> _____
>
> Voter, print name/Votante, nombre en letra de impreta

*In re: Canvass of Absentee and Mail-in Ballots of November 3, 2020 General Election*, Nos. 31–35 EAP & 29 WAP 2020,—— A.3d ——, ——, 2020 WL 6875017, at \*4 (Pa. Nov. 23, 2020). Once the voter assembles the ballot packet, he can mail it back or deliver it in person. 25 Pa. Stat. § 3150.16(a).

Not every voter can be expected to follow this process perfectly. Some forget one of the envelopes. Others forget to sign on the dotted line. Some major errors will invalidate a ballot. For instance, counties may not count mail-in ballots that lack secrecy envelopes. *Pa. Dem. Party v. Boockvar*, 238 A.3d 345, 378–80 (Pa. 2020). But the Election Code says nothing about what should happen if a county notices these errors before election day. Some counties stay silent and do not count the ballots; others contact the voters and give them a chance to correct their errors.

## B. Facts and procedural history

**\*3** On appeal from the dismissal of a complaint, we take the factual allegations as true:

1. *Mail-in voting*. For months, Pennsylvanians went to the polls, so to speak. The first batch of mail-in ballots went out to voters in late September. As they trickled back in, election officials noticed that some voters had not followed the rules. Some ballots were not in secrecy envelopes, so those packages were lighter and thinner than complete ballot packages. Others had declarations that voters had not completed. Some counties did not notify voters about these defective ballots. Others, including the counties named in this suit, decided to reach out to these voters to let them cure their mistakes by voting provisionally on Election Day or asking for a replacement ballot.

2. *Election Day*. Though more than two million Pennsylvanians voted by mail, even more voted in person. On Election Day, November 3, the Campaign set up poll watchers at polling places around the Commonwealth. Appellees' election officials kept poll watchers and representatives away from where ballots were opened, counted, and tallied. In Philadelphia, for instance, poll watchers were kept six to twenty-five feet back from officials. In comparison, other, "Republican[-]controlled" counties did give the Campaign's poll watchers and representatives full access. Second Am. Compl. ¶¶ 151, 154.

In all, nearly seven million Pennsylvanians voted, more than a third of them by mail. *Unofficial Returns for the 2020 Presidential Election*, Pa. Dep't of State, https:// www.electionreturns.pa.gov/ (last visited Nov. 27, 2020). As of today, former Vice President Biden leads President Trump in Pennsylvania by 81,660 votes. *Id.*

Pennsylvania's counties certified their election results by the November 23 certification deadline. 25 Pa. Stat. § 2642(k). The next morning, the Secretary of State (technically, Secretary of the Commonwealth) certified the vote totals, and the Governor signed the Certificate of Ascertainment and sent it to the U.S. Archivist. *Department of State Certifies Presidential Election Results*, PA Media, https://www.media.pa.gov/Pages/State-details.aspx? newsid=435 (last visited Nov. 27, 2020). The certified margin of victory was 80,555 votes. *Id.*

3. *This lawsuit*. Almost a week after the election, the Campaign (as well as two voters) sued seven Pennsylvania

counties and Secretary of State Kathy Boockvar. It alleged that they had violated the Due Process, Equal Protection, and Electors and Elections Clauses of the U.S. Constitution by taking two basic actions: First, the counties (encouraged by Secretary Boockvar) identified defective mail-in ballots early and told voters how to fix them. Second, they kept poll watchers and representatives from watching officials count all ballots.

So far, the Campaign has filed or tried to file three complaints. The original Complaint, filed November 9, set out six counts (plus a duplicate). After Boockvar and the counties moved to dismiss, on November 15 the Campaign filed a First Amended Complaint as of right, dropping four of the six counts (plus the duplicate), including all the counts relating to poll watchers and representatives. The Campaign sought a preliminary injunction to block certifying the election results. Boockvar and the counties again moved to dismiss. On November 18, the Campaign sought to file a Second Amended Complaint, resurrecting four dropped claims from the original Complaint and adding three more about how Philadelphia had blocked poll watching.

**\*4** The District Court ended these volleys, denying leave to file the Second Amended Complaint. Instead, it dismissed the First Amended Complaint with prejudice and denied the Campaign's motion for a preliminary injunction as moot. *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-cv-02078, ---- F. Supp. 3d ----, 2020 WL 6821992 (M.D. Pa. Nov. 21, 2020). In doing so, it held that the individual voters lacked standing. *Id.* at ----, at \*5–6. We commend the District Court for its fast, fair, patient handling of this demanding litigation.

4. *This appeal*. The Campaign filed this appeal on Sunday, November 22, and we granted its motion to expedite. The Campaign filed its brief and another motion November 23; opposing briefs and filings arrived the next day. We are issuing this opinion nonprecedentially so we can rule by November 27.

The Campaign does not challenge the District Court's finding that the voters lacked standing, so we do not consider their claims. On appeal, it seeks only narrow relief: to overturn the District Court's decision not to let it amend its complaint again. We address that claim in Part II. Separately, the Campaign asks us for an injunction to prevent the certified vote totals from taking effect. We address that claim in Part III.

### II. The District Court Properly Denied Leave To Amend the Complaint Again

After one amendment, the District Court denied the Campaign's motion to amend the complaint a second time. We review that denial for abuse of discretion. *Premier Comp. Sol., LLC v. UPMC*, 970 F.3d 316, 318–19 (3d Cir. 2020). But on any standard of review, the court got it right.

Courts should grant leave to amend "freely ... when justice so requires." Fed. R. Civ. P. 15(a)(2). In civil-rights cases, that means granting leave unless "amendment would be futile or inequitable." *Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 113 (3d Cir. 2018); *Cureton v. NCAA*, 252 F.3d 267, 272–73 (3d Cir. 2001) (giving undue delay as an example of inequity). Here, the Campaign's request fails as both inequitable and futile.

#### A. The Campaign's delay was undue, given its stress on needing to resolve the case by November 23

When the Campaign was before the District Court, it focused its arguments on the need to resolve the case by Pennsylvania's deadline for counties to certify their votes: Monday, November 23. Indeed, all three iterations of the complaint focused their prayers for relief on blocking the certification of the vote tally. The Campaign said it could get no "meaningful remedy" after that date. Br. in Supp. of Mot. for TRO & PI, Dkt. 89-1, at 4.

The Campaign filed its First Amended Complaint on November 15, eight days before the certification deadline. In response to several pending motions to dismiss, it dropped many of the challenged counts from the original Complaint. It did not then move to file a Second Amended Complaint until November 18, when its opposition to the new motions to dismiss was due. And it did not file a brief in support of that motion until Friday, November 20. Certification was three days away.

As the District Court rightly noted, amending that close to the deadline would have delayed resolving the issues. True, delay alone is not enough to bar amendment. *Cureton*, 252 F.3d at 273. But "at some point, the delay will become 'undue,' placing an unwarranted burden on the court." *Id.* (quoting *Adams v. Gould, Inc.*, 739 F.2d 858, 868 (3d Cir. 1984)). The Campaign's motion would have done just that. It would

have mooted the existing motions to dismiss and required new briefing, possibly new oral argument, and a reasoned judicial opinion within seventy-two hours over a weekend. That is too much to ask—especially since the proposed Second Amended Complaint largely repleaded many claims abandoned by the first one. *Cf. Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644, 654–55 (3d Cir. 1998) (affirming denial of leave to amend because the movant sought largely to "replead facts and arguments that could have been pled much earlier").

**\*5** Having repeatedly stressed the certification deadline, the Campaign cannot now pivot and object that the District Court abused its discretion by holding the Campaign to that very deadline. It did not.

### B. Amending the Complaint again would have been futile

The Campaign focuses on critiquing the District Court's discussion of undue delay. Though the court properly rested on that ground, we can affirm on any ground supported by the record. Another ground also supports its denial of leave to amend: it would have been futile.

1. *The Campaign had to plead plausible facts, not just conclusory allegations*. Plaintiffs must do more than allege conclusions. Rather, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The Second Amended Complaint does not meet *Twombly* and *Iqbal*'s baseline standard of specifics.

To start, note what it does not allege: fraud. Indeed, in oral argument before the District Court, Campaign lawyer Rudolph Giuliani conceded that the Campaign "doesn't plead fraud." Mot. to Dismiss Hr'g Tr. 118:19–20 (Nov. 17, 2020). He reiterated: "If we had alleged fraud, yes, but this is not a fraud case." *Id.* at 137:18.

Though it alleges many conclusions, the Second Amended Complaint is light on facts. Take the nearly identical paragraphs introducing Counts One, Two, Four, and Six: "Democrats who controlled the Defendant County Election Boards engaged in a deliberate scheme of intentional and purposeful discrimination ... by excluding Republican and Trump Campaign observers from the canvassing of the mail

ballots in order to conceal their decision not to enforce [certain ballot] requirements." Second Am. Compl. ¶¶167, 193, 222, 252. That is conclusory. So is the claim that, "[u]pon information and belief, a substantial portion of the approximately 1.5 million absentee and mail votes in Defendant Counties should not have been counted." *Id.* ¶¶168, 194, 223, 253. "Upon information and belief" is a lawyerly way of saying that the Campaign does not know that something is a fact but just suspects it or has heard it. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. Yet the Campaign offers no specific facts to back up these claims.

2. *The Campaign has already litigated and lost most of these issues*. Many of the Second Amended Complaint's claims have already had their day in court. The Campaign cannot use this lawsuit to collaterally attack those prior rulings. On Counts One, Two, Four, and Six, the Campaign has already litigated whether ballots that lack a handwritten name, address, or date on the outer envelope must be disqualified. *See In re: Canvass of Absentee and Mail-in Ballots*, ---- A.3d at ----, 2020 WL 6875017, at \*1. The Pennsylvania Supreme Court ruled against the Campaign, holding: "[T]he Election Code does not require boards of elections to disqualify mail-in or absentee ballots submitted by qualified electors who signed the declaration on their ballot's outer envelope but did not handwrite their name, their address, and/or date, where no fraud or irregularity has been alleged." *Id.* at ----, at \*1. That holding undermines the Campaign's suggestions that defective ballots should not have been counted.

**\*6** Counts One and Two also challenge the requirement that poll watchers be registered electors of the county they wish to observe and that observers be Pennsylvania lawyers. But a federal district court has already held "that the county-residency requirement for poll watching does not, as applied to the particular circumstances of this election, burden any of [the Campaign's] fundamental constitutional rights." *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, ---- F. Supp. 3d ----, ----, 2020 WL 5997680, at \*66 (W.D. Pa. Oct. 10, 2020). The Campaign never appealed that decision, so it is bound by it.

Count Seven alleges that Philadelphia's Board of Elections violated due process by obstructing poll watchers and representatives. But nothing in the Due Process Clause requires having poll watchers or representatives, let alone watchers from outside a county or less than eighteen feet away

from the nearest table. The Campaign cites no authority for those propositions, and we know of none. (Ditto for notice-and-cure procedures.) And the Campaign litigated and lost that claim under state law too. The Pennsylvania Supreme Court held that poll watchers be in the room, not that they be within any specific distance of the ballots. *In re Canvassing Observation Appeal of: City of Phila. Bd. of Electors*, No. 30 EAP 2020, ––– A.3d ––––, ––––, 2020 WL 6737895, at *8–9 (Pa. Nov. 17, 2020).

The Campaign does not even challenge the dismissal of Counts Three, Five, and Nine, the Electors and Elections Clause counts. It concedes that under our recent decision, it lacks standing to pursue alleged violations of those clauses. *Bognet v. Sec'y Commonwealth of Pa.*, No. 20-3214, ––– F.3d ––––, ––––, 2020 WL 6686120, at *6–9 (3d Cir. Nov. 13, 2020). Given its concession, we need not consider the issue any more.

