2020 WL 5755289
Only the Westlaw citation is currently available.
United States District Court, D. Vermont.

Tracey MARTEL, Robert Frenier,
Brian Smith, Raoul Beaulieu,
and Mary Beausoleil, Plaintiffs,
v.
James C. CONDOS, in his official
capacity as the Secretary of
State of Vermont, Defendant.

Case No. 5:20-cv-131
|
Signed 09/16/2020

**Synopsis**
**Background:** Five registered voters brought action to challenge Secretary of State directive that an election ballot be mailed to every active voter on the statewide voter checklist, alleging that the directive was unconstitutional, ultra vires, and contrary to law and seeking an injunction rescinding the directive and preventing Secretary of State from issuing mail-in ballots. Voter filed motion for preliminary injunction, and Secretary of State filed motion to dismiss.

The District Court, Geoffrey W. Crawford, Chief Judge, held that voters lacked concrete and particularized injury in fact necessary for standing.

Motion for injunction denied, case dismissed.

**Attorneys and Law Firms**

David A. Warrington, Esq., Pro Hac Vice, Kutak Rock LLP, Richmond, VA, Deborah T. Bucknam, Esq., Bucknam Law PC, Walden, VT, Harmeet K. Dhillon, Esq., Pro Hac Vice, Dhillon Law Group Inc., San Francisco, CA, Mark P. Meuser, Esq., Pro Hac Vice, Dhillon Law Group Inc., San Franciso, CA, for Plaintiffs.

David R. Groff, Esq., Philip A. Back, Esq., Office of the Vermont Attorney General, Montpelier, VT, for Defendant.

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION AND ON MOTION TO DISMISS**

Geoffrey W. Crawford, Chief Judge

 *1  In the spring of 2020, faced with the crisis resulting from the spread of COVID-19 infection, the Vermont legislature passed two bills that changed Vermont election law for the 2020 primary and general elections. *See* 2020 Vt. Acts & Resolves Nos. 92 and 135 (Act 92 and Act 135, respectively). These became law in July 2020 after the governor declined to sign or veto the measures. *See* Letter from Philip B. Scott, Governor, to the Vt. Gen. Assembly (July 2, 2020), https://governor.vermont.gov/sites/scott/files/documents/Vermont% 20General% 20Assembly% 20Letter% 20re% 20S.348.pdf. Vermont Secretary of State James C. Condos issued a Directive on July 20, 2020 exercising the authority conferred upon him by the two Acts. (Doc. 1-1.) The Directive includes, among other things, a provision stating that, for the November general election, "[a] ballot will be mailed to every active voter on the statewide voter checklist." (Doc. 1-1 at 4.)

The above-captioned plaintiffs have filed a complaint against Secretary Condos seeking a declaration that the Directive is unconstitutional, *ultra vires*, and contrary to law. (Doc. 1 at 25.) They also seek an injunction rescinding the Directive and preventing Secretary Condos from distributing mail-in ballots as contemplated by the Directive. (*Id.*) Currently pending is Plaintiffs' Motion for a Preliminary Injunction (Doc. 2) and Defendant's Motion to Dismiss (Doc. 10). The court held a hearing on the motions on September 15, 2020.

**Background**

The provisions in Acts 92 and 135 principally at issue in this case concern the legislature's decision to authorize the Secretary of State to require local election officials to send ballots by mail to all registered voters. Act 92 states, in pertinent part:

> In the year 2020, the Secretary of State is authorized, in consultation and agreement with the Governor, to order or permit, as applicable appropriate elections procedures for the purpose of protecting the health, safety and welfare of voters, elections workers, and candidates in carrying out elections including:

(1) requiring mail balloting by requiring town clerks to send ballots by mail to all registered voters ....

Act 92, § 3(a). Act 135 amended Act No. 92. It removed the requirement of "agreement" with the Governor. Act 135, § 1. It also added a new subsection (c):

If the Secretary of State orders or permits the mailing of 2020 General Election ballots to all registered voters pursuant to subsection (a) of this section, the Secretary shall:

(1) inform the Governor as soon as reasonably practicable following the Secretary's decision to do so; and

(2) require the return of those ballots to be in the manner prescribed by 17 V.S.A. § 2543 (return of ballots) as set forth in Sec. 1a of this act, the provisions of which shall apply to that return.

*Id.*[1] Other changes in election practices authorized by the Acts include provisions for collecting and counting mail-in ballots early, permitting drive-up, car window collection of ballots, and extending both voting hours and the time to process and count ballots. Act 92, § 3(a)(1–6); Act 135 § 1 (a)(1–6).

