# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

WILLIAM FEEHAN,

      Plaintiff,

v.

WISCONSIN ELECTIONS COMMISSION,
and its members ANN S. JACOBS, MARK
L. THOMSEN, MARGE BOSTELMANN,
JULIE M. GLANCEY, DEAN HUDSON,
ROBERT F. SPINDELL, JR., in their official
capacities, GOVERNOR TONY EVERS,
in his official capacity,

      Defendants.

Case No.: 20CV1771

---

## BRIEF OF GOVERNOR TONY EVERS IN SUPPORT OF HIS MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

---

Jeffrey A. Mandell
Rachel E. Snyder
Richard A. Manthe
STAFFORD ROSENBAUM LLP
222 W. Washington Ave., Suite 900
Post Office Box 1784
Madison, WI 53701-1784
Telephone: 608-256-0226
jmandell@staffordlaw.com
rsnyder@staffordlaw.com
rmanthe@staffordlaw.com

Paul Smith
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
Telephone: (202) 736-2200
psmith@campaignlegalcenter.org

Justin A. Nelson
Stephen E. Morrissey
Stephen Shackelford Jr.
Davida Brook
SUSMAN GODFREY L.L.P.
1000 Louisiana St., Suite 5100
Houston, TX 77002
Telephone: 713-651-9366
jnelson@susmangodfrey.com
smorrissey@susmangodfrey.com
sshackelford@susmangodfrey.com
dbrook@susmangodfrey.com

*Attorneys for Defendant,*
*Governor Tony Evers*

December 7, 2020

## INTRODUCTION

This Court is the latest theater in a six-state campaign of meritless, scorched earth litigation relentlessly—albeit uniformly unsuccessfully—waged by the Trump campaign and its allies after the November 3 election. In each state, as here, plaintiffs "seek relief that is stunning in its scope and breathtaking in its reach." *King v. Whitmer*, No. 20-13134, Op. & Order, at *2 (E.D. Mich. Dec. 7, 2020).[1] Wisconsin's Supreme Court called a similar request "the most dramatic invocation of judicial power [they] have ever seen." *Wis. Voters Alliance v. Wis. Elections Comm'n*, No. 2020AP1930-OA (Wis. Dec. 4, 2020) (Hagedorn, J., concurring on behalf of majority). This multi-state campaign is failing on every front. It should meet the same fate here.

Plaintiff's unprecedented requests for relief are based on nothing but a mishmash of speculation, conjecture, and conspiracy theories, all without a shred of evidence that could plausibly support their requested relief—and, despite waiting until a month after the election was completed, he asks the Court to grant this drastic relief immediately and thereby imperil Wisconsin's participation in the Electoral College next week. Plaintiff's case falls flat on step one (standing), and it trips again on each of the additional steps he would need to climb to establish a justiciable controversy that is not moot and that could properly be adjudicated in this Court, avoid a laches bar based on his failure to bring his claims earlier, and set forth a claim that could plausibly support his requested relief under *Twombly* and *Iqbal*.

Earlier today, a court in Michigan held, without a hearing or evidentiary presentation, that an analogous case raising nearly identical arguments with many of the same supporting exhibits

---

[1] Pursuant to Civil L.R. 7(j)(2), all unpublished cases, orders, and dispositions cited are filed in conjunction with this brief.

must be dismissed and the plea for injunctive relief denied. It did so for the same reasons identified in Governor Evers's Motion to Dismiss and his companion opposition to injunctive relief:

The plaintiffs lacked standing. Specifically relevant here, the court rejected the theory of vote dilution as a violation of the Equal Protection Clause and the allegation that presidential electors have standing under the Election and Electors Clauses. *King*, Op. & Order, at *23-*30.

The court deemed the case non-justiciable, for several reasons. The court held abstention was appropriate under the *Colorado River* doctrine. That conclusion made it "unnecessary to decide whether abstention is appropriate under other doctrines." *Id.* at *23. *Burford* abstention is argued below. The court also found the matter moot because "[t]he time has passed to provide most of the relief" and "the remaining relief is beyond the power of any court." *Id.* This accords with the Eleventh Circuit's decision affirming dismissal of the Georgia litigation, which noted that courts "cannot turn back the clock and create a world in which' the 2020 election results are not certified." *Wood v. Raffensperger*, No. 20-14418, 2020 WL 7094866, at *6 (11th Cir. Dec. 5, 2020). The Governor's Motion additionally argues that Plaintiff's case fails both because there is an exclusive state judicial procedure and he failed to exhaust his administrative remedies.

The Michigan court deemed the Eleventh Amendment preclusive. To escape that constitutional bar, the court explained, a plaintiff must "allege[] an ongoing violation of federal law and seek[] relief properly characterizes as prospective." *King*, Op. & Order, at *11 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 525 U.S. 635, 645 (2002)). But in Michigan, as here, the election results have been certified, leaving "no continuing violation to enjoin." *Id.* at *13.

The Michigan court applied laches because plaintiffs "waited too long to knock on the Court's door." *Id.* at *16. The Georgia similarly held that, "rather than challenging election rules on the eve of an election, [Wood] wants the rules for the already concluded election declared

unconstitutional and over one million absentee ballots called into question, [which] would disenfranchise a substantial portion of the electorate and erode public confidence in the electoral process." *Wood v. Raffensberger*, No. 1:2020-cv-04651-SDG, 2020 WL 6817513, at *8 (N.D. Ga. Nov. 20, 2020), *aff'd*, 2020 WL 7094866, at *6 (11th Cir. Dec. 5, 2020).

All of this before the court even reached the merits, which it found decidedly lacking. Here, the merits are so lacking that they fail to meet federal pleading standards, as argued below.

Given that Plaintiff Feehan seeks not preliminary relief to preserve the status quo but a radical remedy to reverse the results of Wisconsin's presidential election and disenfranchise millions of voters, the Court should resolve this motion to dismiss before considering any request for relief. *See* Fed. R. Civ. P. 12(i); *accord, e.g.*, *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1062 (N.D. Ill. 2020) (court addressed motion to dismiss first, and then addressed preliminary injunction on remaining count not dismissed); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, No. 16-CV-943-PP, 2016 WL 8846573, at *1 (E.D. Wis. Oct. 3, 2016) (court addressed motion to dismiss before previously filed motion for preliminary injunction).

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) tests the sufficiency of the complaint, not the merits of the case. *Center for Dermatology and Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014). A plaintiff facing a 12(b)(1) motion to dismiss must establish that the jurisdictional requirements have been met. *Id*. at 588-89. A complaint must be dismissed under Rule 12(b)(1) if the plaintiff lacks standing or the case is nonjusticiable.

To establish standing, Plaintiff must show that: (1) he has "suffered an actual or imminent, concrete and particularized injury-in-fact;" (2) there is a "causal connection between [his] injury and the conduct complained of;" and (3) there is a "likelihood that this injury will be redressed by a favorable decision." *Democratic Party of Wis. v. Vos*, 966 F.3d 581, 585 (7th Cir. 2020) (quoting

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "A plaintiff may not rely on only a 'generalized grievance about the conduct of government.'" *Id.* (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (U.S. 2018)). If a plaintiff lacks standing to assert a claim, the court lacks subject-matter jurisdiction over the claim, and the claim must be dismissed. Fed. R. Civ. P. 12(h)(3); *see also Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017). In addition to constitutional standing, the Court must also conclude that Plaintiff has prudential standing, which generally prohibits a litigant from "raising another person's legal rights," bars "adjudication of general grievances more appropriately addressed in the representative branches," and requires that claims "fall within the zone of interests protected by the law invoked." *Winkler v. Gates*, 481 F.3d 977, 979 (7th Cir. 2007) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004)).

A court may also deem a complaint nonjusticiable for several reasons, including that it is: (1) subject to exclusive remedies in a different forum, and, therefore, an appropriate subject for abstention; (2) not yet ripe because the plaintiff has failed to exhaust administrative remedies; or (3) moot because the requested relief is no longer available in light of events that have already transpired. A federal court may appropriately decline to exercise jurisdiction over a matter (abstain) "when (1) there is a substantial uncertainty as to the meaning of the state law and (2) there exists a reasonable probability that the state court's clarification of state law might obviate the need for a federal constitutional ruling." *Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 150 (7th Cir. 2011) (citation omitted). Moreover, under Wisconsin law, "where administrative action has taken place, and a statute sets forth a specific procedure for review of that action and court review of the administrative decision, the statutory remedy is exclusive and the parties cannot seek judicial review of the agency decision through other means." *Thomas v. McCaughtry*, 201 F.3d 995, 1001 (7th Cir. 2000) (citation omitted). Also, a "case is

moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Stotts v. Cmty. Unit Sch. Dist. No. 1*, 230 F.3d 989, 990 (7th Cir. 2000) (internal quotation marks and citations omitted). And as the Eleventh Circuit and Eastern District of Michigan recognized in rejecting substantially identical claims over the past couple days, the failure to overcome these hurdles to establishing a justiciable controversy is fatal to Plaintiff's claims. King, Op. & Order, at *16; Wood v. Raffensberger, 2020 WL 7094866, at *6.

The equitable doctrine of laches may also bar a complaint if a plaintiff's "unwarranted delay in bringing a suit or otherwise pressing a claim produces prejudice to the defendant. In the context of elections, this means that any claim against a state electoral procedure must be expressed expeditiously." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) (citations omitted).

Upon satisfying those basic requirements for pursuing any claim in federal court, a Plaintiff then can nonetheless overcome a motion to dismiss only if the allegations underlying his claims are plausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And where, as here, a plaintiff alleges fraud, the Federal Rules apply a heightened pleading standard. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Under this heightened standard, a plaintiff "must describe the 'who, what, when, where, and how' of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009)).

A court must hear and resolve a properly filed motion to dismiss for the reasons stated above before proceeding to address any other matters. Pursuant to Fed. R. Civ. P. 12(i), a motion under brought under 12(b)(1) and 12(b)(6) "must be heard and decided before trial, unless the court orders a deferral until trial."

5

**ARGUMENT**

Plaintiff's claims are utterly meritless and should be dismissed for several reasons. *First*, Plaintiff lacks standing to bring his claims. *Second*, Plaintiff's claims are non-justiciable in this Court because they are the subject to the exclusive remedy provided in state law, and are properly subject to abstention, are either moot (with respect to some of the requested relief) or not yet ripe (as to others) for Plaintiff's failure to exhaust state administrative remedies, and are moot. *Third*, the Eleventh Amendment of the U.S. Constitution bars Plaintiff's claims. *Fourth*, even if Plaintiff had standing and his claims were properly before this Court, they are barred by the doctrine of laches. *Fifth*, and finally, Plaintiff's claims, rooted in a toxic combination of deeply fatally flawed "expert" "analysis" and wholly unsupported leaps of logic lacking any factual foundation in the Wisconisn election come nowhere near meeting the *Twombly/Iqbal* plausibility standard. are For all of these reasons, this Court should dismiss Plaintiff's Amended Complaint in the first instance, without ever adjudicating Plaintiff's motion for injunctive relief.

**I.     Plaintiff Lacks Standing to Assert His Claims in Federal Court.**

Plaintiff lacks standing to bring his claims, both under Article III of the U.S. Constitution and as a prudential matter. "The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance. This inquiry involves "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Kowalski v. Tesmer*, 534 U.S. 125, 128-29 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). To establish standing, Plaintiff must show: (1) injury in fact; (2) a causal connection between the claim and the alleged injury; and (3) redressability of the claimed harm. *Democratic Party of Wis.*, 966 F.3d at 585. The law is clear: general grievances applicable to everyone do not establish standing. *Winkler*, 481 F.3d at 979 (quoting *Newdow*, 542 U.S. at 11-12). Plaintiff has alleged a general grievance, based

on speculation and conjecture, that does not differentiate his claimed injury from that of other Wisconsin voters. It follows that Plaintiff lacks standing.

### A. Plaintiff lacks standing to pursue his Electors and Elections Clauses Claim.

Plaintiff claims that Defendants violated Wisconsin election law, usurping the power of the Legislature. Specifically, Plaintiff claims that Defendants facilitated the illegal use and counting of absentee ballots by individuals who, allegedly, did not qualify as "indefinitely confined" under state law, contradicted state law which provides that absentee ballots may not be counted if the certification lacks a witness address, and illegally cured absentee ballots by filling in missing witness or voter information. (Amend. Cmplt. ¶¶37-45, 104-106) But Plaintiff alleges general "harms" of statewide non-compliance with election laws that would apply to any of the 3.3 million Wisconsin voters. This is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance in the past." *Lance v. Coffman*, 549 U.S. 437, 442 (2007).

Nor does Plaintiff does gain standing by virtue of his role as a potential presidential elector. Presidential electors have a purely ministerial role under Wisconsin law. The presidential electors pledged to the candidate who won the popular vote, as determined by the state canvass, meet at the state capitol on the first Monday after the second Wednesday in December. Wis. Stat. § 7.75(1). Those presidential electors "*shall* vote by ballot for that person for president and that person for vice president who are, respectively, the candidates" for or by whom they were nominated. Wis. Stat. § 7.75(2) (emphasis added). It is mandatory, not discretionary, that a presidential elector vote for the winner of the statewide popular vote, and there can be no claim that Plaintiff is deprived of any individual or personal right under the Electors and the Elections Clauses by Defendants' alleged failure to administer the election in the manner that Plaintiff desires. Indeed, the Third Circuit recently held that plaintiffs, whether voters or elector candidates, have no private right of

action at all under the Electors and Elections Clauses. *Bognet v. Sec'y of Commonwealth*, No. 20-3214, 2020 WL 6686120, at \*19 (3d Cir. Nov. 13, 2020); *accord Hotze v. Hollins*, No. 4:20-cv-03709, 2020 WL 6437668, at \*2 (S.D. Tex. Nov. 2, 2020); *King*, Op. & Order, at \*28-\*30.[2] Treating electors the same as every other voter for these standing purposes makes sense, given that electors, confined by state law to executing a mandatory duty to vote for the winner of the statewide popular vote, have no personal interest under the Electors and Elections Clauses distinguishable from the rest of the voting population. While electors no doubt have a preference as to who wins the election, that is no different from any of the other millions of Wisconsin voters who voted in the election.

Prudential standing compels the same result. Under the prudential standing doctrine, even plaintiffs who can show some injury in fact, unlike Plaintiff here, may nonetheless, "assert only a violation of [their] own rights." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988). Here, Plaintiff's claims rest entirely on the rights of third parties: the right of the Legislature (which has chosen not to litigate) to determine how elections are conducted; the right of President Trump (who is litigating in state court under Wis. Stat. § 9.01) to be awarded Wisconsin's electoral votes if, as alleged, he received the highest number of votes; and the rights of unidentified non-party Wisconsin voters whose votes allegedly were not properly counted or were diluted by the counting of illegally cast ballots. Plaintiff, himself, has not alleged and cannot claim to have suffered any individualized harm or violation of his own rights. He thus lacks standing to proceed in this Court.

---

[2] Plaintiff erroneously cites *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020) (per curiam), to assert presidential electors have Article II standing. *Carson* is an outlier and wrong as a matter of law. The weight of federal authority holds that only state legislatures have standing to bring Electors/Elections Clause cases in cases like this.

**B.** **Plaintiff also lacks standing to pursue Equal Protection, Due Process, and "widespread fraud" claims.**

The standing principles that doom Plaintiff's lead claim in Count I for violations of the Elections and Electors Clauses also foreclose his claims in Counts II-IV for violations of the Equal Protection Clause, the Due Process Clause, and "Widespread Ballot Fraud." The common thread running through each of these claims is that Plaintiff's vote was diluted because Wisconsin counties counted some votes that Plaintiff contends were "illegal" and failed to count some votes that Plaintiff contends were "legal." But here again, Plaintiff fails to provide any detail whatsoever of a concrete constitutional harm. Courts have consistently, including with respect to the November 2020 election, rejected the notion that the generalized grievance of alleged vote dilution provides private plaintiffs, like Plaintiff here, with a right of action. *Bognet*, 2020 WL 6686120, at *11 ("This conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm."); *Wood,* 2020 WL 6817513, at *5 ("This is a textbook generalized grievance."), *aff'd*, No. 20-14418, 2020 WL 7094866, at *7 (11th Cir. Dec. 5, 2020) ("Vote dilution in this context is a paradigmatic generalized grievance that cannot support standing."); *Moore v. Cicosta*, No. 1:20-cv-911, 2020 WL 6063332, at *14 (M.D.N.C. Oct. 14, 2020) ("[T]he notion that a single person's vote will be less valuable as a result of unlawful or illegal ballots being cast is not a concrete and particularized injury in fact necessary for Article III standing."). There is a good reason for this standing principle that precludes private plaintiffs from challenging governmental action or inaction that impacts the public generally: otherwise, any enterprising conspiracy theorist with a Twitter following could run a GoFundMe campaign to fuel a series of meritless (and seemingly unending) challenges to the results of an election.

9

## II.    Plaintiff's Claims Are Not Justiciable in this Court.

### A.    The exclusive remedy for Plaintiff's claims is in state court.

The gravamen of Plaintiff's claims, "alleged irregularity, defect, or mistake committed during the voting or canvassing process," is addressed by the sole remedy of a recount process outlined in state law. Wis. Stat. § 9.01(11). The recount statute "constitutes the exclusive judicial remedy" for such claims under state law. *Id*. The plain language of the statute is unambiguous on this point, as recently confirmed by the Wisconsin Supreme Court. *Trump v. Evers*, No. 2020AP1971-OA, Order at *2 (Wis. Dec. 3, 2020); *see also id.* (Hagedorn, J. concurring) ("[C]hallenges to election results are also governed by law. … [Section 9.01] provides that these actions should be filed in the circuit court, and spells out detailed procedures for ensuring their orderly and swift disposition."); *Wis. Voters Alliance v. Wis. Elections Comm'n*, No. 2020AP1930-OA, Order at *3 (Wis. Dec. 4, 2020) (Hagedorn, J. concurring in denial of petition for original action, joined by a majority of the Justices) (noting that one reason petition for original action was "woefully deficient" was because it failed to "consider the import of election statutes that may provide the 'exclusive remedy,'" namely, Wis. Stat. §§ 5.05(2m) and 9.01).

President Trump requested a recount, the results of which are currently being appealed in state circuit court pursuant to Wisconsin law. Many of Plaintiff's claims of election law "violations" are in fact currently being litigated where they must be brought: via the recount process in state court. Federal jurisdiction is not available to circumvent the Wisconsin Legislature's designated forum for challenging an election simply by bootstrapping concerns about the constitutional right to vote to any election-related cause of action. Wisconsin has instituted a strict set of procedures for challenging election results, permitting such challenges only when election results are close (no more than a 1% difference between the leading candidates), and requiring such challenges to be brought and proceed promptly. Wis. Stat. § 9.01(1)(a)5.b. To

permit Plaintiff to circumvent these procedures and time limits, through the artifice of filing a federal lawsuit bootstrapping federal claims onto what at bottom are grievances about state officials purportedly failing to properly follow state election law, would eviscerate Wisconsin's careful process for properly and quickly deciding election challenges. If plaintiffs are not required to avail themselves of Wisconsin's strict procedural and timing requirements for challenging election results, what's to stop other disappointed Republican voters or candidates from filing lawsuit after lawsuit until January 20 (if not beyond)? Such a result would not just offend state law but would permit crafty litigants to blow past federal guideposts for finalizing the presidential election results; it would further destabilize our democracy and undermine the will of Congress, the Wisconsin legislature and, above all, the will of Wisconsin's voters. *See also infra* Part IV (laches).

      **B.**      **The Court should abstain from deciding this case.**

      This Court should abstain from exercising jurisdiction over this case. Abstention under the *Pullman* doctrine is warranted when "there is a substantial uncertainty as to the meaning of state law" and "there exists a reasonable probability that the state court's clarification of state law might obviate the need for a federal constitutional ruling." *Wis. Right to Life State Political Action Comm.*, 664 F.3d at 150 (quotation omitted). In other words, this Court should abstain if it concludes that "the resolution of a federal constitutional question might be obviated if state courts were given the opportunity to interpret ambiguous state law." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716-17 (1996). These criteria are easily met here: in accordance with Wisconsin state law, Wisconsin courts are currently considering a recount appeal raising issues that overlap with those Plaintiff asserts here. *See Trump v. Biden*, No. 2020CV7092, Order for Consolidation and for Appointment of Judicial Officer (Milwaukee Cty. Cir. Ct. Dec. 3, 2020).

*First*, the Wisconsin state law issues underlying Plaintiff's claims are sufficiently uncertain to warrant abstention. When similar issues were raised in a petition for leave to commence an original action in the Wisconsin Supreme Court, three Justices of that court characterized the claims as presenting a "matter of statewide concern that requires a declaration" of the relevant Wisconsin law. *See Wisc. Voters All. v. Wisc. Elections Comm'n*, Order, No. 2020AP1930-OA, at *4 (Wis. Dec. 4, 2020) (Roggensack, Ziegler, and Bradley, JJ., dissenting). Particularly in light of the sensitive issues of state law implicated by Plaintiff's claims, the Court should abstain from addressing those issues pending state courts' consideration of them.

*Second*, there exists a reasonable probability that the recount appeal will clarify enough issues of state law to significantly narrow or eliminate altogether the federal constitutional issues Plaintiffs allege are presented in this case. In particular, the recount appeal is likely to provide a resolution on several state law issues raised in this case: the proper interpretation of Wisconsin Stat. § 6.87's absentee ballot signature verification requirements (*see* Recount Pet. ¶4; Amend. Cmplt. ¶¶43-45), and Wisconsin Stat. § 6.86(2)'s voter identification requirements (*see* Recount Pet. ¶6; Amend. Cmplt. ¶¶38-42). There is therefore a strong probability that resolution of the state-law recount appeal process will obviate this Court's need to address most or all of the federal constitutional issues raised here. Accordingly, to "avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication," *Pullman*, 312 U.S. at 500, this Court should refrain from injecting itself into the middle of this dispute.

## C. Plaintiff's failure to exhaust administrative remedies bars litigation.

Plaintiff, as a Wisconsin voter, is required to bring elections claims through a complaint to the Wisconsin Elections Commission pursuant to Wis. Stat. § 5.06. This provision provides an exclusive administrative remedy to all voters. The administrative procedure allows WEC to

investigate the complaint to determine whether it has any merit, and potentially provide the complainant with a hearing. Wis. Stat. §§ 5.06(1) and (5). Critically, Wis. Stat. § 5.06(2) prohibits commencing any "action or proceeding to test the validity of any decision, action or failure to act on the part of any election official … without first filing a complaint…" Plaintiff has not complied with this mandatory administrative procedure. There are no allegations in the Amended Complaint, nor any copies of any WEC complaint forms attached as exhibits. Since Plaintiff has failed to exhaust his administrative remedies, this Court cannot provide the extraordinary relief requested. *See Glisson v. U.S. Forest Serv.*, 55 F.3d 1325, 1326 (7th Cir. 1995).

**D.    Plaintiff's requests for relief are moot.**

Plaintiff's claims are also barred because his requested relief is moot. Federal courts may adjudicate only "live cases and controversies." *See Murphy v. Hunt*, 455 U.S. 478, 481 (1982). "A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Stotts,* 230 F.3d at 990 (internal quotation marks and citations omitted). "When a case is moot, it must be dismissed as non-justiciable." *Id*. at 991.

All of Plaintiff's requests for relief relate to the general election held on November 3, 2020, and its results. (Amend. Cmplt. ¶¶138-42) In part, Plaintiff asks the Court to (1) order Defendants to decertify the election results; (2) enjoin Defendant Governor Evers from transmitting the already certified election results to the Electoral College; and (3) order Defendant Governor Evers to transmit certified election results stating that President Donald Trump is the election winner. (*Id*. ¶142) But, as was recently confirmed in both Georgia and Michigan where similar requests for relief were reviewed, this relief is no longer available to Plaintiff and his claims are moot. *See King*, Op. & Order, at *13-*16; *Wood,* 2020 WL 7094866, at *6-7.

By the time Plaintiff filed his claim, not only had all 72 counties in Wisconsin finished canvassing their results and reported those results to the WEC: (1) both Dane and Milwaukee Counties had completed a full recount and reported their results to the WEC; (2) the WEC Chairperson had completed the statewide canvass and certified the results: (3) Governor Evers had signed the certificate of ascertainment and submitted the slate of presidential electors to the U.S. Archivist; and (4) the U.S. Archivist had confirmed receipt. To paraphrase Judge Parker in Michigan, by the time Plaintiff filed his complaint, the ship had sailed. *See King*, Op. & Order, at *13. Similarly, Judge Pryor of the Eleventh Circuit stated:

> "We cannot turn back the clock and create a world in which" the 2020 election results are not certified. *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015). And it is not possible for us to delay certification nor meaningful to order a new recount when results are already final and certified.

*Wood*, 2020 WL 7094866, at *6.

Because Wisconsin has already certified the election results, Plaintiff's requests to delay or prevent certification are moot and his complaint should be dismissed, as judges in several other states have concluded. "[T]here is no basis in law by which the courts may grant Petitioner's request to ignore the results of an election and recommit the choice to substitute its preferred slate of electors for the one chosen by a majority of Pennsylvania's voters." *Kelly v. Commonwealth*, No. 68 MAP 2020, 2020 WL 7018314, at *3 (Pa. Nov. 28, 2020)) (Wecht, J., concurring); *see also Wood*, 2020 WL 6817513, at *13 (concluding that "interfer[ing] with the result of an election that has already been concluded would be unprecedented and harm the public in countless ways").

### III.  Plaintiff's Claims are Barred by the Eleventh Amendment.

Plaintiff's claims face yet another insurmountable hurdle: the Eleventh Amendment. The Eleventh Amendment bars federal courts from granting "relief against state officials on the basis of state law, whether prospective or retroactive." *Pennhurst State Sch. & Hosp. v. Halderman*, 465

U.S. 89, 106 (1984). This bar applies when the relief sought would require a federal court to "instruct[] state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106. It therefore precludes relief when, as here, plaintiffs have tried to disguise their state law claims as federal causes of action.

As federal courts have repeatedly emphasized, if the "gravamen" of a claim is that the state has "improperly interpreted and failed to adhere" to state law, a plaintiff cannot plead around an Eleventh Amendment problem by asserting that that failure to follow state law violates the federal constitution. *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1204-05 (11th Cir. 2019); *see also Massey v. Coon*, No. 87-3768, 1989 WL 884, at *2 (9th Cir. Jan. 3, 1989) (holding state official immune where claim was brought under the Due Process and Equal Protection Clauses of the Constitution "on its face," but such "constitutional claims [were] entirely based on the failure of defendants to conform to state law"); *Balsam v. Sec'y of State*, 607 F. App'x 177, 183-84 (3d Cir. 2015) (applying the bar to claims "premised on violations of the federal Constitution"); *Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 626 (E.D. Pa. 2018) (explaining that, "[e]ven when voters attempt to tie their state law claims into their federal claims, the Eleventh Amendment bars the state law claims" (quotation omitted)); *Six v. Newsom*, 462 F. Supp. 3d 1060, 1073 (C.D. Cal. 2020) (denying temporary restraining order in part because Fifth and Fourteenth Amendment claims were predicated on violations of state law); *Thompson v. Alabama*, No. 2:16-CV-783-WKW, 2017 WL 3223915, at *8 (M.D. Ala. July 28, 2017) (denying injunction putatively based on federal constitutional claims because those claims rested on premise that state officials were violating state law).

That is just what Plaintiff has done here. Count I, for instance, alleges that Defendants violated the Elections and Electors Clauses by somehow exercising their powers in a way that

"conflict[s] with existing legislation" enacted by the Wisconsin legislature. (Amend. Cmplt. ¶105) But to assess whether that is so, the court would have to adjudicate a host of state law questions, including interpreting the State's photo identification law (*id.* ¶¶40-45), its address certification requirements (*id.* ¶¶46-47), and its purported ballot-processing restrictions (*id.* ¶48), as well as the scope of any delegation to state and county election boards. The same questions underlie Count II, Plaintiff's Equal Protection Clause claim, which relies on allegations that Defendants failed to comply with the requirements of the Wisconsin Election Code. (*Id.* ¶116) Similarly, the Due Process Clause claim asserted in Count III would require concluding that Wisconsin ballots were not tallied in accordance with Wisconsin law—and asks this Court to order decertification or a recount based on claims about what Wisconsin law requires for certification. (*See id.* ¶131) And while Count IV is captioned as "Wide-Spread Ballot Fraud" and cites federal vote-dilution law (*see id.* ¶¶132-38), the factual allegations on which it is premised raise state-law issues with respect to election administration and voting by allegedly ineligible voters. (*Id.* ¶54)

The relief Plaintiff seeks thus "conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Pennhurst*, 465 U.S. at 106.

## IV. The Doctrine of Laches Bars Plaintiff's Claims.

Even if Plaintiff has standing, which he does not, and his claims are both justiciable in this Court and not barred by the Eleventh Amendment, the doctrine of laches bars his claims because he has unreasonably delayed bringing his claims to the detriment not only of Defendants, but also of the nearly 3.3 million voters in Wisconsin who voted in this last election under the good-faith belief they were following the correct procedures to have their votes counted. "Laches arises when an unwarranted delay in bringing a suit or otherwise pressing a claim produces prejudice to the defendant. In the context of elections, this means that any claim against a state electoral procedure must be expressed expeditiously." *Fulani*, 917 F.2d at 1031. In the elections context, federal courts

16

regularly dismiss claims brought both before and after elections based on laches, "lest the granting of post-election relief encourage sandbagging on the part of wily plaintiffs." *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988). This is because of "the extremely disruptive effect of election invalidation and the havoc it wreaks upon local political continuity." *Id.*; *see also, e.g.*, *Knox v. Milw. Cty. Bd. of Election Comm'rs*, 581 F. Supp. 399, 402 (E.D. Wis. 1984) (laches warranted denial of preliminary injunction to restrain Wisconsin county elections where complaint was filed seven weeks before election).

Indeed, relating to the election at issue here, a federal court in Georgia rejected similar challenges to the presidential election results in that state on laches grounds. *See Wood*, 2020 WL 6817513. In doing so, the court stressed that laches principles are particularly salient in post-election cases because of the potential impact on the rights of voters and on public confidence in the electoral process. Unlike a pre-election challenge to the rules, the court explained, Wood "wants the rules for the already concluded election declared unconstitutional and over one million absentee ballots called into question. Beyond merely causing confusion, Wood's requested relief would disenfranchise a substantial portion of the electorate and erode public confidence in the electoral process." *Id.* at *8. The same is true here. Plaintiff unreasonably delayed bringing his claims not only until after the election, but nearly a month after Election Day. This delay is manifestly unwarranted and unreasonable, providing ample grounds for dismissal.

Plaintiff's equal protection and due process claims in Counts II and III are based on alleged violations of Wisconsin election laws. (Amend. Cmplt. ¶¶116, 129) Specifically, Plaintiff complains about directives the WEC issued in October 2016, May 2020, and October 2020, relating to absentee ballot procedures. (*Id.* ¶¶37-45) In Count IV, Plaintiff alleges widespread ballot fraud, or more accurately, suggests that ballot fraud could have potentially occurred, from

the use of Dominion Voting Machines.[3] (*Id.* ¶¶132-35) Plaintiff does not claim actual knowledge that any of these policies or procedures led to counting a single illegal vote or discounting a single legal vote in Wisconsin. Neither does Plaintiff provide any explanation for why he waited until nearly a month *after* the election to bring his claims. More egregiously, he does not explain why he waited more than six months since the May 2020 guidance was issued and more than four years since the October 2016 guidance was issued to challenge these procedures.[4] Yet, he now asks this Court to disenfranchise tens of thousands of citizens, if not all of the nearly 3.3 million Wisconsin voters, who cast their ballots in reliance upon the election proceeding under established rules.

Plaintiff, by his own admission, has long been on notice about alleged "irregularities" with Dominion voting machines. Throughout his Amended Complaint, Plaintiff alleges that Dominion machines perpetuated errors and fraud based on publicly available evidence, including that: (1) in 2018, an expert witness testified about Dominion's vulnerabilities (*see* Amend. Cmplt. ¶¶67-68); (2) on January 24, 2020, Texas opted not to use Dominion due to the possibility of fraud (*see* Amend. Cmplt. ¶64 and Exh. 11); and (3) on October 22, 2020, the Northern District of Georgia issued an order as to Dominion voting machines (*see* Amend. Cmplt. ¶¶65-66). Plaintiff makes no effort to offer a justifiable explanation for why he waited until weeks after the election to challenge the use of Dominion voting machines in Wisconsin.

---

[3] To the extent that Plaintiff claims that he was illegally, or at least inappropriately, prevented from observing the election process (Amend. Cmplt. ¶¶117, 130, 140), this allegation is too underdeveloped to constitute a sufficient claim for relief. Plaintiff's sparse allegation is completely devoid of specificity and without any evidentiary support. On its face, this allegation appears to be a recycled argument from a similar lawsuit filed in a different state. Moreover, Plaintiff's claim is obviated by the fact that a public recount, with observers from both campaigns, was conducted in Dane and Milwaukee Counties after Election Day.

[4] Lest the Court infer that Plaintiff acted with greater alacrity in response to the October 2020 guidance, that is incorrect. The October 2020 guidance merely restated the policy adopted by the WEC in October 2016. There was nothing new about it. (Amend. Cmplt. ¶¶44-45)

There can be no doubt that Plaintiff's delay, if it somehow resulted in his desired relief of decertifying the Wisconsin election results and awarding Wisconsin's electors to the losing candidate instead of the winning candidate, would prejudice both Defendants and the nearly 3.3 million Wisconsinites who cast their votes in the election. Local municipal officials, often part-time workers, administered this election, and Wisconsin voters participated in this election, in reliance on the propriety of the pre-election policies that Plaintiff only now belatedly seeks to challenge. Had Plaintiff raised and diligently pursued his challenges to these policies and before the election, as he should have, then any required changes to election procedures could have been implemented in response to any court rulings before the election—before, that is, the voters of Wisconsin participated in the election in reliance on these very policies. Courts routinely decline to change the rules of elections in the days and weeks leading up to an election, because of the significant prejudice caused by last-minute changes, which can result in voter confusion and depressed turnout. *See, e.g.*, *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). A court decision to *retroactively* change the rules *after* the election, and to invalidate tens of thousands, if not millions, of votes in the process, is even more unacceptable.

Federal appellate courts have repeatedly held that voters should not have their votes nullified for having followed guidance, policies, and court decisions in effect when they cast their ballot. *See, e.g.*, *Griffin v. Burns*, 570 F.2d 1065, 1074-75 (1st Cir. 1978); *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012). These courts have relied both on fundamental notions of fairness and on federal constitutional due-process protections. And this very election cycle, the U.S. Supreme Court followed suit in *Andino v. Middleton*, No. 20A55, 2020 WL 5887393 (U.S. Oct. 5, 2020). In that case, the Supreme Court stayed a district court's order, in effect reinstating a briefly enjoined state-law witness requirement for absentee ballots.

*See id.* But, in doing so, the Supreme Court expressly stated that any votes cast while the district court's order had been in effect "may not be rejected for failing to comply with the witness requirement." *Id.* The Court recognized the need to validate voters' reliance on the rules in place at the time they voted.

Nullifying tens of thousands, if not millions, of votes cast in the November general election based on Plaintiff's inexcusably belated challenges to policies and court decisions in place well before the election would violate due process just as surely as the decisions struck down in *Griffin* and *Husted*, and would run afoul of the U.S. Supreme Court's decision in *Andino*. Violating both the voting and due process rights of Wisconsinites would be hugely, unfairly, and indisputably prejudicial.

## V. Plaintiff's Amended Complaint Fails to Meet Federal Pleading Standards.

Because Plaintiff's claims fail on jurisdictional and justiciability grounds, the Court need not reach the merits to dismiss the case with prejudice. Nonetheless, should the Court conclude that Plaintiff has standing, that this claims are justiciable, and that the doctrine of laches does not apply, Plaintiff's claims should be dismissed for their insurmountable pleading deficiencies – there is simply no plausible basis for the far-reaching conspiracy Plaintiff alleges, and no plausible support for his claim the Wisconsin election results were the product of anything other than counting the valid votes that were cast in reliance on the election procedures in effect. And Plaintiff has only magnified the gross deficiencies and utter ridiculousness and implausibility of his claims with the affidavits and so-called experts incorporated by reference in his complaint. Plaintiff's Amended Complaint fails to meet the fundamental threshold requirement under Rule 12(b)(6) of stating a claim upon which relief can be granted, and certainly falls short of Rule 9(b)'s mandate to plead all claims of fraud with particularity.

**A. Assuming all of Plaintiff's allegations are true, they do not make a plausible allegation that Dominion Voting Systems machines were hacked in Wisconsin.**

For purposes of the Rule 12(b)(6) analysis, this Court must assume Plaintiff's allegations, no matter how fantastical, are true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). The Court must draw reasonable inferences from those allegations. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). But it need not go further and follow Plaintiff down a path of conjecture and conspiracy that is not supported by the facts. *Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 472 (7th Cir. 2020). And, without blindly following Plaintiff through flights of fancy, leaps of faith, and logical fallacies, there is no claim here.

The allegations based on Plaintiff's first exhibit set the tone. That exhibit is a declaration from an anonymous witness who claims to have had ties to long-dead Venezuelan dictator Hugo Chavez[5] and involvement in rigging elections in that country. (Amend. Cmplt. ¶¶8-9, 81, 87 & Exh. 1) Plaintiff's anonymous declarant acknowledges having little knowledge of the electoral process in the United States: "I have not participated in any political process in the United States, have not supported any candidate for office in the United States, am not legally permitted to vote in the United States, and have never attempted to vote in the United States." (Amend. Cmplt. Exh. 1) The witness claims to have witnessed the creation and operation of a voting systems company called "Smartmatic," and claims this system was used to manipulate elections in favor of Chavez and his successor, Nicolas Maduro. (Amend. Cmplt. Exh. 1) The witness also claims this system was used to rig elections throughout Latin America. (*Id.* ¶20) This witness further claims that descendants of this "Smartmatic" system are now "in the DNA" of voting software systems used

---

[5] *See* William Neuman, "Chavez Dies, Leaving Sharp Divisions in Venezuela," *N.Y. Times* (Mar. 6, 2013), *available at* https://www.nytimes.com/2013/03/06/world/americas/hugo-chavez-of-venezuela-dies.html (last visited Dec. 5, 2020).

in the United States, including Dominion Voting Systems, such that they could be exploited by unscrupulous persons seeking to manipulate election results. (*Id.* ¶5) There is no allegation here that any of this has anything to do with Wisconsin. The declarant asserts that, in the U.S. election on November 3, 2020, "vote counting was abruptly stopped in five states using Dominion software" when "Donald Trump was significantly ahead in the votes." (*Id.* ¶26) He then jumps to "the wee hours of the morning," when he vaguely asserts that "something significantly changed" and "[w]hen the vote reporting resumed the very next morning there was a very pronounced change in favor of the opposing candidate, Joe Biden." (*Id.*) Notably, there is no explanation—in the Amended Complaint, this anonymous declaration, or elsewhere in Plaintiff's filings—of which states stopped vote counting, what changed in the wee hours, or that any fraudulent activity occurred in Wisconsin.

Plaintiff alleges that Dominion Voting Systems machines *could be* hacked, but he makes no plausible allegation that Dominion machines in Wisconsin *were* hacked and manipulated. "When a complaint's facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief." *Taha*, 947 F.3d at 469 (quoting *Iqbal*, 556 U.S. at 679) (internal quotation marks omitted). Moreover, beyond presenting allegations of *potential* vulnerabilities of Dominion machines and software, Plaintiff offers no plausible connection whatsoever between these allegations and any impact on the results of the election in Wisconsin. Risk of fraud does not constitute fraud.

**B.    Plaintiff's allegations regarding "unreturned absentee ballots" and out-of-state voters provide no basis for overturning the election results.**

Plaintiff's claim that there were a sufficient number of illegal votes counted and legal votes uncounted to overturn the results of the election is based on the statistical analysis of two proffered experts. Wiliam Briggs, self-proclaimed "Statistician to the Stars!" (Amend. Cmplt. Exh. 2 at 9),

provides statistical analysis, though without any methodological explanation or support. Briggs bases his opinions entirely on survey data provided by Matthew Braynard. (*Id.* at 2) But Braynard is not a qualified expert. In support of Braynard's qualifications, Plaintiff submits an "expert report" submitted by Braynard to the Wisconsin Supreme Court along with the Wisconsin Voters Alliance's petition for original action. (Amend. Cmplt. Exh. 3) However, although the report states that Braynard's resume is attached (*id.* at 3) it is not. Thus, Plaintiff apparently expects the Court to assume (without basis for doing so) Braynard's qualifications but the Court need not do so, as Braynard's resume was filed in a proposed petition to the Wisconsin Supreme Court, and reveals that he is a former Trump campaign staffer with an undergraduate business degree and a masters of fine art and "writing" who and has worked on various Republican campaigns. *See* Report of Matt Braynard, *Wis. Voters Alliance,* No. P2020AP1930-OA, attached as Exh. 15.

Braynard has an undergraduate business degree and an MFA in "writing", and he has worked on various Republican campaigns, including the Trump campaign. (*Id.* at 3-4) Braynard does not have any apparent training or expertise in survey-based research; he does not purport to have any expertise in linking and analyzing complex databases; he does not have any peer-reviewed publications relating to election data or data analysis; and he apparently has never been qualified to serve as an expert witness in any matter in any court. (*Id.* at 4) His survey methodologies have not been disclosed, and the complaint provides no basis for inferring that he is competent to conduct a reliable survey that would comport with professional standards in the field, or that he even endeavored to do so. According to a recent article in the *Washington Post* (and his own postings on Twitter), Braynard and a team of contractors he has retained using crowd-sourced funds, engaged in an effort to "hunt for fraud" in the 2020 election.[6]

---

[6] *See* Jon Swaine & Lisa Raine, "The federal government's chief information security officer is helping an outside effort to hunt for alleged voter fraud," *Washington Post* (Nov. 15, 2020), available

Despite the purported "expert" status of his report, Braynard fails to provide even a cursory explanation of his survey methodologies and whether those methodologies comported with the standards required for considering a survey reliable, the steps taken to ensure his samples were random and representative of the underlying population, or the steps taken to account for possible inaccuracies or falsehoods provided in survey responses. Obviously Braynard is not a qualified expert and his "expert opinions" regarding absentee ballots in Wisconsin are likely not admissible, let alone credible. The same Braynard report was submitted in the Wisconsin Supreme Court recently, leading a majority of the Court to cite "legitimate arguments that [Braynard's] report would not even be admissible evidence." *Wis. Voters Alliance*, No. 2020AP1930-OA, Order at *3 (Hagedorn, J. concurring in denial of original action petition, joined by majority of the Justices).

Briggs's analysis relies upon Braynard's data without question, assuming the validity of Braynard's conclusion that there were approximately 96,771 "unreturned absentee ballots" in Wisconsin.[7] (Amend. Cmplt. Ex 3 at 4) By relying upon Braynard's statistically unreliable data, Briggs's expertise is also questionable, at best. The printout of Wisconsin-specific data included with Briggs's report further undermines the plausibility of Briggs's assertions. (Amend. Cmplt. Exh. 2 at 4-7) This printout indicates that survey respondents were asked whether they requested an absentee ballot "in Wisconsin," and that the 13.92% of respondents who answered "no" were deemed to have received a ballot without requesting one – even though a Wisconsin voter who

---

at https://www.washingtonpost.com/politics/trump-voter-integrity-fund/2020/11/15/89986f1c-25fe-11eb-952e-0c475972cfc0_story.html (last visited Dec. 6, 2020); http://twitter.com/MattBraynard.

[7] Braynard claims this 96,771 ballot figure was derived from a report he obtained from a firm called "L2 Political." (Amend. Cmplt. Exh. 3 at 5-6) Braynard does not provide the report itself, the date of the report, the underlying data from the State that supposedly served as the basis for the report, or any other information that would allow for validation of his double-hearsay account of what this data purportedly shows. Accordingly, there is no basis for relying on the 96,771 ballot figure that serves as the basis for his calculations.

requested an absentee ballot while attending school out-of-state or living on a military base abroad would have properly answered "no" to the question as posed. (*Id.* at 6) Briggs labels this alleged problem Error #1. (*Id.* at 1) From the results of this fatally poorly drafted survey, Briggs even more inexplicably leaps to the conclusion that 16,316-19,273, or 31% of the alleged "unreturned absentee ballots" were "troublesome," (*id.*) which Plaintiff argues supports overturning the results of the election. (Amend. Cmplt. ¶¶107, 119)

Briggs's so-called Error #2, upon which he asserts that somewhere between 13,991 and 16,757 votes of Wisconsinites should be invalidated, bears no closer relationship to plausibility. (Amend. Cmplt. Exh 2 at 1-2) These figures are based on respondents to Braynard's surveys who were listed as having an "unreturned absentee ballot," but who responded "yes" when asked whether they had mailed their ballot. In other words, these are absentee ballots that were allegedly returned but not counted. Neither Briggs nor Braynard does anything to account for various reasons a person may have answered "yes"—perhaps they answered "yes" because they mailed back their ballot, but did not do so in a timely fashion such that it was not properly counted; perhaps they mailed back their ballot, but it was not properly completed or cured, such that it was not counted; or conceivably, some of the respondents to the survey conducted on November 15-17, 2020, *two weeks after the election*, lied or misremembered. Nor does Briggs even suggest there is any reason to believe these ballots predominantly favored Trump rather than Biden. Yet, Plaintiff implausibly asserts this "analysis" serves as a basis for overturning the election.

Plaintiff's assertion that the Court could plausibly conclude that 6,966[8] absentee votes were "illegal" based on voters having moved out-of-state prior to Election Day or having registered to

---

[8] Further highlighting the liberties Plaintiff has taken with the alleged expert opinions is the fact that Braynard concluded, after having removed duplicates, that 6,848 individuals lost Wisconsin

vote in another state after having registered in Wisconsin is equally ridiculous. (Amend. Cmplt.

¶51) This assertion is based entirely on Braynard's questionable analysis. To come to his

conclusions, Braynard compared the National Change of Address database for the day after

Election Day with Wisconsin's database for all absentee or early voters, and alleges that anyone

who appears to have moved as of the day after Election Day was ineligible to vote. (Amend. Cmplt.

Exh. 3 at 9) However, Braynard fails to account for the fact that a person may file a change of

address for a number of reasons, yet retain residence for voting purposes in his or her home state.

For example, college students may file a change of address in order to receive mail while living

out of state on a university campus without establishing residency for voting purposes in that state.

Moreover, neither Plaintiff nor Braynard provides a single, specific example of a person illegally

voting in Wisconsin after having moved out-of-state. Although Plaintiff is entitled to a

presumption in favor of his allegations, that presumption does not extend so far that the Court must

assume an expert's opinions are correct, or even admissible, and there are not facts here that, even

if assumed true, support a reasonable inference that Plaintiff's constitutional rights were violated

in the Wisconsin general election.

    **C.**    **Plaintiff's allegations regarding "statistical impossibilities" provide no basis for overturning the election results.**

    Plaintiff further asks this Court to cast aside 181,440 votes, and thereby reverse the results

of the election as determined by the will of nearly 3.3 million Wisconsin voters, based on

"statistically significant" results favoring President-Elect Biden in unspecified counties using

Dominion Voting Machines. (Amend. Cmplt. ¶¶52-58) Notably, Plaintiff bases this assertion on

the purported statistical analysis of an anonymous "Affiant." (*Id.* ¶52) But, despite this analysis

---

residency and cast illegal ballots (Exh. 3 at 9), yet Plaintiff asserts that 6,966 such votes were cast and should be invalidated. Amend. Cmplt. ¶51.

styled as expert opinion, Plaintiff does not allege any facts to support what is, at best, an implied allegation that vote totals in Wisconsin counties using Dominion Voting Machines were modified in favor of President-Elect Biden. Rather, Plaintiff provides that "[t]he results of the analysis and the pattern seen in the included graph strongly *suggest* a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Wisconsin's vote tallies to be inflated by somewhere between three and five point six percentage points." (*Id.* ¶58 (emphasis added))

That a questionable statistical analysis *suggests* that vote tallies may have been tampered with is a far cry from evidence, or even an allegation, that vote tallies *were in fact* modified, and such a suggestion certainly does not warrant overturning the results of an election in which 3.3 million Wisconsinites participated. Again, the Court is required to presume Plaintiff's allegations are true and to draw reasonable inferences in his favor, but the Court is under no obligation to draw unreasonable inferences. "[W]hen considering the viability of a claim in the face of a Rule 12(b)(6) challenge, [the Court] may reject sheer speculation, bald assertions, and unsupported conclusory statements." *Taha*, 947 F.3d at 469 (citing *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013); *Iqbal*, 556 U.S. at 678, 681; *Twombly*, 550 U.S. at 555).

### D. Plaintiff's allegations regarding alleged violations of Wisconsin Elections laws provide no basis for overturning the election results.

Plaintiff also alleges that Defendants violated Wisconsin elections law by providing guidance to municipal clerks that conflicts with state law. (Amend. Cmplt. ¶¶37-45) Even if the Court accepts as true that election laws were violated, which they were not, Plaintiff fails to allege with any specificity that even one vote was illegally cast and counted. Rather, Plaintiff simply concludes that illegal ballots must have been cast and counted because the allegedly illegal guidance was issued. Plaintiff does allege that 96,437 absentee ballots were illegally cast by

individuals who did not qualify for indefinitely confined statutes under state law, but Plaintiff fails to cite a source for this conclusory allegation.[9]

Plaintiff alleges that the entire Wisconsin general election was "so riddled with fraud, illegality, and statistical impossibility," for the purpose of "manipulating the vote count to manufacture an election of Joe Biden as President of the United States," that the results of the election must be set aside entirely. (Amend. Cmplt. ¶¶2, 5) But, to plead fraud, Plaintiff is required to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). A complaint alleging fraud "must describe the 'who, what, when, where, and how' of the fraud." *Pirelli*, 631 F.3d at 441 (quoting *Lusby*, 570 F.3d at 854). Ostensibly, this alleged fraudulent course of conduct was perpetrated through the combination of the use of allegedly vulnerable Dominion Voting Machines and the issuance of guidance regarding absentee ballots to municipal clerks. However, the use of Dominion Voting Machines and the guidance that Plaintiff cites as illegal and fraudulent have been in use for multiple elections, and in some cases, for years. Plaintiff fails to articulate with any modicum of particularity how these longstanding practices only now demonstrate fraud. And to the extent that such speculation constitutes the "how," which it does not, Plaintiff fails to answer with particularity the requisite who, what, when, and where. As discussed above, because Plaintiff clearly fails to state a claim for which relief can be granted under Fed. R. Civ. P. 12(b)(6), he most certainly fails to state a claim for fraud with the particularity required under Fed. R. Civ. P. 9(b).

---

[9] Presumably, Plaintiff pulls this number from Braynard's report, but his conclusion is based on speculative social media research and faulty statistical extrapolation. (Amend. Cmplt. Exh. 3 at 9-10) Like Plaintiff, Braynard presents no evidence that anyone who was self-identified as indefinitely confined illegally claimed that status to obtain and cast an absentee ballot.

## CONCLUSION

For the reasons above, Defendant Governor Tony Evers's Motion to Dismiss (Dkt. 51) should be adjudicated before the Court considers Plaintiff's request for injunctive relief, and the Governor's Motion should be granted.

Dated: December 7, 2020

Respectfully submitted,

/s/ Jeffrey A. Mandell

Jeffrey A. Mandell
Rachel E. Snyder
Richard A. Manthe
STAFFORD ROSENBAUM LLP
222 W. Washington Ave., Suite 900
Post Office Box 1784
Madison, WI 53701-1784
Telephone: 608-256-0226
jmandell@staffordlaw.com
rsnyder@staffordlaw.com
rmanthe@staffordlaw.com

Paul Smith
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
Telephone: (202) 736-2200
psmith@campaignlegalcenter.org

Justin A. Nelson
Stephen E. Morrissey
Stephen Shackelford Jr.
Davida Brook
SUSMAN GODFREY L.L.P.
1000 Louisiana St., Suite 5100
Houston, TX 77002
Telephone: 713-651-9366
jnelson@susmangodfrey.com
smorrissey@susmangodfrey.com
sshackelford@susmangodfrey.com
dbrook@susmangodfrey.com

*Attorneys for Defendant,*
*Governor Tony Evers*

# EXHIBIT 1

Whitaker v. Kenosha Unified School District No. 1 Board..., Not Reported in Fed....

2016 WL 8846573

2016 WL 8846573
Only the Westlaw citation is currently available.
United States District Court, E.D. Wisconsin.

Ashton WHITAKER, By his mother and
next friend, Melissa Whitaker, Plaintiff,
v.
KENOSHA UNIFIED SCHOOL DISTRICT
NO. 1 BOARD OF EDUCATION and
Sue Savaglio–Jarvis, Defendants.

Case No. 16–cv–943–pp
|
Signed 10/03/2016

**Attorneys and Law Firms**

Alison Pennington, Ilona Turner, Sasha J. Buchert, Shawn Thomas Meerkamper, Transgender Law Center, Oakland, CA, Michael G. Allen, Sasha Samberg–Champion, Robert D Friedman, Joseph J. Wardenski, Relman Dane & Colfax PLLC, Washington, DC, Robert Theine Pledl, McNally Peterson SC, Milwaukee, WI, for Plaintiff.

Aaron J. Graf, Jonathan E. Sacks, Ronald S. Stadler, Mallery & Zimmerman SC, Milwaukee, WI, for Defendants.

**ORDER DENYING DEFENDANTS' CIVIL L.R. 7(h) EXPEDITED, NON–DISPOSITIVE MOTION TO STAY PRELIMINARY INJUNCTION (DKT. NO. 33) PENDING APPEAL (DKT. NO. 44)**

PAMELA PEPPER, United States District Judge

*1 The plaintiff filed his complaint on July 19, 2016, Dkt. No. 1, and less than a month later, filed a motion for preliminary injunction, Dkt. No. 10. A day after the plaintiff filed the motion for preliminary injunction, the defendants filed a motion to dismiss the complaint. Dkt. No. 15. A few days later, they filed a brief in opposition to the motion for preliminary injunction. Dkt. No. 17.

On September 6, 2016, the court heard oral argument on the motion to dismiss. Dkt. No. 26. On September 19, 2016, the court issued an oral ruling denying the defendants' motion to dismiss. Dkt. No. 28. The court scheduled a hearing on the motion for preliminary injunction for the following day, September 20, 2016. Id. at 9.

On September 20, 2016, the parties presented their oral arguments on the motion for preliminary injunction. Dkt. No. 31. In considering the question of whether the plaintiffs had a likelihood of success on the merits, the court relied in good part on its decision from the previous day denying the motion to dismiss.[1] At the conclusion of the hearing, the court granted in part[2] the plaintiff's motion for a preliminary injunction, and enjoined the defendants from prohibiting the plaintiff from using the boys' restrooms at his high school; from taking punitive action against the plaintiff for using the boys' restrooms; and from taking any action to monitor his restroom usage. Dkt. No. 31 at 1. Counsel for the defendants asked the court to stay the injunction until October 1, 2016, to allow the defendants time to appeal. Id. The court declined. Id. at 2. The defendants also asked the court to require the plaintiff to post a bond; the court took that request under advisement. Id.

*2 On September 22, 2016, the court issued its written order granting in part the motion for preliminary injunction. Dkt. No. 33. In particular, the court weighed the balance of harms, and concluded that the harms suffered by the plaintiff if the court did not grant the injunctive relief outweighed any potential harms suffered by the defendant if the court were to impose the injunction. Id. at 13–15. The court also found that the issuance of the injunction would not negatively impact the public interest. Id. at 15. Finally, the court declined to require the plaintiff to post a bond. Id. at 15–17.

The defendants again have asked the court to stay the preliminary injunction. Dkt. No. 44. The defendants point out that they have appealed the court's decision to the Seventh Circuit (both appealed as of right regarding the order granting the motion for preliminary injunction, and sought interlocutory appeal regarding the court's denial of the motion to dismiss the complaint). Id. at 2. They argue, as they did in their motion to dismiss, that the Seventh Circuit's decision on Ulane v. Eastern Airlines, Inc., 742 F.2d 1081) (7th Circuit) mandates a ruling in their favor on the Title IX issue (despite conceding that the court has not decided the precise issue in question in this case). Id. at 1–2. They argue that they will suffer irreparable harm from the injunction, because the injunction "threatens the constitutionally protected privacy interest of the approximately 22,000 students in the school district." Id. at 2–3. They argue that the plaintiff will not be harmed by staying the injunction, because a stay would

maintain the *status quo* and would not worsen the plaintiff's health. Id. at 3. Finally, they argue that the public interest would be served by a stay of the injunction, because it will prevent the school district's students and parents from being "subjected to an injunction that perpetuates a policy that the federal government is unable to enforce," citing State of Texas v. United States, Case No. 16–cv–54, 2016 WL 4426495 (N.D. Tex., August 21, 2016).[3]

As the defendants state in their motion, the factors a movant must satisfy to obtain a stay pending appeal are similar to the factors a movant must satisfy to obtain injunction relief. Hinrichs v. Bosma, 440 F.3d 393, 396 (7th Cir. 2006) (citing Hilton v. Braunskill, 481 U.S. 770, 776 (1987)). The moving party must demonstrate that "1) it has a reasonable likelihood of success on the merits; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if it is denied; 4) the irreparable harm the party will suffer without relief is greater than the harm the opposing party will suffer if the stay is granted; and 5) the stay will be in the public interest." Id.

(citing Kiel v. City of Kenosha, 236 F.3d 814, 815–16 (7th Cir. 2000)).

Every argument which the defendants raise in their motion for stay pending appeal was raised in their objection to the motion for preliminary injunction, and the parties argued every one of those issues at the September 20, 2016 hearing. The court found in favor of the plaintiff, and against the defendants, on each factor. The defendants give no explanation for why the court should find in their favor now, when eight days prior to their filing this motion to stay, the court found against them on exactly the same issues they raise here.

**\*3** The court **DENIES** the defendants' motion Civil L.R. 7(h) Expedited, Non–Dispositive Motion to Stay Preliminary Injunction. Dkt. No. 44.

### All Citations

Not Reported in Fed. Supp., 2016 WL 8846573

### Footnotes

1    There is a bit of a procedural morass surrounding that decision. Counsel for the defendants informed the court at the end of the hearing that he would be submitting a proposed order, denying his motion to dismiss but containing the necessary findings for certification of an interlocutory appeal. He did not make any argument in support of that proposal; the court did not elicit any, nor did it ask for the plaintiff's position. The court entered the order, with the interlocutory appeal certification language, on September 21. Dkt. No. 29. The next day, the plaintiff filed a motion asking the court to reconsider including the interlocutory appeal certification language. Dkt. No. 30. On September 23, 2016, before the court ruled on that motion, the defendants filed a notice of appeal with the Seventh Circuit, appealing both the order denying the motion to dismiss and the order granting the preliminary injunction (an order the court had issued on September 22, 2016, Dkt. No. 33). Dkt. No. 34. On September 25, 2016, the court issued an order granting the plaintiff's motion to reconsider, Dkt. No. 36, and entered an amended order denying the motion to dismiss but removing the interlocutory appeal certification language, Dkt. No. 35. The next day, the Seventh Circuit ordered the plaintiff to respond to the defendants' request for interlocutory appeal by October 11, 2016.

2    The plaintiff's complaint requests other relief: it asks the court to prohibit the defendants from referring to the plaintiff by his birth name, and from using female pronouns to identify him; to require the school to allow him to room with other boys on school trips; to prohibit the school from requiring the plaintiff to wear identifying markers, such as a colored wristband; and other relief. The court did not grant injunctive relief on those requests—some were not ripe, and others speculated actions that had not yet occurred.

3    The defendants' statement that Texas district court's injunction prohibits the federal government from enforcing its policies at all is overbroad. The Texas court's order prohibits the federal government from enforcing certain Department of Education policies (relevant to this case) against the plaintiffs in that case "until the Court rules on the merits of this claim, or until further direction from the Fifth Circuit Court of Appeals." Texas v. United States, 2016 WL 4426495 at 17.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2

2020 WL 6686120
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

Jim BOGNET, Donald K. Miller,
Debra Miller, Alan Clark,
Jennifer Clark, Appellants

v.

SECRETARY COMMONWEALTH OF
PENNSYLVANIA; Adams County Board
of Elections; Allegheny County Board
of Elections; Armstrong County Board
of Elections; Beaver County Board
of Elections; Bedford County Board
of Elections; Berks County Board of
Elections; Blair County Board of Elections;
Bradford County Board of Elections;
Bucks County Board of Elections; Butler
County Board of Elections; Cambria
County Board of Elections; Cameron
County Board of Elections; Carbon County
Board of Elections; Centre County Board
of Elections; Chester County Board
of Elections; Clarion County Board of
Elections; Clearfield County Board of
Elections; Clinton County Board of
Elections; Columbia County Board of
Elections; Crawford County Board of
Elections; Cumberland County Board
of Elections; Dauphin County Board of
Elections; Delaware County Board of
Elections; Elk County Board of Elections;
Erie County Board of Elections; Fayette
County Board of Elections; Forest County
Board of Elections; Franklin County
Board of Elections; Fulton County Board
of Elections; Greene County Board of
Elections; Huntingdon County Board

of Elections; Indiana County Board
of Elections; Jefferson County Board
of Elections; Juniata County Board of
Elections; Lackawanna County Board
of Elections; Lancaster County Board
of Elections; Lawrence County Board
of Elections; Lebanon County Board
of Elections; Lehigh County Board of
Elections; Luzerne County Board of
Elections; Lycoming County Board
of Elections; Mckean County Board
of Elections; Mercer County Board
of Elections; Mifflin County Board of
Elections; Monroe County Board of
Elections; Montgomery County Board
of Elections; Montour County Board
of Elections; Northampton County
Board of Elections; Northumberland
County Board of Elections; Perry County
Board of Elections; Philadelphia County
Board of Elections; Pike County Board
of Elections; Potter County Board of
Elections; Schuylkill County Board
of Elections; Snyder County Board of
Elections; Somerset County Board of
Elections; Sullivan County Board of
Elections; Susquehanna County Board of
Elections; Tioga County Board of Elections;
Union County Board of Elections; Venango
County Board of Elections; Warren County
Board of Elections; Washington County
Board of Elections; Wayne County Board
of Elections; Westmoreland County Board
of Elections; Wyoming County Board of
Elections; York County Board of Elections
Democratic National
Committee, Intervenor

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

No. 20-3214
|
Submitted Pursuant to Third Circuit
L.A.R. 34.1(a) November 9, 2020
|
(Filed: November 13, 2020)

**Synopsis**

**Background:** Voters and congressional candidate brought action against Secretary of Commonwealth of Pennsylvania and county boards of elections, seeking to enjoin the counting of mail-in ballots received during the three-day extension of the ballot-receipt deadline ordered by the Pennsylvania Supreme Court, and seeking a declaration that the extension period and presumption of timeliness was unconstitutional. The United States District Court for the Western District of Pennsylvania, Kim R. Gibson, Senior District Judge, 2020 WL 6323121, denied voters' and candidate's motion for a temporary restraining order (TRO) and preliminary injunction. Voters and candidate appealed.

**Holdings:** The Court of Appeals, Smith, Chief Judge, held that:

the District Court's order was immediately appealable;

voters and candidate lacked standing to bring action alleging violation of Constitution's Elections Clause and Electors Clause;

voters lacked concrete injury for their alleged harm of vote dilution, and thus voters did not have standing for such claim;

voters lacked particularized injury for their alleged harm of vote dilution, and thus voters did not have standing for such claim;

voters failed to allege legally cognizable "preferred class," for purposes of standing to claim equal protection violation;

alleged harm from presumption of timeliness was hypothetical or conjectural, and thus voters did not have standing to challenge presumption; and

voters and candidate were not entitled to receive injunction so close to election.

Affirmed.

On Appeal from the United States District Court for the Western District of Pennsylvania, District Court No. 3-20-cv-00215, District Judge: Honorable Kim. R. Gibson

**Attorneys and Law Firms**

Brian W. Barnes, Peter A. Patterson, David H. Thompson, Cooper & Kirk, 1523 New Hampshire Avenue, N.W., Washington, D.C. 20036, Counsel for Appellants

Mark A. Aronchick, Michele D. Hangley, Robert A. Wiygul, Hangley Aronchick Segal Pudlin & Schiller, One Logan Square, 18th & Cherry Streets, 27th Floor, Philadelphia, PA 19103, J. Bart DeLone, Sean A. Kirkpatrick, Keli M. Neary, Office of Attorney General of Pennsylvania, Strawberry Square, Harrisburg, PA 17120, Dimitrios Mavroudis, Jessica Rickabaugh, Joe H. Tucker, Jr., Tucker Law Group, Ten Penn Center, 1801 Market Street, Suite 2500, Philadelphia, PA 19103, Counsel Secretary Commonwealth of Pennsylvania

Elizabeth A. Dupuis, Molly E. Meacham, Babst Calland, 330 Innovation Boulevard, Suite 302, State College, PA 16803, Counsel for Armstrong, Bedford, Blair, Centre Columbia, Dauphin, Fayette, Huntingdon, Indiana, Lackawanna, Lawrence, Northumberland, Venango, and York County Boards of Elections

Christine D. Steere, Deasey Mahoney & Valentini, 103 Chesley Drive, Lafayette Building, Suite 101, Media, PA 19063, Counsel for Berks County Board of Elections

Edward D. Rogers, Elizabeth V. Wingfield, Ballard Spahr, 1735 Market Street, 51st Floor, Philadelphia, PA 19103, Counsel for Delaware County Board of Elections

Stephen B. Edwards, Frank J. Lavery, Jr., Andrew W. Norfleet, Lavery Law, 225 Market Street, Suite 304, P.O. Box 1245, Harrisburg, PA 17108, Counsel for Franklin and Perry County Boards of Elections

Thomas R. Shaffer, Glassmire & Shaffer Law Offices, 5 East Third Street, P.O. Box 509, Coudersport, PA 16915, Counsel for Potter County Board of Elections

Marc E. Elias, Uzoma Nkwonta, Courtney A. Elgart, Perkins Coie, 700 13th Street, N.W. Suite 800, Washington, D.C. 20005, Counsel for Intervenor Democratic National Committee

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Before: SMITH, Chief Judge, SHWARTZ and SCIRICA, Circuit Judges

OPINION OF THE COURT

SMITH, Chief Judge.

**\*1** *A share in the sovereignty of the state, which is exercised by the citizens at large, in voting at elections is one of the most important rights of the subject, and in a republic ought to stand foremost in the estimation of the law.*—Alexander Hamilton[1]

The year 2020 has brought the country unprecedented challenges. The COVID-19 pandemic, which began early this year and continues today, has caused immense loss and vast disruption. As this is a presidential election year, the pandemic has also presented unique challenges regarding where and how citizens shall vote, as well as when and how their ballots shall be tabulated. The appeal on which we now rule stems from the disruption COVID-19 has wrought on the national elections. We reach our decision, detailed below, having carefully considered the full breadth of statutory law and constitutional authority applicable to this unique dispute over Pennsylvania election law. And we do so with commitment to a proposition indisputable in our democratic process: that the lawfully cast vote of every citizen must count.

## I. Background & Procedural History

### A. The Elections and Presidential Electors Clause
The U.S. Constitution delegates to state "Legislature[s]" the authority to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives," subject to Congress's ability to "make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. This provision is known as the "Elections Clause." The Elections Clause effectively gives state governments the "default" authority to regulate the mechanics of federal elections, *Foster v. Love*, 522 U.S. 67, 69, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997), with Congress retaining "exclusive control" to "make or alter" any state's regulations, *Colegrove v. Green*, 328 U.S. 549, 554, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946). Congress has not often wielded this power but, "[w]hen exercised, the action of Congress, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them." *Ex Parte Siebold*, 100 U.S. 371, 384, 399, 25 L.Ed. 717 (1879) ("[T]he Constitution and constitutional laws of the [United States] are ... the supreme law of the land; and, when they conflict with the laws of the States, they are of paramount authority and obligation."). By statute, Congress has set "[t]he Tuesday next after the 1st Monday in November, in every even numbered year," as the day for the election. 2 U.S.C. § 7.

Much like the Elections Clause, the "Electors Clause" of the U.S. Constitution provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of [Presidential] Electors." U.S. Const. art. II, § 1, cl. 2. Congress can "determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." U.S. Const. art. II, § 1, cl. 4. Congress has set the time for appointing electors as "the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President." 3 U.S.C. § 1.

**\*2** This year, both federal statutes dictate that the day for the election was to fall on Tuesday, November 3 ("Election Day").

### B. Pennsylvania's Election Code
In keeping with the Constitution's otherwise broad delegation of authority to states to regulate the times, places, and manner of holding federal elections, the Pennsylvania General Assembly has enacted a comprehensive elections code. In 2019, the General Assembly passed Act 77, which (among other things) established "no-excuse" absentee voting in Pennsylvania[2]: all eligible voters in Pennsylvania may vote by mail without the need to show their absence from their voting district on the day of the election. 25 Pa. Stat. and Cons. Stat. §§ 3150.11–3150.17. Under Act 77, "[a]pplications for mail-in ballots shall be processed if received not later than five o'clock P.M. of the first Tuesday prior to the day of any primary or election." *Id.* § 3150.12a(a). After Act 77, "a completed absentee [or mail-in] ballot must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election" for that vote to count. *Id.* §§ 3146.6(c), 3150.16(c).

### C. The Pennsylvania Supreme Court Decision
Soon after Act 77's passage, Donald J. Trump for President, Inc., the Republican National Committee ("RNC"), and several Republican congressional candidates and voters brought suit against Kathy Boockvar, Secretary of the

Commonwealth of Pennsylvania, and all of Pennsylvania's county boards of elections. That suit, filed in the Western District of Pennsylvania, alleged that Act 77's "no-excuse" mail-in voting regime violated both the federal and Pennsylvania constitutions. *Donald J. Trump for Pres., Inc. v. Boockvar*, No. 2:20-cv-966, ––– F.Supp.3d ––––, 2020 WL 4920952, at *1 (W.D. Pa. Aug. 23, 2020). Meanwhile, the Pennsylvania Democratic Party and several Democratic elected officials and congressional candidates filed suit in Pennsylvania's Commonwealth Court, seeking declaratory and injunctive relief related to statutory-interpretation issues involving Act 77 and the Pennsylvania Election Code. *See Pa. Democratic Party v. Boockvar*, ––– Pa. ––––, 238 A.3d 345, 352 (2020). Secretary Boockvar asked the Pennsylvania Supreme Court to exercise extraordinary jurisdiction to allow it to immediately consider the case, and her petition was granted without objection. *Id.* at 354–55.

Pending resolution of the Pennsylvania Supreme Court case, Secretary Boockvar requested that the Western District of Pennsylvania stay the federal case. *Trump for Pres. v. Boockvar*, ––– F.Supp.3d at ––––, 2020 WL 4920952, at *1. The District Court obliged and concluded that it would abstain under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *See Trump for Pres. v. Boockvar*, ––– F.Supp.3d at ––––, 2020 WL 4920952, at *21. The RNC then filed a motion for limited preliminary injunctive relief asking that all mailed ballots be segregated, but the District Court denied the motion, finding that the plaintiffs' harm had "not yet materialized in any actualized or imminent way." *Donald J. Trump for Pres., Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5407748, at *1 (W.D. Pa. Sept. 8, 2020).

**\*3** With the federal case stayed, the state court matter proceeded. The Pennsylvania Democratic Party argued that a combination of the COVID-19 pandemic and U.S. Postal Service ("USPS") mail-delivery delays made it difficult for absentee voters to timely return their ballots in the June 2020 Pennsylvania primary election. *Pa. Democratic Party*, 238 A.3d at 362. The Pennsylvania Democratic Party claimed that this voter disenfranchisement violated the Pennsylvania Constitution's Free and Equal Elections Clause, art I., § 5,[3] and sought, among other things, a weeklong extension of the deadline for receipt of ballots cast by Election Day in the upcoming general election—the same deadline for the receipt of ballots cast by servicemembers residing overseas. *Id.* at 353–54. Secretary Boockvar originally opposed the extension deadline; she changed her position after receiving a letter

from USPS General Counsel which stated that Pennsylvania's ballot deadlines were "incongruous with the Postal Service's delivery standards," and that to ensure that a ballot in Pennsylvania would be received by 8:00 P.M. on Election Day, the voter would need to mail it a full week in advance, by October 27, which was also the deadline to *apply* for a mail-in ballot. *Id.* at 365–66; 25 Pa. Stat. and Cons. Stat. § 3150.12a(a). Secretary Boockvar accordingly recommended a three-day extension to the received-by deadline. *Pa. Democratic Party*, 238 A.3d at 364–65.

In a September 17, 2020 decision, the Pennsylvania Supreme Court concluded that USPS's existing delivery standards could not meet the timeline built into the Election Code and that circumstances beyond voters' control should not lead to their disenfranchisement. *Pa. Democratic Party*, 238 A.3d at 371. The Court accordingly held that the Pennsylvania Constitution's Free and Equal Elections Clause required a three-day extension of the ballot-receipt deadline for the November 3 general election. *Id.* at 371, 386–87. All ballots postmarked by 8:00 P.M. on Election Day and received by 5:00 P.M. on the Friday after Election Day, November 6, would be considered timely and counted ("Deadline Extension"). *Id.* at 386–87. Ballots postmarked or signed after Election Day, November 3, would be rejected. *Id.* If the postmark on a ballot received before the November 6 deadline was missing or illegible, the ballot would be presumed to be timely unless "a preponderance of the evidence demonstrates that it was mailed after Election Day" ("Presumption of Timeliness"). *Id.* Shortly after the ruling, Pennsylvania voters were notified of the Deadline Extension and Presumption of Timeliness.

### D. Appeal to the U.S. Supreme Court, and This Litigation

The Republican Party of Pennsylvania and several intervenors, including the President pro tempore of the Pennsylvania Senate, sought to challenge in the Supreme Court of the United States the constitutionality of the Pennsylvania Supreme Court's ruling. Because the November election date was fast approaching, they filed an emergency application for a stay of the Pennsylvania Supreme Court's order pending review on the merits. The U.S. Supreme Court denied the emergency stay request in a 4-4 decision. *Republican Party of Pa. v. Boockvar*, No. 20A54, 592 U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, 2020 WL 6128193 (Oct. 19, 2020); *Scarnati v. Boockvar*, No. 20A53, 592 U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, 2020 WL 6128194 (Oct. 19, 2020). After denial of the stay, the

petitioners moved for expedited consideration of their petition for certiorari. In denying that motion, Justice Alito noted that, per the Pennsylvania Attorney General, all county boards of elections would segregate ballots received during the Deadline Extension period from those received by 8:00 P.M. on Election Day. *Republican Party of Pa. v. Boockvar*, No. 20-542, 592 U.S. ——, —— S.Ct. ——, ——, — L.Ed.2d ——, 2020 WL 6304626, at *2 (Oct. 28, 2020) (Alito, J., statement). Justice Alito later issued an order requiring that all county boards of elections segregate such ballots and count them separately. *Republican Party of Pa. v. Boockvar*, No. 20A84, —— U.S. ——, —— S.Ct. ——, — L.Ed.2d ——, 2020 WL 6536912 (Mem.) (U.S. Nov. 6, 2020) (Alito, J.).

 **\*4** In the meantime, on October 22, 2020, three days after the U.S. Supreme Court declined to stay the Pennsylvania Supreme Court's order, Plaintiffs herein filed this suit in the Western District of Pennsylvania. Plaintiffs are four registered voters from Somerset County, Pennsylvania, who planned to vote in person on Election Day ("Voter Plaintiffs") and Pennsylvania congressional candidate Jim Bognet. Defendants are Secretary Boockvar and each Pennsylvania county's board of elections.

Bognet, the congressional candidate, claimed that the Deadline Extension and Presumption of Timeliness "allow[ ] County Boards of Elections to accept votes ... that would otherwise be unlawful" and "undermine[ ] his right to run in an election where Congress has paramount authority to set the 'times, places, and manner' " of Election Day. *Bognet v. Boockvar*, No. 3:20-cv-215, 2020 WL 6323121, at *2 (W.D. Pa. Oct. 28, 2020). The Voter Plaintiffs alleged that by voting in person, they had to comply with the single, uniform federal Election Day deadline, whereas mail-in voters could submit votes any time before 5:00 P.M. on November 6. *Id.* Thus, they alleged, the Pennsylvania Supreme Court treated them in an arbitrary and disparate way by elevating mail-in voters to a "preferred class of voters" in violation of the U.S. Constitution's Equal Protection Clause and the single, uniform, federal Election Day set by Congress. *Id.* The Voter Plaintiffs also asserted that counting ballots received after Election Day during the Deadline Extension period would unlawfully dilute their votes in violation of the Equal Protection Clause. *Id.*

All Plaintiffs sought to enjoin Defendants from counting ballots received during the Deadline Extension period. *Id.* They also sought a declaration that the Deadline Extension and Presumption of Timeliness are unconstitutional under

the Elections Clause and the Electors Clause as well as the Equal Protection Clause. *Id.* Because Plaintiffs filed their suit less than two weeks before Election Day, they moved for a temporary restraining order ("TRO"), expedited hearing, and preliminary injunction. *Id.*

The District Court commendably accommodated Plaintiffs' request for an expedited hearing, then expeditiously issued a thoughtful memorandum order on October 28, denying the motion for a TRO and preliminary injunction. *Id.* at *7. The District Court held that Bognet lacked standing because his claims were too speculative and not redressable. *Id.* at *3. Similarly, the District Court concluded that the Voter Plaintiffs lacked standing to bring their Equal Protection voter dilution claim because they alleged only a generalized grievance. *Id.* at *5.

At the same time, the District Court held that the Voter Plaintiffs had standing to pursue their Equal Protection arbitrary-and-disparate-treatment claim. But it found that the Deadline Extension did not engender arbitrary and disparate treatment because that provision did not extend the period for mail-in voters to actually cast their ballots; rather, the extension only directed that the timely cast ballots of mail-in voters be counted. *Id.* As to the Presumption of Timeliness, the District Court held that the Voter Plaintiffs were likely to succeed on the merits of their arbitrary-and-disparate-treatment challenge. *Id.* at *6. Still, the District Court declined to grant a TRO because the U.S. Supreme Court "has repeatedly emphasized that ... federal courts should ordinarily not alter the election rules on the eve of an election." *Id.* at *7 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam)). The District Court concluded that with "less than two weeks before the election. ... [g]ranting the relief Plaintiffs seek would result in significant voter confusion; precisely the kind of confusion that *Purcell* seeks to avoid." *Id.*

 **\*5** Plaintiffs appealed the denial of their motion for a TRO and preliminary injunction to this Court on October 29, less than a week before Election Day. Plaintiffs requested an expedited briefing schedule: specifically, their opening brief would be due on October 30 and the response briefs on November 2. Notably, Plaintiffs sought to file a reply brief on November 3—Election Day. Appellants' Emergency Mot. for Expedited Briefing, Dkt. No. 17. Defendants opposed the expedited briefing schedule, arguing that Plaintiffs' own delay had caused the case to reach this Court mere days before the election. Sec'y Boockvar's Opp. to Appellants'

Emergency Mot. for Expedited Briefing, Dkt. No. 33. Defendants also contended that Plaintiffs sought to punish voters by invalidating the very rules mail-in voters had relied on when they cast their ballots. Defendants asked us to deny the motion for expedited briefing and offered to supply us with the actual numbers of mail-in ballots received during the Deadline Extension period together with an approximate count of how many of those mail-in ballots lacked legible postmarks. *Id.*

Even had we granted Plaintiffs' motion for expedited briefing, the schedule they proposed would have effectively foreclosed us from ruling on this appeal before Election Day. So we denied Plaintiffs' motion and instead ordered that their opening brief be filed by November 6. Order, No. 20-3214, Oct. 30, 2020, Dkt. No. 37. We directed Defendants to file response briefs by November 9, forgoing receipt of a reply brief.[4] *Id.* With the matter now fully briefed, we consider Plaintiffs' appeal of the District Court's denial of a TRO and preliminary injunction.

**II. Standard of Review**

The District Court exercised jurisdiction under [28 U.S.C. § 1331](). We exercise jurisdiction under § 1292(a)(1).

Ordinarily, an order denying a TRO is not immediately appealable. *[Hope v. Warden York Cnty. Prison](), 956 F.3d 156, 159 (3d Cir. 2020).* Here, although Bognet and the Voter Plaintiffs styled their motion as an Emergency Motion for a TRO and Preliminary Injunction, *see Bognet v. Boockvar*, No. 3:20-cv-00215, Dkt. No. 5 (W.D. Pa. Oct. 22, 2020), the District Court's order plainly went beyond simply ruling on the TRO request.

Plaintiffs filed their motion for a TRO and a preliminary injunction on October 22, along with a supporting brief. Defendants then filed briefs opposing the motion, with Plaintiffs filing a reply in support of their motion. The District Court heard argument from the parties, remotely, during a 90-minute hearing. The next day, the District Court ruled on the merits of the request for injunctive relief. *Bognet*, 2020 WL 6323121, at *7.* The District Court's Memorandum Order denied both Bognet and the Voter Plaintiffs the affirmative relief they sought to obtain prior to Election Day, confirming that the Commonwealth was to count mailed ballots received after the close of the polls on Election Day but before 5:00 P.M. on November 6.

In determining whether Bognet and the Voter Plaintiffs had standing to sue, we resolve a legal issue that does not require resolution of any factual dispute. Our review is de novo. *[Blunt v. Lower Merion Sch. Dist.](), 767 F.3d 247, 266 (3d Cir. 2014).* "When reviewing a district court's denial of a preliminary injunction, we review the court's findings of fact for clear error, its conclusions of law de novo, and the ultimate decision ... for an abuse of discretion." *[Reilly v. City of Harrisburg](), 858 F.3d 173, 176 (3d Cir. 2017)* (quoting *[Bimbo Bakeries USA, Inc. v. Botticella](), 613 F.3d 102, 109 (3d Cir. 2010)*) (cleaned up).

**III. Analysis**

**A. Standing**

Derived from separation-of-powers principles, the law of standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *[Clapper v. Amnesty Int'l USA](), 568 U.S. 398, 408, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013)* (citations omitted). [Article III of the U.S. Constitution]() vests "[t]he judicial Power of the United States" in both the Supreme Court and "such inferior Courts as the Congress may from time to time ordain and establish." [U.S. Const. art. III, § 1](). But this "judicial Power" extends only to "Cases" and "Controversies." *Id.* art. III, § 2; *see also [Spokeo, Inc. v. Robins](), ---- U.S. ----, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016).* To ensure that judges avoid rendering impermissible advisory opinions, parties seeking to invoke federal judicial power must first establish their standing to do so. *[Spokeo](), 136 S. Ct. at 1547.*

**\*6** [Article III]() standing doctrine speaks in jargon, but the gist of its meaning is plain enough. To bring suit, you—and you personally—must be injured, and you must be injured in a way that concretely impacts your own protected legal interests. If you are complaining about something that does not harm you—and does not harm you in a way that is concrete—then you lack standing. And if the injury that you claim is an injury that does no specific harm to you, or if it depends on a harm that may never happen, then you lack an injury for which you may seek relief from a federal court. As we will explain below, Plaintiffs here have not suffered a concrete, particularized, and non-speculative injury necessary under the U.S. Constitution for them to bring this federal lawsuit.

The familiar elements of Article III standing require a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). To plead an injury in fact, the party invoking federal jurisdiction must establish three sub-elements: first, the "invasion of a legally protected interest"; second, that the injury is both "concrete and particularized"; and third, that the injury is "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S.Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130); *see also Mielo v. Steak 'n Shake Operations*, 897 F.3d 467, 479 n.11 (3d Cir. 2018). The second sub-element requires that the injury "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1, 112 S.Ct. 2130. As for the third, when a plaintiff alleges future injury, such injury must be "certainly impending." *Clapper*, 568 U.S. at 409, 133 S.Ct. 1138 (quoting *Lujan*, 504 U.S. at 565 n.2, 112 S.Ct. 2130). Allegations of "possible" future injury simply aren't enough. *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). All elements of standing must exist at the time the complaint is filed. *See Lujan*, 504 U.S. at 569 n.4, 112 S.Ct. 2130.

With these guideposts in mind, we turn to whether Plaintiffs have pleaded an Article III injury. They bring several claims under 42 U.S.C. § 1983, asserting deprivation of their constitutional rights. They allege that Defendants' implementation of the Pennsylvania Supreme Court's Deadline Extension and Presumption of Timeliness violates the Elections Clause of Article I, the Electors Clause of Article II, and the Equal Protection Clause of the Fourteenth Amendment. Because Plaintiffs lack standing to assert these claims, we will affirm the District Court's denial of injunctive relief.

### 1. Plaintiffs lack standing under the Elections Clause and Electors Clause.

Federal courts are not venues for plaintiffs to assert a bare right "to have the Government act in accordance with law." *Allen v. Wright*, 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–27, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). When the alleged injury is undifferentiated and common to all members of the public, courts routinely dismiss such cases as "generalized grievances" that cannot support standing. *United States v. Richardson*, 418 U.S. 166, 173–75, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). Such is the case here insofar as Plaintiffs, and specifically candidate Bognet, theorize their harm as the right to have government administered in compliance with the Elections Clause and Electors Clause.

To begin with, private plaintiffs lack standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause. For example, in *Lance v. Coffman*, 549 U.S. 437, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007) (per curiam), four private citizens challenged in federal district court a Colorado Supreme Court decision invalidating a redistricting plan passed by the state legislature and requiring use of a redistricting plan created by Colorado state courts. *Id.* at 438, 127 S.Ct. 1194. The plaintiffs alleged that the Colorado Supreme Court's interpretation of the Colorado Constitution violated the Elections Clause "by depriving the state legislature of its responsibility to draw congressional districts." *Id.* at 441, 127 S.Ct. 1194. The U.S. Supreme Court held that the plaintiffs lacked Article III standing because they claimed harm only to their interest, and that of every citizen, in proper application of the Elections Clause. *Id.* at 442, 127 S.Ct. 1194 ("The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed."). Their relief would have no more directly benefitted them than the public at large. *Id.* The same is true here. If anything, Plaintiffs' "interest in the State's ability to 'enforce its duly enacted laws' " is even less compelling because Pennsylvania's "election officials support the challenged decree." *Republican Nat'l Comm. v. Common Cause R.I.*, No. 20A28, 591 U.S. ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2020 WL 4680151 (Mem.), at *1 (Aug. 13, 2020) (quoting *Abbott v. Perez*, —— U.S. ——, 138 S. Ct. 2305, 2324 n.17, 201 L.Ed.2d 714 (2018)).

**\*7** Because the Elections Clause and the Electors Clause have "considerable similarity," *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015) (Roberts, C.J., dissenting) (discussing how Electors Clause similarly vests power to determine manner of appointing electors in the "Legislature" of each State), the same logic applies to Plaintiffs' alleged injury stemming from the claimed violation of the Electors Clause. *See also Foster*, 522 U.S. at 69, 118 S.Ct. 464 (characterizing Electors Clause as Elections Clause's "counterpart for the Executive Branch"); *U.S. Term*

*Limits, Inc. v. Thornton*, 514 U.S. 779, 804–05, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (noting that state's "duty" under Elections Clause "parallels the duty" described by Electors Clause).

Even a party that meets Article III standing requirements must ordinarily rest its claim for relief on violation of its own rights, not those of a third party. *Pitt News v. Fisher*, 215 F.3d 354, 361–62 (3d Cir. 2000). Plaintiffs assert that the Pennsylvania Supreme Court's Deadline Extension and Presumption of Timeliness usurped the General Assembly's prerogative under the Elections Clause to prescribe "[t]he Times, Places and Manner of holding Elections." U.S. Const. art. I, § 4, cl. 1. The Elections Clause grants that right to "the Legislature" of "each State." *Id.* Plaintiffs' Elections Clause claims thus "belong, if they belong to anyone, only to the Pennsylvania General Assembly." *Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) (three-judge panel) (per curiam). Plaintiffs here are four individual voters and a candidate for federal office; they in no way constitute the General Assembly, nor can they be said to comprise any part of the law-making processes of Pennsylvania. *Ariz. State Legislature*, 576 U.S. at 824, 135 S.Ct. 2652.[5] Because Plaintiffs are not the General Assembly, nor do they bear any conceivable relationship to state lawmaking processes, they lack standing to sue over the alleged usurpation of the General Assembly's rights under the Elections and Electors Clauses. No member of the General Assembly is a party to this lawsuit.

That said, prudential standing can suspend Article III's general prohibition on a litigant's raising another person's legal rights. Yet Plaintiffs don't fit the bill. A plaintiff may assert the rights of another if he or she "has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (citation omitted). Plaintiffs cannot invoke this exception to the rule against raising the rights of third parties because they enjoy no close relationship with the General Assembly, nor have they alleged any hindrance to the General Assembly's ability to protect its own interests. *See, e.g.*, *Corman*, 287 F. Supp. 3d at 573. Nor does Plaintiffs' other theory of prudential standing, drawn from *Bond v. United States*, 564 U.S. 211, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011), advance the ball.

**\*8** In *Bond*, the Supreme Court held that a litigant has prudential standing to challenge a federal law that allegedly impinges on the state's police powers, "in contravention of

constitutional principles of federalism" enshrined in the Tenth Amendment. *Id.* at 223–24, 131 S.Ct. 2355. The defendant in *Bond* challenged her conviction under 18 U.S.C. § 229, which Congress enacted to comply with a chemical weapons treaty that the United States had signed. *Id.* at 214–15, 131 S.Ct. 2355. Convicted under the statute she sought to challenge, Bond satisfied Article III's standing requirements. *Id.* at 217, 131 S.Ct. 2355 (characterizing Bond's sentence and incarceration as concrete, and redressable by invalidation of her conviction); *id.* at 224–25, 131 S.Ct. 2355 (noting that Bond was subject to "[a] law," "prosecution," and "punishment" she might not have faced "if the matter were left for the Commonwealth of Pennsylvania to decide"). She argued that her conduct was "local in nature" such that § 229 usurped the Commonwealth's reserved police powers. *Id.* Rejecting the Government's contention that Bond was barred as a third party from asserting the rights of the Commonwealth, *id.* at 225, 131 S.Ct. 2355, the Court held that "[t]he structural principles secured by the separation of powers protect the individual as well" as the State. *Id.* at 222, 131 S.Ct. 2355 ("Federalism also protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions. ... When government acts in excess of its lawful powers, that [personal] liberty is at stake.").

But the nub of Plaintiffs' argument here is that the Pennsylvania Supreme Court intruded on the authority delegated to the Pennsylvania General Assembly under Articles I and II of the U.S. Constitution to regulate federal elections. They do not allege any violation of the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Nor could they. After all, states have no inherent or reserved power over federal elections. *U.S. Term Limits*, 514 U.S. at 804–05, 115 S.Ct. 1842. When "deciding issues raised under the Elections Clause," courts "need not be concerned with preserving a 'delicate balance' between competing sovereigns." *Gonzalez v. Arizona*, 677 F.3d 383, 392 (9th Cir. 2012). Either federal and state election law "operate harmoniously in a single procedural scheme," or they don't—and the federal law preempts ("alter[s]") state election law under the Elections Clause. *Id.* at 394. An assessment that the Pennsylvania Supreme Court lacked the legislative authority under the state's constitution necessary to comply with the Elections Clause (Appellants' Br. 24–27) does not implicate *Bond*, the Tenth Amendment, or even Article VI's Supremacy

Clause.[6] *See Gonzalez,* 677 F.3d at 390–92 (contrasting Elections Clause with Supremacy Clause and describing former as "unique," containing "[an] unusual delegation of power," and "unlike virtually all other provisions of the Constitution"). And, of course, third-party standing under *Bond* still presumes that the plaintiff otherwise meets the requirements of Article III; as discussed above, Plaintiffs do not.

Plaintiff Bognet, a candidate for Congress who is currently a private citizen, does not plead a cognizable injury by alleging a "right to run in an election where Congress has paramount authority," Compl. ¶ 69, or by pointing to a "threatened" reduction in the competitiveness of his election from counting absentee ballots received within three days after Election Day. Appellants' Br. 21. Bognet does not explain how that "right to run" affects him in a particularized way when, in fact, all candidates in Pennsylvania, including Bognet's opponent, are subject to the same rules. And Bognet does not explain how counting *more* timely cast votes would lead to a *less* competitive race, nor does he offer any evidence tending to show that a greater proportion of mailed ballots received after Election Day than on or before Election Day would be cast for Bognet's opponent. What's more, for Bognet to have standing to enjoin the counting of ballots arriving after Election Day, such votes would have to be sufficient in number to change the outcome of the election to Bognet's detriment. *See, e.g., Sibley v. Alexander,* 916 F. Supp. 2d 58, 62 (D.D.C. 2013) ("[E]ven if the Court granted the requested relief, [plaintiff] would still fail to satisfy the redressability element [of standing] because enjoining defendants from casting the ... votes would not change the outcome of the election." (citing *Newdow v. Roberts,* 603 F.3d 1002, 1011 (D.C. Cir. 2010) (citations omitted)). Bognet does not allege as much, and such a prediction was inherently speculative when the complaint was filed. The same can be said for Bognet's alleged wrongfully incurred expenditures and future expenditures. Any harm Bognet sought to avoid in making those expenditures was not "certainly impending"—he spent the money to avoid a speculative harm. *See Donald J. Trump for Pres., Inc. v. Boockvar,* No. 2:20-cv-966, ---- F.Supp.3d ----, ----, 2020 WL 5997680, at *36 (W.D. Pa. Oct. 10, 2020). Nor are those expenditures "fairly traceable" under Article III to the actions that Bognet challenges. *See, e.g., Clapper,* 568 U.S. at 402, 416, 133 S.Ct. 1138 (rejecting argument that plaintiff can "manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending").[7]

**\*9** Plaintiffs therefore lack Article III standing to challenge Defendants' implementation of the Pennsylvania Supreme Court's Deadline Extension and Presumption of Timeliness under the Elections Clause and Electors Clause.

## 2. The Voter Plaintiffs lack standing under the Equal Protection Clause.

Stressing the "personal" nature of the right to vote, the Voter Plaintiffs assert two claims under the Equal Protection Clause.[8] First, they contend that the influence of their votes, cast in person on Election Day, is "diluted" both by (a) mailed ballots cast on or before Election Day but received between Election Day and the Deadline Extension date, ballots which Plaintiffs assert cannot be lawfully counted; and (b) mailed ballots that were unlawfully cast (*i.e.*, placed in the mail) after Election Day but are still counted because of the Presumption of Timeliness. Second, the Voter Plaintiffs allege that the Deadline Extension and the Presumption of Timeliness create a preferred class of voters based on "arbitrary and disparate treatment" that values "one person's vote over that of another." *Bush v. Gore,* 531 U.S. 98, 104–05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). The Voter Plaintiffs lack Article III standing to assert either injury.

a. Vote Dilution

As discussed above, the foremost element of standing is injury in fact, which requires the plaintiff to show a harm that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo,* 136 S. Ct. at 1547–48 (citation omitted). The Voter Plaintiffs lack standing to redress their alleged vote dilution because that alleged injury is not concrete as to votes counted under the Deadline Extension, nor is it particularized for Article III purposes as to votes counted under the Deadline Extension or the Presumption of Timeliness.

*i. No concrete injury from vote dilution attributable to the Deadline Extension.*

The Voter Plaintiffs claim that Defendants' implementation of the Deadline Extension violates the Equal Protection Clause because "unlawfully" counting ballots received within three days of Election Day dilutes their votes. But the source of this

purported illegality is necessarily a matter of state law, which makes any alleged harm abstract for purposes of the Equal Protection Clause. And the purported vote dilution is also not concrete because it would occur in equal proportion *without* the alleged procedural illegality—that is, had the *General Assembly* enacted the Deadline Extension, which the Voter Plaintiffs do not challenge substantively.[9]

**\*10** The concreteness of the Voter Plaintiffs' alleged vote dilution stemming from the Deadline Extension turns on the federal and state laws applicable to voting procedures. Federal law does not provide for *when* or *how* ballot counting occurs. *See, e.g., Trump for Pres., Inc. v. Way*, No. 20-cv-01753, ––– F.Supp.3d ––––, ––––, 2020 WL 5912561, at \*12 (D.N.J. Oct. 6, 2020) ("Plaintiffs direct the Court to no federal law regulating methods of determining the timeliness of mail-in ballots or requiring that mail-in ballots be postmarked."); *see also Smiley v. Holm*, 285 U.S. 355, 366, 52 S.Ct. 397, 76 L.Ed. 795 (1932) (noting that Elections Clause delegates to state lawmaking processes all authority to prescribe "procedure and safeguards" for "counting of votes"). Instead, the Elections Clause delegates to each state's lawmaking function the authority to prescribe such procedural regulations applicable to federal elections. *U.S. Term Limits*, 514 U.S. at 832–35, 115 S.Ct. 1842 ("The Framers intended the Elections Clause to grant States authority to create procedural regulations .... [including] 'whether the electors should vote by ballot or vivâ voce ....' " (quoting James Madison, 2 Records of the Federal Convention of 1787, at 240 (M. Farrand ed. 1911) (cleaned up)); *Smiley*, 285 U.S. at 366, 52 S.Ct. 397 (describing state authority under Elections Clause "to provide a complete code for congressional elections ... in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns"). That delegation of authority embraces all procedures "which experience shows are necessary in order to enforce the fundamental right involved." *Smiley*, 285 U.S. at 366, 52 S.Ct. 397. Congress exercises its power to "alter" state election regulations only if the state regime cannot "operate harmoniously" with federal election laws "in a single procedural scheme." *Gonzalez*, 677 F.3d at 394.

The Deadline Extension and federal laws setting the date for federal elections can, and indeed do, operate harmoniously. At least 19 other States and the District of Columbia have post-Election Day absentee ballot receipt deadlines.[10] And many States also accept absentee ballots mailed by overseas uniformed servicemembers that are received after Election Day, in accordance with the federal Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. §§ 20301–20311. So the Voter Plaintiffs' only cognizable basis for alleging dilution from the "unlawful" counting of invalid ballots is state law defining lawful and unlawful ballot counting practices. *Cf. Wise v. Circosta*, 978 F.3d 93, 100–01 (4th Cir. 2020) ("Whether ballots are *illegally* counted if they are received more than three days after Election Day depends on an issue of state law from which we must abstain." (emphasis in original)), *application for injunctive relief denied sub nom. Moore v. Circosta*, No. 20A72, 592 U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, 2020 WL 6305036 (Oct. 28, 2020). The Voter Plaintiffs seem to admit as much, arguing "that counting votes that are unlawful under the General Assembly's enactments will unconstitutionally dilute the lawful votes" cast by the Voter Plaintiffs. Appellants' Br. 38; *see also id.* at 31. In other words, the Voter Plaintiffs say that the Election Day ballot receipt deadline in Pennsylvania's codified election law renders the ballots untimely and therefore unlawful to count. Defendants, for their part, contend that the Pennsylvania Supreme Court's extension of that deadline under the Free and Equal Elections Clause of the state constitution renders them timely, and therefore lawful to count.

**\*11** This conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment. Violation of state election laws by state officials or other unidentified third parties is not always amenable to a federal constitutional claim. *See Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A deliberate violation of state election laws by state election officials does not transgress against the Constitution.") (cleaned up); *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970) (rejecting Equal Protection Clause claim arising from state's erroneous counting of votes cast by voters unqualified to participate in closed primary). "It was not intended by the Fourteenth Amendment ... that all matters formerly within the exclusive cognizance of the states should become matters of national concern." *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 88 L.Ed. 497 (1944).

Contrary to the Voter Plaintiffs' conceptualization, vote dilution under the Equal Protection Clause is concerned with votes being weighed differently. *See Rucho v. Common Cause*, ––– U.S. ––––, 139 S. Ct. 2484, 2501, 204 L.Ed.2d 931 (2019) (" '[V]ote dilution' in the one-person, one-

vote cases refers to the idea that each vote must carry *equal weight*." (emphasis added)); *cf. Baten v. McMaster*, 967 F.3d 345, 355 (4th Cir. 2020), *as amended* (July 27, 2020) ("[N]o vote in the South Carolina system is diluted. Every qualified person gets one vote and each vote is counted equally in determining the final tally."). As explained below, the Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently. Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment. And if dilution of lawfully cast ballots by the "unlawful" counting of invalidly cast ballots "were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity." *Trump for Pres. v. Boockvar*, ---- F.Supp.3d at ---- – ----, 2020 WL 5997680, at *45–46. That is not how the Equal Protection Clause works.[11]

Even if we were to entertain an end-run around the Voter Plaintiffs' lack of Elections Clause standing—by viewing the *federal* Elections Clause as the source of "unlawfulness" of Defendants' vote counting—the alleged vote dilution would not be a concrete injury. Consider, as we've noted, that the Voter Plaintiffs take no issue with the content of the Deadline Extension; they concede that the General Assembly, as other state legislatures have done, could have enacted exactly the same Deadline Extension as a valid "time[ ], place[ ], and manner" regulation consistent with the Elections Clause. *Cf. Snowden*, 321 U.S. at 8, 64 S.Ct. 397 (concluding that alleged "unlawful administration by state officers of a state statute *fair on its face*, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection" (emphasis added)); *Powell*, 436 F.2d at 88 ("Uneven or erroneous application of an *otherwise valid* statute constitutes a denial of equal protection only if it represents 'intentional or purposeful discrimination.'" (emphasis added) (quoting *Snowden*, 321 U.S. at 8, 64 S.Ct. 397)). Reduced to its essence, the Voter Plaintiffs' claimed vote dilution would rest on their allegation that federal law required a different state organ to issue the Deadline Extension. The Voter Plaintiffs have not alleged, for example, that they were prevented from casting their votes, *Guinn v. United States*, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915), nor that their votes were not counted, *United States v. Mosley*, 238 U.S. 383, 35 S.Ct. 904, 59

L.Ed. 1355 (1915). Any alleged harm of vote dilution that turns not on the proportional influence of votes, but solely on the federal illegality of the Deadline Extension, strikes us as quintessentially abstract in the election law context and "divorced from any concrete harm." *Spokeo*, 136 S. Ct. at 1549 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009)). That the alleged violation here relates to election law and the U.S. Constitution, rather than the mine-run federal consumer privacy statute, does not abrogate the requirement that a concrete harm must flow from the procedural illegality. *See, e.g., Lujan*, 504 U.S. at 576, 112 S.Ct. 2130 ("[T]here is absolutely no basis for making the Article III inquiry turn on the source of the asserted right.").

**\*12** The Voter Plaintiffs thus lack a concrete Equal Protection Clause injury for their alleged harm of vote dilution attributable to the Deadline Extension.

*ii. No particularized injury from votes counted under the Deadline Extension or the Presumption of Timeliness.*

The opposite of a "particularized" injury is a "generalized grievance," where "the impact on plaintiff is plainly undifferentiated and common to all members of the public." *Id.* at 575, 112 S.Ct. 2130 (cleaned up); *see also Lance*, 549 U.S. at 439, 127 S.Ct. 1194. The District Court correctly held that the Voter Plaintiffs' "dilution" claim is a "paradigmatic generalized grievance that cannot support standing." *Bognet*, 2020 WL 6323121, at *4 (quoting *Carson v. Simon*, No. 20-cv-02030, ---- F.Supp.3d ----, ----, 2020 WL 6018957, at *7 (D. Minn. Oct. 12, 2020), *rev'd on other grounds*, No. 20-3139, ---- F.3d ----, 2020 WL 6335967 (8th Cir. Oct. 29, 2020)). The Deadline Extension and Presumption of Timeliness, assuming they operate to allow the illegal counting of unlawful votes, "dilute" the influence of all voters in Pennsylvania equally and in an "undifferentiated" manner and do not dilute a certain group of voters particularly.[12]

Put another way, "[a] vote cast by fraud or mailed in by the wrong person through mistake," or otherwise counted illegally, "has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged." *Martel v. Condos*, No. 5:20-cv-00131, ---- F.Supp.3d ----, ----, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020). Such an alleged "dilution" is suffered equally by all voters and is not "particularized" for standing purposes. The courts to consider

this issue are in accord. *See id.*; *Carson*, ––– F.Supp.3d at
––––  – ––––, 2020 WL 6018957, at *7–8; *Moore v. Circosta*,
Nos. 1:20-cv-00911, 1:20-cv-00912, ––– F.Supp.3d ––––,
––––, 2020 WL 6063332, at *14 (M.D.N.C. Oct. 14, 2020),
*emergency injunction pending appeal denied sub nom. Wise
v. Circosta*, 978 F.3d 93 (4th Cir. 2020), *application for
injunctive relief denied sub nom. Moore v. Circosta*, No.
20A72, 592 U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––,
2020 WL 6305036 (U.S. Oct. 28, 2020); *Paher v. Cegavske*,
457 F. Supp. 3d 919, 926–27 (D. Nev. Apr. 30, 2020).

But the Voter Plaintiffs argue that their purported "vote
dilution" is an injury in fact sufficient to confer standing, and
*not* a generalized grievance belonging to all voters, because
the Supreme Court has "long recognized that a person's
right to vote is 'individual and personal in nature.' " *Gill v.
Whitford*, ––– U.S. ––––, 138 S. Ct. 1916, 1929, 201 L.Ed.2d
313 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561, 84
S.Ct. 1362, 12 L.Ed.2d 506 (1964)). "Thus, 'voters who allege
facts showing disadvantage to themselves as individuals have
standing to sue' to remedy that disadvantage." *Id.* (quoting
*Baker v. Carr*, 369 U.S. 186, 206, 82 S.Ct. 691, 7 L.Ed.2d 663
(1962)).

**\*13** The Voter Plaintiffs' reliance on this language
from *Baker* and *Reynolds* is misplaced. In *Baker*, the
plaintiffs challenged Tennessee's apportionment of seats in its
legislature as violative of the Equal Protection Clause of the
Fourteenth Amendment. 369 U.S. at 193, 82 S.Ct. 691. The
Supreme Court held that the plaintiffs *did* have standing under
Article III because "[t]he injury which appellants assert is that
this classification disfavors the voters in the counties in which
they reside, placing them in a position of constitutionally
unjustifiable inequality *vis-à-vis* voters in irrationally favored
counties." *Id.* at 207–08, 82 S.Ct. 691.

Although the *Baker* Court did not decide the merits of the
Equal Protection claim, the Court in a series of cases—
including *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801,
9 L.Ed.2d 821 (1963), and *Reynolds*—made clear that the
Equal Protection Clause prohibits a state from "diluti[ng] ...
the *weight* of the votes of certain ... voters merely because
of where they reside[ ]," just as it prevents a state from
discriminating on the basis of the voter's race or sex.
*Reynolds*, 377 U.S. at 557, 84 S.Ct. 1362 (emphasis added).
The Voter Plaintiffs consider it significant that the Court in
*Reynolds* noted—though not in the context of standing—that
"the right to vote" is "individual and personal in nature."
*Id.* at 561, 84 S.Ct. 1362 (quoting *United States v. Bathgate*,

246 U.S. 220, 227, 38 S.Ct. 269, 62 L.Ed. 676 (1918)). The
Court then explained that a voter's right to vote encompasses
both the right to cast that vote and the right to have that vote
counted without "debasement or dilution":

> The right to vote can neither be denied outright, *Guinn
> v. United States*, 238 U.S. 347 [35 S.Ct. 926, 59 L.Ed.
> 1340 (1915) ], *Lane v. Wilson*, 307 U.S. 268 [59 S.Ct.
> 872, 83 L.Ed. 1281 (1939) ], nor destroyed by alteration
> of ballots, see *United States v. Classic*, 313 U.S. 299, 315
> [61 S.Ct. 1031, 85 L.Ed. 1368 (1941) ], nor diluted by
> ballot-box stuffing, *Ex parte Siebold*, 100 U.S. 371 [25
> L.Ed. 717 (1880) ], *United States v. Saylor*, 322 U.S. 385
> [64 S.Ct. 1101, 88 L.Ed. 1341 (1944) ]. As the Court
> stated in *Classic*, "Obviously included within the right to
> choose, secured by the Constitution, is the right of qualified
> voters within a state to cast their ballots and have them
> counted ...." 313 U.S. at 315 [61 S.Ct. 1031].
>
> ...
>
> "The right to vote includes the right to have the ballot
> counted. ... It also includes the right to have the vote
> counted at full value without dilution or discount. ... That
> federally protected right suffers substantial dilution ...
> [where a] favored group has full voting strength ... [and]
> [t]he groups not in favor have their votes discounted."

*Reynolds*, 377 U.S. at 555 & n.29, 84 S.Ct. 1362 (alterations
in last paragraph in original) (quoting *South v. Peters*, 339
U.S. 276, 279, 70 S.Ct. 641, 94 L.Ed. 834 (1950) (Douglas,
J., dissenting)).

Still, it does not follow from the labeling of the right to vote as
"personal" in *Baker* and *Reynolds* that *any* alleged illegality
affecting voting rights rises to the level of an injury in fact.
After all, the Court has observed that the harms underlying
a racial gerrymandering claim under the Equal Protection
Clause "are personal" in part because they include the harm of
a voter "being personally subjected to a racial classification."
*Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263,
135 S.Ct. 1257, 191 L.Ed.2d 314 (2015) (cleaned up). Yet a
voter "who complains of gerrymandering, but who does not
live in a gerrymandered district, 'assert[s] only a generalized
grievance against governmental conduct of which he or she
does not approve.' " *Gill*, 138 S. Ct. at 1930 (quoting *United
States v. Hays*, 515 U.S. 737, 745, 115 S.Ct. 2431, 132
L.Ed.2d 635 (1995)) (alteration in original). The key inquiry
for standing is whether the alleged violation of the right to
vote arises from an invidious classification—including those
based on "race, sex, economic status, or place of residence

within a State," *Reynolds*, 377 U.S. at 561, 84 S.Ct. 1362—to which the plaintiff is subject and in which "the favored group has full voting strength and the groups not in favor have their votes discounted," *id.* at 555 n.29, 84 S.Ct. 1362 (cleaned up). In other words, "voters who allege facts *showing disadvantage to themselves*" have standing to bring suit to remedy that disadvantage, *Baker*, 369 U.S. at 206, 82 S.Ct. 691 (emphasis added), but a disadvantage to the plaintiff exists only when the plaintiff is part of a group of voters whose votes will be weighed differently compared to another group. Here, no Pennsylvania voter's vote will count for less than that of any other voter as a result of the Deadline Extension and Presumption of Timeliness.[13]

**\*14** This conclusion cannot be avoided by describing one group of voters as "those ... who lawfully vote in person and submit their ballots *on time*" and the other group of voters as those whose (mail-in) ballots arrive after Election Day and are counted because of the Deadline Extension and/or the Presumption of Timeliness. Appellants' Br. 33 (emphasis in original). Although the former group, under Plaintiffs' theory, should make up 100% of the total votes counted and the latter group 0%, there is simply no differential *weighing* of the votes. *See Wise*, 978 F.3d at 104 (Motz, J., concurring) ("But if the extension went into effect, plaintiffs' votes would not count for less *relative to other North Carolina voters*. This is the core of an Equal Protection Clause challenge." (emphasis in original)). Unlike the malapportionment or racial gerrymandering cases, a vote cast by a voter in the so-called "favored" group counts not one bit more than the same vote cast by the "disfavored" group—no matter what set of scales one might choose to employ. *Cf. Reynolds*, 377 U.S. at 555 n.29, 84 S.Ct. 1362. And, however one tries to draw a contrast, this division is not based on a voter's personal characteristics at all, let alone a person's race, sex, economic status, or place of residence. Two voters could each have cast a mail-in ballot before Election Day at the same time, yet perhaps only one of their ballots arrived by 8:00 P.M. on Election Day, given USPS's mail delivery process. It is passing strange to assume that one of these voters would be denied "equal protection of the laws" were *both* votes counted. U.S. Const. amend. XIV, § 1.

The Voter Plaintiffs also emphasize language from *Reynolds* that "[t]he right to vote can neither be denied outright ... nor diluted by ballot-box stuffing." 377 U.S. at 555, 84 S.Ct. 1362 (citing *Ex parte Siebold*, 100 U.S. 371, 25 L.Ed. 717 (1879); *United States v. Saylor*, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944)). In the first place, casting a vote in accordance

with a procedure approved by a state's highest court—even assuming that approval violates the Elections Clause—is not equivalent to "ballot-box stuffing." The Supreme Court has only addressed this "false"-tally type of dilution where the tally was false as a result of a scheme to cast falsified or fraudulent votes. *See Saylor*, 322 U.S. at 386, 64 S.Ct. 1101. We are in uncharted territory when we are asked to declare that a tally that includes false or fraudulent votes is equivalent to a tally that includes votes that are or may be unlawful for non-fraudulent reasons, and so is more aptly described as "incorrect." *Cf. Gray*, 372 U.S. at 386, 83 S.Ct. 801 (Harlan, J., dissenting) ("[I]t is hard to take seriously the argument that 'dilution' of a vote in consequence of a legislatively sanctioned electoral system can, without more, be analogized to an impairment of the political franchise by ballot box stuffing or other criminal activity.").

Yet even were this analogy less imperfect, it still would not follow that every such "false" or incorrect tally is an injury in fact for purposes of an Equal Protection Clause claim. The Court's cases that describe ballot-box stuffing as an injury to the right to vote have arisen from criminal prosecutions under statutes making it unlawful for anyone to injure the exercise of another's constitutional right. *See, e.g.*, *Ex parte Siebold*, 100 U.S. at 373–74 (application for writ of habeas corpus); *Saylor*, 322 U.S. at 385–86, 64 S.Ct. 1101 (criminal appeal regarding whether statute prohibiting "conspir[ing] to injure ... any citizen in the free exercise ... of any right or privilege secured to him by the Constitution" applied to conspiracy to stuff ballot boxes); *Anderson v. United States*, 417 U.S. 211, 226, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) (criminal prosecution for conspiracy to stuff ballot boxes under successor to statute in *Saylor*). Standing was, of course, never an issue in those cases because the Government was enforcing its criminal laws. Here, the Voter Plaintiffs, who bear the burden to show standing, have presented no instance in which an individual voter had Article III standing to claim an equal protection harm to his or her vote from the existence of an allegedly illegal vote cast by someone else in the same election.

Indeed, the logical conclusion of the Voter Plaintiffs' theory is that whenever an elections board counts any ballot that deviates in some way from the requirements of a state's legislatively enacted election code, there is a *particularized* injury in fact sufficient to confer Article III standing on every other voter—provided the remainder of the standing analysis is satisfied. Allowing standing for such an injury strikes us as indistinguishable from the proposition that a plaintiff has

Article III standing to assert a general interest in seeing the "proper application of the Constitution and laws"—a proposition that the Supreme Court has firmly rejected. *Lujan,* 504 U.S. at 573–74, 112 S.Ct. 2130. The Voter Plaintiffs thus lack standing to bring their Equal Protection vote dilution claim.

b. Arbitrary and Disparate Treatment

**\*15** The Voter Plaintiffs also lack standing to allege an injury in the form of "arbitrary and disparate treatment" of a preferred class of voters because the Voter Plaintiffs have not alleged a legally cognizable "preferred class" for equal protection purposes, and because the alleged harm from votes counted solely due to the Presumption of Timeliness is hypothetical or conjectural.

*i. No legally protected "preferred class."*

The District Court held that the Presumption of Timeliness creates a "preferred class of voters" who are "able to cast their ballots after the congressionally established Election Day" because it "extends the date of the election by multiple days for a select group of mail-in voters whose ballots will be presumed to be timely in the absence of a verifiable postmark."[14] *Bognet,* 2020 WL 6323121, at \*6. The District Court reasoned, then, that the differential treatment between groups of voters is by itself an injury for standing purposes. To the District Court, this supposed "unequal treatment of voters ... harms the [Voter] Plaintiffs because, as in-person voters, they must vote by the end of the congressionally established Election Day in order to have their votes counted." *Id.* The District Court cited no case law in support of its conclusion that the injury it identified gives rise to Article III standing.

The District Court's analysis suffers from several flaws. First, the Deadline Extension and Presumption of Timeliness apply to all voters, not just a subset of "preferred" voters. It is an individual voter's *choice* whether to vote by mail or in person, and thus whether to become a part of the so-called "preferred class" that the District Court identified. Whether to join the "preferred class" of mail-in voters was entirely up to the Voter Plaintiffs.

Second, it is not clear that the mere creation of so-called "classes" of voters constitutes an injury in fact. An injury in

fact requires the "invasion of a legally protected interest." *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. We doubt that the mere existence of groupings of voters qualifies as an injury per se. "An equal protection claim will not lie by 'conflating all persons not injured into a preferred class receiving better treatment' than the plaintiff." *Thornton v. City of St. Helens,* 425 F.3d 1158, 1167 (9th Cir. 2005) (quoting *Joyce v. Mavromatis,* 783 F.2d 56, 57 (6th Cir. 1986)); *see also, e.g., Batra v. Bd. of Regents of Univ. of Neb.,* 79 F.3d 717, 721 (8th Cir. 1996) ("[T]he relevant prerequisite is unlawful discrimination, not whether plaintiff is part of a victimized class."). More importantly, the Voter Plaintiffs have shown no disadvantage to themselves that arises simply by being separated into groupings. For instance, there is no argument that it is inappropriate that some voters will vote in person and others will vote by mail. The existence of these two groups of voters, without more, simply does not constitute an injury in fact to in-person voters.

Plaintiffs may believe that injury arises because of a preference shown for one class over another. But what, precisely, is the preference of which Plaintiffs complain? In *Bush v. Gore,* the Supreme Court held that a State may not engage in arbitrary and disparate treatment that results in the valuation of one person's vote over that of another. 531 U.S. at 104–05, 121 S.Ct. 525. Thus, "the right of suffrage can be denied by a *debasement or dilution of the weight of a citizen's vote* just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* at 105, 121 S.Ct. 525 (quoting *Reynolds,* 377 U.S. at 555, 84 S.Ct. 1362) (emphasis added). As we have already discussed, vote dilution is not an injury in fact here.

**\*16** What about the risk that some ballots placed in the mail after Election Day may still be counted? Recall that no voter—whether in person or by mail—is *permitted* to vote after Election Day. Under Plaintiffs' argument, it might theoretically be easier for one group of voters—mail-in voters—to illegally cast late votes than it is for another group of voters—in-person voters. But even if that is the case, no group of voters has the *right* to vote after the deadline.[15] We remember that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (citations omitted). And "a plaintiff lacks standing to complain about his inability to commit crimes because no one has a right to commit a crime." *Citizen Ctr. v. Gessler,* 770 F.3d 900, 910 (10th Cir. 2014). Without a showing of discrimination or other intentionally unlawful

conduct, or at least some burden on Plaintiffs' own voting rights, we discern no basis on which they have standing to challenge the slim opportunity the Presumption of Timeliness conceivably affords wrongdoers to violate election law. *Cf. Minn. Voters Alliance v. Ritchie*, 720 F.3d 1029, 1033 (8th Cir. 2013) (affirming dismissal of claims "premised on potential harm in the form of vote dilution caused by insufficient pre-election verification of [election day registrants'] voting eligibility and the absence of post-election ballot rescission procedures").

### ii. Speculative injury from ballots counted under the Presumption of Timeliness.

Plaintiffs' theory as to the Presumption of Timeliness focuses on the potential for some voters to vote after Election Day and still have their votes counted. This argument reveals that their alleged injury in fact attributable to the Presumption is "conjectural or hypothetical" instead of "actual or imminent." *Spokeo*, 136 S. Ct. at 1547–48 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). The Supreme Court has emphasized that a threatened injury must be "*certainly impending*" and not merely "*possible*" for it to constitute an injury in fact. *Clapper*, 568 U.S. at 409, 133 S.Ct. 1138 (emphasis in original) (quoting *Whitmore v. Ark.*, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). When determining Article III standing, our Court accepts allegations based on well-pleaded facts; but we do not credit bald assertions that rest on mere supposition. *Finkelman v. NFL*, 810 F.3d 187, 201–02 (3d Cir. 2016). The Supreme Court has also emphasized its "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414, 133 S.Ct. 1138. A standing theory becomes even more speculative when it requires that independent actors make decisions to act *unlawfully*. *See City of L.A. v. Lyons*, 461 U.S. 95, 105–06 & 106 n.7, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (rejecting Article III standing to seek injunction where party invoking federal jurisdiction would have to establish that he would unlawfully resist arrest or police officers would violate department orders in future).

Here, the Presumption of Timeliness could inflict injury on the Voter Plaintiffs only if: (1) another voter violates the law by casting an absentee ballot after Election Day; (2) the illegally cast ballot does not bear a legible postmark, which is against USPS policy;[16] (3) that same ballot still arrives within three days of Election Day, which is faster than USPS anticipates mail delivery will occur;[17] (4) the

ballot lacks sufficient indicia of its untimeliness to overcome the Presumption of Timeliness; and (5) that same ballot is ultimately counted. *See Donald J. Trump for Pres., Inc. v. Way*, No. 20-cv-10753, 2020 WL 6204477, at *7 (D.N.J. Oct. 22, 2020) (laying out similar "unlikely chain of events" required for vote dilution harm from postmark rule under New Jersey election law); *see also Reilly v. Ceridian Corp.*, 664 F.3d 38, 43 (3d Cir. 2011) (holding purported injury in fact was too conjectural where "we cannot now describe how Appellants will be injured in this case without beginning our explanation with the word 'if' "). This parade of horribles "may never come to pass," *Trump for Pres. v. Boockvar*, 2020 WL 5997680, at *33, and we are especially reluctant to endorse such a speculative theory of injury given Pennsylvania's "own mechanisms for deterring and prosecuting voter fraud," *Donald J. Trump for Pres., Inc. v. Cegavske*, No. 20-1445, ––– F.Supp.3d ––––, ––––, 2020 WL 5626974, at *6 (D. Nev. Sept. 18, 2020).[18]

**\*17** To date, the Secretary has reported that at least 655 ballots without a legible postmark have been collected within the Deadline Extension period.[19] But it is mere speculation to say that any one of those ballots was cast after Election Day. We are reluctant to conclude that an independent actor —here, one of 655 voters—decided to mail his or her ballot after Election Day contrary to law. The Voter Plaintiffs have not provided any empirical evidence on the frequency of voter fraud or the speed of mail delivery that would establish a statistical likelihood or even the plausibility that any of the 655 ballots was cast after Election Day. Any injury to the Voter Plaintiffs attributable to the Presumption of Timeliness is merely "possible," not "actual or imminent," and thus cannot constitute an injury in fact.

### B. Purcell

Even were we to conclude that Plaintiffs have standing, we could not say that the District Court abused its discretion in concluding on this record that the Supreme Court's election-law jurisprudence counseled against injunctive relief. Unique and important equitable considerations, including voters' reliance on the rules in place when they made their plans to vote and chose how to cast their ballots, support that disposition. Plaintiffs' requested relief would have upended this status quo, which is generally disfavored under the "voter confusion" and election confidence rationales of *Purcell v. Gonzalez*, 549 U.S. 1, 4–5, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006). One can assume for the sake of argument that aspects of the now-prevailing regime in Pennsylvania are unlawful as

alleged and still recognize that, given the timing of Plaintiffs' request for injunctive relief, the electoral calendar was such that following it "one last time" was the better of the choices available. *Perez,* 138 S. Ct. at 2324 ("And if a [redistricting] plan is found to be unlawful very close to the election date, the only reasonable option may be to use the plan one last time.").

Here, less than two weeks before Election Day, Plaintiffs asked the District Court to enjoin a deadline established by the Pennsylvania Supreme Court on September 17, a deadline that may have informed voters' decisions about whether and when to request mail-in ballots as well as when and how they cast or intended to cast them. In such circumstances, the District Court was well within its discretion to give heed to Supreme Court decisions instructing that "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, — U.S. —, 140 S. Ct. 1205, 1207, 206 L.Ed.2d 452 (2020) (per curiam) (citing *Purcell,* 549 U.S. at 1, 127 S.Ct. 5).

In *Purcell,* an appeal from a federal court order enjoining the State of Arizona from enforcing its voter identification law, the Supreme Court acknowledged that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." 549 U.S. at 4, 127 S.Ct. 5. In other words, "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5, 127 S.Ct. 5. Mindful of "the necessity for clear guidance to the State of Arizona" and "the imminence of the election," the Court vacated the injunction. *Id.* at 5, 127 S.Ct. 5.

The principle announced in *Purcell* has very recently been reiterated. First, in *Republican National Committee,* the Supreme Court stayed on the eve of the April 7 Wisconsin primary a district court order that altered the State's voting rules by extending certain deadlines applicable to absentee ballots. 140 S. Ct. at 1206. The Court noted that it was adhering to *Purcell* and had "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Id.* at 1207 (citing *Purcell,* 549 U.S. at 1, 127 S.Ct. 5). And just over two weeks ago, the Court denied an application to vacate a stay of a district court order that made similar changes to Wisconsin's election rules six weeks before Election Day. *Democratic Nat'l Comm. v. Wis. State Legislature,* No. 20A66, 592 U.S.

—, — S.Ct. —, — L.Ed.2d —, 2020 WL 6275871 (Oct. 26, 2020) (denying application to vacate stay). Justice Kavanaugh explained that the injunction was improper for the "independent reason[ ]" that "the District Court changed Wisconsin's election rules too close to the election, in contravention of this Court's precedents." *Id.* at —, 2020 WL 6275871 at *3 (Kavanaugh, J., concurring). *Purcell* and a string[20] of Supreme Court election-law decisions in 2020 "recognize a basic tenet of election law: When an election is close at hand, the rules of the road should be clear and settled." *Id.*

**\*18** The prevailing state election rule in Pennsylvania permitted voters to mail ballots up through 8:00 P.M. on Election Day so long as their ballots arrived by 5:00 P.M. on November 6. Whether that rule was wisely or properly put in place is not before us now. What matters for our purposes today is that Plaintiffs' challenge to it was not filed until sufficiently close to the election to raise a reasonable concern in the District Court that more harm than good would come from an injunction changing the rule. In sum, the District Court's justifiable reliance on *Purcell* constitutes an "alternative and independent reason[ ]" for concluding that an "injunction was unwarranted" here. *Wis. State Legislature,* — S.Ct. at —, 2020 WL 6275871, at *3 (Kavanaugh, J., concurring).

## IV. Conclusion

We do not decide today whether the Deadline Extension or the Presumption of Timeliness are proper exercises of the Commonwealth of Pennsylvania's lawmaking authority, delegated by the U.S. Constitution, to regulate federal elections. Nor do we evaluate the policy wisdom of those two features of the Pennsylvania Supreme Court's ruling. We hold only that when voters cast their ballots under a state's facially lawful election rule and in accordance with instructions from the state's election officials, private citizens lack Article III standing to enjoin the counting of those ballots on the grounds that the source of the rule was the wrong state organ or that doing so dilutes their votes or constitutes differential treatment of voters in violation of the Equal Protection Clause. Further, and independent of our holding on standing, we hold that the District Court did not err in denying Plaintiffs' motion for injunctive relief out of concern for the settled expectations of voters and election officials. We will affirm the District Court's denial of Plaintiffs' emergency motion for a TRO or preliminary injunction.

**All Citations**

--- F.3d ----, 2020 WL 6686120

Footnotes

1  Second Letter from Phocion (April 1784), *reprinted in* 3 The Papers of Alexander Hamilton, 1782–1786, 530–58 (Harold C. Syrett ed., 1962).

2  Throughout this opinion, we refer to absentee voting and mail-in voting interchangeably.

3  The Free and Equal Elections Clause of the Pennsylvania Constitution provides: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. 1, § 5.

4  Because we have received comprehensive briefing, and given the weighty public interest in a prompt ruling on the matter before us, we have elected to forgo oral argument.

5  Bognet seeks to represent Pennsylvania in Congress, but even if he somehow had a relationship to *state* lawmaking processes, he would lack personal standing to sue for redress of the alleged "institutional injury (the diminution of legislative power), which necessarily damage[d] all Members of [the legislature] ... equally." *Raines v. Byrd*, 521 U.S. 811, 821, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (plaintiffs were six out of 535 members of Congress); *see also Corman*, 287 F. Supp. 3d at 568–69 (concluding that "two of 253 members of the Pennsylvania General Assembly" lacked standing to sue under Elections Clause for alleged "deprivation of 'their legislative authority to apportion congressional districts' "); *accord Va. House of Delegates v. Bethune-Hill*, ––– U.S. ––––, 139 S. Ct. 1945, 1953, 204 L.Ed.2d 305 (2019).

6  Our conclusion departs from the recent decision of an Eighth Circuit panel which, over a dissent, concluded that candidates for the position of presidential elector had standing under *Bond* to challenge a Minnesota state-court consent decree that effectively extended the receipt deadline for mailed ballots. *See Carson v. Simon*, No. 20-3139, ––– F.3d ––––, ––––, 2020 WL 6335967, at *5 (8th Cir. Oct. 29, 2020). The *Carson* court appears to have cited language from *Bond* without considering the context—specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding *Bond* beyond this context, and the *Carson* court cited none.

7  The alleged injury specific to Bognet does not implicate the Qualifications Clause or exclusion from Congress, *Powell v. McCormack*, 395 U.S. 486, 550, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), nor the standing of members of Congress to bring actions alleging separation-of-powers violations. *Moore v. U.S. House of Reps.*, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring).

8  Only the Voter Plaintiffs bring the Equal Protection count in the Complaint; Bognet did not join that count.

9  We exclude the Presumption of Timeliness from our concreteness analysis. Plaintiffs allege that the federal statutes providing for a uniform election day, 3 U.S.C. § 1 and 2 U.S.C. § 7, conflict with, and thus displace, any state law that would authorize voting after Election Day. They claim that the Presumption permits, theoretically at least, some voters whose ballots lack a legible postmark to vote *after* Election Day, in violation of these federal statutes. So unlike the Deadline Extension, Plaintiffs contend that the General Assembly could not enact the Presumption consistent with the Constitution. This conceptualization of injury is thus more properly characterized as "concrete" than is the purported Deadline Extension injury attributable to voters having their timely voted ballots received and counted after Election Day. That said, we express no opinion about whether the Voter Plaintiffs have, in fact, alleged such a concrete injury for standing purposes.

10  *See* AS § 15.20.081(e) & (h) (Alaska – 10 days after Election Day if postmarked on or before Election Day); West's Ann. Cal. Elec. Code § 3020(b) (California – three days after Election Day if postmarked on or before Election Day); DC ST § 1-1001.05(a)(10A) (District of Columbia – seven days after the election if postmarked on or before Election Day); 10 ILCS 5/19-8, 5/18A-15 (Illinois – 14 days after the election if postmarked on or before Election Day); K.S.A. 25-1132 (Kansas – three days after the election if postmarked before the close of polls on Election Day); MD Code, Elec. Law, § 9-505 (Maryland – the second Friday after Election Day if postmarked on or before Election Day); Miss. Code Ann. § 23-15-637 (Mississippi – five business days after Election Day if postmarked on or before Election Day); NV Rev Stat § 293.317 (Nevada – by 5:00 P.M. on the seventh day after Election Day if postmarked by Election Day, and ballots with unclear postmarks must be received by 5:00 P.M. on the third day after Election Day); N.J.S.A. 19:63-22 (New Jersey – 48 hours after polls close if postmarked on or before Election Day); McKinney's Elec. Law § 8-412 (New York – seven days after the election for mailed ballots postmarked on Election Day); N.C. Gen. Stat. § 163-231(b)(2) and *Wise v. Circosta*,

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 18 of 20   Document 59-2

978 F.3d 93, 96 (4th Cir. 2020) (North Carolina – recognizing extension from three to nine days after the election deadline for mail ballots postmarked on or before Election Day); Texas Elec. Code § 86.007 (the day after the election by 5:00 P.M. if postmarked on or before Election Day); Va. Code 24.2-709 (Virginia – by noon on the third day after the election if postmarked on or before Election Day); West's RCWA 29A.40.091 (Washington – no receipt deadline for ballots postmarked on or before Election Day); W. Va. Code, §§ 3-3-5, 3-5-17 (West Virginia – five days after the election if postmarked on or before Election Day); *see also* Iowa Code § 53.17(2) (by noon the Monday following the election if postmarked by the day before Election Day); NDCC 16.1-07-09 (North Dakota – before the canvass if postmarked the day before Election Day); R.C. § 3509.05 (Ohio – 10 days after the election if postmarked by the day before Election Day); Utah Code Ann. § 20A-3a-204 (seven to 14 days after the election if postmarked the day before the election).

11    *Bush v. Gore* does not require us to perform an Equal Protection Clause analysis of Pennsylvania election law as interpreted by the Pennsylvania Supreme Court. *See* 531 U.S. at 109, 121 S.Ct. 525 ("Our consideration is limited to the present circumstances ...."); *id.* at 139–40, 121 S.Ct. 525 (Ginsburg, J., dissenting) (discussing "[r]are[ ]" occasions when Supreme Court rejected state supreme court's interpretation of state law, one of which was in 1813 and others occurred during Civil Rights Movement—and none decided federal equal protection issues).

12    In their complaint, the Voter Plaintiffs alleged that they are all "residents of Somerset County, a county where voters are requesting absentee ballots at a rate *far less* than the state average" and thus, somehow, the Voter Plaintiffs' votes "will be diluted to a greater degree than other voters." Compl. ¶ 71 (emphasis in original). Plaintiffs continue to advance this argument on appeal in support of standing, and it additionally suffers from being a conjectural or hypothetical injury under the framework discussed *infra* Section III.A.2.b.ii. It is purely hypothetical that counties where a greater percentage of voters request absentee ballots will more frequently have those ballots received after Election Day.

13    Plaintiffs also rely on *FEC v. Akins*, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), for the proposition that a widespread injury—such as a mass tort injury or an injury "where large numbers of voters suffer interference with voting rights conferred by law"—does not become a "generalized grievance" just because many share it. *Id.* at 24–25, 118 S.Ct. 1777. That's true as far as it goes. But the Voter Plaintiffs have not alleged an injury like that at issue in *Akins*. There, the plaintiffs' claimed injury was their inability to obtain information they alleged was required to be disclosed under the Federal Election Campaign Act. *Id.* at 21, 118 S.Ct. 1777. The plaintiffs alleged a statutory right to obtain information and that the same information was being withheld. Here, the Voter Plaintiffs' alleged injury is to their right under the Equal Protection Clause not to have their votes "diluted," but the Voter Plaintiffs have not alleged that their votes are less influential than any other vote.

14    The District Court did not find that the Deadline Extension created such a preferred class.

15    Moreover, we cannot overlook that the mail-in voters potentially suffer a *disadvantage* relative to the in-person voters. Whereas in-person ballots that are timely cast will count, timely cast mail-in ballots may not count because, given mail delivery rates, they may not be received by 5:00 P.M. on November 6.

16    *See* Defendant-Appellee's Br. 30 (citing 39 C.F.R. § 211.2(a)(2); Postal Operations Manual at 443.3).

17    *See* Pa. Democratic Party, 238 A.3d at 364 (noting "current two to five day delivery expectation of the USPS").

18    Indeed, the conduct required of a voter to effectuate such a scheme may be punishable as a crime under Pennsylvania statutes that criminalize forging or "falsely mak[ing] the official endorsement on any ballot," 25 Pa. Stat. & Cons. Stat. § 3517 (punishable by up to two years' imprisonment); "willfully disobey[ing] any lawful instruction or order of any county board of elections," *id.* § 3501 (punishable by up to one year's imprisonment); or voting twice in one election, *id.* § 3535 (punishable by up to seven years' imprisonment).

19    As of the morning of November 12, Secretary Boockvar estimates that 655 of the 9383 ballots received between 8:00 P.M. on Election Day and 5:00 P.M. on November 6 lack a legible postmark. *See* Dkt. No. 59. That estimate of 655 ballots does not include totals from five of Pennsylvania's 67 counties: Lehigh, Northumberland, Tioga, Warren, and Wayne. *Id.* The 9383 ballots received, however, account for all of Pennsylvania's counties. *Id.*

20    *See, e.g., Andino v. Middleton*, No. 20A55, 592 U.S. ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2020 WL 5887393, at *1 (Oct. 5, 2020) (Kavanaugh, J., concurring) ("By enjoining South Carolina's witness requirement shortly before the election, the District Court defied [the *Purcell*] principle and this Court's precedents." (citations omitted)); *Merrill v. People First of Ala.*, No. 19A1063, 591 U.S. ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2020 WL 3604049 (Mem.), at *1 (July 2, 2020); *Republican Nat'l Comm.*, 140 S. Ct. at 1207; *see also Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 641 (7th Cir. 2020) (per curiam) (holding that injunction issued six weeks before election violated *Purcell*); *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. Oct. 2, 2020) ("[W]e are not on the eve of the election—we are in the middle of it, with absentee ballots already printed and mailed. An injunction here would thus violate *Purcell's*

well-known caution against federal courts mandating new election rules—especially at the last minute." (citing *Purcell*, 549 U.S. at 4–5, 127 S.Ct. 5)).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 20 of 20   Document 59-2

# EXHIBIT 3

2020 WL 6437668
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

Steven HOTZE, M.D., Wendell
Champion, Hon. Steve Toth,
and Sharon Hemphill, Plaintiffs,
v.
Chris HOLLINS, in his official capacity
as Harris County Clerk, Defendant.

Civil Action No. 4:20-cv-03709
|
Signed 11/02/2020

**Attorneys and Law Firms**

Jared Ryker Woodfill, Woodfill Law Firm P.C., Houston, TX, for Plaintiffs.

Richard Warren Mithoff, Jr., Mithoff Law Firm, Kenneth Royce Barrett, KBR Law, Houston, TX, Charles Stein Siegel, Waters & Kraus, LLP, Dallas, TX, S. Nasim Ahmad, The Ahmad Law Firm, The Woodlands, TX, for Defendant.

**ORDER**

Andrew S. Hanen, United States District Judge

 **\*1** The Court has before it the Motion for Preliminary Injunction (Doc. No. 3) filed by Plaintiffs Steven Hotze, M.D., Wendell Champion, Hon. Steve Toth, and Sharon Hemphill (collectively, "Plaintiffs"), the Response in Opposition (Doc. No. 22) filed by Defendant Chris Hollins in his official capacity as Harris County Clerk (hereinafter, "Defendant"), and various Motions to Intervene filed on behalf of forty-eight individuals and/or entities. The Court also has before it *amicus curiae* briefs filed by the Texas Coalition of Black Democrats, The Lincoln Project, the Libertarian Party of Texas, Joseph R. Straus, III, and election law professor, Benjamin L. Ginsberg.

**I.**

Due to the time constraints given the issue involved, this Court cannot issue the formal opinion that this matter deserves. Consequently, given those confines, this Order must suffice. The Court first notes that it appreciates the participation of all counsel involved and the attention each gave to this important topic on such short notice.

This Court's overall ruling is that the Plaintiffs do not have standing (as explained below). While this ruling is supported by general Equal Protection and Election Clause cases, it is somewhat without precedent with regard to the Plaintiffs (or Intervenors) who are actual candidates for elected office. Therefore, the Court, in anticipation of an appeal or petition for writ of mandamus and knowing that the appellate court could draw a distinction in that regard and hold that standing exists, has gone further to indicate what its ruling would have been in that case.

**II.**

The Court finds that Plaintiffs lack standing to sue. Federal courts must determine whether they have jurisdiction before proceeding to the merits. *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 94–95 (1998). Article III of the Constitution limits federal jurisdiction to "Cases" and "Controversies." One component of the case or controversy requirement is standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The Supreme Court has repeatedly held that an individual plaintiff raising only a generalized grievance about government does not meet the Article III requirement of a case or controversy. *Id.* at 573–74. This Court finds that the Plaintiffs here allege only a "generalized grievance about the conduct of government." *Lance v. Coffman*, 549 U.S. 437, 442 (2007).

The Plaintiffs' lack of a particularized grievance is fatal to their claim under the Equal Protection Clause. "The rule against generalized grievances applies with as much force in the equal protection context as in any other." *U.S. v. Hays*, 515 U.S. 737, 743 (1995). Plaintiffs' general claim that Harris County's election is being administered differently than Texas's other counties does not rise to the level of the sort of particularized injury that the Supreme Court has required for constitutional standing in elections cases. *See id.; Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018) (no standing in equal protection case when alleged injury involved "group political interests" and not "individual legal rights").

**\*2** Further, it is unclear that individual plaintiffs have standing to assert claims under the Elections Clause at all. The Supreme Court has held that individual plaintiffs, like those here, whose only asserted injury was that the Elections Clause had not been followed, did not have standing to assert such a claim. *See Lance*, 549 U.S. at 442. Conversely, the Court has held that the Arizona Legislature did have standing to allege a violation of the Elections Clause as it was "an institutional plaintiff asserting an institutional injury." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 802 (2015). In addition, the Supreme Court has also held plaintiffs had such standing when they were state senators whose "votes had been completely nullified" by executive action. *Id.* at 803 (citing *Raines v. Byrd*, 521 U.S. 811, 822–23 (1997)). These cases appear to stand for the proposition that only the state legislature (or a majority of the members thereof) have standing to assert a violation of the Elections Clause.

The Court finds that the Plaintiffs here are akin to those in *Lance v. Coffman*, in which the Supreme Court held that private citizens, whose primary alleged injury was that the Elections Clause was not followed, lacked standing to bring a claim under the Elections Clause. 549 U.S. at 442. To summarize the Plaintiffs' primary argument, the alleged irreparable harm caused to Plaintiffs is that the Texas Election Code has been violated and that violation compromises the integrity of the voting process. This type of harm is a quintessential generalized grievance: the harm is to every citizen's interest in proper application of the law. *Lujan*, 504 U.S. at 573–74; *Fairchild v. Hughes*, 258 U.S. 126, 129 (1922) (holding that the right, possessed by every citizen, to require that the Government be administered according to the law does not entitle a private citizen to institute a lawsuit in federal court). Every citizen, including the Plaintiff who is a candidate for federal office, has an interest in proper execution of voting procedure. Plaintiffs have not argued that they have any specialized grievance beyond an interest in the integrity of the election process, which is "common to all members of the public." *United States v. Richardson*, 418 U.S. 166, 176–77.[1]

## III.

If the Court had plaintiffs with standing, it would have denied in part and granted in part the motion for preliminary injunction.[2] A preliminary injunction is an "extraordinary remedy" that should only be granted if the movant has "clearly carried the burden of persuasion" on all four factors. *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003). The movant, however, "need not prove his case." *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991) (citing *H & W Indus. v. Formosa Plastics Corp.*, 860 F.2d 172, 179 (5th Cir. 1988)). Before a court will grant a preliminary injunction, the movants must clearly show "(1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) that their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (quoting *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012)); *see also Winter v. NRDC*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

**\*3** This Court finds that there is a difference between the voting periods presented to it. The merits need to be analyzed separately by early voting and election day voting. With respect to the likelihood of success, the Court would find that the Plaintiffs do not prevail on the element of likelihood of success with respect to early voting. First, § 85.062 of the Texas Election Code provides for "temporary branch polling places" during early voting. Tex. Elec. Code. § 85.062. The statute authorizes county election officials to use "movable structure[s]" as polling places. *Id.* § 85.062(b). The Code does not define "structure," but Black's Law Dictionary defines the term as: "Any construction, production, or piece of work artificially built up or composed of parts purposefully joined together." Black's Law Dictionary (11th ed. 2019). The Court finds, after reviewing the record, the briefing, and considering the arguments of counsel, that the tents used for drive-thru voting qualify as "movable structures" for purposes of the Election Code. The Court is unpersuaded by Plaintiffs' argument that the voters' vehicles, and not the tents, are the polling places under the drive-thru voting scheme. Consequently, the Court finds that drive-thru voting was permissible during early voting. Moreover, the Plaintiffs failed to demonstrate under the Texas Election Code that an

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

otherwise legal vote, cast pursuant to the instructions of local voting officials, becomes uncountable if cast in a voting place that is subsequently found to be non-compliant.

Additionally, the promptness with which one brings an injunction action colors both the elements of likelihood of success on the merits and irreparable harm. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 685 (2014) ("In extraordinary circumstances, however, the consequences of a delay in commencing suit may be of sufficient magnitude to warrant, at the very outset of the litigation, curtailment of the relief equitably awardable."); *Environmental Defense Fund, Inc. v. Alexander*, 614 F.2d 474, 478 (1980) ("equitable remedies are not available if granting the remedy would be inequitable to the defendant because of the plaintiff's long delay."). Here, the Court finds that the Plaintiffs did not act with alacrity. There has been an increasing amount of conversation and action around the subject of implementing drive-thru voting since earlier this summer. The Defendant has argued, and no one has refuted, that discussions were held with leaders of both major political parties, and, using that input, a drive-thru voting plan was developed. The Harris County Commissioners Court approved a budget for drive-thru voting in late September. Finally, actual drive-thru voting began October 13, 2020. At virtually any point, but certainly by October 12, 2020, Plaintiffs could have filed this action. Instead, they waited until October 28, 2020 at 9:08 p.m. to file their complaint and did not file their actual motion for temporary relief until mid-day on October 30, 2020—the last day of early voting. The Court finds this delay is critical. It is especially important in this compact early voting timeframe, in a particularly tense election, where each day's voting tally functionally equated to many days or even weeks of early voting in different situations.

Therefore, this Court finds the Plaintiffs do not prevail on the first element.

With regard to the second element, "irreparable injury," this point is covered more thoroughly in the standing discussion, but suffice it to say, in response to the Court's question during oral argument, Plaintiff's counsel described their injuries as the concern for the voting law to be accurately enforced and voting to be legal. In response to the Court's questions, Plaintiffs' Counsel said their irreparable injury was that the election process was being compromised, and that it prevents there being uniformity in the manner of voting throughout Texas. While certainly valid concerns, those are not the kind of injuries that separate Plaintiffs

from other concerned citizens. Plaintiffs have no evidence of individualized irreparable injuries.

The one element that the Court finds the Plaintiffs have prevailed on is the harm to the party defendant. The Court finds that there would be no harm to Harris County. The only suggested harm is that the County has spent millions of dollars to implement drive-thru voting. While these funds may have been better spent, their loss does not prevail over tens of thousands of potentially illegal votes. Further, if granted, the injunction would only require the Defendant to conduct elections as Harris County has conducted them in the past without drive-thru voting.

**\*4** The last element must, like the first, take on extraordinary significance in this context. That element concerns the public interest. Plaintiffs argue, correctly, that the public has an interest in seeing that elections are carried out pursuant to the Election Code. This is no doubt true; however, this generalized interest is offset by two somewhat stronger factors. First, the drive-thru early voting as designed and implemented is, to this Court's reading, legal as described above. Second, there have been over 120,000 citizens who have legally voted utilizing this process. While Plaintiffs have complained about anecdotal reports of irregularities, the record reflects that the vast majority were legal voters, voting as instructed by their local voting officials and voting in an otherwise legal manner. The only claimed widespread illegality is the place of voting—a tent outside the polling place instead of inside the actual building. To disenfranchise over 120,000 voters who voted as instructed the day before the scheduled election does not serve the public interest.

Therefore, if the Court had found standing existed, it would have denied an injunction as to the drive-thru early voting.

The Court finds the issue as to Election Day to cut the opposite direction. On Election Day, as opposed to early voting, there is no legislative authorization for movable structures as polling places. The Election Code makes clear that, on Election Day, "[e]ach polling place shall be located inside a building." Tex. Elec. Code § 43.031(b). The term "building" is not defined in the Code. Nevertheless, Black's Law Dictionary defines "building" as: "A structure with walls and a roof, esp. a permanent structure." Black's Law Dictionary (11th ed. 2019). The Court finds, after reviewing the record and arguments of counsel, that the tents used for drive-thru voting are not "buildings" within the meaning of the Election Code. Further, they are not inside, they are clearly outside.

Accordingly, if the Plaintiffs had standing, the Court would have found that the continuation of drive-thru voting on Election Day violates the Texas Election Code.

It also finds that, unlike in early voting, the Plaintiffs prevail when one weighs the various elements that underlie the issuance of an injunction. First, as stated above, the Court does not find a tent to be a building. Therefore, under the Election Code it is not a legal voting location. Second, the Plaintiffs' request for injunctive relief is timely. While it could and should have been made earlier, it was made days before the election. The Court would have found that the Plaintiffs had a likelihood of success. The analysis of the second element remains the same. With regard to the loss that the Defendant might suffer, the Court finds this to be minimal. While it apparently spent millions in implementing the drive-thru voting system, it had over 120,000 voters use it—so it is money well-spent. The fact it would not be used on Election Day does not diminish its benefit. The analysis of the last element, public interest, swings in favor of the Plaintiffs. No one should want votes to be cast illegally or at an illegal polling place. No one has voted yet—so no one is being disenfranchised. Moreover, for those who are injured or worried that their health would be compromised should they be compelled to enter the building to vote, curbside voting is available under § 64.009 of the Texas Election Code.[3] Lastly, there are very few citizens who would want their vote to be in jeopardy, so it is incumbent on election officials to conduct voting in a proper location—not one which the Attorney General has already said was inappropriate. Consequently, this Court, had it found that standing existed, would have granted the injunction prospectively and enjoined drive-thru voting on Election Day and denied all other relief.

**\*5** Nevertheless, since it found standing does not exist, this action is hereby dismissed.

### All Citations

Slip Copy, 2020 WL 6437668

### Footnotes

1   This Court finds the answer to this question to be particularly thorny, given that some of the Plaintiffs are actual candidates who have put in time, effort, and money into campaigning, to say nothing of the blood, sweat, and tears that a modern campaign for public office entails. This Court would readily understand if some appellate court finds that these Plaintiffs have standing despite the fact they cannot individualize their damage beyond their rightful feeling that an election should be conducted lawfully. Neither this Court's research nor the briefing of the parties have brought forth any precedent to support this concept under either of the two pleaded causes of action based upon claimed violations of Equal Protection or the "Elections Clause." Given the timing of this case and the impact that such a ruling might have, this Court finds it prudent to follow the existing precedent.

2   The Defendant and Intervenors suggested both in oral argument and in their written presentations that the Court should abstain under either *Pullman, Colorado River*, or *Rooker-Feldman* doctrine. Since standing is jurisdictional and since this Court is dismissing this action, it need not analyze these arguments. *See Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S. Ct. 643 (1941); *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800 (1976); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

3   This Court is quite cognizant of the Texas Supreme Court ruling (in a slightly different context) that fear of contracting COVID-19 does not establish an exception. *In re State*, 602 S.W.3d 549 (Tex. 2020).

WESTLAW   Case 2:20-cv-01771-PP   Filed 12/07/20   Page 5 of 5   Document 59-3   4

# EXHIBIT 4

2020 WL 6817513
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

L. LIN WOOD, JR., Plaintiff,

v.

BRAD RAFFENSPERGER, in his official
capacity as Secretary of State of Georgia;
REBECCA N. SULLIVAN, in her official
capacity as Vice Chair of the Georgia State
Election Board; DAVID J. WORLEY,
in his official capacity as a Member
of the Georgia State Election Board;
MATTHEW MASHBURN, in his official
capacity as a Member of the Georgia
State Election Board; and ANH LE, in
her official capacity as a Member of the
Georgia State Election Board, Defendants.

Civil Action No. 1:20-cv-04651-SDG
|
11/20/2020

Steven D. Grimberg, United States District Court Judge

**OPINION AND ORDER**

**\*1** This matter is before the Court on a motion for temporary restraining order filed by Plaintiff L. Lin Wood, Jr. [ECF 6]. For the following reasons, and with the benefit of oral argument, Wood's motion is **DENIED**.

**I. BACKGROUND**
On November 3, 2020, the United States conducted a general election for various federal, state, and local political offices (the General Election).[1] However, the voting process in Georgia began in earnest before that date. On September 15, 2020, local election officials began mailing absentee ballots for the General Election to eligible voters.[2] On October 12, 2020, Georgia's in-person, early voting period started.[3] This entire process played out amidst the throes of a global health pandemic caused by the novel coronavirus SARS-CoV-2—colloquially known as COVID-19. Due in large part to the threat posed by COVID-19, an overwhelming number of Georgia voters—over 1 million of the 5 million votes cast by November 3—participated in the General Election through the use of absentee ballots.[4]

Wood, a registered voter in Fulton County, Georgia, believes Defendants— the elected officials tasked with conducting elections in the state—performed their roles in an unconstitutional manner. As such, Wood initiated this action on November 13, 2020, ten days after the conclusion of the General Election.[5] On November 16, Wood filed an Amended Complaint, asserting three claims against Defendants—all in their official capacities—for violation of: the First Amendment and the Equal Protection Clause of the Fourteenth Amendment (Count I); the Electors and Elections Clause of the Constitution (Count II); and the Due Process Clause of the Fourteenth Amendment (Count III).[6]

Counts I and II seek extraordinary relief:

As a result of Defendants' unauthorized actions and disparate treatment of defective absentee ballots, this Court should enter an order, declaration, and/or injunction that prohibits Defendants from certifying the results of the 2020 general election in Georgia on a statewide basis.

Alternatively, this Court should enter an order, declaration, and/or injunction prohibiting Defendants from certifying the results of the General Election which include the tabulation of defective absentee ballots, regardless of whether said ballots were cured.

Alternatively, this Court should enter an order, declaration, and/or injunction that the results of the 2020 general election in Georgia are defective as a result of the above-described constitutional violations, and that Defendants are required to cure said deficiencies in a manner consistent with federal and Georgia law, and without the taint of the procedures described in the Litigation Settlement.[7]

For Count III, Wood requests an order, declaration, and/or injunction requiring Defendants to perform a myriad of activities, including ordering a second recount prior to the certification of the election results and permitting monitors designated by the Republican Party to have special access to observe all election activity.[8]

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 2 of 13   Document 59-4

**\*2** On November 17, 2020, Wood filed an emergency motion for a temporary restraining order.[9] Two sets of parties subsequently sought permission to intervene as defendants (collectively, the Intervenors): (1) the Democratic Party of Georgia, Inc. (DPG), DSCC, and DCCC; and (2) the Georgia State Conference of the NAACP (Georgia NAACP) and Georgia Coalition for the People's Agenda (GCPA).[10] On November 19, Defendants and Intervenors filed separate responses in opposition to Wood's motion for a temporary restraining order.[11] The Court held oral argument on Wood's motion the same day. At the conclusion of the oral argument, the Court denied Wood's request for a temporary restraining order. This Order follows and supplements this Court's oral ruling.

### a. Georgia Statutory Law Regarding Absentee Ballots.
Georgia law authorizes any eligible voter to cast his or her absentee ballot
by mail without providing a reason. O.C.G.A. § 21-2-380(b). To initiate the absentee-voting process, a prospective voter must submit an application to the applicable registrar's or absentee ballot clerk's office. O.C.G.A. § 21-2-381(a)(1) (A). Upon receipt of a timely absentee ballot request, a registrar or absentee ballot clerk must enter the date the office received the application and compare the prospective voter's information and signature on the application with the information and signature on file in the registrar's or clerk's office. O.C.G.A. § 21-2-381(b)(1). If the prospective voter's eligibility is confirmed, the registrar or clerk must mail the voter an absentee ballot. O.C.G.A. § 21-2-381(b)(2)(A).

An absentee voter receives two envelopes along with the absentee ballot; the completed ballot is placed in the smaller envelope, which is then placed in the larger envelope, which contains the oath of the elector and a signature line. O.C.G.A. § 21-2-384(b). Upon receipt of a timely absentee ballot, a registrar or clerk is required to compare the identifying information and signature provided in the oath with the information and signature on file in the respective office. O.C.G.A. § 21-2-386(a)(1)(B). If the information and signature appear to match, the registrar or clerk signs his or her name below the voter's oath. *Id.* If the information or signature is missing or does not appear to match, the registrar or clerk is required to write "Rejected" across the envelope and provide the reason for the rejection. O.C.G.A. § 21-2-386(a)(1)(C). The board of registrars or absentee ballot clerk is required to "promptly notify" the elector of the rejection, who then has until the end of the period for

verifying provisional ballots to cure the issue that resulted in the rejection. *Id.*

Secretary of State Raffensperger is "the state's chief election official."

O.C.G.A. § 21-2-50(b). *See also* Ga. Op. Att'y Gen. No. 2005-3 (Apr. 15, 2005) ("Just as a matter of sheer volume and scope, it is clear that under both the Constitution and the laws of the State the Secretary is the state official with the power, duty, and authority to manage the state's electoral system. No other state official or entity is assigned the range of responsibilities given to the Secretary of State in the area of elections."). In this role, Raffensperger is required to, among other things, "promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials" and "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-3-31(1)-(2).

### b. The Settlement Agreement
Wood does not challenge the underlying constitutionality of the absentee ballot framework enacted by the Georgia General Assembly. The genesis of his claims instead derive from a lawsuit filed over one year ago by the DPG against Raffensperger, the then-Members of the Georgia State Election Board, and the then-Members of the Gwinnett County Board of Registration and Elections.[12] In that action, the DPG, DSCC, and DCCC challenged several aspects of the process for rejecting absentee ballots based on a missing or mismatched signature.[13]

**\*3** On March 6, 2020, the DPG, DSCC, DCCC, Raffensperger, and the Members of the Georgia State Election Board executed—and filed on the public docket—a "Compromise Settlement Agreement and Release" (Settlement Agreement).[14] As part of the Settlement Agreement, Raffensperger agreed to issue an Official Election Bulletin containing certain procedures for the review of signatures on absentee ballot envelopes by county election officials for the March 24, 2020 Presidential Primary Election and subsequent General Election. In relevant part, the procedures stated:

> When reviewing an elector's signature on the mail-in absentee ballot envelope, the registrar or clerk must compare the signature on the mail-in absentee ballot

envelope to each signature contained in such elector's voter registration record in eNet and the elector's signature on the application for the mail-in absentee ballot. **If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks. A mail in absentee ballot shall not be rejected unless a majority of the registrars, deputy registrars, or absentee ballot clerks reviewing the signature agree that the signature does not match any of the voter's signatures on file in eNet or on the absentee ballot application.** If a determination is made that the elector's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk shall write the names of the three elections officials who conducted the signature review across the face of the absentee ballot envelope, which shall be in addition to writing "Rejected" and the reason for the rejection as required under OCGA 21-2-386(a)(1)(C).[15]

No entity or individual sought permission to intervene and challenge the Settlement Agreement. United States District Judge William M. Ray closed the case on March 9.[16]

### c. The Risk-Limiting Audit

Georgia law provides procedures for conducting a "risk-limiting audit" prior to the final certification of an election. O.C.G.A. § 21-2-498. Such an audit must be "[c]omplete[d]...in public view." O.C.G.A. § 21-2-498(c)(4). And the State Election Board is "authorized to promulgate rules, regulations, and procedures to implement and administer" an audit, including "security procedures to ensure that [the] collection of validly cast ballots is complete, accurate, and trustworthy throughout the audit." O.C.G.A. § 21-2-498(d). *See also* Ga. Comp. R. & Regs. 183-1-15-.04 (2020).

On November 11, 2020, Raffensperger announced a statewide risk-limiting audit (the Audit)—also referred to as a "full hand recount"—of all votes cast in the contest for President of the United States.[17] Every county in Georgia was required to begin the Audit at 9:00 am on November 13 and finish by 11:59 pm on November 18.[18] The statewide election results are set to be certified on November 20.[19] Raffensperger

required the Audit to "be open to the public and the press" and required local election officials to "designate a viewing area from which members of the public and press may observe the audit for the purpose of good order and maintaining the integrity of the audit."[20] The two major political parties—Democratic and Republican—were permitted "the right to have one properly designated person as a monitor of the audit for each ten audit teams that are conducting the audit, with a minimum of two designated monitors in each county per party per room where the audit is being conducted."[21] The designated monitors were not required to remain in the public viewing areas, but were required to comply with the rules promulgated by Raffensperger and the local election officials.[22] The Audit process differs from that required by Georgia law for a recount requested by a unsuccessful candidate following the official certification of votes. *See* O.C.G.A. § 21-2-524.

## II. LEGAL STANDARD

**\*4** The standard for the issuance of a temporary restraining order and a preliminary injunction are identical. *Windsor v. United States*, 379 F. App'x 912, 916–17 (11th Cir. 2010). A preliminary injunction is "an extraordinary remedy." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). To obtain the relief he seeks, Wood must affirmatively demonstrate: "(1) substantial likelihood of success on the merits; (2) [that] irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to [him] outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). *See also Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites.").

## III. DISCUSSION

Wood's motion essentially boils down to two overarching claims:

that Defendants violated the Constitution by (1) executing and enforcing the Settlement Agreement to the extent it requires different procedures than the Georgia Election Code, and (2) not permitting designated monitors to have certain live viewing privileges of the Audit at the county locations.

Defendants and Intervenors posit a number of challenges to Wood's claims.

**a. Standing**

As a threshold matter, the Court finds Wood lacks standing to assert these claims. Article III limits federal courts to the consideration of "Cases" and "Controversies." *U.S. Const. art. III, § 2, cl. 1*. The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)*. It is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013). See also Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016)* ("[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.") (quoting *Raines v. Byrd, 521 U.S. 811, 818 (1997)*). The standing inquiry is threefold: "The litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1245 (11th Cir. 2020)* (citing *Lujan, 504 U.S. at 561*). Wood must "demonstrate standing for each claim he seeks to press and for each form of relief that is sought"—*Town of Chester, N.Y. v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (2017)*—and shoulders "the burden of establishing [each] element[ ]." *Lujan, 504 U.S. at 561*.

Injury in fact is "the first and foremost of standing's three elements" and requires Wood to show that he suffered "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, 136 S. Ct. at 1547–48*. To be "particularized," the alleged injury "must affect the plaintiff in a personal and individual way." *Lujan, 504 U.S. at 561 n.1*. Wood must demonstrate "a personal stake in the outcome of the controversy," as a federal court "is not a forum for generalized grievances." *Gill v. Whitford, 138 S. Ct. 1916, 1929 (2018)*. This requires more than a mere "keen interest in the issue." *Trump v. Hawaii, 138 S. Ct. 2392, 2416 (2018)*. The alleged injury must be "distinct from a generally available grievance about government." *Gill, 138 S. Ct. at 1923. See also id. at 1929* (explaining that a person's "right to vote is individual and personal in nature...[t]hus [only] voters who allege facts showing disadvantage to themselves as individuals have standing to sue to remedy that disadvantage") (quoting *Reynolds v.*

*Sims, 377 U.S. 533, 561 (1964); Baker v. Carr, 369 U.S. 186, 206 (1962)*). Claims premised on allegations that "the law...has not been followed...[are] precisely the kind of undifferentiated, generalized grievance about the conduct of government...[and] quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing." *Dillard v. Chilton Cnty. Comm'n, 495 F.3d 1324, 1332–33 (11th Cir. 2007)* (citing *Baker, 369 U.S. at 207–08). See also Lance v. Coffman, 549 U.S. 437, 440–41 (2007)* ("Our refusal to serve as a forum for generalized grievances has a lengthy pedigree. . . . [A] generalized grievance that is plainly undifferentiated and common to all members of the public" is not sufficient for standing).

**\*5** Wood alleges he has standing because he is "a qualified registered elector residing in Fulton County, Georgia" who has "made donations to various Republican candidates on the ballot for the November 3, 2020 elections, and his interests are aligned with those of the Georgia Republican Party for the purposes of the instant lawsuit."[23] These allegations fall far short of demonstrating that Wood has standing to assert these claims.

**i. The Elections and Electors Clause**

Starting with his claim asserted under the Elections and Electors Clause, Wood lacks standing as a matter of law. The law is clear: A generalized grievance regarding a state government's failure to properly follow the Elections Clause of the Constitution does not confer standing on a private citizen.[24] *Lance, 549 U.S. at 442; Bognet, 2020 WL 6686120, at \*6* ("[P]rivate plaintiffs lack standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause....Their relief would have no more directly benefitted them than the public at large."); *Dillard, 495 F.3d at 1332–33*.

**ii. Equal Protection**

For his equal protection claim, Wood relies on a theory of vote dilution, *i.e.*, because Defendants allegedly did not follow the correct processes, invalid absentee votes may have been cast and tabulated, thereby diluting Wood's in-person vote. But the same prohibition against generalized grievances applies to equal protection claims. *United States v. Hays, 515 U.S. 737, 743 (1995)* ("The rule against generalized grievances applies with as much force in the equal protection context as in any other.") Wood does not differentiate his alleged injury from any harm felt in precisely the same

manner by every Georgia voter. As Wood conceded during oral argument, under his theory any one of Georgia's more than seven million registered voters would have standing to assert these claims. This is a textbook generalized grievance. *Bognet*, 2020 WL 6686120, at \*12 ("Voter Plaintiffs' dilution claim is a paradigmatic generalized grievance that cannot support standing....Put another way, a vote cast by fraud or mailed in by the wrong person through mistake, or otherwise counted illegally, has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged. Such an alleged dilution is suffered equally by all voters and is not particularized for standing purposes.") (internal punctuation omitted) (collecting cases); *Moore v. Circosta*, No. 1:20-cv-911, 2020 WL 6063332, a \*14 (M.D.N.C. Oct. 14, 2020) ("[T]he notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury in fact necessary for Article III standing."). *See also Citizens for Fair Representation v. Padilla*, 815 F. App'x 120, 123 (9th Cir. 2020) (dismissing equal protection claim for lack of standing and stating "the Supreme Court has consistently held that a plaintiff raising only a generally available grievance...does not state an Article III case or controversy.").

### iii. Due Process

 **\*6** For the same reasons, Wood also does not have standing to pursue his due process claim. Wood asserts that various election monitors appointed by the Republican Party "have been denied the opportunity to be present throughout the entire Hand Recount, and when allowed to be present, they were denied the opportunity to observe the Hand Recount in any meaningful way."[25] Yet, Wood does not allege that **he** attempted to participate as a designated monitor. Nor does he allege that, on behalf of the Republican Party, he himself designated monitors who were ultimately denied access. Wood's broad objection is that Defendants failed to conduct the Audit fairly and consistently under Georgia law. This is a generalized grievance.[26] *Lance*, 549 U.S. at 440–41. *See also Nolles v. State Comm. for Reorganization of Sch. Dists.*, 524 F.3d 892, 900 (8th Cir. 2008) (voters lacked standing because substantive due process claim that delay of implementation of new statute until after referendum election violated their right to fair election did not allege particularized injury).

### iv. Alignment with Non-Parties

Wood further points to his status as a donor to the Republican Party whose interests are aligned with that party and its political candidates to support his standing argument. But this does not sufficiently differentiate his alleged injury from that which *any* voter might have suffered—no matter the party affiliation. Ostensibly, Wood believes he suffered a particularized injury because his preferred candidates—to whom he has contributed money—did not prevail in the General Election. This argument has been squarely rejected by the Eleventh Circuit. *Jacobson*, 974 F.3d at 1247 ("A candidate's electoral loss does not, by itself, injure those who voted for the candidate. Voters have no judicially enforceable interest in the outcome of an election. Instead, they have an interest in their ability to vote and in their vote being given the same weight as any other.") (internal citation omitted).

### v. Lack of Relevant Authorities

Finally, the Court notes the futility of Wood's standing argument is particularly evident in that his sole relied-on authority—*Meek v. Metropolitan Dade County, Florida*, 985 F.2d 1471 (11th Cir. 1993)—is no longer good law. The Eleventh Circuit **expressly abrogated** its holding in that case over thirteen years ago. *Dillard*, 495 F.3d at 1331–32 ("We subsequently upheld *Meek's* reasoning against repeated challenges that it was wrongly decided in light of the Supreme Court's later decisions...[b]ut it is clear that we can no longer do so in light of the Supreme Court's most recent pronouncement on voter standing in *Lance*.").

During oral argument, Wood additionally pointed to *Roe v. State of Alabama by & through Evans*, 43 F.3d 574 (11th Cir. 1995), but that case does not support Wood's standing argument. For example, two plaintiffs in *Roe* were candidates for a political office decided in the challenged election. *Id.* at 579. Wood is a private citizen, not a candidate for any elected office. Moreover, the Eleventh Circuit found particularized harm in the post-election inclusion of absentee ballots that had been deemed invalid. *Id.* at 580. Wood here seeks to do the opposite—remove validly cast absentee ballots after completion of the election.

In sum, Wood lacks standing to pursue these claims in the first instance.

### b. The Doctrine of Laches

 **\*7** Even if the Court found Wood possessed standing to pursue his claims regarding the Settlement Agreement (Counts I and II), such claims would nonetheless be barred by

the doctrine of laches. To establish laches, Defendants must show "(1) there was a delay in asserting a right or a claim, (2) the delay was not excusable, and (3) the delay caused [them] undue prejudice." *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005). *See also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1326 (11th Cir. 2019) ("To succeed on a laches claim, [defendant] must demonstrate that [p]laintiffs inexcusably delayed bringing their claim and that the delay caused it undue prejudice."). Courts apply laches in election cases. *E.g.*, *Sanders v. Dooly Cnty., Ga.*, 245 F.3d 1289, 1291 (11th Cir. 2001) ("[W]e conclude that the district court did not abuse its discretion in deeming the claims seeking injunctive relief to be laches-barred."). *See also, e.g, Detroit Unity Fund v. Whitmer*, 819 F. App'x 421, 422 (6th Cir. 2020) (holding district court did not err in finding that plaintiff's claims regarding deadline for local ballot initiatives "barred by laches, considering the unreasonable delay on the part of [p]laintiffs and the consequent prejudice to [d]efendants"). *Cf. Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence. That is as true in election law cases as elsewhere.") (internal citation omitted). Defendants have established each element of laches.

**i. Delay**

First, Wood delayed considerably in asserting these claims. On March 6, 2020, the GDP, DSCC, DCCC, and Defendants executed the Settlement Agreement, which was entered on the public docket. It has since been in effect for at least three elections. Nearly eight months later—and **after** over one million voters cast their absentee ballots in the General Election—Wood challenges the terms of the Settlement Agreement as unconstitutional. Wood could have, and should have, filed his constitutional challenge much sooner than he did, and certainly not two weeks *after* the General Election.

**ii. Excuse**

Nor has Wood articulated any reasonable excuse for his prolonged delay. Wood failed to submit any evidence explaining why he waited to bring these claims until the eleventh hour. He instead relies solely on a representation from his legal counsel during oral argument, without evidence, that Wood did not vote in any election between the execution of the Settlement Agreement and the General Election. Even assuming this proffer to be true, it does not provide a reasonable justification for the delay. Wood's claims are constitutional challenges to Defendants' promulgation authority under state law. If valid, these claims should not

depend on the outcome of any particular election, to wit, whether Wood's preferred candidates won or lost. Indeed, Wood's claims, even assuming his standing for bringing them could be established, were ripe the moment the parties executed the Settlement Agreement.

**iii. Prejudice**

Finally, Defendants, Intervenors, and the public at large would be significantly injured if the Court were to excuse Wood's delay. A bedrock principle of election law is that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006)). This is because a last-minute intervention by a federal court could "result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5. *See also Democratic Nat'l Comm. v. Wisc. State Legislature*, No. 20A66, 2020 WL 6275871, at *4 (U.S. Oct. 26, 2020) (Kavanaugh, J., concurring in denial of application to vacate stay) ("The principle [of judicial restraint] also discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process. For those reasons, among others, this Court has regularly cautioned that a federal court's last-minute interference with state election laws is ordinarily inappropriate.").

 **\*8** Underscoring the exceptional nature of his requested relief, Wood's claims go much further; rather than changing the rules on the eve of an election, he wants the rules for the already concluded election declared unconstitutional and over one million absentee ballots called into question. Beyond merely causing confusion, Wood's requested relief could disenfranchise a substantial portion of the electorate and erode the public's confidence in the electoral process. *See Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) ("Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented.") (citation omitted); *Arkansas United v. Thurston*, No. 5:20-cv-5193, 2020 WL 6472651, at *5 (W.D. Ark. Nov. 3, 2020) ("[T]he equities do not favor intervention where the election is already in progress and the requested relief would change the rules of the game mid-play.").

Thus, Wood is not entitled to injunctive relief on Counts I and II for the additional reason that these claims are barred by the doctrine of laches.

WESTLAW

### c. The Merits of the Request for Injunctive Relief

Even assuming Wood possessed standing, and assuming Counts I and II are not barred by laches, the Court nonetheless finds Wood would not be entitled to the relief he seeks. The Court addresses each required element for a temporary restraining order in turn.

### i. Substantial Likelihood of Success on the Merits

### 1. Equal Protection (Count I)

Wood argues the execution and enforcement of the Settlement Agreement burdens his right to vote in contravention of the Equal Protection Clause because the agreement sets forth additional voting safeguards not found in the Georgia Election Code. States retain the power to regulate their own elections. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citing U.S. Const. Art. I, § 4, cl. 1). The Supreme Court has held that:

> Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.

*Burdick*, 504 U.S. at 433 (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

Inevitably, most election laws will "impose some burden upon individual voters." *Burdick*, 504 U.S. at 433. But the Equal Protection Clause only becomes applicable if "a state either classifies voters in disparate ways...or places restrictions on the right to vote." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012). As recently summarized by one federal district court:

> The Supreme Court has identified two theories of voting harms prohibited by the Fourteenth Amendment. First, the Court has identified a harm caused by debasement or dilution of the weight of a citizen's vote, also referred to [as] vote dilution....Second, the Court has found that the Equal Protection Clause is violated where the state, having once granted the right to vote on equal terms, through later arbitrary and disparate treatment, values one person's vote over that of another.

*Moore*, 2020 WL 6063332, at *12 (citing *Bush v. Gore*, 531 U.S. 98, 104–05 (2000); *Reynolds*, 377 U.S. at 554). A rationale basis standard of review applies if the plaintiff alleges "that a state treated him or her differently than

similarly situated voters, without a corresponding burden on the fundamental right to vote." *Obama for Am.*, 697 F.3d at 429 (citing *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807–09 (1969)). If a fundamental right is implicated, the claim is governed by the flexible *Anderson/Burdick* balancing test. *Burdick*, 504 U.S. at 433–35; *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

**\*9** Wood's equal protection claim does not fit within this framework.[27] Wood does not articulate a cognizable harm that invokes the Equal Protection Clause. For example, to the extent Wood relies on a theory of disparate treatment, *Bush v. Gore* is inapplicable. Defendants applied the Settlement Agreement in a wholly uniform manner across the entire state.[28] In other words, no voter—including Wood—was treated any differently than any other voter. *E.g., Wise v. Circosta*, 978 F.3d 93, 100 (4th Cir. 2020); *Deutsch v. New York State Bd. of Elections*, No. 20 CIV. 8929 (LGS), 2020 WL 6384064, at *6 (S.D.N.Y. Oct. 30, 2020).

Wood fares no better with a vote dilution argument. According to Wood, his fundamental right to vote was burdened because the "rules and regulations set forth in the [Settlement Agreement] created an arbitrary, disparate, and ad hoc process for processing defective absentee ballots, and for determining which of such ballots should be 'rejected,' contrary to Georgia law."[29] At the starting gate, the additional safeguards on signature and identification match enacted by Defendants did not burden Wood's ability to cast his ballot at all. Wood, according to his legal counsel during oral argument, did not vote absentee during the General Election. And the "burden that [a state's] signature-match scheme imposes on the right to vote...falls on vote-by-mail and provisional voters' fundamental right to vote." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019).

This leaves Wood to speculate that, because the Settlement Agreement required three ballot clerks—as opposed to just one—to review an absentee ballot before it could be rejected, fewer ballots were ultimately rejected, invalid ballots were tabulated, and his in-person vote was diluted. In support of this argument, Wood relies on *Baker v. Carr*, where the Supreme Court found vote dilution in the context of apportionment of elected representatives. 369 U.S. at 204–208. But Wood cannot transmute allegations that state officials violated state law into a claim that his vote was somehow weighted differently than others. This theory has been squarely rejected. *Bognet*, 2020 WL 6686120, at

*11 ("[T]he Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently. Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment. And if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity. That is not how the Equal Protection Clause works.").

 *10 Even if Wood's claim were cognizable in the equal protection framework, it is not supported by the evidence at this stage. Wood's argument is that the procedures in the Settlement Agreement regarding information and signature match so overwhelmed ballot clerks that the rate of rejection plummeted and, ergo, invalid ballots were passed over and counted. This argument is belied by the record; the percentage of absentee ballots rejected for missing or mismatched information and signature is the exact same for the 2018 election and the General Election (.15%).[30] This is despite a substantial increase in the total number of absentee ballots submitted by voters during the General Election as compared to the 2018 election.[31]

In sum, there is insubstantial evidence supporting Wood's equal protection theory and he has not established a substantial likelihood of success on the merits as to Count I.

**2. Electors and Elections Clauses (Count II)**

In relevant part, the Constitution states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. This provision— colloquially known as the Elections Clause— vests authority in the states to regulate the mechanics of federal elections. *Foster v. Love*, 522 U.S. 67, 69 (1997). The "Electors Clause" of the Constitution similarly states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of [Presidential] Electors." U.S. Const. art. II, § 1, cl. 2.

Wood argues Defendants violated the Elections and Electors Clauses because the "procedures set forth in the [Settlement Agreement] for the handling of defective absentee ballots

is not consistent with the laws of the State of Georgia, and thus, Defendants' actions...exceed their authority."[32] Put another way, Wood argues Defendants usurped the role of the Georgia General Assembly—and thereby violated the United States Constitution—by enacting additional safeguards regarding absentee ballots not found in the Georgia Election Code. In support, Wood points to Chief Justice Rehnquist's concurrence in *Bush v. Gore*, which states that "in a Presidential election the clearly expressed intent of the legislature must prevail." 531 U.S. at 120 (Rehnquist, C.J., concurring).

State legislatures—such as the Georgia General Assembly —possess the authority to delegate their authority over elections to state officials in conformity with the Elections and Electors Clauses. *Ariz. State Legislature*, 576 U.S. at 816 ("The Elections Clause [ ] is not reasonably read to disarm States from adopting modes of legislation that place the lead rein in the people's hands...it is characteristic of our federal system that States retain autonomy to establish their own governmental processes."). *See also Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) ("The Elections Clause, therefore, affirmatively grants rights to state legislatures, and under Supreme Court precedent, to other entities to which a state may, consistent with the Constitution, delegate lawmaking authority."). *Cf. Bullock*, 2020 WL 5810556, at *11 ("A survey of the relevant case law makes clear that the term 'Legislature' as used in the Elections Clause is not confined to a state's legislative body.").

Recognizing that Secretary Raffensperger is "the state's chief election official,"[33] the General Assembly enacted legislation permitting him (in his official capacity) to "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). The Settlement Agreement is a manifestation of Secretary Raffensperger's statutorily granted authority. It does not override or rewrite state law. It simply adds an additional safeguard to ensure election security by having more than one individual review an absentee ballot's information and signature for accuracy before the ballot is rejected. Wood does not articulate how the Settlement Agreement is not "consistent with law" other than it not being a verbatim recitation of the statutory code. Taking Wood's argument at face value renders O.C.G.A. § 21-2-31(2) superfluous. A state official—such as Secretary Raffensperger—could never wield his or her authority to make rules for conducting elections that had not otherwise already been adopted

by the Georgia General Assembly. The record in this case demonstrates that, if anything, Defendants' actions in entering into the Settlement Agreement sought to achieve consistency among the county election officials in Georgia, which *furthers* Wood's stated goals of conducting "[f]ree, fair, and transparent public elections."[34]

**\*11** Wood has not demonstrated a substantial likelihood of success as to Count II.

### 3. Due Process (Count III)

Under the Fourteenth Amendment, "[n]o State shall...deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const. amend. XIV*. The Due Process Clause has two components: procedural and substantive. *DeKalb Stone, Inc. v. Cnty. of DeKalb, Ga.*, 106 F.3d 956, 959 (11th Cir. 1997). Wood alleges that Defendants have "fail[ed]...to ensure that the Hand Recount is conducted fairly and in compliance with the Georgia Election Code" by denying monitors "the opportunity to be present throughout the entire Hand Recount, and when allowed to be present, they were denied the opportunity to observe the Hand Recount in any meaningful way."[35] Although not articulated in his Amended Complaint or motion for temporary restraining order, Wood clarified during oral argument that he is pursing both a procedural and substantive due process claim. Each will be addressed in turn.

#### a) Procedural Due Process

A procedural due process claim raises two inquires: "(1) whether there exists a liberty or property interest which has been interfered with by the State and (2) whether the procedures attendant upon that deprivation were constitutionally sufficient." *Richardson v. Texas Sec'y of State*, 978 F.3d 220, 229 (5th Cir. 2020) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). The party invoking the Due Process Clause's procedural protections bears the "burden...of establishing a cognizable liberty or property interest." *Richardson*, 978 F.3d at 229 (citing *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). Wood bases his procedural due process claim on "a vested interest in being present and having meaningful access to observe and monitor the electoral process."[36] But Wood does not articulate how this "vested interest" fits within a recognized, cognizable interest protected by procedural due process. The Court is not persuaded that the right to monitor an audit or vote recount is a liberty or property right secured by

the Constitution. For example, the Eleventh Circuit does "assume that the right to vote is a liberty interest protected by the Due Process Clause." *Jones v. Governor of Fla.*, 975 F.3d 1016, 1048 (11th Cir. 2020). But the circuit court has expressly declined to extend the strictures of procedural due process to "a State's election procedures." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) ("The generalized due process argument that the plaintiffs argued for and the district court applied would stretch concepts of due process to their breaking point.").

More specifically, federal courts have rejected the very interest Wood claims has been violated, *i.e.*, the right to observe the electoral process. *See, e.g.*, *Republican Party of Penn. v. Cortes*, 218 F. Supp. 3d 396, 408 (E.D. Pa. 2016) ("[T]here is no individual constitutional right to serve as a poll watcher...but rather the right is conferred by statute."); *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680, at *67 (W.D. Pa. Oct. 10, 2020) (same); *Dailey v. Hands*, No. 14-423, 2015 WL 1293188, at *5 (S.D. Ala. Mar. 23, 2015) ("[P]oll watching is not a fundamental right."); *Turner v. Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) (finding no authority "that supports the proposition that [plaintiff] had a first amendment right to act as a pollwatcher. Indeed, we would suggest that the state is not constitutionally required to permit pollwatchers for political parties and candidates to observe the conduct of elections."). Without such an interest, Wood cannot establish a substantial likelihood of success on the merits as to his procedural due process claim.

#### b) Substantive Due Process

**\*12** Wood's substantive due process claim fares no better. The types of voting rights covered by the substantive due process clause are considered narrow. *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986). Pursuant to the "functional structure embodied in the Constitution," a federal court must not "intervene to examine the validity of individual ballots or supervise the administrative details of a local election." *Id*. In only "extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation." *Id*. *See also Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998) ("We have drawn a distinction between garden variety election irregularities and a pervasive error that undermines the integrity of the vote. In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election.") (citation and punctuation omitted) (collecting cases); *Duncan v. Poythress*, 657 F.2d 691, 700 (5th Cir. 1981) ("[T]he due

process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process."). It is well understood that "garden variety" election disputes, including "the ordinary dispute over the counting and marking of ballots" do not rise to the level of a constitutional deprivation.[37] *Curry, 802 F.2d at 1314–15*. *See also Serpentfoot v. Rome City Comm'n, 426 F. App'x 884, 887 (11th Cir. 2011)* ("[Plaintiff's] allegations show, at most, a single instance of vote dilution and not an election process that has reached the point of patent and fundamental unfairness indicative of a due process violation.").

Although Wood generally claims fundamental unfairness, and the declarations and testimony submitted in support of his motion speculate as to wide-spread impropriety, the actual harm alleged by Wood concerns merely a "garden variety" election dispute. Wood does not allege unfairness in counting the ballots; instead, he alleges that select non-party, partisan monitors were not permitted to observe the Audit in an ideal manner. Wood presents no authority, and the Court finds none, providing for a right to unrestrained observation or monitoring of vote counting, recounting, or auditing. Precedent militates against a finding of a due process violation regarding such an "ordinary dispute over the counting and marking of ballots." *Gamza v. Aguirre, 619 F.2d 449, 453 (5th Cir. 1980)* ("If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute."). Wood has not satisfied his burden of establishing a substantial likelihood of success on the merits as to his substantive due process claim.

### ii. Irreparable Harm

Because Wood cannot show a likelihood of success on the merits, an extensive discussion of the remaining factors for the issuance of a temporary restraining order is unnecessary. *Obama for Am., 697 F.3d at 436* ("When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor."). *See also Bloedorn, 631 F.3d at 1229* ("If [plaintiff] is unable to show a substantial likelihood of success on the merits, we need not consider the other requirements."). Nonetheless, for the

second factor, Plaintiffs must show that "irreparable injury would result if no injunction were issued." *Siegel, 234 F.3d at 1175–76* ("A showing of irreparable injury is the *sine qua non* of injunctive relief."). This factor also weighs in Defendants' favor. As discussed above, Wood's allegations are the quintessential generalized grievance. He has not presented any evidence demonstrating how he will suffer any particularized harm as a voter or donor by the denial of this motion. The fact that Wood's preferred candidates did not prevail in the General Election—for whom he may have voted or to whom he may have contributed financially—does not create a legally cognizable harm, much less an irreparable one. *Jacobson, 974 F.3d at 1247*.

### iii. Balance of the Equities and Public Interest

**\*13** The Court finds that the threatened injury to Defendants as state officials and the public at large far outweigh any minimal burden on Wood. To reiterate, Wood seeks an extraordinary remedy: to prevent Georgia's certification of the votes cast in the General Election, after millions of people had lawfully cast their ballots. To interfere with the result of an election that has already concluded would be unprecedented and harm the public in countless ways. *See Sw. Voter Registration Educ. Project, 344 F.3d at 919*; *Arkansas United, 2020 WL 6472651, at \*5*. Granting injunctive relief here would breed confusion, undermine the public's trust in the election, and potentially disenfranchise of over one million Georgia voters. Viewed in comparison to the lack of any demonstrable harm to Wood, this Court finds no basis in fact or in law to grant him the relief he seeks.

### IV. CONCLUSION

Wood's motion for temporary restraining order [ECF 6] is **DENIED**. **SO ORDERED** this the 20th day of November 2020.

Steven D. Grimberg

United States District Court Judge

**All Citations**

Slip Copy, 2020 WL 6817513

---

Footnotes

1    *Elections and Voter Registration Calendars*, https://sos.ga.gov/index.php/electi

| | |
|---|---|
| | ons/elections_and_voter_registration_calendars (last accessed Nov. 19, 2020). |
| 2 | *Id.* |
| 3 | *Id.* |
| 4 | ECF 33-2; ECF 33-6; ECF 33-8. |
| 5 | ECF 1. |
| 6 | ECF 5. |
| 7 | *E.g.*, ECF 5, ¶¶ 81–83, 93–95. The Litigation Settlement—also referred to as the Settlement Agreement—is discussed *infra* in Section I.b. |
| 8 | ECF 5, ¶ 106. |
| 9 | ECF 6. |
| 10 | ECF 8; ECF 22. |
| 11 | ECF 31; ECF 34; ECF 39. |
| 12 | *Democratic Party of Ga., Inc. v. Raffensperger*, 1:19-cv-05028-WMR (ECF 1) (Compl.). |
| 13 | *Id.* |
| 14 | *Id.* at ECF 56 (Settlement Agreement). |
| 15 | *Id.* (emphasis added). |
| 16 | *Id.* at ECF 57. |
| 17 | ECF 33-1; ECF 33-2; ECF 33-3. |
| 18 | *Id.* |
| 19 | *Id.* |
| 20 | ECF 33-4. |
| 21 | *Id.* |
| 22 | *Id.* |
| 23 | ECF 5, ¶ 8. |
| 24 | Although separate constitutional provisions, the Electors Clause and Elections Clause share "considerably similarity" and may be interpreted in the same manner. *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839 (2015) (Roberts, C.J., dissenting). *See also Bognet v. Sec'y Commonwealth of Pa.*, No. 20-3214, 2020 WL 6686120, at *7 (3d Cir. Nov. 13, 2020) (applying same test for standing under both Elections Clause and Electors Clause); *Donald J. Trump for President, Inc. v. Bullock*, No. CV 20-66-H-DLC, 2020 WL 5810556, at *11 (D. Mont. Sept. 30, 2020) ("As an initial matter, the Court finds no need to distinguish between the term 'Legislature' as it is used in the Elections Clause as opposed to the Electors Clause."). |
| 25 | ECF 6, at 21. |
| 26 | To the extent Wood attempts to rely on a theory of third party standing, the Court disagrees; the doctrine is disfavored and Wood has not alleged or proven any of the required elements—that (1) he "suffered an injury-in-fact that gives [him] a sufficiently concrete interest in the dispute"; (2) he has "a close relationship to the third party"; and (3) there is "a hindrance to the third party's ability to protect its own interests." *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1339 (11th Cir. 2019) (internal quotation marks omitted). |
| 27 | The Court notes that, in the Amended Complaint, Wood alludes to issues caused by Raffensperger's adoption of Ballot Trax—an electronic interface that permits an elector to track his or her ballot as it is being processed [ECF 5, ¶¶ 44–46]. Wood also alleges harm in that the Settlement Agreement permitted the DPG to submit "additional guidance and training materials" for identifying a signature mismatch, which Defendants "agree[d] to consider in good faith" [*id.* ¶ 47; *see also* ECF 5-1, ¶ 4]. Wood did not address how these items violated his constitutional rights—equal protection or otherwise—in either his motion or during oral argument. Therefore, the Court need not address them at this stage. |
| 28 | Wood concedes as much in the Amended Complaint. *See* ECF 5, ¶ 25 (alleging the Settlement Agreement "set[ ] forth different standards to be followed by the clerks and registrars in processing absentee ballots **in the State of Georgia**.") (emphasis added). |
| 29 | ECF 6, at 18. |
| 30 | ECF 33-6. |
| 31 | *Id.* |

32    ECF 5, ¶ 90.

33    O.C.G.A. § 21-2-50(b).

34    ECF 5, ¶ 11.

35    ECF 6, at 20–21.

36    ECF 5, ¶ 101.

37    In contrast, as Defendants note, it would be a violation of the constitutional
      rights of the millions of absentee voters who relied on the absentee ballot procedures in exercising their right to vote.
      *See e.g. Griffin v. Burns*, 570 F.2d 1065, 1079 (1st Cir. 1978) (finding disenfranchisement of electorate who voted by
      absentee ballot a violation of substantive due process).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

2020 WL 7094866
Only the Westlaw citation is currently available.
United States Court of Appeals, Eleventh Circuit.

L. Lin WOOD, Jr., Plaintiff-Appellant,

v.

Brad RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia, Rebecca N. Sullivan, in her official capacity as Vice Chair of the Georgia State Election Board, et al., Defendants-Appellees.

No. 20-14418
|
(December 5, 2020)

**Attorneys and Law Firms**

Ray S. Smith, III, Smith & Liss LLC, Atlanta, GA, for Plaintiff-Appellant.

Charlene S. McGowan, Christopher Michael Carr, Russell D. Willard, Attorney General's Office, Atlanta, GA, for Defendants-Appellees.

Marc Erik Elias, Amanda Rebecca Callais, Perkins Coie, LLP, Washington, DC, Kevin J. Hamilton, Perkins Coie, LLP, Seattle, WA, Susan Coppedge, U.S. Attorney's Office, Halsey G. Knapp, Jr., Joyce Gist Lewis, Adam M. Sparks, Krevolin & Horst, LLC, Atlanta, GA, for Intervenors-Appellees.

Jon M. Greenbaum, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Bryan L. Sells, Law Office of Bryan L. Sells, LLC, Atlanta, GA, for Amici Curiae Helen Butler, Georgia State Conference of the NAACP, Georgia Coalition for the Peoples' Agenda, James Woodall, and Melvin Ivey.

Amanda J. Beane, Perkins Coie, LLP, Seattle, WA, Emily Rachel Brailey, Alexi M. Velez, Perkins Coie, LLP, Washington, DC, Gillian Kuhlmann, Perkins Coie, LLP, Los Angeles, CA, Matthew Joseph Mertens, Perkins Coie, LLP, Portland, OR, for Service.

Appeal from the United States District Court for the Northern District of Georgia, D.C. Docket No. 1:20-cv-04651-SDG

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR and LAGOA, Circuit Judges.

**Opinion**

WILLIAM PRYOR, Chief Judge:

**\*1** This appeal requires us to decide whether we have jurisdiction over an appeal from the denial of a request for emergency relief in a post-election lawsuit. Ten days after the presidential election, L. Lin Wood Jr., a Georgia voter, sued state election officials to enjoin certification of the general election results, to secure a new recount under different rules, and to establish new rules for an upcoming runoff election. Wood alleged that the extant absentee-ballot and recount procedures violated Georgia law and, as a result, his federal constitutional rights. After Wood moved for emergency relief, the district court denied his motion. We agree with the district court that Wood lacks standing to sue because he fails to allege a particularized injury. And because Georgia has already certified its election results and its slate of presidential electors, Wood's requests for emergency relief are moot to the extent they concern the 2020 election. The Constitution makes clear that federal courts are courts of limited jurisdiction, U.S. Const. art. III; we may not entertain post-election contests about garden-variety issues of vote counting and misconduct that may properly be filed in state courts. We affirm.

## I. BACKGROUND

Secretary of State Brad Raffensperger is the "chief election official" of Georgia. Ga. Code Ann. § 21-2-50(b). He manages the state system of elections and chairs the State Election Board. Id. § 21-2-30(a), (d). The Board has the authority to promulgate rules and regulations to ensure uniformity in the practices of county election officials and, "consistent with law," to aid "the fair, legal, and orderly conduct of primaries and elections." Id. § 21-2-31(1)–(2). The Board may also publish and distribute to county election officials a compilation of Georgia's election laws and regulations. Id. § 21-2-31(3). Many of these laws and regulations govern absentee voting.

Any voter in Georgia may vote by absentee ballot. Id. § 21-2-380(b). State law prescribes the procedures by which a voter may request and submit an absentee ballot. Id. §§ 21-2-381; 21-2-384; 21-2-385. The ballot comes with an oath,

which the voter must sign and return with his ballot. *Id.* § 21-2-385(a). State law also prescribes the procedures for how county election officials must certify and count absentee ballots. *Id.* § 21-2-386(a). It directs the official to "compare the identifying information on the oath with the information on file" and "compare the signature or mark on the oath with the signature or mark" on file. *Id.* § 21-2-386(a)(1)(B). If everything appears correct, the official certifies the ballot. *Id.* But if there is a problem, such as a signature that does not match, the official is to "write across the face of the envelope 'Rejected.' " *Id.* § 21-2-386(a)(1)(C). The government must then notify the voter of this rejection, and the voter may cure the problem. *Id.*

In November 2019, the Democratic Party of Georgia, the Democratic Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee challenged Georgia's absentee ballot procedures as unconstitutional under the First and Fourteenth Amendments. They sued Secretary Raffensperger and members of the Board for declaratory and injunctive relief. Secretary Raffensperger and the Board maintained that the procedures were constitutional, but they agreed to promulgate regulations to ensure uniform practices across counties. In March 2020, the parties entered into a settlement agreement and dismissed the suit.

**\*2** In the settlement agreement, Secretary Raffensperger and the Board agreed to issue an Official Election Bulletin regarding the review of signatures on absentee ballots. The Bulletin instructed officials to review the voter's signature with the following process:

> If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file ..., the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks. A mail-in absentee ballot shall not be rejected unless a majority of the registrars, deputy registrars, or absentee ballot clerks reviewing the signature agree that the signature does not match any of the voter's signatures on file ....

Secretary Raffensperger and the Board also agreed to train county election officials to follow this process.

This procedure has been in place for at least three elections since March, including the general election on November 3, 2020. Over one million Georgians voted by absentee ballot in the general election. No one challenged the settlement agreement until the filing of this action. By then, the general

election returns had been tallied and a statewide hand recount of the presidential election results was underway.

On November 13, L. Lin Wood Jr. sued Secretary Raffensperger and the members of the Board in the district court. Wood alleged that he sued "in his capacity as a private citizen." He is a registered voter in Fulton County, Georgia, and a donor to various 2020 Republican candidates. His amended complaint alleged that the settlement agreement violates state law. As a result, he contends, it violates the Election Clause of Article I; the Electors Clause of Article II; and the Equal Protection Clause of the Fourteenth Amendment. *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2; *id.* amend. XIV, § 1. Wood also alleged that irregularities in the hand recount violated his rights under the Due Process Clause of the Fourteenth Amendment. *Id.* amend. XIV, § 1.

State law requires that such recounts be done in public view, and it permits the Board to promulgate policies that facilitate recounting. Ga. Code Ann. § 21-2-498(c)(4), (d). Secretary Raffensperger directed county election officials to designate viewing areas for members of the public and the news media to observe the recount. He also permitted the Democratic and Republican Parties to designate special recount monitors.

Wood alleged that officials ignored their own rules and denied Wood and President Donald Trump's campaign "meaningful access to observe and monitor the electoral process." Although Wood did not personally attempt to observe or monitor the recount, he alleged that Secretary Raffensperger and the Board violated his "vested interest in being present and having meaningful access to observe and monitor the electoral process to ensure that it is properly administered ... and ... otherwise free, fair, and transparent."

Wood submitted two affidavits from volunteer monitors. One monitor stated that she was not allowed to enter the counting area because there were too many monitors already present, and she could not be sure from a distance whether the recount was accurate. The other explained that the counting was hard for her to follow and described what she thought were possible tabulation errors.

**\*3** Wood moved for extraordinary relief. He asked that the district court take one of three steps: prohibit Georgia from certifying the results of the November election; prevent it from certifying results that include "defective absentee ballots, regardless of whether said ballots were cured"; or declare the entire election defective and order the state to fix

the problems caused by the settlement agreement. He also sought greater access for Republican election monitors, both at a new hand recount of the November election and in a runoff election scheduled for January 5, 2021.

Wood's lawsuit faced a quickly approaching obstacle: Georgia law requires the Secretary of State to certify its general election results by 5:00 p.m. on the seventeenth day after Election Day. Ga. Code Ann. § 21-2-499(b). And it requires the Governor to certify Georgia's slate of presidential electors by 5:00 p.m. on the eighteenth day after Election Day. *Id.* Secretary Raffensperger's deadline was November 20, and Governor Brian Kemp had a deadline of November 21.

To avoid these deadlines, Wood moved to bar officials from certifying the election results until a court could consider his lawsuit. His emergency motion reiterated many of the requests from his amended complaint, including requests for changes to the procedures for the January runoff. He also submitted additional affidavits and declarations in support of his motion.

The district court held a hearing on November 19 to consider whether it should issue a temporary restraining order. It heard from Wood, state officials, and two groups of intervenors. Wood also introduced testimony from Susan Voyles, a poll manager who participated in the hand recount. Voyles described her experience during the recount. She recalled that one batch of absentee ballots felt different from the rest, and that that batch favored Joe Biden to an unusual extent. At the end of the hearing, the district court orally denied Wood's motion.

On November 20, the district court issued a written opinion and order that explained its denial. It first ruled that Wood lacked standing because he had alleged only generalized grievances, instead of injuries that affected him in a personal and individual way. It next explained that, even if Wood had standing, the doctrine of laches barred him from challenging the settlement agreement now: he could have sued eight months earlier, yet he waited until two weeks after the election. Finally, it explained why Wood would not be entitled to a temporary restraining order even if the district court could reach the merits of his claims. On the same day, Secretary Raffensperger certified the results of the general election and Governor Kemp certified a slate of presidential electors.

## II. STANDARD OF REVIEW

"We are required to examine our jurisdiction *sua sponte*, and we review jurisdictional issues *de novo*." *United States v. Lopez*, 562 F.3d 1309, 1311 (11th Cir. 2009) (citation omitted).

## III. DISCUSSION

This appeal turns on one of the most fundamental principles of the federal courts: our limited jurisdiction. Federal courts are not "constituted as free-wheeling enforcers of the Constitution and laws." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc). As the Supreme Court "ha[s] often explained," we are instead "courts of limited jurisdiction." *Home Depot U.S.A., Inc. v. Jackson*, —— U.S. ——, 139 S. Ct. 1743, 1746, 204 L.Ed.2d 34 (2019) (internal quotation marks omitted). Article III of the Constitution establishes that our jurisdiction —that is, our judicial power—reaches only "Cases" and "Controversies." U.S. Const. art. III, § 2. Absent a justiciable case or controversy between interested parties, we lack the "power to declare the law." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

**\*4** When someone sues in federal court, he bears the burden of proving that his suit falls within our jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Wood had the choice to sue in state or federal court. Georgia law makes clear that post-election litigation may proceed in a state court. Ga. Code Ann. §§ 21-2-499(b), 21-2-524(a). But Wood chose to sue in federal court. In doing so, he had to prove that his suit presents a justiciable controversy under Article III of the Constitution. *See Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (listing examples of problems that preclude our jurisdiction). He failed to satisfy this burden.

We divide our discussion in two parts. We first explain why Wood lacks standing to sue. We then explain that, even if he had standing, his requests to recount and delay certification of the November election results are moot. Because this case is not justiciable, we lack jurisdiction. *Id.* And because we lack the power to entertain this appeal, we will not address the other issues the parties raise.

*A. Wood Lacks Standing Because He Has Not Been Injured in a Particularized Way.*

Standing is a threshold jurisdictional inquiry: the elements of standing are "an indispensable part of the plaintiff's case." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To prove standing, Wood "must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). If he cannot satisfy these requirements, then we may not decide the merits of his appeal. *Steel Co.*, 523 U.S. at 94, 118 S.Ct. 1003.

Wood lacks standing because he fails to allege the "first and foremost of standing's three elements": an injury in fact. *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (alteration adopted) (internal quotation marks omitted). An injury in fact is "an invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (internal quotation marks omitted). Wood's injury is not particularized.

Wood asserts only a generalized grievance. A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks omitted). For example, if Wood were a political candidate harmed by the recount, he would satisfy this requirement because he could assert a personal, distinct injury. *Cf. Roe v. Alabama ex rel. Evans*, 43 F.3d 574, 579 (11th Cir. 1995). But Wood bases his standing on his interest in "ensur[ing that] ... only lawful ballots are counted." An injury to the right "to require that the government be administered according to the law" is a generalized grievance. *Chiles v. Thornburgh*, 865 F.2d 1197, 1205–06 (11th Cir. 1989) (alteration adopted) (internal quotation marks omitted). And the Supreme Court has made clear that a generalized grievance, "no matter how sincere," cannot support standing. *Hollingsworth v. Perry*, 570 U.S. 693, 706, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013).

A generalized grievance is "undifferentiated and common to all members of the public." *Lujan*, 504 U.S. at 575, 112 S.Ct. 2130 (internal quotation marks omitted). Wood cannot explain how his interest in compliance with state election laws is different from that of any other person. Indeed,

he admits that any Georgia voter could bring an identical suit. But the logic of his argument sweeps past even that boundary. All Americans, whether they voted in this election or whether they reside in Georgia, could be said to share Wood's interest in "ensur[ing] that [a presidential election] is properly administered."

**\*5** Wood argues that he has two bases for standing, but neither satisfies the requirement of a distinct, personal injury. He first asserts that the inclusion of unlawfully processed absentee ballots diluted the weight of his vote. To be sure, vote dilution can be a basis for standing. *Cf. Jacobson*, 974 F.3d at 1247–48. But it requires a point of comparison. For example, in the racial gerrymandering and malapportionment contexts, vote dilution occurs when voters are harmed compared to "irrationally favored" voters from other districts. *See Baker v. Carr*, 369 U.S. 186, 207–08, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). By contrast, "no single voter is specifically disadvantaged" if a vote is counted improperly, even if the error might have a "mathematical impact on the final tally and thus on the proportional effect of every vote." *Bognet v. Sec'y Commonwealth of Pa.*, ––– F.3d ––––, ––––, 2020 WL 6686120, at \*12 (3d Cir. Nov. 13, 2020) (internal quotation marks omitted). Vote dilution in this context is a "paradigmatic generalized grievance that cannot support standing." *Id.* (internal quotation marks omitted).

Wood's second theory—that Georgia "value[d] one person's vote over that of another" through "arbitrary and disparate treatment"—fares no better. He argues that Georgia treats absentee voters as a "preferred class" compared to those who vote in person, both by the terms of the settlement agreement and in practice. In his view, all voters were bound by law before the settlement agreement, but the rules for absentee voting now run afoul of the law, while in-person voters remain bound by the law. And he asserts that in practice Georgia has favored absentee voters because there were "numerous irregularities" in the processing and recounting of absentee ballots. Setting aside the fact that "[i]t is an individual voter's *choice* whether to vote by mail or in person," *Bognet*, ––– F.3d at ––––, 2020 WL 6686120, at \*15, these complaints are generalized grievances. Even if we assume that absentee voters are favored over in-person voters, that harm does not affect Wood as an individual—it is instead shared identically by the four million or so Georgians who voted in person this November. "[W]hen the asserted harm is ... shared in substantially equal measure by ... a large class of citizens," it is not a particularized injury. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). And irregularities

in the tabulation of election results do not affect Wood differently from any other person. His allegation, at bottom, remains "that the law ... has not been followed." *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1332 (11th Cir. 2007) (quoting *Lance v. Coffman*, 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007)).

Wood's attempts to liken his injury to those we have found sufficient in other appeals fall short. In *Common Cause/ Georgia v. Billups*, we ruled that "[r]equiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing." 554 F.3d 1340, 1351–52 (11th Cir. 2009). But the injury there was the burden of producing photo identification, not the existence of separate rules for in-person and absentee voters. *Id.* And the burden to produce photo identification affected each voter in a personal way. For example, some plaintiffs in *Common Cause* alleged that they "would be required to make a special trip" to obtain valid identification "that is not required of voters who have driver's licenses or passports." *Id.* at 1351 (internal quotation marks omitted). By contrast, even Wood agrees that he is affected by Georgia's alleged violations of the law in the same way as every other Georgia voter. "This injury is precisely the kind of undifferentiated, generalized grievance that the Supreme Court has warned must not be countenanced." *Dillard*, 495 F.3d at 1335 (internal quotation marks omitted).

*Roe v. Alabama ex rel. Evans*, 43 F.3d 574, also does not support Wood's argument for standing. In *Roe*, we ruled that the post-election inclusion of previously recorded absentee ballots would violate the substantive-due-process rights of Alabama voters and two political candidates. *Id.* at 579–81. But no party raised and we did not address standing in *Roe*, so that precedent provides no basis for Wood to establish standing. *Cf. Lewis v. Casey*, 518 U.S. 343, 352 n.2, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (noting that in cases where "standing was neither challenged nor discussed ... the existence of unaddressed jurisdictional defects has no precedential effect"). And Wood's purported injury is far more general than the voters' injury in *Roe*. The voters in *Roe* bore individual burdens—to obtain notarization or witness signatures if they wanted to vote absentee—that state courts post-election retroactively permitted other voters to ignore. *Roe*, 43 F.3d at 580–81. In contrast, Georgia applied uniform rules, established before the election, to all voters, who could choose between voting in person or by absentee ballot, and Wood asserts that the effect of those rules

harmed the electorate collectively. That alleged harm is not a particularized injury.

**\*6** Wood suggested in his amended complaint that his status as a donor contributed to standing and aligned his interests with those of the Georgia Republican Party. But he forfeited this argument when he failed to raise it in his opening brief. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1335 (11th Cir. 2004); *see also Nat'l All. for the Mentally Ill v. Bd. of Cnty. Comm'rs*, 376 F.3d 1292, 1296 (11th Cir. 2004) (ruling standing claims forfeited for failure to comply with the Federal Rules of Appellate Procedure). And the donor argument fails on its own terms. True, a donor can establish standing based on injuries that flow from his status as a donor. *See, e.g., Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019). But donors, like voters, "have no judicially enforceable interest in the *outcome* of an election." *Jacobson*, 974 F.3d at 1246. Nor does a donation give the donor a legally cognizable interest in the proper administration of elections. Any injury to Wood based on election irregularities must flow from his status as a voter, unrelated to his donations. And that fact returns him to the stumbling block of particularization.

"[T]he 'injury in fact' test requires ... that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 563, 112 S.Ct. 2130 (internal quotation marks omitted). Wood's allegations suggest that various nonparties might have a particularized injury. For example, perhaps a candidate or political party would have standing to challenge the settlement agreement or other alleged irregularities. Or perhaps election monitors would have standing to sue if they were denied access to the recount. But Wood cannot place himself in the stead of these groups, even if he supports them. *Cf. Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1127 (9th Cir. 2006) (explaining that "associational standing ... does not operate in reverse," so a member cannot represent an association). He is at most a "concerned bystander." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004) (internal quotation marks omitted). So he is not "entitled to have the court[s] decide the merits of [his] dispute." *Warth*, 422 U.S. at 498, 95 S.Ct. 2197.

*B. Wood's Requested Relief Concerning the 2020 General Election Is Moot.*

Even if Wood had standing, several of his requests for relief are barred by another jurisdictional defect: mootness. We are

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

"not empowered to decide moot questions." *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (internal quotation marks omitted). "An issue is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1189 (11th Cir. 2011) (alteration rejected) (internal quotation marks omitted). And an issue can become moot at any stage of litigation, even if there was a live case or controversy when the lawsuit began. *Id.* at 1189–90.

Wood asked for several kinds of relief in his emergency motion, but most of his requests pertained to the 2020 election results. He moved the district court to prohibit either the certification of the election results or certification that included the disputed absentee ballots. He also asked the district court to order a new hand recount and to grant Republican election monitors greater access during both the recount and the January runoff election. But after the district court denied Wood's motion, Secretary Raffensperger certified the election results on November 20. And Governor Kemp certified the slate of presidential electors later that day.

Because Georgia has already certified its results, Wood's requests to delay certification and commence a new recount are moot. "We cannot turn back the clock and create a world in which" the 2020 election results are not certified. *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015). And it is not possible for us to delay certification nor meaningful to order a new recount when the results are already final and certified. *Cf. Tropicana Prods. Sales, Inc. v. Phillips Brokerage Co.*, 874 F.2d 1581, 1582 (11th Cir. 1989) ("[A]n appeal from the denial of a motion for preliminary injunction is mooted when the requested effective end-date for the preliminary injunction has passed."). Nor can we reconstrue Wood's previous request that we temporarily prohibit certification into a new request that we undo the certification. A district court "must first have the opportunity to pass upon [every] issue," so we may not consider requests for relief made for the first time on appeal. *S.F. Residence Club, Inc. v. 7027 Old Madison Pike, LLC*, 583 F.3d 750, 755 (11th Cir. 2009).

**\*7** Wood's arguments reflect a basic misunderstanding of what mootness is. He argues that the certification does not moot anything "because this litigation is ongoing" and he remains injured. But mootness concerns the availability of relief, not the existence of a lawsuit or an injury. *Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1304 (11th Cir. 2011). So even if post-election litigation is not

always mooted by certification, *see, e.g.*, *Siegel v. LePore*, 234 F.3d 1163, 1172–73 (11th Cir. 2000) (en banc), Wood's particular requests are moot. Wood is right that certification does not moot his requests for relief concerning the 2021 runoff—although Wood's lack of standing still forecloses our consideration of those requests—but the pendency of other claims for relief cannot rescue the otherwise moot claims. *See, e.g.*, *Adler v. Duval Cnty. Sch. Bd.*, 112 F.3d 1475, 1478–79, 1481 (11th Cir. 1997) (instructing the district court to dismiss moot claims but resolving other claims on the merits). Wood finally tells us that President Trump has also requested a recount, but that fact is irrelevant to whether Wood's requests remain live.

Nor does any exception to mootness apply. True, we often review otherwise-moot election appeals because they are "capable of repetition yet evading review." *ACLU v. The Fla. Bar*, 999 F.2d 1486, 1496 (11th Cir. 1993) (internal quotation marks omitted). We may apply this exception when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Nat'l Broad. Co. v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1023 (11th Cir. 1988) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)). But we will not apply this exception if there is "some alternative vehicle through which a particular policy may effectively be subject to" complete review. *Bourgeois v. Peters*, 387 F.3d 1303, 1308 (11th Cir. 2004).

The "capable of repetition yet evading review" exception does not save Wood's appeal because there is no "reasonable expectation" that Wood will again face the issues in this appeal. Based on the posture of this appeal, the challenged action is the denial of an emergency injunction against the certification of election results. *See Fleming*, 785 F.3d at 446 (explaining that whether the issues in an interlocutory appeal are "capable of repetition, yet evading review" is a separate question from whether the issues in the overall lawsuit are capable of doing so). That denial is the decision we would review but for the jurisdictional problems. But Wood cannot satisfy the requirement that there be a "reasonable expectation" that he will again seek to delay certification. Wood does not suggest that this situation might recur. *Cf. FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 463–64, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007). And we have no reason to think it would: he is a private citizen, so the possibility of a

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

recurrence is purely theoretical. *Cf. Hall v. Sec'y, Ala.*, 902 F.3d 1294, 1305 (11th Cir. 2018).

**IV. CONCLUSION**

We **AFFIRM** the denial of Wood's motion for emergency relief.

**All Citations**

--- F.3d ----, 2020 WL 7094866

**End of Document**                         © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 8 of 8   Document 59-5

# EXHIBIT 6

2020 WL 6063332

Editor's Note: Additions are indicated by Text and deletions by ~~Text~~ .

Only the Westlaw citation is currently available.

United States District Court, M.D. North Carolina.

Timothy K. MOORE, et al., Plaintiffs,

v.

Damon CIRCOSTA, et al., Defendants,

and

North Carolina Alliance for Retired Americans, et al., Defendant-Intervenors.

Patsy J. Wise, et al., Plaintiffs,

v.

The North Carolina State Board of Elections, et al., Defendants,

and

North Carolina Alliance for Retired Americans, et al., Defendant-Intervenors.

1:20CV911
|
1:20CV912
|
Signed 10/14/2020

**Synopsis**

**Background:** State legislative leaders and individual registered voters sued the executive director and members of the North Carolina State Board of Elections (SBE), seeking an injunction against enforcement and distribution of memoranda issued by SBE pertaining to absentee voting. In a second case, individual voters, a campaign committee, national political parties, and two Members of the U.S. House of Representatives also sought an injunction against the same memoranda. Advocacy group for retirees and individual registered voters who were plaintiffs in a related state court action that resulted in a consent judgment intervened in both cases. Plaintiffs moved for preliminary injunction.

**Holdings:** The District Court, William L. Osteen, J., held that:

plaintiffs lacked Article III standing to bring vote-dilution claim;

individual plaintiffs who had already cast their absentee ballots by mail had standing to raise equal protection claims;

plaintiffs demonstrated a likelihood of success on the merits of their equal protection claims against the mail-in ballot witness-requirement cure procedure and extension of mail-in ballot receipt deadline;

plaintiffs demonstrated a likelihood of irreparable injury on their equal protection claims against witness-requirement cure procedure and extension of mail-in ballot receipt deadline;

balance of equities weighed heavily against preliminary injunction, and thus district court would deny injunctive relief; and

SBE exceeded its statutory authority and emergency powers when it entered into consent agreement and eliminated witness requirements for mail-in ballots.

Motion denied.

**Attorneys and Law Firms**

David H. Thompson, Peter A. Patterson, Nicole Jo Moss, Cooper & Kirk, PLLC, Washington, DC, Nathan Andrew Huff, Phelps Dunbar LLP, Raleigh, NC, for Plaintiffs.

Alexander McClure Peters, Sarah G. Boyce, Terence Steed, North Carolina Department of Justice, Raleigh, NC, for Defendants.

Burton Craige, Patterson Harkavy LLP, Raleigh, NC, Marc E. Elias, Lalitha D. Madduri, Perkins Coie, LLP, Uzoma N. Nkwonta, Kirkland & Ellis, LLP, Washington, DC, Narendra K. Ghosh, Patterson Harkavy, LLP, Chapel Hill, NC, for Defendant-Intervenors.

## MEMORANDUM OPINION AND ORDER

OSTEEN, JR., District Judge

**\*1** Presently before this court are two motions for a preliminary injunction in two related cases.

In the first case, Moore v. Circosta, No. 1:20CV911 ("Moore"), Plaintiffs Timothy K. Moore and Philip E. Berger (together, "State Legislative Plaintiffs"), Bobby Heath, Maxine Whitley, and Alan Swain (together, "Moore Individual Plaintiffs") seek an injunction against the enforcement and distribution of several Numbered Memoranda issued by the North Carolina State Board of Elections pertaining to absentee voting. (Moore v. Circosta, No. 1:20CV911, Mot. for Prelim. Inj. and Mem. in Supp. ("Moore Pls.' Mot.") (Doc. 60).)

In the second case, Wise v. North Carolina State Board of Elections, No. 1:20CV912 ("Wise"), Plaintiffs Patsy J. Wise, Regis Clifford, Samuel Grayson Baum, and Camille Annette Bambini (together, "Wise Individual Plaintiffs"), Donald J. Trump for President, Inc. ("Trump Campaign"), U.S. Congressman Gregory F. Murphy and U.S. Congressman Daniel Bishop (together, "Candidate Plaintiffs"), Republican National Committee ("RNC"), National Republican Senatorial Committee ("NRSC"), National Republican Congressional Committee ("NRCC"), and North Carolina Republican Party ("NCRP") seek an injunction against the enforcement and distribution of the same Numbered Memoranda issued by the North Carolina State Board of Elections at issue in Moore. (Wise Pls.' Mem. in Supp. of Mot. to Convert the Temp. Restraining Order into a Prelim. Inj. ("Wise Pls.' Mot.") (Doc. 43).)

By this order, this court finds Plaintiffs have established a likelihood of success on their Equal Protection challenges with respect to the State Board of Elections' procedures for curing ballots without a witness signature and for the deadline extension for receipt of ballots. This court believes the unequal treatment of voters and the resulting Equal Protection violations as found herein should be enjoined. Nevertheless, under Purcell and recent Supreme Court orders relating to Purcell, this court is of the opinion that it is required to find that injunctive relief should be denied at this late date, even in the face of what appear to be clear violations.

## I. BACKGROUND

### A. Parties

### 1. Moore v. Circosta (1:20CV911)

State Legislative Plaintiffs Timothy K. Moore and Philip E. Berger are the Speaker of the North Carolina House

of Representatives and the President Pro Tempore of the North Carolina Senate, respectively. (Moore v. Circosta, No. 1:20CV911, Compl. for Declaratory and Injunctive Relief ("Moore Compl.") (Doc. 1) ¶¶ 7-8.) Individual Plaintiffs Bobby Heath and Maxine Whitley are registered North Carolina voters who voted absentee by mail and whose ballots have been accepted by the State Board of Elections on September 21, 2020, and September 17, 2020, respectively. (Id. ¶¶ 9-10.) Plaintiff Alan Swain is a resident of Wake County, North Carolina, who is running as a Republican candidate to represent the State's Second Congressional District. (Id. ¶ 11.)

Executive Defendants include Damon Circosta, Stella Anderson, Jeff Carmon, III, and Karen Brinson Bell are members of the State Board of Elections ("SBE"). (Id. ¶¶ 12-15.) Executive Defendant Karen Brinson Bell is the Executive Director of SBE. (Id. ¶ 15.)

**\*2** Intervenor-Defendants North Carolina Alliance for Retired Americans, Barker Fowler, Becky Johnson, Jade Jurek, Rosalyn Kociemba, Tom Kociemba, Sandra Malone, and Caren Rabinowitz ("Alliance Intervenors") are plaintiffs in the related state court action in Wake County Superior Court. (Moore v. Circosta, No. 1:20CV911 (Doc. 28) at 15.)[1] Barker Fowler, Becky Johnson, Jade Jurek, Rosalyn Kociemba, Tom Kociemba, Sandra Malone, and Caren Rabinowitz are individual voters who are concerned they will be disenfranchised by Defendant SBE's election rules, (id.), and North Carolina Alliance for Retired Americans ("NC Alliance") is an organization "dedicated to promoting the franchise and ensuring the full constitutional rights of its members ...." (Id.)

### 2. Wise v. N.C. State Bd. of Elections (1:20CV912)

Individual Plaintiffs Patsy J. Wise, Regis Clifford, Camille Annette Bambini, and Samuel Grayson Baum are registered voters in North Carolina. (Wise v. N.C. State Bd. of Elections, No. 1:20CV912, Compl. for Declaratory and Injunctive Relief ("Wise Compl.") (Doc. 1) ¶¶ 25-28.) Wise has already cast her absentee ballot for the November 3, 2020 election by mail, "in accordance with statutes, including the Witness Requirement, enacted by the General Assembly." (Id. ¶ 25.) Plaintiffs Clifford, Bambini, and Baum intend to vote in the November 3, 2020 election and are "concern[ed] that [their] vote[s] will be negated by improperly cast or fraudulent ballots." (Id. ¶¶ 26-28.)

Plaintiff Trump Campaign represents the interests of President Donald J. Trump, who is running for re-election. (Id. ¶¶ 29-30.) Together, Candidate Plaintiffs Trump Campaign, U.S. Congressman Daniel Bishop, and U.S. Congressman Gregory F. Murphy are candidates who will appear on the ballot for re-election in the November 3, 2020 general election. (Id. ¶¶ 29-32.)

Plaintiff RNC is a national political party, (id. ¶¶ 33-36), that seeks to protect "the ability of Republican voters to cast, and Republican candidates to receive, effective votes in North Carolina elections and elsewhere," (id. ¶ 37), and avoid diverting resources and spending significant amounts of resources educating voters regarding confusing changes in election rules, (id. ¶ 38).

Plaintiff NRSC is a national political party committee that is exclusively devoted to electing Republican candidates to the U.S. Senate. (Id. ¶ 40.) Plaintiff NRCC is the national organization of the Republican Party dedicated to electing Republicans to the U.S. House of Representatives. (Id. ¶ 41.) Plaintiff NRCP is a North Carolina state political party organization that supports Republican candidates running in North Carolina elections. (Id. ¶¶ 44-45.)

Executive Defendant North Carolina SBE is the agency responsible for the administration of the elections laws of the State of North Carolina. (Id. ¶ 46.) As in Moore, included as Executive Defendants are Damon Circosta, Stella Anderson, Jeff Carmon, III, and Karen Brinson Bell of the North Carolina SBE. (Id. ¶¶ 47-50.)

Alliance Intervenors from Moore are also Intervenor-Defendants in Wise. (1:20CV912 (Doc. 22).)

### B. Factual Background

#### 1. This Court's Decision in *Democracy*

On August 4, 2020, this court issued an order in a third related case, Democracy North Carolina v. North Carolina State Board of Elections, No. 1:20CV457, ––– F.Supp.3d ––––, 2020 WL 4484063 (M.D.N.C. Aug. 4, 2020) ("the August Democracy Order"), that "left the One-Witness Requirement in place, enjoined several rules related to nursing homes that would disenfranchise Plaintiff Hutchins, and enjoined the rejection of absentee ballots unless the voter is provided due

process." (Id. at ––––, 2020 WL 4484063, at *1.) As none of the parties appealed that order, the injunctive relief is still in effect.

#### 2. Release of the Original Memo 2020-19

**\*3** In response to the August Democracy Order, on August 21, 2020, SBE officials released guidance for "the procedure county boards must use to address deficiencies in absentee ballots." (Numbered Memo 2020-19 ("Memo 2020-19" or "the original Memo") (Moore v. Circosta, No. 1:20CV911, Moore Compl. (Doc. 1) Ex. 3 – NC State Bd. of Elections Mem. ("Original Memo 2020-19") (Doc. 1-4) at 2.) This guidance instructed county boards regarding multiple topics. First, it instructed county election boards to "accept [a] voter's signature on the container-return envelope if it appears to be made by the voter ... [a]bsent clear evidence to the contrary," even if the signature is illegible. (Id.) The guidance clarified that "[t]he law does not require that the voter's signature on the envelope be compared with the voter's signature in their registration record," as "[v]erification of the voter's identity is completed through the witness requirement." (Id.)

Second, the guidance sorted ballot deficiencies into two categories: curable and uncurable deficiencies. (Id. at 3.) Under this version of Memo 2020-19, a ballot could be cured via voter affidavit alone if the voter failed to sign the certification or signed in the wrong place. (Id.) A ballot error could not be cured, and instead, was required to be spoiled, in the case of all other listed deficiencies, including a missing signature, printed name, or address of the witness; an incorrectly placed witness or assistant signature; or an unsealed or re-sealed envelope. (Id.) Counties were required to notify voters in writing regarding any ballot deficiency – curable or incurable - within one day of the county identifying the defect and enclose either a cure affidavit or a new ballot, based on the type of deficiency at issue. (Id. at 4.)

In the case of an incurable deficiency, a new ballot could be issued only "if there [was] time to mail the voter a new ballot ... [to be] receive[d] by Election Day." (Id. at 3.) If a voter who submitted an uncurable ballot was unable to receive a new absentee ballot in time, he or she would have the option to vote in person on Election Day. (Id. at 4.)

If the deficiency was curable by a cure affidavit, the guidance stated that the voter must return the cure affidavit by no later than 5 p.m. on Thursday, November 12, 2020. (Id.)

### 3. Rescission of Numbered Memo 2020-19

The State began issuing ballots on September 4, 2020, marking the beginning of the election process. (Wise, No. 1:20CV912, Wise Pls.' Mot. (Doc. 43).) On September 11, 2020, SBE directed counties to stop notifying voters of deficiencies in their ballot, as advised in Memo 2020-19, pending further guidance from SBE. (Moore, No. 1:20CV911, Moore Pls.' Mot. (Doc. 60) Ex. 3, Democracy Email Chain (Doc. 60-4) at 6.)

### 4. Revision of Numbered Memo 2020-19

On September 22, over two weeks after the State began issuing ballots, SBE issued a revised Numbered Memo 2020-19, which set forth a variety of new policies not implemented in the original Memo 2020-19. (Numbered Memo 2020-19 ("the Revised Memo" or "Revised Memo 2020-19") (Moore v. Circosta, No. 1:20CV911 (Doc. 36) Ex. 3, Revised Numbered Memo 2020-19 ("Revised Memo 2020-19") (Doc. 36-3).) In subsequent litigation in Wake County Superior Court, SBE advised the court that both the original Memo 2020-19 and the Revised Memo were issued "to ensure full compliance with the injunction entered by Judge Osteen." (Moore v. Circosta, No. 1:20CV911, Exec. Defs.' Br. in Supp. of Joint Mot. for Entry of Consent Judgment ("SBE State Court Br.") (Doc. 68-1) at 15.) Moreover, on September 28, 2020, during a status conference with a district court in the Eastern District of North Carolina prior to transfer to this court, counsel for Defendant SBE stated that Defendant SBE issued the revised Memo 2020-19 "in order to comply with Judge Osteen's preliminary injunction in the Democracy N.C. action in the Middle District." (Moore v. Circosta, No. 1:20CV911, Order Granting Mot. for Temp. Restraining Order ("TRO") (Doc. 47) at 9.) At that time, counsel for SBE indicated that they had not yet submitted the Revised Memo 2020-19 to this court, "but that it was on counsel's list to get [it] done today." (Id.) (internal quotations omitted.) On September 28, 2020, Defendant SBE filed the Revised Memo 2020-19 with this court in the Democracy action. (Democracy N.C. v. N.C. State Bd. of Elections, No. 1:20CV457 (Doc. 143-1).)

**\*4** The revised guidance modified which ballot deficiencies fell into the curable and uncurable categories. Unlike the original Memo 2020-19, the Revised Memo advised that ballots missing a witness or assistant name or address, as well as ballots with a missing or misplaced witness or assistant signature, could be cured via voter certification. (Moore v. Circosta, No. 1:20CV911, Revised Memo 2020-19 (Doc. 36-3) at 3.) According to the revised guidance, the only deficiencies that could not be cured by certification, and thus required spoliation, were where the envelope was unsealed or where the envelope indicated the voter was requesting a replacement ballot. (Id. at 4.)

The cure certification in Revised 2020-19 required voters to sign and affirm the following:

> I am submitting this affidavit to correct a problem with missing information on the ballot envelope. I am an eligible voter in this election and registered to vote in [name] County, North Carolina. I solemnly swear or affirm that I voted and returned my absentee ballot for the November 3, 2020 general election and that I have not voted and will not vote more than one ballot in this election. I understand that fraudulently or falsely completing this affidavit is a Class I felony under Chapter 163 of the North Carolina General Statutes.

(Moore v. Circosta, No. 1:20CV911 (Doc. 45-1) at 34.)

The revised guidance also extended the deadline for civilian absentee ballots to be received to align with that for military and overseas voters. (Moore v. Circosta, No. 1:20CV911, Revised Memo 2020-19 (Doc. 36-3) at 5.) Under the original Memo 2020-19, in order to be counted, civilian absentee ballots must have been received by the county board office by 5 p.m. on Election Day, November 3, 2020, or if postmarked, by Election Day, by 5:00 p.m. on November 6, 2020. (Moore v. Circosta, No. 1:20CV911, Original Memo 2020-19 (Doc. 1-4) at 5 (citing N.C. Gen. Stat. § 163-231(b)).) Under the Revised Memo 2020-19, however, a late civilian ballot would be counted if postmarked on or before Election Day and received by 5:00 p.m. on November 12, 2020. (Moore v. Circosta, No. 1:20CV911, Revised Memo 2020-19 (Doc. 36-3) at 5.) This is the same as the deadline for military and overseas voters, as indicated in the Original Memo 2020-19. (Id.)[2]

### 5. Numbered Memoranda 2020-22 and 2020-23

SBE issued two other Numbered Memoranda on September 22, 2020, in addition to Revised Numbered Memo 2020-19.

First, SBE issued Numbered Memo 2020-22, the purpose of which was to further define the term postmark used in Numbered Memo 2020-19. (Wise, No. 1:20CV912, Wise Compl. (Doc. 1), Ex. 3, N.C. State Bd. of Elections Mem. ("Memo 2020-22") (Doc. 1-3) at 2.) Numbered Memo 2020-22 advised that although "[t]he postmark requirement for ballots received after Election Day is in place to prohibit a voter from learning the outcome of an election and then casting their ballot.... [T]he USPS does not always affix a postmark to a ballot return envelope." (Id.) Recognizing that SBE now offers "BallotTrax," a system in which voters and county boards can track the status of a voter's absentee ballot, SBE said "it is possible for county boards to determine when a ballot was mailed even if does not have a postmark." (Id.) Moreover, SBE recognized that commercial carriers offer tracking services that document when a ballot was deposited with the commercial carrier. (Id.) For these reasons, the new guidance stated that a ballot would be considered postmarked by Election Day if it had a postmark, there is information in BallotTrax, or "another tracking service offered by the USPS or a commercial carrier, indicat[es] that the ballot was in the custody of USPS or the commercial carrier on or before Election Day." (Id. at 3.)

**\*5** Second, SBE issued Numbered Memo 2020-23, which provides "guidance and recommendations for the safe, secure, and controlled in-person return of absentee ballots." (Wise, No. 1:20CV912, Wise Compl. (Doc. 1), Ex. 4, N.C. State Bd. of Elections Mem. ("Memo 2020-23") (Doc. 1-4) at 2.) Referring to N.C. Gen. Stat. § 163-226.3(a)(5),[3] which prohibits any person other than the voter's near relative or legal guardian to take possession of an absentee ballot of another voter for delivery or for return to a county board of elections, (id.), Numbered Memo 2020-23 confirms that "an absentee ballot may not be left in an unmanned drop box." (Id.) The guidance reminds county boards that they must keep a written log when any person returns an absentee ballot in person, which includes the name of the individual returning the ballot, their relationship to the voter, the ballot number, and the date it was received. (Id. at 3.) If the individual who drops off the ballot is not the voter, their near relative, or legal guardian, the log must also record their address and phone number. (Id.)

At the same time, the guidance advises county boards that "[f]ailure to comply with the logging requirement, or delivery or an absentee ballot by a person other than the voter, the voter's near relative, or the voter's legal guardian, is not sufficient evidence in and of itself to establish that the voter

did not lawfully vote their ballot." (Id. at 3.) Instead, the guidance advises the county board that they "may ... consider the delivery of a ballot ... in conjunction with other evidence in determining whether the ballot is valid and should be counted." (Id. at 4.)

## 6. Consent Judgment in North Carolina Alliance for Retired Americans v. North Carolina State Bd. of Elections

On August 10, 2020, NC Alliance, the Defendant-Intervenors in the two cases presently before this court, filed an action against SBE in North Carolina's Wake County Superior Court challenging, among other voting rules, the witness requirement for mail-in absentee ballots and rejection of mail-in absentee ballots that are postmarked by Election Day but delivered to county boards more than three days after the election. (Moore v Circosta, No. 1:20CV911, SBE State Court Br. (Doc. 68-1) at 15.)

On August 12, 2020, Philip Berger and Timothy Moore, Plaintiffs in Moore, filed a notice of intervention as of right in the state court action and became parties to that action as intervenor-defendants on behalf of the North Carolina General Assembly. (Id. at 16.)

On September 22, 2020, SBE and NC Alliance filed a Joint Motion for Entry of a Consent Judgment with the superior court. (Id.) Philip Berger and Timothy Moore were not aware of this "secretly-negotiated" Consent Judgment, (Wise Pls.' Mot. (Doc. 43) at 6), until the parties did not attend a previously scheduled deposition, (Democracy v. N.C. Bd. of Elections, No. 1:20CV457 (Doc. 168) at 73.)

Among the terms of the Consent Judgment, SBE agreed to extend the deadline for receipt of mail-in absentee ballots mailed on or before Election Day to nine days after Election Day, to implement the cure process established in Revised Memo 2020-19, and to establish separate mail in absentee ballot "drop off stations" at each early voting site and county board of elections office which were to be staffed by county board officials. (Moore v. Circosta, No. 1:20CV911, SBE State Court Br. (Doc. 68-1) at 16.)

In its filings with the state court, SBE frequently cited this court's decision in Democracy as a reason why the Wake County Superior Court Judge should accept the Consent Judgment. SBE argued that a cure procedure for deficiencies

related to the witness requirement were necessary because "[w]itness requirements for absentee ballots have been shown to be, broadly speaking, disfavored by the courts," (id. at 26), and that "[e]ven in North Carolina, a federal court held that the witness requirement could not be implemented as statutorily authorized without a mechanism for voters to have adequate notice of and [an opportunity to] cure materials [sic] defects that might keep their votes from being counted," (id. at 27). SBE argued that, "to comply with the State Defendants' understanding of the injunction entered by Judge Osteen, the State Board directed county boards of elections not to disapprove any ballots until a new cure procedure that would comply with the injunction could be implemented," (id. at 30), and that ultimately, the cure procedure introduced in Revised Memo 2020-19 as part of the consent judgment would comply with this injunction. (Id.) SBE indicated that it had notified the federal court of the cure mechanism process on September 22, 2020, (id.), although this court was not made aware of the cure procedure until September 28, 2020, (Democracy N.C. v. N.C. State Bd. of Elections, No. 1:20CV457 (Doc. 143-1)), the day before the processing of absentee ballots was scheduled to begin on September 29, 2020, (Moore v. Circosta, No. 20CV911 Transcript of Oral Argument ("Oral Argument Tr.")(Doc. 70) at 109.)

**\*6** On October 2, 2020, the Wake County Superior Court entered the Stipulation and Consent Judgment. (Moore v. Circosta, No. 1:20CV911, State Court Consent Judgment (Doc. 45-1).) Among its recitals, which Defendant SBE drafted and submitted to the judge as is customary in state court, (Oral Argument Tr. (Doc. 70) at 91), the Wake County Superior Court noted this court's preliminary injunction in Democracy, finding,

> WHEREAS, on August 4, 2020, the United States District Court for the Middle District of North Carolina enjoined the State Board from "the "disallowance or rejection ... of absentee ballots without due process as to those ballots with a material error that is subject to remediation." Democracy N.C. v. N.C. State Bd. of Elections, No. 1:20-cv-00457-WO-JLW [—— F.Supp.3d ——, 2020 WL 4484063] (M.D.N.C. Aug. 4, 2020) (Osteen, J.). ECF 124 at 187. The injunction is to remain in force until the State Board implements a cure process that provides a voter with "notice and an opportunity to be heard before an absentee ballot with a material error subject to remediation is disallowed or rejected." Id.

(State Court Consent Judgment (Doc. 45-1) at 6.)[4]

## 7. **Numbered Memoranda 2020-27, 2020-28, and 2020-29**

In addition to the Numbered Memoranda issued on September 22, 2020, as part of the consent judgment in the state court case, SBE has issued three additional numbered memoranda.

First, on October 1, 2020, SBE issued Numbered Memo 2020-27, which was issued in response to this court's order in Democracy regarding the need for parties to attend a status conference to discuss Numbered Memo 2020-19. (Moore v. Circosta, No. 1:20CV911 (Doc. 40-2) at 2.) The guidance advises county boards that this court did not find Numbered Memo 2020-19:

> "consistent with the Order entered by this Court on August 4, 2020," and indicates that its preliminary injunction order should "not be construed as finding that the failure of a witness to sign the application and certificate as a witness is a deficiency which may be cured with a certification after the ballot has been returned."

(Id.) "In order to avoid confusion while related matters are pending in a number of courts," the guidance advises that "[c]ounty boards that receive an executed absentee container-return envelope with a missing witness signature shall take no action as to that envelope." (Id.) In all other respects, SBE stated that Revised Numbered Memo 2020-19 remains in effect. (Id.)

Second, on October 4, 2020, SBE issued Numbered Memo 2020-28, which states that both versions of Numbered Memo 2020-19, as well as Numbered Memoranda 2020-22, 2020-23, and 2020-27 "are on hold until further notice" following the temporary restraining order entered in the instant cases on October 3, 2020. (Moore v. Circosta, No. 1:20CV911 (Doc. 60-5) at 2.) Moreover, the guidance reiterated that "[c]ounty boards that receive an executed absentee container-return envelope with a deficiency shall take no action as to that envelope," including sending a cure notification or reissuing the ballot. (Id. at 2-3.) Instead, the guidance directs county boards to store envelopes with deficiencies in a secure location until further notice. (Id. at 3.) If, however, a county board had previously issued a ballot and the second envelope is returned without any deficiencies, the guidance permits the county board to approve the second ballot. (Id.)

**\*7** Finally, on October 4, 2020, SBE issued Numbered Memo 2020-29, which states that it provides "uniform

guidance and further clarification on how to determine if the correct address can be identified if the witness's or assistant's address on an absentee container-return envelope is incomplete. (Wise, No. 1:20CV912 (Doc. 43-5).) First, the guidance clarifies that if a witness or assistant does not print their address, the envelope is deficient. (Id. at 2.) Second, the guidance states that failure to list a witness's ZIP code does not require a cure; a witness or assistant's address may be a post office box or other mailing address; and if the address is missing a city or state, but the county board can determine the correct address, the failure to include this information does not invalidate the container-return envelope. (Id.) Third, if both the city and ZIP code are missing, the guidance directs staff to determine whether the correct address can be identified. (Id.) If they cannot be identified, then the envelope is deficient. (Id.)

### C. Procedural History
On September 26, 2020, Plaintiffs in Moore filed their action in the United States District Court for the Eastern District of North Carolina. (Moore Compl. (Doc. 1).) Plaintiffs in Wise also filed their action in the United States District Court for the Eastern District of North Carolina on September 26, 2020. (Wise Compl. (Doc. 1).)

Alliance Intervenors filed a Motion to Intervene as Defendants in Moore on September 30, 2020, (Moore v. Circosta, No. 1:20CV911 (Doc. 27)), and in Wise on October 2, 2020, (Wise, No. 1:20CV912 (Doc. 21)). This court granted Alliance Intervenors' Motion to Intervene on October 8, 2020. (Moore v. Circosta, No. 1:20CV911 (Doc. 67); Wise, No. 1:20CV912 (Doc. 49).)

The district court in the Eastern District of North Carolina issued a temporary restraining order in both cases on October 3, 2020, and transferred the actions to this court for this court's "consideration of additional or alternative injunctive relief along with any such relief in Democracy North Carolina v. North Carolina State Board of Elections ...." (Moore v. Circosta, 1:20CV911, TRO (Doc. 47) at 2; Wise, No. 1:20CV912 (Doc. 25) at 2.)

On October 5, 2020, this court held a Telephone Conference, (Moore v. Circosta, No. 1:20CV911, Minute Entry 10/05/2020; Wise, No. 1:20CV912, Minute Entry 10/05/2020), and issued an order directing the parties to prepare for a hearing on the temporary restraining order and/or a preliminary injunction and to submit additional briefing, (Moore v. Circosta, No. 1:20CV911 (Doc. 51); Wise, No.

1:20CV912 (Doc. 30)). On October 6, 2020, Plaintiffs in Wise filed a Memorandum in Support of Plaintiffs' Motion to Convert the Temporary Restraining Order into a Preliminary Injunction, (Wise Pls.' Mot. (Doc. 43)), and Plaintiffs in Moore filed a Motion for a Preliminary Injunction and Memorandum in Support of Same, (Moore Pls.' Mot. (Doc. 60)). Defendant SBE filed a response to Plaintiffs' motions in both cases on October 7, 2020. (Moore v. Circosta, No. 1:20CV911, State Defs.' Resp. to Pls.' Mot. for Prelim. Inj. ("SBE Resp.") (Doc. 65); Wise, No. 1:20CV912 (Doc. 45).) Alliance Intervenors also filed a response to Plaintiffs' motions in both cases on October 7, 2020. (Moore v. Circosta, No. 1:20CV911, Proposed Intervenors' Mem. in Opp'n to Pls.' Mot. for a Prelim. Inj. ("Alliance Resp.") (Doc. 64); Wise, No. 1:20CV912 (Doc. 47).)[5]

This court held oral arguments on October 8, 2020, in which all of the parties in these two cases presented arguments with respect to Plaintiffs' motions for a preliminary injunction. (Moore v. Circosta, No. 1:20CV911, Minute Entry 10/08/2020; Wise, No. 1:20CV912, Minute Entry 10/08/2020.)

**\*8** This court has federal question jurisdiction over these cases under 28 U.S.C. § 1331. This matter is ripe for adjudication.

### D. Preliminary Injunction Standard of Review
"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Such an injunction "is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017).

### II. ANALYSIS
Executive Defendants and Alliance Intervenors challenge Plaintiffs' standing to seek a preliminary injunction regarding their Equal Protection, Elections Clause, and Electors Clause claims. (Alliance Resp. (Doc. 64) at 14-18; SBE Resp. (Doc. 65) at 11-13.) Executive Defendants and Alliance Intervenors also challenge this court's ability to hear this action under abstention, (Alliance Resp. (Doc. 64) at 10-14; SBE Resp. (Doc. 65) at 10-11), Rooker-Feldman (Alliance

Resp. (Doc. 64) at 13), and preclusion doctrines, (SBE Resp. (Doc. 65) at 7-10). Finally, Executive Defendants and Alliance Intervenors attack Plaintiffs' motions for preliminary injunction on the merits. (Alliance Resp. (Doc. 64) at 19-26; SBE Resp. (Doc. 65) at 13-18.)

Because Rooker-Feldman, abstention, and preclusion are dispositive issues, this court addresses them first, then addresses Plaintiffs' motions on standing and the likelihood of success on the merits.

As to each of these abstention doctrines, as will be explained further, this court's preliminary injunction order, (Doc. 124), in Democracy North Carolina v. North Carolina State Board of Elections, No. 1:20CV457, played a substantial role as relevant authority supporting SBE's request for approval, in North Carolina state court, of Revised Memo 2020-19 and the related Consent Judgment. (See discussion infra Part II.D.3.b.i.) As Berger, Moore, and SBE are all parties in Democracy, this court initially finds that abstention doctrines do not preclude this court's exercise of jurisdiction. This court's August Democracy Order was issued prior to the filing of these state court actions, and that Order was the basis of the subsequent grant of affirmative relief by the state court. This court declines to find that any abstention doctrine would preclude it from issuing orders in aid of its jurisdiction, or as to parties appearing in a pending case in this court.

### A. Rooker-Feldman Doctrine

Rooker-Feldman doctrine is a jurisdictional doctrine that prohibits federal district courts from " 'exercising appellate jurisdiction over final state-court judgments.' " See Thana v. Bd. of License Comm'rs for Charles Cnty., 827 F.3d 314, 319 (4th Cir. 2016) (quoting Lance v. Dennis, 546 U.S. 459, 463, 126 S.Ct. 1198, 163 L.Ed.2d 1059 (2006) (per curiam)). The presence or absence of subject matter jurisdiction under Rooker-Feldman is a threshold issue that this court must determine before considering the merits of the case. Friedman's, Inc. v. Dunlap, 290 F.3d 191, 196 (4th Cir. 2002).

**\*9** Although Rooker-Feldman originally limited only federal-question jurisdiction, the Supreme Court has recognized the applicability of the doctrine to cases brought under diversity jurisdiction:

> Rooker and Feldman exhibit the limited circumstances in which this Court's appellate jurisdiction over state-court judgments, 28 U.S.C. § 1257, precludes a United States

district court from exercising subject-matter jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority, e.g., § 1330 (suits against foreign states), § 1331 (federal question), and § 1332 (diversity).

See Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 291-92, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). Under the Rooker-Feldman doctrine, courts lack subject matter jurisdiction to hear "cases brought by [1] state-court losers complaining of [2] injuries caused by state-court judgments [3] rendered before the district court proceedings commenced and [4] inviting district court review and rejection of those judgments." Id. at 284, 125 S.Ct. 1517. The doctrine is "narrow and focused." Thana, 827 F.3d at 319. "[I]f a plaintiff in federal court does not seek review of the state court judgment itself but instead 'presents an independent claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court.' " Id. at 320 (quoting Skinner v. Switzer, 562 U.S. 521, 532, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011)). Rather, "any tensions between the two proceedings should be managed through the doctrines of preclusion, comity, and abstention." Id. (citing Exxon, 544 U.S. at 292–93, 125 S.Ct. 1517).

Moreover, "the Rooker–Feldman doctrine applies only when the loser in state court files suit in federal district court seeking redress for an injury allegedly caused by the state court's decision itself." Davani v. Va. Dep't of Transp., 434 F.3d 712, 713 (4th Cir. 2006); see also Hulsey v. Cisa, 947 F.3d 246, 250 (4th Cir. 2020) ("A plaintiff's injury at the hands of a third party may be 'ratified, acquiesced in, or left unpunished by' a state-court decision without being 'produced by' the state-court judgment.") (internal citations omitted).

Here, Plaintiffs are challenging SBE's election procedures and seeking injunction of those electoral rules, not attempting to directly appeal results of a state court order. More importantly, however, the Fourth Circuit has previously found that a party is not a state court loser for purposes of Rooker-Feldman if "[t]he [state court] rulings thus were not 'final state-court judgments' " against the party bringing up the same issues before a federal court. Hulsey, 947 F.3d at 251 (quoting Lance, 546 U.S. at 463, 126 S.Ct. 1198). In the Alliance state court case, Alliance brought suit against SBE. The Plaintiffs from this case were intervenors. They were not parties to the Settlement Agreement and were in no way properly adjudicated "state court losers." Given the Supreme Court's intended narrowness of the Rooker-Feldman doctrine, see

Lance, 546 U.S. at 464, 126 S.Ct. 1198, and Plaintiffs' failure to fit within the Fourth Circuit's definition of "state-court losers," this court will decline to abstain under the Rooker-Feldman doctrine.

### B. Abstention

#### 1. Colorado River Abstention

*10 Abstention "is the exception, not the rule." Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); see also id. at 817, 96 S.Ct. 1236 (noting the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them"). Thus, this court's task "is not to find some substantial reason for the exercise of federal jurisdiction," but rather "to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' ... to justify the surrender of that jurisdiction." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25-26, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

First, and crucially for this case, the court must determine whether there are ongoing state and federal proceedings that are parallel. Al-Abood ex rel. Al-Abood v. El-Shamari, 217 F.3d 225, 232 (4th Cir. 2000) ("The threshold question in deciding whether Colorado River abstention is appropriate is whether there are parallel suits."); Ackerman v. ExxonMobil Corp., 734 F.3d 237, 248 (4th Cir. 2013) (finding that abstention is exercised only "in favor of ongoing, parallel state proceedings" (emphasis added)). In this instance, the parties have failed to allege any ongoing state proceeding that this federal suit might interfere with. In fact, Plaintiffs in this case were excluded as parties in the Consent Judgment and are bringing independent claims in this federal court alleging violations, inter alia, of the Equal Protection Clause. This court does not find that Colorado River abstention prevents it from adjudicating Equal Protection claims raised by parties who were not parties to the Consent Judgment.

#### 2. Pennzoil Abstention

As alleged by Defendants, Pennzoil does dictate that federal courts should not "interfere with the execution of state judgments." Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 14, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). However, in the very next sentence, the Pennzoil court caveats that this doctrine

applies "[s]o long as those challenges relate to pending state proceedings." Id. In fact, in Pennzoil itself, the Court clarified that abstention was proper because "[t]here is at least one pending judicial proceeding in the state courts; the lawsuit out of which Texaco's constitutional claims arose is now pending before a Texas Court of Appeals in Houston, Texas." Id. at 14, 107 S.Ct. 1519 n.13.

Abstention was also justified in Pennzoil because the Texas state court was not presented with the contested federal constitutional questions, and thus, "when [the subsequent] case was filed in federal court, it was entirely possible that the Texas courts would have resolved this case ... without reaching the federal constitutional questions." Id. at 12, 107 S.Ct. 1519. In the present case, Plaintiffs raised their constitutional claims in the state court prior to the entry of the Consent Judgment. The state court, through the Consent Judgment and without taking evidence, adjudicated those claims as to the settling parties. The Consent Judgment is effective through the 2020 Election and specifies no further basis upon which Plaintiffs here may seek relief. As a result, there does not appear to be any relief available to Plaintiffs for the federal questions raised here. For these reasons, this court will decline to abstain under Pennzoil.

#### 3. Pullman Abstention

Pullman abstention can be exercised where: (1) there is "an unclear issue of state law presented for decision"; and (2) resolution of that unclear state law issue "may moot or present in a different posture the federal constitutional issue such that the state law issue is potentially dispositive." Educ. Servs., Inc. v. Md. State Bd. for Higher Educ., 710 F.2d 170, 174 (4th Cir. 1983); see also N.C. State Conference of NAACP v. Cooper, 397 F. Supp. 3d 786, 794 (M.D.N.C. 2019). Pullman does not apply here because any issues of state law are not, in this court's opinion, unclear or ambiguous. Alliance's brief in Moore posits that "whether NCSBE has the authority to enter the Consent Judgment and promulgate the Numbered Memos" are at the center of this case, thereby urging Pullman abstention. (Alliance Resp. (Doc. 64 at 12).) SBE has undisputed authority to issue guidance consistent with state law and may issue guidance contrary to state law only in response to natural disasters – the court finds this, though ultimately unnecessary to the relief issued in this case, fairly clear. (See discussion supra at Part II.E.2.b.ii.) Moreover, this court has already expressly assessed and upheld the North Carolina state witness requirement, which

is the primary state law at issue in this case. Democracy N. Carolina, —— F.Supp.3d at ——, 2020 WL 4484063, at *48.

**\*11** Furthermore, Defendants and Intervenors would additionally need to show how "resolution of ... state law issues pending in state court" would "eliminate or substantially modify the federal constitutional issues raised in Plaintiffs' Complaint." N.C. State Conference of NAACP, 397 F. Supp. 3d at 796. As Alliance notes, the Plaintiffs did not appeal the state court's conclusions, but sought relief in federal court – there is no state law issue pending in state court here. For all of these reasons, this court declines to abstain under Pullman.

### C. Issue Preclusion

Collateral estoppel, or issue preclusion "refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." New Hampshire v. Maine, 532 U.S. 742, 748-49, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). The purpose of this doctrine is to "protect the integrity of the judicial process ...." Id. at 749, 121 S.Ct. 1808 (internal quotations omitted).

Plaintiffs argue that issue preclusion does not bar their Equal Protection claims. Citing Arizona v. California, 530 U.S. 392, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000), Plaintiffs in Wise argue that a negotiated settlement between parties, like the consent judgment between the Alliance Intervenors and Defendant SBE in Wake County Superior Court, does not constitute a final judgment for issue preclusion. (Wise Pls.' Mot. (Doc. 43) at 23.) Plaintiffs in Moore, citing In re Microsoft Corp. Antitrust Litig., 355 F.3d 322 (4th Cir. 2004), argue that issue preclusion cannot be asserted because the Individual Plaintiffs in Moore were not parties to the state court litigation that resulted in the consent judgment. (Moore Pls.' Mot. (Doc. 60) at 4.)

In response, Defendant SBE argues that, under North Carolina law, issue preclusion applies where (1) the issue is identical to the issue actually litigated and necessary to a prior judgment, (2) the prior action resulted in a final judgment on the merits, and (3) the plaintiffs in the latter action are the same as, or in privity with, the parties in the earlier action, (SBE Resp. (Doc. 65) at 7), and the parties in these federal actions and those in the state actions are in privity under the third element of the test, (id. at 8).

This court finds that issue preclusion does not bar Plaintiffs' claims. In Arizona v. California, the Supreme Court held that "[i]n most circumstances, it is recognized that consent agreements ordinarily are intended to preclude any further litigation on the claim presented but are not intended to preclude further litigation on any of the issues presented." 530 U.S. at 414, 120 S.Ct. 2304 (internal quotations omitted). Moreover, "settlements ordinarily occasion no issue preclusion ... unless it is clear ... that the parties intend their agreement to have such an effect." Id.

The Consent Judgment SBE and Alliance entered into does not clearly demonstrate that they intended their agreement to have an issue preclusive effect with regard to claims brought now by Plaintiffs in Moore and Wise. The language of the Consent Judgment demonstrates that it "constitutes a settlement and resolution of Plaintiffs' claims against Executive Defendants pending in this Lawsuit" and that "by signing this Stipulation and Consent Judgment, they are releasing any claims ... that they might have against Executive Defendants." (State Court Consent Judgment (Doc. 45-1) at 14 (emphasis added).) Although Timothy Moore and Philip Berger, State Legislative Plaintiffs in Moore, were Defendant-Intervenors in the NC Alliance action, they were not parties to the consent judgment. (Id.) Thus, because the plain language of the agreement did not expressly indicate an intention to preclude Plaintiffs Moore and Berger from litigating the issue in subsequent litigation, neither these State Legislative Plaintiffs, nor any other parties with whom they may or may not be in privity, are estopped from raising these claims now before this court.

### D. Plaintiffs' Equal Protection Claims

**\*12** Plaintiffs raise "two separate theories of an equal protection violation," – a "vote dilution claim, and an arbitrariness claim." (Oral Argument Tr. (Doc. 70) at 52; see also Wise Pls.' Mot. (Doc. 43) at 12-15.)

#### 1. Voting Harms Prohibited by the Equal Protection Clause

Under the Fourteenth Amendment of the U.S. Constitution, a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Fourteenth Amendment is one of several constitutional provisions that "protects the right of all qualified citizens to vote, in state as well as in federal elections." Reynolds v. Sims,

377 U.S. 533, 554, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Because the Fourteenth Amendment protects not only the "initial allocation of the franchise," as well as "to the manner of its exercise," Bush v. Gore, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), "lines may not be drawn which are inconsistent with the Equal Protection Clause ...." Id. at 105, 121 S.Ct. 525 (citing Harper v. Va. State Bd. of Elections, 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)).

The Supreme Court has identified two theories of voting harms prohibited by the Fourteenth Amendment. First, the Court has identified a harm caused by "debasement or dilution of the weight of a citizen's vote," also referred to "vote dilution." Reynolds, 377 U.S. at 555, 84 S.Ct. 1362. Courts find this harm arises where gerrymandering under a redistricting plan has diluted the "requirement that all citizens' votes be weighted equally, known as the one person, one vote principle," and resulted in one group or community's vote counting more than another's. Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections, 827 F.3d 333, 340 (4th Cir. 2016); see also Gill v. Whitford, 585 U.S. ——, ——, 138 S. Ct. 1916, 1930-31, 201 L.Ed.2d 313 (2018) (finding that the "harm" of vote dilution "arises from the particular composition of the voter's own district, which causes his vote – having been packed or cracked – to carry less weight than it would carry in another, hypothetical district"); Wesberry v. Sanders, 376 U.S. 1, 18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (finding that vote dilution occurred where congressional districts did not guarantee "equal representation for equal numbers of people"); Wright v. North Carolina, 787 F.3d 256, 268 (4th Cir. 2015) (invalidating a voter redistricting plan).

Second, the Court has found that the Equal Protection Clause is violated where the state, "[h]aving once granted the right to vote on equal terms," through "later arbitrary and disparate treatment, value[s] one person's vote over that of another." Bush, 531 U.S. at 104-05, 121 S.Ct. 525 (2000); see also Baker v. Carr, 369 U.S. 186, 208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ("A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false tally, or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of the ballot box.") (internal citations omitted). This second theory of voting harms requires courts to balance competing concerns around access to the ballot. On the one hand, a state should not engage in practices which prevent qualified voters from exercising their right to vote. A state must ensure that there is "no preferred class of voters but equality among those

who meet the basic qualifications." Gray v. Sanders, 372 U.S. 368, 379-80, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). On the other hand, the state must protect against "the diluting effect of illegal ballots." Id. at 380, 83 S.Ct. 801. Because "the right to have one's vote counted has the same dignity as the right to put a ballot in a box," id., the vote dilution occurs only where there is both "arbitrary and disparate treatment." Bush, 531 U.S. at 105, 121 S.Ct. 525. To this end, states must have "specific rules designed to ensure uniform treatment" of a voter's ballot. Id. at 106, 121 S.Ct. 525.

## 2. Standing to Bring Equal Protection Claims

*13 In light of the harms prohibited by the Equal Protection Clause, this court must first consider whether Plaintiffs have standing to bring these claims.

For a case or controversy to be justiciable in federal court, a plaintiff must allege "such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." White Tail Park v. Stroube, 413 F.3d 451, 458 (4th Cir. 2005) (quoting Planned Parenthood of S.C. Inc. v. Rose, 361 F.3d 786, 789 (4th Cir. 2004)).

The party seeking to invoke the federal courts' jurisdiction has the burden of satisfying Article III's standing requirement. Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006). To meet that burden, a plaintiff must demonstrate three elements: (1) that the plaintiff has suffered an injury in fact that is "concrete and particularized" and "actual or imminent"; (2) that the injury is fairly traceable to the challenged conduct of the defendant; and (3) that a favorable decision is likely to redress the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

In multi-plaintiff cases, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." Town of Chester v. Laroe Estates, Inc., 581 U.S. ——, ——, 137 S. Ct. 1645, 1651, 198 L.Ed.2d 64 (2017). Further, if there is one plaintiff "who has demonstrated standing to assert these rights as his own," the court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 & n.9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

In the voting context, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue," Baker, 369 U.S. at 206, 82 S.Ct. 691, so long as their claimed injuries are "distinct from a 'generally available grievance about the government,' " Gill, 138 S. Ct. at 1923 (quoting Lance v. Coffman, 549 U.S. 437, 439, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007) (per curiam)).

Defendant SBE and Alliance Intervenors argue that Individual Plaintiffs in Wise and Moore have not alleged a concrete and particularized injury under either of the two Equal Protection theories. (Alliance Resp. (Doc. 64) at 14-15; SBE Resp. (Doc. 65) at 12-13.)

First, under a vote dilution theory, they argue that courts have "repeatedly rejected this theory as a basis for standing, both because it is unduly speculative and impermissibly generalized." (Alliance Resp. (Doc. 64) at 17.) Second, under an arbitrary and disparate treatment theory, they argue that the injury is too generalized because the Numbered Memoranda apply equally to all voters across the state and that Plaintiffs "cannot claim an injury for not having to go through a remedial process put in place for other voters." (SBE Resp. (Doc. 65) at 12.)

Plaintiffs in Moore and Wise do not address standing for their Equal Protection claims in their memoranda in support of their motions for a preliminary injunction. (See Wise Pls.' Mot. (Doc. 43); Moore Pls.' Mot. (Doc. 60).) At oral argument held on October 8, 2020, however, counsel for the Moore Plaintiffs responded to Defendant SBE and Alliance Intervenor's standing arguments. (Oral Argument Tr. (Doc. 70) at 52-59.)

 *14  First, under a vote dilution theory, counsel argued that "the Defendants confuse a widespread injury with not having a personal injury," (id. at 53), and that the Supreme Court's decision in Reynolds demonstrates that "impermissible vote dilution occurs when there's ballot box stuffing," (id.), suggesting that each voter would have standing to sue under the Supreme Court's precedent in Reynolds because their vote has less value. (Id.) Second, under an arbitrary and disparate treatment theory, counsel argued that Plaintiffs were subjected to the witness requirement and that "[t]here are burdens associated with that" which support a finding of an injury in fact. (Id. at 56.) Counsel argued the harm that is occurring is not speculative because, for example, voters have and will continue to fail to comply with the witness requirement, (id. at 55-56), and ballots will arrive between the third and

ninth day following the election pursuant to the Postmark Requirement, (id. at 58). Moreover, counsel argued that the "regime" imposed by the state is arbitrary, citing limitations on assistance allowed to complete a ballot, compared to the lessened restrictions associated with the witness requirement under Numbered Memo 2020-19. (Id. at 59.)

This court finds that Individual Plaintiffs in Moore and Wise have not articulated a cognizable injury in fact for their vote dilution claims. However, all of the Individual Plaintiffs in Moore, and one Individual Plaintiff in Wise have articulated an injury in fact for an arbitrary and disparate treatment claim.

### a. Vote Dilution

Although the Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature.' " Gill, 138 S. Ct. at 1930 (citing Reynolds, 377 U.S. at 561, 84 S.Ct. 1362), the Court has expressly held that "vote dilution" refers specifically to "invidiously minimizing or canceling out the voting potential of racial or ethnic minorities," Abbott v. Perez, 585 U.S. ——, ——, 138 S. Ct. 2305, 2314, 201 L.Ed.2d 714 (2018) (internal quotations and modifications omitted) (emphasis added), a harm which occurs where "the particular composition of the voter's own district ... causes his vote – having been packed or cracked – to carry less weight than it would carry in another, hypothetical district." Gill, 138 S. Ct. at 1931.

Indeed, lower courts which have addressed standing in vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted, as Plaintiffs have argued here, have said that this harm is unduly speculative and impermissibly generalized because all voters in a state are affected, rather than a small group of voters. See, e.g., Donald J. Trump for President, Inc. v. Cegavske, Case No. 2:20-CV-1445 JCM (VCF), —— F.Supp.3d ——, ——, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) ("As with other generally available grievances about the government, plaintiffs seek relief on behalf of their member voters that no more directly and tangibly benefits them than it does the public at large.") (internal quotations and modifications omitted); Martel v. Condos, Case No. 5:20-cv-131, —— F.Supp.3d ——, ——, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); Paher v. Cegavske, 457 F.Supp.3d

919, 926–27 (D. Nev. 2020) ("Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter."); Am. Civil Rights Union v. Martinez-Rivera, 166 F. Supp. 3d. 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution [is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.").

Although "[i]t would over-simplify the standing analysis to conclude that no state-wide election law is subject to challenge simply because it affects all voters," Martel, ––– F.Supp.3d at ––––, 2020 WL 5755289, at *4, the notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury in fact necessary for Article III standing. Compared to a claim of gerrymandering, in which the injury is specific to a group of voters based on their racial identity or the district where they live, all voters in North Carolina, not just Individual Plaintiffs, would suffer the injury Individual Plaintiffs allege. This court finds this injury too generalized to give rise to a claim of vote dilution, and thus, neither Plaintiffs in Moore nor in Wise have standing to bring their vote dilution claims under the Equal Protection Clause.

**b. Arbitrary and Disparate Treatment**

 *15 In Bush, the Supreme Court held that, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." 531 U.S. at 104-05, 121 S.Ct. 525. Plaintiffs argue that they have been subjected to arbitrary and disparate treatment because they voted under one set of rules, and other voters, through the guidance in the Numbered Memoranda, will be permitted to vote invalidly under a different and unequal set of rules, and that this is a concrete and particularized injury. (Oral Argument Tr. (Doc. 70) at 70-71.)

For the purposes of determining whether Plaintiffs have standing, is it not "necessary to decide whether [Plaintiffs'] allegations of impairment of their votes" by Defendant SBE's actions "will, ultimately, entitle them to any relief," Baker, 369 U.S. at 208, 82 S.Ct. 691; whether a harm has occurred is best left to this court's analysis of the merits of Plaintiffs' claims, (see discussion infra Section II.D.3). Instead, the appropriate inquiry is, "[i]f such impairment does produce a legally cognizable injury," whether Plaintiffs "are among

those who have sustained it." Baker, 369 U.S. at 208, 82 S.Ct. 691.

This court finds that Individual Plaintiffs in Moore and one Individual Plaintiff in Wise have standing to raise an arbitrary and disparate treatment claim because their injury is concrete, particularized, and not speculative. Bobby Heath and Maxine Whitley, the Individual Plaintiffs in Moore, are registered North Carolina voters who voted absentee by mail and whose ballots have been accepted by SBE. (Moore Compl. (Doc. 1) ¶¶ 9-10.) In Wise, Individual Plaintiff Patsy Wise is a registered voter who cast her absentee ballot by mail. (Wise Compl. (Doc. 1) ¶ 25.)

If Plaintiffs Heath, Whitley, and Wise were voters who intended to vote by mail but who had not yet submitted their ballots, as is the case with the other Individual Plaintiffs in Wise, (Wise Compl. (Doc. 1) ¶¶ 26-28), or voters who had intended to vote in-person either during the Early Voting period or on Election Day, then they would not in fact have been impacted by the laws and procedures for submission of absentee ballots by mail and the complained-of injury would be merely "an injury common to all other registered voters," Martel, ––– F.Supp.3d at ––––, 2020 WL 5755289, at *4. See also Donald J. Trump for President, Inc., ––– F.Supp.3d at ––––, 2020 WL 5626974, at *4 ("Plaintiffs never describe how their member voters will be harmed by vote dilution where other voters will not."). Indeed, this court finds that Individual Plaintiffs Clifford, Bambini, and Baum in Wise do not have standing to challenge the Numbered Memoranda, because any "shock[ ]" and "serious concern[s]" they have that their vote "will be negated by improperly cast or fraudulent ballots," (Wise Compl. (Doc. 1) ¶¶ 26-28), is merely speculative until such point that they have actually voted by mail and had their ballots accepted, which Plaintiffs' Complaint in Wise does not allege has occurred. (Id.)

Yet, because Plaintiffs Heath, Whitley, and Wise have, in fact, already voted by mail, (Moore Compl. (Doc. 1) ¶¶ 9-10; Wise Compl. (Doc. 1) ¶ 25), their injury is not speculative. Under the Numbered Memoranda 2020-19, 2020-22, and 2020-23, other voters who vote by mail will be subjected to a different standard than that to which Plaintiffs Heath, Whitley, and Wise were subjected when their ballots by mail. Assuming this is an injury that violates the Equal Protection Clause, Baker, 369 U.S. at 208, 82 S.Ct. 691, the harm alleged by Plaintiffs is particular to voters in Heath, Whitley, and Wise's position, rather than a generalized injury that any North Carolina voter could claim. For this reason, this court

finds that Plaintiffs Heath, Whitley, and Wise have standing to raise Equal Protection claims under an arbitrary and disparate treatment theory. Because at least one plaintiff in each of these multi-plaintiff cases has standing to seek the relief requested, the court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." Vill. of Arlington Heights, 429 U.S. at 264 & n.9, 97 S.Ct. 555.

**3. Likelihood of Success on the Merits**

**\*16** Having determined that Individual Plaintiffs have standing to bring their arbitrary and disparate treatment claims, this court now considers whether Plaintiffs' claims are likely to succeed on the merits. To demonstrate a likelihood of success on the merits, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." Di Biase, 872 F.3d at 230.

**a. Parties' Arguments**

Plaintiffs argue that four policies indicated in the Numbered Memoranda are invalid under the Equal Protection Clause: (1) the procedure which allows ballots without a witness signature to be retroactively validated through the cure procedure indicated in Revised Numbered Memo 2020-19 ("Witness Requirement Cure Procedure"); (2) the procedure which allows absentee ballots to be received up to nine days after Election Day if they are postmarked on Election Day, as indicated in Numbered Memo 2020-19 ("Receipt Deadline Extension"); and (3) the procedure which allows for anonymous delivery of ballots to unmanned drop boxes, as indicated in Numbered Memo 2020-23 ("Drop Box Cure Procedure"); (4) the procedure which allows ballots to be counted without a United States Postal Service postmark, as indicated in Numbered Memo 2020-22 ("Postmark Requirement Changes"). (Moore Compl. (Doc. 1) ¶ 93; Wise Compl. (Doc. 1) ¶ 124; Wise Pls.' Mot. (Doc. 43) at 13-14.)

Plaintiffs in Wise argue that the changes in these Memoranda "guarantee that voters will be treated arbitrarily under the ever-changing voting regimes." (Wise Pls.' Mot. (Doc. 43) at 11.) Similarly, Plaintiffs in Moore argue that the three Memoranda were issued "after tens of thousands of North Carolinians cast their votes following the requirements set by the General Assembly," which deprives Plaintiffs "of the Equal Protection Clause's guarantee because it allows

for 'varying standards to determine what [i]s a legal vote.' " (Moore Compl. (Doc. 1) ¶ 90 (citing Bush, 531 U.S. at 107, 121 S.Ct. 525).)

In response, Defendants argue that the Numbered Memoranda will not lead to the arbitrary and disparate treatment of ballots prohibited by the Supreme Court's decision in Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). Defendant SBE argues that the consent judgment and Numbered Memos do "precisely what Bush contemplated: It establishes uniform and adequate standards for determining what is a legal vote, all of which apply statewide, well in advance of Election Day. Indeed, the only thing stopping uniform statewide standards from going into effect is the TRO entered in these cases." (SBE Resp. (Doc. 65) at 17.) Moreover, Defendant SBE argues that the consent judgment "simply establishes uniform standards that help county boards ascertain which votes are lawful," and "in no way lets votes be cast unlawfully." (Id. at 18.)

Alliance Intervenors argue that the Numbered Memos "apply equally to all voters," (Alliance Resp. (Doc. 64) at 18), and "Plaintiffs have not articulated, let alone demonstrated, how their right to vote – or anyone else's – is burdened or valued unequally," (id. at 19). Moreover, Alliance Intervenors argue that the release of the Numbered Memoranda after the election began does not raise equal protection issues because, "[e]lection procedures often change after voting has started to ensure that the fundamental right to vote is protected." (Id. at 20.)

Both Defendant SBE and Alliance Intervenors argue that the release of the Numbered Memoranda after the election began does not raise equal protection issues, as election procedures often change after voting has started. (SBE Resp. (Doc. 65) at 18; Alliance Resp. (Doc. 64) at 20.) For example, Defendant SBE argues that "[i]f it is unconstitutional to extend the receipt deadline for absentee ballots to address mail disruptions, then it would also be unconstitutional to extend hours at polling places on Election Day to address power outages or voting-machine malfunctions." (SBE Resp. (Doc. 65) at 18 (citing N.C. Gen. Stat. § 163-166.01).) "Likewise, the steps that the Board has repeatedly taken to ensure that people can vote in the wake of natural disasters like hurricanes would be invalid if those steps are implemented after voting begins." (Id.)

#### b. __Analysis__

 *17  This court agrees with the parties that an Equal Protection violation occurs where there is both arbitrary and disparate treatment. Bush, 531 U.S. at 105, 121 S.Ct. 525. This court also agrees with Defendants that not all disparate treatment rises to the level of an Equal Protection violation. As Defendant SBE argues, the General Assembly has empowered SBE to make changes to voting policies and procedures throughout the election, including extending hours at polling places or adjusting voting in response to natural disasters. (SBE Resp. (Doc. 65) at 18.) Other federal courts have upheld changes to election procedures even after voting has commenced. For example, in 2018, a federal court enjoined Florida's signature matching procedures and ordered a cure process after the election. Democratic Exec. Comm. of Fla. v. Detzner, 347 F. Supp. 3d 1017, 1031 (N.D. Fla. 2018), appeal dismissed as moot sub nom. Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm., 950 F.3d 790 (11th Cir. 2020). Similarly, a Georgia federal court in 2018 ordered a cure process in the middle of the absentee and early voting periods. Martin v. Kemp, 341 F. Supp. 3d 1326 (N.D. Ga. 2018), appeal dismiss sub nom. Martin v. Sec'y of State of Ga., No. 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018).

A change in election rules that results in disparate treatment shifts from constitutional to unconstitutional when these rules are also arbitrary. The ordinary definition of the word "arbitrary" refers to matters "[d]epending on individual discretion" or "involving a determination made without consideration of or regard for facts, circumstances, fixed rules, or procedures." Arbitrary, Black's Law Dictionary (11th ed. 2019). This definition aligns with the Supreme Court's holding in Reynolds and Bush, that the State must ensure equal treatment of voters both at the time it grants citizens the right to vote and throughout the election. Bush, 531 U.S. at 104-05, 121 S.Ct. 525 ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."); Reynolds, 377 U.S. at 555, 84 S.Ct. 1362 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

The requirement that a state "grant[ ] the right to vote on equal terms," Bush, 531 U.S. at 104, 121 S.Ct. 525, includes protecting the public "from the diluting effect of illegal

ballots," Gray, 372 U.S. at 380, 83 S.Ct. 801. To fulfill this requirement, a state legislature must define the manner in which voting should occur and the minimum requirements for a valid, qualifying ballot. In North Carolina, the General Assembly has passed laws defining the requirements for permissible absentee voting, N.C. Gen. Stat. § 163-226 et seq., including as recently as this summer, when it modified the one-witness requirement, 2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1.(a). As this court found in its order issuing a preliminary injunction in Democracy, these requirements reflect a desire by the General Assembly to prevent voter fraud resulting from illegal voting practices. Democracy N. Carolina, ---- F.Supp.3d at ----, 2020 WL 4484063, at *35.

A state cannot uphold its obligation to ensure equal treatment of all voters at every stage of the election if another body, including SBE, is permitted to contravene the duly enacted laws of the General Assembly and to permit ballots to be counted that do not satisfy the fixed rules or procedures the state legislature has deemed necessary to prevent illegal voting. Any guidance SBE adopts must be consistent with the guarantees of equal treatment contemplated by the General Assembly and Equal Protection.

Thus, following this precedent, and the ordinary definition of the word "arbitrary," this court finds that SBE engages in arbitrary behavior when it acts in ways that contravene the fixed rules or procedures the state legislature has established for voting and that fundamentally alter the definition of a validly voted ballot, creating "preferred class[es] of voters." Gray, 372 U.S. at 380, 83 S.Ct. 801.

 *18  This definition of arbitrariness does not require this court to consider whether the laws enacted by the General Assembly violate other provisions in the North Carolina or U.S. Constitution or whether there are better public policy alternatives to the laws the General Assembly has enacted. These are separate inquiries. This court's review is limited to whether the challenged Numbered Memos are consistent with state law and do not create a preferred class or classes of voters.

#### i. __Witness Requirement Cure Procedure__

This court finds Plaintiffs have demonstrated a likelihood of success on the merits with respect to their Equal Protection challenge to the Witness Requirement Cure Procedure in Revised Memo 2020-19.

Under the 2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1.(a), a witnessed absentee ballot must be "marked ... in the presence of at least one [qualified] person ...." This clear language dictates that the witness must be (1) <u>physically present</u> with the voter, and (2) present <u>at the time the ballot is marked</u> by the voter.

Revised Memo 2020-19 counsels that ballots missing a witness signature may be cured where voters sign and affirm the following statement:

> I am submitting this affidavit to correct a problem with missing information on the ballot envelope. I am an eligible voter in this election and registered to vote in [name] County, North Carolina. I solemnly swear or affirm that I voted and returned my absentee ballot for the November 3, 2020 general election and that I have not voted and will not vote more than one ballot in this election. I understand that fraudulently or falsely completing this affidavit is a Class I felony under Chapter 163 of the North Carolina General Statutes.

(<u>Moore v. Circosta</u>, No. 1:20CV911 (Doc. 45-1) at 34.)

This "cure" affidavit language makes no mention of whether a witness was in the presence of the voter at the time that the voter cast their ballot, which is the essence of the Legislature's Witness Requirement. 2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1.(a). In fact, a voter could truthfully sign and affirm this statement and have their ballot counted by their county board of elections without any witness becoming involved in the process.[6] Because the effect of this affidavit is to eliminate the statutorily required witness requirement, this court finds that Plaintiffs have demonstrated a likelihood of success on the merits in proving that the Witness Requirement Cure Procedure indicated in Revised Memo 2020-19 is arbitrary.

**\*19** Based on counsel's statements at oral arguments, Defendant SBE may contend that the guidance in Revised Memo 2020-19 is not arbitrary because it was necessary to resolve the <u>Alliance</u> state court action. (Oral Argument Tr. (Doc. 70) at 105 ("Our reading then of state law is that the Board has the authority to make adjustments in emergencies or as a means of settling protracted litigation until the General Assembly reconvenes.").) However, Defendant SBE's arguments to the state court judge and the court in the Eastern District of North Carolina belie that assertion, as they advised the state court that both the original Memo 2020-19 and the Revised Memo were issued "to ensure full compliance

with the injunction entered by Judge Osteen," (SBE State Court Br. (Doc. 68-1) at 15), and they advised the court in the Eastern District of North Carolina that they had issued the revised Memo 2020-19 "in order to comply with Judge Osteen's preliminary injunction in the <u>Democracy N.C.</u> action in the Middle District." (TRO (Doc. 47) at 9.) As this court more fully explains in its order issued in <u>Democracy</u>, this court finds that Defendant SBE improperly used this court's <u>August Democracy Order</u> to modify the witness requirement. <u>Democracy v. N. Carolina, No. 1:20CV457, 2020 WL 6058048 (M.D.N.C. Oct. 14, 2020)</u> (enjoining witness cure procedure). Because Defendant SBE acted improperly in that fashion, this court declines to accept an argument now that elimination of the witness requirement was a rational and justifiable basis upon which to settle the state lawsuit. Furthermore, it is difficult to conceive that SBE was authorized to resolve a pending lawsuit that could create a preferred class of voters: those who may submit an absentee ballot without a witness under an affidavit with no definition of the meaning of "vote."

This court also finds Plaintiffs have demonstrated a likelihood of success on the merits in proving disparate treatment may result as a result of the elimination of the Witness Requirement. Individual Plaintiffs Wise, Heath, and Whitley assert that they voted absentee by mail, including complying with the Witness Requirement. (<u>Wise</u> Compl. (Doc. 1) ¶ 25; <u>Moore</u> Compl. (Doc. 1) ¶¶ 9-10.) Whether because a voter inadvertently cast a ballot without a witness or because a voter was aware of the "cure" procedure and thus, willfully did not cast a ballot with a witness, there will be voters whose ballots are cast without a witness. Accordingly, this court finds that Plaintiffs have demonstrated a likelihood of success on the merits in proving that the Witness Requirement Cure Procedure indicated in Memo 2020-19 creates disparate treatment.

Thus, because Plaintiffs have demonstrated a likelihood of success on the merits with respect to arbitrary and disparate treatment that may result from under Witness Requirement Cure Procedure in Revised Memo 2020-19, this court finds Plaintiffs have established a likelihood of success on their Equal Protection claim.

**ii. Receipt Deadline Extension**

This court finds that Plaintiffs are likely to succeed on their Equal Protection challenge to the Receipt Deadline Extension in Revised Memo 2020-19.

Under N.C. Gen. Stat. § 163-231(b), in order to be counted, civilian absentee ballots must have been received by the county board office by 5 p.m. on Election Day, November 3, 2020, or if postmarked by Election Day, by 5:00 p.m. on November 6, 2020. The guidance in Revised Memo 2020-19 extends the time in which absentee ballots must be returned, allowing a late civilian ballot to be counted if postmarked on or before Election Day and received by 5:00 p.m. on November 12, 2020 (Revised Memo 2020-19 (Doc. 36-3) at 5.)

Alliance Intervenors argue that, "[t]o the extent Numbered Memo 2020-22 introduces a new deadline, it affects only the counting of ballots for election officials after Election Day has passed – not when voters themselves must submit their ballots. All North Carolina absentee voters still must mail their ballots by Election Day." (Alliance Resp. (Doc. 64) at 21.)

This court disagrees, finding Plaintiffs have demonstrated a likelihood of success on the merits in proving that this change contravenes the express deadline established by the General Assembly, by extending the deadline from three days after Election Day, to nine days after Election Day. Moreover, it results in disparate treatment, as voters like Individual Plaintiffs returned their ballots within the time-frame permitted under state law, (Wise Compl. (Doc. 1) ¶ 25; Moore Compl. (Doc. 1) ¶¶ 9-10), but other voters whose ballots would otherwise not be counted if received three days after Election Day, will now have an additional six days to return their ballot.

Because Plaintiffs have demonstrated a likelihood of success on the merits in proving arbitrary and disparate treatment may result under the Receipt Deadline Extension, this court finds Plaintiffs have established a likelihood of success on the merits of their Equal Protection claim.

### iii. Drop Box Cure Procedure

**\*20**  Plaintiffs have failed to establish a likelihood of success, however, on their Equal Protection challenge to the Drop Box Cure Procedure indicated in Numbered Memo 2020-23. (Wise, No. 1:20CV912, Memo 2020-23 (Doc. 1-4).)

N.C. Gen. Stat. § 163-226.3(a)(5) makes it a felony for any person other than the voter's near relative or legal guardian to take possession of an absentee ballot of another voter for delivery or for return to a county board of elections.

"Because of this provision in the law," and the need to ensure compliance with it, SBE recognized in Memo 2020-23 that, "an absentee ballot may not be left in an unmanned drop box," (Wise, No. 1:20CV912, Memo 2020-23 (Doc. 1-4) at 2), and directed county boards which have a "drop box, slot, or similar container at their office" for other business purposes to place a "sign indicating that absentee ballots may not be deposited in it." (Id.)

Moreover, the guidance reminds county boards that they must keep a written log when any person returns an absentee ballot in person, which includes the name of the individual returning the ballot, their relationship to the voter, the ballot number, and the date it was received. (Id. at 3.) If the individual who drops off the ballot is not the voter, their near relative, or legal guardian, the log must also record their address and phone number. (Id.) The guidance also advises county boards that "[f]ailure to comply with the logging requirement, or delivery or an absentee ballot by a person other than the voter, the voter's near relative, or the voter's legal guardian, is not sufficient evidence in and of itself to establish that the voter did not lawfully vote their ballot." (Id. at 3.) Instead, the guidance advises the county board that they "may ... consider the delivery of a ballot ... in conjunction with other evidence in determining whether the ballot is valid and should be counted." (Id. at 4.)

Plaintiffs argue that this guidance "undermines the General Assembly's criminal prohibition of the unlawful delivery of ballots," (Moore Compl. (Doc. 1) ¶ 68), and "effectively allow[s] voters to use drop boxes for absentee ballots," (Wise Pls.' Mot. (Doc. 43) at 13), and thus, violates the Equal Protection Clause, (Moore Compl. (Doc. 1) ¶ 93). This court disagrees.

Although Numbered Memo 2020-23 was released on September 22, 2020, (Wise, No. 1:20CV912, Memo 2020-23 (Doc. 1-4) at 2), the guidance it contains is not new. Consistent with the guidance in Numbered Memo 2020-23, SBE administrative rules adopted on December 1, 2018, require that any person delivering a ballot to a county board of elections office provide:

(1) Name of voter;

(2) Name of person delivering ballot;

(3) Relationship to voter;

(4) Phone Number (if available) and current address of person delivering ballot;

(5) Date and time of delivery of ballot; and

(6) Signature or mark of person delivering ballot certifying that the information provided is true and correct and that the person is the voter or the voter's near relative as defined in [N.C. Gen. Stat § 163-226(f)] or verifiable legal guardian as defined in [N.C. Gen. Stat. § 163-226(e)]. 8 N.C. Admin. Code 18.0102 (2018). Moreover, the administrative rule states that "the county board of elections may consider the delivery of a ballot in accordance with this Rule in conjunction with other evidence in determining whether the container-return envelope has been properly executed according to the requirements of [N.C. Gen. Stat. § 163-231]," (id.), and that "[f]ailure to comply with this Rule shall not constitute evidence sufficient in and of itself to establish that the voter did not lawfully vote his or her ballot." (Id.)

**\*21** Because the guidance contained in Numbered Memo 2020-23 was already in effect at the start of this election as a result of SBE's administrative rules, Individual Plaintiffs were already subject to it at the time that they cast their votes. Accordingly, because all voters were subject to the same guidance, Plaintiffs have not demonstrated a likelihood of success on the merits in proving disparate treatment.

It is a closer issue with respect to whether Plaintiffs have demonstrated a likelihood of success on the merits in proving that the rules promulgated by Defendant SBE are inconsistent with N.C. Gen. Stat. § 163-226.3(a)(5).

This statute makes it a felony for any person other than the voter's near relative or legal guardian to take possession of an absentee ballot of another voter for delivery or for return to a county board of elections. Id. It would seem logically inconsistent that the General Assembly would criminalize this behavior, while at the same time, permit ballots returned by unauthorized third parties to be considered valid. Yet, upon review of the legislative history, this court finds the felony statute has been in force since 1979, 1979 N.C. Sess. Laws Ch. 799 (S.B. 519) § 4, https://www.ncleg.gov/enactedlegislation/sessionlaws/pdf/1979-1980/sl1979-799.pdf (last visited Oct.

13, 2020), and in its current form since 2013. 2013 N.C. Sess. Laws 381 (H.B. 589) § 4.6.(a).

That the General Assembly, by not taking legislative action, and instead, permitted SBE's administrative rule and the General Assembly's statute to coexist for nearly two years and through several other elections undermines Plaintiffs' argument that Defendant SBE has acted arbitrarily. For this reason, this court finds that Plaintiffs have not demonstrated a likelihood of success on the merits in proving the arbitrariness of the guidance in Numbered Memo 2020-23 and accordingly, Plaintiffs have failed to establish a likelihood of success on their Equal Protection challenge to Numbered Memo 2020-23.

If the General Assembly believes that SBE's administrative rules are inconsistent with its public policy goals, they are empowered to pass legislation which overturns the practice permitted under the administrative rule.

**iv. Postmark Requirement Changes**

Similarly, this court finds that Plaintiffs have failed to establish likelihood of success on the merits with respect to their Equal Protection challenge to the Postmark Requirement Changes in Numbered Memo 2020-22. (Wise, 1:20CV912, Memo 2020-22 (Doc. 1-3).)

Under Numbered Memo 2020-22, a ballot will be considered postmarked by Election Day if it has a USPS postmark, there is information in BallotTrax, or "another tracking service offered by the USPS or a commercial carrier, indicat[es] that the ballot was in the custody of USPS or the commercial carrier on or before Election Day." (Id. at 3.) This court finds that these changes are consistent with N.C. Gen. Stat. § 163-231(b)(2)b, which does not define what constitutes a "postmark," and instead, merely states that ballots received after 5:00 p.m. on Election Day may not be accepted unless the ballot is "postmarked and that postmark is dated on or before the day of the ... general election ... and are received by the county board of elections not later than three days after the election by 5:00 p.m."

In the absence of a statutory definition for postmark, this court finds Plaintiffs have not demonstrated a likelihood of success on the merits in proving that Numbered Memo 2020-22 is inconsistent with N.C. Gen. Stat. § 163-231(b)(2)b, and thus, arbitrary. If the General Assembly believes

that the Postmark Requirement Changes indicated in Memo 2020-22 are inconsistent with its public policy goals, they are empowered to pass legislation which further specifies the definition of a "postmark." In the absence of such legislation, however, this court finds that Plaintiffs have failed to establish a likelihood of success on the merits of their Equal Protection challenge.

### 4. Irreparable Harm

**\*22** In addition to a likelihood of success on the merits, a plaintiff must also make a "clear showing that it is likely to be irreparably harmed absent preliminary relief" in order to obtain a preliminary injunction. UBS Fin. Servs. Inc. v. Carilion Clinic, 880 F. Supp. 2d 724, 733 (E.D. Va. 2012) (quoting Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 347 (4th Cir. 2009)). Further, an injury is typically deemed irreparable if monetary damages are inadequate or difficult to ascertain. See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994), abrogated on other grounds by Winter, 555 U.S. at 22, 129 S.Ct. 365. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014). "[O]nce the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin th[ese] law[s]." Id.

The court therefore finds Plaintiffs have demonstrated a likelihood of irreparable injury regarding the Equal Protection challenges to the Witness Requirement and the Receipt Deadline Extension.

### 5. Balance of Equities

The third factor in determining whether preliminary relief is appropriate is whether the plaintiff demonstrates "that the balance of equities tips in his favors." Winter, 555 U.S. at 20, 129 S.Ct. 365.

The Supreme Court's decision in Purcell v. Gonzalez, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006), urges that this court should issue injunctive relief as narrowly as possible. The Supreme Court has made clear that "lower federal courts should ordinarily not alter the election rules on the eve of an election," Republican Nat'l Comm. v. Democratic Nat'l

Comm., 589 U.S. ——, ——, 140 S. Ct. 1205, 1207, 206 L.Ed.2d 452 (2020) (per curiam), as a court order affecting election rules will progressively increase the risk of "voter confusion" as "an election draws closer." Purcell, 549 U.S. at 4-5, 127 S.Ct. 5; see also Texas All. for Retired Americans v. Hughs, —— F.3d ——, ——, 2020 WL 5816887, at *2 (5th Cir. Sept. 30, 2020) ("The principle ... is clear: court changes of election laws close in time to the election are strongly disfavored."). This year alone, the Purcell doctrine of noninterference has been invoked by federal courts in cases involving witness requirements and cure provisions during COVID-19, Clark v. Edwards, Civil Action No. 20-283-SDD-RLB, —— F.Supp.3d ——, —— – ——, 2020 WL 3415376, at *1-2 (M.D. La. June 22, 2020); the implementation of an all-mail election plan developed by county election officials, Paher v. Cegavske, 2020 WL 2748301, at *1, *6 (D. Nev. 2020); and the use of college IDs for voting, Common Cause v. Thomsen, No. 19-cv-323-JDP, 2020 WL 5665475, at *1 (W.D. Wis. Sept. 23, 2020) – just to name a few.

Purcell is not a per se rejection of any injunctive relief close to an election. However, as the Supreme Court's restoration of the South Carolina witness requirement last week illustrates, a heavy thumb on the scale weighs against changes to voting regulations. Andino v. Middleton, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 5887393, at *1 (Oct. 5, 2020) (Kavanaugh, J., concurring) ("By enjoining South Carolina's witness requirement shortly before the election, the District Court defied [the Purcell] principle and this Court's precedents.").

In this case, there are two SBE revisions where this court has found that Plaintiffs are likely to succeed on the merits. First, the Witness Requirement Cure Procedure, which determines whether SBE will send the voter a cure certification or spoil the ballot and issue a new one. This court has, on separate grounds, already enjoined the Witness Requirement Cure Procedure in Democracy North Carolina v. North Carolina State Board of Elections, No. 1:20CV457, 2020 WL 6058048 (M.D.N.C. Oct. 14, 2020) (enjoining witness cure procedure). Thus, the issue of injunctive relief on the Witness Requirement Cure Procedure is moot at this time. Nevertheless, in the absence of relief in Democracy, it seems likely that SBE's creation of "preferred class[es] of voters", Gray, 372 U.S. at 380, 83 S.Ct. 801, with elimination of the witness requirement and the cure procedure could merit relief in this case.

**\*23** Ripe for this court's consideration is the Receipt Deadline Extension, which contradicts state statutes regarding when a ballot may be counted. Ultimately, this court will decline to enjoin the Receipt Deadline Extension, in spite of its likely unconstitutionality and the potential for irreparable injury. The Purcell doctrine dictates that this court must "ordinarily" refrain from interfering with election rules. Republican Nat'l Comm., 140 S. Ct. at 1207. These issues may be taken up by federal courts after the election, or at any time in state courts and the legislature. However, in the middle of an election, less than a month before Election Day itself, this court cannot cause "judicially created confusion" by changing election rules. Id. Accordingly, this court declines to impose a preliminary injunction because the balance of equities weighs heavily against such an injunction.

### E. Plaintiffs' Electors Clause and Elections Clause Claims

As an initial matter, this court will address the substantive issues of the Electors Clause and the Elections Clause together. The Electors Clause of the U.S. Constitution requires "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President. U.S. Const. art. II, § 1, cl. 2. Plaintiffs in Wise argue that, in order to "effectuate" this Electors Clause requirement, "the State must complete its canvas of all votes cast by three weeks after the general election" under N.C. Gen. Stat. § 163-182.5(c). (Wise Pls.' Mot. (Doc. 43) at 15.) Plaintiffs argue that (1) the extension of the ballot receipt deadline and (2) the changing of the postmark requirement "threaten to extend the process and threaten disenfranchisement," as North Carolina "must certify its electors by December 14 or else lose its voice in the Electoral College. (Id.)

The meaning of "Legislature" within the Electors Clause can be analyzed in the same way as "Legislature" within the Elections Clause. For example,

> As an initial matter, the Court finds no need to distinguish between the term 'Legislature' as it is used in the Elections Clause as opposed to the Electors Clause. Not only were both these clauses adopted during the 1787 Constitutional Convention, but the clauses share a "considerable similarity.
>
> ....

> ... [T]he Court finds that the term "Legislature" is used in a sufficiently similar context in both clauses to properly afford the term an identical meaning in both instances.

Donald J. Trump for President, Inc. v. Bullock, No. CV 20-66-H-DLC, ⸺ F.Supp.3d ⸺, ⸺, 2020 WL 5810556, at \*11 (D. Mont. Sept. 30, 2020). Nor do Plaintiffs assert any difference in the meaning they assign to "Legislature" and its authority between the two Clauses.

This court finds that all Plaintiffs lack standing under either Clause. The discussion infra of the Elections Clause applies equally to the Electors Clause.

#### 1. Elections Clause

##### a. Standing

The Elections Clause standing analysis differs in Moore and Wise, though this court ultimately arrives at the same conclusion in both cases.

##### i. Standing in Wise

In Wise, Plaintiffs are private parties clearly established by Supreme Court precedent to have no standing to contest the Elections Clause in this manner. Plaintiffs are individual voters, a campaign committee, national political parties, and two Members of the U.S. House of Representatives. Even though Plaintiffs are part of the General Assembly, they bring their Elections Clause claim alleging an institutional harm to the General Assembly. Though the Plaintiffs claim to have suffered "immediate and irreparable harm", (Wise Compl. (Doc. 1) ¶¶ 100, 109), this does not establish standing for their Elections Clause claim or Electors Clause claim. See Corman v. Torres, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) ("[T]he Elections Clause claims asserted in the verified complaint belong, if they belong to anyone, only to the ... General Assembly."). The Supreme Court has already held that a private citizen does not have standing to bring an Elections Clause challenge without further, more particularized harms. See Lance, 549 U.S. at 441-42, 127 S.Ct. 1194 ("The only injury [private citizen] plaintiffs allege is that ... the Elections Clause ... has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance

in the past."). Plaintiffs allege no such extra harms, and in fact, do not speak to standing in their brief at all.

### ii. **Standing in Moore**

**\*24** In *Moore*, both Plaintiff Moore and Plaintiff Berger are leaders of chambers in the General Assembly. The Plaintiffs allege harm stemming from SBE flouting the General Assembly's institutional authority. (*Wise* Pls.' Mot. (Doc. 43) at 16.) However, as Proposed Intervenors NC Alliance argue, "a subset of legislators has no standing to bring a case based on purported harm to the Legislature as a whole." (Alliance Resp. (Doc. 64) at 15.) The Supreme Court has held that legislative plaintiffs can bring Elections Clause claims on behalf of the legislature itself only if they allege some extra, particularized harm to themselves – or some direct authority from the whole legislative body to bring the legal claim. Specifically, the Supreme Court found a lack of standing where "[legislative plaintiffs] have alleged no injury to themselves as individuals"; where "the institutional injury they allege is wholly abstract and widely disperse"; and where the plaintiffs "have not been authorized to represent their respective Houses of Congress in this action." Raines v. Byrd, 521 U.S. 811, 829, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997).

An opinion in a very similar case in the Middle District of Pennsylvania is instructive:

> [T]he claims in the complaint rest solely on the purported usurpation of the Pennsylvania General Assembly's exclusive rights under the Elections Clause of the United States Constitution. We do not gainsay that these [two] Senate leaders are in some sense aggrieved by the Pennsylvania Supreme Court's actions. But that grievance alone does not carry them over the standing bar. United States Supreme Court precedent is clear — a legislator suffers no Article III injury when alleged harm is borne equally by all members of the legislature.

Corman, 287 F. Supp. 3d at 567. In the instant case, the two members of the legislature do not allege individual injury. The institutional injury they allege is dispersed across the entire General Assembly. The crucial element, then, is whether Moore and Berger are authorized by the General Assembly to represent its interests. The General Assembly has not directly authorized Plaintiffs to represent its interests in this specific case. See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, 576 U.S. 787, 802, 135 S.Ct. 2652, 192 L.Ed.2d

704 (2015) (finding plaintiff "[t]he Arizona Legislature" had standing in an Elections Clause case only because it was "an institutional plaintiff asserting an institutional injury" which "commenced this action after authorizing votes in both of its chambers"). Moore and Berger argued the general authorization in N.C. Gen. Stat. Section 120-32.6(b), which explicitly authorizes them to represent the General Assembly "[w]henever the validity or constitutionality of an act of the General Assembly or a provision of the Constitution of North Carolina is the subject of an action in any State or federal court." N.C. Gen. Stat. § 120-32.6(b). The text of § 120-32.6 references N.C. Gen. Stat. § 1-72.2, which further specifies that Plaintiffs will "jointly have standing to intervene on behalf of the General Assembly as a party in any judicial proceeding challenging a North Carolina statute or provision of the North Carolina Constitution." (emphasis added).

Neither statute, however, authorizes them to represent the General Assembly as a whole when acting as plaintiffs in a case such as this one. See N.C. State Conference of NAACP v. Berger, 970 F.3d 489, 501 (4th Cir. 2020) (granting standing to Moore and Berger in case where North Carolina law was directly challenged, distinguishing "execution of the law" from "defense of a challenged act"). The facts of this case do not match up with this court's prior application of N.C. Gen. Stat. § 1-72.2, which has been invoked where legislators defend the constitutionality of legislation passed by the legislature when the executive declines to do so. See Fisher-Borne v. Smith, 14 F. Supp. 3d 699, 703 (M.D.N.C. 2014). Furthermore, to the extent Plaintiffs Moore and Berger disagree with the challenged provisions of the Consent Judgment, they have not alleged they lack the authority to bring the legislature back into session to negate SBE's exercise of settlement authority. See N.C. Gen. Stat. § 163-22.2.

**\*25** Thus, even Plaintiff Moore and Plaintiff Berger lack standing to proceed with the Elections Clause claim. Nonetheless, this court will briefly address the merits as well.

### 2. **Merits of Elections Clause Claim**

### a. **The 'Legislature' May Delegate to SBE**

The Elections Clause of the U.S. Constitution states that the "Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. Plaintiffs

assert that the General Assembly instituted one such time/place/manner rule regarding the election by passing H.B. 1169. Therefore, Plaintiffs argue, SBE "usurped the General Assembly's authority" when it "plainly modif[ied]" what the General Assembly had implemented. (Wise Pls.' Mot. (Doc. 43) at 14.)

The Elections Clause certainly prevents entities other than the legislature from unilaterally tinkering with election logistics and procedures. However, Plaintiffs fail to establish that the Elections Clause forbids the legislature itself from voluntarily delegating this authority. The "Legislature" of a state may constitutionally delegate the power to implement election rules – even rules that may contradict previously enacted statutes.

State legislatures historically have the power and ability to delegate their legislative authority over elections and remain in compliance with the Elections Clause. Ariz. State Legislature, 576 U.S. at 816, 135 S.Ct. 2652 (noting that, despite the Elections Clause, "States retain autonomy to establish their own governmental processes"). Here, the North Carolina General Assembly has delegated some authority to SBE to contravene previously enacted statutes, particularly in the event of certain "unexpected circumstances." (SBE Resp. (Doc. 65) at 15.)

The General Assembly anticipated that SBE may need to implement rules that would contradict previously enacted statutes. See N.C. Gen. Stat. § 163-27.1(a) ("In exercising those emergency powers, the Executive Director shall avoid unnecessary conflict with the provisions of this Chapter." (emphasis added)). Plaintiffs claim that "[t]he General Assembly could not, consistent with the Constitution of the United States, delegate to the Board of Elections the power to suspend or re-write the state's election laws." (Wise Compl. (Doc. 1) ¶ 97.) This would mean that the General Assembly could not delegate any emergency powers to SBE. For example, if a hurricane wiped out all the polling places in North Carolina, Plaintiffs' reading of the Constitution would prohibit the legislature from delegating to SBE any power to contradict earlier state law regarding election procedures. (See SBE Resp. (Doc. 65) at 15.)

As courts have adopted a broad understanding of "Legislature" as written in the Elections Clause, see Corman, 287 F. Supp. 3d at 573, it follows that a valid delegation from the General Assembly allowing SBE to override the General Assembly in certain circumstances would not be

unconstitutional. See Donald J. Trump for President, ––– F.Supp.3d at ––––, 2020 WL 5810556, at *12 (finding that the legislature's "decision to afford" the Governor certain statutory powers to alter the time/place/manner of elections was legitimate under the Elections Clause).

### b. Whether SBE Exceeded Legitimate Delegated Powers

**\*26** The true question becomes, then, whether SBE was truly acting within the power legitimately delegated to it by the General Assembly. Even Proposed Intervenors NC Alliance note that SBE's actions "could ... constitute plausible violations of the Elections Clause if they exceeded the authority granted to [SBE] by the General Assembly." (Alliance Resp. (Doc. 64) at 19.)

SBE used two sources of authority to enter into the Consent Agreement changing the laws and rules of the election process after it had begun: N.C. Gen. Stat. § 163-22.2 and § 163-27.1.

### i. SBE's Authority to Avoid Protracted Litigation

First, this court finds that, while N.C. Gen. Stat. § 163-22.2 authorizes agreements in lieu of protracted litigation, it does not authorize the extensive measures taken in the Consent Agreement:

> In the event any portion of Chapter 163 of the General Statutes or any State election law or form of election of any county board of commissioners, local board of education, or city officer is held unconstitutional or invalid by a State or federal court or is unenforceable because of objection interposed by the United States Justice Department under the Voting Rights Act of 1965 and such ruling adversely affects the conduct and holding of any pending primary or election, the State Board of Elections shall have authority to make reasonable interim rules and regulations with respect to the pending primary or election as it deems advisable so long as they do not conflict with any provisions of this Chapter 163 of the General Statutes and such rules and regulations shall become null and void 60 days after the convening of the next regular session of the General Assembly. The State Board of Elections shall also be authorized, upon recommendation of the Attorney General, to enter into agreement with the courts in lieu of protracted litigation until such time as the General Assembly convenes.

N.C. Gen. Stat. § 163-22.2. While the authority delegated under this statute is broad, it limits SBE's powers to implementing rules that "do not conflict with any provisions of this Chapter." Moreover, this power appears to exist only "until such time as the General Assembly convenes." Id. By eliminating the witness requirement, SBE implemented a rule that conflicted directly with the statutes enacted by the North Carolina legislature.

Moreover, SBE's power to "enter into agreement with the courts in lieu of protracted litigation" is limited by the language "until such time as the General Assembly convenes." Id. Plaintiffs appear to have a remedy to what they contend is an overreach of SBE authority by convening.

### ii. SBE's Power to Override the Legislature in an Emergency

Second, Defendants rely upon N.C. Gen. Stat. § 163-27.1. That statute provides:

(a) The Executive Director, as chief State elections official, may exercise emergency powers to conduct an election in a district where the normal schedule for the election is disrupted by any of the following:

(1) A natural disaster.

(2) Extremely inclement weather.

(3) An armed conflict involving Armed Forces of the United States, or mobilization of those forces, including North Carolina National Guard and reserve components of the Armed Forces of the United States.

N.C. Gen. Stat. § 163-27.1(a)(1-3). As neither (a)(2) or (3) apply, the parties agree that only (a)(1), a natural disaster, is at issue in this case. On March 10, 2020, the Governor of North Carolina declared a state of emergency as a result of the spread of COVID-19. N.C. Exec. Order No. 116 (March 10, 2020). Notably, the Governor did not declare a disaster pursuant to N.C. Gen. Stat. § 166A-19.21. Instead, on March 25, 2020, it was the President of the United States who declared a state of disaster existed in North Carolina:

**\*27** I have determined that the emergency conditions in the State of North Carolina resulting from the Coronavirus Disease 2019 (COVID-19) pandemic beginning on January 20, 2020, and continuing, are of sufficient severity and magnitude to warrant a major disaster declaration under

the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 et seq. (the "Stafford Act"). Therefore, I declare that such a major disaster exists in the State of North Carolina.

Notice, North Carolina; Major Disaster and Related Determinations, 85 Fed. Reg. 20701 (Mar. 25, 2020) (emphasis added). The President cited the Stafford Act as justification for declaring a major disaster. See 42 U.S.C. § 5122(2). Notably, neither the Governor's Emergency Proclamation nor the Presidential Proclamation identified COVID-19 as a natural disaster.

On March 12, 2020, the Executive Director of SBE, Karen Brinson Bell ("Bell"), crafted an amendment to SBE's Emergency Powers rule. Bell's proposed rule change provided as follows:

(a) In exercising his or her emergency powers and determining whether the "normal schedule" for the election has been disrupted in accordance with G.S. ~~163A-750~~ , 163-27.1, the Executive Director shall consider whether one or more components of election administration has been impaired. The Executive Director shall consult with State Board members when exercising his or her emergency powers if feasible given the circumstances set forth in this Rule.

(b) For the purposes of G.S. ~~163A-750~~ , 163-27.1, the following shall apply:

(1) A natural disaster or extremely inclement weather include ~~a:~~ any of the following:

(A) Hurricane;

(B) Tornado;

(C) Storm or snowstorm;

(D) Flood;

(E) Tidal wave or tsunami;

(F) Earthquake or volcanic eruption;

(G) Landslide or mudslide; or

(H) Catastrophe arising from natural causes ~~resulted~~ and resulting in a disaster declaration by the President of the United States or the ~~Governor.~~ Governor, a national emergency declaration by the President of the United States, or a state of emergency declaration

issued under G.S. 166A-19.3(19). "Catastrophe arising from natural causes" includes a disease epidemic or other public health incident. The disease epidemic or other public health incident must make [that makes ] it impossible or extremely hazardous for elections officials or voters to reach or otherwise access the voting [place or that creates ] place, create a significant risk of physical harm to persons in the voting place, or [that ] would otherwise convince a reasonable person to avoid traveling to or being in a voting place.

https://files.nc.gov/ncoah/documents/Rules/RRC/06182020-Follow-up-Tab-B-Board-of-Elections.pdf at 5 (proposed changes in strikethroughs, or underline.) Shortly after submitting the rule change, effective March 20, 2020, SBE declared COVID-19 a natural disaster, attempting to invoke its authority under the Emergency Powers Statute, § 163-27.1. However, the Rules Review Commission subsequently unanimously rejected Bell's proposed rule change, finding in part that there was a "lack of statutory authority as set forth in G.S. 150B-21.9(a)(1)," and more specifically, that "the [SBE] does not have the authority to expand the definition of 'natural disaster' as proposed." North Carolina Office of Administrative Hearings, Rules Review Commission Meeting Minutes (May 21, 2020), at 4 https://files.nc.gov/ncoah/Minutes-May-2020.pdf.

In a June 12, 2020 letter, the Rules Review Commission Counsel indicated that Bell had responded to the committee's findings by stating "that the agency will not be submitting a new statement or additional findings," and, as a result, "the Rule [was] returned" to the agency. Letter re: Return of Rule 08 NCAC 01.0106 (June 12, 2020) at 1 https://files.nc.gov/ncoah/documents/Rules/RRC/06182020-Follow-up-Tab-B-Board-of-Elections.pdf. Despite the Rules Review Commission's rejection of Bell's proposed changes, on July 17, 2020, Bell issued an Emergency Order with the following findings:

**\*28** 18. N.C. Gen. Stat. § 163-27.1 and 08 NCAC 01. 0106 authorize me to exercise emergency powers to conduct an election where the normal schedule is disrupted by a catastrophe arising from natural causes that has resulted in a disaster declaration by the President of the United States or the Governor, while avoiding unnecessary conflict with the laws of North Carolina. The emergency remedial measures set forth here are calculated to offset the nature and scope of the disruption from the COVID-19 disaster.

19. Pursuant to N.C. Gen. Stat. § 163-27.1 and 08 NCAC 01. 0106(a) and (b), and after consultation with the State Board, I have determined that the COVID-19 health emergency is a catastrophe arising from natural causes — i.e., a naturally occurring virus — resulting in a disaster declaration by the President of the United States and a declaration of a state of emergency by the Governor, and that the disaster has already disrupted and continues to disrupt the schedule and has already impacted and continues to impact multiple components of election administration.

(Democracy N. Carolina, No. 1:20CV457 (Doc. 101-1) ¶¶ 18-19.) This directly contradicted the Rules Commission's finding that such a change was outside SBE's authority. In keeping with Bell's actions, the State failed to note in argument before this court that Bell's proposal had been rejected explicitly because SBE lacked statutory authority to exercise its emergency powers. In fact, at the close of a hearing before this court, the State made the following arguments:

but the Rules Review Commission declined to let it go forward as a temporary rule, I think I'm remembering this right, without stating why. But it did not go through.

In the meantime, the president had declared a state of national -- natural disaster declaration. The president had declared a disaster declaration, so under the existing rule, the powers kicked into place.

....

And the statute that does allow her to make those emergency decisions says in it, in exercising those emergency decisions says in it, in exercising those emergency powers, the Executive Director shall avoid unnecessary conflict with the provisions of this chapter, this chapter being Chapter 163 of the election laws.

(Democracy N. Carolina, No. 1:20CV457, Evidentiary Hr'g Tr. vol. 3 (Doc. 114) at 109.) This court agrees with the Rules Review Commission: re-writing the definition of "natural disaster" is outside SBE's rulemaking authority. N.C. Gen. Stat. § 163-27.1(a)(1) limits the Executive Director's emergency powers to those circumstances where "the normal schedule for the election is disrupted by any of the following: (1) A natural disaster."[7]

Nor does the President's major disaster proclamation define COVID-19 as a "natural disaster" – at least not as

Case 2:20-cv-01771-PP Filed 12/07/20 Page 25 of 28 Document 59-6

contemplated by the state legislature when § 163-27.1 (or its predecessor, § 163A-750) was passed. To the contrary, the Emergency Powers are limited to an election "in a district where the normal schedule for the election is disrupted." N.C. Gen. Stat. § 163-27.1(a). Nothing about COVID-19 disrupts the normal schedule for the election as might be associated with hurricanes, tornadoes, or other natural disasters.

### (a) Elimination of the Witness Requirement

Finally, even if, as SBE argues, it had the authority to enter into a Consent Agreement under its emergency powers, it did not have the power to contradict statutory authority by eliminating the witness requirement. See N.C. Gen. Stat. § 163-27.1(a) ("In exercising those emergency powers, the Executive Director shall avoid unnecessary conflict with the provisions of this Chapter.") (emphasis added). The legislature implemented a witness requirement and SBE removed that requirement. This is certainly an unnecessary conflict with the legislature's choices.

**\*29** By the State's own admission, any ballots not subject to witnessing would be unverified. The State of North Carolina argued as much in urging this court to uphold the one-witness requirement:

> As Director Bell testified, it is a basic bedrock principle of elections that you have some form of verifying that the voter is who they say they are; voter verification. As she said, when a voter comes into the poll, whether that is on election day proper or whether it is by –
>
>     ....
>
> Obviously, you can't do that when it is an absentee ballot. Because you don't see the voter, you can't ask the questions. So the witness requirement, the purpose of it is to have some means that the person who sent me this is the person -- the person who has sent this absentee ballot is who they say they are. That's the purpose of the witness requirement. The witness is witnessing that they saw this person, and they know who they are, that they saw this person fill out the ballot and prepare the ballot to mail in. And that is the point of it.
>
> And, as Director Bell testified, I mean, we've heard a lot from the Plaintiffs about how many states do not have witness requirements. And that is true, that the majority

of states, I think at this point, do not have a witness requirement.

> But as Director Bell testified, they're going to have one of two things. They're going to either have the witness requirement, or they're going to have a means of verifying the signature ....
>
> One thing -- and I think that is unquestionably an important State interest. Some means of knowing that this ballot that says it came from Alec Peters actually is from Alec Peters, because somebody else put their name down and said, yes, I saw Alec Peters do this. I saw him fill out this ballot.
>
> Otherwise, we have no way of knowing who the ballot -- whether the ballot really came from the person who voted. It is there to protect the integrity of the elections process, but it is also there to protect the voter, to make sure that the voter knows -- everybody knows that the voter is who they say they are, and so that somebody else is not voting in their place.
>
> Additionally, it is a tool for dealing with voter fraud.

(Democracy N. Carolina, No. 1:20CV457, Evidentiary Hr'g Tr. vol. 3 (Doc. 114) at 111-12.) In this hearing, the State continued on to note that "there needs to be some form of verification of who the voter is," which can "either be through a witness requirement or ... through signature verification," but "it needs to be one or the other." (Id. at 115-16.) Losing the witness requirement, according to the State, would mean having "no verification." (Id. at 116.) Contravening a legislatively implemented witness requirement and switching to a system of "no verification," (id.), was certainly not a necessary conflict under § 163-27.1(a).

SBE argues that this court does not have authority to address how this switch contradicted state law and went outside its validly delegated emergency powers. This is a state law issue, as the dispute is over the extent of the Executive Director's authority as granted to her by the North Carolina Legislature. The State claims that, since a North Carolina Superior Court Judge has approved this exercise of authority, this court is obligated to follow that state court judgment. (SBE Resp. (Doc. 65) at 16.)

**\*30** However, when the Supreme Court of a state has not spoken, federal courts must predict how that highest court would rule, rather than automatically following any state court that might have considered the question first. See Doe v. Marymount Univ., 297 F. Supp. 3d 573, 590 (E.D. Va. 2018)

("[F]ederal courts are not bound to follow state trial court decisions in exercising their supplemental jurisdiction."). The Fourth Circuit has addressed this issue directly in diversity jurisdiction contexts as well:

a federal court sitting in diversity is not bound by a state trial court's decision on matters of state law. In King v. Order of United Commercial Travelers of America, 333 U.S. 153, 68 S. Ct. 488, 92 L. Ed. 608 (1948), the Supreme Court upheld the Fourth Circuit's refusal to follow an opinion issued by a state trial court in a South Carolina insurance case. The Court concluded, "a Court of Common Pleas does not appear to have such importance and competence within South Carolina's own judicial system that its decisions should be taken as authoritative expositions of that State's 'law.' " Id. at 161, 68 S. Ct. 488. Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 370 (4th Cir. 2005). In other words, this court's job is to predict how the Supreme Court of North Carolina would rule on the disputed state law question. Id. at 369 ("If the Supreme Court of [North Carolina] has spoken neither directly nor indirectly on the particular issue before us, [this court is] called upon to predict how that court would rule if presented with the issue.")(quotation omitted); Carter v. Fid. Life Ass'n, 339 F. Supp. 3d 551, 554 (E.D.N.C.), aff'd, 740 F. App'x 41 (4th Cir. 2018) ("Accordingly, the court applies North Carolina law, and the court must determine how the Supreme Court of North Carolina would rule."). In predicting how the North Carolina Supreme Court might decide, this court "consider[s] lower court opinions in [North Carolina], the teachings of treatises, and the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369. This court "follow[s] the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 397-98 (4th Cir. 2013).

In all candor, this court cannot conceive of a more problematic conflict with the provisions of Chapter 163 of the North Carolina General Statutes than the procedures implemented by the Revised 2020-19 memo and the Consent Order. Through this abandonment of the witness requirement, some

class of voters will be permitted to submit ballots with no verification. Though SBE suggests that its "cure" is sufficient to protect against voter fraud, the cure provided has few safeguards: it asks only if the voter "voted" with no explanation of the manner in which that vote was exercised. (Moore v. Circosta, No. 1:20CV911, State Court Consent Judgment (Doc. 45-1) at 34.) This court believes this is in clear violation of SBE's powers, even its emergency powers under N.C. Gen. Stat. § 163-27.1(a). However, none of this changes the fact that Plaintiffs in both Wise and Moore lack standing to challenge the legitimacy of SBE's election rule-setting power under either the Elections Clause or the Electors Clause.

### III. CONCLUSION

This court believes the unequal treatment of voters and the resulting Equal Protection violations as found herein should be enjoined. Nevertheless, under Purcell and recent Supreme Court orders relating to Purcell, this court is of the opinion that it is required to find that injunctive relief should be denied at this late date, even in the face of what appear to be clear violations. For the foregoing reasons, this court finds that in Moore v. Circosta, No. 1:20CV911, Plaintiffs' Motion for Preliminary Injunction should be denied. This court also finds that in Wise v. N. Carolina State Bd. of Elections, No. 1:20CV912, the Plaintiffs' Motion to Convert the Temporary Restraining Order into a Preliminary Injunction should be denied.

**\*31 IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Preliminary Injunction in Moore v. Circosta, No. 1:20CV911, (Doc. 60), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Convert the Temporary Restraining Order into a Preliminary Injunction in Wise v. N. Carolina State Bd. of Elections, No. 1:20CV912, (Doc. 43), is **DENIED**.

### All Citations

--- F.Supp.3d ----, 2020 WL 6063332

### Footnotes

1   All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

2   In Democracy N. Carolina v. N.C. State Board of Elections, No. 1:20CV457, an order is entered contemporaneously with this Memorandum Opinion and Order enjoining certain aspects of the Revised Memo 2020-19.

3   The Memoranda incorrectly cites this statute as N.C. Gen. Stat. § 163-223.6(a)(5).

4    An additional discussion of the facts related to SBE's use of this court's order in obtaining a Consent Judgment is set out in this court's order in [Democracy v. North Carolina State Board of Elections, No. 1:20CV457, 2020 WL 6058048 (M.D.N.C. Oct. 14, 2020)](#) (enjoining witness cure procedure).

5    Defendant SBE and Alliance Intervenors' memoranda filed in opposition to Plaintiffs' motions for a preliminary injunction in Moore are identical to those that each party filed in Wise. (Compare SBE Resp. (Doc. 65) and Alliance Resp. (Doc. 64) with Wise, No. 1:20CV912 (Doc. 45) and Wise, No. 1:20CV912 (Doc. 47).) For clarity and ease, this court will cite only to the briefs Defendant SBE and Alliance Intervenors filed in Moore in subsequent citations.

6    Plaintiffs do not challenge the use of the cure affidavit for ballot deficiencies generally, aside from arguing that the cure affidavit circumvents the statutory Witness Requirement. (See Moore Compl. (Doc. 1) ¶ 93; Wise Compl. (Doc. 1) ¶ 124.) Although not raised by Plaintiffs, this courts finds the indefiniteness of the cure affidavit language troubling as a means of correcting even curable ballot deficiencies.

   During oral arguments, Defendants did not and could not clearly define what it means to "vote," (see, e.g., Oral Argument Tr. (Doc. 70) at 130-32), which is all that the affidavit requires voters to attest that they have done. (Moore v. Circosta, No. 1:20CV911, State Court Consent Judgment (Doc. 45-1) at 34.) Under the vague "I voted" language used in the affidavit, a voter who completed their ballot with assistance from an unauthorized individual; a voter who does not qualify for voting assistance; or a voter who simply delegated the responsibility for completing their ballot to another person could truthfully sign this affidavit, although all three acts are prohibited under state law. See [N.C. Gen. Stat. § 163-226.3(a)(1)](#). Because the cure affidavit does not define what it means to vote, voters are permitted to decide what that means for themselves. This presents additional Equal Protection concerns. A state must ensure that there is "no preferred class of voters but equality among those who meet the basic qualifications." [Gray, 372 U.S. at 380, 83 S.Ct. 801](#). Because the affidavit does not serve as an adequate means to ensure that voters did not engage in unauthorized ballot casting procedures, inevitably, not all voters will be held to the same standards for casting their ballot. This is, by definition, arbitrary and disparate treatment inconsistent with existing state law.

   This court's concerns notwithstanding, however, Plaintiffs do not challenge the use of a cure affidavit in other contexts, so this court will decline to enjoin the use of a cure affidavit beyond its application as an alternative for compliance with the Witness Requirement.

7    Notably, Bell makes no finding as to whether this is a Type I, II, or III Declaration of Disaster, which would in turn limit the term of the Disaster Declaration. See, e.g., [N.C. Gen. Stat. § 166A-19.21](#).

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 7



**OFFICE OF THE CLERK**

# Supreme Court of Wisconsin

**110 EAST MAIN STREET, SUITE 215**
**P.O. BOX 1688**
**MADISON, WI 53701-1688**

**TELEPHONE (608) 266-1880**
**FACSIMILE (608) 267-0640**
Web Site:  www.wicourts.gov

December 3, 2020

To:

R. George Burnett
Conway, Olejniczak & Jerry, SC
P.O. Box 23200
Green Bay, WI 54305-3200

James R. Troupis
Troupis Law Office, LLC
4126 Timber Lane
Cross Plains, WI 53528

Margaret C. Daun
Milwaukee County Corporation Counsel
901 N. 9th Street, Room 303
Milwaukee, WI 53233

Joshua L. Kaul
Thomas C. Bellavia
Colin T. Roth
Colin R. Stroud
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857

David R. Gault
Assistant Corporation Counsel
Office of the Dane County Corporation
Counsel
210 Martin Luther King, Jr. Blvd., Room 419
Madison, WI 53703-3345

*Address list continued on page 9.

You are hereby notified that the Court has entered the following order:

No. 2020AP1971-OA        Trump v. Evers

A petition for leave to commence an original action under Wis. Stat. § (Rule) 809.70, a supporting legal memorandum, and an appendix have been filed on behalf of petitioners, Donald J. Trump, et al.  Responses to the petition have been filed by (1) Governor Tony Evers; (2) the Wisconsin Elections Commission and its Chair, Ann S. Jacobs; (3) Scott McDonell, Dane County Clerk, and Alan A. Arnsten and Joyce Waldrop, members of the Dane County Board of Canvassers; and (4) George L. Christensen, Milwaukee County Clerk, and Timothy H. Posnanski, Richard Baas, and Dawn Martin, members of the Milwaukee County Board of Canvassers. A non-party brief in support of the petition has been filed by the Liberty Justice Center.  A motion to intervene, a proposed response of proposed respondents-intervenors, and an appendix have been filed by the Democratic National Committee (DNC) and Margaret J. Andrietsch, Sheila Stubbs,

Ronald Martin, Mandela Barnes, Khary Penebaker, Mary Arnold, Patty Schachtner, Shannon Holsey, and Benjamin Wikler (collectively, "the Biden electors"). The court having considered all of the filings,

IT IS ORDERED that the petition for leave to commence an original action is denied. One or more appeals from the determination(s) of one or more boards of canvassers or from the determination of the chairperson of the Wisconsin Elections Commission may be filed by an aggrieved candidate in circuit court. Wis. Stat. § 9.01(6); and

IT IS FURTHER ORDERED that the motion to intervene is denied as moot.

BRIAN HAGEDORN, J.   (*concurring).*   I understand the impulse to immediately address the legal questions presented by this petition to ensure the recently completed election was conducted in accordance with the law. But challenges to election results are also governed by law. All parties seem to agree that Wis. Stat. § 9.01 (2017–18)[1] constitutes the "exclusive judicial remedy" applicable to this claim. § 9.01(11). After all, that is what the statute says. This section provides that these actions should be filed in the circuit court, and spells out detailed procedures for ensuring their orderly and swift disposition. See § 9.01(6)–(8). Following this law is not disregarding our duty, as some of my colleagues suggest. It is following the law.

Even if this court has constitutional authority to hear the case straightaway, notwithstanding the statutory text, the briefing reveals important factual disputes that are best managed by a circuit court.[2] The parties clearly disagree on some basic factual issues, supported at times by competing affidavits. I do not know how we could address all the legal issues raised in the petition without sorting through these matters, a task we are neither well-positioned nor institutionally designed to do. The statutory process assigns this responsibility to the circuit court. Wis. Stat. § 9.01(8)(b) ("The [circuit] court shall separately treat disputed issues of procedure, interpretations of law, and findings of fact.").

We do well as a judicial body to abide by time-tested judicial norms, even—and maybe especially—in high-profile cases. Following the law governing challenges to election results is no threat to the rule of law. I join the court's denial of the petition for original action so that the petitioners may promptly exercise their right to pursue these claims in the manner prescribed by the legislature.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2017–18 version.

[2] The legislature generally can and does set deadlines and define procedures that circumscribe a court's competence to act in a given case. Village of Trempealeau v. Mikrut, 2004 WI 79, ¶¶9–10, 273 Wis. 2d 76, 681 N.W.2d 190. The constitution would obviously override these legislative choices where the two conflict.

PATIENCE DRAKE ROGGENSACK, C.J.   *(dissenting).*   Before us is an emergency petition for leave to commence an original action brought by President Trump, Vice President Pence and Donald Trump for President, Inc., against Governor Evers, the Wisconsin Elections Commission (WEC), its members and members of both the Milwaukee County Board of Canvassers and the Dane County Board of Canvassers.  The Petitioners allege that the WEC and election officials caused voters to violate various statutes in conducting Wisconsin's recent presidential election.  The Petitioners raised their concerns during recount proceedings in Dane County and Milwaukee County.  Their objections were overruled in both counties.

The Respondents argue, in part, that we lack subject matter jurisdiction because of the "exclusive judicial remedy" provision found in Wis. Stat. § 9.01(11) (2017-18).[3]  Alternatively, the Respondents assert that we should deny this petition because fact-finding is required, and we are not a fact-finding tribunal.

I conclude that we have subject matter jurisdiction that enables us to grant the petition for original action pending before us.  Our jurisdiction arises from the Wisconsin Constitution and cannot be impeded by statute.  Wis. Const., art. VII, Section 3(2); City of Eau Claire v. Booth, 2016 WI 65, ¶7, 370 Wis. 2d 595, 882 N.W.2d 738.  Furthermore, time is of the essence.

However, fact-finding may be central to our evaluation of some of the questions presented. I agree that the circuit court should examine the record presented during the canvasses to make factual findings where legal challenges to the vote turn on questions of fact.  However, I dissent because I would grant the petition for original action, refer for necessary factual findings to the circuit court, who would then report its factual findings to us, and we would decide the important legal questions presented.

I also write separately to emphasize that by denying this petition, and requiring both the factual questions and legal questions be resolved first by a circuit court, four justices of this court are ignoring that there are significant time constraints that may preclude our deciding significant legal issues that cry out for resolution by the Wisconsin Supreme Court.

## I.  DISCUSSION

The Petitioners set out four categories of absentee votes that they allege should not have been counted because they were not lawfully cast:  (1) votes cast during the 14-day period for in-person absentee voting at a clerk's office with what are alleged to be insufficient written requests for absentee ballots, pursuant to Wis. Stat. § 6.86(1)(b); (2) votes cast when a clerk has completed information missing from the ballot envelope, contrary to Wis. Stat. § 6.87(6d); (3) votes cast by those who obtained an absentee ballot after March 25, 2020 by alleging that they were indefinitely

_____

[3] All subsequent references to the Wisconsin Statutes are to the 2017–18 version.

confined; and (4) votes cast in Madison at "Democracy in the Park" events on September 26 and October 3, in advance of the 14-day period before the election, contrary to Wis. Stat. § 6.87.

Some of the Respondents have asserted that WEC has been advising clerks to add missing information to ballot envelopes for years, so the voters should not be punished for following WEC's advice. They make similar claims for the collection of votes more than 14 days before the November 3 election.

If WEC has been giving advice contrary to statute, those acts do not make the advice lawful. WEC must follow the law. We, as the law declaring court, owe it to the public to declare whether WEC's advice is incorrect. However, doing so does not necessarily lead to striking absentee ballots that were cast by following incorrect WEC advice. The remedy Petitioners seek may be out of reach for a number of reasons.

Procedures by which Wisconsin elections are conducted must be fair to all voters. This is an important election, but it is not the last election in which WEC will be giving advice. If we do not shoulder our responsibilities, we leave future elections to flounder and potentially result in the public's perception that Wisconsin elections are unfair. The Wisconsin Supreme Court can uphold elections by examining the procedures for which complaint was made here and explaining to all where the WEC was correct and where it was not.

I also am concerned that the public will misunderstand what our denial of the petition means. Occasionally, members of the public seem to believe that a denial of our acceptance of a case signals that the petition's allegations are either false or not serious. Nothing could be further from the truth. Indeed, sometimes, we deny petitions even when it appears that a law has been violated. Hawkins v. Wis. Elec. Comm'n, 2020 WI 75, ¶¶14–16, 393 Wis. 2d 629, 948 N.W.2d 877 (Roggensack, C.J., dissenting).

## II. CONCLUSION

I conclude that we have subject matter jurisdiction that enables us to grant the petition for original action pending before us. Our jurisdiction arises from the Wisconsin Constitution and cannot be impeded by statute. Wis. Const., art. VII, Section 3(2); City of Eau Claire, 370 Wis. 2d 595, ¶7. Furthermore, time is of the essence.

However, fact-finding may be central to our evaluation of some of the questions presented. I agree that the circuit court should examine the record presented during the canvasses to make factual findings where legal challenges to the vote turn on questions of fact. However, I dissent because I would grant the petition for original action, refer for necessary factual findings to the circuit court, who would then report its factual findings to us, and we would decide the important legal questions presented.

I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.

REBECCA GRASSL BRADLEY, J.  (*dissenting*).  "It is emphatically the province and duty of the Judicial Department to say what the law is."  Marbury v. Madison, 5 U.S. 137, 177 (1803).  The Wisconsin Supreme Court forsakes its duty to the people of Wisconsin in declining to decide whether election officials complied with Wisconsin's election laws in administering the November 3, 2020 election.  Instead, a majority of this court passively permits the Wisconsin Elections Commission (WEC) to decree its own election rules, thereby overriding the will of the people as expressed in the election laws enacted by the people's elected representatives.  Allowing six unelected commissioners to make the law governing elections, without the consent of the governed, deals a death blow to democracy.  I dissent.

The President of the United States challenges the legality of the manner in which certain Wisconsin election officials directed the casting of absentee ballots, asserting they adopted and implemented particular procedures in violation of Wisconsin law.  The respondents implore this court to reject the challenge because, they argue, declaring the law at this point would "retroactively change the rules" after the election.  It is THE LAW that constitutes "the rules" of the election and election officials are bound to follow the law, if we are to be governed by the rule of law, and not of men.

Under the Wisconsin Constitution, "all governmental power derives 'from the consent of the governed' and government officials may act only within the confines of the authority the people give them. Wis. Const. art. I, § 1."  Wisconsin Legislature v. Palm, 2020 WI 42, ¶66, 391 Wis. 2d 497, 942 N.W.2d 900 (Rebecca Grassl Bradley, J., concurring).  The Founders designed our "republic to be a government of laws, and not of men . . . bound by fixed laws, which the people have a voice in making, and a right to defend."  John Adams, Novanglus: A History of the Dispute with America, from Its Origin, in 1754, to the Present Time, in Revolutionary Writings of John Adams (C. Bradley Thompson ed. 2000) (emphasis in original).  Allowing any person, or unelected commission of six, to be "bound by no law or limitation but his own will" defies the will of the people.  Id.

The importance of having the State's highest court resolve the significant legal issues presented by the petitioners warrants the exercise of this court's constitutional authority to hear this case as an original action.  See Wis. Const. Art. VII, § 3.  "The purity and integrity of elections is a matter of such prime importance, and affects so many important interests, that the courts ought never to hesitate, when the opportunity is offered, to test them by the strictest legal standards."  State v. Conness, 106 Wis. 425, 82 N.W. 288, 289 (1900).  While the court reserves this exercise of its jurisdiction for those original actions of statewide significance, it is beyond dispute that "[e]lections are the foundation of American government and their integrity is of such monumental importance that any threat to their validity should trigger not only our concern but our prompt action."  State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued June 1, 2020 (Rebecca Grassl Bradley, J., dissenting)).

The majority notes that an action "may be filed by an aggrieved candidate in circuit court. Wis. Stat. § 9.01(6)."  Justice Hagedorn goes so far as to suggest that § 9.01 "constitutes the 'exclusive judicial remedy' applicable to this claim."  No statute, however, can circumscribe the

constitutional jurisdiction of the Wisconsin Supreme Court to hear this (or any) case as an original action.     "The Wisconsin Constitution IS the law—and it reigns supreme over any statute." Wisconsin Legislature v. Palm, 391 Wis. 2d 497, ¶67 n.3 (Rebecca Grassl Bradley, J., concurring). "The Constitution's supremacy over legislation bears repeating:  'the Constitution is to be considered in court as a paramount law' and 'a law repugnant to the Constitution is void, and . . . courts, as well as other departments, are bound by that instrument.'  See Marbury [v. Madison], 5 U.S. (1 Cranch) [137] at 178, 180 [1803])."  Mayo v. Wis. Injured Patients and Families Comp. Fund, 2018 WI 78, ¶91, 383 Wis. 2d 1, 914 N.W.2d 678 (Rebecca Grassl Bradley, J., concurring). Wisconsin Statute § 9.01 is compatible with the constitution.  While it provides an avenue for aggrieved candidates to pursue an appeal to a circuit court after completion of the recount determination, it does not foreclose the candidate's option to ask this court to grant his petition for an original action.  Any contrary reading would render the law in conflict with the constitution and therefore void.  Under the constitutional-doubt canon of statutory interpretation, "[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt."  Antonin Scalia & Brian A. Garner, Reading Law:  The Interpretation of Legal Texts 247.  See also Wisconsin Legislature v. Palm, 391 Wis. 2d 497, ¶31 ("[W]e disfavor statutory interpretations that unnecessarily raise serious constitutional questions about the statute under consideration.").

While some will either celebrate or decry the court's inaction based upon the impact on their preferred candidate, the importance of this case transcends the results of this particular election.  "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."  Purcell v. Gonzalez, 549 U.S. 1, 4 (2006).  The majority takes a pass on resolving the important questions presented by the petitioners in this case, thereby undermining the public's confidence in the integrity of Wisconsin's electoral processes not only during this election, but in every future election.  Alarmingly, the court's inaction also signals to the WEC that it may continue to administer elections in whatever manner it chooses, knowing that the court has repeatedly declined to scrutinize its conduct.  Regardless of whether the WEC's actions affect election outcomes, the integrity of every election will be tarnished by the public's mistrust until the Wisconsin Supreme Court accepts its responsibility to declare what the election laws say.  "Only . . . the supreme court can provide the necessary clarity to guide all election officials in this state on how to conform their procedures to the law" going forward.  State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued January 13, 2020 (Rebecca Grassl Bradley, J., dissenting)).

The majority's recent pattern of deferring or altogether dodging decisions on election law controversies[4] cannot be reconciled with its lengthy history of promptly hearing cases involving

---

[4] Hawkins v. Wis. Elec. Comm'n, 2020 WI 75, ¶¶84, 86, 393 Wis. 2d 629, 948 N.W.2d 877 (Rebecca Grassl Bradley, J., dissenting) ("The majority upholds the Wisconsin Elections Commission's violation of Wisconsin law, which irrefutably entitles Howie Hawkins and Angela Walker to appear on Wisconsin's November 2020 general election ballot as candidates for President and Vice President of the United States . . . .  In dodging its responsibility to uphold the rule of law, the majority ratifies a grave threat to our republic, suppresses the votes of

voting rights and election processes under the court's original jurisdiction or by bypassing the court of appeals.[5]  While the United States Supreme Court has recognized that "a state indisputably has a compelling interest in preserving the integrity of its election process[,]" Burson v. Freeman, 504 U.S. 191, 199 (1992), the majority of this court repeatedly demonstrates a lack of any interest in doing so, offering purely discretionary excuses or no reasoning at all.  This year, the majority in Hawkins v. Wis. Elec. Comm'n declined to hear a claim that the WEC unlawfully kept the Green Party's candidates for President and Vice President off of the ballot, ostensibly because the majority felt the candidates' claims were brought "too late."[6]  But when litigants have filed cases involving voting rights well in advance of Wisconsin elections, the court has "take[n] a pass,"

---

Wisconsin citizens, irreparably impairs the integrity of Wisconsin's elections, and undermines the confidence of American citizens in the outcome of a presidential election"); State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued January 13, 2020 (Rebecca Grassl Bradley, J., dissenting)) ("In declining to hear a case presenting issues of first impression immediately impacting the voting rights of Wisconsin citizens and the integrity of impending elections, the court shirks its institutional responsibilities to the people who elected us to make important decisions, thereby signaling the issues are not worthy of our prompt attention."); State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued June 1, 2020 (Rebecca Grassl Bradley, J., dissenting)) ("A majority of this court disregards its duty to the people we serve by inexplicably delaying the final resolution of a critically important and time-sensitive case involving voting rights and the integrity of Wisconsin's elections.").

[5] See, e.g., NAACP v. Walker, 2014 WI 98, ¶¶1, 18, 357 Wis. 2d 469, 851 N.W.2d 262 (2014) (this court took jurisdiction of appeal on its own motion in order to decide constitutionality of the voter identification act enjoined by lower court); Elections Bd. of Wisconsin v. Wisconsin Mfrs. & Commerce, 227 Wis. 2d 650, 653, 670, 597 N.W.2d 721 (1999) (this court granted bypass petition to decide whether express advocacy advertisements advocating the defeat or reelection of incumbent legislators violated campaign finance laws, in absence of cases interpreting applicable statutes); State ex rel. La Follette v. Democratic Party of United States, 93 Wis. 2d 473, 480-81, 287 N.W.2d 519 (1980) (original action deciding whether Wisconsin open primary system was binding on national political parties or infringed their freedom of association), rev'd, Democratic Party of United States v. Wisconsin ex rel. La Follette, 450 U.S. 107 (1981); State ex rel. Reynolds v. Zimmerman, 22 Wis. 2d 544, 548, 126 N.W.2d 551 (1964) (original action seeking to enjoin state from holding elections pursuant to legislative apportionment alleged to violate constitutional rights); State ex rel. Broughton v. Zimmerman, 261 Wis. 398, 400, 52 N.W.2d 903 (1952) (original action to restrain the state from holding elections based on districts as defined prior to enactment of reapportionment law), overruled in part by Reynolds, 22 Wis. 2d 544; State ex rel. Conlin v. Zimmerman, 245 Wis. 475, 476, 15 N.W.2d 32 (1944) (original action to interpret statutes in determining whether candidate for Governor timely filed papers to appear on primary election ballot).

[6] Hawkins v. Wis. Elec. Comm'n, 2020 WI 75, ¶5, 393 Wis. 2d 629, 948 N.W.2d 877 (denying the petition for leave to commence an original action).

thereby "irreparably den[ying] the citizens of Wisconsin a timely resolution of issues that impact voter rights and the integrity of our elections."   State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued January 13, 2020 (Rebecca Grassl Bradley, J., dissenting)). Having neglected to identify any principles guiding its decisions, the majority leaves Wisconsin's voters and candidates guessing as to when, exactly, they should file their cases in order for the majority to deem them worthy of the court's attention.

The consequence of the majority operating by whim rather than rule is to leave the interpretation of multiple election laws in flux—or worse yet, in the hands of the unelected members of the WEC. "To be free is to live under a government by law . . . . Miserable is the condition of individuals, danger is the condition of the state, if there is no certain law, or, which is the same thing, no certain administration of the law . . . ." Judgment in Rex vs. Shipley, 21 St Tr 847 (K.B. 1784) (Lord Mansfield presiding). The Wisconsin Supreme Court has an institutional responsibility to decide important questions of law—not for the benefit of particular litigants, but for citizens we were elected to serve.  Justice for the people of Wisconsin means ensuring the integrity of Wisconsin's elections.  A majority of this court disregards its duty to the people of Wisconsin, denying them justice.

"No aspect of the judicial power is more fundamental than the judiciary's exclusive responsibility to exercise judgment in cases and controversies arising under the law."  Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶37, 376 Wis. 2d 147, 897 N.W.2d 384.  Once again, a majority of this court instead "chooses to sit idly by,"[7] in a nationally important and time-sensitive case involving voting rights and the integrity of Wisconsin's elections, depriving the people of Wisconsin of answers to questions of statutory law that only the state's highest court may resolve. The majority's "refusal to hear this case shows insufficient respect to the State of [Wisconsin], its voters,"[8] and its elections.

"This great source of free government, popular election, should be perfectly pure." Alexander Hamilton, Speech at New York Ratifying Convention (June 21, 1788), in Debates on the Federal Constitution 257 (J. Elliot ed. 1876).  The majority's failure to act leaves an indelible stain on our most recent election.  It will also profoundly and perhaps irreparably impact all local, statewide, and national elections going forward, with grave consequence to the State of Wisconsin and significant harm to the rule of law.  Petitioners assert troubling allegations of noncompliance with Wisconsin's election laws by public officials on whom the voters rely to ensure free and fair elections.  It is not "impulse"[9] but our solemn judicial duty to say what the law is that compels the exercise of our original jurisdiction in this case.  The majority's failure to embrace its duty (or even

---

[7] United Student Aid Funds, Inc. v. Bible, 136 S. Ct. 1607, 1609 (2016) (Thomas, J., dissenting from the denial of certiorari).

[8] County of Maricopa, Arizona v. Lopez-Valenzuela, 135 S. Ct. 2046, 2046 (2015) (Thomas, J., dissenting from the denial of certiorari).

[9] See Justice Hagedorn's concurrence.

an impulse) to decide this case risks perpetuating violations of the law by those entrusted to follow it. I dissent.

      I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK and Justice ANNETTE KINGSLAND ZIEGLER join this dissent.

Sheila T. Reiff
Clerk of Supreme Court

Address list continued:

Andrew A. Jones
Andrew J. Kramer
James F. Cirincione
Hansen Reynolds LLC
301 N. Broadway St., Ste. 400
Milwaukee, WI 53202-2660

John W. McCauley
Hansen Reynolds LLC
10 E. Doty St. Ste 800
Madison, WI 53703

Jeffrey A. Mandell
Rachel E. Snyder
Stafford Rosenbaum LLP
222 W. Washington Avenue
Post Office Box 1784
Madison, WI 53701

Daniel R. Suhr
Liberty Justice Center
190 LaSalle St., Ste. 1500
Chicago, IL 60603

Matthew W. O'Neill
Fox, O'Neill & Shannon, S.C.
622 North Water Street, Suite 500
Milwaukee, WI 53202

Charles G. Curtis
Michelle M. Umberger
Sopen B. Shah
Will M. Conley
Perkins Coie LLP
One East Main St., Suite 201
Madison, WI 53703

Justin A. Nelson
Stephen Shackelford Jr.
Davida Brook
Susman Godfrey LLP
1000 Louisiana Street
Suite 5100
Houston, TX 77002

Paul Smith
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005

David S. Lesser
Jamie Dycus
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Marc E. Elias

John Devaney                          Seth P. Waxman
Zachary J. Newkirk                    Wilmer Cutler Pickering Hale and Dorr LLP
Perkins Coie LLP                      1875 Pennsylvania Ave., NW
700 Thirteenth St., N.W., Suite 800   Washington, DC 20006
Washington, D.C. 20005

# EXHIBIT 8



OFFICE OF THE CLERK

# Supreme Court of Wisconsin

**110 EAST MAIN STREET, SUITE 215**
**P.O. BOX 1688**
**MADISON, WI 53701-1688**

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

December 4, 2020

To:

Gregory M. Erickson
Erick G. Kaardal
Mohrmann, Kaardal and Erickson
150 S. 5th Street, Suite 3100
Minneapolis, MN 55414

Colin T. Roth
Thomas C. Bellavia
Colin R. Stroud
Brian P. Keenan
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857

Brian S. Levy
Katten & Temple
11512 N. Port Washington Road, Suite 101J
Mequon, WI 53092

Joseph S. Goode
Mark M. Leitner
John W. Halpin
Allison E. Laffey
Laffey, Leitner & Goode LLC
325 E. Chicago Street, Suite 200
Milwaukee, WI 53202

*Address list continued on page 5.

You are hereby notified that the Court has entered the following order:

No. 2020AP1930-OA      Wisconsin Voters Alliance v. Wisconsin Elections Commission

A petition for leave to commence an original action under Wis. Stat. § (Rule) 809.70 and a supplement thereto, a supporting legal memorandum, and supporting expert reports have been filed on behalf of petitioners, Wisconsin Voters Alliance, et al. A response to the petition has been filed by respondents, Wisconsin Elections Commission, Ann S. Jacobs, Mark L. Thomsen, Marge Bostelman, Julie M. Glancey, Dean Knudsen, and Robert F. Spindell, and a separate response has been filed by respondent Governor Tony Evers. Amicus briefs regarding the issue of whether to grant leave to commence an original action have been filed by (1) Christine Todd Whitman, et al; (2) the City of Milwaukee; (3) Wisconsin State Conference NAACP, et al.; and (4) the Center for Tech and Civic Life. In addition, a motion to intervene has been filed by proposed intervenor-respondent, Democratic National Committee.

After considering all of the filings, we conclude that this petition does not satisfy our standards for granting leave to commence an original action. Although the petition raises time-

sensitive questions of statewide significance, "issues of material fact [would] prevent the court from addressing the legal issues presented." State ex rel. Ozanne v. Fitzgerald, 2011 WI 43, ¶19, 334 Wis. 2d 70, 798 N.W.2d 436 (Prosser, J., concurring). It is therefore not an appropriate case in which to exercise our original jurisdiction. Accordingly,

IT IS ORDERED that the petition for leave to commence an original action is denied; and

IT IS FURTHER ORDERED that the motion to intervene is denied as moot.

BRIAN HAGEDORN, J.,   (*concurring*). The Wisconsin Voters Alliance and a group of Wisconsin voters bring a petition for an original action raising a variety of questions about the operation of the November 3, 2020 presidential election. Some of these legal issues may, under other circumstances, be subject to further judicial consideration. But the real stunner here is the sought-after remedy. We are invited to invalidate the entire presidential election in Wisconsin by declaring it "null"—yes, the whole thing. And there's more. We should, we are told, enjoin the Wisconsin Elections Commission from certifying the election so that Wisconsin's presidential electors can be chosen by the legislature instead, and then compel the Governor to certify those electors. At least no one can accuse the petitioners of timidity.

Such a move would appear to be unprecedented in American history. One might expect that this solemn request would be paired with evidence of serious errors tied to a substantial and demonstrated set of illegal votes. Instead, the evidentiary support rests almost entirely on the unsworn expert report[1] of a former campaign employee that offers statistical estimates based on call center samples and social media research.

This petition falls far short of the kind of compelling evidence and legal support we would undoubtedly need to countenance the court-ordered disenfranchisement of every Wisconsin voter. The petition does not even justify the exercise of our original jurisdiction.

As an initial matter, the Wisconsin Supreme Court is not a fact-finding tribunal. Yet the petition depends upon disputed factual claims. In other words, we couldn't just accept one side's description of the facts or one side's expert report even if we were inclined to believe them.[2] That alone means this case is not well-suited for an original action. The petition's legal support is no less wanting. For example, it does not explain why its challenge to various election processes

---

[1] After filing their petition for original action, the Petitioners submitted a second expert report. But the second report only provides additional computations based on the assumptions and calculations in the initial expert report.

[2] The Attorney General and Governor offer legitimate arguments that this report would not even be admissible evidence under Wis. Stat. § 907.02 (2017-18).

All subsequent references to the Wisconsin Statutes are to the 2017-18 version.

comes after the election, and not before. Nor does it grapple with how voiding the presidential election results would impact every other race on the ballot, or consider the import of election statutes that may provide the "exclusive remedy."[3] These are just a few of the glaring flaws that render the petition woefully deficient. I therefore join the court's order denying the original action.

Nonetheless, I feel compelled to share a further observation. Something far more fundamental than the winner of Wisconsin's electoral votes is implicated in this case. At stake, in some measure, is faith in our system of free and fair elections, a feature central to the enduring strength of our constitutional republic. It can be easy to blithely move on to the next case with a petition so obviously lacking, but this is sobering. The relief being sought by the petitioners is the most dramatic invocation of judicial power I have ever seen. Judicial acquiescence to such entreaties built on so flimsy a foundation would do indelible damage to every future election. Once the door is opened to judicial invalidation of presidential election results, it will be awfully hard to close that door again. This is a dangerous path we are being asked to tread. The loss of public trust in our constitutional order resulting from the exercise of this kind of judicial power would be incalculable.

I do not mean to suggest this court should look the other way no matter what. But if there is a sufficient basis to invalidate an election, it must be established with evidence and arguments commensurate with the scale of the claims and the relief sought. These petitioners have come nowhere close. While the rough and tumble world of electoral politics may be the prism through which many view this litigation, it cannot be so for us. In these hallowed halls, the law must rule.

Our disposal of this case should not be understood as a determination or comment on the merits of the underlying legal issues; judicial review of certain Wisconsin election practices may be appropriate. But this petition does not merit further consideration by this court, much less grant us a license to invalidate every single vote cast in Wisconsin's 2020 presidential election.

I am authorized to state that Justices ANN WALSH BRADLEY, REBECCA FRANK DALLET, and JILL J. KAROFSKY join this concurrence.

ROGGENSACK, C.J. (*dissenting*). It is critical that voting in Wisconsin elections not only be fair, but that the public also perceives voting as having been fairly conducted.

This is the third time that a case filed in this court raised allegations about purely legal questions that concern Wisconsin Elections Commission (WEC) conduct during the November 3,

---

[3] See Wis. Stat. § 9.01(11) (providing that § 9.01 "constitutes the exclusive judicial remedy for testing the right to hold an elective office as the result of an alleged irregularity, defect or mistake committed during the voting or canvassing process"); Wis. Stat. § 5.05(2m)(k) (describing "[t]he commission's power to initiate civil actions" under § 5.05(2m) as the "exclusive remedy for alleged civil violations of chs. 5 to 10 or 12").

2020, presidential election.[4]  This is the third time that a majority of this court has turned its back on pleas from the public to address a matter of statewide concern that requires a declaration of what the statutes require for absentee voting.  I dissent and write separately because I have concluded that the court has not meet its institutional responsibilities by repeatedly refusing to address legal issues presented in all three cases.

I agree with Justice Hagedorn that we are not a circuit court, and therefore, generally, we do not take cases for which fact-finding is required.  Green for Wisconsin v. State Elections Bd., 2006 WI 120, 297 Wis. 2d 300, 301, 723 N.W.2d 418.  However, when the legal issue that we wish to address requires it, we have taken cases that do require factual development, referring any necessary factual determinations to a referee or to a circuit court.  State ex rel. LeFebre v. Israel, 109 Wis. 2d 337, 339, 325 N.W.2d 899 (1982); State ex rel White v. Gray, 58 Wis. 2d 285, 286, 206 N.W.163 (1973).

We also have taken cases where the issues we wish to address are purely legal questions for which no factual development is required in order to state what the law requires.  Wisconsin Legislature v. Palm, 2020 WI 42, 391 Wis. 2d 497, 942 N.W.2d 900.  The statutory authority of WEC is a purely legal question. There is no factual development required for us to declare what the law requires in absentee voting.

Justice Hagedorn is concerned about some of the relief that Petitioners request.  He begins his concurrence saying, "the real stunner here is the sought after remedy."  He next relates, "The relief being sought by the petitioners is the most dramatic invocation of judicial power I have ever seen."  Then, he concludes with, "this petition does not merit further consideration by this court, much less grant us a license to invalidate every single vote cast in Wisconsin's 2020 presidential election."[5]

Those are scary thoughts, but Justice Hagedorn has the cart before the horse in regard to our consideration of this petition for an original action.  We grant petitions to exercise our jurisdiction based on whether the legal issues presented are of state wide concern, not based on the remedies requested.  Petition of Heil, 230 Wis. 428, 284 N.W.42 (1938).

Granting a petition does not carry with it the court's view that the remedy sought is appropriate for the legal issues raised.  Historically, we often do not provide all the relief requested.  Bartlett v. Evers, 2020 WI 68, ¶9, 393 Wis. 2d 172, 945 N.W.2d 685 (upholding some but not all partial vetoes).  There have been occasions when we have provided none of the relief requested by the petitioner, but nevertheless declared the law.  See Sands v. Menard, Inc., 2010 WI 96, ¶46, 328 Wis. 2d 647, 787 N.W.2d 384 (concluding that while reinstatement is the preferred remedy under

---

[4] Trump v. Evers, No. 2020AP1971-OA, unpublished order (Wis. S. Ct. Dec. 3, 2020); Mueller v. WEC, No. 2020AP1958-OA, unpublished order (Wis. S. Ct. Dec. 3, 2020) and Wisconsin Voters Alliance v. WEC, No. 2020AP193-OA.

[5] Justice Hagedorn forgets to mention that one form of relief sought by Petitioners is, "Any other relief the Court deems appropriate."

Title VII, it is an equitable remedy that may or may not be appropriate); <u>Coleman v. Percy</u>, 96 Wis. 2d 578, 588-89, 292 N.W.2d 615 (1980) (concluding that the remedy Coleman sought was precluded).

We have broad subject matter jurisdiction that enables us to grant the petition for original action pending before us. Our jurisdiction is grounded in the Wisconsin Constitution. Wis. Const., art. VII, Section 3(2); <u>City of Eau Claire v. Booth</u>, 2016 WI 65, ¶7, 370 Wis. 2d 595, 882 N.W.2d 738.

I dissent because I would grant the petition and address the people of Wisconsin's concerns about whether WEC's conduct during the 2020 presidential election violated Wisconsin statutes. As I said as I began, it is critical that voting in Wisconsin elections not only be fair, but that the public also perceives voting as having been fairly conducted. The Wisconsin Supreme Court should not walk away from its constitutional obligation to the people of Wisconsin for a third time.

I am authorized to state that Justices ANNETTE KINGSLAND ZIEGLER and REBECCA GRASSL BRADLEY join this dissent.

Sheila T. Reiff
Clerk of Supreme Court

<u>Address list continued</u>:

Tearman Spencer
Mary L. Schanning
Scott F. Brown
Kathryn Z. Block
Patrick J. McClain
Tyrone M. St. Junior
James M. Carroll
Milwaukee City Attorney's Office
200 East Wells Street
800 City Hall
Milwaukee, WI 53202

Kendall W. Harrison
Mike B. Wittenwyler
Godfrey & Kahn
1 E. Main St., Ste 500
P.O. Box 2719
Madison, WI 53701-2719

Jeffrey A. Mandell
Rachel E. Snyder
Stafford Rosenbaum LLP
222 W. Washington Avenue
Post Office Box 1784
Madison, WI 53701

Charles G. Curtis, Jr.
Sopen B. Shah
Will M. Conley
Perkins Coie LLP
One East Main St., Ste. 201
Madison, WI 53703

Matthew W. O'Neill
Fox, O'Neill & Shannon, S.C.
622 North Water Street Suite 500
Milwaukee, WI 53202

Joshua Matz
Harmann Singh
350 Fifth Avenue, Suite 7110
New York, NY 10118

Justin A. Nelson
Stephen Shackelford Jr.
Davida Brook
Susman Godfrey LLP
1000 Louisiana Street
Suite 5100
Houston, TX 77002

Paul Smith
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005

David S. Lesser
Jamie Dycus
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Marc E. Elias
John Devaney
Zachary J. Newkirk
Perkins Coie LLP
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005

Seth P. Waxman
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006

# EXHIBIT 9



**Troupis Law Office**

4126 Timber Lane
Cross Plains, Wi. 53528
Ph. 608-305-4889
troupisjames@gmail.com

December 3, 2020
Via E-mail to the Clerk of Courts

Chief Justice Patience Roggensack
Wisconsin Supreme Court
110 East Main Street
Suite 215
Madison, Wi. 53701

Dear Chief Justice Roggensack:      Re: Trump et al. v. Evers, et al. #not yet assigned (Dane County)
Trump et al. v. Evers, et al. #not yet assigned (Milwaukee County)

This afternoon, pursuant to Wis. Stat. 9.01 et seq, we filed Notices of Appeal from the Recount in Dane County and Milwaukee County conducted from November 20-29, 2020 on the Verified Petition for Recount of Donald J. Trump and Michael R. Pence in accordance with an Order of the Wisconsin Election Commission. A copy of the Notices of Appeal are enclosed. Pursuant to the statute, the appellant will post "an undertaking and surety in the amount approved by the court" and is prepared to post cash as provided in Wis. Stat. 895.346 to such account and in such amount as the court may approve.

Pursuant to Wis. Stat. 9.01(6)(b) we respectfully request that you "appoint a circuit judge, who shall be a reserve judge if available, to hear the appeal."

In order to avoid any delay, we respectfully request the appointed judge hold a "scheduling conference" (Wis. Stat. 9.01(7)(b)) on Friday, December 4, 2020 or Saturday, December 5, 2020 to set the surety amount and set a schedule. Matters to be addressed in that scheduling conference include, but need not be limited to, the dates for filing a complaint, filing an answer, propounding findings of fact and conclusions of law, submitting record evidence, providing supporting legal memoranda, oral hearings, if any, and final order. Given the time limitations inherent in the election for President, Appellants will be prepared to submit their complaint, proposed findings of fact and conclusion of law, the record evidence and legal memoranda on Monday, December 7. As the evidence and other matters to be addressed are limited to those raised at the Boards of Canvassers, completion should be expeditious.

Thank you for your consideration.

Very truly yours,
TROUPIS LAW OFFICE

James R. Troupis

Cc w/ encl. All parties of record in *Trump et al. v. Evers et al* 2020 AP 1971-OA by email (The parties are identical in the two proceedings.)

STATE OF WISCONSIN    CIRCUIT COURT    MILWAUKEE COUNTY

DONALD J. TRUMP,
1100 South Ocean Boulevard
Palm Beach, FL 33480,

MICHAEL R. PENCE,
4750 North Meridian Street
Indianapolis, IN 46208,

AND

DONALD J. TRUMP FOR
PRESIDENT, INC.,
725 Fifth Avenue
New York, NY 10022,

      Plaintiffs,

v.

JOSEPH R. BIDEN
1209 Barley Mill Road
Wilmington, DE 19807,

KAMALA D. HARRIS
435 N. Kenter Avenue
Los Angeles, CA 90049,

MILWAUKEE COUNTY CLERK
c/o GEORGE L. CHRISTENSON
Milwaukee County Clerk
901 North 9th Street
Milwaukee, WI 53233,

MILWAUKEE COUNTY BOARD OF CANVASSERS
c/o TIMOTHY H. POSNANSKI, Chairman of
Milwaukee County Board of Canvassers
901 North 9th Street
Milwaukee, WI 53233,

WISCONSIN ELECTIONS COMMISSION
212 E. Washington Avenue, Third Floor
Madison, WI 53703,

AND

ANN S. JACOBS,
212 E. Washington Avenue, Third Floor
Madison, WI 53703,

     Defendants.

## NOTICE OF APPEAL AND APPEAL
## UNDER WIS. STAT. § 9.01(6)(a)

TO:   MILWAUKEE COUNTY CLERK OF COURTS
      901 North 9th Street
      Milwaukee, Wisconsin 53233

      WISCONSIN SUPREME COURT
      Attn: CHIEF JUSTICE PATIENCE D. ROGGENSACK
      16 East State Capitol
      Madison, WI 53701-1688

      JOSEPH R. BIDEN
      1209 Barley Mill Road
      Wilmington, DE 19807

      KAMALA D. HARRIS
      435 N. Kenter Avenue
      Los Angeles, CA 90049

      BIDEN FOR PRESIDENT
      c/o Matthew O'Neil
      1120 20TH Street NW, Suite 250
      Washington, DC 20036
      Via electronic service (mwoneill@foslaw.com;
      cc: David.kronig@2020victory.com)

      JO JORGENSEN
      300 Butler Avenue
      Greenville, SC 29601
      c/o Matthew Bughman
      via electronic service (chair@lpwi.org)

      JEREMY SPIKE COHEN
      3620 Pelham Road, #300
      Greenville, SC 29615
      c/o Matthew Bughman
      via electronic service (chair@lpwi.org)

DON BLANKENSHIP
c/o Howie Morgan
via electronic service (howie@netdoor.com;
info@donblankenship.com)

WILLIAM MOHR
c/o Howie Morgan
via electronic service (howie@netdoor.com;
info@donblankenship.com)

BRIAN CARROLL
c/o Dave Bovee
via electronic service (hwisconsinasp@gmail.com)

AMAR PATEL
c/o Dave Bovee
via electronic service (hwisconsinasp@gmail.com)

MILWAUKEE COUNTY CLERK
901 North 9th Street
Milwaukee, WI 53233

MILWAUKEE COUNTY BOARD
OF CANVASSERS
Attn: TIMOTHY H. POSNANSKI, Chair
901 North 9th Street
Milwaukee, WI 53233

WISCONSIN ELECTIONS COMMISSION
212 E. Washington Avenue, Third Floor
Madison, WI 53703

AND

ANN S. JACOBS,
212 E. Washington Avenue, Third Floor
Madison, WI 53703


PLEASE TAKE NOTICE that the above-named Plaintiffs, by their attorneys, TROUPIS

LAW OFFICE and the LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C., hereby appeal to the

Circuit Court of Milwaukee County in accordance with Wis. Stat. § 9.01(6)(a), from the

determination of the recount of the election for the Offices of President and Vice President of the

3

United States in Milwaukee County, Wisconsin. Plaintiffs are further prepared, and have sufficient funds available, to post an undertaking and surety in cash, pursuant to Wis. Stat. § 895.346, and will do so as soon as the court approves an amount as required under Wis. Stat. § 9.01(6)(a).

Because Plaintiffs are also filing a notice of appeal under Wis. Stat. § 9.01 from the determination of the recount of the election for the Offices of President and Vice President of the United States in Dane County, Wisconsin, Plaintiffs request and contemporaneously hereby move the Chief Justice of the Wisconsin Supreme Court, the Honorable Patience D. Roggensack, to "consolidate all appeals relating to [such] election and appoint a circuit judge, who shall be a reserve judge if available, to hear the appeal." Wis. Stat. § 9.01(6)(b).

Dated at Madison, Wisconsin this 3rd day of December, 2020.

**TROUPIS LAW OFFICE**

By: *Electronically Signed by James R. Troupis*
    James R. Troupis, SBN 1005341
    4126 Timber Ln.
    Cross Plains, WI 53528-9786
    Phone:    608.305.4889
    Email:    judgetroupis@gmail.com

**CONWAY, OLEJNICZAK & JERRY S.C.**

By: *Electronically Signed by R. George Burnett*
    R. George Burnett, SBN 1005964
    Kurt A. Goehre, SBN 1068003
    231 S. Adams St., P.O. Box 23200
    Green Bay, WI 54305-3200
    Phone:    920.437.0476
    Email:    rgb@lcojlaw.com

*Attorneys for Plaintiffs*

4

STATE OF WISCONSIN     CIRCUIT COURT     MILWAUKEE COUNTY

DONALD J. TRUMP,
and
MICHAEL R. PENCE,

       Plaintiffs,

v.

JOSEPH R. BIDEN
KAMALA D. HARRIS,
MILWAUKEE COUNTY CLERK
c/o GEORGE L. CHRISTENSON,
MILWAUKEE COUNTY BOARD
OF CANVASSERS
c/o TIMOTHY H. POSNANSKI,
WISCONSIN ELECTION COMMISSION,
and
ANN S. JACOBS,

       Defendants.

## SURETY AND UNDERTAKING FOR APPEAL

WHEREAS, the Republican Party of Wisconsin (the "Surety") desires to act as surety and give undertaking for the payment of all costs taxed against the appellant in the above-captioned matter pursuant to Wis. Stat. § 9.01(6)(a).

WHEREAS, the Surety has deposited the sum of One Hundred Thousand and 00/100 Dollars ($100,000.00) in an account located at BMO Harris Bank, NA.

NOW, THEREFORE, the undersigned surety does hereby obligate itself under said statutory obligations in the amount of up to One Hundred Thousand and 00/100 Dollars ($100,000.00).

IT IS FURTHER AGREED by the Surety, that contemporaneously with the filing of this document, it shall deposit the sum of Fifty Thousand and 00/100 Dollars ($50,000.00) with the Clerk of Court for Milwaukee County  and Fifty Thousand and 00/100 Dollars ($50,000.00) with the Clerk of Court for Dane County or, in the alternative, if these matters are consolidated the Surety shall deposit the sum of One Hundred Thousand and 00/100 Dollars ($100,000.00) with the Clerk of Court for the County as directed by a court having due jurisdiction (the

"Undertaking"). The Undertaking shall be held by the respective county's Clerk of Court as security for the obligations for all costs taxed against the appellant pursuant to Wis. Stat. § 9.01(6)(a).

IT IS FURTHER AGREED by the Surety, that in the case of default or contumacy by the Surety or the appellant, the Court may, upon notice to it of not less than ten (10) days, deduct all costs taxed against the appellant from the Undertaking or proceed summarily and render judgment against the Surety in accordance with its obligation and award execution thereon.

IT IS FURTHER AGREED that the Surety, its successors and assigns, by the signature of the undersigned Chairman, agrees to be bound by the promises set forth herein.

Dated this 3rd day of December, 2020.

REPUBLICAN PARTY OF WISCONSIN


By:___*Electronically signed by Andrew Hitt*___
       Andrew Hitt, its Chairman

STATE OF WISCONSIN     CIRCUIT COURT     DANE COUNTY

---

DONALD J. TRUMP,
1100 South Ocean Boulevard
Palm Beach, FL 33480,

MICHAEL R. PENCE,
4750 North Meridian Street
Indianapolis, IN 46208,

AND

DONALD J. TRUMP FOR
PRESIDENT, INC.,
725 Fifth Avenue
New York, NY 10022,

      Plaintiffs,

v.

JOSEPH R. BIDEN
1209 Barley Mill Road
Wilmington, DE 19807,

KAMALA D. HARRIS
435 N. Kenter Avenue
Los Angeles, CA 90049,

DANE COUNTY CLERK
c/o SCOTT MCDONELL
Dane County Clerk
210 Martin Luther King Jr. Blvd.
Madison, WI 53703,

DANE COUNTY BOARD
OF CANVASSERS
c/o ALAN A. ARNSTEN, Member of
Dane County Board of Canvassers
210 Martin Luther King Jr. Blvd.
Madison, WI 53703,

WISCONSIN ELECTIONS COMMISSION
212 E. Washington Avenue, Third Floor
Madison, WI 53703,

AND

ANN S. JACOBS, Chair
Wisconsin Elections Commission
212 E. Washington Avenue, Third Floor
Madison, WI 53703,

      Defendants.

---

### NOTICE OF APPEAL AND APPEAL
### UNDER WIS. STAT. § 9.01(6)(a)

---

TO:   DANE COUNTY CLERK OF COURTS
      215 S. Hamilton St.
      Madison, Wisconsin 53703

      WISCONSIN SUPREME COURT
      Attn: CHIEF JUSTICE PATIENCE D. ROGGENSACK
      16 East State Capitol
      Madison, WI 53701-1688

      JOSEPH R. BIDEN
      1209 Barley Mill Road
      Wilmington, DE 19807

      KAMALA D. HARRIS
      435 N. Kenter Avenue
      Los Angeles, CA 90049

      BIDEN FOR PRESIDENT
      c/o Matthew O'Neil
      1120 20TH Street NW, Suite 250
      Washington, DC 20036
      Via electronic service (mwoneill@foslaw.com;
      cc: David.kronig@2020victory.com)

      JO JORGENSEN
      300 Butler Avenue
      Greenville, SC 29601
      c/o Matthew Bughman
      via electronic service (chair@lpwi.org)

      JEREMY SPIKE COHEN
      3620 Pelham Road, #300
      Greenville, SC 29615
      c/o Matthew Bughman
      via electronic service (chair@lpwi.org)

2

DON BLANKENSHIP
c/o Howie Morgan
via electronic service (howie@netdoor.com;
info@donblankenship.com)

WILLIAM MOHR
c/o Howie Morgan
via electronic service (howie@netdoor.com;
info@donblankenship.com)

BRIAN CARROLL
c/o Dave Bovee
via electronic service (hwisconsinasp@gmail.com)

AMAR PATEL
c/o Dave Bovee
via electronic service (hwisconsinasp@gmail.com)

DANE COUNTY CLERK
210 Martin Luther King Jr. Blvd
Madison, WI 53703

DANE COUNTY BOARD
OF CANVASSERS
Attn: ALLEN A. ARNSTEN
210 Martin Luther King Jr. Blvd
Madison, WI 53703

WISCONSIN ELECTIONS COMMISSION
212 E. Washington Avenue, Third Floor
Madison, WI 53703

AND

ANN S. JACOBS,
212 E. Washington Avenue, Third Floor
Madison, WI 53703

PLEASE TAKE NOTICE that the above-named Plaintiffs, by their attorneys, TROUPIS

LAW OFFICE and the LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C., hereby appeal to the

Circuit Court of Dane County in accordance with Wis. Stat. § 9.01(6)(a), from the determination

of the recount of the election for the Offices of President and Vice President of the United States

in Dane County, Wisconsin. Plaintiffs are further prepared, and have sufficient funds available,

3

to post an undertaking and surety in cash, pursuant to Wis. Stat. § 895.346, and will do so as soon as the court approves an amount as required under Wis. Stat. § 9.01(6)(a).

Because Plaintiffs are also filing a notice of appeal under Wis. Stat. § 9.01 from the determination of the recount of the election for the Offices of President and Vice President of the United States in Milwaukee County, Wisconsin, Plaintiffs request and contemporaneously hereby move the Chief Justice of the Wisconsin Supreme Court, the Honorable Patience D. Roggensack, to "consolidate all appeals relating to [such] election and appoint a circuit judge, who shall be a reserve judge if available, to hear the appeal." Wis. Stat. § 9.01(6)(b).

Dated at Madison, Wisconsin this 3rd day of December, 2020.

**TROUPIS LAW OFFICE**

By: _Electronically Signed by James R. Troupis_
James R. Troupis, SBN 1005341
4126 Timber Ln.
Cross Plains, WI 53528-9786
Phone:    608.305.4889
Email:    judgetroupis@gmail.com

**CONWAY, OLEJNICZAK & JERRY S.C.**

By: _Electronically Signed by R. George Burnett_
R. George Burnett, SBN 1005964
Kurt A. Goehre, SBN 1068003
231 S. Adams St., P.O. Box 23200
Green Bay, WI 54305-3200
Phone:    920.437.0476
Email:    rgb@lcojlaw.com

_**Attorneys for Plaintiffs**_

4

STATE OF WISCONSIN     CIRCUIT COURT     DANE COUNTY

DONALD J. TRUMP,
and
MICHAEL R. PENCE,

     Plaintiffs,

v.

JOSEPH R. BIDEN
KAMALA D. HARRIS,
DANE COUNTY CLERK
c/o SCOTT MCDONELL,
DANE COUNTY BOARD
OF CANVASSERS
c/o ALAN A. ARNSTEN,
WISCONSIN ELECTION COMMISSION,
and
ANN S. JACOBS,

     Defendants.

## SURETY AND UNDERTAKING FOR APPEAL

WHEREAS, the Republican Party of Wisconsin (the "Surety") desires to act as surety and give undertaking for the payment of all costs taxed against the appellant in the above-captioned matter pursuant to Wis. Stat. § 9.01(6)(a).

WHEREAS, the Surety has deposited the sum of One Hundred Thousand and 00/100 Dollars ($100,000.00) in an account located at BMO Harris Bank, NA.

NOW, THEREFORE, the undersigned surety does hereby obligate itself under said statutory obligations in the amount of up to One Hundred Thousand and 00/100 Dollars ($100,000.00).

IT IS FURTHER AGREED by the Surety, that contemporaneously with the filing of this document, it shall deposit the sum of Fifty Thousand and 00/100 Dollars ($50,000.00) with the Clerk of Court for Dane County and Fifty Thousand and 00/100 Dollars ($50,000.00) with the Clerk of Court for Milwaukee County or, in the alternative, if these matters are consolidated the Surety shall deposit the sum of One Hundred Thousand and 00/100 Dollars ($100,000.00) with the Clerk of Court for the County as directed by a court having due jurisdiction (the

"Undertaking"). The Undertaking shall be held by the respective county's Clerk of Court as security for the obligations for all costs taxed against the appellant pursuant to Wis. Stat. § 9.01(6)(a).

IT IS FURTHER AGREED by the Surety, that in the case of default or contumacy by the Surety or the appellant, the Court may, upon notice to it of not less than ten (10) days, deduct all costs taxed against the appellant from the Undertaking or proceed summarily and render judgment against the Surety in accordance with its obligation and award execution thereon.

IT IS FURTHER AGREED that the Surety, its successors and assigns, by the signature of the undersigned Chairman, agrees to be bound by the promises set forth herein.

Dated this 3rd day of December, 2020.

REPUBLICAN PARTY OF WISCONSIN


By:___*Electronically signed by Andrew Hitt*_____
        Andrew Hitt, its Chairman

2

# EXHIBIT 10

STATE OF WISCONSIN        CIRCUIT COURT        MILWAUKEE COUNTY

Case No. 2020CV7092

Donald J. Trump, Michael R. Pence, and Donald J. Trump for
President, Inc.

    Plaintiffs,

        v.

Joseph R. Biden, Kamala D. Harris, Milwaukee County Clerk
c/o George L. Christenson, Milwaukee County Board of
Canvassers c/o Timothy H. Posnanski, Chairman of Milwaukee
County Board of Canvassers, Wisconsin Elections
Commission, and Ann S. Jacobs

    Defendants.

_____

STATE OF WISCONSIN        CIRCUIT COURT        DANE COUNTY

Case No. 2020CV2514

Donald J. Trump, Michael R. Pence, and Donald J. Trump for
President, Inc.

    Plaintiffs,

        v.

Joseph R. Biden, Kamala D. Harris, Dane County Clerk c/o
Scott McDonell, Dane County Board of Canvassers c/o Allan
A. Arnsten, Member of the Dane County Board of Canvassers,
Wisconsin Election Commission, and Ann S. Jacobs

    Defendants.

1

You are hereby notified that the Chief Justice of the Wisconsin Supreme Court has issued the following order:

Appeals of the determinations of boards of canvassers or of the determinations of the chairperson of the Wisconsin Elections Commission relating to the November 3, 2020 general election have been filed, pursuant to Wis. Stat. § 9.01(6)(a), in Dane County (Trump v. Biden; Case No. 2020CV2514) and in Milwaukee County (Trump v. Biden; Case No. 2020CV7092). Those appeals relate to an election that was held in more than one judicial district. In such circumstances, Wisconsin Statute § 9.01(6)(b) provides that the Chief Justice of the Supreme Court shall consolidate those appeals and appoint the judge, who shall be a reserve judge if available, to preside over the consolidated appeal. Accordingly,

IT IS ORDERED that Trump v. Biden, Milwaukee County Case No. 2020CV7092, and Trump v. Biden, Dane County Case No. 2020CV2514, shall be consolidated for all purposes in the Milwaukee County Circuit Court under Case No. 2020CV7092; and

IT IS FURTHER ORDERED that Reserve Judge Stephen A. Simanek of Racine County is appointed to preside over the consolidated appeal proceedings in the circuit court.

2

Dated this _3_ day of _December_ 2020.

BY:

_Patience D. Roggensack_
Patience D. Roggensack
Chief Justice
Wisconsin Supreme Court

# EXHIBIT 11

2020 WL 5887393
Supreme Court of the United States.

Marci ANDINO, et al.

v.

Kylon MIDDLETON, et al.

No. 20A55
|
October 5, 2020

**Opinion**

 **\*1**  The application for stay presented to THE CHIEF JUSTICE and by him referred to the Court is granted in part, and the district court's September 18, 2020 order granting a preliminary injunction is stayed pending disposition of the appeal in the United States Court of Appeals for the Fourth Circuit and disposition of the petition for a writ of certiorari, if such writ is timely sought. Should the petition for a writ of certiorari be denied, this stay shall terminate automatically. In the event the petition for a writ of certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

The order is stayed except to the extent that any ballots cast before this stay issues and received within two days of this order may not be rejected for failing to comply with the witness requirement.

Justice THOMAS, Justice ALITO, and Justice GORSUCH would grant the application in full.

Justice KAVANAUGH, concurring in grant of application for stay.

The District Court enjoined South Carolina's witness requirement for absentee ballots because the court disagreed with the State's decision to retain that requirement during the COVID–19 pandemic. For two alternative and independent reasons, I agree with this Court's order staying in part the District Court's injunction.

First, the Constitution "principally entrusts the safety and the health of the people to the politically accountable officials of the States." *South Bay United Pentecostal Church* v. *Newsom*, 590 U. S. ——, ——, 140 S.Ct. 1613, 1613-1614, 207 L.Ed.2d 154 (2020) (ROBERTS, C. J., concurring in denial of application for injunctive relief) (internal quotation marks and alteration omitted). "When those officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.' " *Ibid.* (quoting *Marshall v. United States*, 414 U.S. 417, 427, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974); alteration in original). It follows that a State legislature's decision either to keep or to make changes to election rules to address COVID–19 ordinarily "should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *South Bay*, 590 U. S., at ——, 140 S.Ct., at 1613-1614 (citing *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985)). The District Court's injunction contravened that principle.

Second, for many years, this Court has repeatedly emphasized that federal courts ordinarily should not alter state election rules in the period close to an election. See *Purcell v. Gonzalez*, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (*per curiam*). By enjoining South Carolina's witness requirement shortly before the election, the District Court defied that principle and this Court's precedents. See —— F. 3d ——, —— – ——, 2020 WL 5752607 (CA4 2020) (Wilkinson and Agee, JJ., dissenting from denial of stay).

For those two alternative and independent reasons, I agree with this Court's order staying in part the District Court's injunction.

**All Citations**

--- S.Ct. ----, 2020 WL 5887393 (Mem), 2020 Daily Journal D.A.R. 10,854

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 12

865 F.2d 264
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. Use FI CTA9 Rule 36-3 for
rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Ninth Circuit.

G. Donald MASSEY; Bruce L. Bax;
Donna L. Sergi, Plaintiffs–Appellants,

v.

A. COON, District Judge; Circuit Court of
Oregon for Josephine County; Supreme
Court of the State of Oregon; L.A. Cushing,
District Judge, Defendants–Appellees.

No. 87–3768.
|
Submitted[*] Nov. 28, 1988.
|
Decided Jan. 3, 1989.

**Synopsis**
D.Or.

AFFIRMED.

Appeal from the United States District Court for the District
of Oregon; James A. Redden, District Judge, Presiding.

Before CHOY, TANG and O'SCANNLAIN, Circuit Judges.

MEMORANDUM[**]

**\*1** G. Donald Massey, Bruce L. Bax, and Donna L. Sergi
appeal *pro se* the district court's judgment dismissing their
action for injunctive and declaratory relief.

Massey, Bax, and Sergi filed an action in federal district court
seeking declaratory and injunctive relief against the Oregon
Supreme Court, the Circuit Court of Oregon for Josephine
County, Oregon State District Judge A. Coon, and Oregon
Circuit Judge L.A. Cushing. The complaint alleged that the

defendants violated the plaintiffs' federal due process and
equal protection rights by unlawfully assigning Coon to serve
as circuit court judge *pro tem* in plaintiffs' quiet title action
in state court. Defendants moved to dismiss the complaint for
failure to state a claim. The magistrate recommended granting
dismissal and the district court adopted the magistrate's
findings and recommendations and dismissed the action. The
appeal now comes before this court.

A. *Jurisdiction Over Bax and Sergi*
This court does not have jurisdiction to hear an appeal by *pro
se* appellants who do not personally sign their notice of appeal.
*Carter v. Commissioner,* 784 F.2d 1006, 1008 (9th Cir.1986).
Bax and Sergi signed neither the original nor the amended
notices of appeal. Therefore, Bax and Sergi's appeals must be
dismissed.

B. *Massey's Appeal*
Massey contends that Article VII Section 2(a)(3) of the
Oregon Constitution and several Oregon statutes (1) prohibit
the appointment of a state circuit judge *pro tem* to serve in
the judicial district for which the judge was elected; and (2)
forbid a state circuit judge to name a judge *pro tem* as that
power is reserved to the Oregon Supreme Court.

Massey also contends that such assignment, because it
is contrary to state law, violates the due process and
equal protection clauses of the Constitution. Assuming,
arguendo, that Massey has correctly interpreted state law, we
nonetheless conclude that the eleventh amendment bars his
suit.

The eleventh amendment prevents federal courts from
hearing suits brought against a state without its consent,
regardless of the type of relief sought. *See Pennhurst State
School & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984).
Massey has failed to indicate any explicit waiver of Oregon's
immunity to suit in federal court. He contends that the
eleventh amendment is inapplicable because his suit is not
in substance against the state. He further argues that
this suit is excepted from the general jurisdictional bar by the
principles of *Ex Parte Young,* 209 U.S. 123 (1908). We reject
both arguments.

The eleventh amendment bars any suit nominally brought
against individual state officials where the state is the real
party in interest.[1] *Pennhurst,* 465 U.S. at 101. A suit for non-
monetary relief is in substance against the sovereign if the "

effect of the judgment would be 'to restrain the Government from acting or compel it to act.' " *Pennhurst,* 465 U.S. at 101 n. 11 (citing *Dugan v. Rank,* 372 U.S. 609, 620 (1963)). Here, the relief sought would require the state, acting through its officials, to conform its conduct to state law by appointing a judge from another district to serve as judge *pro tem* in this case.

**\*2** Massey contends that this suit is not brought against the state for purposes of the eleventh amendment because defendants' actions were outside their delegated power. However, a state official is not entitled to eleventh amendment immunity only when he acts "without any authority whatever." *Pennhurst,* 465 U.S. at 101 n. 11 (citing *Florida Dept. of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 697 (1982) (plurality opinion)). "A claim of error in the exercise of [an official's delegated] power is therefore not sufficient" to support a claim of ultra vires. *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 690 (1949). Oregon's Constitution and statutes clearly did provide a mechanism for appointing judges *pro tem,* even though the procedures may not have been followed correctly in this case. Therefore, this case does not fall within the narrow scope of the ultra vires doctrine as enunciated by the Supreme Court. The action against Judges Coon and Cushing was thus in substance an action against the state.

Massey argues that if the suit is deemed to be one against the state, it is not barred by the eleventh amendment because it falls under the exception enunciated in *Ex Parte Young. Young* provides that a suit for injunctive relief challenging a state official's action under the Constitution is not considered a suit against the state for purposes of the eleventh amendment. *Young,* 209 U.S. at 167. Although on its face the complaint states a claim under the due process and equal protection clauses of the Constitution, these constitutional claims are entirely based on the failure of defendants to conform to state law. "[W]hen a plaintiff alleges that a state official has violated *state* law.... the entire basis for the doctrine of *Young* ... disappears." *Pennhurst,* 465 U.S. at 106 (emphasis in original). Therefore, the *Young* exception does not apply and the district court correctly dismissed the suit against Judges Coon and Cushing.

Finally, the district court properly dismissed Massey's action without leave to amend. Where amendment of the complaint would have served no purpose because the acts complained of could not constitute a cognizable claim for relief, it is not error to dismiss a complaint without leave to amend. *See Jones v. Community Redevelopment Agency,* 733 F.2d 646, 650 (9th Cir.1984). No restatement of Massey's claim could constitute a claim for relief cognizable in federal court.[2]

AFFIRMED.

**All Citations**

865 F.2d 264 (Table), 1989 WL 884

---

Footnotes

| | |
|---|---|
| \* | The panel unanimously finds this case suitable for submission on the record and briefs and without oral argument. Fed.R.App.P. 34(a), Ninth Circuit Rule 34–4. |
| \*\* | This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3. |
| 1 | We consider only the claims against Judges Coon and Cushing because Massey does not argue on appeal that the district court erred in its determination that the state court defendants are immune from suit in federal court. |
| 2 | We also deny Massey's motion to file an amended opening brief. The amended brief adds no new arguments and would have no effect on the outcome of this case. |

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:20-cv-01771-PP   Filed 12/07/20   Page 3 of 3   Document 59-12

# EXHIBIT 13

607 Fed.Appx. 177
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of
Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals,
Third Circuit.

Mark BALSAM; Charles Donahue;
Hans Henkes; Rebecca Feldman;
Jaime Martinez; William Conger;
Tia Williams; Independent Voter
Project; Committee for a Unified
Independent Party Inc, doing business
as Independentvoting.Org, Appellants

v.

SECRETARY of the
State OF NEW JERSEY.

No. 14–3882.
|
Argued March 17, 2015.
|
Filed: April 8, 2015.

**Synopsis**
**Background:** Voters commenced action against New Jersey's
Secretary of State, alleging that closed primary election
scheme violated § 1983, New Jersey Civil Rights Act, First
and Fourteenth Amendments, and New Jersey Constitution.
The United States District Court for the District of New
Jersey, Stanley R. Chesler, J., 2014 WL 4054051, dismissed
the complaint. Voters appealed.

**Holdings:** The Court of Appeals, Jordan, Circuit Judge, held
that:

fundamental right to meaningfully participate at all stages of
election did not guarantee participation in primary elections;

*Ex Parte Young* 's exception to Eleventh Amendment
immunity did not apply; and

supplemental jurisdiction statute did not authorize district
court to exercise jurisdiction over claims against non-
consenting States.

Affirmed.

**\*178** On Appeal from the United States District Court for the
District of New Jersey (D.C. No. 2–14–cv–01388), District
Judge: Hon. Stanley R. Chesler.

**Attorneys and Law Firms**

Samuel Gregory, Esq. [Argued], Brooklyn, N.Y., Harry
Kresky, Esq., New York, N.Y., S. Chad Peace, Esq. [Argued],
Peace Crowell, San Diego, CA, for Appellants.

Donna Kelly, Esq. [Argued], Eric S. Pasternack, Esq., Office
of Attorney General of New Jersey, Department of Law &
Public Safety, Trenton, NJ, for Appellee.

Dave Frohnmayer, Esq., Harrang Long Gary Rudnick,
Eugene, OR, for Amicus Equal Vote Coalition.

Stephen A. Loney, Jr., Esq., Hogan Lovells US, Philadelphia,
PA, for Amicus Fair Vote.

Richard T. Robol, Esq., Columbus, OH, for
Amici Independent Ohio, Independent Pennsylvanians,
Massachusetts Coalition of Independent Voters, North
Carolina Independents, Utah League of Independent Voters,
and Virginia Independent Voters Association.

Before: SMITH, JORDAN, and VAN ANTWERPEN, Circuit
Judges.

OPINION[*]

JORDAN, Circuit Judge.

The Appellants challenge an order of the United States
District Court for the District of New Jersey dismissing their
complaint. We will affirm.

**I. Background**

**A. New Jersey's Closed Primary Election System**

New Jersey has created a comprehensive statutory scheme to govern elections in the state. *See* N.J. Stat. Ann. §§ 19:1–1 **\*179** to 19:63–28. A "general" election is held on the first Tuesday after the first Monday in November, at which time voters "elect persons to fill public office." *Id.* at § 19:1–1. There are two ways in which a candidate can secure a place on the ballot for a general election. The first is to be nominated by a political party in a primary election; the second is to submit a petition with the requisite number of signatures.

Under the first option, "members of a political party ... nominate candidates" in the month of June "to be voted for at general elections." *Id.* at §§ 19:1–1 and 19:2–1. New Jersey law defines a "political party" as any party that garners at least ten percent of the votes cast in the last general election for the office of a member of the General Assembly. *Id.* at § 19:1–1. To appear on a primary election ballot, a candidate must file a nominating petition accompanied by the requisite number of signatures at least sixty-four days before the primary election. *Id.* at §§ 19:23–8 and 19:23–14. To be eligible to vote in a political party's primary election, a voter must be deemed a member of that party at least fifty-five days before the election, unless the voter is newly registered or the voter has not previously voted in a primary election. *Id.* at § 19:23–45. The state bears the cost of conducting primary elections. *Id.* at § 19:45–1.

Under the second option, candidates unaffiliated with a political party may "bypass the primary election and proceed directly to the general election" upon submission of a petition bearing the necessary number of signatures. *Council of Alt. Political Parties v. Hooks,* 179 F.3d 64, 69 (3d Cir.1999); *see also* N.J. Stat. Ann. §§ 19:13–3 to 19:13–13.

### B. The Appellants' Complaint

Appellants Mark Balsam, Charles Donahue, Hans Henkes, and Rebecca Feldman are registered as unaffiliated voters, which means that they were not permitted to vote in New Jersey's 2013 primary election because they "exercis[ed] their right not to affiliate with either the Democratic or Republican parties." (Opening Br. at 10.) Appellant Jaime Martinez is a registered Democrat, and Appellants William Conger and Tia Williams are registered Republicans; each of whom was, as the Appellants put it, "required to forfeit their right of non-association in order to exercise their right to vote in the 2013 Primary Election." (Opening Br. at 11.) Appellants Independent Voter Project and Committee for a Unified Independent Party, Inc., "seek to protect the rights of all voters to cast a meaningful vote." (Opening Br. at 11.)

Appellants filed this lawsuit against Kim Guadagno in her official capacity as New Jersey's Secretary of State, alleging violations of (1) 42 U.S.C. § 1983; (2) the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6–2(c); (3) the First and Fourteenth Amendments of the United States Constitution; and (4) Article II, Section I and Article VIII, Section III of the New Jersey Constitution. In their complaint, the Appellants sought three forms of relief: (1) an order declaring the state's primary election scheme unconstitutional on its face and as applied; (2) an injunction restraining the state from funding and administering its current primary election scheme; and (3) an order directing the state legislature or Secretary of State to implement a different primary election scheme, in keeping with the Appellants' views of the United States Constitution.

### C. Procedural History

Guadagno filed a motion to dismiss, which the District Court granted. The Court held that "[a]ny attempt to use the Constitution to pry open a state-sanctioned **\*180** closed primary system is precluded by current Supreme Court doctrine." (App. at 6.) In addition, the Court reasoned that the Appellants' state law claims had to be dismissed as being barred by the Eleventh Amendment. This timely appeal followed.

## II. Discussion[1]

As acknowledged by the Appellants at oral argument, their main argument boils down to the following syllogism: (1) all voters in New Jersey, regardless of party affiliation, have a constitutional right to participate at each stage of the electoral process that materially impacts the outcome of non-presidential elections in the state; (2) New Jersey's closed primary elections materially impact the outcome of non-presidential elections in the state; therefore, (3) all voters in New Jersey, regardless of party affiliation, have a constitutional right to participate in New Jersey's closed primary elections—i.e., the primaries may not be closed. But it appears that the Appellants are aware that controlling precedents preclude us from ordering New Jersey to force political parties to open their primary elections to non-party members. Therefore, the Appellants argue instead that, in order to protect their fundamental right to meaningfully participate at all stages of an election, we force New Jersey to abolish the closed primary election scheme altogether.

### A. Federal Claims

The Appellants rely on First Amendment and Fourteenth Amendment theories to support their federal claims. They contend that New Jersey's primary election system violates the First Amendment because it burdens their associational rights by "requir[ing] that a voter 'qualify' for the right to vote in the Primary Election by joining a political party." (Opening Br. at 36.) They further argue that it violates their Fourteenth Amendment right to equal protection of the law because it is inconsistent with the "one person, one vote" standard articulated in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). *See id.* at 566, 84 S.Ct. 1362 ("[T]he Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators."). According to the Appellants, the state's system creates two classes of voters: "(1) major party members who enjoy full participation in both the Primary Election and the general election; and[ ] (2) voters who, by reason of choosing not to associate with one of the dominant political parties, are allowed only limited participation in the general election." (Opening Br. at 35.) As a result, they say, the latter class's Fourteenth Amendment rights are violated because, "[w]ithout equality of the right to vote within all integral stages of the process, there is essential[ly] no meaningful right to vote at all." (Opening Br. at 34–35.) Their position, however, is untenable.

States possess a " 'broad power to prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives," [U.S. Const.] Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices.' " *Clingman v. Beaver,* 544 U.S. 581, 586, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005) (quoting *Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986)). That power is not **\*181** absolute, but is "subject to the limitation that [it] may not be exercised in a way that violates ... specific provisions of the Constitution." *Williams v. Rhodes,* 393 U.S. 23, 29, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). In particular, New Jersey has a " 'responsibility to observe the limits established by the First Amendment rights of [its] citizens,' " including the freedom of political association or, in this case, non-association. *Eu v. S.F. Cnty. Democratic Cent. Comm.,* 489 U.S. 214, 222, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (quoting *Tashjian,* 479 U.S. at 217, 107 S.Ct. 544). Election regulations that impose a severe burden on associational rights are subject to strict scrutiny and may be upheld only if they are "narrowly tailored to serve a compelling state interest." *Clingman,* 544 U.S. at 586, 125 S.Ct. 2029. If a statute imposes only modest burdens, however, then "the state's important regulatory interests are

generally sufficient to justify reasonable, nondiscriminatory restrictions" on election procedures. *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). Accordingly, the Supreme Court has "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." *Burdick v. Takushi,* 504 U.S. 428, 438, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).

While "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction," *Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), no court has ever held that that right guarantees participation in primary elections. The Appellants nevertheless rely on *United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), as authority for their argument that voters have a constitutional right to participate in primary elections. Their reliance is misplaced. In *Classic,* the federal government prosecuted certain Louisiana state elections commissioners for allegedly falsifying ballots in a Democratic primary election for the House of Representatives. The Supreme Court held that the Constitution gives Congress the power to regulate intraparty primaries through the criminal code and secures the right to have one's "vote counted in both the general election and in the primary election, where the latter is a part of the election machinery." *Id.* at 322, 61 S.Ct. 1031.

In answering the question presented to it, the Court in *Classic* presupposed that the right it recognized only applied to voters who were "qualified" to cast votes in Louisiana's Democratic primary. *Id.* at 307, 61 S.Ct. 1031 (stating that one of the "questions for decision [is] whether the right of qualified voters to vote in the Louisiana primary and to have their ballots counted is a right 'secured ... by the Constitution' within the meaning of ... the Criminal Code" (second alteration in original)). But *Classic* did not expound on who was "qualified," and instead left that distinction up to Louisiana law. *See id.* at 311, 61 S.Ct. 1031 ("Pursuant to the authority given by [§] 2 of Article I of the Constitution ... the states are given, and in fact exercise a wide discretion in the formulation of a system for the choice by the people of representatives in Congress."). Fairly read, *Classic* speaks to the constitutional protections that inure to qualified primary voters, but it is completely silent as to who is qualified. It is, therefore, of no help to the Appellants' argument.

The Appellants also quote *Friedland v. State,* 149 N.J.Super. 483, 374 A.2d 60, 63 (N.J.Super. Ct. Law Div.1977), for the

proposition that "courts have held that the right to vote in the Primary Election is 'as protected as voting in a general election.' " (Opening Br. at 20.) As noted by the **\*182** District Court, however, the Appellants' citation to *Friedland* is "puzzling." (App. at 10.) *Friedland* rejected an attack on New Jersey's primary election system that is similar to the one mounted by the Appellants in this case. *See Friedland, 374 A.2d at 63–67* (dismissing complaint that contended New Jersey's primary election law violates the First and Fourteenth Amendments, "in that it deprives [plaintiffs] of their right to vote and to affiliate with political parties of their own choice and denies them equal protection"). When read in context, the language that the Appellants have lifted from *Friedland* does not advance their argument.

The Appellants identify no other precedent even arguably suggesting that voters have a constitutional right to unqualified participation in primary elections. There is, however, relevant precedent that cogently rebuts their position. In *Nader v. Schaffer,* the Supreme Court summarily affirmed a decision upholding Connecticut's closed primary election system, a system which, in broad strokes, looks like New Jersey's. 417 F.Supp. 837 (D.Conn.) (three-judge panel), *aff'd,* 429 U.S. 989, 97 S.Ct. 516, 50 L.Ed.2d 602 (1976) (mem.). The *Nader* plaintiffs were registered voters who refused to enroll in a political party. *Id.* at 840. As a result of that choice, they were prohibited from voting in Connecticut's closed primary elections. *Id.* They argued that Connecticut's closed primary election system violated their constitutional rights in the following ways: (1) it violated their Fourteenth Amendment right to equal protection by denying them the right to participate in primary elections while extending that right to enrolled party members; (2) it violated their First Amendment associational rights by compelling them to either enroll in a political party or forgo the right to vote in a primary; and (3) it violated their right to vote, as guaranteed by Article I, Section 2, cl. 1 and the Fourteenth and Seventeenth Amendments, by preventing them from participating in an " 'integral part' "—namely the primary elections—" 'of the process by which their United States Senators and Representatives are chosen.' " *Id.* The *Nader* plaintiffs argued that participation in a primary election was an exercise of their constitutionally protected rights to vote and associate (or not associate) with others in support of a candidate. *Id.* at 842. They further asserted that they wished to exercise both of those rights but that Connecticut's closed primary election scheme limited them to one or the other; that is, in order to vote in a party's primary election, they were wrongly forced to enroll in a party. *Id.*

*Nader* rejected those arguments and struck a balance of competing First Amendment associational rights and Fourteenth Amendment rights that undermines the Appellants' position here. The court in *Nader* concluded that, in order to safeguard the constitutional rights of party members, Connecticut could "legislat[e] to protect the party from intrusion by those with adverse political principles," during the candidate selection process. *Id.* at 845 (internal quotation marks omitted). *Nader* also reasoned that "a state has a more general, but equally legitimate, interest in protecting the overall integrity of [primary elections]," which "includes preserving parties as viable and identifiable interest groups[, and] insuring that the results of primary elections ... accurately reflect the voting of party members." *Id.* Thus, "in order to protect party members from intrusion by those with adverse political principles, and to preserve the integrity of the electoral process, a state legitimately may condition one's participation in a party's nominating process on some showing of loyalty to that party," including party **\*183** membership. *Id.* at 847 (internal quotation marks omitted).

The reasoning of *Nader* is directly applicable here. The Appellants claim that *Nader* recognized political parties' associational rights without considering the countervailing rights of individuals who are not members of a political party to not have their vote unconstitutionally diluted. (Opening Br. at 39, 42.) But that is simply incorrect. The court in *Nader* did consider the countervailing rights of individuals who were not members of a political party, and it found that the associational rights of party members and the regulatory interests of the state outweighed those rights. *See 417 F.Supp. at 844, 845* ("Because the political party is formed for the purpose of engaging in political activities, constitutionally protected associational rights of its members are vitally essential to the candidate selection process.... The rights of party members may to some extent offset the importance of claimed conflicting rights asserted by persons challenging some aspect of the candidate selection process.").

We conclude, in keeping with *Nader,* that the burden, if any, imposed on the Appellants' First Amendment and Fourteenth Amendment rights is outweighed and constitutionally justified by the interests identified by New Jersey in this case. *See* Answering Br. at 15 ("[T]he State has a legitimate interest in protecting the overall integrity of the ... electoral process as well as the associational rights of political associations, maintaining ballot integrity, avoiding voter confusion, and ensuring electoral fairness.").

**B. State Law Claims**

Under the Eleventh Amendment, state officials acting in their official capacity cannot be sued unless Congress specifically abrogates the state's immunity or the state waives its own immunity. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 66, 70–71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The Appellants assert that, because their state law claims are premised on violations of the federal Constitution and seek prospective injunctive relief, the principles of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), are implicated and the action against Guadagno strips her of her official or representative character and subjects her to the consequences of her individual conduct. Thus, the Appellants argue, this suit is "not really a suit against the state itself" and Eleventh Amendment immunity does not apply. (Opening Br. at 44–45.)

We disagree. Although *Ex Parte Young* held that the Eleventh Amendment does not bar a party from bringing suit for prospective injunctive relief on the basis of federal law, the Supreme Court held in *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), that state officials are immune from suits in federal court based on violations of state law, including suits for prospective injunctive relief under state law, unless the state waives sovereign immunity. *Id.* at 106, 104 S.Ct. 900 ("We conclude that *Young ...* [is] inapplicable in a suit against

state officials on the basis of state law."). Moreover, the supplemental jurisdiction statute, 28 U.S.C. § 1367, does not authorize district courts to exercise jurisdiction over claims against non-consenting States. *See Raygor v. Regents of the Univ. of Minnesota,* 534 U.S. 533, 541–42, 122 S.Ct. 999, 152 L.Ed.2d 27 (2002) ("[W]e hold that § 1367(a)'s grant of jurisdiction does not extend to claims against nonconsenting state defendants.").

The Appellants' attempt to tie their state law claims into their federal claims is unpersuasive. Even assuming that they are correct that violation of the federal **\*184** Constitution could be used to establish a violation of the state law on which they rely, it is state law that provides the cause of action, if any, and the attendant relief they seek. Therefore, *Ex Parte Young* 's exception to Eleventh Amendment immunity does not apply. In short, because Congress has not abrogated and New Jersey has not waived its sovereign immunity, the Appellants cannot invoke federal jurisdiction over their state law challenge to New Jersey's closed primary election system.

**III. Conclusion**

For the foregoing reasons, we will affirm the District Court's dismissal of the Appellants' federal and state law claims.

**All Citations**

607 Fed.Appx. 177

---

Footnotes

\*   This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

1   The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review of the District Court's order granting the motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim. *United States ex rel. Schumann v. AstraZeneca Pharms. L.P.,* 769 F.3d 837, 845 (3d Cir.2014); *Rea v. Federated Investors,* 627 F.3d 937, 940 (3d Cir.2010).

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 14

Thompson v. Alabama, Not Reported in Fed. Supp. (2017)

2017 WL 3223915

2017 WL 3223915
Only the Westlaw citation is currently available.
United States District Court, M.D.
Alabama, Northern Division.

Treva THOMPSON, et al., Plaintiffs,

v.

State of ALABAMA, et al., Defendants.

CASE NO. 2:16-CV-783-WKW
|
Signed 07/28/2017

**Attorneys and Law Firms**

Aderson B. Francois, Institute for Public Representation, Danielle Lang, Joseph Gerald Hebert, Campaign Legal Center, Jessica Ring Amunson, Jenner & Block LLP, Patrick D. Llewellyn, Public Citizen Litigation Group, Washington, DC, Armand Derfner, Derfner & Altman LLC, Charleston, SC, James Uriah Blacksher, Attorney at Law, Birmingham, AL, Joseph Mitchell McGuire, McGuire & Associates LLC, Montgomery, AL, Pamela Karlan, Stanford Law School, Stanford, CA, for Plaintiffs.

Andrew L. Brasher, Misty Shawn Fairbanks Messick, James William Davis, State of Alabama Office of the Attorney General, Montgomery, AL, for Defendants.

MEMORANDUM OPINION AND ORDER

W. Keith Watkins, CHIEF UNITED STATES DISTRICT JUDGE

I. INTRODUCTION

**\*1** Alabama citizens lose their right to vote if they are "convicted of a felony involving moral turpitude." Ala. Const., Art. VIII, § 177(b) (1996). Disenfranchisement of felons, for more than two decades, has hinged on the meaning of "moral turpitude." But what does "moral turpitude" mean? Because the Alabama Constitution did not define this nebulous standard, "[n]either individuals with felony convictions nor election officials ha[d] a comprehensive, authoritative source for determining if a felony conviction involve[d] moral turpitude and [was] therefore a disqualifying felony." Ala. Code § 17-3-30.1 (eff. Aug. 1, 2017). But that

dilemma for felons and election officials appears to have resolved on May 25, 2017, at least prospectively, with the enactment of the Felony Voter Disqualification Act, Alabama Laws Act 2017-378 ("HB 282"), which for the first time established a specific and inclusive list of felonies "involving moral turpitude." HB 282, codified as § 17-3-30.1 of the Alabama Code, has an effective date of August 1, 2017.

This lawsuit originally was not about HB 282; it could not have been because its commencement preceded HB 282's enactment by eight months. Rather, Plaintiffs filed this proposed class action against the State of Alabama and its officials, seeking in part to invalidate § 177(b) of Article VIII of the Alabama Constitution of 1901 on federal constitutional grounds, including vagueness.

HB 282 changed the course of this lawsuit significantly. Acknowledging that HB 282 "seeks to put an end to" a system that required "individual county registrars to make subjective and contradictory determinations of citizens' eligibility to vote on an ad hoc basis" (Pls.' Mot. Prelim. Inj., at 7), Plaintiffs filed a motion for preliminary injunction thirty-seven days after HB 282's enactment. Plaintiffs do not challenge the provisions of HB 282 itself. Instead, they ask for a preliminary injunction mandating Defendants to take specified steps to implement HB 282.

The urgency of the motion, according to Plaintiffs, is the upcoming special election for the United States Senate seat in Alabama, and more specifically, the voter registration deadline, which is July 31, 2017. The special primary election is August 15, 2017; the special runoff election is September 26, 2017; and the special general election is December 12, 2017. Plaintiffs contend that, "[a]bsent immediate relief from this Court, thousands of eligible voters risk losing the opportunity to vote in yet another election." (Pls.' Mot. Prelim. Inj., at 8.) The preliminary injunction motion "seeks relief solely for those voters whose voting rights under Section 177 of the Constitution have been affirmed by HB 282." (Id.) The motion refers to these potential voters as "HB 282 voters." (Id.)

In their motion, Plaintiffs ask for a preliminary injunction mandating Defendants to take the following actions prior to the voter registration deadline on July 31, 2017: (1) to provide notice of HB 282's voting eligibility standards on the electronic Alabama Voter Registration Form on the Alabama Secretary of State's website; (2) to post notice of HB 282's voting eligibility standards on the Alabama Secretary of

Thompson v. Alabama, Not Reported in Fed. Supp. (2017)

2017 WL 3223915

State's website and at county registrars and DMV offices; (3) to submit a request to the federal Election Assistance Commission to provide notice of HB 282's voting eligibility standards in Alabama's state-specific instructions on the Federal Voter Registration Form; and (4) to reinstate HB 282 voters—voters whose registration applications were denied or who were struck from the voter registration rolls in the last two years, but whose eligibility was affirmed by HB 282—to the voter registration rolls and provide them with individualized notice of their eligibility to vote.[1]

**\*2** Defendants oppose the motion, arguing that Plaintiffs have not met "the high bar for an emergency mandatory injunction and [that] the equities clearly outweigh granting one." (Defs. Resp., at 2 (Doc. # 58).) Defendants further represent that the Alabama Secretary of State is responsible for the unanimous passage of the Act and "fully supports the new law and is implementing it in a deliberate fashion." (*Id.* at 8.) The record contains briefing and evidence in support of and in opposition to the motion, and the parties presented additional evidence and arguments at the hearing held on July 25, 2017.

For the reasons that follow, Plaintiffs have not demonstrated that they are entitled to preliminary injunctive relief, and Plaintiffs' motion (Doc. # 56) is due to be denied.

## II. JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue.

## III. BACKGROUND

### A. The Relevant Parties and Claims

Plaintiffs seek a preliminary injunction on some, but not all, counts. Only those parties and claims that are the subject of the preliminary injunction are set out here.

#### 1. *Parties*

Plaintiffs filed this lawsuit on September 26, 2016. The ten individual Plaintiffs are Alabama citizens who, on the basis of their felony convictions, have been removed from the voter registration list, have been denied applications to vote, or have not registered to vote in this state based on the uncertainty of

whether they have been convicted of a disqualifying felony involving moral turpitude. The organizational Plaintiff, Greater Birmingham Ministries, whose central goal is "the pursuit of social justice in the governance of Alabama," expends financial and other resources to help individuals with felony convictions determine whether they are eligible to vote or to have their voting rights restored. (Compl. ¶ 62 (Doc. # 1).) Defendants are the State of Alabama, the Secretary of State of Alabama, the Chair of the Board of Registrars for Montgomery County, and a Defendant class consisting of "[a]ll voter registrars in the State of Alabama." (Compl. ¶ 68.) The individual Defendants are sued in their official capacities only.

The Complaint seeks to certify a class of Plaintiffs defined as: "All unregistered persons otherwise eligible to register to vote in Alabama who are now, or who may in the future be, denied the right to vote because they have been convicted of a felony." (Compl. ¶ 50.) The Complaint also enumerates nine subclasses of Plaintiffs.

The motion for preliminary injunction also contains its own class, namely, "those voters whose voting rights under Section 177 of the [Alabama] Constitution have been affirmed by HB 282." (Pls.' Mot. Prelim. Inj., at 8 (Doc. # 56).)

#### 2. *Claims*

Section 177(b)'s phrase "moral turpitude" is at the forefront of twelve of the Complaint's fifteen counts challenging the constitutionality of § 177(b) of the Alabama Constitution. Only Counts 6–10 are relevant to the motion for preliminary injunction. These counts seek injunctive and declaratory relief.

Counts 6 and 7 allege that § 177(b)'s failure to define which Alabama felonies involve moral turpitude "imposes an unconstitutional burden on the right to vote of eligible Alabama voters with felony convictions in violation of the Equal Protection Clause" (Count 6) and the First Amendment (Count 7), and that, therefore, § 177(b) is subject to strict scrutiny. (Compl. ¶¶ 204, 207.)

Count 8 is a Fourteenth Amendment procedural due process claim, alleging that § 177(b)'s felon-disenfranchisement provision "provides Alabama citizens with little to no pre-deprivation process before revoking their right to vote, a fundamental right protected by both the Alabama and United States Constitutions." (Compl. ¶ 210.) Count 9 alleges that the "prohibition on voting for those convicted of felonies

Thompson v. Alabama, Not Reported in Fed. Supp. (2017)

2017 WL 3223915

'involving moral turpitude' is void for vagueness under the First and Fourteenth Amendments." (Compl. ¶ 225.)

**\*3** Count 10 is a selective enforcement claim under the Fourteenth Amendment's Due Process Clause. It alleges that Defendants arbitrarily distinguish between groups of felons by administering § 177(b) with an unequal hand from county to county and that, therefore, § 177(b) cannot survive rational-basis scrutiny.

The Complaint's prayer for relief seeks certification of the Plaintiff class, of nine Plaintiff sub-classes, and of a Defendant class of county registrars. It also asks for a declaratory judgment that § 177(b) of the Alabama Constitution, on its face and as applied, violates the First Amendment and the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

### B. HB 282

Shortly after taking office in 2014, Alabama Secretary of State John Merrill established an exploratory committee on "voter disenfranchisement and restoration of voting rights." (See Ex. A, Decl. of Edward Packard ¶ 6 (Doc. # 63-1).) A subcommittee of the "voter disenfranchisement and restoration of voting rights" committee drafted proposed legislation to create an exclusive list of felonies that would qualify as felonies of "moral turpitude" for the purposes of voting. (Id.) After this bill was introduced in previous sessions, the Legislature ultimately enacted this proposed legislation in a modified form by a unanimous vote in the 2017 regular legislature session. (Id.) HB 282 sets out its purposes, which are:

a. To give full effect to Article VIII of the Constitution of Alabama of 1901, now appearing as Section 177 of Article VIII of the Official Recompilation of the Constitution of Alabama of 1901, as amended.

b. To ensure that no one is wrongly excluded from the electoral franchise.

c. To provide a comprehensive list of acts that constitute moral turpitude for the limited purpose of disqualifying a person from exercising his or her right to vote.

Ala. Code § 17-3-30.1(b)(2) (eff. Aug. 1, 2017).

On May 25, 2017, Governor Kay Ivey signed HB 282 into law. Defendants estimate that some 60,000 felons could be affected by HB 282.

The effective date of HB 282 is August 1, 2017. However, because the August 15 special primary election for the U.S. Senate seat in Alabama is after HB 282's effective date, the Alabama Secretary of State has instructed registrars to use the new law to determine whether new registrants who have committed felonies are qualified to vote in the August 15 primary election. (See Ex. E, Decl. of George Noblin ¶ 4 (Doc. # 63-5).) The Chairman of the Montgomery County Board of Registrars, George Noblin, gave an example that, on July 17, 2017, his staff permitted an individual convicted of a felony to register to vote based upon application of HB 282. The Secretary of State's liaison with the Board of Registrars is "not aware of any registrar who has received an application to register from a felon and has not applied the new law." (See Ex. B, Decl. of Clay Helms ¶ 7 (Doc. # 63-2).)

The Alabama Secretary of State also is implementing statewide training to registrars. Through a contract with Auburn University, the Secretary of the State implemented a three-year training program on a variety of subjects for all of the state's registrars. The program, which commenced in June 2017, includes a course on felon disenfranchisement and the definition of "moral turpitude." (See Ex. B, Decl. of Clay Helms ¶ 12 & Ex. 6 (contract and course schedule).) Moreover, on June 2, 2017, which was eight days after HB 282's enactment, Secretary Merrill gave a presentation on HB 282 to the state association of registrars at their summer conference and advised them to use the list as the exclusive means of evaluating registrants. (See id.) And the Secretary's staff distributed a modified registrars' handbook that incorporated HB 282. (See id. ¶ 9 & Ex. 5.) The Secretary of State also has provided written guidance on HB 282 to all registrars via email. (Pls.' Mot. Prelim. Inj., at 9.) Based on the steps that the Alabama Secretary of State has taken to train the registrars on HB 282, Plaintiffs, at the hearing, withdrew their request for a preliminary injunction ordering that Defendants provide Alabama's 200 registrars mandatory training regarding the proper implementation of HB 282 for the upcoming special elections for the U.S. Senate seat in Alabama.

### IV. STANDARD OF REVIEW

**\*4** A party seeking a preliminary injunction must establish four elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that its own injury outweighs the injury to the nonmovant; and

Thompson v. Alabama, Not Reported in Fed. Supp. (2017)

2017 WL 3223915

(4) that the injunction would not disserve the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1179 (11th Cir. 2000). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four prerequisites." *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). That burden is even higher where, as here, the plaintiff seeks a mandatory preliminary injunction. *See Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1218 (S.D. Fla. 2014); *see also Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996) (A prohibitory injunction "restrains" a party from acting, while a mandatory injunction requires a party to "take action."). "[T]he burden of persuasion [on a motion for preliminary injunction] becomes even greater where the relief requested is a mandatory injunction, as opposed to a prohibitory injunction."); *see also Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979) ("Only in rare instances is the issuance of a mandatory preliminary injunction proper." (citing *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560 (5th Cir. 1971)).

## V. DISCUSSION

Plaintiffs have not met their high burden for obtaining a mandatory preliminary injunction. They have failed to demonstrate that any of the preliminary injunction factors weighs in their favor.

### A. **Plaintiffs have not shown a likelihood of success on the merits.**

Plaintiffs argue that they are likely to succeed on their claims challenging Alabama's standardless enforcement of the "moral turpitude" provision of § 177(b) as set out in Counts 6–10 of the Complaint. Defendants assert, on the other hand, that Plaintiffs cannot succeed because HB 282 moots Counts 6–10 and because their motion for preliminary injunction seeks relief that is outside the Complaint. These arguments are addressed in turn.

#### 1. *Plaintiffs' claims are moot.*

When, during the pendency of a lawsuit, the challenged law undergoes substantial amendment "so as plainly to cure the alleged defect, ... there is no live controversy for the Court to decide." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 670 (1993) (O'Connor, J., dissenting). "Such cases functionally are indistinguishable from those involving outright repeal:

Neither a declaration of the challenged statute's invalidity nor an injunction against its future enforcement would benefit the plaintiff, because the statute no longer can be said to affect the plaintiff." *Id.* The Eleventh Circuit has recognized that both it and the United States Supreme Court "have repeatedly held that the repeal or amendment of an allegedly unconstitutional statute moots legal challenges to the legitimacy of the repealed legislation." *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1329, 1332 (11th Cir. 2005) (collecting cases).

"While [the] general rule is that repeal [or amendment] of a statute renders a legal challenge moot, an important exception to that general rule is that mere voluntary termination of an allegedly illegal activity is not always sufficient to render a case moot and deprive the federal courts of jurisdiction to try the case." *Id. at 1333.* As a general principle, "[a] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Doe v. Wooten*, 747 F.3d 1317, 1322 (11th Cir. 2014) (citation omitted). However, the Eleventh Circuit "gives government actors more leeway than private parties in the presumption that they are unlikely to resume illegal activities"; this leeway translates to a "rebuttable presumption" or a "lesser burden." *Id.* (citations omitted).

**\*5** Before the presumption can attach, a defendant's termination of the challenged conduct must be "absolutely clear." *Id. at 1322.* Three factors guide that analysis: (1) "whether the termination of the offending conduct was unambiguous"; (2) "whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction"; and (3) "whether the government has 'consistently applied' a new policy or adhered to a new course of conduct." *Id. at 1323.* The government's repeal or amendment of a challenged statute is "often a clear indicator of unambiguous termination." *Id. at 1322.*

When the presumption attaches, "the controversy will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated." *Id.* (citation omitted). Stated differently, only "when a court is presented with evidence of a 'substantial likelihood' that the challenged statute will be reenacted, the litigation is not moot and the court should retain jurisdiction." *Nat'l Advert. Co.*, 402 F.3d at 1334. "[T]he cases are legion from this [circuit] and other courts where the repeal of an allegedly

Thompson v. Alabama, Not Reported in Fed. Supp. (2017)

2017 WL 3223915

unconstitutional statute was sufficient to moot litigation challenging the statute." *Id.* at 1333–34.

Defendants argue for application of the general rule—that HB 282 is a clarifying amendment that moots Counts 6–10. Plaintiffs contend that the voluntary-cessation exception keeps this case alive.

The court begins with an analysis of the three *Doe* factors to determine whether HB 282 makes it "absolutely clear" that Defendants have ceased the challenged conduct. To begin, there is no serious debate that HB 282 resolves Plaintiffs' challenge to § 177(b)'s vagueness. (*See, e.g.*, Pls. Counsel's Letter to Andrew Brasher (Doc. # 56-1), in which counsel acknowledges that "HB 282 is most relevant to Counts 6–10," which challenge "the prior standardless system for determining who could vote," and that "HB 282 is an important step to remedying the harms we alleged in those counts of the complaint").) At the heart of Counts 6, 7, 8, 9, and 10's constitutional challenge is that § 177(b)'s phrase "moral turpitude" is so vague that it fails to provide reasonable guidelines for determining whether a felony conviction "involves moral turpitude." (*See, e.g.*, Compl. ¶ 198 ("The failure [of the State of Alabama] to define ... crimes of moral turpitude imposes an unconstitutional burden on those qualified to vote under Alabama law but who have been convicted of felonies." (Count 6)); Compl. ¶ 207 (incorporating ¶ 198 into Count 7); Compl. ¶ 211 ("[T]he risk of erroneous deprivation [of procedural due process] is high" because county registrars, with no legal training, must interpret § 177(b) in order to determine a citizen's eligibility to vote (Count 8); Compl. ¶¶ 222, 224, 225 § 177(b)'s "prohibition on voting for those convicted of felonies involving moral turpitude—with possible exception of those crimes listed in Alabama Code Section 15-22-36.1(g)"—is standardless, does not provide fair notice of the conduct prohibited, and is void for vagueness (Count 9); Compl. ¶ 227 ("Defendants' enforcement of Section 177(b) is not guided by a principled determination of which felonies 'involve moral turpitude' " and, thus, has resulted in a system of arbitrary disenfranchisement in violation of the Fourteenth Amendment (Count 10)).

Through the enactment of HB 282, the Alabama legislature has addressed Plaintiffs' quandary. HB 282's list of specific Alabama felonies, by crime and code section, is a definitive list of felonies involving moral turpitude under § 177(b)'s felony disenfranchisement provision. Plaintiffs now can be certain whether their convictions are disqualifying. They can

review HB 282 and know whether their felony conviction involves moral turpitude. In fact, as a result of HB 282's listing of disqualifying felonies, Antwoine Giles and Laura Corley now know with certainty that they are eligible to vote because their felonies are not on the HB 282 list.[2] Counts 6–10's challenges that § 177(b)'s phrase "moral turpitude" is vague and lacks reasonably clear guidelines hardly can be said to still exist in view of HB 282. Plaintiffs have not argued that HB 282 fails to provide them with clarity as to whether their felony convictions involve "moral turpitude."

**\*6** Additionally, although Plaintiffs are not content with the progress of HB 282's implementation, the preponderance of the evidence shows that registrars are abiding by and applying HB 282 when registering felons to vote. More specifically, at the state association of registrars conference in June 2017, the Alabama Secretary of State advised registrars to use HB 282's list as the exclusive means of evaluating registrants. Registrars also have received an amended registrars' handbook that has been updated to incorporate the legislation. (Ex. B, Decl. of Clay Helms ¶¶ 8, 9.) And, in Montgomery County, a felon was permitted to register to vote under the new law, whose felony would have been disqualifying under the old law. (Ex. E, Decl. of George Noblin ¶ 4.) The Secretary of State's liaison with the Board of Registrars is "not aware of any registrar who has received an application to register from a felon and has not applied the new law." (Ex. B, Decl. of Clay Helms ¶ 7.) These facts demonstrate that HB 282, through its enactment and application, unambiguously terminated the offending conduct. The first factor is satisfied.

As to the second factor, there is no evidence, argument, or suggestion that HB 282 was an attempt to manipulate this court's jurisdiction over this lawsuit. There is no evidence suggesting that the Alabama legislature intends to repeal HB 282 after this lawsuit concludes. To the contrary, the record reveals that the passage of HB 282 is the culmination of several years of work initiated by the Alabama Secretary of State. (*See* Ex. C, Decl. of Brent Beal ¶ 2 (Doc. # 63-3).) Defendants' evidence establishes that, shortly after taking office in 2014, Secretary of State Merrill established an exploratory committee on "voter disenfranchisement and restoration of voting rights." (Ex. A, Decl. of Edward Packard ¶ 6.) A subcommittee of the "voter disenfranchisement and restoration of voting rights" committee drafted proposed legislation to create an exclusive list of felonies that would qualify as felonies of "moral turpitude" for the purposes of voting. (*Id.*) Ultimately, after this bill was introduced

Thompson v. Alabama, Not Reported in Fed. Supp. (2017)

2017 WL 3223915

in previous sessions, the Alabama Legislature enacted this proposed legislation in a modified form by a unanimous vote in 2017. (*Id.*) These facts show that substantial deliberation undergirded HB 282's enactment. The second factor is met.

Finally, with respect to the third factor, Defendants are applying HB 282 and are in the midst of implementing programs to educate registrars, voters, and other officials on the new law. There is no evidence that any eligible HB 282 voter has been denied the right to register to vote. This evidence, together with the unanimous vote for the law in both chambers of the legislature, demonstrates Defendants' commitment to abide by the new law and its "adhere[nce] to a new course of conduct." *Doe*, 747 F.3d at 1323.

In sum, the State of Alabama's enactment of HB 282 is "a clear indicator of unambiguous termination" of the allegedly unconstitutional conduct. *Id.* at 1322. Accordingly, Defendants are entitled to a rebuttable presumption that "they are unlikely to resume illegal activities." *Id.* Plaintiffs have failed to rebut that presumption; they have presented no evidence, for example, that the Alabama Legislature intends that HB 282's repeal will follow on the heels of the conclusion of this lawsuit. The absence of this sort of evidence is not surprising, given that the state legislature passed HB 282 unanimously and that the state's extensive training efforts on HB 282 already are underway.

Based on the foregoing, the enactment of HB 282, which clarifies for Plaintiffs whether their convictions are felonies "involving moral turpitude" under § 177(b), moots a legal challenge to the vagueness of § 177(b)'s moral turpitude phrase. The claims' mootness is a jurisdictional flaw that precludes the court from reaching the merits of these claims. Because Counts 6, 7, 8, 9, and 10 are moot, Plaintiffs cannot demonstrate a likelihood of success on the merits.[3]

### 2. *The requested preliminary injunctive relief is unlike the relief sought in the Complaint.*

**\*7** A preliminary injunction is not appropriate when it is based on relief that "is not of the same character [as that requested in the complaint], and deals with a matter lying wholly outside the issues in the suit." *Kaimowitz v. Orlando*, 122 F.3d 41, 43 (11th Cir. 1997) (per curiam), *amended on reh'g on other grounds by* 131 F.3d 950 (11th Cir. 1997). *See also Westbank Yellow Pages v. BRI, Inc.*, No. 96-1128, 1996 WL 255912, at *1 (E.D. La. May 13, 1996) ("A preliminary injunction is not an appropriate vehicle for trying to obtain

relief that is not even sought in the underlying action."). The relief requested here is problematic, both for what it seeks and for whom it is sought.

First, the relief requested in the motion for preliminary injunction is of a different nature than that pleaded in the Complaint. The Complaint seeks a declaratory judgment that § 177(b)'s moral-turpitude standard is unconstitutional and a permanent injunction enjoining Defendants from enforcing § 177(b), for example, by preventing Defendants "from denying any voter registration applications on the basis of felony convictions." (Compl., at 56.) The motion for preliminary injunction changes the focus of the relief to HB 282. (Pls.' Mot. Prelim. Inj., at 28.) As Plaintiffs admit, the motion for preliminary injunction asserts "new facts relevant to the passage of HB 282," (*id.* at 2), and asks the court to order the Secretary to provide notice of HB 282 in a specified manner and to automatically reinstate certain HB 282 voters. These remedies are not the remedies that the Complaint requests should Plaintiffs succeed in their underlying suit challenging the constitutionality of § 177(b).[4]

Moreover, to be clear, the subject matter of both the Complaint and the motion for preliminary injunction concerns the voting rights of felons. But the Complaint focuses on felons who, under § 177(b), could not vote, either because the state explicitly had taken away that right or because of the uncertainty § 177(b) created as to whether a conviction arose from a felony involving moral turpitude. The motion for preliminary injunction, on the other hand, turns attention to felons who now undeniably can vote by virtue of HB 282. Felons whose voting rights have been "affirmed" in that they now are eligible to register to vote (the subject of the motion for preliminary injunction) are not felons whose voting rights have been denied because of a felony conviction (the subject matter of the Complaint).

Second, Plaintiffs request preliminary injunctive relief for a new putative class of felons. In their brief in support of their motion for preliminary injunction, Plaintiffs ask for "relief solely for those voters whose rights under Section 177 of the [Alabama] Constitution have been affirmed by HB 282." (Pls.' Mot. Prelim. Inj., at 8.) It appears that Plaintiffs have formulated a class of felons—those who previously were denied voting rights or were unsure of their eligibility to vote under § 177(b) (and therefore did not attempt to register), but who now are eligible to vote and are certain of that eligibility because HB 282 has clarified that their felonies are

Thompson v. Alabama, Not Reported in Fed. Supp. (2017)

2017 WL 3223915

not disqualifying. But this class is not a part of the class or nine sub-classes alleged in the Complaint.

**\*8** The Complaint's class and sub-classes share a common factual denominator. Each includes unregistered voters who have been denied the right to vote because either their voting applications were denied, their names were purged from the voting registration rolls, or they cannot be legally certain whether their felony convictions are felonies involving moral turpitude. As Plaintiffs point out, the Complaint could not have alleged a purported class of HB 282 voters because HB 282 was non-existent at the initiation of this suit. But this point ignores that adding classes (and claims) in briefs circumvents the letter and spirit of the orderly procedures established by the Federal Rules of Civil Procedure for the efficient administration of a lawsuit. *See Gyenis v. Scottsdale Ins. Co.*, No. 8:12-CV-805-T-33AEP, 2013 WL 3013618, at \*1 (M.D. Fla. June 14, 2013) ("The Federal Rules of Civil Procedure are necessary for the orderly and efficient running of this Court and to ensure that in the interests of justice, everyone is on a level playing field. The Rules cannot be ignored or overlooked."); *see, e.g.*, Fed. R. Civ. 15(a), (d) (governing pre-trial amendments to pleadings and supplemental pleadings); *cf. Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

Plaintiffs have not moved to amend the Complaint or to supplement the pleadings in order to redefine the claims for relief or the purported class. These pleading deficiencies, which expand the litigation highway outside the Complaint's roadmap, present yet another reason for denying the motion for preliminary injunction.

### 3. *Plaintiffs have a* Pennhurst *problem.*

The Eleventh Amendment prevents a federal court from issuing an injunction against state officials solely to require them to adhere to state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106–07 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."). To avoid the *Pennhurst* problem, Plaintiffs' new claims challenging Defendants' implementation of HB 282 may only proceed in federal court if a provision of federal law creates a right to the enforcement of HB 282.

Plaintiffs argue that *Pennhurst* is inapposite because they seek an injunction against state officials to "remedy the harms caused by their *unconstitutional* behavior" under federal law. (Doc. # 59, at 4 (emphasis in original).) Plaintiffs' attempt to differentiate *Pennhurst* from this case is not convincing.

Plaintiffs express no dissatisfaction with HB 282 itself; they advance no argument that HB 282 violates the federal constitution. Rather, Plaintiffs complain that, since May 25, 2017, Defendants have refused to implement HB 282 in a manner that would maximize notice to HB 282 voters and give more opportunities to HB 282 voters to vote in the August 15 special election for the U.S. Senate seat in Alabama.[5] (*See* Pls.' Mot. Prelim. Inj., at 28, in which Plaintiffs argue that they seek "full implementation of governing Alabama law"). What Plaintiffs really appear to be asking is that this court supervise and direct these state Defendants in how they should carry out their responsibilities under HB 282, a state law. The true nature of this "remedy" sounds in state law. Plaintiffs fail to persuade the court, at this juncture, that *Pennhurst* is not prohibitive of what they are asking this court to do. At the very least, *Pennhurst* presents another reason why Plaintiffs have not demonstrated a substantial likelihood of success on the merits.

### B. **Plaintiffs have not shown a substantial threat of irreparable injury.**

Plaintiffs contend that "[e]ligible HB 282 voters plainly face irreparable injury if the State does not take the[ ] [requested] commonsense steps to implement HB 282, correct recent unlawful voter registration purges and application denials, and educate voters about HB 282's eligibility requirements." (Pls.' Mot. Prelim. Inj., at 26–27.) The argument is illogical on many levels.

**\*9** "A showing of irreparable injury is the sine qua non of injunctive relief." *Siegel*, 234 F.3d at 1176 (citations omitted). "[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Id.* (citations omitted). Here, for the most part, the asserted injuries are not actual.

An actual injury is imperceptible under these facts. An "HB 282 voter," as Plaintiffs explain it, is an individual whose felony offense does not appear on the list of offenses in HB 282 and, thus, who is *not* disqualified to vote on the basis of a felony involving moral turpitude. The injuries alleged in Counts 6–10 focus on the harm to Plaintiffs —the inability to discern whether their felony convictions

Thompson v. Alabama, Not Reported in Fed. Supp. (2017)

2017 WL 3223915

render them unable to vote—caused by § 177(b)'s "failure to define or list disqualifying crimes or crimes of moral turpitude." (Compl. ¶ 198.) HB 282 has alleviated that harm. It is no longer problematic for Plaintiffs to determine whether they are eligible to vote. All a Plaintiff needs to know is the offense resulting in his or her conviction. If that felony is on the HB 282 list, he or she cannot vote; if it is not on that list, he or she can vote. Plaintiffs do not deny that HB 282's "comprehensive list of crimes that 'involve moral turpitude' " provides the clarity they sought for § 177(b).[6] (Pls.' Mot. Prelim. Inj., at 7.)

Having acknowledged that the alleged unconstitutional scheme (and thus necessarily the injury) of which Plaintiffs allege in the Complaint is "in the past" because of HB 282 (Prel. Inj. H'rg, June 25, 2017), Plaintiffs are left to argue that Defendants are not doing enough to get the word out on HB 282 to all felons, who were previously disenfranchised under Alabama's old § 177(b) scheme, but who now are eligible to vote by reason of HB 282.[7] They want this court to direct the Alabama Secretary of State to post notice about HB 282's voting eligibility standards on its website and to update state and federal voter registration forms.[8] Plaintiffs go so far as to insist that as to those felons, who in the past two years were denied voter registration or were struck from the voter registration rolls, Defendants should automatically reinstate them on the voter registration rolls and provide them with individualized notice of their automatic registration and right to vote. Having reconstructed their injuries in their motion for preliminary injunction, Plaintiffs contend that, post HB 282, they have suffered injuries as a result of Defendants' failure to take these affirmative steps to provide notice and automatic reinstatement.

**\*10** But, at bottom, these alleged injuries are misdirected. It is true that, once the August 15 special primary election passes, "there can be no do-over" for an unconstitutionally disenfranchised voter. *League of Women Voters of N. Carolina v. North Carolina,* 769 F.3d 224, 247 (4th Cir. 2014). But the HB 282 voters do not contend that they have been disenfranchised. To quote Plaintiffs, HB 282 has "affirmed" these individuals' right to vote. It would be an entirely different matter if Defendants were refusing to allow felons to register to vote where their offense of conviction was not on the HB 282 list. There is no evidence, however, that Defendants have denied any eligible HB 282 voter's application to register to vote or have engaged in any type of prohibitive tactic. Instead, the evidence demonstrates that the county registrars, at the direction of the Alabama Secretary of

State, are adhering to HB 282 and are permitting individuals to register to whom HB 282 does not disqualify. Plaintiffs, who are eligible HB 282 voters, cannot claim irreparable harm when they have been granted the right to vote.[9]

Moreover, as to the different forms of notice Plaintiffs request—a posting on the Alabama Secretary of State's website; updated state and federal registration forms; and individualized notice—Plaintiffs have presented no evidence that either named Plaintiff suffered any injury based upon a lack of notice. There is no evidence that Mr. Giles or Ms. Corley do not know that they can go to their respective county registrars office and register to vote. There is no evidence that imminent injury will occur to Mr. Giles or Ms. Corley if the requested forms of notice are denied to them.

Moreover, as a matter of general observation on public notice rather than a finding, HB 282 and Alabama's felon disenfranchisement laws have received widespread news coverage at the local, county, state, and national levels through broadcast news, the internet, and print media. Exhibits, submitted by both Plaintiffs and Defendants, include compilations of the coverage on these issues and confirm that there have been no less than thirty-five sources of publicity about Alabama's laws on felon disenfranchisement, with most of those sources also reporting on HB 282. Notwithstanding Plaintiffs' contention that Defendants have failed to provide adequate notice of HB 282 to the targeted felon pool of eligible HB 282 voters, it is relevant for the equitable equation that the press has assisted in notifying the public about HB 282.[10]

As to the putative class members of eligible HB 282 voters, the following represents the nature of Plaintiffs' evidence. There is a declaration from a Greater Birmingham Ministries employee, who "think[s] many of these [eligible HB 282] voters may never discover that they have the right to vote" unless they receive "individual notification" of HB 282. (Shearer Decl. ¶ 10 (Doc. # 66-6).) She explains that many of the eligible HB 282 voters "are poor and do not have regular access to computers and the internet," and, thus, "website notification alone would be insufficient." (*Id.* ¶ 11.) There also are two declarations from individuals who are eligible HB 282 voters, but who say that they would have been "unaware of the new law and [their] ability to register to vote" if they had not been contacted by the Campaign Legal Center. (Brio Richardson Decl. ¶ 8 (Doc. # 66-9)); (Willie Goldsmith Decl. ¶ 4 (Doc. # 66-10).)

Thompson v. Alabama, Not Reported in Fed. Supp. (2017)

2017 WL 3223915

**\*11** Individualized notice, along with automatic reinstatement on the voter registration rolls, is what the putative class really seeks because Plaintiffs, in effect, concede that a posting on the Secretary's website on HB 282 would not effectively reach eligible HB 282 voters. These affirmative steps, if Defendants were ordered to take them, would not give HB 282 voters any more voting rights than they have today.[11] They, like their proposed class representatives, can register to vote in their respective counties; there is no question as to their eligibility to vote after HB 282.

Plaintiffs contend, though, that *Hobson v. Pow*, 434 F. Supp. 362 (N.D. Ala. 1977), requires individualized notice and reinstatement to the voter registration rolls of the eligible HB 282 voters. In that case, the district court enjoined the State of Alabama from disenfranchising men convicted of "wife-beating," which it found to be an impermissible gender-based classification, and ordered registrars to "either publish the notice [of the court's order] or send notice to each person purged by first-class mail." *Id.* It also ordered some counties to take the extra step of "reinstat[ing] all voters purged" for wife-beating. *Id.* at 368. *Hobson* is distinguishable for at least two reasons.

First, in *Hobson*, the plaintiffs secured the right to vote through litigation and a federal court order. Here, the State changed the law through legislation, which "everyone is presumed to know" and of which everyone "is bound to take notice." *See Meacham v. Halley*, 103 F.2d 967, 972 (5th Cir. 1939). Second, *Hobson* found that it was a violation of equal protection to disqualify a discrete group of male felons (and not their female counterparts). The relief the court granted was prospective declaratory and injunctive relief compelling state officials to comply with federal law. There is no federal constitutional claim by the HB 282 voters; these voters have secured their right to vote. The relief they request arises under state law and seeks enforcement of state law. Again, the HB 282 voters' claims in this lawsuit succumb to *Pennhurst*. Because their alleged injuries have no federal law grounding in this court, they cannot be said to be actual, irreparable, or imminent.

Finally, Plaintiffs' delay in seeking preliminary injunctive relief undercuts their argument of irreparable injury. Under Eleventh Circuit law, "[a] delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal,*

*LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

Here, two significant events preceded Plaintiffs' preliminary injunction motion. First, Plaintiffs have known since April 18, 2017, when Governor Kay Ivey signed a proclamation, of the dates for the special election for the United States Senate seat in Alabama. Yet, Plaintiffs delayed filing a preliminary injunction motion until nearly two-and-a-half months later on June 30, 2017. Second, Plaintiffs have been on notice since May 25, 2017, when HB 282 was enacted, of the bill's effect on current felons' eligibility to vote, but they still waited more than a month to file their preliminary injunction motion. The court is mindful of the efforts Plaintiffs say they made to reach an agreement with the State without the need for court intervention. But with a July 31 voter registration deadline for the special primary election looming and given the multitude of steps that the State must take to get ready for the election, the delay nevertheless cuts against the premise that these HB 282 voters needed urgent action to protect their rights.

**\*12** For all of these reasons, Plaintiffs have not shown a substantial threat of irreparable injury if the requested relief is not granted.

## C. **Plaintiffs have not shown that the threatened injury to them outweighs the harm an injunction may cause the defendant.**

Plaintiffs argue that Defendants will not be harmed by their relief because "[i]t falls squarely within the Secretary of State's responsibilities to update the voter registration forms, [the website], and all other voter education materials, both to reflect current Alabama law and to provide registrars with 'uniform guidance' on the administration of the Election Code." (Pls.' Mot. Prelim. Inj., at 27.) Plaintiffs contend that the important "principle of election law ... that, because of the risk of voter confusion, courts as a general rule should be reluctant to allow last-minute changes to the status quo" is inapplicable in this case because their motion for a preliminary injunction is intended to eliminate confusion. *Hall v. Merrill*, 212 F. Supp. 3d 1148, 1157 (M.D. Ala. 2016) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)).

Contrary to Plaintiffs' position, the requested preliminary injunction, if granted, would alter the status quo. Defendants would have to divert essential resources needed to prepare for and conduct the election in order to fulfill the many last-minute tasks that Plaintiffs want them to perform. Plaintiffs are requesting, for example, the court to order Defendants to

Thompson v. Alabama, Not Reported in Fed. Supp. (2017)

2017 WL 3223915

send individualized notice to a sub-group of the approximate 60,000 felons who were removed from voter rolls or denied registration over an indeterminate time frame. Defendants have demonstrated, at the very least, that identifying the dates of conviction, the specific felonies committed, and whether new felonies had been committed would be an arduous, case-by-case task. With an election looming and only six employees in the Secretary of State's Election Division, just the task of preparing the mass mailings to provide individualized notice to potential HB 282 voters in 67 counties and potentially 3,487 precincts would be massive, and likely impossible. Considering cumulatively Plaintiffs' requests for preliminary injunction, completion of those tasks by Defendants so close to an election would harm Defendants.

Moreover, the harm to Defendants from this court's meddling with the state's election law is not inconsequential, particularly here, where Plaintiffs ask this court to oversee Defendants' implementation of state law. The Eighth Circuit's observations on principles of federalism are fitting:

> The value of decentralized government is recognized more clearly today than it has been for decades. This recognition, born of experience, enables us (and not only us) to see that federal judicial decrees that bristle with interpretive difficulties and invite protracted federal judicial supervision of functions that the Constitution assigns to state and local government are to be reserved for extreme cases of demonstrated noncompliance with milder measures. They are last resorts, not first.

*Ass'n of Cmty. Organizations for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 798 (7th Cir. 1995).

**\*13** Overall, Plaintiffs have not shown that the threatened injury to them outweighs the harm an injunction may cause Defendants.

### D. **Plaintiffs have not demonstrated that a preliminary injunction would serve the public interest.**

Finally, the public interest militates against the granting of the preliminary injunction motion. The HB 282 voters can have a voice in the election for the U.S. Senate seat in Alabama; all of them are, by Plaintiffs' definition of the putative class, eligible to register to vote and to cast a vote in the special election. The grant of a preliminary injunction will not give these voters additional voting rights. HB 282 has advanced, therefore, the public interest in protecting voting rights from erroneous disenfranchisement, and, thus, there is little for the

public to gain by granting Plaintiffs' preliminary injunctive relief.

At the same time, "there is a strong public interest in smooth and effective administration of the voting laws that militates against changing the rules in the hours immediately preceding the election." *Summit Cty. Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004). Plaintiffs contend that they only are seeking enforcement of the new HB 282, not a change in the law, so as to avoid voter confusion. Even so, the diversion of the state's resources to fulfilling Plaintiffs' requested tasks, when balanced against the multitude of hurdles Plaintiffs face as to the other elements for obtaining injunctive relief and the steps Defendants have taken to implement HB 282, weighs heavily against granting preliminary injunction relief.

## VI. CONCLUSION

HB 282 offered long-needed and sought-after clarification to the conundrum in the Alabama Constitution's disenfranchising provision, § 177(b), when it defined a "felony involving moral turpitude." HB 282 did not exist when Plaintiffs filed this lawsuit challenging § 177(b) on federal constitutional grounds, but after its enactment, Plaintiffs filed a motion for preliminary injunction asking this court to tell Alabama's state officials how to implement the law. Plaintiffs' motion, however, is based on claims that HB 282 has mooted; raises new claims, new requests for relief, a new putative class of voters who were ineligible to vote prior to HB 282, but now are eligible; seeks to alter the status quo; and raises serious concerns about federal intrusion into state election law. The motion for preliminary injunction is due to be denied for all these reasons and more. Plaintiffs satisfy none of the elements for granting a preliminary injunction.

Accordingly, based upon careful consideration of Plaintiffs' motion for preliminary injunction, Defendants' opposition, the evidentiary hearing, and the oral arguments, and the record, it is ORDERED that the motion (Doc. # 56) is DENIED.

DONE this 28th day of July, 2017.

### All Citations

Not Reported in Fed. Supp., 2017 WL 3223915

Thompson v. Alabama, Not Reported in Fed. Supp. (2017)

2017 WL 3223915

Footnotes

1     At the July 25, 2017, hearing on the motion for preliminary injunction, Plaintiffs orally narrowed their written requests for preliminary injunctive relief. These are the modified requests.

2     Mr. Giles alleges that his name was purged from the Montgomery County voter registration list after his 2006 Alabama conviction for stalking in the first degree. Because that felony is not on the HB 282 list, he now is eligible to register to vote. Ms. Corley alleges that she received conflicting information from state agencies as to whether her 2015 Alabama convictions for possession of controlled substances disqualified her from voting, and, thus, she was uncertain whether she could register to vote in Jefferson County. Because the felony underlying Ms. Corley's convictions is not on the HB 282 list, she now knows with certainty that she is qualified to vote.

3     Although the court's decision on mootness obviates the necessity to delve into the merits of Counts 6–10, it is nonetheless important to clear up a misconception in Plaintiffs' briefing. Plaintiffs contend that, because "Alabama's system of disenfranchisement unquestionably ... led to the arbitrary deprivation of *fundamental rights*, Plaintiffs are likely to succeed" on Count 6–10. (Pls.' Mot. Prelim. Inj., at 19 (emphasis added).)

Felons do not have a fundamental right to vote protected by strict scrutiny (absent allegations that a disenfranchisement classification discriminates on the basis of race or other suspect criteria). A state's decision to deprive some convicted felons, but not others, of voting rights is not subject to a strict scrutiny standard. In *Richardson v. Ramirez*, 418 U.S. 24 (1974), the Supreme Court upheld a California statute disenfranchising felons convicted of "infamous crimes," holding that, notwithstanding the guarantee of equal protection in Section 1 of the Fourteenth Amendment, the reduced-representation clause in Section 2 permitted the state to disenfranchise felons. *See id.* at 52–55. The Court rejected the petitioners' argument that the statute limiting their voting rights was subject to strict scrutiny. It reasoned that states can disenfranchise felons on the "demonstrably sound proposition that § 1, in dealing with voting rights as it does, could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced representation which § 2 imposed for other forms of disenfranchisement." *Id.* at 55.

The Third, former Fifth, Sixth, and Ninth Circuits have interpreted *Richardson's* analysis of the interplay between Sections 1 and 2 of the Fourteenth Amendment as immunizing felon-disenfranchisement provisions from strict scrutiny under the Equal Protection Clause. In *Owens v. Barnes*, 711 F.2d 25 (3d Cir. 1983), which addressed a challenge that Pennsylvania's law disenfranchising convicted felons during their incarceration violated equal protection, the Third Circuit held that *Richardson* compelled the conclusion that "the right of convicted felons to vote is not fundamental." *Id.* at 27 (citing *Richardson*, 418 U.S. at 654). It held that "the state cannot only disenfranchise all convicted felons but it can also distinguish among them provided that such distinction is rationally related to a legitimate state interest." *Id.* Pennsylvania could have rationally concluded that one of the losses attendant to incarceration should be the loss of "participation in the democratic process" and that incarcerated and un-incarcerated felons did not stand on equal footing for purposes of voting rights. *Id.* at 28. The Sixth Circuit aligned with *Owens*, holding that "[i]t is undisputed that a state may constitutionally disenfranchise convicted felons," *id.* (citing *Richardson*, 418 U.S. at 24), and that "the right to vote is not fundamental," *id.* (citing *Owens*, 711 F.2d at 27).

The Ninth Circuit emphasized that, as for their equal protection claim, the plaintiffs could not "complain about their loss of a fundamental right to vote because felon disenfranchisement is explicitly permitted under the terms of *Richardson*, 18 U.S. at 55." *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010). It explained that it would "not apply strict scrutiny as [it] would if plaintiffs were complaining about the deprivation of a fundamental right." *Id.* Finally, in *Shepherd v. Trevino*, 575 F.2d 1110, 1114–15 (5th Cir. 1978), the former Fifth Circuit applied the rational-basis test, rather than strict scrutiny, to a state statutory scheme that disenfranchised all convicted felons, but that provided a mechanism for the restoration of voting rights only to those who were convicted in state court, not federal court.

All that said, the Supreme Court has not immunized all felon disenfranchisement laws from constitutional review. In *Hunter v. Underwood*, 421 U.S. 22 (1985), the Court held that the 1901 Alabama Constitution's provision that disenfranchised individuals convicted of misdemeanors involving moral turpitude was racially discriminatory. The Court explained: "We are confident that [Section] 2 [of the Fourteenth Amendment] was not designed to permit the purposeful racial discrimination attending the enactment and operation of [the state constitutional provision] which otherwise violates [Section] 1 of the Fourteenth Amendment. Nothing in our opinion in *Richardson v. Ramirez* suggests the contrary." *Id.* at 233. This is the claim Plaintiffs bring in Count 1, which will be addressed in a separate opinion in the context of Defendants' pending motion to dismiss.

States cannot make arbitrary classifications between felons. *See, e.g., Richardson*, 418 U.S. at 56 (remanding a claim that "there was such a total lack of uniformity in county election officials' enforcement of the challenged state laws as

Thompson v. Alabama, Not Reported in Fed. Supp. (2017)

2017 WL 3223915

to work a separate denial of equal protection"); *Owen v. Barnes*, 711 F.2d 25, 27 (3d Cir. 1983) (noting in dicta that a state "could not disenfranchise similarly situated blue-eyed felons but not brown-eyed felons"); *Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978) ("[S]elective disenfranchisement or reenfranchisement of convicted felons ... must bear a rational relationship to the achieving of a legitimate state interest." (internal citations omitted)).

4    Because the relief Plaintiffs seek in their motion for preliminary injunction arises from the passage of HB 282, which occurred eight months after the commencement of this action, that relief could not have been encompassed in the Complaint.

5    There is irony in this argument because HB 282 is not effective until August 1, 2017. However, because HB 282 voters will be able to vote in the August 15, 2017 special primary election, should they choose to register to vote, Defendants are applying the law now so that these individuals can meet the July 31 voter registration deadline.

6    At this phase of litigation, the parties have not argued, and the court does not address, felony convictions outside Alabama law. As alleged in the Complaint, all of the named Plaintiffs have Alabama felony convictions.

7    Of the named Plaintiffs, Mr. Giles and Ms. Corley fit within this new class of HB 282 voters Plaintiffs have identified.

8    There is no dispute that the Alabama Secretary of State's website includes an electronic state voter registration form and that the Secretary has modified the instructions on the electronic form by including a hyperlink that lists the HB 282 felonies. (*See* Ex. B, Decl. of Clay Helms ¶ 13.) Plaintiffs want this court to order the Alabama Secretary of State to attach the list generated by that hyperlink and attach that list to the PDF of the registration form. This additional step, says Plaintiffs, would give voters access to the HB 282 crimes list on the downloaded voter registration form.

9    Alabama has in place statutory procedures for disenfranchised felons to request restoration of voting rights. There is no evidence that the State of Alabama is requiring an eligible HB 282 voter to apply to have his or her rights restored before he or she can register to vote.

10   The media coverage is not referenced here for the truth of the matter asserted, but rather to demonstrate that the news industry is reporting on HB 282 in and outside this state in multiple media formats. *See, e.g., United States v. Michtavi*, 155 Fed.Appx. 433, 435 (11th Cir. 2005) (observing that "the Government did not offer the newspaper articles to prove the truth of the matter asserted therein—the occurrence of the drug bust—but rather to show that newspaper articles reporting a New York drug bust existed, and thereby rehabilitate Cohen's testimony").

11   It can be assumed that a prominent posting about HB 282 on the Alabama Secretary of State's website would provide the possibility of more opportunities, for an individual who previously was denied or purged from the voting list, to learn about his or her eligibility to register to vote under HB 282. It is just a possibility on this record, though, where one declarant claims it would be inadequate alone, no Plaintiff contends that such a notice would be adequate, and where the supposition is that most HB 282 voters do not have internet access. This requested relief is too speculative to warrant preliminary injunctive relief.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 15

# In the Supreme Court of Wisconsin

The Wisconsin Voters Alliance, Ronald H. Heuer, William Joseph Laurent, Richard Kucksdorf, James Fitzgerald, Kelly Ruh, William Berglund, John Jaconi, Donna Utschig, Jeff Wellhouse, Kurt Johnson, Thomas Reczek, Linda Sinkula, Atilla Thorbjorsson, Jeff Kleiman, Navin Jarugumilli, Jonathan Hunt, Suzanne Vlach, Jacob Blazkovec, Donald Utschig, Carol Aldinger, Jay Plaumann, Deborah Gorman, Robert R. Liebeck, Valerie M. Bruns Liebeck, Edward Hudak, Ron Cork, Charles Risch, Karl Lehrke, Arnet Holty and Joseph McGrath, PETITIONERS,

*v.*

Wisconsin Elections Commission, and its members
Ann S. Jacobs, Mark L. Thomsen, Marge Bostelman,
Julie M. Glancey, Dean Knudson, Robert F. Spindell,
Jr., in their official capacities, Governor Tony Evers,
in his official capacity, RESPONDENTS

On Petition For Original Action
Before this Court

## EXPERT REPORT OF MATTHEW BRAYNARD

## I.  INTRODUCTION

I have been retained as an expert witness on behalf of Petitioners in the above captioned proceeding.  I expect to testify on the following subject matters:  (i) analysis of the database for the November 3, 2020 election for the selection of Presidential Electors in the State of Wisconsin ("State"); (ii) render opinions regarding whether individuals identified in the State's voter database actually voted; and (iii) render opinions regarding whether individuals identified in the State's voter database were actually qualified to vote on election day.

This is a statement of my relevant opinions and an outline of the factual basis for these opinions.  The opinions and facts contained herein are based on the information made available to me in this case prior to preparation of this report, as well as my professional experience as an election data analyst.

I reserve the right to supplement or amend this statement on the basis of further information obtained prior to the time of trial or in order to clarify or correct the information contained herein.

## II.  DOCUMENTS REVIEWED

I reviewed the following documents in arriving at my opinions.

1.  The voter records and election returns as maintained on the State's election database;

2.     Records maintained by the National Change of Address Source which is

       maintained by the United States Postal Service and which is available for

       licensed users on the internet.  I am a licensed member.

3.     Records developed by the staff of my call centers and social media

       researchers; and

4.     A national voter database maintained by L2 Political;

In addition, I discussed the facts of this matter with Petitioner's attorney Erick G.

Kaardal and members of his legal team.

## III.   PROFESSIONAL QUALIFICATIONS

I have attached hereto as Exhibit 1 a true and correct copy of my resume.  As

detailed in the resume, I graduated from George Washington University in 2000 with a

degree in business administration with a concentration in finance and management

information systems.  I have been working in the voter data and election administration

field since 1996.  I have worked building and deploying voter databases for the

Republican National Committee, five Presidential campaigns, and no less than one-

hundred different campaigns and election-related organizations in all fifty states and the

U.S. Virgin Islands. I worked for eight years as a senior analyst at the nation's premier

redistricting and election administration firm, Election Data Services, where I worked

with states and municipalities on voter databases, delineation, and litigation support

related to these matters. Also, while at Election Data Services, I worked under our

contract with the US Census Bureau analyzing voting age population. Since 2004, I

have worked for my own business, now known as External Affairs, Inc., providing

statistical and data analysis for local, state, and federal candidates and policy organizations in the areas of voter targeting, polling/research, fundraising, branding, and online development and strategy. My firm has worked for over two-hundred candidates from president to town council and over a dozen DC-based policy/advocacy organizations.

With respect to publications I have authored in the last 10 years, I have not authored any publications in the last ten years.

## IV. COMPENSATION

I have been retained as an expert witness for Petitioners. I am being compensated for a flat fee of $40,000.

## V. PRIOR TESTIMONY

I have not provided testimony as an expert either at trial or in deposition in the last four years.

## VI. STATEMENT OF OPINIONS

As set forth above, I have been engaged to provide expert opinions regarding analysis in the November 3, 2020 election of Presidential electors. Based on my review of the documents set forth above, my discussions with statisticians and analysts working with me and at my direction, my discussions with the attorneys representing the Petitioners, I have the following opinions:

1. It is my opinion, to a reasonable degree of scientific certainty, that in the State, the State's database for the November 3, 2020 election show 96,711 voters whom the state marks as having requested and been sent an absentee ballot did not return it. It is my opinion, to a reasonable degree of scientific certainty, that in my sample

of this universe, 18.12% of these absentee voters in the State did not request an absentee ballot.

2. From the State's database for the November 3, 2020 election and our call center results, it is my opinion to a reasonable degree of scientific certainty that 96,771 individuals whom the State's database identifies as having not returned an absentee ballot, that in my sample of this universe, 15.37% of those absentee voters did in fact mail back an absentee ballot to the clerk's office.

3. From the State's database for the November 3, 2020 election, the NCOA database, and our call center results, it is my opinion to a reasonable degree of scientific certainty that out of the 26,673 individuals had changed their address before the election, that in my sample of this universe, 1.11% of those individuals denied casting a ballot.

4. From the State's database for the November 3, 2020 election and the NCOA database and other state's voter databases, it is my opinion to a reasonable degree of scientific certainty, that at least 6,848 absentee or early voters were not residents of the State when they voted.

5. From the State's database for the November 3, 2020 election and my staff's review of social media for voters who applied for indefinitely confined absentee voting status, it is my opinion to a reasonable degree of scientific certainty, that of the 213,215 who claimed indefinitely confined absentee voter status in the State, that in my sample of this universe, 45.23% of those individuals were not indefinitely confined on Election Day.

6. From the State's database for the November 3, 2020 election and comparing that data to other states voting data and identifying individuals who cast early/absentee ballots in multiple states, it is my opinion to a reasonable degree of scientific certainty, that at least 234 individuals in the State voted in multiple states.

## VII.   BASIS AND REASONS SUPPORTING OPINIONS.

First, State maintains a database for the November 3, 2020 election which I

obtained from L2 Political and which L2 Political obtained from the State's records on,

among other things, voters who applied for an absentee or early voter status.  I received

this database from L2 Political in a table format with columns and rows which can be

searched, sorted and filtered.  Each row sets forth data on an individual voter.  Each

5

column contained information such as the name of the voter, the voter's address, whether the voter applied for an absentee ballot, whether the voter voted and whether the voter voted indefinitely confined status.

Second, we are able to obtain other data from other sources such as the National Change of Address Database maintained by the United States Postal Service and licensed by L2 Political. This database also in table format shows the name of an individual, the individual's new address, the individual's old address and the date that the change of address became effective.

Third, I conducted randomized surveys of data obtained from the State's database by having my staff or the call center's staff make phone calls to and ask questions of individuals identified on the State's database by certain categories such as absentee voters who did not return a ballot. Our staff, if they talked to any of these individuals, would then ask a series of questions beginning with a confirmation of the individual's name to ensure it matched the name of the voter identified in the State's database. The staff would then ask additional questions of the individuals and record the answers.

Fourth, I had this staff survey a random sample I obtained from the State's database on indefinitely confined voters. The staff conducted research on the internet and social media postings by these individuals. Staff would undertake to determine if the individual was the individual listed on the database meant the State's definition of indefinitely confined. Staff would then attempt to determine if the individuals had posted photos, images or other information demonstrating that the individuals were not indefinitely confined. For instance, if the individual's social media showed a photo on or

near election day of the individual doing something inconsistent with indefinitely confined status such as riding a bike. Staff would then record the results as either "not indefinitely confined," "confirmed indefinitely confined," or "inconclusive."

Fifth, attached as Exhibits 2 is my written analysis of the data obtained.

Below are the opinions I rendered and the basis of the reasons for those opinions.

1. It is my opinion, to a reasonable degree of scientific certainty, that in the State, the State's database for the November 3, 2020 election show 96,711 voters whom the state marks as having requested and been sent an absentee ballot did not return it. It is my opinion, to a reasonable degree of scientific certainty, that in my sample of this universe, 18.12% of these absentee voters in the State did not request an absentee ballot.

I obtained this data from the State via L2 Political after the November 3, 2020, Election Day. This data identified 96,771 absentee voters who were sent an absentee ballot but who failed to return the absentee ballot.

I then had my staff make phone calls to a sample of this universe. When contacted, I had my staff confirm the individual's identity by name. Once the name was confirmed, I then had staff ask if the person requested an absentee ballot or not. Staff then recorded the number of persons who answered yes. My staff then recorded that of the 2,114 individuals who answered the question, 1,731 individuals answered yes to the question whether they requested an absentee ballot. My staff recorded that 383 individuals answered no to the question whether they requested an absentee ballot. Attached as Exhibit 2 is my written analysis containing information from the data above on absentee voters. Paragraph 2 of Exhibit 2 presents this information.

Next, I then had staff ask the individuals who answered yes, they requested an absentee ballot, whether the individual mailed back the absentee ballot or did not mail back the absentee ballot. Staff then recorded that of the 1,626 individuals who answered the question, 325 individuals answered yes, they mailed back the absentee ballot. Staff recorded 1301 individuals answered no, they did not mail back the absentee ballot. Paragraph 2 of Exhibit 2 presents this information.

Based on these results, 18.12% of our sample of these absentee voters in the State did not request an absentee ballot.

2. From the State's database for the November 3, 2020 election and our call center results, it is my opinion to a reasonable degree of scientific certainty that 96,771 individuals whom the State's database identifies as having not returned an absentee ballot, that in my sample of this universe, 15.37% of those absentee voters did in fact mail back an absentee ballot to the clerk's office.

This opinion includes the analysis set forth above. Among the 1,626 who told our call center that they did request an absentee ballot and answered the second question, 325 told our staff that they mailed the absentee ballot back, which is 15.37% of those whom the State identified as having not returned the absentee ballot the State sent them. Paragraph 2 of Exhibit 2 presents this information.

3. From the State's database for the November 3, 2020 election, the NCOA database, and our call center results, it is my opinion to a reasonable degree of scientific certainty that out of the 26,673 individuals had changed their address before the election, that in my sample of this universe, 1.11% of those individuals denied casting a ballot.

On Exhibit 2, in paragraph 4, I took the State's database of all absentee or early voters and matched those voters to the NCOA database for the day after election day.

This data identified 26,673 individuals whose address on the State's database did not match the address on the NCOA database on election day. Next, I had my staff call the persons identified and ask these individuals whether they had voted. My call center staff identified 1,607 individuals who confirmed that they had casted a ballot. My call center staff identified 18 individuals who denied casting a ballot. Our analysis shows that 1.11% of our sample of these individuals who changed address did not vote despite the State's data recorded that the individuals did vote.

4. From the State's database for the November 3, 2020 election and the NCOA data and other state's voter data, it is my opinion to a reasonable degree of scientific certainty, that at least 6,848 absentee or early voters were not residents of the State when they voted.

On Exhibit 2, in paragraph 1, I took the State's database of all absentee or early voters and matched those voters to the NCOA database for the day after Election Day. This data identified 6,207 individuals who had moved of the State prior to Election Day. Further, by comparing the other 49 states voter databases to the State's database, I identified 765 who registered to vote in a state other than the State subsequent to the date they registered to vote in the State. When merging these two lists and removing the duplicates, and accounting for moves that would not cause an individual to lose their residency and eligibility to vote under State law, these voters total 6,848.

5. From the State's database for the November 3, 2020 election and my staff's review of social media for voters who applied for indefinitely confined absentee voting status, it is my opinion to a reasonable degree of scientific certainty, that of the 213,215 who claimed indefinitely confined absentee voter status in the State, that in my sample of this universe, 45.23% of those individuals were not indefinitely confined on Election Day.

This opinion is taken from data developed on Exhibit 3. For this determination, I had my staff investigate using the internet and social media the individuals the State's data identified as claiming indefinitely confined status in their absentee ballot applications. The staff conducted research on the internet and social media postings by these individuals. Staff would undertake to determine if the individual was the individual listed on the database as indefinitely confined. Staff would then attempt to determine if the individuals had posted photos, images or other information demonstrating that the individuals were not indefinitely confined. For instance, if the individual's social media showed a photo on or near election day doing something inconsistent with indefinitely confined status such as riding a bike. Staff would then record the results as either "not indefinitely confined," "confirmed indefinitely confined," or "inconclusive."

These results showed that of the 213,215 who claimed indefinitely confined absentee voter status in the State, that in my sample of this universe, 45.23% of those individuals were not indefinitely confined on Election Day.

6. From the State's database for the November 3, 2020 election and comparing that data to other states voting data and identifying individuals who cast early/absentee ballots in multiple states, it is my opinion to a reasonable degree of scientific certainty, that at least 234 individuals in the State voted in multiple states.

On Exhibit 2, in paragraph 2, I had my staff compare the State's early and absentee voters to other states voting data and identified individuals who cast early/absentee ballots in multiple states. My staff located 234 individuals who voted in the State and in other states for the November 3, 2020 general election.