# EXHIBIT 6

2020 WL 6063332

Editor's Note: Additions are indicated by Text and deletions by ~~Text~~ .

Only the Westlaw citation is currently available.
United States District Court, M.D. North Carolina.

Timothy K. MOORE, et al., Plaintiffs,

v.

Damon CIRCOSTA, et al., Defendants,

and

North Carolina Alliance for Retired
Americans, et al., Defendant-Intervenors.
Patsy J. Wise, et al., Plaintiffs,

v.

The North Carolina State Board
of Elections, et al., Defendants,

and

North Carolina Alliance for Retired
Americans, et al., Defendant-Intervenors.

1:20CV911
|
1:20CV912
|
Signed 10/14/2020

**Synopsis**
**Background:** State legislative leaders and individual registered voters sued the executive director and members of the North Carolina State Board of Elections (SBE), seeking an injunction against enforcement and distribution of memoranda issued by SBE pertaining to absentee voting. In a second case, individual voters, a campaign committee, national political parties, and two Members of the U.S. House of Representatives also sought an injunction against the same memoranda. Advocacy group for retirees and individual registered voters who were plaintiffs in a related state court action that resulted in a consent judgment intervened in both cases. Plaintiffs moved for preliminary injunction.

**Holdings:** The District Court, William L. Osteen, J., held that:

plaintiffs lacked Article III standing to bring vote-dilution claim;

individual plaintiffs who had already cast their absentee ballots by mail had standing to raise equal protection claims;

plaintiffs demonstrated a likelihood of success on the merits of their equal protection claims against the mail-in ballot witness-requirement cure procedure and extension of mail-in ballot receipt deadline;

plaintiffs demonstrated a likelihood of irreparable injury on their equal protection claims against witness-requirement cure procedure and extension of mail-in ballot receipt deadline;

balance of equities weighed heavily against preliminary injunction, and thus district court would deny injunctive relief; and

SBE exceeded its statutory authority and emergency powers when it entered into consent agreement and eliminated witness requirements for mail-in ballots.

Motion denied.

**Attorneys and Law Firms**

David H. Thompson, Peter A. Patterson, Nicole Jo Moss, Cooper & Kirk, PLLC, Washington, DC, Nathan Andrew Huff, Phelps Dunbar LLP, Raleigh, NC, for Plaintiffs.

Alexander McClure Peters, Sarah G. Boyce, Terence Steed, North Carolina Department of Justice, Raleigh, NC, for Defendants.

Burton Craige, Patterson Harkavy LLP, Raleigh, NC, Marc E. Elias, Lalitha D. Madduri, Perkins Coie, LLP, Uzoma N. Nkwonta, Kirkland & Ellis, LLP, Washington, DC, Narendra K. Ghosh, Patterson Harkavy, LLP, Chapel Hill, NC, for Defendant-Intervenors.

<u>**MEMORANDUM OPINION AND ORDER**</u>

OSTEEN, JR., District Judge

*\*1* Presently before this court are two motions for a preliminary injunction in two related cases.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.      1

In the first case, Moore v. Circosta, No. 1:20CV911 ("Moore"), Plaintiffs Timothy K. Moore and Philip E. Berger (together, "State Legislative Plaintiffs"), Bobby Heath, Maxine Whitley, and Alan Swain (together, "Moore Individual Plaintiffs") seek an injunction against the enforcement and distribution of several Numbered Memoranda issued by the North Carolina State Board of Elections pertaining to absentee voting. (Moore v. Circosta, No. 1:20CV911, Mot. for Prelim. Inj. and Mem. in Supp. ("Moore Pls.' Mot.") (Doc. 60).)

In the second case, Wise v. North Carolina State Board of Elections, No. 1:20CV912 ("Wise"), Plaintiffs Patsy J. Wise, Regis Clifford, Samuel Grayson Baum, and Camille Annette Bambini (together, "Wise Individual Plaintiffs"), Donald J. Trump for President, Inc. ("Trump Campaign"), U.S. Congressman Gregory F. Murphy and U.S. Congressman Daniel Bishop (together, "Candidate Plaintiffs"), Republican National Committee ("RNC"), National Republican Senatorial Committee ("NRSC"), National Republican Congressional Committee ("NRCC"), and North Carolina Republican Party ("NCRP") seek an injunction against the enforcement and distribution of the same Numbered Memoranda issued by the North Carolina State Board of Elections at issue in Moore. (Wise Pls.' Mem. in Supp. of Mot. to Convert the Temp. Restraining Order into a Prelim. Inj. ("Wise Pls.' Mot.") (Doc. 43).)

By this order, this court finds Plaintiffs have established a likelihood of success on their Equal Protection challenges with respect to the State Board of Elections' procedures for curing ballots without a witness signature and for the deadline extension for receipt of ballots. This court believes the unequal treatment of voters and the resulting Equal Protection violations as found herein should be enjoined. Nevertheless, under Purcell and recent Supreme Court orders relating to Purcell, this court is of the opinion that it is required to find that injunctive relief should be denied at this late date, even in the face of what appear to be clear violations.

## I. BACKGROUND

### A. Parties

#### 1. Moore v. Circosta (1:20CV911)

State Legislative Plaintiffs Timothy K. Moore and Philip E. Moore and Philip E. Berger are the Speaker of the North Carolina House

of Representatives and the President Pro Tempore of the North Carolina Senate, respectively. (Moore v. Circosta, No. 1:20CV911, Compl. for Declaratory and Injunctive Relief ("Moore Compl.") (Doc. 1) ¶¶ 7-8.) Individual Plaintiffs Bobby Heath and Maxine Whitley are registered North Carolina voters who voted absentee by mail and whose ballots have been accepted by the State Board of Elections on September 21, 2020, and September 17, 2020, respectively. (Id. ¶¶ 9-10.) Plaintiff Alan Swain is a resident of Wake County, North Carolina, who is running as a Republican candidate to represent the State's Second Congressional District. (Id. ¶ 11.)

Executive Defendants include Damon Circosta, Stella Anderson, Jeff Carmon, III, and Karen Brinson Bell are members of the State Board of Elections ("SBE"). (Id. ¶¶ 12-15.) Executive Defendant Karen Brinson Bell is the Executive Director of SBE. (Id. ¶ 15.)

**\*2** Intervenor-Defendants North Carolina Alliance for Retired Americans, Barker Fowler, Becky Johnson, Jade Jurek, Rosalyn Kociemba, Tom Kociemba, Sandra Malone, and Caren Rabinowitz ("Alliance Intervenors") are plaintiffs in the related state court action in Wake County Superior Court. (Moore v. Circosta, No. 1:20CV911 (Doc. 28) at 15.)[1] Barker Fowler, Becky Johnson, Jade Jurek, Rosalyn Kociemba, Tom Kociemba, Sandra Malone, and Caren Rabinowitz are individual voters who are concerned they will be disenfranchised by Defendant SBE's election rules, (id.), and North Carolina Alliance for Retired Americans ("NC Alliance") is an organization "dedicated to promoting the franchise and ensuring the full constitutional rights of its members ...." (Id.)

### 2. Wise v. N.C. State Bd. of Elections (1:20CV912)

Individual Plaintiffs Patsy J. Wise, Regis Clifford, Camille Annette Bambini, and Samuel Grayson Baum are registered voters in North Carolina. (Wise v. N.C. State Bd. of Elections, No. 1:20CV912, Compl. for Declaratory and Injunctive Relief ("Wise Compl.") (Doc. 1) ¶¶ 25-28.) Wise has already cast her absentee ballot for the November 3, 2020 election by mail, "in accordance with statutes, including the Witness Requirement, enacted by the General Assembly." (Id. ¶ 25.) Plaintiffs Clifford, Bambini, and Baum intend to vote in the November 3, 2020 election and are "concern[ed] that [their] vote[s] will be negated by improperly cast or fraudulent ballots." (Id. ¶¶ 26-28.)

Plaintiff Trump Campaign represents the interests of President Donald J. Trump, who is running for re-election. (Id. ¶¶ 29-30.) Together, Candidate Plaintiffs Trump Campaign, U.S. Congressman Daniel Bishop, and U.S. Congressman Gregory F. Murphy are candidates who will appear on the ballot for re-election in the November 3, 2020 general election. (Id. ¶¶ 29-32.)

Plaintiff RNC is a national political party, (id. ¶¶ 33-36), that seeks to protect "the ability of Republican voters to cast, and Republican candidates to receive, effective votes in North Carolina elections and elsewhere," (id. ¶ 37), and avoid diverting resources and spending significant amounts of resources educating voters regarding confusing changes in election rules, (id. ¶ 38).

Plaintiff NRSC is a national political party committee that is exclusively devoted to electing Republican candidates to the U.S. Senate. (Id. ¶ 40.) Plaintiff NRCC is the national organization of the Republican Party dedicated to electing Republicans to the U.S. House of Representatives. (Id. ¶ 41.) Plaintiff NRCP is a North Carolina state political party organization that supports Republican candidates running in North Carolina elections. (Id. ¶¶ 44-45.)

Executive Defendant North Carolina SBE is the agency responsible for the administration of the elections laws of the State of North Carolina. (Id. ¶ 46.) As in Moore, included as Executive Defendants are Damon Circosta, Stella Anderson, Jeff Carmon, III, and Karen Brinson Bell of the North Carolina SBE. (Id. ¶¶ 47-50.)

Alliance Intervenors from Moore are also Intervenor-Defendants in Wise. (1:20CV912 (Doc. 22).)

### B. Factual Background

### 1. This Court's Decision in *Democracy*

On August 4, 2020, this court issued an order in a third related case, Democracy North Carolina v. North Carolina State Board of Elections, No. 1:20CV457, ―― F.Supp.3d ――, 2020 WL 4484063 (M.D.N.C. Aug. 4, 2020) ("the August Democracy Order"), that "left the One-Witness Requirement in place, enjoined several rules related to nursing homes that would disenfranchise Plaintiff Hutchins, and enjoined the rejection of absentee ballots unless the voter is provided due

process." (Id. at ――, 2020 WL 4484063, at *1.) As none of the parties appealed that order, the injunctive relief is still in effect.

### 2. Release of the Original Memo 2020-19

**\*3** In response to the August Democracy Order, on August 21, 2020, SBE officials released guidance for "the procedure county boards must use to address deficiencies in absentee ballots." (Numbered Memo 2020-19 ("Memo 2020-19" or "the original Memo") (Moore v. Circosta, No. 1:20CV911, Moore Compl. (Doc. 1) Ex. 3 – NC State Bd. of Elections Mem. ("Original Memo 2020-19") (Doc. 1-4) at 2.) This guidance instructed county boards regarding multiple topics. First, it instructed county election boards to "accept [a] voter's signature on the container-return envelope if it appears to be made by the voter ... [a]bsent clear evidence to the contrary," even if the signature is illegible. (Id.) The guidance clarified that "[t]he law does not require that the voter's signature on the envelope be compared with the voter's signature in their registration record," as "[v]erification of the voter's identity is completed through the witness requirement." (Id.)

Second, the guidance sorted ballot deficiencies into two categories: curable and uncurable deficiencies. (Id. at 3.) Under this version of Memo 2020-19, a ballot could be cured via voter affidavit alone if the voter failed to sign the certification or signed in the wrong place. (Id.) A ballot error could not be cured, and instead, was required to be spoiled, in the case of all other listed deficiencies, including a missing signature, printed name, or address of the witness; an incorrectly placed witness or assistant signature; or an unsealed or re-sealed envelope. (Id.) Counties were required to notify voters in writing regarding any ballot deficiency – curable or incurable - within one day of the county identifying the defect and enclose either a cure affidavit or a new ballot, based on the type of deficiency at issue. (Id. at 4.)

In the case of an incurable deficiency, a new ballot could be issued only "if there [was] time to mail the voter a new ballot ... [to be] receive[d] by Election Day." (Id. at 3.) If a voter who submitted an uncurable ballot was unable to receive a new absentee ballot in time, he or she would have the option to vote in person on Election Day. (Id. at 4.)

If the deficiency was curable by a cure affidavit, the guidance stated that the voter must return the cure affidavit by no later than 5 p.m. on Thursday, November 12, 2020. (Id.)

### 3. Rescission of Numbered Memo 2020-19

The State began issuing ballots on September 4, 2020, marking the beginning of the election process. (Wise, No. 1:20CV912, Wise Pls.' Mot. (Doc. 43).) On September 11, 2020, SBE directed counties to stop notifying voters of deficiencies in their ballot, as advised in Memo 2020-19, pending further guidance from SBE. (Moore, No. 1:20CV911, Moore Pls.' Mot. (Doc. 60) Ex. 3, Democracy Email Chain (Doc. 60-4) at 6.)

### 4. Revision of Numbered Memo 2020-19

On September 22, over two weeks after the State began issuing ballots, SBE issued a revised Numbered Memo 2020-19, which set forth a variety of new policies not implemented in the original Memo 2020-19. (Numbered Memo 2020-19 ("the Revised Memo" or "Revised Memo 2020-19") (Moore v. Circosta, No. 1:20CV911 (Doc. 36) Ex. 3, Revised Numbered Memo 2020-19 ("Revised Memo 2020-19") (Doc. 36-3).) In subsequent litigation in Wake County Superior Court, SBE advised the court that both the original Memo 2020-19 and the Revised Memo were issued "to ensure full compliance with the injunction entered by Judge Osteen." (Moore v. Circosta, No. 1:20CV911, Exec. Defs.' Br. in Supp. of Joint Mot. for Entry of Consent Judgment ("SBE State Court Br.") (Doc. 68-1) at 15.) Moreover, on September 28, 2020, during a status conference with a district court in the Eastern District of North Carolina prior to transfer to this court, counsel for Defendant SBE stated that Defendant SBE issued the revised Memo 2020-19 "in order to comply with Judge Osteen's preliminary injunction in the Democracy N.C. action in the Middle District." (Moore v. Circosta, No. 1:20CV911, Order Granting Mot. for Temp. Restraining Order ("TRO") (Doc. 47) at 9.) At that time, counsel for SBE indicated that they had not yet submitted the Revised Memo 2020-19 to this court, "but that it was on counsel's list to get [it] done today." (Id.) (internal quotations omitted.) On September 28, 2020, Defendant SBE filed the Revised Memo 2020-19 with this court in the Democracy action. (Democracy N.C. v. N.C. State Bd. of Elections, No. 1:20CV457 (Doc. 143-1).)

