# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

WILLIAM FEEHAN,

      Plaintiff,

  v.

WISCONSIN ELECTIONS COMMISSION,
and its members ANN S. JACOBS, MARK
L. THOMSEN, MARGE BOSTELMANN,
JULIE M. GLANCEY, DEAN KNUDSON,
ROBERT F. SPINDELL, JR., in their official
capacities, GOVERNOR TONY EVERS,
in his official capacity,

      Defendants.

Case No.: 20CV1771

---

## DEFENDANT GOVERNOR EVERS'S BRIEF IN SUPPORT OF
## HIS PETITION FOR ATTORNEYS' FEES AND SANCTIONS

---

# INTRODUCTION

Plaintiff and his attorneys advanced a lawsuit that, from its inception, was frivolous, dilatory, and without any merit. Plaintiff's complaint did not outline coherent legal claims so much as it flitted among a variety of fringe conspiracy theories, sourced to anonymous declarations submitted by ostensible experts who were later identified and revealed to be extreme partisans with neither experience nor qualifications to provide any type of opinion on the subject matter. (At least one of the anonymous declarants was revealed not to be a declarant at all, having never agreed to the use of her words in this lawsuit.) In sum, none of the "evidence" offered by Plaintiff had any relevance to Wisconsin's 2020 presidential election, and much of it did not meet other standards for admissibility. Compounding the through-the-looking-glass experience of litigating this action, the arguments Plaintiff's attorneys made during the case's short pendency were utterly bereft of legal foundation, and in some instances foreclosed by binding precedent.

Plaintiff and his attorneys should be held jointly responsible for prosecuting this untenable lawsuit. There is no reason for Wisconsin taxpayers to bear the expense of this attempt to hijack the democratic process. Governor Tony Evers petitions for an order awarding attorney fees incurred in defending Wisconsin's November 2020 election results against this baseless, cynical assault and imposing sanctions against Plaintiff and his attorneys for mounting the assault. Working on the extremely condensed timeline demanded by Plaintiff, despite a completely baseless claim, required a team of attorneys to work nearly around the clock performing all the necessary research and drafting the necessary filings to litigate both a motion to dismiss and Plaintiff's motion for preliminary injunctive relief all in one week. Governor Evers respectfully requests that the Court order Plaintiff and his attorneys to pay the expense of defending democracy from their attacks. Governor Evers further requests that the Court exercise its inherent authority to protect the judicial process by imposing sanctions that will deter similar conduct in the future.

1

## STATEMENT OF CASE AND PROCEDURAL HISTORY

Plaintiff and his attorneys delayed filing this case until four weeks after Wisconsin's presidential election, then demanded an expedited response from both Defendants and this Court. Plaintiff and his attorneys repeatedly bungled their way through this case, thereby multiplying the steps necessary to respond to the action, significantly increasing the expenses incurred pursuant thereto, and unjustly wasting judicial resources.

On December 1, 2020, Plaintiff filed a complaint along with a purported motion for declaratory, emergency, and permanent injunctive relief. (Dkt. 1; Dkt. 2) The same day, Plaintiff filed a "corrected" motion (Dkt. 6), but, as this Court explained in an order issued on December 2, neither version was complete or correct as to form (Dkt. 7). On December 3, Plaintiff and his attorneys filed an amended complaint, removing a named co-plaintiff who reportedly had never consented to participating in this lawsuit.[1] (Dkt. 9) The same day, they filed an amended motion for a temporary restraining order ("TRO") and preliminary injunction, attached to which was not a memorandum in support but a proposed briefing schedule requiring a response from Defendants by the end of the next day (December 4) and a reply from Plaintiff two days later (December 5). (Dkt. 10) In a separate filing, Plaintiff asserted that the Court should issue a decision on the TRO by 5:00 p.m. on December 6. (Dkt. 18 at 2)

On December 4, 2020, this Court noted that again Plaintiff's motion was not in proper form, but it charitably construed Plaintiff's motion as one for injunctive relief to be heard in an expedited manner, granted the motion in part, and set a briefing schedule that required Defendants to respond by 5:00 p.m. on December 7, and Plaintiff to file his reply by 5:00 p.m. on December

---

[1] *See* Molly Beck, *GOP Candidate Says He Was Used Without Permission as a Plaintiff in Lawsuit to Overturn Wisconsin Election Results*, Milwaukee Journal Sentinel, Dec. 1, 2020, https://www.jsonline.com/story/news/politics/elections/2020/12/01/wisconsin-republican-says-he-used-without-permission-trump-suit/3786051001/.

2

8. (Dkt. 29 at 3) In the same order, this Court pointed out that the document filed as a notice of appearance for lead counsel Sidney Powell was blank so that the Court had no completed notice of appearance on file for Attorney Powell. (*Id*. at 9) Attorney Powell filed a complete notice of appearance that same day, but it inaccurately reflected that she represented both Plaintiff and the former co-plaintiff who had never consented to participate in the case. (Dkt. 35) Fortunately for Plaintiff and Attorney Powell, the Court did not strike the notice.

On December 6, in the middle of the Court's briefing schedule, Plaintiff's counsel moved for a consolidated evidentiary hearing and a trial on the merits (Dkt. 44), which Governor Evers opposed in a brief filed on December 7 (Dkt. 60) and which the Court denied during a status conference held on December 8 (Dkt. 70, 71). Over the same time period, Governor Evers's counsel also drafted and timely filed a full response to Plaintiff's amended motion for a TRO (Dkt. 55) and drafted, fully briefed, and timely filed a motion to dismiss Plaintiff's amended complaint (Dkt. 51, 59). On December 9, Governor Evers's counsel also drafted and filed a reply brief in support of the motion to dismiss. (Dkt. 73)

On the night of December 9, hours after briefing concluded, this Court issued a decision that credited most of the jurisdictional and procedural defects Governor Evers's identified, granted Defendants' motions to dismiss, denied as moot Plaintiff's amended motion for injunctive relief, and dismissed the case. (Dkt. 83) Without waiting for the Court to enter a judgment sufficient for appeal, Plaintiff's attorneys rushed a notice of appeal to the Seventh Circuit. (Dkt. 84) Then, on December 15, they filed an amended notice of appeal from the judgment (Dkt. 93), along with a motion to consolidate the two separate appeals they had filed (No. 20-3396, 7th Cir. Dkt. 17). Unwilling to await the Seventh Circuit untangling the procedural mess that they themselves had created, Plaintiff's counsel ran to the U.S. Supreme Court with an emergency petition for

mandamus under Supreme Court Rule 20 on December 11. (*Id.*, ¶13) After the Supreme Court rejected the petition, Plaintiff's counsel filed a second emergency petition on December 15, which the Supreme Court Clerk's office docketed as case no. 20-859.

On January 25, 2021, after Congress had certified the electoral votes and the presidential inauguration had occurred, Defendants jointly moved to dismiss the appeal as moot. (No. 20-3448, 7th Cir. Dkt. 14) Plaintiff joined the motion the very next day. (No. 20-3448, 7th Cir. Dkt. 15) On February 1, 2021, the Seventh Circuit issued an order to dismiss Plaintiff's appeal as moot and remand the case with instructions to vacate the prior decision and dismiss as moot. (No. 20-3448, 7th Cir. Dkt. 16) The mandate did not issue until February 23, 2021. (Dkt. 96) On February 15, 2021, more than a week before the mandate issued, this Court vacated its decision and dismissed the case as moot. (Dkt. 95) On March 1, 2021, the Supreme Court denied Plaintiff's emergency petition for mandamus. *In re Feehan*, No. 20-859, 2021 WL 769780 (U.S. Mar. 1, 2021). Only then were all of Plaintiff's pending claims finally resolved.

