# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

WILLIAM FEEHAN,

              **Plaintiff,**

              **v.**

**WISCONSIN ELECTIONS COMMISSION,**
**and its members ANN S. JACOBS, MARK**
**L. THOMSEN, MARGE BOSTELMAN,**
**JULIE M. GLANCEY, DEAN KNUDSON,**
**ROBERT F. SPINDELL, JR., in their official**
**capacities, GOVERNOR TONY EVERS, in**
**his official capacity,**

              **Defendants.**

**CASE NO.  2:20-cv-1771-PP**

---

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION FOR SANCTIONS (ECF 97)
## EVIDENTIARY HEARING REQUESTED

# Table of Contents

Statement of Facts ........................................................................................................... 2

Legal Argument ............................................................................................................... 3

    II.      The Legal Standard for Sanctions under §1927 ............................................... 3

    III.    The Plaintiff's Claims Had A Plausible Legal or Factual Basis. .................................. 6

        a.    Plaintiff's Filing was Legally Supported. ....................................... 6

        b.    Standing ............................................................................................. 11

        c.    Eleventh Amendment ........................................................................ 14

        d.    Laches and Mootness ........................................................................ 15

        e.    Evidence included in the Amended Complaint. ........................... 16

        f.    Dismissal on Equitable Grounds Should Not Be Basis for Sanctions. ........................ 21

Conclusion ..................................................................................................................... 22

Case 2:20-cv-01771-PP   Filed 04/21/21   Page 2 of 25   Document 109

Plaintiff William Feehan, by and through undersigned counsel, respectfully requests that this Honorable Court deny Defendant Evers' Motion for Sanctions because a request for sanctions based upon a well-plead, factually supported civil lawsuit is patently without merit. The Defendant's untimely request for sanctions under 28 U.S.C. § 1927 is barred as a matter of law and should be struck for being untimely and without jurisdiction. Plaintiff hereby incorporates its Motion to Strike (ECF 105), Memorandum in support of, and Reply Memorandum in further Support of this motion.

The judicial system provides an avenue for attorneys to represent clients to bring forth and attempt to resolve legal disputes. In this case particularly, Defendant Evers, who admits that he reviewed the complaint and opposed it with research and diligence, found, by his own arguments, that the legal claims were pled with particularity. As Defendant Evers makes clear, Defendant and counsel had to review dozens of documents of supporting evidence that were provided in the original complaint and the amended complaint to support each legal claim.

While the court dismissed the case based on standing and laches and later vacated that decision as moot at the direction of the Seventh Circuit Court of Appeals, a determination on standing and laches or mootness bears no impact on the validity of the lawsuit, particularly when the case is dismissed without discovery or any evidentiary hearing addressing questions of fact. As a fundamental matter, Plaintiff's case was dismissed on procedural grounds at the motion to dismiss stage – not based on summary judgment, not after discovery, not after witnesses were examined, and certainly not after any evaluation of the evidence presented before the court.

Plaintiff disagreed with the court's determination on both standing and laches, so it was in Plaintiff's purview and right to seek immediate appeal of the case. Cases are routinely dismissed on procedural grounds and further considered on appeal. Setting a precedent to sanction an

attorney whose case is dismissed at the district court level for procedural grounds is a grave abuse of the disciplinary process.

In the event the court does not strike Defendant's motion, Plaintiff requests a plenary adversarial process and scheduling order, including an <u>Evidentiary Hearing on the Sanctions Motion by Defendant, requiring Defendant Evers to present actual evidence supporting his motion and permitting Plaintiff to examine and rebut any evidence he may be able to marshal</u>.

### Statement of Facts

Defendant begins his argument with a statement that "Plaintiff and his counsel delayed in filing this case for a period of four weeks after Wisconsin's Presidential Election…" (ECF 98, p. 3). This statement appears in support of Defendant's motion for sanctions filed on March 31, 2021, where Plaintiff filed its initial complaint on December 1, 2020, amended once by right, on December 3, 2020, and which this Court dismissed only nine days later, on December 9, 2020 (*See* ECF 83).

As Defendant did not bring any motion or argument for any sanctions during the time this case was before this Court, he has delayed far past any opportunity for relief in this case. It has been 112 days between the Order of Dismissal in this case on Defendant's motion and the filing of Defendant's motion for Sanctions on March 31, 2021.

Moreover, on February 1, 2021, the Seventh Circuit in dismissing the appeal on Defendant's motion with Plaintiff's consent found the case moot and ordered it remanded with an order to vacate the court's prior decision and to dismiss the case as moot. (*See* CTA7 No. 20-3448, Dkt. 16; ECF 95). Two weeks later, this Court complied and vacated its decision and dismissed this case as moot on February 15, 2021. (ECF 95). The Supreme Court denied Plaintiff's appeal on March 1, 2021 without opinion. SCOTUS Case No. 20-859.