The Second Amended Complaint thus boils down to the equal-protection claims in Counts Two, Four, Six, and Eight. They require not violations of state law, but discrimination in applying it. Those claims fail too.

3. *The Campaign never pleads that any defendant treated the Trump and Biden campaigns or votes differently.* A violation of the Equal Protection Clause requires more than variation from county to county. It requires unequal treatment of similarly situated parties. But the Campaign never pleads or alleges that anyone treated it differently from the Biden campaign. Count One alleges that the counties refused to credential the Campaign's poll watchers or kept them behind metal barricades, away from the ballots. It never alleges that other campaigns' poll watchers or representatives were treated differently. Count Two alleges that an unnamed lawyer was able to watch all aspects of voting in York County, while poll watchers in Philadelphia were not. It also makes a claim about one Jared M. Mellott, who was able to poll watch in York County. Counts Four and Six allege that poll watcher George Gallenthin had no issues in Bucks County but was barred from watching in Philadelphia. And Count Eight alleges that Philadelphia officials kept Jeremy Mercer too far away to verify that ballots were properly filled out. None of these counts alleges facts showing improper vote counting. And none alleges facts showing that the Trump campaign was singled out for adverse treatment. The Campaign cites no authority suggesting that an actor discriminates by treating people equally while harboring a partisan motive, and we know of none.

These county-to-county variations do not show discrimination. "[C]ounties may, consistent with equal protection, employ entirely different election procedures and voting systems within a single state." *Donald J. Trump for President, Inc.*, ––– F. Supp. 3d at ––––, 2020 WL 5997680, at *44 (collecting cases). Even when boards of elections "vary ... considerably" in how they decide to reject ballots, those local differences in implementing statewide standards do not violate equal protection. *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 635–36 (6th Cir. 2016); *see also Wexler v. Anderson*, 452 F.3d 1226, 1231–33 (11th Cir. 2006) (recognizing that equal protection lets different counties use different voting systems).

**\*7** Nor does *Bush v. Gore* help the Campaign. 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (per curiam). There, the Florida Supreme Court had ratified treating ballots unequally. *Id.* at 107, 121 S.Ct. 525. That was because the principle it set forth, the "intent of the voter," lacked *any* "specific standards to ensure its equal application." *Id.* at 105–06, 121 S.Ct. 525. The lack of any standards at all empowered officials to treat ballots arbitrarily, violating equal protection. *Id.* Here, by contrast, Pennsylvania's Election Code gives counties specific guidelines. To be sure, counties vary in implementing that guidance, but that is normal. Reasonable county-to-county variation is not discrimination. *Bush v. Gore* does not federalize every jot and tittle of state election law.

4. *The relief sought—throwing out millions of votes—is unprecedented.* Finally, the Second Amended Complaint seeks breathtaking relief: barring the Commonwealth from certifying its results or else declaring the election results defective and ordering the Pennsylvania General Assembly, not the voters, to choose Pennsylvania's presidential electors. It cites no authority for this drastic remedy.

The closest the Campaign comes to justifying the relief it seeks is citing *Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994). But those facts were a far cry from the ones here. In *Marks*, the district court found that the Stinson campaign had orchestrated "massive absentee ballot fraud, deception, intimidation, harassment and forgery." *Id.* at 887 (quoting district court's tentative findings). It had lied to voters, deceived election officials, and forged ballots. *Id.* at 877. We remanded that case, instructing that "the district court should not direct the certification of a candidate unless it finds, on the basis of record evidence, that the designated candidate would have won the election but for wrongdoing." *Id.* at 889. And

Ex. 6

that seemed likely: the Stinson campaign had gotten about 600 net absentee-ballot applications (roughly 1000 minus 400 that were later rejected), more than the 461-vote margin of victory. *Id.* at 876–77.

Here, however, there is no clear evidence of massive absentee-ballot fraud or forgery. On the contrary, at oral argument in the District Court, the Campaign specifically disavowed any claim of fraud. And the margin of victory here is not nearly as close: not 461 votes, but roughly 81,000.

Though district courts should freely give leave to amend, they need not do so when amendment would be futile. Because the Second Amended Complaint would not survive a motion to dismiss, the District Court properly denied leave to file it.

### III. No Stay or Injunction Is Warranted

We could stop here. Once we affirm the denial of leave to amend, this case is over. Still, for completeness, we address the Campaign's emergency motion to stay the effect of certification. No stay or injunction is called for.

Though the Campaign styles its motion as seeking a stay or preliminary injunction, what it really wants is an injunction pending appeal. But it neither requested that from the District Court during the appeal nor showed that it could not make that request, as required by Federal Rule of Appellate Procedure 8(a)(2)(A). That failure bars the motion.

Even if we could grant relief, we would not. Injunctions pending appeal, like preliminary injunctions, are "extraordinary remed[ies] never awarded of right." *Winter v. NRDC*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). For a stay or injunction pending appeal, the movant must show both (1) a "strong" likelihood of success on the merits and (2) irreparable injury absent a stay or injunction. *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987). The first two factors are "the most critical." *Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). After that, we also balance (3) whether a stay or injunction will injure other interested parties (also called the balance of equities) and (4) the public interest. *Hilton*, 481 U.S. at 776, 107 S.Ct. 2113; *In re Revel AC, Inc.*, 802 F.3d 558, 568–71 (3d Cir. 2015). None of the four factors favors taking this extraordinary step.

### A. The Campaign has no strong likelihood of success on the merits

**\*8** As discussed, the Campaign cannot win this lawsuit. It conceded that it is not alleging election fraud. It has already raised and lost most of these state-law issues, and it cannot relitigate them here. It cites no federal authority regulating poll watchers or notice and cure. It alleges no specific discrimination. And it does not contest that it lacks standing under the Elections and Electors Clauses. These claims cannot succeed.

### B. The Campaign faces no irreparable harm

The Campaign has not shown that denying relief will injure it. "Upon information and belief," it suspects that many of the 1.5 million mail-in ballots in the challenged counties were improperly counted. Second Am. Compl. ¶¶168, 194, 223, 253. But it challenges no specific ballots. The Campaign alleges only that at most three specific voters cast ballots that were not counted. *Id.* ¶237 (one voter); First Am. Compl. ¶¶15–16, 112 (three). And it never alleges that anyone except a lawful voter cast a vote. Of the seven counties whose notice-and-cure procedures are challenged, four (including the three most populous) represented that they gave notice to only about 6,500 voters who sent in defective ballot packages. Allegheny Cty. Opp. Mot. TRO & PI 7–8, D. Ct. Dkt. No. 193 (Nov. 20, 2020). The Campaign never disputed these numbers or alleged its own. Even if 10,000 voters got notice and cured their defective ballots, and every single one then voted for Biden, that is less than an eighth of the margin of victory.

Without more facts, we will not extrapolate from these modest numbers to postulate that the number of affected ballots comes close to the certified margin of victory of 80,555 votes. Denying relief will not move the needle.

Plus, states are primarily responsible for running federal elections. U.S. Const. art. I, § 4, cl. 1; 3 U.S.C. § 5. Pennsylvania law has detailed mechanisms for disputing election results. 25 Pa. Stat. §§ 3261–3474. Because the Campaign can raise these issues and seek relief through state courts and then the U.S. Supreme Court, any harm may not be irreparable. *Touchston v. McDermott*, 234 F.3d 1130, 1132–33 (11th Cir. 2000) (per curiam) (en banc).

### C. The balance of equities opposes disenfranchising voters

Nor would granting relief be equitable. The Campaign has already litigated and lost most of these issues as garden-variety state-law claims. It now tries to turn them into federal constitutional claims but cannot. *See Bognet*, ⸺ F.3d at ⸺, 2020 WL 6686120, at *11.

Even if it could, it has delayed bringing this suit. For instance, in proposed Count Four, it challenges giving voters notice and letting them cure ballot defects as violating equal protection. The Campaign could have disputed these practices while they were happening or during the canvassing period. Instead, it waited almost a week after Election Day to file its original complaint, almost another week to amend it, and then another three days to amend it again. Its delay is inequitable, and further delay would wreak further inequity.

And the Campaign's charges are selective. Though Pennsylvanians cast 2.6 million mail-in ballots, the Campaign challenges 1.5 million of them. It cherry-picks votes cast in "Democratic-heavy counties" but not "those in Republican-heavy counties." Second Am. Compl. ¶8. Without compelling evidence of massive fraud, not even alleged here, we can hardly grant such lopsided relief.

Granting relief would harm millions of Pennsylvania voters too. The Campaign would have us set aside 1.5 million ballots without even alleging fraud. As the deadline to certify votes has already passed, granting relief would disenfranchise those voters or sidestep the expressed will of the people. Tossing out those ballots could disrupt every down-ballot race as well. There is no allegation of fraud (let alone proof) to justify harming those millions of voters as well as other candidates.

### D. The public interest favors counting all lawful voters' votes

**\*9** Lastly, relief would not serve the public interest. Democracy depends on counting all lawful votes promptly and finally, not setting them aside without weighty proof. The public must have confidence that our Government honors and respects their votes.

What is more, throwing out those votes would conflict with Pennsylvania election law. The Pennsylvania Supreme Court has long "liberally construed" its Election Code "to protect voters' right to vote," even when a ballot violates a technical requirement. *Shambach v. Bickhart*, 577 Pa. 384, 845 A.2d 793, 802 (2004). "Technicalities should not be used to make the right of the voter insecure." *Appeal of James*, 377 Pa. 405, 105 A.2d 64, 66 (1954) (internal quotation marks omitted).

That court recently reiterated: "[T]he Election Code should be liberally construed so as not to deprive, *inter alia*, electors of their right to elect a candidate of their choice." *Pa. Dem. Party*, 238 A.3d at 356. Thus, unless there is evidence of fraud, Pennsylvania law overlooks small ballot glitches and respects the expressed intent of every lawful voter. *In re: Canvass of Absentee and Mail-in Ballots*, 2020 WL 6875017, at *1 (plurality opinion). In our federalist system, we must respect Pennsylvania's approach to running elections. We will not make more of ballot technicalities than Pennsylvania itself does.

\* \* \* \* \*

Voters, not lawyers, choose the President. Ballots, not briefs, decide elections. The ballots here are governed by Pennsylvania election law. No federal law requires poll watchers or specifies where they must live or how close they may stand when votes are counted. Nor does federal law govern whether to count ballots with minor state-law defects or let voters cure those defects. Those are all issues of state law, not ones that we can hear. And earlier lawsuits have rejected those claims.

Seeking to turn those state-law claims into federal ones, the Campaign claims discrimination. But its alchemy cannot transmute lead into gold. The Campaign never alleges that any ballot was fraudulent or cast by an illegal voter. It never alleges that any defendant treated the Trump campaign or its votes worse than it treated the Biden campaign or its votes. Calling something discrimination does not make it so. The Second Amended Complaint still suffers from these core defects, so granting leave to amend would have been futile.

And there is no basis to grant the unprecedented injunction sought here. First, for the reasons already given, the Campaign is unlikely to succeed on the merits. Second, it shows no irreparable harm, offering specific challenges to many fewer ballots than the roughly 81,000-vote margin of victory. Third, the Campaign is responsible for its delay and repetitive litigation. Finally, the public interest strongly favors finality, counting every lawful voter's vote, and not disenfranchising millions of Pennsylvania voters who voted by mail. Plus, discarding those votes could disrupt every other election on the ballot.

We will thus affirm the District Court's denial of leave to amend, and we deny an injunction pending appeal. The Campaign asked for a very fast briefing schedule, and we have

granted its request. Because the Campaign wants us to move as fast as possible, we also deny oral argument. We grant all motions to file overlength responses, to file amicus briefs, and to supplement appendices. We deny all other outstanding motions as moot. This Court's mandate shall issue at once.