[1] Paragraph (2) of subsection (c) contains a mistake. Section 2543 of Title 17 sets out procedures for returning early ballots to local election officials. Sec. 1a appeared in prior versions of Act No. 135. It contained procedures restricting so-called "ballot harvesting" by third party organizations. Section 1a was dropped from the final version of Act 135 and never enacted. The reference to it is a legislative drafting mistake which was noted in the Governor's July 2, 2020 letter as a technical error. It refers to a proposed change in the law which was not ultimately passed. Such mistakes are unhelpful in understanding statutory language, but this one does not have any effect on the other provisions of Acts 92 and 135. The court will apply the other provisions of the Acts despite the mistaken reference to the (non-existent) Section 1a.

*2 In response to the legislative initiative, the Secretary of State issued a Directive on July 20, 2020 exercising the authority conferred upon him by the two Acts. (Doc. 1-1.) The Directive states that it is issued "[n]otwithstanding any provisions of law contained in Title 17 of the Vermont Statutes Annotated to the contrary" and "pursuant to the authority granted to the Secretary of State by Act 92 (2020) and Act 135 (2020)." (*Id.* at 1.) The Directive describes a variety of measures for both the August primary and November general elections, including new procedures for ballot returns, processing, outdoor and drive-through polling places, outdoor ballot handling, overseas voters, changes of polling places, qualifications of election officials, home delivery of ballots, mask requirements, and voting in person after receiving a ballot by mail. (*See id.* at 1–4.) Regarding ballot returns, the Directive states that, with four enumerated exceptions, "[b]allots may not be returned to the Clerk by any candidate whose name appears on the ballot for that election, or any campaign staff member of any such candidate." (*Id.* at 1.) Regarding changes to polling places, the Directive states that "[t]he location of a polling place may be changed no less than 15 days prior to the election." (*Id.* at 3.)

The Directive contains the following provision for "mailed ballots" in the November general election:

A ballot will be mailed to every active voter on the statewide voter checklist. "Active" voters are any voters that have not been sent a challenge letter by the BCA asking the voter to affirm their residence, or who have responded to any such letter and have affirmed their residence.

- Ballots will be mailed to all active registered voters starting Friday, September 18.

- Ballots will be mailed or otherwise delivered to all military and overseas voters no later than the September 19 deadline mandated by federal law.

- All ballots will be mailed from a central location by the Secretary of State's Office.

- For mailing purposes, the Secretary of State will use the mailing address contained in any pending request for a General Election ballot first, and if none will use the mailing address in the voter's record second, and if none the legal address in the voter's record.

- The issue date for all ballots will be recorded in the statewide election management system by the Secretary of State on a batch basis as they are sent. Clerks will only by required to record the date that ballots are returned. Clerks will be required to enter the request, issue, and return date for any ballots requested by voters after the statewide mailing is sent, including for those voters who may register after that date.

- Postage for the mailing of ballots and the return of ballots to the Clerks by voters will be paid by the Secretary of State's office. All envelopes will be pre-paid.

(*Id.* at 4–5.)

After issuing the Directive and in preparation for the August primary election, the Secretary caused absentee primary ballot request forms printed on postcards to be sent to every person listed on the statewide voter checklist. (Doc. 1 ¶ 42.) According to the Complaint, the issuance of the postcards "was intended to be a test of the process by which Condos intended to mail ballots to all voters on the statewide voter checklist pursuant to the Directive." (*Id.* ¶ 43.) Plaintiffs allege that the postcard mailing revealed "numerous problems," such as postcards being sent to voters at addresses they no longer used, postcards sent to people who are no longer eligible to vote in Vermont, and some longtime registered voters who received no postcard. (*Id.* ¶¶ 45–48.)

The Secretary of State is prepared to follow the Directive and Acts 92 and 135 by mailing out ballots to all active registered voters on Friday, September 18, 2020.

Analysis

**I. Plaintiffs' Challenges**
Plaintiffs are five registered Vermont voters. In addition to their status as registered voters, several have played a role in local and state government. Plaintiff Tracey Martel is the town clerk of Victory, Vermont, where she is responsible for the administration of Victory's elections. Robert Frenier is a former member of the Vermont House of Representatives. Brian Smith is a current member of the Vermont House. Mary Beausoleil is a resident of Lyndon and previously a Justice of the Peace.