**\*4** The revised guidance modified which ballot deficiencies fell into the curable and uncurable categories. Unlike the original Memo 2020-19, the Revised Memo advised that

ballots missing a witness or assistant name or address, as well as ballots with a missing or misplaced witness or assistant signature, could be cured via voter certification. (Moore v. Circosta, No. 1:20CV911, Revised Memo 2020-19 (Doc. 36-3) at 3.) According to the revised guidance, the only deficiencies that could not be cured by certification, and thus required spoliation, were where the envelope was unsealed or where the envelope indicated the voter was requesting a replacement ballot. (Id. at 4.)

The cure certification in Revised 2020-19 required voters to sign and affirm the following:

> I am submitting this affidavit to correct a problem with missing information on the ballot envelope. I am an eligible voter in this election and registered to vote in [name] County, North Carolina. I solemnly swear or affirm that I voted and returned my absentee ballot for the November 3, 2020 general election and that I have not voted and will not vote more than one ballot in this election. I understand that fraudulently or falsely completing this affidavit is a Class I felony under Chapter 163 of the North Carolina General Statutes.

(Moore v. Circosta, No. 1:20CV911 (Doc. 45-1) at 34.)

The revised guidance also extended the deadline for civilian absentee ballots to be received to align with that for military and overseas voters. (Moore v. Circosta, No. 1:20CV911, Revised Memo 2020-19 (Doc. 36-3) at 5.) Under the original Memo 2020-19, in order to be counted, civilian absentee ballots must have been received by the county board office by 5 p.m. on Election Day, November 3, 2020, or if postmarked, by Election Day, by 5:00 p.m. on November 6, 2020. (Moore v. Circosta, No. 1:20CV911, Original Memo 2020-19 (Doc. 1-4) at 5 (citing N.C. Gen. Stat. § 163-231(b)).) Under the Revised Memo 2020-19, however, a late civilian ballot would be counted if postmarked on or before Election Day and received by 5:00 p.m. on November 12, 2020. (Moore v. Circosta, No. 1:20CV911, Revised Memo 2020-19 (Doc. 36-3) at 5.) This is the same as the deadline for military and overseas voters, as indicated in the Original Memo 2020-19. (Id.)[2]

### 5. Numbered Memoranda 2020-22 and 2020-23

SBE issued two other Numbered Memoranda on September 22, 2020, in addition to Revised Numbered Memo 2020-19.

First, SBE issued Numbered Memo 2020-22, the purpose of which was to further define the term postmark used in Numbered Memo 2020-19. (Wise, No. 1:20CV912, Wise Compl. (Doc. 1), Ex. 3, N.C. State Bd. of Elections Mem. ("Memo 2020-22") (Doc. 1-3) at 2.) Numbered Memo 2020-22 advised that although "[t]he postmark requirement for ballots received after Election Day is in place to prohibit a voter from learning the outcome of an election and then casting their ballot.... [T]he USPS does not always affix a postmark to a ballot return envelope." (Id.) Recognizing that SBE now offers "BallotTrax," a system in which voters and county boards can track the status of a voter's absentee ballot, SBE said "it is possible for county boards to determine when a ballot was mailed even if does not have a postmark." (Id.) Moreover, SBE recognized that commercial carriers offer tracking services that document when a ballot was deposited with the commercial carrier. (Id.) For these reasons, the new guidance stated that a ballot would be considered postmarked by Election Day if it had a postmark, there is information in BallotTrax, or "another tracking service offered by the USPS or a commercial carrier, indicat[es] that the ballot was in the custody of USPS or the commercial carrier on or before Election Day." (Id. at 3.)

**\*5** Second, SBE issued Numbered Memo 2020-23, which provides "guidance and recommendations for the safe, secure, and controlled in-person return of absentee ballots." (Wise, No. 1:20CV912, Wise Compl. (Doc. 1), Ex. 4, N.C. State Bd. of Elections Mem. ("Memo 2020-23") (Doc. 1-4) at 2.) Referring to [N.C. Gen. Stat. § 163-226.3(a)(5),](#)[3] which prohibits any person other than the voter's near relative or legal guardian to take possession of an absentee ballot of another voter for delivery or for return to a county board of elections, (id.), Numbered Memo 2020-23 confirms that "an absentee ballot may not be left in an unmanned drop box." (Id.) The guidance reminds county boards that they must keep a written log when any person returns an absentee ballot in person, which includes the name of the individual returning the ballot, their relationship to the voter, the ballot number, and the date it was received. (Id. at 3.) If the individual who drops off the ballot is not the voter, their near relative, or legal guardian, the log must also record their address and phone number. (Id.)

At the same time, the guidance advises county boards that "[f]ailure to comply with the logging requirement, or delivery or an absentee ballot by a person other than the voter, the voter's near relative, or the voter's legal guardian, is not sufficient evidence in and of itself to establish that the voter

did not lawfully vote their ballot." (Id. at 3.) Instead, the guidance advises the county board that they "may ... consider the delivery of a ballot ... in conjunction with other evidence in determining whether the ballot is valid and should be counted." (Id. at 4.)

### 6. Consent Judgment in North Carolina Alliance for Retired Americans v. North Carolina State Bd. of Elections

On August 10, 2020, NC Alliance, the Defendant-Intervenors in the two cases presently before this court, filed an action against SBE in North Carolina's Wake County Superior Court challenging, among other voting rules, the witness requirement for mail-in absentee ballots and rejection of mail-in absentee ballots that are postmarked by Election Day but delivered to county boards more than three days after the election. (Moore v Circosta, No. 1:20CV911, SBE State Court Br. (Doc. 68-1) at 15.)

On August 12, 2020, Philip Berger and Timothy Moore, Plaintiffs in Moore, filed a notice of intervention as of right in the state court action and became parties to that action as intervenor-defendants on behalf of the North Carolina General Assembly. (Id. at 16.)

On September 22, 2020, SBE and NC Alliance filed a Joint Motion for Entry of a Consent Judgment with the superior court. (Id.) Philip Berger and Timothy Moore were not aware of this "secretly-negotiated" Consent Judgment, (Wise Pls.' Mot. (Doc. 43) at 6), until the parties did not attend a previously scheduled deposition, (Democracy v. N.C. Bd. of Elections, No. 1:20CV457 (Doc. 168) at 73.)

Among the terms of the Consent Judgment, SBE agreed to extend the deadline for receipt of mail-in absentee ballots mailed on or before Election Day to nine days after Election Day, to implement the cure process established in Revised Memo 2020-19, and to establish separate mail in absentee ballot "drop off stations" at each early voting site and county board of elections office which were to be staffed by county board officials. (Moore v. Circosta, No. 1:20CV911, SBE State Court Br. (Doc. 68-1) at 16.)

In its filings with the state court, SBE frequently cited this court's decision in Democracy as a reason for why the Wake County Superior Court Judge should accept the Consent Judgment. SBE argued that a cure procedure for deficiencies

related to the witness requirement were necessary because "[w]itness requirements for absentee ballots have been shown to be, broadly speaking, disfavored by the courts," (id. at 26), and that "[e]ven in North Carolina, a federal court held that the witness requirement could not be implemented as statutorily authorized without a mechanism for voters to have adequate notice of and [an opportunity to] cure materials [sic] defects that might keep their votes from being counted," (id. at 27). SBE argued that, "to comply with the State Defendants' understanding of the injunction entered by Judge Osteen, the State Board directed county boards of elections not to disapprove any ballots until a new cure procedure that would comply with the injunction could be implemented," (id. at 30), and that ultimately, the cure procedure introduced in Revised Memo 2020-19 as part of the consent judgment would comply with this injunction. (Id.) SBE indicated that it had notified the federal court of the cure mechanism process on September 22, 2020, (id.), although this court was not made aware of the cure procedure until September 28, 2020, (Democracy N.C. v. N.C. State Bd. of Elections, No. 1:20CV457 (Doc. 143-1)), the day before the processing of absentee ballots was scheduled to begin on September 29, 2020, (Moore v. Circosta, No. 20CV911 Transcript of Oral Argument ("Oral Argument Tr.")(Doc. 70) at 109.)

**\*6** On October 2, 2020, the Wake County Superior Court entered the Stipulation and Consent Judgment. (Moore v. Circosta, No. 1:20CV911, State Court Consent Judgment (Doc. 45-1).) Among its recitals, which Defendant SBE drafted and submitted to the judge as is customary in state court, (Oral Argument Tr. (Doc. 70) at 91), the Wake County Superior Court noted this court's preliminary injunction in Democracy, finding,

> WHEREAS, on August 4, 2020, the United States District Court for the Middle District of North Carolina enjoined the State Board from "the "disallowance or rejection ... of absentee ballots without due process as to those ballots with a material error that is subject to remediation." Democracy N.C. v. N.C. State Bd. of Elections, No. 1:20-cv-00457-WO-JLW [— F.Supp.3d ——, 2020 WL 4484063] (M.D.N.C. Aug. 4, 2020) (Osteen, J.). ECF 124 at 187. The injunction is to remain in force until the State Board implements a cure process that provides a voter with "notice and an opportunity to be heard before an absentee ballot with a material error subject to remediation is disallowed or rejected." Id.

(State Court Consent Judgment (Doc. 45-1) at 6.)[4]

**7. Numbered Memoranda 2020-27, 2020-28, and 2020-29**

In addition to the Numbered Memoranda issued on September 22, 2020, as part of the consent judgment in the state court case, SBE has issued three additional numbered memoranda.

First, on October 1, 2020, SBE issued Numbered Memo 2020-27, which was issued in response to this court's order in Democracy regarding the need for parties to attend a status conference to discuss Numbered Memo 2020-19. (Moore v. Circosta, No. 1:20CV911 (Doc. 40-2) at 2.) The guidance advises county boards that this court did not find Numbered Memo 2020-19:

> "consistent with the Order entered by this Court on August 4, 2020," and indicates that its preliminary injunction order should "not be construed as finding that the failure of a witness to sign the application and certificate as a witness is a deficiency which may be cured with a certification after the ballot has been returned."

(Id.) "In order to avoid confusion while related matters are pending in a number of courts," the guidance advises that "[c]ounty boards that receive an executed absentee container-return envelope with a missing witness signature shall take no action as to that envelope." (Id.) In all other respects, SBE stated that Revised Numbered Memo 2020-19 remains in effect. (Id.)

Second, on October 4, 2020, SBE issued Numbered Memo 2020-28, which states that both versions of Numbered Memo 2020-19, as well as Numbered Memoranda 2020-22, 2020-23, and 2020-27 "are on hold until further notice" following the temporary restraining order entered in the instant cases on October 3, 2020. (Moore v. Circosta, No. 1:20CV911 (Doc. 60-5) at 2.) Moreover, the guidance reiterated that "[c]ounty boards that receive an executed absentee container-return envelope with a deficiency shall take no action as to that envelope," including sending a cure notification or reissuing the ballot. (Id. at 2-3.) Instead, the guidance directs county boards to store envelopes with deficiencies in a secure location until further notice. (Id. at 3.) If, however, a county board had previously issued a ballot and the second envelope is returned without any deficiencies, the guidance permits the county board to approve the second ballot. (Id.)

**\*7** Finally, on October 4, 2020, SBE issued Numbered Memo 2020-29, which states that it provides "uniform

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

guidance and further clarification on how to determine if the correct address can be identified if the witness's or assistant's address on an absentee container-return envelope is incomplete. (Wise, No. 1:20CV912 (Doc. 43-5).) First, the guidance clarifies that if a witness or assistant does not print their address, the envelope is deficient. (Id. at 2.) Second, the guidance states that failure to list a witness's ZIP code does not require a cure; a witness or assistant's address may be a post office box or other mailing address; and if the address is missing a city or state, but the county board can determine the correct address, the failure to include this information does not invalidate the container-return envelope. (Id.) Third, if both the city and ZIP code are missing, the guidance directs staff to determine whether the correct address can be identified. (Id.) If they cannot be identified, then the envelope is deficient. (Id.)

### C. Procedural History

On September 26, 2020, Plaintiffs in Moore filed their action in the United States District Court for the Eastern District of North Carolina. (Moore Compl. (Doc. 1).) Plaintiffs in Wise also filed their action in the United States District Court for the Eastern District of North Carolina on September 26, 2020. (Wise Compl. (Doc. 1).)

Alliance Intervenors filed a Motion to Intervene as Defendants in Moore on September 30, 2020, (Moore v. Circosta, No. 1:20CV911 (Doc. 27)), and in Wise on October 2, 2020, (Wise, No. 1:20CV912 (Doc. 21).) This court granted Alliance Intervenors' Motion to Intervene on October 8, 2020. (Moore v. Circosta, No. 1:20CV911 (Doc. 67); Wise, No. 1:20CV912 (Doc. 49).)

The district court in the Eastern District of North Carolina issued a temporary restraining order in both cases on October 3, 2020, and transferred the actions to this court for this court's "consideration of additional or alternative injunctive relief along with any such relief in Democracy North Carolina v. North Carolina State Board of Elections ...." (Moore v. Circosta, 1:20CV911, TRO (Doc. 47) at 2; Wise, No. 1:20CV912 (Doc. 25) at 2.)