Even more egregious than the slapdash way Plaintiff's attorneys handled the proceedings, was their request that this Court overturn Wisconsin's certified election results, disenfranchising nearly 3.3 million voters, and counterfactually declare by fiat that Donald Trump had won the state's electoral votes. This would be completely unprecedented, but for the fact that Plaintiff's counsel had filed similar cases seeking similar relief—all ending with similar failure—in several other states before filing in Wisconsin. Instead of evidence and legal argument, Plaintiff offered a tangled web of irrelevant (and inaccurate) conspiracy theories, ultimately suggesting that Dominion voting machines had altered individual votes to favor Joseph R. Biden, Jr. Plaintiff advanced this conspiracy theory without factual support and, worse still, deliberately ignored definitive proof disproving his allegations.

4

Any one of these issues, standing alone, could warrant sanctions; taken as a whole, they demand sanctions. Plaintiff and his attorneys significantly abused the judicial process. They must be held accountable.

## LEGAL STANDARD

There are a variety of legal mechanisms available to a court to sanction attorneys, parties, and others who come before it for bad-faith conduct in the course of legal proceedings. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 46-48 (1991). Whether to impose such sanctions is left to a court's broad discretion. *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1183 (7th Cir. 1992). Governor Evers requests that this Court sanction Plaintiff and his attorneys under 28 U.S.C. § 1927 and inherent judicial authority.[2]

### A.  28 U.S.C. § 1927

Congress has expressly authorized courts to tax attorneys' fees against opposing counsel under 28 U.S.C. § 1927. That section provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

The purpose of this statutory provision is to limit abuse of judicial process, deter frivolous litigation, and "penalize attorneys who engage in dilatory conduct." *Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 226 (7th Cir. 1984); *see also, e.g.*, *Roadway Express, Inc. v. Piper*, 447 U.S.

---

[2] Had there been sufficient time, Governor Evers would likely have also pursued sanctions under Federal Rule of Civil Procedure 11. However, Rule 11's safe-harbor provision requires the party moving for sanctions to first notify the opposing party and allow 21 days for withdrawal or correction before filing a motion for sanctions. Here, Plaintiff filed his complaint on December 1 and demanded resolution by December 6. Ultimately, the Court issued an order dismissing the case on December 9. There was no time to comply with Rule 11's safe-harbor requirement. But their demand for an expeditious process cannot insulate Plaintiff and his attorneys from appropriate consequences for their egregious conduct.

752, 766-67 (1980); *Custom Shutters, LLC v. Saia Motor Freight Line, LLC*, No. 12-CV-1070-JPS, 2014 WL 2013375, at *2 (E.D. Wis. May 16, 2014) (quoting *Kapco Mfg. Co., Inc. v. C & O Enters., Inc.*, 886 F.2d 1485, 1491 (7th Cir. 1989)).

Under 28 U.S.C. § 1927, an attorney who files a baseless claim has unreasonably and vexatiously multiplied the proceedings before a court. *See Fredrick v. Clark*, 587 F.Supp. 789, 794 (W.D. Wis. 1984) (where plaintiffs must have known or should have known that their legal position was objectively frivolous, they engaged in bad faith litigation and defendants were entitled to attorney fees under § 1927); *Knorr Brake Corp.*, 738 F.2d at 227 (a court may assess fees under § 1927 against an attorney who intentionally files or prosecutes a claim that lacks a plausible legal or factual basis). "Sanctions against counsel under 28 U.S.C. § 1927 are appropriate when 'counsel acted recklessly, counsel raised baseless claims despite notice of the frivolous nature of these claims, or counsel otherwise showed indifference to statutes, rules, or court orders.'" *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 799 (7th Cir. 2013) (quoting *Kotsilieris*, 966 F.2d at 1184-85).

This Court may assess fees against attorneys whose conduct is both unreasonable and vexatious. *Kotsilieris*, 966 F.2d at 1184. "Vexatious" means exhibiting bad faith, either under a subjective or an objective evaluation. *Id.* Reckless conduct or extreme negligence constitute bad faith. *See Ordower v. Feldman*, 826 F.2d 1569, 1574 (7th Cir. 1987) (intentional ill will or reckless conduct constitutes vexatious conduct); *In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985) (subjective evidence of malice, objective evidence of reckless conduct, or indifference to the law can constitute bad faith). Multiple tactics used by attorneys have warranted section 1927 sanctions. *See, e.g.*, *Fred A. Smith Lumber Co. v. Edidin*, 845 F.2d 750, 752-54 (7th Cir. 1988) (sanctions assessed where counsel pretended potentially dispositive authority did not exist, persisted in

putting forth claims barred by statute of limitations, and acted in bad faith by filing a claim in hopes that discovery would reveal facts to support it); *Walter v. Fiorenzo*, 840 F.2d 427, 435 (7th Cir. 1988) (counsel sanctioned where it should have been obvious to counsel that claim was baseless without alleging more facts); *Ordower*, 826 F.2d at 1575-76 (counsel sanctioned for total indifference to Federal Rules of Civil Procedure); *Westinghouse Elec. Corp. v. NLRB*, 809 F.2d 419, 425 (7th Cir. 1987) (counsel sanctioned for indifference to Federal Rules of Appellate Procedure and court's order).

### B. Inherent Judicial Authority

Independent of section 1927, courts have broad authority to sanction a party or attorney who litigates in bad faith. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980). "[D]istrict courts possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. That authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Royce v. Michael R. Needle P.C.*, 950 F.3d 939, 953 (7th Cir. 2020) (internal quotation marks and citations omitted). Sanctionable abuses can include "harassment, unnecessary delay, needless increase in the cost of litigation, willful disobedience, and recklessly making a frivolous claim." *Mach v. Will Cty. Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009). Additionally, courts may consider the totality of the conduct at issue when determining if sanctions are appropriate. *Fuery v. City of Chicago*, 900 F.3d 450, 454 (7th Cir. 2018).

This inherent authority reaches bad-faith conduct "not only in the actions that led to the lawsuit, but also in the conduct of the litigation." *Hall v. Cole*, 412 U.S. 1, 15 (1973). For example, the Seventh Circuit found bad faith and imposed fees based on "(1) the obvious meritlessness of the … claim; (2) the failure to provide any factual or legal support for the sundry constitutional

claims; (3) counsel's omission of a key sentence from a quotation; and (4) the failure to respond to defendant's motion for fees and costs." *McCandless v. Great Atl. & Pac. Tea Co.*, 697 F.2d 198, 201 (7th Cir. 1983). Imposing sanctions under inherent authority has two primary purposes: to punish and deter attorneys from litigating frivolous lawsuits. *See Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1396 (7th Cir. 1983). "As with fee awards entered against a party guilty of bad faith litigation, an award against counsel serves only incidentally to compensate the prevailing party for fees that should never have been incurred." *Id.*

*Methode Elecs., Inc. v. Adam Techns., Inc.*, 371 F.3d 923, 924 (7th Cir. 2004) further illustrates the breadth of inherent judicial authority. There, the plaintiff filed suit in the Northern District of Illinois, claiming a press release established venue, even though the defendant had no apparent connection to Illinois. *Id*. at 924. When discovery confirmed the venue allegation was false, the defendant moved for sanctions. *Id.* After briefing and a hearing, the court imposed $45,000 in attorney fees and a $10,000 fine. *Id.* at 926. The Seventh Circuit upheld the attorney fee award and the fine, holding that both were within the district court's broad inherent authority. *Id.* at 928. Further demonstrating the wide discretion available to the Court is that bad-faith conduct has even warranted overturning a jury award. *Fuery*, 900 F.3d at 468.