2

## **Legal Argument**

### I.      **Plaintiff's Motion is Without Jurisdiction and is Untimely**

It has been two months since the Seventh Circuit ordered this case dismissed as moot and remanded it with instructions to vacate the court's prior decision. Nonetheless, during those two months, the Defendant made no complaint or request for sanctions, not a peep, not a single application implicating further relief sought since the February 1, 2020 order to vacate the case, although the Seventh Circuit's dismissal was made pursuant to the Defendant's motion, with Plaintiff's immediate consent.  Under controlling Seventh Circuit precedent, Defendant's motion is out of time.  *Overnite Transp. Co. v. Chi. Indus. Tire Co.*, 697 F.2d 789, 793-794 (7th Cir. 1983).

Moreover, Defendant cites to, but fails to explain, that an earlier Supreme Court case, *White v. N.H. Dep't of Emp. Sec.*, preceded the Seventh Circuit's *Overnite* decision, and that it specifically addressed an attorneys' fees application proceedings in vindication of civil rights, 42 USCS § 1988.   *White v. N.H. Dep't of Emp. Sec.*, 455 U.S. 445, 454 (1982).  It therefore is irrelevant to the issues presented here.

### II.     **The Legal Standard for Sanctions under §1927**

Defendant opens the argument for §1927 sanctions against Plaintiff with a cite to *Knorr Brake Corp. v. Harbil* 738 F.2d 223 (7th Cir. 1984), but, in that case, the Seventh Circuit held, in citing to its earlier precedent, *Overnite Transportation Co.*:

> **Where, as here, counsel's alleged misconduct was the filing and arguing of a claim, *it is not sufficient that the claim be found meritless*; the claim must be without a plausible legal or factual basis and lacking in justification.**

(*Id*. at 226-227 (emphasis added) (*citing Overnite Transportation Co.*, 697 F.2d at 794-95; *see Tuf-Flex Glass v. NLRB*, 715 F.2d 291, 298 (7th Cir. 1983))).

The Circuit Court of Appeals therein held that **"[t]hus, before a court may assess fees**

under section 1927, the attorney must intentionally file or prosecute a claim that lacks a plausible legal or factual basis." *Id*. at 227 (emphasis added).

Also, Defendant Evers cites a more recent Seventh Circuit decision that *affirmed a denial of sanctions* while affirming the granting of summary judgment, and in doing so found that "…**the [] claims in the complaint were not unfounded and Joyce did not unreasonably prolong the proceedings in contesting the "unclean hands" defense.**" *Grochocinski v. Mayer Brown Rowe & Maw*, LLP, 719 F.3d 785, 800 (7th Cir. 2013) (emphasis added).

The Court of Appeals reiterated the standard for the court's inherent power to impose sanctions but warned against its abuse: "The federal courts have the inherent power to impose a wide range of sanctions upon parties for abusive litigation. **This inherent power, however, is limited to "cases in which a litigant has engaged in bad-faith conduct or willful disobedience of a court's orders.**" *Id*. at 799 (*citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991); *see also Mach v. Will County Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009)) (emphasis added).

It appears that Defendant's entire argument seeking sanctions under § 1927 relies on the erroneous idea that the Plaintiff moved too quickly – rather than applying the standard of seeking to delay the case and multiply the proceedings. Defendant further cites a 1987 case from the Sixth Circuit, *In re Ruben* 825 F.2d 1225 (6th Cir. 1987), to argue the legal standard on § 1927 motions and to support Defendant Evers' allegation that the Circuit Court of Appeals decision in *Overnite* "is out of step[1]." However, Defendant fails to explain what that case actually held.

In *In re Ruben,* 825 F.2d 977 (6th Cir. 1987), the Sixth Circuit reversed an award of sanctions due to the failure of the District Court to adequately correlate discrete acts by plaintiff's counsel to corresponding increases in defendants' costs, expenses, and fees. 825 F.2d at 990-91.

---

[1] (*See* ECF 98, Defendant Evers' Mot. at p. 26).

4

The Court reached this conclusion even though the complaint stated on its face that it was filed one day after the statute of limitations ran, and even though substantive litigation in the case **spanned nearly four years**. *Id.* at 980-81, 987-88.  By contrast, here, Plaintiff's case lasted only nine days.  Evers' reliance on *In re Ruben* is obviously misplaced.

Further, the United States Court of Appeals for the Sixth Circuit recently reiterated that legal standard for imposing sanctions under 28 U.S.C. § 1927 when it held:

> Yet absent bad faith, we decline to impose sanctions against this trial attorney whose legal argument on appellate procedure—though flawed—might conceivably be characterized as that of a reasonably zealous advocate. Cf. *Mys*, 736 F. App'x at 117-18 ("Section 1927's purpose is to 'deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy.'") (quoting *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006)). In our view, sanctions should generally be reserved only for "truly egregious cases of misconduct." (*Williams v. Shelby Cnty. Sch. Sys.*, 815 F. App'x 842, 846 (6th Cir. 2020) (quoting *Ridder*, 109 F.3d 288, 299 (6th Cir. 1997)).

*Saenz v. Kohl's Dep't Stores, Inc.*, 2020 FED App. 0618N (6th Cir. 2020), 2020 U.S. App. LEXIS 34753, *11, 15, 2020 WL 6393335.

Moreover, the Supreme Court observed in considering a similar statute providing for recovery of attorney's fees for frivolous claims:

> [I]t is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success.