**All Citations**

--- Fed.Appx. ----, 2020 WL 7012522

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Ex. 6

2020 WL 7094866
Only the Westlaw citation is currently available.
United States Court of Appeals, Eleventh Circuit.

L. Lin WOOD, Jr., Plaintiff-Appellant,

v.

Brad RAFFENSPERGER, in his
official capacity as Secretary of State
of the State of Georgia, Rebecca N.
Sullivan, in her official capacity as Vice
Chair of the Georgia State Election
Board, et al., Defendants-Appellees.

No. 20-14418
|
(December 5, 2020)

**Synopsis**
**Background:** Voter brought post-election action against
Georgia election officials alleging violations of equal
protection, due process, and election and electors clauses and
seeking to enjoin certification of general election results, to
secure a new recount under different rules, and to establish
new rules for upcoming runoff election. The United States
District Court for the Northern District of Georgia, No. 1:20-
cv-04651-SDG, Steven D. Grimberg, J., 2020 WL 6817513,
denied voter's motion for temporary restraining order (TRO).
Voter appealed.

**Holdings:** The Court of Appeals, William H. Pryor, Chief
Judge, held that:

voter did not satisfy the injury-in-fact requirement for Article
III standing;

voter's requests to delay certification of election results and
commence a new recount were moot; and

exception to mootness doctrine for issues that are capable of
repetition yet evading review did not apply.

Affirmed.

**Attorneys and Law Firms**

Ray S. Smith, III, Smith & Liss LLC, Atlanta, GA, for
Plaintiff-Appellant.

Charlene S. McGowan, Christopher Michael Carr, Russell
D. Willard, Attorney General's Office, Atlanta, GA, for
Defendants-Appellees.

Marc Erik Elias, Amanda Rebecca Callais, Perkins Coie,
LLP, Washington, DC, Kevin J. Hamilton, Perkins Coie, LLP,
Seattle, WA, Susan Coppedge, U.S. Attorney's Office, Halsey
G. Knapp, Jr., Joyce Gist Lewis, Adam M. Sparks, Krevolin
& Horst, LLC, Atlanta, GA, for Intervenors-Appellees.

Jon M. Greenbaum, Lawyers' Committee for Civil Rights
Under Law, Washington, DC, Bryan L. Sells, Law Office
of Bryan L. Sells, LLC, Atlanta, GA, for Amici Curiae
Helen Butler, Georgia State Conference of the NAACP,
Georgia Coalition for the Peoples' Agenda, James Woodall,
and Melvin Ivey.

Amanda J. Beane, Perkins Coie, LLP, Seattle, WA, Emily
Rachel Brailey, Alexi M. Velez, Perkins Coie, LLP,
Washington, DC, Gillian Kuhlmann, Perkins Coie, LLP, Los
Angeles, CA, Matthew Joseph Mertens, Perkins Coie, LLP,
Portland, OR, for Service.

Appeal from the United States District Court for the Northern
District of Georgia, D.C. Docket No. 1:20-cv-04651-SDG

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR and
LAGOA, Circuit Judges.

**Opinion**

WILLIAM PRYOR, Chief Judge:

**\*1** This appeal requires us to decide whether we have
jurisdiction over an appeal from the denial of a request for
emergency relief in a post-election lawsuit. Ten days after the
presidential election, L. Lin Wood Jr., a Georgia voter, sued
state election officials to enjoin certification of the general
election results, to secure a new recount under different rules,
and to establish new rules for an upcoming runoff election.
Wood alleged that the extant absentee-ballot and recount
procedures violated Georgia law and, as a result, his federal
constitutional rights. After Wood moved for emergency relief,
the district court denied his motion. We agree with the
district court that Wood lacks standing to sue because he
fails to allege a particularized injury. And because Georgia

has already certified its election results and its slate of presidential electors, Wood's requests for emergency relief are moot to the extent they concern the 2020 election. The Constitution makes clear that federal courts are courts of limited jurisdiction, U.S. Const. art. III; we may not entertain post-election contests about garden-variety issues of vote counting and misconduct that may properly be filed in state courts. We affirm.

# I. BACKGROUND

Secretary of State Brad Raffensperger is the "chief election official" of Georgia. Ga. Code Ann. § 21-2-50(b). He manages the state system of elections and chairs the State Election Board. *Id.* § 21-2-30(a), (d). The Board has the authority to promulgate rules and regulations to ensure uniformity in the practices of county election officials and, "consistent with law," to aid "the fair, legal, and orderly conduct of primaries and elections." *Id.* § 21-2-31(1)–(2). The Board may also publish and distribute to county election officials a compilation of Georgia's election laws and regulations. *Id.* § 21-2-31(3). Many of these laws and regulations govern absentee voting.

Any voter in Georgia may vote by absentee ballot. *Id.* § 21-2-380(b). State law prescribes the procedures by which a voter may request and submit an absentee ballot. *Id.* §§ 21-2-381; 21-2-384; 21-2-385. The ballot comes with an oath, which the voter must sign and return with his ballot. *Id.* § 21-2-385(a). State law also prescribes the procedures for how county election officials must certify and count absentee ballots. *Id.* § 21-2-386(a). It directs the official to "compare the identifying information on the oath with the information on file" and "compare the signature or mark on the oath with the signature or mark" on file. *Id.* § 21-2-386(a)(1)(B). If everything appears correct, the official certifies the ballot. *Id.* But if there is a problem, such as a signature that does not match, the official is to "write across the face of the envelope 'Rejected.' " *Id.* § 21-2-386(a)(1)(C). The government must then notify the voter of this rejection, and the voter may cure the problem. *Id.*

In November 2019, the Democratic Party of Georgia, the Democratic Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee challenged Georgia's absentee ballot procedures as unconstitutional under the First and Fourteenth Amendments. They sued Secretary Raffensperger and members of the Board for

declaratory and injunctive relief. Secretary Raffensperger and the Board maintained that the procedures were constitutional, but they agreed to promulgate regulations to ensure uniform practices across counties. In March 2020, the parties entered into a settlement agreement and dismissed the suit.

**\*2** In the settlement agreement, Secretary Raffensperger and the Board agreed to issue an Official Election Bulletin regarding the review of signatures on absentee ballots. The Bulletin instructed officials to review the voter's signature with the following process:

> If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file ..., the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks. A mail-in absentee ballot shall not be rejected unless a majority of the registrars, deputy registrars, or absentee ballot clerks reviewing the signature agree that the signature does not match any of the voter's signatures on file ....

Secretary Raffensperger and the Board also agreed to train county election officials to follow this process.

This procedure has been in place for at least three elections since March, including the general election on November 3, 2020. Over one million Georgians voted by absentee ballot in the general election. No one challenged the settlement agreement until the filing of this action. By then, the general election returns had been tallied and a statewide hand recount of the presidential election results was underway.

On November 13, L. Lin Wood Jr. sued Secretary Raffensperger and the members of the Board in the district court. Wood alleged that he sued "in his capacity as a private citizen." He is a registered voter in Fulton County, Georgia, and a donor to various 2020 Republican candidates. His amended complaint alleged that the settlement agreement violates state law. As a result, he contends, it violates the Election Clause of Article I; the Electors Clause of Article II; and the Equal Protection Clause of the Fourteenth Amendment. *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2; *id.* amend. XIV, § 1. Wood also alleged that irregularities in the hand recount violated his rights under the Due Process Clause of the Fourteenth Amendment. *Id.* amend. XIV, § 1.

State law requires that such recounts be done in public view, and it permits the Board to promulgate policies that facilitate recounting. Ga. Code Ann. § 21-2-498(c)(4), (d). Secretary

Raffensperger directed county election officials to designate viewing areas for members of the public and the news media to observe the recount. He also permitted the Democratic and Republican Parties to designate special recount monitors.

Wood alleged that officials ignored their own rules and denied Wood and President Donald Trump's campaign "meaningful access to observe and monitor the electoral process." Although Wood did not personally attempt to observe or monitor the recount, he alleged that Secretary Raffensperger and the Board violated his "vested interest in being present and having meaningful access to observe and monitor the electoral process to ensure that it is properly administered ... and ... otherwise free, fair, and transparent."

Wood submitted two affidavits from volunteer monitors. One monitor stated that she was not allowed to enter the counting area because there were too many monitors already present, and she could not be sure from a distance whether the recount was accurate. The other explained that the counting was hard for her to follow and described what she thought were possible tabulation errors.

 **\*3**  Wood moved for extraordinary relief. He asked that the district court take one of three steps: prohibit Georgia from certifying the results of the November election; prevent it from certifying results that include "defective absentee ballots, regardless of whether said ballots were cured"; or declare the entire election defective and order the state to fix the problems caused by the settlement agreement. He also sought greater access for Republican election monitors, both at a new hand recount of the November election and in a runoff election scheduled for January 5, 2021.

Wood's lawsuit faced a quickly approaching obstacle: Georgia law requires the Secretary of State to certify its general election results by 5:00 p.m. on the seventeenth day after Election Day. Ga. Code Ann. § 21-2-499(b). And it requires the Governor to certify Georgia's slate of presidential electors by 5:00 p.m. on the eighteenth day after Election Day. *Id.* Secretary Raffensperger's deadline was November 20, and Governor Brian Kemp had a deadline of November 21.

To avoid these deadlines, Wood moved to bar officials from certifying the election results until a court could consider his lawsuit. His emergency motion reiterated many of the requests from his amended complaint, including requests for changes to the procedures for the January runoff. He also submitted additional affidavits and declarations in support of his motion.

The district court held a hearing on November 19 to consider whether it should issue a temporary restraining order. It heard from Wood, state officials, and two groups of intervenors. Wood also introduced testimony from Susan Voyles, a poll manager who participated in the hand recount. Voyles described her experience during the recount. She recalled that one batch of absentee ballots felt different from the rest, and that that batch favored Joe Biden to an unusual extent. At the end of the hearing, the district court orally denied Wood's motion.

On November 20, the district court issued a written opinion and order that explained its denial. It first ruled that Wood lacked standing because he had alleged only generalized grievances, instead of injuries that affected him in a personal and individual way. It next explained that, even if Wood had standing, the doctrine of laches prevented him from challenging the settlement agreement now: he could have sued eight months earlier, yet he waited until two weeks after the election. Finally, it explained why Wood would not be entitled to a temporary restraining order even if the district court could reach the merits of his claims. On the same day, Secretary Raffensperger certified the results of the general election and Governor Kemp certified a slate of presidential electors.

## II. STANDARD OF REVIEW

"We are required to examine our jurisdiction *sua sponte,* and we review jurisdictional issues *de novo.*" *United States v. Lopez,* 562 F.3d 1309, 1311 (11th Cir. 2009) (citation omitted).

## III. DISCUSSION

This appeal turns on one of the most fundamental principles of the federal courts: our limited jurisdiction. Federal courts are not "constituted as free-wheeling enforcers of the Constitution and laws." *Initiative & Referendum Inst. v. Walker,* 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc). As the Supreme Court "ha[s] often explained," we are instead "courts of limited jurisdiction." *Home Depot U.S.A., Inc. v. Jackson,* ---- U.S. ----, 139 S. Ct. 1743, 1746, 204 L.Ed.2d 34 (2019) (internal quotation marks omitted).

Article III of the Constitution establishes that our jurisdiction —that is, our judicial power—reaches only "Cases" and "Controversies." U.S. Const. art. III, § 2. Absent a justiciable case or controversy between interested parties, we lack the "power to declare the law." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

**\*4** When someone sues in federal court, he bears the burden of proving that his suit falls within our jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Wood had the choice to sue in state or federal court. Georgia law makes clear that post-election litigation may proceed in a state court. Ga. Code Ann. §§ 21-2-499(b), 21-2-524(a). But Wood chose to sue in federal court. In doing so, he had to prove that his suit presents a justiciable controversy under Article III of the Constitution. *See Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (listing examples of problems that preclude our jurisdiction). He failed to satisfy this burden.