**A. Challenge to Statewide Mail-In Ballots**
*\*3* Plaintiffs complain that their individual votes will be diluted if the distribution of mail-in ballots leads—as they fear—to mistaken votes or widespread voter fraud. The Complaint alleges that:

> if General Election mail-in ballots are automatically distributed to every eligible voter (any voter on a voter check-list), without any request for such a ballot from that voter, many castable ballots will inevitably fall in the hands of persons other than the voter to whom the mail-in ballot was directed, including some mail-in ballots that will be sent to persons to have moved, died or otherwise become ineligible."

(Doc. 1 ¶ 25.) Plaintiffs fear that ballots will be mailed to voters who have moved away, died, or otherwise become ineligible and that these ballots will be used to vote illegally by the ineligible voter or others who acquire the ballots and return them to polling places. (*See id.* ¶ 62.)

**B. Other Challenges**
In addition to their challenge based on alleged dilution of their votes, Plaintiffs assert in Count II that the Directive is unconstitutional and an *ultra vires* use of legislative power. They assert that the Directive contains provisions that are inconsistent with Vermont law. (*See id.* ¶ 71.) Finally, in Count III, Plaintiffs assert that the Directive is *ultra vires* because, in Plaintiffs' view, it does nothing beyond existing Vermont law to "protect[ ] the health, safety, and welfare of voters, elections workers, and candidates in carrying out elections"—the stated purpose of Acts 92 and 135. *See* Act 92, § 3(a); Act 135 § 1(a).

**II. Standing**
Plaintiffs' case begins and ends with the issue of standing. This is a constitutional requirement which operates as a check on the ability of litigants to file claims for injuries which are insufficiently specific and direct in their effect on the plaintiff. *See Allen v. Wright*, 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–27, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014).[2] Cases in which plaintiffs assert "generalized grievances" of unlawful governmental action are commonly dismissed on standing grounds. *See United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (impact of government action plainly undifferentiated and common to all members of the public). The constitutional minimum of standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 184 (2d Cir. 2020) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

[2] Standing has both a constitutional and a prudential aspect. In this case, the court is only concerned with

constitutional standing. Because it is absent, there is no need to consider the further issue of whether standing is not present for prudential reasons.

The requirement of "injury in fact" serves multiple purposes. It limits justiciable cases to those controversies which are sufficiently well-defined by injury to the plaintiff that the parties will develop the facts and seek remedies which are responsive to the harm. *See Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("The requirement of 'actual injury redressable by the court' ... tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." (internal citations omitted)). In a manner directly relevant to this case, the requirement supports principles of separation of power and caution in second-guessing decisions made by the other branches. *See Laird v. Tatum,* 408 U.S. 1, 15, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) ("Carried to its logical end, [litigation without direct injury] would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for the Congress acting through its committees and the 'power of the purse,' it is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action."). The "injury in fact" must have been "concrete and particularized" and also "actual or imminent, not conjectural or hypothetical." *Liberian Cmty. Ass'n of Conn.,* 970 F.3d at 184 (quoting *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130).

**\*4** Standing doctrine has an extensive history in the context of challenges to election practices. In *United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), the Supreme Court recognized the constitutional right to vote and have one's vote counted. "Obviously included within the right to choose [representatives], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted at Congressional elections." *Id.* at 315, 61 S.Ct. 1031. *See The Ku Klux Cases,* 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884). In reapportionment cases, the Court has long recognized the standing of the disadvantaged voter. *See Baker v. Carr,* 369 U.S. 186, 208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ("[Plaintiffs] are asserting a plain, direct and adequate interest in maintaining the effectiveness of their votes, not merely a claim of the right possessed by every citizen to require that the government be administered according to law.") (citations and internal quotations omitted).

Standing in such cases, however, does not extend to parties who have not themselves suffered discrimination or other individualized injury. *See United States v. Hays,* 515 U.S. 737, 745, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (without evidence that "plaintiff has personally been subjected to a racial classification ... [he] would be asserting only a generalized grievance against governmental conduct of which he or she does not approve."); *Sinkfield v. Kelley,* 531 U.S. 28, 121 S.Ct. 446, 148 L.Ed.2d 329 (2000) (majority white voters lacked standing to complain of unlawful racial practices to which they had not been subjected). The Second Circuit recognized the same principles in *League of Women Voters of Nassau County v. Nassau County Bd. of Supervisors,* 737 F.2d 155, 162 (2d Cir. 1984) ("[parties] who are not persons domiciled in underrepresented voting districts lack standing to prosecute this appeal.") *See Roxbury Taxpayers Alliance v. Delaware Cty Bd. of Supervisors,* 80 F.3d 42 (2d Cir. 1996) (only underrepresented voters have standing to bring claims of disproportional representation).