On October 5, 2020, this court held a Telephone Conference, (Moore v. Circosta, No. 1:20CV911, Minute Entry 10/05/2020; Wise, No. 1:20CV912, Minute Entry 10/05/2020), and issued an order directing the parties to prepare for a hearing on the temporary restraining order and/or a preliminary injunction and to submit additional briefing, (Moore v. Circosta, No. 1:20CV911 (Doc. 51); Wise, No.

1:20CV912 (Doc. 30)). On October 6, 2020, Plaintiffs in Wise filed a Memorandum in Support of Plaintiffs' Motion to Convert the Temporary Restraining Order into a Preliminary Injunction, (Wise Pls.' Mot. (Doc. 43)), and Plaintiffs in Moore filed a Motion for a Preliminary Injunction and Memorandum in Support of Same, (Moore Pls.' Mot. (Doc. 60)). Defendant SBE filed a response to Plaintiffs' motions in both cases on October 7, 2020. (Moore v. Circosta, No. 1:20CV911, State Defs.' Resp. to Pls.' Mot. for Prelim. Inj. ("SBE Resp.") (Doc. 65); Wise, No. 1:20CV912 (Doc. 45).) Alliance Intervenors also filed a response to Plaintiffs' motions in both cases on October 7, 2020. (Moore v. Circosta, No. 1:20CV911, Proposed Intervenors' Mem. in Opp'n to Pls.' Mot. for a Prelim. Inj. ("Alliance Resp.") (Doc. 64); Wise, No. 1:20CV912 (Doc. 47).)[5]

This court held oral arguments on October 8, 2020, in which all of the parties in these two cases presented arguments with respect to Plaintiffs' motions for a preliminary injunction. (Moore v. Circosta, No. 1:20CV911, Minute Entry 10/08/2020; Wise, No. 1:20CV912, Minute Entry 10/08/2020.)

**\*8** This court has federal question jurisdiction over these cases under 28 U.S.C. § 1331. This matter is ripe for adjudication.

### D. Preliminary Injunction Standard of Review

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Such an injunction "is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017).

## II. ANALYSIS

Executive Defendants and Alliance Intervenors challenge Plaintiffs' standing to seek a preliminary injunction regarding their Equal Protection, Elections Clause, and Electors Clause claims. (Alliance Resp. (Doc. 64) at 14-18; SBE Resp. (Doc. 65) at 11-13.) Executive Defendants and Alliance Intervenors also challenge this court's ability to hear this action under abstention, (Alliance Resp. (Doc. 64) at 10-14; SBE Resp. (Doc. 65) at 10-11), Rooker-Feldman (Alliance

Resp. (Doc. 64) at 13), and preclusion doctrines, (SBE Resp. (Doc. 65) at 7-10). Finally, Executive Defendants and Alliance Intervenors attack Plaintiffs' motions for preliminary injunction on the merits. (Alliance Resp. (Doc. 64) at 19-26; SBE Resp. (Doc. 65) at 13-18.)

Because Rooker-Feldman, abstention, and preclusion are dispositive issues, this court addresses them first, then addresses Plaintiffs' motions on standing and the likelihood of success on the merits.

As to each of these abstention doctrines, as will be explained further, this court's preliminary injunction order, (Doc. 124), in Democracy North Carolina v. North Carolina State Board of Elections, No. 1:20CV457, played a substantial role as relevant authority supporting SBE's request for approval, in North Carolina state court, of Revised Memo 2020-19 and the related Consent Judgment. (See discussion infra Part II.D.3.b.i.) As Berger, Moore, and SBE are all parties in Democracy, this court initially finds that abstention doctrines do not preclude this court's exercise of jurisdiction. This court's August Democracy Order was issued prior to the filing of these state court actions, and that Order was the basis of the subsequent grant of affirmative relief by the state court. This court declines to find that any abstention doctrine would preclude it from issuing orders in aid of its jurisdiction, or as to parties appearing in a pending case in this court.

### A. Rooker-Feldman Doctrine

Rooker-Feldman doctrine is a jurisdictional doctrine that prohibits federal district courts from " 'exercising appellate jurisdiction over final state-court judgments.' " See Thana v. Bd. of License Comm'rs for Charles Cnty., 827 F.3d 314, 319 (4th Cir. 2016) (quoting Lance v. Dennis, 546 U.S. 459, 463, 126 S.Ct. 1198, 163 L.Ed.2d 1059 (2006) (per curiam)). The presence or absence of subject matter jurisdiction under Rooker-Feldman is a threshold issue that this court must determine before considering the merits of the case. Friedman's, Inc. v. Dunlap, 290 F.3d 191, 196 (4th Cir. 2002).

**\*9** Although Rooker-Feldman originally limited only federal-question jurisdiction, the Supreme Court has recognized the applicability of the doctrine to cases brought under diversity jurisdiction:

> Rooker and Feldman exhibit the limited circumstances in which this Court's appellate jurisdiction over state-court judgments, 28 U.S.C. § 1257, precludes a United States

district court from exercising subject-matter jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority, e.g., § 1330 (suits against foreign states), § 1331 (federal question), and § 1332 (diversity).

See Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 291-92, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). Under the Rooker-Feldman doctrine, courts lack subject matter jurisdiction to hear "cases brought by [1] state-court losers complaining of [2] injuries caused by state-court judgments [3] rendered before the district court proceedings commenced and [4] inviting district court review and rejection of those judgments." Id. at 284, 125 S.Ct. 1517. The doctrine is "narrow and focused." Thana, 827 F.3d at 319. "[I]f a plaintiff in federal court does not seek review of the state court judgment itself but instead 'presents an independent claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court.' " Id. at 320 (quoting Skinner v. Switzer, 562 U.S. 521, 532, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011)). Rather, "any tensions between the two proceedings should be managed through the doctrines of preclusion, comity, and abstention." Id. (citing Exxon, 544 U.S. at 292–93, 125 S.Ct. 1517).

Moreover, "the Rooker–Feldman doctrine applies only when the loser in state court files suit in federal district court seeking redress for an injury allegedly caused by the state court's decision itself." Davani v. Va. Dep't of Transp., 434 F.3d 712, 713 (4th Cir. 2006); see also Hulsey v. Cisa, 947 F.3d 246, 250 (4th Cir. 2020) ("A plaintiff's injury at the hands of a third party may be 'ratified, acquiesced in, or left unpunished by' a state-court decision without being 'produced by' the state-court judgment.") (internal citations omitted).

Here, Plaintiffs are challenging SBE's election procedures and seeking injunction of those electoral rules, not attempting to directly appeal results of a state court order. More importantly, however, the Fourth Circuit has previously found that a party is not a state court loser for purposes of Rooker-Feldman if "[t]he [state court] rulings thus were not 'final state-court judgments' " against the party bringing up the same issues before a federal court. Hulsey, 947 F.3d at 251 (quoting Lance, 546 U.S. at 463, 126 S.Ct. 1198). In the Alliance state court case, Alliance brought suit against SBE. The Plaintiffs from this case were intervenors. They were not parties to the Settlement Agreement and were in no way properly adjudicated "state court losers." Given the Supreme Court's intended narrowness of the Rooker-Feldman doctrine, see

Lance, 546 U.S. at 464, 126 S.Ct. 1198, and Plaintiffs' failure to fit within the Fourth Circuit's definition of "state-court losers," this court will decline to abstain under the Rooker-Feldman doctrine.

### B. Abstention

#### 1. Colorado River Abstention

 *10 Abstention "is the exception, not the rule." Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); see also id. at 817, 96 S.Ct. 1236 (noting the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them"). Thus, this court's task "is not to find some substantial reason for the exercise of federal jurisdiction," but rather "to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' ... to justify the surrender of that jurisdiction." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25-26, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

First, and crucially for this case, the court must determine whether there are ongoing state and federal proceedings that are parallel. Al-Abood ex rel. Al-Abood v. El-Shamari, 217 F.3d 225, 232 (4th Cir. 2000) ("The threshold question in deciding whether Colorado River abstention is appropriate is whether there are parallel suits."); Ackerman v. ExxonMobil Corp., 734 F.3d 237, 248 (4th Cir. 2013) (finding that abstention is exercised only "in favor of ongoing, parallel state proceedings" (emphasis added)). In this instance, the parties have failed to allege any ongoing state proceeding that this federal suit might interfere with. In fact, Plaintiffs in this case were excluded as parties in the Consent Judgment and are bringing independent claims in this federal court alleging violations, inter alia, of the Equal Protection Clause. This court does not find that Colorado River abstention prevents it from adjudicating Equal Protection claims raised by parties who were not parties to the Consent Judgment.

#### 2. Pennzoil Abstention

As alleged by Defendants, Pennzoil does dictate that federal courts should not "interfere with the execution of state judgments." Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 14, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). However, in the very next sentence, the Pennzoil court caveats that this doctrine

applies "[s]o long as those challenges relate to pending state proceedings." Id. In fact, in Pennzoil itself, the Court clarified that abstention was proper because "[t]here is at least one pending judicial proceeding in the state courts; the lawsuit out of which Texaco's constitutional claims arose is now pending before a Texas Court of Appeals in Houston, Texas." Id. at 14, 107 S.Ct. 1519 n.13.

Abstention was also justified in Pennzoil because the Texas state court was not presented with the contested federal constitutional questions, and thus, "when [the subsequent] case was filed in federal court, it was entirely possible that the Texas courts would have resolved this case ... without reaching the federal constitutional questions." Id. at 12, 107 S.Ct. 1519. In the present case, Plaintiffs raised their constitutional claims in the state court prior to the entry of the Consent Judgment. The state court, through the Consent Judgment and without taking evidence, adjudicated those claims as to the settling parties. The Consent Judgment is effective through the 2020 Election and specifies no further basis upon which Plaintiffs here may seek relief. As a result, there does not appear to be any relief available to Plaintiffs for the federal questions raised here. For these reasons, this court will decline to abstain under Pennzoil.

#### 3. Pullman Abstention

Pullman abstention can be exercised where: (1) there is "an unclear issue of state law presented for decision"; and (2) resolution of that unclear state law issue "may moot or present in a different posture the federal constitutional issue such that the state law issue is potentially dispositive." Educ. Servs., Inc. v. Md. State Bd. for Higher Educ., 710 F.2d 170, 174 (4th Cir. 1983); see also N.C. State Conference of NAACP v. Cooper, 397 F. Supp. 3d 786, 794 (M.D.N.C. 2019). Pullman does not apply here because any issues of state law are not, in this court's opinion, unclear or ambiguous. Alliance's brief in Moore posits that "whether NCSBE has the authority to enter the Consent Judgment and promulgate the Numbered Memos" are at the center of this case, thereby urging Pullman abstention. (Alliance Resp. (Doc. 64 at 12).) SBE has undisputed authority to issue guidance consistent with state law and may issue guidance contrary to state law only in response to natural disasters – the court finds this, though ultimately unnecessary to the relief issued in this case, fairly clear. (See discussion supra at Part II.E.2.b.ii.) Moreover, this court has already expressly assessed and upheld the North Carolina state witness requirement, which

is the primary state law at issue in this case. Democracy N. Carolina, —— F.Supp.3d at ——, 2020 WL 4484063, at *48.

**\*11** Furthermore, Defendants and Intervenors would additionally need to show how "resolution of ... state law issues pending in state court" would "eliminate or substantially modify the <u>federal</u> constitutional issues raised in Plaintiffs' Complaint." N.C. State Conference of NAACP, 397 F. Supp. 3d at 796. As Alliance notes, the Plaintiffs did not appeal the state court's conclusions, but sought relief in federal court – there is no state law issue pending in state court here. For all of these reasons, this court declines to abstain under Pullman.

### C. Issue Preclusion

Collateral estoppel, or issue preclusion "refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." New Hampshire v. Maine, 532 U.S. 742, 748-49, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). The purpose of this doctrine is to "protect the integrity of the judicial process ...." Id. at 749, 121 S.Ct. 1808 (internal quotations omitted).

Plaintiffs argue that issue preclusion does not bar their Equal Protection claims. Citing Arizona v. California, 530 U.S. 392, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000), Plaintiffs in Wise argue that a negotiated settlement between parties, like the consent judgment between the Alliance Intervenors and Defendant SBE in Wake County Superior Court, does not constitute a final judgment for issue preclusion. (Wise Pls.' Mot. (Doc. 43) at 23.) Plaintiffs in Moore, citing In re Microsoft Corp. Antitrust Litig., 355 F.3d 322 (4th Cir. 2004), argue that issue preclusion cannot be asserted because the Individual Plaintiffs in Moore were not parties to the state court litigation that resulted in the consent judgment. (Moore Pls.' Mot. (Doc. 60) at 4.)

In response, Defendant SBE argues that, under North Carolina law, issue preclusion applies where (1) the issue is identical to the issue actually litigated and necessary to a prior judgment, (2) the prior action resulted in a final judgment on the merits, and (3) the plaintiffs in the latter action are the same as, or in privity with, the parties in the earlier action, (SBE Resp. (Doc. 65) at 7), and the parties in these federal actions and those in the state actions are in privity under the third element of the test, (id. at 8).

This court finds that issue preclusion does not bar Plaintiffs' claims. In Arizona v. California, the Supreme Court held that "[i]n most circumstances, it is recognized that consent agreements ordinarily are intended to preclude any further litigation on the claim presented but are not intended to preclude further litigation on any of the issues presented." 530 U.S. at 414, 120 S.Ct. 2304 (internal quotations omitted). Moreover, "settlements ordinarily occasion no issue preclusion ... unless it is clear ... that the parties intend their agreement to have such an effect." Id.