## ARGUMENT

From this case's inception through the staggeringly expedited subsequent proceedings, there is no doubt that Plaintiff and his attorneys brought this lawsuit and litigated in bad faith. Unconscionably, they did so for the purpose of sowing doubt about the legitimacy of the 2020 presidential election, with a goal of disenfranchising nearly 3.3 million Wisconsin voters in order to secure the presidency for their preferred candidate.[3] This Court has both statutory and inherent

---

[3] Plaintiff himself was one of the ten designees who would have served as Wisconsin's presidential electors had Donald Trump won the statewide vote. *See* https://elections.wi.gov/sites/elections.wi.gov/files/2020-

authority to make the state whole for attorneys' fees necessitated by this frivolous suit and to issue sanctions, for which Plaintiff and his attorneys should be jointly and severally liable, to dissuade future partisans and attorneys from engaging in such reckless abuses of the judicial system.

## I. PLAINTIFF AND HIS ATTORNEYS ENGAGED IN VEXATIOUS AND BAD-FAITH LITIGATION.

Plaintiff and his attorneys engaged in unreasonable and vexatious conduct by bringing this meritless, dilatory lawsuit despite publicly available, highly credible evidence defenestrating their claims and then rushing adjudication in a haphazard, procedurally inept way that exacerbated the Defendants' burdens and increased the expenses imposed upon the state treasury. Accordingly, Plaintiff and his counsel should pay the attorneys' fees Governor Evers incurred in defending this suit.

### A. Plaintiff Unreasonably Delayed Filing the Claims Adjudicated Here.

Plaintiff's extreme delay in filing this lawsuit justifies imposing fees. He alleged widespread voter fraud based on purported violations of state election law and dubious claims about the use of Dominion Voting Machines. Such serious allegations warrant prompt and thorough review, if at all true, yet Plaintiff's claims regarding violations of state election law called into question guidance and practices from the Wisconsin Elections Commission ("WEC") that had been adopted and were in place well before the 2020 presidential election. WEC guidance relating to missing witness addresses was in place before the 2016 presidential election. The indefinitely confined voter guidance was issued in March of 2020, prior to Wisconsin's presidential primary.

---

10/Republican%20Elector%20Cert%20form_0.pdf (last visited Mar. 30, 2021). Undeterred by the certified election results or the judgments of this and other courts, on December 14, 2020, Plaintiff joined nine other individuals in holding an unaccredited meeting to pretend that Wisconsin's electoral votes were indeed cast for Donald Trump and to generate fraudulent documents purporting to certify as much. *See* https://static1.squarespace.com/static/5f88891b1bd57b085dc121d1/t/603c60000180d028667e6c0c/16145 69472749/Complaint+Exhibit+G.pdf at 1 (last visited Mar. 30, 2021).

Plaintiff supported his claims regarding widespread ballot fraud based on the use of Dominion Voting Machines with publicly available evidence, including witness testimony from 2018. Yet, despite the longstanding publicly available nature of the information upon which Plaintiff based his claims, he waited until after Donald Trump lost the election—and then for nearly another four weeks—to file this lawsuit. As this Court stated, Plaintiff's "delay [was] manifestly unwarranted and unreasonable." (Dkt. 59 at 18)

### B.    There was No Evidence of Systemic Fraud in Wisconsin's 2020 Election.

As required by state and federal law, Wisconsin election officials conduct an audit of voting machines after every general election. *See* Wis. Stat. § 7.08(6); 52 U.S.C. § 21081. The threshold for error is 1 in 500,000 ballots (0.0002 percent). 52 U.S.C. § 21081(a)(5); Fed. Elections Comm'n, *Voting System Standards* § 3.2.1 (Apr. 2002).[4] The WEC established selection criteria for the audit following the November 2020 election, guaranteeing that the audit included equipment from every county and multiple samples of every machine model used in the state. WEC, *2020 Post-Election Audit of Electronic Voting Equipment Report*, at 2 (Dec. 1, 2020).[5] As part of the post-election audit, the WEC examined 28 Dominion machines. *Id.* at 4-5. The audit found neither any programming errors nor any "identifiable bugs, errors, or failures of the tabulation voting equipment …." *Id.* at 8. The audit results were posted online, and accessible to the public, by at least November 30, 2020 as part of the agenda and meeting packet for the December 1, 2020 WEC public. At  that meeting, Commissioner Dean Knudson, a former Republican legislator and immediate-past chair of the WEC, explained that the audit showed "no evidence of systemic

---

[4]    Available    at    https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf (last visited Mar. 30, 2021).

[5]    Available    at    https://elections.wi.gov/sites/elections.wi.gov/files/2020-12/2020%20Audit%20Program%20Update%20for%2012_1_2020%20Meeting%20FINAL.pdf (last visited Mar. 31, 2021).

problems" or "hacking" or of "switched votes."[6] He specifically noted that the WEC had "audited 15 percent of the Dominion machines"[7] used in the state and had found "no evidence of any Dominion machines changing votes or doing any of the like."[8] Noting that Wisconsin's "election equipment operated with great accuracy," he categorically asserted that he had "yet to see a credible claim of fraudulent activity during this election."[9]

The audit results refuted all of Plaintiff's far-flung conspiracy theories. But Plaintiff made no mention of the audit in either his initial or amended complaint, even though both were filed *after* the audit results were available to the public. Ignoring the facts, he blithely alleged, without even a shred of evidence, that massive fraud tainted Wisconsin's election. (Dkt. 9 at 1). But this lawsuit was never really about Wisconsin or focused on what occurred here. It was simply part of a cookie-cutter approach that most of Plaintiff's attorneys took to achieving their political agenda. Those lawyers filed lawsuits substantially identical to this one in three other states. *See King v. Whitmer*, No. 2:20-cv-13134 (E.D. Mich., filed Nov. 25, 2020); *Pearson v. Kemp*, No. 1:20-cv-04809-TCB (N.D. Ga., filed Nov. 25, 2020); *Bowyer v. Ducey*, No. 20-cv-02321 (D. Ariz., filed Dec. 2, 2020).[10] Each suit alleged widespread fraud as part of a grand multi-national conspiracy to "steal" the November 2020 election. None provided specific, or even remotely reliable, evidence

---

[6] Video available at https://wiseye.org/2020/12/01/wisconsin-elections-commission-december-2020-meeting/ at 2:05:18.

[7] *Id.* at 2:05:34.

[8] *Id.* at 2:08:44.

[9] *Id.* at 2:06:00, 2:06:52.