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978).

There, the Supreme Court affirmed the denial of attorney's fees where, as here, the defendant prevailed on "an issue of first impression requiring judicial resolution."  *Id*. at 424. (internal quotations omitted).

Defendant Evers admits that the basis for his demand for sanctions was the filing of

motions as the initial responses to Plaintiff's Amended Complaint. Specifically, he noted "the complexity of the issues" – which necessitated[2] his attorneys' fees claim of $106,780 for a team of lawyers.[3] His complaint then about the length and complexity of the initial pleading belies the assertion that it was baseless or dilatory. Plaintiff's initial pleading was not dilatory because it was filed within two days of the certification of Biden's victory by the Governor, when Wisconsin became the last of six states to officially declare victory for Joe Biden late that day.[4]

Defendant's motion can easily be disposed of because he admits that Plaintiff's counsel have not multiplied these proceedings. The Defendant has not been required to file numerous pleadings in this case. The case was filed December 1, 2020 and dismissed by this court only nine days later on December 9, 2020. Further, if as suggested, Plaintiff's claims were so "frivolous" as a matter of law, then the Defendant would not have required to undertake "significant time" for a "team of attorneys" to address the "complexity of the issues," in mounting their opposition.

III. **The Plaintiff's Claims Had A Plausible Legal or Factual Basis.**

   a. **Plaintiff's Filing was Legally Supported.**

As a fundamental matter, the case that Plaintiff's counsel filed was dismissed on procedural grounds at the motion to dismiss stage– not based on summary judgment, not after discovery, not after witnesses were examined, and certainly not after any evaluation of the evidence presented before the court. Indeed, a Plaintiff need only allege "enough facts to state a claim to relief that is

---

[2] § 165.25 (1m) Wis. Stats. undermines Evers' entire argument. Defendant Evers had no need whatsoever to employ outside counsel. The Wisconsin Attorney General's office is well-qualified and has sufficient resources to defend the Governor in civil cases.

[3] (*See* ECF 98, Def. Mot. at p. 26)

[4] Mark Niquette and Amanda Albright, *Wisconsin Becomes Last Contested State to Confirm Biden Won*, BLOOMBERG (Nov. 30, 2020), https://www.bloomberg.com/news/articles/2020-11-30/wisconsin-becomes-last-contested-state-to-confirm-biden-won.

6

plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

On December 9, 2020, the court entered an order dismissing the case. (ECF 83) The court determined:

- The plaintiff brought the case in federal court, though state law governed the election process.
- The court had no authority to grant plaintiff the relief he requested.
- Plaintiff did not have standing to sue.
- Most of the relief the plaintiff requested was moot.
- Plaintiff sued defendants who were either "not suable under section 1983 or [were] protected by Eleventh Amendment immunity."

(Order, ECF 83, p. 32-33).

While the Defendant describes Plaintiff's suit as "patently false" and "frivolous," attorney argument is not evidence. Defendant has offered no admissible evidence to refute any of Plaintiff's witnesses or exhibits. Further, the right to file grievances against the government is enshrined in the First Amendment. In fact, the entire Bill of Rights exists to ensure individual protections from the government. A court's decision to dismiss a case on issues of equitable relief should not be a basis for sanctions. The right to petition for redress of grievances is crucial—and it does not give rise to sanctions. Moreover, Justice Thomas' most recent dissent in a case about election fraud during the 2020 election negates any question regarding the legitimacy of the election integrity cases filed by Plaintiff. Determining that there was a compelling interest in addressing such cases, he writes:

> In short, the postelection system of judicial review is at most suitable for garden-variety disputes. It generally cannot restore the state of affairs before an election. And it is often incapable of testing allegations of systemic maladministration, voter suppression, or fraud that go to the heart of public confidence in election results. That is obviously problematic for allegations backed by substantial evidence. But the same is true where allegations are incorrect. After all, "[c]onfidence in the integrity of our electoral process is essential to the functioning of our participatory democracy." *Purcell, supra*, at 4, 127 S. Ct. 5, 166 L. Ed. 2d 1; *cf. McCutcheon v.*

*Federal Election Comm'n*, 572 U. S. 185, 191, 206-207, 134 S. Ct. 1434, 188 L. Ed. 2d 468 (2014) (plurality opinion) (identifying a compelling interest in rooting out the mere "appearance of corruption" in the political process). An incorrect allegation, left to fester without a robust mechanism to test and disprove it, "drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell, supra*, at 4, 127 S. Ct. 5, 166 L. Ed. 2d 1.

*Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732, 737 (2021) (Thomas, J., dissenting).

Further, to prove election fraud, one has to show the election results would have been altered but for the fraud. *Griffin v. Burns*, 570 F.2d 1065, 1075 (1st Cir. 1978). The First Circuit proposed the following guide for determining whether a particular challenge to a state election practice constitutes one of the extraordinary cases in which federal intervention is appropriate:

> If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots ……. (Federal courts have properly intervened when) the attack was, broadly, upon the fairness of the official terms and procedures under which the election was conducted.