We divide our discussion in two parts. We first explain why Wood lacks standing to sue. We then explain that, even if he had standing, his requests to recount and delay certification of the November election results are moot. Because this case is not justiciable, we lack jurisdiction. *Id.* And because we lack the power to entertain this appeal, we will not address the other issues the parties raise.

*A. Wood Lacks Standing Because He Has Not Been Injured in a Particularized Way.*

Standing is a threshold jurisdictional inquiry: the elements of standing are "an indispensable part of the plaintiff's case." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To prove standing, Wood "must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). If he cannot satisfy these requirements, then we may not decide the merits of his appeal. *Steel Co.*, 523 U.S. at 94, 118 S.Ct. 1003.

Wood lacks standing because he fails to allege the "first and foremost of standing's three elements": an injury in fact. *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (alteration adopted) (internal quotation marks omitted). An injury in fact is "an

invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (internal quotation marks omitted). Wood's injury is not particularized.

Wood asserts only a generalized grievance. A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks omitted). For example, if Wood were a political candidate harmed by the recount, he would satisfy this requirement because he could assert a personal, distinct injury. *Cf. Roe v. Alabama ex rel. Evans*, 43 F.3d 574, 579 (11th Cir. 1995). But Wood bases his standing on his interest in "ensur[ing that] ... only lawful ballots are counted." An injury to the right "to require that the government be administered according to the law" is a generalized grievance. *Chiles v. Thornburgh*, 865 F.2d 1197, 1205–06 (11th Cir. 1989) (alteration adopted) (internal quotation marks omitted). And the Supreme Court has made clear that a generalized grievance, "no matter how sincere," cannot support standing. *Hollingsworth v. Perry*, 570 U.S. 693, 706, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013).

A generalized grievance is "undifferentiated and common to all members of the public." *Lujan*, 504 U.S. at 575, 112 S.Ct. 2130 (internal quotation marks omitted). Wood cannot explain how his interest in compliance with state election laws is different from that of any other person. Indeed, he admits that any Georgia voter could bring an identical suit. But the logic of his argument sweeps past even that boundary. All Americans, whether they voted in this election or whether they reside in Georgia, could be said to share Wood's interest in "ensur[ing] that [a presidential election] is properly administered."

**\*5** Wood argues that he has two bases for standing, but neither satisfies the requirement of a distinct, personal injury. He first asserts that the inclusion of unlawfully processed absentee ballots diluted the weight of his vote. To be sure, vote dilution can be a basis for standing. *Cf. Jacobson*, 974 F.3d at 1247–48. But it requires a point of comparison. For example, in the racial gerrymandering and malapportionment contexts, vote dilution occurs when voters are harmed compared to "irrationally favored" voters from other districts. *See Baker v. Carr*, 369 U.S. 186, 207–08, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). By contrast, "no single voter is specifically disadvantaged" if a vote is counted improperly, even if the error might have a "mathematical impact on the final tally

and thus on the proportional effect of every vote." *Bognet v. Sec'y Commonwealth of Pa.*, —— F.3d ——, ——, 2020 WL 6686120, at *12 (3d Cir. Nov. 13, 2020) (internal quotation marks omitted). Vote dilution in this context is a "paradigmatic generalized grievance that cannot support standing." *Id.* (internal quotation marks omitted).

Wood's second theory—that Georgia "value[d] one person's vote over that of another" through "arbitrary and disparate treatment"—fares no better. He argues that Georgia treats absentee voters as a "preferred class" compared to those who vote in person, both by the terms of the settlement agreement and in practice. In his view, all voters were bound by law before the settlement agreement, but the rules for absentee voting now run afoul of the law, while in-person voters remain bound by the law. And he asserts that in practice Georgia has favored absentee voters because there were "numerous irregularities" in the processing and recounting of absentee ballots. Setting aside the fact that "[i]t is an individual voter's *choice* whether to vote by mail or in person," *Bognet*, —— F.3d at ——, 2020 WL 6686120, at *15, these complaints are generalized grievances. Even if we assume that absentee voters are favored over in-person voters, that harm does not affect Wood as an individual—it is instead shared identically by the four million or so Georgians who voted in person this November. "[W]hen the asserted harm is ... shared in substantially equal measure by ... a large class of citizens," it is not a particularized injury. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). And irregularities in the tabulation of election results do not affect Wood differently from any other person. His allegation, at bottom, remains "that the law ... has not been followed." *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1332 (11th Cir. 2007) (quoting *Lance v. Coffman*, 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007)).

Wood's attempts to liken his injury to those we have found sufficient in other appeals fall short. In *Common Cause/ Georgia v. Billups*, we ruled that "[r]equiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing." 554 F.3d 1340, 1351–52 (11th Cir. 2009). But the injury there was the burden of producing photo identification, not the existence of separate rules for in-person and absentee voters. *Id.* And the burden to produce photo identification affected each voter in a personal way. For example, some plaintiffs in *Common Cause* alleged that they "would be required to make a special trip" to obtain valid identification "that is not required of voters who have driver's licenses or passports." *Id.* at 1351 (internal quotation marks omitted). By contrast, even Wood agrees that he is affected by Georgia's alleged violations of the law in the same way as every other Georgia voter. "This injury is precisely the kind of undifferentiated, generalized grievance that the Supreme Court has warned must not be countenanced." *Dillard*, 495 F.3d at 1335 (internal quotation marks omitted).

*Roe v. Alabama ex rel. Evans*, 43 F.3d 574, also does not support Wood's argument for standing. In *Roe*, we ruled that the post-election inclusion of previously excluded absentee ballots would violate the substantive-due-process rights of Alabama voters and two political candidates. *Id.* at 579–81. But no party raised and we did not address standing in *Roe*, so that precedent provides no basis for Wood to establish standing. *Cf. Lewis v. Casey*, 518 U.S. 343, 352 n.2, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (noting that in cases where "standing was neither challenged nor discussed ... the existence of unaddressed jurisdictional defects has no precedential effect"). And Wood's purported injury is far more general than the voters' injury in *Roe*. The voters in *Roe* bore individual burdens—to obtain notarization or witness signatures if they wanted to vote absentee—that state courts post-election retroactively permitted other voters to ignore. *Roe*, 43 F.3d at 580–81. In contrast, Georgia applied uniform rules, established before the election, to all voters, who could choose between voting in person or by absentee ballot, and Wood asserts that the effect of those rules harmed the electorate collectively. That alleged harm is not a particularized injury.

**\*6** Wood suggested in his amended complaint that his status as a donor contributed to standing and aligned his interests with those of the Georgia Republican Party. But he forfeited this argument when he failed to raise it in his opening brief. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1335 (11th Cir. 2004); *see also Nat'l All. for the Mentally Ill v. Bd. of Cnty. Comm'rs*, 376 F.3d 1292, 1296 (11th Cir. 2004) (ruling standing claims forfeited for failure to comply with the Federal Rules of Appellate Procedure). And the donor argument fails on its own terms. True, a donor can establish standing based on injuries that flow from his status as a donor. *See, e.g., Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019). But donors, like voters, "have no judicially enforceable interest in the *outcome* of an election." *Jacobson*, 974 F.3d at 1246. Nor does a donation give the donor a legally cognizable interest in the proper administration of elections. Any injury to Wood based on election irregularities must flow

Ex. 7

from his status as a voter, unrelated to his donations. And that fact returns him to the stumbling block of particularization.

"[T]he 'injury in fact' test requires ... that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 563, 112 S.Ct. 2130 (internal quotation marks omitted). Wood's allegations suggest that various nonparties might have a particularized injury. For example, perhaps a candidate or political party would have standing to challenge the settlement agreement or other alleged irregularities. Or perhaps election monitors would have standing to sue if they were denied access to the recount. But Wood cannot place himself in the stead of these groups, even if he supports them. *Cf. Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1127 (9th Cir. 2006) (explaining that "associational standing ... does not operate in reverse," so a member cannot represent an association). He is at most a "concerned bystander." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004) (internal quotation marks omitted). So he is not "entitled to have the court[s] decide the merits of [his] dispute." *Warth*, 422 U.S. at 498, 95 S.Ct. 2197.

*B. Wood's Requested Relief Concerning the 2020 General Election Is Moot.*

Even if Wood had standing, several of his requests for relief are barred by another jurisdictional defect: mootness. We are "not empowered to decide moot questions." *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (internal quotation marks omitted). "An issue is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1189 (11th Cir. 2011) (alteration rejected) (internal quotation marks omitted). And an issue can become moot at any stage of litigation, even if there was a live case or controversy when the lawsuit began. *Id.* at 1189–90.

Wood asked for several kinds of relief in his emergency motion, but most of his requests pertained to the 2020 election results. He moved the district court to prohibit either the certification of the election results or certification that included the disputed absentee ballots. He also asked the district court to order a new hand recount and to grant Republican election monitors greater access during both the recount and the January runoff election. But after the district court denied Wood's motion, Secretary Raffensperger

certified the election results on November 20. And Governor Kemp certified the slate of presidential electors later that day.

Because Georgia has already certified its results, Wood's requests to delay certification and commence a new recount are moot. "We cannot turn back the clock and create a world in which" the 2020 election results are not certified. *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015). And it is not possible for us to delay certification nor meaningful to order a new recount when the results are already final and certified. *Cf. Tropicana Prods. Sales, Inc. v. Phillips Brokerage Co.*, 874 F.2d 1581, 1582 (11th Cir. 1989) ("[A]n appeal from the denial of a motion for preliminary injunction is mooted when the requested effective end-date for the preliminary injunction has passed."). Nor can we reconstrue Wood's previous request that we temporarily prohibit certification into a new request that we undo the certification. A district court "must first have the opportunity to pass upon [every] issue," so we may not consider requests for relief made for the first time on appeal. *S.F. Residence Club, Inc. v. 7027 Old Madison Pike, LLC*, 583 F.3d 750, 755 (11th Cir. 2009).

**\*7** Wood's arguments reflect a basic misunderstanding of what mootness is. He argues that the certification does not moot anything "because this litigation is ongoing" and he remains injured. But mootness concerns the availability of relief, not the existence of a lawsuit or an injury. *Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1304 (11th Cir. 2011). So even if post-election litigation is not always mooted by certification, *see, e.g.*, *Siegel v. LePore*, 234 F.3d 1163, 1172–73 (11th Cir. 2000) (en banc), Wood's particular requests are moot. Wood is right that certification does not moot his requests for relief concerning the 2021 runoff—although Wood's lack of standing still forecloses our consideration of those requests—but the pendency of other claims for relief cannot rescue the otherwise moot claims. *See, e.g.*, *Adler v. Duval Cnty. Sch. Bd.*, 112 F.3d 1475, 1478–79, 1481 (11th Cir. 1997) (instructing the district court to dismiss moot claims but resolving other claims on the merits). Wood finally tells us that President Trump has also requested a recount, but that fact is irrelevant to whether Wood's requests remain live.

Nor does any exception to mootness apply. True, we often review otherwise-moot election appeals because they are "capable of repetition yet evading review." *ACLU v. The Fla. Bar*, 999 F.2d 1486, 1496 (11th Cir. 1993) (internal quotation marks omitted). We may apply this exception when "(1) the challenged action was in its duration too short to be fully

litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Nat'l Broad. Co. v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1023 (11th Cir. 1988) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)). But we will not apply this exception if there is "some alternative vehicle through which a particular policy may effectively be subject to" complete review. *Bourgeois v. Peters*, 387 F.3d 1303, 1308 (11th Cir. 2004).