It would over-simplify the standing analysis to conclude that no state-wide election law is subject to challenge simply because it affects all voters. State legislation which unfairly restricts a voter's right to vote is subject to review by the courts. "We have long recognized that a person's right to vote is 'individual and personal in nature.' " *Gill v. Whitford,* ––– U.S. ––––, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018) (citing *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)). But as the *Gill* decision illustrates, the Supreme Court continues to decline to extend standing to plaintiffs asserting generalized objections to state election laws. In this case, the alleged injury is similar to the impact alleged by the majority voters who lacked standing in the reapportionment cases. The gerrymandered districts altered the proportional impact of every vote, but only those specifically disadvantaged by the unconstitutional scheme have standing. A vote cast by fraud or mailed in by the wrong person through mistake has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged.

These cases lead the court to be cautious in this case about extending standing to any registered voter – such as the five who have sued here – who alleges an injury common to all other registered voters. If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury. As the affidavit submitted by plaintiffs' expert makes clear, plaintiffs believe that the new processes

in place for the 2020 general election in Vermont have an excessive error rate. They propose a different system with heightened security, principally through a system to compare the signature accompanying the mail-in ballot with the signature on file. It is unnecessary to decide whether their proposed change is a good idea or not since the standing doctrine does not permit everyone and anyone to bring a lawsuit to challenge the merits of legislation.

The Vermont Superior Court in *Paige v. State of Vermont* recently rejected a similar challenge to the Directive on standing grounds. In that case, a Vermont voter and candidate for elected office in the upcoming election, H. Brooke Paige, challenged the Directive's statewide mail-in ballot procedure in the context of what he described as an interlocutory appeal of an administrative election complaint that he had filed. The Superior Court declined to hear the case because Mr. Paige had not exhausted his administrative remedies. *Paige v. State of Vermont*, No. 20-CV-00307 (Vt. Super. Ct. Sept. 8, 2020) (Zonay, J.). But the court also held that Mr. Paige lacked standing to challenge the statewide mail-in ballot procedure based on concerns of fraud because his claim consisted of "theoretical harms to the election process rather than threats of actual injury being caused to a protected legal interest." *Id.*

**\*5** Plaintiffs seek to distinguish *Paige*. They note that Mr. Paige filed his suit prematurely. That is one of the bases for the Superior Court's decision, but the court also separately found that Mr. Paige lacked standing. On the issue of standing, Plaintiffs argue that Mr. Paige had standing because a Vermont statute allowed him to file an election complaint with the Secretary of State. Plaintiffs here do not rely on that Vermont statute, but instead assert that they have alleged an individualized and particular harm flowing from the Directive. For the reasons stated above, the court disagrees; Plaintiffs have failed to show the "injury in fact" necessary to have standing. The *Paige* court's conclusion on the standing issue applies with equal force in this case. *Accord, Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, ––– F.Supp.3d ––––, ––––, 2020 WL 2089813, at \*5 (D. Nev. Apr. 30, 2020) (Nevada voters lacked standing to challenge all-mail election plan based on concerns of an increase in illegal votes; their "purported injury of having their votes diluted due to ostensible election fraud may be conceivable raised by any Nevada voter. Such claimed injury therefore does not satisfy the requirement that Plaintiffs must state a concrete and particularized injury").

At oral argument, counsel for the plaintiff drew attention to a problem different from dilution by fraudulent votes which formed the focus of the complaint. Instead, plaintiffs seek to argue that the universal mail-in system may deprive them of an individualized right to vote if they (1) do not receive their ballot in the mail and (2) fail to take other measures to obtain a ballot such as contacting the town clerk directly or appearing at the polling place on election day in person. As this is not a class action, the court considers the experience of the individual plaintiffs themselves. These are sophisticated voters who have gone to considerable lengths to obtain counsel skilled in election law and to file a lawsuit in federal court. Of all people likely to be confused about how to vote, these five plaintiffs must be last on the list. The court will not enjoin a state-wide mailing because one or more of these plaintiffs may be confused by the non-receipt of a separate mailing last month in connection with the primary election.

## Conclusion

Plaintiffs' Motion for Preliminary Inunction (Doc. 2) is DENIED.

Defendant's Motion to Dismiss (Doc. 10) is GRANTED.

This case is DISMISSED WITHOUT PREJUDICE.

**All Citations**

--- F.Supp.3d ----, 2020 WL 5755289