The Consent Judgment SBE and Alliance entered into does not clearly demonstrate that they intended their agreement to have an issue preclusive effect with regard to claims brought now by Plaintiffs in Moore and Wise. The language of the Consent Judgment demonstrates that it "constitutes a settlement and resolution of Plaintiffs' claims against Executive Defendants pending in this Lawsuit" and that "by signing this Stipulation and Consent Judgment, they are releasing any claims ... that they might have against Executive Defendants." (State Court Consent Judgment (Doc. 45-1) at 14 (emphasis added).) Although Timothy Moore and Philip Berger, State Legislative Plaintiffs in Moore, were Defendant-Intervenors in the NC Alliance action, they were not parties to the consent judgment. (Id.) Thus, because the plain language of the agreement did not expressly indicate an intention to preclude Plaintiffs Moore and Berger from litigating the issue in subsequent litigation, neither these State Legislative Plaintiffs, nor any other parties with whom they may or may not be in privity, are estopped from raising these claims now before this court.

### D. Plaintiffs' Equal Protection Claims

**\*12** Plaintiffs raise "two separate theories of an equal protection violation," – a "vote dilution claim, and an arbitrariness claim." (Oral Argument Tr. (Doc. 70) at 52; see also Wise Pls.' Mot. (Doc. 43) at 12-15.)

### 1. Voting Harms Prohibited by the Equal Protection Clause

Under the Fourteenth Amendment of the U.S. Constitution, a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Fourteenth Amendment is one of several constitutional provisions that "protects the right of all qualified citizens to vote, in state as well as in federal elections." Reynolds v. Sims,

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

377 U.S. 533, 554, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Because the Fourteenth Amendment protects not only the "initial allocation of the franchise," as well as "to the manner of its exercise," Bush v. Gore, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), "lines may not be drawn which are inconsistent with the Equal Protection Clause ...." Id. at 105, 121 S.Ct. 525 (citing Harper v. Va. State Bd. of Elections, 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)).

The Supreme Court has identified two theories of voting harms prohibited by the Fourteenth Amendment. First, the Court has identified a harm caused by "debasement or dilution of the weight of a citizen's vote," also referred to as "vote dilution." Reynolds, 377 U.S. at 555, 84 S.Ct. 1362. Courts find this harm arises where gerrymandering under a redistricting plan has diluted the "requirement that all citizens' votes be weighted equally, known as the one person, one vote principle," and resulted in one group or community's vote counting more than another's. Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections, 827 F.3d 333, 340 (4th Cir. 2016); see also Gill v. Whitford, 585 U.S. ——, ——, 138 S. Ct. 1916, 1930-31, 201 L.Ed.2d 313 (2018) (finding that the "harm" of vote dilution "arises from the particular composition of the voter's own district, which causes his vote – having been packed or cracked – to carry less weight than it would carry in another, hypothetical district"); Wesberry v. Sanders, 376 U.S. 1, 18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (finding that vote dilution occurred where congressional districts did not guarantee "equal representation for equal numbers of people"); Wright v. North Carolina, 787 F.3d 256, 268 (4th Cir. 2015) (invalidating a voter redistricting plan).

Second, the Court has found that the Equal Protection Clause is violated where the state, "[h]aving once granted the right to vote on equal terms," through "later arbitrary and disparate treatment, value[s] one person's vote over that of another." Bush, 531 U.S. at 104-05, 121 S.Ct. 525 (2000); see also Baker v. Carr, 369 U.S. 186, 208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ("A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false tally, or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of the ballot box.") (internal citations omitted). This second theory of voting harms requires courts to balance competing concerns around access to the ballot. On the one hand, a state should not engage in practices which prevent qualified voters from exercising their right to vote. A state must ensure that there is "no preferred class of voters but equality among those

who meet the basic qualifications." Gray v. Sanders, 372 U.S. 368, 379-80, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). On the other hand, the state must protect against "the diluting effect of illegal ballots." Id. at 380, 83 S.Ct. 801. Because "the right to have one's vote counted has the same dignity as the right to put a ballot in a box," id., the vote dilution occurs only where there is both "arbitrary and disparate treatment." Bush, 531 U.S. at 105, 121 S.Ct. 525. To this end, states must have "specific rules designed to ensure uniform treatment" of a voter's ballot. Id. at 106, 121 S.Ct. 525.

## 2. Standing to Bring Equal Protection Claims

**\*13** In light of the harms prohibited by the Equal Protection Clause, this court must first consider whether Plaintiffs have standing to bring these claims.

For a case or controversy to be justiciable in federal court, a plaintiff must allege "such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." White Tail Park v. Stroube, 413 F.3d 451, 458 (4th Cir. 2005) (quoting Planned Parenthood of S.C. Inc. v. Rose, 361 F.3d 786, 789 (4th Cir. 2004)).

The party seeking to invoke the federal courts' jurisdiction has the burden of satisfying Article III's standing requirement. Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006). To meet that burden, a plaintiff must demonstrate three elements: (1) that the plaintiff has suffered an injury in fact that is "concrete and particularized" and "actual or imminent"; (2) that the injury is fairly traceable to the challenged conduct of the defendant; and (3) that a favorable decision is likely to redress the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

In multi-plaintiff cases, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." Town of Chester v. Laroe Estates, Inc., 581 U.S. ——, ——, 137 S. Ct. 1645, 1651, 198 L.Ed.2d 64 (2017). Further, if there is one plaintiff "who has demonstrated standing to assert these rights as his own," the court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 & n.9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

In the voting context, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue," Baker, 369 U.S. at 206, 82 S.Ct. 691, so long as their claimed injuries are "distinct from a 'generally available grievance about the government,' " Gill, 138 S. Ct. at 1923 (quoting Lance v. Coffman, 549 U.S. 437, 439, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007) (per curiam)).

Defendant SBE and Alliance Intervenors argue that Individual Plaintiffs in Wise and Moore have not alleged a concrete and particularized injury under either of the two Equal Protection theories. (Alliance Resp. (Doc. 64) at 14-15; SBE Resp. (Doc. 65) at 12-13.)

First, under a vote dilution theory, they argue that courts have "repeatedly rejected this theory as a basis for standing, both because it is unduly speculative and impermissibly generalized." (Alliance Resp. (Doc. 64) at 17.) Second, under an arbitrary and disparate treatment theory, they argue that the injury is too generalized because the Numbered Memoranda apply equally to all voters across the state and that Plaintiffs "cannot claim an injury for not having to go through a remedial process put in place for other voters." (SBE Resp. (Doc. 65) at 12.)

Plaintiffs in Moore and Wise do not address standing for their Equal Protection claims in their memoranda in support of their motions for a preliminary injunction. (See Wise Pls.' Mot. (Doc. 43); Moore Pls.' Mot. (Doc. 60).) At oral argument held on October 8, 2020, however, counsel for the Moore Plaintiffs responded to Defendant SBE and Alliance Intervenor's standing arguments. (Oral Argument Tr. (Doc. 70) at 52-59.)

 **\*14** First, under a vote dilution theory, counsel argued that "the Defendants confuse a widespread injury with not having a personal injury," (id. at 53), and that the Supreme Court's decision in Reynolds demonstrates that "impermissible vote dilution occurs when there's ballot box stuffing," (id.), suggesting that each voter would have standing to sue under the Supreme Court's precedent in Reynolds because their vote has less value. (Id.) Second, under an arbitrary and disparate treatment theory, counsel argued that Plaintiffs were subjected to the witness requirement and that "[t]here are burdens associated with that" which support a finding of an injury in fact. (Id. at 56.) Counsel argued the harm that is occurring is not speculative because, for example, voters have and will continue to fail to comply with the witness requirement, (id. at 55-56), and ballots will arrive between the third and

ninth day following the election pursuant to the Postmark Requirement, (id. at 58). Moreover, counsel argued that the "regime" imposed by the state is arbitrary, citing limitations on assistance allowed to complete a ballot, compared to the lessened restrictions associated with the witness requirement under Numbered Memo 2020-19. (Id. at 59.)

This court finds that Individual Plaintiffs in Moore and Wise have not articulated a cognizable injury in fact for their vote dilution claims. However, all of the Individual Plaintiffs in Moore, and one Individual Plaintiff in Wise have articulated an injury in fact for an arbitrary and disparate treatment claim.

### a. Vote Dilution

Although the Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature.' " Gill, 138 S. Ct. at 1930 (citing Reynolds, 377 U.S. at 561, 84 S.Ct. 1362), the Court has expressly held that "vote dilution" refers specifically to "invidiously minimizing or canceling out the voting potential of racial or ethnic minorities," Abbott v. Perez, 585 U.S. ——, ——, 138 S. Ct. 2305, 2314, 201 L.Ed.2d 714 (2018) (internal quotations and modifications omitted) (emphasis added), a harm which occurs where "the particular composition of the voter's own district ... causes his vote – having been packed or cracked – to carry less weight than it would carry in another, hypothetical district." Gill, 138 S. Ct. at 1931.

Indeed, lower courts which have addressed standing in vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted, as Plaintiffs have argued here, have said that this harm is unduly speculative and impermissibly generalized because all voters in a state are affected, rather than a small group of voters. See, e.g., Donald J. Trump for President, Inc. v. Cegavske, Case No. 2:20-CV-1445 JCM (VCF), —— F.Supp.3d ——, ——, 2020 WL 5626974, at \*4 (D. Nev. Sept. 18, 2020) ("As with other generally available grievances about the government, plaintiffs seek relief on behalf of their member voters that no more directly and tangibly benefits them than it does the public at large.") (internal quotations and modifications omitted); Martel v. Condos, Case No. 5:20-cv-131, —— F.Supp.3d ——, ——, 2020 WL 5755289, at \*4 (D. Vt. Sept. 16, 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); Paher v. Cegavske, 457 F.Supp.3d

919, 926–27 (D. Nev. 2020) ("Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter."); Am. Civil Rights Union v. Martinez-Rivera, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution [is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.").

Although "[i]t would over-simplify the standing analysis to conclude that no state-wide election law is subject to challenge simply because it affects all voters," Martel, —— F.Supp.3d at ——, 2020 WL 5755289, at *4, the notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury in fact necessary for Article III standing. Compared to a claim of gerrymandering, in which the injury is specific to a group of voters based on their racial identity or the district where they live, all voters in North Carolina, not just Individual Plaintiffs, would suffer the injury Individual Plaintiffs allege. This court finds this injury too generalized to give rise to a claim of vote dilution, and thus, neither Plaintiffs in Moore nor in Wise have standing to bring their vote dilution claims under the Equal Protection Clause.

**b. Arbitrary and Disparate Treatment**

 **\*15**  In Bush, the Supreme Court held that, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." 531 U.S. at 104-05, 121 S.Ct. 525. Plaintiffs argue that they have been subjected to arbitrary and disparate treatment because they voted under one set of rules, and other voters, through the guidance in the Numbered Memoranda, will be permitted to vote invalidly under a different and unequal set of rules, and that this is a concrete and particularized injury. (Oral Argument Tr. (Doc. 70) at 70-71.)

For the purposes of determining whether Plaintiffs have standing, is it not "necessary to decide whether [Plaintiffs'] allegations of impairment of their votes" by Defendant SBE's actions "will, ultimately, entitle them to any relief," Baker, 369 U.S. at 208, 82 S.Ct. 691; whether a harm has occurred is best left to this court's analysis of the merits of Plaintiffs' claims, (see discussion infra Section II.D.3). Instead, the appropriate inquiry is, "[i]f such impairment does produce a legally cognizable injury," whether Plaintiffs "are among

those who have sustained it." Baker, 369 U.S. at 208, 82 S.Ct. 691.

This court finds that Individual Plaintiffs in Moore and one Individual Plaintiff in Wise have standing to raise an arbitrary and disparate treatment claim because their injury is concrete, particularized, and not speculative. Bobby Heath and Maxine Whitley, the Individual Plaintiffs in Moore, are registered North Carolina voters who voted absentee by mail and whose ballots have been accepted by SBE. (Moore Compl. (Doc. 1) ¶¶ 9-10.) In Wise, Individual Plaintiff Patsy Wise is a registered voter who cast her absentee ballot by mail. (Wise Compl. (Doc. 1) ¶ 25.)

If Plaintiffs Heath, Whitley, and Wise were voters who intended to vote by mail but who had not yet submitted their ballots, as is the case with the other Individual Plaintiffs in Wise, (Wise Compl. (Doc. 1) ¶¶ 26-28), or voters who had intended to vote in-person either during the Early Voting period or on Election Day, then they would not in fact have been impacted by the laws and procedures for submission of absentee ballots by mail and the complained-of injury would be merely "an injury common to all other registered voters," Martel, —— F.Supp.3d at ——, 2020 WL 5755289, at *4. See also Donald J. Trump for President, Inc., —— F.Supp.3d at ——, 2020 WL 5626974, at *4 ("Plaintiffs never describe how their member voters will be harmed by vote dilution where other voters will not."). Indeed, this court finds that Individual Plaintiffs Clifford, Bambini, and Baum in Wise do not have standing to challenge the Numbered Memoranda, because any "shock[ ]" and "serious concern[s]" they have that their vote "will be negated by improperly cast or fraudulent ballots," (Wise Compl. (Doc. 1) ¶¶ 26-28), is merely speculative until such point that they have actually voted by mail and had their ballots accepted, which Plaintiffs' Complaint in Wise does not allege has occurred. (Id.)