[10] While it was Plaintiff's out-of-state attorneys who orchestrated these serial filings around the country, Plaintiff's local counsel also filed additional meritless lawsuits. Before this one, working with other national counsel, he had already filed a separate frivolous suit attacking Wisconsin's election results on the basis of nonsensical and baseless claims. *See Langenhorst v. Pecore*, No. 1:20-cv-1701 (E.D. Wis. filed Nov. 12, 2020). That case was voluntarily dismissed within days of initiating litigation, before Judge Griesbach could convene a scheduled initial status conference.

11

to support those extravagant claims. Each suit was a last-ditch attempt to overturn election results and disenfranchise millions of voters. Ultimately, all of the lawsuits, including this one, were dismissed, underscoring the fact that the claims were without basis to begin with and should never have been filed.[11]

## C. Plaintiff's Filings and Legal Conduct Were Riddled with Procedural Errors.

Plaintiff's attorneys made several egregious procedural errors that inflated the time and expense necessary to defend this suit. They originally included a co-plaintiff who never consented to participating in the lawsuit. (Dkt. 83 at 8) It was also apparent that the complaint was a recycled version of a different lawsuit. For instance, the requested relief asked for "production of 48 hours of security camera recordings of all rooms used in the voting process at the TCF Center …." (Dkt. 1 at 50) The TCF center is located in Detroit, Michigan and has no relevance to Wisconsin's 2020 election. These fundamental errors required the filing of an amended complaint, which in turn required review and analysis by defense counsel. But even the amended complaint contained errors, including that it failed to allege that Plaintiff voted in the presidential election, which is an essential detail to establish standing. (Dkt. 83 at 18) These shortcomings were not limited to Plaintiff's initial pleading. Plaintiff's attorneys filed a motion for injunctive relief, but failed to include an order it referenced. (Dkt. 2 at 1; Dkt. 7 at 1) The certificate of service accompanying the motion failed to list addresses for service (at that time, no Defendant had yet filed an appearance so CM-ECF was not sufficient). (Dkt. 2 at 2; Dkt. 7 at 1) And, though Plaintiff's attorneys claimed to file documents under seal, they failed to do so and never requested *in camera* review with that motion. (Dkt. 2 at 2; Dkt. 7 at 1-2) The mistakes made in the first motion for

---

[11] The decisions in *King v. Whitmer* and *Bowyer v. Ducey* are already part of this Court's docket. (*See* Dkt. 55-5; Dkt. 81)

injunctive relief necessitated the filing of a corrected motion, which the Court explained was also not complete or correct as to form. (Dkt. 6; Dkt. 7 at 2-4) Plaintiff's attorneys then filed an amended motion for injunctive relief, which for the third time was not in the proper form, but was construed by this Court in Plaintiff's favor. (Dkt. 10; Dkt. 29 at 5) Attorney Powell, specifically, filed motions without first filing an appearance and, upon notice from this Court, filed an inaccurate appearance that claimed she still represented the removed co-plaintiff. (Dkt. 29 at 9; Dkt. 35).

Then, following briefing and this Court's decision on the matter, Plaintiff's attorneys mishandled the appeal to the Seventh Circuit. They rushed to file before a judgment sufficient for appeal was entered, necessitating the subsequent filing of an amended notice of appeal and a motion to consolidate the two separate appeals. Without doubt Plaintiff's attorneys unreasonable taxed the resources of the judicial system with their significant procedural errors.

### D. Plaintiff's Briefs Misrepresented the Law.

Briefs submitted by Plaintiff's attorneys were riddled with egregious errors. They fabricated a quote and attributed it to an opinion by Judge Stadtmueller. (*See* Dkt. 83 at 32 (noting inaccuracy of Dkt. 72 at 24-25 ostensibly quoting *Swaffer v. Deininger*, No. 08-CV-208 2008 WL 5246167 (E.D. Wis. Dec. 17, 2008)) They argued *Whitford v. Nichol*, 151 F. Supp. 3d 918 (W.D. Wis. 2015), established standing "to challenge state laws that collectively reduce the value of one party[]" (Dkt. 72 at 20), without noting that the Supreme Court expressly overruled that exact rationale in that exact case, *see Gill v. Whitford*, 138 S. Ct. 1916, 1921 (2018). And they recklessly distorted governing law by relying on outdated precedent to argue notice-pleading standards (Dkt. 72 at 15-17 (citing *Kasper v. Bd. of Election Comm'rs of the City of Chicago*, 814 F.2d 332 (7th Cir. 1987)), without acknowledging "the factual heft required to survive a motion to dismiss after *Twombly* and *Iqbal*," *McCauley v. City of Chicago*, 671 F.3d 611, 617 (7th Cir. 2011)) This is not

13

a minor or uncommon point. *See also, e.g.*, *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 589 (7th Cir. 2016) (recognizing that *Twombly* and *Iqbal* established "heightened pleading requirements."); *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) ("After *Twombly* and *Iqbal* a plaintiff to survive dismissal must plead some facts that suggest a right to relief that is beyond the speculative level." (internal quotation marks omitted)); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (after *Twombly* and *Iqbal*, the plaintiff must "present a story that holds together"). This gross misstatement of law, along with the fake quote and the misleading citation to *Whitford*, evidence objective bad faith and exemplify the total hash Plaintiff's attorneys made of this litigation.

### E. Plaintiff's Claims Were Built upon Unreliable and Inadmissible Evidence.

Plaintiff's attorneys filed this lawsuit without the support of credible, relevant, or remotely admissible evidence. Rather, the claims were supported by unreliable fact witnesses, hearsay, and extreme partisans misrepresented as experts. Plaintiff's amended complaint relied heavily upon the testimony of 13 purported experts and fact witnesses. Of those, five were anonymous (Dkt. 9, Exhs. 1, 4, 12, 13 & 19), making verifying their credentials and assessing their qualifications impossible. Indeed, it was impossible to know whether the affidavits were even verified by the affiants, as required by 28 U.S.C. § 1746. Consequently, these affidavits were inadmissible, as Plaintiff's attorneys knew or should have known.

Two of these anonymous "experts" were later revealed to lack all credibility. Exhibit 12 is a declaration written by "Spyder," a pseudonymous individual who Plaintiff's attorneys proffered as a witness (albeit in disguise), asserting that he worked in military intelligence. It turns out that he never passed the entry-level training course in his battalion.[12] Spyder later admitted that he

---

[12] *See* Emma Brown, Aaron C. Davis & Alice Crites, *Sidney Powell's Secret "Military Intelligence Expert," Key to Fraud Claims in Election Lawsuits, Never Worked in Military Intelligence*, The Washington Post,

never worked in military intelligence and that his declaration was false. He explained that the "original paperwork that [he] sent in [to Plaintiff's counsel] didn't say" he was an electronic intelligence analyst under 305th Military Intelligence.[13] He blames Plaintiff's lawyers for making that inaccurate assertion.[14] Exhibit 13 is from an anonymous declarant who claimed China was somehow involved with Dominion Voting Systems and affected Wisconsin's presidential election results. That individual was later revealed to be a pro-Trump podcaster who had previously lied about being a medical doctor and having both a Ph.D. and MBA.[15] Indeed, she was found to have unlawfully misspent raised funds and solicited donations; the judge in that case ordered her to pay more than $25,000.[16] The podcaster had never spoken to any of Plaintiff's attorneys or agreed to the use of her declaration in this suit or others brought by Plaintiff's legal team.[17]

There was no greater credibility in the eight declarations and purported expert reports for whom witness identities were given. Whether a witness qualifies as an expert "can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Moreover, expert testimony requires a reliable methodology. *Hartman v. EBSCO Indus. Inc.*, 758 F.3d 810, 817 (7th Cir. 2014). Plaintiff's "experts" lacked qualifications and failed to provide methodological information to show their opinions were reliable. Plaintiff's

---

Dec. 11, 2020, https://www.washingtonpost.com/investigations/sidney-powell-spider-spyder-witness/2020/12/11/0cd567e6-3b2a-11eb-98c4-25dc9f4987e8_story.html (last visited Mar. 30, 2021).