*Griffin*, 570 F.2d at 1077-78. The First Circuit had no difficulty in finding that disqualification of absentee ballots previously offered by election officials represents "broad-gauged unfairness" that called for a new election. 570 F.2d at 1078. (*See also, Duncan v. Poythress*, 657 F.2d 691, 708 (5th Cir. 1981)).

Moreover, the Court of Appeals for the Seventh Circuit in *Kasper* held that "casting (or approval) of fictitious votes can violate the Constitution and other federal laws," and that for the purposes of Section 1983, it is sufficient to allege that this conduct was permitted pursuant to a state "'policy" of diluting votes that "may be established by a demonstration" state officials who "despite knowing of the practice, [have] done nothing to make it difficult." *Kasper v. Bd. of Election Com'rs of the City of Chicago*, 814 F.2d 332, 344 (7th Cir. 1987). This "policy" may

8

also lie in the "design and administration" of the voting system that is "incapable of producing an honest vote," in which case "[t]he resulting fraud may be attributable" to state officials "because the whole system is in [their] care and therefore is state action." *Id.* The state action requirement is thus clearly met for the Respondents' conduct described above.

And further, as a practical matter, the Help America Vote Act ("HAVA") has since followed, which governs federal elections and federal courts have jurisdiction over injunctive and declaratory relief. Plaintiff brought Fourteenth Amendment and Equal Protection Claims, Amend. XIV and a 42 U.S.C. § 1983 claim and Plaintiff asserted that: "[t]he disparate treatment of Wisconsin voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *Rice v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.*, 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

Plaintiff also cited *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966) that when a franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment. Indeed, the Supreme Court has held:

> "A State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231, 109 S. Ct. 1013, 103 L. Ed. 2d 271 (1989). Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964).

9

> Countering the State's compelling interest in preventing voter fraud is the plaintiffs' strong interest in exercising the "fundamental political right" to vote. *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S. Ct. 995, 31 L. Ed. 2d 274 (1972) (internal quotation marks omitted).

*Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).  *Id.*

In this case, Plaintiff cited the standard for federal abstention in the voting rights and state election law context, and cited *Harman v. Forssenius*, 380 U.S. 528, 534 (1965) to make the point that where the state law in question is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction. *Id.* (citation omitted).  (ECF 72 at p. 29).

Plaintiff also argued to the Court, in good faith and reflecting research, that:

> The evidence shows not only that Defendants failed to administer the November 3, 2020 election in compliance with the manner prescribed by the Wisconsin Legislature, but they administered the voter registration, absentee ballot rules, and subsequent ballot processing and counting in a manner that facilitated fraudulent and illegal voter registration and ballot tabulation by election workers, Dominion, Democratic Party officials and activists and other third parties making certain the election of Joe Biden as President of the United States. This conduct violated Equal Protection and Due Process rights of Plaintiff and other similarly situated voters, as well rights under the Wisconsin election laws. *See Kasper v. Bd. Of Election Com'rs of the City of Chicago*, 814 F.2d 332, 343 (7th Cir. 1987) (state officials casting (or approving) of fictitious votes can violate the Constitution and other federal laws.).

(ECF 72 at p. 11).

While the Court ruled against Plaintiff, it should also be recognized that in a recent 2020 pre-election case where discovery in fact took place, the U.S. District Court for the Northern District Court of Georgia found facts supporting significant vulnerability with the Dominion voting machines, involving state elections and the laws therein, after discovery occurred in that case:

> Plaintiffs' challenge to the State of Georgia's new ballot marking device QR barcode-based computer voting system and its scanner and associated software

presents serious system security vulnerability and operational issues that may place Plaintiffs and other voters at risk of deprivation of their fundamental right to cast an effective vote that is accurately counted. While these risks might appear theoretical to some, Plaintiffs have shown how voting equipment and voter registration database problems during the 2019 pilot elections and again in the June and August 2020 primary elections caused severe breakdowns at the polls, severely burdening voters' exercise of the franchise.

*Curling v. Raffensperger*, Civil Action No. 1:17-cv-2989-AT, 2020 U.S. Dist. LEXIS 188508, *173-174, 2020 WL 5994029 (N. Dist. GA. 2020).

**b.     Standing**

Under Wisconsin law, "[a] vote for the president and vice-president nominations of any party is a vote for the electors of the nominees." Wis. Stat. § 8.25.  Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflect[s] the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of Secretary of State in implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

The existence of a circuit split on standing shows that Plaintiff and counsel had a reasonable basis for their claims and that their position was not frivolous. In fact, the existence of a circuit split can defeat a motion for sanctions even if the position taken runs counter to current controlling authority.  *See Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 154-56 (4th Cir. 2002) (vacating district court order imposing Rule 11 sanctions where other circuits had taken legal position contrary to controlling Fourth Circuit precedent). Here, by contrast, there was no controlling Seventh Circuit or Supreme Court authority on elector standing.  Plaintiff relied on a recent case where the Eighth Circuit interpreted the presidential elector provisions of Minnesota law that were

nearly identical to Wisconsin's electoral law as giving electors standing under the Electors Clause to challenge state law violations. *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of Secretary of State in implementing or modifying State election laws). The Third Circuit, dealing with claims from private citizens and a congressional candidate who lost, not elected Electors, which is what Defendants and the court relied on, reached a different conclusion in *Bognet v. Secy Commonwealth of Pa.*, 980 F.3d 336 (3d Cir. 2020).