The "capable of repetition yet evading review" exception does not save Wood's appeal because there is no "reasonable expectation" that Wood will again face the issues in this appeal. Based on the posture of this appeal, the challenged action is the denial of an emergency injunction against the certification of election results. *See Fleming*, 785 F.3d at 446 (explaining that whether the issues in an interlocutory appeal are "capable of repetition, yet evading review" is a separate question from whether the issues in the overall

lawsuit are capable of doing so). That denial is the decision we would review but for the jurisdictional problems. But Wood cannot satisfy the requirement that there be a "reasonable expectation" that he will again seek to delay certification. Wood does not suggest that this situation might recur. *Cf. FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 463–64, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007). And we have no reason to think it would: he is a private citizen, so the possibility of a recurrence is purely theoretical. *Cf. Hall v. Sec'y, Ala.*, 902 F.3d 1294, 1305 (11th Cir. 2018).

**IV. CONCLUSION**

We **AFFIRM** the denial of Wood's motion for emergency relief.

**All Citations**

--- F.3d ----, 2020 WL 7094866

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Ex. 7

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KING, MARIAN ELLEN
SHERIDAN, JOHN EARL HAGGARD,
CHARLES JAMES RITCHARD,
JAMES DAVID HOOPER, and
DAREN WADE RUBINGH,

          Plaintiffs,

v.

                                      Civil Case No. 20-13134
                                      Honorable Linda V. Parker

GRETCHEN WHITMER, in her official
capacity as Governor of the State of Michigan,
JOCELYN BENSON, in her official capacity as
Michigan Secretary of State, and MICHIGAN
BOARD OF STATE CANVASSERS,

          Defendants,

and

CITY OF DETROIT, DEMOCRATIC
NATIONAL COMMITTEE and
MICHIGAN DEMOCRATIC PARTY, and
ROBERT DAVIS,

          Intervenor-Defendants.
_____/

## **OPINION AND ORDER DENYING PLAINTIFFS' "EMERGENCY MOTION FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF" (ECF NO. 7)**

      The right to vote is among the most sacred rights of our democracy and, in

turn, uniquely defines us as Americans.  The struggle to achieve the right to vote is

1

Ex. 8

one that has been both hard fought and cherished throughout our country's history. Local, state, and federal elections give voice to this right through the ballot. And elections that count each vote celebrate and secure this cherished right.

These principles are the bedrock of American democracy and are widely revered as being woven into the fabric of this country. In Michigan, more than 5.5 million citizens exercised the franchise either in person or by absentee ballot during the 2020 General Election. Those votes were counted and, as of November 23, 2020, certified by the Michigan Board of State Canvassers (also "State Board"). The Governor has sent the slate of Presidential Electors to the Archivist of the United States to confirm the votes for the successful candidate.

Against this backdrop, Plaintiffs filed this lawsuit, bringing forth claims of widespread voter irregularities and fraud in the processing and tabulation of votes and absentee ballots. They seek relief that is stunning in its scope and breathtaking in its reach. If granted, the relief would disenfranchise the votes of the more than 5.5 million Michigan citizens who, with dignity, hope, and a promise of a voice, participated in the 2020 General Election. The Court declines to grant Plaintiffs this relief.

## I.   Background

In the weeks leading up to, and on, November 3, 2020, a record 5.5 million Michiganders voted in the presidential election ("2020 General Election"). (ECF

Ex. 8

No. 36-4 at Pg ID 2622.)  Many of those votes were cast by absentee ballot.  This was due in part to the coronavirus pandemic and a ballot measure the Michigan voters passed in 2018 allowing for no-reason absentee voting.  When the polls closed and the votes were counted, Former Vice President Joseph R. Biden, Jr. had secured over 150,000 more votes than President Donald J. Trump in Michigan. (*Id.*)

Michigan law required the Michigan State Board of Canvassers to canvass results of the 2020 General Election by November 23, 2020.  Mich. Comp. Laws § 168.842.  The State Board did so by a 3-0 vote, certifying the results "for the Electors of President and Vice President," among other offices.  (ECF No. 36-5 at Pg ID 2624.)  That same day, Governor Gretchen Whitmer signed the Certificates of Ascertainment for the slate of electors for Vice President Biden and Senator Kamala D. Harris.  (ECF No. 36-6 at Pg ID 2627-29.)  Those certificates were transmitted to and received by the Archivist of the United States.  (*Id.*)

Federal law provides that if election results are contested in any state, and if the state, prior to election day, has enacted procedures to decide controversies or contests over electors and electoral votes, and if these procedures have been applied, and the decisions are made at least six days before the electors' meetings, then the decisions are considered conclusive and will apply in counting the electoral votes.  3 U.S.C. § 5.  This date (the "Safe Harbor" deadline) falls on

3

Ex. 8

December 8, 2020.  Under the federal statutory timetable for presidential elections, the Electoral College must meet on "the first Monday after the second Wednesday in December," 3 U.S.C. § 7, which is December 14 this year.

Alleging widespread fraud in the distribution, collection, and counting of ballots in Michigan, as well as violations of state law as to certain election challengers and the manipulation of ballots through corrupt election machines and software, Plaintiffs filed the current lawsuit against Defendants at 11:48 p.m. on November 25, 2020—the eve of the Thanksgiving holiday.  (ECF No. 1.) Plaintiffs are registered Michigan voters and nominees of the Republican Party to be Presidential Electors on behalf of the State of Michigan.  (ECF No. 6 at Pg ID 882.)  They are suing Governor Whitmer and Secretary of State Jocelyn Benson in their official capacities, as well as the Michigan Board of State Canvassers.

On November 29, a Sunday, Plaintiffs filed a First Amended Complaint (ECF No. 6), "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof" (ECF No. 7), and Emergency Motion to Seal (ECF No. 8).  In their First Amended Complaint, Plaintiffs allege three claims pursuant to 42 U.S.C. § 1983: (Count I) violation of the Elections and Electors Clauses; (Count II) violation of the Fourteenth Amendment Equal Protection Clause; and, (Count III) denial of the Fourteenth

4

Amendment Due Process Clause.  (ECF No. 6.)  Plaintiffs also assert one count alleging violations of the Michigan Election Code.  (*Id.*)

By December 1, motions to intervene had been filed by the City of Detroit (ECF No. 15), Robert Davis (ECF No. 12), and the Democratic National Committee and Michigan Democratic Party ("DNC/MDP") (ECF No. 14).  On that date, the Court entered a briefing schedule with respect to the motions.  Plaintiffs had not yet served Defendants with their pleading or emergency motions as of December 1.  Thus, on December 1, the Court also entered a text-only order to hasten Plaintiffs' actions to bring Defendants into the case and enable the Court to address Plaintiffs' pending motions.  Later the same day, after Plaintiffs filed certificates of service reflecting service of the summons and Amended Complaint on Defendants (ECF Nos. 21), the Court entered a briefing schedule with respect to Plaintiffs' emergency motions, requiring response briefs by 8:00 p.m. on December 2, and reply briefs by 8:00 p.m. on December 3 (ECF No. 24).

On December 2, the Court granted the motions to intervene.  (ECF No. 28.) Response and reply briefs with respect to Plaintiffs' emergency motions were thereafter filed.  (ECF Nos. 29, 31, 32, 34, 35, 36, 37, 39, 49, 50.)  Amicus curiae Michigan State Conference NAACP subsequently moved and was granted leave to file a brief in support of Defendants' position.  (ECF Nos. 48, 55.)  Supplemental briefs also were filed by the parties.  (ECF Nos. 57, 58.)

5

Ex. 8

In light of the limited time allotted for the Court to resolve Plaintiffs'

emergency motion for injunctive relief—which Plaintiffs assert "must be granted

in advance of December 8, 2020" (ECF No. 7 at Pg ID 1846)—the Court has

disposed of oral argument with respect to their motion pursuant to Eastern District

of Michigan Local Rule 7.1(f).[1]

## II.    Standard of Review

A preliminary injunction is "an extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v.*

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted).  The plaintiff

bears the burden of demonstrating entitlement to preliminary injunctive relief.

*Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).  Such relief will only be

granted where "the movant carries his or her burden of proving that the

circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban Cnty.*

*Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  "Evidence that goes beyond the

unverified allegations of the pleadings and motion papers must be presented to

---

[1] "'[W]here material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing.'"  *Nexus Gas Transmission, LLC v. City of Green, Ohio*, 757 Fed. Appx. 489, 496-97 (6th Cir. 2018) (quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007)) (citation omitted).

6

support or oppose a motion for a preliminary injunction."  11A Mary Kay Kane,
Fed. Prac. & Proc.  § 2949 (3d ed.).

Four factors are relevant in deciding whether to grant preliminary injunctive
relief: "'(1) whether the movant has a strong likelihood of success on the merits;
(2) whether the movant would suffer irreparable injury absent the injunction; (3)
whether the injunction would cause substantial harm to others; and (4) whether the
public interest would be served by the issuance of an injunction.'"  *Daunt v.
Benson*, 956 F.3d 396, 406 (6th Cir. 2020) (quoting *Bays v. City of Fairborn*, 668
F.3d 814, 818-19 (6th Cir. 2012)).  "At the preliminary injunction stage, 'a plaintiff
must show more than a mere possibility of success,' but need not 'prove his case in
full.'"  *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012)
(quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511
F.3d 535, 543 (6th Cir. 2007)).  Yet, "the proof required for the plaintiff to obtain a
preliminary injunction is much more stringent than the proof required to survive a
summary judgment motion …."  *Leary*, 228 F.3d at 739.

## III.  Discussion

The Court begins by discussing those questions that go to matters of subject
matter jurisdiction or which counsel against reaching the merits of Plaintiffs'
claims.  While the Court finds that any of these issues, alone, indicate that
Plaintiffs' motion should be denied, it addresses each to be thorough.

7

Ex. 8

**A.      Eleventh Amendment Immunity**

The Eleventh Amendment to the United States Constitution provides:

> The judicial power of the United States shall not be
> construed to extend to any suit in law or equity,
> commenced or prosecuted against one of the United
> States by Citizens of another State, or by Citizens or
> Subjects of any Foreign State.

U.S. Const. amend. XI.  This immunity extends to suits brought by citizens against

their own states.  *See, e.g., Ladd v. Marchbanks*, 971 F.3d 574, 578 (6th Cir. 2020)

(citing *Hans v. Louisiana*, 134 U.S. 1, 18-19 (1890)).  It also extends to suits

against state agencies or departments, *Pennhurst State Sch. & Hosp. v. Halderman*,

465 U.S. 89, 100 (1984) (citations omitted), and "suit[s] against state officials

when 'the state is the real, substantial party in interest[,]'" *id.* at 101 (quoting *Ford*

*Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)).

A suit against a State, a state agency or its department, or a state official is in

fact a suit against the State and is barred "regardless of the nature of the relief

sought."  *Pennhurst State Sch. & Hosp.*, 465 U.S. at 100-02 (citations omitted).

"'The general rule is that a suit is against the sovereign if the judgment sought

would expend itself on the public treasury or domain, or interfere with the public

administration, or if the effect of the judgment would be to restrain the

Government from acting, or to compel it to act.'"  *Id*. at 101 n.11 (quoting *Dugan*

*v. Rank*, 372 U.S. 609, 620 (1963)) (internal quotation marks omitted).

8

Eleventh Amendment immunity is subject to three exceptions: (1) congressional abrogation; (2) waiver by the State; and (3) "a suit against a state official seeking prospective injunctive relief to end a continuing violation of federal law." *See Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002) (citations omitted).  Congress did not abrogate the States' sovereign immunity when it enacted 42 U.S.C. § 1983.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989).  "The State of Michigan has not consented to being sued in civil rights actions in the federal courts."  *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004) (citing *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986)).  The Eleventh Amendment therefore bars Plaintiffs' claims against the Michigan Board of State Canvassers.  *See McLeod v. Kelly*, 7 N.W.2d 240, 242 (Mich. 1942) ("The board of State canvassers is a State agency …"); *see also Deleeuw v. State Bd. of Canvassers*, 688 N.W.2d 847, 850 (Mich. Ct. App. 2004).  Plaintiffs' claims are barred against Governor Whitmer and Secretary Benson unless the third exception applies.