Yet, because Plaintiffs Heath, Whitley, and Wise have, in fact, already voted by mail, (Moore Compl. (Doc. 1) ¶¶ 9-10; Wise Compl. (Doc. 1) ¶ 25), their injury is not speculative. Under the Numbered Memoranda 2020-19, 2020-22, and 2020-23, other voters who vote by mail will be subjected to a different standard than that to which Plaintiffs Heath, Whitley, and Wise were subjected when they cast their ballots by mail. Assuming this is an injury that violates the Equal Protection Clause, Baker, 369 U.S. at 208, 82 S.Ct. 691, the harm alleged by Plaintiffs is particular to voters in Heath, Whitley, and Wise's position, rather than a generalized injury that any North Carolina voter could claim. For this reason, this court

finds that Plaintiffs Heath, Whitley, and Wise have standing to raise Equal Protection claims under an arbitrary and disparate treatment theory. Because at least one plaintiff in each of these multi-plaintiff cases has standing to seek the relief requested, the court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." Vill. of Arlington Heights, 429 U.S. at 264 & n.9, 97 S.Ct. 555.

### 3. Likelihood of Success on the Merits

 **\*16** Having determined that Individual Plaintiffs have standing to bring their arbitrary and disparate treatment claims, this court now considers whether Plaintiffs' claims are likely to succeed on the merits. To demonstrate a likelihood of success on the merits, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." Di Biase, 872 F.3d at 230.

### a. Parties' Arguments

Plaintiffs argue that four policies indicated in the Numbered Memoranda are invalid under the Equal Protection Clause: (1) the procedure which allows ballots without a witness signature to be retroactively validated through the cure procedure indicated in Revised Numbered Memo 2020-19 ("Witness Requirement Cure Procedure"); (2) the procedure which allows absentee ballots to be received up to nine days after Election Day if they are postmarked on Election Day, as indicated in Numbered Memo 2020-19 ("Receipt Deadline Extension"); and (3) the procedure which allows for anonymous delivery of ballots to unmanned drop boxes, as indicated in Numbered Memo 2020-23 ("Drop Box Cure Procedure"); (4) the procedure which allows ballots to be counted without a United States Postal Service postmark, as indicated in Numbered Memo 2020-22 ("Postmark Requirement Changes"). (Moore Compl. (Doc. 1) ¶ 93; Wise Compl. (Doc. 1) ¶ 124; Wise Pls.' Mot. (Doc. 43) at 13-14.)

Plaintiffs in Wise argue that the changes in these Memoranda "guarantee that voters will be treated arbitrarily under the ever-changing voting regimes." (Wise Pls.' Mot. (Doc. 43) at 11.) Similarly, Plaintiffs in Moore argue that the three Memoranda were issued "after tens of thousands of North Carolinians cast their votes following the requirements set by the General Assembly," which deprives Plaintiffs "of the Equal Protection Clause's guarantee because it allows

for 'varying standards to determine what [i]s a legal vote.' " (Moore Compl. (Doc. 1) ¶ 90 (citing Bush, 531 U.S. at 107, 121 S.Ct. 525).)

In response, Defendants argue that the Numbered Memoranda will not lead to the arbitrary and disparate treatment of ballots prohibited by the Supreme Court's decision in Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). Defendant SBE argues that the consent judgment and Numbered Memos do "precisely what Bush contemplated: It establishes uniform and adequate standards for determining what is a legal vote, all of which apply statewide, well in advance of Election Day. Indeed, the only thing stopping uniform statewide standards from going into effect is the TRO entered in these cases." (SBE Resp. (Doc. 65) at 17.) Moreover, Defendant SBE argues that the consent judgment "simply establishes uniform standards that help county boards ascertain which votes are lawful," and "in no way lets votes be cast unlawfully." (Id. at 18.)

Alliance Intervenors argue that the Numbered Memos "apply equally to all voters," (Alliance Resp. (Doc. 64) at 18), and "Plaintiffs have not articulated, let alone demonstrated, how their right to vote – or anyone else's – is burdened or valued unequally," (id. at 19). Moreover, Alliance Intervenors argue that the release of the Numbered Memoranda after the election began does not raise equal protection issues because, "[e]lection procedures often change after voting has started to ensure that the fundamental right to vote is protected." (Id. at 20.)

Both Defendant SBE and Alliance Intervenors argue that the release of the Numbered Memoranda after the election began does not raise equal protection issues, as election procedures often change after voting has started. (SBE Resp. (Doc. 65) at 18; Alliance Resp. (Doc. 64) at 20.) For example, Defendant SBE argues that "[i]f it is unconstitutional to extend the receipt deadline for absentee ballots to address mail disruptions, then it would also be unconstitutional to extend hours at polling places on Election Day to address power outages or voting-machine malfunctions." (SBE Resp. (Doc. 65) at 18 (citing N.C. Gen. Stat. § 163-166.01).) "Likewise, the steps that the Board has repeatedly taken to ensure that people can vote in the wake of natural disasters like hurricanes would be invalid if those steps are implemented after voting begins." (Id.)

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    14

### b. Analysis

 *17  This court agrees with the parties that an Equal Protection violation occurs where there is both arbitrary and disparate treatment. Bush, 531 U.S. at 105, 121 S.Ct. 525. This court also agrees with Defendants that not all disparate treatment rises to the level of an Equal Protection violation. As Defendant SBE argues, the General Assembly has empowered SBE to make changes to voting policies and procedures throughout the election, including extending hours at polling places or adjusting voting in response to natural disasters. (SBE Resp. (Doc. 65) at 18.) Other federal courts have upheld changes to election procedures even after voting has commenced. For example, in 2018, a federal court enjoined Florida's signature matching procedures and ordered a cure process after the election. Democratic Exec. Comm. of Fla. v. Detzner, 347 F. Supp. 3d 1017, 1031 (N.D. Fla. 2018), appeal dismissed as moot sub nom. Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm., 950 F.3d 790 (11th Cir. 2020). Similarly, a Georgia federal court in 2018 ordered a cure process in the middle of the absentee and early voting periods. Martin v. Kemp, 341 F. Supp. 3d 1326 (N.D. Ga. 2018), appeal dismiss sub nom. Martin v. Sec'y of State of Ga., No. 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018).

A change in election rules that results in disparate treatment shifts from constitutional to unconstitutional when these rules are also arbitrary. The ordinary definition of the word "arbitrary" refers to matters "[d]epending on individual discretion" or "involving a determination made without consideration of or regard for facts, circumstances, fixed rules, or procedures." Arbitrary, Black's Law Dictionary (11th ed. 2019). This definition aligns with the Supreme Court's holding in Reynolds and Bush, that the State must ensure equal treatment of voters both at the time it grants citizens the right to vote and throughout the election. Bush, 531 U.S. at 104-05, 121 S.Ct. 525 ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."); Reynolds, 377 U.S. at 555, 84 S.Ct. 1362 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

The requirement that a state "grant[ ] the right to vote on equal terms," Bush, 531 U.S. at 104, 121 S.Ct. 525, includes protecting the public "from the diluting effect of illegal

ballots," Gray, 372 U.S. at 380, 83 S.Ct. 801. To fulfill this requirement, a state legislature must define the manner in which voting should occur and the minimum requirements for a valid, qualifying ballot. In North Carolina, the General Assembly has passed laws defining the requirements for permissible absentee voting, N.C. Gen. Stat. § 163-226 et seq., including as recently as this summer, when it modified the one-witness requirement, 2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1.(a). As this court found in its order issuing a preliminary injunction in Democracy, these requirements reflect a desire by the General Assembly to prevent voter fraud resulting from illegal voting practices. Democracy N. Carolina, ––– F.Supp.3d at ––––, 2020 WL 4484063, at *35.

A state cannot uphold its obligation to ensure equal treatment of all voters at every stage of the election if another body, including SBE, is permitted to contravene the duly enacted laws of the General Assembly and to permit ballots to be counted that do not satisfy the fixed rules or procedures the state legislature has deemed necessary to prevent illegal voting. Any guidance SBE adopts must be consistent with the guarantees of equal treatment contemplated by the General Assembly and Equal Protection.

Thus, following this precedent, and the ordinary definition of the word "arbitrary," this court finds that SBE engages in arbitrary behavior when it acts in ways that contravene the fixed rules or procedures the state legislature has established for voting and that fundamentally alter the definition of a validly voted ballot, creating "preferred class[es] of voters." Gray, 372 U.S. at 380, 83 S.Ct. 801.

 *18  This definition of arbitrariness does not require this court to consider whether the laws enacted by the General Assembly violate other provisions in the North Carolina or U.S. Constitution or whether there are better public policy alternatives to the laws the General Assembly has enacted. These are separate inquiries. This court's review is limited to whether the challenged Numbered Memos are consistent with state law and do not create a preferred class or classes of voters.

### i. Witness Requirement Cure Procedure

This court finds Plaintiffs have demonstrated a likelihood of success on the merits with respect to their Equal Protection challenge to the Witness Requirement Cure Procedure in Revised Memo 2020-19.

Under the 2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1. (a), a witnessed absentee ballot must be "marked ... in the presence of at least one [qualified] person ...." This clear language dictates that the witness must be (1) <u>physically present</u> with the voter, and (2) present <u>at the time the ballot is marked</u> by the voter.

Revised Memo 2020-19 counsels that ballots missing a witness signature may be cured where voters sign and affirm the following statement:

> I am submitting this affidavit to correct a problem with missing information on the ballot envelope. I am an eligible voter in this election and registered to vote in [name] County, North Carolina. I solemnly swear or affirm that I voted and returned my absentee ballot for the November 3, 2020 general election and that I have not voted and will not vote more than one ballot in this election. I understand that fraudulently or falsely completing this affidavit is a Class I felony under Chapter 163 of the North Carolina General Statutes.

(<u>Moore v. Circosta</u>, No. 1:20CV911 (Doc. 45-1) at 34.)

This "cure" affidavit language makes no mention of whether a witness was in the presence of the voter at the time that the voter cast their ballot, which is the essence of the Legislature's Witness Requirement. 2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1.(a). In fact, a voter could truthfully sign and affirm this statement and have their ballot counted by their county board of elections without any witness becoming involved in the process.[6] Because the effect of this affidavit is to eliminate the statutorily required witness requirement, this court finds that Plaintiffs have demonstrated a likelihood of success on the merits in proving that the Witness Requirement Cure Procedure indicated in Revised Memo 2020-19 is arbitrary.

**\*19** Based on counsel's statements at oral arguments, Defendant SBE may contend that the guidance in Revised Memo 2020-19 is not arbitrary because it was necessary to resolve the <u>Alliance</u> state court action. (Oral Argument Tr. (Doc. 70) at 105 ("Our reading then of state law is that the Board has the authority to make adjustments in emergencies or as a means of settling protracted litigation until the General Assembly reconvenes.").) However, Defendant SBE's arguments to the state court judge and the court in the Eastern District of North Carolina belie that assertion, as they advised the state court that both the original Memo 2020-19 and the Revised Memo were issued "to ensure full compliance

with the injunction entered by Judge Osteen," (SBE State Court Br. (Doc. 68-1) at 15), and they advised the court in the Eastern District of North Carolina that they had issued the revised Memo 2020-19 "in order to comply with Judge Osteen's preliminary injunction in the <u>Democracy N.C.</u> action in the Middle District." (TRO (Doc. 47) at 9.) As this court more fully explains in its order issued in <u>Democracy</u>, this court finds that Defendant SBE improperly used this court's <u>August Democracy Order</u> to modify the witness requirement. <u>Democracy v. N. Carolina, No. 1:20CV457, 2020 WL 6058048 (M.D.N.C. Oct. 14, 2020)</u> (enjoining witness cure procedure). Because Defendant SBE acted improperly in that fashion, this court declines to accept an argument now that elimination of the witness requirement was a rational and justifiable basis upon which to settle the state lawsuit. Furthermore, it is difficult to conceive that SBE was authorized to resolve a pending lawsuit that could create a preferred class of voters: those who may submit an absentee ballot without a witness under an affidavit with no definition of the meaning of "vote."

This court also finds Plaintiffs have demonstrated a likelihood of success on the merits in proving disparate treatment may result as a result of the elimination of the Witness Requirement. Individual Plaintiffs Wise, Heath, and Whitley assert that they voted absentee by mail, including complying with the Witness Requirement. (<u>Wise</u> Compl. (Doc. 1) ¶ 25; <u>Moore</u> Compl. (Doc. 1) ¶¶ 9-10.) Whether because a voter inadvertently cast a ballot without a witness or because a voter was aware of the "cure" procedure and thus, willfully did not cast a ballot with a witness, there will be voters whose ballots are cast without a witness. Accordingly, this court finds that Plaintiffs have demonstrated a likelihood of success on the merits in proving that the Witness Requirement Cure Procedure indicated in Memo 2020-19 creates disparate treatment.

Thus, because Plaintiffs have demonstrated a likelihood of success on the merits with respect to arbitrary and disparate treatment that may result from under Witness Requirement Cure Procedure in Revised Memo 2020-19, this court finds Plaintiffs have established a likelihood of success on their Equal Protection claim.

### ii. Receipt Deadline Extension

This court finds that Plaintiffs are likely to succeed on their Equal Protection challenge to the Receipt Deadline Extension in Revised Memo 2020-19.

Under N.C. Gen. Stat. § 163-231(b), in order to be counted, civilian absentee ballots must have been received by the county board office by 5 p.m. on Election Day, November 3, 2020, or if postmarked by Election Day, by 5:00 p.m. on November 6, 2020. The guidance in Revised Memo 2020-19 extends the time in which absentee ballots must be returned, allowing a late civilian ballot to be counted if postmarked on or before Election Day and received by 5:00 p.m. on November 12, 2020 (Revised Memo 2020-19 (Doc. 36-3) at 5.)

Alliance Intervenors argue that, "[t]o the extent Numbered Memo 2020-22 introduces a new deadline, it affects only the counting of ballots for election officials after Election Day has passed – not when voters themselves must submit their ballots. All North Carolina absentee voters still must mail their ballots by Election Day." (Alliance Resp. (Doc. 64) at 21.)