[13] *Id.*

[14] *Id.*

[15] *See* Jon Swaine, *Sidney Powell's Secret Intelligence Contractor Witness is a Pro-Trump Podcaster,* The Washington Post, Dec. 24, 2020, https://www.washingtonpost.com/investigations/sidney-powells-secret-intelligence-contractor-witness-is-a-pro-trump-podcaster/2020/12/24/d5a1ab9e-4403-11eb-a277-49a6d1f9dff1_story.html (last visited Mar. 30, 2021).

[16] *Id.*

[17] *Id.*

15

named fact witnesses presented only unsupported, speculative assertions, which are inadmissible. *See Zilisch v. R.J. Reynolds Tobacco Co.*, No. 10-cv-474-bbc, 2011 WL 7630628, at \*1 (W.D. Wis. June 21, 2011) (statements in affidavit were "inadmissible because they are conclusory and not made on the basis of [affiant's] personal knowledge"); *Ross v. Bd. of Regents of Univ. of Wis. Sys.*, 655 F. Supp. 2d 895, 923 (E.D. Wis. 2009) (declining to consider portions of affidavit "not based upon the affiant's personal knowledge"). For example:

- Exhibit 3 is report from Matthew Braynard, who discussed a survey that he maintained uncovered assorted irregularities in Wisconsin's election results. But his only identified education was a "degree in business administration," and he identified no other qualifications, experience, or publications in survey design, statistical methods in the social sciences or political science. Braynard also failed to provide any sampling method, telephone protocols, scripts used by interviewers, quality-control steps, information about who conducted the phone calls, or information about how voter telephone numbers were located and verified. In short, Braynard's survey had none of the indicia of reliability necessary to admit survey evidence.

- Exhibit 2, a declaration from William Briggs, is based entirely on Braynard's survey results. Briggs also fails to identify any relevant experience or qualifications in survey design. Because Briggs relies upon Braynard's survey results, which were not presented with any methodological information, Briggs's analysis also lacks the methodological information necessary for admissibility.

- Exhibit 6, an affidavit from Joseph Oltmann, purports to recreate a conversation he purportedly overheard, in which someone he speculates was a Dominion employee made representations about the 2020 election. Oltmann layers speculation on top of hearsay to propagate a conspiracy theory about election manipulation.

- Exhibit 7, a declaration from Harri Hursti, contains a lengthy discussion about issues arising out of the primary election in Georgia, but provides no first-hand information about and made no connection to any Wisconsin election.

- Exhibit 8, a declaration by Ana Mercedes Díaz Cardozo, expresses opinions about the security of electronic voting systems, but she is not a computer scientist or information security expert, nor does she claim to possess any other relevant qualifications. She also offers numerous observations about years-old elections in Venezuela, but makes no coherent connection between activity in Venezuela and the 2020 election in Wisconsin.

- Exhibit 9, a declaration from Seth Keshel, is a statistical analysis conducted by a "trained data analyst." But Keshel gives no details about his education, experience, or other qualifications, aside from "political involvement requiring a knowledge

16

of election trends and voting behavior." This affidavit contains no methodology whatsoever.

- Exhibit 14, the declaration of Ronald Watkins, analyzes the security of electronic of electronic voting systems, but identifies only "experience as a network and information defense analyst and a network security engineer." Watkins does not describe what that experience is with any degree of detail, nor does he explain how that experience qualifies him to testify about the security of electronic voting systems. In reality, Watkins operates the online message board 8kun and is a key propagator of the QAnon conspiracy theory.[18]

- Exhibit 17, the declaration of Russell James Ramsland, Jr., contains both statistical "analysis" and a technical assessment of electronic voting systems, but Ramsland identifies no education, experience, publications or other qualifications in any relevant field. The analysis also does not contain any controls; it ignores obvious explanations for the phenomena discussed; it uses a "random population of Wisconsin votes" as its comparison group, notwithstanding significant and meaningful differences between different areas of the state; and it fails to identify the sources of any of its data or assumptions about voter turnout.

## F. Most of Plaintiff's Requests for Relief Were Unprecedented and Impossible to Grant.

The relief Plaintiff's attorneys requested also evidences bad faith, as it was unprecedented and without legal basis. Wisconsin's Supreme Court denied a similar request to invalidate Wisconsin's presidential election results, with a majority explaining that "[t]he relief being sought by the petitioners is the most dramatic invocation of judicial power I have ever seen. Judicial acquiescence to such entreaties built on so flimsy a foundation would do indelible damage to every future election." *Wis. Voters All. v. Wis. Elections Comm'n*, 2020AP1930-OA at *3 (Wis. Dec. 4, 2020) (Hagedorn, J., concurring, joined by a majority) (filed in this case at Dkt. 55-1). Without any legal support, Plaintiff asked this Court to unilaterally (and counterfactually) declare that Donald Trump had won Wisconsin's presidential election. Plaintiff and his attorneys did not ask for a new election, or to have the Legislature select electors, like other lawsuits requested. Instead,

---

[18] *See* Drew Harwell, *To Boost Voter-Fraud Claims, Trump Advocate Sidney Powell Turns to Unusual Source: The Longtime Operator of QAnon's Internet Home,* The Washington Post, Dec. 1, 2020, https://www.washingtonpost.com/technology/2020/12/01/powell-cites-qanon-watkins/ (last visited Mar. 30, 2021).

they went further still and asked this Court to act by fiat, overriding the will of nearly 3.3 million voters and declaring that the losing candidate had in fact won—an act for which they offered no legal justification. Moreover, as this Court noted, Plaintiff and his attorneys requested the Court to enjoin actions that had already occurred and that were "beyond [the Court's] ability to redress absent the mythical time machine." (Dkt. 83 at 33) For example, they requested an order enjoining Governor Evers from transmitting the certified election results to the Electoral College, which had already occurred by the time the lawsuit was filed. Likewise, they requested that certain ballots not be counted, even though the counting of ballots and certification of the statewide results were both completed before the lawsuit was even filed. Furthermore, this Court concluded that the relief requested was far outside the constitutional limitations imposed upon it and "outside the limits of its oath to uphold and [defend] the Constitution." (*Id.* at 44)

## II. THE COURT SHOULD SANCTION PLAINTIFF AND HIS ATTORNEYS.

Any one of these issues, standing alone, could warrant sanctions. Taken as a whole, they show that Plaintiff and his attorneys significantly abused the judicial process. Governor Evers had no choice but to respond to their baseless arguments and assault on the democratic process. The conduct of this litigation was unreasonably vexatious by several measures. It follows that Plaintiff and his attorneys should face sanctions pursuant to 28 U.S.C. § 1927 and this Court's inherent authority.