In the history of the *Curling* case, the Eleventh Circuit found standing for the plaintiff organization. *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1289 (11th Cir. 2018) (citing *Arcia v. Fl. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014)). This case further reflects that in an election case, a voting rights organization had standing derived from its individual members' standing because they had an interest in electoral reform and the preservation of the rights of all citizens to vote in national, state, and local elections. *See Id*. This is analogous to the standing each individual Presidential Elector would have in having an interest in ensuring the Constitutional duty of the Presidential Electors' votes are preserved in accordance with legality and the process of the Constitution. The Electors had the right to press their claims that their votes should be counted by Congress on January 6, as set forth by the Twelfth Amendment.[5]

"A plaintiff seeking to vindicate a public right embodied in a federal statute, however, must

---

[5] Congress, under Gore as President of the Senate, sought to count the votes under the Twelfth Amendment. Chris Land & David Schultz, *On the Unenforceability of The Electoral Count Act*, 13 Rutgers J.L. & Pub. Pol'y 340, 362.

> Beyond the political fervor in the air of the Hall of the House of Representatives on this day, and Democratic expressions of "solidarity" with Vice President Gore, these overruled objections give rise today to the fundamental *question of whether the ECA is constitutionally enforceable in light of the Rules Clause, entrenchment, and the doctrine of non-delegation."*

*Id.* (Emphasis added).

12

demonstrate that the violation of that public right has caused him a concrete, individual harm distinct from the general population." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1553 (2016) (Thomas J., Concurring) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)).

Here Plaintiff argued, again in good faith, that he had an individual harm distinct from the general population: In Wisconsin as in Minnesota, the President and Vice-President are not directly elected by voters. (ECF 72 at p. 18-19 Plaintiff cited Wis. Stat. § 8.18, Wis. Stat. §8.25.) Instead, voters elect the Presidential Electors, who in turn elect the President and Vice-President. A vote for President Trump and Vice-President Pence in Wisconsin was a vote for Plaintiff and his fellow Republican Presidential Electors. *Id.* It goes without saying that Presidential Electors play a unique and central role in Presidential elections, a role expressly spelled out in the Electors Clause of the U.S. Constitution. *Id.* As such, election fraud or other violations of state election law impacting federal Presidential elections, have a unique and distinct impact on Presidential Electors, and illegal conduct aimed at harming candidates for President similarly injures Presidential Electors. *Id.* In American history, there have been dual slates of electors in prior elections recognized.[6] Further, the Constitution speaks to this process. (*See* Amendment XII).

Plaintiff submits that even if this Court is correct on standing, Plaintiff had a good faith belief that he suffered a concrete and particularized harm, an individual harm distinct from the general population as Elected Presidential Electors for the State of Wisconsin, with a right to file a grievance.

---

[6] *See* Stephen A Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 FLA. L. REV. 541(2004): *see also*, Vasan Kesavan, *Is the Electoral Count Act Unconstitutional?* 80 N.C. L. Rev. 1653 (2002); *see also*, Nathan L. Colvin & Edward B. Foley, *The Twelfth Amendment: A Constitutional Ticking Time Bomb*, 65 U. MIAMI L. REV. 475 (2010).

13

### c. Eleventh Amendment

Plaintiff respectfully submits that Plaintiff argued in good faith that claims in the Amended Complaint are not barred by the Eleventh Amendment because the requested relief falls under the *Ex Parte Young*, 209 U.S. 123, 159-160 (1908), exemption for a suit against state officials seeking only prospective equitable relief.

A pre-election case very much on point in the Eleventh Circuit found that the Eleventh Amendment did not bar the plaintiffs' injunctive and declaratory relief sought therein explaining that:

> Substantively, the Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. As applied, the Eleventh Amendment generally bars actions for monetary relief "when 'the state is the real, substantial party in interest.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984) (*quoting Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464, 65 S. Ct. 347, 89 L. Ed. 389 (1945)). But under *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908), plaintiffs may sue state officials in their official capacities when they seek "prospective equitable relief to end continuing violations of federal law." *Summit*, 180 F.3d at 1336 (emphasis in original). The Supreme Court has explained that *Ex parte Young* "gives life to the Supremacy Clause," *Green v. Mansour*, 474 U.S. 64, 68, 106 S. Ct. 423, 88 L. Ed. 2d 371 (1985), and has armed plaintiffs with the "sword" of the "Civil War Amendments" to contest ongoing violations by the states, *see Edelman v. Jordan*, 415 U.S. 651, 664, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974).
>
> The test for determining whether a suit fits within *Ex parte Young*'s exception is typically "straightforward," asking only whether the "'complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645, 122 S. Ct. 1753, 152 L. Ed. 2d 871 (2002) (*quoting Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997) (O'Connor, J., concurring in part and concurring in judgment)). As long as the plaintiff alleges ongoing violations of federal law and seeks injunctive or declaratory relief, or both, against state officials in their official capacity, plaintiffs usually face no hurdles in clearing *Ex parte Young*.