The third exception arises from the Supreme Court's decision in *Ex parte Young*, 209 U.S. 123 (1908).  But as the Supreme Court has advised:

> To interpret *Young* to permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle … that Eleventh Amendment immunity represents a real

9

> limitation on a federal court's federal-question
> jurisdiction.  The real interests served by the Eleventh
> Amendment are not to be sacrificed to elementary
> mechanics of captions and pleading.  Application of the
> *Young* exception must reflect a proper understanding of
> its role in our federal system and respect for state courts
> instead of a reflexive reliance on an obvious fiction.

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997).  Further, "the

theory of *Young* has not been provided an expansive interpretation."  *Pennhurst*

*State Sch. & Hosp.*, 465 U.S. at 102.  "'In determining whether the doctrine of *Ex*

*parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct

a straightforward inquiry into whether [the] complaint alleges an ongoing violation

of federal law and seeks relief properly characterized as prospective.'"  *Verizon*

*Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (quoting *Coeur d'Alene*

*Tribe of Idaho*, 521 U.S. 296 (O'Connor, J., concurring)).

Ex parte Young does not apply, however, to *state law* claims against state

officials, regardless of the relief sought.  *Pennhurst State Sch. & Hosp.*, 465 U.S. at

106 ("A federal court's grant of relief against state officials on the basis of state

law, whether prospective or retroactive, does not vindicate the supreme authority

of federal law.  On the contrary, it is difficult to think of a greater intrusion on state

sovereignty than when a federal court instructs state officials on how to conform

their conduct to state law."); *see also In re Ohio Execution Protocol Litig.*, 709 F.

App'x 779, 787 (6th Cir. 2017) ("If the plaintiff sues a state official under state law

in federal court for actions taken within the scope of his authority, sovereign

immunity bars the lawsuit regardless of whether the action seeks monetary or

injunctive relief.").  Unquestionably, Plaintiffs' state law claims against

Defendants are barred by Eleventh Amendment immunity.

The Court then turns its attention to Plaintiffs' § 1983 claims against

Defendants.  Defendants and Intervenor DNC/MDP contend that these claims are

not in fact federal claims as they are premised entirely on alleged violations of

*state* law.  (ECF No. 31 at Pg ID 2185 ("Here, each count of Plaintiffs'

complaint—even Counts I, II, and III, which claim to raise violations of federal

law—is predicated on the election being conducted contrary to Michigan law.");

ECF No. 36 at Pg ID 2494 ("While some of [Plaintiffs'] allegations concern

fantastical conspiracy theories that belong more appropriately in the fact-free outer

reaches of the Internet[,] … what Plaintiffs assert at bottom are violations of the

Michigan Election Code.")  Defendants also argue that even if properly stated as

federal causes of action, "it is far from clear whether Plaintiffs' requested

injunction is actually prospective in nature, as opposed to retroactive."  (ECF No.

31 at Pg ID 2186.)

The latter argument convinces this Court that *Ex parte Young* does not

apply.  As set forth earlier, "'[i]n order to fall with the *Ex parte Young* exception, a

claim must seek prospective relief to end a continuing violation of federal law.'"

11

Ex. 8

*Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) (quoting *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013)).  Unlike *Russell*, which Plaintiffs cite in their reply brief, this is not a case where a plaintiff is seeking to enjoin the continuing enforcement of a statute that is allegedly unconstitutional.  *See id.* at 1044, 1047 (plaintiff claimed that Kentucky law creating a 300-foot no-political-speech buffer zone around polling location violated his free-speech rights).  Instead, Plaintiffs are seeking to undo what has already occurred, as their requested relief reflects.[2]  (*See* ECF No. 7 at Pg ID 1847; *see also* ECF No. 6 at Pg 955-56.)

Before this lawsuit was filed, the Michigan Board of State Canvassers had already certified the election results and Governor Whitmer had transmitted the State's slate of electors to the United States Archivist.  (ECF Nos. 31-4, 31-5.)  There is no continuing violation to enjoin.  *See Rios v. Blackwell*, 433 F. Supp. 2d 848 (N.D. Ohio Feb. 7, 2006); *see also King Lincoln Bronzeville Neighborhood Ass'n v. Husted*, No. 2:06-cv-00745, 2012 WL 395030, at *4-5 (S.D. Ohio Feb. 7, 2012); *cf. League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008) (finding that the plaintiff's claims fell within the *Ex parte Young* doctrine

---

[2] To the extent Plaintiffs ask the Court to certify the results in favor of President Donald J. Trump, such relief is beyond its powers.

where it alleged that the problems that plagued the election "are chronic and will continue absent injunctive relief").

For these reasons, the Court concludes that the Eleventh Amendment bars Plaintiffs' claims against Defendants.

### B.    Mootness

This case represents well the phrase: "this ship has sailed."  The time has passed to provide most of the relief Plaintiffs request in their Amended Complaint; the remaining relief is beyond the power of any court.  For those reasons, this matter is moot.

"'Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies.'"  *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 595 (6th Cir. 2014) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).  A case may become moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396, 410 (1980) (internal quotation marks and citation omitted).  Stated differently, a case is moot where the court lacks "the ability to give meaningful relief[.]"  *Sullivan v. Benningfield*, 920 F.3d 401, 410 (6th Cir. 2019).  This lawsuit was moot well before it was filed on November 25.

In their prayer for relief, Plaintiffs ask the Court to: (a) order Defendants to decertify the results of the election; (b) enjoin Secretary Benson and Governor

13

Whitmer from transmitting the certified election results to the Electoral College;

(c) order Defendants "to transmit certified election results that state that President

Donald Trump is the winner of the election"; (d) impound all voting machines and

software in Michigan for expert inspection; (e) order that no votes received or

tabulated by machines not certified as required by federal and state law be counted;

and, (f) enter a declaratory judgment that mail-in and absentee ballot fraud must be

remedied with a manual recount or statistically valid sampling.[3]  (ECF No. 6 at Pg

ID 955-56, ¶ 233.)  What relief the Court could grant Plaintiffs is no longer

available.

Before this lawsuit was filed, all 83 counties in Michigan had finished

canvassing their results for all elections and reported their results for state office

races to the Secretary of State and the Michigan Board of State Canvassers in

accordance with Michigan law.  *See* Mich. Comp. Laws § 168.843.  The State

Board had certified the results of the 2020 General Election and Governor

Whitmer had submitted the slate of Presidential Electors to the Archivists.  (ECF

---

[3] Plaintiffs also seek an order requiring the impoundment of all voting machines and software in Michigan for expert inspection and the production of security camera footage from the TCF Center for November 3 and 4.  (ECF No. 6 at Pg ID 956, ¶ 233.)  This requested relief is not meaningful, however, where the remaining requests are no longer available.  In other words, the evidence Plaintiffs seek to gather by inspecting voting machines and software and security camera footage only would be useful if an avenue remained open for them to challenge the election results.

14

Ex. 8

No. 31-4 at Pg ID 2257-58; ECF No. 31-5 at Pg ID 2260-63.)  The time for

requesting a special election based on mechanical errors or malfunctions in voting

machines had expired.  *See* Mich. Comp. Laws §§ 168.831, 168.832 (petitions for

special election based on a defect or mechanical malfunction must be filed "no

later than 10 days after the date of the election").  And so had the time for

requesting a recount for the office of President.  *See* Mich. Comp. Laws § 168.879.

The Michigan Election Code sets forth detailed procedures for challenging

an election, including deadlines for doing so.  Plaintiffs did not avail themselves of

the remedies established by the Michigan legislature.  The deadline for them to do

so has passed.  Any avenue for this Court to provide meaningful relief has been

foreclosed.  As the Eleventh Circuit Court of Appeals recently observed in one of

the many other post-election lawsuits brought to specifically overturn the results of

the 2020 presidential election:

> "We cannot turn back the clock and create a world in
> which" the 2020 election results are not certified.
> *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015).
> And it is not possible for us to delay certification nor
> meaningful to order a new recount when the results are
> already final and certified.

*Wood v. Raffensperger*, -- F.3d -- , 2020 WL 7094866 (11th Cir. Dec. 5, 2020).

And as one Justice of the Supreme Court of Pennsylvania advised in another 2020

post-election lawsuit: "there is no basis in law by which the courts may grant

Petitioners' request to ignore the results of an election and recommit the choice to

Ex. 8

the General Assembly to substitute its preferred slate of electors for the one chosen by a majority of Pennsylvania's voters." *Kelly v. Commonwealth*, No. 68 MAP 2020, 2020 WL 7018314, at *3 (Pa. Nov. 28, 2020) (Wecht, J., concurring); *see also Wood v. Raffensperger*, No. 1:20-cv-04651, 2020 WL 6817513, at *13 (N.D. Ga. Nov. 20, 2020) (concluding that "interfer[ing] with the result of an election that has already concluded would be unprecedented and harm the public in countless ways").

In short, Plaintiffs' requested relief concerning the 2020 General Election is moot.

### C.   Laches

Defendants argue that Plaintiffs are unlikely to succeed on the merits because they waited too long to knock on the Court's door. (ECF No. 31 at Pg ID 2175-79; ECF No. 39 at Pg ID 2844.) The Court agrees.

The doctrine of laches is rooted in the principle that "equity aids the vigilant, not those who slumber on their rights." *Lucking v. Schram*, 117 F.2d 160, 162 (6th Cir. 1941); *see also United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 9 (2008) ("A constitutional claim can become time-barred just as any other claim can."). An action may be barred by the doctrine of laches if: (1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant is prejudiced by this delay. *Brown-Graves Co. v. Central States, Se. and Sw. Areas Pension Fund*,

16

206 F.3d 680, 684 (6th Cir. 2000); *Ottawa Tribe of Oklahoma v. Logan*, 577 F.3d 634, 639 n.6 (6th Cir. 2009) ("Laches arises from an extended failure to exercise a right to the detriment of another party.").  Courts apply laches in election cases. *Detroit Unity Fund v. Whitmer*, 819 F. App'x 421, 422 (6th Cir. 2020) (holding that the district court did not err in finding plaintiff's claims regarding deadline for local ballot initiatives "barred by laches, considering the unreasonable delay on the part of [p]laintiffs and the consequent prejudice to [d]efendants").  *Cf. Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence. That is as true in election law cases as elsewhere.").

First, Plaintiffs showed no diligence in asserting the claims at bar.  They filed the instant action on November 25—more than 21 days after the 2020 General Election—and served it on Defendants some five days later on December 1.  (ECF Nos. 1, 21.)  If Plaintiffs had legitimate claims regarding whether the treatment of election challengers complied with state law, they could have brought their claims well in advance of or on Election Day—but they did not.  Michigan's 83 Boards of County Canvassers finished canvassing by no later than November 17 and, on November 23, both the Michigan Board of State Canvassers and Governor Whitmer certified the election results.  Mich. Comp. Laws §§ 168.822, 168.842.0.  If Plaintiffs had legitimate claims regarding the manner by which

17

ballots were processed and tabulated on or after Election Day, they could have

brought the instant action on Election Day or during the weeks of canvassing that

followed—yet they did not.  Plaintiffs base the claims related to election machines

and software on "expert and fact witness" reports discussing "glitches" and other

alleged vulnerabilities that occurred as far back as 2010.  (*See e.g.,* ECF No. 6 at

Pg ID 927-933, ¶¶ 157(C)-(E), (G), 158, 160, 167.)  If Plaintiffs had legitimate

concerns about the election machines and software, they could have filed this

lawsuit well before the 2020 General Election—yet they sat back and did nothing.