This court disagrees, finding Plaintiffs have demonstrated a likelihood of success on the merits in proving that this change contravenes the express deadline established by the General Assembly, by extending the deadline from three days after Election Day, to nine days after Election Day. Moreover, it results in disparate treatment, as voters like Individual Plaintiffs returned their ballots within the time-frame permitted under state law, (Wise Compl. (Doc. 1) ¶ 25; Moore Compl. (Doc. 1) ¶¶ 9-10), but other voters whose ballots would otherwise not be counted if received three days after Election Day, will now have an additional six days to return their ballot.

Because Plaintiffs have demonstrated a likelihood of success on the merits in proving arbitrary and disparate treatment may result under the Receipt Deadline Extension, this court finds Plaintiffs have established a likelihood of success on the merits of their Equal Protection claim.

### iii. Drop Box Cure Procedure

**\*20** Plaintiffs have failed to establish a likelihood of success, however, on their Equal Protection challenge to the Drop Box Cure Procedure indicated in Numbered Memo 2020-23. (Wise, No. 1:20CV912, Memo 2020-23 (Doc. 1-4).)

N.C. Gen. Stat. § 163-226.3(a)(5) makes it a felony for any person other than the voter's near relative or legal guardian to take possession of an absentee ballot of another voter for delivery or for return to a county board of elections.

"Because of this provision in the law," and the need to ensure compliance with it, SBE recognized in Memo 2020-23 that, "an absentee ballot may not be left in an unmanned drop box," (Wise, No. 1:20CV912, Memo 2020-23 (Doc. 1-4) at 2), and directed county boards which have a "drop box, slot, or similar container at their office" for other business purposes to place a "sign indicating that absentee ballots may not be deposited in it." (Id.)

Moreover, the guidance reminds county boards that they must keep a written log when any person returns an absentee ballot in person, which includes the name of the individual returning the ballot, their relationship to the voter, the ballot number, and the date it was received. (Id. at 3.) If the individual who drops off the ballot is not the voter, their near relative, or legal guardian, the log must also record their address and phone number. (Id.) The guidance also advises county boards that "[f]ailure to comply with the logging requirement, or delivery or an absentee ballot by a person other than the voter, the voter's near relative, or the voter's legal guardian, is not sufficient evidence in and of itself to establish that the voter did not lawfully vote their ballot." (Id. at 3.) Instead, the guidance advises the county board that they "may ... consider the delivery of a ballot ... in conjunction with other evidence in determining whether the ballot is valid and should be counted." (Id. at 4.)

Plaintiffs argue that this guidance "undermines the General Assembly's criminal prohibition of the unlawful delivery of ballots," (Moore Compl. (Doc. 1) ¶ 68), and "effectively allow[s] voters to use drop boxes for absentee ballots," (Wise Pls.' Mot. (Doc. 43) at 13), and thus, violates the Equal Protection Clause, (Moore Compl. (Doc. 1) ¶ 93). This court disagrees.

Although Numbered Memo 2020-23 was released on September 22, 2020, (Wise, No. 1:20CV912, Memo 2020-23 (Doc. 1-4) at 2), the guidance it contains is not new. Consistent with the guidance in Numbered Memo 2020-23, SBE administrative rules adopted on December 1, 2018, require that any person delivering a ballot to a county board of elections office provide:

(1) Name of voter;

(2) Name of person delivering ballot;

(3) Relationship to voter;

(4) Phone Number (if available) and current address of person delivering ballot;

(5) Date and time of delivery of ballot; and

(6) Signature or mark of person delivering ballot certifying that the information provided is true and correct and that the person is the voter or the voter's near relative as defined in [N.C. Gen. Stat § 163-226(f)] or verifiable legal guardian as defined in [N.C. Gen. Stat. § 163-226(e)].
8 N.C. Admin. Code 18.0102 (2018). Moreover, the administrative rule states that "the county board of elections may consider the delivery of a ballot in accordance with this Rule in conjunction with other evidence in determining whether the container-return envelope has been properly executed according to the requirements of [N.C. Gen. Stat. § 163-231]," (id.), and that "[f]ailure to comply with this Rule <u>shall not</u> constitute evidence sufficient in and of itself to establish that the voter did not lawfully vote his or her ballot." (Id.)

**\*21** Because the guidance contained in Numbered Memo 2020-23 was already in effect at the start of this election as a result of SBE's administrative rules, Individual Plaintiffs were already subject to it at the time that they cast their votes. Accordingly, because all voters were subject to the same guidance, Plaintiffs have not demonstrated a likelihood of success on the merits in proving disparate treatment.

It is a closer issue with respect to whether Plaintiffs have demonstrated a likelihood of success on the merits in proving that the rules promulgated by Defendant SBE are inconsistent with N.C. Gen. Stat. § 163-226.3(a)(5).

This statute makes it a felony for any person other than the voter's near relative or legal guardian to take possession of an absentee ballot of another voter for delivery or for return to a county board of elections. Id. It would seem logically inconsistent that the General Assembly would criminalize this behavior, while at the same time, permit ballots returned by unauthorized third parties to be considered valid. Yet, upon review of the legislative history, this court finds the felony statute has been in force since 1979, 1979 N.C. Sess. Laws Ch. 799 (S.B. 519) § 4, https://www.ncleg.gov/enactedlegislation/sessionlaws/pdf/1979-1980/sl1979-799.pdf (last visited Oct.

13, 2020), and in its current form since 2013. 2013 N.C. Sess. Laws 381 (H.B. 589) § 4.6.(a).

That the General Assembly, by not taking legislative action, and instead, permitted SBE's administrative rule and the General Assembly's statute to coexist for nearly two years and through several other elections undermines Plaintiffs' argument that Defendant SBE has acted arbitrarily. For this reason, this court finds that Plaintiffs have not demonstrated a likelihood of success on the merits in proving the arbitrariness of the guidance in Numbered Memo 2020-23 and accordingly, Plaintiffs have failed to establish a likelihood of success on their Equal Protection challenge to Numbered Memo 2020-23.

If the General Assembly believes that SBE's administrative rules are inconsistent with its public policy goals, they are empowered to pass legislation which overturns the practice permitted under the administrative rule.

### iv. <u>Postmark Requirement Changes</u>

Similarly, this court finds that Plaintiffs have failed to establish likelihood of success on the merits with respect to their Equal Protection challenge to the Postmark Requirement Changes in Numbered Memo 2020-22. (Wise, 1:20CV912, Memo 2020-22 (Doc. 1-3).)

Under Numbered Memo 2020-22, a ballot will be considered postmarked by Election Day if it has a USPS postmark, there is information in BallotTrax, or "another tracking service offered by the USPS or a commercial carrier, indicat[es] that the ballot was in the custody of USPS or the commercial carrier on or before Election Day." (Id. at 3.) This court finds that these changes are consistent with N.C. Gen. Stat. § 163-231(b)(2)b, which does not define what constitutes a "postmark," and instead, merely states that ballots received after 5:00 p.m. on Election Day may not be accepted unless the ballot is "postmarked and that postmark is dated on or before the day of the ... general election ... and are received by the county board of elections not later than three days after the election by 5:00 p.m."

In the absence of a statutory definition for postmark, this court finds Plaintiffs have not demonstrated a likelihood of success on the merits in proving that Numbered Memo 2020-22 is inconsistent with N.C. Gen. Stat. § 163-231(b)(2)b, and thus, arbitrary. If the General Assembly believes

that the Postmark Requirement Changes indicated in Memo 2020-22 are inconsistent with its public policy goals, they are empowered to pass legislation which further specifies the definition of a "postmark." In the absence of such legislation, however, this court finds that Plaintiffs have failed to establish a likelihood of success on the merits of their Equal Protection challenge.

#### 4. Irreparable Harm

**\*22** In addition to a likelihood of success on the merits, a plaintiff must also make a "clear showing that it is likely to be irreparably harmed absent preliminary relief" in order to obtain a preliminary injunction. UBS Fin. Servs. Inc. v. Carilion Clinic, 880 F. Supp. 2d 724, 733 (E.D. Va. 2012) (quoting Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 347 (4th Cir. 2009)). Further, an injury is typically deemed irreparable if monetary damages are inadequate or difficult to ascertain. See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994), abrogated on other grounds by Winter, 555 U.S. at 22, 129 S.Ct. 365. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014). "[O]nce the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin th[ese] law[s]." Id.

The court therefore finds Plaintiffs have demonstrated a likelihood of irreparable injury regarding the Equal Protection challenges to the Witness Requirement and the Receipt Deadline Extension.

#### 5. Balance of Equities

The third factor in determining whether preliminary relief is appropriate is whether the plaintiff demonstrates "that the balance of equities tips in his favors." Winter, 555 U.S. at 20, 129 S.Ct. 365.

The Supreme Court's decision in Purcell v. Gonzalez, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006), urges that this court should issue injunctive relief as narrowly as possible. The Supreme Court has made clear that "lower federal courts should ordinarily not alter the election rules on the eve of an election," Republican Nat'l Comm. v. Democratic Nat'l

Comm., 589 U.S. ——, ——, 140 S. Ct. 1205, 1207, 206 L.Ed.2d 452 (2020) (per curiam), as a court order affecting election rules will progressively increase the risk of "voter confusion" as "an election draws closer." Purcell, 549 U.S. at 4-5, 127 S.Ct. 5; see also Texas All. for Retired Americans v. Hughs, —— F.3d ——, 2020 WL 5816887, at *2 (5th Cir. Sept. 30, 2020) ("The principle ... is clear: court changes of election laws close in time to the election are strongly disfavored."). This year alone, the Purcell doctrine of noninterference has been invoked by federal courts in cases involving witness requirements and cure provisions during COVID-19, Clark v. Edwards, Civil Action No. 20-283-SDD-RLB, —— F.Supp.3d ——, —— – ——, 2020 WL 3415376, at *1-2 (M.D. La. June 22, 2020); the implementation of an all-mail election plan developed by county election officials, Paher v. Cegavske, 2020 WL 2748301, at *1, *6 (D. Nev. 2020); and the use of college IDs for voting, Common Cause v. Thomsen, No. 19-cv-323-JDP, 2020 WL 5665475, at *1 (W.D. Wis. Sept. 23, 2020) – just to name a few.

Purcell is not a per se rejection of any injunctive relief close to an election. However, as the Supreme Court's restoration of the South Carolina witness requirement last week illustrates, a heavy thumb on the scale weighs against changes to voting regulations. Andino v. Middleton, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 5887393, at *1 (Oct. 5, 2020) (Kavanaugh, J., concurring) ("By enjoining South Carolina's witness requirement shortly before the election, the District Court defied [the Purcell] principle and this Court's precedents.").

In this case, there are two SBE revisions where this court has found that Plaintiffs are likely to succeed on the merits. First, the Witness Requirement Cure Procedure, which determines whether SBE will send the voter a cure certification or spoil the ballot and issue a new one. This court has, on separate grounds, already enjoined the Witness Requirement Cure Procedure in Democracy North Carolina v. North Carolina State Board of Elections, No. 1:20CV457, 2020 WL 6058048 (M.D.N.C. Oct. 14, 2020) (enjoining witness cure procedure). Thus, the issue of injunctive relief on the Witness Requirement Cure Procedure is moot at this time. Nevertheless, in the absence of relief in Democracy, it seems likely that SBE's creation of "preferred class[es] of voters", Gray, 372 U.S. at 380, 83 S.Ct. 801, with elimination of the witness requirement and the cure procedure could merit relief in this case.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   19

**\*23** Ripe for this court's consideration is the Receipt Deadline Extension, which contradicts state statutes regarding when a ballot may be counted. Ultimately, this court will decline to enjoin the Receipt Deadline Extension, in spite of its likely unconstitutionality and the potential for irreparable injury. The Purcell doctrine dictates that this court must "ordinarily" refrain from interfering with election rules. Republican Nat'l Comm., 140 S. Ct. at 1207. These issues may be taken up by federal courts after the election, or at any time in state courts and the legislature. However, in the middle of an election, less than a month before Election Day itself, this court cannot cause "judicially created confusion" by changing election rules. Id. Accordingly, this court declines to impose a preliminary injunction because the balance of equities weighs heavily against such an injunction.

### E. Plaintiffs' Electors Clause and Elections Clause Claims

As an initial matter, this court will address the substantive issues of the Electors Clause and the Elections Clause together. The Electors Clause of the U.S. Constitution requires "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President. U.S. Const. art. II, § 1, cl. 2. Plaintiffs in Wise argue that, in order to "effectuate" this Electors requirement, "the State must complete its canvas of all votes cast by three weeks after the general election" under N.C. Gen. Stat. § 163-182.5(c). (Wise Pls.' Mot. (Doc. 43) at 15.) Plaintiffs argue that (1) the extension of the ballot receipt deadline and (2) the changing of the postmark requirement "threaten to extend the process and threaten disenfranchisement," as North Carolina "must certify its electors by December 14 or else lose its voice in the Electoral College. (Id.)

The meaning of "Legislature" within the Electors Clause can be analyzed in the same way as "Legislature" within the Elections Clause. For example,

> As an initial matter, the Court finds no need to distinguish between the term 'Legislature' as it is used in the Elections Clause as opposed to the Electors Clause. Not only were both these clauses adopted during the 1787 Constitutional Convention, but the clauses share a "considerable similarity.
>
> ....

... [T]he Court finds that the term "Legislature" is used in a sufficiently similar context in both clauses to properly afford the term an identical meaning in both instances. Donald J. Trump for President, Inc. v. Bullock, No. CV 20-66-H-DLC, ––– F.Supp.3d ––––, ––––, 2020 WL 5810556, at \*11 (D. Mont. Sept. 30, 2020). Nor do Plaintiffs assert any difference in the meaning they assign to "Legislature" and its authority between the two Clauses.

This court finds that all Plaintiffs lack standing under either Clause. The discussion infra of the Elections Clause applies equally to the Electors Clause.