### A. The Court Should Sanction Plaintiff's Attorneys under 28 U.S.C. § 1927.

The totality of the actions taken by Plaintiff's attorneys, as discussed above, demonstrate that they vexatiously and unreasonably multiplied the proceedings before the Court. They were dilatory in filing this action, waiting until almost four weeks after the election to challenge its validity, and they created needless delay by making procedural errors that necessitated additional filings. *Knorr Brake Corp.*, 738 F.2d at 226 ("The purpose of section 1927 is to penalize attorneys

who engage in dilatory conduct"). The gravamen of the complaint Plaintiff's attorneys filed was that widespread voter fraud, stemming from alleged violations of state election law and the use of certain voting machines, so tainted the presidential election that the results were suspect and should be overturned. But by the time they filed the complaint, the purported evidence they relied upon regarding Dominion Voting Machines dated back to 2018 and the publicly available results of the WEC audit clearly demonstrated the lack of systemic voter fraud in the Wisconsin election. Plaintiff's attorneys neither acknowledged this nor presented any credible evidence to the contrary. Rather, they filed a case based entirely upon inadmissible, outlandish, and speculative testimony that obviously lacked any plausible or factual basis, which they knew or should have known. Plaintiff's attorneys should be held accountable under section 1927 for filing and pursuing a baseless claim. *See Fredrick*, 587 F. Supp. at 794 (where plaintiffs must have known or should have known that their legal position was objectively frivolous, they engaged in bad faith litigation and defendants were entitled to attorney fees under § 1927); *Knorr Brake Corp.*, 738 F.2d at 227 (a court may assess fees against an attorney under § 1927 who intentionally files or prosecutes a claim that lacks a plausible legal or factual basis).

By relying upon generally unreliable and inadmissible evidence, Plaintiff's attorneys behaved recklessly and showed indifference to the Federal Rules of Evidence. *Grochocinski*, 719 F.3d at 799 ("Sanctions against counsel under 28 U.S.C. § 1927 are appropriate when counsel acted recklessly, counsel raised baseless claims despite notice of the frivolous nature of these claims, or counsel otherwise showed indifference to statutes, rules, or court orders" (internal quotation marks omitted)). Even more egregiously, they (1) fabricated a quote to make a point, which they attributed to a judge of this district; (2) cited a case to establish standing, but failed to note the subsequent procedural history in which the Supreme Court expressly overruled the

rationale of the case; and (3) recklessly distorted governing law regarding pleadings by relying upon cases that preceded the sea change augured by *Twombly* and *Iqbal*. Without doubt, these actions constitute unreasonable and vexatious conduct that justify the imposition of sanctions. *See Fred A. Smith Lumber Co.,* 845 F.2d at 752-54 (sanction assessed where counsel pretended potentially dispositive authority did not exist, persisted in putting forth claims despite fact that statute of limitations clearly barred claims, and acted in bad faith in filing a fraud claim in hopes that future discovery would lead to sufficient facts to support such a claim); *Ordower,* 826 F.2d at 1575 (counsel sanctioned for total indifference to Federal Rules of Civil Procedure).

**B.    The Court Should Exercise its Inherent Authority to Sanction Plaintiff and His Attorneys.**

This is an alternate way to assess the attorneys' fees and costs Governor Evers incurred in defending this lawsuit. It also authorizes the Court to levy a fine against Plaintiff and his attorneys for deterrent purposes. Any sanction issued under the Court's inherent authority should be levied jointly and severally against Plaintiff and his attorneys. Where bad-faith litigation conduct cannot be adequately sanctioned otherwise, "the court may safely rely on its inherent power." *Chambers*, 501 U.S. at 50.

As explained above, Plaintiff and his attorneys brought their claims in bad faith. They filed a meritless claim without factual support and fabricated a quote to support their position. *Compare McCandless*, 697 F.2d at 201 (advancing a meritless claim and omitting a key sentence from a quotation warrants sanctions); *Secrease v. W. & S. Life Ins. Co*., 800 F.3d 397, 401 (7th Cir. 2015) (sanction is appropriate for seeking relief based on information known to be false); *Vollmer v. Selden*, 350 F.3d 656, 659 (7th Cir. 2003) ("a judge can sanction a litigant for filing a frivolous suit or claim regardless of the motives for such filing"). They also delayed the proceedings with a series of procedural errors and misrepresented the law on threshold issues of standing and pleading

requirements. *Compare Teamsters Local No. 579 v. B & M Transit, Inc.*, 882 F.2d 274, 280 (7th Cir. 1989) (deliberately ignoring or misstating case law unfavorable to a party's position warrants sanctions); *Precision Specialty Metals, Inc. v. U.S.*, 315 F.3d 1346, 1355 (Fed. Cir. 2003) (selectively quoting precedent, thus distorting meaning, was sanctionable violation). Such conduct merits exercise of the Court's inherent authority to impose sanctions.

It is especially appropriate that the Court exercise its inherent authority to impose sanctions in this case where, by acting in haste, Plaintiff and his attorneys precluded Defendants' opportunity to move for sanctions under Rule 11. The safe-harbor provision in Rule 11 requires a party to give its opponent 21 days' advance notice before filing a motion for sanctions. Here, Plaintiff filed his claim on December 1, demanded an extremely expedited process, and received a final decision from this Court on December 9. Defendants could not satisfy Rule 11 within that time frame. In *Methode*, because the case was filed and voluntarily dismissed too quickly for the defendant to comply with Rule 11's safe-harbor requirement, the Seventh Circuit held it was appropriate for the district court to exercise its "inherent power to control the proceedings before it" by imposing sanctions. 371 F.3d at 927-28. Likewise, here, where the conduct of Plaintiff and his attorneys was egregious, vexatious, and unreasonable, this Court should exercise its inherent authority to impose sanctions.

### C. Imposing Fees Would Discourage Similar Abuse in the Future of the Judicial Process as a Way to Attack Unfavorable Election Results.

The audacity of this lawsuit—an attack on the bedrock principle that ballots decide elections, brought without any legal or factual basis almost four weeks after the election—merits sanctions. This is true not only because Wisconsin taxpayers deserve to be made whole, but also because deterrence demands making an example of Plaintiff and his attorneys to discourage future frivolous litigation. Absent a clear deterrent message here, Wisconsin, which perennially has razor-

thin election results, will likely see similar cases following future elections. Losing candidates, their allies, and associated attorneys will have nothing to lose by challenging results following elections, and could even perceive that they have incentives to do so, if there is not a penalty for bringing litigation like this. Simply put, a message must be sent that this type of behavior cannot be tolerated in the judicial system, and that attorneys should avoid these types of frivolous attempts to disenfranchise voters in the future.

Other courts have reached this conclusion and have imposed sanctions for baseless post-election litigation. An Arizona state court awarded attorneys' fees to the Secretary of State because the Republic Party had filed a groundless lawsuit challenging the outcome of that state's 2020 presidential election.[19] And Judge James Boasberg, on the federal court for the District of D.C., referred a lawyer to a disciplinary panel for bringing a meritless suit as a forum for political grandstanding.[20] That suit, like this one, challenged the results of Wisconsin's 2020 presidential election. Fee petitions in other post-election challenges are pending in Michigan and Georgia.[21] Awarding fees here would not make this Court an outlier. To the contrary, doing so would put this Court on record advancing the deterrent function that the Seventh Circuit has recognized as the purpose of sanctions awarded against counsel. *See Textor*, 711 F.2d at 1396.