*Curling v. Sec'y of Georgia*, 761 Fed. Appx. 927, 931 (11th Cir. 2019).

14

This Court disagreed, but Plaintiff's claim seeking a temporary restraining order, injunctive relief and declaratory relief against state officials in their official capacity included relief properly characterized as prospective, and when the relief requested became moot, Plaintiff immediately consented to Defendants' Motion to dismiss the appeal in the Seventh Circuit. (ECF 95).

   **d.   Laches and Mootness**

Laches is an equitable doctrine that is necessarily fact dependent. Plaintiff argued that "[to] establish laches a defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself." *See, e.g., Lingenfelter v. Keystone Consolidated Indus.*, Inc., 691 F.2d 339, 340 (7th Cir.1982) ("If the delay is inexcusable, then the defendant must show prejudice.") The Court found Plaintiff therein delayed filing suit for at least six years and offered no excuses for his delay.

Ordinarily a motion to dismiss is not the appropriate vehicle to address the defense of laches, *Am. Com. Barge Lines, LLC v. Reserve FTL, Inc.*, 2002 WL 31749171 (N.D. Ill. Dec. 3, 2002) (*citing Farries v. Stanadyne/Chicago Div.*, 832 F.2d 374, 376 (7th Cir. 1987)), because it depends largely on questions of fact. *Id*. (*quoting* 5 Wright & Miller, Federal Practice and Procedure § 1277 (2d ed. 1987)). Accordingly, most courts have found the defense unsuitable for resolution at the pleading stage. *Id*. (citation omitted).

Defendant Evers relied on *Soules v. Kauians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988), ECF 59 at p. 17, but that case had entirely different facts. There, the Ninth Circuit held that plaintiff's Equal Protection claim was barred by laches because they knew the basis of their claim well in advance of the election, months in advance in fact, *Soules*, 849 F.2d at 1181, and failed to provide any explanation for their failure to press their claim before the election.

15

*Id.* at 1182.[7] This Court, however, failed to take an in depth look at *Soules* where the court on summary judgment and after a consideration of the claim on the merits, recognized an equal protection claim, but found that it predated the special election *by years*, and therefore barred under laches. *(See Id.)* These facts have no relation to the instant case.

Moreover, in *Porter v. Jones*, the Ninth Circuit in a case very much on point explained that, "[e]lection cases like the present one come within the type of controversy that is "capable of repetition, yet evading review." . . . Appellate courts are frequently too slow to process appeals before an election determines the fate of a candidate. If such cases were rendered moot by the occurrence of an election, many constitutionally suspect election laws -- including the one under consideration here -- could never reach appellate review." *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003) (*citing Joyner v. Mofford*, 706 F.2d 1523, 1527 (9th Cir. 1983)). In that case, the court found justiciability – despite the fact that the claims therein arose out of the 2000 election and the plaintiff was before the Ninth Circuit on the case in 2003. (*See Id.*).

As for Plaintiff's mistaken citation for *Swaffer v. Deininger*, when Plaintiff's counsel finalized the complaint and the filings, he had mistakenly added quotation marks to a statement that was meant to paraphrase the holding; a regrettable and inadvertent error.

### e. Evidence included in the Amended Complaint.

The Amended complaint was carefully written and supported with evidence that also included public documents, such as Congressional Member Maloney's letter regarding Smartmatic and Dominion Voting Systems. On October 6, 2006 Congresswoman Carolyn Maloney called on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela. (*See* ECF 9 Am. Compl., Exh. 15). It also cited the State

---

[7] (ECF 72 at p. 22)

of Texas's Secretary of State's Report on Dominion Voting Systems Democracy Suite 5.5-A which found significant vulnerabilities to fraud and declined approval (*see* ECF 9, Am. Compl. ¶ 10, n. 1, ¶ 12. (Exhs. 17, 9, 11)).

Plaintiff cited to an FBI CISA Joint Advisory dated October 30, 2020 that also corroborated Plaintiff's claims, where state voter registration data and state registration websites were breached by foreign cyber-attacks pre-election:

> CISA and the FBI can confirm that the actor successfully obtained voter registration data in at least one state. The access of voter registration data appeared to involve the abuse of website misconfigurations and a scripted process using the cURL tool to iterate through voter records. A review of the records that were copied and obtained reveals the information was used in the propaganda video. CISA and FBI analysis of identified activity against state websites, including state election websites, referenced in this product cannot all be fully attributed to this Iranian APT actor. FBI analysis of the Iranian APT actor activity has identified Compromise Infrastructure [T1584]) within a similar timeframe, use of IP addresses and IP ranges including numerous virtual private network (VPN) service exit nodes which correlate to this Iran APT actor (Gather Victim Host Information [T1592]), and other investigative information.

(*See* ECF 9, Am. Compl. ¶ 69) (emphasis added).