Plaintiffs proffer no persuasive explanation as to why they waited so long to

file this suit.  Plaintiffs concede that they "would have preferred to file sooner, but

[] needed some time to gather statements from dozens of fact witnesses, retain and

engage expert witnesses, and gather other data supporting their Complaint."  (ECF

No. 49 at Pg ID 3081.)  But according to Plaintiffs themselves, "[m]anipulation of

votes was apparent *shortly after the polls closed on November 3, 2020*."  (ECF No.

7 at Pg ID 1837 (emphasis added).)  Indeed, where there is no reasonable

explanation, there can be no true justification.  *See Crookston v. Johnson*, 841 F.3d

396, 398 (6th Cir. 2016) (identifying the "first and most essential" reason to issue a

stay of an election-related injunction is plaintiff offering "no reasonable

explanation for waiting so long to file this action").  Defendants satisfy the first

element of their laches defense.

Ex. 8

Second, Plaintiffs' delay prejudices Defendants.  *See Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) ("As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made, and the candidate's claim to be a serious candidate who has received a serious injury becomes less credible by his having slept on his rights.") This is especially so considering that Plaintiffs' claims for relief are not merely last-minute—they are after the fact.  While Plaintiffs delayed, the ballots were cast; the votes were counted; and the results were certified.  The rationale for interposing the doctrine of laches is now at its peak.  *See McDonald v. Cnty. of San Diego*, 124 F. App'x 588 (9th Cir. 2005) (citing *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988)); *Soules*, 849 F.2d at 1180 (quoting *Hendon v. N.C. State Bd. Of Elections*, 710 F.2d 177, 182 (4th Cir. 1983)) (applying doctrine of laches in post-election lawsuit because doing otherwise would, "permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action").

Plaintiffs could have lodged their constitutional challenges much sooner than they did, and certainly not three weeks after Election Day and one week after certification of almost three million votes.  The Court concludes that Plaintiffs' delay results in their claims being barred by laches.

19

Ex. 8

### D.     Abstention

As outlined in several filings, when the present lawsuit was filed on

November 25, 2020, there already were multiple lawsuits pending in Michigan

state courts raising the same or similar claims alleged in Plaintiffs' Amended

Complaint.  (*See, e.g.*, ECF No. 31 at Pg ID 2193-98 (summarizing five state court

lawsuits challenging President Trump's defeat in Michigan's November 3, 2020

General Election).)  Defendants and the City of Detroit urge the Court to abstain

from deciding Plaintiffs' claims in deference to those proceedings under various

abstention doctrines.  (*Id.* at Pg ID 2191-2203; ECF No. 39 at Pg ID 2840-44.)

Defendants rely on the abstention doctrine outlined by the Supreme Court in

*Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).

The City of Detroit relies on the abstention doctrines outlined in *Colorado River*,

as well as those set forth in *Railroad Commission of Texas v. Pullman Co.*, 312

U.S. 496, 500-01 (1941), and *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).  The

City of Detroit maintains that abstention is particularly appropriate when resolving

election disputes in light of the autonomy provided to state courts to initially settle

such disputes.

The abstention doctrine identified in *Colorado River* permits a federal court

to abstain from exercising jurisdiction over a matter in deference to parallel state-

court proceedings.  *Colorado River*, 424 U.S. at 813, 817.  The exception is found

20

Ex. 8

warranted "by considerations of 'proper constitutional adjudication,' 'regard for federal-state relations,' or 'wise judicial administration.'" *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (quoting *Colorado River*, 424 U.S. at 817). The Sixth Circuit has identified two prerequisites for abstention under this doctrine. *Romine v. Compuserve Corp.*, 160 F.3d 337, 339-40 (6th Cir. 1998).

First, the court must determine that the concurrent state and federal actions are parallel. *Id*. at 339. Second, the court must consider the factors outlined by the Supreme Court in *Colorado River* and subsequent cases:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; … (4) the order in which jurisdiction was obtained; … (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

*Romine*, 160 F.3d at 340-41 (internal citations omitted). "These factors, however, do not comprise a mechanical checklist. Rather, they require 'a careful balancing of the important factors as they apply in a give[n] case' depending on the particular facts at hand." *Id*. (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983)).

As summarized in Defendants' response brief and reflected in their exhibits (*see* ECF No. 31 at Pg ID 2193-97; *see also* ECF Nos. 31-7, 31-9, 31-11, 31-12,

21

Ex. 8

31-14), the allegations and claims in the state court proceedings and the pending

matter are, at the very least, substantially similar, *Romine*, 160 F.3d at 340 ("Exact

parallelism is not required; it is enough if the two proceedings are substantially

similar." (internal quotation marks and citation omitted)).  A careful balancing of

the factors set forth by the Supreme Court counsel in favor of deferring to the

concurrent jurisdiction of the state courts.

The first and second factor weigh against abstention.  *Id.* (indicating that the

weight is against abstention where no property is at issue and neither forum is

more or less convenient).  While the Supreme Court has stated that "'the presence

of federal law issues must always be a major consideration weighing against

surrender of federal jurisdiction in deference to state proceedings[,]'" *id*. at 342

(quoting *Moses H. Cone*, 460 U.S. at 26), this "'factor has less significance where

the federal courts' jurisdiction to enforce the statutory rights in question is

concurrent with that of the state courts.'"[4]  *Id.* (quoting *Moses H. Cone*, 460 U.S. at

25).  Moreover, the Michigan Election Code seems to dominate even Plaintiffs'

federal claims.  Further, the remaining factors favor abstention.

"Piecemeal litigation occurs when different courts adjudicate the identical

issue, thereby duplicating judicial effort and potentially rendering conflicting

---

[4] State courts have concurrent jurisdiction over § 1983 actions.  *Felder v. Casey*,
487 U.S. 131, 139 (1988).

Ex. 8

results." *Id.* at 341.  The parallel proceedings are premised on similar factual

allegations and many of the same federal and state claims.  The state court

proceedings were filed well before the present matter and at least three of those

matters are far more advanced than this case.  Lastly, as Congress conferred

concurrent jurisdiction on state courts to adjudicate § 1983 claims, *Felder v. Casey*,

487 U.S. 131, 139 (1988), "[t]here can be no legitimate contention that the

[Michigan] state courts are incapable of safeguarding [the rights protected under

this statute]," *Romine*, 160 F.3d at 342.

      For these reasons, abstention is appropriate under the *Colorado River*

doctrine.  The Court finds it unnecessary to decide whether abstention is

appropriate under other doctrines.

### E.    Standing

      Under Article III of the United States Constitution, federal courts can

resolve only "cases" and "controversies."  U.S. Const. art. III § 2.  The case-or-

controversy requirement is satisfied only where a plaintiff has standing to bring

suit.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24,

2016).  Each plaintiff must demonstrate standing for each claim he seeks to press.[5]

---

[5] Plaintiffs assert a due process claim in their Amended Complaint and twice state
in their motion for injunctive relief that Defendants violated their due process
rights.  (*See* ECF No. 7 at Pg ID 1840, 1844.)  Plaintiffs do not pair either
statement with anything the Court could construe as a developed argument.  (*Id*.)
The Court finds it unnecessary, therefore, to further discuss the due process claim.

23

Ex. 8

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted) ("[A]

plaintiff must demonstrate standing separately for each form of relief sought.").

To establish standing, a plaintiff must show that:  (1) he has suffered an injury in

fact that is "concrete and particularized" and "actual or imminent"; (2) the injury is

"fairly . . . trace[able] to the challenged action of the defendant"; and (3) it is

"likely, as opposed to merely speculative, that the injury will be redressed by a

favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992)

(internal quotation marks and citations omitted).

### 1.    Equal Protection Claim

Plaintiffs allege that Defendants engaged in "several schemes" to, among

other things, "destroy," "discard," and "switch" votes for President Trump, thereby

"devalu[ing] Republican votes" and "diluting" the influence of their individual

votes.  (ECF No. 49 at Pg ID 3079.)  Plaintiffs contend that "the vote dilution

resulting from this systemic and illegal conduct did not affect all Michigan voters

equally; it had the intent and effect of inflating the number of votes for Democratic

candidates and reducing the number of votes for President Trump and Republican

candidates."  (ECF No. 49 at Pg ID 3079.)  Even assuming that Plaintiffs establish

---

*McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a
perfunctory manner, unaccompanied by some effort at developed argumentation,
are deemed waived.").

24

Ex. 8

injury-in-fact and causation under this theory,[6] their constitutional claim cannot

stand because Plaintiffs fall flat when attempting to clear the hurdle of

redressability.

Plaintiffs fail to establish that the alleged injury of vote-dilution can be

redressed by a favorable decision from this Court.  Plaintiffs ask this Court to de-

certify the results of the 2020 General Election in Michigan.  But an order de-

certifying the votes of approximately 2.8 million people would not reverse the

dilution of Plaintiffs' vote.  To be sure, standing is not "dispensed in gross: A

plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill*,

138 S. Ct. at 1934 (citing *Cuno*, 547 U.S. at 353); *Cuno*, 547 U.S. at 353 ("The

remedy must of course be limited to the inadequacy that produced the injury in fact

that the plaintiff has established." (quoting *Lewis v. Casey*, 518 U.S. 343, 357

(1996)).  Plaintiffs' alleged injury does not entitle them to seek their requested

remedy because the harm of having one's vote invalidated or diluted is not

remedied by denying millions of others *their* right to vote.  Accordingly, Plaintiffs

have failed to show that their injury can be redressed by the relief they seek and

thus possess no standing to pursue their equal protection claim.

---

[6] To be clear, the Court does not find that Plaintiffs satisfy the first two elements of
the standing inquiry.

25

Ex. 8

### 2.    Elections Clause & Electors Clause Claims

The provision of the United States Constitution known as the Elections Clause states in part: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]"  U.S. Const. art. I, § 4, cl. 1.  "The Elections Clause effectively gives state governments the 'default' authority to regulate the mechanics of federal elections, *Foster v. Love*, 522 U.S. 67, 69, 118 S. Ct. 464, 139 L.Ed.2d 369 (1997), with Congress retaining 'exclusive control' to 'make or alter' any state's regulations, *Colegrove v. Green*, 328 U.S. 549, 554, 66 S. Ct. 1198, 90 L.Ed. 1432 (1946)."  *Bognet*, 2020 WL 6686120, *1.  The "Electors Clause" of the Constitution states: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors …."  U.S. Const. art. II, § 1, cl. 2.

Plaintiffs argue that, as "nominees of the Republican Party to be Presidential Electors on behalf of the State of Michigan, they have standing to allege violations of the Elections Clause and Electors Clause because "a vote for President Trump and Vice-President Pence in Michigan … is a vote for each Republican elector[], and … illegal conduct aimed at harming candidates for President similarly injures Presidential Electors."  (ECF No. 7 at Pg ID 1837-38; ECF No. 49 at Pg ID 3076-78.)

Ex. 8

But where, as here, the only injury Plaintiffs have alleged is that the

Elections Clause has not been followed, the United States Supreme Court has made

clear that "[the] injury is precisely the kind of undifferentiated, generalized

grievance about the conduct of government that [courts] have refused to

countenance."[7] *Lance v. Coffman*, 549 U.S. 437, 442 (2007). Because Plaintiffs

"assert no particularized stake in the litigation," Plaintiffs fail to establish injury-

in-fact and thus standing to bring their Elections Clause and Electors Clause

claims. *Id.*; *see also Johnson v. Bredesen*, 356 F. App'x 781, 784 (6th Cir. 2009)

(citing *Lance*, 549 U.S. at 441-42) (affirming district court's conclusion that

citizens did not allege injury-in-fact to support standing for claim that the state of

Tennessee violated constitutional law).