### 1. Elections Clause

#### a. Standing

The Elections Clause standing analysis differs in Moore and Wise, though this court ultimately arrives at the same conclusion in both cases.

#### i. Standing in Wise

In Wise, Plaintiffs are private parties clearly established by Supreme Court precedent to have no standing to contest the Elections Clause in this manner. Plaintiffs are individual voters, a campaign committee, national political parties, and two Members of the U.S. House of Representatives. Even though Plaintiffs are part of the General Assembly, they bring their Elections Clause claim alleging an institutional harm to the General Assembly. Though the Plaintiffs claim to have suffered "immediate and irreparable harm", (Wise Compl. (Doc. 1) ¶¶ 100, 109), this does not establish standing for their Elections Clause claim or Electors Clause claim. See Corman v. Torres, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) ("[T]he Elections Clause claims asserted in the verified complaint belong, if they belong to anyone, only to the ... General Assembly."). The Supreme Court has already held that a private citizen does not have standing to bring an Elections Clause challenge without further, more particularized harms. See Lance, 549 U.S. at 441-42, 127 S.Ct. 1194 ("The only injury [private citizen] plaintiffs allege is that ... the Elections Clause ... has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance

in the past."). Plaintiffs allege no such extra harms, and in fact, do not speak to standing in their brief at all.

### ii. **Standing in Moore**

**\*24** In *Moore*, both Plaintiff Moore and Plaintiff Berger are leaders of chambers in the General Assembly. The Plaintiffs allege harm stemming from SBE flouting the General Assembly's institutional authority. (*Wise* Pls.' Mot. (Doc. 43) at 16.) However, as Proposed Intervenors NC Alliance argue, "a subset of legislators has no standing to bring a case based on purported harm to the Legislature as a whole." (Alliance Resp. (Doc. 64) at 15.) The Supreme Court has held that legislative plaintiffs can bring Elections Clause claims on behalf of the legislature itself only if they allege some extra, particularized harm to themselves – or some direct authority from the whole legislative body to bring the legal claim. Specifically, the Supreme Court found a lack of standing where "[legislative plaintiffs] have alleged no injury to themselves as individuals"; where "the institutional injury they allege is wholly abstract and widely disperse"; and where the plaintiffs "have not been authorized to represent their respective Houses of Congress in this action." Raines v. Byrd, 521 U.S. 811, 829, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997).

An opinion in a very similar case in the Middle District of Pennsylvania is instructive:

> [T]he claims in the complaint rest solely on the purported usurpation of the Pennsylvania General Assembly's exclusive rights under the Elections Clause of the United States Constitution. We do not gainsay that these [two] Senate leaders are in some sense aggrieved by the Pennsylvania Supreme Court's actions. But that grievance alone does not carry them over the standing bar. United States Supreme Court precedent is clear — a legislator suffers no Article III injury when alleged harm is borne equally by all members of the legislature.

Corman, 287 F. Supp. 3d at 567. In the instant case, the two members of the legislature do not allege individual injury. The institutional injury they allege is dispersed across the entire General Assembly. The crucial element, then, is whether Moore and Berger are authorized by the General Assembly to represent its interests. The General Assembly has not directly authorized Plaintiffs to represent its interests in this specific case. See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, 576 U.S. 787, 802, 135 S.Ct. 2652, 192 L.Ed.2d

704 (2015) (finding plaintiff "[t]he Arizona Legislature" had standing in an Elections Clause case only because it was "an institutional plaintiff asserting an institutional injury" which "commenced this action after authorizing votes in both of its chambers"). Moore and Berger argued the general authorization in N.C. Gen. Stat. Section 120-32.6(b), which explicitly authorizes them to represent the General Assembly "[w]henever the validity or constitutionality of an act of the General Assembly or a provision of the Constitution of North Carolina is the subject of an action in any State or federal court." N.C. Gen. Stat. § 120-32.6(b). The text of § 120-32.6 references N.C. Gen. Stat. § 1-72.2, which further specifies that Plaintiffs will "jointly have standing to intervene on behalf of the General Assembly as a party in any judicial proceeding challenging a North Carolina statute or provision of the North Carolina Constitution." (emphasis added).

Neither statute, however, authorizes them to represent the General Assembly as a whole when acting as plaintiffs in a case such as this one. See N.C. State Conference of NAACP v. Berger, 970 F.3d 489, 501 (4th Cir. 2020) (granting standing to Moore and Berger in case where North Carolina law was directly challenged, distinguishing "execution of the law" from "defense of a challenged act"). The facts of this case do not match up with this court's prior application of N.C. Gen. Stat. § 1-72.2, which has been invoked when legislators defend the constitutionality of legislation passed by the legislature when the executive declines to do so. See Fisher-Borne v. Smith, 14 F. Supp. 3d 699, 703 (M.D.N.C. 2014). Furthermore, to the extent Plaintiffs Moore and Berger disagree with the challenged provisions of the Consent Judgment, they have not alleged they lack the authority to bring the legislature back into session to negate SBE's exercise of settlement authority. See N.C. Gen. Stat. § 163-22.2.

**\*25** Thus, even Plaintiff Moore and Plaintiff Berger lack standing to proceed with the Elections Clause claim. Nonetheless, this court will briefly address the merits as well.

### 2. **Merits of Elections Clause Claim**

### a. **The 'Legislature' May Delegate to SBE**

The Elections Clause of the U.S. Constitution states that the "Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. Plaintiffs

assert that the General Assembly instituted one such time/place/manner rule regarding the election by passing H.B. 1169. Therefore, Plaintiffs argue, SBE "usurped the General Assembly's authority" when it "plainly modif[ied]" what the General Assembly had implemented. (Wise Pls.' Mot. (Doc. 43) at 14.)

The Elections Clause certainly prevents entities other than the legislature from unilaterally tinkering with election logistics and procedures. However, Plaintiffs fail to establish that the Elections Clause forbids the legislature itself from voluntarily delegating this authority. The "Legislature" of a state may constitutionally delegate the power to implement election rules – even rules that may contradict previously enacted statutes.

State legislatures historically have the power and ability to delegate their legislative authority over elections and remain in compliance with the Elections Clause. Ariz. State Legislature, 576 U.S. at 816, 135 S.Ct. 2652 (noting that, despite the Elections Clause, "States retain autonomy to establish their own governmental processes"). Here, the North Carolina General Assembly has delegated some authority to SBE to contravene previously enacted statutes, particularly in the event of certain "unexpected circumstances." (SBE Resp. (Doc. 65) at 15.)

The General Assembly anticipated that SBE may need to implement rules that would contradict previously enacted statutes. See N.C. Gen. Stat. § 163-27.1(a) ("In exercising those emergency powers, the Executive Director shall avoid unnecessary conflict with the provisions of this Chapter." (emphasis added)). Plaintiffs claim that "[t]he General Assembly could not, consistent with the Constitution of the United States, delegate to the Board of Elections the power to suspend or re-write the state's election laws." (Wise Compl. (Doc. 1) ¶ 97.) This would mean that the General Assembly could not delegate any emergency powers to SBE. For example, if a hurricane wiped out all the polling places in North Carolina, Plaintiffs' reading of the Constitution would prohibit the legislature from delegating to SBE any power to contradict earlier state law regarding election procedures. (See SBE Resp. (Doc. 65) at 15.)

As courts have adopted a broad understanding of "Legislature" as written in the Elections Clause, see Corman, 287 F. Supp. 3d at 573, it follows that a valid delegation from the General Assembly allowing SBE to override the General Assembly in certain circumstances would not be

unconstitutional. See Donald J. Trump for President, ---F.Supp.3d at ——, 2020 WL 5810556, at *12 (finding that the legislature's "decision to afford" the Governor certain statutory powers to alter the time/place/manner of elections was legitimate under the Elections Clause).

### b. Whether SBE Exceeded Legitimate Delegated Powers

**\*26** The true question becomes, then, whether SBE was truly acting within the power legitimately delegated to it by the General Assembly. Even Proposed Intervenors NC Alliance note that SBE's actions "could ... constitute plausible violations of the Elections Clause if they exceeded the authority granted to [SBE] by the General Assembly." (Alliance Resp. (Doc. 64) at 19.)

SBE used two sources of authority to enter into the Consent Agreement changing the laws and rules of the election process after it had begun: N.C. Gen. Stat. § 163-22.2 and § 163-27.1.

#### i. SBE's Authority to Avoid Protracted Litigation

First, this court finds that, while N.C. Gen. Stat. § 163-22.2 authorizes agreements in lieu of protracted litigation, it does not authorize the extensive measures taken in the Consent Agreement:

> In the event any portion of Chapter 163 of the General Statutes or any State election law or form of election of any county board of commissioners, local board of education, or city officer is held unconstitutional or invalid by a State or federal court or is unenforceable because of objection interposed by the United States Justice Department under the Voting Rights Act of 1965 and such ruling adversely affects the conduct and holding of any pending primary or election, the State Board of Elections shall have authority to make reasonable interim rules and regulations with respect to the pending primary or election as it deems advisable so long as they do not conflict with any provisions of this Chapter 163 of the General Statutes and such rules and regulations shall become null and void 60 days after the convening of the next regular session of the General Assembly. The State Board of Elections shall also be authorized, upon recommendation of the Attorney General, to enter into agreement with the courts in lieu of protracted litigation until such time as the General Assembly convenes.

N.C. Gen. Stat. § 163-22.2. While the authority delegated under this statute is broad, it limits SBE's powers to implementing rules that "do not conflict with any provisions of this Chapter." Moreover, this power appears to exist only "until such time as the General Assembly convenes." Id. By eliminating the witness requirement, SBE implemented a rule that conflicted directly with the statutes enacted by the North Carolina legislature.

Moreover, SBE's power to "enter into agreement with the courts in lieu of protracted litigation" is limited by the language "until such time as the General Assembly convenes." Id. Plaintiffs appear to have a remedy to what they contend is an overreach of SBE authority by convening.

### ii. SBE's Power to Override the Legislature in an Emergency

Second, Defendants rely upon N.C. Gen. Stat. § 163-27.1. That statute provides:

(a) The Executive Director, as chief State elections official, may exercise emergency powers to conduct an election in a district where the normal schedule for the election is disrupted by any of the following:

(1) A natural disaster.

(2) Extremely inclement weather.

(3) An armed conflict involving Armed Forces of the United States, or mobilization of those forces, including North Carolina National Guard and reserve components of the Armed Forces of the United States.

N.C. Gen. Stat. § 163-27.1(a)(1-3). As neither (a)(2) or (3) apply, the parties agree that only (a)(1), a natural disaster, is at issue in this case. On March 10, 2020, the Governor of North Carolina declared a state of emergency as a result of the spread of COVID-19. N.C. Exec. Order No. 116 (March 10, 2020). Notably, the Governor did not declare a disaster pursuant to N.C. Gen. Stat. § 166A-19.21. Instead, on March 25, 2020, it was the President of the United States who declared a state of disaster existed in North Carolina:

**\*27** I have determined that the emergency conditions in the State of North Carolina resulting from the Coronavirus Disease 2019 (COVID-19) pandemic beginning on January 20, 2020, and continuing, are of sufficient severity and magnitude to warrant a major disaster declaration under

the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 et seq. (the "Stafford Act"). Therefore, I declare that such a major disaster exists in the State of North Carolina.

Notice, North Carolina; Major Disaster and Related Determinations, 85 Fed. Reg. 20701 (Mar. 25, 2020) (emphasis added). The President cited the Stafford Act as justification for declaring a major disaster. See 42 U.S.C. § 5122(2). Notably, neither the Governor's Emergency Proclamation nor the Presidential Proclamation identified COVID-19 as a natural disaster.

On March 12, 2020, the Executive Director of SBE, Karen Brinson Bell ("Bell"), crafted an amendment to SBE's Emergency Powers rule. Bell's proposed rule change provided as follows:

(a) In exercising his or her emergency powers and determining whether the "normal schedule" for the election has been disrupted in accordance with G.S. ~~163A-750~~ , 163-27.1, the Executive Director shall consider whether one or more components of <u>election</u> administration has been impaired. The Executive Director shall consult with State <u>Board</u> members when exercising his or her emergency powers if feasible given the circumstances set forth in this Rule.

(b) For the purposes of G.S. ~~163A-750~~ , 163-27.1, the following shall apply:

(1) A natural disaster or extremely inclement weather include ~~a:~~ <u>any of the following:</u>

  (A) Hurricane;

  (B) Tornado;

  (C) Storm or snowstorm;

  (D) Flood;

  (E) Tidal wave or tsunami;

  (F) Earthquake or volcanic eruption;

  (G) Landslide or mudslide; or

  (H) Catastrophe arising from natural causes ~~resulted~~ and resulting in a disaster declaration by the President of the United States or the ~~Governor.~~ <u>Governor, a national emergency declaration by the President of the United States, or a state of emergency declaration</u>

issued under G.S. 166A-19.3(19). "Catastrophe arising from natural causes" includes a disease epidemic or other public health incident. The disease epidemic or other public health incident must make [~~that makes~~] it impossible or extremely hazardous for elections officials or voters to reach or otherwise access the voting [~~place or that creates~~] place, create a significant risk of physical harm to persons in the voting place, or [~~that~~] would otherwise convince a reasonable person to avoid traveling to or being in a voting place.

https://files.nc.gov/ncoah/documents/Rules/RRC/06182020-Follow-up-Tab-B-Board-of-Elections.pdf at 5 (proposed changes in strikethroughs, or underline.) Shortly after submitting the rule change, effective March 20, 2020, SBE declared COVID-19 a natural disaster, attempting to invoke its authority under the Emergency Powers Statute, § 163-27.1. However, the Rules Review Commission subsequently unanimously rejected Bell's proposed rule change, finding in part that there was a "lack of statutory authority as set forth in G.S. 150B-21.9(a)(1)," and more specifically, that "the [SBE] does not have the authority to expand the definition of 'natural disaster' as proposed." North Carolina Office of Administrative Hearings, Rules Review Commission Meeting Minutes (May 21, 2020), at 4 https://files.nc.gov/ncoah/Minutes-May-2020.pdf.