---

[19] A copy of the order is available here https://www.democracydocket.com/wp-content/uploads/sites/45/2020/11/m9485207.pdf.

[20] Josh Gerstein, *Lawyer Who Brought Election Suit Referred for Possible Discipline*, Politico, Feb. 19, 2021, https://www.politico.com/news/2021/02/19/lawyer-election-suit-discipline-470369 (last visited Mar. 30, 2021).

[21] Alison Durkee, *Georgia Counties Ask Trump for Nearly $17,000 in Legal Fees as GOP Election Lawyers Face Consequences*, Forbes, Feb. 24, 2021, https://www.forbes.com/sites/alisondurkee/2021/02/24/geor%20gia-counties-ask-trump-for-nearly-17000-in-legal-fees-as-gop-election-lawyers-face-consequences/?sh=22cf93003b0c (last visited Mar. 30, 2021)

## III. GOVERNOR EVERS'S FEE REQUEST IS TIMELY.

In *Overnite Transportation Co. v. Chicago Industrial Tire Co.*, 697 F.2d 789 (7th Cir. 1983), the Seventh Circuit held that "a party must bring a motion for fees and costs either before an appeal is perfected or during the pendency of the appeal on the merits." *Id.* at 793. But both the extraordinary circumstances surrounding this case and *Overnite*'s outlier status—it is in tension (at minimum) with Supreme Court precedent and no other Circuit has adopted the Seventh Circuit's reasoning—militate against its application here.

*First*, if ever there were a case to distinguish on its facts, it is this one. The extremely expedited nature of this case and the fact that it was part of a national, multi-pronged attempt to overturn the 2020 presidential election made it extremely difficult for Governor Evers or any other defendants to file a motion for fees prior to the conclusion of the appeal. Plaintiff filed the complaint on December 1, and by December 9 this Court had granted Defendants' motion to dismiss. Plaintiff appealed to both the Seventh Circuit and to the Supreme Court, twice each. Simultaneously, Governor Evers and the WEC Defendants were defending against an incredibly similar suit brought by then-President Trump himself. Only after the Seventh Circuit dismissed Plaintiff's appeal as moot and the Supreme Court earlier this month denied Plaintiff's petition for mandamus was it clear that this case was resolved and Governor Evers's attorneys had completed their work. Moreover, from start to finish, Plaintiff's case was pending for only three months. By comparison, in *Overnite*, over eight months elapsed between the filing of the notice of appeal and the Seventh Circuit's docketing of its mandate affirming the district court's dismissal, and the defendant filed its motion for attorneys' fees and costs another two months after that. *Overnite*, 697 F.2d at 792-93. *Overnite* is inapposite to a situation like this one, where the Plaintiff's own actions and demands led to such an expedited schedule. Applying *Overnite* here would allow attorneys to engage in unreasonably vexatious conduct, but escape culpability by losing quickly.

23

*Second*, subsequent case law reveals *Overnite* as an outlier decision abrogated by subsequent Supreme Court case law. The Supreme Court rejected *Overnite*'s logic, holding that fee motions under 42 U.S.C. § 1988 need not comply with time limits established by Rule 59(e) because doing so was not "necessary or desirable to promote finality, judicial economy, or fairness." *White v. New Hamp. Dep't of Emp. Sec.*, 455 U.S. 445, 452 (1982). Rather, the *White* Court explained, attorney fees are "uniquely separable from the cause of action to be proved at trial." *Id.*

Other Circuits have recognized the same, refusing to adopt *Overnite*'s approach to section 1927 motions. The Fourth Circuit opined that "[e]ven where, as here, the defendants characterize the plaintiffs' claims as entirely baseless, the appropriateness of the characterization is unsettled as long as there is a pending appeal…. There is some reason to think that such uncertainty should be clarified before counsel and the district judge should be called upon to consider the appropriateness of a fee award and assess the amount." *Hicks v. S. Md. Health Sys. Agency*, 805 F.2d 1165, 1167 (4th Cir. 1986). The *Hicks* Court went on: "The Supreme Court seems to have held in *White* that the district court has jurisdiction to consider and grant a motion for the allowance of fees, though made several months after the conclusion of all appellate proceedings." *Id.* The Third Circuit compared the Seventh Circuit's rationale in *Overnite* with the Fourth Circuit's in *Hicks*, ultimately "agree[ing] with the Court of Appeals for the Fourth Circuit that a Rule 11 motion is 'uniquely separable' and collateral from the decision on the merits" and could be filed even after an appeal was completed. *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 98 (3d Cir. 1988); *accord In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 101-03 (3rd Cir. 2008). The Second, Sixth, and Tenth Circuits have similarly rejected *Overnite*'s reasoning. *See Steinert v. Winn Group, Inc.* 440 F.3d 1214, 1223 (10th Cir. 2006); *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 333 (2d

Cir. 1999); *In re Ruben,* 825 F.2d 977, 982 (6th Cir. 1987). By contrast, no Circuit appears to have adopted *Overnite*'s approach.[22]

Given that the *Overnite* decision is out of step with Supreme Court precedent and that, even on its own terms, it should not apply in the circumstances of this case, there is no doubt that Governor Evers's fee request should be considered timely and granted on its own merits. The request was filed within 30 days of the Supreme Court denying Plaintiff's appeal, and is still within four months of this Court issuing a final order. To consider it otherwise would be to overlook an egregious abuse of the judicial process.

## IV.  GOVERNOR EVERS'S FEE REQUEST IS REASONABLE.

It is appropriate for a Court to award all expenses incurred to defend this suit because it was filed in bad faith and lacked a plausible factual or legal basis from the start. *Goodyear Tire & Rubber Co. v. Haeger*, 137 S.Ct. 1178, 1188 (2017) ("If a plaintiff initiates a case in complete bad faith, so that every cost of defense is attributable only to sanctioned behavior, the court may" award the entire amount of legal expenses incurred). In *Chambers v. NASCO, Inc.*, the Supreme Court affirmed an award of full attorneys' fees against the defendant "due to the frequency and severity of [his] abuses of the judicial system and the resulting need to ensure that such abuses were not repeated." 501 U.S. at 56. The Supreme Court agreed that the defendant's actions were "part of [a] sordid scheme of deliberate misuse of the judicial process." *Id.* at 57 (internal quotation marks and citations omitted). In this case, Plaintiff's abuses of the judicial system began with the dilatory filing of this suit and continued through its conclusion, all for the sordid and undemocratic purpose

---

[22] The *Overnite* rationale has also been rejected by numerous other courts. *See, e.g. In re Veg Liquidation, Inc.*, No. 5:13-BK-73597, 2015 WL 13776226, at *4 (Bankr. W.D. Ark. Sept. 15, 2015); *Kellar v. Van Holtum*, 605 N.W.2d 696, 700 (Minn. 2000), *as amended on denial of reh'g* (Feb. 29, 2000), *superseded in part by rule on other grounds, as stated in In re Com'r of Public Safety*, 735 N.W.2d 706, 710 (Minn. 2007).

of asking this Court to unconstitutionally overturn the certified results of a valid election. But for Plaintiff's abuse of the judicial process, Defendants would have incurred no legal expenses. It follows that this Court should assess, at minimum, all attorneys' fees and costs Governor Evers, and the taxpayers of Wisconsin, incurred defending against Plaintiff's meritless suit.