Plaintiff cited several expert and fact witness opinions, including, but not limited to an expert analysis by Russ Ramsland reporting the use of an algorithm that causes a spike in the data feed, which is shown to be an illegal injection of votes to change the outcome, because natural reporting does not appear in such a way. (*See* ECF 9, Am. Compl. ¶77). Mr. Ramsland supported his opinion by showing that the data feed from real-time voting to Scytl, a vote reporting company used by media that live stream vote counts, was reported with decimal points, which is contrary to one vote as one ballot. Otherwise, votes would be solely represented as whole numbers (votes cannot possibly be added up and have decimal places reported). (*See* ECF 9, Am. Compl. ¶78). Mr. Ramsland concludes that:

> Based on the foregoing, I believe these statistical anomalies and impossibilities

compels the conclusion to a reasonable degree of professional certainty that the vote count in Wisconsin, in particular for candidates for President contain at least 119,430 . . . and up to 384,085 . . . illegal votes that must be disregarded. In my opinion, it is not possible at this time to determine the true results of the Wisconsin vote for President of the United States.

(ECF 9, Am. Compl. Ex 17, at par 14).

Plaintiffs also cited other experts. Dr. Briggs holds a Ph.D. from Cornell University in Statistics, and an M.S., from Cornell University in Atmospheric Science., as well as a B.S., Summa Cum Laude, from Central Michigan University in Meteorology and Mathematics. He has published over 100 peer reviewed publications. (*See* ECF 9, Am. Compl., Exhibit 2-F, copy of Dr. Briggs' CV). Dr. Briggs concluded that errors affected almost 97,000 ballots in the state of Wisconsin, with tens of thousands of unrequested ballots being wrongfully counted, returned ballots not being counted, and others lost or destroyed; and thus concluding that many voters were disenfranchised. (ECF 9, Am. Compl. ¶ ¶ 46 51).

Another witness Plaintiff cited demonstrated evidence of foreign interference in the election through hardware components from companies based in foreign countries with adverse interests. (Am. Compl. ¶ ¶ 73-75). The witness explains the foreign relationships in the hardware used by Dominion Voting Systems and its subsidiary Sequoia and explains specifically the port that Wisconsin uses, which is called Edge Gateway and that is a part of Akamai Technologies based in Germany. Using AKAMAI Technologies is allowing .gov sites to obfuscate and mask their systems by way of HURRICANE ELECTRIC (he.net). Specifically,

Wisconsin has EDGE GATEWAY port which is AKAMAI TECHNOLOGIES based out of GERMANY. Using AKAMAI Technologies is allowing .gov sites to obfuscate and mask their systems by way of HURRICANE ELECTRIC (he.net). China is not the only nation involved in COTS provided to election machines or the networking but so is Germany via a LAOS founded Chinese linked cloud service company that works with SCYTL named Akamai Technologies that have offices in China and are linked to the server [for] Dominion Software.

18

(Am. Compl. ¶ 75 (citing Exh. 13, ¶ 21)).

This analysis is further supported by a public statement by Congressional Representative Zoe Lofgren, (D-California), Administration Committee Chair Member, who stated, in relevant part, at a House Hearing in 2020 while referring to Dominion Voting Systems along with the two other companies Hart Inter-Civic, and Election Systems and Software (ES&S):

> …the companies they represent provide at least 80% of the estimated 350,000 voting machines in use today reaching over 100 million registered voters. However, despite their outsized role and the mechanics of our democracy, some have accused these companies …or others suggest there's an insufficient regulatory structure for the sector. In the committee's May 2019 hearing on election security, Lawrence Norden wrote in his testimony, I quote, there are more federal regulations for ballpoint pens and magic markers than there are for voting systems and other parts of our election infrastructure. So, there may be more work to do and much for Congress to learn about this industry. *Many have concerns about voting systems with remote access software. And I want to make sure that companies no longer sell voting machines that have network capabilities. In 2019, according to a report in Motherboard, a group of election security experts, they uncovered that back-end election systems in at least ten states despite one company's claims that its systems were not. We need also to understand supply chains.*
>
> **In December 2019, a study released by a supply chain monitoring company showed that one-fifth or 20% of components in a popular voting machine came from China-based companies.** [8]

Further, this Court could have granted the requested injunctive relief on the pleadings, without an evidentiary hearing, because Defendants failed to provide any fact or expert witness testimony whatsoever to rebut Plaintiff's fact and expert witnesses. (*See* ECF 72 at p. 9 (*citing Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 663 F.3d 922, 930-31 (Fed. Cir. 2012) (affirming district court grant of preliminary injunction that relied on plaintiff s unrebutted expert testimony))). Moreover, Defendants made no *Daubert* motions to disqualify witnesses, most likely because

---

[8] January 9, 2020 House Hearing: Voting system vendors, local election officials and computer science professors testified on 2020 election security before the House, C-SPAN, https://www.c-span.org/video/?467976-1/2020-election-security.

discovery had not occurred; but nevertheless, *Daubert* motions are filed before determinations on expert qualifications are made.[9] The validity of an expert's opinion is *not* determined by disparaging and conclusory arguments from opposing counsel or from newspaper articles, as Evers' proffers.

As a fundamental matter, the district court dismissed Plaintiff's claim on procedural grounds at the motion to dismiss stage– not based on summary judgment, not after discovery, not after witnesses were examined, and certainly not after any evaluation of the evidence presented before the court.