---

[7] Although separate constitutional provisions, the Electors Clause and Elections
Clause share "considerable similarity," *Ariz. State Leg. v. Ariz. Indep. Redistricting
Comm'n*, 576 U.S. 787, 839, (2015) (Roberts, C.J., dissenting), and Plaintiffs do
not at all distinguish the two clauses in their motion for injunctive relief or reply
brief (ECF No. 7; ECF No. 49 at Pg ID 3076-78). *See also Bognet v. Sec'y
Commonwealth of Pa.*, No. 20-3214, 2020 WL 6686120, at *7 (3d Cir. Nov. 13,
2020) (applying same test for standing under both Elections Clause and Electors
Clause); *Wood*, 2020 WL 6817513, at *1 (same); *Foster*, 522 U.S. at 69
(characterizing Electors Clause as Elections Clauses' "counterpart for the
Executive Branch"); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804-05
(1995) (noting that state's "duty" under Elections Clause "parallels the duty"
described by Electors Clause).

27

Ex. 8

This is so because the Elections Clause grants rights to "the Legislature" of "each State."  U.S. Const. art. I, § 4, cl. 1.  The Supreme Court interprets the words "the Legislature," as used in that clause, to mean the lawmaking bodies of a state. *Ariz. State Legislature*, 135 S.Ct. at 2673.  The Elections Clause, therefore, grants rights to state legislatures and to other entities to which a State may delegate lawmaking authority.  *See id.* at 2668.  Plaintiffs' Elections Clause claims thus belong, if to anyone, Michigan's state legislature.  *Bognet v. Secy. Commonwealth of Pa.*, -- F.3d. --, 2020 WL 6686120, *7 (3d Cir. Nov. 13, 2020).  Plaintiffs here are six presidential elector nominees; they are not a part of Michigan's lawmaking bodies nor do they have a relationship to them.

To support their contention that they have standing, Plaintiffs point to *Carson v. Simon*, 78 F.3d 1051 (8th Cir. 2020), a decision finding that electors had standing to bring challenges under the Electors Clause.  (ECF No. 7 at Pg ID 1839 (citing *Carson*, 978 F.3d at 1057).)  In that case, which was based on the specific content and contours of Minnesota state law, the Eighth Circuit Court of Appeals concluded that because "the plain text of Minnesota law treats prospective electors as candidates," it too would treat presidential elector nominees as candidates. *Carson*, 78 F.3d at 1057.  This Court, however, is as unconvinced about the majority's holding in *Carson* as the dissent:

> I am not convinced the Electors have Article III standing
> to assert claims under the Electors Clause.  Although

28

Minnesota law at times refers to them as "candidates," *see, e.g*., Minn. Stat. § 204B.03 (2020), the Electors are not candidates for public office as that term is commonly understood.  Whether they ultimately assume the office of elector depends entirely on the outcome of the state popular vote for president.  *Id*. § 208.04 subdiv. 1 ("[A] vote cast for the party candidates for president and vice president shall be deemed a vote for that party's electors.").  They are not presented to and chosen by the voting public for their office, but instead automatically assume that office based on the public's selection of entirely different individuals.

78 F.3d at 1063 (Kelly, J., dissenting).[8]

Plaintiffs contend that the Michigan Election Code and relevant Minnesota

law are similar.  (See ECF No. 49 at Pg ID 3076-78.)  Even if the Court were to

---

[8] In addition, at least one Circuit Court, the Third Circuit Court of Appeals, has distinguished *Carson*'s holding, noting:

Our conclusion departs from the recent decision of an Eighth Circuit panel which, over a dissent, concluded that candidates for the position of presidential elector had standing under *Bond* to challenge a Minnesota state-court consent decree that effectively extended the receipt deadline for mailed ballots. . . . The *Carson* court appears to have cited language from *Bond* without considering the context—specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding *Bond* beyond this context, and the *Carson* court cited none.

*Bognet*, 2020 WL 6686120, at *8 n.6.

Ex. 8

agree, it finds that Plaintiffs lack standing to sue under the Elections and Electors Clauses.

**F.      The Merits of the Request for Injunctive Relief**

**1.      Likelihood of Success on the Merits**

The Court may deny Plaintiffs' motion for injunctive relief for the reasons discussed above.  Nevertheless, the Court will proceed to analyze the merits of their claims.

**a.      Violation of the Elections & Electors Clauses**

Plaintiffs allege that Defendants violated the Elections Clause and Electors Clause by deviating from the requirements of the Michigan Election Code.  (*See, e.g.,* ECF No. 6 at Pg ID 884-85, ¶¶ 36-40, 177-81, 937-38.)  Even assuming Defendants did not follow the Michigan Election Code, Plaintiffs do not explain how or why such violations of state election procedures automatically amount to violations of the clauses.  In other words, it appears that Plaintiffs' claims are in fact state law claims disguised as federal claims.

A review of Supreme Court cases interpreting these clauses supports this conclusion.  In *Cook v. Gralike*, the Supreme Court struck down a Missouri law that required election officials to print warnings on the ballot next to the name of any congressional candidate who refused to support term limits after concluding that such a statute constituted a "'regulation' of congressional elections," as used in

30

Ex. 8

the Elections Clause.  531 U.S. 510, 525-26 (2001) (quoting U.S. Const. art. I, § 4,

cl. 1).  In *Arizona State Legislature v. Arizona Independent Redistricting*

*Commission*, the Supreme Court upheld an Arizona law that transferred

redistricting power from the state legislature to an independent commission after

concluding that "the Legislature," as used in the Elections Clause, includes any

official body with authority to make laws for the state.  576 U.S. 787, 824 (2015).

In each of these cases, federal courts measured enacted state election laws against

the federal mandates established in the clauses—they did not measure *violations* of

enacted state elections law against those federal mandates.

By asking the Court to find that they have made out claims under the clauses

due to alleged violations of the Michigan Election Code, Plaintiffs ask the Court to

find that any alleged deviation from state election law amounts to a modification of

state election law and opens the door to federal review.  Plaintiffs cite to no case—

and this Court found none—supporting such an expansive approach.

### b.    Violation of the Equal Protection Clause

Most election laws will "impose some burden upon individual voters."

*Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  But "[o]ur Constitution leaves no

room for classification of people in a way that unnecessarily abridges this right [to

vote]."  *Reynolds v. Sims*, 377 U.S. 533, 559 (1964) (quoting *Wesberry v. Sanders*,

376 U.S. 1, 17-18 (1964)).  Voting rights can be impermissibly burdened "by a

31

debasement or dilution of the weight of a citizen's vote just as effectively as by

wholly prohibiting the free exercise of the franchise."  *Id.* (quoting *Reynolds*, 377

U.S. at 555).

Plaintiffs attempt to establish an Equal Protection claim based on the theory

that Defendants engaged in "several schemes" to, among other things, "destroy,"

"discard," and "switch" votes for President Trump, thereby "devalu[ing]"

Republican votes" and "diluting" the influence of their individual votes.  (ECF No.

49 at Pg ID 3079.)

But, to be perfectly clear, Plaintiffs' equal protection claim is not supported

by any allegation that Defendants' alleged schemes caused votes for President

Trump to be changed to votes for Vice President Biden.  For example, the closest

Plaintiffs get to alleging that physical ballots were altered in such a way is the

following statement in an election challenger's sworn affidavit:  "I believe some of

these workers were changing votes that had been cast for Donald Trump and other

Republican candidates."[9]  (ECF No. 6 at Pg ID 902 ¶ 91 (citing Aff. Articia

---

[9] Plaintiffs allege in several portions of the Amended Complaint that election officials improperly tallied, counted, or marked ballots.  But some of these allegations equivocate with words such as "believe" and "may" and none of these allegations identify which presidential candidate the ballots were allegedly altered to favor. (*See, e.g.,* ECF No. 6 at Pg ID 902, ¶ 91 (citing Aff. Articia Bomer, ECF No. 6-3 at Pg ID 1008-10 ("I *believe* some of these ballots *may* not have been properly counted." (emphasis added))); Pg ID 902-03, ¶ 92 (citing Tyson Aff. ¶ 17) ("At least one challenger observed poll workers adding marks to a ballot where there was no mark for any candidate.").

32

Ex. 8

Bomer, ECF No. 6-3 at Pg ID 1008-1010).)  But of course, "[a] belief is not

evidence" and falls far short of what is required to obtain any relief, much less the

extraordinary relief Plaintiffs request.  *United States v. O'Connor*, No. 96-2992,

1997 WL 413594, at *1 (7th Cir. 1997); *see Brown v. City of Franklin*, 430 F.

App'x 382, 387 (6th Cir. 2011) ("Brown just submits his belief that Fox's

'protection' statement actually meant "protection from retaliation. . . . An

unsubstantiated belief is not evidence of pretext."); *Booker v. City of St. Louis*, 309

F.3d 464, 467 (8th Cir. 2002) ("Booker's "belief" that he was singled out for

testing is not evidence that he was.").[10]  The closest Plaintiffs get to alleging that

election machines and software changed votes for President Trump to Vice

---

[10] As stated by the Circuit Court for the District of Columbia Circuit:

> The statement is that the complainant believes and
> expects to prove some things. Now his belief and
> expectation may be in good faith; but it has been
> repeatedly held that suspicion is not proof; and it is
> equally true that belief and expectation to prove cannot
> be accepted as a substitute for fact.  The complainant
> carefully refrains from stating that he has any
> information upon which to found his belief or to justify
> his expectation; and evidently he has no such
> information.  But belief, without an allegation of fact
> either upon personal knowledge or upon information
> reasonably sufficient upon which to base the belief,
> cannot justify the extraordinary remedy of injunction.

*Magruder v. Schley*, 18 App. D.C. 288, 292, 1901 WL 19131, at *2 (D.C. Cir.
1901).

Ex. 8

President Biden in Wayne County is an amalgamation of theories, conjecture, and speculation that such alterations were *possible*.  (*See e.g.,* ECF No. 6 at ¶¶ 7-11, 17, 125, 129, 138-43, 147-48, 155-58, 160-63, 167, 171.)  And Plaintiffs do not at all explain how the question of whether the treatment of election challengers complied with state law bears on the validity of votes, or otherwise establishes an equal protection claim.

With nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails.[11]  *See Wood*, 2020 WL 7094866 (quoting *Bognet*, 2020 WL 6686120, at \*12) ("'[N]o single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'").

---

[11] "[T]he Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently.  Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment.  And if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity.  That is not how the Equal Protection Clause works." *Bognet*, 2020 WL 6686120, at \*11.

Ex. 8

## 2.      Irreparable Harm & Harm to Others

Because "a finding that there is simply no likelihood of success on the merits is usually fatal[,]" *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997), the Court will not discuss the remaining preliminary injunction factors extensively.

As discussed, Plaintiffs fail to show that a favorable decision from the Court would redress their alleged injury.  Moreover, granting Plaintiffs' injunctive relief would greatly harm the public interest.  As Defendants aptly describe, Plaintiffs' requested injunction would "upend the statutory process for election certification and the selection of Presidential Electors.  Moreover, it w[ould] disenfranchise millions of Michigan voters in favor [of] the preferences of a handful of people who [are] disappointed with the official results."  (ECF No. 31 at Pg ID 2227.)

In short, none of the remaining factors weigh in favor of granting Plaintiffs' request for an injunction.

## IV.   Conclusion

For these reasons, the Court finds that Plaintiffs are far from likely to succeed in this matter.  In fact, this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court—and more about the impact of their allegations on People's faith in the democratic

35

process and their trust in our government.  Plaintiffs ask this Court to ignore the

orderly statutory scheme established to challenge elections and to ignore the will of

millions of voters.  This, the Court cannot, and will not, do.

The People have spoken.

The Court, therefore, **DENIES** Plaintiffs' "Emergency Motion for

Declaratory, Emergency, and Permanent Injunctive Relief" (ECF No. 7.)

**IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE


Dated: December 7, 2020

36

Ex. 8