In a June 12, 2020 letter, the Rules Review Commission Counsel indicated that Bell had responded to the committee's findings by stating "that the agency will not be submitting a new statement or additional findings," and, as a result, "the Rule [was] returned" to the agency. Letter re: Return of Rule 08 NCAC 01.0106 (June 12, 2020) at 1 https://files.nc.gov/ncoah/documents/Rules/RRC/06182020-Follow-up-Tab-B-Board-of-Elections.pdf. Despite the Rules Review Commission's rejection of Bell's proposed changes, on July 17, 2020, Bell issued an Emergency Order with the following findings:

> **\*28** 18. N.C. Gen. Stat. § 163-27.1 and 08 NCAC 01.0106 authorize me to exercise emergency powers to conduct an election where the normal schedule is disrupted by a catastrophe arising from natural causes that has resulted in a disaster declaration by the President of the United States or the Governor, while avoiding unnecessary conflict with the laws of North Carolina. The emergency remedial measures set forth here are calculated to offset the nature and scope of the disruption from the COVID-19 disaster.

> 19. Pursuant to N.C. Gen. Stat. § 163-27.1 and 08 NCAC 01.0106(a) and (b), and after consultation with the State Board, I have determined that the COVID-19 health emergency is a catastrophe arising from natural causes — i.e., a naturally occurring virus — resulting in a disaster declaration by the President of the United States and a declaration of a state of emergency by the Governor, and that the disaster has already disrupted and continues to disrupt the schedule and has already impacted and continues to impact multiple components of election administration.

(Democracy N. Carolina, No. 1:20CV457 (Doc. 101-1) ¶¶ 18-19.) This directly contradicted the Rules Commission's finding that such a change was outside SBE's authority. In keeping with Bell's actions, the State failed to note in argument before this court that Bell's proposal had been rejected explicitly because SBE lacked statutory authority to exercise its emergency powers. In fact, at the hearing before this court, the State made the following arguments:

> but the Rules Review Commission declined to let it go forward as a temporary rule, I think I'm remembering this right, without stating why. But it did not go through.

> In the meantime, the president had declared a state of national -- natural disaster declaration. The president had declared a disaster declaration, so under the existing rule, the powers kicked into place.

> ....

> And the statute that does allow her to make those emergency decisions says in it, in exercising those emergency decisions says in it, in exercising those emergency powers, the Executive Director shall avoid unnecessary conflict with the provisions of this chapter, this chapter being Chapter 163 of the election laws.

(Democracy N. Carolina, No. 1:20CV457, Evidentiary Hr'g Tr. vol. 3 (Doc. 114) at 109.) This court agrees with the Rules Review Commission: re-writing the definition of "natural disaster" is outside SBE's rulemaking authority. N.C. Gen. Stat. § 163-27.1(a)(1) limits the Executive Director's emergency powers to those circumstances where "the normal schedule for the election is disrupted by any of the following: (1) A natural disaster."[7]

Nor does the President's major disaster proclamation define COVID-19 as a "natural disaster" – at least not as

contemplated by the state legislature when § 163-27.1 (or its predecessor, § 163A-750) was passed. To the contrary, the Emergency Powers are limited to an election "in a district where the normal schedule for the election is disrupted." N.C. Gen. Stat. § 163-27.1(a). Nothing about COVID-19 disrupts the normal schedule for the election as might be associated with hurricanes, tornadoes, or other natural disasters.

**(a) Elimination of the Witness Requirement**

Finally, even if, as SBE argues, it had the authority to enter into a Consent Agreement under its emergency powers, it did not have the power to contradict statutory authority by eliminating the witness requirement. See N.C. Gen. Stat. § 163-27.1(a) ("In exercising those emergency powers, the Executive Director shall avoid unnecessary conflict with the provisions of this Chapter.") (emphasis added). The legislature implemented a witness requirement and SBE removed that requirement. This is certainly an unnecessary conflict with the legislature's choices.

**\*29** By the State's own admission, any ballots not subject to witnessing would be unverified. The State of North Carolina argued as much in urging this court to uphold the one-witness requirement:

> As Director Bell testified, it is a basic bedrock principle of elections that you have some form of verifying that the voter is who they say they are; voter verification. As she said, when a voter comes into the poll, whether that is on election day proper or whether it is by –
>
> ....
>
> Obviously, you can't do that when it is an absentee ballot. Because you don't see the voter, you can't ask the questions. So the witness requirement, the purpose of it is to have some means that the person who sent me this is the person -- the person who has sent this absentee ballot is who they say they are. That's the purpose of the witness requirement. The witness is witnessing that they saw this person, and they know who they are, that they saw this person fill out the ballot and prepare the ballot to mail in. And that is the point of it.
>
> And, as Director Bell testified, I mean, we've heard a lot from the Plaintiffs about how many states do not have witness requirements. And that is true, that the majority

of states, I think at this point, do not have a witness requirement.

> But as Director Bell testified, they're going to have one of two things. They're going to either have the witness requirement, or they're going to have a means of verifying the signature ....
>
> One thing -- and I think that is unquestionably an important State interest. Some means of knowing that this ballot that says it came from Alec Peters actually is from Alec Peters, because somebody else put their name down and said, yes, I saw Alec Peters do this. I saw him fill out this ballot.
>
> Otherwise, we have no way of knowing who the ballot -- whether the ballot really came from the person who voted. It is there to protect the integrity of the elections process, but it is also there to protect the voter, to make sure that the voter knows -- everybody knows that the voter is who they say they are, and so that somebody else is not voting in their place.
>
> Additionally, it is a tool for dealing with voter fraud.

(Democracy N. Carolina, No. 1:20CV457, Evidentiary Hr'g Tr. vol. 3 (Doc. 114) at 111-12.) In this hearing, the State continued on to note that "there needs to be some form of verification of who the voter is," which can "either be through a witness requirement or ... through signature verification," but "it needs to be one or the other." (Id. at 115-16.) Losing the witness requirement, according to the State, would mean having "no verification." (Id. at 116.) Contravening a legislatively implemented witness requirement and switching to a system of "no verification," (id.), was certainly not a necessary conflict under § 163-27.1(a).

SBE argues that this court does not have authority to address how this switch contradicted state law and went outside its validly delegated emergency powers. This is a state law issue, as the dispute is over the extent of the Executive Director's authority as granted to her by the North Carolina Legislature. The State claims that, since a North Carolina Superior Court Judge has approved this exercise of authority, this court is obligated to follow that state court judgment. (SBE Resp. (Doc. 65) at 16.)

**\*30** However, when the Supreme Court of a state has not spoken, federal courts must predict how that highest court would rule, rather than automatically following any state court that might have considered the question first. See Doe v. Marymount Univ., 297 F. Supp. 3d 573, 590 (E.D. Va. 2018)

("[F]ederal courts are not bound to follow state trial court decisions in exercising their supplemental jurisdiction."). The Fourth Circuit has addressed this issue directly in diversity jurisdiction contexts as well:

> a federal court sitting in diversity is not bound by a state trial court's decision on matters of state law. In King v. Order of United Commercial Travelers of America, 333 U.S. 153, 68 S. Ct. 488, 92 L. Ed. 608 (1948), the Supreme Court upheld the Fourth Circuit's refusal to follow an opinion issued by a state trial court in a South Carolina insurance case. The Court concluded, "a Court of Common Pleas does not appear to have such importance and competence within South Carolina's own judicial system that its decisions should be taken as authoritative expositions of that State's 'law.'" Id. at 161, 68 S. Ct. 488.

Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 370 (4th Cir. 2005). In other words, this court's job is to predict how the Supreme Court of North Carolina would rule on the disputed state law question. Id. at 369 ("If the Supreme Court of [North Carolina] has spoken neither directly nor indirectly on the particular issue before us, [this court is] called upon to predict how that court would rule if presented with the issue.")(quotation omitted); Carter v. Fid. Life Ass'n, 339 F. Supp. 3d 551, 554 (E.D.N.C.), aff'd, 740 F. App'x 41 (4th Cir. 2018) ("Accordingly, the court applies North Carolina law, and the court must determine how the Supreme Court of North Carolina would rule."). In predicting how the North Carolina Supreme Court might decide, this court "consider[s] lower court opinions in [North Carolina], the teachings of treatises, and the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369. This court "follow[s] the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 397-98 (4th Cir. 2013).

In all candor, this court cannot conceive of a more problematic conflict with the provisions of Chapter 163 of the North Carolina General Statutes than the procedures implemented by the Revised 2020-19 memo and the Consent Order. Through this abandonment of the witness requirement, some

class of voters will be permitted to submit ballots with no verification. Though SBE suggests that its "cure" is sufficient to protect against voter fraud, the cure provided has few safeguards: it asks only if the voter "voted" with no explanation of the manner in which that vote was exercised. (Moore v. Circosta, No. 1:20CV911, State Court Consent Judgment (Doc. 45-1) at 34.) This court believes this is in clear violation of SBE's powers, even its emergency powers under N.C. Gen. Stat. § 163-27.1(a). However, none of this changes the fact that Plaintiffs in both Wise and Moore lack standing to challenge the legitimacy of SBE's election rule-setting power under either the Elections Clause or the Electors Clause.

### III. CONCLUSION

This court believes the unequal treatment of voters and the resulting Equal Protection violations as found herein should be enjoined. Nevertheless, under Purcell and recent Supreme Court orders relating to Purcell, this court is of the opinion that it is required to find that injunctive relief should be denied at this late date, even in the face of what appear to be clear violations. For the foregoing reasons, this court finds that in Moore v. Circosta, No. 1:20CV911, Plaintiffs' Motion for Preliminary Injunction should be denied. This court also finds that in Wise v. N. Carolina State Bd. of Elections, No. 1:20CV912, the Plaintiffs' Motion to Convert the Temporary Restraining Order into a Preliminary Injunction should be denied.

**\*31 IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Preliminary Injunction in Moore v. Circosta, No. 1:20CV911, (Doc. 60), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Convert the Temporary Restraining Order into a Preliminary Injunction in Wise v. N. Carolina State Bd. of Elections, No. 1:20CV912, (Doc. 43), is **DENIED**.

### All Citations

--- F.Supp.3d ----, 2020 WL 6063332

---

Footnotes

1    All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

2    In Democracy N. Carolina v. N.C. State Board of Elections, No. 1:20CV457, an order is entered contemporaneously with this Memorandum Opinion and Order enjoining certain aspects of the Revised Memo 2020-19.

3    The Memoranda incorrectly cites this statute as N.C. Gen. Stat. § 163-223.6(a)(5).

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

4    An additional discussion of the facts related to SBE's use of this court's order in obtaining a Consent Judgment is set out in this court's order in [Democracy v. North Carolina State Board of Elections, No. 1:20CV457, 2020 WL 6058048 (M.D.N.C. Oct. 14, 2020)](#) (enjoining witness cure procedure).

5    Defendant SBE and Alliance Intervenors' memoranda filed in opposition to Plaintiffs' motions for a preliminary injunction in Moore are identical to those that each party filed in Wise. (Compare SBE Resp. (Doc. 65) and Alliance Resp. (Doc. 64) with Wise, No. 1:20CV912 (Doc. 45) and Wise, No. 1:20CV912 (Doc. 47).) For clarity and ease, this court will cite only to the briefs Defendant SBE and Alliance Intervenors filed in Moore in subsequent citations.

6    Plaintiffs do not challenge the use of the cure affidavit for ballot deficiencies generally, aside from arguing that the cure affidavit circumvents the statutory Witness Requirement. (See Moore Compl. (Doc. 1) ¶ 93; Wise Compl. (Doc. 1) ¶ 124.) Although not raised by Plaintiffs, this courts finds the indefiniteness of the cure affidavit language troubling as a means of correcting even curable ballot deficiencies.

   During oral arguments, Defendants did not and could not clearly define what it means to "vote," (see, e.g., Oral Argument Tr. (Doc. 70) at 130-32), which is all that the affidavit requires voters to attest that they have done. (Moore v. Circosta, No. 1:20CV911, State Court Consent Judgment (Doc. 45-1) at 34.) Under the vague "I voted" language used in the affidavit, a voter who completed their ballot with assistance from an unauthorized individual; a voter who does not qualify for voting assistance; or a voter who simply delegated the responsibility for completing their ballot to another person could truthfully sign this affidavit, although all three acts are prohibited under state law. See [N.C. Gen. Stat. § 163-226.3(a)(1)](#). Because the cure affidavit does not define what it means to vote, voters are permitted to decide what that means for themselves. This presents additional Equal Protection concerns. A state must ensure that there is "no preferred class of voters but equality among those who meet the basic qualifications." [Gray, 372 U.S. at 380, 83 S.Ct. 801](#). Because the affidavit does not serve as an adequate means to ensure that voters did not engage in unauthorized ballot casting procedures, inevitably, not all voters will be held to the same standards for casting their ballot. This is, by definition, arbitrary and disparate treatment inconsistent with existing state law.

   This court's concerns notwithstanding, however, Plaintiffs do not challenge the use of a cure affidavit in other contexts, so this court will decline to enjoin the use of a cure affidavit beyond its application as an alternative for compliance with the Witness Requirement.

7    Notably, Bell makes no finding as to whether this is a Type I, II, or III Declaration of Disaster, which would in turn limit the term of the Disaster Declaration. See, e.g., [N.C. Gen. Stat. § 166A-19.21](#).

---

**End of Document**                  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.