Governor Evers's request for $106,780 in attorneys' fees is reasonable. (*See* Declaration of Jeffrey A. Mandell ("Mandell Decl."), ¶30) It reflects the time expended by his lead counsel team, necessitated by the filing of Plaintiff's baseless claim and the extraordinarily expedited timeline Plaintiff demanded, the complexity of the issues involved, and the high stakes of the litigation. The hours expended and the hourly rates ascribed are reasonable for this type of case. Calculation of fees begins with the lodestar calculation, which is "the product of the hours reasonably expended on the case multiplied by a reasonable hourly rate." *Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014). Governor Evers's legal team on this case was led by a team of three lawyers at Stafford Rosenbaum LLP. While a number of other lawyers provided pro bono counsel to Governor Evers before this Court—including several partners at Susman Godfrey LLP and Paul Smith at the Campaign Legal Center—the Stafford team led the Governor's representation in all post-election litigation. Fees for that team should be taxed against Plaintiff and his lawyers.

The number of hours the Stafford team devoted to litigating this matter was reasonable. Plaintiff waited until nearly four full weeks after the election to file his lawsuit, and then he demanded an expedited schedule to resolve the case in the minimal time available between his belated filing and the meeting of the Electoral College. The Court accommodated Plaintiff, allowing three calendar days (including a Saturday and Sunday) for Defendants to file briefs opposing Plaintiff's motion for injunctive relief. (Dkt. 29) Within that same tight briefing schedule, Governor Evers drafted and briefed a successful motion to dismiss on several jurisdictional,

prudential, and merits grounds. (Dkt. 51, 59) After Plaintiff submitted his opposition to that motion, Governor Evers submitted a reply brief within less than 24 hours. (Dkt. 73)

The hours worked in researching and drafting briefs, as well as preparing for and participating in a conference with the Court, and the merits hearing were all reasonable under the circumstances. (*See* Mandell Decl., ¶27; Declaration of Jeff Scott Olson ("Olson Decl."), ¶¶25-29; Declaration of Matthew O'Neill ("O'Neill Decl."), ¶13; Declaration of Tamara Packard ("Packard Decl."), ¶¶17-18; Declaration of Stacie Rosenzweig ("Rosenzweig Decl."), ¶13; Declaration of Mark Leitner ( "Leitner Decl."), ¶16) A team of attorneys had to work together to respond to Plaintiff's claims and also raise a panoply of arguments for dismissal. (*Id*. ¶¶6-7, 10) Governor Evers's legal team worked in concert, at times in shifts around the clock, to research, draft, and refine multiple briefs simultaneously. (*Id*.) That work was necessary to dispatch of this frivolous lawsuit and protect Wisconsin's election results. (*Id*. ¶¶3, 10)

The variety and complexity of issues addressed by Governor Evers's briefs also contributed to the hours consumed. (*Id*. ¶¶9-10) Plaintiff's untimely request for unprecedented injunctive relief required delving into a panoply of constitutional bars to Plaintiff's suit, such as standing for claims under the Constitution's distinct Election Clause and Electors Clause, as well as the Eleventh Amendment's preclusive effect. (Dkt. 55 at 22-31; Dkt. 59 at 7-10, 15-17) Governor Evers also presented arguments asserting laches, mootness, exclusive state remedies, abstention, and failure to state a claim. (Dkt. 59 at 11-15, 17-29) Each of these arguments required research, analysis, and development into a clear, cogent, concise brief. (Mandell Decl., ¶7) The complexity of these issues required a significant time investment from Governor Evers's attorneys. (*Id*. ¶¶7, 9) Thus, the total hours number of hours worked was reasonable. (*Id*. ¶27)

The rates requested by Governor Evers are also reasonable. "A reasonable hourly rate is based on the local market rate for the attorney's services." *Montanez*, 755 F.3d at 553. That market rate can be determined by reference to "rates charged by similarly experienced attorneys in the community." *Id*. Submitted with this motion is a declaration by Jeffrey A. Mandell, lead special counsel for Governor Evers in post-election matters, outlining his qualifications and those of others who represented Governor Evers in this matter. (Mandell Decl., ¶¶13-23) Mandell routinely handles complex and constitutional litigation matters. The rates he and other members of the Stafford team assert here are consistent with the local market for rates in these kinds of cases, as evidenced by the declarations provided with this brief from several other Wisconsin attorneys who handle matters of this complexity and importance. (Olson Decl., ¶¶21-24; O'Neill Decl., ¶14; Packard Decl., ¶16; Rosenzweig Decl., ¶15; Leitner Decl., ¶17) , submitted simultaneously with this brief) They are also consistent with rates paid over the past several years by the Wisconsin Legislature to private outside counsel in litigation matters involving governance issues. (Mandell Decl., ¶29, Ex. B)

Bearing in mind that one purpose of sanctions is deterrence, *Riddle & Assocs., P.C. v. Kelly*, 414 F.3d 832, 835 (7th Cir. 2005), Governor Evers suggests that the fees sought here should be supplemented with a monetary sanction against Plaintiff and his attorneys. In the *Methode Electronics, Inc.*, case, the court imposed a fine payable to the court. 371 F.3d at 926. Governor Evers believes a fine payable to the Court, or alternatively to one or more nonprofit, nonpartisan organizations focused on protecting voting rights in Wisconsin, would also be appropriate.

## V. PLAINTIFF AND HIS ATTORNEYS SHOULD BE HELD JOINTLY AND SEVERALLY LIABLE FOR SANCTIONS.

If the Court imposes fees against Plaintiff and his attorneys, it should make all of those against whom they are assessed jointly and severally liable. All fees awarded under 28 U.S.C.

§ 1927 should be joint and several against all counsel who entered appearances on behalf of Plaintiff in this case. All fees and any sanctions levied under the Court's inherent authority should be joint and several against Plaintiff and his attorneys. The Seventh Circuit held that parties and multiple counsel can be made jointly and severally liable for attorney fees. *See Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 710 (7th Cir. 2014). Because Plaintiff and his attorneys all played a role in bringing, prosecuting, and perpetrating this bad faith litigation, the Court should find them all jointly and severally liable for any resulting fees and sanctions.

## CONCLUSION

For the forgoing reasons, this Court should find that Plaintiff and his attorneys filed this claim in bad faith, thereby abusing the judicial system. The Court should accordingly sanction Plaintiff and his counsel, on a joint and several basis.

Respectfully submitted this 31st day of March, 2021.

/s/ Jeffrey A. Mandell
Jeffrey A. Mandell
Rachel E. Snyder
Richard A. Manthe
STAFFORD ROSENBAUM LLP
222 W. Washington Ave., Suite 900
Madison, WI 53701-1784
Telephone: 608-256-0226
Email: jmandell@staffordlaw.com
Email: rsnyder@staffordlaw.com
Email: rmanthe@staffordlaw.com

*Attorneys for Defendant, Governor Tony Evers*