Another witness proffered by Plaintiff explained the inherent bias at the most senior levels of Dominion's management. And while the Defendant attacks Joe Oltmann for his declaration without genuine basis, nonetheless, other sources confirm the biases of Dominion Voting's engineer and senior representative. Specifically, in 2016, Dr. Eric Coomer admitted to the State of Illinois that Dominion Voting machines can be manipulated remotely. (*See* ECF 9, Am. Compl. at ¶91). He has also publicly posted videos explaining how Dominion voting machines can be remotely manipulated. *Id*. An examination of his previous public statements has revealed that Dr. Coomer is highly partisan and even more anti-Trump, precisely the opposite of what one would expect from the management of a company charged with fairly and impartially counting votes (which is presumably why he tried to scrub his social media history). (*See* ECF 9, Am Compl. at ¶¶ 91-97). Unfortunately for Dr. Coomer, however, a number of these posts have

---

[9] District courts have a "gatekeeping" obligation to ensure that expert testimony is both relevant and reliable. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (2993); *Lees v. Carthage College*, 714 F.3d 516, 521 (7th Cir. 2013). Essentially, the district court must ask three questions before admitting expert testimony: is the expert qualified, is the expert's methodology reliable, and will the expert's testimony assist the trier of fact in understanding the evidence or determining a fact in issue. *Myers v. Illinois Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). In determining relevance and reliability, the party offering the expert testimony bears the burden of proof. *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) (citing *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009)).

been captured for perpetuity.  Below is Coomer's quote which proves his motive and opportunity to tamper with election results. (*See Id*; *see also*, Fed. R. Civ. P. 404(b)):

> If you are planning to vote for that autocratic, narcissistic, fascist ass-hat blowhard and his Christian jihadist VP pic, UNFRIEND ME NOW! No, I'm not joking. … Only an absolute F[**]KING IDIOT could ever vote for that wind-bag f--k-tard FASCIST RACIST F[**]K! …  I don't give a damn if you're friend, family, or random acquaintance, pull the lever, mark an oval, touch a screen for that carnival barker … UNFRIEND ME NOW!  I have no desire whatsoever to ever interact with you. You are beyond hope, beyond reason.  You are controlled by fear, reaction and bullsh[*]t.  Get your shit together.  F[***] YOU! Seriously, this f[**]king ass-clown stands against everything that makes this country awesome! You want in on that? You [Trump voters] deserve nothing but contempt.

(*See* ECF 9, Am. Compl. at ¶ 93 (July 21, 2016 Facebook post)).

These facts set forth a pattern of fraud, as described in the Federal Rules of Evidence, R. 404(b).  But here the motion to dismiss was granted without discovery or any fact determinations.

### f.    Dismissal on Equitable Grounds Should Not Be Basis for Sanctions.

Equitable remedies allow that "substantial justice may be attained in particular cases where the prescribed or customary forms of ordinary law seem to be inadequate." 27A AM. JUR. 2D EQUITY § 1 (*citing Sec. and Exch. Comm'n v. U.S. Realty & Imp. Co.*, 310 U.S. 434, 60 S. Ct. 1044, 84 L. Ed. 1293 (1940)). By its very nature, equitable claims are heavily fact and circumstance dependent and a particularly bad fit for sanctions when relief is denied. Litigants must know that they can come to court seeking equitable remedies in unusual disputes, without fear of sanctions. While equitable defenses, such as laches or mootness, may foreclose relief given a particular fact pattern, they are not grounds for a court to hold the relief requested is factually or legally baseless because of the purposefully flexible nature of equity.

21

**<u>Conclusion</u>**

The mere fact that large and small states could all complete counting votes on the night of the Presidential Election – but five swing states: Michigan, Arizona, Pennsylvania, Georgia, and Wisconsin, could not finish their counting until well after November 3, 2020 – and during this delay, each coincidently changed the lead from Trump to Biden, would alone make one wonder about election integrity in those states. Indeed, the State of Texas (which was joined by 18 other state Attorney Generals) asked the United States Supreme Court to set aside Wisconsin's 2020 election results. [ECF 72, Ex. 2]. Section 1927 sanctions are for multiplied proceedings and vexatious litigation. This case lasted nine days. Defendant's motion for sanctions is out of time and frivolous. It should be denied.

Respectfully submitted, this 21st day of April 2021.

ATTORNEYS FOR PLAINTIFF

Sidney Powell
Texas Bar No. 16209700
Sidney Powell, PC
2911 Turtle Creek Blvd.
Suite 300
Dallas, Texas 75219
(214) 707-1775
sidney@federalappeals.com

*/s/ Howard Kleinhendler*
Howard Kleinhendler
New York Bar No. 2657120
Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

22

Local Counsel for Plaintiff

Michael D. Dean
Wis. Bar No.01019171
P.O. Box 2545
Brookfield, Wisconsin 53008
(262) 798-8044
miked@michaelddeanllc.com

Daniel J. Eastman
Wis. Bar No.1011433
P.O. Box 158
Mequon, Wisconsin 53092
(414) 881-9383
dan@attorneyeastman.com